**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM, | Civil Action No. 1:22-cv-00249 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY, and; GENIUS BRANDS INTERNATIONAL, INC., | |
| Defendants. | |

Plaintiff Todd Augenbaum, by his attorneys, alleges based upon knowledge with respect to facts relating to himself and upon information and belief with respect to all other allegations herein as follows:

### INTRODUCTION

1.     Defendants are hard money lenders who joined together to purchase securities of Genius Brands International, Inc. ("Genius Brands" or the "Company"), a microcap company with a long history of operating losses and with minimal, if any, prospects of future profitability from its operations.  On March 17, 2020, Defendants purchased Senior Secured Convertible Notes ("Convertible Notes") issued by Genius Brands and warrants ("Warrants") to purchase substantial additional shares of Common Stock.

2.     Defendants' purchases of those securities were made pursuant to a Securities Purchase Agreement dated March 11, 2020 (the "March 11th SPA" or the "Agreement") with a condition precedent to the purchase being that management-related stockholders (the "Principal Stockholders") owning approximately 40% of the Company's common stock (the "Common Stock") at that time entered into a voting agreement (the "Voting Agreement") requiring that they vote in favor of, among other things, certain changes to the terms of the Convertible Notes and Warrants and a lock-up agreement (the "Lock-Up Agreement") favorable to Defendants and requiring the Principal Stockholders to hold the Common Stock subject to the Lock-Up Agreement for a year-and-a-half.

3.     The Lock-Up Agreement was designed to facilitate the profitable sale of the Common Stock Defendants obtained through exercising the conversion feature of the Convertible Notes and the Warrants.  Defendants coordinated their activities with respect to their Genius Brands investment by, among other things, entering a Leak-Out Agreement (defined below) limiting the number of shares any Defendant could sell through a pre-arranged formula while the Company issued a stream of press releases and social media posts hyping Genius Brands' prospects and value as an acquisition candidate.

4.     Defendants' coordination resulted in their earning of windfall returns on the Convertible Notes and the Warrants through exercising the conversion feature of those investment to acquire Common Stock at $0.21 per share and then, within six months of when the terms of conversion or exercise were established (which, for purposes of Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78p(b), is their purchases), selling the Common Stock for prices exceeding $2.00 per share.  The profits Defendants gained from their

trading in Common Stock thus constituted short-swing trading profits within the meaning of Section 16(b).

5.     Section 16(b) encompasses a non-rebuttable statutory presumption that certain insider short-swing profits are created by access to, or misuse of, inside information.  It is not necessary to prove wrongdoing in prosecuting a Section 16(b) claim.  Thus, Section 16(b) requires the inside, short-swing trader to disgorge all profits realized on all "purchases" and "sales" within a six-month period, without proof of actual abuse of insider information or of intent to profit on the basis of such information, irrespective of their state of mind.

6.     Since the public disclosures by the Company and Defendants are, at best, opaque, the precise dates on which Defendants sold the Common Stock and the precise amount of the short-swing profits earned by each Defendant is not yet known to Plaintiff, however Defendants' disgorgeable profits are believed to exceed $100 million.

7.     Plaintiff made a demand (the "Demand") on the Company and its board of directors (the "Board"), as required by Section 16(b), more than sixty days ago.  The Demand was rejected by the Board, and Plaintiff, therefore, brings this action in order to require Defendants to disgorge their short-swing insider trading profits as required by Section 16(b).

## **PARTIES**

8.     Plaintiff Todd Augenbaum is a shareholder of Genius Brands.

9.     (a)     Defendant Anson Investments Master Fund LP ("Anson Investments") lists its address in the Company's public filings as being Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands.

       (b)     Anson Advisors Inc. and Anson Funds Management LP, are the Co-Investment Advisers for Anson Investments, holding voting and dispositive power over the

securities held by Anson Investments, and maintain offices at 155 University Ave, Suite 207, Toronto, ON, M5H 3B7, and 16000 Dallas Parkway, Suite 800, Dallas, TX 75248, respectively.

10.  (a)  Defendant Brio Capital Master Fund Ltd. ("Brio Master") lists its address in the Company's public filings as being 100 Merrick Road Suite 401W, Rockville Centre, NY 11570.

(b)  Defendant Brio Select Opportunities Fund, LP ("Brio Select" and with Brio Master "Brio") lists its address in the Company's public filings as being 100 Merrick Road Suite 401W, Rockville Centre, NY 11570.

(c)  Shaye Hirsch is identified in the Company's SEC filings as having voting and dispositive power over the shares held by both Brio Select and Brio Capital.

11.  Defendant CVI Investments, Inc. ("CVI") maintains an address care of Heights Capital Management, 101 California St., Suite 3250, San Francisco, CA 94111.

12.  (a)  Defendant Empery Asset Master, LTD. ("EAM") maintains an address care of Empery Asset Management, LP, 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(b)  Defendant Empery Debt Opportunity Fund, LP ("EDOF") maintains its offices care of Empery Asset Management, LP, 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(c)  Defendant Empery Tax Efficient, LP ("ETE" and with EAM and EDOF the "Empery Funds") maintains its offices care of Empery Asset Management, LP, 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(d)  Empery Asset Management, LP maintains its offices at 1 Rockefeller Plaza, Suite 1205, New York, NY 10020 and is the authorized agent of the Empery Funds having

discretionary authority to vote and dispose of the shares held by the Empery Funds and may be deemed to be the beneficial owner any shares owned by the Empery Funds.

13.     (a)     Defendant Iroquois Master Fund Ltd. ("Iroquois Master") maintains its offices at 125 Park Ave., 25th Fl. NY, NY 10017.

(b)     Defendant Iroquois Capital Investment Group, LLC ("Iroquois Capital" and with Iroquois Master "Iroquois" or the "Iroquois Funds") maintains its offices at 125 Park Ave., 25th Fl. NY, NY 10017.

(c)     Richard Abbe has the sole authority and responsibility for the investments made on behalf of Iroquois as its managing member and shares authority and responsibility for the investments made on their behalf of the Fund with Kimberly Page, each of whom serves as directors of the Iroquois Funds.

14.     Defendant L1 Capital Global Opportunities Master Fund ("L1 Capital") maintains its offices at 161A Shedden Road, 1 Artillery Court, Grand Cayman, Cayman Islands KY1-1001 and 1688 Meridian Avenue, Level 6, Miami Beach FL 33139.

15.     Defendant M3A LP ("M3A") maintains its offices at 150 Greenwich Street, Floor 29, New York, NY 10007.

16.     Defendant Richard Molinsky ("Molinsky") maintains an address at 51 Lords Hwy East, Weston, CT 06883.  Molinsky is the subject of a May 5, 2003 Order entered by the SEC finding that he engaged in fraudulent sales practices including participating in schemes to support or increase the prices of securities through fraudulent and manipulative means, and imposing sanctions on Molinsky.

17.     Anson Investments, Brio, CVI, Empery, Iroquois, L1 Capital, M3A and Molinsky are collectively referred to herein as "Defendants" or the "Investor Group."

18.     Defendant Genius Brands is a corporation formed under the laws of the State of Nevada which maintains its principal offices at 190 N. Cannon Drive, 4th Fl., Beverly Hills, California 90210.   Common Stock is registered with the U.S. Securities and Exchange Commission (the "SEC") pursuant to Section 12(g) of the Exchange Act and trades on The Nasdaq Capital Market under the symbol "GNUS."   Genius Brands is a necessary party because Plaintiff is bringing this action to obtain a recovery for the Company.

## JURISDICITION AND VENUE

19.     Jurisdiction of this Court is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa.   Venue is properly laid in this District because several Defendants are in this District, several Defendants transact business in this District, and the March 11th SPA contains a choice of forum provision for any dispute in connection therewith to be brought in this District.

## SUBSTANTIVE ALLEGATIONS

### Genius Brands

20.     Genius Brands, originally known as Pacific Entertainment Corporation, became a publicly traded company in 2009.   In 2012, Pacific Entertainment Corporation changed its corporate name to Genius Brands in advance of a 2013 merger with A Squared Entertainment LLC, a multimedia and entertainment company controlled by Andrew Heyward ("Heyward"), who became the Company's Chief Executive Officer ("CEO").[1]

21.     The Company, since 2016, has described itself in its SEC filings as "a global content and brand management company that creates and licenses multimedia content" purportedly

---

[1]     Heyward's total compensation in 2020 was $17.441 million, more than forty times his 2019 compensation of $411,500.   The Summary Compensation Table in the Company's most recent proxy statement shows its other named executive officers' compensation increased by an order of magnitude in 2020.

led by experienced industry veterans (including Heyward) that "distributes its content in all formats as well as a broad range of consumer products based on its characters."  In the children's media sector, the Company described its portfolio as featuring "'content with a purpose' for toddlers to tweens, which provides enrichment as well as entertainment[.]"

22.    Genius Brands generates relatively minimal revenues and, since its inception, has suffered recurring losses and negative cash flows from operations.  As a result, the Company's primary activity was selling securities in private placements to certain qualified investors – and primarily the Investors Group, including Molinsky who had been previously accused by the SEC of being a market manipulator – and then registering the Common Stock underlying those private placements for sale to the investing public.  Thus, from July 22, 2014, through November 29, 2018, the Company filed multiple prospectuses for the sale by those qualified investors of more than 15,000,000 shares of Common Stock.  By comparison, the Company had 6,383,269 shares of Common Stock outstanding before those offerings.

23.    In 2019, the Company delivered *Llama Llama Season 2* to Netflix and delivered *Rainbow Rangers Season 1* to Nickelodeon and Shanghai Senyu Media in China, causing reported revenue to rise dramatically to $5.9 million.  However, its expenses rose from $10 million to $13.2 million, with the Company reporting a net loss for 2019 of $11,481,245, and a decrease in cash on hand of $2.8 million, causing Genius Brands to continue to require outside funding to continue operations.

**The Transactions at Issue**

24.    On or about March 11, 2020, to fund its continued operating losses, the Company entered into the Agreement to sell a total of $13,750,000 in Senior Secured Convertible Notes (defined above as the "Convertible Notes") for $11,000,000 reflecting an original issue discount

of $2,750,000. The March 11th SPA provided that the Convertible Notes were convertible into Common Stock at a price of $1.375 per share with the purchasers of the Convertible Notes were to receive warrants to purchase 65,476,190 shares of the Common Stock, exercisable for a period of five years at an initial exercise price of $0.26 per share (the "2020 Warrants").

25.    The March 11th SPA required the Company to hold a stockholder meeting (the "Stockholder Meeting"), by May 15, 2020, to approve the issuance of shares of Common Stock issuable under the Convertible Notes for the purposes of complying with the rules of The Nasdaq Stock Market ("Stockholder Approval"). The March 11th SPA also provided that following the Stockholder Approval: (a) the conversion price of the Convertible Notes would be reduced to $0.21 per share; and (b) the exercise price of the Warrants would be reduced to $0.21 per share.

26.    The March 11th SPA also provided that warrants to purchase an aggregate of 8,715,229 shares of the Company's Common Stock previously issued by the Company owned by Defendants would have the existing warrants' exercise prices, some of which were as high as $5.30 per share, reduced to $0.21 per share upon Stockholder Approval. The Company failed to disclose the persons who owned the previously issued and re-priced warrants. However, an analysis of SEC filings made by the Company and Defendants reveal that those investors include at least Anson, Iroquois and Brio and that those investors as a group beneficially owned 10% or more of the Common Stock at that time.

27.    On April 14, 2020, the Company filed a proxy statement with the SEC containing the following table disclosing the issuance dates and prior exercise price of those warrants:

| Date of Issuance of Warrants | Number of Warrants to Purchase Shares of Common Stock | Current Exercise Price of Warrants |
|---|---|---|
| 11/03/2 | 166,667 | $3.30 |
| 2/10/17 | 681,312 | $5.30 |
| 1/10/18 | 495,000 | $3.00 |
| 8/17/18 | 159,950 | $3.00 |
| 2/19/19 | 1,763,670 | $2.55 |

| Date of Issuance of Warrants | Number of Warrants to Purchase Shares of Common Stock | Current Exercise Price of Warrants |
|---|---|---|
| 7/22/19 | 1,681,668 | $1.14 |
| 10/28/19 | 477,474 | $0.76 |
| 12/17/19 | 3,471,135 | $0.30 |

28.     The Agreement required, as a condition precedent to any obligation to purchase the Convertible Notes, that: (a) that the Company enter into the Voting Agreement with Genius Brands stockholders owning 10,035,861 shares, or approximately 40%, of outstanding Common Stock (who were defined as the "Principal Stockholders") to vote in favor of the Stockholder Approval; and (b) the Company enter into the Lock-Up Agreement with the Principal Stockholders prohibiting them from selling Common Stock for ninety days following the one-year anniversary of the closing date, *i.e.*, until June 2021.  *See* March 11th SPA §§7(xiv), 7(xv).[2]  The Voting Agreement and the Lock-Up Agreement both state that they were entered into by the Principal Stockholders "[i]n order to induce [Defendants] to enter into the Securities Purchase Agreement."

29.     The March 11th SPA was negotiated by a single lead investor which is identified in the Convertible Notes as being Anson.  In addition, the March 11th SPA, as well as a related Pledge and Security Agreement, reflected that Defendants appointed Anson as the collateral agent for the Agreement and authorized Anson (and its officers, directors, employees and agents) to take any relevant action on behalf of all Defendants.

---

[2]     Schedule 4(q) of the Agreement identifies the Principal Stockholders and the number of shares held by the Principal Stockholders as being:

| | |
|---|---|
| Andy Heyward – | 2,369,199 |
| Silverado Holdings LDC – | 1,590,476 |
| Leister Capital Holdings – | 1,585,714 |
| Hana Resources (BAHAMA) Ltd. – | 1,585,714 |
| Mike Maliani/HBA Trade Co. Ltd. – | 1,414,030 |
| A Squared Holdings LLC – | 990,728 |

30.     Defendants also entered into a Master Netting Agreement allowing each of them "recover against the other Party [*i.e.,* Defendant], under and across the Underlying Agreements as herein specified and to treat this Agreement and the Underlying Agreements [*i.e.* the Note Purchase Agreement, the Investor Note, the Note and the Securities Purchase Agreement] as a single agreement for the purposes set forth herein and the Note Purchase Agreement and the Securities Purchase Agreement each as a 'securities contract' (11 U.S.C. § 741), or other similar agreements[.]"  The Master Netting Agreement then provides that it was "entered into in reliance on the Parties' agreement that for the purposes set forth herein this Agreement and ***the Underlying Agreements form a single integrated agreement between the Parties***, and the Parties would not otherwise enter into this Agreement and the Underlying Agreements."  (Emphasis added)

31.     On March 17, 2020, after the Principal Stockholders delivered signed copies of the Voting Agreement and the Lock-Up Agreement, the Company issued $9,750,000 of the Convertible Notes and Warrants pursuant to the March 11th SPA.  *See* 5/15/20 Form 8-K Item 1.01; 4/14/20 Schedule 14A at 24, 25.  Heyward paid $1,000,000 for $1,250,000 in principal of the Convertible Notes with Defendants paying $7,000,000 in cash and issuing $4,000,000 in promissory notes payable in 2060 and bearing a zero percent interest rate.

32.     Defendants were the intended third-party beneficiaries of the Voting Agreement, which helped ensure the Stockholder Approval, allowing for reduced conversion and exercise prices with respect to the Convertible Notes and Warrants.  The Voting Agreement and the Lock-Up Agreement both allowed for third-party enforcement of their terms, *i.e.*, enforcement was not limited to the Company but instead extended to each of the holders of Group Member Notes (the "Group Members").  In contrast, the March 11th SPA includes a "<u>No Third Party Beneficiaries</u>" clause (March 11th SPA §9(h)) as does a related Maser Netting Agreement.

33.    On March 17, 2020, the Company paid Heyward the total amount due to him of $483,600 for his services as an executive producer with respect to twenty-six half hours of *Rainbow Rangers* that had been delivered with respect to which Heyward was owed $322,400 and with respect to thirteen half hours of *Rainbow Rangers Season 2* with respect to which Heyward was owed an additional $161,200.

34.    On March 22, 2020, Genius Brands agreed to sell 4,000,000 shares of Common Stock at $0.2568 per share to "certain long standing investors" in a transaction that closed on March 27, 2020.  The precise identity of those long standing investors was not disclosed in the Form 8-K but is believed to include at least some of the Defendants.  The Common Stock was registered with the SEC through a Form S-3 (File No. 333-235962) filed by the Company on January 17, 2020 (the "January 2020 Registration Statement").  3/23/20 Form 8-K at Item 1.01.

35.    On April 20, 2020, Heyward sent a letter to the Company's shareholders, which was also attached as an exhibit to a Form 8-K filed with the SEC on that same day, identifying Genius Brands as a "global brand management company that creates and licenses multimedia entertainment content for children" and announcing the spring 2021 premiere of a new children's animated series on Amazon Prime, Stan Lee's Superhero Kindergarten starring Arnold Schwarzenegger.  Heyward's letter went on to state that "With *Stan Lee's Superhero Kindergarten* launching on these two mammoth platforms **and** commerce from consumer products based on the show driven across them as well, we have what I would call 'Plutonium in a Bottle.'... and we expect to shortly announce a broad line up of tiffany consumer product licensees."

36.    On May 7, 2020, Genius Brands agreed to sell 8,000,000 shares of Common Stock previously registered with the SEC pursuant to the January 2020 Registration Statement at $0.35 per share to "certain long standing investors" in a transaction that closed on or about May 8, 2020.

The precise identity of those long standing investors was not disclosed in the Form 8-K but is believed to include at least some of the Defendants. 5/7/20 Form 8-K at Item 1.01.

37.     On May 15, 2020, the Company filed a Form 8-K with the SEC reporting that holders of 21,368,586 shares of Common Stock, representing 72.70% of the total shares of outstanding Common Stock entitled to vote as of the record date of March 28, 2020, were present or represented by proxy at the stockholder's meeting and that 12,299,546 shares had voted in favor of the Stockholder Approval, which was the second of six resolutions voted upon at the stockholders' meeting.  The 12,299,546 shares voted in favor represented 2,263,685 shares more than the 10,035,861 owned by the Principal Stockholders and primarily represented the voting in favor of the resolution by Defendants with 486,714 shares voting against the proposal, 101,379 shares abstaining and 8,840,947 shares constituting broker non-votes.

38.     On May 15, 2020, following the Stockholder Approval but before the end of the stockholders' meeting: (a) the conversion price of the Convertible Notes was reduced from $1.375 per share to $0.21 per share; (b) the exercise price of the Warrants issued in connection with the March 11th SPA was reduced from $0.26 per share to $0.21 per share; and (c) the exercise price of the existing warrants held by Defendants was also reduced to $0.21 per share.

39.     On May 18, 2020, Genius Brands sold 7,500,000 shares of Common Stock previously registered with the SEC pursuant to the January 2020 Registration Statement for $1.20 per share to "certain long standing investors" in a transaction that closed on or about May 20, 2020. The precise identity of those long standing investors was not disclosed in the Form 8-K but is believed to include at least some of the Defendants. 5/18/20 Form 8-K at Item 1.01.

40.     On May 28, 2020, Genius Brands entered into a Securities Purchase Agreement with "certain long standing investors" pursuant to which the Company agreed to sell 20,000,000

shares of Common Stock previously registered with the SEC pursuant to the January 2020 Registration Statement at $1.50 per share with the transaction that closed on or about June 1, 2020. The precise identity of those long standing investors was not disclosed in the Form 8-K but is believed to include at least some of the Defendants.  5/28/20 Form 8-K at Item 1.01.

41.     Defendants agreed to provide their waiver and consent to the sale of Common Stock pursuant to the May 28, 2020, Securities Purchase Agreement with the Company agreeing in return that it would file a resale registration statement on Form S-3 on or before June 5, 2020 (instead of May 29, 2020 as previously agreed) registering the resale of the shares of Common Stock issued or issuable upon exercise of the Warrants issued to the Group Members.

42.     On June 3, 2020, *Insider Financial*, a stock market tout, which according to a disclaimer on its website is "**engaged in the business of marketing and advertising companies for monetary compensation"** published an article titled "*Will Netflix or Disney Buy Genius Brands International (NASDAQ:GNUS*)?" (emphasis in original).  The article caused Common Stock to surge in price by more than 40%, to $4.02 per share, on heavy trading volume.

43.     On June 11, 2020, the Company filed a prospectus (the "June 2020 Prospectus") with the SEC for the sale of 60,100,617 shares of Common Stock.  Those shares of Common Stock to be sold included 31,100,091 shares of Common Stock obtained by the Group Members pursuant to the cashless exercise of Warrants which began on May 15, 2020.  *See* 11/16/20 Form 10-Q at 25.  The cashless exercise of the Warrants involved paying for the Common Stock based upon the difference between the market price of the Common Stock and the Warrants.

44.     The June 2020 Prospectus disclosed the sales of Common Stock in connection with the cashless exercise of Warrants by the following Group Members.  Precise sales terms were not disclosed but based upon the disclosures contained in the prospectus:

a.      EAM received 119,920 shares of Common Stock upon the cashless exercise of 136,614 Warrants reflecting a sales price $1.0878 for the 136,614 shares of Common Stock sold through the cashless exercise of the Warrants;

b.      EDOF received 2,848,099 shares of Common Stock upon the cashless exercise of 3,244,585 Warrants reflecting a sales price $1.0878 for the 3,244,585 shares of Common Stock sold through the cashless exercise of the Warrants;

c.      ETE received 29,981 shares of Common Stock upon the cashless exercise of 34,154 Warrants reflecting a sales price $1.0878 for the 34,154 shares of Common Stock sold through the cashless exercise of the Warrants;

d.      Molinsky received 437,390 shares of Common Stock upon the cashless exercise of 505,952 Warrants reflecting a sales price $1.1414 for the 437,390 shares of Common Stock sold through the cashless exercise of the Warrants;

e.      CVI received 4,778,956 shares of Common Stock upon the cashless exercise of 5,467,940 Warrants reflecting a sales price $1.0839 for the 5,467,940 shares of Common Stock sold through the cashless exercise of the Warrants;

f.      Brio Master received 2,793,639 shares of Common Stock upon the cashless exercise of 3,110,119 Warrants reflecting a sales price $1.1082 for the 3,110,119 shares of Common Stock sold through the cashless exercise of the Warrants;

g.      Brio Select received 4,691,710 shares of Common Stock upon the cashless exercise of 5,223,214 Warrants reflecting a sales price $1.1082 for the 5,223,214 shares of Common Stock sold through the cashless exercise of the Warrants;

h.      Anson received 5,000,000 shares of Common Stock upon the cashless exercise of 5,303,468 Warrants reflecting a sales price $1.1527 for the 5,303,468 shares of Common Stock sold through the cashless exercise of the Warrants; and

i.      M3A received 4,740,099 shares of Common Stock upon the cashless exercise of 5,000,000 Warrants reflecting a sales price $1.198 for the 5,000,000 shares of Common Stock sold through the cashless exercise of the Warrants.

45.     The June 2020 Prospectus also identified sales of up to 60,100,617 shares of Common Stock which would be "resold from time to time" including by the following Group Members:

a.      Anson Investments – 17,553,675 shares of Common Stock;

b.      Brio Master – 2,793,639 shares of Common Stock;

c.      Brio Select – 4,691,710 shares of Common Stock;

d.      CVI – 5,263,397 shares of Common Stock;

e.      EAM – 340,449 shares of Common Stock;

f.      EDOF – 8,085,657 shares of Common Stock;

g.      ETE – 85,113 shares of Common Stock;

h.      Iroquois Capital – 3,869,048 shares of Common Stock;

i.      Iroquois Master – 2,083,333 shares of Common Stock;

j.      L1 Capital – 3,571,429 shares of Common Stock;

k.      M3A – 5,665,480 shares of Common Stock; and

l.      Molinsky – 437,390 shares of Common Stock.

46.     On June 15, 2020, Genius Brands made a series of announcements, including on social media, relating to a purported "investment" by Arnold Schwarzenegger.  The headline read

"Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International" and the byline was "Schwarzenegger Will Receive Warrants in Genius Brands Under the Agreement for His Role Starring in and Co-Producing the New Animated Children's Series, Stan Lee's Superhero Kindergarten[,]" giving investors the misleading impression that Schwarzenegger was investing capital into Genius Brands and receiving stock as compensation for his acting.

47.     On June 19, 2020, Heyward, as subsequently reported in a Form 4 he filed with the SEC on June 25, 2020: (a) sold 448,029 shares of Common Stock through a transaction in which he exercised 5,952,381 Warrants for $0.21 per share of Common Stock paid on a cashless exercise by withholding 448,029 Warrants to pay the exercise price; and (b) sold an additional 12,545 shares of Common Stock through a transaction in which he exercised 166,667 warrants to purchase Common Stock at $1.10 per share.

48.     On June 21, 2020, *Insider Financial* again published an article stating that "[w]ith Schwarzenegger now on board, we are even more bullish on our thesis" that "it's only a matter of time before either Disney or Netflix buys Genius Brands International." *Insider Financial* also accused Citron and Hindenburg of issuing "short and distort" reports to drive down the price of Common Stock.

49.     On June 22, 2020, Genius Brands republished the June 21, 2020 *Insider Financial* article stating that the Company might be sold to Disney or Netflix on the Company's Twitter page, pulling specific quotations from the articles and repeating them on Genius Brands' Twitter account.

50.     On or about June 23, 2020, the Company entered into a conversion agreement (the "Conversion Agreement") with all the holders of the Convertible Notes and Warrants, *i.e.*,

Defendants, providing that: the Holders would prepay the Group Member Notes, tender a notice of conversion in full of the Convertible Notes, and entered into a leak-out agreement (the "Leak-Out Agreement") governing the sale of Common Stock received from conversion of the Convertible Notes and also providing that the Company would file a registration statement with the SEC on or before June 26, 2020, covering the resale of the shares of Common Stock issuable upon conversion of the Group Member Notes.  *See* 6/23/20 Form 8-K Ex. 10.1.

51.     The Leak-Out Agreement provided that each of the Holders, including Defendants, could not, for thirty days after the effective date of the registration statement, sell any Common Stock obtained through conversion of the Group Member Notes or exercise of the Warrants for a price below $2.00 per share unless the total amount of shares sold on any trading day obtained through the conversion of the Group Member Notes or exercise of the Warrants did not exceed 30% in the aggregate of the trading volume of the Common Stock as reported by Bloomberg LP. The Leak-Out Agreement allows for enforcement of its terms by a third-party beneficiary.  *See* 6/23/20 Form 8-K Ex. 10.1 at 5-7.

52.     On June 23, 2021, Heyward received 5,952,381 shares of Common Stock upon conversion of $1,250,000 of the Convertible Notes.

53.     On June 23, 2020, the Company also issued a press release in which Heyward was quoted as stating that:

> This is a win-win for all parties.  The Company today is debt free and holding $55 million in cash.  The Company is uniquely positioned to take steps to build *Kartoon Channel!* into the pre-eminent childrens' broadcaster anywhere, and produce, acquire, and license, the most compelling, forward-thinking programming for children today.  We are delighted that our existing senior secured debt holders had the confidence in the Company to pre-pay the $4,000,000 Note obligation and to then convert their entire debt into equity right away.

54.     On June 26, 2020, the Company filed a registration statement which the SEC declared effective on July 6, 2020, causing the Leak-Out Agreement to be effective through and including August 5, 2020.

55.     On July 6, 2020, the Company also issued the following press release:

**Genius Brands International Announces Transaction to Create "Stan Lee Universe"**



Genius Brands Will Control New Joint Venture Drawing from Over 100 Original Stan Lee Creations

BEVERLY HILLS, Calif., July 06, 2020 (GLOBE NEWSWIRE) -- Through a groundbreaking joint venture between Genius Brands International ("Genius Brands") (NASDAQ:GNUS) and Stan Lee's POW! Entertainment, an agreement has been struck to create *Stan Lee Universe*. *Stan Lee Universe* will assume worldwide rights, in perpetuity, to the *name, physical likeness, physical signature, live-action and animated motion picture, television, online, digital, publishing, comic book, merchandising* and *licensing* rights to Stan Lee and his IP creations past*, present, and going forward.

In announcing the deal today, Andy Heyward, Chairman & CEO of Genius Brands, said that, "In all of Hollywood, there is no greater prize. This is the Holy Grail. *Stan Lee Universe* is a *once in a lifetime* asset drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time."

Jointly owned and subject to due diligence and documentation, the deal will leave Genius Brands as the managing and controlling partner of the *Stan Lee Universe* joint venture.

Stan Lee was the creator of the most successful characters ever made, including *Spiderman*, *Iron Man*, *Black Panther*, *The*

18

***Incredible Hulk, X Men, Thor, Captain America***, ***Ms. Marvel***, ***Silver Surfer***, ***Antman***, ***Nick Fury***, ***Guardians of the Galaxy***, and of course *the #1 movie box-office franchise of all time*, ***The Avengers***.  For decades, Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount.

In addition to the #1 movie box office hit, ***Avengers Endgame***, Stan Lee created ***two of the Walt Disney Company's top three blockbusters***, *and* <u>***five of the top 12 grossing movies of all time***</u>*.*

"It's almost impossible to conceive that one mind created all this wealth," said Heyward. "The spinoffs alone defy the imagination. From animated television, to toys, apparel, video games, and every conceivable licensed product imaginable, Stan Lee characters populate the screens and retail shelves worldwide. There is no creator who has influenced pop culture and created more successful entertainment. Not even Walt Disney. Over and over, again and again, he created characters and stories that resonated in the hearts and minds of all peoples of all ages around the world, with billions and billions and billions of dollars of motion picture box-office, television, and consumer product licensing."

***Stan Lee Universe*** will be built from the repository of all of the characters and IP created by Stan Lee, post-Marvel Entertainment*, not otherwise elsewhere.  It is drawn from over 100 original Stan Lee creations, from which it will develop and license approximately seven properties per year.

"Having worked with Stan and been a close friend for almost 30 years, nothing could make me prouder than for Genius Brands to become the guardian of both his brand and body of work," commented Heyward. "I have no doubt that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told*. As big as *Spider Man, Black Panther, X Men,* and *the Avengers are today, tomorrow it will be Stan Lee's* ***TOMORROW MEN***, *his* ***STRINGBEAN***, *his* ***BLACK FURY***, *and* ***VIRUS****."*

Former President of Marvel Productions, Margaret Loesch, said, "Stan Lee was a one of a kind. So is this asset. ***Stan Lee Universe*** is going to be an unimaginable source of blockbuster entertainment for many years to come."

Former President of Walt Disney Television and Chief Content Officer of Genius Brands' new Kartoon Channel!, David Neuman

said, *"*The spinoff opportunities for Kartoon Channel! alone are mindboggling, including a dedicated ***Stan Lee Universe*** program block.*"*

Heyward concluded, *"*When we looked at the depth of these creations that sit in this library, the magnitude and value of this asset slowly began to sink in. There simply is no greater treasure chest of Intellectual Property anywhere. I feel like we went down to the basement of John Lennon and Paul McCartney's recording studio and found 200 songs that had never been released.  One was called *Yesterday*, another was called *Hey Jude*, and another called *Sergeant Pepper*. They were just waiting for us to bring them forth to the market, along with their names and likenesses, signatures, and the right to merchandise *the Beatles*.  It feels that big to us!

"We will be creating a dedicated business and creative unit specific to ***Stan Lee Universe***. For the millions of Stan Lee fans, we look forward to taking this unique asset and faithfully bringing the characters to the movie screens, to comic books, to toys and licensed products worldwide.

"For the Genius Brands' shareholders, we look forward to effectively and smartly monetizing this asset across all platforms. I have no doubt that we will attract the most talented producers, directors, and marketers in the world as we unlock this one of a kind treasury and bring forth the next wave of Stan Lee creations for the world to experience and enjoy. We are proceeding immediately with our due diligence and expect final documentation to follow promptly thereafter."

**About Genius Brands International**

Genius Brands International, Inc. (Nasdaq: GNUS) is a leading global kids media company developing, producing, marketing and licensing branded children's entertainment properties and consumer products for media and retail distribution. The Company's award-winning 'content with a purpose' portfolio includes the upcoming *Stan Lee's Superhero Kindergarten*, starring Arnold Schwarzenegger; *Rainbow Rangers* for Nick Jr.; *Llama Llama*, starring Jennifer Garner, for Netflix; award-winning toddler brand *Baby Genius*; adventure comedy STEM series *Thomas Edison's Secret Lab*; and entrepreneurship series *Warren Buffett's Secret Millionaires Club*. Through licensing agreements with leading partners, characters from Genius Brands' IP also appear on a wide range of consumer products for the worldwide retail marketplace. The Company's new *Kartoon Channel!* is available in over 100 million U.S. television households via a broad range of distribution

platforms, including Comcast, Cox, DISH, Amazon Prime, Sling TV, Apple TV, Roku, Amazon Fire and more. For additional information, please visit www.gnusbrands.com.

56.     On July 8, 2020, the Company filed a prospectus (the "July 2020 Prospectus") with respect to the proposed sale of 59,523,812 shares of Common Stock issuable upon conversion of the Notes by the following Group Members:

      a.     Anson Investments – 17,857,143 shares of Common Stock;

      b.     Brio Master – 3,110,119 shares of Common Stock;

      c.     Brio Select – 5,223,214 shares of Common Stock;

      d.     CVI – 5,952,381 shares of Common Stock;

      e.     EAM – 357,143 shares of Common Stock;

      f.     EDOF – 8,482,143 shares of Common Stock;

      g.     ETE – 89,286 shares of Common Stock;

      h.     Iroquois Capital – 3,869,048 shares of Common Stock;

      i.     Iroquois Master – 2,088,333 shares of Common Stock;

      j.     L1 Capital – 3,071,429 shares of Common Stock;

      k.     M3A – 5,952,381 shares of Common Stock; and

      l.     Molinsky – 505,953 shares of Common Stock.

57.     On July 15, 2020, the Company issued a press release with the headline "Archie Comics, Genius Brands Partner to Launch Comic Books Based on 'Stan Lee Universe' of Characters" with the byline *Industry Icon, Originator and Executive Producer of "Batman" Films, Michael E. Uslan, to Lead Development of the 'Stan Lee Universe.'"* (emphasis in original). The press release stated in relevant part that:

BEVERLY HILLS, Calif., July 15, 2020 (GLOBE NEWSWIRE) -- Following the recently announced 'STAN LEE UNIVERSE,' Genius Brands International "Genius Brands" (NASDAQ:GNUS)

has entered into a ground-breaking comic book publishing agreement with Archie Comics (Archie, Betty & Veronica, Sabrina, Josie and the Pussycats, and more), to publish comic books/graphic novels based on the never-before-exploited IP of Stan Lee Universe.

"It is only fitting that the comic book roots of Stan Lee, which began with Marvel, give birth to the next generation of great Stan Lee properties. I have long felt that the greatest Stan Lee characters and stories have yet to be told, and the next Marvel has yet to be built. That is Stan Lee Universe," said Genius Brands CEO and Chairman, Andy Heyward. "Archie Comics are everywhere.  You can't go to a supermarket checkout stand and not see them, and soon that will be the same with Stan Lee Universe.  Under the leadership of Jon Goldwater, shows like Riverdale and The Chilling Adventures of Sabrina have become huge hits. Jon understands better than anyone the unique value of Stan Lee and his ideas. There is no better publishing partner than Archie to bring Stan Lee Universe comics to market."

The initial property slated for publication as a comic book in partnership with Archie will be Superhero Kindergarten.

"I had the great pleasure of knowing Stan Lee and understanding his genius," said Archie Comics CEO/Publisher Jon Goldwater. "Getting the chance to partner with Andy and Genius Brands to introduce an entire universe of Stan Lee ideas to the comic book and graphic novel marketplace is an opportunity we can't pass up."

Concurrent with the announcement of the Archie Comics publishing deal, Genius Brands is proud to announce that Michael E. Uslan will bring his decades of experience and expertise to advise and help mine the great IP in the Stan Lee Universe to build ongoing global branded franchises.  The treasure chest of post-Marvel Stan Lee IP will be guided by Uslan, whose input will cover all film and TV development and production under the banner.

Uslan, who works with his son, David Uslan, is best known as the Originator and Executive Producer of the Batman movie series, starting with Tim Burton's 1989 film, continuing through Christopher Nolan's The Dark Knight Trilogy, Todd Phillips's JOKER, and the upcoming The Batman in 2021. He also served as Executive Producer of Warner Bros. The Lego Movie (2014) and The Lego Movie 2: The Second Part (2019).

"Michael is the foremost expert today in comic book IP. Period.  He is the only person we ever considered to guide us through the process of building franchises under the banner of his idol, mentor,

and friend, Stan Lee," said Heyward.  "He was a close friend of Stan, and there is nobody more qualified to guide this creatively forward. Michael has stewarded some of the biggest and most successful hits from comic books through film, TV, and merchandising."

Michael Uslan stated, "In my world, there is no bigger honor than to be entrusted to carry the mantle of Stan Lee forward.  This is taking the Olympic torch on the final leg up Mt. Olympus.  We look forward to bringing the most talented writers and artists in our field to the next generation of Stan Lee creations."

Stan Lee Universe, a joint venture between Genius Brands and Stan Lee's POW! Entertainment, managed by Genius, owns the worldwide rights, in perpetuity, to the name, physical likeness, physical signature, live-action and animated motion picture, television, online, digital, publishing, comic book, theme park, and merchandising/licensing rights from the repository of characters and IP created by Stan Lee drawn from over one hundred creations (post-Marvel Entertainment), including Tomorrow Men, Stringbean, Black Fury, Virus, Superhero Kindergarten, and many more. Genius Brands will develop seven new franchises per year, primarily targeted for families and kids.

The legendary Stan Lee was the Co-Creator of some of the most successful characters of all time, including Spider-Man, Iron Man, Black Panther, The Incredible Hulk, X-MEN, Thor, Silver Surfer, Ant-Man, Nick Fury, and The Avengers.  As the editor and a creative force behind Marvel Comics for decades, which was sold to the Walt Disney Company for $4.4 billion, Stan Lee CO-CREATED franchises that continue to prove to be worth billions of dollars.

About Genius Brands International

Genius Brands International, Inc. (Nasdaq: GNUS) is a leading global kids media company developing, producing, marketing and licensing branded children's entertainment properties and consumer products for media and retail distribution. The Company's award-winning 'content with a purpose' portfolio includes the upcoming Stan Lee's Superhero Kindergarten, starring Arnold Schwarzenegger and in partnership with Alibaba; Rainbow Rangers for Nick Jr.; Llama Llama, starring Jennifer Garner, for Netflix; award-winning toddler brand Baby Genius; adventure comedy STEM series Thomas Edison's Secret Lab; and entrepreneurship series Warren Buffett's Secret Millionaires Club. Through licensing agreements with leading partners, characters from Genius Brands' IP also appear on a wide range of consumer products for the

worldwide retail marketplace. The Company's new Kartoon Channel! is available in over 100 million U.S. television households via a broad range of distribution platforms, including Comcast, Cox, DISH, Amazon Prime, Sling TV, Apple TV, Roku, Amazon Fire and more. For additional information, please visit www.gnusbrands.com.

About Archie Comics

Archie Comics is the leading mass market comic book publisher in the world and the home to a wide array of the most popular humor, action-adventure and superhero characters in entertainment, including Archie, Jughead, Betty and Veronica, Reggie, Kevin Keller, Josie and the Pussycats, Sabrina the Teenage Witch, Afterlife With Archie, the Dark Circle Comics superhero characters (The Black Hood, The Fox, The Shield, Sam Hill and more), Li'l Jinx and many more. Archie Comics have sold over 2 billion comics worldwide and are published around the world in a number of languages. In addition to comics, the Archie Comics characters are spotlighted weekly on The CW's Riverdale TV series and the Netflix series Chilling Adventures of Sabrina, and have been featured in animation, television, film and music. Follow Archie Comics on Twitter, Facebook, YouTube and the Archie Comics Store.

About Michael E. Uslan

Michael Uslan and his partner, Benjamin Melniker, formed Batfilm Productions and optioned the movie rights to Batman in 1979. The first movie, 1989's Batman, took home an Academy Award and a People's Choice Award for best movie. The Dark Knight Trilogy includes two top-grossing movies in history: The Dark Knight (2008) was nominated for eight Academy Awards, winning two, with Heath Ledger winning the Academy Award, BAFTA, and Golden Globe, for Best Supporting Actor; and The Dark Knight Rises (2012). And JOKER is the top-grossing R-rated movie of all time, nominated for 11 Academy Awards, winning Best Actor and Best Score; and winner of two Golden Globes, also for Best Actor and Best Score. Other movies in the franchise include Batman Returns (1992), Batman: Mask of the Phantasm (1993), Batman Forever (1995), and the Lego Batman Movie (2017), among many others.

Uslan has executive produced thirty animated Batman movies including Batman Beyond: Return of The Joker (2000), which won the Annie Award for Outstanding Achievement in Animation. Uslan brought Stan Lee to DC Comics to create a series called 'Just

Imagine Stan Lee Creating' which included Stan's reimagined versions of Batman, Superman, Wonder Woman, Aquaman, Shazam, Flash, and Justice League.

58.    The July 6 and July 15 press releases were designed to generate investor interest to facilitate the sale of Common Stock owned by Defendants registered through the July 2020 Registration Statement and to allow the sales of Common Stock contemplated by the July 2020 Prospectus to occur rapidly and profitably.

59.    On July 24, 2020, the Company filed a preliminary proxy statement with the SEC identifying any person known by GNUS through its transfer agent and other records as beneficially owning 5% or more of the outstanding shares of Common Stock.  Anson, which had been previously identified as beneficially owning 9.9% of the Common Stock (*see, e.g.*, June 11, 2020 Prospectus at 6), is not identified as beneficially owning 5% or more of the Common Stock. Similarly, on July 28, 2020, Brio filed a Schedule 13G with the SEC stating that it no longer beneficially owned any shares of Common Stock.

60.    The rapid sale of Common Stock which was the subject of the July 2020 Prospectus is also confirmed by the surge in the trading volume in the Common Stock accompanying the filing of the July 6, 2020, Prospectus.  Thus, on July 2, 2020, the reported trading volume in the Common Stock surged from 17,607,500 shares the prior day to over 285,000,000 shares.  On July 6, 2020, the reported trading volume for the Common Stock was over 170 million shares and on July 7, 2020, it was over 135 million shares.  All those reported trades took place at prices exceeding the $2.00 per share threshold contained in the Leak-Out Agreement.  In addition, from July 8, 2020 through July 20, 2020, another more than 318 million shares of Common Stock traded at prices exceeding the $2.00 per share threshold contained in the Leak-Out Agreement, allowing for the unencumbered sale of Common Stock by the Group Members.

## CLAIM FOR RELIEF

61.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

62.   This claim for relief does not allege or sound in fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

63.   This claim is brought against Anson Investments, Brio, CVI, Empery, Iroquois, L1 Capital, M3A and Molinsky, and for the benefit of Genius Brands.

64.   On October 28, 2020, Plaintiff made a demand on the Board to pursue the claims asserted in this Complaint.  The Board rejected that demand.

65.   Defendants beneficially owned 10% or more of the Company's outstanding Common Stock at the times relevant to this action by being members of a group within the meaning of Sections 16(b) and 13(d) of the Exchange Act, 15 U.S.C. §§78p(b) and 78m(d), and SEC Rule 13d-5(a) promulgated thereunder, 17 C.F.R. §240.13d-5(a), for the purpose of acquiring, holding, voting or disposing of equity securities based on at least the following relationships:

a.   Defendants forming a group to purchase the Company's securities pursuant to the March 11th SPA with the exemption from the existence of a group otherwise provided by SEC Rule 13d-5(b), 17 C.F.R. §240.13d-5(b), not applying because:

i.   One of the purposes of the transaction as evidenced by the Voting Agreement involved changing or influencing control of the issuer within the meaning of SEC Rule 13d-5(b)(ii), 17 C.F.R. §240.13d-5(b)(ii);

ii.   The change in terms of the Previously Issued Warrants constituted an "agreement among, or between any members of the group to act together with respect to the

issuer or its securities except for the purpose of facilitating the specific purchase involved" within the meaning of SEC Rule 13d-5(b)(iii), 17 C.F.R. §240.13d-5(b)(iii);

        iii.     The Voting Agreement and Lock-Up Agreement being conditions precedents to Defendants' purchases of the Convertible Notes constituted an "agreement among, or between any members of the group to act together with respect to the issuer or its securities except for the purpose of facilitating the specific purchase involved" within the meaning of SEC Rule 13d-5(b)(iii), 17 C.F.R. §240.13d-5(b)(iii);

        iv.     Engaging in the following non-ministerial actions falling within the meaning of SEC Rule 13d-5(b)(iv), 17 C.F.R. §240.13d-5(b)(iii), limiting the SEC Rule 13d-5(a) exemption from being considered members of a group where "[t]he only actions among or between any members of the group with respect to the issuer or its securities subsequent to the closing date of the non-public offering are those which are necessary to conclude ministerial matters directly related to the completion of the offer or sale of the securities":

        1.     Voting in favor of the Stockholder Approval at the Stockholder Meeting;

        2.     Agreeing to a waiver in connection with the Company's May 28, 2020 sale of Common Stock;

        3.     Entering into the Conversion Agreement; and

        4.     Entering into the Leak-Out Agreement.

        b.     Some or all of the Defendants forming a group to negotiate new terms for the Warrants issued by the Company prior to March 17, 2020 which was also not exempt under SEC Rule 13d-5(b) for the same reason as the other purchases of securities made in connection with the March 11th SPA;

   c.  Each Defendant retaining the right as a third-party beneficiary to enforce the Voting Agreement;

   d.  Each Defendant retaining the right as a third-party beneficiary to enforce the Lock-Up Agreement;

   e.  Anson being authorized by all Defendants to act as their Lead Investor and the sole collateral agent under the terms of the Security and Collateral Agreement;

   f.  Defendants entering into the Master Netting Agreement;

   g.  Each Defendant entering into the Conversion Agreement;

   h.  Each Defendant entering into the Leak-Out Agreement allowing for enforcement of its terms by a third-party beneficiary;

   i.  Brio Master and Brio Select being under common control;

   j.  Iroquois Capital and Iroquois Master being under common control; and

   k.  The Empery Funds being under common control.

66.  Defendants' acquisition of the Convertible Notes and Warrants on or about March 17, 2020 was a purchase of Common Stock within the meaning of SEC Rule 16b-6(a), 17 C.F.R. §240.16b-6(a), because they involved the setting of a call equivalent position within the meaning of SEC Rule 16a-1(b), 17 C.F.R. §240.16a-1(b).

67.  The change in the conversion prices for the Convertible Notes, the Warrants and the Previously Issued Warrants taking place on May 15, 2020, at the time of the Stockholder Approval, constituted a purchase of Common Stock because it constituted an increase in a call equivalent position within the meaning of SEC Rule 16b-6(a), 17 C.F.R. §240.16b-6(a).

68.     The purchases of Common Stock which took place through Securities Purchase Agreements entered into on or about May 7, 2020, May 18, 2020 and May 28, 2020 (¶¶35,38,39) constituted purchases within the meaning of the Exchange Act.

69.     The cashless exercises of the Warrants and the Previously Issued Warrants including those referenced in the June 11, 2020 Prospectus (¶43) constituted the sales of a call equivalent position and as such were sales within the meaning of SEC Rule 16b-6(b), 17 C.F.R. §240.16b-6(b).

70.     Defendants sold shares of Common Stock: (a) registered with the SEC pursuant to and the subject of the June 2020 Prospectus and the July 2020 Prospectus; (b) originally purchased in the offerings taking place on or about March 22, 2020, May 7, 2020, May 18, 2020 and May 28, 2020; (c) owned prior to March 11, 2020; and (d) other shares of Common Stock they otherwise purchased.  Plaintiff does not know the precise date and terms of those or any sales of Common Stock because Defendants failed to disclose those transactions as required by Section 16(a) of the Exchange Act, 15 U.S.C. §78p(a).

71.     Defendants' sales of Common Stock took place within six months of Defendants' purchases of Common Stock.

72.     Defendants' sales of Common Stock were made at prices higher than their purchases of Common Stock.

## BASIS FOR INFORMATION AND BELIEF

73.     Plaintiff's information and belief is based upon filings made with the SEC by and with respect to Genius Brands, a review of Court filings with respect to Genius Brands, and a review of other publicly available information concerning the Company and the Defendants, with

the Company's and Defendants' disclosures being opaque with respect to transactions in the Convertible Notes, Warrants and Common Stock.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants for the benefit of Genius Brands in an amount to be determined at trial, plus pre-judgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

Dated: January 11, 2022

By: /s/ Jeffrey S. Abraham
Jeffrey S. Abraham
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email: jabraham@aftlaw.com