**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM, <br><br>                 Plaintiff, <br><br>              v. <br><br> ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY, and; GENIUS BRANDS INTERNATIONAL, INC., <br><br>              Defendants. | Civil Action No. 1:22-cv-00249-VM |

**MEMORANDUM OF LAW IN SUPPORT OF MOVING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, and Empery Tax Efficient, LP (collectively, the "Empery Funds") respectfully submit this memorandum of law on behalf of the Moving Defendants[1] in support of the motion to dismiss the complaint filed by Plaintiff Todd Augenbaum (the "Complaint," Dkt. 1) pursuant to Federal Rule of Civil Procedure 12(b) and the Court's  June 27, 2022 and July 15, 2022 orders (Dkt. 74-75).

## INTRODUCTION

Plaintiff's Section 16(b) claim rests on impermissible inferences and theories of liability that either have been rejected by courts in the Southern District of New York or have no basis in any statute or legal precedent. The Complaint seeks to turn an ordinary-course March 2020 private placement (the "March 2020 Transaction") by Genius Brands International, Inc. ("Genius Brands" or the "Company") in which each of the Moving Defendants separately participated, into allegations of "group" activity, thereby manufacturing a Section 16(b) claim out of whole cloth.  But there is no allegation of facts that would support a finding of coordination among the defendants in connection with their investment.  To the contrary, as the Complaint concedes, a single defendant—Anson—negotiated the March 2020 Transaction, and, as the transaction documents reflect, each other investor, represented by its own counsel, independently signed on to participate in the offering.

Rather than rely on allegations that could plausibly raise an inference of a group, Plaintiff's claim rests entirely on the transaction documents governing the March 2020 Transaction and certain subsequent transactions.  Those transaction documents—including  a Voting Agreement and a Lock-Up Agreement, to which the Moving Defendants were not parties, and independent Leak-Out Agreements, which merely restricted the number of shares each of the Moving Defendant could independently sell—are commonplace in the market for private investments in public equity, known as "PIPEs."  Put simply, the case law under Section 16(b) makes clear that these allegations are insufficient.  Holding otherwise could seriously constrain the ability of public companies to raise capital in transactions with multiple investors.  Plaintiff's Complaint fails to state a plausible claim and ought to be dismissed pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

Plaintiff is a purported shareholder of Genius Brands, Compl. ¶ 8, "a global content and brand management company that creates and licenses multimedia content."  *Id*. ¶ 21.  The Moving Defendants and the Company are parties to an ordinary-course PIPE announced on March 11, 2020.  *Id.* ¶ 24.  The Moving Defendants' investments were made pursuant to a securities purchase agreement, dated March 11, 2020 (the "March Securities Purchase Agreement"). *Id.*

As alleged, the Company was required to obtain stockholder approval for the March 2020 Transaction.  *Id*. ¶ 28.  In connection therewith, the Company entered into (i) Voting Agreements

---

[1]  Pursuant to this Court's June 27, 2022 order authorizing a single motion to dismiss on behalf of "Moving Defendants," this memorandum is submitted on behalf of the Empery Funds, together with Anson Investments Master Fund LP ("Anson"); Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund, LP; CVI Investments, Inc.; Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC; L1 Capital Global Opportunities Fund; M3A LP; and Richard Molinsky, collectively referred to herein as the "Moving Defendants."

with certain stockholders—none of which were the Defendants—owning about 40% of the Company's common stock (such non-Defendant stockholders, the "Principal Stockholders")) and (ii) Lock-Up Agreements with those Principal Stockholders.  *Id.*; Dkt. 60 at 1.  Significantly, *no Moving Defendant was a party to any of those agreements.* Rather, the obligations imposed by the Voting Agreement and the Lock-Up Agreements were borne by the Principal Stockholders *only*. *See* Voting Agreement ¶ 1; Lock-Up Agreement at 1.  No such obligations were imposed on the Moving Defendants.[2]

Plaintiff asserts that Anson was the "lead investor" in the March 2020 Transaction, Compl. ¶ 29, and was the "single investor negotiating the terms of the [March Securities Purchase Agreement] and assuming control of the collateral for the Convertible Notes" Dkt. 73 at 3; *see also* Dkt. 60 at 2.  There is no allegation that Anson coordinated investment decisions in any way with any Moving Defendant.  Rather, the transaction documents expressly state that each of the Moving Defendants had "independently participated in the negotiation of the transaction … with the advice of [their] own counsel and advisors."  Dkt. 31-2 at 4.

The Complaint also claims that "Defendants …entered into a Master Netting Agreement," Compl. ¶ 30, and suggests that the Master Netting Agreement governed the rights of *all* PIPE investors.  A cursory review of that document, however, reveals that it did no such thing.  The Company executed separate Master Netting Agreements with each PIPE Investor individually, and none of the Moving Defendants is a party to a Master Netting Agreement with any other Moving Defendant.

Finally, the Complaint cites a later Waiver and Consent Agreement provided by each PIPE Investor allowing the Company to conduct a subsequent equity raise in May 2020, and two June 2020 agreements entered into by the Company with each Moving Defendant individually: (i) the Conversion Agreement, authorizing the Company to convert debt held by each Moving Defendant (Dkt. 60 at 2, 3; Dkt. 73 at 3), and (ii) the Leak-Out Agreement, limiting the amount of converted stock that each Moving Defendant could sell. *Id.*  Each investor entered into its own separate Waiver and Consent, Conversion and Leak-Out Agreement with the Company, as expressly represented therein.[3] Dkts. 31-4, 31-5, 31-6.  And, importantly, these agreements were entered into well after the March 2020 Transaction.

## PLAINTIFF FAILS TO ALLEGE A PLAUSIBLE SECTION 16(B) CLAIM

Section 16(b) was enacted by Congress as a prophylactic measure to combat potential insider trading by directors, officers and greater than 10% beneficial owners of securities, imposing liability regardless of whether any inside information was actually misused.  *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976).  As no single Moving Defendant beneficially owned more than 10% of Company stock, Section 16(b) liability could attach only if they were members of a Section 13(d) group that beneficially owned in excess of

---

[2] The Lock-Up Agreements did not bind any Moving Defendant.  While the Principal Stockholders were required to hold their shares for the duration of the lockup (*see* Lock-Up Agreement at 1), the Moving Defendants were not so constricted and could sell the shares they acquired through the PIPE at any time without restriction.

[3] The Complaint does not even identify which of the Moving Defendants participated in the May 2020 Transaction, instead only suggesting that some did.  Under any pleading standard, that lack of specificity is insufficient.

10% of the Company's stock in the aggregate at both the time of purchase and the time of sale. Accordingly, absent plausible allegations that the Moving Defendants formed such a group, the Complaint must be dismissed. The "touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011) (citations omitted).

The fundamental flaw of the Complaint is that it contains no plausible allegations of the formation of a group. Rather, it combines independent actions by multiple shareholders participating in an ordinary course PIPE investment with conclusory assertions of group conduct. This is insufficient as a matter of law. As numerous courts have held, parallel participation in a private placement is insufficient to give rise to the existence of a "group." *See Greenberg v. Hudson Bay Master Fund Ltd.,* 2015 WL 2212215, at *6 (S.D.N.Y. 2015) ("The use of a single document in a private placement is not unusual, and courts have routinely rejected the argument that transaction documents granting investors parallel rights and obligations create an inference that a shareholder group was formed." (citation omitted)); *Litzler v. CC. Invs, L.D.C.*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006) (appointment of "lead" drafter or negotiator for the convenience of the issuer does not create a Section 13(d) group); *see also Chechele v. Scheetz*, 819 F. Supp. 2d 342, 349 (S.D.N.Y. 2011) (rejecting inference that a group was formed based on agreements executed separately by each of the defendants).

>     A.    The Voting and Lock-Up Agreements Do Not Create a Plausible Inference of Group Activity

The bulk of Plaintiff's argument is devoted to the Voting and Lock-Up Agreements between Genius Brands and the Principal Stockholders. However, none of the Moving Defendants was a party to those agreements. That alone ends the inquiry. *See Scheetz*, 819 F. Supp. 2d at 349 (no group where neither defendant "nor any other member of the alleged shareholder group was party to the agreement").

Recognizing this deficiency, Plaintiff attempts to build an argument out of the *absence* of a "no third party beneficiary" provision in the Voting and Lock-Up Agreements, asserting that the Moving Defendants were part of a group because they were purported *third-party beneficiaries* of the Voting and Lock-Up Agreements. Dkt. 61 at 2. Plaintiff provides no support for that conclusion. Nor does he contest that *no court has ever held that allegations of third-party beneficiary rights are sufficient to plead a combination in furtherance of a common objective*. This is hardly surprising, as the absence of a provision in agreements in which no Moving Defendant is a party, hardly constitutes a combination by the Moving Defendants in furtherance of a common objective among them.

Further, even if the Moving Defendants could be considered third-party beneficiaries of such agreements, Plaintiff's claim would still fail. As the Second Circuit stated, in *Lowinger v. Morgan Stanley & Co., LLC*, "we have explicitly avoided holding that [a lock-up] agreement, without more, forms a group under Section 13(d)." 841 F.3d 122, 130 (2d Cir. 2016). It explained its "reluctance to recognize the existence of a 'group,' notwithstanding a contractual arrangement explicitly limiting the disposal of shares, reflects the fact that lock-up agreements, rather than being agreements 'to act together,' are generally one-way streets," preventing pre-existing shareholders from selling shares for a period of time. *Id.*

The theory asserted in the Complaint has even less merit. In *Lowinger,* the defendants were parties to the lock-up agreement. If there was no inference of a group among parties to a lock-up agreement in *Lowinger,* there can be no inference of a group here among non-parties.

B.    The Remaining Allegations Concerning the March 2020 Transaction Are Insufficient To Raise an Inference of a Common Objective

Plaintiff emphasizes the designation of Anson as the "lead" drafter and "collateral agent" in the March 2020 Transaction. Dkt. 60 at 2; Dkt. 73 at 2. Notably, however, Plaintiff points to no facts from which any inference can be drawn that Anson combined with any other Moving Defendant toward a common objective, as is required to plausibly plead the existence of a group. Plaintiff does not allege that Anson negotiated or even communicated with any other Moving Defendant. Further, the appointment of a "lead" drafter or negotiator for the convenience of the issuer does not create a Section 13(d) group, *see Litzler,* 411 F. Supp. 2d at 415-16, and for good reason: If the appointment of a lead drafter were sufficient to create a group, companies would be unable to efficiently negotiate offerings with multiple counterparties.[4]

Further, the cases cited in Plaintiff's letter serve to underscore the inadequacy of the Complaint's allegations. Plaintiff cites *Morales v. Quintile Entertainment, Inc.*, 249 F.3d 115, 127 (2d Cir. 2001), asserting that a lock-up agreement, "viewed in the light of the other facts," may "suggest…a mutual agreement with respect to the holding and disposing of shares." Dkt. 60 at 2. Omitted from Plaintiff's letter, however, are "the other facts" relied on by the Second Circuit that raised a plausible inference of group conduct.

In *Morales*, (i) the three alleged group members were partners in a closely held corporation; (ii) all three shareholders allegedly deposited their holdings "in identical trusts all naming the same person as trustee," and (iii) redeemed their investments together on the exact same day. 249 F.3d at 127, 121. Likewise, in *Schaffer v. CC Investments*, *LDC,* Your Honor recognized that there were "numerous allegations of coordinated activity or concerted actions," including that defendants negotiated "as a group," and that their agreement contained a damages provision that expressly permitted the defendants "to allocate…payments from the Company among themselves." 153 F.Supp.2d 484, 488 (S.D.N.Y. 2001). And, in *Wellman v. Dickinson,* 682 F.2d 355, 363 (2d Cir. 1982), the defendants coordinated the pooling of their stock in an attempted corporate takeover—a combination to achieve a common purpose.

The Complaint stands in stark contrast to those cases. Here, the Moving Defendants are not alleged to have negotiated the relevant agreements "as a group," or to have agreed to any allocation among themselves of economic benefits or liabilities. In addition, apart from the March Securities Purchase Agreement, none of the agreements to which the Moving Defendants are parties are alleged to have been signed by more than one Moving Defendant,[5] and the Moving Defendants were not parties to the remaining agreements discussed in the Complaint (the Voting and Lock-Up Agreements). As to the March Securities Purchase Agreement, it

---

[4] Plaintiff also points to Anson's role as "collateral agent" to suggest it had a fiduciary relationship with the remaining Moving Defendants. Compl. ¶ 29; *see also* Dkt. 60 at 2; Dkt. 73 at 2. Not so. As collateral agent, all that can be inferred is that Anson agreed to hold the collateral as security for performance by the Company.

[5] Each Moving Defendant entered into separate Waiver and Consent, Conversion and Leak-Out Agreements.

4

expressly states that each Moving Defendant had "independently participated in the negotiation of the transaction…with the advice of [their] own counsel and advisors." Dkt. 31-2 at 4.

C.     The May 2020 Waiver and Consent and June 2020 Conversion
Agreements Are Likewise Insufficient to Plead Section 16(b) Liability

The only other "agreements" alleged in the Complaint—the Waiver and Consent Agreements provided by individual Moving Defendants allowing the Company to conduct a May 2020 offering, and the June 2020 Conversion and Leak-Out Agreements—also do not raise a plausible inference of group activity.  First, those agreements do not support an inference of a group *at the time of the March 2020 Transaction* because they were entered into well after the March 2020 Transaction closed.  Moreover, as the Complaint and the underlying transaction documents make clear, those agreements were requested by the Company, for the benefit of the Company, and were separately executed in parallel by and between the Company, on the one hand, and each individual Moving Defendants, on the other.  Compl. ¶¶ 50-51; Dkt. 35-6. Accordingly, no plausible inference of a group agreement is raised.  *See Scheetz*, 819 F. Supp. 2d at 342 (parallel lock-up agreements insufficient as "the primary flaw with such an inference, of course, is that the alleged members of the shareholder group were parties to separate Lock–Up Agreements").

Plaintiff's effort to distinguish the *Leak-Out Agreement* with the Company from the *lock-up agreement* in *Lowinger*, for which the Second Circuit found no Section 16(b) liability, also fails.  Plaintiff contends that *Lowinger* is limited to lock-up agreements "with an underwriter and to facilitate an IPO." Dkt. 60 at 3.  That is a distinction without a difference.

Like the Lock-Up Agreement in *Lowinger,* the Leak-Out Agreement here was a "one way street[]," which helped to maintain "an orderly market free of the danger of large sales of pre-owned shares…." *Lowinger*, 841 F.3d at 130-31.  While *Lowinger* involved the orderly IPO market, this case involves the orderly primary offering market, and the Leak-Out Agreements here serve precisely the same function as the *Lowinger* Lock-Up Agreements.  Thus, *Lowinger's* reasoning squarely applies, as there is no functional distinction between a lock-up agreement, which *prohibits* the sale of shares, and a leak-out agreement, which *limits* the sale of shares. The Moving Defendants each individually retained the ability to determine whether and when to sell; the Leak-Out Agreements simply limited the amount.  The Leak-Out Agreements expressly provided that the obligations of each Moving Defendant were wholly independent of the obligations of any other Moving Defendant, and that no Moving Defendant would have any obligation with respect to the performance of any other party under any other Leak-Out Agreement.

D.     The Complaint Fails to Allege Matching Purchases and Sales

As explained above, Plaintiff has not adequately alleged the formation of a group in connection with the March 2020 Transaction.  And, even if a group had been formed in June or July 2020 as a result of the Conversion and Leak-Out Agreements (and it had not), Plaintiff has failed to allege that a group existed *both* at the time of any alleged purchase *and* sale, as is required.  The only alleged purchases in the Complaint are in connection with the March 2020 Transaction.  In his pre-motion letters, Plaintiff argued that "Defendants are alleged to have *sold*

5

Common Stock during the time of the 30 day period when the Leak-Out Agreement was operative beginning on June 23, 2020 and otherwise pursuant to a July 8, 2020 registration statement" Dkt. 61 at 3 (emphasis added) (citations omitted), but the Complaint alleges no subsequent *purchases* of securities that could be subject to Section 16(b).

### E.    Plaintiff's Reliance on the SEC's Proposed Rule Changes Is Misplaced

In his letters, Plaintiff relied heavily on a recent release by the SEC in connection with proposed revisions to the beneficial ownership rules, entitled *Modernization of Beneficial Ownership Reporting*, SEC Rel. Nos. 33-11030, 34-94211 (Feb. 10, 2022) (the "Release"). Plaintiff claims that because the SEC took the position that an "agreement" among the defendants is not a prerequisite to Section 16(b) liability in the Release (Release at 73), the SEC's view is dispositive here.  Plaintiff is wrong.

*First*, the Moving Defendants' argument is not contingent on the absence of an agreement among the Moving Defendants, but instead is premised on the fact that Plaintiff has not plausibly alleged that the Moving Defendants "combined" with each other investor in furtherance of any "common objective."  This fundamental requirement for formation of a Section 13(d) group has not been questioned by Plaintiff or the SEC Staff in its Release. Dkt. 60 at 1; Dkt. 73 at 2.

*Second*, Plaintiff's position—that an SEC release seeking comment on *proposed rule* changes is not only entitled to *Chevron* deference, but also overturns Second Circuit precedent—is wrong.  *See In re Appletree Mkts.*, 19 F.3d 969, 973 (5th Cir. 1994) ("We agree with AppleTree and hold that proposed regulations are entitled to no deference until final."); *Oakley v. City of Longmont*, 890 F.2d 1128, 1133 (10th Cir. 1989) ("Until the agency completes formal rule-making and promulgates final regulations, the proposed rules, which the Internal Revenue Service has already deemed interpretive regulations, are unpersuasive." (citation omitted)). Setting aside that the proposed changes are just that—proposed—the SEC's view expressed in a release concerning unadopted rule amendments does not override decades of Second Circuit authority.  The cases that Plaintiff cites in support of his contention that precedent gives way to the Release both involved SEC releases accompanying the *promulgation* of an SEC rule, rather than a proposal that had yet to be approved or adopted, as is the case here.  *See S.E.C. v. Cavanagh,* 445 F.3d 105, 114 n.20 (2d Cir. 2006) (SEC Release "announcing Rule 144's adoption"); *Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 145 n.8 (2d Cir.2002) (SEC release "accompanying the promulgation of Rule 16b-3").[6]

---

[6] The critical distinction between unadopted proposed rules and final rules is laid bare by the circumstances surrounding the Release.  Since promulgation of the Release, dozens of comments have been submitted to the SEC concerning the Release.  https://www.sec.gov/comments/s7-06-22/s70622.htm.  Some of those comments have argued that the aspects of the Release concerning formation of a "group" are unduly vague or exceed the bounds of the SEC's authority.  *See, e.g.*, https://www.sec.gov/comments/s7-06-22/s70622-279518.pdf; https://www.sec.gov/comments/s7-06-22/s70622-20123299-279599.pdf.  These circumstances illustrate precisely why interim commentary and proposed rules should not be afforded the deference Plaintiff seeks.

Dated:  July 25, 2022

**SCHULTE ROTH & ZABEL LLP**

Michael E. Swartz
Andrew D. Gladstein
Ramya Sundaram
919 Third Avenue
New York, New York 10022
(212) 756-2000
michael.swartz@srz.com
andrew.gladstein@srz.com

*Counsel for Defendants Empery Funds*

**HOGAN LOVELLS US LLP**

/s/ Dennis H. Tracey, III

Dennis H. Tracey, III
390 Madison Avenue
New York, New York 10017
(212) 918-3000
dennis.tracey@hoganlovells.com
catherine.bratic@hoganlovells.com
russell.welch@hoganlovells.com

*Counsel for Defendant Anson Investments
Master Fund LP*

**ELLENOFF GROSSMAN & SCHOLE LLP**

/s/ John Brilling Horgan

John Brilling Horgan
1345 Avenue of the Americas
11th Floor
New York, New York 10105
(646) 895-7158
jhorgan@egsllp.com
flee@egsllp.com
jcohen@egsllp.com

*Counsel for Defendants Brio Capital Master
Fund Ltd. and Brio Select Opportunities Fund
LP*

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

/s/ Susan Saltzstein

Susan Saltzstein
One Manhattan West
New York, New York  10001
(212) 735-4132
susan.saltzstein@skadden.com
jeffrey.geier@skadden.com

*Counsel for Defendant CVI Investments, Inc.*

**LATHAM & WATKINS LLP**

/w/ William O. Reckler

William O. Reckler
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1350
chris.clark@lw.com
william.reckler@lw.com

*Counsel for Defendants Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC*

**PHILLIPS NIZER LLP**

/s/ Marc Andrew Landis

Marc Andrew Landis
485 Lexington Avenue
14th Floor
New York, New York 10017
(212) 841-0705
mlandis@phillipsnizer.com
jclark@phillipsnizer.com

*Counsel for Defendant L1 Capital Global Opportunities Master Fund*

**LITMAN, ASCHE & GIOIELLA, LLP**

/s/ Richard Asche

Richard Asche
140 Broadway #38
New York, New York 10005
(212) 809-4500
richardasche@lagnyc.com

*Counsel for Defendant M3A LP*


**STINSON LLP**

/s/ Kieran M. Corcoran

Kieran M. Corcoran
1325 Avenue of the Americas
27th Floor
New York, New York 10019
(212) 763-8491
kieran.corcoran@stinson.com

*Counsel for Defendant Rich Molinsky*