**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

          Plaintiff,

          v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; IROQUOIS MASTER FUND
LTD.; IROQUOIS CAPITAL INVESTMENT
GROUP, LLC; L1 CAPITAL GLOBAL
OPPORTUNITIES MASTER FUND; M3A LP;
RICHARD MOLINSKY, and; GENIUS
BRANDS INTERNATIONAL, INC.,

          Defendants.

Civil Action No. 1:22-cv-00249-VM

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOVING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ................................................................................................3

      A.     The March 2020 Transaction ...........................................................3

      B.     The Voting Agreements Between the Company and the Principal
            Stockholders.....................................................................................4

      C.     The Lock-Up Agreements Between the Company and the Principal
            Stockholders.....................................................................................5

      D.     The May 2020 Waiver and Consents.................................................6

      E.     The June 2020 Conversion and Leak-Out Agreements ......................7

      F.     Plaintiff's Demand and the Company's Denial ..................................8

      G.     The Complaint ..................................................................................8

LEGAL STANDARDS ....................................................................................................9

      A.     Section 16(b)....................................................................................10

      B.     "Beneficial Owner" Under Section 13(d) of the Exchange Act ...............11

      C.     The Supreme Court's Caution To Apply Section 16(b) Narrowly............13

ARGUMENT...................................................................................................................14

      A.     Plaintiff's "Group" Allegations Are Insufficient to Infer a
            Combination Among the Moving Defendants in Furtherance of a
            Common Objective ..........................................................................14

            1.     The Moving Defendants' Parallel Participation in the March
                    2020 Transaction Does Not Raise a Plausible Inference of a
                    Group ..................................................................................14

            2.     The Voting and Lock-Up Agreements Do Not Create a
                    Plausible Inference of Group Activity .........................................16

            3.     The May 2020 Waiver and Consents and June 2020
                    Conversion and Leak-Out Agreements Are Likewise
                    Insufficient to Plead Section 16(b) Liability...............................19

            4.      The Complaint's Allegations Stand in Stark Contrast to those that Have Been Held Sufficient to Survive a Motion to Dismiss.........................................................................................21

      B.     The Complaint Fails to Allege Matching Purchases and Sales .................22

      C.     Recent SEC Guidance Has No Bearing On The Outcome Of This Dispute ........................................................................................................23

CONCLUSION.....................................................................................................................1

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*In re Appletree Mkts., Inc.*,
   19 F.3d 969 (5th Cir. 1994) ...............................................................................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................10

*Bath Indus., Inc. v. Blot*,
   427 F.2d 97 (7th Cir. 1970) ...............................................................................24

*Bell Atl.Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................10

*Bennigson v. Huntsman*,
   13-cv-452 (KBF), 2013 WL 5348461
   (S.D.N.Y. Sept. 24, 2013).................................................................................13

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..............................................................................10

*Chechele v. Scheetz*,
   819 F. Supp. 2d 342 (S.D.N.Y. 2011),
   *aff'd*, 466 F. App'x 39 (2d Cir. 2012)................................................... *passim*

*Corenco Corp. v. Schiavone & Sons, Inc.*,
   488 F.2d 207 (2d Cir. 1973)..............................................................................24

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
   654 F.3d 276 (2d Cir. 2011)..........................................................................12, 24

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010)..............................................................................10

*Donoghue v. Centillium Commc'ns, Inc.*,
   No. 05 Civ. 4082 (WHP), 2006 WL 775122
   (S.D.N.Y. Mar. 28, 2006),
   aff'd, 959 F.3d 541 (2d Cir. 2020) ....................................................................11

*Donoghue v. Murdock,*
    No. 13 Civ. 1224 (PAE), 2013 WL 4007565
   (S.D.N.Y. Aug. 6, 2013) ....................................................................................11

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 544 (S.D.N.Y. 2014),
   aff'd, 841 F.3d 122 (2d Cir. 2016) ....................................................................15

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
　423 U.S. 232 (1976) .................................................................................................... 13, 23

*Greenberg v. Hudson Bay Master Fund, Ltd.*,
　No. 14cv5226 (DLC), 2015 WL 2212215
　(S.D.N.Y. May 12, 2015) .......................................................................................... 10, 15, 16

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
　156 F.3d 305, 308 (2d Cir. 1998) ..................................................................................... 11

*Kisor v. Wilkie*,
　139 S.Ct. 2400 (2019) ................................................................................................. 25, 26

*Litzler v. CC. Invs., L.D.C.*,
　411 F. Supp. 2d 411 (S.D.N.Y. 2006) ............................................................................. 15

*Lowinger v. Morgan Stanley & Co.*,
　841 F.3d 122 (2d Cir. 2016) .................................................................................... *passim*

*Magma Power Co. v. Dow Chem. Co.*,
　136 F.3d 316 (2d Cir. 1998) ............................................................................................ 13

*Morales v. Quintel Ent., Inc.*,
　249 F.3d 115 (2d Cir. 2001) ................................................................................... 11, 22, 24

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
　545 U.S. 967 (2005) ........................................................................................................ 25

*Oakley v. City of Longmont*,
　890 F.2d 1128 (10th Cir. 1989) ...................................................................................... 25

*Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*,
　898 F. Supp. 2d 673 (S.D.N.Y. 2012),
　*aff'd*, 548 F. App'x 16 (2d Cir. 2013) ............................................................................. 23

*Reliance Elec. Co. v. Emerson Elec. Co.*,
　404 U.S. 418 (1972) ........................................................................................................ 13

*Roth v. Jennings*,
　489 F.3d 499 (2d Cir.2007) ............................................................................................. 12

*Rubenstein v. Int'l Value Advisers, LLC*,
　363 F. Supp. 3d 379 (S.D.N.Y. 2019),
　aff'd, 959 F.3d 541 (2d Cir. 2020) ................................................................................. 11

*Schaffer v. CC Investments, LDC*,
　153 F. Supp. 2d 484 (S.D.N.Y. 2001) ............................................................................. 22

*Trans World Corp. v. Odyssey Partners*,
    561 F. Supp. 1315 (S.D.N.Y. 1983)..................................................................................18

*U.S. Commodity Futures Trading Comm'n v. Byrnes*,
    No. 13-CV-1174 (VSB), 2019 WL 4515209
    (S.D.N.Y. Sept. 19, 2019)............................................................................................26

**Statutes**

15 U.S.C. § 78p(b) ........................................................................................................11

15 U.S.C. § 78m(d)(3) ...............................................................................................12, 25

Securities Exchange Act of 1934 ("Exchange Act") § 13(d)................................................. *passim*

Securities Exchange Act of 1934 § 16(b) ................................................................. *passim*

**Code of Federal Regulations**

17 C.F.R. § 240.16a-1(a)(1)............................................................................................12

17 C.F.R. § 240.13d–5(b)(1)...........................................................................................12

**Proposed Rules**

Sec. & Exch. Comm'n,
    Proposed Rule,
    *Modernization of Beneficial Ownership Reporting*,
    17 C.F.R. pts. 232, 240 (March 10, 2022), https://www.sec.gov/rules/proposed/2022/33-
    11030.pdf ................................................................................................24, 25, 26

**Other Authorities**

Asset Mgmt. Grp. of the Sec. Indus. and Fin. Mkts. Ass'n.,
    Comment Letter on Modernization of Beneficial Ownership Reporting (March 10, 2022),
    https://www.sec.gov/comments/s7-06-22/s70622-20123299-279599.pdf .............................25

Elliott Investment Management L.P.,
    Comment Letter on Modernization of Beneficial Ownership Reporting (March 10, 2022),
    https://www.sec.gov/comments/s7-06-22/s70622-279518.pdf. ...........................................25

Defendants Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, and Empery Tax Efficient, LP (collectively, "Empery"), together with Anson Investments Master Fund LP ("Anson"); Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund, LP ("Brio"); CVI Investments, Inc. ("CVI"); Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC ("Iroquois"); L1 Capital Global Opportunities Fund ("L1"); M3A LP ("M3A"); and Richard Molinsky (collectively, with Empery, the "Moving Defendants"), respectfully submit this memorandum of law pursuant to the Court's September 7, 2022 order (Dkt. 89) in further support of their motion to dismiss the complaint filed by Plaintiff Todd Augenbaum ("Complaint" or "Compl.", Dkt. 1) pursuant to Federal Rule of Civil Procedure 12(b) (Dkt. 77).

## PRELIMINARY STATEMENT

The Complaint seeks to turn an ordinary-course private placement transaction—in which independent, unrelated investors separately participated—into a claim under Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act") (together with all rules and regulations promulgated thereunder, "Section 16(b)") by alleging that the Moving Defendants acted as a "group" and therefore are "insiders" subject to Section 16(b).  But there are no plausible allegations of any facts from which an inference could be drawn that the Moving Defendants agreed to act together "in furtherance of a common objective," as is required to form a group.

Rather, Plaintiff's allegations rest primarily on the terms of a March 2020 transaction (the "March 2020 Transaction") that are commonplace in the private investment in public equity ("PIPE") and other capital markets.  Essentially, the Complaint asserts that because each Moving Defendant held parallel rights in that transaction, all of them were a "group" for purposes of Section 16(b).  But if allegations of mere parallel behavior are found to be sufficient to state a claim under Section 16(b), the floodgates to litigation will open in virtually every multi-investor

1

transaction, thereby upsetting the ordinary functioning of the capital markets and significantly chilling the ability of public companies to obtain financing through multi-party transactions.

It is well-settled that a parallel investment on its own is not sufficient to infer a "group" necessary to state a cause of action under Section 16(b).  Yet, the Complaint alleges that a single defendant—Anson—negotiated the March 2020 Transaction, and the transaction documents reflect that the other investors, represented by their own counsel, independently signed on to participate in the offering.  Plaintiff's allegations fail to raise an inference of coordination among the Moving Defendants, as there is no basis to infer anything other than that each of them made its own independent investment decision with respect to entering into the March 2020 Transaction.

In a futile effort to overcome the Complaint's many shortcomings, Plaintiff advances a novel, but wholly deficient theory of group conduct in support of its claim.  Plaintiff asserts that the Moving Defendants *became* unnamed "third-party beneficiaries" to agreements between the Company and certain non-party shareholders pursuant to which those shareholders agreed to approve the Company's transactions with the Moving Defendants and agreed to a lock-up of their shares for a period of time following the March 2020 Transaction.

According to Plaintiff, the mere allegation of third-party beneficiary status is sufficient to state a claim for a Section 13(d) group.  That theory is without precedent, and for good reason: The fact that existing shareholders of the Company agreed to limitations on the sale of their own shares in order to induce the Moving Defendants to invest creates no plausible inference that *the Moving Defendants* formed a group among themselves.

Plaintiff also attempts to argue that group activity may be inferred from the Moving Defendants' independent (i) consents allowing the Company to conduct an additional issuance of

2

shares in May 2020, or (ii) conversion of debt pursuant to conversion agreements executed in June 2020.  Again, parallel, but independent actions do not give rise to an inference that the Moving Defendants were acting in furtherance of a common objective, and therefore do not give rise to an inference of group activity.  And, even if the Court were to conclude that those allegations were somehow sufficient to infer the existence of a "group" (and they are not), the Complaint would still fail because, to the extent the group was formed in May or June (and it was not), there are no subsequent purchases alleged in the Complaint to match to any sales.

For those reasons and the reasons set forth below, Plaintiff's Complaint should be dismissed pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS

Plaintiff Todd Augenbaum is a shareholder of Genius Brands International Inc. ("Genius Brands" or the "Company").  Compl. ¶ 8.  Genius Brands is "a global content and brand management company that creates and licenses multimedia content," which it "distributes . . . in all formats as well as a broad range of consumer products based on its characters."  *Id.* ¶ 21 (citation omitted).

### A.    The March 2020 Transaction

Each of the Moving Defendants invested in the Company pursuant to a securities purchase agreement, dated March 11, 2020 (the "SPA").  Compl. ¶ 24.  The SPA governs the rights and obligations of the Company and the Moving Defendants with respect to their investments.

Under the terms of the SPA, the Company agreed to issue (i) Senior Secured Convertible Notes[1] to each Investor ("Convertible Notes"); and (ii) warrants to purchase shares of the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the SPA.

Company's common stock exercisable for a period of five years at an initial exercise price of $0.26 per share ("Warrants"). *Id.* Each of the Moving Defendants participated in the March 2020 Transaction and each was a signatory to the SPA with the Company.

The Complaint does not allege coordination among the Moving Defendants in connection with entering into the SPA. Rather, Plaintiff alleges that the SPA "was negotiated by a single lead investor which is identified in the Convertible Notes as being Anson." Compl. ¶ 29.

Indeed, in the SPA, the Company acknowledged—and each of the Moving Defendants confirmed—that each "ha[d] independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors":

> Independent Nature of Buyers' Obligations and Rights. The obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any other Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any other Buyer under any Transaction Document…. [T]he Company acknowledges, and each Buyer confirms, that the Buyers are not acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. *The Company acknowledges and each Buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors.* Each Buyer shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Buyer to be joined as an additional party in any proceeding for such purpose.

Swartz Decl. Ex. A at 50-51 (emphasis added) (*i.e.*, the SPA).

### B.     The Voting Agreements Between the Company and the Principal Stockholders

The SPA required that the Company obtain approval from its existing stockholders for the issuance (or potential issuance) of the shares of common stock underlying the Convertible Notes and the Warrants to be sold to the Moving Defendants in connection with the March 2020 Transaction ("Stockholder Approval"). Compl. ¶ 25. To facilitate that approval, the SPA

4

required the Company to secure voting agreements ("Voting Agreements") from certain existing shareholders representing an aggregate of approximately 40% of the Company's outstanding common stock (the "Principal Stockholders"), in which they agreed with the Company to vote all of their shares in favor of the Stockholder Approval. *Id.* ¶ 28.

The Voting Agreements were a "condition" of the March 2020 Transaction, described by the Company as needed "[i]n order to induce [Moving Defendants] to enter into the [SPA]." *Id.* (citation omitted). The Voting Agreements imposed obligations only on the Principal Stockholders that signed them. *See* Swartz Decl. Ex. B ¶ 1 (*i.e.*, the Voting Agreement). They imposed no obligation of any kind on the Moving Defendants. *Id.* No Moving Defendant is a party to any of the Voting Agreements.[2]

C.    **The Lock-Up Agreements Between the Company and the Principal Stockholders**

The Company also entered into lock-up agreements ("Lock-Up Agreements") with the Principal Stockholders "[i]n order to induce [Moving Defendants] into the [SPA]." Compl. ¶ 28. The Lock-Up Agreements precluded the Principal Stockholders from selling shares of the Company's common stock until 90 days after the one-year anniversary of the closing date of the March 2020 Transaction in order to foster an orderly marketplace. *Id.*

The Company was obligated to enforce the terms of the Lock-Up Agreements, including by "impos[ing] irrevocable stop-transfer instructions preventing the Transfer Agent from effecting any actions in violation of this Lock-Up Agreement." Swartz Decl. Ex. C at 3 (*i.e.*, the Lock-Up Agreement).

---

[2] The Voting Agreements also addressed the adjustment of certain exercise prices for existing warrants held by certain of the Moving Defendants. Compl. ¶ 26. That fact, however, does not alter the reality that *none* of the Moving Defendants are parties to the Voting Agreements.

Like the Voting Agreements, the Moving Defendants were not parties to the Lock-Up Agreements, and the Lock-Up Agreements did not otherwise apply to any of the Moving Defendants. *See id.* at 1. While the Principal Stockholders expressly agreed not to sell their shares during the lock-up period, the Moving Defendants were not restricted from selling. Compl. ¶ 70.[3]

**D.      The May 2020 Waiver and Consents**

Following the March 2020 Transaction, the Company conducted a number of follow-on, registered direct transactions with unidentified investors, which Plaintiff conclusorily asserts are "believed to include at least some of the Defendants." *See* Compl. ¶¶ 34, 36, 39-40. There are no allegations that the Moving Defendants acted together in connection with those transactions.

The Complaint then focuses on a May 28, 2020 transaction that required the consent and participation of each of the Moving Defendants (the "Waiver and Consents"). *See Id.* ¶¶ 40-41.

Once again, there is no allegation of any coordination among the Moving Defendants in connection with the Waiver and Consents. Plaintiff does not allege that the Moving Defendants discussed with each other whether they would agree to such consent, strategized with each other with respect to the subsequent offerings, coordinated their sales of the Company's stock, or did

---

[3] In addition, as part of the March 2020 Transaction, each Moving Defendant separately executed master netting agreements with the Company (the "Master Netting Agreements"). Compl. ¶ 30. A master netting agreement is a simple agreement between a company and an investor (or, in this case, separate agreements between the company and each investor), allowing each of the parties to net amounts due to each other rather than send money back and forth. The Complaint suggests that the Master Netting Agreements allowed each of the Moving Defendants to "'recover against the other Party [*i.e.*, Defendant], under and across the Underlying Agreements,'" Compl. ¶ 30 (first alteration in original) (citation omitted), but the Master Netting Agreements say nothing of the sort. Rather, as the language of the Master Netting Agreements makes clear, those agreements were entered into by and between the Company and each investor, *not* by and between the investors collectively. Furthermore, the agreements were enforceable only by and between each of the Moving Defendants and the Company individually. The Master Netting Agreements, for purposes of federal bankruptcy law, allowed the Company and each investor to treat "the Underlying Agreements [as] a single integrated agreement between [the Company and each individual investor]." Swartz Decl. Ex. G at 2 (*i.e.*, the Master Netting Agreement).

anything other than make their own independent determinations based on the rights that each of the Moving Defendants held under the terms of the SPA.

In exchange for the Waiver and Consents, the Company agreed to file a registration statement for the resale of shares of common stock issued upon exercise of the warrants in connection with the March 2020 Transaction. Compl. ¶ 41. Plaintiff does not allege that the Moving Defendants acted together in connection with any sales of stock.

**E.     The June 2020 Conversion and Leak-Out Agreements**

On June 23, 2020, the Company executed a transaction aimed at obtaining prepayment of the $4 million in promissory notes that the Company had received from the investors in the March 2020 Transaction (*i.e.*, the Moving Defendants) and inducing them to agree to convert all of the outstanding Convertible Notes for shares of common stock. *See* Compl. ¶ 50. To do so, the Company entered into separate conversion agreements (the "Conversion Agreements") with each of the Moving Defendants. *See id.*

Pursuant to the Conversion Agreements, each Moving Defendant agreed to (i) prepay in full the Investor Note (as defined in the SPA) it had issued to the Company and (ii) tender a conversion notice to the Company for the full conversion of its Convertible Notes. As a result of the foregoing, the Investor Notes were prepaid in full and common stock was issued to each of the Moving Defendants in connection with their conversion of the Convertible Notes. Swartz Decl. Ex. D at 1-2 (*i.e.*, the Conversion Agreement).

In connection with the Conversion Agreements, the Company asked each Moving Defendant to execute an individual leak-out agreement (the "Leak-Out Agreements") in the form and substance attached to the Conversion Agreements. *See id.* at 1. Each Leak-Out Agreement separately restricted the applicable Moving Defendant from selling a pre-determined percentage of the Company's trading volume of the common stock on any trading day if the price of that

stock was trading under $2.00 per share.  Compl. ¶ 51. The Leak-Out Agreements made clear that the obligations are "several and not joint with the obligations of any other holder of any of the Securities issued under the [SPA] . . . or under any other agreement, and the [investor] shall not be responsible in any way for the performance of the obligations of any [other investor] under any such other agreement."  Conversion Agreement at 8-9.

The Complaint does not allege that any of the Moving Defendants acquired any additional shares of the Company after the Conversion Agreements were entered.

### F.      Plaintiff's Demand and the Company's Denial

More than eighteen months after the March 2020 Transaction, Plaintiff demanded that the Company bring an action against the Moving Defendants under Section 16(b) (the "Demand"), including because the Moving Defendants had participated in the March 2020 Transaction and purportedly were third-party beneficiaries of the Voting and Lock-Up Agreements between the Company and the Principal Stockholders.  *See* Swartz Decl. Ex. E (*i.e.*, the Demand).

On December 27, 2021, the Company rejected the Demand.  *See* Swartz Decl. Ex. F. Among other reasons, the Company noted that Plaintiff had failed to demonstrate how the Moving Defendants acted as a group by virtue of their parallel participation in the March 2020 Transaction.  *Id.* at 2-4.  It explained that "the SPA expressly contemplated independent action by the investors" and the "voting agreements and lock-up agreements are standard in, and are necessary to facilitate, PIPE transactions."  *Id.* at 3-4.  The Company also stated that there was no support that a group could be formed on the basis of a non-signatory's purported third-party beneficiary status, and that Plaintiff had failed to identify matching purchases and sales.  *Id.* at 4-5.

### G.      The Complaint

Plaintiff filed the Complaint on January 11, 2022, alleging a single claim against the

Case 1:22-cv-00249-AS    Document 97    Filed 10/04/22    Page 15 of 36

Moving Defendants under Section 16(b).  Plaintiff alleges that the Moving Defendants, by virtue of their parallel participation in the March 2020 Transaction, formed a group under the applicable meaning of Sections 16(b) and 13(d) of the Exchange Act and Rule 13d-5(A) promulgated thereunder.  Plaintiff asserts that each of the Moving Defendants "engage[d]" in "non-ministerial actions" including: (1) "Voting in favor of the Stockholder Approval at the Stockholder Meeting"; (2) "Agreeing to a waiver in connection with the Company's May 28, 2020 sale of Common Stock"; (3) "Entering into the Conversion Agreement"; and (4) "Entering into the Leak-Out Agreement."  Compl. ¶ 65(a)(iv).

Plaintiff also claims that "[s]ome or all of the Defendants form[ed] a group to negotiate new terms for the Warrants issued by the Company prior to March 17, 2020," but does not identify which defendants held those warrants or negotiated their terms.  *Id.*  ¶ 65(b).  He further alleges that "[e]ach Defendant retain[ed] the right as a third-party beneficiary to enforce" the Voting Agreement and Lock-Up Agreement, that Anson was "authorized by all Defendants to act as their Lead Investor and the sole collateral agent," and that the Moving Defendants entered into the Master Netting Agreement, the Conversion Agreement, and the Leak-Out Agreement. *Id.* ¶ 65(c)-(h).  The Complaint alleges that each of those latter agreements were entered into between the Company and each Moving Defendant individually, but does not allege any communication or coordination among the Moving Defendants.

Finally, Plaintiff alleges that Moving Defendants sold shares following the March 2020 Transaction, but concedes that he "does not know the precise date and terms of those or any sales…." *Id.* ¶ 70.  Plaintiff alleges no purchases following the May 2020 Waiver and Consents or the June 2020 Conversion Agreements.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

9

Procedure, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citation omitted). Those "well-pleaded facts" must "permit the court to infer more than the mere possibility" of a claim. *Id.* at 679 (internal citation omitted). They must "show" that the pleader is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On a motion to dismiss, a court may consider documents attached to or referenced in a complaint. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010). Here, the Court should consider in full the SPA, the Voting and Lock-Up Agreements, the Waiver and Consents, the Conversion Agreements and the Leak-Out Agreements, all relied on by Plaintiff in the Complaint. Compl. ¶¶ 2, 41, 50. *See, e.g., Greenberg v. Hudson Bay Master Fund, Ltd.,* No. 14cv5226 (DLC), 2015 WL 2212215, at *4 (S.D.N.Y. May 12, 2015) ("The Complaint references the Notes, Warrants, SPA, Rights Agreement, and Schedule 13G and 14A SEC filings in the Complaint. Accordingly, these documents may be considered at the motion to dismiss stage.").

### A.   <u>Section 16(b)</u>

Plaintiff brings this action under Section 16(b), seeking disgorgement by the Moving Defendants of alleged short swing profits generated by the purchase and sale of the Company's stock. Section 16(b) is prophylactic in nature, as it "was enacted to prevent corporate insiders from using non-public information to 'speculate in the stock of the corporations to which they owe a fiduciary duty.'" *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 388 (S.D.N.Y. 2019) (quoting *Donoghue v. Centillium Commc'ns, Inc.,* No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006), *aff'd*, 959 F.3d 541 (2d Cir. 2020)).

"Section 16(b) imposes strict liability on insiders, including officers, directors, and beneficial owners of more than 10% of a company's securities, who realize short-swing profits."

*Chechele v. Scheetz,* 819 F. Supp. 2d 342, 345 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir. 2012) (same).  Short-swing profits are generated from "the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be 'insiders'…." *Id.* (internal quotations and citation omitted).[4]  Section 16(b) requires that any such profits be disgorged to the issuer of the stock.  *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Thus, to establish liability under Section 16(b), a plaintiff must prove "that there was (1) a purchase and (2) a sale of securities (3) by [an insider] (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998); *Donoghue v. Murdock,* No. 13 Civ. 1224 (PAE), 2013 WL 4007565, at *3 (S.D.N.Y. Aug. 6, 2013).  No Moving Defendant beneficially owned in excess of 10% of the Company's stock.  The sole basis for Plaintiff's allegation that the 10% beneficial ownership requirement has been met is the Moving Defendants' alleged participation in a Section 16(b) group.  *See* Compl. ¶ 65.

### B.    "Beneficial Owner" Under Section 13(d) of the Exchange Act

Determination of Section 16(b)'s beneficial ownership threshold is governed by Section 13 of the Exchange Act.  Specifically, SEC Rule 16a-1(a)(1) provides that "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities," the term 'beneficial owner' means, with exceptions not pertinent here, "any

---

[4] Section 16(b) provides, in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement involving any such equity security within any period of less than six months, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months.

15 U.S.C. § 78p(b).

person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder."  17 C.F.R. § 240.16a-1(a)(1).

Pursuant to Section 13(d) of the Exchange Act, "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).  In turn, SEC Rule 13d-5(b)(1), promulgated under Section 13(d), provides, in relevant part:

> [W]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership... of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d–5(b)(1).

Accordingly, under Section 13(d) and the rules promulgated thereunder, "if two or more entities agree to act together for any of the listed purposes, a 'group' is 'thereby' formed."  *Roth v. Jennings*, 489 F.3d 499, 507-08 (2d Cir. 2007).  While the necessary agreement can be formal or informal, the "touchstone of a group within the meaning of section 13(d) is that the members combined in furtherance of a common objective."  *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011) (citations omitted).

As it is undisputed that no single Moving Defendant beneficially owned more than 10% of the Company's common stock, Plaintiff's Section 16(b) claim can survive only if the Moving Defendants were members of a Section 13(d) group that beneficially owned in excess of 10% of the Company's common stock in the aggregate at both the time of purchase and the time of sale. Absent plausible allegations of those facts, the Complaint must be dismissed.  *See Scheetz*, 819 F. Supp. 2d at 346 (granting motion to dismiss for failure to adequately allege a Section 13(d)

group).  As no such plausible allegations have been made here, dismissal is required.

### C.        The Supreme Court's Caution To Apply Section 16(b) Narrowly

"Because Section 16(b) provides for strict liability, the Supreme Court has expressed a reluctance to exceed a literal, mechanical application of the statute."  *Bennigson v. Huntsman*, No. 13 Civ. 452 (KBF), 2013 WL 5348461, at 5* (S.D.N.Y. Sept. 24, 2013).  By requiring statutory insiders to disgorge short-swing profits even if they did not trade on inside information or intend to profit on the basis of such information, Section 16(b) operates as a "blunt instrument."  *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998).

The Supreme Court has emphasized that Section 16(b)'s strict-liability regime must be confined within "narrowly drawn limits."  *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976).  As such, more than once, the Supreme Court has rejected claims that were within the "spirit" of Section 16(b) but not within its "prophylactic" letter.  *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972); *Foremost-McKesson,* 423 U.S. at 251-60 (1976).

The Supreme Court also has held that, through Section 16(b), "Congress did not reach every transaction in which an investor relies on inside information."  *Reliance*, 404 U.S. at 422.  If proof exists that an individual actually *has* abused inside information, investors have access to other, less mechanical, remedies.  *Foremost-McKesson*, 423 U.S. at 255.  "These [other] sanctions alleviate concern that ordinary investors are unprotected against actual abuses of inside information in transactions not covered by [§] 16(b)."  *Id.*

Of course, there are no allegations of any actual abuse of inside information in this case—only Plaintiff's effort to shoehorn ordinary course transactions within the ambit of Section 16(b)'s strict liability provisions.

13

**ARGUMENT**

**A.    Plaintiff's "Group" Allegations Are Insufficient to Infer a Combination Among the Moving Defendants in Furtherance of a Common Objective**

The fundamental flaw of the Complaint is that it contains no plausible allegations of the formation of a group necessary to meet Section 16(b)'s 10% beneficial ownership threshold. Rather, it combines the parallel investments by multiple shareholders participating in an ordinary course PIPE transaction with conclusory assertions of group conduct.

The Complaint does not allege that the Moving Defendants negotiated the relevant agreements "as a group," agreed to any allocation among themselves of economic benefits, or coordinated their sales or any other investment decisions. Apart from their parallel investments pursuant to the SPA, all the agreements involving the Moving Defendants and relied on by Plaintiff are separate agreements between the Company, on the one hand, and each individual Moving Defendant, on the other. *See* SPA at 1, 50-51. Thus, Plaintiff's allegations are insufficient as a matter of law.

**1.    The Moving Defendants' Parallel Participation in the March 2020 Transaction Does Not Raise a Plausible Inference of a Group**

The Complaint alleges that each of the Moving Defendants participated in the March 2020 Transaction, which was negotiated by a single, lead investor, Anson. Compl. ¶ 29. As numerous courts have held, allegations of parallel participation in a transaction, and the appointment of a lead draftsperson, are not sufficient to give rise to the existence of a "group."

"The use of a single document in a private placement is not unusual, and courts have routinely rejected the argument that transaction documents granting investors parallel rights and obligations create an inference that a shareholder group was formed." *Greenberg,* 2015 WL 2212215, at *6 (citing *In re Facebook, Inc., IPO Sec. & Derivative Litig.,* 986 F. Supp. 2d 544, 552-53 (S.D.N.Y. 2014) (dismissing Section 16(b) claims on a 12(b)(6) motion)); *Scheetz,* 819 F.

14

Supp. 2d at 348-49 (same).[5]  Similarly, the appointment of "lead" drafter or negotiator for the convenience of the issuer does not create a Section 13(d) group.  *Litzler v. CC. Invs., L.D.C.*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006).[6]

*Litzler* is particularly instructive.  There, the plaintiff alleged the existence of a group of shareholders that beneficially owned more than 10% of the issuer's common stock.  *See id.* at 414.  The defendants all had entered into a common securities purchase agreement, as well as other agreements, with the issuer.  *See id*. at 412-413.  All the defendants then purchased convertible securities pursuant to that agreement.  *See id*.  After the initial purchase, the defendants, at various times, exercised their conversion rights and sold the underlying common stock within six months of having purchased their convertible securities.  *See id.* at 413.  The plaintiff further alleged that the defendants entered into their securities purchase agreement through the use of a common lawyer, and argued that those "coordinated activities of purchase" constituted "group activity" for purposes of Section 16.  *See id*. at 413, 415.

The Court disagreed, recognizing the commercial reality that "the circumstances of private placement *require* a single set of documents equally affecting all investors."  *Id.* at 415. (emphasis added).  The Court further held that the existence of a common purchase agreement negotiated on behalf of all the defendants by a single lawyer indicated "nothing more than the use of a lead draftsman."  *Id.* at 416.  As the Court explained:

> The SEC has acknowledged the "sound business considerations

---

[5] While the court in *Greenberg* denied the motion to dismiss, it did so only because of allegations, absent here, that the defendants "worked together for some time in advance" of a transaction that was aimed at disposing of their securities, including "prepar[ing] for the incorporation" of a company designed "to achieve that objective," as well as "opportunity sourcing, negotiating, drafting, and due diligence." *Greenberg,* 2015 WL 2212215, at *6.  Had the defendants not coordinated with each other on incorporating an entity to use to dispose of their collective securities, the complaint likely would have been dismissed—as the court noted "[t]he transaction documents provide[d] little support for the plaintiff's contention that the Defendants formed a shareholder group…." *Id.*

[6] While *Litzler* was decided on a motion for summary judgment, the defendants never moved for dismissal on the basis that the complaint failed to allege the existence of a group.

15

such as cost savings" that generally lead to "cooperative activity characteristic of an institutional placement." Filing and Disclosure Requirements Relating to Beneficial Ownership, Securities Act Release No. 5925, Exchange Act Release No. 14692, Investment Company Act Release No. 10212, 1978 SEC LEXIS 1716, *54 (Apr. 21, 1978). More than such cooperative activity has to be alleged and proved to show that the investors were motivated by "a desire to affect control," or by some other indicia of concerted activity.

*Id.* at 415.

That is particularly true where, as here, the documents disclaim any intent to form a group.  The SPA expressly states that each Moving Defendant had "independently participated in the negotiation of the transaction…with the advice of [their] own counsel and advisors," and that no Moving Defendant was "responsible in any way for the performance of the obligations of any other [Moving Defendant] under any Transaction Document."  SPA at 50, 51; *see also Greenberg,* 2015 WL 2212215, at *6 (noting that the "transaction documents provide little support" for the inference that a group was formed and pointing to the provisions of "the SPA and Rights Agreement [which] specifically assert that the rights are separately granted and the use of a single document is for the convenience of [the Company].").

### 2. The Voting and Lock-Up Agreements Do Not Create a Plausible Inference of Group Activity

Recognizing that under well-established precedent the mere participation by the Moving Defendants is not enough to state a Section 16(b) claim, Plaintiff centers his allegations on the Voting and Lock-Up Agreements *to which the Moving Defendants were not parties.*  Those agreements were executed only by the Company and the Principal Stockholders:  In the Voting Agreements, the Principal Stockholders committed to approve the March 2020 Transaction, and, in the Lock-Up Agreements, the Principal Stockholders agreed to be restricted from selling their

16

stock for a 15-month period following consummation of the March 2020 Transaction. Voting Agreement at 1; Lock-Up Agreement at 1.

Because no Moving Defendant was a party to those agreements, they cannot serve as the basis for alleging the existence of a Section 13(d) group. *See, e.g., Scheetz,* 819 F. Supp. 2d at 349 ("[T]he Registration Rights Agreement attached to the motion papers can hardly form the basis for Section 16(b) liability, since neither Scheetz nor any other member of the alleged shareholder group was a party to the agreement.").

In an attempt to avoid this commonsense conclusion, Plaintiff invents a third-party beneficiary theory that has never been recognized by any court in the context of a Section 16(b) or 13(d) claim. He alleges that the mere *absence* of a "no third party beneficiary" provision in the Voting Agreements and Lock-Up Agreements—contracts to which no Moving Defendant was a party, and thus for which no Moving Defendant controlled the terms—means that the Moving Defendants were collective third-party beneficiaries *by default*. Compl. ¶ 32. From that conclusion, Plaintiff proclaims that the Moving Defendants were part of a Section 13(d) group. Dkt. 61 at 2-3.

Plaintiff's theory is baseless, and entirely inconsistent with the Supreme Court's instruction that liability for Section 16(b) is to be narrowly construed. Significantly, *no court ever has held that allegations of third-party beneficiary rights are sufficient to plead a Section 13(d) group for Section 16(b) purposes or otherwise.*

Indeed, Plaintiff's theory that alleged implied, *i.e.,* passive, third-party rights could give rise to a Section 13(d) group is inimical to its very definition. As this Court squarely has held, to form a "group" under Section 13(d), the members must take some "act in furtherance of a common objective." *Trans World Corp. v. Odyssey Partners*, 561 F. Supp. 1315, 1324

17

(S.D.N.Y. 1983). But Plaintiff alleges that the Moving Defendants somehow formed a group by not acting at all—specifically, by others not including language in their agreements that explicitly precluded the Moving Defendants from acting as third-party beneficiaries to enforce contracts to which they were not a party. Unsurprisingly, Plaintiff can point to no legal authority for this counterintuitive proposition.

The weakness of Plaintiff's third-party beneficiary theory is highlighted by that fact that, even if the Moving Defendants were parties to the Lock Up Agreements rather than purported third-party beneficiaries of such agreements, Plaintiff's Section 16(b) claim would still fail. The Second Circuit already has rejected a similar attempt to bring a Section 16(b) claim against underwriters of an IPO because they were parties to a collective lock-up agreement.

In *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 126-27 (2d Cir. 2016), the same plaintiff's counsel in this action argued that lock-up agreements between the lead underwriters of Facebook's IPO and other shareholders, "which prevented the Shareholders from selling…their pre-IPO shares of Facebook stock for a specified period of time after the IPO without the Lead Underwriter's consent," had the effect of creating a group under Section 13(d).

The Second Circuit, however, concluded that "we have explicitly avoided holding that [a lock-up] agreement, without more, forms a group under Section 13(d)." *Id.* at 130. It explained that, "notwithstanding a contractual arrangement explicitly limiting the disposal of shares," "lock-up agreements, rather than being agreements 'to act together,' are generally one-way streets keeping certain shareholders out of the IPO market for a specified period of time." *Id.* at 130-31.

The theory asserted in the Complaint has even less merit than the argument rejected by the Second Circuit in *Lowinger*. In *Lowinger*, the defendant underwriters were signatory *parties*

18

to the lock-up agreement at issue, which was not enough to survive a 12(b)(6) motion.  Here, the

Moving Defendants had *no* connection to the Voting and Lock-Up Agreements, other than as

alleged (but unnamed) third-party beneficiaries.  If signatory *parties* to a lock-up agreement in

*Lowinger* do not support an inference of a Section 13(d) group, there can be no inference of a

group here among the non-party Moving Defendants.

### 3.    The May 2020 Waiver and Consents and June 2020 Conversion and Leak-Out Agreements Are Likewise Insufficient to Plead Section 16(b) Liability

The only other purportedly relevant "agreements" alleged in the Complaint—the May

2020 Waiver and Consents and the June 2020 Conversion and Leak-Out Agreements—also do

not raise a plausible inference of group activity.[7]  Apart from alleging their existence, Plaintiff

offers no allegations relating to those agreements at all.  Nevertheless, precedent makes clear that

the Leak-Out Agreements, as alleged, do not raise a plausible inference of a group.

The May 2020 Waiver and Consents provided by the individual Moving Defendants

permitted the Company to sell common stock pursuant to a May 28, 2020 Securities Purchase

Agreement.  Compl. ¶ 41.  The June 2020 Conversion Agreements provided that each Moving

Defendant would prepay in full the Investor Note it had issued to the Company and tender a

conversion notice to the Company for the full conversion of its Convertible Notes.  Conversion

Agreement at 1.  Neither set of agreements raises even a remote inference of actions taken "in

combination" by the Moving Defendants "in furtherance of a common objective."

Plaintiff does not allege that Defendants negotiated, coordinated, communicated, or acted

in any way as a group with respect to the Waiver and Consents or the Conversion Agreements.

---

[7] Plaintiff does allege that the Company entered into a number of subsequent transactions between March and May 2022, but there are no allegations of group activity in connection with those transactions.

19

Rather, as the Complaint and the underlying transaction documents make clear, those agreements were requested by the Company, for the benefit of the Company, and were separately executed in parallel by and between the Company, on the one hand, and each individual Moving Defendant, on the other.  Compl. ¶¶ 50-51; Leak-Out Agreement at 1.  Accordingly, no plausible inference of a group agreement is raised.  *See Scheetz*, 819 F. Supp. 2d at 342 (no inference of a group when defendants signed *separate* agreements).

Each Conversion Agreement contained a requirement that the relevant Moving Defendants enter into a Leak-Out Agreement with the Company, which effectively limited the number of shares that each Moving Defendant could sell on a daily basis based on the trading volume of the Company's stock.  The Leak-Out Agreement here is functionally no different than the lock-up agreement in *Lowinger*, for which dismissal was affirmed.

Like the lock-up agreement in *Lowinger,* the Leak-Out Agreements here were "one-way streets," which helped to maintain "an orderly market free of the danger of large sales of pre-owned shares."  *Lowinger*, 841 F.3d at 130-31.  While *Lowinger* involved the orderly IPO market, this case involves the orderly primary offering market—*i.e.*, the market in which public companies raise capital *post*-IPO.  The Leak-Out Agreements serve the same function as the *Lowinger* lock-up agreements.  Thus, *Lowinger's* reasoning applies, as there is no functional distinction between a lock-up agreement, which *prohibits* the sale of shares, and a leak-out agreement, which *limits* the sale of shares.  More is required to create the inference of a group.

But here, there is far less.  Unlike in *Lowinger*, which involved a single agreement among shareholders and the company, the Leak-Out Agreements here were separately entered into by each of the Moving Defendants.  Pursuant to the plain terms of the Leak-Out Agreements, the Moving Defendants each retained the ability to independently determine whether and when to

sell; the Leak-Out Agreements simply limited the number of shares each Moving Defendant could sell at a particular time.  The Leak-Out Agreements also expressly provided that the obligations of each Moving Defendant were wholly independent of the obligations of any other Moving Defendant, and that no Moving Defendant would have any obligation with respect to the performance of any other party under any other Leak-Out Agreement.

Finally, in *Lowinger,* the Second Circuit was guided by the policy concerns articulated by the SEC as *amicus curiae*, including its position that "ordinary lock-up agreements do not implicate the purposes of Section 13(d) and its definition of a 'group.'"  *Id.* at 132.  Whereas "Section 13(d) is intended to alert investors about possible changes in control and provide information about possible parties to those changes," "the imposition of damages" based on a lock-up agreement alone "would have nothing to do with the allaying of concerns about changes in control but would greatly raise the costs, and reduce the number, of IPOs."  *Id.*

The same reasoning applies here.  Holding that Plaintiff has plausibly alleged the existence of a group merely because oparallel Leak-Out Agreements with the Company "would have nothing to do with the allaying of concerns about changes in control but would greatly raise the costs, and reduce the number, of [private offerings]."  *Id.*

### 4.   The Complaint's Allegations Stand in Stark Contrast to those that Have Been Held Sufficient to Survive a Motion to Dismiss

Applicable case law, including *Scheetz and Lowinger,* confirm that a plaintiff must plead facts sufficient to infer the existence of a group to survive a motion to dismiss.  That Plaintiff is unable to do so is confirmed not only by his own pleadings, but by contrasting his allegations to those in cases in which courts have found Section 16(b) claims sufficiently pleaded.  A review of those cases confirms that far more than what is alleged in the Complaint is required.

For example, in *Morales*, the Second Circuit held that a group had been sufficiently alleged, where (i) all three shareholders deposited their holdings "in identical trusts all naming the same person as trustee," and (ii) the company redeemed all three shareholders' investments together on the exact same day.  249 F.3d at 127, 121.  Nothing of the sort is alleged here.

Likewise, in *Schaffer v. CC Invs., LDC*, this Court recognized that there were "numerous allegations of coordinated activity or concerted actions," including that defendants, who were alleged to have "collectively purchased 100% of the Preferred Stock," negotiated "as a group," including for a damages provision that expressly permitted the defendants "to allocate … payments from the Company among themselves." 153 F. Supp. 2d 484, 488 (S.D.N.Y. 2001) (Marrero, J.).  In other words, the agreement in *Schaffer* expressly contemplated coordination among the defendants.  That decidedly is not the case here.

Unlike the cases on which Plaintiff relies, here:  (1) Plaintiff does not allege that Defendants jointly negotiated any of the relevant agreements; (2) apart from the March SPA, each Moving Defendant entered into separate agreements; and (3) none of the Moving Defendants were parties to the Voting Agreements and Lock-Up Agreements executed in connection with the March 2020 Transaction.

### B.    The Complaint Fails to Allege Matching Purchases and Sales

The Complaint suffers from an additional defect.  Even if Plaintiff had alleged adequate facts to support an inference that a group arose in connection with the May or June agreements (and he has not), the claim still would fail.

To state a claim, Plaintiff must allege that the Moving Defendants were insiders at the time of both the applicable purchases and sales.  Here, Plaintiff's sole allegations of insider status arise from his defective group allegations.  Accordingly, for the claim to survive,  Plaintiff must adequately allege that a group existed *both* at the time of any alleged purchase *and* sale.

22

The rationale for that rule is that by enacting Section 16(b), Congress intended to "deter beneficial owners from making both a purchase and a sale on the basis of inside information, which is presumptively available only after the purchase." *Foremost-McKesson, Inc.*, 423 U.S. at 232-33, 254 (concluding that it would be inconsistent with Congress's intent "to impose liability on the basis of a purchase made when the percentage of stock ownership requisite to insider status had not been acquired.").[8]

Plaintiff has not alleged that the Moving Defendants made any purchases after the May and June agreements. *See* Dkt. 61 at 3 (arguing only that "Defendants are alleged to have *sold* Common Stock during the time of the 30 day period when the Leak-Out Agreement was operative…." ) (emphasis added). Plaintiff's allegations that the Moving Defendants formed a group by virtue of the Waiver and Consents, the Conversion Agreements, or the Leak-Out Agreements that each Moving Defendant individually signed cannot salvage his Section 16(b) claim. Accordingly, the Complaint's 16(b) allegations must rise and fall on a group existing prior to the purchase in the March 2020 Transaction.

**C.      Recent SEC Guidance Has No Bearing On The Outcome Of This Dispute**

In his pre-motion letters, Plaintiff relied on SEC commentary issued in connection with amendments the SEC proposes to make to Rule 13d-5(b) (SEC Release Nos. 33-11030; 34-94211, at *72-83) (the "Proposed Rules"). *See* Dkts. 60-62, 81. This is misplaced.

At the outset, the Proposed Rules are irrelevant to the argument advanced by Moving Defendants. Plaintiff points to the Proposed Rules to support his argument that the existence of an "agreement" is not necessary for the formation of a "group" under Section 13(d). But,

---

[8] "To be considered a beneficial owner at the time of the purchase, an insider must have been a beneficial owner before the purchase." *Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 694 (S.D.N.Y. 2012) *aff'd*, 548 F. App'x 16 (2d Cir. 2013) (internal citations omitted).

23

regardless of whether an "agreement" is necessary, it is, and remains, beyond dispute that the "touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *CSX Corp.*, 654 F.3d at 283 (internal citations omitted). As explained above, that "touchstone" is missing from the facts pleaded in the Complaint. Thus, whether or not an "agreement" is required, Plaintiff has failed to plead the plausible existence of a group.

The absence of an "agreement," however, constitutes an additional and independent defect in the Complaint. For decades, the Second Circuit, and other Courts of Appeal, have considered the existence of an "agreement" to be a prerequisite for the formation of a group. *See, e.g.*, *Morales*, 249 F.3d at 123-24 (2d Cir. 2001); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217-18 (2d Cir. 1973); *Bath Indus., Inc. v. Blot*, 427 F.2d 97, 109 (7th Cir. 1970). Plaintiff, however, contends that this long-standing requirement was vitiated by commentary issued by the SEC in connection with the Proposed Rules, and that the SEC has "overrule[d]" the Second Circuit. Dkt. 81 at 6. But the Proposed Rules are not yet effective, and proposed rules are entitled to no deference until final. *See In re Appletree Mkts., Inc.*, 19 F.3d 969, 973 (5th Cir. 1994); *Oakley v. City of Longmont*, 890 F.2d 1128, 1133 (10th Cir. 1989).

The commentary on which Plaintiff relies is a step removed from the non-binding Proposed Rules, and is subject to the same uncertainties that render proposed rules unsuitable for deference. Indeed, it remains to be seen what, if any, changes the SEC will make to the Proposed Rules or the accompanying commentary before the final version is issued.[9]

---

[9] Since promulgation of the Release, dozens of comments have been submitted to the SEC, https://www.sec.gov/comments/s7-06-22/s70622.htm, several of which argue that the commentary regarding "group" formation is unduly vague or exceed the bounds of the SEC's authority. *See, e.g.*, Elliott Investment Management L.P., Comment Letter on Modernization of Beneficial Ownership Reporting (March 10, 2022), https://www.sec.gov/comments/s7-06-22/s70622-279518.pdf; Asset Mgmt. Grp. of the Sec. Indus. and Fin. Mkts.

In any event, the SEC's position (even if it were final) would not overrule controlling judicial authority reaching a contrary result in reliance on the text of the statute, s*ee Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1004 (2005), and deference to an agency's determination is appropriate only where the "regulation is genuinely ambiguous," *Kisor v. Wilkie*, 139 S.Ct. 2400, 2404 (2019). Here, Section 13(d) indicates that Congress intended to require more than parallel action alone to create a group by referencing "a partnership, limited partnership [and] syndicate" (*i.e.* formal arrangements) alongside "other group" in the text of the statute. 15 U.S.C. § 78m(d)(3). Thus, the SEC's newly expressed view seeking to eliminate the agreement requirement should not be afforded deference.

Deference to the SEC's commentary would also be inappropriate because "a court may not defer to a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties. That disruption of expectations may occur when an agency substitutes one view of a rule for another." *Kisor*, 139 S.Ct. at 2417-18 (internal citation omitted); *see also U.S. Commodity Futures Trading Comm'n v. Byrnes*, No. 13-CV-1174 (VSB), 2019 WL 4515209, at \*6 (S.D.N.Y. Sept. 19, 2019) (declining to accept agency's interpretation where "entities and persons in the industry have been relying on their previous interpretation for over twenty years.").

Courts have required the existence of an agreement, and the SEC rule that it now seeks to change has referenced an "agreement" for decades. Changing the settled expectations precipitously in the context of commentary accompanying unadopted proposed rules is just the sort of "unfair surprise" that is not entitled to deference.

---

Ass'n., Comment Letter on Modernization of Beneficial Ownership Reporting (March 10, 2022), https://www.sec.gov/comments/s7-06-22/s70622-20123299-279599.pdf

## CONCLUSION

Based on the foregoing, the Moving Defendants respectfully request that the Court dismiss the Complaint.

Dated:  September 30, 2022

**SCHULTE ROTH & ZABEL LLP**


*/s/ Michael E. Swartz*

Michael E. Swartz
Andrew D. Gladstein

919 Third Avenue
New York, NY 10022
(212) 756-2000
michael.swartz@srz.com
andrew.gladstein@srz.com

*Counsel for Defendants Empery Funds*




**HOGAN LOVELLS US LLP**


*/s/ Dennis H. Tracey, III*

Dennis H. Tracey, III

390 Madison Ave.
New York, NY 10017
(212) 918-3000
Fax: (212) 918-3100
dennis.tracey@hoganlovells.com
catherine.bratic@hoganlovells.com
russell.welch@hoganlovells.com

*Counsel for Defendant Anson Investments
Master Fund LP*

**ELLENOFF GROSSMAN & SCHOLE LLP**

*/s/ John Brilling Horgan*

John Brilling Horgan

1345 Avenue of the Americas
11th Floor
New York, New York 10105
Phone: (646) 895-7158
Cell: (518) 339-0614
jhorgan@egsllp.com
flee@egsllp.com
jcohen@egsllp.com

*Counsel for Defendants Brio Capital Master
Fund Ltd. and Brio Select Opportunities Fund
LP*

**SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP**

*/s/ Susan Saltzstein*

Susan Saltzstein

One Manhattan West
New York, New York  10001
(212) 735-4132
Fax: (917) 777-4132
susan.saltzstein@skadden.com
jeffrey.geier@skadden.com

*Counsel for Defendant CVI Investments, Inc.*

**LATHAM & WATKINS LLP**


 */s/ William O. Reckler*
William O. Reckler

1271 Avenue of the Americas
New York, NY 10020
(212) 906-1350
chris.clark@lw.com
william.reckler@lw.com

*Counsel for Defendants Iroquois Master Fund
Ltd. and Iroquois Capital Investment Group,
LLC*


**PHILLIPS NIZER LLP**


 */s/ Jared R. Clark*
Jared R. Clark

485 Lexington Avenue, 14th Floor
New York, New York 10017
(212) 841-0705
Fax: (212) 262-5152
jclark@phillipsnizer.com
mlandis@phillipsnizer.com


*Counsel for Defendant L1 Capital Global
Opportunities Master Fund*

**LITMAN, ASCHE & GIOIELLA, LLP**

*/s/ Richard Asche*

Richard Asche

140 Broadway #38
New York, NY 10005
(212) 809-4500
richardasche@lagnyc.com

*Counsel for Defendant M3A LP*

**STINSON LLP**

*/s/ Kiernan M/ Corcoran*

Kieran M. Corcoran

1325 Avenue of the Americas
27th Floor
New York, NY 10019
(212) 763-8491
kieran.corcoran@stinson.com

*Counsel for Defendant Richard Molinsky*