**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM,<br><br>                    Plaintiff,<br><br>        v.<br><br>ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY, and; GENIUS BRANDS INTERNATIONAL, INC.,<br><br>                    Defendants. | Civil Action No. 1:22-cv-00249-VM |


**MEMORANDUM OF LAW IN OPPOSITION TO**
**THE INSIDER TRADING DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

SUMMARY OF RELEVANT FACTS .......................................................................... 2

ARGUMENT .............................................................................................................. 4

    A.    PLAINTIFF PLAUSIBLY ALLEGES THAT DEFENDANTS ARE SUBJECT TO §16(B) LIABILITY .......................................................... 4

        1.    Plaintiff Properly Alleges That Defendants Were Members of a Group Beneficially Owning 10% or More of Genius Common Stock ....... 5

            a.    Defendants Formed a Group Within the Meaning of Rule 13d-5(b)(1) by Combining to Purchase Genius Securities Through the SPA ...................................................................................... 5

            b.    The Voting Agreement Demanded and Obtained by the Insider Trading Defendants Creates a Plausible Inference of Group Activity ............................................................................... 9

            c.    The Lock-Up Agreement Defendants Demanded and Obtained Combined with Other Facts Also Creates a Plausible Inference of Group Activity .......................................................................... 11

            d.    The Leak-Out Agreement Creates a Reasonable Inference of Group Activity Through at Least the End of the Leak-Out Period .................................................................................................. 13

            e.    The Waiver Agreement and Conversion Agreement Combined with the Other Facts Also Create a Reasonable Inference That Defendants Acted as a §13(d) Group at all Relevant Times ........................................................................... 15

            f.    The SEC's 2022 Release Further Dooms Defendants' Motion to Dismiss by Establishing that Concerted Action Alone is Sufficient to Create a §13(d) Group ............................................. 16

        2.    Plaintiff Properly Alleges the Existence of Matching Purchases and Sales ...................................................................................................... 18

    B.    THE REMEDIAL PURPOSE OF §16(B) IS WELL-SERVED BY THE CLAIMS PLAINTIFF IS ASSERTING .......................................................... 19

CONCLUSION ....................................................................................................... 20

i

## TABLE OF AUTHORITIES

**Cases**

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
    684 F.3d 36 (2d Cir. 2012), as amended (July 13, 2012) ................................................ 20

*Auer v. Robbins*,
    419 U.S. 452 (1997) .......................................................................................................... 16

*Bath Indus. Inc. v. Blot*,
    427 F.2d 97 (7th Cir. 1970) .............................................................................................. 17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................ 4, 8

*Chechele v. Scheetz*,
    819 F. Supp. 2d 342 (S.D.N.Y. 2011), *aff'd,* 466 F. App'x 39 (2d Cir. 2012) ................... 9

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ..................................................................................................... 16, 17

*Corenco Corp. v. Schiavone & Sons, Inc.*,
    488 F.2d 207 (2d Cir. 1973) ......................................................................................... 10, 17

*Donoghue v. Gad*,
    2022 WL 3156181 (S.D.N.Y. Aug. 8, 2022) .................................................................... 14

*Feder v. Frost*,
    220 F.3d 29 (2d Cir. 2000) ............................................................................................. 5, 7

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*,
    66 N.Y. 2d 38 (N.Y. 1985) ............................................................................................... 10

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*,
    1999 WL 544708 (S.D.N.Y. July 27, 1999) ..................................................................... 14

*Gollust v. Mendell*,
    501 U.S. 115 (1991) .......................................................................................................... 19

*Greenberg v. Hudson Bay Master Fund Ltd.*,
    2015 WL 2212215 (S.D.N.Y. May 12, 2015) ......................................................... 8, 18, 20

*H. Daya Int'l Co. v. Do Denim LLC*,
    258 F. Supp. 3d 401 (S.D.N.Y. 2017) ................................................................................. 4

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .......................................................................................... 16, 17, 18

*Kramer v. Time Warner Inc.,*
    937 F.2d 767 (2d Cir. 1991)........................................................................................ 14

*Levy v. Office Depot, Inc*,
    Docket No. 9:01-cv-08529, ECF No. 121 ..................................................................... 20

*Litzler v. CC Invs., L.D.C.,*
    411 F. Supp. 2d 411 (S.D.N.Y. 2006)..................................................................... 6, 7, 8

*Lowinger v. Morgan Stanley & Co., LLC*,
    841 F.3d 122 (2d Cir. 2016)................................................................................... 12, 13

*Magma Power Co. v. Dow Chem. Co.*,
    136 F.3d 316 (2d Cir. 1998)....................................................................................... 19

*Morales v. Freund,*
    163 F.3d 763 (2d Cir.1999).......................................................................................... 5

Morales v. New Valley Corp.,
    999 F. Supp. 470 (S.D.N.Y.1998) ............................................................................... 5

*Morales v. Quintel Etm't, Inc.*,
    249 F.3d 115 (2d Cir. 2001)................................................................................. passim

*Nat'l Cable & Telecommunications Ass'n. v. Brand X Internet Servs.*,
    545 U.S. 967 (2005)................................................................................................... 17

*Reliance Elec. Co. v. Emerson Elec. Co.*,
    404 U.S. 418 (1972)................................................................................................... 19

*Roth v. Jennings,*
    489 F.3d 499 (2d Cir. 2007)....................................................................................... 14

*S.E.C. v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006).......................................................................................... 7

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*,
    2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ........................................................ 5, 7

*SEC v. Savoy Indus., Inc.*,
    587 F.2d 1149 (D.C. Cir. 1978)........................................................................ 9, 14, 15

*Simon Prop. Grp., Inc. v. Taubman Centers, Inc.*,
    240 F. Supp. 2d 642 (E.D. Mich. 2003)...................................................................... 10

*Smolowe v. Delendo Corp.*,
    136 F.2d 231 (2d Cir. 1943)....................................................................................... 19

*Steiner v. Williams; Levy v. Southbrook Int'l Invs., Ltd.*,
　2001 WL 604035 (S.D.N.Y.  May 31, 2001) ................................................. 20

*Trans World Corp. v. Odyssey Partners,*
　561 F. Supp. 1315 (S.D.N.Y. 1983) ............................................................ 11

*U.S. Commodity Futures Trading Comm'n v. Byrnes*,
　2019 WL 4515209 (S.D.N.Y. 2019) ............................................................. 18

*U.S. v. Mead*,
　533 U.S. 218 (2001) ................................................................................ 16

*Wellman v. Dickinson*,
　682 F.2d 355 (2d Cir. 1982) ............................................... 9, 11, 13, 15

**Statutes, Rules & Regulations**

15 U.S.C. §78b ........................................................................................ 19

15 U.S.C. §78m(d) .......................................................................... *passim*

15 U.S.C. §78p(a) ..................................................................................... 19

15 U.S.C. §78p(b) ............................................................................ 1, 4, 19

15 U.S.C. §78w(a) ...................................................................................... 7

17 C.F.R. §240.13d-5 ...................................................................... *passim*

17 C.F.R. §240.16a-1(a)(1) ........................................................................ 5

17 C.F.R. §240.16a-1(b) ........................................................................ 5, 18

17 C.F.R. §240.16b-6(a) ........................................................................... 18

17 C.F.R. §240.16b-6(b) ........................................................................... 18

Fed. R. Civ. P. 12(b)(6) ............................................................... 4, 8, 11, 18

*Filing and Disclosure Requirements Relating to Beneficial Ownership*,
　SEC Release No. 33-5925; 34-14692, 43 FR 18484, 18492 (Apr. 28, 1978) ................ 6, 7

*Interpretative Release on Rules Applicable to Insider Reporting and Trading*,
　Exchange Act Release No. 18114, 1981 WL 31301 (Sept. 24, 1981) ............................ 19

*Modernization of Beneficial Ownership Reporting*,
　SEC. Rel. Nos. 33-11030, 34-94211 (Feb. 10, 2022) ................................................ 16, 18

**Other Authorities**

Brief of the Securities and Exchange Commission *Amicus Curiae*, *Morales v. Quintel Entertainment, Inc.* 99-9724 (2d Cir.) ......................................................................... 12, 14

Patrick M. Corrigan, *Footloose with Green Shoes: Can Underwriters Profit from IPO Underpricing?,*
38 Yale J. on Reg. 908 (2021) ...................................................................................... 12

S. Rep. No. 550, 90th Cong., 1st Sess. 8 (1967); H.R. Rep. No. 1711, 90th Cong., 2d Sess. 8-9 (1968), reprinted in (1968) U.S. Code Cong. & Admin. News 2811, 2818 ..................... 11

S. Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L.J. 391 (1991)............................................................................................ 19

Plaintiff Todd Augenbaum, by his undersigned attorneys, respectfully submits this memorandum of law in opposition to the motion made by Defendants Anson Investments Master Fund LP ("Anson"); Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund, LP ("Brio"); CVI Investments, Inc.; Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, and Empery Tax Efficient, LP (collectively, "Empery"); Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC ("Iroquois"); L1 Capital Global Opportunities Fund ("L1"); M3A LP; and Richard Molinsky (collectively the "Insider Trading Defendants" or "Defendants").

## INTRODUCTION

The Insider Trading Defendants are not ordinary investors and their investment in the securities of Genius Brands International, Inc. ("Genius" or the "Company") was no ordinary investment.  Instead, Defendants pushed through their purchases of Genius common stock (the "Common Stock") for $0.21 per share in May 2020, with the cash outlay for much of those purchases only paid in late June 2020.  The Insider Trading Defendants then sold Common Stock for between $1.00 and $2.00 per share in June and July 2020, earning short-swing trading profits estimated to exceed $100 million from an investment of less than $10 million.

No matter how many times the Insider Trading Defendants package and then re-package their arguments – and their latest motion to dismiss represents at least the third iteration of those arguments – the facts pled unquestionably raise a reasonable inference that Defendants acted as a group within the meaning of meaning of Section 13(d)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78m(d)(3)).  Section 16(b) of the Exchange Act (15 U.S.C. §78p) thus requires that the Insider Trading Defendants, as members of a Section 13(d)(3) group, disgorge their short-swing profits from their trading in the Common Stock.

1

## SUMMARY OF RELEVANT FACTS

Genius is a public company which at the times relevant to this action was generating minimal revenues and suffering recurring losses. ¶22.[1] The Company routinely sold securities in private placements to generate the capital necessary to operate its business and pay its Chief Executive Officer ("CEO"), Andy Heyward ("Heyward"). *Id.*

On March 11, 2020, the Insider Trading Defendants and the Company entered into the SPA providing for Defendants to purchase senior notes (the "Convertible Notes") convertible into Common Stock at $1.375 per share and to receive warrants to purchase additional Common Stock for $0.26 per share (the "2020 Warrants"). ¶24. Anson, as the lead investor, negotiated the SPA's terms and served as the collateral agent with the right to act on behalf of the other Insider Trading Defendants with respect to the SPA. ¶29. While negotiating the SPA, Anson, together with Brio, Iroquois, and potentially other Defendants, owned 8,715,229 previously issued warrants (the "Previously Issued Warrants" and with the 2020 Warrants (the "Warrants")) to purchase Common Stock. ¶¶26-27.

The SPA required Genius to hold a stockholder's meeting by May 15, 2020, to obtain stockholder approval ("Stockholder Approval") for the sale of the Convertible Notes and reducing the exercise price for the Convertible Notes and the Warrants (including the Previously Issued Warrants) to $0.21 per share. ¶25. The SPA also conditioned the Insider Trading Defendants' obligation to purchase the Convertible Notes on the holders of 40% of the Common Stock (the "Principal Stockholders") delivering both: (i) a signed voting agreement requiring them to vote for Stockholder Approval (the "Voting Agreement") and; (ii) a signed lock-up agreement (the "Lock-Up Agreement" and with the Voting Agreement, the "Agreements") preventing the Principal

---

[1]    Citations taking the form "¶_" refer to allegations of the Complaint. Capitalized terms, unless otherwise defined herein, are defined in the Complaint.

Stockholders from selling their Common Stock for one year and ninety days. ¶28. The Insider Trading Defendants were intended third-party beneficiaries having the right to enforce the terms of the Agreements. ¶32.

On March 17, 2020, following the Principal Stockholders delivering signed copies of the Agreements, the Insider Trading Defendants closed on the SPA, paying $7 million in cash and issuing promissory notes (the "Promissory Notes") for the remaining $4 million. ¶31. Heyward paid $1,000,000 to purchase $1,250,000 of the Convertible Notes and, after the SPA's closing, received $483,600 due to him from Genius. ¶¶31, 33.

On March 22, May 7, and May 18, 2020, Genius sold an additional 4,000,000, 8,000,000 and 7,500,000 shares of Common Stock to "certain long standing investors" the identity of which were undisclosed but who are believed to include some of the Defendants. ¶¶34, 36, 39. On May 15, 2020, the Company obtained Stockholder Approval for the proposals, reducing the exercise price of the Convertible Notes and Warrants to $0.21 per share, constituting another purchase for purposes of §16(b). ¶38, 67. On May 28, 2020, the Insider Trading Defendants waived restrictions on Genius selling additional Common Stock (the "Waiver Agreement") conditioned upon the Company registering the resale of Common Stock issued pursuant to the Warrants by June 5, 2020. ¶41.

On June 23, 2020, Genius and the Insider Trading Defendants entered into a conversion agreement (the "Conversion Agreement") requiring the Insider Trading Defendants to pay off the Promissory Notes and then convert the Convertible Notes into Common Stock. ¶50; Conversion Agreement (ECF No. 96-4) at 1. The Conversion Agreement included a leak-out agreement (the "Leak-Out Agreement") governing the number of shares of Common Stock the Insider Trading

Defendants could sell through July 26, 2020 (the "Leak-Out Period"), after which time Defendants were free to sell the Common Stock on any terms they wished. ¶¶50-51.

The Insider Trading Defendants sold a substantial amount of Common Stock for more than $1.00 per share through the cashless exercise of Warrants prior to a June 11, 2020, prospectus registering Common Stock owned by the Insider Trading Defendants for resale. ¶¶43-45. On July 8, 2020, Genius filed another prospectus registering more than 59 million shares of Common Stock owned by the Insider Trading Defendants. ¶56. Throughout this time, there was a steady flow of rumors and statements touting Genius's attractiveness as a potential acquisition target and the depth of its products (¶¶42, 46, 48, 49, 55, 57-58), enabling the Insider Trading Defendants to rapidly sell their Common Stock at or above $2.00 per share (¶60), representing a very substantial multiple to the $0.21 purchase price. This allowed the Insider Trading Defendants to earn short-swing profits from their sale of Common Stock believed to exceed $100 million. ¶6.

<u>**ARGUMENT**</u>

Rule 12(b)(6) requires that a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court should not dismiss a complaint for failure to state a claim if the Complaint's factual allegations "raise a right to relief above the speculative level[.]" *Id.* at 555. "The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *H. Daya Int'l Co. v. Do Denim LLC*, 258 F. Supp. 3d 401, 404 (S.D.N.Y. 2017) (Marrero, J.) (citations omitted). Here, Plaintiff has more than adequately satisfied this standard.

**A.   PLAINTIFF PLAUSIBLY ALLEGES THAT DEFENDANTS ARE SUBJECT TO §16(B) LIABILITY**

There are four elements to a §16(b) claim: "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any

4

one class of the issuer's securities (4) within a six-month period." *Feder v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000) (citations omitted). "No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement." *Id.* (citations omitted).

**1.      Plaintiff Properly Alleges That Defendants Were Members of a Group Beneficially Owning 10% or More of Genius Common Stock**

SEC rules provide that, for purposes of Section 16, "a person is a beneficial owner of more than ten percent of any class of equity securities" in accordance with "section 13(d) of the [Exchange] Act and the rules promulgated thereunder." 17 C.F.R. §240.16a-1(a)(1). "A 'group' under § 13(d) and § 16(b) need not be committed to acquiring, holding, voting, or disposing of securities on a specific set of terms. All that is required is that the members of the group have combined to further a common objective with regard to one of those activities." *Morales v. Freund,* 163 F.3d 763, 767 n.5 (2d Cir.1999). "[P]arties can agree on a common objective and, thereby, form a group for purposes of [§13(d)], yet they 'might not always march in lockstep.'" *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 2002 WL 31869391, at *10 (S.D.N.Y. Dec. 20, 2002) (Marrero, J.) (citing *Morales v. New Valley Corp.,* 999 F. Supp. 470, 475-76 (S.D.N.Y.1998), *aff'd sub nom. Morales, supra*).

**a.      Defendants Formed a Group Within the Meaning of Rule 13d-5(b)(1) by Combining to Purchase Genius Securities Through the SPA**

A group for purposes of §13(d)(3) exists "when two or more persons agree to act together for the purposes of acquiring, holding, voting or disposing of equity securities of an issuer[.]" 17 C.F.R. §240.13d-5(b)(1). Rule 13d-5(b)(2) provides a safe harbor for "concerted actions relating to the purchase of equity securities directly from an issuer in a transaction not involving a public offering." 17 C.F.R. §240.13d-5(b)(1) . However, Rule 13d-5(b)(2) is limited by four exceptions to the safe harbor, each of which causes concerted activity in connection with a non-public offering to form a group within the meaning of §13(d)(3). *Id*.

The Insider Trading Defendants seek to disregard Rule 13d-5(b)(2) and, instead, contend that any finding that they formed a §13(d)(3) group would be "upsetting [to] the ordinary functioning of the capital markets and significantly chilling of the ability of public companies to obtain financing through multi-party transactions." ECF No. 95 at 2. That argument, however, ignores that "[t]hese concerns are embodied in the exception to Rule 13d-5(b)(1) [contained in] Rule 13d-5(b)(2)." *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006) (Hellerstein, J.). As a result, the failure to comply with the terms of the Rule 13d-5(b)(2) safe harbor causes "a group filing obligation [to] arise." *Filing and Disclosure Requirements Relating to Beneficial Ownership*, SEC Release No. 33-5925; 34-14692, 43 FR 18484, 18492 (Apr. 28, 1978) (the "1978 Release").

One of the limitations on the availability of the Rule 13d-5(b)(2) safe harbor is that "[t]he only actions among or between any members of the group with respect to the issuer or its securities subsequent to the closing date of the non-public offering are those which are [1] necessary to conclude ministerial matters [and 2] directly related to the completion of the offer or sale of the securities." 17 C.F.R. §240.13d-5(b)(2)(iv). Here, after the SPA closing date, *i.e.,* March 17, 2020 (¶31), the Insider Trading Defendants entered into the Waiver Agreement, the Conversion Agreement and the Leak-Out Agreement. ¶¶41, 50. Those agreements are each non-ministerial actions, not directly related to completing the sale of securities through the SPA (¶65.a.iv) and, therefore, standing alone, cause the group activity inherent in coordinating the actions of multiple investors investing in the same private offering to be considered members of a §13(d) group pursuant to the plain language of Rule 13d-5(b)(1), 17 C.F.R. §240.13d-5(b)(1), and the express limitation on the safe harbor contained in Rule 13d-5(b)(2), 17 C.F.R. §240.13d-5(b)(2). *See* 1978 Release, *supra.*

Similarly, the change in terms of the Previously Issued Warrants falls outside the limitation imposed by Rule 13d-5(b)(2)(iii) that there be "no agreement among, or between any members of the group to act together with respect to the issuer or its securities *except for the purpose of facilitating the specific purchase involved*[.]"  17 C.F.R. §240.13d-5(b)(2)(iii).  Specifically, Anson, Brio and Iroquois already owned the Previously Issued Warrants at the time they closed the SPA on March 17, 2020.  ¶¶26, 27 and 31.  The same is true of the Voting Agreement which had "the effect of changing or influencing control of the issuer" (17 C.F.R. §240.13d-5(b)(2)(ii)) in requiring the Principal Stockholders to vote in favor of Stockholder Approval.  ¶25.

The Insider Trading Defendants, not surprisingly and without explanation, ignore Rule 13d-5(b)(2) even though it plainly constitutes controlling authority with respect to the scope of the exemption for non-public offerings.  *See* 15 U.S.C. §78w(a); *Feder*, 220 F.3d at 32-33.  Similarly, the 1978 Release is entitled to deference as contemporaneous interpretation of the meaning of Rule 13d-5(b)(2).  *See, e.g.*, *S.E.C. v. Cavanagh*, 445 F.3d 105, 114 n.20 (2d Cir. 2006).  These are both explicitly referenced in Plaintiff's prior submissions to this Court (*see* ECF Nos. 73 at 2; 81 at 2-3) and in the case of Rule 13d-5(b), referenced in the Complaint.  ¶65.  Defendants ignoring these authorities in briefing their motion demonstrates that they cannot fashion any argument consistent with those controlling authorities.

*Schaffer v. CC Investments, LDC*, 2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) (Marrero, J.), is also on point as it too involved "concerted activity … over an extensive period of months and through a number of transactions."  *Litzler*, 411 F. Supp. 2d at 416 (distinguishing *Schaffer*). *Litzler*, upon which Defendants rely, is not on point because aside from using a lead lawyer to negotiate the securities purchase "[a]ll other activities … were done individually" with there being "no evidence of communications among the parties following the closing of the first traunch" and

"no other fact of concerted activity to which Plaintiff cites[.]" *Id.* at 415.  Indeed, even absent coordinated activities, other facts Plaintiff alleges (¶¶65.a.i-iii) defeat the Rule 13d-5(b)(2) safe harbor and make *Litzler* inapposite to the case at Bar.

*Litzler* is also not on point because it involved a summary judgment motion (411 F. Supp. 2d at 412) while the instant motion is being made pursuant to Fed. R. Civ. P. 12(b)(6), prior to any pre-trial discovery (*see* ECF No. 95 at 1) and a resulting liberal standard for allowing cases to proceed to discovery.  *See Twombly*, *supra*.  Defendants suggest without citation that the defendants in *Litzler* never moved to dismiss for failure to allege the existence of a group (ECF No. 95 at 15 n.6) with that motion being limited to statute of limitations issues.  It is unclear that is the case but even if it were the fact remains that in *Litzler* those precise claims were never dismissed on a Rule 12(b)(6) motion and the decision which Defendants rely upon is based upon the evidentiary requirements of a summary judgment motion rather than the Rule 12(b)(6) motion currently before the Court.

*Greenberg v. Hudson Bay Master Fund Ltd.*, 2015 WL 2212215 (S.D.N.Y. May 12, 2015), upon which Defendants also rely, is not on point because there were no allegations of subsequent concerted activities such as those which existed in this action.  Nonetheless, *Greenberg* found that a §13(d) group had been properly alleged based upon a pre-existing transaction and relationship among the defendants comparable to that of Anson, Brio and Iroquois negotiating the repricing of the Previously Issued Warrants while also recognizing that the "precise nature of the relationship … need not be alleged with particularity in the Complaint." *Id.* at *8.

Defendants seek to avoid *Greenberg*'s holding by contending, in a footnote, that case was based upon the defendants having "worked together for some time in advance" on the pre-existing transaction.  ECF No. 95 at 15 n.5.  However, nothing in *Greenberg* indicates that the ruling

depended on the amount of time in advance spent working together nor is there any evidence that it was any longer than the time Anson, Brio and Iroquois spent together as joint investors in Genius through, among other things, the ownership of the Previously Issued Warrants.  In any event, the amount of time spent working together is irrelevant under the plain language of the governing SEC rule limiting the scope of the Rule 13d-5(b)(2) safe harbor.  *See* 17 C.F.R. §240.13d-5(b)(2)(iii) ("There is no agreement among, or between any members of the group to act together with respect to the issuer or its securities except for the purpose of facilitating the specific purchase involved[.]")

*Chechele v. Scheetz*, 819 F. Supp. 2d 342 (S.D.N.Y. 2011), *aff'd,* 466 F. App'x 39 (2d Cir. 2012), upon which Defendants rely, is inapposite to the case at Bar because it did not involve the non-public offering of securities implicating Rule 13d-5(b)(2).  In addition, *Sheetz* involved "[b]are allegations that an unspecified number of parties entered an unspecified agreement at an unspecified time or times."  819 F. Supp. 2d at 350.  Here, in contrast, the SPA involved a non-public offering of securities with the parties entering into the SPA and the other agreements being identified, as are the times those agreements were entered into.  *See, e.g.*, ¶¶28, 31, 38, 66, 67.

**b.     The Voting Agreement Demanded and Obtained by the Insider Trading Defendants Creates a Plausible Inference of Group Activity**

Defendants contend that because they "*were not parties*" to the Voting Agreements, Plaintiff has failed to properly allege the existence of a §13(d) group.  ECF No. 95 at 16.  This argument disregards controlling principles of law that "the concerted action of the group's members need not be expressly memorialized in writing."  *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) (citing *Securities and Exchange Commission v. Savoy, Indus., Inc.*, 587 F.2d 1149, 1163 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 913 (1979)); *see also Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007) (quoting *Wellman*).  Instead, "the key inquiry … is whether

9

[Defendants] 'agreed to act together for the purpose of acquiring, holding, voting or disposing' of [the Company's] common stock." *Morales v. Quintel Entertainment*, 249 F.3d 123-24 (citing 17 C.F.R. §240.13d-5(b)(1); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973)).

Here, the Insider Trading Defendants' obligation to purchase the Convertible Notes was conditioned upon the Voting Agreement requiring the Principal Stockholders, including Heyward, to vote in favor of Stockholder Approval of the proposals. *See* ¶28 & n.2. These facts alone create a reasonable inference that there existed an informal agreement among Defendants to also vote for Stockholder Approval especially given that the Insider Trading Defendants shared a common objective of lowering the exercise price of the Convertible Notes and Warrants with Heyward. *See, e.g.*, *Simon Prop. Grp., Inc. v. Taubman Centers, Inc.*, 240 F. Supp. 2d 642, 650 (E.D. Mich. 2003) (holding that control of a block of shares and "action taken by the group to affect the corporate direction of the company" supports the existence of a §13(d) group) (citation omitted).

In addition, each of the Insider Trading Defendants had the right to enforce the Voting Agreement because, in contrast to the contemporaneously signed SPA, that agreement did not include language barring third-party enforcement. This right of third-party enforcement is not some theory, as Defendants contend, that "Plaintiff invents" (ECF No. 95 at 17) but, instead, a well-settled principle of controlling New York law. *See, e.g., Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 66 N.Y.2d 38, 43 (1985) (cited in ECF No. 81 at 4).[2] The Insider Trading Defendants' right to enforce the Voting Agreement as a third-party beneficiary, therefore, further demonstrates that it is at least plausible – if not almost certain – that the Insider Trading

---

[2]     The terms of the Voting Agreement are governed by New York law. *See* ECF No. 96-2, §4(f).

Defendants were members of a §13(d) through "obtain[ing] the benefits of ownership by reason of any contract … or other arrangement." *Wellman*, 682 F.2d at 366 (quoting S. Rep. No. 550, 90th Cong., 1st Sess. 8 (1967); H.R. Rep. No. 1711, 90th Cong., 2d Sess. 8-9 (1968), reprinted in (1968) U.S. Code Cong. & Admin. News 2811, 2818).

*Trans World Corp. v. Odyssey Partners,* 561 F. Supp. 1315, 1324 (S.D.N.Y. 1983), upon which Defendants rely, is not on point. In *Trans World*, the group allegations failed because conclusory allegations of contracts, agreements and understandings did not create a reasonable inference that a group had been formed.[3] Here, in contrast, Plaintiff has alleged precisely such agreements and understandings as evidenced through the terms of the Voting Agreement and the conditions surrounding the Principal Stockholders entering into the Voting Agreement in connection with and as a condition of the Insider Trading Defendants purchasing the Convertible Notes.

> **c.   The Lock-Up Agreement Defendants Demanded and Obtained Combined with Other Facts Also Creates a Plausible Inference of Group Activity**

The Insider Trading Defendants err in their contention that a lock-up agreement standing alone cannot serve as the basis for alleging the existence of a §13(d) group. ECF No. 95 at 18. *Morales v. Quintel Etm't, Inc.,* the leading Second Circuit case addressing lock-up agreements, instead held that it is "reasonable to infer" that being parties to a lock-up agreement "may bear upon the continued existence of a concerted agreement" or, put another way, provides sufficient facts from which to reasonably infer the existence of a §13(d) group on a Rule 12(b)(6) motion. 249 F.3d 115, 127 (2d Cir. 2001). *Morales*, however, involved a summary judgment motion

---

[3]   Defendants also misquote *Trans World* as requiring an "act in furtherance of a common objective." ECF No. 95 at 17 (quoting 561 F. Supp. at 1324). However, that quote does not appear in the opinion.

11

requiring proof to establish the existence of a group rather than allegations creating a reasonable inference that a group existed. Nonetheless, the Second Circuit declined "to decide whether such lock-up provisions, considered in isolation, would suffice to establish such an agreement[.]" *Id.*

The Second Circuit's holding is consistent with the opinion of the SEC as expressed in an *amicus* brief filed in the *Morales* case that:

> There are situations where a lock-up agreement might constitute an agreement by a group of shareholders to act together for the purposes of acquiring, holding, or disposing of securities. For example, lock-up agreements entered into by an issuer and a group of shareholders might serve to support the price of securities by keeping stock off the market at a time when positive information about the issuer is circulating in the media, thereby benefitting both the-issuer and the shareholder group.

*See* ECF No. 73-1 (Brief of the Securities and Exchange Commission *Amicus Curiae*, *Morales v. Quintel Entertainment, Inc.* 99-9724 (2d Cir.) (the "*Morales* SEC Amicus Brief")) at pp. 26-27. Here, the shoe fits as the Lock-Up Agreement was entered into between the issuer, *i.e.*, Genius, and a group of shareholders, *i.e.,* the Principal Stockholders with the Insider Trading Defendants as third-party beneficiaries, designed to support the price of the Common Stock when Defendants were selling their stock.

*Lowinger v. Morgan Stanley & Co., LLC*, upon which Defendants rely, did not alter the holding in *Morales* and, instead, is pellucid in holding that "our analysis applies only to standard lock-up agreements like those at issue here." 841 F.3d 122, 132 (2d Cir. 2016). The standard lock-up agreement in *Morgan Stanley* involved "underwriters engaged in lock-up agreements as facilitators of a[n initial] public offering." *Id.* at 131; *see also* Patrick M. Corrigan, *Footloose with Green Shoes: Can Underwriters Profit from IPO Underpricing?,* 38 Yale J. on Reg. 908, 969 (2021) (*Morgan Stanley* is limited to underwriters in an IPO). Here, Defendants do not, nor could they reasonably, contend that any public offering accompanied the Lock-Up Agreement which, instead, was entered into in connection with the SPA, involving a private placement. ¶¶2, 22.

12

Thus, when Defendants replace "IPOs" with "private offerings" in their quoting of *Morgan Stanley*, they do violence to the Second Circuit's opinion. *See* ECF No. 95 at 21.[4]

In any event, contrary to the Insider Trading Defendants' arguments, the Lock-Up Agreement does not stand alone in this action. Instead, it was executed contemporaneously with the Voting Agreement (¶¶28, 31) which was then followed by the Waiver Agreement, the Conversion Agreement and the Leak-Out Agreement (¶¶41, 50) which were entered into during the one year and ninety-day term of the Lock-Up Agreement. ¶28.

Equally meritless is Defendants' contention that there not having been signatories to the Lock-Up Agreement precludes them for evidencing the existence of a §13(d) group. ECF No. 95 at 18-19. That argument ignores the controlling authority of *Wellman* making it pellucid that a formal written agreement is not a prerequisite to finding that a §13(d) group has been formed. *See* Point A.1.b, *supra*.

> **d.    The Leak-Out Agreement Creates a Reasonable Inference of Group Activity Through at Least the End of the Leak-Out Period**

Defendants initially contend that the Leak-Out Agreement does not qualify as the basis for finding the existence of a §13(d) group because it fits within the reasoning of the Second Circuit's decision in *Lowinger*. ECF No. 95 at 20. This argument fails because the Leak-Out Agreement does not constitute a standard lock-up agreement with underwriters designed to facilitate an initial public offering. *See* Point A.1.c, *supra*. There is no underwriter and no public offering (let alone an initial public offering) and certainly not one at a set price at which a set number of shares would be sold. Instead, all that exists in this case is the Insider Trading Defendants acting to elevate the price of the Common Stock to maximize their trading profits.

---

[4]    Not only did the quoted sentence of *Morgan Stanley* refer explicitly to IPOs, the prior sentence of the opinion also references IPOs and public offerings. 841 F.3d at 132.

Defendants also contend that the Leak-Out Agreement does not support the existence of a §13(d) group because it was requested by Genius for the benefit of the Company. Even assuming *arguendo* that the Company was the party demanding the Leak-Out Agreement, a §13(d) group is still formed because *Morales v. Quintel Entertainment* unequivocally holds that it is irrelevant that the company "insisted on the lock-up provisions" and, instead, the relevant inquiry is whether Defendants "agreed to those provisions." 249 F.3d at 127.[5] Here, that agreement is further supported by the Insider Trading Defendants' common objective of maximizing the price of the Common Stock they were selling during the Leak-Out Period. *E.g.*, *Morales* SEC Amicus Brief, *supra*; *see also Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, 1999 WL 544708, at *14 (S.D.N.Y. July 27, 1999) (finding that the defendants "acted as a group with a common objective of improperly profiting from short sales in and driving down the price of Global common stock.").

Defendants separately contend that signing parallel copies of the Leak-Out Agreement rather than a single master document defeats the existence of a §13(d) group. ECF No. 95 at 19-20. This argument also fails because it seeks to "exalt form over substance, as group disclosure under section 13(d)(3) would then hinge on the degree of formality of the arrangement." *SEC v. Savoy Indus., Inc.*, 587 F.2d at 1163. Instead, the relevant issue is whether "sufficient evidence supports an inference that such an agreement or understanding exists." *Morales*, 249 F.3d at 123

---

[5] In any event, the Leak-Out Agreement stating that it was requested by Genius is not dispositive of the issue because "the Court may consider [SEC filings] 'only to determine what the documents stated' and '*not to prove the truth of their contents.*'" *Donoghue v. Gad*, 2022 WL 3156181, at *5 (S.D.N.Y. Aug. 8, 2022) (emphasis in original) (quoting *Roth,* 489 F.3d at 509; *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir. 1991)). That is particularly true given that the Insider Trading Defendants act to craft contract provisions designed to facially give the impression that they are not acting as a group. *Cf.* ECF No. 31-1. Instead, given that the Insider Trading Defendants – and not the Company – were the beneficiaries of the Common Stock's higher trading price during the Leak-Out Period based upon their sales of Common Stock during the Leak-Out Period (¶60) it is at least plausible that Defendants were the real moving force behind the Leak-Out Agreement especially.

(citing *Wellman,* 682 F.2d at 363; *Savoy Indus., supra*). Thus, in similar circumstances, the Second Circuit found that shareholders depositing their shares in identical though separate trusts naming the same trustees supported the existence of group activity within the meaning of §13(d). *Morales,* 249 F.3d at 127.

        **e.**      **The Waiver Agreement and Conversion Agreement Combined with the Other Facts Also Create a Reasonable Inference That Defendants Acted as a §13(d) Group at all Relevant Times**

The Insider Trading Defendants contend that the Waiver Agreement and the Conversion Agreement lacked any common objective of purchasing, selling, voting or holding stock as required by Rule 13d-5. *See* ECF No. 95 at 19. They then seek to taint the Leak-Out Agreement as similarly lacking a common objective within the meaning of Rule 13d-5 by considering those agreements as a single unit. *Id.*

However, the common objective of the Leak-Out Agreement is not dependent upon the Waiver Agreement and Conversion Agreement having a similar objective. In addition, the Insider Trading Defendants also ignore that the Conversion Agreement does in fact have an objective connected to the purchase of Common Stock and that the Waiver Agreement was entered into almost one month prior to the Leak-Out Agreement. ¶¶41, 50-51.

In any event, the Waiver Agreement and Conversion Agreement are separately relevant to the existence of a §13(d)(3) group based upon Rule 13d-5(b)(2)(iv). *See* Point A.1.a, *supra*. Thus, even if the precise transaction is not directly related to a common objective of selling or holding Common Stock, it "could … shed light backwards in time on the unity of purpose of the investors in 1996, when they entered into a lock-up agreement with [the company]." *Morales v. Quintel Entertainment,* 249 F.3d at 127 (holding that the formation of identical trusts in 1997 and the joint redemption of stock in 1999 were relevant facts to be considered in determining whether the defendants formed a §13(d) group).

15

####    f.    The SEC's 2022 Release Further Dooms Defendants' Motion to Dismiss by Establishing that Concerted Action Alone is Sufficient to Create a §13(d) Group

The SEC has recently taken the position that: (i) an agreement is not necessary to form a group for purposes of §13(d)(3) with concerted action alone being sufficient; and (ii) Rule 13d-5(b) is not the exclusive means of establishing a §13(d) group because doing so would "impede application of Section 13(d)[.]" *Modernization of Beneficial Ownership Reporting*, SEC. Rel. Nos. 33-11030, 34-94211 (Feb. 10, 2022) (the "2022 Release") (previously filed with the Court at ECF No. 60-1) at 72-74. These stated positions involve the proper statutory interpretation of §13(d)(3), implicating the deference accorded under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984), and, alternatively in the case of the second position, involves application of an existing SEC regulation implicating the principle of agency deference. *See Auer v. Robbins*, 419 U.S. 452 (1997).

Defendants contend that the SEC's commentary is not entitled to deference because Rule 13d-5 is not genuinely ambiguous. ECF No. 95 at 25. However, Plaintiff is *not* seeking deference with respect to the SEC's interpretation of Rule 13d-5, but with respect to the SEC's interpretation of the statutory language of §13(d)(3). Similarly, the Insider Trading Defendants fixating on the 2022 Release's interpretation of §13(d)(3) having been made in connection with proposed rules (ECF No. 95 at 24-25) ignores that the only limitation on agency deference is that "the regulatory interpretation [is] one actually made by the agency ... rather than any mere ad hoc statement not reflecting the agency's views." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019).[6] Here, the 2022

---

[6]    *Kisor*'s reasoning, made in the context of *Auer* deference applying to an agency's interpretation of its own rules, applies with equal force to deference to an agency's interpretation of a statute it administers, such as §13(d) of the Exchange Act for the SEC, because it relied on and cited to the late Justice Scalia's dissent in *U.S. v. Mead*, 533 U.S. 218, 257-259 & n.6 (2001), opining that an authoritative statement of an agency's view is entitled to *Chevron* deference

Release unquestionably represents the authoritative views of the SEC, entitling those views to the full scope of deference.  *See Chevron*, 467 U.S. at 844-45.

Equally meritless is the Insider Trading Defendants' contention that the SEC's views are not entitled to deference because they are contrary to controlling Second Circuit authority.  That is incorrect as "[o]nly a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction."  *Nat'l Cable*, 545 U.S. at 982-83.  *Morales,* upon which the Insider Trading Defendants rely, did not opine that §13(d)(3) required the existence of an agreement (let alone an explicit agreement) but, instead, referenced Rule 13d-5 as requiring an agreement.  249 F.3d at 123-24 ("the key inquiry in the present case is whether [the defendants] 'agree[d] to act together for the purpose of acquiring, holding, voting or disposing of" Quintel common stock.  17 C.F.R. § 240.13d-5(b)(1).'").  *Corenco Corp.*, the other Second Circuit case the Insider Trading Defendants cite, did not rely upon the statutory language of §13(d)(3) but, instead, repeated the language of the plaintiff's allegations which referred to an agreement.  488 F.2d 207, 217-18 (2d Cir. 1973).[7]

Defendants' newfound argument that the SEC's interpretation of §13(d)(3) is not entitled to deference because it represents an "unfair surprise" (ECF No. 95 at 25) fails.  *Kisor*, upon which Defendants rely, spoke theoretically of an agency's interpretation of its own regulations rather than the underlying statute, *i.e.,* §13(d)(3), as is the case here.  In addition, "unfair surprise" requires

---

regardless of the form it takes.  *See also Nat'l Cable & Telecommunications Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 1004 (2005) (Breyer, J., concurring) ("formal rulemaking proceeding is neither a necessary nor a sufficient condition for according *Chevron* deference").

[7]     *Bath Indus. Inc. v. Blot*, 427 F.2d 97 (7th Cir. 1970), which Defendants rely upon, is not controlling authority and addressed the issue of whether §13(d)(3) was limited to groups formed in connection with tender offers with any remaining discussion of §13(d)(3) being *dicta* which did not rely on the language of the statute.

17

the "upending of reliance" on the prior interpretation (139 S. Ct. at 2418), something which Defendants have not even attempted to do in this case.[8]

### 2.      Plaintiff Properly Alleges the Existence of Matching Purchases and Sales

Defendants' argument that there exist no matching transactions depends on no group activity existing before May 2020. *See* ECF No. 95 at 22-23. However, Plaintiff properly alleges that Defendants acted as a §13(d) group at such times, including the following purchases of Common Stock by the Insider Trading Defendants: (a) the March 17, 2020 purchases of the Convertible Notes and Warrants (¶66 (citing 17 C.F.R. §240.16a-1(b))); (b) the change in the exercise prices of the Convertible Notes and Warrants on May 15, 2020 (¶67 (citing 17 C.F.R. §240.16b-6(a))); and (c) the cashless exercise of the Warrants (¶69 (citing 17 C.F.R. §240.16b-6(b))). Plaintiff alleges that those purchases primarily made for $0.21 per share are properly matched with the Insider Trading Defendants' sale of Common Stock made, *inter alia*, during the Leak-Out Period at prices often exceeding $2.00 per share which was many multiples of the $0.21 purchase price. ¶¶60 and 70. No more specificity is required on a Rule 12(b)(6) motion. *See, e.g., Greenberg*, 2015 WL 2212215, at *9. This is especially true where, as here, the facts regarding the Insider Trading Defendants' transactions have been obscured by their failure to make the disclosures otherwise required by the Exchange Act. ¶¶6, 73.[9]

---

[8]      *U.S. Commodity Futures Trading Comm'n v. Byrnes*, the other case Defendants cite, also involved an agency interpretation of its own regulation with the interpretation made for the first time in a legal brief submitted in that case. 2019 WL 4515209, at *5 (S.D.N.Y. 2019). Here, in contrast, the 2022 Release  is completely unrelated to this litigation.

[9]      Section 16(a) of the Exchange Act requires disclosure of trading by beneficial owners of 10% or more of an issuer's securities and Section 13(d) requires disclosure of information by 5% holders of any class of an issuer's securities. *See* 15 U.S.C. §78p(a); 15 U.S.C. §78m(d).

**B.    THE REMEDIAL PURPOSE OF §16(B) IS WELL-SERVED BY THE CLAIMS PLAINTIFF IS ASSERTING**

Congress adopted Section 16(b) based upon evidence that "insiders actually manipulated the market price of their stock by causing a corporation to follow financial policies calculated to produce sudden changes in market prices in order to obtain short swing profits." *Interpretative Release on Rules Applicable to Insider Reporting and Trading*, Exchange Act Release No. 18114, 1981 WL 31301, at *1 (Sept. 24, 1981). "Prohibiting short-swing trading by insiders with nonpublic information was an important part of Congress' plan in the 1934 Act to 'insure the maintenance of fair and honest markets' and to eliminate such trading." *Gollust v. Mendell*, 501 U.S. 115, 121 (1991) (quoting 15 U.S.C. §78b, citation omitted).

Congress believed that it would be difficult, if not impossible, to prove such actual speculative abuse by insiders, making "the only method Congress deemed effective to curb the evils of insider trading … a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972); *see also* S. Thel, *The Genius of Section 16: Regulating the Management of Publicly Held Companies*, 42 Hastings L.J. 391, 433 & n.141 (1991). Accordingly, "Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320-21 (2d Cir. 1998) (citing *Smolowe v. Delendo Corp.*, 136 F.2d 231, 235-36 (2d Cir. 1943) (quoting Rep. Corcoran, chief spokesman for the drafters and proponents of Section 16(b))).

Even though actual abuse of inside information is not an element of the claim, Defendants' trading in Genius securities implicates the precise concerns Congress had in mind in enacting §16(b). Specifically, Genius is the precise type of small capitalization stock for which retail

19

investors trading activity as a result of heightened social media discourse is unrelated to fundamental disclosures. *See, e.g.*, Declaration of Jeffrey S. Abraham, Exhibit A at 119. Such stocks are often referred to as "meme stocks" and, indeed, Genius Common Stock even has its own group on Reddit, a popular social media platform. *See id.* at 73 (referencing Genius); Declaration of Jeffrey S. Abraham, Exhibit B. Plaintiff also notes that the Insider Trading Defendants' sale of Common Stock coordinated through the Leak-Out Agreement followed the successful touting of the Company's business prospects and, indeed, were designed to maintain that elevated price. *E.g.*, ¶¶42, 46, 48, 49, 55, 57, 58.[10]

## **CONCLUSION**

Therefore, for all the reasons set forth above and in Plaintiff's prior submissions, the Insider Trading Defendants' motion to dismiss should be denied in its entirety.

Dated: October 27, 2022

By:  /s/  Jeffrey S. Abraham
Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email: jabraham@aftlaw.com
          mklein@aftlaw.com

---

[10]   Defendants' attacks on Plaintiff's counsel are irrelevant to the merits of the motion to dismiss and otherwise unjustified. Plaintiff's counsel has been effectively litigating Section 16(b) claims including in one case over 20 years ago in which then Judge Martin complimented counsel by stating "the corporation recovered $20,000,000.00 which never would have been received were it not for counsel's diligence and ingenuity." *Steiner v. Williams; Levy v. Southbrook Int'l Invs., Ltd.*, 2001 WL 604035, at *7 (S.D.N.Y. May 31, 2001). That decision has been followed by many other successful §16(b) decisions and recoveries. *See, e.g.*, *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36 (2d Cir. 2012), *as amended* (July 13, 2012) (affirming entry of $4.9 million judgment); *Levy v. Office Depot, Inc*, Docket No. 9:01-cv-08529, ECF No. 121 (approving a $9.4 million settlement of Section 16(b) claims following a successful appeal to the U.S. Court of Appeals for the Eleventh Circuit).