USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/30/2023

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

                          Plaintiff,

                - against -

ANSON INVESTMENTS MASTER FUND LP, et
al.,

                          Defendants.

**22 Civ. 249 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Todd Augenbaum ("Augenbaum") brings this shareholder derivative action on behalf of Genius Brands International, Inc. ("Genius" or the "Company"), who is named as a nominal defendant, against defendants Anson Investments Master Fund LP ("Anson"), Brio Capital Master Fund Ltd., Brio Select Opportunities Fund, LP (with Brio Capital Master Fund Ltd., "Brio"), CVI Investments, Inc., Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, Iroquois Master Fund, Ltd., Iroquois Capital Investment Group, LLC (with Iroquois Master Fund, Ltd., "Iroquois"), L1 Capital Global Opportunities Master Fund, M3A LP, and Richard Molinsky (collectively, the "Moving Defendants"). Augenbaum alleges that the Moving Defendants violated Section 16(b) ("Section 16(b)") of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b).

Now before the Court is the Moving Defendants' motion and accompanying opening brief seeking to dismiss Augenbaum's Complaint ("Complaint" or "Compl.," Dkt. No. 1) pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See "Motion," Dkt. No. 77; "Brief," Dkt. No. 97.) Augenbaum filed an opposition to the Motion (see "Opp.," Dkt. No. 98), and the Moving Defendants filed a reply (see "Reply," Dkt. No. 100). For the reasons set forth below, the Moving Defendants' Motion is **GRANTED** without prejudice and with leave to amend.

## I.   BACKGROUND

A.   FACTUAL BACKGROUND[1]

Genius is a global company that creates and licenses multimedia content and provides brand management primarily in the children's media sector. Augenbaum is a shareholder of Genius. Though Genius has delivered various children's programming to platforms, including Netflix and Nickelodeon, it has often generated losses, requiring external funding sources to continue operating.

---

[1] The factual recitation set forth below, except as otherwise noted, derives from the Complaint, and the facts pleaded therein, which the Court accepts as true for the purpose of ruling on a motion to dismiss. (See Section II.A., *infra*.) Except where specifically quoted, no further citation will be made to the Complaint or the documents referred to therein.

On March 11, 2020, Genius entered into a Securities Purchase Agreement (the "March 2020 SPA") with the Moving Defendants in order to finance the Company. Pursuant to the March 2020 SPA, Genius would sell a total of $13,750,000 in senior secured convertible notes (the "Convertible Notes"), which were convertible into common stock at a price of $1.375 per share. Each purchaser of the Convertible Notes would receive warrants (the "Warrants") to purchase a combined total of 65,476,190 shares of common stock which could be exercised at $0.26 per share.

The March 2020 SPA further required that Genius would hold a stockholder meeting by May 15, 2020 to approve the issuance of shares of common stock under the Convertible Notes (the "Stockholder Approval"). The agreement provided that after the Stockholder Approval, both the conversion price of the Convertible Notes and the exercise price of the Warrants would be reduced to $0.21 per share. Augenbaum alleges that some of the Moving Defendants, including Anson, Iroquois, and Brio, were among the owners of the warrants that had been issued prior to the March 2020 SPA and repriced.

Pursuant to the March 2020 SPA, as a condition precedent to any obligation of the Moving Defendants to purchase the Convertible Notes, Genius would be required to enter a voting agreement (the "Voting Agreement") with stockholders of the

Company owning roughly 40 percent of the outstanding common stock (the "Principal Stockholders"). Genius would also be required to enter into a lock-up agreement (the "Lock-Up Agreement") with the Principal Stockholders barring them from selling their common stock for one year and 90 days, following the closing date. Both agreements indicate that they were entered into "[i]n order to induce [Defendants] to enter into the Securities Purchase Agreement." (Compl. ¶ 28 (alterations in original).) None of the Moving Defendants was a party to either the Voting Agreement or the Lock-Up Agreement.

The SPA was negotiated by a single lead investor, Anson, which the Moving Defendants appointed as collateral agent and had authorized to take action on behalf of the Moving Defendants. After the Principal Stockholders delivered signed copies of the Voting Agreement and the Lock-Up Agreement, the Moving Defendants closed on the SPA on March 17, 2020. They paid $7,000,000 in cash and issued promissory notes for the remaining $4,000,000.

Augenbaum alleges that although the Moving Defendants were not parties to the Voting and Lock-Up Agreements, they were intended third-party beneficiaries as the agreements lacked a no-third-party-beneficiary clause, thereby allowing for third-party enforcement. The Moving Defendants' third-party beneficiary status with respect to the Voting Agreement

would purportedly help ensure Stockholder Approval to reduce the conversion price of the Convertible Notes and the exercise price of the Warrants.

On March 22 and May 7, 2020, Genius agreed to sell 4,000,000 and 8,000,000 shares of common stock, respectively, to "certain long standing investors." (Id. ¶¶ 34, 36.) The common stock had been registered with the U.S. Securities and Exchange Commission (the "SEC") in January 2020. On May 18, 2020, Genius sold 7,500,000 shares of the previously registered common stock to "certain long standing investors." (Id. ¶ 39.) Though the identities of these "certain long standing investors" were not disclosed, Augenbaum alleges that some of the Moving Defendants were among those investors.

Genius obtained Stockholder Approval for the proposals on May 15, 2020. The Moving Defendants waived and consented to selling additional common stock pursuant to a May 28, 2020 Securities Purchase Agreement with Genius (the "Waiver and Consent Agreement"), who would, in turn, register the resale of the shares of common stock issued or issuable upon exercise of the Warrants by June 5, 2020.

On June 23, 2020, each of the Moving Defendants separately entered into a conversion agreement (the "Conversion Agreement") with Genius requiring the Moving Defendant to pay off the promissory notes and convert the

Convertible Notes into common stock. It further required Genius to file a registration statement with the SEC by June 26, 2020, covering the resale of the shares of common stock issuable upon conversion. The Conversion Agreement included a leak-out agreement (the "Leak-Out Agreement"), which restricted each Moving Defendant from selling common stock obtained through conversion or exercise of the Warrants for a price below $2.00 per share for a 30-day period. The registration statement that Genius filed with the SEC was declared effective on July 6, 2020, which caused the Leak-Out Agreement to be effective through and including August 5, 2020.

Beginning on May 15, 2020, prior to the June 11, 2020 filing of a prospectus with the SEC that registered the common stock owned by the Moving Defendants, the Moving Defendants sold common stocks for more than $1.00 per share through the cashless exercise of Warrants. [2] Genius filed another prospectus on July 8, 2020, registering more than 59 million shares of common stock owned by the Moving Defendants. During this time, Genius issued various statements and press releases about its new products and potential acquisitions.

---

[2] The cashless exercise of Warrants was the payment of common stock "based upon the difference between the market price of the Common Stock and the Warrants." (Compl. ¶ 43.)

For example, in June 2020, *Insider Financial* published an article speculating whether Netflix or Disney would buy Genius, after which the price of common stock increased more than 40 percent. Genius made social media posts, such as one indicating that Arnold Schwarzenegger might invest in the Company, which resulted in another *Insider Financial* article stating that Arnold Schwarzenegger was "on board" with Genius and that it was "'only a matter of time before either Disney or Netflix buys Genius Brands International.'" (<u>Id.</u> ¶ 48 (citing *Insider Financial*).)

On July 2, 2020, the reported trading volume in the common stock increased from 17,607,500 shares to over 285,000,000 shares overnight. On July 6, 2020 and July 15, 2020, Genius issued press releases regarding its plan to create the "Stan Lee Universe" for comic book creator Stan Lee's creations outside of Marvel Entertainment.

From July 8, 2020 through July 20, 2020, more than 318 million shares of common stock were traded at prices greater than the $2.00 per share limit contained in the Leak-Out Agreement. On July 24, 2020, Genius filed a preliminary proxy statement with the SEC identifying those entities beneficially owning five percent or more of the outstanding shares of common stock. Both Anson and Brio, which were previously identified as beneficially owning shares of common

stock at or above the five percent threshold, were no longer identified as beneficially owning any shares of common stock.

In October 2020, Augenbaum made a demand on the Genius Board (the "Board") to bring an action against the Moving Defendants pursuant to Section 16(b) of the Exchange Act. The Board subsequently rejected the demand, causing Augenbaum to bring this action.

B.  <u>PROCEDURAL HISTORY</u>

Augenbaum commenced this shareholder derivative action on January 11, 2022, on behalf of Genius. On March 14, 2022, the Moving Defendants each filed pre-motion letters identifying deficiencies in the Complaint that would form the basis of a motion to dismiss. (<u>See</u> Dkt. Nos. 31, 33, 38, 42, 43, 48, 53.) After the parties exchanged pre-motion letters, the Court directed the Moving Defendants to file a motion to dismiss with limited briefing.

However, upon filing their Motion on July 25, 2022, the Moving Defendants requested full briefing on the Motion to Dismiss (<u>see</u> Dkt. No. 86), which the Court subsequently granted (<u>see</u> Dkt. No. 87). In accordance with the Court's September 7, 2022 Order approving the briefing schedule (<u>see</u> Dkt. No. 89), the Moving Defendants filed their opening brief, Augenbaum filed an opposition, and the Moving Defendants filed their reply. For the purposes of this Decision and

Order, the Court relies on the briefing submitted pursuant to the Court's September 7, 2022 Order. (See id.)

## II.   LEGAL STANDARD

### A.   RULE 12(b)(6) MOTION TO DISMISS

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. However, a complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See Iqbal, 556 U.S. at 678.

When resolving a Rule 12(b)(6) motion, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in

support thereof." In re Initial Pub. Offering Sec. Litig.,
383 F. Supp. 2d 566, 573-74 (S.D.N.Y. 2005) (internal
quotation marks omitted), aff'd sub nom. Tenney v. Credit
Suisse First Boston Corp. Inc., No. 05 Civ. 3430, 2006 WL
1423785 (2d Cir. May 19, 2006); accord In re MF Glob. Holdings
Ltd. Sec. Litig., 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013).
In this context, the Court must draw reasonable inferences
and resolve any doubts in favor of the non-moving party. See
Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir.
2002). However, the requirement that a court accept the
factual allegations in the claim as true does not extend to
legal conclusions. See Iqbal, 556 U.S. at 678.

Finally, in adjudicating a motion to dismiss, a district
court must generally confine its consideration "to facts
stated on the face of the complaint, in documents appended to
the complaint or incorporated in the complaint by reference,
and to matters of which judicial notice may be taken." Leonard
F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir.
1999) (internal quotation marks omitted). The Second Circuit
has held that courts may consider "public disclosure
documents required by law to be, and that have been, filed
with the SEC[.]" City of Pontiac Policemen's & Firemen's Ret.
Sys. v. UBS AG, 752 F.3d 173, 179 (2d Cir. 2014) (citing
Rothman v. Gregory, 220 F.3d 81, 88 (2d Cir. 2000)). However,

the Court may consider such filings only to "determine what the documents stated and not to prove the truth of their contents." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks and citation omitted); Donoghue v. Gad, No. 21 Civ. 7182, 2022 WL 3156181, at *5 (S.D.N.Y. Aug. 8, 2022) (same). Further, on a motion to dismiss, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted).[3]

B.    SECTION 16(b) OF THE EXCHANGE ACT

Section 16(b) of the Exchange Act aims to "prevent[] the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . ." 15 U.S.C. § 78p(b). Section 16(b) "requires that profits derived from short-swing trading

---

[3] The Moving Defendants attached to their Motion a declaration of Attorney Michael E. Swartz (see Dkt. No. 96) with accompanying exhibits, which include the March 2020 SPA (see Dkt. No. 96-1), the Voting Agreement (see Dkt. No. 96-2), the Lock-Up Agreement (see Dkt. No. 96-3), the Conversion Agreement with the attached Leak-Out Agreement(see Dkt. No. 96-4), and the Master Netting Agreement (see Dkt. No. 96-7). As the Complaint relies on these documents in its allegations, the Court recognizes that while it may consider these documents to determine what they stated, it may not consider the filings "to prove the truth of their contents." Roth, 489 F.3d at 509.

be disgorged to the issuer of stock." <u>Morales v. Quintel Ent., Inc.</u>, 249 F.3d 115, 121 (2d Cir. 2001). Short-swing trading is "the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be 'insiders' . . . ." <u>Id.</u> For Section 16(b) to apply, the individual must be "a statutory insider at both the time of the purchase and the time of sale." <u>Greenberg v. Hudson Bay Master Fund Ltd.</u>, No. 14 Civ. 5226, 2015 WL 2212215, at *4 (S.D.N.Y. May 12, 2015) (citing <u>Foremost-McKesson, Inc. v. Provident Sec. Co.</u>, 423 U.S. 232, 235 (1976)). An insider is defined as a "person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security . . . ." 15 U.S.C. § 78p(a)(1).

As Section 16(b) imposes strict liability, "courts are 'reluctant to exceed a literal, mechanical application of the statutory text in determining who may be subject to liability, even though in some cases a broader view of statutory liability could work to eliminate an evil that Congress sought to correct through § 16(b).'" <u>Greenberg</u>, 2015 WL 2212215, at *4 (citing <u>Gollust v. Mendell</u>, 501 U.S. 115, 122 (1991)). An action under Section 16(b) may be brought by the issuer or a shareholder acting derivatively on behalf of the issuer. <u>See Rubenstein v. Int'l Value Advisers, LLC</u>, 363 F. Supp. 3d 379, 388 (S.D.N.Y. 2019).

To state a claim under Section 16(b), "a plaintiff must plausibly allege that 'there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period.'" Olagues v. Perceptive Advisors LLC, 902 F.3d 121, 125 (2d Cir. 2018) (citing Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998)). Moreover, "[t]he shareholder must be a 10 [percent] beneficial owner before the short-swing transaction." Litzler v. CC Investments, L.D.C., 411 F. Supp. 2d 411, 414 (S.D.N.Y. 2006) (citing Foremost-McKesson, 423 U.S. at 249-50).

C.   "BENEFICIAL OWNER" UNDER SECTION 13(d) OF EXCHANGE ACT

Though the term "beneficial owner" is not defined in the Exchange Act, the SEC promulgated regulations[4] providing guidance on "determining whether a person is a beneficial owner of more than ten percent of any class of equity securities." Morales, 249 F.3d at 122. Under that guidance,

---

[4] Two definitions of beneficial owner are encompassed by the SEC's guidance "because of the different uses to which the term is put in Section 16." Feder v. Frost, 220 F.3d 29, 33 (2d Cir. 2000). The first use, as relevant here, "is to determine who is a ten-percent beneficial owner and therefore a statutory insider. The second use is the determination of which transactions . . . trigger[] liability under Section 16(b)." Id. Under the second definition, a beneficial owner is "any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities . . . ." Int'l Value Advisers, 363 F. Supp. 3d at 390 (citing Rubenstein v. Berkowitz, No. 17 Civ. 821, 2017 WL 6343685, at *2 (S.D.N.Y. Dec. 11, 2017)) (internal quotation marks omitted).

the term "beneficial owner" means "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." 17 C.F.R. § 240.16a-1(a)(1).

A beneficial owner need not be a single individual or entity. See Int'l Value Advisers, 363 F. Supp. 3d at 389. Section 13(d)(3) of the Exchange Act considers a group of investors to be a single beneficial "owner" for the purposes of Section 16(b) "when two or more persons act as a partnership, limited partnership, syndicate, or other *group* for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3) (emphasis added). A group is formed "if two or more entities *agree* to act together for any of the listed purposes . . . ." Roth, 489 F.3d at 507-08 (emphasis added). Such an agreement "may be formal or informal and may be proved by direct or circumstantial evidence." Morales, 249 F.3d at 124. Further, "the touchstone of a group . . . is that members *combined* in furtherance of a common objective." Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982) (emphasis added). "General allegations of parallel investments by institutional investors do not suffice to plead a group." Litzler, 411 F. Supp. 2d at 415 (citing Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C., 223 F. Supp. 2d 435, 449 (S.D.N.Y. 2001)).

### III. <u>DISCUSSION</u>

Augenbaum alleges that the Moving Defendants constitute a "group" that beneficially owned more than 10 percent of Genius's common stock within the relevant time period for the purpose of acquiring, holding, or disposing of equity securities, and earned short-swing profits, which are subject to disgorgement under Section 16(b) of the Exchange Act. The Moving Defendants move to dismiss Augenbaum's Complaint on the grounds that he failed to plausibly allege that they are a group within the meaning of Section 13(d)(3) and for purposes of Section 16(b) liability. Further, they argue that Augenbaum failed to plausibly allege matching purchases and sales, that is, that the Moving Defendants were statutory insiders at the time of both the alleged purchase and the alleged sale. For the reasons set forth below, the Court grants the Moving Defendants' Motion without prejudice and with leave to amend.

A.    <u>GROUP ALLEGATIONS</u>

In his Complaint, Augenbaum alleges that the Moving Defendants constituted a "group," within the meaning of Sections 16(b) and 13(d)(3), that was a beneficial owner of at least 10 percent of Genius's common stock at all relevant times in the action. In their Motion, the Moving Defendants argue that Augenbaum's allegations fall short of plausibly

pleading a "group" within the meaning of Section 13(d)(3) because Augenbaum has failed to allege that the Moving Defendants combined "in [f]urtherance of a [c]ommon [o]bjective." (Brief at 14.) The Court agrees that Augenbaum has not plausibly alleged the existence of a "group" subject to liability pursuant to Section 16(b).

    1.   <u>Rule 13d-5(b)(2) "Safe Harbor"</u>

As an initial matter, the Court addresses the applicability of Rule 13d-5(b)(2).[5] In his Complaint and briefing, Augenbaum relies on the so-called "safe harbor" of Rule 13d-5(b)(2) to allege that the Moving Defendants engaged in group activity because their conduct does not meet the criteria enumerated thereunder to be exempted from being

---

[5] Rule 13d-5(b)(2) provides, in relevant part, that:
> [A] group shall be deemed not to have acquired any equity securities beneficially owned by the other members of the group solely by virtue of their concerted actions relating to the purchase of equity securities directly from an issuer in a transaction not involving a public offering: Provided, That:
> (i) All the members of the group are persons specified in Rule 13d-1(b)(1)(ii);
> (ii) The purchase is in the ordinary course of each member's business and not with the purpose nor with the effect of changing or influencing control of the issuer, nor in connection with or as a participant in any transaction having such purpose or effect, including any transaction subject to Rule 13d-3(b);
> (iii) There is no agreement among, or between any members of the group to act together with respect to the issuer or its securities except for the purpose of facilitating the specific purchase involved; and
> (iv) The only actions among or between any members of the group with respect to the issuer or its securities subsequent to the closing date of the non-public offering are those which are necessary to conclude ministerial matters directly related to the completion of the offer or sale of the securities.

17 C.F.R. § 240.13d-5(b)(2).

considered a "group." See 17 C.F.R. § 240.13d-5(b)(2). He argues that Rule 13d-5(b)(2), specifically, "provides a safe harbor for 'concerted actions relating to the purchase of equity securities directly from an issuer in a transaction not involving a public offering,'" and because the Moving Defendants' conduct does not satisfy the four criteria, they must constitute a "group" within the meaning of Section 13(d)(3). (Opp. at 5 (citing 17 C.F.R. § 240.13d-5(b)(2)).) The Moving Defendants rebut that the "safe harbor" rule is not relevant at this stage because Augenbaum must first establish a group as a "necessary predicate step" before applying the rule at all. (Reply at 3.)

The Court agrees with the Moving Defendants that the safe harbor provision relied upon by Augenbaum is misapplied. Contrary to Augenbaum's contention, the safe harbor provision determines whether a collective of specific individuals or entities that constitute a group would otherwise be exempt from being considered a "beneficial owner" and therefore exempt from liability. This provision is not guidance for determining whether two or more investors constitute a group. Rule 13d-5(b)(2) specifically reads that "a *group* shall be deemed not to have acquired any equity securities beneficially owned by the other members of the group solely by virtue of their concerted actions" if they fall under the

four criteria. 17 C.F.R. § 240.13d-5(b)(2). Thus, the provision itself assumes that a group already exists for the purposes of applying this rule. Accordingly, whether the Moving Defendants' conduct falls within or outside the bounds of the safe harbor rule is immaterial to determining whether Augenbaum has plausibly alleged a group at all.

### 2.  Parallel Participation

Augenbaum's Complaint alleges that the Moving Defendants constitute a group because they purchased securities together pursuant to the March 2020 SPA and Anson acted as the lead investor and sole collateral agent of the Moving Defendants. The Moving Defendants argue in their Motion that Augenbaum's allegations that they engaged in parallel conduct with respect to this transaction and appointed a "lead draftsperson" do not raise a plausible inference of a "group." (Brief at 14.)

The Moving Defendants rely on Litzler, to support their position. In Litzler, the court held at the summary judgment stage that a collective of shareholders did not constitute a "group" for purposes of imposing Section 16(b) liability. See Litzler, 411 F. Supp. 2d at 416. In making that determination, the court considered that the defendants acted through a common lawyer but were each represented by separate counsel who made their decisions separately, and that there was "no

18

evidence of communications among the parties following the closing of the first traunch [sic]." Id. at 415. It also considered that the realities of a private placement "require[d] a single set of documents equally affecting all investors." Id.; see also Greenberg, 2015 WL 2212215, at *6 ("The use of a single document in a private placement is not unusual, and courts have routinely rejected the argument that transaction documents granting investors parallel rights and obligations create an inference that a shareholder group was formed.").[6]

Further, in Litzler, the court determined there was no prior history or relationship that could suggest group activity. The court noted that "[p]rivate offerings of securities generally involve common purchase agreements with subscribers." Litzler, 411 F. Supp. 2d at 416. And that the use of a lead draftsman was not dispositive of group membership. See id. Though Augenbaum seeks to distinguish Litzler by arguing that the case was at the summary judgment stage with the benefit of discovery and imposing a stricter

---

[6] Augenbaum argues that Greenberg, which the Moving Defendants cite, is inapposite because there, the court found that a group had been properly alleged based on pre-existing transactions and relationships among the defendants and not based on subsequent concerted activities, following the relevant transaction. (See Opp. at 8.) Augenbaum asserts in his Opposition brief that here, "Anson, Brio, and Iroquois negotiat[ed] the repricing of the Previously Issued Warrants." (Id.) However, the Court notes that the Complaint does not allege that these three entities "negotiated" together.

standard for group membership than at a motion to dismiss stage, Litzler nonetheless provides guidance in dicta for a motion to dismiss, noting that "[g]eneral allegations of parallel investments by institutional investors do not suffice to plead a 'group.'" Id. (citing Log On Am., 223 F. Supp. 2d at 449).

The Court is persuaded that the parallel investments made pursuant to a typical securities purchase agreement, along with the involvement of a single lead investor are not sufficient to raise a plausible inference that a group was formed. Though Augenbaum alleges that the March 2020 SPA was negotiated by a single, lead investor, Anson, such an allegation does not give rise to a Section 13(d) group. In Litzler, the single negotiator was a lawyer appointed by the defendants to negotiate on their behalf "because the circumstances of a private placement require a single set of documents equally affecting all investors," which was not sufficient to establish a group. Id. at 415. The Litzler court noted the SEC's policy rationale that "sound business considerations such as cost savings" could result in "cooperative activity characteristic of an institutional placement" and that "[m]ore than such cooperative activity has to be alleged and proved to show that the investors were motivated by a desire to affect control, or by some other

20

indicia of concerted activity." Id. (internal quotation marks and citation omitted).

Augenbaum seeks to also distinguish Litzler by noting that the activities in Litzler were conducted individually with "no evidence of communications" among the parties following closing. (Opp. at 7 (citing Litzler, 411 F. Supp. 2d at 415-16).) As explained in the following sections, the Court is not persuaded that Augenbaum has offered sufficient allegations of communications or other "group activity," Litzler, 411 F. Supp. 2d at 416, among the Moving Defendants after the closing of the March transactions that would give rise to a plausible inference that the alleged group conducted its activities together, and not individually.[7]

Augenbaum instead relies on this Court's decision in Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC in support of his contention that he properly alleged a group. See No. 99 Civ. 2821, 2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ("Schaffer III"). Augenbaum argues that Schaffer III, which Litzler also cites, is on point because this Court found

---

[7] The Moving Defendants note that under the terms of the SPA, each of the Moving Defendants "independently participated in the negotiation of the transaction . . . with the advice of its own counsel and advisors." (Dkt. No. 96-1 at 51.) However, while the Court may acknowledge that the March 2020 SPA contained that provision, it may not, at this stage, rely on that provision "to prove the truth of their contents" -- that the Moving Defendants in fact acted with the advice of independent counsel. Roth, 489 F.3d at 509.

a group where the members engaged in "concerted activity . . . over an extensive period of months and through a number of transactions." (Opp. at 7 (citing Litzler, 411 F. Supp. 2d at 416 (distinguishing Schaffer III, 2002 WL 31869391)).)

However, prior to Schaffer III, this Court held, in addressing the first motion to dismiss, that the plaintiff failed to plausibly allege a group as she had "advance[d] no allegations of interrelationships, contracts, alliances, meetings, agreements, coordinated activity, or understandings between or among any of the defendants regarding the conversion of preferred shares, the sale of common stock upon conversion or any other issue." Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC, 115 F. Supp. 2d 440, 443-44 (S.D.N.Y. 2000) (Marrero, J.) ("Schaffer I").

In her amended complaint, the plaintiff in Schaffer cured the deficiencies by alleging coordinated activity or concerted actions towards the goals of "acquir[ing], hold[ing], and dispos[ing] of equity securities issued by the [issuer c]ompany." Schaffer v. CC Investments, LDC, 153 F. Supp. 2d 484, 488 (S.D.N.Y. 2001) ("Schaffer II"). The amended complaint alleged for example, that "all of the defendants acted together" for the purposes of the above goals, and "as a group, negotiated for, and received a put option to sell 351 preferred shares to the Company at a premium of 20%." Id.

The group also "agreed collectively to a damages provision which allowed the defendants to allocate any damages payments from the Company among themselves and anticipated that the parties would negotiate with Lasersight as a group." Id. Thus, the amended allegations in Schaffer II, set forth well-pleaded allegations of concerted activity that would give rise to a group. Such allegations of "act[ing] together," id., or collective agreement, written or otherwise, are missing from Augenbaum's Complaint here.

### 3.   Voting and Lock-Up Agreements

As further support for the notion that the Moving Defendants constitute a group, Augenbaum alleges that the Moving Defendants were the intended third-party beneficiaries of the Voting and Lock-Up Agreements[8] which were condition precedents to the Moving Defendants purchasing the Convertible Notes. The Moving Defendants contend that Augenbaum has failed to create a plausible inference of group activity because the Moving Defendants were not parties to these agreements. The only parties to both agreements were Genius and the Principal Stockholders, who are not defendants in the present action.

---

[8] The Voting Agreement here would "allow[] for the reduced conversion and exercise prices with respect to the Convertible Notes and Warrants." (Compl. ¶ 32.) The Lock-Up Agreement sought to prohibit the sale of shares by the Principal Stockholders until June 2021.

Augenbaum argues that the Moving Defendants being non-parties to the agreements does not dismantle the "group" allegation as concerted activity "need not be expressly memorialized in writing." Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982). He contends that the Moving Defendants' obligation to purchase the Convertible Notes was conditioned upon the Voting Agreement requiring the Principal Stockholders to vote for Stockholder Approval, which created the reasonable inference of "an informal agreement among the [Moving] Defendants to also vote for Shareholder Approval." (Opp. at 10.)

In Dickinson, which Augenbaum cites to support the proposition that an agreement need not be in writing, the Second Circuit discerned, even absent a formal or informal agreement, other factors relevant to determining whether a group was formed.[9] See Dickinson, 682 F.2d at 364-65. Those factors included representations made by the defendant and his representatives to potential purchasers concerning the availability of control shares, communications between the defendant and other alleged group members about finding a corporation that would buy their shares, the defendant

---

[9] The Court notes that the procedural posture of Dickinson was not appellate review of a motion to dismiss, but rather appellate review after a bench trial that consolidated seven actions for alleged violations of the Exchange Act and various state laws and therefore had the benefit of witness testimony. See Dickinson, 682 F.2d at 356, 364-65.

soliciting one of the group members to assist his search for a buyer, and the alleged group member agreeing to join the defendant's "effort to interest a corporate purchaser in a takeover or partial takeover" of the company. Id.

Thus, the proposition that concerted activity need not be memorialized in writing suggests that something more is required than merely Augenbaum's allegations that the Moving Defendants were purported third-party beneficiaries of the Voting and Lock-Up Agreements. Allegations of express representations, communications, or solicitations between and among the Moving Defendants, even alleged on information and belief, are absent from this case. The Court is not persuaded that being third-party beneficiaries to an agreement is the kind of unwritten "concerted activity" that was contemplated by the Dickinson court's discussion.

As the Moving Defendants point out, there have not been any decisions that found the existence of a group based on the third-party beneficiary status of the defendants. The Moving Defendants cite Chechele v. Scheetz in which the court determined that the existence of a registration rights agreement to which the alleged members were not parties could "hardly form the basis for Section 16(b) liability." 819 F. Supp. 2d 342, 349 (S.D.N.Y. 2011), aff'd, 466 F. App'x 39 (2d Cir. 2012). In rebuttal, Augenbaum argues that Scheetz is

inapposite because it "did not involve a non-public offering of securities implicating Rule 13d-5(b)(2)," which the Court notes does not apply here, and it "involved '[b]are allegations that an unspecified number of parties entered an unspecified agreement at an unspecified time or times.'" (Opp. at 9 (citing Scheetz, 819 F. Supp. 2d at 350).)

The Court finds that the type of offering, non-public or otherwise, is immaterial to determining whether a group is adequately pled in this case. Thus, Augenbaum's reliance on Scheetz's distinct facts is unpersuasive. While the Court agrees with Augenbaum that the group allegations in Scheetz are more tenuous than the allegations at issue here, the Court here is reluctant to find that being non-signatories to an agreement, without more, gives rise to a group under any pleading standard.

Further, taking as true that the Moving Defendants were third-party beneficiaries, Augenbaum has not alleged that any communications or interactions among the Moving Defendants took place that would plausibly show concerted or coordinated activity. Thus, Augenbaum fails to create a reasonable inference that the Moving Defendants *combined* to become third-party beneficiaries to these agreements for the purpose of acquiring, holding, or disposing of the Company's common stock.

In cases where the alleged group members were parties to such agreements, courts have often determined that even being a party to a voting agreement or lock-up agreement did not categorically give rise to a group. The Moving Defendants argue that they were not parties to the Lock-Up Agreement and rely on the Second Circuit decision in Lowinger v. Morgan Stanley & Co. LLC in which the court declined to find that allegations that the defendants entered into a lock-up agreement sufficed to support a finding of a group. 841 F.3d 122, 130 (2d Cir. 2016). Likewise, in Scheetz, though the alleged members were parties to the lock-up agreements, they entered into separate lock-up agreements which, standing alone, was "not enough to allege the existence of a shareholder group." Scheetz, 819 F. Supp. 2d at 349; see also In re Facebook, Inc., IPO Sec. & Derivative Litig., 986 F. Supp. 2d 544, 553 (S.D.N.Y. 2014), aff'd sub nom. Lowinger, 841 F.3d 122 ("Because lock-up agreements are standard industry practice and can join groups with divergent interests, as here, the Second Circuit has determined that the existence of a lock-up agreement, 'standing alone,' is insufficient to establish a Section 16(b) group."). Instead, the "plausibility of a group inference based on the Lock-Up Agreements stands and falls with the factual content of the supporting allegations." Scheetz, 819 F. Supp. 2d at 349.

Augenbaum relies on the Second Circuit decision in Morales, contending that lock-up agreements can form a stand-alone basis for alleging a Section 13(d) group. (See Opp. at 11.) Augenbaum argues that in Morales, the Second Circuit determined that "it is 'reasonable to infer' that being parties to a lock-up agreement 'may bear upon the continued existence of a concerted agreement[.]'" (Id. (citing Morales, 249 F.3d at 127).) He further relies on the SEC's amicus brief in Morales for its discussion on lock-up agreements. There, the SEC posited that situations may exist in which "a lock-up agreement might constitute an agreement by a group of shareholders to act together for the purposes of acquiring, holding, or disposing of securities." (Opp. at 12 (citing "SEC Morales Amicus," Dkt. No. 73-1 at 26-27) (internal quotation marks omitted).) Those situations where a lock-up agreement may be sufficient include when it is "entered into by an issuer and a group of shareholders . . . to support the price of securities by keeping stock off the market at a time when positive information about the issuer is circulating in the media" in order to benefit both parties to the transaction. (Id. (citing SEC Morales Amicus at 26-27).) Augenbaum contends that the situation contemplated by the SEC is what transpired here.

28

The Moving Defendants distinguish Morales on the grounds that the court there did not rely solely on the lock-up agreement in finding a Section 13(d) group and instead looked to "other evidence in the record" in support of its conclusion. (Reply at 7.) This "other evidence" that the Morales court considered includes SEC filings that indicated that the shareholders in the alleged group deposited their holdings on the same day "in identical trusts all naming the same person as trustee" and that the company "redeemed the holdings of all three shareholders together" on the same day. Morales, 249 F.3d at 127. The Moving Defendants also argue that the SEC Morales Amicus has no bearing on the issue because the SEC hypothesized a lock-up agreement that would give rise to group liability where the parties to the agreement included the alleged group itself. In the instant case, the Moving Defendants argue, and the Court agrees, that the alleged group was not in fact a party to the lock-up agreement, rendering reliance on the SEC's contemplated situation misplaced.

Augenbaum further contends that the Lock-Up Agreement at issue did not actually "stand alone" because it "was executed contemporaneously with the Voting Agreement [] which was then followed by the Waiver Agreement, the Conversion Agreement and the Leak-Out Agreement." (Opp. at 13.) However, the Court is not moved that these agreements -- two of which the Moving

Defendants were not parties to and the remainder of which
were executed separately without any allegation otherwise of
joint cooperation, communication, or coordination -- suffice
to constitute a group. The case law relied upon by the parties
establish that while ordinary lock-up agreements on their own
may not necessarily give rise to a reasonable inference of a
group, if bolstered by supporting allegations, a court could
find group liability. As the Court described above, these
allegations can be that the Moving Defendants combined in
some way, through communications, representations,
discussions, meetings, and other such conduct. But as alleged,
Augenbaum has not provided the factual support that would
raise a reasonable inference of a group to survive a motion
to dismiss.

     4.   <u>May 2020 Waiver and Consent Agreement and June 2020
Conversion and Leak-Out Agreements</u>

The Moving Defendants also argue that the Waiver and
Consent Agreement, entered into in May 2020, and the
Conversion and Leak-Out Agreements, entered into on June 23,
2020, do not support the existence of a group because they do
not raise an inference that the Moving Defendants combined
"in furtherance of a common objective." (Brief at 19.) They
argue that "those agreements were requested by the Company,
for the benefit of the Company, and were separately executed

in parallel by and between the Company, on the one hand, and each individual Moving Defendant," thereby failing to raise a plausible inference of a group. (Id.)

Augenbaum counters that even if the Waiver and Consent Agreement and the Conversion Agreement are "not directly related to a common objective of selling or holding Common Stock, [they] 'could . . . shed light backwards in time on the unity of purpose of the investors . . . .'" (Opp. at 15 (citing Morales, 249 F.3d at 127).)

The Court does not hold to be true, for resolving this Motion, that the agreements were in fact requested by Genius for its own benefit. See Roth, 489 F.3d at 509. However, the Court acknowledges that the agreements contained such a provision and that they were in fact executed separately between Genius and each individual Moving Defendant. Nevertheless, the Court finds that without more, such as allegations of cooperation, communication, or meetings regarding these transactions, these agreements do not give rise to a group. See Greenberg, 2015 WL 2212215, at *6 (noting that transaction documents "provide little support" that a shareholder group was formed).

The Court now turns to the Leak-Out Agreement. The Moving Defendants cite Lowinger to argue that the Leak-Out Agreement here should be treated similarly to Lowinger's treatment of

lock-up agreements. A leak-out agreement seeks to limit the sale of shares, while a lock-out agreement prohibits the sale of shares for a certain period of time. The Moving Defendants reason that the Leak-Out Agreement here "helped to maintain 'an orderly market free of the danger of large sales of pre-owned shares'" like the lock-up agreements discussed in Lowinger. (Brief at 20 (citing Lowinger, 841 F.3d at 131).) The Lowinger court, relying on an amicus brief filed by the SEC, noted that "ordinary lock-up agreements do not implicate the purposes of Section 13(d) and its definition of a 'group.'" (Id. at 21 (citing Lowinger, 841 F.3d at 132).) Augenbaum offers in rebuttal that Lowinger is distinguishable because it involved pertained to an ordinary lock-up agreement with underwriters in the context of an initial public offering whereas this action involves neither an underwriter nor a public offering.

The Court is not persuaded that the Leak-Out Agreement here is exceptional to the point that the analysis of the lock-out agreement in Lowinger would not apply. Augenbaum has not identified "atypical language" in the agreement or allegations of coordination that would warrant the Leak-Out Agreement to be analyzed with greater scrutiny.

Augenbaum further counters that signing parallel copies of the Leak-Out Agreement rather than a master document

together does not defeat an allegation of a group. Citing <u>SEC v. Savoy Indus. Inc.</u>, Augenbaum contends that such an argument would otherwise "exalt form over substance, as group disclosure under section 13(d)(3) would then hinge on the degree of formality of the arrangement." (Opp. at 14 (citing <u>SEC v. Savoy Indus. Inc.</u>, 587 F.2d 1149, 1163 (D.C. Cir. 1978)) (internal quotation marks omitted).) The Court finds that Augenbaum's interpretation is not consistent with the D.C. Circuit court's understanding. In <u>Savoy</u>, the court did not require a formal contract involving an "offer" and "acceptance" to find an agreement among alleged group members. 587 F.2d at 1163. Rather, it contemplated that "sufficient direct or circumstantial evidence [could] support the inference of a formal or informal agreement or understanding." <u>Id.</u> There, the court considered the relationship between the alleged group members, instances of solicitations to purchase shares, discussions regarding changes of leadership in the company, meetings with alleged group members in attendance, and the direct involvement of one of the *alleged* group members with a *reported* group member. <u>See</u> <u>id.</u> at 1164-65. Signing parallel agreements with no facts supporting that the alleged group members interacted in any way is likely not within the range of conduct that could "support the inference of a formal or informal agreement or understanding" of the alleged group.

Id. at 1163. Accordingly, the Court finds that the above agreements do not give rise to a group within the meaning of Section 13(d).

B.    MATCHING PURCHASES AND SALES

The Moving Defendants argue that Augenbaum failed to allege matching purchases and sales as required under Section 16(b). To assert a Section 16(b) violation, Augenbaum must allege that the Moving Defendants were statutory insiders at the time of the relevant purchase and sale. See 15 U.S.C. § 78p(b) (stating that "[t]his subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved"); see also Foremost-McKesson, 423 U.S. at 249-50 (holding that "in a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner 'before the purchase'").

As the Court has already determined that Augenbaum failed to plausibly allege a group for purposes of Section 16(b) liability, it declines to address whether a matching purchase and sale has been alleged. To do so would be a futile exercise as it hinges on when exactly a group that is deemed to have acquired beneficial ownership arose. Accordingly, the Court does not address this issue.

C.    <u>SEC PROPOSED REGULATIONS</u>

Lastly, the Court turns to Augenbaum's argument that the SEC's commentary on its proposed regulations "to amend certain rules that govern beneficial ownership reporting" applies. <u>See</u> Modernization of Beneficial Ownership Reporting, 87 Fed. Reg. 13846 (proposed Mar. 10, 2022) (to be codified at 17 C.F.R. pts. 232, 240); (<u>see also</u> "SEC Proposed Rules," Dkt. No. 60-1.) The SEC proffers commentary to the proposed regulations, clarifying the contours of "group" membership within the meaning of Section 13(d)(3). Specifically, the SEC explains that "[u]nder a plain reading of Section[] 13(d)(3)[,] . . . an agreement is not a necessary element of group formation." (SEC Proposed Rules at 73.) Instead, the SEC sets forth that "[w]hether or not a group exists is dependent upon the facts and circumstances." (<u>Id.</u> at 76.) It continues that "the Commission has relied upon circumstantial evidence instead of an agreement to establish that two or more persons combined in furtherance of a common objective." (<u>Id.</u>) Augenbaum argues that the SEC's stated position is entitled to deference as it involves the proper statutory interpretation of Section 13(d)(3), while the Moving Defendants contend the opposite.

Here, the Court finds that it need not decide the issue of the deference that it should accord the SEC's commentary.

Under either formulation -- whether an agreement is required or not -- the Court finds that Augenbaum has failed to plausibly allege the existence of a group. Even if the lack of an agreement, formal or otherwise, were not fatal to the existence of a group, "the facts and circumstances" here still do not raise a plausible inference that a group was formed. (Id.)

In the commentary, the SEC cites several cases as examples of circumstantial evidence beyond a formal or informal agreement supporting the existence of a group. For example, the SEC cites Fin. Gen. Bankshares, Inc. v. Lance in which the court found a group based on facts showing that the defendants had a common purpose with respect to the company shares held. See No. 78 Civ. 276, 1978 WL 1082, at *9 (D.D.C. Apr. 27, 1978). Examples of circumstantial evidence the Lance court relied upon included the alleged group member defendants' dissatisfaction with the management of the company at issue, meetings attended by the defendants, solicitations by some of the alleged group members for an increase in a percentage of stock, and representations by one of the defendants regarding the group of investors on whose behalf he was speaking. Id. at *10. In Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., which the SEC also cites in its commentary, the Second Circuit affirmed a

district court's ruling that the circumstantial evidence pointed to the existence of a group. See 286 F.3d 613, 618 (2d Cir. 2002). The Second Circuit noted that the district court considered, among other things, prior relationships between the defendants, trading patterns, discussions between the defendants, "evidence of a viable exit strategy for the investment, and evidence whether [the defendant] had a particular *modus operandi*." Id.

The SEC also cited a case in which it too relied upon circumstantial evidence rather than an agreement to argue the existence of a group. (SEC Proposed Rules at 76.) In S.E.C. v. Levy, the SEC alleged group membership based on circumstantial facts, including that the defendant introduced other alleged group members to his account executives after they expressed an interest in purchasing the stocks at issue, the defendant discussed his plans regarding the company with the alleged group members, and the defendant made representations regarding group membership to company executives. See 706 F. Supp. 61, 70 (D.D.C. 1989).

As the Court has laid out above, Augenbaum has failed to allege sufficient circumstantial evidence, such as non-conclusory facts of communications, discussions, alliances, or meetings, that would demonstrate that "two or more persons *combined* in furtherance of a common objective." (SEC Proposed

37

Rules at 76); see also Dickinson, 682 F.2d at 363. Augenbaum seems to want the Court to read between the lines to infer that a group exists, but the gaps between the lines are so wide that without even a single thread connecting them, the Court cannot find that Augenbaum has plausibly pleaded the existence of a "group" comprised of all the Moving Defendants, subject to Section 16(b) liability. The Court, however, grants Augenbaum leave to amend the Complaint in order to provide him the opportunity to cure the defects in his Complaint. Accordingly, the Court grants the Moving Defendants' Motion to Dismiss without prejudice and with leave to amend.

## IV.   ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 77) of defendants Anson Investments Master Fund LP, Brio Capital Master Fund Ltd., Brio Select Opportunities Fund, LP, CVI Investments, Inc., Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, Iroquois Master Fund, Ltd., Iroquois Capital Investment Group, LLC, L1 Capital Global Opportunities Master Fund, M3A LP, and Richard Molinsky to dismiss the Complaint (Dkt. No. 1) filed by plaintiff Todd Augenbaum ("Augenbaum") pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure is **GRANTED** in its entirety without prejudice and with leave to amend; and it is further

**ORDERED** that Augenbaum shall have twenty (20) days of the date of entry of this Order to file an amended complaint.

The Court respectfully directs the Clerk of Court to terminate the pending motion at Dkt. No. 77.


**SO ORDERED.**

Dated:    30 March 2023
          New York, New York

                                        _____
                                        Victor Marrero
                                             U.S.D.J.