**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

Plaintiff,

v.

ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY; and GENIUS BRANDS INTERNATIONAL, INC.,

Defendants.

Civil Action No. 1:22-cv-00249-VM

**AMENDED COMPLAINT**

Plaintiff Todd Augenbaum, by his attorneys, alleges based upon knowledge with respect to facts relating to himself and upon information and belief with respect to all other allegations herein as follows:

## INTRODUCTION

1. In 2013, Genius Brands International, Inc. ("Genius Brands," "GBI" or the "Company") acquired A Squared Entertainment LLC ("A Squared"), a company controlled by Andy Heyward ("Heyward"), an experienced media executive, through a merger (the "Merger"). The terms of the Merger provided for Heyward to become the Chief Executive Officer ("CEO") and a major shareholder of GBI through A Squared.

2. The Company's stated business goal was to create enriching children's programming. Development costs for that programming, however, substantially exceeded GBI's

relatively small operating revenues, causing the Company to suffer continual and growing multi-million-dollar annual losses and cash flow shortfalls.

3. Genius Brands, as a result, worked closely with Special Equities Group LLC ("Special Equities" or "SEG") to fund its operations through a series of private securities offerings over the course of several years. The investors purchasing those securities were investment funds and private investors who were repeat players that had previously invested in a cooperative fashion in prior securities offerings managed by SEG.

4. In August 2019, Genius Brands sought to engage in a more traditional public offering of securities. However, notwithstanding the registration statement for that offering being declared effective by the Securities and Exchange Commission ("SEC"), GBI was unable to complete, and ultimately was forced to withdraw, the offering. This development caused the Company to be teetering on the edge of insolvency, unable to make timely payment on senior notes it had issued and threatening the need for a bankruptcy filing absent new funding.

5. GBI noteholders began to coalesce into separate groups or alliances to protect their interests in their dealings and negotiations with the Company relating to the respective senior securities they owned. In March 2020, the Company's major shareholders joined together in a plan to provide new funding to GBI preventing a bankruptcy filing while preserving or enhancing the value of the Company's securities they already owned and allowing them to profit from the purchase of new securities issued by GBI.

6. The plan was crafted through Special Equities and involved one alliance or group (defined below as the "Buyers Group" or the "Buyers") of the Company's shareholders acting to provide new funding to GBI by jointly purchasing newly issued secured convertible notes and warrants convertible into the Company's common stock (the "Common Stock") with another

group or alliance of shareholders (defined below in ¶58 as the "Holders Group") agreeing to hold and vote the Common Stock they beneficially owned for the purpose of enabling the Buyers Group to profitably sell the Common Stock underlying the secured convertible notes and warrants.

7. These arrangements and agreements among the members of the Buyers Group, and between the Buyers Group and the Holders Group, succeeded in enabling each of the Buyers to profitably sell tens of millions of shares of Common Stock purchased for prices as low as $0.21 per share for over $1.00 per share. At times, the Buyers were able to sell Common Stock for prices exceeding $2.00 per share based upon yet another new agreement made for the purpose of holding, selling and allocating the number of shares of Common Stock each member of the Buyers Group was permitted to sell on any one day – or, put another way, an agreement relating to the holding and disposing of the Common Stock.

8. At all relevant times, the Buyers Group acted together for the purpose of acquiring, holding, voting or disposing of equity securities issued by the Company thereby creating a group within the meaning of Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78m(d). The Buyers Group's joint actions were facilitated by, among other things: (a) prior alliances among members of the Buyers Group relating to the purchase and sales of their Genius Brand securities; (b) the members of the Buyers Group being longstanding clients of SEG; and (c) the joint desire of the Buyers Group and the Holders Group to preserve and profit from the GBI securities they already owned; and (d) Heyward individually and through A Squared being a member of both the Buyers Group and the Holders Group, enabling him to separately profit by insuring that the Company was able to continue paying him or A Squared substantial fees in connection with program production.

9. Defendants' profitable purchases and sales (or sales and purchases) of Common Stock therefore were made within a six-month period while Defendants were each beneficial owners of 10% or more of the Common Stock, triggering liability under Section 16(b) of the Exchange Act, 15 U.S.C. §78p(b), for short-swing insider trading profits. Plaintiff is bringing this action to cause Defendants to disgorge those short-swing profits as required by Section 16(b).

**PARTIES**

10. Plaintiff Todd Augenbaum, a shareholder of Genius Brands, made a demand (the "Demand") on the Company and its board of directors (the "Board"), as required by Section 16(b), more than sixty days ago, which the Board refused to act upon.

11. (a) Defendant Anson Investments Master Fund LP ("Anson Investments") maintains its offices at Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands.

(b) Anson Advisors Inc. and Anson Funds Management LP (with Anson Investments, "Anson"), are the co-investment advisers for Anson Investments, holding voting and dispositive power over the securities held by Anson Investments, and maintain offices at 155 University Ave, Suite 207, Toronto, ON, M5H 3B7, and 16000 Dallas Parkway, Suite 800, Dallas, TX 75248, respectively.

12. (a) Defendant Brio Capital Master Fund Ltd. ("Brio Master") maintains its offices at 100 Merrick Road, Suite 401 W. Rockville Centre, NY 11570.

(b) Defendant Brio Select Opportunities Fund, LP ("Brio Select" and with Brio Master "Brio") maintains its offices at 100 Merrick Road Suite 401 W. Rockville Centre, NY 11570.

(c) Shaye Hirsch is identified in the Company's SEC filings as having voting and dispositive power over the shares held by both Brio Select and Brio Capital.

13. Defendant CVI Investments, Inc. ("CVI") maintains an address care of Heights Capital Management, 101 California St., Suite 3250, San Francisco, CA 94111.

14. (a) Defendant Empery Asset Master, LTD. ("EAM") maintains an address care of Empery Asset Management, LP, 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(b) Defendant Empery Debt Opportunity Fund, LP ("EDOF") maintains its offices care of Empery Asset Management, LP, 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(c) Defendant Empery Tax Efficient, LP ("ETE" and with EAM and EDOF the "Empery Funds") maintains its offices care of Empery Asset Management, LP, 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(d) Empery Asset Management, LP (with the Empery Funds, "Empery") maintains its offices at 1 Rockefeller Plaza, Suite 1205, New York, NY 10020 and is the authorized agent of the Empery Funds having discretionary authority to vote and dispose of the shares held by the Empery Funds and may be deemed to be the beneficial owner of shares owned by the Empery Funds.

15. (a) Defendant Iroquois Master Fund Ltd. ("Iroquois Master") maintains its offices at 601 Lexington Avenue, New York, New York 10022.

(b) Defendant Iroquois Capital Investment Group LLC ("Iroquois Capital" and with Iroquois Master "Iroquois") maintains its offices at 601 Lexington Avenue, New York, New York 10022.

(c) Richard Abbe and Kimberly Page have the sole authority and responsibility for the investments made on behalf of Iroquois as its managing members.

16. Defendant L1 Capital Global Opportunities Master Fund ("L1 Capital") maintains its offices at 161A Shedden Road, 1 Artillery Court, PO Box 10085, Grand Cayman, Cayman Islands KY1-1001.

17. Defendant M3A LP ("M3A") maintains its offices care of 3i Management LLC, 140 Broadway, 38th Floor, New York, NY 10005.

18. Defendant Richard Molinsky ("Molinsky") maintains an address at 52 Lords Hwy East, Weston, CT 06883. Molinsky is the subject of a May 5, 2003 Order entered by the SEC finding that he engaged in fraudulent sales practices including participating in schemes to support or increase the prices of securities through fraudulent and manipulative means, and imposing sanctions on Molinsky.

19. Anson, Brio, CVI, the Empery Funds, Iroquois, L1 Capital, M3A and Molinsky are collectively referred to herein as "Defendants" and together with Heyward as the "Buyers Group" and each individually as "Buyer." Defendants are either individual investors or investment funds, none of whom are registered with or subject to regulation by the SEC as broker-dealers.

20. Defendant Genius Brands is a corporation formed under the laws of the State of Nevada which maintains its principal offices at 190 N. Cannon Drive, 4th Fl., Beverly Hills, California 90210. The Common Stock is registered with the SEC pursuant to Section 12(g) of the Exchange Act and trades under the ticker symbol "GNUS" on The Nasdaq Capital Market ("NASDAQ").

21. No claims are brought against the Company, but Genius Brands is a necessary party because Plaintiff is bringing this action to obtain a recovery for the Company. In addition, no

claims are being asserted against Heyward because as an officer and director of GBI, his transactions with the Company are subject to the exemption from liability contained in SEC Rule 16b-3, 17 C.F.R. §240.16b-3.

## JURISDICTION AND VENUE

22. Jurisdiction of this Court is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa. Venue is properly laid in this District because several Defendants are in this District, several Defendants transact business in this District, and a March 11, 2020 Securities Purchase Agreement to which the Buyers are parties contains a choice of forum provision for any dispute in connection therewith to be brought in this District.

## SUBSTANTIVE ALLEGATIONS

### Genius Brands

23. Genius Brands, originally known as Pacific Entertainment Corporation, became a publicly traded company in 2009. In 2011, Pacific Entertainment Corporation changed its corporate name to Genius Brands International, Inc. in advance of the Merger with A Squared, a multimedia and entertainment company controlled by Heyward, who became the Company's CEO at the closing of the Merger. The stated business of GBI was to create, produce and distribute original "content with a purpose" for kids providing enrichment as well as entertainment.

24. A Squared had previously been formed by Heyward and his then-wife in 2009 as an animation company which had an initial four-show celebrity-inspired cartoon slate initially planned as webisodes which then switched to a TV format of thirteen 22-minute shows. The slate consisted of *The Secret Millionaires Club*, *Gigi & The Green Team*, *Little Martha*, and *Kosmos*, which were respectively inspired by Warren Buffett, Gisele Bundchen, Martha Stewart and the late Carl Sagan.

25. The Company assumed the interest in Stan Lee Comics, LLC, previously held by A Squared and, in April 2014, the Company launched a *Baby Genius* subscription video on demand service which, in June 2014, was licensed to LeapFrog Enterprises ("LeapFrog"), along with *Secret Millionaires Club* and *Thomas Edison's Secret Lab*, two of the Company's shows, which were added to LeapFrog's library for its kids' learning tablets.

**The Company's Operating Losses Require Multiple Rounds of Financing**

26. The Company was incurring significant losses with a monthly "burn rate", or expected cash outflow, for fixed general and administrative costs (including all employee salaries, public company expenses and consultants), marketing and sales costs, and interest costs of approximately $325,000 during each month of the first quarter 2014. The Company's burn rate continued to grow as GBI sought to produce more programming while also requiring it to pay Heyward his related production fees.

27. On or about May 14, 2014, to fund its operations, Genius Brands sold 6,000 shares of the Company's newly designated Series A Convertible Preferred Stock (the "Preferred Stock") for $1,000 per share, with GBI receiving net proceeds of approximately $5,465,000. The Preferred Stock was initially convertible into Common Stock at a price of $2.00 per share but contained a most-favored-nations provision in the event the Company issued shares of Common Stock or their equivalents at a price per share lower than $2.00, subject to certain exceptions.

28. Special Equities, which at the time was a division of Chardan Capital Markets LLC ("Chardan"), acted as the placement agent for the Preferred Stock's sale. The investors purchasing the Preferred Stock, including Brio, Iroquois Master Fund and Molinsky, had prior relationships and business dealings with SEG as they pursued a common strategy of regularly purchasing senior securities in poorly funded microcap publicly traded companies. For example, each was party to a Share Exchange Agreement dated as of September 29, 2010, by and among The Empire Sports

& Entertainment Holdings Co., The Empire Sports & Entertainment, Co., and the certain shareholders of The Empire Sports & Entertainment, Co.;[1] Brio, Iroquois Master, and SEG were identified as Selling Stockholders in a Form S-1 filed by Myos Corporation on August 6, 2012;[2] Brio, Iroquois Master, and SEG were identified as Selling Stockholders in a Form S-3 filed by Document Security Systems, Inc. on October 11, 2013;[3] and, Brio and SEG were identified as Selling Stockholders in a Form S-1 filed by Profire Energy on December 24, 2013.[4] The investors purchasing the Preferred Stock also had prior overlap in investing in private placements in relatively small companies, as evidenced by a March 20, 2014, Form S-1 showing that Anson, Brio, CVI, Empery, and Iroquois all invested in a 2014 private placement with respect to LabStyle Innovations Corp[5] and a prospectus showing each of them was a selling stockholder with respect to securities of Real Goods Solar, Inc., dated August 12, 2014.[6]

29. On or about October 29, 2015, the Company sold an aggregate of 4,330,000 shares of Common Stock and warrants (the "2015 Warrants") to purchase up to an aggregate of 4,330,000 shares of Common Stock for a purchase price of $1.00 per share for gross proceeds of $4,330,000. Special Equities again acted as placement with Defendants contributing $1,575,000, or more than

---

[1] *Available at* https://www.sec.gov/Archives/edgar/data/1432196/000114420410052514/v198113_ex2-1.htm.

[2] *Available at* https://www.sec.gov/Archives/edgar/data/1402479/000121390012004209/fs12012_myos.htm.

[3] *Available at* https://www.sec.gov/Archives/edgar/data/771999/000114420413054979/v357121_s3.htm.

[4] *Available at* https://www.sec.gov/Archives/edgar/data/1289636/000103883813000415/s1.htm.

[5] *Available at* https://www.sec.gov/Archives/edgar/data/1533998/000114420414016910/v371389_s1.htm.

[6] *Available at* https://www.sec.gov/Archives/edgar/data/1425565/000119312514305403/d771137d424b3.htm.

35% of that funding round, through the following purchases: Anson, $350,000; Brio, $350,000; CVI, $200,000: Empery, $300,000; Iroquois, $325,000 (including $50,000 by American Capital Management); and Molinsky, $50,000.

30. Fiscal year 2016 proved even more challenging than 2015, with the Company reporting only $866,875 in operating revenues, compared to total expenses of $7,331,736, producing a reported loss from operations of $6,464,861.

31. On or about November 7, 2016, GBI effected a one-for-three reverse stock split in connection with its forthcoming anticipated move from the less liquid over the counter ("OTC") exchange to the ranks of widely traded stocks on NASDAQ.

32. On February 9, 2017, the Company entered into a warrant exercise agreement with persons holding the 2015 Warrants to purchase 1,443,334 shares of Common Stock at $3.30 per share, to exercise the Original Warrants in full, and to receive from Genius new warrants (the "February 2017 Warrants"), with the 2017 Warrants having financial terms identical to those of the 2015 Warrants and an additional 371,699 warrants having an exercise price of $5.30 per share of Common Stock. Genius Brands, through those transactions received net proceeds of $3,401,924, with Special Equities, through Chardan, acting as the Company's financial advisor and receiving $363,617.

33. On October 3, 2017, Genius Brands sold 1,647,691 shares of Common Stock at $3.90 per share with the investors purchasing those shares receiving an equal number of warrants (the "October 2017 Warrants") to purchase Common Stock at $3.90 per share. Defendants purchased 1,375,191 of those shares of Common Stock, or more than 80% of that offering, as follows: Molinsky, 15,000 shares; Anson, 500,000 shares; CVI, 200,000 shares; Iroquois Master, 180,191 shares; Iroquois Capital, 30,000 shares; Empery, 300,000 shares; and Brio, 150,000

shares. Special Equities, through Chardan, once again, acted as the Company's placement agent, with the Company receiving net proceeds of $5,699,534 and Chardan receiving a fee equal to 9.0% of the gross proceeds of $6,425,995 or over $578,000.

34. On or about January 10, 2018, GBI sold approximately 592,000 shares of Common Stock at a per share price of $3.00 and warrants to purchase approximately 592,000 shares of Common Stock at $3.00 per share for total proceeds of approximately $1,776,000. Defendants purchased 495,000 of the shares of Common Stock and warrants for a total of $1,485,000, or approximately 83% of the total purchases, as follows: Brio $300,000 for 100,000 shares and 100,000 warrants; Iroquois Capital $210,000 for 70,000 shares and warrants; Iroquois Master $375,000 for 125,000 shares and warrants; Anson $600,000 for 200,000 shares and warrants. Special Equities, through Chardan, once again, acted as the Company's placement agent receiving $100,000 in cash and warrants to purchase 93,000 shares of Common Stock.

35. On or about August 20, 2018, Genius Brands sold $4.50 million in Secured Convertible Notes (the "Secured Notes") maturing on August 20, 2019 and accruing interest at 10% per annum, convertible into Common Stock at $2.50 per share and warrants to purchase 1,800,000 shares of Common Stock at an exercise price of $3.00 per share (the "2018 Warrants"). The purchase agreement contained covenants providing that: (a) as long as any Secured Notes are outstanding, the Company would not issue any shares of Common Stock or Common Stock equivalents for an effective per share purchase price of less than $2.50 per share; and (b) as long as any of the 2018 Warrants are outstanding, the Company agreed not to issue securities convertible into Common Stock at a price subject to being reset at some future date or upon the occurrence of specified or contingent events. Defendants collectively purchased $3,025,000, or

over two thirds, of the Secured Notes in the following amounts: Anson, $1,800,000; Iroquois Master, $425,000; Iroquois Capital, $250,000; Molinsky, $50,000; and Brio, $500,000.

36. On February 19, 2019, the Company sold 945,894 shares of Common Stock and warrants to Anson to purchase up to 945,894 shares of Common Stock for $2.12 per share (the "2019 Warrants") for gross proceeds of approximately $2,000,000. Anson combined with the other Defendants owning Secured Notes to grant a waiver allowing for the sale of securities to Anson for below $2.50 per share and in return caused the Company to issue them warrants to purchase up to an additional 1,800,000 shares of Common Stock at $2.55 per share. Special Equities, through Chardon, was the placement agent for the transaction, for which it received a cash fee equal to 9.0% of the gross proceeds, or approximately $180,000.

37. On or about April 1, 2019, the Company filed with the SEC its annual report on Form 10-K including the following disclosure:

> Historically, the Company has incurred net losses. For the years ended December 31, 2018 and 2017, the Company reported net losses of $9,003,901 and $4,908,736, respectively. The Company reported net cash used in operating activities of $8,008,010 and $7,186,870 for the years ended December 31, 2018 and 2017, respectively. As of December 31, 2018, the Company had an accumulated deficit of $50,702,486 and total stockholders' equity of $12,839,771. As a result, the Company will require additional capital to fund its operations and execute its business plan. As of December 31, 2018, the Company had cash, cash equivalents, and restricted cash of $3,085,026, which is not sufficient to fund the Company's planned operations and production through one year after the date the consolidated financial statements are issued, and accordingly, there is substantial doubt about the Company's ability to continue as a going concern.
>
> The analysis used to determine the Company's ability as a going concern does not include cash sources outside the Company's direct control that management expects to be available within the next 12 months. Management is in negotiations to obtain new long-term financing and has a long history of successful capital raises with its investment bank group that will be leading the upcoming round. Both the Company and the Investment banking group are confident in their ability to raise sufficient capital to meet the Company's obligations and fund its production slate for the coming twelve months. There is inherent uncertainty and business risks that the Company will be able to raise such additional capital. The Company also expects revenue from operations to increase in the third quarter and for the

> subsequent quarters based on executed licensing agreements. These consolidated financial statements have been prepared on a going concern basis and do not include any adjustments to the amounts and classification of assets and liabilities that may be necessary in the event the Company can no longer continue as a going concern.

**GBI's Attempt to Engage in a More Traditional Public Offering Fail**

38. On July 22, 2019, GBI entered into an amendment, waiver and consent agreement with holders constituting a majority-in-interest of the holders of the Secured Notes and of the shares of Common Stock issued in January 2018 to allow for new issuance of Common Stock. In exchange, the Company agreed to reduce the conversion price of the Secured Notes from $2.50 per share of Common Stock to $1.515 and to issue warrants to purchase an additional 1,800,000 shares of Common Stock at $1.14 per share (the "Waiver Warrants") to purchasers of the 2018 Warrants. Anson, as the holder of $1,800,000 of the Secured Notes, joined together with Iroquois Capital, as the holder of $425,000 of the Convertible Notes, and 32 Entertainment LLC, holding $1,000,000 of the Secured Notes, to grant the waiver and consent, with a similar consent from the 2018 common stock purchasers which, at a minimum, included Anson and Iroquois.

39. On July 23, 2019, after receiving the waivers and consents, the Company filed a registration statement on Form S-1 with respect to a planned sale of 8,771,930 shares of Common Stock at $1.14 per share in a public offering by Aegis Capital Corp. In connection with that proposed offering, it was contemplated that each of the Company's officers, directors, affiliates and certain existing stockholders aggregating at least 5% of the outstanding Common Stock would agree, subject to certain exceptions, not to offer, issue, sell, contract to sell, encumber, grant any option for the sale of or otherwise dispose of any shares of Common Stock or other securities convertible into or exercisable or exchangeable for shares of Common Stock for a period of ninety (90) days from the date of that offering without the prior written consent of Aegis Capital Corp., as a representative of the underwriters (the "Offering Lockup").

40. The July 23, 2019 Form S-1 disclosed information concerning persons beneficially owning 5% or more of the Common Stock, excluding many of Defendants because they claimed to beneficially own no more than 4.99% based upon contractual provisions purporting to limit their beneficial ownership of the Common Stock, reflecting that Brio, Anson and Iroquois collectively either owned directly or through other instruments convertible or exercisable into Common Stock a total of 9,307,542 shares of Common Stock as follows:

(a) Brio was reported to own (i) 262,922 shares of Common Stock, (ii) 300 shares of Preferred Stock convertible into 263,158 shares of Common Stock, (iii) 330,033 shares of Common Stock upon the conversion of the $500,000 of Secured Notes and (iv) warrants exercisable into 766,667 shares of Common Stock, representing 9.95% of the outstanding Common Stock;

(b) Anson was reported to own (i) 460,734 shares of Common Stock (ii) 1,188,119 shares of Common Stock issuable upon the conversion of $1,800,000 of Secured Notes and (iii) 4,181,789 shares of Common Stock issuable upon exercise of certain warrants, representing beneficial ownership of 9.99% of the outstanding Common Stock; and

(c) Iroquois was reported to own (i) 161,101 shares of Common Stock, (ii) 210,526 shares of Common Stock issuable upon conversion of 240 shares of Preferred Stock, (iii) 445,545 shares of Common Stock issuable upon the conversion of $675,000 of Secured Notes and (iv) 1,036,858 shares of Common Stock issuable upon the exercise of certain warrants, representing beneficial ownership of 9.99% of the outstanding Common Stock.

41. On August 2, 2019, the Company filed an amended Form S-1 registration statement reflecting that the planned public offering would be reduced to 6,024,097 shares of Common Stock

offered at $0.83 per share for total proceeds before underwriters' commissions of approximately $5 million.

42. On August 7, 2019, GBI made a request to the SEC for acceleration and the next day the registration statement was declared effective.

43. On August 14, 2019, the Company filed a Form NT-10-Q with the SEC stating that it would be unable to timely file its quarterly report on Form 10-Q.

44. On August 19, 2019, GBI wrote to the SEC requesting that the Commission consent to the withdrawal of the Form S-1 registration statement at the earliest practicable date.

**The Company Defaults on the Secured Notes and Struggles to Avoid A Bankruptcy Filing**

45. On August 20, 2019, the Secured Notes matured obligating the Company to repay in cash their then outstanding principal amount in full within the six-months. GBI could not repay the Secured Notes in full and, as a result, on August 20, 2019, elected to make six equal monthly principal payments of $750,000 with the first payment with interest being paid on August 23, 2019.

46. On September 6, 2019, the Company disclosed that on September 4, 2019 it had received a delisting notice from NASDAQ.

47. On September 17, 2019, Heyward purchased $500,000 of the Secured Notes from another holder. The Company did not receive any proceeds from that transaction.

48. On September 18, 2019, the Company entered into an agreement pursuant to which Anson exercised warrants to acquire 945,894 shares of Common Stock for $2.12 per share at a reduced price of $0.76 per share. Special Equities, which had since become a division of Bradley Woods & Co. LTD, acted as financial advisor to the Company in connection with the transaction, for which it received a fee of more than $50,000.

49. (a) On or about September 20, 2019, the Company agreed to an Amendment to Secured Convertible Note with Anson, Brio and Molinsky acting as a single group and collectively

holding \$1,958,334 of the Secured Notes (the "First Amendment"). The First Amendment (the form of which was attached as Exhibit 4.3 to the Form 10-Q filed by Genius Brands with the SEC on November 14, 2019) provided, *inter alia*, for: extending the maturity date of those Secured Notes until January 31, 2020 or until the Company raises \$5,000,000 in the aggregate in a debt or equity offering; and, that if a "Company Redemption Event" had not been met by the maturity date that GBI would repay one-sixth of the outstanding principal amount of the Notes each month for six months. Anson, Brio and Molinsky executing the First Amendment was contingent upon Heyward entering into a substantially similar amendment and a most favored nations clause requiring that any more favorable terms granted to other holders of the Secured Notes also be provided to Anson, Brio and Molinsky and, by extension, Heyward.

(b) The Company entered a separate Amendment to Secured Convertible Note with Jaime Taicher, Michael G. Klein Living Trust and AGC Aviation, LLC (the "Second Amendment" the form of which was attached as Exhibit 4.4 to the Form 10-Q filed by Genius with the SEC on November 14, 2019) who were other holders of the Secured Notes. The Second Amendment, unlike the First Amendment, provided for a new maturity date of August 20, 2021, and was *not* contingent upon any similar actions being taken by any other owners of the Secured Convertible Notes.

(c) GBI entered yet another Amendment to Secured Convertible Note with K. Tucker Anderson (the "Anderson Amendment" the form of which was attached as Exhibit 4.5 to the Form 10-Q filed by Genius with the SEC on November 14, 2019) which, like the Second Amendment, provided for a new maturity date of August 20, 2021 and was *not* contingent upon any similar actions being taken by any other owners of the Secured Notes. Also, the Anderson Amendment, unlike the First Amendment and the Second Amendment did not provide that if the

Company Redemption Event had not been met by the maturity date that GBI would repay one-sixth of the outstanding principal amount of the Secured Notes each month for six months.

(d) The remaining balance of $883,332 under the Secured Notes was not extended.

(e) As subsequently disclosed in a Form 10-Q filed with the SEC on November 14, 2019, during the fiscal quarter ended September 30, 2019, the Company paid $970,834 to redeem certain of the Senior Notes.

50. On October 3, 2019, Heyward purchased another 1,000,000 shares of Common Stock from the Company for $0.76 per share.

51. On October 28, 2019, the Company sold 663,158 shares of Common Stock to an unidentified investor for $0.76 per share or gross proceeds of $504,000. Once again, Special Equities acted as the placement agent for the transaction for which it received a cash fee of $35,280 and warrants to purchase 46,421 shares at an exercise price of $0.836 per share.

52. (a) On November 20, 2019, GBI entered into a settlement agreement and release with Silverado Holdings LDC ("Silverado"), Hana Resources (Bahamas) LTD ("Hana Resources") and Leister Capital Limited ("Leister" and with Silverado and Hana Resources, collectively the "Chehebar Group"), entities controlled by Simon Chehebar and Moises Chehebar, and Heyward as holders of 58% of the outstanding Preferred Stock, adjusting the conversion price of the Preferred Stock to $0.21 per share of Common Stock. Iroquois and Brio, despite owning shares of Preferred Stock, were not signatories to the settlement agreement and accordingly did not provide any release of claims.

(b) The settlement agreement followed the Chehebar Group members having purchased 1,000 shares of the Preferred Stock from other holders and then threatening to sue the

Company to reduce the conversion price of the Preferred Stock based upon recent sales of Common Stock for $0.76 per share.

53. (a) On December 16, 2019, the Company entered into warrant exercise agreements (the "Exercise Agreements") with certain warrant holders (the "Exercising Holders") to purchase 3,646,135 shares of Common Stock for $0.21 per share. The Exercise Agreements provided for GBI to issue new warrants for the purchase up to an aggregate of approximately 3,646,135 shares of Common Stock equal to the number of warrants exercised at an exercise price per share of $0.3004. Special Equities acted as the Company's financial adviser receiving a cash fee of $53,598.18 and warrants to purchase 255,230 shares of Common Stock.

(b) The Form 8-K filed by the Company disclosing the Exercise Agreements did not identify the Exercising Holders but it is apparent that: (i) Anson was one of the Exercising Holders because the warrants being repriced included those issued in February 2019 with Anson being the only person owning warrants issued on that date; (ii) Iroquois was another one of the Exercising Holders based upon reporting in a Form 13G owning a total of 786,667 warrants as of December 31, 2019 compared to the 1,036,858 warrants the Company reported Iroquois owned in a July 23, 2019 Form S-1; and (iii) Brio was another one of the Exercising Holders based upon its reporting in Form 13G that it beneficially owned 1,242,605 shares of Common Stock representing a 380,175 share decline from the 1,622,780 shares of Common Stock the Company reported Brio owned in a July 23, 2019 Form S-1.

(c) Anson, Iroquois, Brio and other Defendants entered into the Warrant Exercise Agreement combining together as a group or as part of an alliance to purchase securities at the same $0.21 per share conversion price agreed to by the Company weeks earlier with the Chehebar Group. Not all warrant holders participating received the same favorable treatment as

evidenced by the Company, on January 22, 2020, entering into a warrant exercise agreement with a single unnamed holder of warrants issued in 2017 to exercise warrants to purchase 500,000 shares of Common Stock at $0.34 per share. The new warrant exercise agreement, in addition to being at a less favorable price also, unlike the Exercise Agreements, did not provide for new warrants to be issued as an inducement to exercise.

**The Buyers Join Together with the Holders in Agreements Relating to the Purchase, Holding, Voting and Disposing of the Common Stock**

54. On or about March 11, 2020, the Company had no choice but to allow Buyers to invest jointly on favorable terms and to allow significant economic improvements to previously issued warrants (the "Previously Issued Warrants") because without further capital GBI would be forced into bankruptcy. Therefore, to fund its continued operating losses, the Company entered into a Stock Purchase Agreement (the "SPA") to sell and issue to the Buyers, who negotiated as a group: (a) $13,750,000 in Senior Secured Convertible Notes (the "Convertible Notes") initially convertible into Common Stock at a price of $1.375 per share; and (b) warrants to purchase 65,476,190 shares of the Common Stock exercisable for five years at an initial exercise price of $0.26 per share which were immediately exercisable upon closing of the transaction.

55. The SPA served as a master agreement with at least the following additional agreements each of which was collectively agreed to by Buyers, being referenced and defined in the SPA: Investor Note (issued by the Buyers); Security Agreement; Guarantee Agreement; Investor Note Purchase Agreement; Master Netting Agreement, Voting Agreement; and Lock-Up Agreement. *See* Form 8-K dated 3/11/19 at Exs. 4.2, 10.2, 10.3, 10.4, 10.5, 10.6 and 10.7. The SPA, together with its constituent contracts, reflected an agreement by the Buyers to act together with members of the Holders Group for the purpose of acquiring, voting, holding and disposing of the Common Stock.

56. The Buyers paid GBI $11,000,000 for the Convertible Notes reflecting an original issue discount of $2,750,000 with consideration consisting of: (a) a cash payment of $7,000,000, and (b) $4,000,000 of Investor Notes, which were full recourse cash secured promissory notes payable by the Buyers to the Company but did not accrue any interest. The proceeds from the sale of Convertible Notes as reflected in Schedule 4(d) of the SPA were used for, among other things, redeeming $2,866,665.00 of the Secured Notes which were primarily, if not entirely, owned by Anson, Brio, Molinsky and Heyward. *See* ¶49, *supra*.

57. The SPA required the Company to hold a stockholder meeting (the "Stockholder Meeting") by May 15, 2020, to approve the issuance of shares of Common Stock upon any conversion of the Convertible Notes for the purposes of complying with NASDAQ rules ("Stockholder Approval") and that following the Stockholder Approval: (a) the conversion price of the Convertible Notes would be reduced to $0.21 per share; and (b) the exercise price of the Warrants would be reduced to $0.21 per share. This $0.21 price matched the prior $0.21 per share conversion price obtained months earlier by the Chehebar Group with respect to the Preferred Stock.

58. To help assure Stockholder Approval, the SPA provided that a condition precedent to the Buyers proceeding with the transaction was that certain stockholders of the Company holding in the aggregate owning 10,035,861 or approximately 40% of the outstanding shares of Common Stock enter into a voting agreement (the "Voting Agreement") with GBI requiring that those stockholders vote in favor of Stockholder Approval at the Stockholder Meeting. *See* SPA §7(xv). Those stockholders consisted of two groups of GBI shareholders: (a) the Chehebar Group; and (b) Heyward, A Squared and Mike Maliani/HBA Trade Co. Ltd with Mike Maliani being the

Company's chief creative officer (the "Heyward Group" and together with the Chehebar Group, the "Holders Group").[7]

59. The SPA provided that if any member of the Holders Group breached any provisions of the Voting Agreement, "the Company shall promptly use its best efforts to seek specific performance of the terms of the Voting Agreement in accordance with Section 4.02 thereof." SPA §4(q). The Company was also obligated to promptly inform each Buyer if it "receives any notice from any of the [Holders Group stockholder] pursuant to the Voting Agreement." *Id.* Each of the Buyers had the contractual right to "obtain temporary and permanent injunctive relief for any breach of the SPA without the need to post any bond or security" (SPA §9(m)) effectively giving each Buyer the right to enforce the Voting Agreement, a right which was further enhanced by the Buyers being intended third-party beneficiaries of the Voting Agreement.

60. The Lock-Up Agreement executed in connection with the SPA also required, as a condition precedent to any obligation on the part of the Buyers to purchase the Convertible Notes, that members of the Holders Group were prohibited from selling any Common Stock they owned at that time for ninety days following the one-year anniversary of the closing date, *i.e.*, until June 2021. *See* SPA §4(n) (obliging the Company to enforce the Lock-Up Agreement). The Lock-Up Agreement differed from a standard lock-up agreement which underwriters traditionally cause

---

[7] Schedule 4(q) of the Agreement identifies the number of shares held by each of those stockholders as being:

| | |
|---|---|
| Andy Heyward – | 2,369,199 |
| Silverado – | 1,590,476 |
| Leister – | 1,585,714 |
| Hana Resources – | 1,585,714 |
| Mike Maliani/HBA Trade Co. Ltd. – | 1,414,030 |
| A Squared Holdings LLC – | 990,728 |

officers, directors and shareholders to enter into before a public offering in at least the following ways:

(a) traditional lock-up agreements can be amended at the discretion of the underwriter or the issuer while the SPA prohibited any such amendment by providing that "[t]he Company shall not amend or waive any provision of the Lock-Up Agreements except to extend the term of the lock-up period contained therein and shall enforce the provisions of the Lock-Up Agreements in accordance with their terms" SPA §4(n);

(b) traditional lock-up agreements do not require the issuer or the underwriter to obtain specific performance while, the SPA requires the Company to do so by "[i]f any party to a Lock-Up Agreement breaches any provision of a Lock-Up Agreement." *Id.*;

(c) traditional lock-up agreements do not enable other securityholders such as the Buyers to be able to enforce its terms while the SPA provides each of the Buyers with the contractual right to "obtain temporary and permanent injunctive relief for any breach of the SPA without the need to post any bond or security" (SPA §9(m)) which provides them with precisely that right of enforcement with respect to the Lock-Up Agreement given the Company's obligation to seek specific enforcement of the Lock-Up Agreement;

(d) traditional lock-up agreements do not enable parties in the position of any of the Buyers to have the added power to enforce their terms while the Lock-Up Agreement does not prevent or preclude enforcement by intended third-party beneficiaries such as the Buyers;

(e) traditional lock-up agreements are limited to the shares owned at the time of the offering and exclude additional shares purchased by signatories while the Lock-Up Agreement by its terms extends to any additional GBI securities acquired by any member of the Holders Group; and

(f) traditional lock-up agreements generally extend for no more than 180 days such as the Offering Lockup which only extended for 90 days while the Lock-Up Agreement provides for a term of one year and 90 days.

61. The SPA separately provided for joint action or sharing of risks and rewards by the Buyers in providing that until the date that the Convertible Notes are no longer outstanding, the Company will not issue, offer, sell or grant any equity or equity-linked security, subject to certain limited exceptions described in the SPA, unless:

(a) prior to the six-month anniversary of the closing date, at least 75% of the gross proceeds after the first $2,000,000 of gross proceeds of any financing consummated are first applied to the redemption of the Convertible Notes on a *pro-rata* basis; and

(b) after the six-month anniversary of the closing date, at least 75% of the gross proceeds of any such subsequent placement consummated are first applied to the redemption of the Convertible Notes on a *pro-rata* basis.

62. The Master Netting Agreement also provided for joint action or sharing of risks and rewards by the Buyers in the event the Company filed for bankruptcy protection by allowing each of them "recover against the other Party [*i.e.,* Buyer] under and across the Underlying Agreements as herein specified and to treat this Agreement and the Underlying Agreements [*i.e.* the Note Purchase Agreement, the Investor Note, the Note and the Securities Purchase Agreement] as a single agreement for the purposes set forth herein and the Note Purchase Agreement and the Securities Purchase Agreement each as a 'securities contract' (11 U.S.C. § 741), or other similar agreements[.]" The Master Netting Agreement then provides that it was "entered into in reliance on the Parties' agreement that for the purposes set forth herein this Agreement and ***the Underlying***

***Agreements form a single integrated agreement between the Parties***, and the Parties would not otherwise enter into this Agreement and the Underlying Agreements." (emphasis added).

63. The SPA was negotiated by a single lead investor identified in the Convertible Notes as being Anson. In addition, the SPA, as well as the related Security Agreement, reflected that the Buyers appointed Anson as the collateral agent for the Agreement and authorized Anson (and its officers, directors, employees and agents) to take any relevant action on behalf of all the Buyers.

64. The SPA also provided that the exercise prices of the Previously Issued Warrants owned by the Buyers to purchase 8,715,229 shares of the Common Stock would be reduced to $0.21 per share upon Stockholder Approval. The Company's SEC filings do not disclose the owners of the Previously Issued Warrants but an analysis of SEC filings made by Defendants reveal that at least Anson, Iroquois and Brio owned Previously Issued Warrants.

65. On March 17, 2020, after the Holders Group delivered signed copies of the Voting Agreement and the Lock-Up Agreement, the Company issued $9,750,000 of the Convertible Notes and Warrants pursuant to the SPA. *See* 5/15/20 Form 8-K Item 1.01; 4/14/20 Schedule 14A at 25. Heyward paid $1,000,000 for $1,250,000 in principal of the Convertible Notes with Defendants paying $7,000,000 in cash and issuing $4,000,000 in promissory notes payable in 2060 and bearing a zero percent interest rate.

66. On March 17, 2020, the Company paid Heyward the total amount purportedly due to him of $483,600 for his services as an executive producer with respect to twenty-six half hour episodes of *Rainbow Rangers* that had been delivered, with respect to which Heyward was owed $322,400, and with respect to thirteen half hour episodes of *Rainbow Rangers Season 2*, with respect to which Heyward was owed an additional $161,200.

67. On March 22, 2020, Genius Brands agreed to sell 4,000,000 shares of Common Stock at $0.2568 per share to "certain long-standing investors" in a transaction that closed on March 25, 2020. The precise identity of those long-standing investors was not disclosed in the Form 8-K but is believed to include at least some of the Defendants. The Common Stock was registered with the SEC through a Form S-3 filed by the Company on January 17, 2020 (the "January 2020 Registration Statement"). This sale of Common Stock totaled less than $2,000,000 and, therefore, did not trigger the provision of the SPA providing for *pro rata* redemption of the Convertible Notes. *See* ¶61(a), *supra*.

68. On April 20, 2020, Heyward sent a letter to the Company's shareholders, attached as an exhibit to a Form 8-K filed with the SEC on that same day, identifying Genius Brands as a "global brand management company that creates and licenses multimedia entertainment content for children" and announcing the spring 2021 premiere of a new children's animated series on Amazon Prime, *Stan Lee's Superhero Kindergarten* starring Arnold Schwarzenegger. Heyward's letter went on to state that "With *Stan Lee's Superhero Kindergarten* launching on these two mammoth platforms ***and*** commerce from consumer products based on the show driven across them as well, we have what I would call 'Plutonium in a Bottle,'... and we expect to shortly announce a broad line up of tiffany consumer product licensees."

69. On May 7, 2020, Genius Brands agreed to sell 8,000,000 shares of Common Stock previously registered with the SEC pursuant to the January 2020 Registration Statement at $0.35 per share to "certain long standing investors" in a transaction that closed on or about May 8, 2020. The identity of those investors was not disclosed by the Form 8-K. 5/7/20 Form 8-K at Item 1.01. Special Equities acted as the placement agent for this transaction receiving a cash fee of $196,000.

70. On May 15, 2020, the Company filed a Form 8-K with the SEC reporting that holders of 21,368,586 shares of Common Stock, representing 72.70% of the total shares entitled to vote as of the record date of March 28, 2020, were present or represented by proxy at the stockholder's meeting and that 12,299,546 shares had voted in favor of the Stockholder Approval, which was the second of six resolutions voted upon at the stockholders' meeting. The 12,299,546 shares voted in favor represented 2,263,685 shares more than the 10,035,861 owned by the Holding Group and primarily represented votes in favor of the resolution by the Buyers or additional shares of Common Stock acquired by members of the Holders Group with 486,714 shares voting against the proposal, 101,379 shares abstaining and 8,840,947 broker non-votes.

71. On May 15, 2020, following the Stockholder Approval: (a) the conversion price of the Convertible Notes was reduced from $1.375 per share to $0.21 per share; (b) the exercise price of the Warrants issued in connection with the SPA was reduced from $0.26 per share to $0.21 per share; and (c) the exercise prices of the Previously Issued Warrants were also reduced to $0.21 per share.

72. On May 18, 2020, Genius Brands sold 7,500,000 shares of Common Stock previously registered with the SEC pursuant to the January 2020 Registration Statement for $1.20 per share to "certain long standing investors" in a transaction that closed on or about May 20, 2020. The precise identity of those long standing investors was not disclosed in the Form 8-K but is believed to include at least some of the Defendants. *See* 5/18/20 Form 8-K at Item 1.01. Defendants provided a waiver and consent to the Registered Offering, the Company agreed that it would file a Registration Statement on Form S-3 on or before May 29, 2020 registering the resale of the shares of Common Stock underlying the Convertible Notes and warrants issued to them. Special Equities acted as the placement agent for this transaction receiving a cash fee of $630,000.

73. On May 28, 2020, Genius Brands entered into a Securities Purchase Agreement with "certain long standing investors" pursuant to which the Company agreed to sell 20,000,000 shares of Common Stock previously registered with the SEC pursuant to the January 2020 Registration Statement at $1.50 per share in a transaction that closed on or about June 1, 2020. The precise identity of those long-standing investors was not disclosed in the Form 8-K. 5/28/20 Form 8-K at Item 1.01. Special Equities acted as the placement agent for this transaction receiving a cash fee of $2,100,000.

74. The Buyers agreed to provide their waiver and consent to the sale of Common Stock pursuant to the May 28, 2020, Securities Purchase Agreement with the Company agreeing in return that it would file a resale registration statement on Form S-3 on or before June 5, 2020 (instead of May 29, 2020 as previously agreed) registering the resale of the shares of Common Stock issued or issuable upon exercise of the Warrants issued to the Buyers.

75. On June 3, 2020, *Insider Financial*, a stock market tout, which according to a disclaimer on its website is "**engaged in the business of marketing and advertising companies for monetary compensation**" published an article titled "*Will Netflix or Disney Buy Genius Brands International (NASDAQ:GNUS*)?" (emphasis in original). The article caused Common Stock to surge in price by more than 40%, to $4.02 per share, on heavy trading volume.

76. On June 11, 2020, the Company filed a prospectus (the "June 2020 Prospectus") with the SEC for the sale of 60,100,617 shares of Common Stock. Those shares of Common Stock to be sold included 31,100,091 shares of Common Stock obtained by Defendants pursuant to the cashless exercise of warrants which began during the first half of 2020, after the Stockholder Approval. *See* 11/16/20 Form 10-Q at 25. The cashless exercise of the warrants involved paying

for the Common Stock based upon the difference between the market price of the Common Stock and the warrants.

77. The June 2020 Prospectus disclosed the sales of Common Stock in connection with the cashless exercise of Warrants by the following Buyers. Precise sales terms were not disclosed but based upon the disclosures contained in the prospectus:

(a) EAM received 119,920 shares of Common Stock upon the cashless exercise of 136,614 Warrants reflecting a sales price of $1.0878 for the 136,614 shares of Common Stock sold through the cashless exercise of the Warrants;

(b) EDOF received 2,848,099 shares of Common Stock upon the cashless exercise of 3,244,585 Warrants reflecting a sales price of $1.0878 for the 3,244,585 shares of Common Stock sold through the cashless exercise of the Warrants;

(c) ETE received 29,981 shares of Common Stock upon the cashless exercise of 34,154 Warrants reflecting a sales price of $1.0878 for the 34,154 shares of Common Stock sold through the cashless exercise of the Warrants;

(d) Molinsky received 437,390 shares of Common Stock upon the cashless exercise of 505,952 Warrants reflecting a sales price of $1.1414 for the 437,390 shares of Common Stock sold through the cashless exercise of the Warrants;

(e) CVI received 4,778,956 shares of Common Stock upon the cashless exercise of 5,467,940 Warrants reflecting a sales price of $1.0839 for the 5,467,940 shares of Common Stock sold through the cashless exercise of the Warrants;

(f) Brio Master received 2,793,639 shares of Common Stock upon the cashless exercise of 3,110,119 Warrants reflecting a sales price of $1.1082 for the 3,110,119 shares of Common Stock sold through the cashless exercise of the Warrants;

(g) Brio Select received 4,691,710 shares of Common Stock upon the cashless exercise of 5,223,214 Warrants reflecting a sales price of $1.1082 for the 5,223,214 shares of Common Stock sold through the cashless exercise of the Warrants;

(h) Anson received 5,000,000 shares of Common Stock upon the cashless exercise of 5,303,468 Warrants reflecting a sales price of $1.1527 for the 5,303,468 shares of Common Stock sold through the cashless exercise of the Warrants; and

(i) M3A received 4,740,099 shares of Common Stock upon the cashless exercise of 5,000,000 Warrants reflecting a sales price of $1.198 for the 5,000,000 shares of Common Stock sold through the cashless exercise of the Warrants.

78. The June 2020 Prospectus also identified sales of up to 60,100,617 shares of Common Stock which would be "resold from time to time" including by the following Buyers:

(a) Anson Investments – 17,553,675 shares of Common Stock;

(b) Brio Master – 2,793,639 shares of Common Stock;

(c) Brio Select – 4,691,710 shares of Common Stock;

(d) CVI – 5,263,397 shares of Common Stock;

(e) EAM – 340,449 shares of Common Stock;

(f) EDOF – 8,085,657 shares of Common Stock;

(g) ETE – 85,113 shares of Common Stock;

(h) Iroquois Capital – 3,869,048 shares of Common Stock;

(i) Iroquois Master – 2,083,333 shares of Common Stock;

(j) L1 Capital – 3,571,429 shares of Common Stock;

(k) M3A – 5,665,480 shares of Common Stock; and

(l) Molinsky – 437,390 shares of Common Stock.

79. On June 15, 2020, Genius Brands made a series of announcements, including on social media, relating to a purported "investment" by Arnold Schwarzenegger. The headline read "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International" and the byline was "Schwarzenegger Will Receive Warrants in Genius Brands Under the Agreement for His Role Starring in and Co-Producing the New Animated Children's Series, Stan Lee's Superhero Kindergarten[,]" giving investors the misleading impression that Schwarzenegger was investing capital into Genius Brands and receiving stock as compensation for his acting.

80. On June 19, 2020, Heyward, as subsequently reported in a Form 4 he filed with the SEC on June 25, 2020: (a) sold 448,029 shares of Common Stock through a transaction in which he exercised 5,952,381 Warrants for $0.21 per share of Common Stock paid on a cashless exercise by withholding 448,029 Warrants to pay the exercise price; and (b) sold an additional 12,545 shares of Common Stock through a transaction in which he exercised 166,667 warrants to purchase Common Stock at $1.10 per share. The sales of Common Stock Heyward made to the Company through the cashless exercise of Warrants was exempted from Section 16(b) liability by SEC Rule 16b-3(e), 17 C.F.R. §240.16b-3(e).

81. On June 21, 2020, *Insider Financial* again published an article stating that "[w]ith Schwarzenegger now on board, we are even more bullish on our thesis" that "it's only a matter of time before either Disney or Netflix buys Genius Brands International." *Insider Financial* also accused Citron and Hindenburg of issuing "short and distort" reports to drive down the price of the Common Stock.

82. On June 22, 2020, Genius Brands republished the June 21, 2020 *Insider Financial* article stating that the Company might be sold to Disney or Netflix on Twitter, pulling specific quotations from the articles and repeating them on Genius Brands' Twitter account.

83. On or about June 23, 2020, the Company entered into a conversion agreement (the "Conversion Agreement") with all the holders of the Convertible Notes and Warrants, *i.e.*, the Buyers Group, providing that: the Buyers would prepay the Investor Notes, tender a notice of conversion in full of the Convertible Notes, and enter into a leak-out agreement (the "Leak-Out Agreement") governing the sale of Common Stock received from conversion of the Convertible Notes and also providing that the Company would file a registration statement with the SEC on or before June 26, 2020, covering the resale of the shares of Common Stock issuable upon conversion of the Group Member Notes. *See* 6/23/20 Form 8-K Ex. 10.1.

84. The Leak-Out Agreement provided that each of the Buyers could not, for thirty days after the registration statement became effective, sell any Common Stock obtained through conversion of the Convertible Notes or exercise of the Warrants for a price below $2.00 per share unless the total amount of shares sold on any trading day obtained through the conversion of the Group Member Notes or exercise of the Warrants did not exceed 30% in the aggregate of the trading volume of the Common Stock as reported by Bloomberg LP. The Leak-Out Agreement allowed for enforcement of its terms by a third-party beneficiary which included the Buyers. *See* 6/23/20 Form 8-K Ex. 10.1 at 5-7.

85. The language and terms of the Leak-Out Agreement differ from an ordinary lock-up agreement in at least the following ways:

(a) the Leak-Out Agreement only limits shareholder sales of Common Stock based upon either the trading volume or price of the Common Stock while ordinary lock up agreements restrict shareholders from selling *any* securities they previously owned;

(b) the Leak-Out Agreement, unlike a typical lock-up agreement, contains a provision allowing for any sale not reported on NASDAQ's consolidated tape;

(c) the Leak-Out Agreement, unlike a typical lock-up agreement, contains a provision protecting the Buyers from having the Company repay or redeem the Convertible Notes;

(d) the Leak-Out Agreement contains a provision allowing each of the Buyers to seek specific enforcement of its terms while a typical lock-up agreement does not allow the shareholders subject to the lock-up to seek specific enforcement against other shareholders subject to the same lock-up agreement;

(e) ordinary lock-up agreements involve an underwriter seeking to restrict the sale of securities by existing shareholders, while the Leak-Out Agreement involves existing shareholders acting to regulate their own sale of securities through coordination with the Company;

(f) ordinary lock-up agreements "are generally one-way streets keeping certain shareholders out of the IPO market for a specified period of time" (*Lowinger v. Morgan Stanley & Co., LLC,* 841 F.3d 122, 130-31 (2d Cir. 2016)) while the Leak-Out Agreement applied equally to all selling shareholders; and

(g) ordinary lock-up agreements involve the sale of securities to the public, rather than only to pre-existing securities holders, in an offering at a pre-set price over a relatively short period of time generally not lasting more than one week rather than an at-the-market offering anticipated to last at least 30 days.

86. On June 23, 2020, Heyward received 5,952,381 shares of Common Stock upon conversion of his $1,250,000 of the Convertible Notes.

87. On June 23, 2020, the Company also issued a press release in which Heyward was quoted as stating that:

> This is a win-win for all parties. The Company today is debt free and holding $55 million in cash. The Company is uniquely positioned to take steps to build *Kartoon Channel!* into the pre-eminent childrens' broadcaster anywhere, and produce, acquire, and license, the most compelling, forward-thinking programming for children today. We are delighted that our existing senior secured debt holders had the confidence in the Company to pre-pay the $4,000,000 Note obligation and to then convert their entire debt into equity right away.

88. On June 26, 2020, the Company filed a registration statement which the SEC declared effective on July 6, 2020, causing the Leak-Out Agreement to be effective through and including August 5, 2020.

89. In the fiscal quarter ended June 30, 2020, as disclosed in an August 14, 2020, Form 10-Q filed by the Company, the Buyers converted all of the $13,750,000 of Convertible Notes they had purchased for $11,000,000 into a total of 65,476,190 shares of Common Stock and that the Buyers and potentially other persons had exercised 58,522,601 warrants on a cashless basis resulting in the issuance of 52,551,716 shares of Common Stock.

**Genius Brands Touts Its Prospects to Facilitate Defendants'**
**<u>Profitable Sale of the Common Stock Underlying Their Securities</u>**

90. On July 6, 2020, the Company issued a press release touting its operations and future business prospects including through specific quotes attributed to Heyward. The press release stated in relevant part that:

**Genius Brands International Announces Transaction to Create "Stan Lee Universe"**




Genius Brands Will Control New Joint Venture Drawing from Over 100 Original Stan Lee Creations

BEVERLY HILLS, Calif., July 06, 2020 (GLOBE NEWSWIRE) -- Through a groundbreaking joint venture between Genius Brands International ("Genius Brands") (NASDAQ:GNUS) and Stan Lee's POW! Entertainment, an agreement has been struck to create ***Stan Lee Universe***. ***Stan Lee Universe*** will assume worldwide rights, in perpetuity, to the *name, physical likeness, physical signature*, *live-action and animated motion picture, television, online, digital, publishing, comic book, merchandising* and *licensing* rights to Stan Lee and his IP creations past*, present, and going forward.

In announcing the deal today, Andy Heyward, Chairman & CEO of Genius Brands, said that, "In all of Hollywood, there is no greater prize. This is the Holy Grail. ***Stan Lee Universe*** is a *once in a lifetime* asset drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time."

Jointly owned and subject to due diligence and documentation, the deal will leave Genius Brands as the managing and controlling partner of the ***Stan Lee Universe*** joint venture.

Stan Lee was the creator of the most successful characters ever made, including Spiderman, Iron Man, Black Panther, The Incredible Hulk, X Men, Thor, Captain America, Ms. Marvel, Silver Surfer, Antman, Nick Fury, Guardians of the Galaxy, and of course the #1 movie box-office franchise of all time, The Avengers. For decades, Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount.

In addition to the #1 movie box office hit, ***Avengers Endgame***, Stan Lee created ***two of the Walt Disney Company's top three blockbusters****, and* ***five of the top 12 grossing movies of all time*****.**

"It's almost impossible to conceive that one mind created all this wealth," said Heyward. "The spinoffs alone defy the imagination. From animated television, to toys, apparel, video games, and every conceivable licensed product imaginable, Stan Lee characters populate the screens and retail shelves worldwide. There is no creator who has influenced pop culture and created more successful entertainment. Not even Walt Disney. Over and over, again and again, he created characters and stories that resonated in the hearts and minds of all peoples of all ages around the world, with billions and billions and billions of dollars of motion picture box-office, television, and consumer product licensing."

***Stan Lee Universe*** will be built from the repository of all of the characters and IP created by Stan Lee, post-Marvel Entertainment*, not otherwise elsewhere. It is drawn from over 100 original Stan Lee creations, from which it will develop and license approximately seven properties per year.

"Having worked with Stan and been a close friend for almost 30 years, nothing could make me prouder than for Genius Brands to become the guardian of both his brand and body of work," commented Heyward. "I have no doubt that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told. As big as Spider Man, Black Panther, X Men, and the Avengers are today, tomorrow it will be Stan Lee's TOMORROW MEN, his STRINGBEAN, his BLACK FURY, and VIRUS."

Former President of Marvel Productions, Margaret Loesch, said, "Stan Lee was a one of a kind. So is this asset. ***Stan Lee Universe*** is going to be an unimaginable source of blockbuster entertainment for many years to come."

Former President of Walt Disney Television and Chief Content Officer of Genius Brands' new Kartoon Channel!, David Neuman said*, "*The spinoff opportunities for Kartoon Channel! alone are mindboggling, including a dedicated ***Stan Lee Universe*** program block.*"*

Heyward concluded*, "*When we looked at the depth of these creations that sit in this library, the magnitude and value of this asset slowly began to sink in. There simply is no greater treasure chest of Intellectual Property anywhere. I feel like we went down to the basement of John Lennon and Paul McCartney's recording studio and found 200 songs that had never been released. One was called *Yesterday*, another was called *Hey Jude*, and another called *Sergeant Pepper*. They were just waiting for us to bring them forth to the market, along with their names and likenesses, signatures, and the right to merchandise *the Beatles*. It feels that big to us!

"We will be creating a dedicated business and creative unit specific to ***Stan Lee Universe***. For the millions of Stan Lee fans, we look forward to taking this unique asset and faithfully bringing the characters to the movie screens, to comic books, to toys and licensed products worldwide.

> "For the Genius Brands' shareholders, we look forward to effectively and smartly monetizing this asset across all platforms. I have no doubt that we will attract the most talented producers, directors, and marketers in the world as we unlock this one of a kind treasury and bring forth the next wave of Stan Lee creations for the world to experience and enjoy. We are proceeding immediately with our due diligence and expect final documentation to follow promptly thereafter."

91. On July 8, 2020, the Company filed a prospectus (the "July 2020 Prospectus") with respect to the proposed sale of 59,523,812 shares of Common Stock issuable upon conversion of the Notes by the following Buyers:

(a) Anson Investments – 17,857,143 shares of Common Stock;

(b) Brio Master – 3,110,119 shares of Common Stock;

(c) Brio Select – 5,223,214 shares of Common Stock;

(d) CVI – 5,952,381 shares of Common Stock;

(e) EAM – 357,143 shares of Common Stock;

(f) EDOF – 8,482,143 shares of Common Stock;

(g) ETE – 89,286 shares of Common Stock;

(h) Iroquois Capital – 3,869,048 shares of Common Stock;

(i) Iroquois Master – 2,088,333 shares of Common Stock;

(j) L1 Capital – 3,071,429 shares of Common Stock;

(k) M3A – 5,952,381 shares of Common Stock; and

(l) Molinsky – 505,953 shares of Common Stock.

92. On July 15, 2020, the Company issued yet another press release touting its business operations and quoting Heyward with the headline "Archie Comics, Genius Brands Partner to Launch Comic Books Based on 'Stan Lee Universe' of Characters" with the byline "*Industry Icon, Originator and Executive Producer of "Batman" Films, Michael E. Uslan, to Lead Development of the 'Stan Lee Universe.'*" (emphasis in original). The press release stated in relevant part that:

BEVERLY HILLS, Calif., July 15, 2020 (GLOBE NEWSWIRE) -- Following the recently announced **'STAN LEE UNIVERSE,'** Genius Brands International "Genius Brands" (NASDAQ:GNUS) has entered into a ground-breaking comic book publishing agreement with **Archie Comics** (Archie, Betty & Veronica, Sabrina, Josie and the Pussycats, and more), to publish comic books/graphic novels based on the never-before-exploited IP of Stan Lee Universe.

"It is only fitting that the comic book roots of Stan Lee, which began with Marvel, give birth to the next generation of great Stan Lee properties. I have long felt that the greatest Stan Lee characters and stories have yet to be told, and the next Marvel has yet to be built. That is Stan Lee Universe," said Genius Brands CEO and Chairman, Andy Heyward. "Archie Comics are everywhere. You can't go to a supermarket checkout stand and not see them, and soon that will be the same with Stan Lee Universe. Under the leadership of Jon Goldwater, shows like Riverdale and The Chilling Adventures of Sabrina have become huge hits. Jon understands better than anyone the unique value of Stan Lee and his ideas. There is no better publishing partner than Archie to bring Stan Lee Universe comics to market."

The initial property slated for publication as a comic book in partnership with Archie will be **Superhero Kindergarten**.

"I had the great pleasure of knowing Stan Lee and understanding his genius," said Archie Comics CEO/Publisher Jon Goldwater. "Getting the chance to partner with Andy and Genius Brands to introduce an entire universe of Stan Lee ideas to the comic book and graphic novel marketplace is an opportunity we can't pass up."

Concurrent with the announcement of the Archie Comics publishing deal, Genius Brands is proud to announce that **Michael E. Uslan** will bring his decades of experience and expertise to advise and help mine the great IP in the Stan Lee Universe to build ongoing global branded franchises. The treasure chest of post-Marvel Stan Lee IP will be guided by Uslan, whose input will cover all film and TV development and production under the banner.

Uslan, who works with his son, David Uslan, is best known as the Originator and Executive Producer of the Batman movie series, starting with Tim Burton's 1989 film, continuing through Christopher Nolan's The Dark Knight Trilogy, Todd Phillips's JOKER, and the upcoming The Batman in 2021. He also served as Executive Producer of Warner Bros. The Lego Movie (2014) and The Lego Movie 2: The Second Part (2019).

"Michael is the foremost expert today in comic book IP. Period. He is the only person we ever considered to guide us through the process of building franchises under the banner of his idol, mentor, and friend, Stan Lee," said Heyward. "He was a close friend of Stan, and there is nobody more qualified to guide this creatively forward. Michael has stewarded some of the biggest and most successful hits from comic books through film, TV, and merchandising."

> **Michael Uslan** stated, "In my world, there is no bigger honor than to be entrusted to carry the mantle of Stan Lee forward. This is taking the Olympic torch on the final leg up Mt. Olympus. We look forward to bringing the most talented writers and artists in our field to the next generation of Stan Lee creations."
>
> **Stan Lee Universe**, a joint venture between Genius Brands and Stan Lee's POW! Entertainment, managed by Genius, owns the worldwide rights, in perpetuity, to the name, physical likeness, physical signature, live-action and animated motion picture, television, online, digital, publishing, comic book, theme park, and merchandising/licensing rights from the repository of characters and IP created by Stan Lee drawn from over one hundred creations (post-Marvel Entertainment), including **Tomorrow Men, Stringbean, Black Fury, Virus, Superhero Kindergarten**, and many more. Genius Brands will develop seven new franchises per year, primarily targeted for families and kids.
>
> The legendary Stan Lee was the Co-Creator of some of the most successful characters of all time, including Spider-Man, Iron Man, Black Panther, The Incredible Hulk, X-MEN, Thor, Silver Surfer, Ant-Man, Nick Fury, and The Avengers. As the editor and a creative force behind Marvel Comics for decades, which was sold to the Walt Disney Company for $4.4 billion, Stan Lee CO-CREATED franchises that continue to prove to be worth billions of dollars.

93. The July 6 and July 15 press releases were designed to generate investor interest to facilitate the sale of Common Stock owned by the Buyers registered through the July 2020 Registration Statement and to allow the sales of Common Stock contemplated by the July 2020 Prospectus to occur rapidly and profitably.

94. On July 24, 2020, the Company filed a preliminary proxy statement with the SEC identifying persons known by the Company through its transfer agent and other records as beneficially owning 5% or more of the outstanding shares of Common Stock. Anson, which had been previously identified as beneficially owning 9.9% of the Common Stock (*see, e.g.*, June 11, 2020 Prospectus at 6), is not identified as beneficially owning 5% or more of the Common Stock. Similarly, on July 28, 2020, Brio filed a Schedule 13G with the SEC stating that it no longer beneficially owned any Common Stock.

95. Defendants' rapid sale of the Common Stock, which was the subject of the July 2020 Prospectus, is confirmed by a surge in Common Stock trading volume accompanying the

filing of the July 6, 2020, Prospectus. Thus, on July 2, 2020, the reported trading volume in the Common Stock surged from 17,607,500 shares the prior day to over 285,000,000 shares. On July 6, 2020, the reported trading volume for the Common Stock was over 170 million shares and on July 7, 2020, it was over 135 million shares. All those reported trades took place at prices exceeding the $2.00 per share threshold contained in the Leak-Out Agreement. In addition, from July 8, 2020 through July 20, 2020, another more than 318 million shares of Common Stock traded at prices exceeding the $2.00 per share threshold contained in the Leak-Out Agreement, allowing for the unencumbered sale of Common Stock by the Buyers.

## CLAIM FOR RELIEF

96. Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

97. This claim for relief does not allege or sound in fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

98. This claim is brought by Plaintiff against Anson Investments, Brio, CVI, Empery, Iroquois, L1 Capital, M3A and Molinsky, and for the benefit of Genius Brands.

99. On October 28, 2020, Plaintiff made a demand on the Board to pursue the claims asserted in this Complaint which the Board rejected.

100. Defendants beneficially owned 10% or more of the Company's outstanding Common Stock at the times relevant to this action by being members of a group within the meaning of Sections 16(b) and 13(d) of the Exchange Act, 15 U.S.C. §§78p(b) and 78m(d), and SEC Rule 13d-5(a) promulgated thereunder, 17 C.F.R. §240.13d-5(a), for the purpose of acquiring, holding, voting or disposing of equity securities based on at least the following relationships:

(a) Anson, Brio and Iroquois acted together to grant a waiver on July 22, 2019 for the Company to issue new shares of Common Stock after previously having acted together to allow a February 19, 2019 waiver;

(b) Anson, Brio and Molinsky acting as a group with respect to the negotiated September 20, 2019 amendment to the Secured Convertible Notes they owned, which was not offered or provided to other holders of the Secured Convertible Notes;

(c) Iroquois and Brio, despite owning shares of Preferred Stock, not being signatories to the November 20, 2019 settlement agreement and release the Company entered into with the Chehebar Group;

(d) Anson, Brio and Iroquois entering into the December 16, 2019 Exercise Agreements on the same terms which were not offered to other warrant holders;

(e) The Chehebar Group, despite owning GBI securities, not participating in the purchase of any securities issued pursuant to the SPA;

(f) Defendants forming a group to purchase the Company's securities pursuant to the SPA with the exemption from the existence of a group otherwise provided by SEC Rule 13d-5(b), 17 C.F.R. §240.13d-5(b), not applying because:

i. One of the purposes of the transaction as evidenced by the Voting Agreement involved changing or influencing control of the issuer within the meaning of SEC Rule 13d-5(b)(ii), 17 C.F.R. §240.13d-5(b)(ii);

ii. The change in terms of the Previously Issued Warrants constituted an "agreement among, or between any members of the group to act together with respect to the issuer or its securities except for the purpose of facilitating the specific purchase involved" within the meaning of SEC Rule 13d-5(b)(iii), 17 C.F.R. §240.13d-5(b)(iii);

iii. The Voting Agreement and Lock-Up Agreement being conditions precedent to Defendants' purchases of the Convertible Notes constituted an "agreement among, or between any members of the group to act together with respect to the issuer or its securities except for the purpose of facilitating the specific purchase involved" within the meaning of SEC Rule 13d-5(b)(iii), 17 C.F.R. §240.13d-5(b)(iii);

iv. Engaging in the following non-ministerial actions falling within the meaning of SEC Rule 13d-5(b)(iv), 17 C.F.R. §240.13d-5(b)(iii), limiting the SEC Rule 13d-5(a) exemption from being considered members of a group where "[t]he only actions among or between any members of the group with respect to the issuer or its securities subsequent to the closing date of the non-public offering are those which are necessary to conclude ministerial matters directly related to the completion of the offer or sale of the securities":

1. Voting in favor of the Stockholder Approval at the Stockholder Meeting;

2. Agreeing to a waiver in connection with the Company's May 28, 2020 sale of Common Stock;

3. Entering into the Conversion Agreement; and

4. Entering into the Leak-Out Agreement.

(g) Some or all of the Defendants forming a group to negotiate new terms for the Warrants issued by the Company prior to March 17, 2020 which was also not exempt under SEC Rule 13d-5(b) for the same reason as the other purchases of securities made in connection with the SPA;

(h) Each Defendant having the right under the SPA to cause the Company to enforce the Voting Agreement while also having the right as a third-party beneficiary to enforce the Voting Agreement;

(i) Each Defendant having the right under the SPA to cause the Company to enforce the Lock-Up Agreement while also having the right as a third-party beneficiary to enforce the Lock-Up Agreement;

(j) Anson being authorized by all Defendants to act as their Lead Investor and the sole collateral agent under the terms of the Security and Collateral Agreement;

(k) Defendants entering into agreements to share the risks and rewards from the ownership of the Convertible Notes including the right to *pro rata* redemption and the Master Netting Agreement;

(l) Each Defendant entering into the Conversion Agreement; and

(m) Each Defendant entering into the Leak-Out Agreement allowing for enforcement of its terms by a third-party beneficiary, *i.e.,* other Buyers.

101. Defendants' acquisition of the Warrants on or about March 17, 2020 was a purchase of Common Stock for $0.26 per share within the meaning of SEC Rule 16b-6(a), 17 C.F.R. §240.16b-6(a), because they involved the setting of a call equivalent position within the meaning of SEC Rule 16a-1(b), 17 C.F.R. §240.16a-1(b).

102. The change in the conversion prices for the Convertible Notes, the Warrants and the Previously Issued Warrants taking place on May 15, 2020, at the time of the Stockholder Approval, constituted a purchase of Common Stock at no more than $0.21 per share because it constituted an increase in a call equivalent position within the meaning of SEC Rule 16b-6(a), 17 C.F.R. §240.16b-6(a).

103. Any purchases by Defendants of Common Stock which took place through Securities Purchase Agreements entered into on or about May 7, 2020, May 18, 2020 and May 28, 2020 (¶¶69, 72, 73) constituted purchases within the meaning of the Exchange Act.

104. The cashless exercises of the warrants including those referenced in the June 11, 2020 Prospectus (¶7776) constituted sales of a call equivalent position and as such were sales of Common Stock within the meaning of SEC Rule 16b-6(b), 17 C.F.R. §240.16b-6(b).

105. Defendants sold shares of Common Stock: (a) registered with the SEC pursuant to and the subject of the June 2020 Prospectus and the July 2020 Prospectus; (b) originally purchased in the offerings taking place on or about March 22, 2020, May 7, 2020, May 18, 2020 and May 28, 2020; (c) owned prior to March 11, 2020; and (d) other shares of Common Stock they otherwise purchased. Plaintiff does not know the precise date and terms of those or any sales of Common Stock because Defendants failed to disclose those transactions as required by Section 16(a) of the Exchange Act, 15 U.S.C. §78p(a).

106. Defendants' sales of Common Stock took place within six months of Defendants' purchases of Common Stock.

107. Defendants' sales of Common Stock were made at prices higher than their purchases of Common Stock.

## BASIS FOR INFORMATION AND BELIEF

108. Plaintiff's information and belief is based upon filings made with the SEC by and with respect to Genius Brands, a review of Court filings with respect to Genius Brands, and a review of other publicly available information concerning the Company and the Defendants, with the Company's and Defendants' disclosures being opaque with respect to transactions in the Convertible Notes, Warrants and Common Stock.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants for the benefit of Genius Brands in an amount to be determined at trial, plus pre-judgment interest, post-judgment interest and such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 1, 2023

By: /s/ Jeffrey S. Abraham

Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email: jabraham@aftlaw.com
mklein@aftlaw.com