UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TODD AUGENBAUM,

                        Plaintiff,

  -against-

ANSON INVESTMENTS MASTER FUND LP, et al.,

                        Defendants.

22-cv-249 (AS)

MEMORANDUM OPINION
AND ORDER

ARUN SUBRAMANIAN, United States District Judge.

    The plaintiff in this § 16(b) securities case is Todd Augenbaum, a shareholder in Genius Brands International, Inc. The defendants are institutional investors who traded Genius securities in 2020. Augenbaum says that the defendants were corporate "insiders" at the time they made their trades because they beneficially owned more than 10% of Genius securities. If true, then the defendants were subject to § 16(b)'s bar on short-swing trading by insiders and may have to disgorge their profits to Genius. There are two questions on this motion: Does Augenbaum have standing? If so, does the complaint plausibly allege that the defendants were 10% beneficial owners? The answer to both questions is yes, so the motion to dismiss is DENIED.

## BACKGROUND

### A. Factual background

    Augenbaum sued the defendants, several investment companies, alleging that their trades in Genius violated § 16(b) of the Securities Exchange Act. Am. Compl. ¶ 9, Dkt. 105. That section prohibits "short-swing" trades by certain defined insiders, including "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security." 15 U.S.C. § 78p(a)(1). Augenbaum argues that the defendants were beneficial owners of more than 10% of Genius's securities and engaged in short-swing trades, requiring them to disgorge their profits to Genius. As allowed by § 16(b), Augenbaum brings this action derivatively on Genius's behalf. *See* § 78p(b).

    Here is the background on the defendants' trades: In March 2020, Genius needed financing, so the company, the defendants, and Andy Heyward (the CEO of Genius) negotiated a Securities Purchase Agreement (SPA) and other related contracts. ¶¶ 5, 54–55. Under the SPA, Genius would sell notes and warrants to the defendants and Heyward that would be convertible (at favorable

terms) to Genius common stock. ¶ 54.[1] Augenbaum says that the defendants coalesced for the deal based in part on "prior alliances" among some of them "relating to the purchases and sales of Genius securities," and in part on some defendants being "longstanding clients" of Special Equities Group LLC, the company's private-placement agent. ¶ 8; *see also* ¶¶ 26–53.

The SPA provided that before the defendants were bound to buy the notes and warrants, Genius needed to execute both a voting agreement and a lock-up agreement with a group of principal stockholders (those holding 40% of the outstanding common stock). ¶¶ 57–58. The voting agreement required the stockholders to vote in favor of the issuance of the notes and warrants, including the price at which the defendants could turn their notes and warrants into Genius stock ($0.21 a share). *Id.*; *see also* Dkt. 125-2 at 2; Dkt. 125-1 at 34. As for the lock-up agreement, it banned the stockholders from selling their common stock for a year and ninety days after the SPA's closing. Dkt. 125-3 at 2.

The principal stockholders agreed to the voting and lock-up agreements on March 17, 2020, and Genius and the defendants closed on the SPA that day. ¶ 65. The defendants were not themselves parties to the voting or lock-up agreements, which were between Genius and the principal stockholders. But as noted above, those agreements were conditions to closing on the SPA, and if any stockholder breached either the voting or lock-up agreement, Genius promised to "promptly use its best efforts to seek specific performance." Dkt. 125-1 at 32, 34. If Genius failed to do so, the defendants were entitled to seek injunctive relief against the company to force it to invoke its rights. *Id.* at 50. The shareholders, in line with the voting agreement, voted to approve the notes and warrants on May 15, 2020. ¶ 70.

Augenbaum alleges that the defendants negotiated the SPA "as a group." ¶ 54. In support of this allegation, the complaint alleges that the SPA "was negotiated by a single lead investor," defendant Anson Investments. ¶ 63. And further reflecting the defendants' group action, the complaint alleges that the defendants "appointed Anson as the collateral agent for the Agreement and authorized Anson . . . to take any relevant action on behalf of" the defendants. *Id.* The SPA also had provisions designed to make sure each defendant would be treated equally. If Genius wanted to issue more stock before the defendants' notes were redeemed, Genius was required to apply the issuance's proceeds to the redemption of the defendants' notes "on a *pro-rata* basis," meaning equally for each defendant. ¶ 61. A defendant could give up its *pro rata* distribution right, but neither Genius nor the other defendants could take it away. Dkt. 125-1 at 33.

On or about June 23, 2020, Genius entered into an agreement for the defendants to convert their notes to shares, along with a so-called "leak-out agreement." ¶ 83. The leak-out agreement provided that each of the defendants could not sell the stock they received for less than $2 per share, subject to an exception, for thirty days. ¶¶ 83–84.

---

[1] For simplicity, the rest of this summary of the complaint's allegations focuses on the defendants, but as noted above, the transactions at issue are also alleged to involve Heyward.

The complaint alleges that, in the second quarter of 2020, the defendants converted all their notes and exercised many of their warrants, acquiring about 100 million Genius shares. ¶ 89. Then, in June and July, Genius issued press releases touting future programming that included Arnold Schwarzenegger and Stan Lee's comics. ¶¶ 79, 90, 92. The complaint alleges that the press releases issued on July 6 and July 15 were "designed to generate investor interest to facilitate the sale" of stock issued as a result of the conversion of the defendants' notes and to allow the sale of the stock to occur "rapidly and profitably." ¶ 93. Augenbaum alleges that the defendants sold their shares in this timeframe, as Genius's share price rose on the news. ¶¶ 91, 93–95, 105–06.

### B. Legal background

"Short-swing trading is defined as the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be 'insiders,' who are presumed to have access to confidential corporate information not generally available to other participants in the public market." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). An insider is "a person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security." 15 U.S.C. § 78p(a)(1).

The SEC's regulations do not require that a single person own more than 10%. Instead, a "person" will be "deemed a beneficial owner pursuant to section 13(d) of the [Exchange] Act and the rules thereunder." 17 C.F.R. § 240.16a-1(a)(1); *Morales*, 249 F.3d at 122. And § 13(d) states that a beneficial owner can be a "group." 15 U.S.C. § 78m(d)(3) ("When two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer, such . . . group shall be deemed a 'person' for the purposes of this subsection.").

Consistent with § 13(d), Rule 13d-5(b) states that a group is formed when "two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1); *see also Roth v. Jennings*, 489 F.3d 499, 507–08 (2d Cir. 2007). That agreement "may be formal or informal and may be proved by direct or circumstantial evidence." *Morales*, 249 F.3d at 124.

Finally, to be held liable under § 16(b), a trader must be an insider at the time of both purchase and sale. 15 U.S.C. § 78p(b). And both trades must take place within a six-month window. *Id.*

### C. Procedural background

Prior to reassignment of this case to me, Augenbaum's first complaint was dismissed without prejudice. *See Augenbaum v. Anson Invs. Master Fund LP*, 2023 WL 2711087, at *1–3 (S.D.N.Y. Mar. 30, 2023). There, the Court held that Augenbaum failed to plausibly plead that the defendants had formed a group. Augenbaum amended his complaint, and the defendants have moved to dismiss on the same basis as before. *See* Dkts. 105, 123. The Court held a hearing on the motion on November 16, 2023. Dkt. 138.[2]

---

[2] In addition to the group argument, Augenbaum argues that the defendants were beneficial owners under a different regulation, Rule 13d-3, which deals with control over voting and investment

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Second Circuit has "underscore[d]" that "*Twombly* does not impose a probability requirement at the pleading stage." *Keiler v. Harlequin Enterprises Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014). "It simply requires factual allegations sufficient to raise a reasonable expectation that discovery is likely to generate evidence of liability." *Id.* In reviewing a motion to dismiss, the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).

## DISCUSSION

### I. Augenbaum has standing

Before reaching the merits, the Court must address whether Augenbaum has standing to pursue this case. Augenbaum's suit is derivative, so he stands in Genius's shoes. *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 176 (2d Cir. 2012). Augenbaum does not allege that Genius suffered economic injury because of the defendants' trades or that defendants traded on insider information to the detriment of Genius and its shareholders. But about a decade ago, the Second Circuit held in *Bulldog* that such allegations are unnecessary to establish a plaintiff's standing in a § 16(b) case. The question is whether *Bulldog* remains good law after the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).

#### A. *Bulldog* remains good law

This Court is bound by *Bulldog* unless *TransUnion* "so undermines [the case] that it will almost inevitably be overruled." *Austin v. United States*, 280 F. Supp. 3d 567, 572 (S.D.N.Y. 2017) (citation omitted). Said another way, the Court is bound by *Bulldog* unless it would be impossible to comply with both its commands and those of the Supreme Court in *TransUnion*. Here, the Court is not presented with such a conundrum, because *Bulldog* and *TransUnion* can be reconciled.

In *TransUnion*, the Supreme Court emphasized that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." 594 U.S. at 426. In deciding concreteness, "history and tradition offer a meaningful guide": "courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 424 (cleaned up). The

---

power. Dkt. 126 at 18–19. The Court received post-argument letters on this rule, given the paucity of the parties' briefing, and the lack of authoritative guidance on the rule or its application from the SEC. *See* Dkts. 136, 137. Because the Court holds that the amended complaint's group allegations suffice, the Court does not address this alternative ground.

"inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.*

Such injuries can be tangible, like economic or physical harm. *Id.* at 425. They can also be intangible, like reputational harm. *Id.* And though "Congress's say-so" is not sufficient, its "views may be instructive." *Id.* at 425–26 (cleaned up). Congress "may not simply enact an injury into existence," but it "may elevate harms that exist in the real world before Congress recognized them to actionable legal status." *Id.* at 426 (cleaned up).

*Bulldog*'s reasoning is consistent with *TransUnion*. *Bulldog* held that "§ 16(b)'s flat rule effectively makes 10% beneficial owners fiduciaries," and the court recognized that short-swing trading by those fiduciaries is a "breach[] of trust." 696 F.3d at 177 (cleaned up). The *Bulldog* court was not the first to characterize a violation of § 16(b) as a breach of trust. In fact, that account comes from no less than Judge Learned Hand. "As Judge Hand explained, even at common law, a fiduciary's duty to a beneficiary often required more than the avoidance of actual unfair dealing: 'A trustee with power to sell trust property is under a duty not to sell to himself either at private sale or at auction, whether the property has a market price or not, and whether the trustee makes a profit thereby.'" *Id.* (quoting *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir. 1951)).

"All such transactions are breaches of trust," which satisfies *TransUnion*'s search for a traditional injury. *Gratz*, 187 F.2d at 49; *see also Avalon Holdings Corp. v. Gentile*, 2023 WL 4744072, at *6 (S.D.N.Y. July 25, 2023); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 321 (1936) (describing "shareholders" as having "a proprietary interest in the corporate enterprise which is subject to injury through breaches of trust or duty on the part of the directors"); *Taylor v. Benham*, 46 U.S. 233, 275 (1847) ("A trustee is liable for misconduct or breach of trust or negligence, as well as for money actually received. And if in these ways he injures the *cestui que trust*, he is [further] liable, whether he himself gains by his misbehaviour or not." (citation omitted)); *Koehler v. Black River Falls Iron Co.*, 67 U.S. 715, 721 (1862) ("In executing this [insider transaction], and thereby securing to themselves advantages which were not common to all the stockholders, they were guilty of an unauthorized act, and violated a plain principle of equity applicable to trustees. The directors are the trustees or managing partners, and the stockholders are the *cestuis que trust*, and have a joint interest in all the property and effects of the corporation, and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of equity, be suffered to pass without a remedy." (cleaned up)).

A breach of trust is a well-established traditional injury, but it is also supported by a concrete rationale. "A corporate issuer, after all, has an 'interest in maintaining a reputation of integrity, an image of probity,' for its § 16(b) insiders 'and in insuring the continued public acceptance and marketability of its stock.'" *Bulldog*, 696 F.3d at 177–78 (quoting *Diamond v. Oreamuno*, 24 N.Y.2d 494, 499 (N.Y. 1969)). "This interest is injured not only by actual insider trading but by any trading in violation of an insider's fiduciary duty, including the trading altogether prohibited by § 16(b)." *Id.* at 178. So the injury depends "not on whether the § 16(b) fiduciary traded on inside information but on whether he traded at all." *Id.* at 177.

5

This traditional breach of trust is different from *TransUnion*'s examples of non-concrete claims: a resident of Hawaii suing for pollution in Maine where "[t]he violation did not personally harm the plaintiff in Hawaii," 594 U.S. at 427; damages claims over misleading credit files where the files were never given to any creditor, *id.* at 433–39; and damages claims based on disclosures that "were formatted incorrectly," when the formatting caused no harm and no information was withheld, *id.* at 440. As the Court in *TransUnion* observed, those claims had no common-law analogues. Unlike the traditional breach-of-trust injury arising from a § 16(b) violation, they were "bare procedural violation[s], divorced from any concrete harm." *Id.* at 440 (alteration in original) (quoting *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016)).

Because *Bulldog* can be reconciled with *TransUnion*, this Court is required to follow it, just as the majority of other courts have done. *See Avalon*, 2023 WL 4744072, at *6; *Safe & Green Holdings Corp. v. Shaw*, 2023 WL 5509319, at *2 (S.D.N.Y. Aug. 25, 2023); *Revive Investing LLC v. 20 Armistice Cap. Master Fund, Ltd.*, 2023 WL 5333768 (D. Col. Aug. 18, 2023). *But see Packer ex rel. 1-800 Flowers.com, Inc. v. Raging Cap. Mgmt., LLC*, 661 F. Supp. 3d 3, 13 (E.D.N.Y. 2023). Of course, if the Second Circuit or Supreme Court gets rid of *Bulldog*, then Augenbaum will need to allege a concrete injury consistent with whatever the law at that point requires. But for the time being, *Bulldog* remains binding on this Court.

### B. The defendants' acting as a group doesn't change the analysis

Even if *Bulldog* remains good law, the defendants argue, this case presents an added wrinkle. Here, Augenbaum says the defendants exceeded the 10% ownership threshold by combination. The defendants say that "there is no historical analog to imposing fiduciary-like duties on shareholders that a plaintiff amalgamates into a 'group.'" Dkt. 124 at 20. But for starters, it's not clear that the defendants' history is right. The one case they cite is about duties only "[u]nder Delaware law," not wider historical traditions. *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987). And it speaks to only the necessary degree of ownership or control, not aggregations of ownership by cooperating parties. *Id.* Plus, it expressly "recognize[s] that one who knowingly joins with a fiduciary . . . in a breach of a fiduciary obligation is liable to the beneficiaries of the trust relationship." *Id.*; *see also* Austin Wakeman Scott, *Participation in a Breach of Trust*, 34 Harv. L. Rev. 454, 454 (1921) ("Anyone who participates with a trustee in a breach of trust may be held liable in a court of equity to the *cestui que trust*."). Although no investor here had a fiduciary obligation before forming a group, incurring new responsibilities and liabilities after joining forces is not unusual. *See, e.g.*, *Dubroff v. Wren Holdings, LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) ("[A] number of shareholders, each of whom individually cannot exert control over the corporation . . . can collectively form a control group . . . by contract, common ownership, agreement, or other arrangement . . . . In that case, the control group is accorded controlling shareholder status, and, therefore, its members owe fiduciary duties to their fellow shareholders.").

And even if the defendants' distinction were historically accurate, they haven't explained why it should make a constitutional difference. Fundamentally, the "Constitution deals with substance,

not shadows." *Cummings v. Missouri*, 71 U.S. 277, 325 (1866). So whether it is one investor holding 10% or two cooperating investors each holding 5%, the "legal result must be the same, for what cannot be done directly cannot be done indirectly." *Id.* Congress itself recognized this in § 16(b) when it made clear that beneficial ownership may exist either "directly or indirectly," and the Second Circuit has noted that the purpose of § 13(d)'s group requirement was to avoid "evasion" of that statute's reporting requirements. *Morales*, 249 F.3d at 132. So even if the injury here were not an "exact duplicate" of a traditional breach of trust, the two would have a sufficiently "close relationship." *TransUnion*, 594 U.S. at 433.

## II. The complaint plausibly alleges that the defendants were 10% beneficial owners under § 13(d) and Rule 13d-5

The "touchstone of a group within the meaning of section 13(d) is that the members combined in furtherance of a common objective." *CSX Corp. v. Children's Inv. Fund Management (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011) (citation omitted). And that common objective must be "acquiring, holding, voting or disposing of" an issuer's shares. 17 C.F.R. § 240.13d-5(b)(1). Forming a group takes no more than that—it doesn't require kickbacks, cut-ins, or any other "specific set of terms." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). The complaint will survive a motion to dismiss so long as it plausibly pleads that the defendants "reached an understanding to act in concert" to acquire or dispose of Genius's stock. *Id.*

"Where, as here, a claim is premised on the existence of an agreement, 'stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made.'" *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 346 (S.D.N.Y. 2011) (quoting *Twombly*, 550 U.S. at 556). "Allegations of parallel investment decisions . . . do not suffice to plead a group." *Nano Dimension Ltd. v. Murchinson Ltd.*, 2023 WL 4422788, at *8 (S.D.N.Y. July 10, 2023). Instead, the allegations "must be placed in a context that raises a suggestion of a preceding agreement" or include some "further circumstance pointing toward a meeting of the minds." *Twombly*, 550 U.S. at 557. These allegations must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

The defendants say that Augenbaum can't meet this standard, first because all his arguments are foreclosed by the Court's decision on the first motion to dismiss, which the defendants say is law of the case. But the law-of-the-case doctrine is "discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). And while the Court's thoughtful opinion on the defendants' first motion to dismiss is instructive, it was about a prior complaint that has since been amended. Under these circumstances, the Court will analyze the issues from scratch.

Taking the complaint's allegations together, Augenbaum has alleged enough to raise his right to relief "above the speculative level." *Twombly*, 550 U.S. at 555. Viewed in the light most favorable to Augenbaum, as *Twombly* requires, here is the story the complaint tells: The defendants were seeking notes and warrants that could be exchanged for Genius stock at a low price. They appointed a single lead investor and collateral agent—defendant Anson—to negotiate and oversee

the deal. They entered into a single agreement, the SPA, which had provisions to make sure each defendant would be treated equally, like requiring *pro rata* redemptions of the defendants' notes. The defendants further ensured that the deal would go through and wouldn't be undermined by shares flooding the market by requiring voting and lock-up agreements that the defendants could sue the company to enforce. The defendants quickly turned their notes and warrants into Genius stock, right before big corporate news broke. Around that same time, they also made a pact with each other (the leak-out agreement) not to hurt the price of Genius stock by selling shares on the cheap. And when the big news hit and Genius's stock price shot up, the defendants sold their stock for a huge profit.

To be clear, none of these facts has been proved at this stage. But there's enough here to make it more than just speculative that the defendants reached an agreement concerning the "acquiring, holding, voting or disposing of" Genius stock. 17 C.F.R. § 240.13d-5(b)(1); 15 U.S.C. § 78m(d)(3). To hold that the complaint's allegations do not even "raise a reasonable expectation that discovery is likely to generate evidence of liability," *Keiler*, 751 F.3d at 71, would be to impose a "probability requirement at the pleading stage," *id.*, exactly what the Supreme Court and Second Circuit have made clear that courts are not to do.

The defendants cite cases holding that certain facts, like the use of a single contract or appointment of a lead investor, are not enough to give rise to the inference of a group. *See, e.g.*, *Greenberg v. Hudson Bay Master Fund Ltd.*, 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015) (single agreement); *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) (lead investor). Relying on these cases, the defendants invite the Court to pick off each of Augenbaum's allegations one by one until nothing is left. But there are also allegations that have been held relevant to inferring a group, such as (1) "prior relationships and trading patterns," *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 618 (2d Cir. 2002), (2) that the SPA "allocate[s]" certain payments among defendants equally, *Schaffer v. CC Invs., LDC*, 153 F. Supp. 2d 484, 488 (S.D.N.Y. 2001), and (3) that the voting, lock-up, and leak-out agreements "directly governed the holding and disposing of [Genius] common stock," *Morales*, 249 F.3d at 127.

In any event, "a complex factual finding such as that required here cannot be reduced to a checklist." *Hallwood*, 286 F.3d at 618. And on a motion to dismiss, the Court must "assess[] the allegations of the complaint as a whole and draw[] all reasonable inferences in the plaintiff's favor." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 979 (2d Cir. 2023) (cleaned up). Here, while the mere fact that the defendants signed onto a single purchase agreement or appointed a lead investor might not be enough to plausibly allege a group, those facts are among several allegations that, when viewed in Augenbaum's favor, paint a picture of a coordinated strategy to acquire and then dispose of Genius stock for a profit. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) ("The proper question is whether there is a permissible relevant inference from '*all* of the facts alleged, taken collectively,' not whether an inference is permissible based on 'any individual allegation, scrutinized in isolation.'" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).

The defendants also say Augenbaum must have evidence of communications among the defendants to demonstrate that they acted as a group. Indeed, this was a focus of the prior motion-to-dismiss decision. *See Augenbaum*, 2023 WL 2711087, at *6–10. But the key cases that the defendants and the prior decision cite for this idea are at summary judgment or even later. *See Litzler*, 411 F. Supp. 2d at 412 (summary judgment); *Wellman*, 682 F.2d at 358 (appellate review of a bench trial). That makes sense—internal communications are exactly the kind of evidence that will be turned over in discovery. But the Federal Rules don't require smoking guns in the pleadings.

To be clear, Augenbaum must find evidence to support his claims in discovery. If discovery doesn't reveal anything beyond industry-standard contracts and parallel investments, Augenbaum will face an uphill climb on summary judgment. On the other hand, if discovery reveals emails and meetings among the defendants and a coordinated strategy relating to Genius securities, Augenbaum will be in a stronger position. As it stands, the latter inference is plausible, so this Court cannot dismiss the complaint before a page of discovery has been turned over.

### III. The complaint plausibly alleges matching purchases and sales

Finally, the defendants argue that Augenbaum has failed to allege that they were insiders both when they bought and when they sold their shares. *See* Dkt. 124 at 18–19. The defendants say they didn't buy shares after May 2020, so a group formed by agreements after that time (such as the leak-out agreement) doesn't count. But the vast majority of Augenbaum's allegations are based on the negotiation and terms of the SPA, which was executed in March. And even if some of the group-related allegations postdate the defendants' purchases, those later agreements can still "shed light backwards in time" by evidencing a preexisting agreement. *Morales*, 249 F.3d at 127.

## CONCLUSION

For these reasons, the defendants' motion to dismiss is DENIED. The Clerk of Court is directed to close Dkt. 123.

SO ORDERED.

Dated: January 24, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge

9