Abraham Declaration Exhibit 86
(EMPGNUS0004231-41)

| From: | Joe Reda [reda@theseg.com] |
|---|---|
| Sent: | 1/23/2020 2:15:22 AM |
| To: | Ryan Lane [ryan.lane@emperyam.com] |
| CC: | Brett Director [Brett.Director@emperyam.com]; Jonathan Schechter [shex@theseg.com]; Linda Mackay [linda@theseg.com] |
| Subject: | GNUS - Empery over the wall |
| Attachments: | GNUS - AIMF - Term Sheet - Jan 22 2020.pdf |

Importance:    High

Ryan,

GNUS (NASDAQ - $5mil Pre-Money Val)

**https://www.youtube.com/watch?v=vI5-MBZbohM**

This is a Highly structured piece of paper...It's a Self-Amortizing Senior Secured Convertible Note Original Issue discount with ratchets and resets and price protection and most favored nations with 100% warrants with the same protective features as the note.

AMIN is the lead for $3mil out of $10mil...other note holders are in for another $2mil....We are open on $5mil and **YOU SHOULD PLAY FOR SIZE!**

Please be nice...Thanks for the "imitation is the greatest form of flattery"!

-Reda

Pursuant to our discussion and as an inducement to obtain confidential investment information, this will confirm that you have *agreed to keep the information to be disclosed/discussed as confidential and have agreed to not disclose the content of the information to any party not bound by our agreement. Furthermore, you agree not to use the information presented in connection with any investment outside the nature and scope of the proposed investment opportunity. This agreement shall terminate at the earliest of the public release of the information discussed or the completion/termination of the proposed offering.*

**The below fundamentals of the company are ALL in the public domain, through 10K's, 10Q's, 8k's, PR's, Investor letters, website, etc.**

*Media Assets:*

2 tent pole brands that have become big broadcast successes on Nick and Netflix (Rainbow Rangers and Llama)

*1.      The shows are performing very well on air in an extremely competitive environment, so we know there is an appetite for the characters.*

*2.      There are licensed products in virtually all categories coming into the market.*
*3.      The likelihood of all these blue-chip licensees, having failed in their due diligence and them all subsequently failing at retail would be quite hard to imagine, and to my knowledge has never occurred.  When so many manufacturers get behind a brand that is already performing successfully in entertainment, the products sell.* (Many of us saw the ratings doing well 5 years ago for Peppa Pig, PJ Masks, and Paw Patrol, and we knew that a few years later, they would be generating a fortunate from product sales.)

Robust pipeline including Stan Lee's last project, *Stan Lee's Superhero Kindergarten* starring Arnold Schwarzenegger being launched this year.

EMPGNUS0004231

We expect that this cartoon will becomes the 3rd tent pole brand for us, alongside *Rainbow Rangers*, and *Llama Llama*. It is **STAN LEE'S SUPERHERO KINDERGARTEN** (STARRING Arnold Schwarzenegger). Arnold is so enthusiastic about the program that he has chosen to take his full compensation in Genius Brands stock. The initial response has been extremely strong and we have closed some major deals, including Alibaba becoming our global partner, and will distribute and put up on their massive platform in China. We have multiple toy company offers. We have a robust pipeline in large part fueled by a package of Stan Lee properties which we co-created and share with his estate from right before he passed away. Stan Lee has created more billion dollar brands than anyone (*Spider-man, Hulk, X-Men, Fantastic Four, Captain America, Black Panther, Guardians of the Galaxy, The Avengers.)*

**_Media & Merchandise Partners:_**

1. Consumer products contracted for coming to market this year with over 450 product SKUs
2. Mattel
3. WalMart
4. Target
5. Bentex
6. Direct/Sling
7. Mattel
8. Random House/Penguin
9. Target
10. WalMart
- Alibaba
- Nickelodeon
- Amazon Prime/Amazon Fire
- Netflix
- Sony
- Cox
- Comcast
- POW!
- US Public TV

*Genius has now a network of partnerships and licensees*, each of whom are interconnected into our brands and businesses through an incredible ecosystem that is early stages of coming online. From broadcasters to licensees, to retail. They are tiffany players, who do their own due diligence, and play to win.

**_Genius Kids Network_ is also a powerful asset in our portfolio. I consider it like oil in the ground about to be pumped.** Distributed in over 80% of US TV households. Time will prove this to be an important driver of value for the company.

**The list of Genius Brands' core partners is a '_Dream Team_,' that others couldn't begin to imagine or duplicate:**

**We have over 450 SKUs contracted and coming to market in the coming months for both _Llama Llama_ and _Rainbow Rangers._**
**_Other Salient Points:_**

11. Approximately $5 million of minimum guarantees (a ridiculously high number relative to the market cap of the company). Some require nothing, some are subject to different deliverables.

EMPGNUS0004232

12.     Contracting industry, where similar companies are being sold daily for quite large amounts of money, and we are quickly becoming, 'the last oasis in the desert'

13.     *HUMAN CAPITAL*-The human capital in the company as I have often said, coming from Disney, Hasbro, and Spinmaster is pedigreed and proven.

14.     a company called Entertainment One which fundamentally had 2 assets only…"Peppa Pig" and "PJ Masks" was sold for $4.2 billion dollars.  We are in a time where the media industry is amidst its own reset.  Every major media company in the world is now investing in their own streaming service. Disney+, HBO Max, Peacock, and CBS are just the tip of the iceberg joining Netflix, Amazon, and Hulu.  The one common point is that they all need content.  As the likes of Disney and Warner's pull back all of their own content, only for their own services, kids content more than ever is becoming scarce and in demand.

15.     Genius is not a day trade.  It is a long term bet based on tangible real catalogue assets, pipeline, and tiffany relations across the entire kids content and consumer products food chain.

16.     ….Look at what the recent comparable sales have been for companies like ours.

17.     The heavy lifting is *already done*.

18.     *WHY NOW?* It takes 4-5 years from creation of a children's property, to production, distribution, licensing, to *on- shelf at retail*.  *On-shelf at retail* is where the money finally arrives from.  As Warren Buffett once said to me, "*You can't cook a 3 minute egg in 90 seconds, no matter how many stoves you have.*" We have built a good catalogue over the last 6 years since the company began; however, two of our shows have now emerged as hits.  *Lllama Llama* on Netflix, and *Rainbow Rangers* on Nickelodeon.  Both have strong ratings. Both have been renewed for second seasons, and both have very robust licensing programs now contracted for with products coming into the market. Combined, there are over 450 product SKUs in every imaginable category of children consumer products.  When a show hits, the numbers can be in the *$billions*, not millions. This is not anecdotal, but real-world outcomes for TV driven properties. *Paw Patrol*, *Peppa Pig*, *PJ Masks*, to name only 3 in our very pre-school space.  (*Strawberry Shortcake,* which I produced, did over $5 billion.) *Rainbow Rangers* has often been referred to as the "*Paw Patrol* for girls."  *Paw Patrol* has a 4-year head start on *Rainbow Rangers*, yet at this point, we are significantly ahead of where they were at their launch.  Another interesting data point is Entertainment One, a UK based kids company which has 2 strong brands.  *Peppa Pig* and *PJ Masks*. They have also a 5-year head start on us, and they were recently sold to Hasbro for $4.2 billion, based exclusively on the success of those two kids brands.  I stated earlier that we have a product which is a very coveted asset.  Not too many years ago, the buyers were the major studios, e.g. Disney, Warner, Universal.  They still are of course, but with the explosion of new services, children's content is more coveted than ever.  Every day, there is a new streaming service announced. THEY ALL WANT ANIMATED CHILDRENS PRODUCT. It is evergreen and doesn't go out of style, and is the backbone of any program service.  (I worked on *The Flintstones* as my first job at Hanna-Barbera, and today you can still buy Flintstones vitamins at the drugstore, and Pebbles and Bam-Bam cereal at the supermarket, and Warner Brothers the owner of Hanna-Barbera still makes a ton of money from it.)  Netflix, Amazon, Apple, AT&T, Verizon, and many foreign companies like Alibaba and TenCent, are all seeking animated catalogues, and when the time is right, Genius is going to be poised to do a significant transaction. Today, we are like *the last oasis in the desert, and the real play is the equity play.*

19.     *The sale of Entertainment One to Hasbro for $4.2 billion dollars is very informative.*

20.     **We have two hits on the air today and a likely 3ʳᵈ one about to pop.  One on Netflix and one om Nickelodeon, and to the best of my knowledge there is only one other company besides the Walt Disney Company that has that and it is Entertainment One(Peppa Pig and PJ Masks) which was recently sold to Hasbro Toys for $4.2 billion dollars.  The main difference between E One and Genius is that their brands hit the marketplace about 5 years before ours so they have been running merchandising that much more time than us.  When those shows came on the air, it was 2-3 years before we saw product in the marketplace, but those like me, who know the industry knew it would be coming with huge value for them, because when the ratings are high, products follows.  The ratings of our shows are high and the product will follow.**

EMPGNUS0004233

**_CEO:_**

Andy Heyward

1.      I own a TON of stock
2.      I have *continued to buy more and more this year*.  I bought 2 million dollars last December in a block from my ex-wife. I bought 500 of debt 3 months ago and I bought 750,000 more after that a month ago. It has all been on Form 4 filings.  And that is in addition to  all of my earlier purchases from the start
3.      Despite that stock performance heretofore, the company's business is stronger than ever from a standpoint of assets.

**We provide a product that is highly coveted in the marketplace. Virtually every company that has produced animated cartoons has ultimately been sold for many times, their investment.  I, personally, have sold my previous company <u>3 times</u>. To Cap Cities/ABC, to the Walt Disney Company, and to Cookie Jar.  We will do it again, with Genius Brands, when the time is right.  I cannot say exactly, when that will be, but my guess is that it is in the next 24 months.**

**Our business is very simple:**

·      **We make children's animated content which we license to broadcasters around the world for fees.**

·      **We license the characters from our shows to manufacturers of consumer products for children.  They pay us royalties on all products sold.**

·      <u>**It is the exact same model as the Walt Disney Company.**</u>

Should you require "reference", as to myself and the company,  I will give you 5 names, and I'm sure each of them will give you the same reference, sic, that you are dealing with a team that is at the very top of our industry, that plays to win, and has the track record to demonstrate it.

·      *Warren Buffett* **(CEO, Berkshire Hathaway)**

·      *Bob Iger* **(CEO, Walt Disney Company)**

·      *Ynon Kreitz* **(CEO, Mattel Toys)**

·      *Brian Goldner* **(CEO, Hasbro)**

·      *Haim Saban* **(CEO, Saban Capital)**

Joe Reda
Founder/Partner

EMPGNUS0004234

The Special Equities Group "SEG"

150 E 58th St - 28th Floor
New York, NY 10155
(W) 212.258.2341
(C) 516.521.1354

(Email) reda@TheSEG.com



The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
**************************************************************

This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warranted by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************************ This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

EMPGNUS0004235



| | | |
|---|---|---|
| **Registered address** | **Anson Funds (USA)** | **Anson Funds (Canada)** |
| Intertrust Corporate Services | 5950 Berkshire Lane, Suite 210 | 155 University Avenue Suite 207 |
| 190 Elgin Ave | Dallas, Texas, 75225 USA | Toronto, Ontario, M5H 3B7 |
| George Town, Grand Cayman, KY1- | Tel. 214. 866.0202 | Canada |
| Cayman Islands | Fax. 214. 276.1395 | Tel. 416.447.8874 |
| | | Fax. 416.352.1880 |

*The purpose of this letter is to set forth the indicative terms pursuant to which, subject to certain conditions set forth herein, Anson Investments Master Fund LP (the "Purchaser") will participate as a lead investor in a transaction (the "Transaction") in which the Purchaser would purchase certain securities of the Company, and the Company would sell such securities to the Purchaser(s). The terms and conditions set forth herein does not constitute a binding offer. The issuance and sale of such securities is subject to the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party and, in the case of the Purchaser, that the Purchaser shall have determined that subsequent to the date hereof and prior to the closing of the Transaction, there shall have been no material adverse developments relating to the business, assets, operations, properties, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole.*

| | |
|---|---|
| **Issuer:** | Genius Brands Intl. (the "**Company**") |
| **Investors:** | Anson Investment Master Fund LP (the "**Lead Investor**"), and other institutional and accredited investors acceptable to the Lead Investor (together with the Lead Investor, the "**Investors**"). |
| **Offering Size:** | The Company will sell to the Purchaser(s), for the sum of $10,000,000 million of Senior Secured Convertible Notes (the "**Notes**") Original Issue Discount with a principal amount of $12,500,000 million (the "**Offering**"), of which the Lead Investor has committed to doing up to $3,000,000 if the offering is fully subscribed. |
| **Escrow:** | In the event that $10,000,000 is raised from the Offering, $4,000,000 from the Offering will be held in an escrow account, only to be released to the Company after (i) shareholder approval, and (ii) effectiveness of the registration statement covering all registrable securities. |
| | If both conditions have not been met within 6 months of Closing, all amounts from escrow will be returned to the investors as partial repayment of the principal of the Notes. |
| **Use of Proceeds:** | Debt repayment and working capital. |
| **Repayment of Existing Debt:** | Existing debt holders must invest in this deal at least 200% of the amount of their existing debt and then be repaid on the existing debt. |
| | The Lead Investor at its sole discretion may permit the Company to use some of the proceeds to repay existing debt holders in cash. |
| **Securities:** | Senior secured promissory notes (the "**Notes**"), that will be the most senior debt of the Company, except for certain existing credit lines. |
| **Maturity:** | The Notes shall mature 18 months from Closing (the "**Maturity Date**"). |

EMPGNUS0004236

| | |
|---|---|
| **Interest:** | The Notes shall not accrue any interest, except in the case of Default, in which case the Notes will then accrue interest at 18% per annum. |
| **Conversion Price:** | The conversion price for the Notes shall equal the lower of: a) 100% of the closing price of the common stock on the day of signing the definitive agreement plus $0.125 to qualify as an at market transaction for NASDAQ purposes or b) 100% of the average of the 5 prior closing prices plus $0.125 to qualify as an at market transaction for NASDAQ purposes (the "**Conversion Price**"). |
| **Closing:** | The closing of the transaction will take on or before February 7th (the "**Closing Date**") |
| **Registration:** | The Company will file a registration statement with SEC (the "Registration Statement") to register for resale within 10 days following the filing of its 10-K (the "**Filing Date**"), and will use its best efforts to cause such Registration Statement to become effective within 30 days of the Filing Date (or 60 days in the event of a regulatory review). If the Registration Statement is not filed or declared effective within the applicable timeframes, the company will pay liquidated cash damages of 1.0% of the aggregate purchase price for every month following the required filing or effective date (pro-rated for partial months). |
| **Most Favored Nation:** | If the Company enters into a subsequent financing, then the Investors at their sole discretion shall have the ability to exchange their Notes on a $1 for $1 basis into securities of the new transaction. Each investor shall have up to 5 days post-closing of the new transaction to make such election. Notwithstanding the foregoing, such right of exchange shall not become effective until receipt of Shareholder Approval pursuant to NASDAQ Listing Rule 5635(d). |
| **Share Reservation:** | The Company will always reserve enough shares from its authorized capital for all shares underlying the Notes. |
| **Standstill:** | The Company shall be prohibited from entering new financings unless the Company agrees to use 75% of the proceeds towards repayment of the Notes.<br><br>The Company shall not enter into any variable, reset, or otherwise adjustable transactions while the Notes are outstanding. |
| **Restrictive Covenants:** | Standard restrictive covenants for similar transactions, including but not limited to cash burn rate that is equal to or less than $550,000 per month after payment out of the proceeds from the Offering of placement agent fees, existing debt in the amount of $2,866,665 and outstanding fees of legal counsel not to exceed $350,000. |

EMPGNUS0004237

| | |
|---|---|
| **Shareholder Approval:** | The Company shall use its best efforts to file a preliminary proxy with the Securities and Exchange Commission by March 1, 2020 to present the provisions requiring stockholder approval contemplated hereby to its stockholders for approval (the "**Shareholder Approval**") in accordance with Nasdaq's rules and regulations no later than April 15, 2020. If the Company does not obtain Shareholder Approval at the first meeting, the Company shall call a meeting every three months thereafter to seek Shareholder Approval until the earlier of the date of Shareholder Approval is obtained or the Notes are no longer outstanding. |
| **Reset Conversion Price:** | The Conversion Price on the Notes shall decrease to $0.21 (the "Reset Conversion Price"), subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Warrants:** | At Closing, the Company will also issue to the Investors 100% of new warrants (the "**Warrants**") based on the number of common shares that the Notes are convertible into based on the $0.21 price. The Warrants shall have a 5 year life and initial exercise price equal to 100% of the closing price of the common shares immediately preceding the entry into of the definitive purchase agreement. The Warrants exercise price will decrease to $0.21 subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Anti-Dilution Protection:** | Further, the Notes and Warrants will have full ratchet anti-dilution protection for subsequent financings which shall not become effective until receipt of shareholder approval pursuant to NASDAQ Listing Rule 5635(d). |
| **Waivers:** | So long as the Lead Investor holds at least $1,000,000 of the Notes, they shall have the sole ability to waive or modify any transaction documents relating to the Offering. |
| **Existing Warrants** | Any existing Warrant holder that participates in the Offering will have their existing Warrants' exercise prices reduced to the Reset Conversion Price subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Redemption Dates:** | The Notes shall be redeemed in equal monthly redemptions equal to the $1/12^{th}$ of the principal value of the Notes (in each case, pro rata for each Investor) (each a Redemption Amount"). The first Redemption Date shall be the last trading day of the 6th month following the Closing Date. The remaining Redemption Dates shall be the last trading day of each month following the first Redemption Date. |
| **Redemption Payments:** | Each Redemption Amount shall be paid in full in cash, or if (a) the Equity Conditions are satisfied or waived and (b) the Company so chooses and Shareholder Approval has been obtained pursuant to Nasdaq Listing Rule 5635(d), in shares of common stock as set forth |

EMPGNUS0004238

below. To the extent that the Company elects to pay a full Redemption Amount in shares of common stock, then (A) twenty-three (23) trading days prior to the applicable Redemption Date (each such date being a "Pre-Installment Date"), the Company shall deliver to the Investor(s) a number of shares of common stock (each such quantity being a "Pre-Installment Share Amount") equal to the Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Pre-Installment Date (such lower price, the "Pre-Installment Redemption Price"), and (B) on the applicable Redemption Date, the Company shall deliver to the Investor a number of shares of common stock equal to (a) the amount of applicable Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Redemption Date (such lower price, the "Redemption Price"), less (b) any applicable Pre-Installment Share Amount delivered pursuant to the applicable Redemption Amount. Notwithstanding the foregoing, if the Redemption Price is less than 20% of the average of the five closing prices immediately prior to signing of the definitive documents (the "Floor Price"), then, at each Investor's option, (i) such Investor may elect to treat the Floor Price as the Redemption Price for some or all of the Redemption Amount, or (ii) for the Redemption Amount not reduced by shares pursuant to clause (i) above, the remaining Pre-Installment Share Amount shall be returned to the Company and the Company shall be required to pay such remaining Redemption Amount in cash.

**Market Price:** Equal to 85% of the average of the lowest five daily volume weighted average prices of common stock during the twenty consecutive trading days ending on the trading day immediately preceding the applicable date of determination.

**Equity Conditions:** Typical equity conditions, including without limitation, the Market Price being above the Floor Price, the average daily dollar volume of trading being greater than $100,000, the Company's common stock is listed or designated for quotation on the NASDAQ, the shares underlying the relevant Redemption Amount are registered for issuance or resale or eligible for public resale pursuant to Rule 144, the Company shall remain in compliance with the terms of the transaction documents, the Company's common stock meets certain reasonable price and volume requirements (to be determined), etc.

**Placement Agent:** The Special Equities Group will receive a 10% cash fee and 10% warrants with an exercise price equal to 100% of the closing price of the common stock immediately preceding the entry into of the definitive purchase agreement on all monies received by the Company as a result of this transaction.

EMPGNUS0004239

**Due Diligence /**
**Legal Fees:**          The Company will pay the Lead Investor's legal fees and expenses related to this transaction up to a maximum of $50,000, which amount shall be withheld by the Lead Investor at closing

**Confidentiality:**     The contents of this Term Sheet are confidential. The Company and each Investor agree that it will not show, circulate, or otherwise disclose this letter or its contents to any other person (other than its officers, employees, directors, affiliates and advisors, on a need-to-know basis).

EMPGNUS0004240

**Genius Brands Intl.**

Date: 1/22/2020

By: _____

Name: Michael Taff

Title: General Counsel

**Anson Investments Master Fund LP**

Date: 1/22/2020

By: _____

Name: Amin Nathoo

Title: Director, Anson Advisors Inc.

EMPGNUS0004241

Abraham Declaration Exhibit 87
(EW-AUG0013355-61)

Message

---

**From:** Joe Reda [reda@theseg.com]
**Sent:** 1/29/2020 3:35:46 PM
**To:** rmol15 [rmol15@aol.com]; rmol15@icloud.com
**Subject:** RE: GNUS - Mols over the wall

I have you in the shadow book for $100k

Let me know if I'm right

---

**From:** Joe Reda
**Sent:** Thursday, January 23, 2020 9:54 AM
**To:** rmol15; Jonathan Schechter; rmol15@icloud.com
**Cc:** Linda Mackay
**Subject:** RE: GNUS - Mols over the wall

THAT'S NOT THE DEAL

READ THE TERM SHEET

CALL FOR COLOR

**From:** rmol15 [mailto:rmol15@aol.com]
**Sent:** Thursday, January 23, 2020 9:54 AM
**To:** Jonathan Schechter; Joe Reda; rmol15@icloud.com
**Cc:** Linda Mackay
**Subject:** Re: GNUS - Mols over the wall

so do i ....thats why i am taking the money owed to me this month from gnus and rolling it into this debt deal ..thanks !!

-----Original Message-----
From: Jonathan Schechter <shex@theseg.com>
To: Joe Reda <reda@theseg.com>; Richard Molinsky - Max Communications (Richard Molinsky (rmol15@aol.com)) <rmol15@aol.com>; richard molinsky <rmol15@icloud.com>
Cc: Linda Mackay <linda@theseg.com>
Sent: Thu, Jan 23, 2020 9:50 am
Subject: RE: GNUS - Mols over the wall

The company is at an inflection point and this paper is very protective on the downside...Reda and I have been tirelessly working with the company to restructure everything. I like it

---

**From:** Joe Reda
**Sent:** Wednesday, January 22, 2020 9:39 PM
**To:** Richard Molinsky - Max Communications (Richard Molinsky (rmol15@aol.com)) <rmol15@aol.com>; richard molinsky <rmol15@icloud.com>
**Cc:** Jonathan Schechter <shex@theseg.com>; Linda Mackay <linda@theseg.com>
**Subject:** GNUS - Mols over the wall
**Importance:** High

Mols,

GNUS (NASDAQ - $5mil Pre-Money Val)

Confidential                                                                 EW-AUG0013355

https://www.youtube.com/watch?v=vI5-MBZbohM
This is a Highly structured piece of paper…It's a Self-Amortizing Senior Secured Convertible Note Original Issue discount with ratchets and resets and price protection and most favored nations with 100% warrants with the same protective features as the note.
AMIN is the lead for $3mil out of $10mil…other note holders are in for another $2mil….We are open on $5mil and **YOU SHOULD PLAY FOR SIZE!**
-Reda
Pursuant to our discussion and as an inducement to obtain confidential investment information, this will confirm that you have *agreed to keep the information to be disclosed/discussed as confidential and have agreed to not disclose the content of the information to any party not bound by our agreement. Furthermore, you agree not to use the information presented in connection with any investment outside the nature and scope of the proposed investment opportunity. This agreement shall terminate at the earliest of the public release of the information discussed or the completion/termination of the proposed offering.*
**The below fundamentals of the company are ALL in the public domain, through 10K's, 10Q's, 8k's, PR's, Investor letters, website, etc.**
**_Media Assets:_**

2 tent pole brands that have become big broadcast successes on Nick and Netflix (Rainbow Rangers and Llama)

1.      *The shows are performing very well on air in an extremely competitive environment, so we know there is an appetite for the characters.*


2.      *There are licensed products in virtually all categories coming into the market.*

3.      *The likelihood of all these blue-chip licensees, having failed in their due diligence and them all subsequently failing at retail would be quite hard to imagine, and to my knowledge has never occurred.  When so many manufacturers get behind a brand that is already performing successfully in entertainment, the products sell.* (Many of us saw the ratings doing well 5 years ago for Peppa Pig, PJ Masks, and Paw Patrol, and we knew that a few years later, they would be generating a fortunate from product sales.)

Robust pipeline including Stan Lee's last project, *Stan Lee's Superhero Kindergarten* starring Arnold Schwarzenegger being launched this year.

We expect that this cartoon will becomes the 3rd tent pole brand for us, alongside *Rainbow Rangers*, and *Llama Llama*.  It is **_STAN LEE'S SUPERHERO KINDERGARTEN_** (STARRING Arnold Schwarzenegger). Arnold is so enthusiastic about the program that he has chosen to take his full compensation in Genius Brands stock.  The initial response has been extremely strong and we have closed some major deals, including Alibaba becoming our global partner, and will distribute and put up on their massive platform in China.  We have multiple toy company offers.  We have a robust pipeline in large part fueled by a package of Stan Lee properties which we co-created and share with his estate from right before he passed away. Stan Lee has created more billion dollar brands than anyone (*Spider-man, Hulk, X-Men, Fantastic Four, Captain America, Black Panther, Guardians of the Galaxy, The Avengers.*)

**_Media & Merchandise Partners:_**

1.      Consumer products contracted for coming to market this year with over 450 product SKUs
2.      Mattel
3.      WalMart
4.      Target

                                                                                    EW-AUG0013356

5. Bentex
6. Direct/Sling
7. Mattel
8. Random House/Penguin
9. Target
10. WalMart
- Alibaba
- Nickelodeon
- Amazon Prime/Amazon Fire
- Netflix
- Sony
- Cox
- Comcast
- POW!
- US Public TV

***Genius has now a network of partnerships and licensees***, each of whom are interconnected into our brands and businesses through an incredible ecosystem that is early stages of coming online.  From broadcasters to licensees, to retail.   They are tiffany players, who do their own due diligence, and play to win.

***Genius Kids Network* is also a powerful asset in our portfolio. I consider it like oil in the ground about to be pumped**. Distributed in over 80% of US TV households. Time will prove this to be an important driver of value for the company.

**The list of Genius Brands' core partners is a '*Dream Team*,' that others couldn't begin to imagine or duplicate:**

**We have over 450 SKUs contracted and coming to market in the coming months for both *Llama Llama* and *Rainbow Rangers*.**
***Other Salient Points:***

11.      Approximately $5 million of minimum guarantees (a ridiculously high number relative to the market cap of the company).  Some require nothing, some are subject to different deliverables.

12.      Contracting industry, where similar companies are being sold daily for quite large amounts of money, and we are quickly becoming, 'the last oasis in the desert'

13.      ***HUMAN CAPITAL*-**The human capital in the company as I have often said, coming from Disney, Hasbro, and Spinmaster is pedigreed and proven.

14. a company called Entertainment One which fundamentally had 2 assets only…"Peppa Pig" and "PJ Masks" was sold for $4.2 billion dollars.  We are in a time where the media industry is amidst its own reset.  Every major media company in the world is now investing in their own streaming service. Disney+, HBO Max, Peacock, and CBS are just the tip of the iceberg joining Netflix, Amazon, and Hulu.  The one common point is that they all need content.  As the likes of Disney and Warner's pull back all of their own content, only for their own services, kids content more than ever is becoming scarce and in demand.

15. Genius is not a day trade.  It is a long term bet based on tangible real catalogue assets, pipeline, and tiffany relations across the entire kids content and consumer products food chain.

16. ….Look at what the recent comparable sales have been for companies like ours.

17. The heavy lifting is *already done*.

18. **WHY NOW?** It takes 4-5 years from creation of a children's property, to production, distribution, licensing, to *on- shelf at retail*.  *On-shelf at retail* is where the money finally arrives from.  As Warren Buffett once said to me, "*You can't cook a 3 minute egg in 90 seconds, no matter how many stoves you have.*" We have built a good

catalogue over the last 6 years since the company began; however, two of our shows have now emerged as hits. *Lllama Llama* on Netflix, and *Rainbow Rangers* on Nickelodeon. Both have strong ratings. Both have been renewed for second seasons, and both have very robust licensing programs now contracted for with products coming into the market. Combined, there are over 450 product SKUs in every imaginable category of children consumer products. When a show hits, the numbers can be in the *$billions*, not millions. This is not anecdotal, but real-world outcomes for TV driven properties. *Paw Patrol*, *Peppa Pig*, *PJ Masks*, to name only 3 in our very pre-school space. (*Strawberry Shortcake,* which I produced, did over $5 billion.) *Rainbow Rangers* has often been referred to as the "*Paw Patrol* for girls." *Paw Patrol* has a 4-year head start on *Rainbow Rangers*, yet at this point, we are significantly ahead of where they were at their launch. Another interesting data point is Entertainment One, a UK based kids company which has 2 strong brands. *Peppa Pig* and *PJ Masks*. They have also a 5-year head start on us, and they were recently sold to Hasbro for $4.2 billion, based exclusively on the success of those two kids brands. I stated earlier that we have a product which is a very coveted asset. Not too many years ago, the buyers were the major studios, e.g. Disney, Warner, Universal. They still are of course, but with the explosion of new services, children's content is more coveted than ever. Every day, there is a new streaming service announced. THEY ALL WANT ANIMATED CHILDRENS PRODUCT. It is evergreen and doesn't go out of style, and is the backbone of any program service. (I worked on *The Flintstones* as my first job at Hanna-Barbera, and today you can still buy Flintstones vitamins at the drugstore, and Pebbles and Bam-Bam cereal at the supermarket, and Warner Brothers the owner of Hanna-Barbera still makes a ton of money from it.) Netflix, Amazon, Apple, AT&T, Verizon, and many foreign companies like Alibaba and TenCent, are all seeking animated catalogues, and when the time is right, Genius is going to be poised to do a significant transaction. Today, we are like *the last oasis in the desert, and the real play is the equity play.*

**19. The sale of Entertainment One to Hasbro for $4.2 billion dollars is very informative.**

**20.We have two hits on the air today and a likely 3rd one about to pop. One on Netflix and one om Nickelodeon, and to the best of my knowledge there is only one other company besides the Walt Disney Company that has that and it is Entertainment One(Peppa Pig and PJ Masks) which was recently sold to Hasbro Toys for $4.2 billion dollars. The main difference between E One and Genius is that their brands hit the marketplace about 5 years before ours so they have been running merchandising that much more time than us. When those shows came on the air, it was 2-3 years before we saw product in the marketplace, but those like me, who know the industry knew it would be coming with huge value for them, because when the ratings are high, products follows. The ratings of our shows are high and the product will follow.**


## *CEO:*

Andy Heyward


1.    I own a TON of stock

2.    I have *continued to buy more and more this year*. I bought 2 million dollars last December in a block from my ex-wife. I bought 500 of debt 3 months ago and I bought 750,000 more after that a month ago. It has all been on Form 4 filings. And that is in addition to all of my earlier purchases from the start

3.    Despite that stock performance heretofore, the company's business is stronger than ever from a standpoint of assets.


**We provide a product that is highly coveted in the marketplace. Virtually every company that has produced animated cartoons has ultimately been sold for many times, their investment. I, personally, have sold my previous company 3 times. To Cap Cities/ABC, to the Walt Disney Company, and to Cookie Jar. We will do it again, with Genius Brands, when the time is right. I cannot say exactly, when that will be, but my guess is that it is in the next 24 months.**

Confidential                                                                                                                EW-AUG0013358

**Our business is very simple:**

·        **We make children's animated content which we license to broadcasters around the world for fees.**

·        **We license the characters from our shows to manufacturers of consumer products for children.  They pay us royalties on all products sold.**

·        <u>**It is the exact same model as the Walt Disney Company.**</u>

Should you require "reference", as to myself and the company,  I will give you 5 names, and I'm sure each of them will give you the same reference, sic, that you are dealing with a team that is at the very top of our industry, that plays to win, and has the track record to demonstrate it.

·        *Warren Buffett* **(CEO, Berkshire Hathaway)**

·        *Bob Iger* **(CEO, Walt Disney Company)**

·        *Ynon Kreitz* **(CEO, Mattel Toys)**

·        *Brian Goldner* **(CEO, Hasbro)**

·        *Haim Saban* **(CEO, Saban Capital)**

Joe Reda
Founder/Partner
The Special Equities Group "SEG"

150 E 58th St - 28th Floor
New York, NY 10155
(W) 212.258.2341
(C) 516.521.1354

(Email) reda@TheSEG.com



Confidential

EW-AUG0013359

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************
This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read.

Confidential

The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Confidential

Abraham Declaration Exhibit 88
(EW-AUG0013378-84)

Message
_____

**From:**        Joe Reda [reda@theseg.com]
**Sent:**        1/30/2020 12:32:16 AM
**To:**          Shaye Hirsch [shaye@briocapital.com]
**Subject:**     Re: GNUS - final term sheet


Between lawyers and nasdaq we are looking at 1-2 weeks.



Sent from my iPhone



On Jan 29, 2020, at 6:26 PM, Shaye Hirsch <shaye@briocapital.com> wrote:

 Yeah, I figured

Sent from my iPhone



On Jan 29, 2020, at 7:24 PM, Joe Reda <reda@theseg.com> wrote:

 U got more time to shake the trees.   Nasdaq is slowwwwww

Sent from my iPhone



On Jan 29, 2020, at 5:36 PM, Shaye Hirsch <shaye@briocapital.com> wrote:

 Probably closer to 1mm, but will let you know when I have more clarity

Sent from my iPhone



On Jan 29, 2020, at 10:11 AM, Joe Reda <reda@theseg.com> wrote:


I have you in the order book for $1-2mil

Let me know your guestimates

Most instos doing $1-2mil

Amin at $3mil


................................................................................

**From:** Joe Reda
**Sent:** Thursday, January 23, 2020 4:26 PM
**To:** Shaye Hirsch


Highly Confidential                                          EW-AUG0013378

**Cc:** Jonathan Schechter
**Subject:** Re: GNUS - final term sheet

10000%.   Please do.   More friendlies the better.

Sent from my iPhone

On Jan 23, 2020, at 4:22 PM, Shaye Hirsch <shaye@briocapital.com> wrote:

Please confirm that I can share the terms within brio and with brio LP's and co-investors in a brio fund. I will convey that they are restricted

Sent from my iPhone

On Jan 22, 2020, at 10:20 PM, Joe Reda <reda@theseg.com> wrote:

Shaye,

GNUS (NASDAQ - $5mil Pre-Money Val)

https://www.youtube.com/watch?v=vI5-MBZbohM

This is a Highly structured piece of paper...It's a Self-Amortizing Senior Secured Convertible Note Original Issue discount with ratchets and resets and price protection and most favored nations with 100% warrants with the same protective features as the note.

AMIN is the lead for $3mil out of $10mil...I'm hoping you and the European come in for another $2mil...I'll get the other $5mil from existing note holders and warrant holders.

-Reda

Pursuant to our discussion and as an inducement to obtain confidential investment information, this will confirm that you have *agreed to keep the information to be disclosed/discussed as confidential and have agreed to not disclose the content of the information to any party not bound by our agreement. Furthermore, you agree not to use the information presented in connection with any investment outside the nature and scope of the proposed investment opportunity. This agreement shall terminate at the earliest of the public release of the information discussed or the completion/termination of the proposed offering.*

**The below fundamentals of the company are ALL in the public domain, through 10K's, 10Q's, 8k's, PR's, Investor letters, website, etc.**

***Media Assets:***

2 tent pole brands that have become big broadcast successes on Nick and Netflix (Rainbow Rangers and Llama)

1.      *The shows are performing very well on air in an extremely competitive environment, so we know there is an appetite for the characters.*

2.      *There are licensed products in virtually all categories coming into the market.*

Highly Confidential                                                                                      EW-AUG0013379

3.        _The likelihood of all these blue-chip licensees, having failed in their due diligence and them all subsequently failing at retail would be quite hard to imagine, and to my knowledge has never occurred.  When so many manufacturers get behind a brand that is already performing successfully in entertainment, the products sell._ (Many of us saw the ratings doing well 5 years ago for Peppa Pig, PJ Masks, and Paw Patrol, and we knew that a few years later, they would be generating a fortunate from product sales.)

Robust pipeline including Stan Lee's last project, _Stan Lee's Superhero Kindergarten_ starring Arnold Schwarzenegger being launched this year.

We expect that this cartoon will becomes the 3rd tent pole brand for us, alongside _Rainbow Rangers_, and _Llama Llama_.  It is **STAN LEE'S SUPERHERO KINDERGARTEN** (STARRING Arnold Schwarzenegger). _Arnold is so enthusiastic about the program that he has chosen to take his full compensation in Genius Brands stock._  The initial response has been extremely strong and we have closed some major deals, including Alibaba becoming our global partner, and will distribute and put up on their massive platform in China.  We have multiple toy company offers.  We have a robust pipeline in large part fueled by a package of Stan Lee properties which we co-created and share with his estate from right before he passed away. Stan Lee has created more billion dollar brands than anyone (_Spider-man, Hulk, X-Men, Fantastic Four, Captain America, Black Panther, Guardians of the Galaxy, The Avengers._)

**_Media & Merchandise Partners:_**

1.        Consumer products contracted for coming to market this year with over 450 product SKUs
2.        Mattel
3.        WalMart
4.        Target
5.        <!--[if !supportLists]--><!--[endif]-->Bentex
6.        <!--[if !supportLists]--><!--[endif]-->Direct/Sling
7.        <!--[if !supportLists]--><!--[endif]-->Mattel
8.        <!--[if !supportLists]--><!--[endif]-->Random House/Penguin
9.        <!--[if !supportLists]--><!--[endif]-->Target
10.      <!--[if !supportLists]--><!--[endif]-->WalMart
- <!--[if !supportLists]--><!--[endif]-->Alibaba
- <!--[if !supportLists]--><!--[endif]-->Nickelodeon
- <!--[if !supportLists]--><!--[endif]-->Amazon Prime/Amazon Fire
- <!--[if !supportLists]--><!--[endif]-->Netflix
- <!--[if !supportLists]--><!--[endif]-->Sony
- <!--[if !supportLists]--><!--[endif]-->Cox
- <!--[if !supportLists]--><!--[endif]-->Comcast
- <!--[if !supportLists]--><!--[endif]-->POW!
- <!--[if !supportLists]--><!--[endif]-->US Public TV

**_Genius has now a network of partnerships and licensees_**, each of whom are interconnected into our brands and businesses through an incredible ecosystem that is early stages of coming online.  From broadcasters to licensees, to retail.   They are tiffany players, who do their own due diligence, and play to win.

**_Genius Kids Network_ is also a powerful asset in our portfolio. I consider it like oil in the ground about to be pumped.** Distributed in over 80% of US TV households. Time will prove this to be an important driver of value for the company.

Highly Confidential                                                                                    EW-AUG0013380

**The list of Genius Brands' core partners is a *'Dream Team*,' that others couldn't begin to imagine or duplicate:**

**We have over 450 SKUs contracted and coming to market in the coming months for both *Llama Llama* and *Rainbow Rangers*.**
***Other Salient Points:***

11.      Approximately $5 million of minimum guarantees (a ridiculously high number relative to the market cap of the company).  Some require nothing, some are subject to different deliverables.

12.      Contracting industry, where similar companies are being sold daily for quite large amounts of money, and we are quickly becoming, 'the last oasis in the desert'

13.      ***HUMAN CAPITAL***-The human capital in the company as I have often said, coming from Disney, Hasbro, and Spinmaster is pedigreed and proven.

14.      <!--[if !supportLists]--><!--[endif]-->a company called Entertainment One which fundamentally had 2 assets only…"Peppa Pig" and "PJ Masks" was sold for $4.2 billion dollars.  We are in a time where the media industry is amidst its own reset.  Every major media company in the world is now investing in their own streaming service. Disney+, HBO Max, Peacock, and CBS are just the tip of the iceberg joining Netflix, Amazon, and Hulu.  The one common point is that they all need content.  As the likes of Disney and Warner's pull back all of their own content, only for their own services, kids content more than ever is becoming scarce and in demand.

15.      <!--[if !supportLists]--><!--[endif]-->Genius is not a day trade.  It is a long term bet based on tangible real catalogue assets, pipeline, and tiffany relations across the entire kids content and consumer products food chain.

16.      <!--[if !supportLists]--><!--[endif]-->….Look at what the recent comparable sales have been for companies like ours.

17.      <!--[if !supportLists]--><!--[endif]-->The heavy lifting is *already done*.

18.      <!--[if !supportLists]--><!--[endif]-->***WHY NOW?*** It takes 4-5 years from creation of a children's property, to production, distribution, licensing, to *on- shelf at retail*.  *On-shelf at retail* is where the money finally arrives from.  As Warren Buffett once said to me, "*You can't cook a 3 minute egg in 90 seconds, no matter how many stoves you have.*" We have built a good catalogue over the last 6 years since the company began; however, two of our shows have now emerged as hits.  *Lllama Llama* on Netflix, and *Rainbow Rangers* on Nickelodeon.  Both have strong ratings. Both have been renewed for second seasons, and both have very robust licensing programs now contracted for with products coming into the market. Combined, there are over 450 product SKUs in every imaginable category of children consumer products.  When a show hits, the numbers can be in the *$billions*, not millions. This is not anecdotal, but real-world outcomes for TV driven properties. *Paw Patrol*, *Peppa Pig*, *PJ Masks*, to name only 3 in our very pre-school space. (*Strawberry Shortcake,* which I produced, did over $5 billion.) *Rainbow Rangers* has often been referred to as the "*Paw Patrol* for girls."  *Paw Patrol* has a 4-year head start on *Rainbow Rangers*, yet at this point, we are significantly ahead of where they were at their launch.  Another interesting data point is Entertainment One, a UK based kids company which has 2 strong brands. *Peppa Pig* and *PJ Masks*. They have also a 5-year head start on us, and they were recently sold to Hasbro for $4.2 billion, based exclusively on the success of those two kids brands.  I stated earlier that we have a product which is a very coveted asset.  Not too many years ago, the buyers were the major studios, e.g. Disney, Warner, Universal.  They still are of course, but with the explosion of new services, children's content is more coveted than ever.   Every day, there is a new streaming service announced. THEY ALL WANT ANIMATED CHILDRENS PRODUCT. It is evergreen and doesn't go out of style, and is the backbone of any program service.  (I worked on *The Flintstones* as my first job at Hanna-Barbera, and today you can still buy Flintstones vitamins at the drugstore, and Pebbles and Bam-Bam cereal at the supermarket, and Warner Brothers the owner of Hanna-Barbera still makes a ton of money from it.)  Netflix, Amazon, Apple, AT&T, Verizon, and many foreign companies like Alibaba and TenCent, are all seeking animated

Highly Confidential                                                                                          EW-AUG0013381

catalogues, and when the time is right, Genius is going to be poised to do a significant transaction. Today, we are like *the last oasis in the desert, and the real play is the equity play.*

19.    <!--[if !supportLists]--><!--[endif]-->***The sale of Entertainment One to Hasbro for $4.2 billion dollars is very informative.***

20.    <!--[if !supportLists]--><!--[endif]-->**We have two hits on the air today and a likely 3rd one about to pop. One on Netflix and one om Nickelodeon, and to the best of my knowledge there is only one other company besides the Walt Disney Company that has that and it is Entertainment One(Peppa Pig and PJ Masks) which was recently sold to Hasbro Toys for $4.2 billion dollars. The main difference between E One and Genius is that their brands hit the marketplace about 5 years before ours so they have been running merchandising that much more time than us. When those shows came on the air, it was 2-3 years before we saw product in the marketplace, but those like me, who know the industry knew it would be coming with huge value for them, because when the ratings are high, products follows. The ratings of our shows are high and the product will follow.**


## *CEO:*

Andy Heyward

1.    I own a TON of stock

2.    I have *continued to buy more and more this year*. I bought 2 million dollars last December in a block from my ex-wife. I bought 500 of debt 3 months ago and I bought 750,000 more after that a month ago. It has all been on Form 4 filings. And that is in addition to all of my earlier purchases from the start

3.    Despite that stock performance heretofore, the company's business is stronger than ever from a standpoint of assets.

**We provide a product that is highly coveted in the marketplace. Virtually every company that has produced animated cartoons has ultimately been sold for many times, their investment. I, personally, have sold my previous company <u>3 times</u>. To Cap Cities/ABC, to the Walt Disney Company, and to Cookie Jar. We will do it again, with Genius Brands, when the time is right. I cannot say exactly, when that will be, but my guess is that it is in the next 24 months.**

**Our business is very simple:**

·    **We make children's animated content which we license to broadcasters around the world for fees.**

·    **We license the characters from our shows to manufacturers of consumer products for children. They pay us royalties on all products sold.**

·    **<u>It is the exact same model as the Walt Disney Company.</u>**


Should you require "reference", as to myself and the company, I will give you 5 names, and I'm sure each of them will give you the same reference, sic, that you are dealing with a team that is at the very top of our industry, that plays to win, and has the track record to demonstrate it.

·    ***Warren Buffett*** **(CEO, Berkshire Hathaway)**

·    ***Bob Iger*** **(CEO, Walt Disney Company)**

    EW-AUG0013382

·     *Ynon Kreitz* (CEO, Mattel Toys)

·     *Brian Goldner* (CEO, Hasbro)

·     *Haim Saban* (CEO, Saban Capital)

Joe Reda
Founder/Partner
The Special Equities Group "SEG"

150 E 58th St - 28th Floor
New York, NY 10155
(W) 212.258.2341
(C) 516.521.1354

(Email) reda@TheSEG.com

&lt;image002.jpg&gt;

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************

This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Highly Confidential

<GNUS - AIMF - Term Sheet - Jan 22 2020.pdf>

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

EW-AUG0013384

Abraham Declaration Exhibit 89
(ANSON_00000056-118)

Message

| | |
|---|---|
| **From:** | Jonathan Schechter [shex@theseg.com] |
| **Sent:** | 1/23/2020 12:39:02 PM |
| **To:** | Robert F. Charron [rcharron@egsllp.com]; Charles Phillips [cphillips@egsllp.com]; Matthew McCullough [mmccullough@egsllp.com] |
| **CC:** | Joe Reda [reda@theseg.com]; Amin Nathoo [anathoo@ansonfunds.com] |
| **Subject:** | GNUS Updated Term Sheet |
| **Attachments:** | TRNX Series H COD 11.26.2019.docx; GNUS - AIMF - Term Sheet - Jan 22 2020.pdf |

Guys,

Attached is the latest iteration of the term sheet. Also attached is a doc that shows the amort payments (see section 9). If we can get revised docs Monday that would be awesome....

We also need to add the following:

1.      Voting Agreement to approve proposals in proxy
2.      40% in escrow for whatever amount is raised
3.      Ability to increase amorts if the stock goes up a lot in 1 month (ie- investors can do a look back to get one of the prior month's pricings)
4.      Reverse split approval in proxy

Thanks!

Shex

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

CONFIDENTIAL

SRZ Draft: 11/26/2019

## CERTIFICATE OF DESIGNATIONS, PREFERENCES
## AND RIGHTS OF SERIES H CONVERTIBLE PREFERRED STOCK
## OF
## TARONIS TECHNOLOGIES, INC.

Taronis Technologies, Inc. (the "**Company**"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "**DGCL**"), does hereby certify that, pursuant to authority conferred upon the Board of Directors of the Company (the "**Board**") by the Certificate of Incorporation, as amended, of the Company, and pursuant to the provisions of the DGCL, the Board adopted resolutions (i) designating a series of the Company's previously authorized preferred stock, par value $0.001 per share, and (ii) providing for the designations, preferences and relative, participating, optional or other rights, and the qualifications, limitations or restrictions thereof, of forty hundred (40,000) shares of Series H Convertible Preferred Stock of the Company, as follows:

RESOLVED, that the Company is authorized to issue forty hundred (40,000) shares of Series H Convertible Preferred Stock, par value $0.001 per share (the "**Series H Preferred Shares**"), which shall have the following powers, designations, preferences and other special rights:

(1) <u>RANKING</u>. The Series H Preferred Shares shall rank prior and superior to all of the Common Stock and any other capital stock of the Company, except the Company's Series G Convertible Preferred Stock, par value $0.001 per share (the "**Series G Preferred Shares**"), with respect to the preferences as to dividends (other than pursuant to TRNF Spin-Off), distributions and payments upon a Liquidation Event (such stock being referred to hereinafter collectively as "**Junior Stock**"). The rights of the shares of Common Stock and other capital stock of the Company, except for the Series G Preferred Shares, shall be of junior rank to and subject to the preferences and relative rights of the Series H Preferred Shares. The Series G Preferred Shares shall rank equal to the Series H Preferred Shares with respect to the preferences as to dividends, distributions and payments upon a Liquidation Event (the Series G Preferred Shares and such other stock, if any, ranking equal to the Series H Preferred Shares as to dividends, distributions and payments upon a Liquidation Event being referred to hereinafter collectively as "**Pari Passu Stock**").

(2) <u>PAYMENTS OF STATED VALUE; PREPAYMENT</u>. The Company acknowledges and agrees that the Series H Preferred Shares were issued at an original issue discount. On each Installment Date, the Company shall pay to each Holder an amount equal to the Installment Amount due on such Installment Date in accordance with Section 9. If any Series H Preferred Shares remain outstanding on the Maturity Date after giving effect to any Company Conversions and Company Redemptions occurring on such date in accordance with Section 9, the Company shall redeem such Series H Preferred Shares in cash in an amount equal to the Conversion Amount (as defined in Section 5(b)) for each such Series H Preferred Share. The "**Maturity Date**" shall be [•], 2021[1] (the "**Initial Scheduled Maturity Date**"), as (i) shall be

---

[1] Insert the last Business Day of the calendar month that is twenty-four (24) months immediately following the Issuance Date.

DOC ID - 33068325.3

ANSON_00000057

extended to [•], 2022[2] (the **"Extended Scheduled Maturity Date"** and as applicable with the Initial Scheduled Maturity Date, the **"Scheduled Maturity Date"**) in the event that the Company, directly or through its Subsidiary, Taronis Fuel, Inc., receives non-refundable deposits of not less than $4,500,000 pursuant to the Turkish Contract and (ii) may be extended at the option of each Holder (x) in the event that, and for so long as, a Triggering Event (as defined in Section 6(a)) shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 2) or any event shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 2) that with the passage of time and the failure to cure would result in a Triggering Event, (y) through the date that is ten (10) Business Days after the consummation of a Change of Control in the event that a Change of Control is publicly announced or a Change of Control Notice (as defined in Section 7(b)) is delivered prior to the Maturity Date and (z) to such date elected by any Holder pursuant to a Deferral Notice in accordance with Section 9(d) in the event such Holder elects to submit such a Deferral Notice electing to defer the last Installment Date hereunder beyond the Scheduled Maturity Date. Other than as specifically permitted by this Certificate of Designations, the Company may not prepay any portion of the outstanding Stated Value, accrued and unpaid dividends, if any, or accrued and unpaid Late Charges (as defined in Section 25(b)) on Stated Value and dividends, if any.

**(3)** <u>LIQUIDATION.</u>

(a) <u>Preferential Payment to Holders.</u> In the event of a Liquidation Event, holders of Series H Preferred Shares (each, a **"Holder"** and collectively, the **"Holders"**) shall be entitled to receive in cash out of the assets of the Company, whether from capital or from earnings available for distribution to its stockholders (the **"Liquidation Funds"**) upon such Liquidation Event, but before any amount shall be paid to the holders of any Junior Stock, an amount per Series H Preferred Share equal to the Conversion Amount; provided that, if the Liquidation Funds are insufficient to pay the full amount due to the Holders and holders of Pari Passu Stock, if any, then each Holder and each holder of any such Pari Passu Stock shall receive a percentage of the Liquidation Funds equal to the full amount of Liquidation Funds payable to such Holder as a liquidation preference, in accordance with their respective Certificate of Designations, Preferences and Rights, as a percentage of the full amount of Liquidation Funds payable to all holders of Series H Preferred Shares and Pari Passu Stock.

(b) <u>Distribution of Remaining Assets.</u> After the foregoing distributions, the Holders shall be entitled, on a *pari passu* basis with the holders of Common Stock and treating for the purpose thereof all of the Series H Preferred Shares as having been converted into Common Stock pursuant to Section 5, to participate in the distribution of any remaining assets of the Company to the holders of the outstanding Common Stock (without regard to any limitations on conversion). To the extent necessary, the Company shall cause such actions to be taken by any of its Subsidiaries so as to enable, to the maximum extent permitted by law, the proceeds of a Liquidation Event to be distributed to the Holders in accordance

---

[2] Insert the last Business Day of the calendar month that is thirty-six (36) months immediately following the Issuance Date.

CONFIDENTIAL                                                                 ANSON_00000058

with this Section. All the preferential amounts to be paid to the Holders under this Section shall be paid or set apart for payment before the payment or setting apart for payment of any amount for, or the distribution of any Liquidation Funds of the Company to the holders of Junior Stock in connection with a Liquidation Event as to which this Section applies.

(c) Maximum Percentage. Notwithstanding the foregoing, to the extent that a Holder's right to participate in any liquidation pursuant to this Section 3 would result in such Holder and such Holder's other Attribution Parties exceeding the Maximum Percentage, if applicable, then such Holder shall not be entitled to participate in such liquidation to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such liquidation (and beneficial ownership) to such extent) and the portion of such liquidation shall be held in abeyance for such Holder until such time or times as its right thereto would not result in such Holder and its other Attribution Parties exceeding the Maximum Percentage, if applicable, at which time or times such Holder shall be granted such rights (and any rights under this Section 3 to be held similarly in abeyance) to the same extent as if there had been no such limitation.

**(4)** DIVIDENDS.

(a) Except for the TRNF Spin-Off (as defined below), from and after the first date of issuance of any Series H Preferred Shares (the **"Issuance Date"**), the Holders shall be entitled to receive dividends per Series H Preferred Share when, as and if declared by the Board. In addition, from and after the occurrence and during the continuance of any Triggering Event, dividends shall accrue hereunder at eighteen percent (18.0%) per annum (the **"Default Rate"**) and shall be computed on the basis of a 360-day year and twelve 30-day months and shall be payable, if applicable, in arrears on the last Business Day of any Calendar Quarter during which dividends accrue hereunder (a **"Dividend Date"**) to the record holder of the Series H Preferred Shares in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holders in writing to the Company. Accrued and unpaid dividends, if any, shall also be payable prior to a Dividend Date by way of inclusion of the dividends in the Conversion Amount (as defined in Section 5(b)(i)) on each (i) Conversion Date (as defined in Section 5(c)(i)) in accordance with Section 5(c)(i) and/or (ii) upon any redemption hereunder occurring prior to the Maturity Date. In the event that an Triggering Event is subsequently cured (and no other Triggering Event then exists (including, without limitation, for the Company's failure to pay such dividends at the Default Rate on the Maturity Date)), dividends shall cease to accrue hereunder as of the calendar day immediately following the date of such cure; provided that the dividends as calculated and unpaid during the continuance of such Triggering Event shall continue to apply to the extent relating to the days after the occurrence of such Triggering Event through and including the date of such cure of such Triggering Event; provided, further, that for the purpose of this Section 4, such Triggering Event shall not be deemed cured unless and until any accrued and unpaid dividends shall be paid to the Holders.

DOC ID - 33068325.3                                 - 3 -

CONFIDENTIAL                                                                      ANSON_00000059

(b) In addition to the dividends, if any, referred to in Section 4(a), and excepting any dividends pursuant to the TRNF Spin-Off, from and after the Issuance Date, the Holders shall be entitled to receive such dividends paid and distributions made to the holders of Common Stock to the same extent as if such Holders had converted the Series H Preferred Shares into Common Stock (without regard to any limitations on conversion) and had held such shares of Common Stock on the record date for such dividends and distributions. Payments under the preceding sentence shall be made concurrently with the dividends or distribution to the holders of Common Stock. Following the occurrence of a Liquidation Event and the payment in full to a Holder of its applicable liquidation preference as set forth in Section 3 above, such Holder shall cease to have any rights hereunder to participate in any future dividends or distributions made to the holders of Common Stock. Except pursuant to the TRNF Spin-Off, the Company shall not declare or pay any dividends on any Junior Stock or Pari Passu Stock unless the Holders of Series H Preferred Shares then outstanding shall simultaneously receive dividends on a pro rata basis as if the Series H Preferred Shares had been converted into shares of Common Stock pursuant to Section 5 immediately prior to the record date for determining the stockholders eligible to receive such dividends (without regard to any limitations on conversion). Notwithstanding the foregoing, to the extent that a Holder's right to participate in any such dividends or distribution pursuant to this Section 4 would result in such Holder and its other Attribution Parties exceeding the Maximum Percentage, then such Holder shall not be entitled to participate in such dividends or distribution to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such dividends or distribution (and beneficial ownership) to such extent) and the portion of such dividends or distribution shall be held in abeyance for such Holder until such time or times as its right thereto would not result in such Holder and its other Attribution Parties exceeding the Maximum Percentage, at which time or times such Holder shall be granted such rights (and any rights under this Section 4 on such initial rights or on any subsequent such rights to be held similarly in abeyance) to the same extent as if there had been no such limitation.

(5) CONVERSION OF SERIES H PREFERRED SHARES. At any time or times after the Issuance Date, the Series H Preferred Shares shall be convertible into shares of Common Stock, on the terms and conditions set forth in this Section 5.

(a) Conversion Right. Subject to the provisions of Section 5(d), at any time or times on or after the Issuance Date, any Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount into fully paid and nonassessable shares of Common Stock in accordance with Section 5(c), at the Conversion Rate (as defined below). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be

CONFIDENTIAL                                                                              ANSON_00000060

payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount.

(b) <u>Conversion Rate</u>.  The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 5(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i)    "**Conversion Amount**" means the sum of (A) the portion of the Stated Value to be converted, amortized, redeemed or otherwise with respect to which this determination is being made, (B) accrued and unpaid dividends, if any, with respect to such Stated Value and (C) accrued and unpaid Late Charges, if any, with respect to such Stated Value and dividends.

(ii)    "**Conversion Price**" means, as of any Conversion Date or other date of determination, $2.25, subject to adjustment as provided herein.

(c) <u>Mechanics of Conversion</u>.

(i)    <u>Optional Conversion</u>.  To convert Series H Preferred Shares into shares of Common Stock on any date on or following the Issuance Date (each a "**Conversion Date**"), a Holder shall (A) deliver on or prior to 11:59 p.m., New York time, on such date, a copy of an executed notice of conversion in the form attached hereto as <u>Exhibit I</u> (a "**Conversion Notice**") to the Company and (B) if required by Section 5(c)(iv), but without delaying the Company's requirement to deliver shares of Common Stock on the applicable Share Delivery Date (as defined below), surrender the original certificates representing the Series H Preferred Shares, if any (the "**Series H Preferred Stock Certificates**") being converted to a common carrier for delivery to the Company as soon as practicable on or following such date (or an indemnification undertaking with respect to such Series H Preferred Stock Certificates in the case of its loss, theft, destruction or mutilation in compliance with the procedures set forth in Section 27).  In lieu of indicating the portion of the Conversion Amount that a Holder elects to convert, such Holder may indicate in a Conversion Notice the number of shares of Common Stock it seeks to receive upon conversion of any portion of such Holder's Series H Preferred Shares and the reduction of the Conversion Amount pursuant to such conversion shall be determined at the end of such Conversion Date by multiplying such number of shares of Common Stock by the applicable Conversion Price.  No ink-original Conversion Notice shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Conversion Notice be required.

(ii)    <u>Company's Response</u>.  On or before the first (1st) Business Day following the date of delivery of a Conversion Notice,

CONFIDENTIAL                                                                                 ANSON_00000061

the Company shall transmit via electronic mail a confirmation of receipt of such Conversion Notice to the applicable Holder and the Company's transfer agent (the **"Transfer Agent"**).  On or before the earlier of (i) the second (2nd) Trading Day and (ii) the number of Trading Days comprising the Standard Settlement Period, in each case, following the date on which a Holder has delivered a Conversion Notice to the Company (a **"Share Delivery Date"**), the Company shall (x) provided that the Transfer Agent is participating in the Depository Trust Company (**"DTC"**) Fast Automated Securities Transfer Program, credit such aggregate number of shares of Common Stock to which such Holder shall be entitled to such Holder's or its designee's balance account with DTC through its Deposit Withdrawal At Custodian system or (y) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of such Holder or its designee, for the number of shares of Common Stock to which such Holder shall be entitled.  If the number of Series H Preferred Shares represented by the Series H Preferred Stock Certificate(s) submitted for conversion, as required by Section 5(c)(iv), is greater than the number of Series H Preferred Shares being converted, then the Company shall as soon as practicable and in no event later than three (3) Business Days after receipt of the Series H Preferred Stock Certificate(s) (the **"Preferred Stock Delivery Date"**) and at its own expense, issue and deliver to such Holder a new Series H Preferred Stock Certificate representing the number of Series H Preferred Shares not converted.  The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of Series H Preferred Shares shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the applicable Conversion Date, irrespective of the date such Conversion Shares are credited to such Holder's account with DTC or the date of delivery of the certificates evidencing such Conversion Shares, as the case may be. In the event that a Holder elects to convert a portion of the Conversion Amount of such Holder's Series H Preferred Shares prior to any applicable Installment Date, the Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder to such Holder on the final Installment Date, unless such Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(iii)    <u>Company's Failure to Timely Convert</u>.   If the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to a Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, or credit such Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, for the number of shares of Common Stock to which such

DOC ID - 33068325.3

- 6 -

CONFIDENTIAL

ANSON_00000062

Holder is entitled upon such Holder's conversion of any Conversion Amount (a "**Conversion Failure**"), then (A) the Company shall pay damages to such Holder for each Trading Day of such Conversion Failure in an amount equal to 1.5% of the product of (1) the sum of the number of shares of Common Stock not issued to such Holder on or prior to the Share Delivery Date and to which such Holder is entitled, and (2) any trading price of the Common Stock selected by such Holder in writing as in effect at any time during the period beginning on the applicable Conversion Date and ending on the applicable Share Delivery Date and (B) such Holder, upon written notice to the Company, may void its Conversion Notice with respect to, and retain or have returned, as the case may be, any portion of such Holder's Series H Preferred Shares that has not been converted pursuant to such Conversion Notice; provided that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 5(c)(iii) or otherwise.  In addition to the foregoing, if the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to a Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, or credit such Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, for the number of shares of Common Stock to which such Holder is entitled upon such Holder's conversion of any Conversion Amount or on any date of the Company's obligation to deliver shares of Common Stock as contemplated pursuant to clause (y) below, and if on or after such Trading Day such Holder purchases (in an open market transaction or otherwise) Common Stock to deliver in satisfaction of a sale by such Holder of Common Stock issuable upon such conversion that such Holder anticipated receiving from the Company (a "**Buy-In**"), then the Company shall, within two (2) Trading Days after such Holder's request and in such Holder's discretion, either (x) pay cash to such Holder in an amount equal to such Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "**Buy-In Price**"), at which point the Company's obligation to issue and deliver such certificate or credit such Holder's balance account with DTC for the shares of Common Stock to which such Holder is entitled upon such Holder's conversion of the applicable Conversion Amount shall terminate, or (y) promptly honor its obligation to deliver to such Holder a certificate or certificates representing such shares of Common Stock or credit such Holder's balance account with DTC for such shares of Common Stock and pay cash to such Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of

DOC ID - 33068325.3

- 7 -

CONFIDENTIAL

ANSON_00000063

Common Stock, times (B) the price at which the sell order giving rise to such purchase obligation was executed.

(iv)    <u>Book-Entry</u>.    Notwithstanding anything to the contrary set forth herein, upon conversion of Series H Preferred Shares in accordance with the terms hereof, a Holder shall not be required to physically surrender the certificate representing the Series H Preferred Shares to the Company unless (A) the full or remaining number of Series H Preferred Shares represented by the certificate are being converted or (B) a Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of Series H Preferred Shares upon physical surrender of any Series H Preferred Shares.  Each Holder and the Company shall maintain records showing the number of Series H Preferred Shares so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holders and the Company, so as not to require physical surrender of the certificate representing the Series H Preferred Shares upon each such conversion. If the Company does not update its records to record such Stated Value, dividends and Late Charges converted and/or paid (as the case may be) and the dates of such conversions and/or payments (as the case may be) within two (2) Business Days of such occurrence, then the Company's records shall be automatically deemed updated to reflect such occurrence.  In the event of any dispute or discrepancy, such records of the Company establishing the number of Series H Preferred Shares to which the record holder is entitled shall be controlling and determinative in the absence of manifest error.  Notwithstanding the foregoing, if Series H Preferred Shares represented by a certificate are converted as aforesaid, a Holder may not transfer the certificate representing the Series H Preferred Shares unless such Holder first physically surrenders the certificate representing the Series H Preferred Shares to the Company, whereupon the Company will forthwith issue and deliver upon the order of such Holder a new certificate of like tenor, registered as such Holder may request, representing in the aggregate the remaining number of Series H Preferred Shares represented by such certificate.  A Holder and any assignee, by acceptance of a certificate, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of any Series H Preferred Shares, the number of Series H Preferred Shares represented by such certificate may be less than the number of Series H Preferred Shares stated on the face thereof.  Each certificate for Series H Preferred Shares shall bear the following legend:

ANY TRANSFEREE OF THIS CERTIFICATE SHOULD CAREFULLY REVIEW THE TERMS OF THE COMPANY'S CERTIFICATE OF DESIGNATIONS RELATING TO THE SERIES H

CONFIDENTIAL                                                    ANSON_00000064

PREFERRED SHARES REPRESENTED BY THIS CERTIFICATE, INCLUDING SECTION 5(c)(iv) THEREOF.   THE NUMBER OF SERIES H PREFERRED SHARES REPRESENTED BY THIS CERTIFICATE MAY BE LESS THAN THE NUMBER OF SERIES H PREFERRED SHARES STATED ON THE FACE HEREOF PURSUANT TO SECTION 5(c)(iv) OF THE CERTIFICATE OF DESIGNATIONS RELATING TO THE SERIES H PREFERRED SHARES REPRESENTED BY THIS CERTIFICATE.

(v)     Pro Rata Conversion; Disputes.   In the event the Company receives a Conversion Notice from more than one Holder and/or holder of Pari Passu Stock for the same Conversion Date and the Company can convert some, but not all, of such Series H Preferred Shares and Pari Passu Stock submitted for conversion, the Company, subject to Section 5(d), shall convert from each Holder and holder of Pari Passu Stock electing to have Series H Preferred Shares converted on such date, a pro rata amount of such Holder's Series H Preferred Shares and such holder's Pari Passu Stock submitted for conversion based on the sum of the Stated Value of Series H Preferred Shares and the stated value of the Pari Passu Stock submitted for conversion on such date by such Holder and/or holder relative to the sum of the Stated Value of all Series H Preferred Shares and the stated value of all Pri Passu Stock submitted for conversion on such date.  In the event of a dispute as to the number of shares of Common Stock issuable to a Holder in connection with a conversion of Series H Preferred Shares, the Company shall issue to such Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 24.

(d)   Beneficial Ownership Conversion Limitation.   Notwithstanding anything to the contrary contained herein, the Company shall not issue any shares of Common Stock pursuant to the terms of this Certificate of Designations, and no Holder shall not have the right to any shares of Common Stock otherwise issuable pursuant to the terms of this Certificate of Designations and such issuance shall be null and void and treated as if never made, to the extent that after giving effect to such issuance, such Holder together with the other Attribution Parties collectively would beneficially own in excess of 4.99% or 9.99%, as the Buyers shall have indicated on their respective signature pages attached to the Securities Purchase Agreement or as any subsequent transferee of Series H Preferred Shares indicates in a written notice to the Company (as applicable, the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such issuance.  For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by a Holder and its other Attribution Parties shall include the

CONFIDENTIAL                                                                      ANSON_00000065

number of shares of Common Stock held by such Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon conversion of the Series H Preferred Shares with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted Series H Preferred Shares beneficially owned by such Holder or any of the other Attribution Parties and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including the Warrants) beneficially owned by such Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 5(d). For purposes of this Section 5(d), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. For purposes of determining the number of outstanding shares of Common Stock a Holder may acquire upon the conversion of Series H Preferred Shares without exceeding the Maximum Percentage, such Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (y) a more recent public announcement by the Company or (z) any other written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**"). If the Company receives a Conversion Notice from a Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall notify such Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Conversion Notice would otherwise cause such Holder's beneficial ownership, as determined pursuant to this Section 5(d), to exceed the Maximum Percentage, such Holder must notify the Company of a reduced number of shares of Common Stock to be purchased pursuant to such Conversion Notice. For any reason at any time, upon the written or oral request of any Holder, the Company shall within one (1) Trading Day confirm orally and in writing or by electronic mail to such Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including the Series H Preferred Shares, by such Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to a Holder upon conversion of such Holder's Series H Preferred Shares results in such Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the Exchange Act), the number of shares so issued by which such Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and such Holder shall not have the power to vote or to transfer

CONFIDENTIAL                                                                 ANSON_00000066

the Excess Shares. Upon delivery of a written notice to the Company, any Holder may from time to time increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to such Holder and its other Attribution Parties and not to any other holder of Series H Preferred Shares that is not an Attribution Party of such Holder. For purposes of clarity, the shares of Common Stock issuable with respect to the Series H Preferred Shares in excess of the Maximum Percentage shall not be deemed to be beneficially owned by a Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the Exchange Act. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 5(d) to the extent necessary to correct this paragraph (or any portion of this paragraph) which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 5(d) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of Series H Preferred Shares.

(e) <u>Adjustments to Conversion Price</u>. The Conversion Price will be subject to adjustment from time to time as provided in this Section 5(e).

(i) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Subscription Date subdivides (by any stock split, stock dividend (other than pursuant to the TRNF Spin-Off), recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Subscription Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased. Any adjustment under this Section 5(e)(i) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(ii) <u>Voluntary Adjustment by Company</u>. Subject to the prior approval of the Principal Market, or if the Principal Market is not as of the applicable date of determination the principal trading market of the Common Stock, such other applicable Eligible Market that then serves as the principal trading market of the Common Stock, the Company may at any time, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board.

CONFIDENTIAL                                                                    ANSON_00000067

**(6)** <u>RIGHTS UPON TRIGGERING EVENT</u>.

(a) <u>Triggering Event</u>. Each of the following events or failures therewith shall constitute a **"Triggering Event"**, each of the events or failures set forth clauses (i) through (xiv) shall constitute a **"General Triggering Event"** and the event set forth in clause (xv) shall constitute a **"Price Triggering Event"**:

(i)        the shares of Common Stock issued and issuable with respect to the Series H Preferred Shares shall be issued or issuable without restrictive legends and eligible for immediate sale without restriction or limitation pursuant to Rule 144 and Section 3(a)(9) of the Securities Act without the requirement to be in compliance with Rule 144(c)(1) and without the need for registration under any applicable federal or state securities laws;

(ii)        (A) the suspension of the Common Stock from trading on an Eligible Market for a period of two (2) consecutive Trading Days or for more than an aggregate of ten (10) Trading Days in any 365-day period or (B) the failure of the Common Stock to be listed on an Eligible Market;

(iii)        the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within five (5) Business Days after the applicable Conversion Date or (B) notice, written or oral, to any Holder, including by way of public announcement, or through any of its agents, at any time, of its intention not to comply with a request for conversion of any Series H Preferred Shares into shares of Common Stock that is tendered in accordance with the provisions of this Certificate of Designations, other than pursuant to Section 5(d);

(iv)        at any time following the fifth (5th) consecutive Business Day that the Holder's Authorized Share Allocation (as defined in Section 12(a)) is less than the Holder's Pro Rata Amount of the Required Reserve Amount (as defined in Section 12(a));

(v)        the Company's failure to pay to such Holder any amount of Stated Value, dividends, Late Charges, Redemption Price or other amounts when and as due under this Certificate of Designations or any other Transaction Document, except, in the case of a failure to pay dividends and/or Late Charges when and as due, in which case only if such failure continues for a period of at least an aggregate of two (2) Business Days;

(vi)        the occurrence of any default (after lapse of any applicable cure periods) under, redemption of or acceleration prior to

CONFIDENTIAL                                    ANSON_00000068

maturity of at least an aggregate of $100,000 of Indebtedness of the Company or any of its Subsidiaries;

(vii)    the Company or any of its Subsidiaries, pursuant to or within the meaning of Title 11, U.S. Code, or any similar federal, foreign or state law for the relief of debtors (collectively, **"Bankruptcy Law"**), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a **"Custodian"**), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(viii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries;

(ix)    a final judgment or judgments for the payment of money aggregating in excess of $100,000 are rendered against the Company or any of its Subsidiaries and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $100,000 amount set forth above so long as the Company provides the Holders a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holders) to the effect that such judgment is covered by insurance or an indemnity and the Company or such Subsidiary (as the case may be) will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment;

(x)    other than as specifically set forth in another clause of this Section 6(a), the Company or any of its Subsidiaries breaches any representation, warranty, covenant or other term or condition of any Transaction Document, except, in the case of a breach of a covenant or other term or condition of any Transaction Document which is curable, only if such breach remains uncured for a period of five (5) consecutive Business Days;

(xi) any breach or failure in any respect to comply with either Sections 15 or 16 of this Certificate of Designations;

DOC ID - 33068325.3                    - 13 -

CONFIDENTIAL                                                    ANSON_00000069

(xii) any material damage to, or loss, theft or destruction of, any material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(xiii) a false or inaccurate certification (including a false or inaccurate deemed certification) by the Company that the Equity Conditions are satisfied or that there has been no Equity Conditions Failure or as to whether any Triggering Event has occurred;

(xiv) any Material Adverse Effect occurs; or

(xv) the Weighted Average Price of the Common Stock on any Trading Day following the Issuance Date is less than [•][3] (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction relating to the Common Stock occurring after the Subscription Date).

(b) Redemption Right Upon a General Triggering Event.  Upon the occurrence of a General Triggering Event, the Company shall within one (1) Business Day deliver written notice thereof via electronic mail (a "**Triggering Event Notice**") to the Holders.  At any time after the earlier of a Holder's receipt of a General Triggering Event Notice and a Holder becoming aware of a General Triggering Event, such Holder may require the Company to redeem (an "**General Triggering Event Redemption**") all or any portion of such Holder's Series H Preferred Shares by delivering written notice thereof (the "**General Triggering Event Redemption Notice**") to the Company, which General Triggering Event Redemption Notice shall indicate the number of such Holder's Series H Preferred Shares that such Holder is electing to require the Company to redeem.  Each Series H Preferred Share subject to redemption by the Company pursuant to this Section 6(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 118% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Sale Price of the shares of Common Stock during the period beginning on the date immediately preceding such General Triggering Event and ending on the date such Holder delivers the General Triggering Event Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**General Triggering Event Redemption Price**").  Redemptions required by this Section 6(b) shall be made in accordance with the provisions of

---

[3] Insert 200 % of the arithmetic average of the Closing Sale Prices of the Common Stock on the five (5) Trading Days immediately prior to the Subscription Date.

CONFIDENTIAL                    ANSON_00000070

Section 13. To the extent redemptions required by this Section 6(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Series H Preferred Shares by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 6, but subject to Section 5(d), until the General Triggering Event Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 6(b) may be converted, in whole or in part, by a Holder into Common Stock pursuant to Section 5. In the event less than all of a Holder's remaining Series H Preferred Shares are redeemed pursuant hereto, the Conversion Amount so redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless a Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable General Triggering Event Redemption Notice. The parties hereto agree that in the event of the Company's redemption of any Series H Preferred Shares under this Section 6(b), each Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for such Holder. Accordingly, any General Triggering Event redemption premium due under this Section 6(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of a Holder's actual loss of its investment opportunity and not as a penalty.

(c) Price Triggering Event. On the second Trading Day immediately following any Trading Day on which a Price Triggering Event occurs (the "**Initial Price Triggering Event Conversion Date**"), the Company shall pay to each Holder the Conversion Amount that then remains outstanding under such Holder's Series H Preferred Shares, unless such Holder waives such failure in writing by delivering a notice thereof to the Company prior to the Initial Price Triggering Event Conversion Date, by converting all or some of such Conversion Amount into Common Stock, in accordance with this Section 6 (a "**Price Triggering Event Conversion**"); provided, however, that the Company may, at its option following written notice to each Holder as set forth below, pay the Conversion Amount that then remains outstanding under such Holder's Series H Preferred Shares by redeeming such Conversion Amount in cash on the tenth (10th) calendar day (or if such date is not a Trading Day, the immediately following Trading Day) immediately following any Trading Day on which a Price Triggering Event occurs (the "**Initial Price Triggering Event Redemption Date**" and such redemption, a "**Price Triggering Event Redemption**" and together with a General Triggering Event Redemption, a "**Triggering Event Redemption**") or by any combination of a Price Triggering Event Conversion and a Price Triggering Event Redemption so long as all of the Conversion Amount that then remains outstanding under the Series H Preferred Shares shall be redeemed by the Company on the Initial Price Triggering Event Redemption Date and/or converted by the Company on the Initial Price Triggering Event Conversion Date, subject to the provisions of this Section 6. On the first (1st) Trading Day immediately following the occurrence of a Price Triggering Event (the "**Price Triggering Event Notice Due Date**"), the Company shall deliver

CONFIDENTIAL                                                    ANSON_00000071

written notice (the "**Price Triggering Event Notice**" and the date all of the Holders receive such notice is referred to as the "**Price Triggering Event Notice Date**"), to each Holder which Price Triggering Event Notice shall (i) either (A) confirm that the Conversion Amount that then remains outstanding under such Holder's Series H Preferred Shares shall be fully converted into Common Stock pursuant to a Price Triggering Event Conversion (any Conversion Amount to be converted, in whole or in part, into Common Stock, the "**Price Triggering Event Conversion Amount**") or (B) (1) state that the Company elects to redeem, in whole or in part, for cash, or is required to redeem for cash, in whole or in part, in each case, in accordance with the provisions of this Certificate of Designations, the applicable Conversion Amount pursuant to a Price Triggering Event Redemption and (2) specify the portion of such Conversion Amount which the Company elects or is required to redeem pursuant to a Price Triggering Event Redemption (such Conversion Amount to be redeemed, the "**Price Triggering Event Redemption Amount**") and the portion of such Conversion Amount that is the Price Triggering Event Conversion Amount, which amounts, when added together, must equal the Conversion Amount that then remains outstanding under the Series H Preferred Shares, (ii) if the Conversion Amount that then remains outstanding under the Series H Preferred Shares is to be paid, in whole or in part, in Common Stock pursuant to a Price Triggering Event Conversion, certify that no Equity Conditions Failure has occurred as of the Price Triggering Event Notice Date. The Price Triggering Event Notice shall be irrevocable. If the Company does not timely deliver the Price Triggering Event Notice in accordance with this Section 6, then the Company shall be deemed to have delivered an irrevocable Price Triggering Event Notice confirming a Price Triggering Event Conversion in full and shall be deemed to have certified that there shall not have occurred an Equity Conditions Failure in connection with the Price Triggering Event Conversion as of the Price Triggering Event Notice Date. Except as expressly provided in this Section 6, the Company shall redeem the Conversion Amount that then remains outstanding under all Series H Preferred Shares on the Initial Price Triggering Event Redemption Date and/or convert the Conversion Amount that then remains outstanding under all Series H Preferred Shares on the Initial Price Triggering Event Conversion Date, in each case, pursuant to this Section 6 in the same ratio. The Price Triggering Event Conversion Amount (whether set forth in the Price Triggering Event Notice or by operation of this Section 6) shall be converted in accordance with Section 5 and the Price Triggering Event Redemption Amount shall be redeemed in accordance with Section 6(c). Notwithstanding anything herein to the contrary, in the event of any partial conversion or redemption of a Holder's Series H Preferred Shares prior to the Initial Price Triggering Event Conversion Date or Initial Price Triggering Event Redemption Date, the Conversion Amount converted or redeemed, as applicable, shall be deducted from the Conversion Amount to be paid hereunder on the Initial Price Triggering Event Conversion Date or the Initial Price Triggering Event Redemption Date., as applicable

(d) <u>Mechanics of Price Triggering Event Conversion</u>. If the Company delivers a Price Triggering Event Notice and confirms or elects a Price Triggering

CONFIDENTIAL                                                                              ANSON_00000072

Event Conversion in accordance with Section 6(c), in whole or in part, or is deemed to have confirmed or elected, in whole or in part, a Price Triggering Event Conversion in accordance with Section 6(c), then (1) on or prior to the Initial Price Triggering Event Conversion Date, (A) the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to each Holder a certificate for) a number of shares of Common Stock (the **"Initial Price Triggering Event Conversion Shares"**) equal to the quotient of (x) the Conversion Amount that then remains outstanding under such Holder's Series H Preferred Shares divided by (y) the Initial Price Triggering Event Conversion Price then in effect, rounded to the nearest whole share of Common Stock and (B) in the event a Conversion Floor Price Condition occurs with respect to the Initial Price Triggering Event Conversion Price used to calculate the number of Initial Price Triggering Event Conversion Shares, each Holder shall have the option, in its sole and absolute discretion, to notify the Company in writing by no later than 5:00 p.m., New York time, on the Trading Day immediately prior to the Initial Price Triggering Event Conversion Date that, notwithstanding the Company's election to convert all or any portion of the Conversion Amount that then remains outstanding under such Holder's Series H Preferred Shares pursuant to a Price Triggering Event Conversion, such Holder elects to require the Company to pay all or any portion of such Conversion Amount in cash by wire transfer of immediately available funds and (2) on the forty-first (41st) Trading Day immediately following the Initial Price Triggering Event Conversion Date (the **"Adjusted Price Triggering Event Conversion Date"** and together with the Initial Price Triggering Event Redemption Date, a **"Price Triggering Event Conversion Date"**), (A) the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate) for an additional number of shares of Common Stock, if any, equal to the Price Triggering Event Balance Conversion Shares and (B) in the event of a Conversion Floor Price Condition occurs with respect to the Price Triggering Event Conversion Price used to calculate the number of Price Triggering Event Balance Conversion Shares, each Holder shall have the option, in its sole and absolute discretion, to notify the Company in writing by no later than 5:00 p.m., New York time, on the Trading Day immediately prior to the Adjusted Price Triggering Event Conversion Date that (x) by no later than the fifth (5th) Trading Day immediately following the Adjusted Price Triggering Event Conversion Date, such Holder shall deliver to the Company any number of shares of Common Stock not exceeding the number of Initial Price Triggering Event Conversion Shares delivered to such Holder on the Initial Price Triggering Event Conversion Date (such shares, the **"Initial Triggering Event Return Shares"**) and (y) the Company shall pay to such Holder an additional amount in cash, by wire transfer of immediately available funds, equal to the product of (I) the applicable number of Initial Triggering Event Return Shares and (II) the Initial Price Triggering Event Conversion Price used to calculate the number of Initial Price Triggering

DOC ID - 33068325.3                                     - 17 -

Event Conversion Shares; provided, that in each of cases (1) and (2), no Equity Conditions Failure has occurred (unless waived in writing by such Holder) on each day during the period commencing on the Price Triggering Event Notice Date through each Price Triggering Event Conversion Date.  On the second (2nd) Trading Day immediately after the end of each Price Triggering Event Measuring Period, the Company shall deliver a written notice setting forth the calculation of the Initial Price Triggering Event Conversion Shares and the  Price Triggering Event Balance Conversion Shares, as applicable, (and the calculation of the component parts of such calculations) to the Holders.  If a General Triggering Event occurs during the period from the Price Triggering Event Notice Date through any Price Triggering Event Conversion Date, the Holder may elect a General Triggering Event Redemption in accordance with Section 6(b) without being required to return to the Company any Initial Price Triggering Event Conversion Shares previously delivered to the Holder.   All Initial Price Triggering Event Conversion Shares and Price Triggering Event Balance Conversion Shares shall be fully paid and nonassessable shares of Common Stock (rounded to the nearest whole share).  If an Equity Conditions Failure occurs as of the Price Triggering Event Notice Date, then unless the Company has elected to redeem the Conversion Amount that then remains outstanding, the Price Triggering Event Notice shall indicate that unless a Holder waives the Equity Conditions Failure, the Conversion Amount that then remains outstanding under the Series H Preferred Shares shall be redeemed for cash.  If the Company confirmed the conversion of the applicable Price Triggering Event Conversion Amount, in whole or in part (or if the conversion of the applicable Price Triggering Event Conversion Amount is deemed to have been confirmed in full by operation of Section 6(c)), and there was no Equity Conditions Failure as of the Price Triggering Event Notice Date (or is deemed to have certified that there is no Equity Conditions Failure in connection with any such conversion by operation of Section 6(c)) but an Equity Conditions Failure occurred between the Price Triggering Event Notice Date and any time through any Price Triggering Event Conversion Date (the "**Interim Price Triggering Event Period**"), the Company shall provide each Holder a subsequent written notice to that effect.  If an Equity Conditions Failure occurs (unless waived in writing by such Holder) during such Interim Price Triggering Event Period, then at the option of such Holder designated in writing to the Company, such Holder may require the Company to do either one or both of the following: (i) the Company shall redeem all or any part designated by such Holder of the Price Triggering Event Conversion Amount (such designated amount is referred to as the "**First Price Triggering Event Redemption Amount**") on such Price Triggering Event Conversion Date and the Company shall pay to such Holder on such Price Triggering Event Conversion Date, by wire transfer of immediately available funds, an amount in cash equal to 125% of such First Price Triggering Event Redemption Amount and/or (ii) the Price Triggering Event Conversion shall be null and void with respect to all or any part designated by such Holder of the unconverted Price Triggering Event Conversion Amount and such Holder shall be entitled to all the rights of a Holder with respect to such amount of the Price

CONFIDENTIAL                                                                    ANSON_00000074

Triggering Event Conversion Amount. If the Company fails to redeem any First Price Triggering Event Redemption Amount on or before the Price Triggering Event Conversion Date by payment of such amount on the applicable Price Triggering Event Conversion Date, then such Holder shall have the rights set forth in Section 13(a) as if the Company failed to pay the applicable Price Triggering Event Redemption Price (as defined in Section 6(c)) and all other rights under this Certificate of Designations (including, without limitation, such failure constituting a General Triggering Event described in Section 6(a)(v)). Notwithstanding anything to the contrary in this Section 6(d), but subject to the limitations set forth in Section 5(d), until the Company credits the Holder's account with DTC, or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issues and delivers to such Holder a certificate for, the shares of Common Stock representing the Price Triggering Event Conversion Amount to such Holder, the Price Triggering Event Conversion Amount may be converted by such Holder into Common Stock pursuant to Section 5. In the event that a Holder elects to convert the Price Triggering Event Conversion Amount prior to a Price Triggering Event Conversion Date as set forth in the immediately preceding sentence, the Price Triggering Event Conversion Amount so converted shall be deducted from the Conversion Amount to be paid hereunder on the applicable Price Triggering Event Conversion Date.

(e) <u>Mechanics of Price Triggering Event Redemption</u>. If, upon a Price Triggering Event, the Company elects a Price Triggering Event Redemption in accordance with Section 6, then the Price Triggering Event Redemption Amount which is to be paid to each Holder on the Initial Price Triggering Event Redemption Date shall be redeemed by the Company and the Company shall pay to such Holder on the Initial Price Triggering Event Redemption Date, by wire transfer of immediately available funds, an amount in cash (the "**Price Triggering Event Redemption Price**" and together with the General Triggering Event Redemption Price, the "**Triggering Event Redemption Price**") equal to 100% of the Price Triggering Event Redemption Amount. If the Company fails to redeem the Price Triggering Event Redemption Amount on the Initial Price Triggering Event Redemption Date by payment of the Price Triggering Event Redemption Price on such date, then at the option of a Holder designated in writing to the Company (any such designation shall be deemed a "**Conversion Notice**" pursuant to Section 5(c) for purposes of this Certificate of Designations), such Holder shall have the rights set forth in Section 13(a) as if the Company failed to pay the applicable Price Triggering Event Redemption Price and all other rights as a Holder (including, without limitation, such failure constituting a General Triggering Event described in Section 6(a)(v)). Conversions required by this Section 6(e) shall be made in accordance with the provisions of Section 5. Notwithstanding anything to the contrary in this Section 6(e), but subject to Section 5(d), until the Price Triggering Event Redemption Price is paid in full, the Price Triggering Event Amount may be converted, in whole or in part, by each Holder into Common Stock pursuant to Section 5. In the event a Holder elects to convert all or any portion of the Price Triggering Event Redemption Amount prior to the Initial Price Triggering Event Redemption Date as set forth

CONFIDENTIAL                                                                 ANSON_00000075

in the immediately preceding sentence, the Initial Price Triggering Event Redemption Amount so converted shall be deducted from the Conversion Amount to be paid hereunder on the Initial Price Triggering Event Triggering Date.

**(7)** RIGHTS UPON FUNDAMENTAL TRANSACTION AND CHANGE OF CONTROL.

(a) Assumption. If, at any time while any Series H Preferred Shares are outstanding, a Fundamental Transaction occurs or is consummated, then, upon any subsequent conversion of any Series H Preferred Shares, the Holders shall have the right to receive, for each share of Common Stock that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, at the option of such Holder (without regard to any limitation in Section 5(d) on the conversion of the Series H Preferred Shares), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "**Alternate Consideration**") receivable as a result of such Fundamental Transaction by such holder of the number of shares of Common Stock for which such Holder's Series H Preferred Shares is convertible immediately prior to such Fundamental Transaction (without regard to any limitation in Section 5(d) on the conversion of the Series H Preferred Shares). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holders shall be given the same choice as to the Alternate Consideration it receives upon any conversion of the Series H Preferred Shares following such Fundamental Transaction. The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "**Successor Entity**") to assume in writing all of the obligations of the Company under this Certificate of Designations in accordance with the provisions of this Section 7(a) pursuant to written agreements in form and substance reasonably satisfactory to the Holders and approved by the Holders (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of each Holder, deliver to such Holder in exchange for such Holder's Series H Preferred Shares a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Certificate of Designations governing shares of preferred stock of the Successor Entity which are convertible for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon conversion of such Holder's Series H Preferred Shares (without regard to any limitations on the conversion set forth in this Certificate of

CONFIDENTIAL

ANSON_00000076

Designations) prior to such Fundamental Transaction, and with a conversion price which applies the conversion price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such conversion price being for the purpose of protecting the economic value of the Series H Preferred Shares immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holders. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Certificate of Designations referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Certificate of Designations with the same effect as if such Successor Entity had been named as the Company herein.

(b) <u>Redemption Right</u>.  No sooner than twenty (20) days nor later than fifteen (15) days prior to the consummation of a Change of Control, but not prior to the public announcement of such Change of Control, the Company shall deliver written notice thereof via electronic mail to the Holders (a "**Change of Control Notice**").  At any time during the period beginning on the earlier to occur of (x) any oral or written agreement by the Company or any of its Subsidiaries, upon consummation of which the transaction contemplated thereby would reasonably be expected to result in a Change of Control, (y) a Holder becoming aware of a Change of Control if the Change of Control Notice is not delivered to such Holder in accordance with the immediately preceding sentence (as applicable) and (z) a Holder's receipt of a Change of Control Notice and ending twenty (20) Trading Days after the date of the consummation of such Change of Control, such Holder may require the Company to redeem (a "**Change of Control Redemption**") all or any portion of such Holder's Series H Preferred Shares by delivering written notice thereof ("**Change of Control Redemption Notice**") to the Company, which Change of Control Redemption Notice shall indicate the Conversion Amount such Holder is electing to require the Company to redeem.  Any Series H Preferred Shares subject to redemption pursuant to this Section 7(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to greater of (i) 118% of the Conversion Amount being redeemed and (ii) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (1) the greatest Closing Sale Price of the shares of Common Stock during the period beginning on the date immediately preceding the earlier to occur of (x) the consummation of the Change of Control and (y) the public announcement of such Change of Control and ending on the date the Holder delivers the Change of Control Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**Change of Control Redemption Price**").  Redemptions required by this Section 7(b) shall be made in accordance with the provisions of Section 13 and shall have priority to payments to stockholders in connection with a Change of Control.  To the extent redemptions required by this Section 7(b) are deemed or determined by a court of

DOC ID - 33068325.3                                           - 21 -

CONFIDENTIAL                                                                 ANSON_00000077

competent jurisdiction to be prepayments of the Series H Preferred Shares by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 7(b), but subject to Section 5(d), until the Change of Control Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 7(b) may be converted, in whole or in part, by a Holder into shares of Common Stock pursuant to Section 5. In the event that less than all of a Holder's remaining Series H Preferred Shares are redeemed pursuant hereto, the Conversion Amount so redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless such Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Change of Control Redemption Notice. The parties hereto agree that in the event of the Company's redemption of any portion of the Series H Preferred Shares under this Section 7(b), the Holders' damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holders. Accordingly, any Change of Control redemption premium due under this Section 7(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holders' actual loss of its investment opportunity and not as a penalty.

(8) PURCHASE RIGHTS. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to all record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holders will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such Holder could have acquired if such Holder had held the number of shares of Common Stock acquirable upon complete conversion of the Series H Preferred Shares (without taking into account any limitations or restrictions on the convertibility of the Series H Preferred Shares) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (provided, however, that to the extent that a Holder's right to participate in any such Purchase Right would result in such Holder and the other Attribution Parties exceeding the Maximum Percentage, then such Holder shall not be entitled to participate in such Purchase Right to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to such extent) and such Purchase Right to such extent shall be held in abeyance for such Holder until such time or times as its right thereto would not result in such Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times such Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase Right or on any subsequent Purchase Right to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(9) COMPANY CONVERSION OR REDEMPTION.

(a) General. On each applicable Installment Date, provided there has been no Equity Conditions Failure, the Company shall pay to each Holder the

CONFIDENTIAL                                                                    ANSON_00000078

Installment Amount due on such date by converting all, but not less than all, of such Installment Amount into Common Stock in accordance with this Section 9 (a "**Company Conversion**"); provided, however, that the Company may, at its option following written notice to each Holder as set forth below, pay all, but not less than all, of the Installment Amount due on such date by redeeming such Installment Amount in cash (a "**Company Redemption**"). On or prior to the date which is the twenty-third (23rd) Trading Day prior to each Installment Date (each, an "**Installment Notice Due Date**"), the Company shall deliver written notice (each, a "Company Installment Notice" and the date all of the Holders receive such notice is referred to as the "**Company Installment Notice Date**"), to each Holder which Company Installment Notice shall (i) either (A) confirm that the applicable Installment Amount of such Holder's Series H Preferred Shares shall be fully converted into Common Stock pursuant to a Company Conversion (such Conversion Amount to be converted, the "**Company Conversion Amount**") or (B) (1) state that the Company elects to redeem for cash, or is required to redeem for cash in accordance with the provisions of this Certificate of Designations, in whole but not in part, the applicable Installment Amount pursuant to a Company Redemption (such Conversion Amount to be redeemed, the "**Company Redemption Amount**") or a Company Conversion and (ii) if the Installment Amount is to be paid in Common Stock pursuant to a Company Conversion, certify that no Equity Conditions Failure has occurred as of the applicable Company Installment Notice Date. Each Company Installment Notice shall be irrevocable. If the Company does not timely deliver a Company Installment Notice in accordance with this Section 9, then the Company shall be deemed to have delivered an irrevocable Company Installment Notice confirming a Company Conversion in full and shall be deemed to have certified that there shall not have occurred an Equity Conditions Failure in connection with such Company Conversion as of the applicable Company Installment Notice Date. Except as expressly provided in this Section 9, the Company shall convert and/or redeem the applicable Installment Amount of all Series H Preferred Shares pursuant to this Section 9 in the same ratio. The Company Conversion Amount (whether set forth in the Company Installment Notice or by operation of this Section 9) shall be converted in accordance with Section 9(b) and the Company Redemption Amount shall be redeemed in accordance with Section 9(c). Notwithstanding anything herein to the contrary, in the event of any partial conversion or redemption of a Holder's Series H Preferred Shares, the Conversion Amount converted or redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless such Holder otherwise indicates and allocates among any Installment Dates hereunder in a written notice to the Company.

(b) Mechanics of Company Conversion. If the Company delivers a Company Installment Notice and confirms, or is deemed to have confirmed, in whole but not in part, a Company Conversion in accordance with Section 9(a), then (1) contemporaneously with the delivery of the Company Installment Notice on the applicable Company Installment Notice Date, (A) the Company shall, or shall direct the Transfer Agent to, credit each Holder's account with DTC (or if

CONFIDENTIAL    ANSON_00000079

the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to such Holder a certificate for) a number of shares of Common Stock (the **"Initial Pre-Installment Conversion Shares"**) equal to the quotient of (x) the Company Conversion Amount related to the applicable Installment Date divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock; provided, however, if some or all of any Deferral Amount(s) (as defined in Section 9(d)) from one or more prior Installment Date(s) was deferred by a Holder to the Installment Date related to the applicable Company Installment Notice Date, and Initial Pre-Installment Conversion Shares were previously delivered to such Holder with respect to such Deferral Amount(s) (the **"Deferral Pre-Installment Conversion Shares"**), then the amount of Initial Pre-Installment Conversion Shares to be delivered by the Company to such Holder on the applicable Company Installment Notice Date shall be reduced, but not to an amount less than zero (0), by such amount of Deferral Pre-Installment Conversion Shares and (B) in the event of a Conversion Floor Price Condition occurs with respect to the Initial Company Pre-Installment Conversion Price used to calculate the number of Initial Pre-Installment Conversion Shares, each Holder shall have the option, in its sole and absolute discretion, to notify the Company in writing by no later than the second (2nd) Trading Day immediately prior to the applicable Company Installment Notice Date that, notwithstanding the Company's election to convert the applicable Installment Amount pursuant to a Company Conversion, such Holder elects to require the Company to pay all or any portion of such Installment Amount in cash by wire transfer of immediately available funds, (2) in addition, in the event a Holder delivers an Acceleration Notice (as defined in Section 9(e)) at least three (3) Trading Days prior to the applicable Installment Date, on the Trading Day immediately following delivery of such Acceleration Notice (such date, the **"Additional Pre-Installment Conversion Shares Date"**) the Company shall, or shall direct the Transfer Agent to, credit such Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to such Holder a certificate for) a number of shares of Common Stock (the **"Additional Pre-Installment Conversion Shares"** and together with the Initial Pre-Installment Conversion Shares, the **"Pre-Installment Conversion Shares"**) equal to the quotient of (x) the Accelerated Amount(s) (as defined in Section 9(e)) set forth in such Acceleration Notice divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock and (3) on the applicable Installment Date, (A) the Company shall, or shall direct the Transfer Agent to, credit each Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to such Holder a certificate) for an additional number of shares of Common Stock, if any, equal to the Installment Balance Conversion Shares and (B) in the event of a Conversion Floor Price Condition occurs with respect to the Company Conversion Price used to calculate the number of Installment Balance Conversion Shares, each Holder shall have the option, in its sole and absolute discretion, to notify the Company in writing by no

CONFIDENTIAL                                                    ANSON_00000080

later than 5:00 p.m., New York time, on the Trading Day immediately prior to the applicable Installment Date that (x) by no later than the fifth (5<sup>th</sup>) Trading Day immediately following the applicable Installment Date, such Holder shall deliver to the Company any number of shares of Common Stock not exceeding the number of Pre-Installment Conversion Conversion Shares delivered to such Holder on the related Company Installment Notice Date (such shares, the **"Pre-Installment Return Shares"**) and (y) the Company shall pay to such Holder an additional amount in cash, by wire transfer of immediately available funds, equal to the product of (I) the applicable number of Pre-Installment Return Shares and (II) the Initial Company Pre-Installment Conversion Price used to calculate the number of Initial Pre-Installment Conversion Shares; provided, that no Equity Conditions Failure has occurred (unless waived in writing by such Holder) on each day during the period commencing on such Company Installment Notice Date through the applicable Installment Date. On the second (2nd) Trading Day immediately after the end of each Measuring Period, the Company shall deliver a written notice setting forth the calculation of the Initial Pre-Installment Conversion Shares and the Installment Balance Conversion Shares, as applicable, (and the calculation of the component parts of such calculations) to each Holder. If a Triggering Event occurs during the period from any Company Installment Notice Date through the applicable Installment Date, each Holder may elect a Triggering Event Redemption in accordance with Section 6 without being required to return to the Company any Pre-Installment Conversion Shares previously delivered to such Holder. All Pre-Installment Conversion Shares and Installment Balance Conversion Shares shall be fully paid and nonassessable shares of Common Stock (rounded to the nearest whole share). If an Equity Conditions Failure occurs as of the applicable Company Installment Notice Date, then unless the Company has elected to redeem such Installment Amount, the Company Installment Notice shall indicate that unless a Holder waives the Equity Conditions Failure, the Installment Amount shall be redeemed for cash. If the Company confirmed (or is deemed to have confirmed by operation of Section 9(a)) the conversion of the applicable Company Conversion Amount, in whole but not in part, and there was no Equity Conditions Failure as of the applicable Company Installment Notice Date (or is deemed to have certified that there is no Equity Conditions Failure in connection with any such conversion by operation of Section 9(a)) but an Equity Conditions Failure occurred between the applicable Company Installment Notice Date and any time through the applicable Installment Date (an **"Interim Installment Period"**), the Company shall provide each Holder a subsequent written notice to that effect. If an Equity Conditions Failure occurs (unless waived in writing by such Holder) during such Interim Installment Period, then at the option of such Holder designated in writing to the Company, such Holder may require the Company to do either one or both of the following: (i) the Company shall redeem all or any part designated by such Holder of the Company Conversion Amount (such designated amount is referred to as the **"First Redemption Amount"**) on such Installment Date and the Company shall pay to such Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash equal to 125% of such First

CONFIDENTIAL

ANSON_00000081

Redemption Amount and/or (ii) the Company Conversion shall be null and void with respect to all or any part designated by such Holder of the unconverted Company Conversion Amount and such Holder shall be entitled to all the rights of a Holder with respect to such amount of the Company Conversion Amount. If the Company fails to redeem any First Redemption Amount on or before the applicable Installment Date by payment of such amount on the applicable Installment Date, then such Holder shall have the rights set forth in Section 13 as if the Company failed to pay the applicable Company Installment Redemption Price (as defined below) and all other rights under this Certificate of Designations (including, without limitation, such failure constituting a Triggering Event described in Section 6(a)(v)). Notwithstanding anything to the contrary in this Section 9(b), but subject to the limitations set forth in Section 5(d), until the Company credits a Holder's account with DTC, or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issues and delivers to such Holder a certificate for, the shares of Common Stock representing the Company Conversion Amount to such Holder, the Company Conversion Amount may be converted by such Holder into Common Stock pursuant to Section 5. In the event that a Holder elects to convert the Company Conversion Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless such Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(c) <u>Mechanics of Company Redemption</u>. If the Company elects a Company Redemption in accordance with Section 9, then the Company Redemption Amount which is to be paid to each Holder on the applicable Installment Date shall be redeemed by the Company and the Company shall pay to such Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash (the "**Company Installment Redemption Price**") equal to 100% of the Company Redemption Amount. If the Company fails to redeem the Company Redemption Amount on the applicable Installment Date by payment of the Company Installment Redemption Price on such date, then at the option of a Holder designated in writing to the Company (any such designation shall be deemed a "**Conversion Notice**" pursuant to Section 5(c) for purposes of this Certificate of Designations), (i) such Holder shall have the rights set forth in Section 13 as if the Company failed to pay the applicable Company Installment Redemption Price and all other rights as a Holder (including, without limitation, such failure constituting a Triggering Event described in Section 6(a)(v)) and (ii) such Holder may require the Company to convert all or any part of the Company Redemption Amount at the Company Conversion Price as in effect on the applicable Installment Date. Conversions required by this Section 9(c) shall be made in accordance with the provisions of Section 5(c). Notwithstanding anything to the contrary in this Section 9(c), but subject to Section 5(d), until the Company Installment Redemption Price is paid in full, the Company Redemption Amount may be converted, in whole or in part, by a Holder

CONFIDENTIAL                                                                    ANSON_00000082

into Common Stock pursuant to Section 5. In the event a Holder elects to convert all or any portion of the Company Redemption Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Redemption Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless such Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(d) Deferred Installment Amount. Notwithstanding any provision of this Section 9 to the contrary, each Holder may from time to time, at its option and in its sole discretion, deliver a written notice (a "**Deferral Notice**") to the Company no later than the Trading Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of an Installment Amount payable on such Installment Date deferred (such amount(s) deferred, the "**Deferral Amount**") until (i) any subsequent Installment Date selected by such Holder, in its sole discretion, in which case, the Deferral Amount shall be added to, and become part of, the Installment Amount to be paid on such subsequent Installment Date or (ii) until the last Business Day of any calendar month following the last Installment Date occurring hereunder, which date may be after the Scheduled Maturity Date hereunder. Any Deferral Notice delivered by a Holder pursuant to this Section 9(d) shall set forth (i) the Deferral Amount and (ii) the date that such Deferral Amount shall now be payable.

(e) Accelerated Installment Amount. Notwithstanding any provision of this Section 9 to the contrary, each Holder may, at its option and in its sole discretion, deliver a written notice to the Company (an "**Acceleration Notice**") no later than the Trading Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of any or all Installment Amount(s) scheduled to be paid on future Installment Dates after the applicable Installment Date accelerated (such amount(s) accelerated, the "**Accelerated Amount(s)**") to be paid on the applicable Installment Date pursuant to a Company Conversion, in which case, such Accelerated Amount(s) shall be added to, and become part of, the Installment Amount as such Installment Amount may have been increased pursuant to the terms hereof, payable on such applicable Installment Date by including such Accelerated Amount(s) in the Installment Amount for the applicable Installment Date and shall be payable in Common Stock regardless of whether the Installment Amount scheduled to be paid on such applicable Installment Date in accordance with the provisions of this Section 9 shall be paid in cash or in shares of Common Stock. Any Acceleration Notice delivered by a Holder pursuant to this Section 9(e) shall set forth (i) the Accelerated Amount(s) and (ii) the date that such Accelerated Amount should have been paid if not for such Holder's right to accelerate such Installment Amount(s) pursuant to this Section 9(e).

(10)    OPTIONAL REDEMPTION AT THE COMPANY'S ELECTION. At any time after the Issuance Date, the Company shall have the right to redeem all, but not less than all, of the Conversion Amount then remaining under the Series H Preferred Shares (the "**Company**

CONFIDENTIAL                                                                    ANSON_00000083

**Optional Redemption Amount**") as designated in the Company Optional Redemption Notice on the Company Optional Redemption Date (each as defined below) (the "**Company Optional Redemption**"). The Series H Preferred Shares subject to redemption pursuant to this Section 10 shall be redeemed by the Company on the Company Optional Redemption Date in cash by wire transfer of immediately available funds at a price equal to: (i) so long as there has been no Equity Conditions Failure during the period beginning on the Company Optional Redemption Notice Date (as defined below) through the Company Optional Redemption Date (as defined below), 125% of the Conversion Amount to be redeemed and (ii) if an Equity Conditions Failure occurs (which is not waived in writing by such Holder) at any time during the period beginning on the Company Optional Redemption Notice Date through the Company Optional Redemption Date (the "**Company Optional Redemption Interim Period**"), the greater of (x) 125% of the Conversion Amount to be redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Sale Price of the shares of Common Stock during the period beginning on the date immediately preceding the Company Optional Redemption Notice Date and ending on the Company Optional Redemption Date, by (II) the lowest Conversion Price in effect during such period (the price set forth in the foregoing clause (i) or (i), as applicable, the "**Company Optional Redemption Price**"). The Company may exercise its right to require redemption under this Section 10 by delivering a thirty (30) calendar day prior written notice thereof via electronic mail to all, but not less than all, of the Holders (the "**Company Optional Redemption Notice**" and the date all of the Holders received such notice is referred to as the "**Company Optional Redemption Notice Date**"). The Company Optional Redemption Notice shall be irrevocable. The Company Optional Redemption Notice shall (i) state the date on which the Company Optional Redemption shall occur (the "**Company Optional Redemption Date**"), which date shall be the thirtieth (30th) calendar day immediately following the Company Optional Redemption Notice Date (or if such date is not a Business Day, the immediately following Business Day), (ii) state the aggregate Conversion Amount of the Series H Preferred Shares which the Company has elected to be subject to Company Optional Redemption from the Holders pursuant to this Section 10 on the Company Optional Redemption Date, (iii) state the applicable Company Optional Redemption Price in the event: (x) no Equity Conditions Failure occurs during the Company Optional Redemption Interim Period and (y) an Equity Conditions Failure has occurred or will occur (which is not waived in writing by a Holder) during the Company Optional Redemption Interim Period. If the Company confirmed that there was no such Equity Conditions Failure as of the Company Optional Redemption Notice Date but an Equity Conditions Failure occurs at any time during the Company Optional Redemption Interim Period, the Company shall provide the Holders a subsequent written notice to that effect. Notwithstanding anything to the contrary in this Section 10, until the Company Optional Redemption Price is paid, in full, the Company Optional Redemption Amount may be converted, in whole or in part, by the Holder into shares of Common Stock pursuant to Section 5. All Conversion Amounts converted by a Holder after the Company Optional Redemption Notice Date shall reduce the Company Optional Redemption Amount of such Holder's Series H Preferred Shares required to be redeemed on the Company Optional Redemption Date, unless such Holder otherwise indicates in the applicable Conversion Notice. Company Optional Redemptions made pursuant to this Section 10 shall be made in accordance with Section 13. To the extent redemptions required by this Section 10 are deemed or determined by a court of competent jurisdiction to be prepayments of the Series H Preferred Shares by the Company, such redemptions shall be deemed to be voluntary prepayments. The parties hereto agree that in the event of the Company's redemption of any portion of a Holder's

CONFIDENTIAL                                                                    ANSON_00000084

Series H Preferred Shares under this Section 10, such Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for such Holder. If the Company elects to cause a Company Optional Redemption pursuant to Section 10, then it must simultaneously take the same action in the same proportion with respect to all Holders.

(11)    NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Certificate of Designations, and will at all times in good faith carry out all of the provisions of this Certificate of Designations and take all action as may be required to protect the rights of the Holders.

(12)    RESERVATION OF AUTHORIZED SHARES.

(a) Reservation. The Company shall have sufficient authorized and unissued shares of Common Stock for each of the Series H Preferred Shares equal to not less than [•]%[4] of the number of shares of Common Stock necessary to effect the conversion at the Conversion Rate (without regard to any limitations herein on any such conversion) with respect to the Conversion Amount of each such Series H Preferred Share as of the Issuance Date (the "**Required Reserve Amount**"). The Company shall, so long as any of the Series H Preferred Shares are outstanding, take all action necessary to reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversions of the Series H Preferred Shares, such number of shares of Common Stock as shall from time to time be necessary to effect the conversion of all of the Series H Preferred Shares then outstanding; provided that at no time shall the number of shares of Common Stock so reserved shall at no time be less than the Required Reserve Amount. The initial number of shares of Common Stock reserved for conversions of the Series H Preferred Shares and each increase in the number of shares so reserved shall be allocated pro rata among the Holders based on the number of Series H Preferred Shares held by each Holder at the time of issuance of the Series H Preferred Shares or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event a Holder shall sell or otherwise transfer any of such Holder's Series H Preferred Shares, each transferee shall be allocated a pro rata portion of the number of reserved shares of Common Stock reserved for such transferor. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Series H Preferred Shares (other than pursuant to a transfer of Series H Preferred Shares in accordance with the immediately preceding sentence) shall be allocated

---

[4] To calculate the maximum number of shares required based on the Conversion Floor Price assuming a deal size of $40,000,000.

CONFIDENTIAL                                                                ANSON_00000085

to the remaining Holders of Series H Preferred Shares, pro rata based on the number of Series H Preferred Shares then held by such Holders.

(b) Insufficient Authorized Shares. If at any time while any of the Series H Preferred Shares remain outstanding the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve for issuance upon conversion of the Series H Preferred Shares at least a number of shares of Common Stock equal to the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for the Series H Preferred Shares then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its Board of Directors to recommend to the stockholders that they approve such proposal. Notwithstanding the foregoing, if during any such time of an Authorized Share Failure, the Company is able to obtain the written consent of a majority of the shares of its issued and outstanding Common Stock to approve the increase in the number of authorized shares of Common Stock, the Company may satisfy this obligation by obtaining such consent and submitting for filing with the SEC an Information Statement on Schedule 14C. If, upon any conversion of the Series H Preferred Shares, the Company does not have sufficient authorized shares to deliver in satisfaction of such conversion, then unless a Holder elects to rescind such attempted conversion, such Holder may require the Company to pay to the Holder within three (3) Trading Days of the applicable attempted conversion, cash in an amount equal to the product of (i) the number of shares of Common Stock that the Company is unable to deliver pursuant to this Section 12, and (ii) the highest Closing Sale Price of the Common Stock during the period beginning on the date of the applicable Conversion Date and ending on the date the Company makes the applicable cash payment.

**(13)    REDEMPTIONS.**

(a) Mechanics. The Company shall deliver the applicable General Triggering Event Redemption Price to a Holders within three (3) Business Days after the Company's receipt of such Holder's General Triggering Event Redemption Notice (the "**General Triggering Event Redemption Date**"). If a Holder has submitted a Change of Control Redemption Notice in accordance with Section 7(b), the Company shall deliver the applicable Change of Control Redemption Price to such Holder (i) concurrently with the consummation of such Change of Control if such notice is received prior to the consummation of such

CONFIDENTIAL                                                    ANSON_00000086

Change of Control and (ii) within three (3) Business Days after the Company's receipt of such notice otherwise (such date, the "**Change of Control Redemption Date**"). The Company shall deliver the applicable Price Triggering Event Redemption Amount to each Holder on the Initial Price Triggering Event Redemption Date. The Company shall deliver the applicable Company Installment Redemption Price to each Holder on the applicable Installment Date. The Company shall deliver the applicable Company Optional Redemption Price to each Holder on the applicable Company Optional Redemption Date. The Company shall pay the applicable Redemption Price to the Holders in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the holder in writing to the Company on the applicable due date. In the event that the Company does not pay a Redemption Price to a Holder within the time period required, at any time thereafter and until the Company pays such unpaid Redemption Price in full, a Holder shall have the option, in lieu of redemption, to require the Company to promptly return to such Holder any or all of the Series H Preferred Shares that were submitted for redemption by such Holder and for which the applicable Redemption Price has not been paid. Upon the Company's receipt of such notice, (i) the applicable Redemption Notice of, or to, such Holder shall be null and void with respect to such Series H Preferred Shares and (ii) the Company shall immediately return any Series H Preferred Shares, or issue new Series H Stock Certificates to such Holder representing such Conversion Amount to be redeemed. A Holder's delivery of a notice voiding a Redemption Notice and exercise of its rights following such notice shall not affect the Company's obligations to make any payments of Late Charges which have accrued prior to the date of such notice with respect to the Conversion Amount subject to such notice.

(b) <u>Redemption by Other Holders</u>. Upon the Company's receipt of notice from any Holder for redemption or repayment as a result of an event or occurrence substantially similar to the events or occurrences described in Section 6 or Section 7(b) or Section 9 (each, an "**Other Redemption Notice**"), the Company shall immediately, but no later than one (1) Business Day of its receipt thereof, forward to each Holder a copy of such notice. If the Company receives a Redemption Notice and one or more Other Redemption Notices, during the seven (7) Business Day period beginning on and including the date which is three (3) Business Days prior to the Company's receipt of such Holder's Redemption Notice and ending on and including the date which is three (3) Business Days after the Company's receipt of a Holder's Redemption Notice and the Company is unable to redeem all Stated Value, dividends, Late Charges and other amounts designated in such Redemption Notice and such Other Redemption Notices received during such seven (7) Business Day period, then the Company shall redeem a pro rata amount from each Holder based on the Stated Value of the Series H Preferred Shares submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven (7) Business Day period.

DOC ID - 33068325.3

- 31 -

CONFIDENTIAL

ANSON_00000087

(c)    Insufficient Assets.  If upon a Redemption Date, the assets of the Company are insufficient to pay the applicable Redemption Price, the Company shall (i) take all appropriate action reasonably within its means to maximize the assets available for paying the applicable Redemption Price, (ii) redeem out of all such assets available therefor on the applicable Redemption Date the maximum possible number of Series H Preferred Shares that it can redeem on such date pro rata among the Holders to be redeemed in proportion to the aggregate number of Series H Preferred Shares outstanding on the applicable Redemption Date and (iii) following the applicable Redemption Date, at any time and from time to time when additional assets of the Company become available to pay the balance of the applicable Redemption Price of the Series H Preferred Shares, the Company shall use such assets, at the end of the then current fiscal quarter, to pay the balance of such Redemption Price of the Series H Preferred Shares, or such portion thereof for which assets are then available, on the basis set forth above at the applicable Redemption Price, and such assets will not be used prior to the end of such fiscal quarter for any other purpose. Dividends on the Stated Value of the Series H Preferred Shares that have not been redeemed shall continue to accrue until such time as the Company redeems the Series H Preferred Shares. The Company shall pay to each Holder the applicable Redemption Price for each Series H Preferred Share without regard to the legal availability of funds unless expressly prohibited by applicable law or unless the payment of the applicable Redemption Price could reasonably be expected to result in personal liability to the directors of the Company.

(14)    VOTING RIGHTS.  Each Holder shall vote on all matters submitted to a class vote of the Holders.  Except as set forth in this Section 14 and as required by applicable law, the Series H Preferred Shares shall not have any voting rights.

(15)    NEGATIVE COVENANTS.  After the date hereof and until all of the Series H Preferred Shares have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall not, and the Company shall not permit any of its Subsidiaries, without the prior written consent of the Required Holders, to directly or indirectly:

(a)    incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness;

(b)    allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its Subsidiaries (collectively, "**Liens**") other than Permitted Liens and as set forth on Schedule 3(yy)(i) of the Securities Purchase Agreement;

(c)    redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such

DOC ID - 33068325.3

- 32 -

CONFIDENTIAL

ANSON_00000088

payment, an event constituting, or that with the passage of time and without being cured would constitute, a Triggering Event has occurred and is continuing;

(d)    redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (including, without limitation Permitted Indebtedness) other than as set forth on Schedule 3(yy)(ii) of the Securities Purchase Agreement;

(e)    other than with respect to the Series H Preferred Shares in accordance with the terms of the Certificate of Designations, redeem or repurchase its Equity Interest (except on a pro rata basis among all holders thereof);

(f)    declare or pay any cash dividends or distribution on any Equity Interest of the Company or of its Subsidiaries (other than in connection with the TRNF Spin-Off);

(g)    make, any change in the nature of its business as described in the Company's most recent Annual Report filed on Form 10-K with the SEC or modify its corporate structure or purpose, except as contemplated by the TRNF Spin-Off;

(h) encumber, license or otherwise allow any Liens on any Intellectual Property, including, without limitation, any claims for damage by way of any past, present, or future infringement of any of the foregoing, in each case, other than Permitted Liens;

(i)    except as contemplated by the TRNF Spin-Off, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, license, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof;

(j)    issue Series H Preferred Shares (other than as contemplated by the Securities Purchase Agreement), or issue any other securities that would cause a breach or default under this Certificate of Designations; or

(k)    create (by reclassification or otherwise), or authorize the creation of, or issue or obligate itself to issue additional or other capital stock or securities exchangeable for or convertible or exercisable into capital stock whether such capital stock is Pari Passu Stock or ranks senior to the Series H Preferred Shares prior and in preference to the Series H Preferred Shares in respect of the preferences as to distributions, the payment of dividends and payments upon a Liquidation Event.

(16)    AFFIRMATIVE COVENANTS. Until all of the Series H Preferred Shares have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall, and the Company shall, except with respect to clause (e) below, cause each Subsidiary to, unless otherwise agreed to by the Required Holders, directly and indirectly:

CONFIDENTIAL                                                                      ANSON_00000089

(a)    maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except in the case that any such failure to so maintain, preserve or comply has not had and is not reasonably likely to have, a Material Adverse Effect;

(b)    maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except in the case that any such failure to so maintain, preserve or comply has not had, and is not reasonably likely to have, a Material Adverse Effect;

(c)    take all action necessary or advisable to maintain all of the Intellectual Property that is necessary or material to the conduct of its business in full force and effect;

(d)    maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated;

(e)    maintain on deposit unrestricted and unencumbered cash in a U.S. bank in an aggregate amount equal to not less than the greater of (i) $6,000,000 and (ii) fifty percent (50%) of the Stated Value of the Series H Preferred Shares that remain outstanding as of any applicable date of determination; and

(f)    notify the Holders in writing whenever an Equity Conditions Failure occurs, and simultaneously with the delivery of such notice to the Holder, file a Current Report on Form 8-K with the SEC to state such fact.

**(17)    VOTE TO CHANGE THE TERMS OF OR ISSUE SERIES H PREFERRED SHARES.**  In addition to any other rights provided by law, except where the vote or written consent of the holders of a greater number of shares is required by law or by another provision of the Certificate of Incorporation, the affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders, voting together as a single class, shall be required before the Company may: (a) amend or repeal any provision of, or add any provision to, the Certificate of Incorporation or bylaws, or file any articles of amendment, certificate of designations, preferences, limitations and relative rights of any series of preferred stock, if such action would adversely alter or change the preferences, rights, privileges or powers of, or restrictions provided for the benefit of the Series H Preferred Shares, regardless of whether any such action shall be by means of amendment to the Certificate of Incorporation or by merger, consolidation or otherwise; (b) increase or decrease (other than by conversion) the authorized number of shares of Series H Preferred Shares; or (c) amend or waive any provision of the Certificate of Designations with respect to the Series H Preferred Shares.  Any amendment or

CONFIDENTIAL                                                                                   ANSON_00000090

waiver to this Certificate of Incorporation made in conformity with the provisions of this Section 17 shall be binding on all Holders.  No such amendment or waiver shall be effective to the extent that it applies to less than all of the Holders.

(18)    TRANSFER.  Series H Preferred Shares and any shares of Common Stock issued upon conversion of the Series H Preferred Shares may be offered, sold, assigned or transferred by a Holder without the consent of the Company, subject only to the provisions of Section 2(h) of the Securities Purchase Agreement.  Holders shall have the right to transfer and to exercise rights with respect to  fractional Series H Preferred Shares and any redemptions of Series H Preferred Shares by the Company shall be made calculating the number of applicable Series H Preferred Shares to one thousandth of a Series H Preferred Share.

(19)    EQUAL TREATMENT OF HOLDERS.  No consideration shall be offered or paid to any of the Holders to amend or waive or modify any provision of the Series H Preferred Shares, unless the same consideration (other than the reimbursement of legal fees) is also offered to all of the Holders.  This provision constitutes a separate right granted to each of the Holders by the Company and shall not in any way be construed as the Holders acting in concert or as a group with respect to the purchase, disposition or voting of securities or otherwise.

(20)    GENERAL PROVISIONS.

(a)    In addition to the above provisions with respect to Series H Preferred Shares, such Series H Preferred Shares shall be subject to and be entitled to the benefit of the provisions set forth in the Certificate of Incorporation of the Company with respect to preferred stock of the Company generally; provided, however, that in the event of any conflict between such provisions, the provisions set forth in this Certificate of Designations shall control.

(b)    Any Series H Preferred Shares which are converted, repurchased or redeemed shall be automatically and immediately cancelled and shall not be reissued, sold or transferred.

(c)    Whenever notice is required to be given under this Certificate of Designations, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement.

(21)    REMEDIES,    CHARACTERIZATIONS,    OTHER    OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF.  The remedies provided in this Certificate of Designations shall be cumulative and in addition to all other remedies available under this Certificate of Designations and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit a Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Certificate of Designations.  The Company covenants to each Holder that there shall be no characterization concerning this instrument other than as expressly provided herein.  Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by such Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).  The Company acknowledges that a breach by it of its obligations

CONFIDENTIAL

ANSON_00000091

hereunder will cause irreparable harm to the Holders and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holders shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(22) CONSTRUCTION; HEADINGS. This Certificate of Designations shall be deemed to be jointly drafted by the Company and all the Buyers and shall not be construed against any person as the drafter hereof. The headings of this Certificate of Designations are for convenience of reference and shall not form part of, or affect the interpretation of, this Certificate of Designations.

(23) FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of a Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(24) DISPUTE RESOLUTION. In the case of a dispute as to the determination of the Closing Bid Price, the Closing Sale Price, the Weighted Average Price or the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall instruct the Transfer Agent to issue to such Holder the number of shares of Common Stock that is not disputed and the Company shall submit the disputed determinations or arithmetic calculations within one (1) Business Day of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the applicable Holder. If a Holder and the Company are unable to agree upon such determination or calculation within one (1) Business Day of such disputed determination or arithmetic calculation being submitted to such Holder, then the Company shall, within one (1) Business Day submit (a) the disputed determination of the Closing Bid Price, the Closing Sale Price or the Weighted Average Price to an independent, reputable investment bank selected by such Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed, or (b) the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by such Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the applicable Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(25) NOTICES; PAYMENTS.

(a) Notices. Whenever notice is required to be given under this Certificate of Designations, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Certificate of Designations, including in reasonable detail a description of such action and the reason therefore. Without limiting the

CONFIDENTIAL                                                                                     ANSON_00000092

generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least ten (10) Business Days prior to the date on which the Company closes its books or takes a record (I) with respect to any dividends or distribution upon the Common Stock, (II) with respect to any pro rata subscription offer to holders of Common Stock or (III) for determining rights to vote with respect to any Fundamental Transaction or Liquidation Event, provided that such information shall be made known to the public prior to or in conjunction with such notice being provided to such Holder.

(b) <u>Payments</u>.  Whenever any payment of cash is to be made by the Company to any Person pursuant to this Certificate of Designations, such payment shall be made in lawful money of the United States of America via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and such Holder's wire transfer instructions; <u>provided</u>, that a Holder may elect to receive a payment of cash by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Buyers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement). Whenever any amount expressed to be due by the terms of this Certificate of Designations is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day.  Any amount of Stated Value or other amounts due under the Transaction Documents which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of eighteen percent (18.0%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

(26)    GOVERNING LAW; JURISDICTION; JURY TRIAL.  This Certificate of Designations shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Certificate of Designations shall be governed by, the internal laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of Delaware. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.  The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any

CONFIDENTIAL                                                                                   ANSON_00000093

manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holders from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holders, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holders. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS CERTIFICATE OF DESIGNATIONS OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(27)    LOST OR STOLEN CERTIFICATES. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any Series H Preferred Stock Certificates representing the Series H Preferred Shares (if any), and, in the case of loss, theft or destruction, of any indemnification undertaking by such Holder to the Company in customary form (but without any obligation to post a surety or other bond) and, in the case of mutilation, upon surrender and cancellation of the Series H Preferred Stock Certificate(s), the Company shall execute and deliver new preferred stock certificate(s) representing the outstanding Stated Value; provided, however, the Company shall not be obligated to re-issue preferred stock certificates if such Holder contemporaneously requests the Company to convert such Series H Preferred Shares into Common Stock.

(28)    DISCLOSURE. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Certificate of Designations, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall contemporaneously with any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to the Holders contemporaneously with delivery of such notice, and in the absence of any such indication, the Holders shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(29)    SERIES H PREFERRED SHARE REGISTER. The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate by notice to the Holders), a register for the Series H Preferred Shares, in which the Company shall record the name and address of the persons in whose name the Series H Preferred Shares have been issued, as well as the name and address of each transferee. The Company may treat the Person in whose name any Series H Preferred Share is registered on the register as the owner and holder thereof for all purposes, notwithstanding any notice to the contrary, but in all events recognizing any properly made transfers.

(30)    STOCKHOLDER MATTERS. Any stockholder action, approval or consent required, desired or otherwise sought by the Company pursuant to the rules and regulations of the Principal Market, the DGCL, this Certificate of Designations or otherwise with respect to the issuance of the Series H Preferred Shares or the Common Stock issuable upon conversion thereof may be effected by written consent of the Company's stockholders or at a duly called

CONFIDENTIAL                                                                                    ANSON_00000094

meeting of the Company's stockholders, all in accordance with the applicable rules and regulations of the Principal Market and the DGCL. This provision is intended to comply with the applicable sections of the DGCL permitting stockholder action, approval and consent affected by written consent in lieu of a meeting.

**(31)** INDEPENDENT NATURE OF HOLDERS' OBLIGATIONS AND RIGHTS. The rights and obligations of each Holder under any Transaction Document are several and not joint with the obligations of any other Holder, and no Holder shall be responsible in any way for the performance of the obligations of any other Holder under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Holder pursuant hereto or thereto, shall be deemed to constitute such Holder as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Holders are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Holder shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Certificate of Designations or out of any other Transaction Documents, and it shall not be necessary for any other Holder to be joined as an additional party in any proceeding for such purpose.

**(32)** CERTAIN DEFINITIONS. For purposes of this Certificate of Designations, Preferences and Rights of Series H Preferred Shares of the Company (this **"Certificate of Designations"**) the following terms shall have the following meanings:

(a) **"Affiliate"** shall have the meaning ascribed to such term in Rule 405 of the Securities Act.

(b) **"Attribution Parties"** means, collectively, the following Persons: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by such Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of such Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with such Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Common Stock would or could be aggregated with such Holder's and the other Attribution Parties for purposes of Section 13(d) of the Exchange Act. For clarity, the purpose of the foregoing is to subject collectively such Holder and all other Attribution Parties to the Maximum Percentage.

(c) **"Bloomberg"** means Bloomberg Financial Markets.

(d) **"Business Day"** means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(e) **"Buyers"** has the meaning ascribed to such term in the Securities Purchase Agreement.

CONFIDENTIAL     ANSON_00000095

(f) "**Calendar Quarter**" means each of: the period beginning on and including January 1 and ending on and including March 31; the period beginning on and including April 1 and ending on and including June 30; the period beginning on and including July 1 and ending on and including September 30; and the period beginning on and including October 1 and ending on and including December 31.

(g) "**Change of Control**" means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the Common Stock in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification continue after such reorganization, recapitalization or reclassification to hold publicly traded securities and, directly or indirectly, are, in all material respect, the holders of the voting power of the surviving entity (or entities with the authority or voting power to elect the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities) after such reorganization, recapitalization or reclassification or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(h) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the applicable Holder. If the Company and such Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 24. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

DOC ID - 33068325.3                                    - 40 -

                                                                  ANSON_00000096

(i) "**Common Stock**" means (i) the Company's shares of Common Stock, par value $0.001 per share, and (ii) any share capital into which such Common Stock shall have been changed or any share capital resulting from a reorganization, recapitalization or reclassification of such Common Stock, excluding shares of Taronis Fuels, Inc. to be issued pursuant to the TRNF Spin-Off.

(j) "**Company Conversion Price**" means as of the applicable Installment Date, that price which shall be the lower of (i) the Conversion Price then in effect and (ii) the Market Price calculated as of as of such applicable Installment Date.

(k) "**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(l) "**Conversion Floor Price**" means [•][5] (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction relating to the Common Stock occurring after the Subscription Date).

(m) "**Conversion Floor Price Condition**" means that the relevant Initial Price Triggering Event Conversion Price, Price Triggering Event Conversion Price, Initial Company Pre-Installment Conversion Price or Company Conversion Price, as applicable, is lower that the Conversion Floor Price.

(n) "**Conversion Shares**" means shares of Common Stock issuable by the Company pursuant to the terms of this Certificate of Designations, including any related dividends and Late Charges so converted or redeemed.

(o) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(p) "**Eligible Market**" means the Principal Market, The New York Stock Exchange, The NASDAQ Global Market, The NASDAQ Global Select Market, or the NYSE American.

(q) "**Equity Conditions**" means each of the following conditions: (i) on each day during Equity Conditions Measuring Period, all Underlying Shares, including the shares of Common Stock issuable upon conversion of the

---

[5] Insert 20% of the arithmetic average of the Closing Sale Prices of the Common Stock on the five (5) Trading Days immediately prior to the Subscription Date.

DOC ID - 33068325.3                          - 41 -

CONFIDENTIAL                                                      ANSON_00000097

Conversion Amount that is subject to the applicable Price Triggering Event Conversion, Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, issued or issuable without restrictive legends and eligible for immediate sale without restriction or limitation pursuant to pursuant to Rule 144 and Section 3(a)(9) of the Securities Act without the requirement to be in compliance with Rule 144(c)(1) and without the need for registration under any applicable federal or state securities laws; (ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Principal Market or any other Eligible Market and shall not have been suspended from trading on such exchange or market nor shall delisting or suspension by such exchange or market been threatened (with delisting reasonably likely to occur after giving effect to all applicable notice, appeal, cure, compliance and hearing periods), commenced or pending either (A) in writing by such exchange or market or (B) by falling below the then effective minimum listing maintenance requirements of such exchange or market; (iii) during the Equity Conditions Measuring Period, the Company shall have delivered shares of Common Stock pursuant to the terms of this Certificate of Designations and shares of Common Stock upon exercise of the Warrants to the holders on a timely basis as set forth in Section 5(c) hereof and Section 1(a) of the Warrants; (iv) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Price Triggering Event Conversion, Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions may be issued in full without violating Section 5(d) hereof and the rules or regulations of the Principal Market or any other applicable Eligible Market; (v) during the Equity Conditions Measuring Period, the Company shall not have failed to timely make any payments within five (5) Business Days of when such payment is due pursuant to any Transaction Document; (vi) during the Equity Conditions Measuring Period, there shall not have occurred either (A) the public announcement of a pending, proposed or intended Fundamental Transaction which has not been abandoned, terminated or consummated, (B) a Triggering Event (other than a Price Triggering Event if the event requiring the satisfaction of the Equity Conditions is a Price Triggering Event) or (C) an event that with the passage of time or giving of notice would constitute a Triggering Event (other than a Price Triggering Event of the event requiring the satisfaction if the Equity Conditions is a Price Triggering Event); (vii) the Company shall have no knowledge of any fact that would cause any Underlying Shares, including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Price Triggering Event Conversion, Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, not to be eligible for immediate sale without restriction pursuant to Rule 144 and Section 3(a)(9) of the Securities Act without the requirement to be in compliance with Rule 144(c)(1); (viii) during the Equity Conditions Measuring Period, the Company otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document in any respect; (ix)

DOC ID - 33068325.3

- 42 -

CONFIDENTIAL

ANSON_00000098

during the Equity Conditions Measuring Period, such Holder shall not be in possession of any unsolicited material, nonpublic information received from the Company, any Subsidiary or its respective agent or affiliates; (x) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Price Triggering Event Conversion, Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions are duly authorized and listed and eligible for trading without restriction on an Eligible Market; (xi) on each day during Equity Conditions Measuring Period, the average daily dollar trading volume of the Common Stock as reported by Bloomberg during the twenty (20) Trading Days immediately prior to the applicable date of determination shall be at least twenty percent (20%) of the Stated Value of the then outstanding Series H Preferred Shares; and (x) on each day during Equity Conditions Measuring Period, the Weighted Average Price of the Common Stock shall exceed the Conversion Floor Price.

(r) **"Equity Conditions Failure"** means that on any applicable date of determination, the Equity Conditions have not each been satisfied or waived in writing by such Holder; provided, however, that the Equity Condition set forth in clause (iv) of such definition is not waivable by any Holder.

(s) **"Equity Conditions Measuring Period"** means each day during the period beginning thirty (30) Trading Days immediately prior to the applicable date of determination and ending on and including the applicable date of determination.

(t) **"Equity Interests"** means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, Options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(u) **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

(v) **"Fundamental Transaction"** means (i) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (a) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (b) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (c) make, or allow one or more Subject Entities to make, or allow the Company to

DOC ID - 33068325.3                    - 43 -

CONFIDENTIAL                                                                    ANSON_00000099

be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (1) 50% of the outstanding shares of Common Stock, (2) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (3) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (d) consummate a share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (1) at least 50% of the outstanding shares of Common Stock, (2) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (3) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (e) reorganize, recapitalize or reclassify its Common Stock, (ii) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (a) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (b) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the Subscription Date calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (c) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (iii) that the Company shall directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which

CONFIDENTIAL                                                                                      ANSON_00000100

case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction. Notwithstanding anything to the contrary contained herein, the TRNF Spin-Off shall not constitute a Fundamental Transaction or a Change of Control.

(w)    **"GAAP"** means United States generally accepted accounting principles, consistently applied during the periods involved.

(x)    **"Group"** means a "group" as that term is used in Section 13(d) of the Exchange Act and as defined in Rule 13d-5 thereunder.

(y)    **"Indebtedness"** of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into in the ordinary course of business consistent with past practice), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, lien, pledge, charge, security interest or other encumbrance of any nature whatsoever in or upon any property or assets (including accounts and contract rights) with respect to any asset or property owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

(z)    **"Initial Company Pre-Installment Conversion Price"** means, with respect to any Company Installment Notice Date and Additional Pre-Installment Conversion Shares Date, that price which shall be the lower of (i) the then Conversion Price then in effect and (ii) the Market Price as of the applicable or related, as applicable, Company Installment Notice Date.

(aa)    **"Initial Price Triggering Event Conversion Price"** means as of the date of determination, that price which shall be the lower of (i) the Conversion

CONFIDENTIAL

ANSON_00000101

Price then in effect and (ii) the Price Triggering Event Market Price as of the Initial Price Triggering Event Conversion Date.

(bb) **"Installment Amount"** means with respect to each Installment Date, an amount equal to the sum of the (i) the Stated Value equal to the lesser of (A) if, as of the applicable date of determination (x) the Scheduled Maturity Date is the Initial Scheduled Maturity Date, then such Holder's Pro Rata Amount of $[•][6] and (y) the Scheduled Maturity Date is the Extended Scheduled Maturity Date, then such Holder's Pro Rata Amount of $[•][7], and (B) the Stated Value outstanding on such Installment Date, less, in each case, with respect to each Holder, any Deferral Amount that has been deferred by such Holder from the applicable Installment Date to one or more future Installment Date(s) and any Accelerated Amount that has been accelerated by such Holder from the applicable Installment Date to one or more earlier Installment Date(s), (ii) any Deferral Amount deferred by such Holder pursuant to Section 9(d) and included in such Installment Amount, (iii) any Accelerated Amount accelerated by such Holder pursuant to Section 9(e) and included in such Installment Amount and (iv) accrued and unpaid Interest with respect to such Stated Value and accrued and unpaid Late Charges, if any, with respect to such Stated Value and dividends, as any such Installment Amount for each Holder may be reduced pursuant to the terms hereof, whether upon conversion, redemption or otherwise. In the event a Holder shall sell or otherwise transfer or assign any portion of such Holder's Series H Preferred Shares, the transferee shall be allocated a pro rata portion of each unpaid Installment Amount under such Holder's Series H Preferred Shares.

(cc) **"Installment Balance Conversion Shares"** means, for any Installment Date, a number of shares of Common Stock equal to (i) the Post-Installment Conversion Shares for such date minus (ii) the sum of (x) the amount of any Pre-Installment Conversion Shares delivered to such Holder in respect of the applicable Installment Date that is being paid pursuant to a Company Conversion on the applicable Installment Date and (y) the amount of any Pre-Installment Conversion Shares delivered to such Holder in respect of one or more prior Installment Date(s) in respect of a Deferral Amount being paid pursuant to a Company Conversion on the applicable Installment Date; provided, that in the event that the amount of Pre-Installment Conversion Shares exceeds the amount of Post-Installment Conversion Shares for such Installment Date (such excess, the **"Installment Conversion Shares Excess"**), the applicable Installment Balance Conversion Shares shall equal zero (0) for such Installment Date and in no event shall any Installment Conversion Shares Excess reduce the number of Pre- Installment Conversion Shares payable to such Holder on any subsequent Company Installment Notice Date, if any.

---

[6] Insert the quotient obtained by dividing (i) the aggregate Stated Value of Series H Preferred Shares issued on the Closing Date by the Company pursuant to the Securities Purchase Agreement, by (ii) twenty four (24).

[7] Insert the quotient obtained by dividing (i) the aggregate Stated Value of Series H Preferred Shares issued on the Closing Date by the Company pursuant to the Securities Purchase Agreement, by (ii) thirty six (36).

DOC ID - 33068325.3                                   - 46 -

                                        ANSON_00000102

(dd) **"Installment Date"** means [December 31, 2019][8] and the last Business Day of every calendar month anniversary thereafter through and including the Maturity Date.

(ee) **"Intellectual Property"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(ff) **"Lead Investor"** means Empery Debt Opportunity Fund, LP.

(gg) **"Liquidation Event"** means the voluntary or involuntary liquidation, dissolution or winding up of the Company or such Subsidiaries the assets of which constitute all or substantially all of the assets of the business of the Company and its Subsidiaries taken as a whole, in a single transaction or series of transactions, or adoption of any plan for the same.

(hh) **"Market Price"** means 85% of the arithmetic average of the two (2) lowest daily Weighted Average Prices of the Common Stock during the Measuring Period. All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination, reclassification or other similar transaction relating to the Common Stock during such Measuring Period.

(ii) **"Material Adverse Effect"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(jj) **"Measuring Period"** means the twenty (20) consecutive Trading Day period ending on the Trading Day immediately preceding the applicable date of determination.

(kk) **"Options"** means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(ll) **"Permitted Indebtedness"** means (i) trade payables incurred in the ordinary course of business consistent with past practice and (ii) Indebtedness secured by Permitted Liens described in clauses (iv) of the definition of Permitted Liens.

(mm) **"Permitted Liens"** means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate

---

[8] Include date that is the last Business Day of the month following the first (1st) full calendar month immediately following the Closing Date (as defined in the Securities Purchase Agreement). Assuming the Closing Date occurs in November 2019, the first Installment Date hereunder shall be December 31, 2019.

CONFIDENTIAL    ANSON_00000103

proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods and (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting a Triggering Event under Section 6(a)(ix).

(nn) **"Person"** means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(oo) **"Post-Installment Conversion Shares"** means, with respect to any Holder, for any Installment Date and without taking into account the delivery of any Pre-Installment Conversion Shares to such Holder, that number of shares of Common Stock equal to the applicable Company Conversion Amount (including, without limitation, the addition to such Company Conversion Amount of any Deferral Amount(s) that have been deferred by such Holder from prior Installment Date(s) to the applicable Installment Date in accordance with Section 9(d) and/or the addition to such Company Conversion Amount of any Accelerated Amount(s) that have been accelerated by such Holder from future Installment Date(s) to the applicable Installment Date in accordance with Section 9(e)) on such Installment Date divided by the Company Conversion Price as in effect on the applicable Installment Date, rounded to the nearest whole share of Common Stock.

(pp) **"Post-Price Triggering Event Conversion Shares"** means, for the Adjusted Price Triggering Event Conversion Date and without taking into account the delivery of any Initial Price Triggering Event Conversion Shares, that number of shares of Common Stock equal to the applicable Price Triggering Event Conversion Amount divided by the Price Triggering Event Conversion Price as in effect on the Adjusted Price Triggering Event Conversion Date, rounded to the nearest whole share of Common Stock.

(qq) **"Principal Market"** means The Nasdaq Capital Market.

CONFIDENTIAL                                                                      ANSON_00000104

(rr) **"Pro Rata Amount"** means a fraction (i) the numerator of which is the number of Series H Preferred Shares issued to the applicable Holder on the Issuance Date and (ii) the denominator of which is the aggregate number of Series H Preferred Shares issued by the Company on the Issuance Date. In the event a Holder shall sell or otherwise transfer or assign any portion of such Holder's Series H Preferred Shares, the transferee shall be allocated a pro rata portion of the Pro Rata Amount of such Holder that is transferring or assigning its Series H Preferred Shares.

(ss) **"Price Triggering Event Balance Conversion Shares"** means, for the Adjusted Price Triggering Event Conversion Date, a number of shares of Common Stock equal to (i) the Post-Price Triggering Event Conversion Shares for such date <u>minus</u> (ii) the amount of any Initial Price Triggering Event Conversion Shares delivered in respect of the Adjusted Price Triggering Event Conversion Date that is being paid pursuant to a Price Triggering Event Conversion on the Adjusted Price Triggering Event Conversion Date; <u>provided</u>, that in the event that the amount of Initial Price Triggering Event Conversion Shares exceeds the amount of Post-Price Triggering Event Conversion Shares for the Adjusted Price Triggering Event Conversion Date (such excess, the **"Price Triggering Event Conversion Shares Excess"**), the applicable Price Triggering Event Balance Conversion Shares shall equal zero (0) for the Adjusted Price Triggering Event Conversion Date.

(tt) **"Price Triggering Event Conversion Price"** means as of the Adjusted Price Triggering Event Conversion Date, that price which shall be the lower of (i) the Conversion Price then in effect and (ii) the Price Triggering Event Market Price as of the Adjusted Price Triggering Event Conversion Date.

(uu) **"Price Triggering Event Market Price"** means 85% of the arithmetic average of the five (5) lowest daily Weighted Average Prices of the Common Stock during the applicable Price Triggering Event Measuring Period. All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination, reclassification or other similar transaction relating to the Common Stock during the Price Triggering Event Measuring Period.

(vv) **"Price Triggering Event Measuring Period"** means the forty (40) consecutive Trading Day period ending on the Trading Day immediately preceding the Initial Price Triggering Event Conversion Date or the Adjusted Price Triggering Redemption Date, as applicable.

(ww) **"Redemption Dates"** means, collectively, the General Triggering Event Redemption Dates, the Initial Price Triggering Event Redemption Date, the Change of Control Redemption Dates, the Installment Dates and the Company Optional Redemption Date, as applicable, each of the foregoing, individually, a Redemption Date.

DOC ID - 33068325.3

- 49 -

CONFIDENTIAL

ANSON_00000105

(xx)  **"Redemption Notices"** means, collectively, the General Triggering Event Redemption Notices, a Price Triggering Event Notice, the Change of Control Redemption Notices, the Company Installment Notices and the Company Optional Redemption Notice, each of the foregoing, individually, a Redemption Notice.

(yy)  **"Redemption Prices"** means, collectively, the General Triggering Event Redemption Prices, the Price Triggering Redemption Amount, the Change of Control Redemption Prices, the Company Installment Redemption Prices and the Company Optional Redemption Price, each of the foregoing, individually, a Redemption Price.

(zz)  **"Required Holders"** means the Holders representing at least a majority of the aggregate Series H Preferred Shares then outstanding and shall include the Lead Investor so long as the Lead Investor or any of its Affiliates is a Holder.

(aaa) **"SEC"** means the United States Securities and Exchange Commission.

(bbb) **"Securities Act"** means the Securities Act of 1933, as amended.

(ccc) **"Securities Purchase Agreement"** means that certain securities purchase agreement dated as of the Subscription Date by and among the Company and the investors listed on the signature pages attached thereto pursuant to which the Company issued the Series H Preferred Shares and Warrants, as amended from time to time.

(ddd) **"Standard Settlement Period"** means the standard settlement period, expressed in a number of Trading Days, on the principal securities exchange or securities market on which the Common Stock is then traded as in effect on the date of delivery of the applicable Conversion Notice.

(eee) **"Stated Value"** means $1,000 per Series H Preferred Share (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction relating to the Company's preferred stock occurring after the Subscription Date).

(fff)  **"Subject Entity"** means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(ggg) **"Subscription Date"** means [•], 2019.

(hhh) **"Subsidiary"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(iii)  **"Trading Day"** means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading

CONFIDENTIAL    ANSON_00000106

market for the Common Stock on such day, then on the principal securities exchange or securities market on which the Common Stock is then traded.

(jjj)"**Transaction Documents**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(kkk)"**TRNF Spin-Off**" means the Company's previously announced stock dividend to each holder of Common Stock of the Company of five (5) shares of common stock of Taronis Fuels, Inc. for each share of Common Stock of the Company held by stockholders of the Company from November 29, 2019 through and including the distribution date of such securities, currently contemplated to be December 5, 2019.

(lll)"**Turkish Contract**" means that certain binding definitive purchase contract dated as of July 22, 2019 by and between Taronis Fuels, Inc. and a Turkish organization that has partnered with five (5) of the largest industrial gas distributors in Turkey providing for the initial purchase by such Turkish organization of fifteen (15) gasification units from Taronis Fuels, Inc. over an eighteen (18) month period and the option for such Turkish organization to purchase up to an additional fifteen (15) gasification units from Taronis Fuels, Inc. over an eighteen (18) month period, as may be amended, amended and restated, supplemented or otherwise modified from time to time.

(mmm)    "**Underlying Securities**" means all all shares of Common Stock issued and issuable pursuant to the terms of this Certificate of Designations and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and in the Warrants).

(nnn)"**Warrants**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all warrants issued in exchange therefor or replacement thereof.

(ooo)"**Weighted Average Price**" means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market during the period beginning at 9:30:01 a.m., New York Time (or such other time as the Principal Market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as the Principal Market publicly announces is the official close of trading) as reported by Bloomberg through its "Volume at Price" function, or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York Time (or such other time as such market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as such market publicly announces is the official close of trading) as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of

CONFIDENTIAL                                    ANSON_00000107

any of the market makers for such security as reported in the OTC Link or Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices). If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder.  If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 26.  All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction relating to the Common Stock during the applicable calculation period.

\* \* \* \* \*

CONFIDENTIAL                                                                 ANSON_00000108

IN WITNESS WHEREOF, the Company has caused this Certificate of Designations to be signed by Scott Mahoney, its Chief Executive Officer, as of the __th day of _____, 2019.

**TARONIS TECHNOLOGIES, INC.**

By:_____
  Name: Scott Mahoney
  Title: Chief Executive Officer

DOC ID - 33068325.3

ANSON_00000109

<u>EXHIBIT I</u>

**TARONIS TECHNOLOGIES, INC.**

CONVERSION NOTICE

Reference is made to the Certificate of Designations, Preferences and Rights of Series H Convertible Preferred Stock of Taronis Technologies, Inc. (the **"Certificate of Designations"**).    In accordance with and pursuant to the Certificate of Designations, the undersigned hereby elects to convert the number of shares of Series H Convertible Preferred Stock, par value $0.001 per share (the **"Series H Preferred Shares"**), of Taronis Technologies, Inc., a Delaware corporation (the **"Company"**), indicated below into shares of Common Stock, par value $0.001 per share (the **"Common Stock"**), of the Company, as of the date specified below.

Date of Conversion:_____

Number of Series H Preferred Shares to be converted or number of Conversion Shares to be issued upon conversion::_____

Stock certificate no(s). of Series H Preferred Shares to be converted:_____

Tax ID Number (If applicable): _____

Please confirm the following information:_____

Conversion Price:_____

Conversion of Initial Unrestricted Amount: ☐

Conversion of Other Unrestricted Amount: ☐

If number of Series H Preferred Shares is provided above, number of shares of Common Stock to be issued: :_____

Percentage of conversion to constitute Initial Unrestricted Amount: _____

Percentage of conversion to constitute Other Unrestricted Amount: _____

Please issue the Common Stock into which the Series H Preferred Shares are being converted to the Holder, or for its benefit, as follows:

☐    Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to:_____

_____

Address: _____

DOC ID - 33068325.3

ANSON_00000110

Telephone Number: _____

Facsimile Number and Electronic Mail:_____

☐Check here if requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant:_____

DTC Number: _____

Account Number: _____

Authorization:_____

By:_____
Title:_____

Dated:

Account Number (if electronic book entry transfer):_____

Transaction Code Number (if electronic book entry transfer):_____

Installment Amounts to be reduced and amount of reduction:_____

[NOTE TO HOLDER -- THIS FORM MUST BE SENT CONCURRENTLY TO TRANSFER AGENT]

CONFIDENTIAL                                                                                     ANSON_00000111

## ACKNOWLEDGMENT

The Company hereby acknowledges this Conversion Notice and hereby directs Corporate Stock Transfer, Inc. to issue the above indicated number of shares of Common Stock in accordance with the Irrevocable Transfer Agent Instructions dated November 15, 2019 from the Company and acknowledged and agreed to by Corporate Stock Transfer, Inc.

TARONIS TECHNOLOGIES, INC.

By:_____

Name:_____
Title:_____

DOC ID - 33068325.3

CONFIDENTIAL                                                                    ANSON_00000112



| Registered address | Anson Funds (USA) | Anson Funds (Canada) |
|---|---|---|
| Intertrust Corporate Services | 5950 Berkshire Lane, Suite 210 | 155 University Avenue Suite 207 |
| 190 Elgin Ave | Dallas, Texas, 75225 USA | Toronto, Ontario, M5H 3B7 |
| George Town, Grand Cayman, KY1– | Tel. 214. 866.0202 | Canada |
| Cayman Islands | Fax. 214. 276.1395 | Tel. 416.447.8874 |
| | | Fax. 416.352.1880 |

*The purpose of this letter is to set forth the indicative terms pursuant to which, subject to certain conditions set forth herein, Anson Investments Master Fund LP (the "Purchaser") will participate as a lead investor in a transaction (the "Transaction") in which the Purchaser would purchase certain securities of the Company, and the Company would sell such securities to the Purchaser(s). The terms and conditions set forth herein does not constitute a binding offer. The issuance and sale of such securities is subject to the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party and, in the case of the Purchaser, that the Purchaser shall have determined that subsequent to the date hereof and prior to the closing of the Transaction, there shall have been no material adverse developments relating to the business, assets, operations, properties, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole.*

**Issuer:** Genius Brands Intl. (the "**Company**")

**Investors:** Anson Investment Master Fund LP (the "**Lead Investor**"), and other institutional and accredited investors acceptable to the Lead Investor (together with the Lead Investor, the "**Investors**").

**Offering Size:** The Company will sell to the Purchaser(s), for the sum of $10,000,000 million of Senior Secured Convertible Notes (the "**Notes**") Original Issue Discount with a principal amount of $12,500,000 million (the "**Offering**"), of which the Lead Investor has committed to doing up to $3,000,000 if the offering is fully subscribed.

**Escrow:** In the event that $10,000,000 is raised from the Offering, $4,000,000 from the Offering will be held in an escrow account, only to be released to the Company after (i) shareholder approval, and (ii) effectiveness of the registration statement covering all registrable securities.

If both conditions have not been met within 6 months of Closing, all amounts from escrow will be returned to the investors as partial repayment of the principal of the Notes.

**Use of Proceeds:** Debt repayment and working capital.

**Repayment of Existing Debt:** Existing debt holders must invest in this deal at least 200% of the amount of their existing debt and then be repaid on the existing debt.

The Lead Investor at its sole discretion may permit the Company to use some of the proceeds to repay existing debt holders in cash.

**Securities:** Senior secured promissory notes (the "**Notes**"), that will be the most senior debt of the Company, except for certain existing credit lines.

**Maturity:** The Notes shall mature 18 months from Closing (the "**Maturity Date**").

ANSON_00000113

| | |
|---|---|
| **Interest:** | The Notes shall not accrue any interest, except in the case of Default, in which case the Notes will then accrue interest at 18% per annum. |
| **Conversion Price:** | The conversion price for the Notes shall equal the lower of: a) 100% of the closing price of the common stock on the day of signing the definitive agreement plus $0.125 to qualify as an at market transaction for NASDAQ purposes or b) 100% of the average of the 5 prior closing prices plus $0.125 to qualify as an at market transaction for NASDAQ purposes (the "**Conversion Price**"). |
| **Closing:** | The closing of the transaction will take on or before February 7th (the "**Closing Date**") |
| **Registration:** | The Company will file a registration statement with SEC (the "Registration Statement") to register for resale within 10 days following the filing of its 10-K (the "**Filing Date**"), and will use its best efforts to cause such Registration Statement to become effective within 30 days of the Filing Date (or 60 days in the event of a regulatory review). If the Registration Statement is not filed or declared effective within the applicable timeframes, the company will pay liquidated cash damages of 1.0% of the aggregate purchase price for every month following the required filing or effective date (pro-rated for partial months). |
| **Most Favored Nation:** | If the Company enters into a subsequent financing, then the Investors at their sole discretion shall have the ability to exchange their Notes on a $1 for $1 basis into securities of the new transaction. Each investor shall have up to 5 days post-closing of the new transaction to make such election. Notwithstanding the foregoing, such right of exchange shall not become effective until receipt of Shareholder Approval pursuant to NASDAQ Listing Rule 5635(d). |
| **Share Reservation:** | The Company will always reserve enough shares from its authorized capital for all shares underlying the Notes. |
| **Standstill:** | The Company shall be prohibited from entering new financings unless the Company agrees to use 75% of the proceeds towards repayment of the Notes.<br><br>The Company shall not enter into any variable, reset, or otherwise adjustable transactions while the Notes are outstanding. |
| **Restrictive Covenants:** | Standard restrictive covenants for similar transactions, including but not limited to cash burn rate that is equal to or less than $550,000 per month after payment out of the proceeds from the Offering of placement agent fees, existing debt in the amount of $2,866,665 and outstanding fees of legal counsel not to exceed $350,000. |

ANSON_00000114

| | |
|---|---|
| **Shareholder Approval:** | The Company shall use its best efforts to file a preliminary proxy with the Securities and Exchange Commission by March 1, 2020 to present the provisions requiring stockholder approval contemplated hereby to its stockholders for approval (the "**Shareholder Approval**") in accordance with Nasdaq's rules and regulations no later than April 15, 2020. If the Company does not obtain Shareholder Approval at the first meeting, the Company shall call a meeting every three months thereafter to seek Shareholder Approval until the earlier of the date of Shareholder Approval is obtained or the Notes are no longer outstanding. |
| **Reset Conversion Price:** | The Conversion Price on the Notes shall decrease to $0.21 (the "Reset Conversion Price"), subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Warrants:** | At Closing, the Company will also issue to the Investors 100% of new warrants (the "**Warrants**") based on the number of common shares that the Notes are convertible into based on the $0.21 price. The Warrants shall have a 5 year life and initial exercise price equal to 100% of the closing price of the common shares immediately preceding the entry into of the definitive purchase agreement. The Warrants exercise price will decrease to $0.21 subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Anti-Dilution Protection:** | Further, the Notes and Warrants will have full ratchet anti-dilution protection for subsequent financings which shall not become effective until receipt of shareholder approval pursuant to NASDAQ Listing Rule 5635(d). |
| **Waivers:** | So long as the Lead Investor holds at least $1,000,000 of the Notes, they shall have the sole ability to waive or modify any transaction documents relating to the Offering. |
| **Existing Warrants** | Any existing Warrant holder that participates in the Offering will have their existing Warrants' exercise prices reduced to the Reset Conversion Price subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Redemption Dates:** | The Notes shall be redeemed in equal monthly redemptions equal to the $1/12^{th}$ of the principal value of the Notes (in each case, pro rata for each Investor) (each a Redemption Amount"). The first Redemption Date shall be the last trading day of the 6th month following the Closing Date. The remaining Redemption Dates shall be the last trading day of each month following the first Redemption Date. |
| **Redemption Payments:** | Each Redemption Amount shall be paid in full in cash, or if (a) the Equity Conditions are satisfied or waived and (b) the Company so chooses and Shareholder Approval has been obtained pursuant to Nasdaq Listing Rule 5635(d), in shares of common stock as set forth |

CONFIDENTIAL

below. To the extent that the Company elects to pay a full Redemption Amount in shares of common stock, then (A) twenty-three (23) trading days prior to the applicable Redemption Date (each such date being a "Pre-Installment Date"), the Company shall deliver to the Investor(s) a number of shares of common stock (each such quantity being a "Pre-Installment Share Amount") equal to the Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Pre-Installment Date (such lower price, the "Pre-Installment Redemption Price"), and (B) on the applicable Redemption Date, the Company shall deliver to the Investor a number of shares of common stock equal to (a) the amount of applicable Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Redemption Date (such lower price, the "Redemption Price"), less (b) any applicable Pre-Installment Share Amount delivered pursuant to the applicable Redemption Amount. Notwithstanding the foregoing, if the Redemption Price is less than 20% of the average of the five closing prices immediately prior to signing of the definitive documents (the "Floor Price"), then, at each Investor's option, (i) such Investor may elect to treat the Floor Price as the Redemption Price for some or all of the Redemption Amount, or (ii) for the Redemption Amount not reduced by shares pursuant to clause (i) above, the remaining Pre-Installment Share Amount shall be returned to the Company and the Company shall be required to pay such remaining Redemption Amount in cash.

**Market Price:** Equal to 85% of the average of the lowest five daily volume weighted average prices of common stock during the twenty consecutive trading days ending on the trading day immediately preceding the applicable date of determination.

**Equity Conditions:** Typical equity conditions, including without limitation, the Market Price being above the Floor Price, the average daily dollar volume of trading being greater than $100,000. the Company's common stock is listed or designated for quotation on the NASDAQ, the shares underlying the relevant Redemption Amount are registered for issuance or resale or eligible for public resale pursuant to Rule 144, the Company shall remain in compliance with the terms of the transaction documents, the Company's common stock meets certain reasonable price and volume requirements (to be determined), etc.

**Placement Agent:** The Special Equities Group will receive a 10% cash fee and 10% warrants with an exercise price equal to 100% of the closing price of the common stock immediately preceding the entry into of the definitive purchase agreement on all monies received by the Company as a result of this transaction.

CONFIDENTIAL

ANSON_00000116

| | |
|---|---|
| **Due Diligence / Legal Fees:** | The Company will pay the Lead Investor's legal fees and expenses related to this transaction up to a maximum of $50,000, which amount shall be withheld by the Lead Investor at closing |
| **Confidentiality:** | The contents of this Term Sheet are confidential. The Company and each Investor agree that it will not show, circulate, or otherwise disclose this letter or its contents to any other person (other than its officers, employees, directors, affiliates and advisors, on a need-to-know basis). |

CONFIDENTIAL

**Genius Brands Intl.**

Date: 1/22/2020        By: _____
                       Name: Nichad Butt-
                       Title: General Counsel

**Anson Investments Master Fund LP**

Date: 1/22/2020        By: _____
                       Name: Amin Nathoo
                       Title: Director, Anson Advisors Inc.

CONFIDENTIAL

ANSON_00000118

Abraham Declaration Exhibit 90
(ANSON_00003156-59)

Message

---

**From:**      Joe Reda [reda@theseg.com]
**Sent:**      1/24/2020 4:16:46 PM
**To:**        Charles Phillips [cphillips@egsllp.com]
**CC:**        Jonathan Schechter [shex@theseg.com]; Amin Nathoo [anathoo@ansonfunds.com]; Robert F. Charron [rcharron@egsllp.com]
**Subject:**   Re: GNUS - Revised Transaction Documents


Agreeeee

Sent from my iPhone

> On Jan 24, 2020, at 4:15 PM, Charles Phillips <cphillips@egsllp.com> wrote:
>
> I'm sure whatever comments Brett has will just improve the docs for all.  Just need to get the company to start their review, especially given the time crunch.
>
> Charles Phillips
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, NY 10105
> Telephone: (212) 944-7454
> email: cphillips@egsllp.com
> website:
https://can01.safelinks.protection.outlook.com/?url=www.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cb076d00bf4df4a0458ca08d7a112b8e5%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637154974111605396&amp;sdata=bpaFJO01foJ8gkC3%2BzmIpYLpeZaJjqccFSQ9jP7EEpQ%3D&amp;reserved=0
>
> -----Original Message-----
> From: Joe Reda <reda@theseg.com>
> Sent: Friday, January 24, 2020 4:11 PM
> To: Charles Phillips <cphillips@egsllp.com>; Jonathan Schechter <shex@theseg.com>
> Cc: Amin Nathoo <anathoo@ansonfunds.com>
> Subject: Re: GNUS - Revised Transaction Documents
>
> Brett Director to see before company.    Empery is going to make 304847 comments.
>
>
> Sent from my iPhone
>
>> On Jan 24, 2020, at 3:55 PM, Charles Phillips <cphillips@egsllp.com> wrote:
>>
>> What did he want?
>>
>> Charles Phillips
>> Ellenoff Grossman & Schole LLP
>> 1345 Avenue of the Americas
>> New York, NY 10105
>> Telephone: (212) 944-7454
>> email: cphillips@egsllp.com
>> website:
https://can01.safelinks.protection.outlook.com/?url=www.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cb076d00bf4df4a0458ca08d7a112b8e5%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637154974111605396&amp;sdata=bpaFJO01foJ8gkC3%2BzmIpYLpeZaJjqccFSQ9jP7EEpQ%3D&amp;reserved=0
>>
>> -----Original Message-----
>> From: Joe Reda <reda@theseg.com>
>> Sent: Friday, January 24, 2020 3:55 PM
>> To: Charles Phillips <cphillips@egsllp.com>
>> Cc: Amin Nathoo <anathoo@ansonfunds.com>
>> Subject: Re: GNUS - Revised Transaction Documents
>>
>> Shit     This is not what Shex wanted.    But he's dark.    Not your fault.
>>
>> Sent from my iPhone
>>
>>>> On Jan 24, 2020, at 3:43 PM, Charles Phillips <cphillips@egsllp.com> wrote:
>>>
>>> Everyone
>>>

CONFIDENTIAL                                                                                      ANSON_00003156

>>> Attached please find the revised transaction documents, along with redlines to the previously circulated versions.  Please note, in the interest of time, we are distributing these to our client and therefore remain subject to their comments and review.  Please note, no changes to the Subsidiary Guarantee, voting agreement or opinion were needed.
>>>
>>> Regards,
>>> Charles
>>>
>>> Charles Phillips
>>> Ellenoff Grossman & Schole LLP
>>> 1345 Avenue of the Americas
>>> New York, NY 10105
>>> Telephone: (212) 944-7454
>>> email: cphillips@egsllp.com
>>> website:
https://can01.safelinks.protection.outlook.com/?url=www.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cb076d00bf4df4a0458ca08d7a112b8e5%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637154974111605396&amp;sdata=bpaFJ001foJ8gkC3%2BzmIpYLpeZaJjqccFSQ9jP7EEpQ%3D&amp;reserved=0
>>>
>>> -----Original Message-----
>>> From: Schultz, Jeffrey <JSchultz@mintz.com>
>>> Sent: Monday, January 20, 2020 7:43 AM
>>> To: Joe Reda <reda@theseg.com>
>>> Cc: Jonathan Schechter <shex@theseg.com>; Langer, Alan
>>> <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob
>>> denton <bdenton@gnusbrands.com>; Jon Ollwerther
>>> <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>;
>>> Charles Phillips <cphillips@egsllp.com>; Robert F. Charron
>>> <rcharron@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>;
>>> Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori
>>> <lsalvatori@ansonfunds.com>
>>> Subject: Re: GNUS - Revised Transaction Documents
>>>
>>> Given that Nasdaq has not been provided docs yet, we have no visibility on Nasdaq timing.
>>>
>>>> On Jan 20, 2020, at 7:33 AM, Joe Reda <reda@theseg.com> wrote:
>>>
>>>
>>> When will Nasdaq will give the thumbs up to move forward?
>>>
>>> From: Jonathan Schechter
>>> Sent: Friday, January 17, 2020 5:44 PM
>>> To: Jeffrey Schultz; Alan Langer; Michael Jaffa; Bob denton; Jon
>>> Ollwerther; Andy Heyward
>>> Cc: Charles Phillips; Robert Charron; Matthew McCullough; Joe Reda;
>>> Amin Nathoo; Laura Salvatori
>>> Subject: GNUS - Revised Transaction Documents
>>>
>>> All-
>>>
>>> Attached please find the proposed transaction documents for your review.
>>>
>>> Amin is on a plane so the docs are still subject to Anson's review.
>>>
>>> The goal is to close this as quick as possible.
>>>
>>> Please use this email for the working group.
>>>
>>> Thanks-
>>>
>>> Shex
>>>
>>>
>>>
>>> .
>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
>>> ***************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and

ANSON_00003157

disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
****************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>
>>> _____
>>>
>>>
>>>
>>> STATEMENT OF CONFIDENTIALITY:
>>> The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at DirectorofIT@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.
>>>
>>>
>>>
>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>> <GNUS SPA.redline.doc>
>>> <GNUS Sub Guarantee.1.doc>
>>> <GNUS Voting Agreement.1.doc>
>>> <GNUS Warrant.3.doc>
>>> <GNUS Warrant.redline.doc>
>>> <GNUS Debenture.3.doc>
>>> <GNUS Debenture.redline.doc>
>>> <GNUS Security Agreement.3.doc>
>>> <GNUS Security Agreement.redline.doc> <GNUS SPA.3.doc> <GNUS
>>> Opinion.1.doc> <GNUS RRA.2.doc> <GNUS RRA.redline.doc>
>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
****************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>
>>
>>
>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

ANSON_00003158

> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
**************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
**************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

ANSON_00003159

Abraham Declaration Exhibit 91
(EMPGNUS0002005-08)

| From: | Joe Reda [reda@theseg.com] |
|---|---|
| Sent: | 1/24/2020 9:29:50 PM |
| To: | Brett Director [Brett.Director@emperyam.com]; Ryan Lane [ryan.lane@emperyam.com]; Jonathan Schechter [shex@theseg.com] |
| Subject: | Fwd: GNUS - Revised Transaction Documents |
| Attachments: | GNUS SPA.redline.doc; ATT00001.htm; GNUS Sub Guarantee.1.doc; ATT00002.htm; GNUS Voting Agreement.1.doc; ATT00003.htm; GNUS Warrant.3.doc; ATT00004.htm; GNUS Warrant.redline.doc; ATT00005.htm; GNUS Debenture.3.doc; ATT00006.htm; GNUS Debenture.redline.doc; ATT00007.htm; GNUS Security Agreement.3.doc; ATT00008.htm; GNUS Security Agreement.redline.doc; ATT00009.htm; GNUS SPA.3.doc; ATT00010.htm; GNUS Opinion.1.doc; ATT00011.htm; GNUS RRA.2.doc; ATT00012.htm; GNUS RRA.redline.doc; ATT00013.htm |

Brett

Work your magic.   Get docs in shape for Ryan to do $3mil.

We love you.

Reda


Sent from my iPhone

Begin forwarded message:

**From:** Jonathan Schechter <shex@theseg.com>
**Date:** January 24, 2020 at 4:13:47 PM EST
**To:** Jeffrey Schultz <JSchultz@mintz.com>
**Cc:** Joe Reda <reda@theseg.com>
**Subject: Fwd:  GNUS - Revised Transaction Documents**

 Don't review these yet. Brett Director is going to make changes to kane sure it is right.

Sent from my iPhone

Begin forwarded message:

**From:** Charles Phillips <cphillips@egsllp.com>
**Date:** January 24, 2020 at 3:43:13 PM EST
**To:** "Schultz, Jeffrey" <JSchultz@mintz.com>, Joe Reda <reda@theseg.com>
**Cc:** Jonathan Schechter <shex@theseg.com>, "Langer, Alan" <AJLanger@mintz.com>, Michael Jaffa <mjaffa@gnusbrands.com>, Bob denton <bdenton@gnusbrands.com>, Jon Ollwerther <jollwerther@gnusbrands.com>, Andy Heyward <aheyward@gnusbrands.com>, "Robert F. Charron" <rcharron@egsllp.com>, Matthew McCullough <mmccullough@egsllp.com>, Amin Nathoo <anathoo@ansonfunds.com>, Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject: RE:  GNUS - Revised Transaction Documents**

Everyone

Attached please find the revised transaction documents, along with redlines to the previously circulated versions.  Please note, in the interest of time, we are distributing these to our client and therefore remain subject to their comments and review.  Please note, no changes to the Subsidiary Guarantee, voting agreement or opinion were needed.

Regards,
Charles

Charles Phillips
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 944-7454
email: cphillips@egsllp.com
website: www.egsllp.com

-----Original Message-----
From: Schultz, Jeffrey <JSchultz@mintz.com>
Sent: Monday, January 20, 2020 7:43 AM
To: Joe Reda <reda@theseg.com>
Cc: Jonathan Schechter <shex@theseg.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Charles Phillips <cphillips@egsllp.com>; Robert F. Charron <rcharron@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: Re: GNUS - Revised Transaction Documents

Given that Nasdaq has not been provided docs yet, we have no visibility on Nasdaq timing.

On Jan 20, 2020, at 7:33 AM, Joe Reda <reda@theseg.com> wrote:


When will Nasdaq will give the thumbs up to move forward?

From: Jonathan Schechter
Sent: Friday, January 17, 2020 5:44 PM
To: Jeffrey Schultz; Alan Langer; Michael Jaffa; Bob denton; Jon Ollwerther; Andy Heyward
Cc: Charles Phillips; Robert Charron; Matthew McCullough; Joe Reda; Amin Nathoo; Laura Salvatori
Subject: GNUS - Revised Transaction Documents

All-

Attached please find the proposed transaction documents for your review.

Amin is on a plane so the docs are still subject to Anson's review.

The goal is to close this as quick as possible.

Please use this email for the working group.

Thanks-

Shex

Confidential                                                                                          EMPGNUS0002006

.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

_____

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at DirectorofIT@Mintz.com, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential

and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************ This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************ This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Abraham Declaration Exhibit 92 (ANSON_00003594-603, marked as Exhibit 20 at the deposition of Nathoo / Anson)

Message
_____

From:       Amin Nathoo [anathoo@ansonfunds.com]
Sent:       1/24/2020 3:37:29 PM
To:         Charles Phillips [cphillips@egsllp.com]; Joe Reda [reda@theseg.com]
CC:         Robert F. Charron [rcharron@egsllp.com]; Jonathan Schechter [shex@theseg.com]; Matthew McCullough
            [mmccullough@egsllp.com]
Subject:    RE: GNUS Updated Term Sheet


Yes, lets do that in the interest of time

**Amin Nathoo, CFA | Anson Funds**
155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416) 804-4141
anathoo@ansonfunds.com


**From:** Charles Phillips <cphillips@egsllp.com>
**Sent:** January 24, 2020 3:37 PM
**To:** Amin Nathoo <anathoo@ansonfunds.com>; Joe Reda <reda@theseg.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Matthew McCullough
<mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet


Amin

Docs are almost ready to go back out.  Would you like for me to send over to the entire WG and say they're subject to
your review?

Thanks

Charles Phillips
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 944-7454
email: cphillips@egsllp.com
website: www.egsllp.com


**From:** Amin Nathoo <anathoo@ansonfunds.com>
**Sent:** Friday, January 24, 2020 12:07 PM
**To:** Charles Phillips <cphillips@egsllp.com>; Joe Reda <reda@theseg.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Matthew McCullough
<mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

sure

**Amin Nathoo, CFA | Anson Funds**
155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416) 804-4141
anathoo@ansonfunds.com


CONFIDENTIAL                                                     ANSON_00003594

**EXHIBIT**

**20**

**From:** Charles Phillips <cphillips@egsllp.com>
**Sent:** January 24, 2020 11:51 AM
**To:** Amin Nathoo <anathoo@ansonfunds.com>; Joe Reda <reda@theseg.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

It would then actually make sense to keep as how it was originally drafted (with the exception of increasing the premium to 115%), wherein its paid in cash but all equity conditions have to be met.

Charles Phillips
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 944-7454
email: cphillips@egsllp.com
website: www.egsllp.com

---

**From:** Amin Nathoo <anathoo@ansonfunds.com>
**Sent:** Friday, January 24, 2020 11:44 AM
**To:** Charles Phillips <cphillips@egsllp.com>; Joe Reda <reda@theseg.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

Redmeption should not be allowed w/o equity conditions being met (registered, liquid etc.)
And then given we are getting stock at 15% discount, redemption premium should be 15% up so that we are indifferent between being paid and amortizing out.

Those are my thoughts.. not sure what other folks with think. Reda, maybe check with Richie and Ryan?

**Amin Nathoo, CFA | Anson Funds**
155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416) 804-4141
anathoo@ansonfunds.com

---

**From:** Charles Phillips <cphillips@egsllp.com>
**Sent:** January 24, 2020 11:40 AM
**To:** Joe Reda <reda@theseg.com>; Amin Nathoo <anathoo@ansonfunds.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

Amin

When we were originally contemplating the 90 day term, we included a company optional redemption at 1005 of the principal. Do you want to still keep that in there or just remove (not contemplated in the new term sheet)? If you want to keep in there, in cash only, or in shares if the equity conditions met and how the monthly redemptions are to be done?

Thanks

CONFIDENTIAL

ANSON_00003595

Charles Phillips
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 944-7454
email: cphillips@egsllp.com
website: www.egsllp.com

---

**From:** Joe Reda <reda@theseg.com>
**Sent:** Friday, January 24, 2020 9:06 AM
**To:** Amin Nathoo <anathoo@ansonfunds.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** Re: GNUS Updated Term Sheet

Cosmetics on That would be even better.  If it's even possible.

Sent from my iPhone

On Jan 24, 2020, at 8:39 AM, Amin Nathoo <anathoo@ansonfunds.com> wrote:

If they pay us in cash, we want to get the money.. so lowering conversion price doesn't work.

Why don't we make starting price high enough such that even with OID its deemed at the market?

**Amin Nathoo, CFA | Anson Funds**
155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416) 804-4141
anathoo@ansonfunds.com

---

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** January 24, 2020 8:38 AM
**To:** Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>
**Cc:** Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

Rather than do an OID let's simply make it an interest balloon payment at maturity and we can deal with it then or simply lower the 21 cent price to give you the same benefit.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931 8704
Cell: (917) 843 1457
Facsimile: (212) 401 4741
e-mail:  rcharron@egsllp.com

---

**From:** Jonathan Schechter [mailto:shex@theseg.com]
**Sent:** Friday, January 24, 2020 8:32 AM
**To:** Robert F. Charron <rcharron@egsllp.com>; Joe Reda <reda@theseg.com>

CONFIDENTIAL

ANSON_00003596

**Cc:** Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

How about the fact that we have no 20% available right now?

---

**From:** Robert F. Charron [mailto:rcharron@egsllp.com]
**Sent:** Friday, January 24, 2020 8:29 AM
**To:** Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>
**Cc:** Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

If the stock rips wouldn't you do an at market deal off the shelf intraday?  In any event, we can remove the caps and see what Nasdaq says when they get it.  I just think if you have the caps in there Nasdaq will be much quicker to approve the deal.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931 8704
Cell: (917) 843 1457
Facsimile: (212) 401 4741
e-mail:  rcharron@egsllp.com

---

**From:** Jonathan Schechter [mailto:shex@theseg.com]
**Sent:** Friday, January 24, 2020 8:25 AM
**To:** Robert F. Charron <rcharron@egsllp.com>; Joe Reda <reda@theseg.com>
**Cc:** Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

Our concern is if the stock trades well and we want to raise money off the shelf we wont have availability off the shelf unless we do an at-market deal...

---

**From:** Robert F. Charron [mailto:rcharron@egsllp.com]
**Sent:** Friday, January 24, 2020 8:21 AM
**To:** Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>
**Cc:** Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

Right now the documents are drafted with a 20% Nasdaq cap so we don't need to make it at market and you can have all the bell and whistles you want.  Historically Nasdaq has not agreed to structures where you say it is market but then have a bunch of discount resets triggered on shareholder approval.  In fact, when they've done that they've said fine provided you add the cap.  My point is we are going to need a cap no matter what so making it at market here doesn't get you anywhere.  The cap goes away when you get shareholder approval so the net effect is the same.  Amin, in many ways the cap is better for you because it allows you to get the benefit of everything up to 20% so your cost basis on what you can convert is lower.  The down side is if the stock rips you are limited to 20% until they get shareholder approval.  One thought is to add another series of warrants non-exercisable for 6 months and priced at market without AD that terminate upon receipt of shareholder approval.  This way if the stock rips you don't lose your upside.

Robert Charron

CONFIDENTIAL

ANSON_00003597

Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931 8704
Cell: (917) 843 1457
Facsimile: (212) 401 4741
e-mail: rcharron@egsllp.com

**From:** Jonathan Schechter [mailto:shex@theseg.com]
**Sent:** Friday, January 24, 2020 8:10 AM
**To:** Joe Reda <reda@theseg.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** RE: GNUS Updated Term Sheet

Can we make the OID upon shareholder approval also?

**From:** Joe Reda
**Sent:** Friday, January 24, 2020 8:08 AM
**To:** Jonathan Schechter <shex@theseg.com>
**Cc:** Robert F. Charron <rcharron@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Subject:** Re: GNUS Updated Term Sheet

Somehow Amin needs to capture all the economics.   Doesn't have to be on day one but very very quickly.

Sent from my iPhone


On Jan 24, 2020, at 8:05 AM, Jonathan Schechter <shex@theseg.com> wrote:


We have to get Shareholder Approval for all of this

**From:** Robert F. Charron [mailto:rcharron@egsllp.com]
**Sent:** Friday, January 24, 2020 7:55 AM
**To:** Amin Nathoo <anathoo@ansonfunds.com>; Jonathan Schechter <shex@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Cc:** Joe Reda <reda@theseg.com>
**Subject:** RE: GNUS Updated Term Sheet

The 12.5 cent premium doesn't do anything for Nasdaq because of the structure of the deal.  Nasdaq will treat this as a discount because of the SLD, resets and OID (did you eliminate this last part?  It is still in the title but the provision was removed).  The 20% cap is what makes this work.  Doesn't mean you can't have a premium for optics if you want, but they won't deem this at market.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931 8704
Cell: (917) 843 1457
Facsimile: (212) 401 4741
e-mail: rcharron@egsllp.com

CONFIDENTIAL

ANSON_00003598

**From:** Amin Nathoo [mailto:anathoo@ansonfunds.com]
**Sent:** Thursday, January 23, 2020 5:30 PM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Cc:** Joe Reda <reda@theseg.com>
**Subject:** RE: GNUS Updated Term Sheet


**Amin Nathoo, CFA | Anson Funds**
155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416) 804-4141
anathoo@ansonfunds.com


**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** January 23, 2020 5:27 PM
**To:** Jonathan Schechter <shex@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Cc:** Joe Reda <reda@theseg.com>; Amin Nathoo <anathoo@ansonfunds.com>
**Subject:** RE: GNUS Updated Term Sheet


Any chance we can get a Word version of the final term sheet?  Would make it a little more efficient.  Thanks!

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.


**From:** Jonathan Schechter <shex@theseg.com>
**Sent:** Thursday, January 23, 2020 12:39 PM
**To:** Robert F. Charron <rcharron@egsllp.com>; Charles Phillips <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>
**Cc:** Joe Reda <reda@theseg.com>; Amin Nathoo <anathoo@ansonfunds.com>
**Subject:** GNUS Updated Term Sheet

Guys,

Attached is the latest iteration of the term sheet.  Also attached is a doc that shows the amort payments (see section 9).  If we can get revised docs Monday that would be awesome....

We also need to add the following:

1.      Voting Agreement to approve proposals in proxy
2.      40% in escrow for whatever amount is raised
3.      Ability to increase amorts if the stock goes up a lot in 1 month (ie- investors can do a look back to get one of the prior month's pricings)

CONFIDENTIAL                                                                                        ANSON_00003599

4.        Reverse split approval in proxy

Thanks!

Shex

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

CONFIDENTIAL

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************ This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************ This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************ This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read.

ANSON_00003601

The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

ANSON_00003602

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

CONFIDENTIAL

Abraham Declaration Exhibit 93
(CVI_0002406-13)

**From:**       Jonathan Schechter [shex@theseg.com]
**Sent:**       1/29/2020 9:48:08 PM
**To:**         Winer, Sam [Sam.Winer@sig.com]
**CC:**         Joe Reda [reda@theseg.com]
**Subject:**    Re: GNUS - Heights over the wall

Empery reviewing now

Sent from my iPhone

On Jan 29, 2020, at 4:25 PM, Winer, Sam <Sam.Winer@sig.com> wrote:

Waiting for documents.  Devil will be in the details.  Main problem I anticipate is if Nasdaq imposes a floor.  That will make it significantly less attractive.

---------------------------------------------------
Sam Winer
Heights Capital Management, Inc.
101 California Street, Suite 3250
San Francisco, California 94111
(415) 403-6500 (tel)
(925) 330-1902 (m)
(415) 403-6525 (fax)

**From:** Joe Reda [mailto:reda@theseg.com]
**Sent:** Wednesday, January 29, 2020 7:11 AM
**To:** Winer, Sam <Sam.Winer@msx.bala.susq.com>
**Cc:** Jonathan Schechter <shex@theseg.com>
**Subject:** RE: GNUS - Heights over the wall

Let us know your ballpark size....$X-Ymil

Starting to build the order book

Everyone wants you in...most guys doing $1-2mil

fyi

Thx!

**From:** Joe Reda
**Sent:** Friday, January 24, 2020 6:16 PM
**To:** Winer, Sam
**Cc:** Jonathan Schechter; Linda Mackay
**Subject:** Re: GNUS - Iroquois over the wall

Sounds like a Shex Q.   you lost me at hello.

CONFIDENTIAL

Sent from my iPhone


On Jan 24, 2020, at 6:14 PM, Winer, Sam <Sam.Winer@sig.com> wrote:


20% floor is going to be a problem for us (may not be able to get around it with Nasdaq).  May have to keep $4 million in escorw until shareholder approval and the VWAP of stock not being less than 70% of market on closing.


------------------------------------------------------
Sam Winer
Heights Capital Management, Inc.
101 California Street, Suite 3250
San Francisco, California 94111
(415) 403-6500 (tel)
(925) 330-1902 (m)
(415) 403-6525 (fax)

**From:** Winer, Sam
**Sent:** Friday, January 24, 2020 3:07 PM
**To:** 'Joe Reda' <reda@theseg.com>; Jonathan Schechter - Chardan (shex@theseg.com) <shex@theseg.com>
**Cc:** Linda Mackay <linda@theseg.com>
**Subject:** RE: GNUS - Iroquois over the wall

The Waiver provision won't work for us.  Doubt it would work for Empery either.  I assume final documents will have an acceptable amendment/waiver provision, but just wanted to point it out now.


------------------------------------------------------
Sam Winer
Heights Capital Management, Inc.
101 California Street, Suite 3250
San Francisco, California 94111
(415) 403-6500 (tel)
(925) 330-1902 (m)
(415) 403-6525 (fax)

**From:** Joe Reda [mailto:reda@theseg.com]
**Sent:** Wednesday, January 22, 2020 6:30 PM
**To:** Winer, Sam <Sam.Winer@msx.bala.susq.com>
**Cc:** Linda Mackay <linda@theseg.com>; Jonathan Schechter <shex@theseg.com>
**Subject:** GNUS - Iroquois over the wall
**Importance:** High

Sam,

GNUS (NASDAQ - $5mil Pre-Money Val)

**https://www.youtube.com/watch?v=vI5-MBZbohM**

This is a Highly structured piece of paper...It's a Self-Amortizing Senior Secured Convertible Note Original Issue discount with ratchets and resets and price protection and most favored nations with 100% warrants with the same protective features as the note.

CONFIDENTIAL

AMIN is the lead for $3mil out of $10mil...other note holders are in for another $2mil....We are open on $5mil and **YOU SHOULD PLAY FOR SIZE!**

Please be nice...You should do at least $3mil!

-Reda

Pursuant to our discussion and as an inducement to obtain confidential investment information, this will confirm that you have *agreed to keep the information to be disclosed/discussed as confidential and have agreed to not disclose the content of the information to any party not bound by our agreement. Furthermore, you agree not to use the information presented in connection with any investment outside the nature and scope of the proposed investment opportunity. This agreement shall terminate at the earliest of the public release of the information discussed or the completion/termination of the proposed offering.*

**The below fundamentals of the company are ALL in the public domain, through 10K's, 10Q's, 8k's, PR's, Investor letters, website, etc.**

***Media Assets:***

2 tent pole brands that have become big broadcast successes on Nick and Netflix (Rainbow Rangers and Llama)

1.      *The shows are performing very well on air in an extremely competitive environment, so we know there is an appetite for the characters.*

2.      *There are licensed products in virtually all categories coming into the market.*
3.      *The likelihood of all these blue-chip licensees, having failed in their due diligence and them all subsequently failing at retail would be quite hard to imagine, and to my knowledge has never occurred.  When so many manufacturers get behind a brand that is already performing successfully in entertainment, the products sell.* (Many of us saw the ratings doing well 5 years ago for Peppa Pig, PJ Masks, and Paw Patrol, and we knew that a few years later, they would be generating a fortunate from product sales.)

Robust pipeline including Stan Lee's last project, *Stan Lee's Superhero Kindergarten* starring Arnold Schwarzenegger being launched this year.

We expect that this cartoon will becomes the 3rd tent pole brand for us, alongside *Rainbow Rangers*, and *Llama Llama*.  It is ***STAN LEE'S SUPERHERO KINDERGARTEN*** (STARRING Arnold Schwarzenegger).  Arnold is so enthusiastic about the program that he has chosen to take his full compensation in Genius Brands stock.  The initial response has been extremely strong and we have closed some major deals, including Alibaba becoming our global partner, and will distribute and put up on their massive platform in China.  We have multiple toy company offers.  We have a robust pipeline in large part fueled by a package of Stan Lee properties which we co-created and share with his estate from right before he passed away. Stan Lee has created more billion dollar brands than anyone (*Spider-man, Hulk, X-Men, Fantastic Four, Captain America, Black Panther, Guardians of the Galaxy, The Avengers.*)

***Media & Merchandise Partners:***

1.      Consumer products contracted for coming to market this year with over 450 product SKUs
2.      Mattel
3.      WalMart
4.      Target
5.  Bentex
6.  Direct/Sling

    CVI_0002408

7. Mattel
8. Random House/Penguin
9. Target
10. WalMart
- Alibaba
- Nickelodeon
- Amazon Prime/Amazon Fire
- Netflix
- Sony
- Cox
- Comcast
- POW!
- US Public TV

***Genius has now a network of partnerships and licensees***, each of whom are interconnected into our brands and businesses through an incredible ecosystem that is early stages of coming online. From broadcasters to licensees, to retail. They are tiffany players, who do their own due diligence, and play to win.

***Genius Kids Network*** **is also a powerful asset in our portfolio. I consider it like oil in the ground about to be pumped**. Distributed in over 80% of US TV households. Time will prove this to be an important driver of value for the company.

**The list of Genius Brands' core partners is a *'Dream Team,'* that others couldn't begin to imagine or duplicate:**

**We have over 450 SKUs contracted and coming to market in the coming months for both *Llama Llama* and *Rainbow Rangers*.**
***Other Salient Points:***

11.    Approximately $5 million of minimum guarantees (a ridiculously high number relative to the market cap of the company). Some require nothing, some are subject to different deliverables.
12.    Contracting industry, where similar companies are being sold daily for quite large amounts of money, and we are quickly becoming, 'the last oasis in the desert'
13.    ***HUMAN CAPITAL***-The human capital in the company as I have often said, coming from Disney, Hasbro, and Spinmaster is pedigreed and proven.
14. a company called Entertainment One which fundamentally had 2 assets only…"Peppa Pig" and "PJ Masks" was sold for $4.2 billion dollars. We are in a time where the media industry is amidst its own reset. Every major media company in the world is now investing in their own streaming service. Disney+, HBO Max, Peacock, and CBS are just the tip of the iceberg joining Netflix, Amazon, and Hulu. The one common point is that they all need content. As the likes of Disney and Warner's pull back all of their own content, only for their own services, kids content more than ever is becoming scarce and in demand.
15. Genius is not a day trade. It is a long term bet based on tangible real catalogue assets, pipeline, and tiffany relations across the entire kids content and consumer products food chain.
16. ….Look at what the recent comparable sales have been for companies like ours.
17. The heavy lifting is *already done*.
18. ***WHY NOW?*** It takes 4-5 years from creation of a children's property, to production, distribution, licensing, to *on- shelf at retail*. *On-shelf at retail* is where the money finally arrives from. As Warren Buffett once said to me, "*You can't cook a 3 minute egg in 90 seconds, no matter how many stoves you have.*" We have built a good catalogue over the last 6 years since the company began; however, two of our shows have now emerged as hits. *Lllama Llama* on Netflix, and *Rainbow Rangers* on Nickelodeon. Both

have strong ratings. Both have been renewed for second seasons, and both have very robust licensing programs now contracted for with products coming into the market. Combined, there are over 450 product SKUs in every imaginable category of children consumer products.  When a show hits, the numbers can be in the *$billions*, not millions. This is not anecdotal, but real-world outcomes for TV driven properties. *Paw Patrol*, *Peppa Pig*, *PJ Masks*, to name only 3 in our very pre-school space.  (*Strawberry Shortcake,* which I produced, did over $5 billion.) *Rainbow Rangers* has often been referred to as the "*Paw Patrol* for girls."  *Paw Patrol* has a 4-year head start on *Rainbow Rangers*, yet at this point, we are significantly ahead of where they were at their launch.  Another interesting data point is Entertainment One, a UK based kids company which has 2 strong brands.  *Peppa Pig* and *PJ Masks*. They have also a 5-year head start on us, and they were recently sold to Hasbro for $4.2 billion, based exclusively on the success of those two kids brands.  I stated earlier that we have a product which is a very coveted asset.  Not too many years ago, the buyers were the major studios, e.g. Disney, Warner, Universal.  They still are of course, but with the explosion of new services, children's content is more coveted than ever.   Every day, there is a new streaming service announced. THEY ALL WANT ANIMATED CHILDRENS PRODUCT. It is evergreen and doesn't go out of style, and is the backbone of any program service.  (I worked on *The Flintstones* as my first job at Hanna-Barbera, and today you can still buy Flintstones vitamins at the drugstore, and Pebbles and Bam-Bam cereal at the supermarket, and Warner Brothers the owner of Hanna-Barbera still makes a ton of money from it.)  Netflix, Amazon, Apple, AT&T, Verizon, and many foreign companies like Alibaba and TenCent, are all seeking animated catalogues, and when the time is right, Genius is going to be poised to do a significant transaction. Today, we are like *the last oasis in the desert, and the real play is the equity play.*

**19. The sale of Entertainment One to Hasbro for $4.2 billion dollars is very informative.**

**20. We have two hits on the air today and a likely 3rd one about to pop.  One on Netflix and one om Nickelodeon, and to the best of my knowledge there is only one other company besides the Walt Disney Company that has that and it is Entertainment One(Peppa Pig and PJ Masks) which was recently sold to Hasbro Toys for $4.2 billion dollars.  The main difference between E One and Genius is that their brands hit the marketplace about 5 years before ours so they have been running merchandising that much more time than us.  When those shows came on the air, it was 2-3 years before we saw product in the marketplace, but those like me, who know the industry knew it would be coming with huge value for them, because when the ratings are high, products follows.  The ratings of our shows are high and the product will follow.**


*__CEO:__*

Andy Heyward

1.      I own a TON of stock
2.      I have *continued to buy more and more this year*.  I bought 2 million dollars last December in a block from my ex-wife. I bought 500 of debt 3 months ago and I bought 750,000 more after that a month ago. It has all been on Form 4 filings.  And that is in addition to  all of my earlier purchases from the start
3.      Despite that stock performance heretofore, the company's business is stronger than ever from a standpoint of assets.

**We provide a product that is highly coveted in the marketplace. Virtually every company that has produced animated cartoons has ultimately been sold for many times, their investment.   I, personally, have sold my previous company 3 times. To Cap Cities/ABC, to the Walt Disney Company, and to Cookie Jar.  We will do it again, with Genius Brands, when the time is right.  I cannot say exactly, when that will be, but my guess is that it is in the next 24 months.**

**Our business is very simple:**

CVI_0002410

· **We make children's animated content which we license to broadcasters around the world for fees.**

· **We license the characters from our shows to manufacturers of consumer products for children.  They pay us royalties on all products sold.**

· <u>**It is the exact same model as the Walt Disney Company.**</u>

Should you require "reference", as to myself and the company,  I will give you 5 names, and I'm sure each of them will give you the same reference, sic, that you are dealing with a team that is at the very top of our industry, that plays to win, and has the track record to demonstrate it.

· *Warren Buffett* **(CEO, Berkshire Hathaway)**

· *Bob Iger* **(CEO, Walt Disney Company)**

· *Ynon Kreitz* **(CEO, Mattel Toys)**

· *Brian Goldner* **(CEO, Hasbro)**

· *Haim Saban* **(CEO, Saban Capital)**

Joe Reda
Founder/Partner
The Special Equities Group "SEG"

150 E 58th St - 28th Floor
New York, NY 10155
(W) 212.258.2341
(C) 516.521.1354

(Email) reda@TheSEG.com

<image001.jpg>
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

IMPORTANT: The information contained in this email and/or its attachments is confidential. If you are not the intended recipient, please notify the sender immediately by reply and immediately delete this message and all its attachments. Any review, use, reproduction, disclosure or dissemination of this message or any attachment by an unintended recipient is strictly prohibited. Neither this message nor any attachment is intended as or should be construed as an offer, solicitation or recommendation to buy or sell any security or other financial instrument. Neither the sender, his or her employer nor any of their respective affiliates makes any warranties as to the completeness or accuracy of any of the information contained herein or that this message or any of its attachments is free of viruses

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

IMPORTANT: The information contained in this email and/or its attachments is confidential. If you are not the intended recipient, please notify the sender immediately by reply and immediately delete this message and all its attachments. Any review, use, reproduction, disclosure or dissemination of this message or any attachment by an unintended recipient is strictly prohibited. Neither this message nor any attachment is intended as or should be construed as an offer, solicitation or recommendation to buy or sell any security or other financial instrument. Neither the sender, his or her employer nor any of their respective affiliates makes any warranties as to the completeness or accuracy of any of the information contained herein or that this message or any of its attachments is free of viruses.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any

review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

CONFIDENTIAL

Abraham Declaration Exhibit 94
(ANSON_00000624-43)

Message
_____

**From:**      Joe Reda [reda@theseg.com]
**Sent:**      2/25/2020 9:54:06 AM
**To:**        Jonathan Schechter [shex@theseg.com]
**CC:**        Robert F. Charron [rcharron@egsllp.com]; Schultz, Jeffrey [JSchultz@mintz.com]; Amin Nathoo
               [anathoo@ansonfunds.com]
**Subject:**   Re: some due diligence questions from Amin


Can't imagine any future deal having better terms.    Why not just ask for all the best terms now.
Which I think we did.    ☐

Sent from my iPhone

> On Feb 25, 2020, at 9:35 AM, Jonathan Schechter <shex@theseg.com> wrote:
>
> Should we remove MFN?  The structured is pretty much as good as it gets.
>
> Sent from my iPhone
>
>> On Feb 25, 2020, at 9:34 AM, Robert F. Charron <rcharron@egsllp.com> wrote:
>>
>> In order to do another deal they have to have obtained shareholder approval and use at least 75% of
the gross proceed to the repayment of the Notes.  Shareholder approval is the gating item, nothing before
then.  No new ROP in this deal, just an MFN which you would likely need to get waivers.
>>
>> Robert Charron
>> Ellenoff Grossman & Schole LLP
>> 1345 Avenue of the Americas
>> New York, New York 10105
>> Direct: (212) 931 8704
>> Cell: (917) 843 1457
>> Facsimile: (212) 401 4741
>> e-mail:  rcharron@egsllp.com
>>
>>
>> -----Original Message-----
>> From: Joe Reda [mailto:reda@theseg.com]
>> Sent: Monday, February 24, 2020 10:07 PM
>> To: Schultz, Jeffrey <JSchultz@mintz.com>
>> Cc: Robert F. Charron <rcharron@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Jonathan Schechter
<shex@theseg.com>
>> Subject: Re: some due diligence questions from Amin
>>
>> How long is the standstill for doing a new deal?
>>
>> We should allow a deal right away if the new deal is priced above $0.21 since 75% of the money goes to
repay the debt anyway.
>>
>> Thoughts?!?
>>
>> Also want to make sure ROP doesn't screw up a quick and quiet overnight or intra day RD print.
>>
>>
>>
>> Sent from my iPhone
>>
>>>> On Feb 24, 2020, at 8:40 PM, Joe Reda <reda@theseg.com> wrote:
>>>
>>> Awesome.    That's quicker than Shex thought.    Thanks.
>>>
>>> Sent from my iPhone
>>>
>>>>> On Feb 24, 2020, at 8:37 PM, Schultz, Jeffrey <JSchultz@mintz.com> wrote:
>>>>
>>>> We have asked the Company to provide the information for #2.
>>>>
>>>> For #3, since the Company intends to have such stockholder meeting to be its annual meeting, the
earliest record date is March 23 for a meeting in early May. The Company would file its preliminary proxy
statement as soon as practicable after filing its Form 10-K.
>>>>
>>>> Regards,

CONFIDENTIAL                                                                      ANSON_00000624

>>>> Jeff
>>>>
>>>>> On Feb 24, 2020, at 8:17 PM, Joe Reda <reda@theseg.com> wrote:
>>>>
>>>>
>>>> Ok…probably better to give the stock a 6 month breather and then we can pay down debt off the shelf if the market improves
>>>>
>>>> #1 is answered
>>>>
>>>> Will wait for jeff on #2/3
>>>>
>>>> Thx!
>>>>
>>>> From: Robert F. Charron [mailto:rcharron@egsllp.com]
>>>> Sent: Monday, February 24, 2020 8:16 PM
>>>> To: Joe Reda; Schultz, Jeffrey
>>>> Cc: 'Amin Nathoo'; Jonathan Schechter
>>>> Subject: RE: some due diligence questions from Amin
>>>>
>>>> Empery told me that they won't participate in the deal if the company files a registration statement.  They do not want to be named as a selling shareholder.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931 8704
>>>> Cell: (917) 843 1457
>>>> Facsimile: (212) 401 4741
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> From: Joe Reda [mailto:reda@theseg.com]
>>>> Sent: Monday, February 24, 2020 5:11 PM
>>>> To: Robert F. Charron <rcharron@egsllp.com>; Schultz, Jeffrey <JSchultz@mintz.com>
>>>> Cc: 'Amin Nathoo' <anathoo@ansonfunds.com>; Jonathan Schechter <shex@theseg.com>
>>>> Subject: some due diligence questions from Amin
>>>>
>>>>
>>>> 1.      What was the logic behind the reg rights?   Amin is fine with it, but confused as to why he agreed to it…lol
>>>>
>>>> 2.      Voting agreements?   What % of the vote does that cover?
>>>>
>>>> 3.      Record date for shareholder vote?    When is the earliest that can be set for?  Amin had a few creative ideas to get more yes votes
>>>>
>>>> From: Robert F. Charron [mailto:rcharron@egsllp.com]
>>>> Sent: Monday, February 24, 2020 4:34 PM
>>>> To: Langer, Alan; Schultz, Jeffrey; Jonathan Schechter
>>>> Cc: Joe Reda; Charles Phillips; Michael Jaffa; Bob denton; Jon Ollwerther; Andy Heyward; Matthew McCullough; Amin Nathoo; Laura Salvatori
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> I'm fine with all the changes and have saved them over as final for our purposes.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>
>>>> Sent: Monday, February 24, 2020 10:53 AM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton

ANSON_00000625

<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> All,
>>>>
>>>> Attached please find some additional comments to some of the documents. Please note that the last draft of the Security Agreement that we received was a redline copy and some of the section headers were missing in the redline, so these changes should be made to the latest Word version.
>>>>
>>>> Best,
>>>> Alan
>>>>
>>>> Alan Langer
>>>> Associate
>>>>
>>>> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
>>>> 666 Third Avenue, New York, NY 10017
>>>> +1.212.692.6213<tel:+1.212.692.6213>
>>>> AJLanger@mintz.com<mailto:AJLanger@mintz.com> |
Mintz.com<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496683784&amp;sdata=obbC1YqfZQq8Q0ikFpgjyS%2FjaNQSVKqRRw6fOLR3R4A%3D&amp;reserved=0>
>>>>
>>>>
[mintz.com]<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496683784&amp;sdata=obbC1YqfZQq8Q0ikFpgjyS%2FjaNQSVKqRRw6fOLR3R4A%3D&amp;reserved=0>
>>>>
>>>> From: Langer, Alan
>>>> Sent: Wednesday, February 19, 2020 3:42 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> All,
>>>>
>>>> Attached please find some comments to the SPA, along with some notes for the Company's attention.
>>>>
>>>> Best,
>>>> Alan
>>>>
>>>> Alan Langer
>>>> Associate
>>>>
>>>> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
>>>> 666 Third Avenue, New York, NY 10017
>>>> +1.212.692.6213<tel:+1.212.692.6213>
>>>> AJLanger@mintz.com<mailto:AJLanger@mintz.com> |
Mintz.com<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496683784&amp;sdata=obbC1YqfZQq8Q0ikFpgjyS%2FjaNQSVKqRRw6fOLR3R4A%3D&amp;reserved=0>
>>>>
>>>>
[mintz.com]<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=O9cQuUoga%2BJ%2FTaH%2BlwXvOikC%2BdFPTun8LVYirNdGtJU%3D&amp;reserved=0>
>>>>
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Tuesday, February 18, 2020 11:04 AM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>

ANSON_00000626

>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Thanks Rob.  The Company will update the draft Disclosure Schedules and determine which reps and
warranties it desires to cross reference to the SEC filings.
>>>>
>>>> Regards,
>>>> Jeff
>>>>
>>>> From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Sent: Tuesday, February 18, 2020 10:00 AM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Jeff – Anson's response to the issues raised last week are as follows:
>>>>
>>>>
>>>> 1.  On reps and warranties they won't agree to a general exception for what is in the SEC reports
but we can take each rep and warranty on a case by case basis as to whether cross reference is permitted.
I know that capitalization, litigation, affiliate transactions and MAE will need separate schedules
(although, for example, in litigation if you want to reference a specific part of the disclosure that is
fine).  As for any others, let me know which ones you want to cross reference.
>>>> 2.  Legal fees on this deal are adding up given we are on structure #3 so we'll need to keep it at
$75k but we can work with company on cash covenant.
>>>> 3.  On Llama Anson understands the situation – it is what it is.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Thursday, February 13, 2020 5:04 PM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> No, not yet.  Our voicemails are currently being ignored. My guess is that they won't get back to us
until our original analyst returns from her vacation next week (which will still be less than 15 days).

ANSON_00000627

We have been encountering Nasdaq's non-responsiveness on a number of other deals which are far simpler than this GNUS deal.  There were a lot of offerings trying to get done this week before financials go stale.
>>>>
>>>> Do you have any feedback from the investors on our client's issues with some of their comments that we discussed?  Thanks.
>>>>
>>>> Regards,
>>>> Jeff
>>>>
>>>> From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Sent: Thursday, February 13, 2020 4:51 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Any luck with Nasdaq?
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Robert F. Charron
>>>> Sent: Wednesday, February 12, 2020 4:28 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Jeff, attached please find the Investor Note Purchase Agreement.  Thought I'd already sent this to you.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Tuesday, February 11, 2020 12:30 PM

CONFIDENTIAL

ANSON_00000628

>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Hi Rob.  The Investor Note and Master Netting Agreement reference a Note Purchase Agreement which we
have not seen yet.  Please send at your convenience.
>>>>
>>>> With respect to the following Existing Warrant repricing deal term, it should have some threshold of
participation and also it needs to be limited to warrants issued more than six months ago because of
Nasdaq aggregation issues.  See proposed revised Term Sheet language below:
>>>>
>>>> Any existing Warrant holder that holds Warrants issued more than six months ago (the "Existing
Warrants") that participates in the Offering in an amount of at least $500,000 will have their Existing
Warrants' exercise prices reduced to the Reset Conversion Price subject to receipt of Shareholder
Approval pursuant to Nasdaq Listing Rule 5635(d).
>>>>
>>>> Please contact me with any questions or concerns.
>>>>
>>>> Regards,
>>>> Jeff
>>>>
>>>> From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Sent: Monday, February 10, 2020 2:00 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Any time at your convenience.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Monday, February 10, 2020 1:47 PM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents

ANSON_00000629

>>>>
>>>> Hi Rob.  I have been in communications with the Company on the remaining issues.  Do you have some time this afternoon to discuss?
>>>>
>>>> Thanks,
>>>> Jeff
>>>>
>>>> From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Sent: Friday, February 7, 2020 5:52 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Jeff, after consultation with Anson, attached are clean and redlines against your versions from earlier this week.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Wednesday, February 5, 2020 11:15 AM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Rob,
>>>> Attached are comments to the draft Transaction documents.  Please contact me with any questions.
>>>>
>>>> Regards,
>>>> Jeff
>>>> Jeffrey Schultz
>>>> Member
>>>>
>>>> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
>>>> 666 Third Avenue, New York, NY 10017
>>>> +1.212.692.6732<tel:+1.212.692.6732>
>>>> JSchultz@mintz.com<mailto:JSchultz@mintz.com> |
Mintz.com<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=O9cQuUoga%2BJ%2FTaH%2BlwXvOikC%2BdFPTun8LVYirNdGtJU%3D&amp;reserved=0>
>>>>
>>>>
<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=O9cQuUoga%2BJ%2FTaH%2BlwXvOikC%2BdFPTun8LVYirNdGtJU%3D&amp;reserved=0>
>>>> <image001.jpg>

CONFIDENTIAL                                                    ANSON_00000630

>>>>
>>>>
>>>>
>>>> From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Sent: Tuesday, February 4, 2020 4:40 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Jeff, the floor is under Equity Conditions.  If price below the floor, company must pay in cash.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Tuesday, February 4, 2020 4:31 PM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Attached are a few comments to the Term Sheet on behalf of the Company.
>>>>
>>>> Regards,
>>>> Jeff
>>>> Jeffrey Schultz
>>>> Member
>>>>
>>>> Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
>>>> 666 Third Avenue, New York, NY 10017
>>>> +1.212.692.6732<tel:+1.212.692.6732>
>>>> JSchultz@mintz.com<mailto:JSchultz@mintz.com> |
Mintz.com<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%
7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0
%7C0%7C637182392496693774&amp;sdata=O9cQuUoga%2BJ%2FTaH%2BlwXvOikC%2BdFPTun8LVYirNdGtJU%3D&amp;reserved=0
>
>>>>
>>>>
<https://can01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.mintz.com%2F&amp;data=02%7C01%7Can
athoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C63
7182392496693774&amp;sdata=O9cQuUoga%2BJ%2FTaH%2BlwXvOikC%2BdFPTun8LVYirNdGtJU%3D&amp;reserved=0>
>>>> <image001.jpg>
>>>>
>>>>
>>>>
>>>> From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Sent: Monday, February 3, 2020 3:25 PM

>>>> To: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> attached is the revised term sheet with a redline against the prior one. Amin - note that Empery's preference is that the company not file a registration statement but rather rely on 144 in 6 months. I took it out of the TS but note it can be put in the documents fairly easily if you and Shex convince Ryan otherwise.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> -----Original Message-----
>>>> From: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
>>>> Sent: Monday, February 3, 2020 2:38 PM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Cc: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>>
>>>>
>>>> -----Original Message-----
>>>> From: Robert F. Charron [mailto:rcharron@egsllp.com]
>>>> Sent: Monday, February 3, 2020 2:35 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> I'll try and revise the last one with the netting language.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457

CONFIDENTIAL                                    ANSON_00000632

>>>> e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> -----Original Message-----
>>>> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
>>>> Sent: Monday, February 3, 2020 2:32 PM
>>>> To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
>>>> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: Re: GNUS - Revised Transaction Documents
>>>>
>>>> Thanks Rob.
>>>>
>>>> Shex and Reda,
>>>> Can you please send the up to date Term Sheet that reflects the latest docs? It will help Nasdaq (and presumably investors) in trying to understand what's going on.
>>>>
>>>> Thanks,
>>>> Jeff
>>>>
>>>>> On Feb 3, 2020, at 2:20 PM, Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>> wrote:
>>>>
>>>>
>>>> Jeff - here is the SPA. You should have everything you need for Nasdaq now.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Robert F. Charron
>>>> Sent: Monday, February 3, 2020 10:40 AM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
>>>> Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Just pinged Brett asking him.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457

ANSON_00000633

>>>> e-mail:
rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>
>>>> Sent: Monday, February 3, 2020 10:28 AM
>>>> To: Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbrands.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnusbrands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@ansonfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsalvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Hi Rob. Any update on the draft SPA. That is the last major doc we need in order to submit to Nasdaq. Thanks.
>>>>
>>>> Regards,
>>>> Jeff
>>>>
>>>> From: Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>>
>>>> Sent: Friday, January 31, 2020 11:00 AM
>>>> To: Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbrands.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnusbrands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@ansonfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsalvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> If you consider that the netting agreement is all about the conditional funding then I think the docs are pretty on point. I tried to keep it tailored to the term sheet but I also had my hands full with creating a new set of documents from scratch.
>>>>
>>>> Robert Charron

CONFIDENTIAL    ANSON_00000634

>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:
rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>>>>
>>>> From: Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>
>>>> Sent: Friday, January 31, 2020 10:44 AM
>>>> To: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>;
Joe Reda <reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>;
Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>
>>>> Cc: Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.c
om>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbran
ds.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnus
brands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:
jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@
gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@
egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@anso
nfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsa
lvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> THIS WAS the last but some things have probably been added by Empery.
>>>>
>>>> From: Schultz, Jeffrey [mailto:JSchultz@mintz.com]
>>>> Sent: Friday, January 31, 2020 10:32 AM
>>>> To: Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>; Robert F.
Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>
>>>> Cc: Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.c
om>>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbran
ds.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnus
brands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:
jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@
gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@
egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@anso
nfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsa
lvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> I can assure you that Nasdaq won't be quick. We will start to review the documents to understand the
deal and then submit a description and documents to Nasdaq. If there is an updated term sheet that
reflects the updated terms, please send our way. Thanks.

ANSON_00000635

>>>>
>>>> From: Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Sent: Friday, January 31, 2020 9:43 AM
>>>> To: Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>
>>>> Cc: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>;
Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.c
om>>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbran
ds.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnus
brands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:
jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@
gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@
egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@anso
nfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsa
lvatori@ansonfunds.com>>>
>>>> Subject: Re: GNUS - Revised Transaction Documents
>>>>
>>>> When will we have nasdaq blessing. What's the process. Trying to give investors timing. They are all
getting deal fatigued.
>>>> Sent from my iPhone
>>>>
>>>>> On Jan 31, 2020, at 9:38 AM, Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
> wrote:
>>>>
>>>> Jeff - attached please find the Note and Warrant for the GNUS transaction. Per Empery the note is
Schulte's form and has been reviewed by Brett. For the warrant, he is ok using our form of warrant
provided the AD provision is the same one used in the note which I have revised to reflect as such. I
expect to have Brett's comments on the SPA at some point today and once received I'll get them right over
to you.
>>>>
>>>> I've also attached the security agreement, master netting agreement, investor note and guaranty
which Brett has not reviewed but I really don't expect many comments. Briefly, the additional $4 million
is being done through the acceleration of an investor note which, upon any breach or event of default by
the company, basically net's to zero through the Master Netting Agreement.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:
rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>
>>>> Sent: Tuesday, January 28, 2020 2:38 PM
>>>> To: Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.c
om>>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa

ANSON_00000636

<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbrands.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnusbrands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@ansonfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsalvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Thanks Rob for the update.
>>>>
>>>> From: Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>>
>>>> Sent: Tuesday, January 28, 2020 2:35 PM
>>>> To: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>;
Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.com>>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbrands.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnusbrands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@gnusbrands.com>>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@ansonfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsalvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Investors want us to use Schulte forms so disregard what was sent although trying to get them to back down a bit. I just received the precedent to draft from so will take me a couple days to get through. Very dense. I'll send you docs as I finish to keep things moving.
>>>>
>>>> Robert Charron
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, New York 10105
>>>> Direct: (212) 931-8704
>>>> Facsimile: (212) 401 4741
>>>> Cell: (917) 843 1457
>>>> e-mail:
rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>>>>
>>>> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>>>>
>>>> From: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>
>>>> Sent: Tuesday, January 28, 2020 2:21 PM
>>>> To: Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.com>>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa

CONFIDENTIAL

ANSON_00000637

<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbrands.com>>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnusbrands.com>>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:jollwerther@gnusbrands.com>>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@gnusbrands.com>>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@egsllp.com>>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@ansonfunds.com>>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsalvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Hi Charles. I understand that these docs are being revised to reflect the current deal. Do you have an expectation of timing of the new drafts?
>>>>
>>>> Thanks,
>>>> Jeff
>>>>
>>>> From: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.com>>>
>>>> Sent: Friday, January 24, 2020 3:43 PM
>>>> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbrands.com>>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnusbrands.com>>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:jollwerther@gnusbrands.com>>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@gnusbrands.com>>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@egsllp.com>>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@ansonfunds.com>>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsalvatori@ansonfunds.com>>>
>>>> Subject: RE: GNUS - Revised Transaction Documents
>>>>
>>>> Everyone
>>>>
>>>> Attached please find the revised transaction documents, along with redlines to the previously circulated versions. Please note, in the interest of time, we are distributing these to our client and therefore remain subject to their comments and review. Please note, no changes to the Subsidiary Guarantee, voting agreement or opinion were needed.
>>>>
>>>> Regards,
>>>> Charles
>>>>
>>>> Charles Phillips
>>>> Ellenoff Grossman & Schole LLP
>>>> 1345 Avenue of the Americas
>>>> New York, NY 10105
>>>> Telephone: (212) 944-7454
>>>> email: cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.com>>
>>>> website: https://can01.safelinks.protection.outlook.com/?url=www.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=naKlo2X4Moa2UPd69%2Bxr4ZgwU%2BvBAQeCNAPEaNCQJz4%3D&amp;reserved=0<https://can01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=gokrd3GqvvhO02sq8B8wyTxOuciC2ZC86jKHnUEwR48%3D&amp;reserved=0<https://can01.safelinks.protection.outlook.com/?

ANSON_00000638

url=http%3A%2F%2Fwww.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0
290bd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=gokrd3GqvvhOO2sq8B8wyTxOu
ciC2ZC86jKHnUEwR48%3D&amp;reserved=0<https://can01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww
.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7Cc666ef943f2b4537c1e708d7ba0290bd%7Ccc9b37f8dcad
49d5ae78c4bd3b8862f3%7C0%7C0%7C637182392496693774&amp;sdata=gokrd3GqvvhOO2sq8B8wyTxOuciC2ZC86jKHnUEwR48%3
D&amp;reserved=0>>

>>>>
>>>> -----Original Message-----
>>>> From: Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com<mailto:JSchultz@mintz.com%3cmailto:JSchultz@mintz.com>>>
>>>> Sent: Monday, January 20, 2020 7:43 AM
>>>> To: Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>>
>>>> Cc: Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com<mailto:shex@theseg.com%3cmailto:shex@theseg.com>>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com<mailto:AJLanger@mintz.com%3cmailto:AJLanger@mintz.com>>>;
Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com%3cmailto:mjaffa@gnusbran
ds.com>>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com%3cmailto:bdenton@gnus
brands.com>>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com%3cmailto:
jollwerther@gnusbrands.com>>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com%3cmailto:aheyward@
gnusbrands.com>>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com<mailto:cphillips@egsllp.com%3cmailto:cphillips@egsllp.c
om>>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com<mailto:rcharron@egsllp.com%3cmailto:rcharron@egsllp.com>>
>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com<mailto:mmccullough@egsllp.com%3cmailto:mmccullough@
egsllp.com>>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com%3cmailto:anathoo@anso
nfunds.com>>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com%3cmailto:lsa
lvatori@ansonfunds.com>>>
>>>> Subject: Re: GNUS - Revised Transaction Documents
>>>>
>>>> Given that Nasdaq has not been provided docs yet, we have no visibility on Nasdaq timing.
>>>>
>>>>> On Jan 20, 2020, at 7:33 AM, Joe Reda
<reda@theseg.com<mailto:reda@theseg.com<mailto:reda@theseg.com%3cmailto:reda@theseg.com>>> wrote:
>>>>
>>>>
>>>> When will Nasdaq will give the thumbs up to move forward?
>>>>
>>>> From: Jonathan Schechter
>>>> Sent: Friday, January 17, 2020 5:44 PM
>>>> To: Jeffrey Schultz; Alan Langer; Michael Jaffa; Bob denton; Jon Ollwerther; Andy Heyward
>>>> Cc: Charles Phillips; Robert Charron; Matthew McCullough; Joe Reda; Amin Nathoo; Laura Salvatori
>>>> Subject: GNUS - Revised Transaction Documents
>>>>
>>>> All-
>>>>
>>>> Attached please find the proposed transaction documents for your review.
>>>>
>>>> Amin is on a plane so the docs are still subject to Anson's review.
>>>>
>>>> The goal is to close this as quick as possible.
>>>>
>>>> Please use this email for the working group.
>>>>
>>>> Thanks-
>>>>
>>>> Shex
>>>>
>>>>
>>>>
>>>> .
>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
>>>> ************************************************************** This email is only for use by the
intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR
OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review,
dissemination, replication or distribution of this communication and any attachments is strictly
prohibited. If you have received this communication in error, then please delete this email, any and all
attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward
this message, or any portion thereof, including any attachments, by any means to any other person
whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the
information in this communication nor any opinion or recommendation expressed herein constitutes an offer

to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>>
>>>> _____
>>>>
>>>>
>>>>
>>>> STATEMENT OF CONFIDENTIALITY:
>>>> The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at DirectorofIT@Mintz.com<mailto:DirectorofIT@Mintz.com<mailto:DirectorofIT@Mintz.com%3cmailto:DirectorofIT@Mintz.com>>, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>> <GNUS Warrant.4.doc>
>>>> <GNUS Note.2.docx>
>>>> <GNUS Security Agreement.1.docx>
>>>> <GNUS Master Netting Agreement.1.docx>
>>>> <GNUS Investor Note.1.docx>
>>>> <GNUS Guaranty.1.docx>
>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person

                                    ANSON_00000640

whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>> <GNUS SPA.2.docx>
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
**************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>>>
>>>>
>>>>
>>>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

ANSON_00000642

>>>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
******************************************************************* This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
******************************************************************* This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>>
>>
>>
>> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
******************************************************************* This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
******************************************************************* This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Abraham Declaration Exhibit 95
(ANSON_00009954-73)

Message

---

**From:**       Robert F. Charron [rcharron@egsllp.com]
**Sent:**       2/3/2020 3:24:51 PM
**To:**         Jonathan Schechter [shex@theseg.com]; Schultz, Jeffrey [JSchultz@mintz.com]
**CC:**         Joe Reda [reda@theseg.com]; Charles Phillips [cphillips@egsllp.com]; Langer, Alan [AJLanger@mintz.com]; Michael
                Jaffa [mjaffa@gnusbrands.com]; Bob denton [bdenton@gnusbrands.com]; Jon Ollwerther
                [jollwerther@gnusbrands.com]; Andy Heyward [aheyward@gnusbrands.com]; Matthew McCullough
                [mmccullough@egsllp.com]; Amin Nathoo [anathoo@ansonfunds.com]; Laura Salvatori
                [lsalvatori@ansonfunds.com]
**Subject:**    RE: GNUS - Revised Transaction Documents
**Attachments:** GNUS Term Sheet.redline.doc; GNUS Term Sheet.docx

attached is the revised term sheet with a redline against the prior one.  Amin - note that Empery's
preference is that the company not file a registration statement but rather rely on 144 in 6 months. I
took it out of the TS but note it can be put in the documents fairly easily if you and Shex convince Ryan
otherwise.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

-----Original Message-----
From: Jonathan Schechter <shex@theseg.com>
Sent: Monday, February 3, 2020 2:38 PM
To: Robert F. Charron <rcharron@egsllp.com>; Schultz, Jeffrey <JSchultz@mintz.com>
Cc: Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan
<AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon
Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough
<mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori
<lsalvatori@ansonfunds.com>
Subject: RE: GNUS - Revised Transaction Documents


-----Original Message-----
From: Robert F. Charron [mailto:rcharron@egsllp.com]
Sent: Monday, February 3, 2020 2:35 PM
To: Schultz, Jeffrey <JSchultz@mintz.com>
Cc: Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>; Charles Phillips
<cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob
denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward
<aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo
<anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: RE: GNUS - Revised Transaction Documents

I'll try and revise the last one with the netting language.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

CONFIDENTIAL

ANSON_00009954

-----Original Message-----
From: Schultz, Jeffrey <JSchultz@mintz.com>
Sent: Monday, February 3, 2020 2:32 PM
To: Robert F. Charron <rcharron@egsllp.com>
Cc: Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>; Charles Phillips
<cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob
denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward
<aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo
<anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: Re: GNUS - Revised Transaction Documents

Thanks Rob.

Shex and Reda,
Can you please send the up to date Term Sheet that reflects the latest docs?  It will help Nasdaq (and
presumably investors) in trying to understand what's going on.

Thanks,
Jeff

On Feb 3, 2020, at 2:20 PM, Robert F. Charron <rcharron@egsllp.com> wrote:


Jeff - here is the SPA.  You should have everything you need for Nasdaq now.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

From: Robert F. Charron
Sent: Monday, February 3, 2020 10:40 AM
To: Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>; Joe Reda
<reda@theseg.com>
Cc: Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa
<mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther
<jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough
<mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori
<lsalvatori@ansonfunds.com>
Subject: RE: GNUS - Revised Transaction Documents

Just pinged Brett asking him.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Monday, February 3, 2020 10:28 AM
To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo

CONFIDENTIAL

ANSON_00009955

<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Hi Rob. Any update on the draft SPA.  That is the last major doc we need in order to submit to Nasdaq.
Thanks.

Regards,
Jeff

From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Sent: Friday, January 31, 2020 11:00 AM
To: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Schultz, Jeffrey
<JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

If you consider that the netting agreement is all about the conditional funding then I think the docs are
pretty on point.  I tried to keep it tailored to the term sheet but I also had my hands full with
creating a new set of documents from scratch.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

From: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
Sent: Friday, January 31, 2020 10:44 AM
To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

THIS WAS the last but some things have probably been added by Empery.

From: Schultz, Jeffrey [mailto:JSchultz@mintz.com]
Sent: Friday, January 31, 2020 10:32 AM
To: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>;
Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

ANSON_00009956

I can assure you that Nasdaq won't be quick. We will start to review the documents to understand the deal and then submit a description and documents to Nasdaq. If there is an updated term sheet that reflects the updated terms, please send our way. Thanks.

From: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Sent: Friday, January 31, 2020 9:43 AM
To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Cc: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: Re: GNUS - Revised Transaction Documents

When will we have nasdaq blessing.    What's the process.    Trying to give investors timing.    They are all getting deal fatigued.
Sent from my iPhone

On Jan 31, 2020, at 9:38 AM, Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>> wrote:

Jeff - attached please find the Note and Warrant for the GNUS transaction.  Per Empery the note is Schulte's form and has been reviewed by Brett.  For the warrant, he is ok using our form of warrant provided the AD provision is the same one used in the note which I have revised to reflect as such.  I expect to have Brett's comments on the SPA at some point today and once received I'll get them right over to you.

I've also attached the security agreement, master netting agreement, investor note and guaranty which Brett has not reviewed but I really don't expect many comments.  Briefly, the additional $4 million is being done through the acceleration of an investor note which, upon any breach or event of default by the company, basically net's to zero through the Master Netting Agreement.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Tuesday, January 28, 2020 2:38 PM
To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Thanks Rob for the update.

From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Sent: Tuesday, January 28, 2020 2:35 PM
To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo

CONFIDENTIAL

ANSON_00009957

<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Investors want us to use Schulte forms so disregard what was sent although trying to get them to back
down a bit.  I just received the precedent to draft from so will take me a couple days to get through.
Very dense.  I'll send you docs as I finish to keep things moving.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Tuesday, January 28, 2020 2:21 PM
To: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Hi Charles. I understand that these docs are being revised to reflect the current deal. Do you have an
expectation of timing of the new drafts?

Thanks,
Jeff

From: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>
Sent: Friday, January 24, 2020 3:43 PM
To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Everyone

Attached please find the revised transaction documents, along with redlines to the previously circulated
versions. Please note, in the interest of time, we are distributing these to our client and therefore
remain subject to their comments and review. Please note, no changes to the Subsidiary Guarantee, voting
agreement or opinion were needed.

Regards,
Charles

Charles Phillips
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 944-7454
email: cphillips@egsllp.com<mailto:cphillips@egsllp.com>
website:
https://can01.safelinks.protection.outlook.com/?url=www.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfund

s.com%7C4530421003b747446ecb08d7a8e724cd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637163583903672665&amp;sdata=psPxlk7oEjt1HUEwJ7ZlDlcaylroMqUXNY3jM%2B6zv40%3D&amp;reserved=0<https://can01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fwww.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7C4530421003b747446ecb08d7a8e724cd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637163583903672665&amp;sdata=uGqSx27KgL7xa1wOn6s4sT9CubVIi5md9tO21X2bljg%3D&amp;reserved=0>

-----Original Message-----
From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Monday, January 20, 2020 7:43 AM
To: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: Re: GNUS - Revised Transaction Documents

Given that Nasdaq has not been provided docs yet, we have no visibility on Nasdaq timing.

On Jan 20, 2020, at 7:33 AM, Joe Reda <reda@theseg.com<mailto:reda@theseg.com>> wrote:


When will Nasdaq will give the thumbs up to move forward?

From: Jonathan Schechter
Sent: Friday, January 17, 2020 5:44 PM
To: Jeffrey Schultz; Alan Langer; Michael Jaffa; Bob denton; Jon Ollwerther; Andy Heyward
Cc: Charles Phillips; Robert Charron; Matthew McCullough; Joe Reda; Amin Nathoo; Laura Salvatori
Subject: GNUS - Revised Transaction Documents

All-

Attached please find the proposed transaction documents for your review.

Amin is on a plane so the docs are still subject to Anson's review.

The goal is to close this as quick as possible.

Please use this email for the working group.

Thanks-

Shex




.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
***************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
***************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the

                                                                    ANSON_00009959

information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

_____


STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at DirectorofIT@Mintz.com<mailto:DirectorofIT@Mintz.com>, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.


Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.


Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.


Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
<GNUS Warrant.4.doc>
<GNUS Note.2.docx>
<GNUS Security Agreement.1.docx>
<GNUS Master Netting Agreement.1.docx>
<GNUS Investor Note.1.docx>
<GNUS Guaranty.1.docx>
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person

ANSON_00009960

whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
<GNUS SPA.2.docx>

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

CONFIDENTIAL

# ertible Note and Warrant Financing Facility

| ~~Registered address~~ | ~~Anson Funds (USA)~~ | ~~Anson Funds (Canada)~~ |
|---|---|---|
| ~~Intertrust Corporate Services~~ | ~~5950 Berkshire Lane, Suite 210~~ | ~~155 University Avenue Suite 207~~ |
| ~~190 Elgin Ave~~ | ~~Dallas, Texas, 75225 USA~~ | ~~Toronto, Ontario, M5H 3B7 Canada~~ |
| ~~George Town, Grand Cayman, KY1-9005~~ | ~~Tel. 214. 866.0202~~ | ~~Tel. 416.447.8874~~ |
| | ~~Fax. 214. 276.1395~~ | ~~Fax. 416.352.1880~~ |

*~~The purpose of this letter is to set forth the indicative terms pursuant to which, subject to certain conditions set forth herein, Anson Investments Master Fund LP (the "Purchaser") will participate as a lead investor in a transaction (the "Transaction") in which the Purchaser would purchase certain securities of the Company, and the Company would sell such securities to the Purchaser(s).~~ The terms and conditions set forth herein does not constitute a binding offer. The issuance and sale of such securities is subject to the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party and, in the case of the Purchaser, that the Purchaser shall have determined that subsequent to the date hereof and prior to the closing of the Transaction, there shall have been no material adverse developments relating to the business, assets, operations, properties, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole.*

| | |
|---|---|
| **Issuer:** | Genius Brands Intl. (the "**Company**") |
| **Investors:** | ~~Anson Investment Master Fund LP (the "**Lead Investor**"), and other institutional~~Institutional and accredited investors ~~acceptable to the Lead Investor~~ (together with the Lead Investor, the "**Investors**"). |
| **Offering Size:** | The Company will sell to the Purchaser(s), for the sum of $10,000,000 million of <u>Original Issue Discount</u> Senior Secured Convertible Notes (the "**Notes**") ~~Original Issue Discount~~ with a principal amount of $12,500,000 million (the "**Offering**")~~, of which the Lead Investor has committed to doing up to $3,000,000 if the offering is fully subscribed~~. |
| ~~**Escrow**~~<u>**Investor Notes:**</u> | ~~In~~<u>Of</u> the ~~event that $10,000,000 is raised from the Offering, $4,000,000 from the Offering will be held in an escrow account, only to be released to the Company after (i) shareholder approval, and (ii) effectiveness of the registration statement covering all registrable securities.~~ |
| | ~~If both conditions have not been met within 6 months of Closing~~<u>$10 million aggregate purchase price, $6 million will be paid at the closing in cash and the balance shall be paid with full recourse cash secured promissory notes from the Investors ("**Investor Notes**"). Upon the occurrence of certain favorable events the Investor Notes may be accelerated by the Company and upon the occurrence of certain unfavorable events</u>, ~~all amounts from escrow will be returned to the investors as partial repayment of the principal of the Notes.~~<u>such as an event of default under the Notes, the Investor Notes may be netted, at the option of the Investors, against the Notes.</u> |
| **Use of Proceeds:** | Debt repayment and working capital. |
| **Repayment of Existing Debt:** | Existing debt holders must invest in this deal at least 200% of the amount of their existing debt and then be repaid on the existing debt. |

CONFIDENTIAL

The Lead Investor at its sole discretion may permit the Company to use some of the proceeds to repay existing debt holders in cash.

**Securities:** Senior secured promissory notes (the "**Notes**"), that will be the most senior debt of the Company, except for certain existing credit lines.

**Maturity:** The Notes shall mature 18 months from Closing (the "**Maturity Date**").

**Interest:** The Notes shall not accrue any interest, except in the case of Default, in which case the Notes will then accrue interest at 18% per annum.

**Conversion Price:** The conversion price for the Notes shall equal the lower of: a) 100% of the closing price of the common stock on the day of signing the definitive agreement plus $0.125 to qualify as an at market transaction for NASDAQ purposes or b) 100% of the average of the 5 prior closing prices plus $0.125 to qualify as an at market transaction for NASDAQ purposes (the "**Conversion Price**").

**Closing:** The closing of the transaction will take on or before February 7th (the "**Closing Date**")

**Registration:** The Company will file a registration statement with SEC (the "Registration Statement") to register for resale within 10 days following the filing of its 10-K (the "**Filing Date**"), and will use its best efforts to cause such Registration Statement to become effective within 30 days of the Filing Date (or 60 days in the event of a regulatory review). If the Registration Statement is not filed or declared effective within the applicable timeframes, the company will pay liquidated cash damages of 1.0% of the aggregate purchase price for every month following the required filing or effective date (pro-rated for partial months).

**Most Favored Nation:** If the Company enters into a subsequent financing, then the Investors at their sole discretion shall have the ability to exchange their Notes on a $1 for $1 basis into securities of the new transaction. Each investor shall have up to 5 days post-closing of the new transaction to make such election. Notwithstanding the foregoing, such right of exchange shall not become effective until receipt of Shareholder Approval pursuant to NASDAQ Listing Rule 5635(d).

**Share Reservation:** The Company will always reserve enough shares from its authorized capital for all shares underlying the Notes.

**Standstill:** The Company shall be prohibited from entering new financings unless the Company agrees to use 75% of the proceeds towards repayment of the Notes.

The Company shall not enter into any variable, reset, or otherwise

ANSON_00009963

adjustable transactions while the Notes are outstanding.

**Restrictive Covenants:** Standard restrictive covenants for similar transactions, including but not limited to cash burn rate that is equal to or less than $550,000 per month after payment out of the proceeds from the Offering of placement agent fees, existing debt in the amount of $2,866,665 and outstanding fees of legal counsel not to exceed $350,000.

**Shareholder Approval:** The Company shall use its best efforts to file a preliminary proxy with the Securities and Exchange Commission by March 1, 2020 to present the provisions requiring stockholder approval contemplated hereby to its stockholders for approval (the "**Shareholder Approval**") in accordance with Nasdaq's rules and regulations no later than April 15, 2020. If the Company does not obtain Shareholder Approval at the first meeting, the Company shall call a meeting every three months thereafter to seek Shareholder Approval until the earlier of the date of Shareholder Approval is obtained or the Notes are no longer outstanding.

**Reset Conversion Price:** The Conversion Price on the Notes shall decrease to $0.21 (the "Reset Conversion Price"), subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d).

**Warrants:** At Closing, the Company will also issue to the Investors 100% of new warrants (the "**Warrants**") based on the number of common shares that the Notes are convertible into based on the $0.21 price. The Warrants shall have a 5 -year life and initial exercise price equal to 100% of the closing price of the common shares immediately preceding the entry into of the definitive purchase agreement. The Warrants exercise price will decrease to $0.21 subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d).

**Anti-Dilution Protection:** Further, the Notes and Warrants will have full ratchet anti-dilution protection for subsequent financings which shall not become effective until receipt of shareholder approval pursuant to NASDAQ Listing Rule 5635(d).

**Waivers:** So long as the Lead Investor holds at least $1,000,000 of the Notes, they shall have the sole ability to waive or modify any transaction documents relating to the Offering.

**Existing Warrants** Any existing Warrant holder that participates in the Offering will have their existing Warrants' exercise prices reduced to the Reset Conversion Price subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d).

**Redemption Dates:** The Notes shall be redeemed in equal monthly redemptions equal to the $1/12^{th}$ of the principal value of the Notes (in each case, pro rata for each Investor) (each a Redemption Amount"). The first Redemption

ANSON_00009964

Date shall be the last trading day of the 6th month following the Closing Date. The remaining Redemption Dates shall be the last trading day of each month following the first Redemption Date.

**Redemption Payments:** Each Redemption Amount shall be paid in full in cash, or if (a) the Equity Conditions are satisfied or waived and (b) the Company so chooses and Shareholder Approval has been obtained pursuant to Nasdaq Listing Rule 5635(d), in shares of common stock as set forth below. To the extent that the Company elects to pay a full Redemption Amount in shares of common stock, then (A) twenty-three (23) trading days prior to the applicable Redemption Date (each such date being a "Pre-Installment Date"), the Company shall deliver to the Investor(s) a number of shares of common stock (each such quantity being a "Pre-Installment Share Amount") equal to the Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Pre-Installment Date (such lower price, the "Pre-Installment Redemption Price"), and (B) on the applicable Redemption Date, the Company shall deliver to the Investor a number of shares of common stock equal to (a) the amount of applicable Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Redemption Date (such lower price, the "Redemption Price"), less (b) any applicable Pre-Installment Share Amount delivered pursuant to the applicable Redemption Amount. Notwithstanding the foregoing, if the Redemption Price is less than 20% of the average of the five closing prices immediately prior to signing of the definitive documents (the "Floor Price"), then, at each Investor's option, (i) such Investor may elect to treat the Floor Price as the Redemption Price for some or all of the Redemption Amount, or (ii) for the Redemption Amount not reduced by shares pursuant to clause (i) above, the remaining Pre-Installment Share Amount shall be returned to the Company and the Company shall be required to pay such remaining Redemption Amount in cash.

**Market Price:** Equal to 85% of the average of the lowest five daily volume weighted average prices of common stock during the twenty consecutive trading days ending on the trading day immediately preceding the applicable date of determination.

**Equity Conditions:** Typical equity conditions, including without limitation, the Market Price being above the Floor Price, the average daily dollar volume of trading being greater than $100,000. the Company's common stock is listed or designated for quotation on the NASDAQ, the shares underlying the relevant Redemption Amount are registered for issuance or resale or eligible for public resale pursuant to Rule 144, the Company shall remain in compliance with the terms of the transaction

ANSON_00009965

documents, the Company's common stock meets certain reasonable price and volume requirements (to be determined), etc.

**Placement Agent:** The Special Equities Group will receive a 10% cash fee and 10% warrants with an exercise price equal to 100% of the closing price of the common stock immediately preceding the entry into of the definitive purchase agreement on all monies received by the Company as a result of this transaction.

**Due Diligence / Legal Fees:** The Company will pay the Lead Investor's legal fees and expenses related to this transaction up to a maximum of $50,000, which amount shall be withheld by the Lead Investor at closing

**Confidentiality:** The contents of this Term Sheet are confidential. The Company and each Investor agree that it will not show, circulate, or otherwise disclose this letter or its contents to any other person (other than its officers, employees, directors, affiliates and advisors, on a need-to-know basis).

CONFIDENTIAL

ANSON_00009966

**Genius Brands Intl.**

Date:_____        By:_____
                            Name:
                            Title:


**Anson Investments Master Fund LP**

Date:_____        By:_____
                            Name: Amin Nathoo
                            Title: Director, Anson Advisors Inc.

CONFIDENTIAL                                                                    ANSON_00009967

Document comparison by Workshare 9 on Monday, February 3, 2020 3:21:42 PM

| Input: | |
|---|---|
| Document 1 ID | file://W:\123 EGS\Anson\GNUS\2020 Debenture Transaction\GNUS - AIMF - GBI Comments 1 22 2020 RL.docx |
| Description | GNUS - AIMF - GBI Comments 1 22 2020 RL |
| Document 2 ID | file://W:\123 EGS\Anson\GNUS\GNUS Term Sheet.docx |
| Description | GNUS Term Sheet |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 8 |
| Deletions | 26 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 34 |

CONFIDENTIAL

ANSON_00009968

# Convertible Note and Warrant Financing Facility

*The terms and conditions set forth herein does not constitute a binding offer. The issuance and sale of such securities is subject to the preparation of definitive documentation to effect the Transaction that is mutually satisfactory to each party and, in the case of the Purchaser, that the Purchaser shall have determined that subsequent to the date hereof and prior to the closing of the Transaction, there shall have been no material adverse developments relating to the business, assets, operations, properties, condition (financial or otherwise) or prospects of the Company and its subsidiaries, taken as a whole.*

| | |
|---|---|
| **Issuer:** | Genius Brands Intl. (the "**Company**") |
| **Investors:** | Institutional and accredited investors (together with the Lead Investor, the "**Investors**"). |
| **Offering Size:** | The Company will sell to the Purchaser(s), for the sum of $10,000,000 million of Original Issue Discount Senior Secured Convertible Notes (the "**Notes**") with a principal amount of $12,500,000 million (the "**Offering**"). |
| **Investor Notes:** | Of the $10 million aggregate purchase price, $6 million will be paid at the closing in cash and the balance shall be paid with full recourse cash secured promissory notes from the Investors ("**Investor Notes**").  Upon the occurrence of certain favorable events the Investor Notes may be accelerated by the Company and upon the occurrence of certain unfavorable events, such as an event of default under the Notes, the Investor Notes may be netted, at the option of the Investors, against the Notes. |
| **Use of Proceeds:** | Debt repayment and working capital. |
| **Repayment of Existing Debt:** | Existing debt holders must invest in this deal at least 200% of the amount of their existing debt and then be repaid on the existing debt.<br><br>The Lead Investor at its sole discretion may permit the Company to use some of the proceeds to repay existing debt holders in cash. |
| **Securities:** | Senior secured promissory notes (the "**Notes**"), that will be the most senior debt of the Company, except for certain existing credit lines. |
| **Maturity:** | The Notes shall mature 18 months from Closing (the "**Maturity Date**"). |
| **Interest:** | The Notes shall not accrue any interest, except in the case of Default, in which case the Notes will then accrue interest at 18% per annum. |
| **Conversion Price:** | The conversion price for the Notes shall equal the lower of: a) 100% of the closing price of the common stock on the day of signing the definitive agreement plus $0.125 to qualify as an at market transaction for NASDAQ purposes or b) 100% of the average of the 5 prior closing prices plus $0.125 to qualify as an at market transaction for NASDAQ purposes (the "**Conversion Price**"). |

ANSON_00009969

| | |
|---|---|
| **Closing:** | The closing of the transaction will take on or before February 7<sup>th</sup> (the "**Closing Date**") |
| **Most Favored Nation:** | If the Company enters into a subsequent financing, then the Investors at their sole discretion shall have the ability to exchange their Notes on a $1 for $1 basis into securities of the new transaction. Each investor shall have up to 5 days post-closing of the new transaction to make such election. Notwithstanding the foregoing, such right of exchange shall not become effective until receipt of Shareholder Approval pursuant to NASDAQ Listing Rule 5635(d). |
| **Share Reservation:** | The Company will always reserve enough shares from its authorized capital for all shares underlying the Notes. |
| **Standstill:** | The Company shall be prohibited from entering new financings unless the Company agrees to use 75% of the proceeds towards repayment of the Notes.<br><br>The Company shall not enter into any variable, reset, or otherwise adjustable transactions while the Notes are outstanding. |
| **Restrictive Covenants:** | Standard restrictive covenants for similar transactions, including but not limited to cash burn rate that is equal to or less than $550,000 per month after payment out of the proceeds from the Offering of placement agent fees, existing debt in the amount of $2,866,665 and outstanding fees of legal counsel not to exceed $350,000. |
| **Shareholder Approval:** | The Company shall use its best efforts to file a preliminary proxy with the Securities and Exchange Commission by March 1, 2020 to present the provisions requiring stockholder approval contemplated hereby to its stockholders for approval (the "**Shareholder Approval**") in accordance with Nasdaq's rules and regulations no later than April 15, 2020. If the Company does not obtain Shareholder Approval at the first meeting, the Company shall call a meeting every three months thereafter to seek Shareholder Approval until the earlier of the date of Shareholder Approval is obtained or the Notes are no longer outstanding. |
| **Reset Conversion Price:** | The Conversion Price on the Notes shall decrease to $0.21 (the "Reset Conversion Price"), subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d). |
| **Warrants:** | At Closing, the Company will also issue to the Investors 100% of new warrants (the "**Warrants**") based on the number of common shares that the Notes are convertible into based on the $0.21 price. The Warrants shall have a 5-year life and initial exercise price equal to 100% of the closing price of the common shares immediately preceding the entry into of the definitive purchase agreement. The Warrants exercise price will |

CONFIDENTIAL

ANSON_00009970

decrease to $0.21 subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d).

**Anti-Dilution Protection:** Further, the Notes and Warrants will have full ratchet anti-dilution protection for subsequent financings which shall not become effective until receipt of shareholder approval pursuant to NASDAQ Listing Rule 5635(d).

**Waivers:** So long as the Lead Investor holds at least $1,000,000 of the Notes, they shall have the sole ability to waive or modify any transaction documents relating to the Offering.

**Existing Warrants** Any existing Warrant holder that participates in the Offering will have their existing Warrants' exercise prices reduced to the Reset Conversion Price subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d).

**Redemption Dates:** The Notes shall be redeemed in equal monthly redemptions equal to the $1/12^{th}$ of the principal value of the Notes (in each case, pro rata for each Investor) (each a Redemption Amount"). The first Redemption Date shall be the last trading day of the 6th month following the Closing Date. The remaining Redemption Dates shall be the last trading day of each month following the first Redemption Date.

**Redemption Payments:** Each Redemption Amount shall be paid in full in cash, or if (a) the Equity Conditions are satisfied or waived and (b) the Company so chooses and Shareholder Approval has been obtained pursuant to Nasdaq Listing Rule 5635(d), in shares of common stock as set forth below. To the extent that the Company elects to pay a full Redemption Amount in shares of common stock, then (A) twenty-three (23) trading days prior to the applicable Redemption Date (each such date being a "Pre-Installment Date"), the Company shall deliver to the Investor(s) a number of shares of common stock (each such quantity being a "Pre-Installment Share Amount") equal to the Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Pre-Installment Date (such lower price, the "Pre-Installment Redemption Price"), and (B) on the applicable Redemption Date, the Company shall deliver to the Investor a number of shares of common stock equal to (a) the amount of applicable Redemption Amount being paid in shares of common stock divided by the lower of (i) the Conversion Price or (ii) the Market Price determined on the applicable Redemption Date (such lower price, the "Redemption Price"), less (b) any applicable Pre-Installment Share Amount delivered pursuant to the applicable Redemption Amount. Notwithstanding the foregoing, if the Redemption Price is less than 20% of the average of the five closing prices immediately prior to signing of the definitive documents (the "Floor Price"), then, at each Investor's option, (i) such Investor may

CONFIDENTIAL

elect to treat the Floor Price as the Redemption Price for some or all of the Redemption Amount, or (ii) for the Redemption Amount not reduced by shares pursuant to clause (i) above, the remaining Pre-Installment Share Amount shall be returned to the Company and the Company shall be required to pay such remaining Redemption Amount in cash.

**Market Price:**     Equal to 85% of the average of the lowest five daily volume weighted average prices of common stock during the twenty consecutive trading days ending on the trading day immediately preceding the applicable date of determination.

**Equity Conditions:**     Typical equity conditions, including without limitation, the Market Price being above the Floor Price, the average daily dollar volume of trading being greater than $100,000. the Company's common stock is listed or designated for quotation on the NASDAQ, the shares underlying the relevant Redemption Amount are registered for issuance or resale or eligible for public resale pursuant to Rule 144, the Company shall remain in compliance with the terms of the transaction documents, the Company's common stock meets certain reasonable price and volume requirements (to be determined), etc.

**Placement Agent:**     The Special Equities Group will receive a 10% cash fee and 10% warrants with an exercise price equal to 100% of the closing price of the common stock immediately preceding the entry into of the definitive purchase agreement on all monies received by the Company as a result of this transaction.

**Due Diligence / Legal Fees:**     The Company will pay the Lead Investor's legal fees and expenses related to this transaction up to a maximum of $50,000, which amount shall be withheld by the Lead Investor at closing

**Confidentiality:**     The contents of this Term Sheet are confidential. The Company and each Investor agree that it will not show, circulate, or otherwise disclose this letter or its contents to any other person (other than its officers, employees, directors, affiliates and advisors, on a need-to-know basis).

CONFIDENTIAL                                                                                 ANSON_00009972

**Genius Brands Intl.**


**Date:**_____        **By:**_____
                        Name:
                        Title:


**Anson Investments Master Fund LP**


**Date:**_____        **By:**_____
                        Name: Amin Nathoo
                        Title: Director, Anson Advisors Inc.

ANSON_00009973