Abraham Declaration Exhibit 96
(ANSON_00001883-92)

Message

---

**From:**        Robert F. Charron [rcharron@egsllp.com]
**Sent:**        2/4/2020 1:46:32 PM
**To:**          Joe Reda [reda@theseg.com]
**CC:**          Amin Nathoo [anathoo@ansonfunds.com]; Jonathan Schechter [shex@theseg.com]; Charles Phillips
                 [cphillips@egsllp.com]; Matthew McCullough [mmccullough@egsllp.com]; Laura Salvatori
                 [lsalvatori@ansonfunds.com]
**Subject:**     RE: GNUS - Revised Transaction Documents

I would hold off and wait until Mintz and Nasdaq have reviewed and commented.  These documents are very
investor friendly right now but I'm sure there will be some changes specific to the company.  No point in
wasting investor time until we have approved documents.  Will be a much stronger message.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was
not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any
taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under
the Internal Revenue Code.

-----Original Message-----
From: Joe Reda <reda@theseg.com>
Sent: Tuesday, February 4, 2020 11:43 AM
To: Robert F. Charron <rcharron@egsllp.com>
Cc: Amin Nathoo <anathoo@ansonfunds.com>; Jonathan Schechter <shex@theseg.com>; Charles Phillips
<cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>; Laura Salvatori
<lsalvatori@ansonfunds.com>
Subject: Re: GNUS - Revised Transaction Documents

When can I show investors a clean set of docs.

I assume we are not taking any company comments, correct!?!?


Sent from my iPhone

> On Feb 4, 2020, at 11:38 AM, Robert F. Charron <rcharron@egsllp.com> wrote:
>
> Shex - Amin and I spoke and he is good without an RRA.
>
> Robert Charron
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, New York 10105
> Direct: (212) 931-8704
> Facsimile: (212) 401 4741
> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com
>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>
> -----Original Message-----
> From: Amin Nathoo <anathoo@ansonfunds.com>
> Sent: Tuesday, February 4, 2020 11:34 AM
> To: Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter
> <shex@theseg.com>
> Cc: Joe Reda <reda@theseg.com>; Charles Phillips
> <cphillips@egsllp.com>; Matthew McCullough <mmccullough@egsllp.com>;
> Laura Salvatori <lsalvatori@ansonfunds.com>
> Subject: RE: GNUS - Revised Transaction Documents

CONFIDENTIAL

ANSON_00001883

> > Why did we remove the registration requirement?
> >
> > Amin Nathoo, CFA | Anson Funds
> > 155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
> > Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416)
> > 804-4141 anathoo@ansonfunds.com
> >
> > -----Original Message-----
> > From: Robert F. Charron <rcharron@egsllp.com>
> > Sent: February 3, 2020 3:25 PM
> > To: Jonathan Schechter <shex@theseg.com>; Schultz, Jeffrey
> > <JSchultz@mintz.com>
> > Cc: Joe Reda <reda@theseg.com>; Charles Phillips
> > <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael
> > Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>;
> > Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward
> > <aheyward@gnusbrands.com>; Matthew McCullough
> > <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura
> > Salvatori <lsalvatori@ansonfunds.com>
> > Subject: RE: GNUS - Revised Transaction Documents
> >
> > attached is the revised term sheet with a redline against the prior one.  Amin - note that Empery's preference is that the company not file a registration statement but rather rely on 144 in 6 months. I took it out of the TS but note it can be put in the documents fairly easily if you and Shex convince Ryan otherwise.
> >
> > Robert Charron
> > Ellenoff Grossman & Schole LLP
> > 1345 Avenue of the Americas
> > New York, New York 10105
> > Direct: (212) 931-8704
> > Facsimile: (212) 401 4741
> > Cell: (917) 843 1457
> > e-mail:  rcharron@egsllp.com
> >
> > Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
> >
> > -----Original Message-----
> > From: Jonathan Schechter <shex@theseg.com>
> > Sent: Monday, February 3, 2020 2:38 PM
> > To: Robert F. Charron <rcharron@egsllp.com>; Schultz, Jeffrey
> > <JSchultz@mintz.com>
> > Cc: Joe Reda <reda@theseg.com>; Charles Phillips
> > <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael
> > Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>;
> > Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward
> > <aheyward@gnusbrands.com>; Matthew McCullough
> > <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura
> > Salvatori <lsalvatori@ansonfunds.com>
> > Subject: RE: GNUS - Revised Transaction Documents
> >
> >
> >
> > -----Original Message-----
> > From: Robert F. Charron [mailto:rcharron@egsllp.com]
> > Sent: Monday, February 3, 2020 2:35 PM
> > To: Schultz, Jeffrey <JSchultz@mintz.com>
> > Cc: Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>;
> > Charles Phillips <cphillips@egsllp.com>; Langer, Alan
> > <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob
> > denton <bdenton@gnusbrands.com>; Jon Ollwerther
> > <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>;
> > Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo
> > <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
> > Subject: RE: GNUS - Revised Transaction Documents
> >
> > I'll try and revise the last one with the netting language.
> >
> > Robert Charron
> > Ellenoff Grossman & Schole LLP
> > 1345 Avenue of the Americas
> > New York, New York 10105
> > Direct: (212) 931-8704
> > Facsimile: (212) 401 4741

ANSON_00001884

> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com
>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>
> -----Original Message-----
> From: Schultz, Jeffrey <JSchultz@mintz.com>
> Sent: Monday, February 3, 2020 2:32 PM
> To: Robert F. Charron <rcharron@egsllp.com>
> Cc: Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>;
> Charles Phillips <cphillips@egsllp.com>; Langer, Alan
> <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob
> denton <bdenton@gnusbrands.com>; Jon Ollwerther
> <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>;
> Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo
> <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
> Subject: Re: GNUS - Revised Transaction Documents
>
> Thanks Rob.
>
> Shex and Reda,
> Can you please send the up to date Term Sheet that reflects the latest docs?  It will help Nasdaq (and presumably investors) in trying to understand what's going on.
>
> Thanks,
> Jeff
>
> On Feb 3, 2020, at 2:20 PM, Robert F. Charron <rcharron@egsllp.com> wrote:
>
>
> Jeff - here is the SPA.  You should have everything you need for Nasdaq now.
>
> Robert Charron
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, New York 10105
> Direct: (212) 931-8704
> Facsimile: (212) 401 4741
> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com
>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>
> From: Robert F. Charron
> Sent: Monday, February 3, 2020 10:40 AM
> To: Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter
> <shex@theseg.com>; Joe Reda <reda@theseg.com>
> Cc: Charles Phillips <cphillips@egsllp.com>; Langer, Alan
> <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob
> denton <bdenton@gnusbrands.com>; Jon Ollwerther
> <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>;
> Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo
> <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
> Subject: RE: GNUS - Revised Transaction Documents
>
> Just pinged Brett asking him.
>
> Robert Charron
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, New York 10105
> Direct: (212) 931-8704
> Facsimile: (212) 401 4741
> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>
> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>

ANSON_00001885

> Sent: Monday, February 3, 2020 10:28 AM
> To: Robert F. Charron
> <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter
> <shex@theseg.com<mailto:shex@theseg.com>>; Joe Reda
> <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
> <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
> <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
> <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> Hi Rob. Any update on the draft SPA.  That is the last major doc we need in order to submit to Nasdaq.
Thanks.
>
> Regards,
> Jeff
>
> From: Robert F. Charron
> <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
> Sent: Friday, January 31, 2020 11:00 AM
> To: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>;
> Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe
> Reda <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
> <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
> <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
> <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> If you consider that the netting agreement is all about the conditional funding then I think the docs
are pretty on point.  I tried to keep it tailored to the term sheet but I also had my hands full with
creating a new set of documents from scratch.
>
> Robert Charron
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, New York 10105
> Direct: (212) 931-8704
> Facsimile: (212) 401 4741
> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein
was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or
any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person
under the Internal Revenue Code.
>
> From: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
> Sent: Friday, January 31, 2020 10:44 AM
> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>;
> Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Robert F. Charron
> <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
> Cc: Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
> <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
> <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
> <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;

ANSON_00001886

> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> THIS WAS the last but some things have probably been added by Empery.
>
> From: Schultz, Jeffrey [mailto:JSchultz@mintz.com]
> Sent: Friday, January 31, 2020 10:32 AM
> To: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Robert F.
> Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
> Cc: Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Jonathan
> Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan
> <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
> <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
> <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> I can assure you that Nasdaq won't be quick.  We will start to review the documents to understand the deal and then submit a description and documents to Nasdaq. If there is an updated term sheet that reflects the updated terms, please send our way.  Thanks.
>
> From: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
> Sent: Friday, January 31, 2020 9:43 AM
> To: Robert F. Charron
> <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
> Cc: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>;
> Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>;
> Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer,
> Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
> <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
> <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: Re: GNUS - Revised Transaction Documents
>
> When will we have nasdaq blessing.   What's the process.   Trying to give investors timing.   They are all getting deal fatigued.
> Sent from my iPhone
>
> On Jan 31, 2020, at 9:38 AM, Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>> wrote:
>
> Jeff - attached please find the Note and Warrant for the GNUS transaction.  Per Empery the note is Schulte's form and has been reviewed by Brett.  For the warrant, he is ok using our form of warrant provided the AD provision is the same one used in the note which I have revised to reflect as such.  I expect to have Brett's comments on the SPA at some point today and once received I'll get them right over to you.
>
> I've also attached the security agreement, master netting agreement, investor note and guaranty which Brett has not reviewed but I really don't expect many comments.  Briefly, the additional $4 million is being done through the acceleration of an investor note which, upon any breach or event of default by the company, basically net's to zero through the Master Netting Agreement.
>
> Robert Charron
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, New York 10105
> Direct: (212) 931-8704
> Facsimile: (212) 401 4741
> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>

CONFIDENTIAL

ANSON_00001887

>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>
> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
> Sent: Tuesday, January 28, 2020 2:38 PM
> To: Robert F. Charron
> <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda
> <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>;
> Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael
> Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob
> denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> Thanks Rob for the update.
>
> From: Robert F. Charron
> <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
> Sent: Tuesday, January 28, 2020 2:35 PM
> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>;
> Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>;
> Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>;
> Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael
> Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob
> denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> Investors want us to use Schulte forms so disregard what was sent although trying to get them to back down a bit.  I just received the precedent to draft from so will take me a couple days to get through. Very dense.  I'll send you docs as I finish to keep things moving.
>
> Robert Charron
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, New York 10105
> Direct: (212) 931-8704
> Facsimile: (212) 401 4741
> Cell: (917) 843 1457
> e-mail:  rcharron@egsllp.com<mailto:rcharron@egsllp.com>
>
> Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.
>
> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
> Sent: Tuesday, January 28, 2020 2:21 PM
> To: Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda
> <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>;
> Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael
> Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob
> denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;

CONFIDENTIAL

ANSON_00001888

> Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> Hi Charles. I understand that these docs are being revised to reflect the current deal. Do you have an expectation of timing of the new drafts?
>
> Thanks,
> Jeff
>
> From: Charles Phillips
> <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>
> Sent: Friday, January 24, 2020 3:43 PM
> To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>;
> Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>;
> Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael
> Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob
> denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori
> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: RE: GNUS - Revised Transaction Documents
>
> Everyone
>
> Attached please find the revised transaction documents, along with redlines to the previously circulated versions. Please note, in the interest of time, we are distributing these to our client and therefore remain subject to their comments and review. Please note, no changes to the Subsidiary Guarantee, voting agreement or opinion were needed.
>
> Regards,
> Charles
>
> Charles Phillips
> Ellenoff Grossman & Schole LLP
> 1345 Avenue of the Americas
> New York, NY 10105
> Telephone: (212) 944-7454
> email: cphillips@egsllp.com<mailto:cphillips@egsllp.com>
> website:
> https://can01.safelinks.protection.outlook.com/?url=www.egsllp.com&amp
> ;data=02%7C01%7Canathoo%40ansonfunds.com%7C4530421003b747446ecb08d7a8e
> 724cd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C637163583903672665&
> amp;sdata=psPxlk7oEjt1HUEwJ7ZlDlcaylroMqUXNY3jM%2B6zv40%3D&amp;reserve
> d=0<https://can01.safelinks.protection.outlook.com/?url=http%3A%2F%2Fw
> ww.egsllp.com&amp;data=02%7C01%7Canathoo%40ansonfunds.com%7C4530421003
> b747446ecb08d7a8e724cd%7Ccc9b37f8dcad49d5ae78c4bd3b8862f3%7C0%7C0%7C63
> 7163583903672665&amp;sdata=uGqSx27KgL7xa1wOn6s4sT9CubVIi5md9tO21X2bljg
> %3D&amp;reserved=0>
>
> -----Original Message-----
> From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
> Sent: Monday, January 20, 2020 7:43 AM
> To: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
> Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>;
> Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael
> Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob
> denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon
> Ollwerther
> <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy
> Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>;
> Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>;
> Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>;
> Matthew McCullough
> <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
> <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura
> Salvatori

CONFIDENTIAL

ANSON_00001889

> <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
> Subject: Re: GNUS - Revised Transaction Documents
>
> Given that Nasdaq has not been provided docs yet, we have no visibility on Nasdaq timing.
>
> On Jan 20, 2020, at 7:33 AM, Joe Reda <reda@theseg.com<mailto:reda@theseg.com>> wrote:
>
>
> When will Nasdaq will give the thumbs up to move forward?
>
> From: Jonathan Schechter
> Sent: Friday, January 17, 2020 5:44 PM
> To: Jeffrey Schultz; Alan Langer; Michael Jaffa; Bob denton; Jon
> Ollwerther; Andy Heyward
> Cc: Charles Phillips; Robert Charron; Matthew McCullough; Joe Reda;
> Amin Nathoo; Laura Salvatori
> Subject: GNUS - Revised Transaction Documents
>
> All-
>
> Attached please find the proposed transaction documents for your review.
>
> Amin is on a plane so the docs are still subject to Anson's review.
>
> The goal is to close this as quick as possible.
>
> Please use this email for the working group.
>
> Thanks-
>
> Shex
>
>
>
> .
> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
> ***************************************************************** This email is only for use by the
intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR
OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review,
dissemination, replication or distribution of this communication and any attachments is strictly
prohibited. If you have received this communication in error, then please delete this email, any and all
attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward
this message, or any portion thereof, including any attachments, by any means to any other person
whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the
information in this communication nor any opinion or recommendation expressed herein constitutes an offer
to buy or sell any securities. The contents of this communication are for information purposes only, and
should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product.
Attachments that are part of an electronic communication may have additional important disclosures and
disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in
no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods
and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
> ***************************************************************** This email is only for use by the
intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR
OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review,
dissemination, replication or distribution of this communication and any attachments is strictly
prohibited. If you have received this communication in error, then please delete this email, any and all
attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward
this message, or any portion thereof, including any attachments, by any means to any other person
whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the
information in this communication nor any opinion or recommendation expressed herein constitutes an offer
to buy or sell any securities. The contents of this communication are for information purposes only, and
should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product.
Attachments that are part of an electronic communication may have additional important disclosures and
disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in
no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods
and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>
> _____
>
>
>
> STATEMENT OF CONFIDENTIALITY:
> The information contained in this electronic message and any attachments to this message are intended
for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you
are not the intended recipient, or the person responsible for delivering the e-mail to the intended
recipient, be advised you have received this message in error and that any use, dissemination,
forwarding, printing, or copying is strictly prohibited. Please notify Mintz, Levin, Cohn, Ferris,

ANSON_00001890

Glovsky and Popeo immediately at either (617) 542-6000 or at
DirectorofIT@Mintz.com<mailto:DirectorofIT@Mintz.com>, and destroy all copies of this message and any
attachments. You will be reimbursed for reasonable costs incurred in notifying us.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of
the individual or entity to which it is addressed and may contain information that is legally privileged,
confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby
notified that any use, dissemination, distribution, or copying of this message, or any attachment, is
strictly prohibited. If you have received this message in error, please delete this message, along with
any attachments, from your computer. Thank you.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of
the individual or entity to which it is addressed and may contain information that is legally privileged,
confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby
notified that any use, dissemination, distribution, or copying of this message, or any attachment, is
strictly prohibited. If you have received this message in error, please delete this message, along with
any attachments, from your computer. Thank you.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of
the individual or entity to which it is addressed and may contain information that is legally privileged,
confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby
notified that any use, dissemination, distribution, or copying of this message, or any attachment, is
strictly prohibited. If you have received this message in error, please delete this message, along with
any attachments, from your computer. Thank you.
> <GNUS Warrant.4.doc>
> <GNUS Note.2.docx>
> <GNUS Security Agreement.1.docx>
> <GNUS Master Netting Agreement.1.docx> <GNUS Investor Note.1.docx>
> <GNUS Guaranty.1.docx> The Special Equities Group "SEG" is a Division
> of Bradley Woods & Co. Ltd. *************************************************************** This email
is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY,
CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any
review, dissemination, replication or distribution of this communication and any attachments is strictly
prohibited. If you have received this communication in error, then please delete this email, any and all
attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward
this message, or any portion thereof, including any attachments, by any means to any other person
whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the
information in this communication nor any opinion or recommendation expressed herein constitutes an offer
to buy or sell any securities. The contents of this communication are for information purposes only, and
should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product.
Attachments that are part of an electronic communication may have additional important disclosures and
disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in
no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods
and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*************************************************************** This email is only for use by the
intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR
OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review,
dissemination, replication or distribution of this communication and any attachments is strictly
prohibited. If you have received this communication in error, then please delete this email, any and all
attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward
this message, or any portion thereof, including any attachments, by any means to any other person
whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the
information in this communication nor any opinion or recommendation expressed herein constitutes an offer
to buy or sell any securities. The contents of this communication are for information purposes only, and
should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product.
Attachments that are part of an electronic communication may have additional important disclosures and
disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in
no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods
and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of
the individual or entity to which it is addressed and may contain information that is legally privileged,
confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby
notified that any use, dissemination, distribution, or copying of this message, or any attachment, is
strictly prohibited. If you have received this message in error, please delete this message, along with
any attachments, from your computer. Thank you.
>
>
>

CONFIDENTIAL

> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
> <GNUS SPA.2.docx>
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
> The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
>
>
>
> Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.


Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

CONFIDENTIAL

Abraham Declaration Exhibit 97
(EMPGNUS0009392-498)

**From:** Robert F. Charron [rcharron@egsllp.com]
**Sent:** 1/28/2020 10:21:00 PM
**To:** Brett Director [Brett.Director@emperyam.com]
**Subject:** RE: Precedent for GNUS
**Attachments:** GNUS Note.redline.pdf; GNUS Note.1.docx

Here's the revised Note.  As you said, ended up being fairly well on point.  Note I tried to follow what I believe are the terms here but honestly I think it is totally up for negotiation so see what Ryan says on the business points and we'll go back to them.  Turning to the SPA now.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

**From:** Brett Director <Brett.Director@emperyam.com>
**Sent:** Tuesday, January 28, 2020 3:15 PM
**To:** Robert F. Charron <rcharron@egsllp.com>
**Cc:** Brett Director <Brett.Director@emperyam.com>
**Subject:** RE: Precedent for GNUS

Here you go.  Have fun!!

**From:** Robert F. Charron [mailto:rcharron@egsllp.com]
**Sent:** Tuesday, January 28, 2020 2:49 PM
**To:** Brett Director <Brett.Director@emperyam.com>
**Subject:** RE: Precedent for GNUS

Answered my question already.  We need to use your form of SPA because it has all the references to the netting agreement, note SPA and investor note which I'm assuming we'll need because of the $4 million of restricted cash out of the $10 million (I'm assuming you will do that instead of escrow, correct?).

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

Confidential

**From:** Brett Director <Brett.Director@emperyam.com>
**Sent:** Monday, January 27, 2020 4:40 PM
**To:** Robert F. Charron <rcharron@egsllp.com>
**Cc:** Jonathan Schechter (shex@TheSEG.com) <shex@TheSEG.com>; notices <notices@emperyam.com>
**Subject:** Precedent for GNUS

The note should be a good precedent.  The SPA probably has a bunch of stuff that is irrelevant.  I will call you.

Regards,
Brett

Brett S. Director
*General Counsel & Chief Compliance Officer*
Empery Asset Management, LP
1 Rockefeller Plaza, Suite 1205
New York, NY 10020
Main: 212-608-3300
Fax: 212-608-3307
brett.director@emperyam.com

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

EMPGNUS0009393

~~SRZ Draft~~
~~06/20/2019~~

[FORM OF SENIOR SECURED CONVERTIBLE NOTE]

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.  ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 3(c)(iii) AND 18(a) HEREOF.  THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 3(c)(iii) OF THIS NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID"). PURSUANT TO TREASURY REGULATION §1.1275-3(b)(1), [●], A REPRESENTATIVE OF THE COMPANY HEREOF WILL, BEGINNING TEN DAYS AFTER THE ISSUANCE DATE OF THIS NOTE, PROMPTLY MAKE AVAILABLE TO THE HOLDER UPON REQUEST THE INFORMATION DESCRIBED IN TREASURY REGULATION §1.1275-3(b)(1)(i). HE MAY BE REACHED AT TELEPHONE NUMBER [●]].

### ~~SITO MOBILE, LTD.~~GENIUS BRANDS INTERNATIONAL, INC.

### SENIOR SECURED CONVERTIBLE NOTE

Issuance Date: ~~June~~January [  ], ~~2019~~2020          Original Principal Amount: U.S. $[        ]
                                                          Initial Unrestricted Principal: U.S. $[        ][1]

FOR VALUE RECEIVED, ~~SITO Mobile, Ltd~~Genius Brands International, Inc., a ~~Delaware~~Nevada corporation (the "**Company**"), hereby promises to pay to [BUYER] or registered assigns (the "**Holder**") in cash and/or in shares of Common Stock (as defined below) the amount set forth above as the Original Principal Amount (as reduced pursuant to the terms hereof pursuant to redemption, conversion, amortization or otherwise, the "**Principal**") when due, whether upon the Maturity Date (as defined below), on any Installment Date with respect to

---

[1] Insert Holder's Pro Rata Amount of $~~4,117,647.~~4,000,000.

DOC ID - 32122650.9

the Installment Amount due on such Installment Date, acceleration, redemption or otherwise (in each case in accordance with the terms hereof) and to pay default interest ("**Interest**") on any outstanding Principal at the applicable Default Rate to the extent it accrues pursuant to Section 2 at any time from the date set out above as the Issuance Date (the "**Issuance Date**") until the same becomes due and payable, whether upon an Interest Date (as defined below), any Installment Date, the Maturity Date, acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). This Senior Secured Convertible Note (including all Senior Secured Convertible Notes issued in exchange, transfer or replacement hereof, this "**Note**") is one of an issue of Senior Secured Convertible Notes issued pursuant to the Securities Purchase Agreement on the Closing Date (collectively, the "**Notes**" and such other Senior Secured Convertible Notes, the "**Other Notes**"). Certain capitalized terms used herein are defined in Section 32.

(1)     PAYMENTS OF PRINCIPAL; PREPAYMENT.    The Company acknowledges and agrees that this Note was issued at an original issue discount and that any Principal amount that reflects such original issue discount shall be Unrestricted Principal and Initial Unrestricted Principal hereunder. On each Installment Date, the Company shall pay to the Holder an amount equal to the Installment Amount due on such Installment Date in accordance with Section 8. On the Maturity Date, if any portion of this Note remains outstanding after giving effect to any Company Conversions and Company Redemptions occurring on such date in accordance with Section 8, the Company shall pay to the Holder an amount in cash representing all outstanding Principal, accrued and unpaid Interest and accrued, if any, and unpaid Late Charges (as defined in Section 26(b)), if any, on such Principal and Interest, except that any Restricted Principal hereunder shall be satisfied on the Maturity Date (in lieu of a cash payment) by Maturity Netting. The "**Maturity Date**" shall be ~~June~~August [ ], 2021[2] (the "**Scheduled Maturity Date**"), as may be extended at the option of the Holder (i) in the event that, and for so long as, an Event of Default (as defined in Section 4(a)) shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 1) or any event shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 1) that with the passage of time and the failure to cure would result in an Event of Default, (ii) through the date that is ten (10) Business Days after the consummation of a Change of Control in the event that a Change of Control is publicly announced or a Change of Control Notice (as defined in Section 5(b)) is delivered prior to the Maturity Date and (iii) to such date elected by the Holder pursuant to a Deferral Notice in accordance with Section 8(d) in the event the Holder elects to submit such a Deferral Notice electing to defer the last Installment Date hereunder beyond the Scheduled Maturity Date. Other than as specifically permitted by this Note, the Company may not prepay any portion of the outstanding Principal, accrued and unpaid Interest or accrued and unpaid Late Charges on Principal and Interest, if any.

(a)     Securities Contract.    The Company and the Holder hereby acknowledge and agree that the Securities Purchase Agreement and the Note Purchase Agreement (as defined in the Securities Purchase Agreement) each is a "securities contract" as defined in 11 U.S.C. § 741 and that the Holder shall have all rights in respect of this Note, the Master Netting Agreement (as defined in the Securities Purchase Agreement), the Investor Note, the Securities Purchase Agreement and the Note Purchase

---

[2] Insert date that is ~~twenty-four (24)~~18 months immediately following the Issuance Date.

Confidential                                                                                          EMPGNUS0009395

Agreement as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), including, without limitation, all rights of credit, deduction, setoff, offset, Netting, and netting (collectively, **"Netting"** or **"Net"**) as are available under this Note, the Master Netting Agreement and the Investor Note and all Netting provisions of this Note, the Investor Note and the Master Netting Agreement, including without limitation the provisions set forth in Section 7 of the Investor Note, are hereby incorporated in this Note and made a part hereof as if such provisions were set forth herein.

(b)        Investor Prepayments; No Share Issuance or Sales until Fully Paid. Upon the consummation of any Investor Prepayment, the aggregate outstanding Restricted Principal under this Note shall automatically become Unrestricted Principal hereunder, on a dollar-for-dollar basis, in an amount equal to the aggregate amount of cash paid in such Investor Prepayment. Notwithstanding anything herein to the contrary, the shares of Common Stock issuable upon conversion of Restricted Principal hereunder shall not be required to be issued by the Company until such portion of the Investor Note equivalent to the Restricted Principal subject to such conversion has been fully paid pursuant to an Investor Prepayment or otherwise (to the Company or to such other Persons as directed by the Company in writing) and such Restricted Principal becomes Unrestricted Principal in accordance with the preceding sentence.

(c)        Prohibited Transfer or Severability Reduction. Upon any Prohibited Transfer (as defined in the Investor Note) of the Investor Note, (x) the Investor Note shall be deemed paid in full and shall be null and void, and (y) 75% of the remaining Restricted Principal of this Note shall be automatically cancelled with the remaining 25% of the Restricted Principal of this Note automatically becoming Unrestricted Principal hereunder.

(d)        Investor Netting Right Reduction. Upon any exercise by the Holder of Investor Netting Rights, the Restricted Principal hereunder shall automatically and simultaneously be reduced, on a dollar-for-dollar basis, by such portion of the aggregate principal of the Investor Note cancelled pursuant to such Investor Netting Rights.

(e)        Single Integrated Transaction. The Company hereby acknowledges and agrees that (i) the Holder shall be entitled to exercise the Investor Netting Rights through any means permissible under applicable law, including without limitation, Netting and (ii) the obligations of the Holder under the Investor Note and the obligations of the Company under this Note arise in a single integrated transaction and constitute related and interdependent obligations within such transaction.

(f)        Grant of Security Interest. In addition to the security interest granted to the Collateral Agent for the benefit of the Holder and the holders of the Other Notes pursuant to the Security Documents, the Company hereby grants and pledges to the Holder a continuing security interest in the Investor Note of the Holder, including any and all cash, proceeds, funds, credits, rights and other assets therein or arising therefrom, from time to time, and any additions, dividends, profits and interest in the foregoing and any replacements or substitutions therefore (collectively, the **"Investor Note Collateral"**) to secure prompt repayment of any and all amounts outstanding hereunder from time to time

DOC ID - 32122650.9                          - 3 -

and to secure prompt performance by the Company of each of its covenants and duties under this Note. Such security interest constitutes a valid, first priority security interest in the Investor Note Collateral, and will constitute a valid, first priority security interest in later-acquired Investor Note Collateral. Notwithstanding any filings undertaken related to the Holder's rights under the ~~Delaware~~Nevada Uniform Commercial Code, the Holder's Lien on the Investor Note Collateral shall remain in effect for so long as any Restricted Principal remains outstanding.

(g)    Order of Conversion and/or Redemption. Notwithstanding anything herein to the contrary, at any time after no Initial Unrestricted Principal remains outstanding, with respect to any partial conversion or redemption hereunder, as applicable, the Company shall convert or redeem, as applicable, First, all accrued and unpaid Late Charges on any Principal and Interest hereunder and under any other Notes held by such Holder, Second, all accrued and unpaid Interest hereunder and under any other Notes held by such Holder, Third, all other amounts owed (other than Principal) hereunder and under any other Notes held by such Holder and, Fourth, all Principal (other than Restricted Principal) outstanding hereunder and under any other Notes held by such Holder, in each case, immediately prior to any such conversion or redemption, as applicable, in each case, allocated pro rata among this Note and such other Notes held by such Holder.

(2) INTEREST. No Interest shall accrue hereunder unless and until an Event of Default has occurred. From and after the occurrence and during the continuance of any Event of Default, Interest shall accrue hereunder at eighteen percent (18.0%) per annum (the "**Default Rate**") and shall be computed on the basis of a 360-day year and twelve 30-day months and shall be payable, if applicable, in arrears on the last Business Day of any Calendar Quarter during which Interest accrues hereunder (an "**Interest Date**") to the record holder of this Note in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holder in writing to the Company. Accrued and unpaid Interest, if any, shall also be payable prior to an Interest Date by way of inclusion of the Interest in the Conversion Amount (as defined in Section 3(b)(i)) on each (i) Conversion Date (as defined in Section 3(c)(i)) in accordance with Section 3(c)(i) and/or (ii) upon any redemption hereunder occurring prior to the Maturity Date, including, without limitation, upon a Bankruptcy Event of Default redemption. In the event that an Event of Default is subsequently cured (and no other Event of Default then exists (including, without limitation, for the Company's failure to pay such Interest at the Default Rate on the Maturity Date)), Interest shall cease to accrue hereunder as of the calendar day immediately following the date of such cure; provided that the Interest as calculated and unpaid during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of such cure of such Event of Default; provided, further, that for the purpose of this Section 2, such Event of Default shall not be deemed cured unless and until any accrued and unpaid Interest shall be paid to the Holder.

(3)    CONVERSION OF NOTES. At any time or times after the Issuance Date, this Note shall be convertible into shares of Common Stock, on the terms and conditions set forth in this Section 3.

Confidential                                                                                    EMPGNUS0009397

(a)    Conversion Right.  Subject to the provisions of Section 3(d), at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below).  The Company shall not issue any fraction of a share of Common Stock upon any conversion.  If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share.  The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount.

(b)    Conversion Rate.   The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the **"Conversion Rate"**).

(i)    **"Conversion Amount"** means the sum of (A) the portion of the Principal to be converted, amortized, redeemed or otherwise with respect to which this determination is being made, (B) accrued and unpaid Interest, if any, with respect to such Principal and (C) accrued and unpaid Late Charges, if any, with respect to such Principal and Interest.

(ii)    **"Conversion Price"** means, as of any Conversion Date or other date of determination, ~~(x) with respect to the Initial Unrestricted Principal and any Interest and Late Charges unpaid and accrued with respect thereto (collectively, the **"Initial Unrestricted Amounts"**), $[•]³ and (y) with respect to any Conversion Amount that does not constitute Initial Unrestricted Amounts (collectively, the **"Other Unrestricted Amounts"**), 130% of the lower of (i) the arithmetic average of the five (5) Weighted Average Prices of the Common Stock immediately prior to the first Unrestricted Date occurring hereunder and (ii) the last Closing Bid Price of the Common Stock immediately prior to the first Unrestricted Date occurring hereunder,~~ subject to adjustment as provided herein; provided, however, upon receipt of Nasdaq Stockholder Approval, $0.21, subject to adjustment as provided herein.

(c)    Mechanics of Conversion.

(i)    Optional Conversion.  To convert any Conversion Amount into shares of Common Stock on any date (a **"Conversion Date"**), the Holder shall (A) transmit by facsimile or electronic mail (or otherwise deliver), for delivery on or prior to 11:59 p.m., New York time, on such date, a copy of an executed notice of conversion in the form attached hereto as Exhibit I (a **"Conversion Notice"**) to the Company and (B) if required by Section 3(c)(iii), but without delaying the Company's requirement to deliver shares of Common Stock on the applicable Share Delivery Date (as defined below), surrender this Note to a common carrier for delivery to the Company as soon as practicable on or following such date (or an indemnification undertaking with respect to

---

³ Insert ~~130% of~~$0.125 plus the lower of (i) the arithmetic average of the five (5) ~~Weighted Average~~Closing Prices of the Common Stock immediately prior to the immediately prior to signing definitive documents and (ii) the last Closing ~~Bid Price~~Prices of the Common Stock immediately prior to signing definitive documents.

Confidential                                                                            EMPGNUS0009398

this Note in the case of its loss, theft, destruction or mutilation in compliance with the procedures set forth in Section 20(b)). Each Conversion Notice shall indicate, at the Holder's sole discretion, the portion of the Initial Unrestricted Amount and/or the Other Unrestricted Amount of this Note being converted. Also, in lieu of indicating the portion of the Initial Unrestricted Amount and/or the Other Unrestricted Amount that the Holder elects to convert, the Holder may indicate in a Conversion Notice the number of shares of Common Stock it seeks to receive upon conversion of any portion of this Note (and the percentage of such Conversion Amount that the Holder elects to allocate to the Initial Unrestricted Amount and the percentage of such Conversion Amount that the Holder elects to allocate to the Other Unrestricted Amount) and the reduction of the Conversion Amount pursuant to such conversion shall be determined at the end of such Conversion Date by multiplying such number of shares of Common Stock by the applicable Conversion Price. No ink-original Conversion Notice shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Conversion Notice be required. On or before the first (1st) Business Day following the date of delivery of a Conversion Notice, the Company shall transmit by facsimile or electronic mail a confirmation of receipt of such Conversion Notice to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the earlier of (i) the second (2nd) Trading Day and (ii) the number of Trading Days comprising the Standard Settlement Period, in each case, following the date on which the Holder has delivered a Conversion Notice to the Company (a "**Share Delivery Date**"), the Company shall (x) provided that the Transfer Agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program and (A) the Conversion Shares are subject to an effective resale registration statement in favor of the Holder or (B) if converted at a time when Rule 144 would be available for immediate resale of the Conversion Shares by the Holder, credit such aggregate number of Conversion Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, credit such aggregate number of shares of Common Stock to which the Holder shall be entitled to the Holder's or its designee's balance account with DTC through its Deposit Withdrawal At Custodian system or (y) if (A) the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or (B) the Conversion Shares are not subject to an effective resale registration statement in favor of the Holder and, if converted at a time when Rule 144 would not be available for immediate resale of the Conversion Shares by the Holder, issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled. If this Note is physically surrendered for conversion as required by Section 3(c)(iii) and the outstanding Principal of this Note is greater than the Principal portion of the Conversion Amount being converted, then the Company shall as soon as practicable and in no event later than three (3) Business Days after delivery of this Note and at its own expense, issue and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal not converted. The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the applicable Conversion Date, irrespective of the date such Conversion Shares are credited to the Holder's account with

Confidential                                                                                    EMPGNUS0009399

DTC or the date of delivery of the certificates evidencing such Conversion Shares, as the case may be. In the event that the Holder elects to convert a portion of the Principal amount of this Note prior to any applicable Installment Date, the Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder to the Holder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(ii)    Company's Failure to Timely Convert. If the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to the Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or if converted, at a time when the Conversion Shares are not subject to an effective resale registration statement in favor of the Holder and Rule 144 would not be available for immediate resale of the Conversion Shares by the Holder, or credit the Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program and (a) the Conversion Shares are subject to an effective resale registration statement in favor of the Holder or (b) if converted at a time when Rule 144 would be available for immediate resale of the Conversion Shares by the Holder, for the number of shares of Common Stock to which the Holder is entitled upon the Holder's conversion of any Conversion Amount (a "**Conversion Failure**"), then (A) the Company shall pay damages to the Holder for each Trading Day of such Conversion Failure in an amount equal to 1.25% of the product of (1) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, and (2) any trading price of the Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Conversion Date and ending on the applicable Share Delivery Date and (B) the Holder, upon written notice to the Company, may void its Conversion Notice with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Conversion Notice; provided that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 3(c)(ii) or otherwise. In addition to the foregoing, if the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to the Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, or credit the Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, for the number of shares of Common Stock to which the Holder is entitled upon the Holder's conversion of any Conversion Amount or on any date of the Company's obligation to deliver shares of Common Stock as contemplated pursuant to clause (y) below, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) Common Stock to deliver in satisfaction of a sale by the Holder of Common Stock issuable upon such conversion that the Holder anticipated receiving from the Company (a "**Buy-In**"), then the Company shall, within three (3) Trading Days after the Holder's request and in the Holder's discretion, either (x) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "**Buy-In Price**"), at which point the Company's obligation to issue and

Confidential                                                                                      EMPGNUS0009400

deliver such certificate or credit the Holder's balance account with DTC for the shares of Common Stock to which the Holder is entitled upon the Holder's conversion of the applicable Conversion Amount shall terminate, or (y) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such shares of Common Stock or credit the Holder's balance account with DTC for such shares of Common Stock and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the price at which the sell order giving rise to such purchase obligation was executed.

(iii)    <u>Registration; Book-Entry</u>. The Company shall maintain a register (the "**Register**") for the recordation of the names and addresses of the holders of each Note and the Initial Unrestricted Principal, Other Unrestricted Principal and Restricted Principal (and stated interest thereon) held by such holders (the "**Registered Notes**"). The entries in the Register shall be conclusive and binding for all purposes absent manifest error. The Company and the holders of the Notes shall treat each Person whose name is recorded in the Register as the owner of a Note for all purposes, including, without limitation, the right to receive payments of Principal and Interest, if any, hereunder, notwithstanding notice to the contrary. A Registered Note may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Upon its receipt of a request to assign or sell all or part of any Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 20. Notwithstanding anything to the contrary in this Section 3(c)(iii), the Holder may assign any Note or any portion thereof to an Affiliate of the Holder or a Related Fund of the Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); <u>provided</u>, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until the Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless (A) the full Conversion Amount represented by this Note is being converted or (B) the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Initial Unrestricted Principal, Other Unrestricted Principal, Interest and Late Charges, if any, converted and/or paid (as the case may be) or Restricted Principal becoming unrestricted and the dates of such conversions, Investor Prepayments and/or payments (as the case may be) or shall use such other method, reasonably satisfactory to

Confidential                                                                                     EMPGNUS0009401

the Holder and the Company, so as not to require physical surrender of this Note upon conversion.  If the Company does not update the Register to record such Principal, Interest and Late Charges converted and/or paid (as the case may be) or Restricted Principal becoming unrestricted and the dates of such conversions, Investor Prepayment and/or payments (as the case may be) within two (2) Business Days of such occurrence, then the Register shall be automatically deemed updated to reflect such occurrence.

(iv)    Pro Rata Conversion; Disputes.   In the event that the Company receives a Conversion Notice from the Holder and one or more ~~holder~~holders of Other Notes ~~and/or Preferred Shares~~ for the same Conversion Date and the Company can convert some, but not all, of such portions of this Note ~~the~~and/or Other Notes ~~and/or Preferred Shares~~ submitted for conversion, the Company, subject to Section 3(d), shall convert from the Holder and each holder of Other Notes ~~and/or Preferred Shares~~ electing to have Notes ~~and/or Preferred Shares~~ converted on such date~~, first,~~ a pro rata amount of such holder's ~~portion of Preferred Shares submitted for conversion based on the Stated Value of Preferred Shares submitted for conversion on such date by such holder relative to the Stated Value of all Preferred Shares submitted for conversion on such date, and, second, a~~ pro rata amount of such holder's portion of the Note and its Other Notes submitted for conversion based on the Principal amount of this Note and the Other Notes submitted for conversion on such date by such holder relative to the aggregate Principal amount of this Note and all Other Notes submitted for conversion on such date.  In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 25.

(d)    Conversion Limitations.

(i)    Beneficial Ownership.  Notwithstanding anything to the contrary contained herein, the Company shall not issue any shares of Common Stock pursuant to the terms of this Note, and the Holder shall not have the right to any shares of Common Stock otherwise issuable pursuant to the terms of this Note and such issuance shall be null and void and treated as if never made, to the extent that after giving effect to such issuance, the Holder together with the other Attribution Parties collectively would beneficially own in excess of [4.99] [9.99][4]% (the **"Maximum Percentage"**) of the shares of Common Stock outstanding immediately after giving effect to such issuance. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon conversion of this Note with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (i) conversion of the remaining, nonconverted portion of this Note beneficially owned by the Holder or any of the other Attribution Parties and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including the ~~Preferred Shares and~~ Warrants)

---

[4] Insert Maximum Percentage as indicated on the Buyer's signature page attached to the Securities Purchase Agreement.

Confidential                                                                    EMPGNUS0009402

beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 3(d)(i). For purposes of this Section 3(d)(i), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the conversion of the Note without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (i) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (ii) a more recent public announcement by the Company or (iii) any other written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**"). If the Company receives a Conversion Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Conversion Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 3(d)(i), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of shares of Common Stock to be purchased pursuant to such Conversion Notice. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Trading Day confirm orally and in writing or by electronic mail to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Note, by the Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon conversion of this Note results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the Exchange Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of Notes that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Note in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the Exchange Act. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 3(d)(i) to the extent necessary to correct this paragraph (or any portion of this paragraph) which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 3(d)(i) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Note.

Confidential                                                                          EMPGNUS0009403

(ii)    <u>Principal Market Regulation</u>.  The Company shall not be obligated to issue any shares of Common Stock pursuant to the terms of this Note, and the Holder shall not have the right to receive pursuant to the terms of this Note any shares of Common Stock, to the extent the issuance of such shares of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue pursuant to the terms of the Notes ~~and the Certificate of Designations~~ and upon exercise of the Warrants without breaching the Company's obligations under the rules or regulations of the Principal Market (the "**Exchange Cap**"), except that such limitation shall not apply in the event that the Company obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of Common Stock in excess of such amount <u>("**Nasdaq Stockholder Approval**")</u>.  Until such approval is obtained, no Buyer shall be issued in the aggregate, pursuant to the terms of the Notes ~~and the Certificate of Designations~~ and upon exercise of the Warrants, shares of Common Stock in an amount greater than the product of the Exchange Cap multiplied by a fraction, the numerator of which is the Principal amount of Notes issued to such Buyer pursuant to the Securities Purchase Agreement on the Issuance Date and the denominator of which is the aggregate principal amount of all Notes issued to the Buyers pursuant to the Securities Purchase Agreement on the Issuance Date (with respect to each Buyer, the "**Exchange Cap Allocation**").  In the event that any Buyer shall sell or otherwise transfer any of such Buyer's Notes, the transferee shall be allocated a pro rata portion of such Buyer's Exchange Cap Allocation with respect to such portion of such Notes transferred, and the restrictions of the prior sentence shall apply to such transferee with respect to the portion of the Exchange Cap Allocation allocated to such transferee.  In the event that any holder of Notes shall convert all of such holder's Notes ~~and Preferred Shares~~ and exercise all of such holder's Warrants into a number of shares of Common Stock which, in the aggregate, is less than such holder's Exchange Cap Allocation, then the difference between such holder's Exchange Cap Allocation and the number of shares of Common Stock actually issued to such holder shall be allocated to the respective Exchange Cap Allocations of the remaining holders of Notes, ~~Preferred Shares~~ and Warrants on a pro rata basis in proportion to the number of shares of Common Stock underlying the Notes, ~~Preferred Shares~~ and SPA Warrants then held by each such holder. In the event that the Company is prohibited from issuing any shares of Common Stock for which a Conversion Notice has been delivered as a result of the operation of this Section 3(d)(ii), the Company shall within two (2) Trading Days of the applicable attempted conversion pay cash in exchange for cancellation of the Conversion Amount that is subject to such Conversion Notice, at a price per share of Common Stock that would have been issuable upon such conversion if this Section 3(d)(ii) were not in effect, equal to the greater of (x) the Closing ~~Sale~~ Price of the Common Stock and (y) the arithmetic average of the Closing ~~Sale~~ Prices of the Common Stock during the five (5) Trading Days, in each case, immediately preceding the applicable attempted conversion (or if any such date is not a Trading Day, the last Trading Day prior to such date). <u>[TWO POINTS, I SIMPLIFIED EVERYTHING TO BE CLOSING PRICE.  SECOND, IF NOTHING IS ADJUSTED BELOW MARKET BEFORE STOCKHOLDER APPROVAL DO WE NEED THIS OR ARE WE JUST ASSUMING NASDAQ WILL APPROVE IT QUICKER? THEORETICALLY YOU NEED ONE OR THE OTHER BUT NOT BOTH]</u>

DOC ID - 32122650.9                                - 11 -

Confidential                                                                                EMPGNUS0009404

(4)    RIGHTS UPON EVENT OF DEFAULT.

(a)    Event of Default. Each of the following events shall constitute an **"Event of Default"** and each of the events in clauses (vi) and (vii) shall constitute a **"Bankruptcy Event of Default"**:

(i)    (A) the suspension of the Common Stock from trading on an Eligible Market for a period of two (2) consecutive Trading Days or for more than an aggregate of ten (10) Trading Days in any 365-day period or (B) the failure of the Common Stock to be listed on an Eligible Market;

(ii)    the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within five (5) Business Days after the applicable Conversion Date or (B) notice, written or oral, to the Holder or any holder of the Other Notes, including by way of public announcement or through any of its agents, at any time, of its intention not to comply with a request for conversion of this Note or any Other Notes into shares of Common Stock that is tendered in accordance with the provisions of this Note or the Other Notes, other than pursuant to Section 3(d) (and analogous provisions under the Other Notes);

(iii)    at any time following the fifth (5th) consecutive Business Day that the Holder's Authorized Share Allocation is less than the Holder's Pro Rata Amount of the applicable Required Reserve Amount (as defined in Section 11(a));

(iv)    the Company's failure to pay to the Holder any amount of Principal, Interest, Late Charges, Redemption Price or other amounts when and as due under this Note or any other Transaction Document, except, in the case of a failure to pay Interest and/or Late Charges when and as due, in which case only if such failure continues for a period of at least an aggregate of two (2) Business Days;

(v)    the occurrence of any default (after lapse of any applicable cure periods) under, redemption of or acceleration prior to maturity of at least an aggregate of $100,000 of Indebtedness of the Company or any of its Subsidiaries other than with respect to this Note or any Other Notes;

(vi)    the Company or any of its Subsidiaries, pursuant to or within the meaning of Title 11, U.S. Code, or any similar federal, foreign or state law for the relief of debtors (collectively, **"Bankruptcy Law"**), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a **"Custodian"**), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(vii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries;

Confidential                                                                                                    EMPGNUS0009405

(viii)    a final judgment or judgments for the payment of money aggregating in excess of $100,000 are rendered against the Company or any of its Subsidiaries and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $100,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company or such Subsidiary (as the case may be) will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment;

(ix)    other than as specifically set forth in another clause of this Section 4(a), the Company or any of its Subsidiaries breaches any representation, warranty, in any material respect (other than representations or warranties subject to Material Adverse Effect or materiality, which may not be breached in any respect), covenant or other term or condition of any Transaction Document, except, in the case of a breach of a covenant or other term or condition of any Transaction Document which is curable, only if such breach remains uncured for a period of at least five (5) consecutive Business Days;

(x)    any breach or failure in any respect to comply with either Sections 8, 16 or 17 of this Note;

(xi)    the Company or any Subsidiary shall fail to perform or comply with any covenant or agreement contained in the Security Agreement to which it is a party;

(xii)    any material provision of this Note or any Security Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiii)    this Note, any Security Document or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (as defined in Section 16(b)) in favor of the Holder or the Collateral Agent for the benefit of the holders of the Notes on the Investor Note Collateral and any Collateral purported to be covered hereby and thereby, provided however that Fast Pay Partners LLC shall have a first priority Lien for a period of no more than thirty (30) days after the Issuance Date;

Confidential                                                                    EMPGNUS0009406

(xiv)   any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xv)   any material damage to, or loss, theft or destruction of, any Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(xvi)   a false or inaccurate certification (including a false or inaccurate deemed certification) by the Company that the Equity Conditions are satisfied or that there has been no Equity Conditions Failure or as to whether any Event of Default has occurred;

(xvii)   any Material Adverse Effect occurs;

(xviii)   the Company fails to remove any restrictive legend on any certificate or any shares of Common Stock issued to the Holder upon conversion or exercise (as the case may be) of any ~~PIPE Securities (as defined in the Securities Purchase Agreement) acquired by the Holder under the Securities Purchase Agreement (including this Note) as~~ Securities and when required by such Securities, ~~the Certificate of Designations~~ or the Securities Purchase Agreement, unless otherwise then prohibited by applicable federal securities laws, and any such failure remains uncured for at least five (5) consecutive Trading Days; or

(xix)   any Event of Default (as defined in the Other Notes) occurs with respect to any Other Notes~~; or(xx)         any Triggering Event (as defined in the Certificate of Designations) occurs with respect to any Preferred Shares~~.

(b)   Redemption Right.  Upon the occurrence of an Event of Default with respect to this Note or any Other Note ~~or upon the occurrence of a Triggering Event with respect to the Preferred Shares~~, the Company shall within one (1) Business Day deliver written notice thereof via facsimile or electronic mail and overnight courier (an "**Event of Default Notice**") to the Holder.  At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Holder may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of this Note by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note the Holder is

Confidential                                                                                      EMPGNUS0009407

electing to require the Company to redeem.  Each portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Sale Price of the shares of Common Stock during the period beginning on the date immediately preceding such Event of Default and ending on the date the Holder delivers the Event of Default Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**Event of Default Redemption Price**").  Redemptions required by this Section 4(b) shall be made in accordance with the provisions of Section 12.  To the extent redemptions required by this Section 4(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 4, but subject to Section 3(d), until the Event of Default Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 4(b) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3.  In the event of a partial redemption of this Note pursuant hereto, the Principal amount redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Event of Default Redemption Notice.  The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 4(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder.  Accordingly, any Event of Default redemption premium due under this Section 4(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(c)    Mandatory Redemption upon Bankruptcy Event of Default. Notwithstanding anything to the contrary herein, and notwithstanding any conversion that is then required or in process, upon any Bankruptcy Event of Default, whether occurring prior to or following the Maturity Date, the Company shall immediately pay to the Holder an amount in cash representing 125% of all outstanding Principal, accrued and unpaid Interest, if any, and accrued and unpaid Late Charges, if any, on such Principal and Interest, in addition to any and all other amounts due hereunder (the "**Bankruptcy Event of Default Redemption Price**"), without the requirement for any notice or demand or other action by the Holder or any other Person, except that any Restricted Principal then outstanding hereunder shall be satisfied through Bankruptcy Event of Default Netting (as defined in the Investor Note) (in lieu of such cash payment hereunder); provided that the Holder may, in its sole discretion, waive such right to receive payment upon a Bankruptcy Event of Default, in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect of such Bankruptcy Event of Default, any right to conversion, and any right to payment of the Event of Default Redemption Price or any other Redemption Price, as applicable.

Confidential                                                                                      EMPGNUS0009408

(5)     RIGHTS UPON FUNDAMENTAL TRANSACTION AND CHANGE OF CONTROL.

(a)     Assumption.  If, at any time while this Note is outstanding, a Fundamental Transaction occurs or is consummated, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each share of Common Stock that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder (without regard to any limitation in Section 3(d) on the conversion of this Note), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "**Alternate Consideration**") receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Note is convertible immediately prior to such Fundamental Transaction (without regard to any limitation in Section 3(d) on the conversion of this Note).  For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration.  If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction.  The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "**Successor Entity**") to assume in writing all of the obligations of the Company under this Note in accordance with the provisions of this Section 4(a) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Note a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Note which is convertible for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon conversion of this Note (without regard to any limitations on the conversion of this Note) prior to such Fundamental Transaction, and with a conversion price which applies the conversion price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such conversion price being for the purpose of protecting the economic value of this Note immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Note with the same effect as if such Successor Entity had been named as the Company herein.

(b)     Redemption Right.  No sooner than twenty (20) days nor later than fifteen (15) days prior to the consummation of a Change of Control, but not prior to the public

Confidential                                                                                    EMPGNUS0009409

announcement of such Change of Control, the Company shall deliver written notice thereof via facsimile or electronic mail and overnight courier to the Holder (a **"Change of Control Notice"**). At any time during the period beginning on the earlier to occur of (x) any oral or written agreement by the Company or any of its Subsidiaries, upon consummation of which the transaction contemplated thereby would reasonably be expected to result in a Change of Control, (y) the Holder becoming aware of a Change of Control if the Change of Control Notice is not delivered to the Holder in accordance with the immediately preceding sentence (as applicable) and (z) the Holder's receipt of a Change of Control Notice and ending twenty (20) Trading Days after the date of the consummation of such Change of Control, the Holder may require the Company to redeem (a **"Change of Control Redemption"**) all or any portion of this Note by delivering written notice thereof (**"Change of Control Redemption Notice"**) to the Company, which Change of Control Redemption Notice shall indicate the Conversion Amount the Holder is electing to require the Company to redeem.  The portion of this Note subject to redemption pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing ~~Sale~~ Price of the shares of Common Stock during the period beginning on the date immediately preceding the earlier to occur of (x) the consummation of the Change of Control and (y) the public announcement of such Change of Control and ending on the date the Holder delivers the Change of Control Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the **"Change of Control Redemption Price"**).  Redemptions required by this Section 5 shall be made in accordance with the provisions of Section 12 and shall have priority to payments to stockholders in connection with a Change of Control.  To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(d), until the Change of Control Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3.  In the event of a partial redemption of this Note pursuant hereto, the Principal amount redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Change of Control Redemption Notice.  The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder.  Accordingly, any Change of Control redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6)     DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS.

(a)     Distribution of Assets.  If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation,

Confidential                                                                          EMPGNUS0009410

any distribution of cash, stock or other securities, property, Options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions (provided, however, that to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to such extent) and the portion of such Distribution shall be held in abeyance for the Holder until such time or times as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such rights (and any rights under this Section 6(a) on such initial rights or on any subsequent such rights to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(b)     Purchase Rights.  If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (provided, however, that to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time or times as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase Right or on any subsequent Purchase Right to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(7) ADJUSTMENTS TO CONVERSION PRICE.  The Conversion Price will be subject to adjustment from time to time as provided in this Section 7.

(a) Adjustment of Conversion Price upon Issuance of Common Stock.  If and whenever on or after the date Nasdaq Stockholder Approval is obtained, the Company issues or sells, or in accordance with this Section 7(a) is deemed to have issued or sold, or the Company publicly announces the issuance or sale of, any shares of Common Stock (including the issuance

Confidential                                                                                   EMPGNUS0009411

or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock issued or sold, or in accordance with this Section 7(a) is deemed to have been issued or sold, by the Company (x) in connection with any Excluded Securities, (y) for which the Holder received a Distribution in at least an equivalent amount pursuant to Section 6(a) and (z) adjusting the Conversion Price pursuant to Section 7(b)), for a consideration per share (the "**New Issuance Price**") less than a price (the "**Applicable Price**") equal to the Conversion Price in effect immediately prior to such issue or sale or deemed issuance or sale (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance the Conversion Price then in effect shall be reduced to an amount equal to the New Issuance Price. For purposes of determining the adjusted Conversion Price under this Section 7(a), the following shall be applicable:

(i)    Issuance of Options.  If the Company in any manner grants or sells, or the Company publicly announces the issuance or sale of, any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share.  For purposes of this Section 7(a)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion exercise or exchange of any Convertible Security issuable upon exercise of such Option.  No further adjustment of the Conversion Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities.

(ii)    Issuance of Convertible Securities.  If the Company in any manner issues or sells, or the Company publicly announces the issuance or sale of, any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share.  For the purposes of this Section 7(a)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security

Confidential

EMPGNUS0009412

less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security. No further adjustment of the Conversion Price shall be made upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Conversion Price has been or is to be made pursuant to other provisions of this Section 7(a), no further adjustment of the Conversion Price shall be made by reason of such issue or sale.

(iii)    Change in Option Price or Rate of Conversion. If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exchangeable or exercisable for shares of Common Stock increases or decreases at any time, the Conversion Price in effect at the time of such increase or decrease shall be adjusted to the Conversion Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 7(a)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 7(a) shall be made if such adjustment would result in an increase of the Conversion Price then in effect.

(iv)    Calculation of Consideration Received. If any Option and/or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "**Primary Security**", and such Option and/or Convertible Security and/or Adjustment Right, the "**Secondary Securities**" and together with the Primary Security, each a "**Unit**"), together comprising one integrated transaction (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing), the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be the lowest of (x) the purchase price of such Unit, (y) if such Primary Security is an Option and/or Convertible Security, the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise or conversion of the Primary Security in accordance with Section 7(a)(i) or 7(a)(ii) above and (z) the lowest Weighted Average Price of the Common Stock on any Trading Day during the three (3) Trading Day period immediately following the public announcement of such Dilutive Issuance (for the avoidance of doubt, if such public announcement is released prior to the opening of the Principal Market on a Trading Day, such Trading Day shall be the first Trading Day in such three (3) Trading Day period). If any shares of

Confidential                                    EMPGNUS0009413

Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration other than cash received therefor will be deemed to be the net amount received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such publicly traded securities on the date of receipt of such publicly traded securities. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Required Holders. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the **"Valuation Event"**), the fair value of such consideration will be determined within five (5) Business Days after the tenth (10th) day following the Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Required Holders. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company. Notwithstanding anything to the contrary contained in this Section 7(a), if the New Issuance Price calculated pursuant to this Section 7(a) would result in a price less than $0.0001, the New Issuance Price shall be deemed to be $0.0001.

(v)     Record Date. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(vi)     No Readjustments. For the avoidance of doubt, in the event the Conversion Price has been adjusted pursuant to this Section 7(a) and the Dilutive Issuance that triggered such adjustment does not occur, is not consummated, is unwound or is cancelled after the facts for any reason whatsoever, in no event shall the Conversion Price be readjusted to the Conversion Price that would have been in effect if such Dilutive Issuance had not occurred or been consummated.

(b)     (a)  Adjustment of Conversion Price upon Subdivision or Combination of Common Stock. If the Company at any time on or after the Subscription Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company

DOC ID - 32122650.9                         - 21 -

at any time on or after the Subscription Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased. Any adjustment under this Section 7(a̶b) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(c)    (b) Voluntary Adjustment by Company. The Company may at any time during the term of this Note, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(8)    COMPANY CONVERSION OR REDEMPTION.

(a)    General. On each applicable Installment Date, provided there has been no Equity Conditions Failure, the Company shall pay to the Holder the Installment Amount due on such date by converting all or some of such Installment Amount into Common Stock, in accordance with this Section 8 (a "**Company Conversion**"); provided, however, that the Company may, at its option following written notice to the Holder as set forth below, pay the Installment Amount by redeeming such Installment Amount in cash (a "**Company Redemption**") or by any combination of a Company Conversion and a Company Redemption so long as all of the outstanding applicable Installment Amount due on any Installment Date shall be converted and/or redeemed by the Company on the applicable Installment Date, subject to the provisions of this Section 8. On or prior to the date which is the ~~twenty-third (23rd~~twentieth (20ᵗʰ) Trading Day prior to each Installment Date (each, an "**Installment Notice Due Date**"), the Company shall deliver written notice (each, a "**Company Installment Notice**" and the date all of the holders receive such notice is referred to as the "**Company Installment Notice Date**"), to each holder of Notes which Company Installment Notice shall (i) either (A) confirm that the applicable Installment Amount of the Holder's Note shall be converted to Common Stock in whole or in part pursuant to a Company Conversion (such amount to be converted, the "**Company Conversion Amount**") or (B) (1) state that the Company elects to redeem for cash, or is required to redeem for cash in accordance with the provisions of the Notes, in whole or in part, the applicable Installment Amount pursuant to a Company Redemption and (2) specify the portion of such Installment Amount which the Company elects or is required to redeem pursuant to a Company Redemption (such amount to be redeemed, the "**Company Redemption Amount**") and the portion of such Installment Amount that is the Company Conversion Amount, which amounts, when added together, must equal the applicable Installment Amount and (ii) if the Installment Amount is to be paid, in whole or in part, in Common Stock pursuant to a Company Conversion, certify that no Equity Conditions Failure has occurred as of the applicable Company Installment Notice Date. Each Company Installment Notice shall be irrevocable. If the Company does not timely deliver a Company Installment Notice in accordance with this Section 8, then the Company shall be deemed to have delivered an irrevocable Company Installment Notice confirming a Company Conversion and shall be deemed to have certified that there shall not have occurred an Equity Conditions Failure in connection with such Company Conversion as of the applicable Company Installment Notice Date. Except as expressly provided in this Section 8, the Company shall convert and/or redeem the applicable Installment Amount of this Note pursuant to this Section 8 and the corresponding Installment Amounts of the Other Notes pursuant to the corresponding provisions of the Other Notes in the same ratio of the

DOC ID - 32122650.9                                           - 22 -

Confidential                                                                                    EMPGNUS0009415

Installment Amount being converted and/or redeemed hereunder. The Company Conversion Amount (whether set forth in the Company Installment Notice or by operation of this Section 8) shall be converted in accordance with Section 8(b) and the Company Redemption Amount shall be redeemed in accordance with Section 8(c). Notwithstanding anything herein to the contrary, in the event of any partial conversion or redemption of this Note, the Conversion Amount converted or redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in a written notice to the Company.

(b) <u>Mechanics of Company Conversion</u>. If the Company delivers a Company Installment Notice and confirms, or is deemed to have confirmed, in whole or in part, a Company Conversion in accordance with Section 8(a), then (1) contemporaneously with the delivery of the Company Installment Notice on the applicable Company Installment Notice Date, the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate for) a number of shares of Common Stock (the **"Initial Pre-Installment Conversion Shares"**) equal to the quotient of (x) the Company Conversion Amount related to the applicable Installment Date divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock, (2) in addition, in the event the Holder delivers an Acceleration Notice (as defined in Section 8(e)) by no later than the Trading Day immediately prior to the applicable Installment Date, on the Trading Day immediately following delivery of such Acceleration Notice (such date, the **"Additional Pre-Installment Conversion Shares Date"**) the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate for) a number of shares of Common Stock (the **"Additional Pre-Installment Conversion Shares"** and together with the Initial Pre-Installment Conversion Shares, the **"Pre-Installment Conversion Shares"**) equal to the quotient of (x) the Accelerated Amount(s) (as defined in Section 8(e)) set forth in such Acceleration Notice divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock and (3) on the applicable Installment Date, the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate) for an additional number of shares of Common Stock, if any, equal to the Installment Balance Conversion Shares; <u>provided</u>, that no Equity Conditions Failure has occurred (or waived in writing by the Holder) on each day during the period commencing on such Company Installment Notice Date through the applicable Installment Date. On the second (2nd) Trading Day immediately after the end of the applicable Measuring Period, the Company shall deliver a written notice setting forth the calculation of the Installment Balance Conversion Shares (and the calculation of the component parts of such calculation) to the Holder and the holders of the Other Notes. If an Event of Default occurs during the period from any Company Installment Notice Date through the applicable Installment Date, the Holder may elect an Event of Default Redemption in accordance with Section 4(b) without being required to return to the Company any Pre-Installment Conversion Shares previously delivered to the Holder. All Pre-Installment Conversion Shares and Installment Balance Conversion Shares shall be fully paid and nonassessable shares of Common Stock (rounded to the nearest whole share). If an Equity

Confidential                                                                                    EMPGNUS0009416

Conditions Failure occurs as of the applicable Company Installment Notice Date, then unless the Company has elected to redeem such Installment Amount, the Company Installment Notice shall indicate that unless the Holder waives the Equity Conditions Failure, the Installment Amount shall be redeemed for cash. If the Company confirmed (or is deemed to have confirmed by operation of Section 8(a)) the conversion of the applicable Company Conversion Amount, in whole or in part, and there was no Equity Conditions Failure as of the applicable Company Installment Notice Date (or is deemed to have certified that there is no Equity Conditions Failure in connection with any such conversion by operation of Section 8(a)) but an Equity Conditions Failure occurred between the applicable Company Installment Notice Date and any time through the applicable Installment Date (the "**Interim Installment Period**"), the Company shall provide the Holder a subsequent written notice to that effect. If an Equity Conditions Failure occurs (unless waived in writing by the Holder) during such Interim Installment Period, then at the option of the Holder designated in writing to the Company, the Holder may require the Company to do either one or both of the following: (i) the Company shall redeem all or any part designated by the Holder of the Company Conversion Amount (such designated amount is referred to as the "**First Redemption Amount**") on such Installment Date and the Company shall pay to the Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash equal to ~~125~~130% of such First Redemption Amount and/or (ii) the Company Conversion shall be null and void with respect to all or any part designated by the Holder of the unconverted Company Conversion Amount and the Holder shall be entitled to all the rights of a holder of this Note with respect to such amount of the Company Conversion Amount; provided, however, that the Conversion Price for such unconverted Company Conversion Amount shall thereafter be adjusted to equal the lesser of (A) the Company Conversion Price as in effect on the date on which the Holder voided the Company Conversion and (B) the Company Conversion Price as in effect on the date on which the Holder delivers a Conversion Notice relating thereto. If the Company fails to redeem any First Redemption Amount on or before the applicable Installment Date by payment of such amount on the applicable Installment Date, then the Holder shall have the rights set forth in Section 12(a) as if the Company failed to pay the applicable Company Installment Redemption Price (as defined below) and all other rights under this Note (including, without limitation, such failure constituting an Event of Default described in Section 4(a)(iv)). Notwithstanding anything to the contrary in this Section 8(b), but subject to the limitations set forth in Section 3(d), until the Company credits the Holder's account with DTC, or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issues and delivers to the Holder a certificate for, the shares of Common Stock representing the Company Conversion Amount to the Holder, the Company Conversion Amount may be converted by the Holder into Common Stock pursuant to Section 3. In the event that the Holder elects to convert the Company Conversion Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(c) <u>Mechanics of Company Redemption</u>. If the Company elects a Company Redemption in accordance with Section 8, then the Company Redemption Amount which is to be paid to the Holder on the applicable Installment Date shall be redeemed by the Company and the Company shall pay to the Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash (the "**Company Installment Redemption**

Confidential                                                                                EMPGNUS0009417

**Price**") equal to 100% of the Company Redemption Amount. If the Company fails to redeem the Company Redemption Amount on the applicable Installment Date by payment of the Company Installment Redemption Price on such date, then at the option of the Holder designated in writing to the Company (any such designation shall be deemed a "**Conversion Notice**" pursuant to Section 3(c) for purposes of this Note), (i) the Holder shall have the rights set forth in Section 12(a) as if the Company failed to pay the applicable Company Installment Redemption Price and all other rights as a Holder of Notes (including, without limitation, such failure constituting an Event of Default described in Section 4(a)(iv)) and (ii) the Holder may require the Company to convert all or any part of the Company Redemption Amount at the Company Conversion Price as in effect on the applicable Installment Date. Conversions required by this Section 8(c) shall be made in accordance with the provisions of Section 3(c). Notwithstanding anything to the contrary in this Section 8(c), but subject to Section 3(d), until the Company Installment Redemption Price is paid in full, the Company Redemption Amount may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. In the event the Holder elects to convert all or any portion of the Company Redemption Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Redemption Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(d) Deferred Installment Amount. Notwithstanding any provision of this Section 8 to the contrary, the Holder may from time to time, at its option and in its sole discretion, deliver a written notice (a "**Deferral Notice**") to the Company no later than the Business Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of an Installment Amount payable on such Installment Date deferred (such amount(s) deferred, the "**Deferral Amount**") until (i) any subsequent Installment Date selected by the Holder, in its sole discretion, in which case, the Deferral Amount shall be added to, and become part of, the Installment Amount to be paid on such subsequent Installment Date or (ii) until the last Business Day of any calendar month following the last Installment Date occurring hereunder, which date may be after the Scheduled Maturity Date hereunder. Any Deferral Notice delivered by the Holder pursuant to this Section 8(d) shall set forth (i) the Deferral Amount and (ii) the date that such Deferral Amount shall now be payable.

(e) Accelerated Installment Amount. Notwithstanding any provision of this Section 8 to the contrary, the Holder may, at its option and in its sole discretion, deliver a written notice to the Company (an "**Acceleration Notice**") no later than the Trading Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of any or all Installment Amount(s) scheduled to be paid on future Installment Dates after the applicable Installment Date accelerated (such amount(s) accelerated, the "**Accelerated Amount(s)**") to be paid on the applicable Installment Date pursuant to a Company Conversion, in which case, such Accelerated Amount(s) shall be added to, and become part of, the Installment Amount as such Installment Amount may have been increased pursuant to the terms hereof, payable on such applicable Installment Date by including such Accelerated Amount(s) in the Installment Amount for the applicable Installment Date and shall be payable in Common Stock regardless of whether the Installment Amount scheduled to be paid on such applicable Installment Date in accordance with the provisions of this Section 8 shall be paid in cash, shares of Common Stock or a combination thereof; provided, however, that in the event that the Holder

Confidential                                                                      EMPGNUS0009418

delivers one or more Acceleration Notice(s) with respect to an Installment Date, the aggregate Accelerated Amount(s) with respect to such Installment Date shall not be greater than three (3) times the Holder's Pro Rata Amount of $~~672,268.91.~~_____. Any Acceleration Notice delivered by the Holder pursuant to this Section 8(e) shall set forth (i) the Accelerated Amount(s) and (ii) the date that such Accelerated Amount should have been paid if not for the Holder's right to accelerate such Installment Amount(s) pursuant to this Section 8(e).

(9)    OPTIONAL REDEMPTION AT THE COMPANY'S ELECTION. At any time after the Issuance Date, the Company shall have the right to redeem all, but not less than all, of the Conversion Amount (as defined in the Notes ~~and in the Certificate of Designations~~) then remaining under this Note, the Other Notes ~~and the Preferred Shares~~ (the "**Company Optional Redemption Amount**") as designated in the Company Optional Redemption Notice on the Company Optional Redemption Date (each as defined below) (a "**Company Optional Redemption**"). This Note, and the Other Notes ~~and the Preferred Shares~~ subject to redemption pursuant to this Section 9 shall be redeemed by the Company on the Company Optional Redemption Date in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holder in writing to the Company at a price equal to: (i) so long as there has been no Equity Conditions Failure during the period beginning on the Company Optional Redemption Notice Date (as defined below) through the Company Optional Redemption Date (as defined below), ~~125~~100% of the Conversion Amount to be redeemed and (ii) if an Equity Conditions Failure occurs (which is not waived in writing by the Holder) at any time during the period beginning on the Company Optional Redemption Notice Date through the Company Optional Redemption Date (the "**Company Optional Redemption Interim Period**"), the greater of (x) ~~125~~130% of the Conversion Amount to be redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing ~~Sale~~ Price of the shares of Common Stock during the period beginning on the date immediately preceding the Company Optional Redemption Notice Date and ending on the Company Optional Redemption Date, by (II) the lowest Conversion Price in effect during such period (the "**Company Optional Redemption Price**"). The Company may exercise its right to require redemption under this Section 9 by delivering a ~~thirty~~ten (~~30~~)10 Trading Days prior written notice thereof by facsimile or electronic mail and overnight courier to the Holder and all, but not less than all, of the holders of the Other Notes ~~and Preferred Shares~~ (the "**Company Optional Redemption Notice**" and the date all of the holders of the Notes ~~and the Preferred Shares~~ received such notice is referred to as the "**Company Optional Redemption Notice Date**"). The Company Optional Redemption Notice shall be irrevocable. The Company Optional Redemption Notice shall (i) state the date on which the Company Optional Redemption shall occur (the "**Company Optional Redemption Date**"), which date shall be the ~~thirtieth~~tenth (~~30~~10th) Trading Day immediately following the Company Optional Redemption Notice Date, (ii) state the aggregate Conversion Amount of the Notes ~~and aggregate Conversion Amount (as defined in the Certificate of Designations) of the Preferred Shares~~ which the Company has elected to be subject to Company Optional Redemption from the Holder and all of the holders of the Other Notes ~~and Preferred Shares~~ pursuant to this Section 9 (and analogous provisions under the Other Notes ~~and Certificate of Designations~~) on the Company Optional Redemption Date, (iii) state the applicable Company Optional Redemption Price in the event: (x) no Equity Conditions Failure occurs during the Company Optional Redemption Interim Period and (y) an Equity Conditions Failure has occurred or will occur (which is not waived in writing by the

Confidential                                                                 EMPGNUS0009419

Holder) during the Company Optional Redemption Interim Period. If the Company confirmed that there was no such Equity Conditions Failure as of the Company Optional Redemption Notice Date but an Equity Conditions Failure occurs at any time during the Company Optional Redemption Interim Period, the Company shall provide the Holder a subsequent written notice to that effect. Notwithstanding anything to the contrary in this Section 9, until the Company Optional Redemption Price is paid, in full, the Company Optional Redemption Amount may be converted, in whole or in part, by the Holder into shares of Common Stock pursuant to Section 3. All Conversion Amounts converted by the Holder after the Company Optional Redemption Notice Date shall reduce the Company Optional Redemption Amount of this Note required to be redeemed on the Company Optional Redemption Date, unless the Holder otherwise indicates in the applicable Conversion Notice. Company Optional Redemptions made pursuant to this Section 9 shall be made in accordance with Section 12. To the extent redemptions required by this Section 9 are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 9, the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. If the Company elects to cause a Company Optional Redemption pursuant to Section 9, then it must simultaneously take the same action in the same proportion with respect to the Other Notes and the Preferred Shares.

(10)    NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(11)    RESERVATION OF AUTHORIZED SHARES.

(a) Reservation. From and after the date the Company obtains the Share Increase Approval (as defined in the Securities Purchase Agreement), the Company shall reserve a number of authorized and otherwise unreserved shares of Common Stock to satisfy its obligation to issue shares of Common Stock upon conversion of this Note, and the Other Notes and the Preferred Shares equal to at least the number of shares of Common Stock issuable pursuant to the terms of the Notes and Preferred Shares assuming a Conversion Price (as defined in each of the Notes and the Certificate of Designations) equal to $[●]⁵ without regard to any limitation on conversion set forth herein and corresponding provisions in the Other Notes and the Certificate of Designations (the "**Final Required Reserve Amount**"). Prior to the date the Company obtains the Share Increase Approval, the Company shall reserve a number of authorized and otherwise unreserved shares of Common Stock to satisfy its obligation to issue shares of Common Stock upon conversion of this Note and the Other Notes equal to the lesser of (i) the maximum number of shares of Common Stock required under the Final Required Reserve Amount and (ii) the maximum number of shares of Common Stock that is then available and

---

⁵ Insert 20% of the arithmetic average of the Closing Sale Prices of the Common Stock for the five (5) Trading Days, in each case, immediately prior to signing definitive documents.

Confidential                                                                                  EMPGNUS0009420

otherwise authorized and unreserved after the Company first complies with its reservation requirements with respect to the ~~Preferred Shares or~~ Warrants (the "**Initial Required Reserve Amount**" and together with the Final Required Reserve Amount the "**Required Reserve Amount**"). So long as any of this Note~~,~~ and the Other Notes ~~and the Preferred Shares~~ are outstanding, the Company shall take all action necessary to reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of this Note~~,~~ and the Other Notes ~~and the Preferred Shares~~, the applicable Required Reserve Amount necessary to effect the conversion of all of the Notes ~~and Preferred Shares~~ then outstanding; provided, that at no time shall the number of shares of Common Stock so reserved be less than the applicable Required Reserve Amount. The initial number of shares of Common Stock reserved for conversions of this Note ~~,~~and the Other Notes ~~and the Preferred Shares~~ and each increase in the number of shares so reserved shall be allocated pro rata among the Holder, the holders of the Other Notes ~~and the holders of the Preferred Shares~~ based on the Principal amount of this Note and the Other Notes ~~and the Stated Value of the Preferred Shares~~ held by each holder at the Closing (as defined in the Securities Purchase Agreement) or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event that a holder shall sell or otherwise transfer this Note or any of such holder's Other Notes ~~or Preferred Shares~~, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Notes shall be allocated to the Holder, the remaining holders of Other Notes ~~and the holders of Preferred Shares~~, pro rata based on the Principal amount of this Note and the Other Notes ~~and Stated Value of the Preferred Shares~~ then held by such holders.

(b)    Insufficient Authorized Shares. Without limiting the generality of the provisions set forth in Section 4(m) of the Securities Purchase Agreement, if at any time while any of the Notes remain outstanding the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve for issuance upon conversion of the Notes at least a number of shares of Common Stock equal to the applicable Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the applicable Required Reserve Amount for the Notes then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall either (x) obtain the majority written consent of its stockholders for the approval of an increase in the number of authorized shares of Common Stock and provide each stockholder with an information statement or (y) hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its Board of Directors to recommend to the stockholders that they approve such proposal. Notwithstanding the foregoing, if during any such time of an Authorized Share Failure, the Company is able to obtain the written consent of a majority of the shares of its issued and outstanding Common Stock to approve the increase in the number of authorized shares of Common Stock, the Company may satisfy this obligation by obtaining such consent and submitting for filing with the SEC an Information Statement on Schedule 14C. If, upon any conversion of this Note, the Company does not have sufficient authorized shares to deliver in

Confidential                                                                                    EMPGNUS0009421

satisfaction of such conversion, then unless the Holder elects to rescind such attempted conversion, the Holder may require the Company to pay to the Holder within three (3) Trading Days of the applicable attempted conversion, cash in an amount equal to the product of (i) the number of shares of Common Stock that the Company is unable to deliver pursuant to this Section 11, and (ii) the highest Closing Sale Price of the Common Stock during the period beginning on the date of the applicable Conversion Date and ending on the date the Company makes the applicable cash payment.

(12) REDEMPTIONS.

(a) Mechanics. The Company shall deliver the applicable Event of Default Redemption Price to the Holder within three (3) Business Days after the Company's receipt of the Holder's Event of Default Redemption Notice; provided that upon a Bankruptcy Event of Default, the Company shall deliver the applicable Bankruptcy Event of Default Redemption Price in accordance with Section 4(c) (as applicable, the "**Event of Default Redemption Date**"). If the Holder has submitted a Change of Control Redemption Notice in accordance with Section 5(b), the Company shall deliver the applicable Change of Control Redemption Price to the Holder (i) concurrently with the consummation of such Change of Control if such notice is received prior to the consummation of such Change of Control and (ii) within three (3) Business Days after the Company's receipt of such notice otherwise (such date, the "**Change of Control Redemption Date**"). The Company shall deliver the applicable Company Installment Redemption Price to the Holder on the applicable Installment Date. The Company shall deliver the applicable Company Optional Redemption Price to the Holder on the applicable Company Optional Redemption Date. The Company shall pay the applicable Redemption Price to the Holder in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the holder in writing to the Company on the applicable due date. In the event of a redemption of less than all of the Conversion Amount of this Note, the Company shall promptly cause to be issued and delivered to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal which has not been redeemed and any accrued Interest on such Principal which shall be calculated as if no Redemption Notice has been delivered. In the event that the Company does not pay a Redemption Price to the Holder within the time period required, at any time thereafter and until the Company pays such unpaid Redemption Price in full, the Holder shall have the option, in lieu of redemption, to require the Company to promptly return to the Holder all or any portion of this Note representing the Conversion Amount that was submitted for redemption and for which the applicable Redemption Price has not been paid. Upon the Company's receipt of such notice, (x) the applicable Redemption Notice shall be null and void with respect to such Conversion Amount, (y) the Company shall immediately return this Note, or issue a new Note (in accordance with Section 20(d)) to the Holder representing such Conversion Amount to be redeemed and (z) the Conversion Price of this Note or such new Notes shall be adjusted to the lesser of (A) the Conversion Price as in effect on the date on which the applicable Redemption Notice is voided and (B) the lowest Closing Bid Price of the Common Stock during the period beginning on and including the date on which the applicable Redemption Notice is delivered to the Company and ending on and including the date on which the applicable Redemption Notice is voided. The Holder's delivery of a notice voiding a Redemption Notice and exercise of its rights following such notice shall not affect the Company's obligations to make any payments of Late Charges

Confidential                                                                    EMPGNUS0009422

which have accrued prior to the date of such notice with respect to the Conversion Amount subject to such notice.

(b)    Redemption by Other Holders.    Upon the Company's receipt of notice from any of the holders of the Other Notes ~~and Preferred Shares~~ for redemption or repayment as a result of an event or occurrence substantially similar to the events or occurrences described in Section 4(b) or Section 5(b) or pursuant to corresponding provisions set forth in the Other Notes ~~and Preferred Shares~~ (each, an **"Other Redemption Notice"**), the Company shall immediately, but no later than one (1) Business Day of its receipt thereof, forward to the Holder by facsimile or electronic mail a copy of such notice.  If the Company receives a Redemption Notice and one or more Other Redemption Notices, during the seven (7) Business Day period beginning on and including the date which is three (3) Business Days prior to the Company's receipt of the Holder's Redemption Notice and ending on and including the date which is three (3) Business Days after the Company's receipt of the Holder's Redemption Notice and the Company is unable to redeem all principal, interest and other amounts designated in such Redemption Notice and such Other Redemption Notices received during such seven (7) Business Day period, then the Company shall redeem~~, first, a pro rata amount from each holder of Preferred Shares (including the Holder) based on the Stated Value of the Preferred Shares submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven (7) Business Day period, and, second,~~ a pro rata amount from the Holder and each holder of the Other Notes based on the Principal amount of this Note and the Other Notes submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven (7) Business Day period.

(c)    Insufficient Assets.    If upon a Redemption Date, the assets of the Company are insufficient to pay the applicable Redemption Price, the Company shall (i) take all appropriate action reasonably within its means to maximize the assets available for paying the applicable Redemption Price, (ii) redeem out of all such assets available therefor on the applicable Redemption Date the maximum possible portion of the applicable Redemption Price that it can redeem on such date, ~~first, pro rata among the holders of the Preferred Shares to be redeemed in proportion to the aggregate Stated Value of the Preferred Shares outstanding on the applicable Redemption Date and, second,~~ a pro rata among the Holder and the holders of the Other Notes to be redeemed in proportion to the aggregate Principal amount of this Note and the Other Notes outstanding on the applicable Redemption Date and (iii) following the applicable Redemption Date, at any time and from time to time when additional assets of the Company become available to pay the balance of the applicable Redemption Price of this Note and the Other Notes, the Company shall use such assets, at the end of the then current fiscal quarter, to pay the balance of such Redemption Price of this Note and the Other Notes, or such portion thereof for which assets are then available, on the basis set forth above at the applicable Redemption Price, and such assets will not be used prior to the end of such fiscal quarter for any other purpose. Interest on the Principal amount of this Note and the Other Notes that have not been redeemed shall continue to accrue until such time as the Company redeems this Note and the Other Notes. The Company shall pay to the Holder the applicable Redemption Price without regard to the legal availability of funds unless expressly prohibited by applicable law or unless the payment of the applicable Redemption Price could reasonably be expected to result in personal liability to the directors of the Company.

Confidential    EMPGNUS0009423

(13)    VOTING RIGHTS. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(14)    SECURITY. This Note and the Other Notes are secured to the extent and in the manner set forth herein and in the Security Documents.

(15)    RANK. All payments due under this Note (a) shall rank *pari passu* with all Other Notes and (b) shall be senior to all other Indebtedness of the Company and its Subsidiaries.

(16)    NEGATIVE COVENANTS. Until all of the Notes and Preferred Shares have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall not, and the Company shall not permit any of its Subsidiaries without the prior written consent of the Required Holders to, directly or indirectly:

(a) incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness;

(b) allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its Subsidiaries (collectively, "**Liens**") other than Permitted Liens;

(c) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (other than this Note and the Other Notes), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing;

(d) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (including, without limitation Permitted Indebtedness other than this Note, and the Other Notes and the Fast Pay Indebtedness), by way of payment in respect of principal of (or premium, if any) such Indebtedness. For clarity, such restriction shall not preclude the payment of regularly scheduled interest payments which may accrue under such Permitted Indebtedness;

(e) other than with respect to the Series B Preferred Shares in accordance with the terms of the Certificate of Designations, redeem or repurchase its Equity Interest (except on a pro rata basis among all holders thereof);

(f) declare or pay any cash dividend or distribution on any Equity Interest of the Company or of its Subsidiaries;

Confidential                                                                    EMPGNUS0009424

(g) make, any change in the nature of its business as described in the Company's most recent Annual Report filed on Form 10-K with the SEC or modify its corporate structure or purpose;

(h) encumber, license or otherwise allow any Liens on any Intellectual Property, including, without limitation, any claims for damage by way of any past, present, or future infringement of any of the foregoing, in each case, other than Permitted Liens;

(i) enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, license, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof; or

(j) issue any Notes or Preferred Shares (other than as contemplated by the Securities Purchase Agreement), or issue any other securities that would cause a breach or default under the Notes or the Certificate of Designations.

(17)    AFFIRMATIVE COVENANTS.

(a) Until all of the Notes and Preferred Shares have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall, and the Company shall, except with respect to clause (vi) below, cause each Subsidiary to, unless otherwise agreed to by the Required Holders, directly and indirectly:

(i)    maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except in the case that any such failure to so maintain, preserve or comply has not had and is not reasonably likely to have, a Material Adverse Effect;

(ii)    maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except in the case that any such failure to so maintain, preserve or comply has not had, and is not reasonably likely to have, a Material Adverse Effect;

(iii)    take all action necessary or advisable to maintain all of the Intellectual Property that is necessary or material to the conduct of its business in full force and effect;

(iv)    maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks

DOC ID - 32122650.9                                 - 32 -

as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated;

(v)    cause such Subsidiary formed on or after the Subscription Date to execute, and deliver to each holder of Notes a guaranty agreement substantially in the form of the Guarantee Agreement (as defined in the Securities Purchase Agreement) and all other Security Documents as requested by Required Holders, as applicable;

(vi)    maintain on deposit unrestricted and unencumbered (other than the Liens contemplated by the Security Documents) cash in a U.S. bank in an aggregate amount equal to not less than $~~1,500,000~~_____; and

(vii)    notify the Holder and the holders of the Other Notes ~~and Preferred Shares~~ in writing whenever an Equity Conditions Failure occurs other than with respect to clauses (xi) and (xii) of the definition of "Equity Conditions", and simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes ~~and the Preferred Shares~~, file a Current Report on Form 8-K with the SEC to state such fact.

(b) Cash Burn Covenant.  ~~On or prior to [•]~~[6]So long as the Notes are outstanding, the Company's net loss adjusted by excluding non-cash items and charges, shall not exceed $~~275,000~~550,000 for ~~the immediately preceding~~any calendar month ~~and shall not exceed $275,000 for any calendar months remaining until the Maturity Date~~ (each, a "**Cash Burn Milestone**").  ~~Upon satisfaction of the initial Cash Burn Milestone, the Company shall: (i) deliver a written notice to the Holder and each holder of the Other Notes and the Series B Preferred Shares certifying whether (x) it has complied with the foregoing and (y) it reasonably expects to comply with the foregoing while this Note~~, the Other Notes or the Series B Preferred Shares ~~remain outstanding (such certification, the "Cash Burn Certification" and the date of delivery of such notice, the "Initial Certification Date") and shall simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes and the Series B Preferred Shares, file a Current Report on Form 8-K with the SEC to state such fact.~~  On every fifteenth (15th) day of each calendar month ~~following the Initial Certification Date~~ (or if such day is not a Business Day, the next following day that is a Business Day) the Company shall: (i) deliver a ~~Cash Burn Certification~~written notice to the Holder and each holder of the Other Notes certifying whether (x) it has complied with the foregoing and (y) it reasonably expects to comply with the foregoing while this Note or the Other Notes remain outstanding and (ii) in the event the Company is not able to certify as to clause (x) or (y) ~~in the second sentence of this Section 17(b)~~above, it shall simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes ~~and the Series B Preferred Shares~~, file a Current Report on Form 8-K with the SEC to state such fact.

---

[6] ~~Insert the date that is the five (5) month anniversary of the Issuance Date (or if such day is not a Business Day, the next following day that is a Business Day).~~

Confidential    EMPGNUS0009426

(18)   VOTE TO ISSUE, OR CHANGE THE TERMS OF, NOTES.   The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders shall be required for any change or amendment or waiver of any provision to this Note or any of the Other Notes. Any change, amendment or waiver by the Company and the Required Holders shall be binding on the Holder of this Note and all holders of the Other Notes.

(19)   TRANSFER.   This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred by the Holder without the consent of the Company, subject only to the provisions of Section 2(f) of the Securities Purchase Agreement.

(20)   REISSUANCE OF THIS NOTE.

(a)   Transfer.   If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 20(d) and subject to Section 3(c)(iii)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 20(d)) to the Holder representing the outstanding Principal not being transferred.   The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of Section 3(c)(iii) following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b)   Lost, Stolen or Mutilated Note.   Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form (but without any obligation to post a surety or other bond) and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal.

(c)   Note Exchangeable for Different Denominations.   This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 20(d)) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d)   Issuance of New Notes.   Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 20(a) or Section 20(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the

Confidential                                                                           EMPGNUS0009427

Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest and Late Charges, if any, on the Principal and Interest of this Note, from the Issuance Date.

(21)    REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(22)    PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(23)    CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Company and all the Buyers and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(24)    FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(25)    DISPUTE RESOLUTION. In the case of a dispute as to the determination of the Closing ~~Bid Price, the Closing Sale~~ Price or the Weighted Average Price or the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Day of receipt, or deemed receipt, of the Conversion Notice or

DOC ID - 32122650.9                                    - 35 -

Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within one (1) Business Day of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within one (1) Business Day submit via facsimile or electronic mail (a) the disputed determination of the Closing ~~Bid Price, the Closing Sale~~ Price or the Weighted Average Price to an independent, reputable investment bank selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed, or (b) the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed.  The Company, at the Company's expense, shall cause the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations.  Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(26)    NOTICES; PAYMENTS.

(a)    Notices.  Whenever notice is required to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement.  The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore.  Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least ten (10) Business Days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b)    Payments.  Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions; provided, that the Holder may elect to receive a payment of cash by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Buyers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement).  Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day.  Any amount of Principal or other amounts due under the Transaction Documents which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate

DOC ID - 32122650.9

- 36 -

Confidential                                                                                    EMPGNUS0009429

of eighteen percent (18.0%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

(27)    CANCELLATION.    After all Principal, accrued Interest and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(28)    WAIVER OF NOTICE.    To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Securities Purchase Agreement.

(29)    GOVERNING LAW; JURISDICTION; JURY TRIAL.    This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.  The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law.  Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder.  **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(30)    SEVERABILITY. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the

Confidential                                                      EMPGNUS0009430

respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(31)    DISCLOSURE. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall contemporaneously with any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(32)    CERTAIN DEFINITIONS. For purposes of this Note, the following terms shall have the following meanings:

(a)    "**Affiliate**" shall have the meaning ascribed to such term in Rule 405 of the Securities Act.

(b)    "**Attribution Parties**" means, collectively, the following Persons: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the Exchange Act. For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(c)    "**Bloomberg**" means Bloomberg Financial Markets.

(d)    "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(e)    "**Buyers**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(f)    "**Calendar Quarter**" means each of: the period beginning on and including January 1 and ending on and including March 31; the period beginning on and including April 1 and ending on and including June 30; the period beginning on and including

Confidential    EMPGNUS0009431

July 1 and ending on and including September 30; and the period beginning on and including October 1 and ending on and including December 31.

(g)    ~~"Certificate of Designations" has the meaning ascribed to such term in the Securities Purchase Agreement.~~

(g)    ~~(h)~~ "**Change of Control**" means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the Common Stock in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification continue after such reorganization, recapitalization or reclassification to hold publicly traded securities and, directly or indirectly, are, in all material respect, the holders of the voting power of the surviving entity (or entities with the authority or voting power to elect the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities) after such reorganization, recapitalization or reclassification or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(h)    ~~(i)~~ "**Closing ~~Bid Price" and "Closing Sale~~ Price**" means, for any security as of any date, the ~~last~~ closing ~~bid~~ price ~~and last closing trade price, respectively,~~ for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing ~~bid~~ price ~~or the closing trade price, as the case may be,~~ then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing ~~bid~~ price or last trade price ~~, respectively,~~ of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing ~~bid~~ price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing ~~bid~~ price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices).  If the Closing ~~Bid Price or the Closing Sale~~ Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing ~~Bid~~ Price ~~or the Closing Sale Price, as the case may be,~~ of such security on such date shall be the fair market value as mutually determined by the Company and the Holder.  If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25.  All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

(i)    ~~(j)~~ "**Closing Date**" shall have the meaning set forth in the Securities Purchase Agreement, which date is the date the Company initially issued Notes pursuant to the terms of the Securities Purchase Agreement.

(j)    ~~(k)~~ "**Collateral**" has the meaning ascribed to such term in the Security Documents.

Confidential                                                           EMPGNUS0009432

(k)    (l) "**Collateral Agent**" has the meaning ascribed to such term in the Security Documents.

(l)    (m) "**Common Stock**" means (i) the Company's shares of Common Stock, par value $0.001 per share, and (ii) any share capital into which such Common Stock shall have been changed or any share capital resulting from a reclassification of such Common Stock.

(m)    (n) "**Company Conversion Price**" means as of any date of determination, that price which shall be the lower of (i) the Conversion Price then in effect and (ii) the Market Price as of such date of determination.

(n)    (o) "**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(o)    (p) "**Conversion Shares**" means shares of Common Stock issuable by the Company pursuant to the terms of any of the Notes, including any related Interest and Late Charges so converted, amortized or redeemed.

(p)    (q) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(q)    (r) "**Eligible Market**" means the Principal Market, The New York Stock Exchange, The NASDAQ Global Market, The NASDAQ Global Select Market, or the NYSE American.

(r)    (s) "**Equity Conditions**" means each of the following conditions: (i) on each day during Equity Conditions Measuring Period, either (x) one or more registration statements filed shall be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, and there shall not have been any suspension of such registration statement(s) or (y) all shares of Common Stock issuable pursuant to the terms of this Note and the Other Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, shall be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (assuming that all Warrants were exercised pursuant to a Cashless Exercise (as defined in the Warrants), provided that no Public Information

Confidential    EMPGNUS0009433

Failure has occurred, and without the need for registration under any applicable federal or state securities laws; (ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Principal Market or any other Eligible Market and shall not have been suspended from trading on such exchange or market nor shall delisting or suspension by such exchange or market been threatened (with delisting reasonably likely to occur after giving effect to all applicable notice, appeal, cure, compliance and hearing periods), commenced or pending either (A) in writing by such exchange or market or (B) by falling below the then effective minimum listing maintenance requirements of such exchange or market; (iii) during the Equity Conditions Measuring Period, the Company shall have delivered shares of Common Stock pursuant to the terms of this Note, and the Other Notes ~~and the Certificate of Designations~~ and shares of Common Stock upon exercise of the Warrants to the holders on a timely basis as set forth in Section 3(c) hereof (and analogous provisions under the Other Notes ~~and the Certificate of Designations~~) and Section 1(a) of the Warrants; (iv) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions may be issued in full without violating Section 3(d) hereof and the rules or regulations of the Principal Market or any other applicable Eligible Market; (v) during the Equity Conditions Measuring Period, the Company shall not have failed to timely make any payments within five (5) Business Days of when such payment is due pursuant to any Transaction Document; (vi) during the Equity Conditions Measuring Period, there shall not have occurred either (A) the public announcement of a pending, proposed or intended Fundamental Transaction which has not been abandoned, terminated or consummated, (B) an Event of Default ~~or Triggering Event (as defined in the Certificate of Designations)~~ or (C) an event that with the passage of time or giving of notice would constitute an Event of Default or Triggering Event; (vii) the Company shall have no knowledge of any fact that would cause (x) one or more registration statement(s) not to be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the terms of the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, or (y) any shares of Common Stock issuable pursuant to the terms of this Note and the Other Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, not to be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (or any successor thereto) promulgated under the Securities Act, provided that no Public Information Failure has occurred, and any applicable state securities laws; (viii) during the Equity Conditions Measuring Period, the Company otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document in any material respect (other than representations or warranties subject to Material Adverse Effect or materiality, which may not be breached in any respect); (ix) during the Equity Conditions Measuring Period, the Holder shall not have been in possession of any material, nonpublic information received from the Company, any Subsidiary or its respective agent or affiliates; (x) the shares of Common Stock issuable upon conversion of the Conversion

Confidential      EMPGNUS0009434

Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions are duly authorized and listed and eligible for trading without restriction on an Eligible Market; (xi) the average daily dollar trading volume of the Common Stock as reported by Bloomberg during the twenty (20) Trading Days immediately prior to the applicable date of determination shall be at least $~~40,000~~100,000; and (xii) on each Trading Day during the Equity Conditions Measuring Period, the Closing ~~Sale~~ Price of the Common Stock equals or exceeds $[•[76]] (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction occurring after the Subscription Date).

(s) ~~(t)~~ **"Equity Conditions Failure"** means that on any applicable date of determination, the Equity Conditions have not each been satisfied or waived in writing by the Holder; provided, however, that the Equity Condition set forth in clause (iv) of such definition is not waivable by the Holder.

(t) ~~(u)~~ **"Equity Conditions Measuring Period"** means each day during the period beginning thirty (30) Trading Days immediately prior to the applicable date of determination and ending on and including the applicable date of determination.

(u) ~~(v)~~ **"Equity Interests"** means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, Options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(v) ~~(w)~~ **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

~~(x) "Fast Pay Indebtedness" means Indebtedness under that certain Financing and Security Agreement, dated as of February 11, 2019, by and among the Company and its Subsidiaries, and Fast Pay Partners LLC.~~

(w) ~~(y)~~ **"Fundamental Transaction"** means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common

---

[76] Insert 20% of the arithmetic average of the Closing ~~Sale~~ Prices of the Common Stock for the five (5) Trading Days, in each case, immediately prior to signing definitive documents.

Confidential    EMPGNUS0009435

Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the Subscription Date calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(x)    (z) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(y)    (aa) "**Group**" means a "group" as that term is used in Section 13(d) of the Exchange Act and as defined in Rule 13d-5 thereunder.

Confidential                                                                EMPGNUS0009436

(z)    (bb) "**Indebtedness**" of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into in the ordinary course of business consistent with past practice), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, consistently applied for the periods covered thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, lien, pledge, charge, security interest or other encumbrance of any nature whatsoever in or upon any property or assets (including accounts and contract rights) with respect to any asset or property owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

(aa)    (cc) "**Initial Company Pre-Installment Conversion Price**" means, with respect to any Company Installment Notice Date, that price which shall be the lower of (i) the then Conversion Price then in effect and (ii) the Market Price as of the applicable Company Installment Notice Date.

(bb)    (dd) "**Initial Unrestricted Principal**" means any Principal outstanding under this Note that is not Restricted Principal outstanding under this Note as of the Issuance Date.

(cc)    (ee) "**Installment Amount**" means with respect to each Installment Date, an amount equal to the sum of the (i) the lesser of (A) ~~(x) with respect to the first (1ˢᵗ) Installment Date occurring hereunder, the Holder's Pro Rata Amount of $33,613.46 and (y) with respect to all subsequent Installment Dates occurring hereunder, the Holder's Pro Rata Amount of $672,268.91 and (B) the Unrestricted~~$_____⁷ and (B) the Principal amount of this Note outstanding on such Installment Date, (ii) any Deferral Amount deferred pursuant to Section 8(d) and included in such Installment Amount, (iii) any Accelerated Amount accelerated pursuant to Section 8(e) and included in such Installment Amount and (iv) accrued and unpaid Interest with respect to such Principal and accrued and unpaid Late Charges, if any, with respect to such Principal and Interest, as any such Installment Amount for each Holder may be reduced pursuant to the terms hereof, whether upon conversion, redemption or otherwise~~;~~. provided, however, that any Installment Amount payable hereunder shall first be allocated to the Initial Unrestricted Amounts until all of the Initial Unrestricted Amounts have been amortized and only after the Initial Unrestricted Amounts shall be amortized in full shall any Installment Amounts be

⁷ Principal Amount of all Notes divided by 12.

Confidential                                                                                  EMPGNUS0009437

allocated to the Other Unrestricted Amounts. In the event the Holder shall sell or otherwise transfer or assign any portion of this Note, the transferee shall be allocated a pro rata portion of each unpaid Installment Amount hereunder.

(dd)    (ff) "**Installment Balance Conversion Shares**" means, for any Installment Date, a number of shares of Common Stock equal to (i) the Post-Installment Conversion Shares for such date minus (ii) the amount of any Pre-Installment Conversion Shares delivered in respect of the applicable Installment Date; provided, that in the event that the amount of Pre-Installment Conversion Shares exceeds the amount of Post-Installment Conversion Shares for such Installment Date (such excess, the "**Installment Conversion Shares Excess**"), the applicable Installment Balance Conversion Shares shall equal zero (0) for such Installment Date and any Installment Conversion Shares Excess shall reduce the number of Pre-Installment Conversion Shares payable on the immediately following Company Installment Notice Date or Additional Pre-Installment Conversion Shares Date, if any, on a share for share basis.

(ee)    (gg) "**Installment Date**" means [February 29, each of August 31, 2020][8] and the last Business Day of every calendar month anniversary thereafter through and including the Maturity Date.

(ff)    (hh) "**Intellectual Property**" has the meaning ascribed to such term in the Security Agreement.

(gg)    (ii) "**Investor Netting Rights**" means the rights of Investor Optional Netting and Automatic Netting (each as defined in the Investor Note).

(hh)    (jj) "**Investor Note**" means that certain promissory note of the Holder issued to the Company at the Closing Date, pursuant to the Securities Purchase Agreement, with an aggregate principal amount outstanding equal to the Restricted Principal outstanding hereunder and secured by a cash amount set forth in a bank account of the Holder (or its affiliates) at least equal to the Restricted Principal outstanding hereunder.

(ii)    (kk) "**Investor Notes**" means those certain promissory notes of the holders of Notes issued to the Company at the Closing Date, pursuant to the Securities Purchase Agreement.

(jj)    (ll) "**Investor Prepayment**" means any Prepayment (as defined in the Investor Note) of the Investor Note.

(kk)    (mm) "**Lead Investor**" means Empery AssetAnson Investment Master Fund, Ltd LP.

(ll)    (nn) "**Market Price**" means 85% of the arithmetic average of the twofive (25) lowest  daily Weighted Average Prices of the Common Stock during the Measuring

---

[8] Include date that is the last Business Day of the month following seven (7) full calendar months immediately following the Closing Date. Assuming the Closing Date occurs in June 2019, the first Installment Date hereunder shall be February 29, 2020.

Confidential                                                                                    EMPGNUS0009438

Period.  All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination, reclassification or other similar transaction during such Measuring Period.

(mm)  (oo)-"**Material Adverse Effect**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(nn)  (pp)-"**Maturity Netting**" has the meaning ascribed to such term in the Investor Notes.

(oo)  (qq)-"**Measuring Period**" means the twenty (20) consecutive Trading Day period ending on the Trading Day immediately preceding the applicable date of determination.

(pp)  (rr)-"**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(qq)  (ss)-"**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes, (ii) trade payables incurred in the ordinary course of business consistent with past practice, (iii) unsecured Indebtedness incurred by the Company that is made expressly subordinate in right of payment to the Indebtedness evidenced by this Note, as reflected in a written agreement acceptable to the Required Holders and approved by the Required Holders in writing, and which Indebtedness does not provide at any time for (a) the payment, prepayment, repayment, repurchase or defeasance, directly or indirectly, of any principal or premium, if any, thereon until ninety-one (91) days after the Maturity Date or later and (b) total interest and fees at a rate in excess of eight percent (8.0%) per annum, and (iv) Indebtedness secured by Permitted Liens described in clauses (iv) of the definition of Permitted Liens and (v) only for a period of five (5) Business Days following the Issuance Date, the Fast Pay Indebtedness.

(rr)  (tt)-"**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of

DOC ID - 32122650.9

- 46 -

Confidential

EMPGNUS0009439

law to secure payments of custom duties in connection with the importation of goods, and (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) and (ix) only for a period of thirty (30) days beginning on the Closing Date, any Lien outstanding in connection with the Fast Pay Indebtedness.

(ss)    (uu) **"Person"** means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(tt)    (vv) **"Post-Installment Conversion Shares"** means, for any Installment Date and without taking into account the delivery of any Pre-Installment Conversion Shares, that number of shares of Common Stock equal to the applicable Company Conversion Amount (including, without limitation, the addition of any Accelerated Amounts to such Company Conversion Amount in accordance with Section 8(e)) on such Installment Date divided by the Company Conversion Price as in effect on the applicable Installment Date, rounded up to the nearest whole share of Common Stock.

(ww)    **"Preferred Shares"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(uu)    (xx) **"Principal Market"** means The Nasdaq Capital Market.

(vv)    (yy) **"Pro Rata Amount"** means a fraction (i) the numerator of which is the original principal amount of the Holder's Note issued to the Holder pursuant to the Securities Purchase Agreement and (ii) the denominator of which is the aggregate original principal amount of all Notes issued to the Buyers pursuant to the Securities Purchase Agreement.

(ww)    (zz) **"Public Information Failure"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(xx)    (aaa) **"Redemption Dates"** means, collectively, the Event of Default Redemption Dates, the Change of Control Redemption Dates, the Installment Dates and the Company Optional Redemption Date, as applicable, each of the foregoing, individually, a Redemption Date.

(yy)    (bbb) **"Redemption Notices"** means, collectively, the Event of Default Redemption Notices, the Change of Control Redemption Notices, the Company Installment Notices and the Company Optional Redemption Notice, each of the foregoing, individually, a Redemption Notice.

(zz)    (ccc) **"Redemption Prices"** means, collectively, the Event of Default Redemption Prices, the Change of Control Redemption Prices, the Company Installment Redemption Prices and the Company Optional Redemption Price, each of the foregoing, individually, a Redemption Price.

Confidential                                                                 EMPGNUS0009440

(aaa)    (ddd) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(bbb)    (eee) "**Required Holders**" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding and shall include the Lead Investor so long as the Lead Investor or any of its Affiliates holds any Notes.

(ccc)    (fff) "**Restricted Principal**" means, initially Principal outstanding in the amount of $[*] 4,000,000, subject to reduction as provided herein, including, without limitation, pursuant to Investor Prepayments, Maturity Netting or Investor Netting Rights.

(ddd)    (ggg) "**SEC**" means the United States Securities and Exchange Commission.

(eee)    (hhh) "**Securities Act**" means the Securities Act of 1933, as amended.

(fff)    (iii) "**Securities Purchase Agreement**" means that certain securities purchase agreement dated as of the Subscription Date by and among the Company and the investors listed on the signature pages attached thereto pursuant to which the Company issued the Preferred Shares, Notes and Warrants, as amended from time to time.

(ggg)    (jjj) "**Security Agreement**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(hhh)    (kkk) "**Security Documents**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(iii)    (lll) "**Standard Settlement Period**" means the standard settlement period, expressed in a number of Trading Days, on the principal securities exchange or securities market on which the Common Stock is then traded as in effect on the date of delivery of the applicable Conversion Notice.

(mmm)    "Stated Value" shall have the meaning ascribed to such term in the Certificate of Designations.

(jjj)    (nnn) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(kkk)    (ooo) "**Subscription Date**" means June February [ ], 2019 2020.

(lll)    (ppp) "**Subsidiary**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(mmm)    (qqq) "**Trading Day**" means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock on such day, then on the principal securities exchange or securities market on which the Common Stock is then traded.

DOC ID - 32122650.9

Confidential                                                    EMPGNUS0009441

(nnn)    ~~(rrr)~~ "**Transaction Documents**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(ooo)    ~~(sss)~~ "**Warrants**" has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all warrants issued in exchange therefor or replacement thereof.

(ppp)    ~~(ttt)~~ "**Weighted Average Price**" means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market during the period beginning at 9:30:01 a.m., New York Time (or such other time as the Principal Market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as the Principal Market publicly announces is the official close of trading) as reported by Bloomberg through its "Volume at Price" function, or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York Time (or such other time as such market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as such market publicly announces is the official close of trading) as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing ~~bid~~ price and the lowest closing ask price of any of the market makers for such security as reported in the OTC Link or Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices).  If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder.  If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25.  All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

(qqq)    ~~(uuu)~~ "**Unrestricted Date**" means any date on which all or any portion of the Restricted Principal becomes Unrestricted Principal.

(rrr)    ~~(vvv)~~ "**Unrestricted Principal**" means any Principal outstanding under this Note that is not Restricted Principal outstanding under this Note."

[Signature Page Follows]

Confidential                                                                EMPGNUS0009442

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

<div style="margin-left: 40%;">

~~SITO MOBILE, LTD~~**GENIUS BRANDS INTERNATIONAL, INC**.

By:_____
     Name:
     Title:

</div>

DOC ID - 32122650.9

# EXHIBIT I

## ~~SITO MOBILE, LTD~~GENIUS BRANDS INTERNATIONAL, INC.

### CONVERSION NOTICE

Reference is made to the Senior Secured Convertible Note (the **"Note"**) issued to the undersigned by ~~SITO Mobile, Ltd~~Genius Brands International, Inc., a ~~Delaware~~Nevada corporation (the **"Company"**). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock par value $0.001 per share (the **"Common Stock"**) of the Company, as of the date specified below.

Date of Conversion: _____

Aggregate Conversion Amount to be converted or number of Conversion Shares to be issued upon conversion: _____

Please confirm the following information:

Conversion of Initial Unrestricted Amount: ☐      Conversion of Other Unrestricted Amount: ☐

Conversion Price: _____

If Aggregate Conversion Amount is provided above, number of shares of Common Stock to be issued: _____

Percentage of conversion to constitute Initial Unrestricted Amount: _____

Percentage of conversion to constitute Other Unrestricted Amount: _____

Please issue the Common Stock into which the Note is being converted to the Holder, or for its benefit, as follows:

☐Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to: _____

_____

Address: _____

Facsimile Number and Electronic Mail: _____

DOC ID - 32122650.9

Confidential                                                    EMPGNUS0009444

☐     Check here if requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant:

_____

DTC Number:

_____

Account Number:

By its delivery of this Conversion Notice, the undersigned represents and warrants to the Company that in giving effect to the conversion evidenced hereby the undersigned will not beneficially own in excess of the number of shares of Common Stock (determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended) permitted to be owned under Section 3(d)(i) of this Note.

Authorization:     _____

By:     _____

Title:     _____

Dated:     _____

Account Number:     _____
(if electronic book entry transfer)

Transaction Code Number:     _____
(if electronic book entry transfer)

Installment Amounts to be reduced and amount of reduction:

_____

DOC ID - 32122650.9

Confidential     EMPGNUS0009445

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Conversion Notice and hereby directs Continental Stock Transfer & Trust Company to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions dated June __, 2019 from the Company and acknowledged and agreed to by Continental Stock Transfer & Trust Company.

~~SITO MOBILE, LTD~~**GENIUS BRANDS INTERNATIONAL, INC.**

By:_____
        Name:
        Title:

DOC ID - 32122650.9

Confidential                                    EMPGNUS0009446

Document comparison by Workshare 9 on Tuesday, January 28, 2020 5:18:38 PM

| Input: | |
|---|---|
| Document 1 ID | file://W:\123 EGS\Anson\GNUS\32122650-v9.docx |
| Description | 32122650-v9 |
| Document 2 ID | file://W:\123 EGS\Anson\GNUS\GNUS Note.1.docx |
| Description | GNUS Note.1 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 149 |
| Deletions | 223 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 378 |

Confidential

EMPGNUS0009447

**[FORM OF SENIOR SECURED CONVERTIBLE NOTE]**

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 3(c)(iii) AND 18(a) HEREOF. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 3(c)(iii) OF THIS NOTE.

[THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID"). PURSUANT TO TREASURY REGULATION §1.1275-3(b)(1), [●], A REPRESENTATIVE OF THE COMPANY HEREOF WILL, BEGINNING TEN DAYS AFTER THE ISSUANCE DATE OF THIS NOTE, PROMPTLY MAKE AVAILABLE TO THE HOLDER UPON REQUEST THE INFORMATION DESCRIBED IN TREASURY REGULATION §1.1275-3(b)(1)(i). HE MAY BE REACHED AT TELEPHONE NUMBER [●]].

GENIUS BRANDS INTERNATIONAL, INC.

SENIOR SECURED CONVERTIBLE NOTE

Issuance Date: January [  ], 2020          Original Principal Amount: U.S. $[          ]
                                           Initial Unrestricted Principal: U.S. $[          ][1]

      **FOR VALUE RECEIVED**, Genius Brands International, Inc., a Nevada corporation (the "**Company**"), hereby promises to pay to [BUYER] or registered assigns (the "**Holder**") in cash and/or in shares of Common Stock (as defined below) the amount set forth above as the Original Principal Amount (as reduced pursuant to the terms hereof pursuant to redemption, conversion, amortization or otherwise, the "**Principal**") when due, whether upon the Maturity Date (as defined below), on any Installment Date with respect to the Installment Amount due on such Installment Date, acceleration, redemption or otherwise (in each case in accordance

---

[1] Insert Holder's Pro Rata Amount of $4,000,000.

DOC ID - 32122650.9

EMPGNUS0009448

with the terms hereof) and to pay default interest ("**Interest**") on any outstanding Principal at the applicable Default Rate to the extent it accrues pursuant to Section 2 at any time from the date set out above as the Issuance Date (the "**Issuance Date**") until the same becomes due and payable, whether upon an Interest Date (as defined below), any Installment Date, the Maturity Date, acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). This Senior Secured Convertible Note (including all Senior Secured Convertible Notes issued in exchange, transfer or replacement hereof, this "**Note**") is one of an issue of Senior Secured Convertible Notes issued pursuant to the Securities Purchase Agreement on the Closing Date (collectively, the "**Notes**" and such other Senior Secured Convertible Notes, the "**Other Notes**"). Certain capitalized terms used herein are defined in Section 32.

(1)     PAYMENTS OF PRINCIPAL; PREPAYMENT. The Company acknowledges and agrees that this Note was issued at an original issue discount and that any Principal amount that reflects such original issue discount shall be Unrestricted Principal and Initial Unrestricted Principal hereunder. On each Installment Date, the Company shall pay to the Holder an amount equal to the Installment Amount due on such Installment Date in accordance with Section 8. On the Maturity Date, if any portion of this Note remains outstanding after giving effect to any Company Conversions and Company Redemptions occurring on such date in accordance with Section 8, the Company shall pay to the Holder an amount in cash representing all outstanding Principal, accrued and unpaid Interest and accrued, if any, and unpaid Late Charges (as defined in Section 26(b)), if any, on such Principal and Interest, except that any Restricted Principal hereunder shall be satisfied on the Maturity Date (in lieu of a cash payment) by Maturity Netting. The "**Maturity Date**" shall be August [ ], 2021[2] (the "**Scheduled Maturity Date**"), as may be extended at the option of the Holder (i) in the event that, and for so long as, an Event of Default (as defined in Section 4(a)) shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 1) or any event shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 1) that with the passage of time and the failure to cure would result in an Event of Default, (ii) through the date that is ten (10) Business Days after the consummation of a Change of Control in the event that a Change of Control is publicly announced or a Change of Control Notice (as defined in Section 5(b)) is delivered prior to the Maturity Date and (iii) to such date elected by the Holder pursuant to a Deferral Notice in accordance with Section 8(d) in the event the Holder elects to submit such a Deferral Notice electing to defer the last Installment Date hereunder beyond the Scheduled Maturity Date. Other than as specifically permitted by this Note, the Company may not prepay any portion of the outstanding Principal, accrued and unpaid Interest or accrued and unpaid Late Charges on Principal and Interest, if any.

(a)     Securities Contract. The Company and the Holder hereby acknowledge and agree that the Securities Purchase Agreement and the Note Purchase Agreement (as defined in the Securities Purchase Agreement) each is a "securities contract" as defined in 11 U.S.C. § 741 and that the Holder shall have all rights in respect of this Note, the Master Netting Agreement (as defined in the Securities Purchase Agreement), the Investor Note, the Securities Purchase Agreement and the Note Purchase Agreement as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), including, without limitation, all rights of credit,

---

[2] Insert date that is 18 months immediately following the Issuance Date.

EMPGNUS0009449

deduction, setoff, offset, Netting, and netting (collectively, **"Netting"** or **"Net"**) as are available under this Note, the Master Netting Agreement and the Investor Note and all Netting provisions of this Note, the Investor Note and the Master Netting Agreement, including without limitation the provisions set forth in Section 7 of the Investor Note, are hereby incorporated in this Note and made a part hereof as if such provisions were set forth herein.

(b)        <u>Investor Prepayments; No Share Issuance or Sales until Fully Paid</u>. Upon the consummation of any Investor Prepayment, the aggregate outstanding Restricted Principal under this Note shall automatically become Unrestricted Principal hereunder, on a dollar-for-dollar basis, in an amount equal to the aggregate amount of cash paid in such Investor Prepayment.  Notwithstanding anything herein to the contrary, the shares of Common Stock issuable upon conversion of Restricted Principal hereunder shall not be required to be issued by the Company until such portion of the Investor Note equivalent to the Restricted Principal subject to such conversion has been fully paid pursuant to an Investor Prepayment or otherwise (to the Company or to such other Persons as directed by the Company in writing) and such Restricted Principal becomes Unrestricted Principal in accordance with the preceding sentence.

(c)        <u>Prohibited Transfer or Severability Reduction</u>.  Upon any Prohibited Transfer (as defined in the Investor Note) of the Investor Note, (x) the Investor Note shall be deemed paid in full and shall be null and void, and (y) 75% of the remaining Restricted Principal of this Note shall be automatically cancelled with the remaining 25% of the Restricted Principal of this Note automatically becoming Unrestricted Principal hereunder.

(d)        <u>Investor Netting Right Reduction</u>.  Upon any exercise by the Holder of Investor Netting Rights, the Restricted Principal hereunder shall automatically and simultaneously be reduced, on a dollar-for-dollar basis, by such portion of the aggregate principal of the Investor Note cancelled pursuant to such Investor Netting Rights.

(e)        <u>Single Integrated Transaction</u>.  The Company hereby acknowledges and agrees that (i) the Holder shall be entitled to exercise the Investor Netting Rights through any means permissible under applicable law, including without limitation, Netting and (ii) the obligations of the Holder under the Investor Note and the obligations of the Company under this Note arise in a single integrated transaction and constitute related and interdependent obligations within such transaction.

(f)        <u>Grant of Security Interest</u>.  In addition to the security interest granted to the Collateral Agent for the benefit of the Holder and the holders of the Other Notes pursuant to the Security Documents, the Company hereby grants and pledges to the Holder a continuing security interest in the Investor Note of the Holder, including any and all cash, proceeds, funds, credits, rights and other assets therein or arising therefrom, from time to time, and any additions, dividends, profits and interest in the foregoing and any replacements or substitutions therefore (collectively, the **"Investor Note Collateral"**) to secure prompt repayment of any and all amounts outstanding hereunder from time to time and to secure prompt performance by the Company of each of its covenants and duties under this Note. Such security interest constitutes a valid, first priority security interest in

EMPGNUS0009450

the Investor Note Collateral, and will constitute a valid, first priority security interest in later-acquired Investor Note Collateral. Notwithstanding any filings undertaken related to the Holder's rights under the Nevada Uniform Commercial Code, the Holder's Lien on the Investor Note Collateral shall remain in effect for so long as any Restricted Principal remains outstanding.

(g) Order of Conversion and/or Redemption. Notwithstanding anything herein to the contrary, at any time after no Initial Unrestricted Principal remains outstanding, with respect to any partial conversion or redemption hereunder, as applicable, the Company shall convert or redeem, as applicable, First, all accrued and unpaid Late Charges on any Principal and Interest hereunder and under any other Notes held by such Holder, Second, all accrued and unpaid Interest hereunder and under any other Notes held by such Holder, Third, all other amounts owed (other than Principal) hereunder and under any other Notes held by such Holder and, Fourth, all Principal (other than Restricted Principal) outstanding hereunder and under any other Notes held by such Holder, in each case, immediately prior to any such conversion or redemption, as applicable, in each case, allocated pro rata among this Note and such other Notes held by such Holder.

(2) INTEREST. No Interest shall accrue hereunder unless and until an Event of Default has occurred. From and after the occurrence and during the continuance of any Event of Default, Interest shall accrue hereunder at eighteen percent (18.0%) per annum (the "**Default Rate**") and shall be computed on the basis of a 360-day year and twelve 30-day months and shall be payable, if applicable, in arrears on the last Business Day of any Calendar Quarter during which Interest accrues hereunder (an "**Interest Date**") to the record holder of this Note in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holder in writing to the Company. Accrued and unpaid Interest, if any, shall also be payable prior to an Interest Date by way of inclusion of the Interest in the Conversion Amount (as defined in Section 3(b)(i)) on each (i) Conversion Date (as defined in Section 3(c)(i)) in accordance with Section 3(c)(i) and/or (ii) upon any redemption hereunder occurring prior to the Maturity Date, including, without limitation, upon a Bankruptcy Event of Default redemption. In the event that an Event of Default is subsequently cured (and no other Event of Default then exists (including, without limitation, for the Company's failure to pay such Interest at the Default Rate on the Maturity Date)), Interest shall cease to accrue hereunder as of the calendar day immediately following the date of such cure; provided that the Interest as calculated and unpaid during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of such cure of such Event of Default; provided, further, that for the purpose of this Section 2, such Event of Default shall not be deemed cured unless and until any accrued and unpaid Interest shall be paid to the Holder.

(3) CONVERSION OF NOTES. At any time or times after the Issuance Date, this Note shall be convertible into shares of Common Stock, on the terms and conditions set forth in this Section 3.

(a) Conversion Right. Subject to the provisions of Section 3(d), at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below). The

EMPGNUS0009451

Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount.

(b)    Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i)    "**Conversion Amount**" means the sum of (A) the portion of the Principal to be converted, amortized, redeemed or otherwise with respect to which this determination is being made, (B) accrued and unpaid Interest, if any, with respect to such Principal and (C) accrued and unpaid Late Charges, if any, with respect to such Principal and Interest.

(ii)    "**Conversion Price**" means, as of any Conversion Date or other date of determination, $[•][3], subject to adjustment as provided herein; provided, however, upon receipt of Nasdaq Stockholder Approval, $0.21, subject to adjustment as provided herein.

(c)    Mechanics of Conversion.

(i)    Optional Conversion. To convert any Conversion Amount into shares of Common Stock on any date (a "**Conversion Date**"), the Holder shall (A) transmit by facsimile or electronic mail (or otherwise deliver), for delivery on or prior to 11:59 p.m., New York time, on such date, a copy of an executed notice of conversion in the form attached hereto as Exhibit I (a "**Conversion Notice**") to the Company and (B) if required by Section 3(c)(iii), but without delaying the Company's requirement to deliver shares of Common Stock on the applicable Share Delivery Date (as defined below), surrender this Note to a common carrier for delivery to the Company as soon as practicable on or following such date (or an indemnification undertaking with respect to this Note in the case of its loss, theft, destruction or mutilation in compliance with the procedures set forth in Section 20(b)). Each Conversion Notice shall indicate, at the Holder's sole discretion, the portion of the Initial Unrestricted Amount and/or the Other Unrestricted Amount of this Note being converted. Also, in lieu of indicating the portion of the Initial Unrestricted Amount and/or the Other Unrestricted Amount that the Holder elects to convert, the Holder may indicate in a Conversion Notice the number of shares of Common Stock it seeks to receive upon conversion of any portion of this Note (and the percentage of such Conversion Amount that the Holder elects to allocate to the Initial Unrestricted Amount and the percentage of such Conversion Amount that the Holder elects to allocate to the Other Unrestricted Amount) and the reduction of the Conversion Amount pursuant to such conversion shall be determined at the end of such Conversion Date by multiplying

---

[3] Insert $0.125 plus the lower of (i) the arithmetic average of the five (5) Closing Prices of the Common Stock immediately prior to the immediately prior to signing definitive documents and (ii) the last Closing Prices of the Common Stock immediately prior to signing definitive documents.

EMPGNUS0009452

such number of shares of Common Stock by the applicable Conversion Price. No ink-original Conversion Notice shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Conversion Notice be required. On or before the first (1st) Business Day following the date of delivery of a Conversion Notice, the Company shall transmit by facsimile or electronic mail a confirmation of receipt of such Conversion Notice to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the earlier of (i) the second (2nd) Trading Day and (ii) the number of Trading Days comprising the Standard Settlement Period, in each case, following the date on which the Holder has delivered a Conversion Notice to the Company (a "**Share Delivery Date**"), the Company shall (x) provided that the Transfer Agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program and (A) the Conversion Shares are subject to an effective resale registration statement in favor of the Holder or (B) if converted at a time when Rule 144 would be available for immediate resale of the Conversion Shares by the Holder, credit such aggregate number of Conversion Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, credit such aggregate number of shares of Common Stock to which the Holder shall be entitled to the Holder's or its designee's balance account with DTC through its Deposit Withdrawal At Custodian system or (y) if (A) the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or (B) the Conversion Shares are not subject to an effective resale registration statement in favor of the Holder and, if converted at a time when Rule 144 would not be available for immediate resale of the Conversion Shares by the Holder, issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled. If this Note is physically surrendered for conversion as required by Section 3(c)(iii) and the outstanding Principal of this Note is greater than the Principal portion of the Conversion Amount being converted, then the Company shall as soon as practicable and in no event later than three (3) Business Days after delivery of this Note and at its own expense, issue and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal not converted. The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the applicable Conversion Date, irrespective of the date such Conversion Shares are credited to the Holder's account with DTC or the date of delivery of the certificates evidencing such Conversion Shares, as the case may be. In the event that the Holder elects to convert a portion of the Principal amount of this Note prior to any applicable Installment Date, the Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder to the Holder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(ii)     Company's Failure to Timely Convert. If the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to the Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or if converted, at a time when the Conversion Shares are not subject to an effective resale registration statement in favor of the Holder and Rule 144 would not be

EMPGNUS0009453

available for immediate resale of the Conversion Shares by the Holder, or credit the Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program and (a) the Conversion Shares are subject to an effective resale registration statement in favor of the Holder or (b) if converted at a time when Rule 144 would be available for immediate resale of the Conversion Shares by the Holder, for the number of shares of Common Stock to which the Holder is entitled upon the Holder's conversion of any Conversion Amount (a "**Conversion Failure**"), then (A) the Company shall pay damages to the Holder for each Trading Day of such Conversion Failure in an amount equal to 1.25% of the product of (1) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, and (2) any trading price of the Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Conversion Date and ending on the applicable Share Delivery Date and (B) the Holder, upon written notice to the Company, may void its Conversion Notice with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Conversion Notice; provided that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 3(c)(ii) or otherwise. In addition to the foregoing, if the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to the Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, or credit the Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, for the number of shares of Common Stock to which the Holder is entitled upon the Holder's conversion of any Conversion Amount or on any date of the Company's obligation to deliver shares of Common Stock as contemplated pursuant to clause (y) below, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) Common Stock to deliver in satisfaction of a sale by the Holder of Common Stock issuable upon such conversion that the Holder anticipated receiving from the Company (a "**Buy-In**"), then the Company shall, within three (3) Trading Days after the Holder's request and in the Holder's discretion, either (x) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "**Buy-In Price**"), at which point the Company's obligation to issue and deliver such certificate or credit the Holder's balance account with DTC for the shares of Common Stock to which the Holder is entitled upon the Holder's conversion of the applicable Conversion Amount shall terminate, or (y) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such shares of Common Stock or credit the Holder's balance account with DTC for such shares of Common Stock and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the price at which the sell order giving rise to such purchase obligation was executed.

(iii)    Registration; Book-Entry. The Company shall maintain a register (the "**Register**") for the recordation of the names and addresses of the holders of each Note and the Initial Unrestricted Principal, Other Unrestricted Principal and Restricted Principal (and stated interest thereon) held by such holders (the "**Registered Notes**"). The entries in the Register shall be conclusive and binding for all purposes absent

EMPGNUS0009454

manifest error. The Company and the holders of the Notes shall treat each Person whose name is recorded in the Register as the owner of a Note for all purposes, including, without limitation, the right to receive payments of Principal and Interest, if any, hereunder, notwithstanding notice to the contrary. A Registered Note may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Upon its receipt of a request to assign or sell all or part of any Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 20. Notwithstanding anything to the contrary in this Section 3(c)(iii), the Holder may assign any Note or any portion thereof to an Affiliate of the Holder or a Related Fund of the Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a **"Related Party Assignment"**); provided, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until the Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the **"Related Party Register"**) comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless (A) the full Conversion Amount represented by this Note is being converted or (B) the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Initial Unrestricted Principal, Other Unrestricted Principal, Interest and Late Charges, if any, converted and/or paid (as the case may be) or Restricted Principal becoming unrestricted and the dates of such conversions, Investor Prepayments and/or payments (as the case may be) or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion. If the Company does not update the Register to record such Principal, Interest and Late Charges converted and/or paid (as the case may be) or Restricted Principal becoming unrestricted and the dates of such conversions, Investor Prepayment and/or payments (as the case may be) within two (2) Business Days of such occurrence, then the Register shall be automatically deemed updated to reflect such occurrence.

(iv)    Pro Rata Conversion; Disputes. In the event that the Company receives a Conversion Notice from the Holder and one or more holders of Other Notes for the same Conversion Date and the Company can convert some, but not all, of such portions of this Note and/or Other Notes submitted for conversion, the Company, subject to Section 3(d), shall convert from the Holder and each holder of Other Notes electing to have Notes converted on such date a pro rata amount of such holder's pro rata amount of such holder's portion of the Note and its Other Notes submitted for conversion

EMPGNUS0009455

based on the Principal amount of this Note and the Other Notes submitted for conversion on such date by such holder relative to the aggregate Principal amount of this Note and all Other Notes submitted for conversion on such date.  In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 25.

(d)    Conversion Limitations.

(i)    Beneficial Ownership.  Notwithstanding anything to the contrary contained herein, the Company shall not issue any shares of Common Stock pursuant to the terms of this Note, and the Holder shall not have the right to any shares of Common Stock otherwise issuable pursuant to the terms of this Note and such issuance shall be null and void and treated as if never made, to the extent that after giving effect to such issuance, the Holder together with the other Attribution Parties collectively would beneficially own in excess of [4.99] [9.99][4]% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such issuance.  For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon conversion of this Note with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (i) conversion of the remaining, nonconverted portion of this Note beneficially owned by the Holder or any of the other Attribution Parties and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including the Warrants) beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 3(d)(i).  For purposes of this Section 3(d)(i), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act.  For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the conversion of the Note without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (i) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (ii) a more recent public announcement by the Company or (iii) any other written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**").  If the Company receives a Conversion Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Conversion Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 3(d)(i), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of shares of Common Stock to be purchased pursuant to such Conversion Notice.  For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Trading Day confirm orally and in writing or by

---

[4] Insert Maximum Percentage as indicated on the Buyer's signature page attached to the Securities Purchase Agreement.

EMPGNUS0009456

electronic mail to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Note, by the Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon conversion of this Note results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the Exchange Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of Notes that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Note in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the Exchange Act. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 3(d)(i) to the extent necessary to correct this paragraph (or any portion of this paragraph) which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 3(d)(i) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Note.

(ii)    Principal Market Regulation. The Company shall not be obligated to issue any shares of Common Stock pursuant to the terms of this Note, and the Holder shall not have the right to receive pursuant to the terms of this Note any shares of Common Stock, to the extent the issuance of such shares of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue pursuant to the terms of the Notes and upon exercise of the Warrants without breaching the Company's obligations under the rules or regulations of the Principal Market (the "**Exchange Cap**"), except that such limitation shall not apply in the event that the Company obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of Common Stock in excess of such amount ("**Nasdaq Stockholder Approval**"). Until such approval is obtained, no Buyer shall be issued in the aggregate, pursuant to the terms of the Notes and upon exercise of the Warrants, shares of Common Stock in an amount greater than the product of the Exchange Cap multiplied by a fraction, the numerator of which is the Principal amount of Notes issued to such Buyer pursuant to the Securities Purchase Agreement on the Issuance Date and the denominator of which is the aggregate principal amount of all Notes issued to the Buyers pursuant to the Securities Purchase Agreement on the Issuance Date (with respect to each Buyer, the "**Exchange Cap Allocation**"). In the event that any Buyer shall sell or otherwise transfer any of such Buyer's Notes, the transferee shall be allocated a pro rata portion of such Buyer's Exchange Cap Allocation with respect to such portion of such Notes transferred, and the restrictions of the prior sentence shall apply to such

EMPGNUS0009457

transferee with respect to the portion of the Exchange Cap Allocation allocated to such transferee. In the event that any holder of Notes shall convert all of such holder's Notes and exercise all of such holder's Warrants into a number of shares of Common Stock which, in the aggregate, is less than such holder's Exchange Cap Allocation, then the difference between such holder's Exchange Cap Allocation and the number of shares of Common Stock actually issued to such holder shall be allocated to the respective Exchange Cap Allocations of the remaining holders of Notes and Warrants on a pro rata basis in proportion to the number of shares of Common Stock underlying the Notes and SPA Warrants then held by each such holder. In the event that the Company is prohibited from issuing any shares of Common Stock for which a Conversion Notice has been delivered as a result of the operation of this Section 3(d)(ii), the Company shall within two (2) Trading Days of the applicable attempted conversion pay cash in exchange for cancellation of the Conversion Amount that is subject to such Conversion Notice, at a price per share of Common Stock that would have been issuable upon such conversion if this Section 3(d)(ii) were not in effect, equal to the greater of (x) the Closing Price of the Common Stock and (y) the arithmetic average of the Closing Prices of the Common Stock during the five (5) Trading Days, in each case, immediately preceding the applicable attempted conversion (or if any such date is not a Trading Day, the last Trading Day prior to such date). [TWO POINTS, I SIMPLIFIED EVERYTHING TO BE CLOSING PRICE. SECOND, IF NOTHING IS ADJUSTED BELOW MARKET BEFORE STOCKHOLDER APPROVAL DO WE NEED THIS OR ARE WE JUST ASSUMING NASDAQ WILL APPROVE IT QUICKER? THEORETICALLY YOU NEED ONE OR THE OTHER BUT NOT BOTH]

(4)    RIGHTS UPON EVENT OF DEFAULT.

(a)    Event of Default. Each of the following events shall constitute an **"Event of Default"** and each of the events in clauses (vi) and (vii) shall constitute a **"Bankruptcy Event of Default"**:

(i)    (A) the suspension of the Common Stock from trading on an Eligible Market for a period of two (2) consecutive Trading Days or for more than an aggregate of ten (10) Trading Days in any 365-day period or (B) the failure of the Common Stock to be listed on an Eligible Market;

(ii)    the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within five (5) Business Days after the applicable Conversion Date or (B) notice, written or oral, to the Holder or any holder of the Other Notes, including by way of public announcement or through any of its agents, at any time, of its intention not to comply with a request for conversion of this Note or any Other Notes into shares of Common Stock that is tendered in accordance with the provisions of this Note or the Other Notes, other than pursuant to Section 3(d) (and analogous provisions under the Other Notes);

(iii)    at any time following the fifth (5th) consecutive Business Day that the Holder's Authorized Share Allocation is less than the Holder's Pro Rata Amount of the applicable Required Reserve Amount (as defined in Section 11(a));

EMPGNUS0009458

(iv)    the Company's failure to pay to the Holder any amount of Principal, Interest, Late Charges, Redemption Price or other amounts when and as due under this Note or any other Transaction Document, except, in the case of a failure to pay Interest and/or Late Charges when and as due, in which case only if such failure continues for a period of at least an aggregate of two (2) Business Days;

(v)    the occurrence of any default (after lapse of any applicable cure periods) under, redemption of or acceleration prior to maturity of at least an aggregate of $100,000 of Indebtedness of the Company or any of its Subsidiaries other than with respect to this Note or any Other Notes;

(vi)    the Company or any of its Subsidiaries, pursuant to or within the meaning of Title 11, U.S. Code, or any similar federal, foreign or state law for the relief of debtors (collectively, **"Bankruptcy Law"**), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a **"Custodian"**), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(vii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries;

(viii)    a final judgment or judgments for the payment of money aggregating in excess of $100,000 are rendered against the Company or any of its Subsidiaries and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $100,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company or such Subsidiary (as the case may be) will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment;

(ix)    other than as specifically set forth in another clause of this Section 4(a), the Company or any of its Subsidiaries breaches any representation, warranty, in any material respect (other than representations or warranties subject to Material Adverse Effect or materiality, which may not be breached in any respect), covenant or other term or condition of any Transaction Document, except, in the case of a breach of a covenant or other term or condition of any Transaction Document which is curable, only if such breach remains uncured for a period of at least five (5) consecutive Business Days;

(x)    any breach or failure in any respect to comply with either Sections 8, 16 or 17 of this Note;

DOC ID - 32122650.9                                    - 12 -

EMPGNUS0009459

(xi)    the Company or any Subsidiary shall fail to perform or comply with any covenant or agreement contained in the Security Agreement to which it is a party;

(xii)    any material provision of this Note or any Security Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiii)    this Note, any Security Document or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (as defined in Section 16(b)) in favor of the Holder or the Collateral Agent for the benefit of the holders of the Notes on the Investor Note Collateral and any Collateral purported to be covered hereby and thereby;

(xiv)    any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xv)    any material damage to, or loss, theft or destruction of, any Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(xvi)    a false or inaccurate certification (including a false or inaccurate deemed certification) by the Company that the Equity Conditions are satisfied or that there has been no Equity Conditions Failure or as to whether any Event of Default has occurred;

(xvii)    any Material Adverse Effect occurs;

EMPGNUS0009460

(xviii) the Company fails to remove any restrictive legend on any certificate or any shares of Common Stock issued to the Holder upon conversion or exercise (as the case may be) of any Securities and when required by such Securities or the Securities Purchase Agreement, unless otherwise then prohibited by applicable federal securities laws, and any such failure remains uncured for at least five (5) consecutive Trading Days; or

(xix)   any Event of Default (as defined in the Other Notes) occurs with respect to any Other Notes.

(b)    Redemption Right. Upon the occurrence of an Event of Default with respect to this Note or any Other Note, the Company shall within one (1) Business Day deliver written notice thereof via facsimile or electronic mail and overnight courier (an "**Event of Default Notice**") to the Holder.  At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Holder may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of this Note by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note the Holder is electing to require the Company to redeem.  Each portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding such Event of Default and ending on the date the Holder delivers the Event of Default Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**Event of Default Redemption Price**").   Redemptions required by this Section 4(b) shall be made in accordance with the provisions of Section 12.  To the extent redemptions required by this Section 4(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 4, but subject to Section 3(d), until the Event of Default Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 4(b) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3.  In the event of a partial redemption of this Note pursuant hereto, the Principal amount redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Event of Default Redemption Notice.  The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 4(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder.  Accordingly, any Event of Default redemption premium due under this Section 4(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(c)    Mandatory Redemption upon Bankruptcy Event of Default. Notwithstanding anything to the contrary herein, and notwithstanding any conversion that is then required or in process, upon any Bankruptcy Event of Default, whether occurring prior to or

EMPGNUS0009461

following the Maturity Date, the Company shall immediately pay to the Holder an amount in cash representing 125% of all outstanding Principal, accrued and unpaid Interest, if any, and accrued and unpaid Late Charges, if any, on such Principal and Interest, in addition to any and all other amounts due hereunder (the **"Bankruptcy Event of Default Redemption Price"**), without the requirement for any notice or demand or other action by the Holder or any other Person, except that any Restricted Principal then outstanding hereunder shall be satisfied through Bankruptcy Event of Default Netting (as defined in the Investor Note) (in lieu of such cash payment hereunder); provided that the Holder may, in its sole discretion, waive such right to receive payment upon a Bankruptcy Event of Default, in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect of such Bankruptcy Event of Default, any right to conversion, and any right to payment of the Event of Default Redemption Price or any other Redemption Price, as applicable.

(5)    RIGHTS UPON FUNDAMENTAL TRANSACTION AND CHANGE OF CONTROL.

(a)    Assumption.    If, at any time while this Note is outstanding, a Fundamental Transaction occurs or is consummated, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each share of Common Stock that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder (without regard to any limitation in Section 3(d) on the conversion of this Note), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the **"Alternate Consideration"**) receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Note is convertible immediately prior to such Fundamental Transaction (without regard to any limitation in Section 3(d) on the conversion of this Note).  For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration.  If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction.  The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the **"Successor Entity"**) to assume in writing all of the obligations of the Company under this Note in accordance with the provisions of this Section 4(a) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Note a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Note which is convertible for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon conversion of this Note (without regard to any limitations on the conversion of this Note) prior to such Fundamental Transaction, and with a conversion price which applies the conversion price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such

EMPGNUS0009462

Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such conversion price being for the purpose of protecting the economic value of this Note immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Note with the same effect as if such Successor Entity had been named as the Company herein.

(b)      Redemption Right.  No sooner than twenty (20) days nor later than fifteen (15) days prior to the consummation of a Change of Control, but not prior to the public announcement of such Change of Control, the Company shall deliver written notice thereof via facsimile or electronic mail and overnight courier to the Holder (a "**Change of Control Notice**"). At any time during the period beginning on the earlier to occur of (x) any oral or written agreement by the Company or any of its Subsidiaries, upon consummation of which the transaction contemplated thereby would reasonably be expected to result in a Change of Control, (y) the Holder becoming aware of a Change of Control if the Change of Control Notice is not delivered to the Holder in accordance with the immediately preceding sentence (as applicable) and (z) the Holder's receipt of a Change of Control Notice and ending twenty (20) Trading Days after the date of the consummation of such Change of Control, the Holder may require the Company to redeem (a "**Change of Control Redemption**") all or any portion of this Note by delivering written notice thereof ("**Change of Control Redemption Notice**") to the Company, which Change of Control Redemption Notice shall indicate the Conversion Amount the Holder is electing to require the Company to redeem.  The portion of this Note subject to redemption pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding the earlier to occur of (x) the consummation of the Change of Control and (y) the public announcement of such Change of Control and ending on the date the Holder delivers the Change of Control Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**Change of Control Redemption Price**").  Redemptions required by this Section 5 shall be made in accordance with the provisions of Section 12 and shall have priority to payments to stockholders in connection with a Change of Control.  To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments.  Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(d), until the Change of Control Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3.  In the event of a partial redemption of this Note pursuant hereto, the Principal amount redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Change of Control Redemption Notice.  The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future

DOC ID - 32122650.9                                 - 16 -

EMPGNUS0009463

interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Change of Control redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6)    DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS.

(a)    Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, Options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "Distributions"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions (provided, however, that to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to such extent) and the portion of such Distribution shall be held in abeyance for the Holder until such time or times as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such rights (and any rights under this Section 6(a) on such initial rights or on any subsequent such rights to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(b)    Purchase Rights. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "Purchase Rights"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (provided, however, that to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time or times as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase

EMPGNUS0009464

Right or on any subsequent Purchase Right to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(7) ADJUSTMENTS TO CONVERSION PRICE. The Conversion Price will be subject to adjustment from time to time as provided in this Section 7.

(a) Adjustment of Conversion Price upon Issuance of Common Stock. If and whenever on or after the date Nasdaq Stockholder Approval is obtained, the Company issues or sells, or in accordance with this Section 7(a) is deemed to have issued or sold, or the Company publicly announces the issuance or sale of, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock issued or sold, or in accordance with this Section 7(a) is deemed to have been issued or sold, by the Company (x) in connection with any Excluded Securities, (y) for which the Holder received a Distribution in at least an equivalent amount pursuant to Section 6(a) and (z) adjusting the Conversion Price pursuant to Section 7(b)), for a consideration per share (the "**New Issuance Price**") less than a price (the "**Applicable Price**") equal to the Conversion Price in effect immediately prior to such issue or sale or deemed issuance or sale (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance the Conversion Price then in effect shall be reduced to an amount equal to the New Issuance Price. For purposes of determining the adjusted Conversion Price under this Section 7(a), the following shall be applicable:

(i) Issuance of Options. If the Company in any manner grants or sells, or the Company publicly announces the issuance or sale of, any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 7(a)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion exercise or exchange of any Convertible Security issuable upon exercise of such Option. No further adjustment of the Conversion Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities.

(ii) Issuance of Convertible Securities. If the Company in any manner issues or sells, or the Company publicly announces the issuance or sale of, any Convertible Securities and the lowest price per share for which one share of Common Stock

EMPGNUS0009465

is issuable upon the conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 7(a)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security. No further adjustment of the Conversion Price shall be made upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Conversion Price has been or is to be made pursuant to other provisions of this Section 7(a), no further adjustment of the Conversion Price shall be made by reason of such issue or sale.

(iii)     <u>Change in Option Price or Rate of Conversion</u>.  If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exchangeable or exercisable for shares of Common Stock increases or decreases at any time, the Conversion Price in effect at the time of such increase or decrease shall be adjusted to the Conversion Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 7(a)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 7(a) shall be made if such adjustment would result in an increase of the Conversion Price then in effect.

(iv)     <u>Calculation of Consideration Received</u>. If any Option and/or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "**Primary Security**", and such Option and/or Convertible Security and/or Adjustment Right, the "**Secondary Securities**" and together with the Primary Security, each a "**Unit**"), together comprising one integrated transaction (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing), the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be the lowest of (x) the purchase price of such Unit, (y) if such Primary Security

EMPGNUS0009466

is an Option and/or Convertible Security, the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise or conversion of the Primary Security in accordance with Section 7(a)(i) or 7(a)(ii) above and (z) the lowest Weighted Average Price of the Common Stock on any Trading Day during the three (3) Trading Day period immediately following the public announcement of such Dilutive Issuance (for the avoidance of doubt, if such public announcement is released prior to the opening of the Principal Market on a Trading Day, such Trading Day shall be the first Trading Day in such three (3) Trading Day period). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration other than cash received therefor will be deemed to be the net amount received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such publicly traded securities on the date of receipt of such publicly traded securities. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Required Holders. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Business Days after the tenth (10th) day following the Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Required Holders. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company. Notwithstanding anything to the contrary contained in this Section 7(a), if the New Issuance Price calculated pursuant to this Section 7(a) would result in a price less than $0.0001, the New Issuance Price shall be deemed to be $0.0001.

(v)     Record Date. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(vi)     No Readjustments. For the avoidance of doubt, in the event the Conversion Price has been adjusted pursuant to this Section 7(a) and the Dilutive Issuance that triggered such adjustment does not occur, is not consummated, is unwound or is cancelled after the facts for any reason whatsoever, in no event shall the Conversion

EMPGNUS0009467

Price be readjusted to the Conversion Price that would have been in effect if such Dilutive Issuance had not occurred or been consummated.

(b)    Adjustment of Conversion Price upon Subdivision or Combination of Common Stock.  If the Company at any time on or after the Subscription Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced.  If the Company at any time on or after the Subscription Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.  Any adjustment under this Section 7(b) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(c)    Voluntary Adjustment by Company. The Company may at any time during the term of this Note, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(8)    COMPANY CONVERSION OR REDEMPTION.

(a)    General.  On each applicable Installment Date, provided there has been no Equity Conditions Failure, the Company shall pay to the Holder the Installment Amount due on such date by converting all or some of such Installment Amount into Common Stock, in accordance with this Section 8 (a "**Company Conversion**"); provided, however, that the Company may, at its option following written notice to the Holder as set forth below, pay the Installment Amount by redeeming such Installment Amount in cash (a "**Company Redemption**") or by any combination of a Company Conversion and a Company Redemption so long as all of the outstanding applicable Installment Amount due on any Installment Date shall be converted and/or redeemed by the Company on the applicable Installment Date, subject to the provisions of this Section 8.  On or prior to the date which is the twentieth (20th) Trading Day prior to each Installment Date (each, an "**Installment Notice Due Date**"), the Company shall deliver written notice (each, a "**Company Installment Notice**" and the date all of the holders receive such notice is referred to as the "**Company Installment Notice Date**"), to each holder of Notes which Company Installment Notice shall (i) either (A) confirm that the applicable Installment Amount of the Holder's Note shall be converted to Common Stock in whole or in part pursuant to a Company Conversion (such amount to be converted, the "**Company Conversion Amount**") or (B) (1) state that the Company elects to redeem for cash, or is required to redeem for cash in accordance with the provisions of the Notes, in whole or in part, the applicable Installment Amount pursuant to a Company Redemption and (2) specify the portion of such Installment Amount which the Company elects or is required to redeem pursuant to a Company Redemption (such amount to be redeemed, the "**Company Redemption Amount**") and the portion of such Installment Amount that is the Company Conversion Amount, which amounts, when added together, must equal the applicable Installment Amount and (ii) if the Installment Amount is to be paid, in whole or in part, in Common Stock pursuant to a Company Conversion, certify that no Equity Conditions Failure has occurred as of the applicable Company Installment Notice Date.  Each Company Installment Notice shall be irrevocable.  If the Company does not timely deliver a Company Installment Notice

EMPGNUS0009468

in accordance with this Section 8, then the Company shall be deemed to have delivered an irrevocable Company Installment Notice confirming a Company Conversion and shall be deemed to have certified that there shall not have occurred an Equity Conditions Failure in connection with such Company Conversion as of the applicable Company Installment Notice Date.  Except as expressly provided in this Section 8, the Company shall convert and/or redeem the applicable Installment Amount of this Note pursuant to this Section 8 and the corresponding Installment Amounts of the Other Notes pursuant to the corresponding provisions of the Other Notes in the same ratio of the Installment Amount being converted and/or redeemed hereunder.  The Company Conversion Amount (whether set forth in the Company Installment Notice or by operation of this Section 8) shall be converted in accordance with Section 8(b) and the Company Redemption Amount shall be redeemed in accordance with Section 8(c).  Notwithstanding anything herein to the contrary, in the event of any partial conversion or redemption of this Note, the Conversion Amount converted or redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in a written notice to the Company.

(b) <u>Mechanics of Company Conversion</u>.  If the Company delivers a Company Installment Notice and confirms, or is deemed to have confirmed, in whole or in part, a Company Conversion in accordance with Section 8(a), then (1) contemporaneously with the delivery of the Company Installment Notice on the applicable Company Installment Notice Date, the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate for) a number of shares of Common Stock (the "**Initial Pre-Installment Conversion Shares**") equal to the quotient of (x) the Company Conversion Amount related to the applicable Installment Date divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock, (2) in addition, in the event the Holder delivers an Acceleration Notice (as defined in Section 8(e)) by no later than the Trading Day immediately prior to the applicable Installment Date, on the Trading Day immediately following delivery of such Acceleration Notice (such date, the "**Additional Pre-Installment Conversion Shares Date**") the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate for) a number of shares of Common Stock (the "**Additional Pre-Installment Conversion Shares**" and together with the Initial Pre-Installment Conversion Shares, the "**Pre-Installment Conversion Shares**") equal to the quotient of (x) the Accelerated Amount(s) (as defined in Section 8(e)) set forth in such Acceleration Notice divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock and (3) on the applicable Installment Date, the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate) for an additional number of shares of Common Stock, if any, equal to the Installment Balance Conversion Shares; <u>provided</u>, that no Equity Conditions Failure has occurred (or waived in writing by the Holder) on each day during the period commencing on such Company Installment Notice Date through the applicable Installment Date.  On the second (2nd) Trading Day immediately after the end of the applicable Measuring Period, the Company shall deliver a written notice setting forth the calculation of the Installment Balance Conversion Shares (and the calculation of the component parts of such calculation) to the Holder and the holders of the Other Notes.  If an Event

EMPGNUS0009469

of Default occurs during the period from any Company Installment Notice Date through the applicable Installment Date, the Holder may elect an Event of Default Redemption in accordance with Section 4(b) without being required to return to the Company any Pre-Installment Conversion Shares previously delivered to the Holder. All Pre-Installment Conversion Shares and Installment Balance Conversion Shares shall be fully paid and nonassessable shares of Common Stock (rounded to the nearest whole share). If an Equity Conditions Failure occurs as of the applicable Company Installment Notice Date, then unless the Company has elected to redeem such Installment Amount, the Company Installment Notice shall indicate that unless the Holder waives the Equity Conditions Failure, the Installment Amount shall be redeemed for cash. If the Company confirmed (or is deemed to have confirmed by operation of Section 8(a)) the conversion of the applicable Company Conversion Amount, in whole or in part, and there was no Equity Conditions Failure as of the applicable Company Installment Notice Date (or is deemed to have certified that there is no Equity Conditions Failure in connection with any such conversion by operation of Section 8(a)) but an Equity Conditions Failure occurred between the applicable Company Installment Notice Date and any time through the applicable Installment Date (the "**Interim Installment Period**"), the Company shall provide the Holder a subsequent written notice to that effect. If an Equity Conditions Failure occurs (unless waived in writing by the Holder) during such Interim Installment Period, then at the option of the Holder designated in writing to the Company, the Holder may require the Company to do either one or both of the following: (i) the Company shall redeem all or any part designated by the Holder of the Company Conversion Amount (such designated amount is referred to as the "**First Redemption Amount**") on such Installment Date and the Company shall pay to the Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash equal to 130% of such First Redemption Amount and/or (ii) the Company Conversion shall be null and void with respect to all or any part designated by the Holder of the unconverted Company Conversion Amount and the Holder shall be entitled to all the rights of a holder of this Note with respect to such amount of the Company Conversion Amount; provided, however, that the Conversion Price for such unconverted Company Conversion Amount shall thereafter be adjusted to equal the lesser of (A) the Company Conversion Price as in effect on the date on which the Holder voided the Company Conversion and (B) the Company Conversion Price as in effect on the date on which the Holder delivers a Conversion Notice relating thereto. If the Company fails to redeem any First Redemption Amount on or before the applicable Installment Date by payment of such amount on the applicable Installment Date, then the Holder shall have the rights set forth in Section 12(a) as if the Company failed to pay the applicable Company Installment Redemption Price (as defined below) and all other rights under this Note (including, without limitation, such failure constituting an Event of Default described in Section 4(a)(iv)). Notwithstanding anything to the contrary in this Section 8(b), but subject to the limitations set forth in Section 3(d), until the Company credits the Holder's account with DTC, or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issues and delivers to the Holder a certificate for, the shares of Common Stock representing the Company Conversion Amount to the Holder, the Company Conversion Amount may be converted by the Holder into Common Stock pursuant to Section 3. In the event that the Holder elects to convert the Company Conversion Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

EMPGNUS0009470

(c) <u>Mechanics of Company Redemption</u>. If the Company elects a Company Redemption in accordance with Section 8, then the Company Redemption Amount which is to be paid to the Holder on the applicable Installment Date shall be redeemed by the Company and the Company shall pay to the Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash (the **"Company Installment Redemption Price"**) equal to 100% of the Company Redemption Amount. If the Company fails to redeem the Company Redemption Amount on the applicable Installment Date by payment of the Company Installment Redemption Price on such date, then at the option of the Holder designated in writing to the Company (any such designation shall be deemed a **"Conversion Notice"** pursuant to Section 3(c) for purposes of this Note), (i) the Holder shall have the rights set forth in Section 12(a) as if the Company failed to pay the applicable Company Installment Redemption Price and all other rights as a Holder of Notes (including, without limitation, such failure constituting an Event of Default described in Section 4(a)(iv)) and (ii) the Holder may require the Company to convert all or any part of the Company Redemption Amount at the Company Conversion Price as in effect on the applicable Installment Date. Conversions required by this Section 8(c) shall be made in accordance with the provisions of Section 3(c). Notwithstanding anything to the contrary in this Section 8(c), but subject to Section 3(d), until the Company Installment Redemption Price is paid in full, the Company Redemption Amount may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. In the event the Holder elects to convert all or any portion of the Company Redemption Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Redemption Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(d) <u>Deferred Installment Amount</u>. Notwithstanding any provision of this Section 8 to the contrary, the Holder may from time to time, at its option and in its sole discretion, deliver a written notice (a **"Deferral Notice"**) to the Company no later than the Business Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of an Installment Amount payable on such Installment Date deferred (such amount(s) deferred, the **"Deferral Amount"**) until (i) any subsequent Installment Date selected by the Holder, in its sole discretion, in which case, the Deferral Amount shall be added to, and become part of, the Installment Amount to be paid on such subsequent Installment Date or (ii) until the last Business Day of any calendar month following the last Installment Date occurring hereunder, which date may be after the Scheduled Maturity Date hereunder. Any Deferral Notice delivered by the Holder pursuant to this Section 8(d) shall set forth (i) the Deferral Amount and (ii) the date that such Deferral Amount shall now be payable.

(e) <u>Accelerated Installment Amount</u>. Notwithstanding any provision of this Section 8 to the contrary, the Holder may, at its option and in its sole discretion, deliver a written notice to the Company (an **"Acceleration Notice"**) no later than the Trading Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of any or all Installment Amount(s) scheduled to be paid on future Installment Dates after the applicable Installment Date accelerated (such amount(s) accelerated, the **"Accelerated Amount(s)"**) to be paid on the applicable Installment Date pursuant to a Company Conversion, in which case, such Accelerated Amount(s) shall be added to, and become part of, the Installment Amount as such Installment Amount may have been increased pursuant to the terms hereof, payable on such

EMPGNUS0009471

applicable Installment Date by including such Accelerated Amount(s) in the Installment Amount for the applicable Installment Date and shall be payable in Common Stock regardless of whether the Installment Amount scheduled to be paid on such applicable Installment Date in accordance with the provisions of this Section 8 shall be paid in cash, shares of Common Stock or a combination thereof; provided, however, that in the event that the Holder delivers one or more Acceleration Notice(s) with respect to an Installment Date, the aggregate Accelerated Amount(s) with respect to such Installment Date shall not be greater than three (3) times the Holder's Pro Rata Amount of $_____.  Any Acceleration Notice delivered by the Holder pursuant to this Section 8(e) shall set forth (i) the Accelerated Amount(s) and (ii) the date that such Accelerated Amount should have been paid if not for the Holder's right to accelerate such Installment Amount(s) pursuant to this Section 8(e).

(9)    OPTIONAL REDEMPTION AT THE COMPANY'S ELECTION.  At any time after the Issuance Date, the Company shall have the right to redeem all, but not less than all, of the Conversion Amount (as defined in the Notes) then remaining under this Note, the Other Notes (the "**Company Optional Redemption Amount**") as designated in the Company Optional Redemption Notice on the Company Optional Redemption Date (each as defined below) (a "**Company Optional Redemption**").  This Note and the Other Notes subject to redemption pursuant to this Section 9 shall be redeemed by the Company on the Company Optional Redemption Date in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holder in writing to the Company at a price equal to: (i) so long as there has been no Equity Conditions Failure during the period beginning on the Company Optional Redemption Notice Date (as defined below) through the Company Optional Redemption Date (as defined below), 100% of the Conversion Amount to be redeemed and (ii) if an Equity Conditions Failure occurs (which is not waived in writing by the Holder) at any time during the period beginning on the Company Optional Redemption Notice Date through the Company Optional Redemption Date (the "**Company Optional Redemption Interim Period**"), the greater of (x) 130% of the Conversion Amount to be redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding the Company Optional Redemption Notice Date and ending on the Company Optional Redemption Date, by (II) the lowest Conversion Price in effect during such period (the "**Company Optional Redemption Price**").  The Company may exercise its right to require redemption under this Section 9 by delivering a ten (10 Trading Days prior written notice thereof by facsimile or electronic mail and overnight courier to the Holder and all, but not less than all, of the holders of the Other Notes (the "**Company Optional Redemption Notice**" and the date all of the holders of the Notes received such notice is referred to as the "**Company Optional Redemption Notice Date**"). The Company Optional Redemption Notice shall be irrevocable.  The Company Optional Redemption Notice shall (i) state the date on which the Company Optional Redemption shall occur (the "**Company Optional Redemption Date**"), which date shall be the tenth (10th) Trading Day immediately following the Company Optional Redemption Notice Date, (ii) state the aggregate Conversion Amount of the Notes which the Company has elected to be subject to Company Optional Redemption from the Holder and all of the holders of the Other Notes pursuant to this Section 9 (and analogous provisions under the Other Notes) on the Company Optional Redemption Date, (iii) state the applicable Company Optional Redemption Price in the event: (x) no Equity Conditions Failure occurs during the Company Optional Redemption Interim Period and (y) an Equity Conditions Failure has occurred or will occur (which is not waived in writing by the Holder)

DOC ID - 32122650.9                                      - 25 -

EMPGNUS0009472

during the Company Optional Redemption Interim Period. If the Company confirmed that there was no such Equity Conditions Failure as of the Company Optional Redemption Notice Date but an Equity Conditions Failure occurs at any time during the Company Optional Redemption Interim Period, the Company shall provide the Holder a subsequent written notice to that effect. Notwithstanding anything to the contrary in this Section 9, until the Company Optional Redemption Price is paid, in full, the Company Optional Redemption Amount may be converted, in whole or in part, by the Holder into shares of Common Stock pursuant to Section 3. All Conversion Amounts converted by the Holder after the Company Optional Redemption Notice Date shall reduce the Company Optional Redemption Amount of this Note required to be redeemed on the Company Optional Redemption Date, unless the Holder otherwise indicates in the applicable Conversion Notice. Company Optional Redemptions made pursuant to this Section 9 shall be made in accordance with Section 12. To the extent redemptions required by this Section 9 are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 9, the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. If the Company elects to cause a Company Optional Redemption pursuant to Section 9, then it must simultaneously take the same action in the same proportion with respect to the Other Notes.

(10)    NONCIRCUMVENTION. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(11)    RESERVATION OF AUTHORIZED SHARES.

(a) Reservation. From and after the date the Company obtains the Share Increase Approval (as defined in the Securities Purchase Agreement), the Company shall reserve a number of authorized and otherwise unreserved shares of Common Stock to satisfy its obligation to issue shares of Common Stock upon conversion of this Note and the Other Notes equal to at least the number of shares of Common Stock issuable pursuant to the terms of the Notes equal to $[●][5] without regard to any limitation on conversion set forth herein and corresponding provisions in the Other Notes (the "**Final Required Reserve Amount**"). Prior to the date the Company obtains the Share Increase Approval, the Company shall reserve a number of authorized and otherwise unreserved shares of Common Stock to satisfy its obligation to issue shares of Common Stock upon conversion of this Note and the Other Notes equal to the lesser of (i) the maximum number of shares of Common Stock required under the Final Required Reserve Amount and (ii) the maximum number of shares of Common Stock that is then available and otherwise authorized and unreserved after the Company first complies with its reservation requirements with respect to

_____

[5] Insert 20% of the arithmetic average of the Closing Prices of the Common Stock for the five (5) Trading Days, in each case, immediately prior to signing definitive documents.

EMPGNUS0009473

the Warrants (the **"Initial Required Reserve Amount"** and together with the Final Required Reserve Amount the **"Required Reserve Amount"**). So long as any of this Note and the Other Notes are outstanding, the Company shall take all action necessary to reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of this Note and the Other Notes, the applicable Required Reserve Amount necessary to effect the conversion of all of the Notes then outstanding; provided, that at no time shall the number of shares of Common Stock so reserved be less than the applicable Required Reserve Amount. The initial number of shares of Common Stock reserved for conversions of this Note and the Other Notes and each increase in the number of shares so reserved shall be allocated pro rata among the Holder, the holders of the Other Notes based on the Principal amount of this Note and the Other Notes held by each holder at the Closing (as defined in the Securities Purchase Agreement) or increase in the number of reserved shares, as the case may be (the **"Authorized Share Allocation"**). In the event that a holder shall sell or otherwise transfer this Note or any of such holder's Other Notes, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Notes shall be allocated to the Holder, the remaining holders of Other Notes, pro rata based on the Principal amount of this Note and the Other Notes then held by such holders.

(b)     Insufficient Authorized Shares. Without limiting the generality of the provisions set forth in Section 4(m) of the Securities Purchase Agreement, if at any time while any of the Notes remain outstanding the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve for issuance upon conversion of the Notes at least a number of shares of Common Stock equal to the applicable Required Reserve Amount (an **"Authorized Share Failure"**), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the applicable Required Reserve Amount for the Notes then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall either (x) obtain the majority written consent of its stockholders for the approval of an increase in the number of authorized shares of Common Stock and provide each stockholder with an information statement or (y) hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its Board of Directors to recommend to the stockholders that they approve such proposal. Notwithstanding the foregoing, if during any such time of an Authorized Share Failure, the Company is able to obtain the written consent of a majority of the shares of its issued and outstanding Common Stock to approve the increase in the number of authorized shares of Common Stock, the Company may satisfy this obligation by obtaining such consent and submitting for filing with the SEC an Information Statement on Schedule 14C. If, upon any conversion of this Note, the Company does not have sufficient authorized shares to deliver in satisfaction of such conversion, then unless the Holder elects to rescind such attempted conversion, the Holder may require the Company to pay to the Holder within three (3) Trading Days of the applicable attempted conversion, cash in an amount equal to the product of (i) the number of shares of Common Stock that the Company is unable to deliver pursuant to this Section 11, and (ii) the highest Closing Price

EMPGNUS0009474

of the Common Stock during the period beginning on the date of the applicable Conversion Date and ending on the date the Company makes the applicable cash payment.

(12) REDEMPTIONS.

(a) Mechanics.  The Company shall deliver the applicable Event of Default Redemption Price to the Holder within three (3) Business Days after the Company's receipt of the Holder's Event of Default Redemption Notice; provided that upon a Bankruptcy Event of Default, the Company shall deliver the applicable Bankruptcy Event of Default Redemption Price in accordance with Section 4(c) (as applicable, the "**Event of Default Redemption Date**").  If the Holder has submitted a Change of Control Redemption Notice in accordance with Section 5(b), the Company shall deliver the applicable Change of Control Redemption Price to the Holder (i) concurrently with the consummation of such Change of Control if such notice is received prior to the consummation of such Change of Control and (ii) within three (3) Business Days after the Company's receipt of such notice otherwise (such date, the "**Change of Control Redemption Date**").  The Company shall deliver the applicable Company Installment Redemption Price to the Holder on the applicable Installment Date.  The Company shall deliver the applicable Company Optional Redemption Price to the Holder on the applicable Company Optional Redemption Date.  The Company shall pay the applicable Redemption Price to the Holder in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the holder in writing to the Company on the applicable due date.  In the event of a redemption of less than all of the Conversion Amount of this Note, the Company shall promptly cause to be issued and delivered to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal which has not been redeemed and any accrued Interest on such Principal which shall be calculated as if no Redemption Notice has been delivered.  In the event that the Company does not pay a Redemption Price to the Holder within the time period required, at any time thereafter and until the Company pays such unpaid Redemption Price in full, the Holder shall have the option, in lieu of redemption, to require the Company to promptly return to the Holder all or any portion of this Note representing the Conversion Amount that was submitted for redemption and for which the applicable Redemption Price has not been paid.  Upon the Company's receipt of such notice, (x) the applicable Redemption Notice shall be null and void with respect to such Conversion Amount, (y) the Company shall immediately return this Note, or issue a new Note (in accordance with Section 20(d)) to the Holder representing such Conversion Amount to be redeemed and (z) the Conversion Price of this Note or such new Notes shall be adjusted to the lesser of (A) the Conversion Price as in effect on the date on which the applicable Redemption Notice is voided and (B) the lowest Closing Price of the Common Stock during the period beginning on and including the date on which the applicable Redemption Notice is delivered to the Company and ending on and including the date on which the applicable Redemption Notice is voided.  The Holder's delivery of a notice voiding a Redemption Notice and exercise of its rights following such notice shall not affect the Company's obligations to make any payments of Late Charges which have accrued prior to the date of such notice with respect to the Conversion Amount subject to such notice.

(b) Redemption by Other Holders.  Upon the Company's receipt of notice from any of the holders of the Other Notes for redemption or repayment as a result of an event or occurrence substantially similar to the events or occurrences described in Section 4(b) or Section 5(b) or pursuant to corresponding provisions set forth in the Other Notes (each, an "**Other Redemption Notice**"), the Company shall immediately, but no later than one (1) Business Day of

EMPGNUS0009475

its receipt thereof, forward to the Holder by facsimile or electronic mail a copy of such notice.  If the Company receives a Redemption Notice and one or more Other Redemption Notices, during the seven (7) Business Day period beginning on and including the date which is three (3) Business Days prior to the Company's receipt of the Holder's Redemption Notice and ending on and including the date which is three (3) Business Days after the Company's receipt of the Holder's Redemption Notice and the Company is unable to redeem all principal, interest and other amounts designated in such Redemption Notice and such Other Redemption Notices received during such seven (7) Business Day period, then the Company shall redeem a pro rata amount from the Holder and each holder of the Other Notes based on the Principal amount of this Note and the Other Notes submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven (7) Business Day period.

(c) <u>Insufficient Assets</u>.  If upon a Redemption Date, the assets of the Company are insufficient to pay the applicable Redemption Price, the Company shall (i) take all appropriate action reasonably within its means to maximize the assets available for paying the applicable Redemption Price, (ii) redeem out of all such assets available therefor on the applicable Redemption Date the maximum possible portion of the applicable Redemption Price that it can redeem on such date, a pro rata among the Holder and the holders of the Other Notes to be redeemed in proportion to the aggregate Principal amount of this Note and the Other Notes outstanding on the applicable Redemption Date and (iii) following the applicable Redemption Date, at any time and from time to time when additional assets of the Company become available to pay the balance of the applicable Redemption Price of this Note and the Other Notes, the Company shall use such assets, at the end of the then current fiscal quarter, to pay the balance of such Redemption Price of this Note and the Other Notes, or such portion thereof for which assets are then available, on the basis set forth above at the applicable Redemption Price, and such assets will not be used prior to the end of such fiscal quarter for any other purpose. Interest on the Principal amount of this Note and the Other Notes that have not been redeemed shall continue to accrue until such time as the Company redeems this Note and the Other Notes. The Company shall pay to the Holder the applicable Redemption Price without regard to the legal availability of funds unless expressly prohibited by applicable law or unless the payment of the applicable Redemption Price could reasonably be expected to result in personal liability to the directors of the Company.

(13) <u>VOTING RIGHTS</u>.  The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(14) <u>SECURITY</u>.  This Note and the Other Notes are secured to the extent and in the manner set forth herein and in the Security Documents.

(15) <u>RANK</u>.  All payments due under this Note (a) shall rank *pari passu* with all Other Notes and (b) shall be senior to all other Indebtedness of the Company and its Subsidiaries.

(16) <u>NEGATIVE COVENANTS</u>.  Until all of the Notes have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall not, and

EMPGNUS0009476

the Company shall not permit any of its Subsidiaries without the prior written consent of the Required Holders to, directly or indirectly:

(a) incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness;

(b) allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its Subsidiaries (collectively, **"Liens"**) other than Permitted Liens;

(c) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (other than this Note and the Other Notes), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing;

(d) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (including, without limitation Permitted Indebtedness other than this Note and the Other Notes), by way of payment in respect of principal of (or premium, if any) such Indebtedness. For clarity, such restriction shall not preclude the payment of regularly scheduled interest payments which may accrue under such Permitted Indebtedness;

(e) redeem or repurchase its Equity Interest (except on a pro rata basis among all holders thereof);

(f) declare or pay any cash dividend or distribution on any Equity Interest of the Company or of its Subsidiaries;

(g) make, any change in the nature of its business as described in the Company's most recent Annual Report filed on Form 10-K with the SEC or modify its corporate structure or purpose;

(h) encumber, license or otherwise allow any Liens on any Intellectual Property, including, without limitation, any claims for damage by way of any past, present, or future infringement of any of the foregoing, in each case, other than Permitted Liens;

(i) enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, license, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair

EMPGNUS0009477

consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof; or

(j) issue any Notes (other than as contemplated by the Securities Purchase Agreement), or issue any other securities that would cause a breach or default under the Notes.

(17)    AFFIRMATIVE COVENANTS.

(a) Until all of the Notes have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall, and the Company shall, except with respect to clause (vi) below, cause each Subsidiary to, unless otherwise agreed to by the Required Holders, directly and indirectly:

(i)    maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except in the case that any such failure to so maintain, preserve or comply has not had and is not reasonably likely to have, a Material Adverse Effect;

(ii)    maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except in the case that any such failure to so maintain, preserve or comply has not had, and is not reasonably likely to have, a Material Adverse Effect;

(iii)    take all action necessary or advisable to maintain all of the Intellectual Property that is necessary or material to the conduct of its business in full force and effect;

(iv)    maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated;

(v)    cause such Subsidiary formed on or after the Subscription Date to execute, and deliver to each holder of Notes a guaranty agreement substantially in the form of the Guarantee Agreement (as defined in the Securities Purchase Agreement) and all other Security Documents as requested by Required Holders, as applicable;

(vi)    maintain on deposit unrestricted and unencumbered (other than the Liens contemplated by the Security Documents) cash in a U.S. bank in an aggregate amount equal to not less than $_____; and

(vii)    notify the Holder and the holders of the Other Notes in writing whenever an Equity Conditions Failure occurs other than with respect to clauses (xi) and

DOC ID - 32122650.9                    - 31 -

EMPGNUS0009478

(xii) of the definition of "Equity Conditions", and simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes, file a Current Report on Form 8-K with the SEC to state such fact.

(b) Cash Burn Covenant.   So long as the Notes are outstanding, the Company's net loss adjusted by excluding non-cash items and charges, shall not exceed $550,000 for any calendar month (each, a "**Cash Burn Milestone**").  On every fifteenth (15th) day of each calendar month (or if such day is not a Business Day, the next following day that is a Business Day) the Company shall: (i) deliver a written notice to the Holder and each holder of the Other Notes certifying whether (x) it has complied with the foregoing and (y) it reasonably expects to comply with the foregoing while this Note or the Other Notes remain outstanding and (ii) in the event the Company is not able to certify as to clause (x) or (y) above, it shall simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes, file a Current Report on Form 8-K with the SEC to state such fact.

(18)   VOTE TO ISSUE, OR CHANGE THE TERMS OF, NOTES.   The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders shall be required for any change or amendment or waiver of any provision to this Note or any of the Other Notes. Any change, amendment or waiver by the Company and the Required Holders shall be binding on the Holder of this Note and all holders of the Other Notes.

(19)   TRANSFER.   This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred by the Holder without the consent of the Company, subject only to the provisions of Section 2(f) of the Securities Purchase Agreement.

(20)   REISSUANCE OF THIS NOTE.

(a)   Transfer.  If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 20(d) and subject to Section 3(c)(iii)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 20(d)) to the Holder representing the outstanding Principal not being transferred.  The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of Section 3(c)(iii) following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b)   Lost, Stolen or Mutilated Note.  Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form (but without any obligation to post a surety or other bond) and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal.

EMPGNUS0009479

(c)    Note Exchangeable for Different Denominations.  This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 20(d)) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d)    Issuance of New Notes.  Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 20(a) or Section 20(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest and Late Charges, if any, on the Principal and Interest of this Note, from the Issuance Date.

(21)    REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF.  The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note.  The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein.  Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof).  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate.  The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(22)    PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS.  If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(23)    CONSTRUCTION; HEADINGS.  This Note shall be deemed to be jointly drafted by the Company and all the Buyers and shall not be construed against any person as the

EMPGNUS0009480

drafter hereof.  The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(24)    FAILURE OR INDULGENCE NOT WAIVER.  No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(25)    DISPUTE RESOLUTION.  In the case of a dispute as to the determination of the Closing Price or the Weighted Average Price or the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Day of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder.  If the Holder and the Company are unable to agree upon such determination or calculation within one (1) Business Day of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within one (1) Business Day submit via facsimile or electronic mail (a) the disputed determination of the Closing Price or the Weighted Average Price to an independent, reputable investment bank selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed, or (b) the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed.  The Company, at the Company's expense, shall cause the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations.  Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(26)    NOTICES; PAYMENTS.

(a)    Notices.  Whenever notice is required to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement.  The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore.  Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least ten (10) Business Days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b)    Payments.  Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the

EMPGNUS0009481

United States of America via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions; provided, that the Holder may elect to receive a payment of cash by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Buyers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement). Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day. Any amount of Principal or other amounts due under the Transaction Documents which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of eighteen percent (18.0%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

(27)    CANCELLATION. After all Principal, accrued Interest and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(28)    WAIVER OF NOTICE. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Securities Purchase Agreement.

(29)    GOVERNING LAW; JURISDICTION; JURY TRIAL. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

EMPGNUS0009482

(30)  SEVERABILITY. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties.  The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(31)  DISCLOSURE. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall contemporaneously with any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise.  In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(32)  CERTAIN DEFINITIONS.  For purposes of this Note, the following terms shall have the following meanings:

(a)  "**Affiliate**" shall have the meaning ascribed to such term in Rule 405 of the Securities Act.

(b)  "**Attribution Parties**" means, collectively, the following Persons: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the Exchange Act.  For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(c)  "**Bloomberg**" means Bloomberg Financial Markets.

(d)  "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

EMPGNUS0009483

(e)    **"Buyers"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(f)    **"Calendar Quarter"** means each of: the period beginning on and including January 1 and ending on and including March 31; the period beginning on and including April 1 and ending on and including June 30; the period beginning on and including July 1 and ending on and including September 30; and the period beginning on and including October 1 and ending on and including December 31.

(g)    **"Change of Control"** means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the Common Stock in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification continue after such reorganization, recapitalization or reclassification to hold publicly traded securities and, directly or indirectly, are, in all material respect, the holders of the voting power of the surviving entity (or entities with the authority or voting power to elect the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities) after such reorganization, recapitalization or reclassification or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(h)    **"Closing Price"** means, for any security as of any date, the closing price for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing price, then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing price or last trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices). If the Closing Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

(i)    **"Closing Date"** shall have the meaning set forth in the Securities Purchase Agreement, which date is the date the Company initially issued Notes pursuant to the terms of the Securities Purchase Agreement.

(j)    **"Collateral"** has the meaning ascribed to such term in the Security Documents.

EMPGNUS0009484

(k)    **"Collateral Agent"** has the meaning ascribed to such term in the Security Documents.

(l)    **"Common Stock"** means (i) the Company's shares of Common Stock, par value $0.001 per share, and (ii) any share capital into which such Common Stock shall have been changed or any share capital resulting from a reclassification of such Common Stock.

(m)    **"Company Conversion Price"** means as of any date of determination, that price which shall be the lower of (i) the Conversion Price then in effect and (ii) the Market Price as of such date of determination.

(n)    **"Contingent Obligation"** means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(o)    **"Conversion Shares"** means shares of Common Stock issuable by the Company pursuant to the terms of any of the Notes, including any related Interest and Late Charges so converted, amortized or redeemed.

(p)    **"Convertible Securities"** means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(q)    **"Eligible Market"** means the Principal Market, The New York Stock Exchange, The NASDAQ Global Market, The NASDAQ Global Select Market, or the NYSE American.

(r)    **"Equity Conditions"** means each of the following conditions: (i) on each day during Equity Conditions Measuring Period, either (x) one or more registration statements filed shall be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, and there shall not have been any suspension of such registration statement(s) or (y) all shares of Common Stock issuable pursuant to the terms of this Note and the Other Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, shall be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (assuming that all Warrants were exercised pursuant to a Cashless Exercise (as defined in the Warrants), provided that no Public Information Failure

EMPGNUS0009485

has occurred, and without the need for registration under any applicable federal or state securities laws; (ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Principal Market or any other Eligible Market and shall not have been suspended from trading on such exchange or market nor shall delisting or suspension by such exchange or market been threatened (with delisting reasonably likely to occur after giving effect to all applicable notice, appeal, cure, compliance and hearing periods), commenced or pending either (A) in writing by such exchange or market or (B) by falling below the then effective minimum listing maintenance requirements of such exchange or market; (iii) during the Equity Conditions Measuring Period, the Company shall have delivered shares of Common Stock pursuant to the terms of this Note and the Other Notes and shares of Common Stock upon exercise of the Warrants to the holders on a timely basis as set forth in Section 3(c) hereof (and analogous provisions under the Other Notes) and Section 1(a) of the Warrants; (iv) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions may be issued in full without violating Section 3(d) hereof and the rules or regulations of the Principal Market or any other applicable Eligible Market; (v) during the Equity Conditions Measuring Period, the Company shall not have failed to timely make any payments within five (5) Business Days of when such payment is due pursuant to any Transaction Document; (vi) during the Equity Conditions Measuring Period, there shall not have occurred either (A) the public announcement of a pending, proposed or intended Fundamental Transaction which has not been abandoned, terminated or consummated, (B) an Event of Default or (C) an event that with the passage of time or giving of notice would constitute an Event of Default or Triggering Event; (vii) the Company shall have no knowledge of any fact that would cause (x) one or more registration statement(s) not to be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the terms of the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, or (y) any shares of Common Stock issuable pursuant to the terms of this Note and the Other Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, not to be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (or any successor thereto) promulgated under the Securities Act, provided that no Public Information Failure has occurred, and any applicable state securities laws; (viii) during the Equity Conditions Measuring Period, the Company otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document in any material respect (other than representations or warranties subject to Material Adverse Effect or materiality, which may not be breached in any respect); (ix) during the Equity Conditions Measuring Period, the Holder shall not have been in possession of any material, nonpublic information received from the Company, any Subsidiary or its respective agent or affiliates; (x) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions are duly authorized and listed and

EMPGNUS0009486

eligible for trading without restriction on an Eligible Market; (xi) the average daily dollar trading volume of the Common Stock as reported by Bloomberg during the twenty (20) Trading Days immediately prior to the applicable date of determination shall be at least $100,000; and (xii) on each Trading Day during the Equity Conditions Measuring Period, the Closing Price of the Common Stock equals or exceeds $[•[6]] (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction occurring after the Subscription Date).

(s)    **"Equity Conditions Failure"** means that on any applicable date of determination, the Equity Conditions have not each been satisfied or waived in writing by the Holder; provided, however, that the Equity Condition set forth in clause (iv) of such definition is not waivable by the Holder.

(t)    **"Equity Conditions Measuring Period"** means each day during the period beginning thirty (30) Trading Days immediately prior to the applicable date of determination and ending on and including the applicable date of determination.

(u)    **"Equity Interests"** means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, Options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(v)    **"Exchange Act"** means the Securities Exchange Act of 1934, as amended.

(w)    **"Fundamental Transaction"** means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a share purchase

---

[6] Insert 20% of the arithmetic average of the Closing Prices of the Common Stock for the five (5) Trading Days, in each case, immediately prior to signing definitive documents.

EMPGNUS0009487

agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the Subscription Date calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(x)    **"GAAP"** means United States generally accepted accounting principles, consistently applied.

(y)    **"Group"** means a "group" as that term is used in Section 13(d) of the Exchange Act and as defined in Rule 13d-5 thereunder.

(z)    **"Indebtedness"** of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into in the ordinary course of business consistent with past practice), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any

EMPGNUS0009488

conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, consistently applied for the periods covered thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, lien, pledge, charge, security interest or other encumbrance of any nature whatsoever in or upon any property or assets (including accounts and contract rights) with respect to any asset or property owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

(aa)    **"Initial Company Pre-Installment Conversion Price"** means, with respect to any Company Installment Notice Date, that price which shall be the lower of (i) the then Conversion Price then in effect and (ii) the Market Price as of the applicable Company Installment Notice Date.

(bb)    **"Initial Unrestricted Principal"** means any Principal outstanding under this Note that is not Restricted Principal outstanding under this Note as of the Issuance Date.

(cc)    **"Installment Amount"** means with respect to each Installment Date, an amount equal to the sum of the (i) the lesser of (A) $_____ [7] and (B) the Principal amount of this Note outstanding on such Installment Date, (ii) any Deferral Amount deferred pursuant to Section 8(d) and included in such Installment Amount, (iii) any Accelerated Amount accelerated pursuant to Section 8(e) and included in such Installment Amount and (iv) accrued and unpaid Interest with respect to such Principal and accrued and unpaid Late Charges, if any, with respect to such Principal and Interest, as any such Installment Amount for each Holder may be reduced pursuant to the terms hereof, whether upon conversion, redemption or otherwise. provided, however, that any Installment Amount payable hereunder shall first be allocated to the Initial Unrestricted Amounts until all of the Initial Unrestricted Amounts have been amortized and only after the Initial Unrestricted Amounts shall be amortized in full shall any Installment Amounts be allocated to the Other Unrestricted Amounts. In the event the Holder shall sell or otherwise transfer or assign any portion of this Note, the transferee shall be allocated a pro rata portion of each unpaid Installment Amount hereunder

(dd)    **"Installment Balance Conversion Shares"** means, for any Installment Date, a number of shares of Common Stock equal to (i) the Post-Installment Conversion Shares for such date minus (ii) the amount of any Pre-Installment Conversion Shares delivered in respect of the applicable Installment Date; provided, that in the event that the amount of Pre-Installment Conversion Shares exceeds the amount of Post-Installment Conversion Shares for such Installment Date (such excess, the **"Installment Conversion Shares Excess"**), the applicable Installment Balance Conversion Shares shall equal zero (0) for such Installment Date and any Installment Conversion Shares Excess shall reduce the number of Pre- Installment

---

[7]    Principal Amount of all Notes divided by 12.

EMPGNUS0009489

Conversion Shares payable on the immediately following Company Installment Notice Date or Additional Pre-Installment Conversion Shares Date, if any, on a share for share basis.

(ee)   **"Installment Date"** means each of August 31, 2020 and the last Business Day of every calendar month anniversary thereafter through and including the Maturity Date.

(ff)   **"Intellectual Property"** has the meaning ascribed to such term in the Security Agreement.

(gg)   **"Investor Netting Rights"** means the rights of Investor Optional Netting and Automatic Netting (each as defined in the Investor Note).

(hh)   **"Investor Note"** means that certain promissory note of the Holder issued to the Company at the Closing Date, pursuant to the Securities Purchase Agreement, with an aggregate principal amount outstanding equal to the Restricted Principal outstanding hereunder and secured by a cash amount set forth in a bank account of the Holder (or its affiliates) at least equal to the Restricted Principal outstanding hereunder.

(ii)   **"Investor Notes"** means those certain promissory notes of the holders of Notes issued to the Company at the Closing Date, pursuant to the Securities Purchase Agreement.

(jj)   **"Investor Prepayment"** means any Prepayment (as defined in the Investor Note) of the Investor Note.

(kk)   **"Lead Investor"** means Anson Investment Master Fund LP.

(ll)   **"Market Price"** means 85% of the arithmetic average of the five (5) lowest  daily Weighted Average Prices of the Common Stock during the Measuring Period.  All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination, reclassification or other similar transaction during such Measuring Period.

(mm)   **"Material Adverse Effect"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(nn)   **"Maturity Netting"** has the meaning ascribed to such term in the Investor Notes.

(oo)   **"Measuring Period"** means the twenty (20) consecutive Trading Day period ending on the Trading Day immediately preceding the applicable date of determination.

(pp)   **"Options"** means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(qq)   **"Permitted Indebtedness"** means (i) Indebtedness evidenced by this Note and the Other Notes, (ii) trade payables incurred in the ordinary course of business

EMPGNUS0009490

consistent with past practice, (iii) unsecured Indebtedness incurred by the Company that is made expressly subordinate in right of payment to the Indebtedness evidenced by this Note, as reflected in a written agreement acceptable to the Required Holders and approved by the Required Holders in writing, and which Indebtedness does not provide at any time for (a) the payment, prepayment, repayment, repurchase or defeasance, directly or indirectly, of any principal or premium, if any, thereon until ninety-one (91) days after the Maturity Date or later and (b) total interest and fees at a rate in excess of eight percent (8.0%) per annum and (iv) Indebtedness secured by Permitted Liens described in clauses (iv) of the definition of Permitted Liens.

(rr)    **"Permitted Liens"** means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods and (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix).

(ss)    **"Person"** means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(tt)    **"Post-Installment Conversion Shares"** means, for any Installment Date and without taking into account the delivery of any Pre-Installment Conversion Shares, that number of shares of Common Stock equal to the applicable Company Conversion Amount (including, without limitation, the addition of any Accelerated Amounts to such Company Conversion Amount in accordance with Section 8(e)) on such Installment Date divided by the Company Conversion Price as in effect on the applicable Installment Date, rounded up to the nearest whole share of Common Stock.

(uu)    **"Principal Market"** means The Nasdaq Capital Market.

(vv)    **"Pro Rata Amount"** means a fraction (i) the numerator of which is the original principal amount of the Holder's Note issued to the Holder pursuant to the Securities

EMPGNUS0009491

Purchase Agreement and (ii) the denominator of which is the aggregate original principal amount of all Notes issued to the Buyers pursuant to the Securities Purchase Agreement.

(ww)    **"Public Information Failure"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(xx)    **"Redemption Dates"** means, collectively, the Event of Default Redemption Dates, the Change of Control Redemption Dates, the Installment Dates and the Company Optional Redemption Date, as applicable, each of the foregoing, individually, a Redemption Date.

(yy)    **"Redemption Notices"** means, collectively, the Event of Default Redemption Notices, the Change of Control Redemption Notices, the Company Installment Notices and the Company Optional Redemption Notice, each of the foregoing, individually, a Redemption Notice.

(zz)    **"Redemption Prices"** means, collectively, the Event of Default Redemption Prices, the Change of Control Redemption Prices, the Company Installment Redemption Prices and the Company Optional Redemption Price, each of the foregoing, individually, a Redemption Price.

(aaa)    **"Related Fund"** means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(bbb)    **"Required Holders"** means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding and shall include the Lead Investor so long as the Lead Investor or any of its Affiliates holds any Notes.

(ccc)    **"Restricted Principal"** means, initially Principal outstanding in the amount of $4,000,000, subject to reduction as provided herein, including, without limitation, pursuant to Investor Prepayments, Maturity Netting or Investor Netting Rights.

(ddd)    **"SEC"** means the United States Securities and Exchange Commission.

(eee)    **"Securities Act"** means the Securities Act of 1933, as amended.

(fff)    **"Securities Purchase Agreement"** means that certain securities purchase agreement dated as of the Subscription Date by and among the Company and the investors listed on the signature pages attached thereto pursuant to which the Company issued the Notes and Warrants, as amended from time to time.

(ggg)    **"Security Agreement"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(hhh)    **"Security Documents"** has the meaning ascribed to such term in the Securities Purchase Agreement.

EMPGNUS0009492

(iii)    **"Standard Settlement Period"** means the standard settlement period, expressed in a number of Trading Days, on the principal securities exchange or securities market on which the Common Stock is then traded as in effect on the date of delivery of the applicable Conversion Notice.

(jjj)    **"Subject Entity"** means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(kkk)    **"Subscription Date"** means February [ ], 2020.

(lll)    **"Subsidiary"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(mmm)**"Trading Day"** means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock on such day, then on the principal securities exchange or securities market on which the Common Stock is then traded.

(nnn)    **"Transaction Documents"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(ooo)    **"Warrants"** has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all warrants issued in exchange therefor or replacement thereof.

(ppp)    **"Weighted Average Price"** means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market during the period beginning at 9:30:01 a.m., New York Time (or such other time as the Principal Market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as the Principal Market publicly announces is the official close of trading) as reported by Bloomberg through its "Volume at Price" function, or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York Time (or such other time as such market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as such market publicly announces is the official close of trading) as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing price and the lowest closing ask price of any of the market makers for such security as reported in the OTC Link or Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices). If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

EMPGNUS0009493

(qqq)    **"Unrestricted Date"** means any date on which all or any portion of the Restricted Principal becomes Unrestricted Principal.

(rrr)    **"Unrestricted Principal"** means any Principal outstanding under this Note that is not Restricted Principal outstanding under this Note."

[Signature Page Follows]

EMPGNUS0009494

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

**GENIUS BRANDS INTERNATIONAL, INC.**

By: _____
   Name:
   Title:

DOC ID - 32122650.9

EMPGNUS0009495

## EXHIBIT I

## GENIUS BRANDS INTERNATIONAL, INC.

## CONVERSION NOTICE

Reference is made to the Senior Secured Convertible Note (the "**Note**") issued to the undersigned by Genius Brands International, Inc., a Nevada corporation (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock par value $0.001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of Conversion: _____

Aggregate Conversion Amount to be converted or number of Conversion Shares to be issued upon conversion: _____

Please confirm the following information:

Conversion of Initial Unrestricted Amount: ☐    Conversion of Other Unrestricted Amount: ☐

Conversion Price: _____

If Aggregate Conversion Amount is provided above, number of shares of Common Stock to be issued: _____

Percentage of conversion to constitute Initial Unrestricted Amount: _____

Percentage of conversion to constitute Other Unrestricted Amount: _____

Please issue the Common Stock into which the Note is being converted to the Holder, or for its benefit, as follows:

☐ Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to: _____

_____

Address: _____

DOC ID - 32122650.9

Facsimile Number and
Electronic Mail:                          _____

☐      Check here if requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant:                          _____

DTC Number:                              _____

Account Number:

By its delivery of this Conversion Notice, the undersigned represents and warrants to the Company that in giving effect to the conversion evidenced hereby the undersigned will not beneficially own in excess of the number of shares of Common Stock (determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended) permitted to be owned under Section 3(d)(i) of this Note.

Authorization:            _____

By:            _____

Title:            _____

Dated:            _____

Account Number:
(if electronic book entry transfer)            _____

Transaction Code Number:
(if electronic book entry transfer)            _____

Installment Amounts to be reduced and amount of reduction:
_____

DOC ID - 32122650.9

EMPGNUS0009497

## ACKNOWLEDGMENT

The Company hereby acknowledges this Conversion Notice and hereby directs Continental Stock Transfer & Trust Company to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions dated June __, 2019 from the Company and acknowledged and agreed to by Continental Stock Transfer & Trust Company.

**GENIUS BRANDS INTERNATIONAL, INC.**

By: _____
        Name:
        Title:

DOC ID - 32122650.9

EMPGNUS0009498

Abraham Declaration Exhibit 98
(ANSON_00000816-17)

Message
_____

**From:**      Amin Nathoo [anathoo@ansonfunds.com]
**Sent:**      2/23/2020 8:58:17 PM
**To:**        Joe Reda [reda@theseg.com]
**CC:**        Jonathan Schechter [shex@theseg.com]
**Subject:**   RE: GNUS Book


I don't want to complicate things if we already have the book.
So let's see where we get to with the guys we already have... if we have a shortage, we show AJ.


**From:** Joe Reda <reda@theseg.com>
**Sent:** February 23, 2020 8:56 PM
**To:** Amin Nathoo <anathoo@ansonfunds.com>
**Cc:** Jonathan Schechter <shex@theseg.com>
**Subject:** Re: GNUS Book

We are at $7-13mil.    Everyone gave me ranges and won't firm up until docs are final and nasdaq signed off.

I will show anyone/everyone you want me to except WAQAS.

Let us know.

Reda



EXHIBIT

*SEG 33*

Sent from my iPhone


On Feb 23, 2020, at 8:34 PM, Amin Nathoo <anathoo@ansonfunds.com> wrote:


How we looking on the GNUS book? If we're not going to be at the $10mm perhaps we show it do AJ from Obsidian.?

**Amin Nathoo, CFA | Anson Funds**
155 University Avenue, Suite 207 | Toronto, ON | M5H 3B7
Direct: (416) 572-1902 | Office: (416) 447-8874 | Mobile: (416) 804-4141
anathoo@ansonfunds.com


The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
************************************************************** This email is only for use by the intended
recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE
PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or
distribution of this communication and any attachments is strictly prohibited. If you have received this communication in
error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not
duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any
other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the
information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or
sell any securities. The contents of this communication are for information purposes only, and should not be regarded as
an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic
communication may have additional important disclosures and disclaimers, which you should read. The information

contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

CONFIDENTIAL

ANSON_00000817

Abraham Declaration Exhibit 99 (ANSON_00002904-22, marked as Anson Ex. 25)

Message
---

**From:** Joe Reda [reda@theseg.com]
**Sent:** 2/24/2020 5:11:14 PM
**To:** Robert F. Charron [rcharron@egsllp.com]; Schultz, Jeffrey [JSchultz@mintz.com]
**CC:** Amin Nathoo [anathoo@ansonfunds.com]; Jonathan Schechter [shex@theseg.com]
**Subject:** some due diligence questions from Amin

1.      What was the logic behind the reg rights?   Amin is fine with it, but confused as to why he agreed to it...lol
2.      Voting agreements?   What % of the vote does that cover?
3.      Record date for shareholder vote?   When is the earliest that can be set for?  Amin had a few creative ideas to get more yes votes

---

**From:** Robert F. Charron [mailto:rcharron@egsllp.com]
**Sent:** Monday, February 24, 2020 4:34 PM
**To:** Langer, Alan; Schultz, Jeffrey; Jonathan Schechter
**Cc:** Joe Reda; Charles Phillips; Michael Jaffa; Bob denton; Jon Ollwerther; Andy Heyward; Matthew McCullough; Amin Nathoo; Laura Salvatori
**Subject:** RE: GNUS - Revised Transaction Documents

I'm fine with all the changes and have saved them over as final for our purposes.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail:  rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

---

**From:** Langer, Alan <AJLanger@mintz.com>
**Sent:** Monday, February 24, 2020 10:53 AM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

All,

Attached please find some additional comments to some of the documents. Please note that the last draft of the Security Agreement that we received was a redline copy and some of the section headers were missing in the redline, so these changes should be made to the latest Word version.

Best,
Alan

CONFIDENTIAL                                                                    ANSON_00002904

**EXHIBIT**

25

**Alan Langer**
*Associate*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue, New York, NY 10017
+1.212.692.6213
AJLanger@mintz.com | Mintz.com



**From:** Langer, Alan
**Sent:** Wednesday, February 19, 2020 3:42 PM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

All,

Attached please find some comments to the SPA, along with some notes for the Company's attention.

Best,
Alan

**Alan Langer**
*Associate*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue, New York, NY 10017
+1.212.692.6213
AJLanger@mintz.com | Mintz.com



**From:** Schultz, Jeffrey <JSchultz@mintz.com>
**Sent:** Tuesday, February 18, 2020 11:04 AM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Thanks Rob. The Company will update the draft Disclosure Schedules and determine which reps and warranties it desires to cross reference to the SEC filings.

Regards,

CONFIDENTIAL

ANSON_00002905

Jeff

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** Tuesday, February 18, 2020 10:00 AM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Jeff – Anson's response to the issues raised last week are as follows:

1.      On reps and warranties they won't agree to a general exception for what is in the SEC reports but we can take each rep and warranty on a case by case basis as to whether cross reference is permitted.  I know that capitalization, litigation, affiliate transactions and MAE will need separate schedules (although, for example, in litigation if you want to reference a specific part of the disclosure that is fine).  As for any others, let me know which ones you want to cross reference.

2.      Legal fees on this deal are adding up given we are on structure #3 so we'll need to keep it at $75k but we can work with company on cash covenant.

3.      On Llama Anson understands the situation – it is what it is.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

**From:** Schultz, Jeffrey <JSchultz@mintz.com>
**Sent:** Thursday, February 13, 2020 5:04 PM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

No, not yet.  Our voicemails are currently being ignored. My guess is that they won't get back to us until our original analyst returns from her vacation next week (which will still be less than 15 days).  We have been encountering Nasdaq's non-responsiveness on a number of other deals which are far simpler than this GNUS deal.  There were a lot of offerings trying to get done this week before financials go stale.

Do you have any feedback from the investors on our client's issues with some of their comments that we discussed?  Thanks.

Regards,
Jeff

                                                          ANSON_00002906

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** Thursday, February 13, 2020 4:51 PM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Any luck with Nasdaq?

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

**From:** Robert F. Charron
**Sent:** Wednesday, February 12, 2020 4:28 PM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Jeff, attached please find the Investor Note Purchase Agreement.  Thought I'd already sent this to you.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

**From:** Schultz, Jeffrey <JSchultz@mintz.com>
**Sent:** Tuesday, February 11, 2020 12:30 PM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough

CONFIDENTIAL

ANSON_00002907

<mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Hi Rob. The Investor Note and Master Netting Agreement reference a Note Purchase Agreement which we have not seen yet. Please send at your convenience.

With respect to the following Existing Warrant repricing deal term, it should have some threshold of participation and also it needs to be limited to warrants issued more than six months ago because of Nasdaq aggregation issues. See proposed revised Term Sheet language below:

Any existing Warrant holder that holds Warrants issued more than six months ago (the "Existing Warrants") that participates in the Offering in an amount of at least $500,000 will have their Existing Warrants' exercise prices reduced to the Reset Conversion Price subject to receipt of Shareholder Approval pursuant to Nasdaq Listing Rule 5635(d).

Please contact me with any questions or concerns.

Regards,
Jeff

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** Monday, February 10, 2020 2:00 PM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Any time at your convenience.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

**From:** Schultz, Jeffrey <JSchultz@mintz.com>
**Sent:** Monday, February 10, 2020 1:47 PM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Hi Rob. I have been in communications with the Company on the remaining issues. Do you have some time this afternoon to discuss?

ANSON_00002908

Thanks,
Jeff

---

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** Friday, February 7, 2020 5:52 PM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Jeff, after consultation with Anson, attached are clean and redlines against your versions from earlier this week.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

---

**From:** Schultz, Jeffrey <JSchultz@mintz.com>
**Sent:** Wednesday, February 5, 2020 11:15 AM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Rob,
Attached are comments to the draft Transaction documents. Please contact me with any questions.

Regards,
Jeff

**Jeffrey Schultz**
*Member*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue, New York, NY 10017
+1.212.692.6732
JSchultz@mintz.com | Mintz.com

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** Tuesday, February 4, 2020 4:40 PM
**To:** Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Jeff, the floor is under Equity Conditions. If price below the floor, company must pay in cash.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

**From:** Schultz, Jeffrey <JSchultz@mintz.com>
**Sent:** Tuesday, February 4, 2020 4:31 PM
**To:** Robert F. Charron <rcharron@egsllp.com>; Jonathan Schechter <shex@theseg.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

Attached are a few comments to the Term Sheet on behalf of the Company.

Regards,
Jeff

**Jeffrey Schultz**
*Member*

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
666 Third Avenue, New York, NY 10017
+1.212.692.6732
JSchultz@mintz.com | Mintz.com

**From:** Robert F. Charron <rcharron@egsllp.com>
**Sent:** Monday, February 3, 2020 3:25 PM
**To:** Jonathan Schechter <shex@theseg.com>; Schultz, Jeffrey <JSchultz@mintz.com>
**Cc:** Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
**Subject:** RE: GNUS - Revised Transaction Documents

attached is the revised term sheet with a redline against the prior one. Amin - note that Empery's preference is that the company not file a registration statement but rather rely on 144 in 6 months. I took it out of the TS but note it can be put in the documents fairly easily if you and Shex convince Ryan otherwise.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

-----Original Message-----
From: Jonathan Schechter <shex@theseg.com>
Sent: Monday, February 3, 2020 2:38 PM
To: Robert F. Charron <rcharron@egsllp.com>; Schultz, Jeffrey <JSchultz@mintz.com>
Cc: Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: RE: GNUS - Revised Transaction Documents

-----Original Message-----
From: Robert F. Charron [mailto:rcharron@egsllp.com]
Sent: Monday, February 3, 2020 2:35 PM
To: Schultz, Jeffrey <JSchultz@mintz.com>
Cc: Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: RE: GNUS - Revised Transaction Documents

I'll try and revise the last one with the netting language.

CONFIDENTIAL

ANSON_00002911

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

-----Original Message-----
From: Schultz, Jeffrey <JSchultz@mintz.com>
Sent: Monday, February 3, 2020 2:32 PM
To: Robert F. Charron <rcharron@egsllp.com>
Cc: Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@theseg.com>; Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: Re: GNUS - Revised Transaction Documents

Thanks Rob.

Shex and Reda,
Can you please send the up to date Term Sheet that reflects the latest docs? It will help Nasdaq (and presumably investors) in trying to understand what's going on.

Thanks,
Jeff

On Feb 3, 2020, at 2:20 PM, Robert F. Charron <rcharron@egsllp.com> wrote:


Jeff - here is the SPA. You should have everything you need for Nasdaq now.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the

ANSON_00002912

Internal Revenue Code.

From: Robert F. Charron
Sent: Monday, February 3, 2020 10:40 AM
To: Schultz, Jeffrey <JSchultz@mintz.com>; Jonathan Schechter <shex@theseg.com>; Joe Reda <reda@thescg.com>
Cc: Charles Phillips <cphillips@egsllp.com>; Langer, Alan <AJLanger@mintz.com>; Michael Jaffa <mjaffa@gnusbrands.com>; Bob denton <bdenton@gnusbrands.com>; Jon Ollwerther <jollwerther@gnusbrands.com>; Andy Heyward <aheyward@gnusbrands.com>; Matthew McCullough <mmccullough@egsllp.com>; Amin Nathoo <anathoo@ansonfunds.com>; Laura Salvatori <lsalvatori@ansonfunds.com>
Subject: RE: GNUS - Revised Transaction Documents

Just pinged Brett asking him.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Monday, February 3, 2020 10:28 AM
To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Hi Rob. Any update on the draft SPA. That is the last major doc we need in order to submit to Nasdaq. Thanks.

Regards,
Jeff

From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Sent: Friday, January 31, 2020 11:00 AM
To: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Schultz, Jeffrey

                                                          ANSON_00002913

<JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

If you consider that the netting agreement is all about the conditional funding then I think the docs are pretty on point. I tried to keep it tailored to the term sheet but I also had my hands full with creating a new set of documents from scratch.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

From: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>
Sent: Friday, January 31, 2020 10:44 AM
To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe Reda
<reda@theseg.com<mailto:reda@theseg.com>>; Robert F. Charron
<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

THIS WAS the last but some things have probably been added by Empery.

From: Schultz, Jeffrey [mailto:JSchultz@mintz.com]
Sent: Friday, January 31, 2020 10:32 AM
To: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>; Robert F. Charron

CONFIDENTIAL
ANSON_00002914

<rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Cc: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

I can assure you that Nasdaq won't be quick. We will start to review the documents to understand the deal and then submit a description and documents to Nasdaq. If there is an updated term sheet that reflects the updated terms, please send our way. Thanks.

From: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Sent: Friday, January 31, 2020 9:43 AM
To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Cc: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Charles Phillips
<cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Jonathan Schechter
<shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan
<AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa
<mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton
<bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther
<jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward
<aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough
<mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo
<anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori
<lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: Re: GNUS - Revised Transaction Documents

When will we have nasdaq blessing. What's the process. Trying to give investors timing. They are all getting deal fatigued.
Sent from my iPhone

On Jan 31, 2020, at 9:38 AM, Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>> wrote:

Jeff - attached please find the Note and Warrant for the GNUS transaction. Per Empery the note is Schulte's form and has been reviewed by Brett. For the warrant, he is ok using our form of warrant provided the AD provision is the same one used in the note which I have revised to reflect as such. I expect to have Brett's comments on the SPA at some point today and once received I'll get them right over to you.

I've also attached the security agreement, master netting agreement, investor note and guaranty which Brett has not reviewed but I really don't expect many comments. Briefly, the additional $4 million is being done through the acceleration of an investor note which, upon any breach or event of default by the company, basically net's to zero through the Master Netting Agreement.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas

CONFIDENTIAL

ANSON_00002915

New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Tuesday, January 28, 2020 2:38 PM
To: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Thanks Rob for the update.

From: Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>
Sent: Tuesday, January 28, 2020 2:35 PM
To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Investors want us to use Schulte forms so disregard what was sent although trying to get them to back down a bit. I just received the precedent to draft from so will take me a couple days to get through. Very dense. I'll send you docs as I finish to keep things moving.

Robert Charron
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas

CONFIDENTIAL

ANSON_00002916

New York, New York 10105
Direct: (212) 931-8704
Facsimile: (212) 401 4741
Cell: (917) 843 1457
e-mail: rcharron@egsllp.com<mailto:rcharron@egsllp.com>

Pursuant to IRS Circular 230, we hereby inform you that any U.S. federal tax advice set forth herein was not intended or written by Ellenoff Grossman & Schole LLP to be used, and cannot be used, by you or any taxpayer, for the purpose of avoiding any penalties that may be imposed on you or any other person under the Internal Revenue Code.

From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Tuesday, January 28, 2020 2:21 PM
To: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Hi Charles. I understand that these docs are being revised to reflect the current deal. Do you have an expectation of timing of the new drafts?

Thanks,
Jeff

From: Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>
Sent: Friday, January 24, 2020 3:43 PM
To: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>; Joe Reda <reda@theseg.com<mailto:reda@thcseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: RE: GNUS - Revised Transaction Documents

Everyone

Attached please find the revised transaction documents, along with redlines to the previously circulated

CONFIDENTIAL

ANSON_00002917

versions. Please note, in the interest of time, we are distributing these to our client and therefore remain subject to their comments and review. Please note, no changes to the Subsidiary Guarantee, voting agreement or opinion were needed.

Regards,
Charles

Charles Phillips
Ellenoff Grossman & Schole LLP
1345 Avenue of the Americas
New York, NY 10105
Telephone: (212) 944-7454
email: cphillips@egsllp.com<mailto:cphillips@egsllp.com>
website: www.egsllp.com<http://www.egsllp.com>

-----Original Message-----
From: Schultz, Jeffrey <JSchultz@mintz.com<mailto:JSchultz@mintz.com>>
Sent: Monday, January 20, 2020 7:43 AM
To: Joe Reda <reda@theseg.com<mailto:reda@theseg.com>>
Cc: Jonathan Schechter <shex@theseg.com<mailto:shex@theseg.com>>; Langer, Alan <AJLanger@mintz.com<mailto:AJLanger@mintz.com>>; Michael Jaffa <mjaffa@gnusbrands.com<mailto:mjaffa@gnusbrands.com>>; Bob denton <bdenton@gnusbrands.com<mailto:bdenton@gnusbrands.com>>; Jon Ollwerther <jollwerther@gnusbrands.com<mailto:jollwerther@gnusbrands.com>>; Andy Heyward <aheyward@gnusbrands.com<mailto:aheyward@gnusbrands.com>>; Charles Phillips <cphillips@egsllp.com<mailto:cphillips@egsllp.com>>; Robert F. Charron <rcharron@egsllp.com<mailto:rcharron@egsllp.com>>; Matthew McCullough <mmccullough@egsllp.com<mailto:mmccullough@egsllp.com>>; Amin Nathoo <anathoo@ansonfunds.com<mailto:anathoo@ansonfunds.com>>; Laura Salvatori <lsalvatori@ansonfunds.com<mailto:lsalvatori@ansonfunds.com>>
Subject: Re: GNUS - Revised Transaction Documents

Given that Nasdaq has not been provided docs yet, we have no visibility on Nasdaq timing.

On Jan 20, 2020, at 7:33 AM, Joe Reda <reda@theseg.com<mailto:reda@theseg.com>> wrote:

When will Nasdaq will give the thumbs up to move forward?

From: Jonathan Schechter
Sent: Friday, January 17, 2020 5:44 PM
To: Jeffrey Schultz; Alan Langer; Michael Jaffa; Bob denton; Jon Ollwerther; Andy Heyward
Cc: Charles Phillips; Robert Charron; Matthew McCullough; Joe Reda; Amin Nathoo; Laura Salvatori
Subject: GNUS - Revised Transaction Documents

All-

Attached please find the proposed transaction documents for your review.

Amin is on a plane so the docs are still subject to Anson's review.

The goal is to close this as quick as possible.

CONFIDENTIAL

ANSON_00002918

Please use this email for the working group.

Thanks-

Shex

.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
***************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
***************************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

_____

STATEMENT OF CONFIDENTIALITY:
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, or the person responsible for delivering the e-mail to the intended recipient, be advised you have received this message in error and that any use, dissemination, forwarding, printing, or copying is strictly

prohibited. Please notify Mintz, Levin, Cohn, Ferris, Glovsky and Popeo immediately at either (617) 542-6000 or at DirectorofIT@Mintz.com<mailto:DirectorofIT@Mintz.com>, and destroy all copies of this message and any attachments. You will be reimbursed for reasonable costs incurred in notifying us.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
<GNUS Warrant.4.doc>
<GNUS Note.2.docx>
<GNUS Security Agreement.1.docx>
<GNUS Master Netting Agreement.1.docx>
<GNUS Investor Note.1.docx>
<GNUS Guaranty.1.docx>
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.
*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

CONFIDENTIAL                                                                          ANSON_00002920

The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.

*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warrantied by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
<GNUS SPA.2.docx>

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.
The Special Equities Group "SEG" is a Division of Bradley Woods & Co. Ltd.

*********************************************************** This email is only for use by the intended recipient and may contain information that is PRIVILEGED, PROPRIETARY, CONFIDENTIAL AND/OR OTHERWISE PROTECTED FROM DISCLOSURE. If you are not the intended recipient, then any review, dissemination, replication or distribution of this communication and any attachments is strictly prohibited. If you have received this communication in error, then please delete this email, any and all attachments, and copies. Unless otherwise provided herein, you may not duplicate, redistribute or forward this message, or any portion thereof, including any attachments, by any means to any other person whomsoever

without the express permission of Bradley Woods & Co. Ltd. ("Bradley Woods"). Neither the information in this communication nor any opinion or recommendation expressed herein constitutes an offer to buy or sell any securities. The contents of this communication are for information purposes only, and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product. Attachments that are part of an electronic communication may have additional important disclosures and disclaimers, which you should read. The information contained herein is deemed to be reliable, but is in no case assured or warranted by Bradley Woods. All messages are monitored and retained by Bradley Woods and are subject to regulatory disclosure. Bradley Woods & Co. Ltd. is a member of FINRA and SIPC.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please delete this message, along with any attachments, from your computer. Thank you.

Privileged Information: This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and/or exempt from disclosure. If you are not the intended recipient, you are hereby notified that any use, dissemination, distribution, or copying of this message, or any attachment, is

ANSON_00002922

Abraham Declaration Exhibit 100 (Transcript of Ryan Lane's / Empery's deposition)

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 1:22-cv-00249-AS
- - - - - - - - - - - - - - - - - - - - -x
TODD AUGENBAUM,

Plaintiff,

-against-

ANSON INVESTMENTS MASTER FUND LP; BRIO
CAPITAL MASTER FUND LTD.; BRIO SELECT
OPPORTUNITIES FUND, LP;
CVI INVESTMENTS, INC.;
EMPERY ASSET MASTER, LTD.;
EMPERY DEBT OPPORTUNITY FUND, LP;
EMPERY TAX EFFICIENT, LP;
IROQUOIS MASTER FUND, LTD.;
IROQUOIS CAPITAL INVESTMENT GROUP, LLC;
L1 CAPITAL GLOBAL OPPORTUNITIES
MASTER FUND; M3A LP; AND
RICHARD MOLINSKY,

Defendants,

-and-

KARTOON STUDIOS, INC.,

Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - -x

September 25, 2024
10:30 a.m.

VIDEO DEPOSITION OF RYAN LANE
New York, New York
Wednesday, September 25, 2024

REPORTED BY:
DANIELLE GRANT

Page 2

SEPTEMBER 25, 2024

10:30 a.m.

Video Deposition of RYAN LANE, held at the offices of Freshfields Burckhaus Deringer, LLP 3 World Trade Center, New York, New York pursuant to Notice before DANIELLE GRANT, a Shorthand Reporter and Notary Public of the State of New York.

Page 3

A P P E A R A N C E S:

ABRAHAM FRUCHTER & TWERSKY LLP
Attorneys for Plaintiff
  450 Seventh Avenue
  New York, New York 10123
BY:  JEFFREY ABRAHAM, ESQ.
    MICHAEL KLEIN, ESQ.

FRESHFIELDS BRUCKHAUS DERINGER, LLP
Attorneys for Defendant
Empery Asset Master, Ltd.,
Empery Debt Opportunity Fund, LP,
Empery Tax Efficient, LP and the Witness
  175 Greenwich Street
  3 World Trade Center
  51st Floor
  New York, New York 10007
BY:  ANDREW GLADSTEIN, ESQ.
    SHANNON SCIARETTA, ESQ.
    AMELLA VISO, ESQ.

Page 4

A P P E A R A N C E S (Cont'd):

LATHAM & WATKINS, LLP
Attorneys for Defendant
Iroquois Master Fund, Ltd.,
Iroquois Capital Investment Group, LLC
  1271 Avenue of the Americas
  New York, New York 10020
BY:  WILLIAM O. RECKLER, ESQ. (Via Zoom)

ELLENOFF GROSSMAN & SCHOLE ESQS
Attorneys for Defendant
Brio Capital Master Fund Ltd.,
Brio Select Opportunities Fund, LP
  1345 Avenue of the Americas
  New York, New York 10105
BY:  JOHN BRILLING HORGAN, ESQ.

PHILLIPS NIZER LLP
Attorneys for Defendant
L1 Capital Global Opportunities
Master Fund
  485 Lexington Avenue
  14th Floor
  New York, New York 10017
BY:  JARED CLARK, ESQ.

Page 5

A P P E A R A N C E S (Cont'd):

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Attorneys for Defendant
CVI Investments, Inc.
  One Manhattan West
  New York, New York 10001
BY:  JEFFREY GEIER, ESQ.

STINSON, LLP
Attorneys for Defendant
Richard Molinsky
  1325 Avenue of the Americas
  New York, New York 10019
BY:  KIERAN M. CORCORAN, ESQ. (Via Zoom)
    NICOLE KHALOUIAN, ESQ. (Via Zoom)

HOGAN LOVELLS, LLP
Attorneys for Defendant
Anson Investments Master Fund LP
  609 Main Street
  Suite 4200
  Houston, Texas 77002
BY:  DENNIS TRACEY, ESQ.

2 (Pages 2 - 5)

Page 6

A P P E A R A N C E S (Cont'd):

LITMAN ASCHE & GIOIELLA LLP

Attorneys for the Defendant M3A LP

350 Central Park West

Suite 10F

New York, New York 10025

BY:  RICHARD ASCHE, ESQ.

ALSO PRESENT:

ODALYSS ALVARADO & DAVID HERNANDEZ,

Videographers

Page 7

VIDEOGRAPHER:  Good morning. We're going on the record at 10:30 a.m. on September 25, 2024. Please note that the microphones are sensitive and may take up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Empery taken by counsel for Plaintiff in the matter of Augenbaum, Todd, versus Anson Investments Master Fund, Case Docket Number 1:22-CV-00249-AS. The location of the deposition is 175 Greenwich Street, Three World Trade Center, 51st Street Floor, New York, New York 10007.

My name is Odalyss Alvarado representing Veritext, and I'm the videographer.  The court reporter

Page 8

is Danielle Grant representing Court [sic] Veritext.  I'm not authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.  If there are any objections to the proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearance and informations for the record beginning with the noticing attorney.

MR. ABRAHAM:  We agreed that we wouldn't state our appearance. Our appearances would be noted on the record.

VIDEOGRAPHER:  Will the court reporter please swear in the witness, and the counsel may proceed.

R Y A N    L A N E, called as a witness, having been first duly sworn by Danielle Grant, a Notary Public

Page 9

within and for the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. ABRAHAM:

Q   Good morning, Mr. Lane, how are you?

A   Good morning.

Q   Have you ever been deposed before?

A   I have.

Q   How many times?

A   Less than five.

Q   When was the last time?

A   Last time was about two months ago.

Q   In connection with a civil case?

A   It was in connection with an SEC matter where I was a witness for the SEC.

Q   Is that matter confidential?

A   Not as far as I know.

Q   What is that matter?

A   SEC versus Ryan Drexler.

3 (Pages 6 - 9)

Page 10

Q   Who is Ryan Drexler?
A   Ryan Drexler is the former CEO of now bankrupt MusclePharm.
Q   Did Empery have an interest in MusclePharm?
A   Empery did have an interest in MusclePharm.
Q   What was Empery's interest in MusclePharm?
A   We owned --
MR. GLADSTEIN:  Object to form.
A   We owned a nonconvertible secured note.
MR. ABRAHAM:  Do you want to put your stipulation on the record?
MR. GLADSTEIN:  Appreciate that, Counsel.  Consistent with all prior depositions, the parties have agreed that an objection by counsel for Mr. Lane will be an objection for all Defendants.
Q   Have you ever been deposed in any matter in which any of the Empery

Page 11

funds have been Defendants?
A   I do not believe so.
Q   Have you ever been deposed in any matter in which any of the Empery funds have been Plaintiff?
A   Yes, sir.
Q   Can you tell me which cases, please?
A   I don't remember the cases -- all the cases specifically, but we had a contract dispute with XAIR.
Q   Can you spell that for the record, please?
A   XAIR.
Q   Anything else?
A   Not that I recall.
MR. GLADSTEIN:  Jeff, not to interrupt.
Do you mind if I ask that you define the Empery funds just so there's no confusion?
MR. ABRAHAM:  I'll define them per question, because some questions relate to all the Empery funds and some relate to some of

Page 12

the Empery funds.
MR. GLADSTEIN:  Understood.  I just want to.
MR. ABRAHAM:  If I just say -- that's why I'm saying Empery funds to take into account all the funds managed by the management company.
A   But the management company is not a fund.
Q   I know, but they manage funds, okay?
I'm taking -- when I say the "Empery funds," I'm referring to the funds managed by whatever the name of the management company.
Is that Empery Management, LLC?
Is that the name for it?
A   No.  It's LP.  Empery Asset Management, LP.
Q   Empery Asset Management LP.
Are you a partner at Empery Asset Management LP?
A   Yes, sir.
Q   Are there any other partners?

Page 13

A   There's one another.
Q   Who is it?
A   Martin Hoe.
Q   Are you both general partners?
A   We both are owners of the general partnership of the limited partnership.
Q   Are there persons who are limited partners who are not you or Mr. Hoe?
A   Within the funds or within the management?
Q   The management company.
A   No, sir.
Q   How about in the funds?
A   Yes.
Q   Are you also an investor in any of the Empery funds?
A   Yes, sir.
Q   In which funds?
A   All the funds.
Q   In the same proportion of the funds, or does the proportion vary?
A   It varies.
Q   So since you have been deposed

4 (Pages 10 - 13)

Page 14

before, I assume you are familiar with the process here?

A   Generally.

Q   All right.  But I'll just tell you that I didn't say it, and I like to say it on the record that I'm representing Plaintiffs.  I'm asking you questions which you're required to answer unless your attorney instructs you not to answer.  If you don't understand the question, please let me know, and I will try to rephrase or better explain the question.

Is there any reason you're unable to testify truthfully today?

A   No.

Q   Are you suffering from any ailment which would cause you to be unable to testify?

A   No, sir.

Q   Are you on any medication which impairs your ability to testify?

A   No.

Q   Let's go through your personal background.  If you can give me a thumbnail sketch of your education

Page 15

background starting with post-high school.

A   I went to Frankling & Marshall College.  I was a finance economics major.

Q   What year did you graduate?

A   2000.

Q   Did you go to graduate school?

A   No, sir.

Q   Did you start working after you graduated college?

A   I did.

Q   Where did you start working at?

A   I started working at Gruntal & Company in their healthcare investment banking group.

Q   In what capacity?

A   As an analyst.

Q   How long did you work at Gruntal as an analyst?

A   It's not a totally straightforward answer.  It was after -- during September 11th.  I started there in 2000.  In September 11th, our building was down here, and it was damaged.  They told us to go home.  We went home.  We still

Page 16

got paid.  I think I was there for another 18 months without really being requested to do much work, but I was getting paid.  So I was technically employed there.

Q   After Gruntal, did you get another job?

A   My father and I formed a broker-dealer called Lane Capital Markets, and I worked there for about five and a half years.

Q   When did you leave Lane Capital Markets?

A   I left Lane Capital Markets, and it still continued to exist without me, although it was not that active, in early 2008.

Q   And what did you do after that?

A   Formed Empery.

Q   Did you form it with anybody else?

A   Same partner, Martin Ho.

Q   Was your father involved?

A   No.

Q   Did he invest in any of the

Page 17

funds?

MR. GLADSTEIN:  Object to form.

A   Not that I recall.

Q   Had he --

A   Not at the beginning.

Q   Is he currently an investor in any of the funds?

A   No.

Q   Do you recall when you learned of this lawsuit?

A   I don't remember the date, but I think it was about a year and a half ago.

Q   Do you know whether the Empery funds took any actions to preserve documents after learning about this lawsuit?

A   I'm sure we did.  That's our policy.

Q   So do the Empery funds have a policy with respect to retention of documents including electronic communications?

A   Yes.

5 (Pages 14 - 17)

Page 18

Q   What is that policy?

A   All substantive business communications must be archived.  All emails are archived in compliance with SEC rules under investment adviser registration.

Q   Does Empery have any policy with respect to the use of text messages to discuss matters related to work?

A   It's prohibited.

Q   Have you discussed the testimony you're going to give with anybody else aside from your lawyers at Freshfields?

A   Can you re-ask it.

Q   I'll repeat it.  But please don't put it in the record.

Have you discussed the testimony you were going to give here today with anyone else aside from your lawyer at the Freshfields firm?

A   No, sir.  Although previously we did have counsel at Schulte.  So we would have -- I would have to include that.

Page 19

Q   Have you discussed this case with anybody else aside from your lawyers at Freshfields aside from the testimony you're giving here today?

A   No, sir.

Q   Was the policy concerning text messages also followed during the COVID-19 pandemic?

A   It was -- we do have a policy, though, because we can get unsolicited messages that anything that we do get is sent to our archiving system.

Q   So text messages are archived as well?

A   If they exist.  To the extent they exist.

Q   Do you have WhatsApp?

A   I don't use it for any business communication.

Q   And that's true of the other people at Empery according to its policy as well; is that right?

A   Correct.

Q   All right.  Have you ever heard of a company called Genius Brands?

Page 20

A   Yes, sir.

Q   When was the first time you heard of it?

A   I don't recall the first time I heard of it.  I could not pin a date.

Q   All right.  Do you recall the first time any of the Empery funds invested in Genius Brand [sic] securities?

A   Sometime prior to 2019.

Q   Do you recall the nature of that investment?

A   I believe there were equity and warrant investments.

Q   Do you recall whether there was a lead investor with respect to those investments?

MR. GLADSTEIN:  Object to form.

A   Generally, there is a lead investor.  I don't remember the specifics around the investments that preceded 2020.

Q   All right.  Your counsel objected.  So let me clarify something on the record.

What would you consider a lead

Page 21

investor?

A   The lead investor is someone who generally outlines terms with the issuer, often the placement agent involved, and seeks to make all or part of that investment on those terms.

Q   Do they generally outline the terms by themselves?

A   Generally.

Q   And generally is the deal then offered to other investors?

A   Generally.

MR. GLADSTEIN:  Object to the form of the question.

Let's be very careful when we're talking -- when we're differentiating between term sheets and a deal offering.  I just don't want the witness to be confused.  And I assume --

MR. ABRAHAM:  All right.  Try not to do a speaking objection because you know the judge's standing order does not allow for that.

6 (Pages 18 - 21)

Page 22

MR. GLADSTEIN:  Understood.  I just want to avoid confusion.

Q    Where are the terms for a deal generally outlined?

MR. GLADSTEIN:  Object to form.

A    I mean, that's an extremely general question.  They could be outlined on the phone.  They could be outlined in an email.  They could be outlined on a term sheet.  I mean, you have to understand that some transactions take a day, and some transactions take three months.  There are hundreds of transactions done annually.  Potentially thousands.  There is no formula for a transaction.

Q    In what circumstances would the terms of a deal be outlined on the phone?

MR. GLADSTEIN:  Object to form.

A    A banker calls up.  An ECM calls up.  ECM desk calls up and says: Can you guide me on where this should be

Page 23

priced?

That is their job is to solicit the market for interest at different levels.

Q    Would they call about any other terms aside from price?

MR. GLADSTEIN:  Object to form.

A    Of course.

Q    And would they solicit your input on that as well.

MR. ABRAHAM:  Object to form.

A    Of course.

Q    Would they ever change the terms of the deal in response to that solicitation?

MR. GLADSTEIN:  Object to form.

A    Of course.

Q    Can you give me an example of one circumstance in which that happened?

A    I'm not going to give you a specific circumstance where that happened because I don't recall specific, but I can give you generalities of how it works, how

Page 24

the market prices anything.  Just like if you're selling your house, the broker is going to solicit interest from different buyers, and one buyer is going to win.  And they're going to, in this case, round up the rest of the investors based on those terms.  And people are going to be in and out based on their own judgment.  Kind of how it works.

Q    Can you give me an example of a deal in which you invested in which the terms were outlined in an email?

A    I can't recall a specific example.

Q    Can you give me an example of the deal in which the terms of the deal were outlined in a term sheet?

A    Where we were the lead investor -- what do you -- please specify.

Q    In any deal?

A    Any deal?

Q    Yeah.

A    Where someone else --

Q    Yes.

A    -- put a term sheet --

Page 25

Q    Yes.

A    -- on the table?

Q    Yes.

A    Genius Brands.

Q    Have any of the Empery funds ever served as a lead investor?

A    Yes.

Q    When was the last time the Empery -- any of the Empery funds served as a lead investor?

MR. GLADSTEIN:  Object to form.

A    I would have to go through our files.

Q    When the Empery funds serve as lead investors, how do they outline the terms of the deal?

MR. GLADSTEIN:  Object to form.

A    As I described, depends on the nature of the transaction.  It can be a detailed written term sheet that's delivered to the banker.  It can be a discussion over the phone, or it can be bullet points in an email.  It depends.

7 (Pages 22 - 25)

Page 26

It depends on the complexity of the transaction. It depends on the speed of the transaction. It depends on the agent involved in the transaction. It depends on the type of issuer.

Q    How does the type of issuer affect the speed of the transaction?

MR. GLADSTEIN:  Object to form.

A    Private company generally moves very slowly. Public company generally moves a little faster.

Q    How about the market capitalization of a public company.

Does that affect the speed of the transaction?

A    Generally smaller market cap companies have more complex terms, but that is a generality. You can have smaller issuers that do just common stock offerings. That happens frequently.

Q    And when you use the term complex offering, do you mean offerings aside from ones which are straight common stock?

Page 27

A    Generally.

Q    Or straight debt?

A    Straight debt is considered complex in my mind.

Q    So A debt issuance that is not convertible would be considered complex as well?

A    Correct.

Q    Why would you consider it complex?

A    Because there is a lot of negotiation around covenants, around reps and warranties, around different provisions, around term.

Q    Are covenants important?

A    Yes.

Q    Why?

A    Because they dictate the terms of the security. They dictate what each party can/can't do often.

Q    How about reps and warranties, are they important?

A    The same.

Q    Why?

A    For the same reason.

Page 28

Q    Any other reasons?

MR. GLADSTEIN:  Object to the form of the question.

A    I mean, there's lots of reasons. Reps and warranties are generally more legal based than the covenants.

Q    The covenants are not as legal based in your mind?

MR. GLADSTEIN:  Object to the form.

A    Correct.

Q    Why is that?

A    Covenants generally represent more business-type terms. Reps and warranties usually represent more legal-type terms.

Q    Do you consider covenants more important than reps and warranties?

MR. GLADSTEIN:  Object to form.

A    It depends on the transaction.

Q    How about in the case of Genius Brands?

A    I was more focused on

Page 29

covenants in the Genius transaction.

Q    Why is that?

A    Because covenants can dictate business elements of a transaction. It can dictate what an issuer can and can't do, what they can use their cash for, what they can't use their cash for.

Q    Why was that important in the case of Genius Brands.

MR. GLADSTEIN:  Object to form.

A    Specifically in the case of Genius Brands, there was what I recall was a cash covenant. And it was the company's use of cash. I don't remember the specifics, but I remember being involved in making sure that that was appropriate for our funds and made me comfortable for the benefit of our limited partners.

Q    How did that make you comfortable, those covenants?

A    It would make sure in my mind that the company had enough cash to be able to get to the maturity of the note or whatever the, you know, thesis was for the

8 (Pages 26 - 29)

Page 30

Empery funds to be able to execute their business. If they raise six months of cash and it only lasts them four, that's a problem.

Q   It's a problem because Empery might not get paid over its note?

A   Correct.

MR. ABRAHAM:  I'm going to ask the court reporter -- I'll make your counsel happy -- to mark as Exhibit 1 a document which is in Tab 2 of the FTP we sent around yesterday, and it's Bates-stamped EW-AUG0012146 through 148.

MR. GLADSTEIN:  I'd like the record to reflect that I'm always happy.

MR. ABRAHAM:  The record reflects that counsel, aside from myself, snickered.

Thank you.

(Whereupon, a Document, Bates-stamped EW-AUG0012146 through 148 was marked as Deposition Exhibit No. 1 for

Page 31

identification, as of this date.)

Q   Take a chance to review this document before I ask you any questions.

A   I have reviewed it.

Q   Have you -- have you ever seen this document before?

A   I have. I've had my memory refreshed.

Q   Do you recall the last time you saw this?

A   I believe I saw it yesterday in reviewing documents with my counsel.

Q   Did you see any other documents yesterday when reviewing documents with your counsel?

A   I did.

Q   What other documents did you see?

MR. GLADSTEIN:  Object to the form of the question.

A   I don't recall the specific documents, but if you show me documents, I'm happy to have a review of them.

Q   Do you recall generally any of

Page 32

the documents you saw?

MR. GLADSTEIN:  Object to the form of the question.

A   Generally, I saw some emails. But as I said, if you show me documents, I'm happy to --

Q   Okay. I'm just trying to understand what you saw.

Did you see any documents aside from emails yesterday?

MR. GLADSTEIN:  Object to the -- sorry.

A   I reviewed some other documents, but as I said, I'm happy to review whatever you show me.

Q   What other types of documents did you review aside from emails yesterday?

A   Some transaction documents.

Q   Do you recall which transaction documents you reviewed?

MR. GLADSTEIN:  Objection.

A   There was a lot of transaction documents associated with this -- these various transactions. So if you show me

Page 33

documents, I'm happy to review them.

Q   Okay. Do you recall how long you met with your lawyer for?

A   Yesterday, I met with my lawyer for about three hours.

Q   Was that the first time you met with your lawyer concerning this deposition?

A   I met with him the week before for about 45 minutes.

Q   Did you review any documents at that time?

A   I reviewed documents both times.

Q   Okay. Let's look at this document, if we can.

Do you see at the bottom there is a reference to Delcath Systems?

A   I do.

Q   Do you recall anything about Delcath Systems? Did Empery invest in it?

A   We did.

Q   In what capacity?

MR. GLADSTEIN:  Object to the form of the question.

9 (Pages 30 - 33)

Page 34

Q   Were you a lead investor?

A   We were not a lead investor.

Q   Do you recall who was a lead investor?

A   I don't recall who was a lead investor, sitting here now.

Q   And in the email at the bottom of the page, which is from alertprivateraise.com, date August 21, 2019, it says:  Subject:  Private raise investor alert, Empery Asset Management, LP.

Do you see that?

A   I do.

Q   Do you know what "private raise" is?

A   I think it's some subscription service.  I am not a subscriber.  Empery is not a subscriber to it.  But I think it's some service that tracks placements.

Q   Is it correct that the email seems to indicate that Empery Asset Management is connected to Delcath Systems?

A   The Empery funds, I believe --

Page 35

and I don't recall exactly which ones -- invested in Delcath, presumably in this round of financing.

Q   But not as a lead investor; is that correct?

A   Not that I recall.

Q   Do you recall who was the lead investor?

MR. GLADSTEIN:  Object to the form of the question.

A   Asked and answered.

MR. ABRAHAM:  Thank you, Counsel.

MR. GLADSTEIN:  I got it.

Q   Let's go to the next -- let's go up the page.  It says on August -- well, let's skip that.  Let's go up to page it says on August 22, 2019, at 10:07 a.m., Joe Reda wrote.

Do you see that?

A   Yep.

Q   It says:  Wow, can we do something simulate for GNUS.

Do you see that?

A   I do.

Page 36

Q   Do you understand when he wrote "simulate" to mean "similar"?

MR. GLADSTEIN:  Object to the form.

A   I believe that's what he meant.

Q   Do you have any understanding what he meant when he said:  Can we do something similar for GNUS?

A   I presumed, sitting here today reading this email, that he meant he was seeking to raise capital for GNUS and saw this transaction get done and wanted to see if we could do something similar for them.

Q   And going up the page, it says on August 22, 2019, at 10:11 a.m., Ryan Lane wrote:  Ha, no chance.

Do you recall writing that?

A   I see it here now.

Q   Do you have any understanding why you wrote "No chance"?

A   I think for the reason that I stated here.  Delcath is a Phase III drug.  I mean, technically, it's a Phase III

Page 37

device but...

Q   Does that -- did that make it a favorable investment?

A   That's a late stage biotech company.  So it's a, you know, more attractive investment in my mind than Genius was at that time.

Q   Why was it a more attractive investment in your mind than Genius was at the time?

A   Because they had a Phase III device that was -- appeared to be effective in treating tumors.

Q   And what did Genius have at that time?

A   Genius had some --

MR. GLADSTEIN:  Object to form.

A   -- content for children that was struggling to, you know, get traction viewership-wise.

Q   Had any of the Empery funds made any investment to Genius securities prior to August 22, 2019?

A   As I said earlier, I believe

10 (Pages 34 - 37)

Page 38

so, but I don't remember the exact transactions prior to 2020. But I do believe we entered 2020 owning some securities.

Q   Okay.

MR. ABRAHAM: I'm going to ask the court reporter to please mark as Exhibit 2 a document which is at Tab 3 and is Bates-stamped EMPGNUS0001975 through 1976.

(Discussion off the record.)

(Whereupon, a Document, Bates-stamped EMPGNUS0001975 through 1976 was marked as Deposition Exhibit No. 2 for identification, as of this date.)

Q   Take a chance to review this document, please, Mr. Lane. And let me know when you're done, please.

A   I have reviewed it.

Q   Have you ever seen this document before?

A   I reviewed it, I believe, as part of my deposition preparation.

Page 39

Q   Okay. Let me direct your attention to the email at the bottom of the page, which says on September 4, 2019, at 8:45 a.m., Joe Reda wrote: Ryan, let me know if you want to be over the wall on a senior secured convertible debt deal, open parens, top of the cap table, close parens, with warrants for a media, slash, entertainment, slash, consumer products company on the NASDAQ for your new debt fund.

Do you see that?

A   I do.

Q   Do you know which new debt fund Mr. Reda is referring to?

A   You know, this is probably around the time that we launched our debt fund.

Q   What is the name of that debt fund?

A   Empery Debt Opportunity Fund, LP.

Q   Do you have any understanding what Mr. Reda meant by "over the wall"?

A   It's a process by which a

Page 40

banker or a ECM group will give you parameters about a issuance that they're looking to do, but they have been retained on by the issuer. And they will ask you if you want to come over the wall and receive material nonpublic information.

Q   What does "ECM Group" refer to?

A   Equity capital markets.

Q   Do you understand Mr. Reda's email as referring to Genius Brands?

A   I deduced that from his probably overly descriptive words.

Q   How long have you known Mr. Reda?

A   Probably about 15 years.

Q   All right. Do you consider him a personal friend?

A   No.

Q   Do you consider him a business acquaintance?

A   I would consider him a business acquaintance that I'm friendly with.

Q   Do you ever discuss

Page 41

non-business matters with Mr. Reda?

A   It is my job in my capacity as an investor to see as many investments as I can from all investment banks. So it is my job to interact with them. And sometimes I do interact with them on a personal basis. We talk about personal stuff to, you know, form some relationship.

Q   Would you consider this email to be a business-related email?

A   Yes.

Q   Okay. Let me go up the page to the next email, which is from Ryan Lane sent Wednesday, September 4, 2019, at 9 a.m. to Joe Reda: Subject re: New PIPE deal, dash, teaser.

Do you see that?

A   I do.

Q   And in it you write: Not investing with the dirtbag CEO named Heyward. He deserves to go bankrupt.

What did you mean by "dirtbag"?

A   I was being facetious, but I'm

11 (Pages 38 - 41)

Page 42

generally a skeptical person. And I had seen the company perform over the previous years or not perform. They had not created any shareholder value, and I didn't think it was something that we were going to be interested in. I probably went a little far with my words there, but I was sending a message.

Q   But why would you call Mr. Heyward a dirtbag?

A   Because they hadn't created any value for investors.

Q   Any other reason?

A   No.

Q   Let's go up the page, and it says on September 4, 2019, at 9:07 a.m., Joe Reda wrote.

Do you see that?

And he writes a -- it's an email to you.

I think your name is Ryan; is that correct?

A   That's correct.

Q   And in the first paragraph, he writes: You know I love you and I respect

Page 43

you, but I don't know what he did to you to make him, a quote-unquote, dirtbag. He likes you, not as much as I do.

Do you see that?

A   I do.

Q   And he goes on to write: He'll be in NYC on 9/12 to 13. Let's do sushi and keep an open mind.

Do you see that?

A   I do.

Q   Did you wind up meeting Mr. Heyward on either September 12th or September 13th of 2019?

A   I don't recall if I met him on those dates.

Q   Do you recall meeting him in any dates in September 2019?

A   I did have lunch with him. I did have sushi with him at some point. But I don't remember if it was 2019. It may have predated that.

Q   Was that in New York City?

A   It was.

Q   Let's go down in the email.

And do you see there is a

Page 44

paragraph that starts with the word "Aegis? "

Do you see that, A-E-G-I-S?

A   I do.

Q   And it says:  Aegis botched the S-1 deal where the stock dropped 70 percent and they swung on and missed on a common-only deal, which is creating an amazing opportunity for us to come on top of the cap table.

Do you see that?

A   I do.

Q   Do you know who Aegis is?

A   I do.

Q   Do you know what Mr. Reda was speaking about when he referred to the "botched S-1 deal"?

A   You would have to ask him.

Q   But sitting here today, do you know what he was referring to?

A   I believe he was referring to an S-1, which is a regulatory filing made with the SEC to purport to raise capital under that --

Q   And was that --

Page 45

A   -- filing.

Q   -- and was that an effort to raise capital through an offering of common stock?

MR. GLADSTEIN:  Object to the form of the question.

A   That's what it looks like here.

Q   Do you -- do you recall what happened to that proposed offering? Did it go forward?

A   I was not involved in that proposed offering.

Q   But were any of the Empery funds investors in Genius Brands at the time?

A   As I said I don't --

MR. GLADSTEIN:  Object to the form of the question.

A   -- I don't recall which offering -- which offerings we invested in prior to 2020. We did have some securities.

Q   Let's go up the page to the email from Ryan Lane sent 9/4/2019 at

12 (Pages 42 - 45)

Page 46

1:13:07 p.m. to Joe Reda.

Do you see that?

A   I do.

Q   The second line says: Zero chance I put a single one dollar in. Guy is a criminal.

Do you see that?

A   I do.

Q   When you say "Guy is a criminal," who are you referring to?

A   I believe I was referring to Andy Heyward.

Q   Why did you refer to him as a criminal?

A   Again, I hadn't created shareholder value, was frustrated with the situation, and I was being facetious. That word was not warranted.

Q   Do you often refer to CEOs who don't create shareholder value as "criminals"?

A   I refer to them as a lot of things.

Q   But as "criminals"?

A   I would have to go back and

Page 47

look at all my emails.

Q   Well, can you think of any other CEO of a public company that you have ever referred to as a criminal?

A   Not specifically.

Q   Generally?

A   Generally, I've probably said it before.

Q   But you don't recall when?

MR. GLADSTEIN:  Object to the form of the question.

A   I don't recall a specific situation.

Q   Do you recall any conversations after -- in 2019, after September 4, 2019, regarding a proposed offering of Genius Brands securities?

A   Can you re-ask the question?

MR. GLADSTEIN:  Jeff, just before you do, can we put the next -- this document away?  Are we done with it?

MR. ABRAHAM:  You can put that document away.

MR. GLADSTEIN:  Just this

Page 48

side.

MR. ABRAHAM:  Do you want to repeat that question for me?

(The requested portion of the record was read back.)

MR. RECKLER:  Objection to form.

(Whereupon, the court reporter requested clarification.)

MR. ABRAHAM:  Mr. Reckler said it.

A   I believe there were some conversations after that email after September of '19.

Q   Were those conversations in 2 -- any of those -- strike that.

Were any of those conversations in -- made in 2019?

MR. GLADSTEIN:  Object to the form.

A   Potentially.

Q   Would you have kept a record of any of those conversations?

MR. GLADSTEIN:  Object to form.

Page 49

A   It depends if they were on the phone, but if they were on email, they would have been produced.

Q   Do you keep records of your phone conversations?

A   I do not.

Q   Do you make notes of your phone conversations?

A   I do not.  I do not take notes.

Q   Is that a policy at the Empery funds not to take notes on phone conversations?

A   No.  I've never taken notes in my life.

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit 3 what is Tab 4 in the FTP we sent to other counsel. It's a document Bates-stamped EW-AUG0013088 through 13094.

(Discussion off the record.)

(Whereupon, a Document, Bates-stamped EW-AUG0013088 through 13094 was marked as

13 (Pages 46 - 49)

Page 50

Deposition Exhibit No. 3 for identification, as of this date.)

Q   Take your time to review the document, and please let me know when you're done doing so.

A   Okay.

Q   Have you ever seen this document before?

A   I believe I reviewed it as part of my preparation for the deposition.

Q   Do you recall the last time before that that you saw this document?

A   Probably when I wrote it.

Q   All right.  And at the bottom of the first page, which is Bates-stamped 13088, there is an email from Joe Reda sent Wednesday January 22, 2020, at 9:15 p.m. to Ryan Lane, copying Brett Director, Jonathan Schechter (ph), and Linda Maquet (ph).  Subject:  GNUS.  Empery, over the wall.

Do you see that?

A   I do.  And I should correct.  It looks like I didn't respond to any of

Page 51

these.  So probably when it came across my email was the first time I ever saw it.  There's no response from me here that I can see.  But, yes, I see what you're talking about.

Q   Do you recall receiving this email?

A   Not at the time.  I mean, at the time, yes, but not -- as we sit here today, I don't recall this email other than reviewing it and refreshing my memory for preparation in the deposition.

Q   Okay.  Who is Brett Director?

A   Brett Director is our internal counsel.  He is our GC and chief compliance officer.

Q   Do you have any understanding why Mr. Reda would have sent this email to Mr. Director?

MR. GLADSTEIN:  Object to form.

A   You would have to ask him.

Q   Is Mr. Director often involved in the Empery funds' decisions whether to invest in a new deal?

Page 52

MR. GLADSTEIN:  Object to the form of the question.

A   He has zero voting power for any investments.

Q   Does he have any other involvement aside from voting power?

MR. GLADSTEIN:  Object to the form of the question.

A   He is involved in and responsible for reviewing and drafting documents for investments as well as compliance materials.

Q   Who has voting power?

A   Myself and Martin Hoe.

Q   Anybody else?

A   No, not explicitly.

Q   How about implicitly?

A   We have two associates and -- well, an associate and a portfolio manager that have input, but they don't have explicit votes.

Q   Who are those portfolio managers and associates?

More appropriately, let me ask you, who were they in 2020 -- in

Page 53

January 2020?

A   So there was only one in 2020.

Q   Who was that?

A   That was Bryan Armenta.

Q   Did he have any involvement in Genius Brands?

A   Only assisting --

MR. GLADSTEIN:  Object to the form of the question.

I apologize.

A   Only assisting with, you know, some document preparation, some allocation of the investment between our funds, and probably some, you know, exercise of warrants and other stuff associated with managing the instrument and instruments.

Q   Did the Empery funds have a process for allocation Investments between its different funds in January 2020?

A   Yes.

Q   What was that process?

A   It's a formulaic process.

Q   Is the formula confidential?

A   It is.

Q   Are you able to share it with

14 (Pages 50 - 53)

Page 54

me, and we'll keep it confidential?

A   I can give you a general sketch of the concept.

Q   I'll take the general sketch.

A   It has to do with the amount of cash in each fund; the amount of different types of investments in each fund; the amount of available cash in each fund minus a cash buffer.  So we have a cash buffer that, you know, we always maintain in each fund based on a percentage of the assets in that fund so there is liquid cash to manage existing positions.

Q   Does each fund maintain a credit line as well?

A   No.  We have zero leverage in any of our Empery funds.

Q   Is it an algorithm where you just plug in numbers?

MR. GLADSTEIN:  Objection to the form of the question.

A   It's formulaic.  I mean, an algorithm is a type of formula, but this is --

Page 55

Q   Okay.  But it's a formula where you plug in numbers.

Is there any judgment involved aside from plugging in the numbers?

A   The only judgment that is involved is the type of investment.  If it's a debt investment, it is allocated to the debt fund first about 90 percent and then potentially allocated to the other funds based on, you know, that instrument.

Q   Does a debt fund also hold debt which is convertible into equity?

MR. GLADSTEIN:  Object to the form.

A   As we sit here today?

Q   As we sit here today, and after you answer that question, as we -- in 2020?

A   As we sit here today, it does not.

Q   How about in 2020, in January of 2020?

A   I would have to go back and look.  But at that time, the debt fund was relatively new.  So...

Page 56

Q   Do you recall how much capital was in the debt fund in or about January 2020?

A   About $60 million.

Q   Do you recall how much capital was in the other Empery funds in January 2020?

A   In January 2020.  I'd have to go back and look.  I don't recall.

Q   Okay.  How much capital is currently in all the Empery funds put together?

A   About 250 million, give or take.

Q   Is that roughly the amount of capital that was in all the Empery funds back in January 2020?

A   There was a lot of fluctuation during COVID.  So I don't want to ponder a guess.

Q   How about in 2021?

A   There was a substantial amount of capital in 2021.

Q   Was there more in 2021?

A   Yes.

Page 57

Q   Why is that?

A   Because the market --

MR. GLADSTEIN:  Object to the form of the question.

A   -- was generally going up, and our positions were worth more.

Q   Let's go up the page here on the first page of this Exhibit 3, which is Bates-stamped 13088.  And there is an email from Jonathan Schechter sent Thursday, January 23, 2020, to Joe Reda, Ryan Lane, copying Brett Director and Linda Maquet.  Subject:  The GNUS, Empery over the wall.

Do you see that?

A   I do.

Q   By the way, as used in this email, do you understand what was meant by "Empery over the wall"?

A   You know, I think we previously spoke about that.

Q   But once this -- you received this email, was Empery, in any way, restricted from trading in Genius Brands stock?

15 (Pages 54 - 57)

Page 58

A   Yes.

Q   Why is that?

A   Because we were in possession of material nonpublic information.

Q   And what was that material nonpublic information?

A   The existence of a financing.

Q   Was it the existence of an actual financing, or was it the existence of a potential financing?

MR. GLADSTEIN:  Object to form.

You can answer.

A   Potential financing.

Q   Is it correct that Empery had not yet agreed to invest in this proposed investment?

A   That's correct.

Q   Prior to this time and after -- so between September 2019 and January 22, 2020, did Empery have any conversations with anyone concerning a proposed new investment in Genius Brand securities?

MR. GLADSTEIN:  Object to the

Page 59

form of the question.

A   Not that I recall.

Q   But it's possible they did?

MR. GLADSTEIN:  Object to the form of the question.

A   We would have to drill down on the specific dates of when we went over the wall because I see a chain of email here, and the subject is obviously "Over the wall."  So at some point prior to this we went over the wall.  I don't know the exact date.  But I don't imagine that we would have any substantive conversations about a Genius transaction prior to going over the wall.

Q   Are you certain this is the first time that Empery went over the wall is when they received Joe Reda's email on January 22, 2020?

MR. GLADSTEIN:  Object to form.

A   Over the wall is an email process that I don't see here.  So there is probably another email where we officially went over the wall, or there

Page 60

was a conversation on the phone where we officially went over the wall.  This seems more of an acknowledgment that we're over the wall.

Q   But you have no recollection of any such conversation on the phone, do you?

MR. GLADSTEIN:  Object to the form of the question.

A   I don't remember the exact method they used to bring us over the wall, if that's what you're asking.

Q   But it's possible it was a phone conversation; is that correct?

MR. GLADSTEIN:  Object to form.

A   It's possible.

Q   All right.  Going to Mr. Schechter's email of January 23 of 2020.

He writes:  The company is at an inflection point, and this paper is very protective on the downside.

Do you see that?

A   I do.

Page 61

Q   Do you have any understanding what Mr. Schechter meant by "an inflection point"?

MR. GLADSTEIN:  Object to the form of the question.

A   I can generally tell you what an inflection point is.  I don't know what he's referring to here.  You'll have to ask him.

Q   All right.  At the time of this email, did you still consider Mr. Heyward to be a dirtbag?

MR. GLADSTEIN:  Object to the form of the question.

A   As I said, that was facetious.

Q   Well, since the time of the email in which you called Mr. Heyward a dirtbag, did you change your opinion by January 23, 2020?

A   I tried to keep an open mind.  I don't think at this point I had changed my, you know, general opinion that it wasn't something that I was likely to participate in.

Q   Well, if we go back to

16 (Pages 58 - 61)

Page 62

Exhibit 2 -- I don't know if you have it there.

MR. GLADSTEIN: Why don't you give us a Bates number -- Bates stamp?

MR. ABRAHAM: Bate number is 1975.

Does that help you?

MR. GLADSTEIN: It does.

Q    And if you look at the top of the page, I think we went through this email before. There is an email from Ryan Lane dated 9/4/2019 to Joe Reda, and you write: Zero chance I put a single dollar in.

Do you see that?

A    I do.

Q    Did you change your mind on that opinion from the time of September 4, 2019?

A    At some point I changed my mind. I don't know exactly when I changed my mind.

Q    Did you change your mind prior to January 22, 2020?

Page 63

MR. GLADSTEIN: Object to form.

A    I don't believe so, no.

Q    Did there come a point in time you changed your mind?

MR. GLADSTEIN: Object to form.

A    I made an investment.

Q    So does that mean you changed your mind?

A    I made an investment. I presumably changed my mind if I put capital in.

Q    Well, would you invest capital in a company where you thought ill of the company's CEO?

A    No.

Q    Let's go up the page, and there is --

A    Are we changing exhibits?

MR. ABRAHAM: Let's go back to Exhibit 3. I'm sorry. Thank you for --

MR. GLADSTEIN: Exhibit 4, counselor.

Page 64

MR. ABRAHAM: Is it Exhibit 4?

THE WITNESS: Three.

MR. KLEIN: It's Tab 4.

MR. ABRAHAM: Tab 4, Exhibit 3. If you're going to correct me, make sure that you're correct.

MR. GLADSTEIN: I think I wrote down the tab you guys announced. All right. Let's...

Q    All right. At Exhibit 3, there is an email from Joe Reda towards the top of the page sent Thursday, January 23, 2020, at 2:21 p.m. to Jonathan Schechter and Ryan Lane, Subject: Re: GNUS, dash, Empery over the wall.

Do you see that?

A    I do.

Q    And in it, he says: Ryan, Call Schechs (ph). Amin and Richie want you in for size.

Do you see that?

A    I do.

Q    Do you know who Amin is?

A    I believe that's the principal

Page 65

at Anson.

Q    Do you know his last name?

A    Nathoo, I think.

Q    Is he a personal friend of yours?

A    No.

Q    Is he a business associate of yours?

A    He is a competitor.

Q    Do you ever talk to him about personal matters?

A    Rarely, if at all.

Q    Do you know who Richie is?

A    I believe so.

Q    Who do you believe it is?

A    I believe that would be Richard Abbe.

Q    Is he a personal friend of yours?

A    No.

Q    Is -- does he have the same relationship with you as Mr. Nathoo?

MR. GLADSTEIN: Object to form.

A    I didn't -- I didn't

17 (Pages 62 - 65)

Page 66

characterize that relationship.

Q All right. Is he a business associate of yours, Mr. Reda?

A He's a competitor.

Q Do you ever talk to him about personal matters?

MR. GLADSTEIN: Object to form.

A Unlikely.

Q And did you have any understanding what Joe Reda meant by saying he wanted you in for size?

MR. GLADSTEIN: Object to the form of the question.

A You would have to ask Joe.

Q Did you ever ask Joe that question?

A I never asked Joe that question. This -- I mean, Joe and Jonathan Schechter are sales guys. This is an attempt to convince me to participate. This is puffery.

Q What do you mean by "puffery"?

A They are likely making things up to try and entice me to do it.

Page 67

Q So you don't --

A This is common for any sales professional in almost any profession that I have seen, and we see this all the time as funds.

Q So it would be fair to say that you don't take everything they say at face value?

A I would say that I don't even take it close to face value.

MR. GLADSTEIN: Are you done with the document?

MR. ABRAHAM: I'm done with the document. I would like to take a break now.

THE WITNESS: Sure.

MR. ABRAHAM: Five minutes.

MR. GLADSTEIN: Absolutely.

MR. ABRAHAM: Is that okay? Go off the record.

VIDEOGRAPHER: This is the end of the Media 1. We're going off the record. The time at 11:25 a.m.

(Whereupon, at 11:25 a.m., a

Page 68

recess was taken to 11:40 a.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: We're going back on the record at the time of 11:40 a.m.

Q All right. Mr. Lane, I believe before we went off the record, we spoke about term sheets at some point; is that correct?

Do you recall that?

A I do.

Q What is the purpose of a term sheet?

A The purpose of the term sheet is to memorialize generally the business terms of an investment by a fund or the seeking of investment by an issuer.

Q Can the actual terms of the investment ever conflict with those found in the term sheet?

MR. GLADSTEIN: Object to form.

A Absolutely.

Page 69

Q Under what circumstance?

MR. GLADSTEIN: Object to form.

A I mean, it evolves over time, right? In a transaction if there is a lead investor and then you have other investors who express interest, they're going to want to have input with respect to what their interests are for their limited partners. So you can have a term sheet that evolves or terms of a transaction that evolve over time based on other people's interests.

Q So --

A Term sheet generally only reflects the interest of the lead investor or potentially even the investment bank who is outlining terms for an investment. And then when you get investors involved, they are going to seek terms that please them.

Q So is it fair to say that the terms evolve as the investors work together?

MR. GLADSTEIN: Object to

18 (Pages 66 - 69)

Page 70

form.

Are we talking about Genius, or are you asking generally? And I'm not trying to be difficult. I just want to make sure the witness is answering the right question.

Q   Generally.

A   Investors work on their own behalf to seek terms they want. They don't work with other investors. They work with the counterparty, which is the issuer and the placement agent. And they seek in terms that benefit themselves and their LPs because the investment advisor is a fiduciary for their LPs. So I think using the word "together as investors" is self-fulfilling for you.

Q   Is it fair to say that all the investors have to come to an agreement on the terms?

MR. GLADSTEIN:  Object to form.

A   Investors can go in and out of a transaction based on what they are seeking. So they are not agreeing.

Page 71

They're agreeing with the counterparty, which is the issuer. And if they get the terms that they want that satisfies their investment criteria, they will invest; if they don't, they don't.

Q   Have you ever invested in a deal where different investors get different terms.

MR. RECKLER:  Objection to form.

A   Generally, what the agreements --

THE WITNESS:  Sorry. I'll get better at...

A   -- generally what the agreements say is you're investing on substantially similar terms. You're executing substantially similar documents. I have never reviewed another investor's documents to see if it was identical. We review our documents.

Q   Did you have an understanding in the context of Empery's investment in Genius Brands whether Empery was getting different terms than any of the other

Page 72

investors?

MR. GLADSTEIN:  Object to form.

A   It's a parallel investment where we're getting substantially the same terms, but I'm negotiating for my funds on behalf of my LPs to get the terms that I want for my investors.

Q   And is it your understanding that the other investors would get substantially the same terms?

MR. GLADSTEIN:  Object to form.

A   It is my understanding, yes. That's the way these transactions work.

Q   Was Empery's position hostile to the other investors?

MR. GLADSTEIN:  Object to form.

A   I don't specifically know. I know that we were asking for what we wanted, and other people would receive it however they received it.

Q   Did you expect Empery to get different terms than other investors with

Page 73

respect to its investment in Genius Brand securities?

A   Asked and answered.

Q   You can answer again.

MR. GLADSTEIN:  Ryan, let me handle the substance of the objections, okay?

THE WITNESS:  I'm not objecting. I'm just saying I already answered the question.

MR. GLADSTEIN:  I will object to form, and then you can answer.

Q   You can answer.

A   It was our understanding that all the investors would get substantially similar terms.

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit 4 --

MR. KLEIN:  Tab 5.

MR. ABRAHAM:  -- which is Tab 5, a document Bates-stamped ANSON0 -- whoa, whoa, whoa. One second. One second. Okay. One second. One second. We have a --

19 (Pages 70 - 73)

Page 74

we have a problem here.  We've got a problem.

MR. GLADSTEIN:  That's not the only one.

MR. ABRAHAM:  It might be the --

MR. KLEIN:  Oh, that's my fault.

(Off the record.)

MR. GLADSTEIN:  So are we doing Tab four and a half or Tab 5?

MR. ABRAHAM:  No, no.  Tab 5.

MR. KLEIN:  Tab 5.

MR. ABRAHAM:  And it's document Bates-stamped EP -- EMPGNUS00020005 --

COURT REPORTER:  Sorry.

MR. GLADSTEIN:  No, you're fine.

MR. ABRAHAM:  -- through 2008.

MR. GLADSTEIN:  All right.  So we -- sorry.  We're marking this as Exhibit 4, correct?

MR. ABRAHAM:  That is correct.

Page 75

MR. GLADSTEIN:  Thank you.

(Whereupon, a Document, Bates-stamped EMPGNUS00020005 through 2008 was marked as Deposition Exhibit No. 4 for identification, as of this date.)

Q    Take your time to review this document, and please let me know when you finish doing so.

A    Okay.

Q    Have you ever seen this document before?

A    I believe I've reviewed some of it in deposition preparation.

Q    And on the first page, which is Bates-stamped 2005, there is an email from Joe Reda to Brett Director, Ryan Lane, Jonathan Schechter:  Subject:  FWD GNUS, dash, revised transaction document.

Do you see that?

A    I do.

Q    And in it, he writes:  Brett, work your magic.  Get docs in shape for Ryan to do $3 million.  We love you.

Page 76

Do you see that?

A    I do.

Q    Do you recall receiving this email in 2020?

A    As we sit here today, I recall it.  I -- do I remember back then receiving it?

Q    Yes.

A    Not specifically.  Reviewing it today, I'm -- it's refreshing my memory.

Q    Do you recall your reaction to receiving this email?

MR. GLADSTEIN:  Object to form.

A    This is ordinary course business.

Q    So it didn't really register with you; is that fair?

MR. GLADSTEIN:  Object to the form of the question.

A    I don't know what you mean by the question "didn't register with me" but...

Q    It didn't make much of an

Page 77

impact upon you receiving this email --

MR. GLADSTEIN:  Object to form.

Q    -- is that fair?

A    No.

MR. GLADSTEIN:  Object to form.

A    It didn't impact me.

MR. ABRAHAM:  All right.  I am going to ask the court reporter to mark as Exhibit 5 a document which I believe is Tab 6, and it's Bates-stamped EMPGNUS0009392 through 9393.

(Whereupon, a Document, Bates-stamped EMPGNUS0009392 through 9393 was marked as Deposition Exhibit No. 5 for identification, as of this date.)

Q    Have ever seen this document before?

A    Yes, I believe I reviewed it in preparation for the deposition.

Q    And the email at the bottom of

20 (Pages 74 - 77)

Page 78

the first page which is -- well, let's go to the second page actually --

MR. GLADSTEIN: Turn the page over.

Q -- which is Bates-stamped 9393 at the bottom. And there is an email from Brett Director sent Monday, January 27, 2020, at 4:40 p.m. to Robert Charron: Subject: Precedent for GNUS.

Do you see that?

A I do.

Q Do you recall any conversations with Mr. Director prior to the time he sent this email in January 2020 concerning precedents for GNUS?

A I don't remember any conversations, no.

Q Do you recall any conversations at the end of January 2020 in which he discussed Empery potentially investing in Genius securities?

MR. GLADSTEIN: I'm going to caution the witness, and I'm going to make this a single caution now because I think we're going to get

Page 79

into a line of questions given that Mr. Director is general counsel of Empery and serves in both his legal capacity as counsel to the fund and in nonlegal ways.

To the extent the forthcoming questions, Ryan, cause you or call for the disclosure of any information that is privileged and confidential, I'm going to instruct you not to answer. To the extent Mr. Abraham's questions refer to conversations with Mr. Director that are not privileged and confidential, you can answer.

So just exercise caution as we go into these questions and make sure you understand before you answer whether or not you believe you're being asked for privileged and confidential information.

THE WITNESS: Understood.

MR. ABRAHAM: With Mr. Gladstein's short objection on

Page 80

the record, can you please repeat the prior question?

(The requested portion of the record was read back.)

MR. ABRAHAM: End of January 2020.

(The requested portion of the record was read back.)

Q I'll ask a new question, okay?

A Okay.

Q Do you recall any conversations with Mr. Director towards the end of January 2020 in which you discussed the possibility of Empery investing in Genius Brand securities?

A I do not.

Q Do you recall receiving a copy of any term sheet with respect to investment in Genius Brand securities in January of 2020?

A I do not.

Q Do you have any understanding why Mr. Director would have sent this email on January 27, 2020?

A Presumably he was trying to be

Page 81

an advocate for Empery in the situation where we may invest. It is best for us if we have forms that we're comfortable with, if we have provisions that we as a fund are comfortable with. So him providing forms is something that we advocate for if there is a possibility we would invest.

Q So is it fair to say that at the end of January 2020 that the Empery funds were considering investing in Genius Brand securities?

MR. GLADSTEIN: Object to form.

A I would say it wasn't zero chance at that time; otherwise, he likely wouldn't have sent documents. But, you know, we would like to leave the optionality open. So if there is a chance that we do invest that it's at least based on forms that we would be comfortable with.

Q Was there at least a 50 percent chance?

A Probably not even close.

Q Okay. Around what percent

21 (Pages 78 - 81)

Page 82

chance would you have said that there was at the end of January 2020?

A   Greater than zero.

Q   But less than 50?

A   Greater than zero.

Q   But it would be less than 50?

A   I'm comfortable saying greater than zero.

Q   But there is a broad range that is greater than zero that's less than a hundred.

A   I would instruct my general counsel to send forms for a transaction where our probability of investing is greater than zero.  If it's zero, then we're not going to be involved, and we're not going to...

Q   Would you instruct your general counsel to send forms if there was as little as a 10 percent chance of investing.

MR. GLADSTEIN:  Object to form.

A   Depends on the situation.

Q   Can you think of any --

Page 83

A   We like optionality.

Q   I understand.  But can you think of any investment where there was less than a 10 percent chance where you instructed your general counsel to send forms?

MR. GLADSTEIN:  Object to form.

A   I can't point to a specific transaction.

Q   How about generally?

A   Generally, I'm sure that happens.

Q   But you can't point to a specific transaction; is that correct?

MR. GLADSTEIN:  Object to form.

A   Correct.

Q   Let me ask you to turn to the first page of this document, which is Bates-stamped 9392.  And at the bottom of the page, there is an email from Robert Charron to Brett Director.  Do you see that?

And it's dated January 28,

Page 84

2020.

A   I see that.

Q   Do you know who Robert Charron is?

A   I do.

Q   Who is he?

A   He is a lawyer working for Ellenoff Grossman.

Q   Was he your lawyer?
When I say "your," I mean the Empery funds' lawyer on this matter.

A   Rob Charron has never represented the Empery funds.

Q   So is it fair to say that Rob Charron did not represent the Empery funds in connection with its -- with the Empery funds' investment of Genius Brands securities?

A   That's correct.

Q   Now, Mr. Charron's email to Brett Director on January 28, 2020, towards the end of the first line, beginning of the second line references a "netting agreement."
Do you see that?

Page 85

A   I do.

Q   Do you have any understanding generally what a netting agreement is?

A   Yes.

Q   What is your understanding?

A   In this case, I think it's called a "master netting agreement."  The concept is that it is an unfunded cash portion of a note purchase agreement.  So you will fund a portion with cash, and you will fund a portion with a note to the company where you net out the note by payment of cash.  So the master netting agreement is the portion that's not cash funded, and there are usually terms and provisions that require you to fund it at some time in the future if those conditions are met.

Q   Does it have any utility in case the company goes bankrupt?

A   It's not -- that's not the purpose.

Q   That's not the purpose?

MR. GLADSTEIN:  Object to form.

22 (Pages 82 - 85)

Page 86

Q   Did you review the terms of the master netting agreement in this case?

A   My counsel reviewed the specifics, Brett Director, and he would communicate to me the, you know, general terms we're looking at and tell me if it's consistent with, you know, what my expectations are.

Q   But the actual terms of the agreement govern what its terms are, correct?

A   Correct.

Q   And if you go to the top of the page, the first page which is Bates-stamped 9392, there is an email from Robert Charron 1/28/2020 at 10:21 p.m. to Brett Director.

Do you see that?

A   I do.

Q   And it says:  Here is a revised note.  As you said, ended up being fairly well on point.  Note, I tried to follow what I believe are the terms but -- here, but honestly, I think it's totally up for negotiation.  So see what Ryan says

Page 87

on the business points, and we'll go back to them.

Do you see that?

A   I do.

Q   Do you have any understanding what Mr. Charron meant when he said "the terms" here?

A   I mean, you would have to ask him.

Q   Would that be referencing back to the term sheet?

MR. GLADSTEIN:  Object to form.

A   You would have to ask him.

Q   And do you recall anybody going back to you after January 28, 2020, with respect to the business points?

MR. GLADSTEIN:  Object to form.

Q   Of this proposed investment?

A   Anybody?

Q   Anybody.  Anybody at all.

A   I'm -- I don't know.

Q   You don't recall?

A   Not in relationship to this

Page 88

email.

Q   But how about in relationship to the business points of the proposed investment in Genius Brands securities to which this email relates?

A   After this date, between this date and the time of the investment, there were communications back and forth about various business terms between me and my counsel and my counsel and issuer and issuer counsel and potentially even to Rob Charron.

Q   Did you speak about the business points to -- with anybody aside from your counsel?

A   Generally not.  There may be a situation here or there because it was COVID where I could communicate directly to either issuer counsel or to Rob Charron on specific points, if he was working on them on behalf of his client in order to input, you know, Empery's view of the situation, but that is all to benefit our fund and my LPs.

Q   Were you working from home

Page 89

during COVID in 2020?

A   Yes.

Q   But is it correct that COVID had not yet occurred in January of 2020 at the outbreak; is that correct?

A   That's false.

Q   Is it correct that the outbreak of COVID in the United States had not yet occurred in January of 2020?

MR. GLADSTEIN:  Object to form.

A   It had just started, actually.

Q   When did you start working from home January --

A   We were --

Q   -- in 2020?

A   I don't remember the exact date, but we were very early on the curve because I was watching what was happening in China.  We do a lot of biotech.  So I was well up to speed on the situations.  We had already, you know, had provisions in our basement.  We were well-positioned in early January.

MR. ABRAHAM:  I'm going to ask

23 (Pages 86 - 89)

Page 90

the court reporter to please mark as Exhibit --

COURT REPORTER: Six.

MR. ABRAHAM: -- 6 a document which is Tab 8.

(Whereupon, a Document, Bates-stamped EMPGNUS0009391 was marked as Deposition Exhibit No. 6 for identification, as of this date.)

Q    And is Bates-stamped EMPGNUS0009391.

And take a chance to review this document.

Have you ever seen this document before?

A    I believe I reviewed it in preparation for this deposition.

Q    Do you recall seeing this document in February 2020?

A    I do not.

Q    Do you recall discussing anything mentioned in this -- well, strike that.

Page 91

Do you recall any discussions with Mr. Director concerning the investor collateral certificate in or about February 26, 2020?

A    Not specifically.

Q    How about generally?

A    Not generally either.

Q    Do you recall any discussions with Mr. Charron concerning the voting agreement in or about February 26, 2020?

MR. GLADSTEIN: Object to form.

A    Me discussing with Mr. Charron?

Q    I'm sorry. You discussing with Mr. Director. Let me strike that.

Do you recall any discussions with Mr. Director concerning the voting agreement in or about February 26, 2020?

A    I don't specifically remember discussing a voting agreement.

Q    Do you recall reviewing the voting agreement?

A    I did not review the voting agreement.

Page 92

Q    Do you recall knowing about the voting agreement?

A    I don't remember exactly when I was aware that there was a voting agreement associated with this transaction, but I do remember discussing a voting agreement.

Q    Do you recall who you discussed the voting agreement with?

A    With my general counsel, Brett Director.

Q    And was your discussion with Mr. Director limited to legal matters concerning the voting agreement?

A    I don't remember the specifics of the discussion.

Q    Do you recall any discussions with Mr. Director concerning the voting agreement that did not relate to Mr. Director giving you legal advice?

A    I can say generally when there are voting agreements involved in a transaction we look at what the implications of the voting agreement are and how it will affect the instrument

Page 93

we're buying. I assume that was the nature of the discussion here.

Q    Do you recall what the implications of the voting agreement were in connection with the proposed investment in Genius Brands securities in February 2020?

MR. GLADSTEIN: Object to form.

A    Generally.

Q    What were they?

A    Generally, the shareholder vote was going to permit the security to, you know, adjust the conversion price and the exercise price of the warrants and the convertible note respectively.

Q    And would that adjustment be a downward adjustment in the exercise price of the warrants and the convertible note?

MR. GLADSTEIN: Object to form.

A    I believe so.

Q    Did that affect Empery's decision with respect to the instruments they were purchasing from Genius Brands in

24 (Pages 90 - 93)

Page 94

March 2020?

MR. GLADSTEIN: Object to form.

A   Generally.

Q   How did it affect it?

A   It's more economic if the conversion price is lower and the exercise price is lower.

Q   Were the terms of the voting agreement important to Empery?

MR. GLADSTEIN: Object to form.

A   All Empery cares about is that we get the benefit of the bargain, and the benefit of the bargain is that the company will seek a shareholder vote to reduce the conversion price and the exercise price of our instruments.

Q   Was the benefit of the bargain that certain shareholders agreed that they would vote in favor of reducing the conversion and exercise price?

MR. GLADSTEIN: Object to form.

A   My understanding was that the

Page 95

company was going to do whatever they had to do to seek as many votes as they could seek to give us the benefit of our bargain. And we have to make a judgment call.

Q   Did the voting agreement in any way relate to that benefit of the bargain?

MR. GLADSTEIN: Object to the form of the question.

A   The company was representing that they would seek a shareholder vote to reduce our conversion price and the exercise price of our warrants, and that is part of the benefit of the bargain that we got.

Q   Is it correct that part of the benefit of the bargain is that certain shareholders agreed that they would vote in favor of that reduction in the conversion price and exercise price?

MR. GLADSTEIN: Object to form?

A   I believe that is what the company put in place.

Page 96

Q   Was that part of the agreement between the investors and the company?

MR. GLADSTEIN: Object to the form of the question.

A   The company sought to satisfy the investors that they would get shareholder approval to reduce the conversion price and exercise price on our securities. We as Empery wanted to have a high probability that the company could satisfy the obligations under the securities so we would get the benefit of the bargain, which is the lower conversion price and the lower exercise price.

Q   And was the voting agreement part of that process?

MR. GLADSTEIN: Object to the form of the question.

A   The voting agreement was part of the company's process to deliver the -- to deliver the Empery funds what we were seeking, which was a lower conversion price and a lower exercise price.

Q   But is it correct that it was an exhibit to the securities purchase

Page 97

agreement?

A   It was an exhibit to the securities purchase agreement.

Q   Do you have any understanding why it was an exhibit to the securities purchase agreement?

A   It was what allowed the company to satisfy us that they were seeking to reduce the exercise price and the conversion price.

Q   Do you recall whether the shareholders of Genius Brands signing the voting agreement was a condition precedent to closing on the securities purchase agreement?

MR. GLADSTEIN: Object to form.

A   The company was seeking to have shareholders executed so they could increase the probability that they could satisfy the investors, right, the Empery funds, that we could have a reduced exercise price and the reduced conversion price as part of our benefit of our bargain.

25 (Pages 94 - 97)

Page 98

Q   Were the --

A   We were -- we were not parties to the voting agreement.

Q   But that's an object -- well, are you saying that as a legal conclusion based upon your understanding of the agreements?

MR. RECKLER:  Objection to form.

A   I didn't sign the voting agreement.  I'm not a party to the voting agreement.  I didn't execute the voting agreement as a fund.

Q   Was Empery able to enforce the terms of the voting agreement in any way?

MR. GLADSTEIN:  Object to the form.

A   I'm not -- I'm not privy to enforcing the agreement.  That was an agreement between the company and their shareholders.

Q   Would Empery have invested in the March 2020 offering of securities through the securities purchase agreement if there had not been a voting agreement?

Page 99

MR. GLADSTEIN:  Object to the form.

A   I cannot answer that question because I would have had to have judged it based on the economics I was getting without it and their -- if they -- the company could not satisfy what we were asking as in a reduced -- or probability of a reduced exercise price and a reduced conversion price, then we could have potentially asked for other economics in a different capacity.  So I cannot answer that question in a -- in a vacuum.

Q   Well, is it fair to say that the voting agreement was a material factor in the economics of the agreement that Empery entered into at the company in connection with the issuance of securities in March 2020?

A   It --

MR. GLADSTEIN:  Hang on, Ryan.  Object to the form of the question.

You can answer if you understood the question.

Page 100

A   It was how the company proposed to satisfy our economic requests.  If they could not satisfy it that way, we would have -- they would have purportedly proposed to settle it a different way, different economics --

Q   Was --

A   -- through a different mechanism, a different capacity.

Q   Is it correct that Empery agreed to that proposal?

A   We felt satisfied that there was a high probability that our conversion price and our exercise price would be reduced by the company's proposal.

Q   Let me just ask the question again because I would like a yes-or-no answer.

Is it correct that Empery agreed to that proposal?

MR. GLADSTEIN:  Object to the form of the question.

A   We agreed that the probability that we would get the economics of our investment was high based on the company's

Page 101

proposal to provide a voting agreement with their shareholders.

Q   Is it correct that Empery agreed to that proposal that there be a voting agreement as an exhibit to the securities purchase agreement?

MR. GLADSTEIN:  Object to the form of the question.

A   The company added the voting agreement to satisfy my concern that we would get the benefit of our bargain.

Q   And when Empery signed the securities purchase agreement, it agreed to all the terms of the securities purchase agreement including the related agreements referenced therein; is that correct?

MR. GLADSTEIN:  Object to the form of the question.

A   We saw that the company had executed the voting agreement with their shareholders, and that satisfied a closing condition.

Q   Okay.  Do you know what an "investor collateral certificate" is?

26 (Pages 98 - 101)

Page 102

A   Generally.

Q   How about in this context as referenced on Exhibit 6, which we have in front of us?

A   I didn't review this specific document, but I generally know what a collateral certificate is.

Q   Can you let me know what that is, please?

A   The company is purporting to post collateral or make collateral or put liens on collateral for the benefit of the collateral agent.

Q   And do you recall how that was satisfied in this case?

MR. GLADSTEIN:  Object to the form of the question.

A   I don't exactly recall how that was satisfied.

Q   Do you generally recall?

A   I assume it was satisfied by the company providing an executed collateral certificate.

Q   Do you recall generally the terms of the lock-up agreement?

Page 103

Strike that.

Do you recall whether there was a lock-up agreement executed by any Genius Brands shareholders in connection with Empery purchasing securities in the March 2020 securities purchase agreement --

MR. GLADSTEIN:  Object to the form --

Q   -- from Genius Brands?

MR. GLADSTEIN:  -- of the question.

A   Can you repeat the question.

MR. ABRAHAM:  Please repeat the question.

(The requested portion of the record was read back.)

A   I believe so.  I don't specifically recall.

Q   Do you recall the purpose of that lock-up agreement?

MR. GLADSTEIN:  Object to form.

A   Generally, a lock-up agreement will lock up specific parties, usually

Page 104

management and directors, from selling shares for a certain period.  I do not recall the specifics here.

Q   Do you recall agreeing to the terms of the lock-up agreement in connection with the purchasing securities through Genius Brands in March 2020?

MR. GLADSTEIN:  Object to form.  I'm going to assume you are not intentionally trying to mislead the witness.  Mr. Abraham, you understand these documents by now.  Don't ask questions that way.

Q   You can answer the question if you understand.

MR. ABRAHAM:  You can limit yourself to objection as to form.

MR. GLADSTEIN:  Not when you're going to pull that.

MR. ABRAHAM:  I'm not pulling anything.

MR. GLADSTEIN:  That's where you get beyond the -- no.

MR. ABRAHAM:  I'm not pulling

Page 105

anything.

MR. GLADSTEIN:  You know exactly what you're doing here.

MR. ABRAHAM:  I don't know exactly what I'm doing.

MR. GLADSTEIN:  Well, then, that's even worse.

MR. ABRAHAM:  Okay.

MR. GLADSTEIN:  Go ahead.

A   Could you re-ask the question?

MR. ABRAHAM:  Could you repeat the question, please?

(The requested portion of the record was read back.)

Q   Okay.  I understand his objection now.

Do you recall knowing about the terms of the lock-up agreement at the time Empery entered into the SPA with Genius Brands in March 2020?

A   I don't recall the specifics of the lock-up agreement, the term, or the parties that were locked up.  Generally, there are lock-up agreements in our transactions that lock up directors and

27 (Pages 102 - 105)

Page 106

officers.

Q    And what is the purpose of those lock-up agreements?

MR. GLADSTEIN:  Object to form.

A    It locks up the directors and officers from trading in the securities in the -- generally in the open market, which is common in offerings.

Q    Did that affect the economics of the transaction through which -- through which Empery purchased securities from Genius Brands in March 2020?

MR. GLADSTEIN:  Object to form.

A    It's not an economic term.

Q    What type of term is it?

A    It's a covenant term.  It's something the company represents --

Q    Was that --

A    -- or the specific directors and officers represent.

Q    Was that covenant term important to Empery in the context of its decision to purchase Genius Brands

Page 107

securities in March 2020?

MR. GLADSTEIN:  Object to form.

A    I don't recall in this situation how important it was, as we sit here today.

Q    Is it correct that the lock-up agreement prevents company insiders from selling securities they already owned?

A    Generally.

Q    Does it generally prevent corporate insiders from trading in the company's securities other than the securities they already own?

MR. GLADSTEIN:  Object to form.

A    Generally.

Q    Did it do so here?

MR. GLADSTEIN:  Object to form.

A    As I said, I don't recall the specific terms of the lock-up agreement. I will volunteer that Andy Heyward was a large shareholder so that was probably on our radar, but I don't know the specific

Page 108

terms that we requested from him.

Q    And is it correct Andy Heyward entered into the lock-up agreement was a condition precedent to Empery purchasing securities pursuant to the March 2020 SPA from Genius Brands?

MR. GLADSTEIN:  Object to form.

A    I don't think it was a condition precedent because I think it was a closing condition as a closing deliverable.  So it had to be satisfied before closing.  So we would have already subscribed.

Q    So it was a -- but it was a condition to Empery actually putting money into the security; is that correct?

A    It generally is, yeah.

Q    But in this circumstance?

A    I believe so.

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit --

COURT REPORTER:  Seven.

MR. ABRAHAM:  -- Exhibit 7 --

Page 109

MR. GLADSTEIN:  Done with six?

MR. ABRAHAM:  Done with six, yes -- a document, which is, I believe, Tab 10 and is Bates-stamped ANSON_0009678 through 9710.

Take a chance to review this document.

(Discussion off the record.)

(Whereupon, a Document, Bates-stamped ANSON_0009678 through 9710 was marked as Deposition Exhibit No. 7 for identification, as of this date.)

A    Okay.

Q    Have you ever seen this document before?

A    I don't think so.

Q    Did you ever see the investment note which is -- well, did you ever see the attachments to this -- to these emails which are Bates-stamped from 9686 through 9711?

A    I have seen the security

28 (Pages 106 - 109)

Page 110

promissory note, but it looks like there are a couple of versions. This is just an excerpt of it with some red lines. So I don't know what version this is or if I looked at this exact version, but I've seen the final secured note in our files. You would have to be more specific with your question.

Q   All right. Let me ask you to turn to page Bates-stamped 9687, please.

A   9687. 9687. Okay.

Q   All right. You see there is -- there is paragraph 3(c).

Do you see that?

A   I do.

Q   And do you see there's a -- at least on my version, there is some language which is stricken out in red and other language that is underlined in blue.

Do you see that?

A   I do.

Q   And language that's stricken out in red says six-month anniversary of the closing date, open paren, as defined in the securities purchase agreement.

Page 111

Do you see that?

A   I do.

Q   And that is with respect to forced mandatory payment.

And do you see that the language underlined in blue is: The date that the share is issuable upon the conversion in full of the notes, open parens, ignoring for such purpose any conversion limitations therein can be sold, signed, or transferred pursuant to Rule 144.

Do you see that?

A   Yes.

Q   Would you consider that a business term?

MR. GLADSTEIN: Object to form.

A   I think that's somewhere between a business term and a legal term.

Q   Well, what portions are a business term?

MR. GLADSTEIN: Object to form.

A   The six-month anniversary is

Page 112

also the 144 date if the company is 1934 Act compliant.

Q   And is it correct that, in this case, Genius Brands, at the time of this discussion, was 1934 Act compliant?

A   But that's not what's relevant.

Q   What is relevant?

A   That it was compliant at the time of the conversion.

It has to be compliant at the time, right?

So you could have a six-month anniversary, and if they're not compliant on that anniversary, then this forced mandatory prepayment wouldn't kick in. So it's basically saying it may be on the seventh anniversary, it may be on the eighth anniversary become -- when they come -- become compliant again. So this is -- this is it's closing a legal loophole, but it's relevant, from a business perspective, because it mitigates risk.

Q   And do you recognize that as a

Page 113

proposed change that Empery made?

MR. GLADSTEIN: Object to form.

A   I don't recall who made this.

Q   Okay.

MR. ABRAHAM: I'm going to ask the court reporter to please mark as Exhibit 8 --

A   Are you done with this --

Q   Yes?

A   -- 7?

Thank you.

Q   Whenever I move to a new exhibit, unless I say otherwise, we're done with an exhibit.

A   Well, you've made me pull them back off the pile so...

Q   Every so often, I'll ask you to do that, too.

A   Okay.

Q   I want to keep you --

A   Keep me on my toes.

Q   -- keep you from falling asleep.

A   You got me.

29 (Pages 110 - 113)

Page 114

Q   Or being bored, I should say. That's Exhibit 8, and it's Bates-stamped ANSON_00014591 -- let me get this right this time -- through 14595.

(Whereupon, a Document, Bates-stamped ANSON_00014591 through 14595 was marked as Deposition Exhibit No. 8 for identification, as of this date.)

Q   Why don't you take a chance to review this document before I ask you any questions, and let me know when you're done, please?

All right?

A   I'm not done yet.

MR. GLADSTEIN: I have a good story for you about his reading when we're off the record.

Don't put that on the record.

A   Okay.

Q   Have you ever seen this document before?

A   I don't believe so.

Q   Do you recall any discussions

Page 115

concerning the cumulative cash flow concept as it related to Empery's investment in Genius securities through the March 2020 SPA?

A   I do remember being involved in some discussion around the language and the cash covenant concept.

Q   Do you consider that a business concept?

A   Yes.

Q   Why?

A   Because it was going to help us understand the risk of the security.

Q   How would it help Empery understand the risk of the security?

A   Because we would have an understanding of the cash runway for the company based on the amount of capital they were raising.

Q   What do you mean when you say "cash runway"?

A   The amount of cash invested versus the amount of cash burn a company would have.

Q   Would that mean how many

Page 116

months of cash they would have on hand?

A   Something like that.

Q   And that -- is it correct that impacted the -- Empery's perception of risk in this investment?

A   Yes.

Q   All right.  Let's go to the next document then, which is going to be Exhibit 9, and it happens to be Tab 12. And it's Bates-stamped EMPGNUS0004391 through 4394.

(Whereupon, a Document, Bates-stamped EMPGNUS0004391 through 4394 was marked as Deposition Exhibit No. 9 for identification, as of this date.)

Q   Take a chance to review this document.  I know you do it carefully, and please let me know when you're done doing so.

A   Okay.

Q   At the top of the first page, which is Bates-stamped 4391, there is an email from Brett Director sent 3/10/2020

Page 117

to Jonathan Schechter, copying Robert Charron, Ryan Lane, Brett Director: Subject GNUS draft Form 8-K.

Do you see that?

A   I do.

Q   Have you ever seen this document before?

A   I think I reviewed it as part of the dep.

Q   Do you recall receiving this email at -- in March 10, 2020?

A   I don't recall.

Q   And it says in the body of the email:  Ryan and I just tried calling you to discuss a few business-level issues.

Do you see that?

A   I do.

Q   Do you recall what those business-level issues were?

A   I don't specifically recall what they were.

Q   How about generally?

A   I don't even generally recall what they were.

(Whereupon, a Document,

30 (Pages 114 - 117)

Page 118

Bates-stamped EMPGNUS0003091 through 3095 was marked as Deposition Exhibit No. 10 for identification, as of this date.)

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit --

COURT REPORTER:  Yes.

MR. ABRAHAM:  -- as Exhibit 10, a document which I believe is Tab 13 and is Bates-stamped EMPGNUS0003091 through 3095.

Q    And take a chance to review this document, and I know you'll do it carefully.  Let me know when you're done.

MR. RECKLER:  Can we have the document?

COURT REPORTER:  Yeah.  I was just --

(Cross talk.)

MR. RECKLER:  Oh, yeah.  Of course.  Just making sure.

MR. ABRAHAM:  I did not know

Page 119

that you did not have the document.

MR. GLADSTEIN:  Thank you.

A    Okay.

Q    Have you ever seen this document before?

A    I don't recall seeing this document.

Q    All right.  Let me direct your attention to the email on top of the first page, which is Bates-stamped 3091, which is from Brett Director to Jonathan Schechter copying Robert Charron.

And bcc, I believe that refers to blind copy; am I correct?

A    Yes, sir.

Q    And you're one of the people blind copied, as is Martin Hoe and Brett Director, Alyson Chung, and Brian Armenta.

Do you see that?

A    I do.

Q    Do you have any understanding why Mr. Director would blind copy you on this email?

MR. GLADSTEIN:  Object to

Page 120

form.

A    I'm not sure.

Q    Who is Alyson Chung?

A    She's our controller.

Q    Do you have any understanding why she is blind copied on this email?

MR. GLADSTEIN:  Object to form.

A    I don't -- I don't know but this email here notices at Empery AM, that -- that may have triggered that because that -- that is a internal email at Empery that has all of those bcc people on it.  So if we want to do communications internally, we often use that, and we also give that out to issuers to communicate with everyone inside Empery in case someone is on vacation.  So that may be an implication that notices is capturing those people, because that's probably the way the server system works.

Because it's routed to those people from notices.  So I don't think it was an intentional email to all these people, but I don't know.  I'm

Page 121

speculating.

Q    And you would have to speculate to know why he blind copied anybody; is that correct?

MR. GLADSTEIN:  Object to form.

A    I don't -- I don't know.

Q    And your email address here is listed as Emperyam.com.

Do you see that?

A    I do.

MR. GLADSTEIN:  Objection to form.

Q    Do you have another email address?

A    I do not.

Q    And the body of the email says:  See below for the comments that we discussed, dash, for Rob's benefit.

Do you see that?

A    I do.

Q    And one is in Section 17B:  The cash burn covenant should not be cumulative.

Do you see that?

31 (Pages 118 - 121)

Page 122

A   I do.

Q   Do you have an -- do you have any understanding what is meant by "cumulative" in this context?

A   Yeah, I do.

Q   What is your understanding of what cumulative means in this context?

A   Each month, cash burn has to exist in isolation.  You can't roll or use unused cash burn and credit it to another month, so it has to be each month on its own.  So you can't, you know, manipulate by having a low cash burn one month and an exorbitant cash burn the next month.  The idea was that it was on a month-by-month basis, calculated on a month-by-month basis.

Q   Was that an important provision for Empery?

MR. GLADSTEIN:  Object to form.

A   I was simply trying to make sure that there were holes that were closed if there was potential to...

Q   Potential to what?

Page 123

A   To manipulate the cash covenant.

Q   Were you concerned that Genius Brands might manipulate the cash covenant?

A   Potentially.  I'm always concerned that everyone is going to try and manipulate everything.

Q   Are you generally suspicious of people?

MR. GLADSTEIN:  Object to form.

A   Generally.

Q   And if you go down a little further, there is a reference to SPA.

Do you see that?

A   I do.

Q   And Point 1 references Section 4, open parens, O.

Do you see that?

A   I do.

Q   And it says the company could raise $2 million.

Am I reading that correctly?

A   Uh-huh.

Q   Multiple times and not have

Page 124

any -- not have to use any of the money to repay the notes.

Do you see that?

A   I do.

MR. GLADSTEIN:  Object to form.

Q   Was that a concern of Empery in making this investment?

MR. GLADSTEIN:  Object to form.

A   So, again, our edits were closing a loophole, right?

Because we wanted to make sure, if the company was raising more than $2 million, that they would have to use some of the proceeds to pay back the note so we could reduce our risk.  In this case, the way it was drafted, they could raise two, two, two, and two, so we were trying to make sure that, in the aggregate, if it was over two, that proceeds would go to pay us back.

Q   And Point 2 is:  Please add a covenant that the neither the company or Llama Productions, LLC, will amend the

Page 125

terms of, open bracket, describing Llama Llama credit line, close bracket, without the prior written consent of the required holders.

Do you see that?

A   I do.

Q   Was that an economic term?

MR. GLADSTEIN:  Object to form.

A   That was an associated economic term that had to do with the credit of the note, right?

If the company could take on additional indebtedness, that would reduce the credit of our note, it would make the collateral behind our note more diluted.

Q   And would that be bad for Empery as an investor?

A   Potentially.

MR. GLADSTEIN:  Object to form.

Q   Under what circumstances would it be bad for Empery as an investor?

MR. GLADSTEIN:  Object to form.

32 (Pages 122 - 125)

Page 126

You can answer.

A    There are circumstances where the company could draw additional debt under the Llama Llama entity and use that capital productively and increase the value of Llama Llama.  Or there are situations where they could draw additional debt off the LLC and not increase the value of Llama Llama.

Q    And were you trying to prevent the second possibility from taking place?

MR. GLADSTEIN:  Object to form.

A    We were trying to simply limit the amount that they could draw under the Llama Llama so it wouldn't affect our credit, so we didn't have to make a determination either way at the time.

Q    And in Point 2 at the end, there is a reference to "required holders."

Do you see that?

A    I do.

MR. GLADSTEIN:  Object to form.

Page 127

Q    Do you know what that referred to?

A    It's a capitalized term.  So the "R" and the "H" are capitalized, so required holders has a definition in the documents.  You would have to refer to that definition to see what the details are.

Q    Does that indicate to you that other people would be investing aside from Empery?

MR. GLADSTEIN:  Object to form.

A    That doesn't always have to be the case, no.

Q    But the term "required holders" is plural, correct?

A    For example Empery has three entities, right?

So that right there are three holders, so I disagree with your --

Q    At --

A    -- conclusion.

Q    -- at any time did you believe that Empery was going to be the only

Page 128

investor purchasing securities from Genius Brands pursuant to the terms of the securities purchase agreement in March 2020?

MR. GLADSTEIN:  Object to form.

A    I was led to believe that there were other investors, but, again, I'm being told that by two salespeople.  So until people have actually funded the transaction, I don't know who is going to show up and who is going to fund and who is not.

Q    Was Empery's investment in Genius Brand securities in March 2020 in any way contingent upon other investors providing capital to Genius Brands or purchasing securities from Genius capital at the same time?

MR. GLADSTEIN:  Object to form.

A    I don't think we contemplated that situation.

Q    Was Empery the lead investor?

A    No.

Page 129

Q    Who was the lead investor?

A    I believe it was Anson.

Q    Did you have any reason to believe that Anson would not purchase securities from Genius Brands in March 2020 pursuant to the terms of the proposed securities purchase agreement?

MR. GLADSTEIN:  Object to form.

A    I believed that they would participate, but I had no firsthand knowledge of their desire to participate.

Q    Did any terms of the securities purchase agreement relieve Empery of the requirement to participate if a minimum amount of investment had not been obtained?

MR. GLADSTEIN:  Object to form.

A    I don't recall that.  There are situations where we -- where we do require that they raise a minimum amount.  I don't recall if this was that situation.

Q    By March 10, 2020, had you ever seen a copy of Anson's term sheet

33 (Pages 126 - 129)

Page 130

with the company?

A   I believe, prior to our investment, we did see --

MR. GLADSTEIN:  Object to form.

A   -- a draft term sheet.

Q   And do you recall generally what -- how much capital the draft term sheet identified as being raised in this proposed offer?

MR. GLADSTEIN:  Object to form.

A   I don't recall what the term sheet said on it.  And also a term sheet is no one binding, so those are just words on a page.

Q   What's the purpose of the term sheet if it's not binding?

A   To memorialize general terms that will be drafted into documents for execution of a later binding agreement.

MR. GLADSTEIN:  Jeff, if you can find a good place to take a break, I think it's lunchtime.

MR. ABRAHAM:  Now is a good

Page 131

time.

MR. GLADSTEIN:  Great.

MR. ABRAHAM:  And I --

VIDEOGRAPHER:  This is the end of the Media 2.  We're going off the record at 12:48 p.m.

(Whereupon, at 12:48 p.m., a recess was taken to 1:41 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  We're back on the record at 1:41 p.m.

MR. ABRAHAM:  All right.  I'm going to ask the court reporter to mark as Exhibit 11 a document entitled waiver and consent and Bates-stamped EMPGNUS0008489 through 8493.

MR. KLEIN:  Tab 16.

MR. ABRAHAM:  And it's -- thank you.

(Whereupon, a Document, Bates-stamped EMPGNUS0008489 through 8493 was marked as Deposition Exhibit No. 11 for

Page 132

identification, as of this date.)

A   Okay.

Q   Have you ever seen this document before?

A   Not that I recall.

Q   Do you know what this document is?

A   I do now.

Q   What is it?

A   It's a waiver and consent.

Q   Between whom and whom?

A   Between Empery and Genius Brands.

Q   And if I direct your attention to the fourth page of this document Bates-stamped 8492, do you recognize that signature?

A   I do.

Q   Whose is it?

A   Our general counsel's.

Q   Is his name Brett Director?

A   Yes, sir.

Q   And moving to the next page, which is Bates-stamped 8493, do you

Page 133

recognize that signature?

A   I do.

Q   Whose is it?

A   Brett Director our general counsel.

Q   And if you turn to the next page, which is Bates-stamped 8494, do you know whose signature it is?

A   I do.

Q   Whose is it?

A   Brett Director.

Q   Do you recall authorizing Mr. Director to sign this waiver and consent?

A   I don't specifically remember, but when he executes something, I give him authorization to execute something, so...

Q   So would it be fair to say that he was properly authorized to sign the waiver and consent?

A   Yeah.  And he's generally authorized to sign on behalf of the management company.

Q   Do you have any understanding why Empery entered into this waiver and

34 (Pages 130 - 133)

Page 134

consent?

A   I do, based on my reading of the document.

Q   Well, what's your understanding?

A   That some warrants that were issued in 2017 had a prohibition on variable rate transactions.

Q   And were the securities which were being issued pursuant to the March 2020 SPA, did any of them have variable rate provisions?

A   I believe it could be interpreted that the amortizing feature on the securities were a variable rate.

Q   How did the amortizing feature on the securities work?

A   I don't know the specific language for this, but generally an amortizing feature works based on some price in the market at the time, and you amortize a portion of the principal based on the then-market price or a market price that is determined at the time of the conversion of that portion of the

Page 135

instrument.

Q   Does that reduce -- strike that.

Can that act reduce the conversion or exercise price of the instrument?

A   Temporarily for that amortization payment.

Q   Would that help reduce the downside risk of the investment?

A   My view is that it gives the company a non-cash mechanism to be able to pay back a portion of the instrument.  So if the equity is available for trading and it's still listed and traded and the company is '34 Act eligible, then it does gives them a mechanism other than cash repayment.  So I believe that it potentially does reduce the risk of the instrument.

Q   And that's reduce the risk of the instrument to the investor; is that correct?

A   It reduces the risk of -- my view is it reduces the risk of the

Page 136

investment for the Empery funds, yes.

Q   Was that a material term of this investment for the Empery funds?

MR. GLADSTEIN:  Object to form.

A   It didn't turn out to be, but our perception going in was that it was helpful to mitigate some risk.

Q   And why did it not turn out to be the case?

A   Because the stock performed well, and none of the amortization features were utilized in the instrument, and everything was converted at the original -- or sorry -- the fixed conversion price.

Q   And that's the fixed conversion price as was changed at the May 15, 2020 shareholder meeting?

A   I believe so, yes.

Q   Did Empery hold any voting stock in Genius Brands, which it voted at the May 15, 2020 --

A   I don't believe so.

Q   -- meeting?

Page 137

Okay.  Did the warrant exercise agreement effectively give Empery veto rights over the terms of the securities and particularly the secured convertible note being issued in the March 2020 offering by Genius Brands?

MR. GLADSTEIN:  Object to form.

A   I don't understand the question.

Q   Well, is it correct on March 11, 2020, Empery entered into a securities purchase agreement?

A   Yes.

Q   Is it correct that one of the securities it purchased was a secured convertible note?

A   Yes.

Q   Is it correct that one of the terms of the security convertible note was an amortizing provision that we just spoke about?

A   Yes.

Q   Is it correct that the warrant exercise agreement referenced in the

35 (Pages 134 - 137)

Page 138

waiver and consent gave Empery veto power over any such amortizing provision being part of the secured convertible note?

MR. GLADSTEIN:  Object to form.

A   So you're asking your question in a tricky way, but the answer is, if we had not given this waiver, they would not have been allowed to have that specific provision drafted in that way in the instrument.

But it didn't give us veto power over the transaction, because they would have just figured out a way to amend the transaction or change the documents so it didn't conflict with these 2017 warrants.

Q   Would you have purchased secured convertible notes absent the amortizing provision?

MR. GLADSTEIN:  Object to form.

Q   When I say "you," I mean, the Empery funds.

A   Again, if we could not have

Page 139

a -- if we did not give this waiver, there likely would have been a different proposal to satisfy our risk requirements for this transaction.  This is -- this is not a take it or leave it.  This is -- this is an à la carte menu where you come up with features that satisfy your risk parameters.  And this is what we came up with.  If we couldn't have accomplished it this way, we could have accomplished another way if we wanted to do the transaction.

Q   So when you say "à la carte," if one provision is missing, would it be correct that you make up for the risk profile with another potential provision?

MR. GLADSTEIN:  Object to form.

A   Yes.  These are bespoke instruments that are drafted by interested investors.

Q   What do you mean by "bespoke instruments"?

A   Customized.

Q   So the terms of this deal, the

Page 140

securities offered through the March 11, 2020 securities purchase agreement were customized?

MR. GLADSTEIN:  Object to form.

A   Yes.

MR. ABRAHAM:  Let me ask the court reporter to please mark as Exhibit 12 a document which is Bates-stamped TOON0011940 through 1944, and I believe it's Tab 21.

(Whereupon, a Document, Bates-stamped TOON0011940 through 1944 was marked as Deposition Exhibit No. 12 for identification, as of this date.)

Q   And take an opportunity to review that document, please, and let me know when you're done, if you can?

A   Okay.

Q   All right.  Do you see on the first page of this document, Bates-stamped 11940, towards the middle of the page, it says:  Empery says no to

Page 141

quote/unquote adjusted?

A   Yes.

Q   Why did Empery say no to adjusted?

MR. GLADSTEIN:  Object to form.

A   Can you show me the full language of the cash covenant?

Q   All right.

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit 13 a document which is -- it included as Tab 18 in the FTP sent to counsel and which is Bates-stamped EMPGNUS000847 through 855.

(Whereupon, a Document, Bates-stamped EMPGNUS000847 through 855 was marked as Deposition Exhibit No. 13 for identification, as of this date.)

A   Thank you.

Q   And I believe on the first page, in the email from Brett Director to

36 (Pages 138 - 141)

Page 142

Robert Charron dated Tuesday, March 10, 2020, there is a reference to the cash burn covenant.

A    I believe what I was trying to do was make it current tense versus past tense so they couldn't change the way the derivative liability was accounted for.

Q    When you say -- how were you trying -- which word was current tense or which phrase was current tense?

A    Adjust versus adjusted.  So they could have -- they could have -- if it was adjusted based on the derivative liability, they could potentially do it so that the current number was adjusted for future derivative liability -- for derivative liability based on warrant derivative liability, which is a -- it's a GAAP accounting issue.

Q    Do you recall what the final language actually -- of the -- strike that.

Do you recall what actually turned out to be the final language of the cash burn covenant?

Page 143

MR. GLADSTEIN:  Object to form.

A    Yes.  I think they -- we didn't want the "ED."  We didn't want the "adjusted;" we wanted "adjust."

Q    And did you get your way?

MR. GLADSTEIN:  Object to form.

A    Seems so.

Q    And if you --

A    If what you're showing me here was the final version, then it seems that we did.

Q    All right.  We could put that down for now, and go to back to Exhibit 12 if you can?

And on the top of the first page, which is Bates-stamped 11940, there is an email from Jeffrey Schultz sent 3/11/2020 to Bob Denton:  Subject:  Re: revised lock-up agreement schedule.

Do you see that?

A    I do.

Q    Do you know who Jeffrey Schultz is?

Page 144

A    I think he's company counsel at Mintz Levin.

Q    And in it, he writes:  I'll let that one go, period.  Empery will disagree that the sky is blue.

Do you see that?

A    I do.

Q    Do you have any understanding what he meant when he said that Empery will disagree that the sky is blue?

A    You would have to ask him.

Q    Did -- do you believe he felt that Empery was just being difficult?

MR. GLADSTEIN:  Object to form.

A    I think a lot of people think I'm difficult --

Q    In a --

A    -- potentially.

Q    -- in a business context?

A    Correct.

Q    Not in a personal context?

A    Correct.

Q    Okay.  You can put that aside for now.

Page 145

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit 14 a document, which I think was tabbed at 22, and which is Bates-stamped EMPGNUS0001789 through 790.

Q    And take an opportunity to review the document if you like.

(Whereupon, a Document, Bates-stamped EMPGNUS0001789 through 790 was marked as Deposition Exhibit No. 14 for identification, as of this date.)

Q    Are you done?

A    I am.

Q    Have you ever seen this document before?

A    I reviewed it in the course of my preparation for the deposition.

Q    All right.  Let's go to the second page of this document, which is Bates-stamped 1790.

And at the bottom of the page, there is an email from Joe Reda, date

37 (Pages 142 - 145)

Page 146

March 20, 2020, to Ryan Lane copying Jonathan Schechter:  Subject potential deal over the weekend.

Do you see that?

A   I do.

Q   And the body of the email starts by saying:  Ryan, we just got a bit off-the-shelf from an investor for a company that SEG loves.  Lead investor willing to do 625K.

Do you understand $625K to be $625,000?

A   I do.

Q   Looking for one to two others of the same size.

Do you see that?

A   I do.

Q   PR would hit before the market opens Monday so long as the board approves the deal with Scheck is hopeful they will.

Do you see that?

A   I do.

Q   Either way, you won't be restricted once the market opens Monday.

Do you see that?

Page 147

A   I do.

Q   Do you know what he's referring to when he says "restricted"?

MR. GLADSTEIN:  Object to form.

A   My presumption is that he's indicating that we will be cleansed of the material nonpublic information.

Q   And if you go up the page towards the top?

On March 21, 2020 at 10:39 a.m., Ryan -- sorry -- Ryan Lane wrote:  You can bring us over.

Do you see that?

A   I do.

Q   What did you mean when you wrote "you can bring us over"?

A   You can bring us over the wall.  You can restrict us in trading.  You can give us the material nonpublic information.

Q   And I believe, in response to that, at 11:39 a.m., the email on top of that on March 21, 2020, is from Jonathan Schechter.

Page 148

Do you see that?

A   I do.

Q   And it says:  GNUS.  Amin said he would do common only at market.  Chip away at getting him 2MM.

Do you understand "2MM" to be 2 million?

A   I do.

Q   And then it says:  Point 2568.

Do you have any understanding what that means in the context of this email?

A   Yeah.  It's likely the purchase price of the common.

Q   Let's go to the first page of this exhibit, which is Bates-stamped 1789, if we can?

And at the bottom of the page, there is an -- reference to an email on March 21, 2020 at 11:54 a.m.

From -- Joe Reda wrote:  Ryan, if you get a chance, read the shareholder letter and listen to the call yesterday.

Do you see that?

A   I do.

Page 149

Q   Do you recall whether you ever read the shareholder letter from the prior day after reading this email?

A   I don't recall.

Q   And the next paragraph says:  Would love you to match his size.  We have a bazillion warrants already.

Do you see that?

A   I do.

Q   And in response, the next email up is March 21, 2020 at 12:11 p.m.

Ryan Lane wrote:  Guy is buying common in the face of the convert we just did, exclamation point, question mark, exclamation, question mark.

Do you see that?

A   I do.

Q   What do you mean when you did exclamation, question mark, exclamation, question mark?

A   Can I ask you a question?

Q   Well, I'm not here to answer questions but you could?

A   During the break, did you switch sides?

38 (Pages 146 - 149)

Page 150

Because this proves our case.

You want me to answer that?

Because --

Q   You could answer the question.

A   -- this is demonstrating that I am acting independently as an independent fund, that I think what he's doing is reckless.

Q   You're acting independently with respect to this offer?

A   To my Empery funds.

Q   Your Empery funds?

A   Yes.

Q   Sounds like one of the dumbest things I've ever heard.

Do you see that?

A   I do.

Q   You thought he was being dumb?

A   I think it's a dumb investment, yeah, that I would have no part of.

Q   Okay.

A   Are we done with this one?

Q   Done for now.

A   Okay.

Page 151

MR. ABRAHAM:  I'm going to ask the court reporter please to mark as Exhibit 14 a document Bates-stamped EW --

It's 14.  I think it's --

what?

It's -- I think we're 15, aren't we?

-- Exhibit 15, a document Bates-stamped, EW-AUG0001001 through 1002.

(Whereupon, a Document, Bates-stamped EW-AUG0001001 through 1002 was marked as Deposition Exhibit No. 15 for identification, as of this date.)

A   Thank you.  Okay.

Q   Have you ever seen this document before?

A   I have.  I reviewed it in the context of my preparation for the deposition.

Q   Do you recall receiving this email in 2020?

Page 152

A   I faintly do.

Q   What is your faint recollection?

A   That the latter part of this email was in reference to conversations we had around COVID.

And when he said "you nailed everything," he was speaking about my prediction on COVID, that I -- at this point, had all come true.

Q   All right.  Let's look at the second full paragraph in the email.

It says:  Even though you hate GNUS.

Do you see that?

A   I do.

Q   Did you hate GNUS?

A   What Joe Reda is doing here is he is angry that I was not into the financing that he just tried to complete for the $2 million.  So he is extrapolating from that that I hate Genius.  I just thought it was a bad investment at the wrong time -- or an investment at the wrong time.

Page 153

Q   All right.  You can put that document to the side.

A   Okay.

MR. ABRAHAM:  I'm going to ask the court reporter please mark as Exhibit 16 a document, which is Tab 25.5 and is Bates-stamped EMP -- EMPGNUS0010228 through 229.

(Whereupon, a Document, Bates-stamped EMPGNUS0010228 through 229 was marked as Deposition Exhibit No. 16 for identification, as of this date.)

A   Okay.

Q   All right.  If you look on the first page of this document, which is Bates-stamped 10228, there is an email from Jonathan Schechter sent Friday, May 8, 2020 to Ryan Lane, Brett Director, copying Joe Reda, Linda Maquet:  Subject GNUS, dash, over the wall.

Do you see that?

A   I do.

Q   And if you go down, it says:

39 (Pages 150 - 153)

Page 154

12 mil shares at $0.454.

Do you see that?

A   I do.

Q   Do you know what that refers to?

A   I'm not certain, but I think that's the number of shares they're purporting to sell.

Q   And is that the price they're purporting to sell at?

A   I believe so.  Yeah.

Q   And the next paragraph says: Whoever doesn't invest in this round, their pro rata will not be invited in on any future GNUS deals, quote, as per the lead, close quote.

Do you see that?

A   I do.

Q   Do you have any understanding what the term "pro rata" as used in this paragraph refers to?

A   Generally that would refer to the amount of investment you would have in the current round based on your holdings from a previous round or a previous

Page 155

holding.

Q   And would that previous round or holding be the securities purchase through the March 11th securities purchase agreement?

A   Yes, likely.  That's probably what this is referring to.  So you would have a right to -- or purportedly have a right to investment based on your percentage of that original --

Q   Do you recall --

A   -- SPA.

Q   I'm sorry.

Do you recall whether Empery purchased shares in this offering?

A   I believe we did.

Q   Do you recall whether it was a pro rata amount that Empery purchased in this offering?

MR. GLADSTEIN:  Object to form.

A   I don't remember exactly what we were allocated or what was sold.

Q   Well, do you recall whether it was the pursuant to some contractual right

Page 156

that Empery had?

A   I don't believe there was a right of participation in the March deal.

Q   Was Empery's decision to purchase shares in this offering voluntary?

A   Of course.

Q   What motivated Empery's decision to purchase shares in this offering?

A   Like every investment we make, we invest when we think that we can return capital for our limited partners.  So if I invested, I thought I was going to make money for the benefit of my limited partners.

Q   How about the general partners?

MR. GLADSTEIN:  Object to form.

A   My fiduciary duty is to the limited partners.

Q   Not to your general partner?

A   If I make money for my limited partners, the general partner makes

Page 157

money --

MR. GLADSTEIN:  Object to form of the prior question.

A   -- assuming we're above the high watermark.

MR. GLADSTEIN:  I mean --

Q   What is the high watermark that you're referring to?

MR. GLADSTEIN:  -- you're just asking for it.

A   I'm just --

MR. GLADSTEIN:  Can I have a minute to just --

Q   -- I'm just trying to be thorough.

MR. GLADSTEIN:  I don't blame you for that follow-up.

Q   All right.  The --

A   A high watermark is you -- the GP doesn't make money unless the LPs are at their high watermark, so the highest level at which the GP has previously been paid at a calendar year-end, right?

So we can't make money -- if we can't -- make money then lose money,

40 (Pages 154 - 157)

Page 158

then we can't make it on the way back up again if we got paid on it the first time.

Q   What is -- what is that formula?

Or what was it in 2020?

MR. GLADSTEIN:  Object to form.

A   Twenty percent of the profits we make for our investors net of all expenses; typical hedge fund terms.

Q   All right.  Yeah.

Did anything change between Empery's decision not to purchase in the March 22, 2020 offering of common stock and Empery's decision to purchase in the May 8, 2020 offering of Genius common stock?

MR. GLADSTEIN:  Object to form.

You can answer.

A   Did anything change with respect to what?

Q   Did anything change influencing Empery's decision to purchase -- strike that.

Page 159

Did anything change with respect to Empery's opinion on investing in Genius Brands' common stock between March 22, 2020 and May 8, 2020?

A   Yes.

Q   What?

A   The liquidity.

Q   Liquidity in the common stock?

A   Correct.

Q   The number of shares that changed hands on an average day; is that correct?

A   Correct.

Q   Is that something that Empery monitors?

A   That's a risk parameter that we look at.

Q   Why does Empery look at that?

A   If you want to exit a security, you have to do it by selling the shares.  If there is no liquidity, then you're essentially buying a private company.

Q   Okay.  Anything else?

A   No.  Not that I am aware of,

Page 160

no.

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as Exhibit 17 a document which is Tab 26 and is Bates-stamped EMPGNUS0004718 through 4722.

(Whereupon, a Document, Bates-stamped EMPGNUS0004718 through 4722 was marked as Deposition Exhibit No. 17 for identification, as of this date.)

Q   Take your time to review this document and please let me know when you're done.

A   Okay.  I've generally reviewed this.

Q   Have you ever seen this document before?

A   I've seen the email as well as the leak-out, yes.

Q   When was the last time you saw it?

A   In preparation for my deposition.

Page 161

Q   Do you recall any discussions related to a leak-out agreement on or about May 16, 2020?

A   I do.

Q   What do you recall regarding those discussions?

A   What predated this email was a request by me to either Joe Reda or Jonathan Schechter to register our shares from the March transaction.

Q   The March 2020 transaction?

A   Yes.

Q   Why did Empery want to register the shares from the --

A   So we wanted --

Q   -- March 2020 transaction?

A   So from the March -- so around this time, the stock had appreciated pretty significantly from our exercise price and our conversion price.

Q   And did Empery want it to prepare to sell those shares underlying its --

A   We.

Q   -- convertible notes and

41 (Pages 158 - 161)

Page 162

warrants.

MR. GLADSTEIN: Let -- just let him finish the question --

THE WITNESS: Yeah.

MR. GLADSTEIN: -- give it a second and then respond.

Q   I know you know you think what I'm going to say, but I actually have to say it.

MR. GLADSTEIN: He's a very dynamic guy.

A   Sorry.

MR. GLADSTEIN: So please repeat the question for the witness.

A   I got it. So we wanted to have the option to be able to sell the shares. When the shares contain a restrictive legend on them, we don't have the option to sell them until either the six-month period has expired, assuming the company is current in their filings, or there is a resale registration statement that has been declared effective by the SEC.

Page 163

Q   Does Empery ever sell shares short?

A   We do sell shares short sometimes.

Q   Do you recall whether Empery ever sold shares of Genius Brands common stock short around this time of May 16, 2020?

A   I mean, we weren't selling shares short to the extent we were restricted in the security.

If, when we were cleansed of information, did we sell short?

I don't recall, but I don't think so. I don't think there was a borrow available. You have to get a valid borrow or a locate on shares. You have to borrow the shares from somebody before you can affect a short. And I don't believe there was borrow available on that security, so if we did short anything, it was not material in the scheme of our position. But I am not certain if we shorted any --

Q   Do you have any --

Page 164

A   -- or did or not.

Q   Sorry. Do you have any understanding of what the purpose of the leak-out agreement was intended to be?

A   A company -- in exchange for us asking for registration, the company proposed that we sign a leak-out agreement. Why they want it, you would have to ask them or their agent, SEG.

Q   Did the company communicate that desire to you directly?

A   I think that's communicated in this email here.

Q   Which email?

A   To Brett from Scheck. They're going to register the shares on the S-3 for any investor that agrees to the leak-out.

Is this the first time you're seeing that?

Q   No.

A   Okay.

Q   By the way, I'm not here to answer questions.

A   But you did.

Page 165

Q   You got me.

MR. RECKLER: Boys, boys be nice.

Q   Was Empery amenable to entering into a leak-out agreement?

MR. GLADSTEIN: Object to form.

A   We were amenable to it, you know, if we got what we were asking for. We wanted to reduce -- have the option to reduce our risk, and if that was what the company required in order to file a registration statement, we were open to considering it.

Q   What would the alternative have been had the company not filed a registration statement for Empery to dispose of its shares?

A   We would have had to wait additional time for the 144 Date, which would have been six months from March.

Q   Was there a benefit to Empery to being able to sell sooner rather than waiting those six months?

A   Yeah, we could turn our shares

42 (Pages 162 - 165)

Page 166

into cash, therefore reducing our risk to the company, which we had put in some money, and it was worth substantially more. It's my job as a fiduciary for my limited partners to reduce risk based on overall risk parameters of the fund.

Q    Were you concerned that the price of Genius stock might go down?

A    Of course.

Q    Why?

A    Because what goes up can go down.

Q    Anything specific about Genius and the general principle that what goes up can go down?

A    Nothing specific to the company, but there would have been appreciation in the stock. I know it was COVID, and I know that people were in front of their TVs more, and the stock was probably worth more. But I wasn't going to speculate how much more. So in my mind, I would put some money in. It was worth more, and I wanted to de-risk or at least have the option to.

Page 167

MR. ABRAHAM: Okay. Let me ask the court reporter to please mark as Exhibit 18 a document which is Tab 28, and Bates-stamped EMPGNUS0004806 through 4815.

(Whereupon, a Document, Bates-stamped EMPGNUS0004806 through 4815 was marked as Deposition Exhibit No. 18 for identification, as of this date.)

Q    Before the court reporter hands you that document, was Empery forced to enter into a leak-out agreement?

A    No. We're not forced to enter into any leak-out agreements.

Q    So if it entered into a leak-out agreement, is it correct that it did so voluntarily?

A    It did so as consideration for what we were being offered in exchange.

Q    And was that voluntary?

A    Yes.

Q    Okay.

A    Okay.

Page 168

Q    Have you ever seen this document before?

A    I saw it in my preparation for this deposition.

Q    Do you recall seeing this document in May 2020?

A    Not specifically.

Q    Do you recall -- how about generally?

A    Not even generally.

Q    Do you recall any conversations related to this topic in May 2020?

A    I do.

Q    What conversations do you recall?

A    The conversations that we've previously spoke about where I agreed to the leak-out based on the company's willingness to file a registration statement for shares underlying what turned out to be just our warrants in this case from the March transaction.

Q    On the first page of this document, which is Bates-stamped 4806,

Page 169

there is an email on May 17, 2020, at 6:22 p.m., Brett Director wrote.

Do you see that?

A    I do.

Q    And he writes: Why did they change the leak-out percentage to a flat 30 percent for each investor.

Do you see that?

A    I do.

Q    Shouldn't it be the pro rata of 30 percent?

Do you see that?

A    I do.

Q    Do you have any understanding what Mr. Director meant by "pro rata" in this context?

A    I think what he's referring to is the -- like we spoke about before, based on the percentage we held from the March transaction.

Q    Do you know whether the company insisted on a pro rata provision for the leak-out?

MR. GLADSTEIN: Object to form.

43 (Pages 166 - 169)

Page 170

A   You would have to ask them.

Q   Is it correct that the pro rata percentages were agreed to by the investors independent of the company?

A   My under --

MR. RECKLER:  Object to form.

A   -- my understanding is this was a proposal by the company, and I believe it was negotiated by the investors.  I believe there was a -- the company proposed the leak-out percentages, and we proposed that there would be no leak-out above a certain price for our Empery funds.

Q   Is there anything else that the investors negotiated from the leak-out agreement that the company did not request?

MR. GLADSTEIN:  Object to the form of the question.  Misstates testimony.

A   We were negotiating for things that were better for Empery.  So we were negotiating for a release on the leak-out as in over a certain price there would be

Page 171

no restriction on our ability to sell an unlimited amount.

Q   Did Empery negotiate for the pro rata provision?

MR. GLADSTEIN:  Object to the form of the question.

A   We didn't want any leak-out.

Q   Did the company negotiator ask for a pro rata provision?

MR. GLADSTEIN:  Object to the form.

A   I was presented with a proposal.  As I said, if we get registration of our shares underlying our warrants, the company wanted some sort of modified lock-up on our shares.

Q   But I'm asking specifically about the pro rata provision.

Did the company ask for the pro rata provision?

MR. GLADSTEIN:  Object to form.  Jeff, if you want to put a provision in front of the witness, I think he will probably be better to responding to questions.

Page 172

You're just asking him to talk about a provision not in front of him.  Your prerogative but just a suggestion.

Q   You can answer the question.

A   I'm not sure how else you would do it.  I'm not sure how else you would limit the maximum amount that any investor could sell other than tying it to their risk, which was based on the amount purchased in the March transaction.  If we didn't want our shares registered, we didn't have to agree to any leak-out for our funds.

Q   Did you consider not agreeing to a leak-out?

A   We talked about it internally.

Q   And why did you ultimately decide to agree on the leak-out?

A   As previously discussed, we determined that it was important for us to be able to have the flexibility to dispose of shares.

Q   And to do so, you needed to have the pro rata provision; is that

Page 173

correct?

MR. GLADSTEIN:  Object to form.

A   I didn't request a pro rata provision.  I would have preferred no leak-out.  I would have preferred to be able to dispose of the shares at whatever percentage of the volume I wanted to.  This was a request by that company or their agents to reduce our ability to -- or limit our maximum ability in the market.

Q   But it was a provision voluntarily agreed to?

MR. GLADSTEIN:  Object to form.

A   As I said, it was a compromise.  We asked for something, and then they asked for something in return.

MR. GLADSTEIN:  Jeff, we've been going for about an hour now.  Can we take five minutes, or do you have a couple more questions and want to --

MR. ABRAHAM:  If you -- if you

44 (Pages 170 - 173)

Page 174

feel the need, I'll take five minutes even though I am perfectly fine.

MR. GLADSTEIN: I have no doubt that you are, but I would like five minutes. So if this is a good -- if you have one or two questions more on this, no problem.

MR. ABRAHAM: Yeah, let's try to do one more document if we can.

MR. GLADSTEIN: Okay. That's fine.

Are you okay with that?

THE WITNESS: I do have to go to the bathroom but...

MR. ABRAHAM: Oh, no, no, no, break. Break. People have to go to the bathroom, we break.

THE WITNESS: I can do one more document.

MR. ABRAHAM: No, no, no.

VIDEOGRAPHER: This is the end of the Media 3. We're going off the record at 2:36 p.m.

Page 175

(Whereupon, at 2:36 p.m., a recess was taken to 2:44 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: We're going back on the record at 2:44 p.m.

MR. ABRAHAM: Are we on Exhibit 18?

COURT REPORTER: Nineteen.

MR. GLADSTEIN: This is 18, yes.

COURT REPORTER: That is 18, but that ...

Q   Okay. We're on 18.

A   I'm taking 18 back in front of me?

Q   Actually, one second. Yes, take 18 back in front of you.

The top email on the top of the page from Brett Director, 5/17/2020, to Jonathan Schechter in which you are one of the people blind copied.

Do you see that?

A   Yeah. I'll note it's probably for the same reason but yes.

Page 176

Q   I am not asking you the reason. And the subject is: Re: GNUS RD waiver and leak-out.

Do you see that?

A   I do.

Q   And the body of the email says: See attached for the Empery sig pages.

Do you see that?

A   I do.

Q   Do you understand "sig" to be signature?

A   I do.

Q   And the next sentence says: Please hold in escrow pending release by representative of Empery.

Do you see that?

A   I do.

Q   Do you have any understanding why Mr. Director wanted the signature pages held in escrow pending release by a representative of Empery?

A   That is how he is instructed to deliver signature pages for almost all of our transactions.

Page 177

Q   And in this case, what did -- in this -- in the case of this leak-out agreement, what would be the triggering point for releasing these signature pages held in escrow?

MR. GLADSTEIN: Object to form.

A   So the way we usually do this -- and I don't know about the specifics in this situation --

MR. GLADSTEIN: Answer the specific question.

MR. ABRAHAM: No. Don't interrupt him.

A   I don't -- I don't want to be wrong about the details of the situation, but we put our signature pages in escrow, and the counterparty puts their signature pages in escrow, and then we do a contemporaneous release.

Q   How about the other investors signing leak-out agreements?

A   What I would be concerned about in this situation is that the company signed the registration rights

45 (Pages 174 - 177)

Page 178

agreement, right, which was the exchange for us agreeing to the leak-out. So I would put my -- our leak-out -- Empery leak-out signature pages in escrow. And then we would see that the company has signed the registration rights agreement. So they did their part. We do our part. Signature pages cross in the ether.

Q    Would Empery have signed the leak-out agreement had the other investors not signed the leak-out agreement?

A    That's of no matter to me. I want my registration rights, and I'm agreeing to our 4.5 percent of the daily -- max of the daily traded volume. So I can't trade more than 4.5 percent of the daily traded volume for our three funds. If the company signs a registration rights agreement, then that's all that matters to me.

Q    Would you be concerned if the other investors were granted registration rights without being restricted by a leak-out agreement and Empery being restricted by the leak-out agreement?

Page 179

MR. GLADSTEIN:  Object to form.

A    My understanding was that the company was giving us registration rights in exchange for us agreeing to the leak-out. If they had offered a different deal to other investors, that would have -- the company would have misrepresented the stuff to us.

Q    So is it correct you were concerned that other investors were agreeing to the same terms as Empery was agreeing to with respect to this leak-out agreement?

MR. GLADSTEIN:  Object to form.

A    As I said, I wanted my registration rights. And if the company is signing the registration rights agreement and agreeing to register my shares in 15 days, then I'm willing to give the leak-out for Empery.

Q    So you didn't care whether other investors were signing the leak-out agreement in exchange for registration

Page 180

rights agreement?

A    My understanding was that the other investors were also going to be required to sign the leak-out in order to get registration. So registration was only going to be granted to investors who agreed to the leak-out. If they don't agree to it, that's not my problem. I'm happy to take what the company offered me and my funds.

Q    If the other investors did not agree to the leak-out agreement in connection with obtaining registration rights, would that have negatively affected Empery?

A    If the other investor did not agree to sign the leak-out and did not get registration, that would be positive if for me.

Q    Well, let's take it if the --

MR. GLADSTEIN:  Object to the form of the prior question.

Q    Let's take it if the other investors did not agree to the leak-out but obtained registration rights.

Page 181

Would that have been negative for Empery?

A    That would have been a misrepresentation to me and my funds.

Q    But would it have affected Empery in a negative fashion?

MR. RECKLER:  Objection to form.

A    You're asking me to speculate.

Q    You don't know if other funds were free to trade in any terms they want, would that have negatively affected Empery's ability to sell at a higher price?

A    You're --

MR. GLADSTEIN:  Object to form.

Wait for me to object before you respond.  You can respond.

A    You're asking me to speculate on a situation that didn't exist.  The company asked me if we would sign a leak-out if they gave us registration.  Registration was my request.  The companies counter was sign the leak-out.

46 (Pages 178 - 181)

Page 182

So you're asking me to speculate on something that would have made the company do something that is a misrepresentation of what they represented to me. So you're asking me to speculate on a situation that did not exist, which I will not do.

Q   So you -- so you don't know the answer to my question; is that correct?

A   You're asking me to speculate on a situation that did not exist. I am not here -- I am not back then at that time, and I do not know what I would have done at that time, but that was not something I was proposed. It's not something I had to think about. It's not something I have to think about now. It was not a scenario.

Q   Let me ask you -- if you go back to Exhibit 18, I just want to make sure I ask you questions whether you --

A   I am still on 18.

Q   You are on 18. Well, let's look at 18.

A   Okay.

Page 183

Q   If you turn the page to 4807, do you recognize Mr. Director's signature there?

A   I do.

Q   And if you turn to page 4808, do you recognize Mr. Director's signature there as well?

A   I do.

Q   How about 4809, is that Mr. Director's signature?

A   Yes, sir.

Q   How about 4810?

A   Yes.

Q   How about 4811?

A   Yes.

Q   How about 4812?

A   Yes.

Q   And if you go back to 4809, do you see there is a reference to subscription amount $2,280,000, shares 1,900,000?

A   I do.

Q   Do you know what that refers to?

A   That's the amount of dollars

Page 184

that Empery Opportunity Fund invested in one of the -- this contemplated May registered direct.

Q   And if you go back to 4807, which is two pages before, do you know what subscription amount 96,000 refers to?

A   That is the amount that Empery Asset Master invested in the same registered direct in May.

Q   Is that the registered direct for $1.20 a share?

MR. GLADSTEIN:  Object to form.

A   I believe that's correct.

Q   Because 96,000 divided by 80,000 is 120 --

A   Yeah.

Q   -- is that correct?

A   I agree with your math.

Q   Thank you.

And if you go to the next page, which is 4808, the subscription amount is 24,000, shares 20,000.

Do you see that?

A   4808.  Yes, sir.

Page 185

Q   And does that also reflect a price of $1.20 a share?

A   It does.

Q   And if you go to the next page, 4809, there is 2,280,000 divided by 1,900,000 also reflect $1.20 a share?

A   It does.

Q   Okay.  And if you go to 4810, there is an original subscription amount that's $75,000.

Do you see that?

A   I do.

Q   Do you know what that refers to?

A   I believe that refers to the amount that Empery Asset Master invested in the March convertible venture deal.

Q   And if you turn the page to 4811, there's a reference to original subscription amount $18,750.

Do you see that?

A   I see that.

Q   Do you have any understanding what that refers to?

A   I believe that refers to the

47 (Pages 182 - 185)

Page 186

amount that Empery Tax Efficient invested in the March transaction, or at least a previous transaction.

Q   And if you go to the next page, which is 4812?

It's an original subscription amount of a $1,781,250.

Do you see that?

A   I do.

Q   Do you know what that refers to?

A   I believe it's the same.  It refers to the amount that Empery Opportunity Fund invested in a previous transaction.

Q   Okay.  And if you turn to the next page, which is Bates-stamped 4813?

Do you see that?

A   I do.

Q   And do you recognize that signature as being Mr. Director's?

A   I do.

Q   And if you go to the next page, which is Bates-stamped 4814, do you recognize that signature as being that of

Page 187

Mr. Director?

A   I do.

Q   And if you go to the next page, which is Bates-stamped 4815, do you recognize that as being the signature of Mr. Director as well?

A   I do.

Q   Do you have any understanding whether Empery's ability to purchase shares in the May 18, 2020 offering was in any way contingent upon entering into the leak-out agreement?

MR. GLADSTEIN:  Object to form.

A   I don't believe those things were connected.

Q   You don't believe they were connected?

A   No.

Q   One was not contingent on the other; is that correct?

A   That is not my -- no.  That was -- that is not -- the connection was not the offering.

Q   What was the connection?

Page 188

A   The only reason it was contemplated around this offering is because we were over the wall in negotiating with the company about something else, and that was an opportunity for me to ask for registration.

Q   Do you recall whether -- after the May 18, 2020, whether Empery entered into any other agreements with respect to the shares it owned in Genius Brands?

MR. GLADSTEIN:  Object to form.

A   I mean, that -- you have to specify because we --

Q   Is there --

A   -- at that point, we owned warrants; we owned a convert; we owned common shares from the registered direct.

What are we talking about?

Q   Do you recall whether, after the May 18, 2020 registered direct offering, whether Empery entered into any other agreements with respect to the convertible notes and warrants in Genius

Page 189

securities that it owned?

A   I believe we entered into a conversion agreement in June.

Q   Do you recall what the purpose of that conversion agreement was?

A   I do.

Q   What was the purpose of that conversion agreement?

A   Again, I believe the stock had continued to appreciate, and we owned the convert, which was not part of this registration rights agreement.

This registration rights agreement, that was contemplated on May 17th or May 18th, company agreed to register shares underlying our warrants from the March transaction, right?

They obviously wanted the proceeds from our exercise, which they would be eligible for if we exercised if there were registered shares underlying it.  So they were enticed to do that, but it -- the shares underlying the convert were not part of that negotiation.

Q   And they became part of a

48 (Pages 186 - 189)

Page 190

subsequent negotiation; is that correct?

A   They became part of a subsequent negotiation.

Q   Do you recall when that subsequent negotiation took place approximately?

A   I don't remember exactly when it started.  It was sometime in early June, I believe.

Q   Do you recall whether Empery participated in that negotiation?

A   So I believe that we asked for registration of those shares.  We asked SEG, Jonathan Schechter and Joe Reda if they could make a request to the company to register the shares underlying the converts.

I said to them:  We will agree to convert those shares into common shares, right?

Because then the company could reduce their debt, and we would net out the master netting agreement, so we would fund the balance that was the -- that was the subject to the note to the company,

Page 191

right?

The master netting agreement was a note by us to the company that we owed them that.  You net that out.

So we would complete the purchase with cash the balance of that note, right?

So they got those proceeds. We would then agree to convert the entire amount of that debt into equity if they would agree to register those shares.  So that request went in from me to the company from their agents, and then the negotiation began on or about June -- early June.

Q   Do you know whether any of the other investors participated in that negotiation?

MR. GLADSTEIN:  Object to form.

A   I don't know if other investors participated in that negotiation.

Q   But do you know whether Empery ever signed the conversion agreement?

Page 192

A   We did.  I don't remember how long it took to negotiate it, but we agreed to convert.  We funded the rest. Well, we funded the rest.  They -- we then agreed to convert, you know, in a moment in time.  And then they agreed to register the shares some period after that agreement, so it was a separate registration rights agreement.

Q   And do you recall whether there was another leak-out provision entered into concurrently with the conversion agreement?

A   I do.  There was a subsequent leak-out, so that came as a request from the company again that, if we're going to register these shares for you, the Empery funds, that we will require you to execute a leak-out, essentially the same as the first, a springing leak-out that would go into effect upon the effectiveness of the registration statement for those shares.

Q   Did Empery enter into such an agreement?

A   We came to an agreement on

Page 193

what we were asking, and we gave them what they were asking.

Q   Did Empery do so voluntarily?

A   Again, we volunteered that we would do it if they would participate in what we were requesting.

Q   Did you know whether any of the other investors, in the March 11, 2020 SPA, also agreed to the terms of that conversion agreement?

MR. GLADSTEIN:  Object to form.

A   I believe that the request by the company was that, if you wanted registration, you would have to agree to fund the balance of your note and agree to convert it to reduce the debt.  That was the ask and that was the reply --

Q   But do you --

A   -- so...

Q   -- but do you know whether any of the other investors, in the March 11, 2020 SPA, also agreed to the terms of that conversion agreement?

A   I believe -- I believe

49 (Pages 190 - 193)

Page 194

everyone converted their securities but I'm not certain.

Q   Would you have agreed to the terms of the second leak-out agreement entered into as part of the conversion agreement had another investor not agreed to enter into a leak-out agreement at the same time?

A   Again -- we'll go through this again, like last time.  The company was offering to give us registration if we funded the balance of the note and if we converted the whole thing if we signed a leak-out.  So anyone who would have funded the balance, converted their debt, would have likely been offered the same thing that Empery funds were offered.

MR. ABRAHAM:  I'm going to ask the court reporter to please mark as --

Exhibit what?

COURT REPORTER:  Nineteen.

MR. ABRAHAM:  -- 19 a document Bates-stamped EMPGNUS0001373 through 1375.

Page 195

(Whereupon, a Document, Bates-stamped EMPGNUS0001373 through 1375 was marked as Deposition Exhibit No. 19 for identification, as of this date.)

Q   Have you ever -- have you -- are you done looking at the document?

A   No.  I just was looking up at you, but I'm almost done.  Okay.

Q   Have you ever seen this document before?

A   In the preparation for my deposition today, yes.

Q   All right.  If you go on the first page of this document, which is EMPGNUS0001373 through 1375 -- I'm sorry.  If you go on the first page, which is Bates-stamped 1373?

Do you see there is an email from Jonathan Schechter sent Monday, June 22, 2020 at 10:45 p.m.?

A   I do.

Q   And it's sent to Brett Director, Ryan, and you're also listed as

Page 196

one of the recipients.

Do you see that?

A   I do.

Q   Do you recall receiving this email?

A   Not specifically.

Q   How about generally?

A   Generally.

Q   Do you have any reason to believe you did not receive this email?

A   No.

Q   And the subject is leak-out percentages.

Do you see that?

A   I do.

Q   And the first line says: Empery in the aggregate 4.5 percent.

A   Yes.

Q   Do you see the next line is Anson 9 percent?

A   I see that.

Q   And the next line is Brio in the aggregate 4.2 percent.

A   Uh-huh.

Q   And then Iroquois in the

Page 197

aggregate 3 percent.  And then M3A 3 percent, CVI 3 percent, L1 Capital 1.8 percent, and I won't read the rest.

Is it fair to say that, on June 22, 2020, you knew the leak-out percentages -- strike that.

Was it fair to say, on June 22, 2020, you knew that Anson, Brio, Iroquois, M3A, CVI, and L1 Capital were all bound by the terms of the leak-out agreement?

A   I knew that, if they agreed to signed the leak-out agreement in exchange for their registration, that this would be the max percent that they could sell.

Q   Did you have any reason to believe that they would not enter into the leak-out agreement?

MR. GLADSTEIN:  Object to form.

A   I didn't care.

Q   You didn't care either way?

A   If they're not entering into the leak-out agreement, they're not getting registration.  Because if you

Page 198

refer here -- let's do this again.

As discussed with Ryan, you will be funding your investor note and then converting all your debt into equity in return for the company agreeing to file a registration statement on Friday to register the common shares.

So they're representing to me that, if these people sign the leak-out agreement, they will have their shares registered that they just converted from their note. So that is the agreement. So if they don't sign, that's fine with me because now I'm getting registered and they're not. And frankly, I would prefer that because that's less shares that are getting registered.

Q   Well, if you look on page 1374, which is the second page of this document?

MR. GLADSTEIN:  That's the page he's reading from.

A   I just read from that.

Q   Okay.  You are reading from that.  And you read from that email, which

Page 199

starts with Brett.

On the second line of the first full paragraph, it says:  Everyone is also agreeing to a lock-up agreement in the same form and substance as last time.

Do you see that?

A   I do.

Q   So --

A   Because it says, in the line before:  In return for the company agreeing to file a registration statement.

Q   But is it correct that you were aware that everybody was entering into a lock-up agreement in the same form and substance as last time?

MR. GLADSTEIN:  Object --

A   I did not --

MR. GLADSTEIN:  -- to form.

A   -- know that.

Q   But is that --

A   And we'll go over this again.

Q   Don't --

A   It says if they're agreeing to the lock-up agreement, they will get their shares registered.  But if they don't sign

Page 200

the lock-up agreement -- right? -- it says equity -- in return for the company agreeing to file a registration statement.

Return, right?

They're -- that is the quid pro quo.  You sign the lock-up agreement, company registers your shares.

Q   But it does say everyone is also agreeing to a lock-up agreement.

Do you see that?

A   In return, right?

You can't ignore the sentence before.

Q   Well -- but it does say everyone is agreeing to a lock-up agreement, yes?

A   At this point, do the signature pages exist?

I don't know, right?

This is coming from a salesman who is trying to convince us to proceed forward here, but this doesn't matter to me because it says "in return."  So if they don't sign it, they're not getting registration.  That's great.

Page 201

Q   Well, would it have mattered to you if they got registration without signing a leak-out agreement?

A   Then that would --

MR. GLADSTEIN:  Object to form.

A   -- be fraud, because that would have been a misrepresentation of what the company was proposing to offer.

Q   I'm just asking would it have mattered to you if they got registration?

A   Again --

MR. GLADSTEIN:  Object to form.

Q   -- rights without signing a leak-out agreement?

MR. GLADSTEIN:  Let's -- let's --

A   We'll do -- we'll do this again.

That would be speculation, right?

And you're asking me to speculate on a situation that did not exist.  I am -- I am making my decision

51 (Pages 198 - 201)

Page 202

based on the company telling me that, in return for signing a lock-up agreement, they're offering registration. I had requested registration; this is what they offered.

Q But it is that everybody will have the same agreement in return for getting registration rights; is that correct?

MR. GLADSTEIN: Object to form.

A I -- if they agree, if they agree this will be the maximum they can sell. If they don't agree, they don't get registration. So whether or not they sign is of no bearing to me.

Q Do you have any reason to believe they would not sign?

MR. GLADSTEIN: Object to form.

A They make their own independent decisions. I make my own independent decision for the benefit of my limited partners. If they decide that they don't want to sign, that's for their

Page 203

own reasons.

MR. ABRAHAM: All right. Let's take a break.

MR. GLADSTEIN: I was just going to suggest the same thing.

VIDEOGRAPHER: This is the end of the Media Number 4. We're going off the record at 3:12 p.m.

(Whereupon, at 3:12 p.m., a recess was taken to 3:37 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: We're back on record at 3:37 p.m.

MR. ABRAHAM: All right. I'm going to ask the court reporter to please mark as --

COURT REPORTER: Twenty.

MR. ABRAHAM: -- Exhibit 20 the documents which are tabbed 33, which consists of certain trading records of the Empery funds.

(Whereupon, Certain trading documents were marked as Deposition Exhibit No. 20 for

Page 204

identification, as of this date.)

THE WITNESS: Thank you.

MR. GLADSTEIN: Mr. Abraham, before you go, I know this was produced natively, but is this -- this is not -- or it is -- or does it purport to be the entirety of the spreadsheet that was produced.

MR. ABRAHAM: I don't know that it matters, because I'm going to ask him about the identity of certain funds.

MR. GLADSTEIN: Okay. I just want him to know whether he is looking at a complete document or a portion of the document.

MR. KLEIN: I believe it's the full document.

MR. GLADSTEIN: Okay. Thank you.

A Okay.

Q All right. Do you see there is a reference to Empery Tax Efficient LP SA.

Page 205

Do you see that?

A I do. Yeah.

Q What is that?

Is that a separate fund?

A It is not.

Q What is it then?

A It's a -- it's what's called a "side pocket" of an existing fund, so it's just for accounting purposes.

Q So the assets of Empery Tax Efficient LP SA owned by Empery Tax Efficient LP?

A It's literally the same fund.

Q Okay. And what is Empery Tax Efficient Roman numeral two?

Is that also a side pocket?

A No, that's a separate fund.

Q Does it still exist?

A That fund does not exist, no. That fund has been dissolved.

Q Did that fund have separate investors than Empery Tax Efficient?

A Yes.

Q Did any of its investments flow through to the Empery Tax Efficient?

52 (Pages 202 - 205)

Page 206

MR. GLADSTEIN:  Object to form.

A    None of the -- none of the limited partners flow to any other limited partner.  Each fund exists on its own.  Some of the funds do have the same LP, like myself and my partner and some Empery employees.  But there is no crossing between funds --

Q    But you do --

A    -- each fund.

Q    -- understand what I asked about crossing between funds?

It does -- but it doesn't happen with the Empery funds; is that correct?

MR. GLADSTEIN:  Object to form.

A    Correct.

Q    Okay.  Do you know whether Empery relied on any SEC rules in making any of its investment decisions with respect to Genius Brand securities?

MR. GLADSTEIN:  Object to form.

Page 207

A    I don't understand the question.

Q    Do you know whether Empery relied on any SEC rules relating to Section 16(b) in making its investment decisions with respect to Genius Brand securities?

MR. GLADSTEIN:  Object to form.

A    I'm not sure what you're asking me.

Q    Do you have any knowledge of any SEC rules which govern Section 16(b) liability?

A    I'm --

MR. GLADSTEIN:  Object to form.

You can answer.

A    I'm familiar with Section 16(b).  We have set up our funds; we've set up our compliance; we've set up our processes and procedures to be client with potential group activity.  We are conscious of what would potentially be group activity, and we avoid all activity

Page 208

that would be presumed.

For example, we make sure that, when we sign signature pages, that we're signing our own signature pages with the counterparty being the company and Empery funds being the signatory, right?

We will not sign signature pages where there are other funds on the signature pages to a securities purchase agreement, right?

So we have procedures in place to make sure that people like you can't come around and say, You've formed a group, because we have processes in place to make sure that we don't.  We don't do calls with other investors.  We don't do group calls with other investors.  We don't do due diligence with other investors.  We have procedures in place so that no one at our shop trips up on the 16(b) rules.  So we are compliant with 16(b) rules.

Q    Any other rule, aside from the group rule --

MR. GLADSTEIN:  Object to

Page 209

form.

Q    -- that Empery relied upon?

MR. GLADSTEIN:  Same objection.

A    Yeah.  Regular -- this transaction was done pursuant to Regulation D.  Regulation D is an exemption from registration.  These securities were sold pursuant to Reg D.  So we relied on that SEC exemption for the purchase of these securities from the company.

Q    But they were convertible into Genius Brand common stock, correct?

MR. GLADSTEIN:  Object to form.

A    Also issued pursuant to Regulation D.

Q    Okay.

MR. ABRAHAM:  Have a nice day.

THE WITNESS:  Do you want to take me up on my deal?

MR. ABRAHAM:  What's your deal?

THE WITNESS:  You drop the

53 (Pages 206 - 209)

Page 210

case and I'll send subscription documents your way --

MR. GLADSTEIN: Whoa, whoa, whoa, we are off the record. We are off the record. Hold on. Let's -- That -- I don't want that in transcript.

MR. ABRAHAM: So take that off the record then. Actually keep it in.

MR. GLADSTEIN: No.

MR. ABRAHAM: Keep it in.

MR. GLADSTEIN: No. Give me five -- no, we're not done. Give me five minutes.

I have to -- can we have five minutes?

I have to think about some things and come back.

MR. ABRAHAM: What are your returns?

COURT REPORTER: Go off the record.

VIDEOGRAPHER: We're off the record at 3:44 p.m.

Page 211

(Whereupon, at 3:44 p.m., a recess was taken to 3:48 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER: We're back on the record at 3:48 p.m.

MR. GLADSTEIN: Mr. Lane, just a few questions for you, if you don't mind.

THE WITNESS: Okay.

BY MR. GLADSTEIN:

Q   Mr. Abraham just spoke to you, I think, in the last ten minutes, about SEC rules.

Do you remember that line of questions?

A   I do.

Q   And one of the things you spoke about was the fact that your fund is set up or the Empery funds are set up to avoid potential group liability; is that right?

MR. ABRAHAM: Objection as to form.

A   Correct.

Page 212

Q   Mr. Abraham showed you a series of documents this morning, and I'll try to do this without referencing the documents.

But there were a series of emails between Mr. Director, who I believe you testified was your in-house counsel at Empery -- the general counsel of Empery, correct?

A   Yes.

Q   And there were communications between Mr. Director and counsel for the company, at Mintz Levin, Mr. Schechter, Mr. Reda, at SEG, advisors of the company as well as Mr. Charron, counsel for the lead investor, correct?

A   Correct.

Q   Was it your understanding that those communications violated any of the policies you have in place to prevent the risk of group activity?

MR. ABRAHAM: Objection as to form.

A   Absolutely not.

Q   And do you say that?

Page 213

A   That falls within the procedures --

MR. ABRAHAM: Objection as to form.

Okay. You can answer.

A   That falls within the procedures that we have designed. There's no other way to facilitate, for the benefit of Empery's limited partners, a parallel transaction unless there is communication between counsels. Counsels draft documents; counsels prepare documents that parallel investors sign that are substantially the same or representatively substantially the same for each investor. It would be unfeasible to conduct a transaction where documents are signed and counsels aren't communicating. It is an -- it is an imperative part of the capital markets.

Q   So is it typical, then, for Mr. Director to pass along revisions to transaction documents to other participants in those transactions which reflect Empery's own terms and views of

54 (Pages 210 - 213)

Page 214

the transaction?

MR. ABRAHAM: Objection as to form.

A   That is traditional in the capital markets. He's reflecting Empery's interest. He's representing Empery. He's working on the behalf of the limited partners for our funds and reflecting what is important to the managers of the fund. And other investors may benefit from that or they may not like those changes, but that is not of our interest. But we pass those comments along to move the transaction along.

Q   You saw an email earlier today in which Mr. Charron, counsel for Anson, asked your counsel, Mr. Director, from -- for some either form precedent.

Do you remember the email I'm referring to?

A   I do.

Q   Why would he ask Mr. Director, to your knowledge, for form precedent rather than just drafting up the documents himself?

Page 215

MR. ABRAHAM: Objection as to form.

A   Precedent is a common, you know, thing in the legal world, where you're using transaction documents that have successfully been used in other transactions, that have dealt with issues that have been dealt with in other transactions and accommodated other issues that have arisen other transactions. So we have forms on our system that work for us, so we are inclined to share those documents for the benefit of our own funds.

Q   And when you say "for the benefit of our own funds," is it your understanding that providing form precedent helps facilitate the closing of a PIPE transaction?

MR. ABRAHAM: Objection as to form.

A   Is it -- it is -- is an efficient use of time for all parties to use precedent forms. Is an efficient use of -- for all parties to communicate about

Page 216

documentation of a parallel transaction. It is standard practice for lawyers to communicate and use precedent form.

Q   Mr. Lane, at any point in time throughout any of the Genius transactions that we discussed, was Mr. Director representing any entity or any individual other than the Empery funds?

MR. ABRAHAM: Objection as to form.

A   Brett is general counsel and chief compliance officer for Empery. He works on behalf of the management company and on behalf of the GP, Martin and myself, and we're fiduciaries for our limited partners. Everything he does is instructed by myself or Martin for the benefit of our limited partners.

Q   Did you view Brett sharing terms or precedent demanded or required or requested by Empery as coordinated activity in furtherance of a joint investment strategy with any other investor?

A   No.

Page 217

MR. ABRAHAM: Objection as to form.

A   No.

Q   Mr. Lane, you were asked some questions about the leak-out agreements.

Do you remember those?

A   I do.

Q   And I believe you testified that the company provided each investor with their own independent ability to register their shares in exchange for a leak-out agreement.

Do I have that right?

MR. ABRAHAM: Objection as to form.

A   Yes. Each investor signed their own leak-out agreement with their own percentage, if they were willing to do that, for -- in exchange for registration of their shares. We did -- if they did sign that -- I don't know, but that's what they were offered. We -- we signed the leak-out for the benefit of our funds, that precedent form was provided for the benefit of our funds.

55 (Pages 214 - 217)

Page 218

Q   Did you ever discuss the leak-out with any other investor?

MR. ABRAHAM:  Objection as to form.

A   Never.

MR. GLADSTEIN:  What is the basis of the form of the objection?

MR. ABRAHAM:  Leading question.

Q   When, if ever, did you discuss the leak-out agreement with any other investor?

A   Never.

Q   Thank you.

Is it fair to say or would you say that Empery's decision to enter into the leak-out agreement was Empery's and Empery's alone?

MR. ABRAHAM:  Objection as to form.

A   We entered into the leak-out agreement for the benefit of our LPs, our limited partners for our own reasons.

Q   Did you coordinate that

Page 219

decision in any respect with any other fund or investor in Genius securities?

A   No.

MR. ABRAHAM:  Objection as to form.

MR. GLADSTEIN:  One second. Okay.  No further questions.

MR. ABRAHAM:  All right.  I'm going to ask you a couple of questions.

THE WITNESS:  Okay.

BY MR. ABRAHAM:

Q   Did you know that other investors were also entering into leak-out agreements?

A   No.

Q   You had no idea?

MR. GLADSTEIN:  Object to form.

A   Not for certain.

Q   Did you see that other -- that emails referenced that other investors were entering into leak-out agreements?

MR. RECKLER:  Objection to form.

Page 220

A   I saw on an email, from Jonathan Schechter and Joe Reda, that they believed that other investors were going to sign leak-out agreement.

Q   So do you have a form book of procedures that the funds follows?

MR. GLADSTEIN:  Object to form.

Q   Does Empery have a book of procedures that it follows?

A   Yeah.  They're filed publicly.

Q   No.

Is --

MR. GLADSTEIN:  Objection.

Q   -- they're -- they're filed publicly?

A   I should restate.  We have form ADV Part 1 and Part 2, which speaks to some of those policies and procedures, but we do have a policies and procedures manual.

Q   Does the policy and procedure manual contain a statement that you should not do multiple signatures on a single page?

Page 221

MR. GLADSTEIN:  Objection.

A   It is -- it is more general than that, but we have orally stated and we have meetings about it internally with our compliance department about the evolving rules and how to, you know, be conscious of 16(b) liability.  And that's one of the things that we talk about in our meetings.

Q   And do you have any understanding when you speak -- strike that.

Do you have an understanding when Empery speaks to an entity, like Special Equities Group, that they will communicate Empery's views to the other investors?

A   Special Equities Group communicates whatever they have to in order to get the sale.  I've seen emails where they have communicated things about me that are not true.

Q   Do you have a standing instruction that Special Equity Group [sic] is not to communicate Empery's views

56 (Pages 218 - 221)

Page 222

about transactions to other investors?

MR. GLADSTEIN: Object to form.

A  I have a standing agreement with Special Equities Group that they are not supposed to put us on emails with other investors, and if they do, they get scorned.

Q  Okay.  But do you have a standing instruction with Special Equities Group that they not communicate Empery's views concerning transactions to other investors?

A  I can't control what they say to others.  I can control what they say to me, and that's why we have those procedures.

Q  Has Empery ever asked Special Equity Group not to communicate its views concerning any transactions to other investors?

A  I don't know if we've articulated it in that way.

Q  Is there another way you may have articulated it?

Page 223

A  I've articulated it, like I said, that we will not participate in phone calls with other investors; we will not participate on emails with other investors.

Q  But can you send messages to other investors through Special Equities Group?

A  We would never do that.

Q  But you -- is it possible --

A  That would be against our procedures.

Q  Which procedures are those?

A  That would be in violation of 16(b) liability, we believe.

Q  Are those procedures written any place?

A  I don't believe that specific procedure or specific procedures like that are written, but we have general procedures that would capture that.

Q  So basically, Empery has a procedure that it doesn't want to be subject to 16(b) liability; is that correct?

Page 224

MR. GLADSTEIN: Object to form.

A  That we wouldn't do things that would be in violation of 16(b) liability or general securities laws.

Q  Or is it more a question that Empery does things to avoid an appearance of acting as a group?

MR. GLADSTEIN: Object to form.

A  We do not participate in activities that would subject us to 16(b) liability.  That's part of our operating procedure.

Q  But it's not written any place; is that correct?

A  Part of our operating procedure is we don't violate securities laws.

Q  But are those operating procedures written any place?

A  I said we have meetings about it, and we are continually evaluating what is going on in the marketplace with respect to different securities laws.

Page 225

Q  Who participates in those meetings?

A  Myself, Martin Hoe, and Brett Director.

Q  How often do those meetings take place?

A  They're not scheduled; they're based on evolving law and evolving policy.

Q  When was the last time you had such a meeting?

A  We had a conversation probably last week that revolved around a different securities law.

Q  Which securities law was that?

A  We were -- I don't remember the specifics of the discussion.  It was -- it was around -- it was around a ongoing litigation matter.

Q  All right.  I assume your counsel will assert privilege with respect to that.

A  It's a --

MR. GLADSTEIN: We're very close.

A  -- that was with respect to an

57 (Pages 222 - 225)

Page 226

active litigation where we are a plaintiff, and it revolves around a specific --

MR. GLADSTEIN: Alright.

A  -- provision in those documents.

MR. GLADSTEIN: Alright. We're getting way too far.

Q  Outside the context of active litigation, have you ever had such meetings?

A  Yes.

Q  Did you have any such meetings in 2020?

A  We -- I -- we have frequent discussions internally about evolving regulatory environment and evolving compliance department.

Q  Were any of those --

A  Okay.

Q  -- memorialized in 2020 in written form?

A  We do write some memos about some of these. I don't know if we wrote a memo in 2020, but we have numerous memos

Page 227

on our system that speak to that.

Q  Do you have any memos from 2019 addressing the subject?

MR. GLADSTEIN: Object to form.

A  I can't say specifically.

Q  How about prior to 2019?

MR. GLADSTEIN: Object to form.

Q  Do you have any memos addressing the subject?

A  I can't say specifically.

Q  Has Empery ever been an investor in a PIPE deal in which it was the only investor?

A  Yes.

Q  When was the last time?

A  I can't say specifically.

Q  How about in 2020? Was it ever the only investor in a PIPE deal?

A  Over the course of our 15 years, we have been the only investor in PIPE transactions.

Q  Can you recall any time in

Page 228

2020 that was the case?

A  I cannot recall a specific time.

Q  Is it correct when there's more than one investor in a PIPE deal that they all need -- that those investors need to come to an agreement on the terms of the PIPE deal?

MR. GLADSTEIN: Object to form.

A  I wouldn't ask it that way, because I'm not coming to agreement with other investors.

I'm coming to agreement with the other company, right? My counterparty is the company. So other investors may agree that they will execute that document because they've independently decided that that's an investment they want to do, but I'm not coming to any agreement with them. I'm coming to an agreement for my own benefit.

Q  Has Empery ever been an investor in a PIPE deal in which other

Page 229

investors participated where Empery had different terms than the other investors?

MR. GLADSTEIN: Object to form.

A  I -- generally the transaction terms, the documents are substantially similar for all parallel investors.

Q  So the answer therefore is no?

MR. GLADSTEIN: Object to form.

A  I said they're substantially similar.

Q  Did you speak to Mr. Gladstein during any breaks about the substance of your testimony?

A  He told me to stop shaking my knee which I've not --

Q  That's not the substance --

A  -- successfully done.

Q  In connection with preparing for this deposition --

A  No.

Q  -- did you review any docs -- you reviewed documents other than emails, correct?

58 (Pages 226 - 229)

Page 230

MR. GLADSTEIN: Object to form.

Q   Is it correct that you reviewed only docs --

A   Yes.

Q   Did you review any pleadings from this case, filings with the court?

A   I don't think I reviewed any filings with the court.

Q   Did you review the report prepared by Plaintiff's expert in connection with preparing for this deposition?

MR. GLADSTEIN: Object to form.

You can answer that question, but we're getting close.

The question was did you review the expert report in preparation for this deposition?

A   Which expert report?

MR. GLADSTEIN: I -- I --

Q   Max Holmes.

MR. GLADSTEIN: The so-called expert report.

Page 231

Q   The Plaintiff's -- the Plaintiff's expert report?

A   I've read that report.

Q   Did you read it in connection with this deposition -- preparing for this deposition?

A   I -- not in connection with preparing for this deposition. I read it in -- when it became available.

Q   Did reading that report inform any of the answers to the questions I asked today?

A   Your expert was wholly uninformed about the securities business, so it was completely uninformative to me.

Q   So is it fair to say it did not inform any of the answers to the questions that I asked you today; is that correct?

A   Far from it.

Q   Okay.

MR. ABRAHAM: I have no further questions at this time.

MR. GLADSTEIN: Two more please.

Page 232

BY MR. GLADSTEIN:

Q   Mr. Abraham asked you whether Empery has a policy of prohibiting the sharing of Empery's views concerning possible transactions with respect to other investors.

Do you remember that question?

Let me put it differently. Scratch that.

You were asked whether Empery prohibits somebody like SEG from sharing Empery's views concerning a transaction with others.

Do you remember that?

A   I do.

Q   Can you explain how Empery would participate in a parallel transaction if it prohibited an issuer's placement agent from sharing its own demands and views with respect to the transaction documents?

MR. ABRAHAM: Objection as to form.

A   I mean, they would not -- they would not be able to hide what we're

Page 233

providing for edits, right?

Their red-lining exists for a purpose. They have to see the changes since their last review so...

Q   In your view, would Empery be able to complete any parallel transactions if it had a policy prohibiting issuers' agents from disseminating comments it makes to transaction documents?

MR. ABRAHAM: Objection as to form.

A   Let me put it this way: If I received a red-line of a document back or I received a document back that was different from a document I provided and it wasn't red-lined, I would be concerned that someone was trying to deceive me about what was or was not changed. So you have to reflect changes that others make in a document with red lines. That is standard practice.

Q   Okay. And Mr. Abraham has also asked you whether you communicate with other investors through the placement agent.

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Page 234

Do you remember that question?

A   I do.

Q   And I think you opined that it -- that something like that may violate Section 16(b).

Are you a lawyer?

A   I don't think I opined that, but --

Q   Okay.

A   -- I'm not a lawyer.  But I would never trust anyone to communicate my words other than me.

Q   Okay.  And does that mean that your counsel communicating deal terms, as required by the Empery funds, to participate in a parallel transaction runs afoul of anything you view to be in violation of 16(b)?

MR. ABRAHAM:  Objection as to form.

A   No.

MR. GLADSTEIN:  No further questions.

MR. ABRAHAM:  Have a good day.

VIDEOGRAPHER:  We're off the

Page 235

record at 4:08 p.m. and this will concludes the testimony given by Ryan Lane.  The total number of media used was six and will be retained by Veritext.

(Time noted:  4:08 p.m.)

Page 236

------------------INDEX----------------------

WITNESS       EXAMINATION BY       PAGE
RYAN LANE      MR. ABRAHAM        6, 219
              MR. GLADSTEIN     211, 232
------------------EXHIBITS--------------------
FOR IDENTIFICATION  DESCRIPTION       PAGE

Exhibit No. 1     Document,           31
      Bates-stamped
      EW-AUG0012146 through
      148

Exhibit No. 2     Document,           38
      Bates-stamped
      EMPGNUS0001975 through
      1976

Exhibit No. 3     Document,           50
      Bates-stamped
      EW-AUG0013088 through
      13094

Exhibit No. 4     Document,           75
      Bates-stamped
      EMPGNUS00020005
      through 2008

Exhibit No. 5     Document,           77
      Bates-stamped
      EMPGNUS0009392 through
      9393

Exhibit No. 6     Document,           90
      Bates-stamped
      EMPGNUS0009391

Exhibit No. 7     Document,          109
      Bates-stamped
      ANSON_0009678 through
      9710

Exhibit No. 8     Document,          114
      Bates-stamped
      ANSON_00014591 through
      14595

Page 237

------------------EXHIBITS--------------------
FOR IDENTIFICATION  DESCRIPTION       PAGE

Exhibit No. 9     Document,          116
      Bates-stamped
      EMPGNUS0004391 through
      4394

Exhibit No. 10    Document,          118
      Bates-stamped
      EMPGNUS0003091 through
      3095

Exhibit No. 11    Document,          132
      Bates-stamped
      EMPGNUS0008489 through
      8493

Exhibit No. 12    Document,          140
      Bates-stamped
      TOON0011940 through
      1944

Exhibit No. 13    Document,          141
      Bates-stamped
      EMPGNUS000847 through
      855

Exhibit No. 14    Document,          145
      Bates-stamped
      EMPGNUS0001789 through
      790

Exhibit No. 15    Document,          151
      Bates-stamped
      EW-AUG0001001 through
      1002

Exhibit No. 16    Document,          153
      Bates-stamped
      EMPGNUS0010228 through
      229

Exhibit No. 17    Document,          160
      Bates-stamped
      EMPGNUS0004718 through
      4722

60 (Pages 234 - 237)

Page 238

------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 18 | Document, Bates-stamped EMPGNUS0004806 through 4815 | 167 |
| Exhibit No. 19 | Document, Bates-stamped EMPGNUS0001373 through 1375 | 195 |
| Exhibit No. 20 | Certain trading documents | 204 |

----------PREVIOUSLY MARKED EXHIBITS----------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|

-----NONE WERE MARKED------

-----------REQUESTS FOR PRODUCTION------------

| DESCRIPTION | PAGE |
|---|---|

-----NONE WERE MADE------

---- ***** ----

Page 239

CERTIFICATE

STATE OF NEW YORK )

)ss:

COUNTY OF RICHMOND)

I, DANIELLE GRANT, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That RYAN LANE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 30th day of September, 2024.

_Danielle Grant_

_____

DANIELLE GRANT

Page 240

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

9/25/2024 - RYAN LANE

ACKNOWLEDGEMENT OF DEPONENT

I, RYAN LANE, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

RYAN LANE                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

Page 241

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

9/25/2024 - RYAN LANE

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

RYAN LANE                Date

Page 242

TODD AUGENBAUM vs.
ANSON INVESTMENTS MASTER FUND LP, et al.
9/25/2024 - RYAN LANE

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

RYAN LANE               Date

**[& - 195]**                                                                 Page 1

| & | | | |
| --- | --- | --- | --- |
| **&** | **10019** 5:13 | **12th** 43:12 | **153** 237:21 |

**&**

**&** 3:2 4:2,10 5:2 6:2,13 15:2 15:13

**0**

**0.454.** 154:1
**00014591** 114:3 114:6 236:24
**0009678** 109:5 109:11 236:22
**00249** 1:2 7:18

**1**

**1** 7:12 30:11,25 44:6,17,22 67:22 123:17 220:18 236:6
**1,781,250** 186:7
**1,900,000** 183:21 185:6
**1.20** 184:11 185:2,6
**1.8** 197:3
**1/28/2020** 86:16
**10** 82:20 83:4 109:4 117:11 118:3,11 129:24 142:1 237:6
**10001** 5:6
**10007** 3:19 7:22
**10017** 4:24

**10019** 5:13
**1002** 151:11,14 237:20
**10020** 4:7
**10025** 6:6
**10105** 4:15
**10123** 3:5
**10228** 153:18
**109** 236:21
**10:11** 36:17
**10:21** 86:16
**10:39** 147:12
**10:45** 195:22
**10f** 6:5
**11** 131:15,25 137:12 140:1 193:8,22 237:8
**114** 236:23
**116** 237:3
**118** 237:6
**11940** 140:24 143:18
**11:25** 67:24,25
**11:39** 147:23
**11:54** 148:20
**11th** 15:22,23 155:4
**12** 116:9 140:9 140:15 143:15 154:1 237:11
**120** 184:16
**1271** 4:6
**12:11** 149:11
**12:48** 131:6,7

**12th** 43:12
**13** 43:7 118:12 141:12,20 237:13
**13088** 50:17 57:9
**13094** 49:21,25 236:13
**132** 237:8
**1325** 5:12
**1345** 4:14
**1373** 195:19
**1374** 198:19
**1375** 194:25 195:3,17 238:7
**13th** 43:13
**14** 145:3,12 151:3,5 237:16
**140** 237:11
**141** 237:13
**144** 111:12 112:1 165:20
**145** 237:16
**14595** 114:4,7 236:25
**148** 30:14,24 236:8
**14th** 4:23
**15** 40:16 136:19,23 151:7,9,15 179:21 227:23 237:18
**151** 237:18

**153** 237:21
**16** 131:19 153:6,12 161:3 163:7 207:5,13 207:20 208:21 208:22 221:7 223:15,24 224:4,12 234:5 234:18 237:21
**160** 237:23
**167** 238:3
**17** 160:4,10 169:1 237:23
**175** 3:16 7:20
**1789** 148:16
**1790** 145:23
**17b** 121:22
**17th** 189:15
**18** 16:2 141:13 167:3,9 175:8 175:10,12,14 175:15,18 182:20,22,23 182:24 187:10 188:9,22 238:3
**18,750** 185:20
**18th** 189:15
**19** 19:7 48:14 194:23 195:4 238:6
**1934** 112:2,5
**1944** 140:11,14 237:12
**195** 238:6

**[1975 - 3:37]**                                                    Page 2

**1975**  62:7
**1976**  38:10,14
  236:10
**1:13:07**  46:1
**1:22**  1:2 7:18
**1:41**  131:8,12

**2**

**2**  30:12 38:8,15
  48:16 62:1
  123:22 124:15
  124:23 126:19
  131:5 148:7
  152:21 220:18
  236:9
**2,280,000**
  183:20 185:5
**20**  146:1
  203:19,25
  238:8 240:17
**20,000**  184:23
**2000**  15:5,23
**2005**  75:17
**2008**  16:16
  74:21 75:4
  236:15
**2017**  134:7
  138:16
**2019**  20:9
  34:10 35:18
  36:17 37:24
  39:3 41:15
  42:16 43:13,17
  43:20 47:15,16
  48:18 58:20
  62:20 227:3,7

**2020**  20:21
  38:2,3 45:22
  50:18 52:25
  53:1,2,19
  55:18,21,22
  56:3,7,8,17
  57:11 58:21
  59:19 60:20
  61:19 62:25
  64:14 76:4
  78:8,15,19
  80:6,13,20,24
  81:9 82:2 84:1
  84:21 87:16
  89:1,4,9,16
  90:21 91:4,10
  91:19 93:7
  94:1 98:23
  99:19 103:6
  104:7 105:20
  106:13 107:1
  108:5 115:4
  117:11 128:4
  128:15 129:6
  129:24 134:11
  136:19,23
  137:6,12 140:2
  142:2 146:1
  147:11,24
  148:20 149:11
  151:25 153:20
  158:5,14,16
  159:4,4 161:3
  161:11,16
  163:8 168:6,13

  169:1 187:10
  188:9,22 193:8
  193:23 195:22
  197:5,8 226:14
  226:21,25
  227:19 228:1
**2021**  56:21,23
  56:24
**2024**  1:14,19
  2:9 7:3 239:21
**204**  238:8
**21**  34:9 140:11
  147:11,24
  148:20 149:11
**211**  236:4
**219**  236:3
**22**  35:18 36:17
  37:24 50:18
  58:21 59:19
  62:25 145:4
  158:14 159:4
  195:22 197:5,8
**229**  153:8,11
  237:22
**23**  57:11 60:19
  61:19 64:14
**232**  236:4
**24,000**  184:23
**25**  1:14,19 2:9
  7:3
**25.5**  153:7
**250**  56:13
**2568**  148:9
**26**  91:4,10,19
  160:5

**27**  78:7 80:24
**28**  83:25 84:21
  87:16 167:4
**2:21**  64:14
**2:36**  174:25
  175:1
**2:44**  175:2,6
**2mm**  148:5,6

**3**

**3**  2:16 3:17
  38:9 49:18
  50:1 57:8
  63:22 64:5,11
  75:25 110:13
  164:16 174:24
  197:1,2,2
  236:11
**3/10/2020**
  116:25
**3/11/2020**
  143:20
**30**  169:7,11
**3091**  119:11
**3095**  118:2,14
  237:7
**30th**  239:20
**31**  236:6
**33**  203:20
**34**  135:16
**350**  6:4
**359**  239:23
**38**  236:9
**3:12**  203:8,9
**3:37**  203:10,14

**[3:44 - abraham]**                                                    Page 3

**3:44**  210:25 211:1
**3:48**  211:2,6

**4**

**4**  39:3 41:15 42:16 47:16 49:18 62:19 63:24 64:1,3,4 73:19 74:24 75:5 123:18 203:7 236:14
**4.2**  196:23
**4.5**  178:14,16 196:17
**4200**  5:22
**4391**  116:24
**4394**  116:11,14 237:5
**45**  33:10
**450**  3:4
**4722**  160:6,9 237:25
**4806**  168:25
**4807**  183:1 184:4
**4808**  183:5 184:22,25
**4809**  183:9,18 185:5
**4810**  183:12 185:8
**4811**  183:14 185:19
**4812**  183:16 186:5

**4813**  186:17
**4814**  186:24
**4815**  167:5,8 187:4 238:5
**485**  4:22
**4:08**  235:1,6
**4:40**  78:8

**5**

**5**  73:20,22 74:12,13,14 77:11,18 236:16
**5/17/2020**  175:20
**50**  81:23 82:4,6 236:11
**51st**  3:18 7:21

**6**

**6**  77:12 90:4,9 102:3 236:3,19
**60**  56:4
**609**  5:21
**625,000**  146:12
**625k**  146:10,11

**7**

**7**  108:25 109:13 113:11 236:21
**70**  44:7
**75**  236:14
**75,000**  185:10
**77**  236:16
**77002**  5:23

**790**  145:6,11 237:17

**8**

**8**  90:5 113:8 114:2,8 117:3 153:20 158:16 159:4 236:23
**80,000**  184:16
**8492**  132:17
**8493**  131:18,24 132:25 237:10
**8494**  133:7
**855**  141:16,19 237:15
**8:45**  39:4

**9**

**9**  41:16 116:9 116:15 196:20 237:3
**9/12**  43:7
**9/25/2024**  240:2 241:2 242:2
**9/4/2019**  45:25 62:13
**90**  55:8 236:19
**9392**  83:21 86:15
**9393**  77:14,17 78:5 236:18
**96,000**  184:6,15
**9686**  109:24
**9687**  110:10,11 110:11

**9710**  109:6,12 236:22
**9711**  109:24
**9:07**  42:16
**9:15**  50:19

**a**

**a.m.**  1:15 2:10 7:3 35:19 36:17 39:4 41:16 42:16 67:24,25 68:2 68:7 147:12,23 148:20
**abbe**  65:17
**ability**  14:21 171:1 173:10 173:11 181:13 187:9 217:10
**able**  29:24 30:1 53:25 98:14 135:12 162:17 165:23 172:22 173:7 232:25 233:6
**above**  157:4 170:13
**abraham**  3:2,6 8:15 9:5 10:15 11:22 12:4 21:21 23:12 30:8,18 35:12 38:6 47:23 48:2,10 49:16 62:6 63:21 64:1,4 67:13

67:17,19 73:17
73:21 74:5,13
74:15,21,25
77:9 79:24
80:5 89:25
90:4 103:14
104:11,17,21
104:25 105:4,8
105:11 108:21
108:25 109:2
113:6 118:6,10
118:25 130:25
131:3,13,20
140:7 141:10
145:1 151:1
153:4 160:2
167:1 173:25
174:10,17,22
175:7 177:13
194:18,23
203:2,15,19
204:4,10
209:20,23
210:8,12,20
211:12,23
212:1,22 213:3
214:2 215:1,20
216:9 217:1,14
218:3,9,20
219:4,8,12
231:22 232:2
232:22 233:10
233:22 234:19
234:24 236:3

**abraham's**
  79:12
**absent** 138:19
**absolutely**
  67:18 68:25
  212:24
**accommodated**
  215:9
**accomplished**
  139:9,10
**account** 12:6
**accounted**
  142:7
**accounting**
  142:19 205:9
**acknowledge...**
  240:3
**acknowledg...**
  60:3
**acquaintance**
  40:21,23
**act** 112:2,5
  135:4,16
**acting** 150:6,9
  224:8
**action** 1:2 8:5
  239:16
**actions** 17:16
**active** 16:15
  226:1,9
**activities**
  224:12
**activity** 207:23
  207:25,25
  212:21 216:22

**actual** 58:9
  68:20 86:9
**actually** 78:2
  89:12 108:16
  128:10 142:21
  142:23 162:8
  175:17 210:9
**add** 124:23
**added** 101:9
**additional**
  125:14 126:3,8
  165:20
**additions** 240:6
**address** 121:8
  121:15
**addressing**
  227:3,11
**adjust** 93:14
  142:11 143:5
**adjusted** 141:1
  141:4 142:11
  142:13,15
  143:5
**adjustment**
  93:17,18
**administer** 8:3
**adv** 220:18
**advice** 92:20
**adviser** 18:5
**advisor** 70:14
**advisors**
  212:14
**advocate** 81:1,6
**aegis** 44:2,5,13

**affect** 26:7,15
  92:25 93:23
  94:5 106:10
  126:16 163:19
**affected** 180:15
  181:5,12
**afoul** 234:17
**agent** 21:4 26:3
  70:12 102:13
  164:9 232:19
  233:25
**agents** 173:10
  191:13 233:8
**aggregate**
  124:21 196:17
  196:23 197:1
**ago** 9:16 17:14
**agree** 7:11
  172:13,19
  180:8,12,17,24
  184:19 190:18
  191:9,11
  193:15,16
  202:12,13,14
  228:17
**agreed** 8:15
  10:21 58:16
  94:20 95:19
  100:11,20,23
  101:4,13
  168:18 170:3
  173:14 180:7
  189:15 192:3,5
  192:6 193:9,23
  194:3,6 197:12

**[agreeing - anson]**

**agreeing** 70:25
  71:1 104:4
  172:15 178:2
  178:14 179:5
  179:12,13,20
  198:5 199:4,11
  199:23 200:3,9
  200:15
**agreement**
  70:19 84:24
  85:3,7,9,14
  86:2,10 91:10
  91:19,21,23,25
  92:2,5,7,9,14
  92:19,24 93:4
  94:10 95:6
  96:1,15,19
  97:1,3,6,13,15
  98:3,11,12,13
  98:15,19,20,24
  98:25 99:15,16
  101:1,5,6,10,13
  101:15,21
  102:25 103:3,7
  103:21,24
  104:5 105:18
  105:22 107:8
  107:22 108:3
  110:25 128:3
  129:7,14
  130:21 137:2
  137:13,25
  140:2 143:21
  155:5 161:2
  164:4,8 165:5

167:14,18
170:17 177:3
178:1,6,10,11
178:19,24,25
179:14,20,25
180:1,12
187:12 189:3,5
189:8,12,14
190:23 191:2
191:25 192:8,9
192:13,24,25
193:10,24
194:4,6,7
197:11,13,18
197:24 198:10
198:12 199:4
199:14,24
200:1,6,9,16
201:3,16 202:2
202:7 208:10
217:12,17
218:12,18,23
220:4 222:4
228:7,12,14,21
228:22
**agreements**
  71:12,16 92:22
  98:7 101:16
  105:24 106:3
  167:16 177:22
  188:10,24
  217:5 219:15
  219:23
**agrees** 164:17

**ahead** 105:9
**ailment** 14:17
**al** 240:1 241:1
  242:1
**alert** 34:11
**alertprivatera...**
  34:9
**algorithm**
  54:19,24
**allocated** 55:7
  55:9 155:23
**allocation**
  53:12,18
**allow** 21:24
**allowed** 97:7
  138:9
**alright** 226:4,7
**alternative**
  165:15
**alvarado** 6:13
  7:23
**alyson** 119:19
  120:3
**amazing** 44:9
**amella** 3:22
**amenable**
  165:4,8
**amend** 124:25
  138:14
**americas** 4:6
  4:14 5:12
**amin** 64:20,24
  148:3
**amortization**
  135:8 136:12

**amortize**
  134:22
**amortizing**
  134:14,16,20
  137:21 138:2
  138:20
**amount** 54:5,6
  54:8 56:15,22
  115:18,22,23
  126:15 129:16
  129:22 154:23
  155:18 171:2
  172:8,10
  183:20,25
  184:6,7,23
  185:9,16,20
  186:1,7,13
  191:10
**analyst** 15:17
  15:19
**andrew** 3:20
**andy** 46:12
  107:23 108:2
**angry** 152:19
**anniversary**
  110:23 111:25
  112:14,15,18
  112:19
**announced**
  64:10
**annually** 22:15
**anson** 1:6 5:20
  7:16 65:1
  109:5,11 114:3
  114:6 129:2,4

**[anson - augenbaum]**

196:20 197:8
214:16 236:22
236:24 240:1
241:1 242:1
**anson's** 129:25
**anson0** 73:23
**answer** 14:8,9
15:21 55:17
58:13 73:4,12
73:13 79:11,16
79:20 99:3,12
99:24 100:18
104:15 126:1
138:7 149:22
150:2,4 158:20
164:24 172:5
177:11 182:8
207:18 213:5
229:8 230:16
**answered**
35:11 73:3,10
**answering** 70:6
**answers** 231:11
231:17
**anybody** 16:20
18:13 19:2
52:15 87:15,21
87:22,22 88:14
121:4
**apologize** 53:10
**appearance** 8:9
8:12,16 224:7
**appearances**
8:17

**appeared** 37:12
**appended**
240:8
**appreciate**
10:18 189:10
**appreciated**
161:18
**appreciation**
166:18
**appropriate**
29:17
**appropriately**
52:24
**approval** 96:7
**approves**
146:19
**approximately**
190:6
**archived** 18:3,4
19:13
**archiving**
19:12
**arisen** 215:10
**armenta** 53:4
119:19
**arps** 5:2
**articulated**
222:23,25
223:1
**asche** 6:2,7
**aside** 18:13,20
19:2,3 23:6
26:24 30:19
32:10,17 52:6
55:4 88:14

127:10 144:24
208:23
**asked** 35:11
66:18 73:3
79:21 99:11
173:18,19
181:22 190:12
190:13 206:12
214:17 217:4
222:18 231:12
231:18 232:2
232:10 233:23
**asking** 14:7
60:12 70:3
72:21 99:8
138:6 157:10
164:6 165:9
171:17 172:1
176:1 181:9,20
182:1,5,10
193:1,2 201:10
201:23 207:11
**asleep** 113:24
**assert** 225:20
**asset** 1:8 3:13
12:19,21,23
34:11,22 184:8
185:16
**assets** 54:12
205:10
**assisting** 53:7
53:11
**associate** 52:19
65:7 66:3

**associated**
32:24 53:15
92:5 125:10
**associates**
52:18,23
**assume** 14:1
21:20 93:1
102:21 104:9
225:19
**assuming** 157:4
162:21
**attached** 176:7
**attachments**
109:22
**attempt** 66:21
**attention** 39:2
119:10 132:15
**attorney** 8:14
14:9
**attorneys** 3:3
3:12 4:3,11,19
5:3,10,19 6:3
**attractive** 37:6
37:8
**audio** 7:8
**aug0001001**
151:10,13
237:19
**aug0012146**
30:14,23 236:7
**aug0013088**
49:21,24
236:12
**augenbaum** 1:3
7:16 240:1

241:1 242:1
**august**  34:9
  35:16,18 36:17
  37:24
**authorization**
  133:17
**authorized**  8:3
  133:19,22
**authorizing**
  133:12
**available**  54:8
  135:14 163:16
  163:20 231:9
**avenue**  3:4 4:6
  4:14,22 5:12
**average**  159:11
**avoid**  22:2
  207:25 211:21
  224:7
**aware**  92:4
  159:25 199:13

**b**

**b**  207:5,13,20
  208:21,22
  221:7 223:15
  223:24 224:4
  224:12 234:5
  234:18
**back**  46:25
  48:5 55:23
  56:9,17 61:25
  63:21 68:6
  76:6 80:4,8
  87:1,10,16
  88:8 103:17

105:14 113:17
124:16,22
131:11 135:13
143:15 158:1
175:6,15,18
182:12,20
183:18 184:4
203:13 210:19
211:5 233:13
233:14
**background**
  14:24 15:1
**bad**  125:17,23
  152:23
**balance**  190:24
  191:6 193:16
  194:12,15
**bank**  69:17
**banker**  22:23
  25:23 40:1
**banking**  15:15
**bankrupt**  10:3
  41:22 85:20
**banks**  41:4
**bargain**  94:14
  94:15,19 95:4
  95:8,15,18
  96:13 97:25
  101:11
**based**  24:6,8
  28:6,9 54:11
  55:10 69:12
  70:24 81:19
  98:6 99:5
  100:25 115:18

134:2,20,22
142:13,17
154:24 155:9
166:5 168:19
169:19 172:10
202:1 225:8
**basement**
  89:23
**basically**
  112:17 223:22
**basis**  41:7
  122:16,17
  218:7
**bate**  62:6
**bates**  30:13,23
  38:9,13 49:20
  49:24 50:16
  57:9 62:4,4
  73:22 74:16
  75:3,17 77:13
  77:16 78:5
  83:21 86:15
  90:7,12 109:5
  109:11,23
  110:10 114:2,6
  116:10,13,24
  118:1,13
  119:11 131:17
  131:23 132:17
  132:25 133:7
  140:10,13,24
  141:15,18
  143:18 145:5
  145:10,23
  148:16 151:4

151:10,13
153:7,10,18
160:5,8 167:4
167:7 168:25
186:17,24
187:4 194:24
195:2,19 236:7
236:9,12,14,17
236:19,21,24
237:4,6,9,11,14
237:16,19,21
237:24 238:4,6
**bathroom**
  174:16,19
**bazillion**  149:7
**bcc**  119:14
  120:13
**bearing**  202:16
**began**  191:14
**beginning**  8:13
  17:6 84:23
**behalf**  70:9
  72:7 88:21
  133:22 214:7
  216:13,14
**believe**  11:2
  20:12 31:12
  34:25 36:5
  37:25 38:3,24
  44:21 46:11
  48:12 50:10
  63:3 64:25
  65:14,15,16
  68:9 75:14
  77:12,23 79:20

86:23 90:18
93:22 95:24
103:18 108:20
109:4 114:24
118:12 119:14
127:24 128:7
129:2,4 130:2
134:13 135:18
136:20,24
140:11 141:24
142:4 144:12
147:22 154:11
155:16 156:2
163:19 170:9
170:10 184:14
185:15,25
186:12 187:15
187:17 189:2,9
190:9,12
193:13,25,25
196:10 197:17
202:18 204:18
212:6 217:8
223:15,18
**believed** 129:10
220:3
**benefit** 29:19
70:13 88:23
94:14,15,19
95:3,7,15,18
96:12 97:24
101:11 102:12
121:19 156:15
165:22 202:23
213:9 214:10

215:13,16
216:18 217:23
217:25 218:23
228:23
**bespoke** 139:19
139:22
**best** 81:2
**better** 14:12
71:14 170:23
171:24
**beyond** 104:24
**binding** 130:15
130:18,21
**biotech** 37:4
89:20
**bit** 146:7
**blame** 157:16
**blind** 119:15,18
119:23 120:6
121:3 175:22
**blood** 239:16
**blue** 110:19
111:6 144:5,10
**board** 146:19
**bob** 143:20
**body** 117:13
121:17 146:6
176:6
**book** 220:5,9
**bored** 114:1
**borrow** 163:16
163:17,18,20
**botched** 44:5
44:17

**bottom** 33:17
34:7 39:2
50:15 77:25
78:6 83:21
145:24 148:18
**bound** 197:10
**boys** 165:2,2
**bracket** 125:1,2
**brand** 20:8
58:23 73:1
80:15,19 81:11
128:15 206:23
207:6 209:14
**brands** 19:25
25:4 28:24
29:9,13 40:11
45:15 47:17
53:6 57:24
71:24 84:17
88:4 93:6,25
97:12 103:4,10
104:7 105:20
106:13,25
108:6 112:4
123:4 128:2,17
129:5 132:14
136:22 137:6
159:3 163:6
188:11
**break** 67:15
130:24 149:24
174:18,18,19
203:3
**breaks** 229:14

**brett** 50:19
51:13,14 57:12
75:18,23 78:7
83:23 84:21
86:4,17 92:10
116:25 117:2
119:12,18
132:22 133:4
133:11 141:25
153:20 164:15
169:2 175:20
195:24 199:1
216:11,19
225:3
**brian** 119:19
**brilling** 4:16
**bring** 60:11
147:13,17,18
**brio** 1:6,6 4:12
4:13 196:22
197:8
**broad** 82:9
**broker** 16:8
24:2
**bruckhaus**
3:11
**bryan** 53:4
**buffer** 54:9,10
**building** 15:23
**bullet** 25:25
**burckhaus**
2:15
**burn** 115:23
121:23 122:8
122:10,13,14

**[burn - changing]**

142:3,25
**business** 18:2
19:19 28:15
29:4 30:2
40:20,23 41:1
41:11 65:7
66:2 68:17
76:17 87:1,17
88:3,9,14
111:16,20,22
112:23 115:9
117:15,19
144:20 231:14
**buyer** 24:4
**buyers** 24:4
**buying** 93:1
149:13 159:22

**c**

**c** 3:1 4:1 5:1 6:1
110:13
**calculated**
122:16
**calendar**
157:23
**call** 23:5 42:9
64:20 79:7
95:5 148:23
**called** 8:23 16:8
19:25 61:17
85:7 205:7
230:24
**calling** 117:14
**calls** 22:23,24
22:24 208:16
208:17 223:3

**cap** 26:17 39:7
44:10
**capacity** 15:16
33:23 41:2
79:4 99:12
100:9
**capital** 1:6,10
1:10 4:5,12,20
16:8,12,13
36:12 40:9
44:23 45:3
56:1,5,10,16,23
63:13,14
115:18 126:5
128:17,18
130:8 156:13
197:2,9 213:20
214:5
**capitalization**
26:14
**capitalized**
127:3,4
**capture** 223:21
**capturing**
120:19
**care** 179:23
197:21,22
**careful** 21:15
**carefully**
116:19 118:17
**cares** 94:13
**carte** 139:6,13
**case** 7:17 9:18
19:1 24:5
28:23 29:9,12

85:6,20 86:2
102:15 112:4
120:17 124:18
127:15 136:10
150:1 168:23
177:1,2 210:1
228:1 230:7
**cases** 11:7,9,10
**cash** 29:6,7,14
29:15,23 30:3
54:6,8,9,10,13
85:8,10,13,14
115:1,7,17,21
115:22,23
116:1 121:23
122:8,10,13,14
123:1,4 135:12
135:17 141:8
142:2,25 166:1
191:6
**cause** 14:17
79:7
**caution** 78:23
78:24 79:17
**center** 2:16
3:17 7:21
**central** 6:4
**ceo** 10:2 41:21
47:3 63:16
**ceos** 46:19
**certain** 59:16
94:20 95:18
104:2 154:6
163:23 170:13
170:25 194:2

203:21,23
204:13 219:20
238:8
**certificate** 91:3
101:25 102:7
102:23 239:1
**certified** 239:5
**certify** 239:8,14
**chain** 59:8
**chance** 31:3
36:18,22 38:18
46:5 62:14
81:15,18,23
82:1,20 83:4
90:14 109:7
114:11 116:18
118:15 148:22
**change** 23:14
61:18 62:18,24
113:1 138:15
142:6 158:12
158:21,23
159:1 169:6
241:4,7,10,13
241:16,19
242:4,7,10,13
242:16,19
**changed** 61:21
62:21,22 63:5
63:9,12 136:18
159:11 233:18
**changes** 214:11
233:3,19 240:7
**changing** 63:20

**[characterize - company]**                                           Page 10

**characterize**
  66:1
**charron**  78:8
  83:23 84:3,12
  84:15 86:16
  87:6 88:12,19
  91:9,14 117:2
  119:13 142:1
  212:15 214:16
**charron's**
  84:20
**chief**  51:15
  216:12
**children**  37:19
**china**  89:20
**chip**  148:4
**chung**  119:19
  120:3
**circumstance**
  23:21,23 69:1
  108:19
**circumstances**
  22:18 125:22
  126:2
**city**  43:22
**civil**  1:2 9:17
**clarification**
  48:9
**clarify**  20:23
**clark**  4:25
**cleansed**  147:7
  163:12
**client**  88:21
  207:22

**close**  39:7
  67:10 81:24
  125:2 154:16
  225:24 230:17
**closed**  122:24
**closing**  97:14
  101:22 108:11
  108:11,13
  110:24 112:21
  124:12 215:18
**collateral**  91:3
  101:25 102:7
  102:11,11,12
  102:13,23
  125:16
**college**  15:3,9
**come**  40:5 44:9
  63:4 70:19
  112:20 139:6
  152:10 208:13
  210:19 228:7
**comfortable**
  29:18,21 81:3
  81:5,20 82:7
**coming**  200:20
  228:12,14,21
  228:22
**comments**
  121:18 214:13
  233:8
**common**  26:20
  26:24 44:8
  45:4 67:2
  106:9 148:4,14
  149:13 158:14

  158:16 159:3,8
  163:6 188:19
  190:19 198:7
  209:14 215:3
**communicate**
  86:5 88:18
  120:16 164:10
  215:25 216:3
  221:16,25
  222:11,19
  233:23 234:11
**communicated**
  164:12 221:21
**communicates**
  221:19
**communicating**
  213:19 234:14
**communication**
  19:19 213:11
**communicati...**
  17:24 18:3
  88:8 120:14
  212:11,19
**companies**
  26:18 181:25
**company**  12:7
  12:8,15 13:13
  15:14 19:25
  26:10,11,14
  29:23 37:5
  39:10 42:2
  47:3 60:21
  63:15 85:12,20
  94:15 95:1,11
  95:25 96:2,5

  96:10 97:8,18
  98:20 99:7,17
  100:1 101:9,20
  102:10,22
  106:19 107:8
  112:1 115:18
  115:23 123:21
  124:14,24
  125:13 126:3
  130:1 133:23
  135:12,16
  144:1 146:9
  159:23 162:22
  164:5,6,10
  165:12,16
  166:2,17
  169:22 170:4,8
  170:11,17
  171:8,15,19
  173:9 177:25
  178:5,18 179:4
  179:8,18 180:9
  181:22 182:2
  188:4 189:15
  190:15,21,25
  191:3,13
  192:16 193:14
  194:10 198:5
  199:10 200:2,7
  201:9 202:1
  208:5 209:12
  212:13,14
  216:13 217:9
  228:15,17

**company's** 29:14 63:16 96:20 100:15 100:25 107:13 168:19

**competitor** 65:9 66:4

**complete** 152:20 191:5 204:16 233:6 240:9

**completely** 231:15

**complex** 26:18 26:23 27:4,6 27:10

**complexity** 26:1

**compliance** 18:4 51:16 52:12 207:21 216:12 221:5 226:18

**compliant** 112:2,5,9,11,14 112:20 208:21

**compromise** 173:18

**concept** 54:3 85:8 115:2,7,9

**concern** 101:10 124:7

**concerned** 123:3,6 166:7 177:23 178:21

179:11 233:16

**concerning** 19:6 33:7 58:22 78:15 91:2,9,18 92:14,18 115:1 222:12,20 232:4,12

**concludes** 235:2

**conclusion** 98:5 127:23

**concurrently** 192:12

**condition** 97:13 101:23 108:4 108:10,11,16

**conditions** 85:18

**conduct** 213:17

**confidential** 9:22 53:23 54:1 79:10,15 79:22

**conflict** 68:21 138:16

**confused** 21:20

**confusion** 11:21 22:2

**connected** 34:23 187:16 187:18

**connection** 9:17,19 84:16 93:5 99:18

103:4 104:6 180:13 187:23 187:25 229:20 230:12 231:4,7

**conscious** 207:24 221:7

**consent** 125:3 131:16 132:11 133:14,20 134:1 138:1

**consider** 20:25 27:9 28:18 40:17,20,22 41:10 61:11 111:15 115:8 172:15

**consideration** 167:20

**considered** 27:3,6

**considering** 81:10 165:14

**consistent** 10:19 86:7

**consists** 203:21

**consumer** 39:9

**cont'd** 4:1 5:1 6:1

**contain** 162:18 220:23

**contemplated** 128:22 184:2 188:2 189:14

**contemporan...** 177:20

**content** 37:19

**context** 71:23 102:2 106:24 122:4,7 144:20 144:22 148:11 151:22 169:16 226:9

**contingent** 128:16 187:11 187:20

**continually** 224:23

**continue** 7:9

**continued** 16:14 189:10

**contract** 11:11

**contractual** 155:25

**control** 222:14 222:15

**controller** 120:4

**conversation** 60:1,6,14 225:11

**conversations** 7:7 47:15 48:13,15,18,23 49:5,8,13 58:22 59:13 78:13,17,19 79:13 80:12 152:5 168:12 168:15,17

**[conversion - court]** Page 12

**conversion**
93:14 94:7,17
94:22 95:13,21
96:8,13,22
97:10,23 99:10
100:13 111:8
111:10 112:10
134:25 135:5
136:16,18
161:20 189:3,5
189:8 191:25
192:13 193:10
193:24 194:5
**convert** 149:13
188:18 189:11
189:23 190:19
191:9 192:3,5
193:17
**converted**
136:14 194:1
194:13,15
198:11
**convertible**
27:6 39:6
55:12 93:16,19
137:5,17,20
138:3,19
161:25 185:17
188:25 209:13
**converting**
198:4
**converts**
190:17
**convince** 66:21
200:21

**coordinate**
218:25
**coordinated**
216:21
**copied** 119:18
120:6 121:3
175:22
**copy** 80:17
119:15,23
129:25
**copying** 50:19
57:12 117:1
119:13 146:1
153:21
**corcoran** 5:14
**corporate**
107:12
**correct** 19:23
27:8 28:12
30:7 34:21
35:5 42:22,23
50:24 58:15,18
60:14 64:6,7
68:11 74:24,25
83:15,18 84:19
86:11,12 89:3
89:5,7 95:17
96:24 100:10
100:19 101:3
101:17 107:7
108:2,17 112:3
116:3 119:15
121:4 127:17
135:23 137:11
137:15,19,24

139:15 144:21
144:23 159:9
159:12,13
167:18 170:2
173:1 179:10
182:9 184:14
184:18 187:21
190:1 199:12
202:9 206:16
206:19 209:14
211:25 212:9
212:16,17
223:25 224:16
228:4 229:25
230:3 231:19
240:9
**corrections**
240:6
**correctly**
123:23
**counsel** 7:14
8:10,21 10:19
10:22 18:23
20:22 30:10,19
31:13,16 35:13
49:19 51:15
79:3,4 82:13
82:19 83:5
86:3 88:10,10
88:11,15,19
92:10 133:5
141:14 144:1
212:7,8,12,15
214:16,17
216:11 225:20

234:14
**counsel's**
132:21
**counselor**
63:25
**counsels**
213:11,11,12
213:18
**counter** 181:25
**counterparty**
70:11 71:1
177:18 208:5
228:16
**county** 239:4
**couple** 110:2
173:23 219:9
**course** 23:9,13
23:19 76:16
118:24 145:19
156:7 166:9
227:22
**court** 1:1 7:25
8:2,19 30:9
38:7 48:8
49:17 73:18
74:18 77:10
90:1,3 108:22
108:24 113:7
118:7,9,20
131:14 140:8
141:11 145:2
151:2 153:5
160:3 167:2,12
175:9,12
194:19,22

**[court - delcath]** Page 13

203:16,18
210:22 230:7,9
**covenant** 29:14
106:18,23
115:7 121:23
123:2,4 124:24
141:8 142:3,25
**covenants**
27:12,15 28:7
28:8,14,18
29:1,3,21
**covid** 19:7
56:19 88:18
89:1,3,8 152:6
152:9 166:19
**create** 46:20
**created** 42:4,11
46:15
**creating** 44:8
**credit** 54:16
122:10 125:2
125:12,15
126:17
**criminal** 46:6
46:10,14 47:4
**criminals** 46:21
46:24
**criteria** 71:4
**cross** 118:22
178:8
**crossing** 206:8
206:13
**cumulative**
115:1 121:24
122:4,7

**current** 142:5,9
142:10,15
154:24 162:22
**currently** 17:7
56:11
**curve** 89:18
**customized**
139:24 140:3
**cv** 1:2 7:18
**cvi** 1:7 5:4
197:2,9

**d**

**d** 209:7,7,9,18
**daily** 178:15,15
178:17
**damaged** 15:24
**danielle** 1:24
2:17 8:1,25
239:5,24
**dash** 41:17
64:16 75:20
121:19 153:22
**date** 17:12 20:5
31:2 34:9
38:17 50:3
59:12 75:7
77:20 88:6,7
89:18 90:11
109:15 110:24
111:6 112:1
114:10 116:17
118:5 132:2
140:17 141:22
145:14,25
151:17 153:14

160:12 165:20
167:11 195:6
204:2 240:13
241:24 242:24
**dated** 62:13
83:25 142:1
**dates** 43:15,17
59:7
**david** 6:13
**day** 22:13
149:3 159:11
209:20 234:24
239:20 240:17
**days** 179:21
**de** 166:24
**deal** 21:10,18
22:3,19 23:15
24:11,16,16,20
24:21 25:17
39:6 41:17
44:6,8,17
51:25 71:7
139:25 146:3
146:20 156:3
179:7 185:17
209:22,24
227:14,21
228:5,8,25
234:14
**dealer** 16:8
**deals** 154:15
**dealt** 215:7,8
**debt** 1:8 3:14
27:2,3,5 39:6
39:10,14,17,19

39:21 55:7,8
55:11,12,24
56:2 126:3,8
190:22 191:10
193:17 194:15
198:4
**deceive** 233:17
**decide** 172:19
202:24
**decided** 228:19
**decision** 93:24
106:25 156:4,9
158:13,15,24
201:25 202:23
218:17 219:1
**decisions** 51:24
202:22 206:22
207:6
**declare** 240:4
**declared**
162:24
**deduced** 40:12
**deemed** 240:7
**defendant** 1:13
3:12 4:3,11,19
5:3,10,19 6:3
**defendants**
1:12 10:23
11:1
**define** 11:20,22
**defined** 110:24
**definition**
127:5,7
**delcath** 33:18
33:21 34:23

35:2 36:24
**deliver** 96:20
  96:21 176:24
**deliverable**
  108:12
**delivered** 25:23
**demanded**
  216:20
**demands**
  232:20
**demonstrating**
  150:5
**dennis** 5:24
**denton** 143:20
**dep** 117:9
**department**
  221:5 226:18
**depends** 25:20
  25:25 26:1,2,3
  26:4 28:22
  49:1 82:24
**deponent** 240:3
**deposed** 9:9
  10:24 11:3
  13:25
**deposition** 1:17
  2:14 7:13,19
  30:25 33:8
  38:15,25 50:1
  50:11 51:12
  75:5,15 77:18
  77:24 90:8,19
  109:13 114:8
  116:15 118:3
  131:25 140:15

141:20 145:12
145:20 151:15
151:23 153:12
160:10,25
167:9 168:4
195:4,14
203:25 229:21
230:13,20
231:5,6,8
239:10,12
**depositions**
  10:20
**deringer** 2:16
  3:11
**derivative**
  142:7,13,16,17
  142:18
**described**
  25:20
**describing**
  125:1
**description**
  236:6 237:2
  238:2,12,17
**descriptive**
  40:13
**deserves** 41:22
**designed** 213:7
**desire** 129:12
  164:11
**desk** 22:24
**detailed** 25:22
**details** 127:7
  177:16

**determination**
  126:18
**determined**
  134:24 172:21
**device** 37:1,12
**dictate** 27:18
  27:19 29:3,5
**different** 23:4
  24:3 27:13
  53:19 54:7
  71:7,8,25
  72:25 99:12
  100:5,6,8,9
  139:2 179:6
  224:25 225:12
  229:2 233:15
**differentiating**
  21:17
**differently**
  232:8
**difficult** 70:4
  144:13,17
**diligence**
  208:18
**diluted** 125:16
**direct** 39:1
  119:9 132:15
  184:3,9,10
  188:19,22
**directly** 88:18
  164:11
**director** 50:20
  51:13,14,19,23
  57:12 75:18
  78:7,13 79:2

79:14 80:12,23
83:23 84:21
86:4,17 91:2
91:16,18 92:11
92:13,18,20
116:25 117:2
119:12,19,23
132:22 133:4
133:11,13
141:25 153:20
169:2,15
175:20 176:20
187:1,6 195:25
212:6,12
213:22 214:17
214:22 216:6
225:4
**director's**
  183:2,6,10
  186:21
**directors** 104:1
  105:25 106:6
  106:21
**dirtbag** 41:21
  41:24 42:10
  43:2 61:12,18
**disagree**
  127:21 144:5
  144:10
**disclosure** 79:8
**discuss** 18:9
  40:25 117:15
  218:1,11
**discussed** 18:11
  18:18 19:1

**[discussed - earlier]**

78:20 80:14
92:9 121:19
172:20 198:2
216:6
**discussing**
90:23 91:13,15
91:21 92:6
**discussion**
25:24 38:11
49:22 92:12,16
93:2 109:9
112:5 115:6
225:16
**discussions**
91:1,8,17
92:17 114:25
161:1,6 226:16
**dispose** 165:18
172:22 173:7
**dispute** 11:11
**disseminating**
233:8
**dissolved**
205:20
**district** 1:1,1
**divided** 184:15
185:5
**docket** 7:18
**docs** 75:24
229:23 230:4
**document**
30:11,22 31:4
31:7 33:16
38:8,12,19,23
47:21,24 49:20

49:23 50:5,9
50:13 53:12
67:12,14 73:22
74:16 75:2,9
75:13,20 77:11
77:15,21 83:20
90:4,6,15,17,21
102:6 109:3,8
109:10,18
114:5,12,23
116:8,12,19
117:7,25
118:11,16,19
119:2,6,8
131:15,22
132:5,7,16
134:3 140:9,12
140:19,23
141:12,17
145:3,8,9,18,22
151:3,9,12,20
153:2,6,9,17
160:4,7,14,19
167:3,6,13
168:2,6,25
174:11,21
194:23 195:1,8
195:12,16
198:20 204:16
204:17,19
228:18 233:13
233:14,15,20
236:6,9,11,14
236:16,19,21
236:23 237:3,6

237:8,11,13,16
237:18,21,23
238:3,6
**documentation**
216:1
**documents**
17:17,23 31:13
31:15,16,18,23
31:23 32:1,5,9
32:14,16,19,21
32:24 33:1,11
33:13 52:11
71:18,20,21
81:16 104:12
127:6 130:20
138:15 203:20
203:24 210:2
212:2,4 213:12
213:13,17,23
214:24 215:5
215:13 226:6
229:6,24
232:21 233:9
238:9
**doing** 50:6
74:11 75:10
105:3,5 116:20
150:8 152:18
**dollar** 46:5
62:14
**dollars** 183:25
**doubt** 174:5
**downside** 60:23
135:10

**downward**
93:18
**draft** 117:3
130:6,8 213:12
**drafted** 124:18
130:20 138:10
139:20
**drafting** 52:10
214:24
**draw** 126:3,7
126:15
**drexler** 9:25
10:1,2
**drill** 59:6
**drop** 209:25
**dropped** 44:6
**drug** 36:24
**due** 208:18
**duly** 8:24
239:11
**dumb** 150:18
150:19
**dumbest**
150:14
**duty** 156:21
**dynamic**
162:11

**e**

**e** 3:1,1 4:1,1 5:1
5:1 6:1,1 8:23
44:3 241:3,3,3
242:3,3,3
**earlier** 37:25
214:15

**[early - empery]** Page 16

early 16:16 89:18,24 190:8 191:15

ecm 22:23,24 40:1,7

economic 94:6 100:2 106:16 125:7,11

economics 15:3 99:5,11,16 100:6,24 106:10

ed 143:4

edits 124:11 233:1

education 14:25

effect 192:21

effective 37:13 162:24

effectively 137:2

effectiveness 192:21

efficient 1:9 3:15 186:1 204:24 205:11 205:12,15,22 205:25 215:23 215:24

effort 45:2

eighth 112:19

either 43:12 88:19 91:7 126:18 146:23

161:8 162:20 197:22 214:18

electronic 17:23

elements 29:4

eligible 135:16 189:20

ellenoff 4:10 84:8

email 22:10 24:12 25:25 34:7,21 36:11 39:2 40:11 41:10,11,14 42:20 43:24 45:25 48:13 49:2 50:17 51:2,7,10,18 57:10,18,23 59:8,18,22,24 60:19 61:11,17 62:12,12 64:12 75:17 76:4,13 77:1,25 78:6 78:14 80:24 83:22 84:20 86:15 88:1,5 116:25 117:11 117:14 119:10 119:24 120:6 120:10,12,24 121:8,14,17 141:25 143:19 145:25 146:6 147:23 148:12

148:19 149:3 149:11 151:25 152:5,12 153:18 160:20 161:7 164:13 164:14 169:1 175:19 176:6 195:20 196:5 196:10 198:25 214:15,19 220:1

emails 18:4 32:4,10,17 47:1 109:23 212:6 219:22 221:20 222:6 223:4 229:24

emp 153:8

empery 1:8,8,9 3:13,14,15 7:14 10:4,6,25 11:4,20,24 12:1,5,13,16,19 12:21,22 13:18 16:19 17:15,21 18:7 19:21 20:7 25:5,9,9 25:15 30:1,5 33:21 34:11,18 34:22,25 37:22 39:21 45:14 49:11 50:22 51:24 53:17 54:18 56:6,11 56:16 57:13,19

57:23 58:15,21 59:17 64:16 71:24 72:24 78:20 79:3 80:14 81:1,9 84:11,13,15,16 94:10,13 96:9 96:21 97:21 98:14,22 99:17 100:10,19 101:3,12 103:5 105:19 106:12 106:24 108:4 108:16 113:1 115:14 120:10 120:13,17 122:19 124:7 125:18,23 127:11,18,25 128:24 129:15 132:13 133:25 136:1,3,21 137:2,12 138:1 138:24 140:25 141:3 144:4,9 144:13 150:11 150:12 155:14 155:18 156:1 159:14,18 161:13,21 163:1,5 165:4 165:17,22 167:13 170:14 170:23 171:3 176:7,16,22

**[empery - evolving]**                                          Page 17

178:3,9,24
179:12,22
180:15 181:2,6
184:1,7 185:16
186:1,13 188:9
188:23 190:10
191:24 192:17
192:23 193:3
194:17 196:17
203:22 204:24
205:10,11,14
205:22,25
206:7,15,21
207:3 208:6
209:2 211:20
212:8,8 214:6
216:8,12,21
220:9 221:14
222:18 223:22
224:7 227:13
228:24 229:1
232:3,10,16
233:5 234:15
**empery's**  10:8
71:23 72:16
88:22 93:23
115:2 116:4
128:14 156:4,8
158:13,15,24
159:2 181:13
187:9 213:9,25
214:5 218:17
218:18,19
221:16,25
222:11 232:4

232:12
**emperyam.co...**
121:9
**empgnus000...**
194:24 195:2
195:17 238:7
**empgnus000...**
145:5,10
237:17
**empgnus000...**
38:10,13
236:10
**empgnus000...**
74:17 75:3
236:15
**empgnus000...**
118:1,13 237:7
**empgnus000...**
116:10,13
237:4
**empgnus000...**
160:6,8 237:24
**empgnus000...**
167:5,7 238:4
**empgnus000...**
141:15,18
237:14
**empgnus000...**
131:17,23
237:9
**empgnus000...**
90:7,13 236:20
**empgnus000...**
77:13,16
236:17

**empgnus001...**
153:8,10
237:22
**employed**  16:4
**employees**
206:8
**ended**  86:21
**enforce**  98:14
**enforcing**
98:19
**enter**  167:14,15
192:23 194:7
197:17 218:17
**entered**  38:3
99:17 105:19
108:3 133:25
137:12 167:17
188:9,23 189:2
192:12 194:5
218:22
**entering**  165:5
187:11 197:23
199:13 219:14
219:23
**entertainment**
39:9
**entice**  66:25
**enticed**  189:22
**entire**  191:9
**entirety**  204:8
**entities**  127:19
**entitled**  131:16
**entity**  126:4
216:7 221:14

**environment**
226:17
**ep**  74:16
**equities**  221:15
221:18 222:5
222:10 223:7
**equity**  20:12
40:9 55:12
135:14 191:10
198:4 200:2
221:24 222:19
**errata**  240:8
**escrow**  176:15
176:21 177:5
177:17,19
178:4
**esq**  3:6,7,20,21
3:22 4:8,16,25
5:7,14,15,24
6:7
**esqs**  4:10
**essentially**
159:22 192:19
**et**  240:1 241:1
242:1
**ether**  178:8
**evaluating**
224:23
**everybody**
199:13 202:6
**evolve**  69:12,23
**evolves**  69:4,11
**evolving**  221:6
225:8,8 226:16
226:17

ew   30:14,23 49:21,24 151:4 151:10,13 236:7,12 237:19
exact   38:1 59:12 60:10 89:17 110:5
exactly   35:1 62:22 92:3 102:18 105:3,5 155:22 190:7
examination 9:4 236:2
examined   9:2
example   23:20 24:10,14,15 127:18 208:2
excerpt   110:3
exchange   164:5 167:21 178:1 179:5,25 197:13 217:11 217:19
exclamation 149:14,15,19 149:19
execute   30:1 98:12 133:17 192:18 228:18
executed   97:19 101:21 102:22 103:3
executes 133:16

executing 71:18
execution 130:21
exemption 209:8,10
exercise   53:14 79:17 93:15,18 94:7,17,22 95:14,21 96:8 96:14,23 97:9 97:23 99:9 100:14 135:5 137:2,25 161:19 189:19
exercised 189:20
exhibit   30:11 30:25 38:8,15 49:18 50:1 57:8 62:1 63:22,24 64:1 64:5,11 73:19 74:24 75:5 77:11,18 90:2 90:9 96:25 97:2,5 101:5 102:3 108:23 108:25 109:13 113:8,14,15 114:2,8 116:9 116:15 118:3,8 118:11 131:15 131:25 140:9 140:15 141:12

141:20 143:15 145:3,12 148:16 151:3,9 151:15 153:6 153:12 160:4 160:10 167:3,9 175:8 182:20 194:21 195:4 203:19,25 236:6,9,11,14 236:16,19,21 236:23 237:3,6 237:8,11,13,16 237:18,21,23 238:3,6,8
exhibits   63:20 236:5 237:1 238:1,11
exist   16:14 19:15,16 122:9 181:21 182:6 182:11 200:18 201:25 205:18 205:19
existence   58:7 58:8,9
existing   54:13 205:8
exists   206:5 233:2
exit   159:19
exorbitant 122:14
expect   72:24

expectations 86:8
expenses 158:10
expert   230:11 230:19,21,25 231:2,13
expired   162:21
explain   14:12 232:16
explicit   52:21
explicitly   52:16
express   69:7
extent   19:15 79:6,12 163:10
extrapolating 152:22
extremely   22:7

**f**

face   67:8,10 149:13
facetious   41:25 46:17 61:15
facilitate   213:8 215:18
fact   211:19
factor   99:15
faint   152:2
faintly   152:1
fair   67:6 69:22 70:18 76:19 77:4 81:8 84:14 99:14 133:18 197:4,7 218:16 231:16

**[fairly - form]**                                                    Page 19

| | | | |
|---|---|---|---|
| **fairly** 86:22 | **files** 25:14 | 199:3 | 28:3,11,21 |
| **falling** 113:23 | 110:6 | **firsthand** | 29:11 31:21 |
| **falls** 213:1,6 | **filing** 44:22 | 129:11 | 32:3 33:25 |
| **false** 89:6 | 45:1 | **five** 9:13 16:9 | 35:10 36:4 |
| **familiar** 14:1 | **filings** 162:22 | 67:17 173:22 | 37:18 41:8 |
| 207:19 | 230:7,9 | 174:1,6 210:14 | 45:6,19 47:11 |
| **far** 9:23 42:7 | **final** 110:6 | 210:15,16 | 48:7,20,25 |
| 226:8 231:20 | 142:20,24 | **fixed** 136:15,17 | 51:21 52:2,8 |
| **fashion** 181:6 | 143:12 | **flat** 169:6 | 53:9 54:22 |
| **faster** 26:12 | **finance** 15:3 | **flexibility** | 55:14 57:4 |
| **father** 16:7,23 | **financially** 8:5 | 172:22 | 58:12 59:1,5 |
| **fault** 74:8 | **financing** 35:3 | **flom** 5:2 | 59:21 60:9,16 |
| **favor** 94:21 | 58:7,9,10,14 | **floor** 3:18 4:23 | 61:5,14 63:2,7 |
| 95:20 | 152:20 | 7:21 | 65:24 66:8,14 |
| **favorable** 37:3 | **find** 130:23 | **flow** 115:1 | 68:24 69:3 |
| **feature** 134:14 | **fine** 74:20 | 205:25 206:4 | 70:1,22 71:10 |
| 134:16,20 | 174:3,13 | **fluctuation** | 72:3,13,19 |
| **features** 136:13 | 198:13 | 56:18 | 73:12 76:15,21 |
| 139:7 | **finish** 75:10 | **focused** 28:25 | 77:3,7 81:13 |
| **february** 90:21 | 162:3 | **follow** 86:23 | 82:23 83:8,17 |
| 91:4,10,19 | **firm** 18:21 | 157:17 | 85:25 87:13,19 |
| 93:6 | **first** 8:24 20:2 | **followed** 19:7 | 89:11 91:12 |
| **feel** 174:1 | 20:4,7 33:6 | **follows** 9:3 | 93:9,21 94:3 |
| **felt** 100:12 | 42:24 50:16 | 220:6,10 | 94:12,24 95:10 |
| 144:12 | 51:2 55:8 57:8 | **forced** 111:4 | 95:23 96:4,18 |
| **fiduciaries** | 59:17 75:16 | 112:15 167:13 | 97:17 98:9,17 |
| 216:15 | 78:1 83:20 | 167:15 | 99:2,22 100:22 |
| **fiduciary** 70:15 | 84:22 86:14 | **foregoing** | 101:8,19 |
| 156:21 166:4 | 116:23 119:10 | 240:5 | 102:17 103:9 |
| **figured** 138:14 | 140:23 141:24 | **form** 10:12 | 103:23 104:9 |
| **file** 165:12 | 143:17 148:15 | 16:20 17:3 | 104:18 106:5 |
| 168:20 198:5 | 153:17 158:2 | 20:18 21:14 | 106:15 107:3 |
| 199:11 200:3 | 164:19 168:24 | 22:6,22 23:8 | 107:16,20 |
| **filed** 165:16 | 192:20 195:16 | 23:12,18 25:12 | 108:8 111:18 |
| 220:11,15 | 195:18 196:16 | 25:19 26:9 | 111:24 113:3 |

**[form - funds]** Page 20

117:3 120:1,8
121:6,13
122:21 123:11
124:6,10 125:9
125:21,25
126:13,25
127:13 128:6
128:21 129:9
129:19 130:5
130:12 136:5
137:8 138:5,22
139:18 140:5
141:6 143:2,8
144:15 147:5
155:21 156:20
157:2 158:7,19
165:7 169:25
170:6,20 171:6
171:11,22
173:3,16 177:7
179:2,16
180:22 181:8
181:17 184:13
187:14 188:13
191:20 193:12
197:20 199:5
199:14,18
201:6,14
202:11,20
206:2,18,25
207:9,17 209:1
209:16 211:24
212:23 213:4
214:3,18,23
215:2,17,21

216:3,10 217:2
217:15,24
218:4,7,21
219:5,19,25
220:5,8,18
222:3 224:2,10
226:22 227:5,9
228:10 229:4
229:10 230:2
230:15 232:23
233:11 234:20
**formed** 16:7,19
208:13
**former** 10:2
**forms** 81:3,6,20
82:13,19 83:6
215:11,24
**formula** 22:16
53:23 54:24
55:1 158:4
**formulaic**
53:22 54:23
**forth** 88:8
239:11
**forthcoming**
79:6
**forward** 45:11
200:22
**found** 68:21
**four** 30:3 74:11
**fourth** 132:16
**frankling** 15:2
**frankly** 198:15
**fraud** 201:7

**free** 181:11
**frequent**
226:15
**frequently**
26:21
**freshfields** 2:15
3:11 18:14,21
19:3
**friday** 153:19
198:6
**friend** 40:18
65:4,18
**friendly** 40:23
**front** 102:4
166:20 171:23
172:2 175:15
175:18
**fruchter** 3:2
**frustrated**
46:16
**ftp** 30:12 49:19
141:14
**fulfilling** 70:17
**full** 111:8 141:7
152:12 199:3
204:19
**fund** 1:6,6,7,8,9
1:11 3:14 4:4
4:12,13,21
5:20 7:17 12:9
39:11,15,18,20
39:21 54:6,8,9
54:11,12,15
55:8,11,24
56:2 68:18

79:5 81:4
85:10,11,16
88:24 98:13
128:12 150:7
158:10 166:6
184:1 186:14
190:24 193:16
205:4,8,13,17
205:19,20,21
206:5,11
211:19 214:9
219:2 240:1
241:1 242:1
**funded** 85:15
128:10 192:3,4
194:12,14
**funding** 198:3
**funds** 11:1,5,20
11:25 12:1,5,6
12:10,13,13
13:11,15,18,20
13:21,23 17:1
17:8,16,21
20:7 25:5,9,15
29:18 30:1
34:25 37:22
45:15 49:12
51:24 53:13,17
53:19 54:18
55:10 56:6,11
56:16 67:5
72:6 81:10
84:11,13,15,17
96:21 97:22
136:1,3 138:24

**[funds - gladstein]**                                    Page 21

150:11,12
170:14 172:14
178:18 180:10
181:4,10
192:18 194:17
203:22 204:13
206:6,9,13,15
207:20 208:6,8
211:20 214:8
215:14,16
216:8 217:23
217:25 220:6
234:15
**further**  123:14
219:7 231:23
234:22 239:14
**furtherance**
216:22
**future**  85:17
142:16 154:15
**fwd**  75:19

**g**

**g**  44:3
**gaap**  142:19
**gc**  51:15
**geier**  5:7
**general**  13:4,6
22:8 54:2,4
61:22 79:2
82:12,19 83:5
86:5 92:10
130:19 132:21
133:4 156:17
156:23,25
166:14 212:8

216:11 221:2
223:20 224:5
**generalities**
23:25
**generality**
26:19
**generally**  14:3
20:19 21:3,7,9
21:10,12 22:4
26:10,12,17
27:1 28:6,14
31:25 32:4
42:1 47:6,7
57:5 61:6
68:17 69:15
70:3,7 71:11
71:15 83:11,12
85:3 88:16
91:6,7 92:21
93:10,12 94:4
102:1,6,20,24
103:24 105:23
106:8 107:10
107:11,17
108:18 117:22
117:23 123:8
123:12 130:7
133:21 134:19
154:22 160:16
168:9,10 196:7
196:8 229:5
**genius**  19:25
20:8 25:4
28:24 29:1,9
29:13 37:7,9

37:14,16,23
40:11 45:15
47:17 53:6
57:24 58:23
59:14 70:2
71:24 73:1
78:21 80:15,19
81:10 84:17
88:4 93:6,25
97:12 103:4,10
104:7 105:20
106:13,25
108:6 112:4
115:3 123:3
128:1,15,17,18
129:5 132:13
136:22 137:6
152:23 158:16
159:3 163:6
166:8,13
188:11,25
206:23 207:6
209:14 216:5
219:2
**getting**  16:3
71:24 72:5
99:5 148:5
197:25 198:14
198:17 200:24
202:8 226:8
230:17
**gioiella**  6:2
**give**  14:24
18:12,19 23:20
23:22,25 24:10

24:15 40:1
54:2 56:13
62:4 95:3
120:16 133:16
137:2 138:12
139:1 147:20
162:5 179:22
194:11 210:13
210:14
**given**  79:1
138:8 235:2
239:13 240:10
**gives**  135:11,17
**giving**  19:4
92:20 179:4
**gladstein**  3:20
10:11,18 11:17
12:2 17:2
20:17 21:13
22:1,5,21 23:7
23:17 25:11,18
26:8 28:2,10
28:20 29:10
30:15 31:20
32:2,11,22
33:24 35:9,14
36:3 37:17
45:5,18 47:10
47:19,25 48:19
48:24 51:20
52:1,7 53:8
54:21 55:13
57:3 58:11,25
59:4,20 60:8
60:15 61:4,13

**[gladstein - going]**                                    Page 22

| | | | |
|---|---|---|---|
| 62:3,9 63:1,6 | 128:20 129:8 | 219:6,18 220:7 | 145:21 147:9 |
| 63:24 64:8 | 129:18 130:4 | 220:14 221:1 | 148:15 153:25 |
| 65:23 66:7,13 | 130:11,22 | 222:2 224:1,9 | 166:8,11,15 |
| 67:11,18 68:23 | 131:2 136:4 | 225:23 226:4,7 | 174:15,18 |
| 69:2,25 70:21 | 137:7 138:4,21 | 227:4,8 228:9 | 182:19 183:18 |
| 72:2,12,18 | 139:17 140:4 | 229:3,9,13 | 184:4,21 185:4 |
| 73:5,11 74:3 | 141:5 143:1,7 | 230:1,14,22,24 | 185:8 186:4,23 |
| 74:10,19,22 | 144:14 147:4 | 231:24 232:1 | 187:3 192:20 |
| 75:1 76:14,20 | 155:20 156:19 | 234:22 236:4 | 194:9 195:15 |
| 77:2,6 78:3,22 | 157:2,6,9,12,16 | **gladstein's** | 195:18 199:21 |
| 81:12 82:22 | 158:6,18 162:2 | 79:25 | 204:5 210:22 |
| 83:7,16 85:24 | 162:5,10,13 | **global**  1:10 | **goes**  43:6 85:20 |
| 87:12,18 89:10 | 165:6 169:24 | 4:20 | 166:11,14 |
| 91:11 93:8,20 | 170:19 171:5 | **gnus**  35:23 | **going**  7:2 18:12 |
| 94:2,11,23 | 171:10,21 | 36:9,12 50:21 | 18:19 23:22 |
| 95:9,22 96:3 | 173:2,15,20 | 57:13 64:16 | 24:3,4,5,7 30:8 |
| 96:17 97:16 | 174:4,12 | 75:20 78:9,15 | 36:16 38:6 |
| 98:16 99:1,21 | 175:10 177:6 | 117:3 148:3 | 42:6 49:16 |
| 100:21 101:7 | 177:11 179:1 | 152:14,17 | 57:5 59:14 |
| 101:18 102:16 | 179:15 180:21 | 153:22 154:15 | 60:18 64:5 |
| 103:8,11,22 | 181:16 184:12 | 176:2 | 67:22 68:5 |
| 104:8,19,23 | 187:13 188:12 | **go**  7:11 14:23 | 69:8,20 73:17 |
| 105:2,6,9 | 191:19 193:11 | 15:6,25 25:13 | 77:10 78:22,23 |
| 106:4,14 107:2 | 197:19 198:21 | 35:15,16,17 | 78:25 79:10 |
| 107:15,19 | 199:16,18 | 41:13,22 42:15 | 82:16,17 87:16 |
| 108:7 109:1 | 201:5,13,17 | 43:24 45:11,24 | 89:25 93:13 |
| 111:17,23 | 202:10,19 | 46:25 55:23 | 95:1 104:9,20 |
| 113:2 114:17 | 203:4 204:4,14 | 56:9 57:7 | 108:21 113:6 |
| 119:3,25 120:7 | 204:20 206:1 | 61:25 63:18,21 | 115:12 116:8 |
| 121:5,12 | 206:17,24 | 67:20 70:23 | 118:6 123:6 |
| 122:20 123:10 | 207:8,16 | 78:1 79:18 | 127:25 128:11 |
| 124:5,9 125:8 | 208:25 209:3 | 86:13 87:1 | 128:12 131:5 |
| 125:20,24 | 209:15 210:3 | 105:9 116:7 | 131:14 136:7 |
| 126:12,24 | 210:11,13 | 123:13 124:22 | 141:10 145:1 |
| 127:12 128:5 | 211:7,11 218:6 | 143:15 144:4 | 151:1 153:4 |

156:14 160:2 162:8 164:16 166:21 173:21 174:24 175:5 180:3,6 192:16 194:18 203:5,8 203:16 204:11 219:9 220:3 224:24

**good** 7:1 9:6,8 114:17 130:23 130:25 174:7 234:24

**govern** 86:10 207:13

**gp** 157:20,22 216:14

**graduate** 15:4 15:6

**graduated** 15:9

**grant** 1:24 2:18 8:1,25 239:5 239:24

**granted** 178:22 180:6

**great** 131:2 200:25

**greater** 82:3,5 82:7,10,15

**greenwich** 3:16 7:20

**grossman** 4:10 84:8

**group** 1:10 4:5 15:15 40:1,7

207:23,25 208:14,17,24 211:21 212:21 221:15,18,24 222:5,11,19 223:8 224:8

**gruntal** 15:13 15:19 16:5

**guess** 56:20

**guide** 22:25

**guy** 46:5,9 149:12 162:11

**guys** 64:9 66:20

**h**

**h** 127:4 241:3 242:3

**ha** 36:18

**half** 16:10 17:13 74:11

**hand** 116:1 239:20

**handle** 73:6

**hands** 159:11 167:13

**hang** 99:21

**happen** 206:15

**happened** 23:21,23 45:10

**happening** 89:19

**happens** 26:21 83:13 116:9

**happy** 30:10,17 31:24 32:6,14 33:1 180:9

**hate** 152:13,17 152:22

**he'll** 43:7

**healthcare** 15:14

**heard** 19:25 20:3,5 150:15

**hedge** 158:10

**held** 2:14 169:19 176:21 177:5

**help** 62:8 115:12,14 135:9

**helpful** 136:8

**helps** 215:18

**hereinbefore** 239:10

**hereto** 240:8

**hereunto** 239:20

**hernandez** 6:13

**heyward** 41:22 42:10 43:12 46:12 61:12,17 107:23 108:2

**hide** 232:25

**high** 15:1 96:10 100:13,25 157:5,7,19,21

**higher** 181:13

**highest** 157:21

**hit** 146:18

**ho** 16:22

**hoe** 13:3,10 52:14 119:18 225:3

**hogan** 5:18

**hold** 55:11 136:21 176:15 210:5

**holders** 125:4 126:21 127:5 127:17,21

**holding** 155:1,3

**holdings** 154:24

**holes** 122:23

**holmes** 230:23

**home** 15:25,25 88:25 89:14

**honestly** 86:24

**hopeful** 146:20

**horgan** 4:16

**hostile** 72:16

**hour** 173:21

**hours** 33:5

**house** 24:2 212:7

**houston** 5:23

**huh** 123:24 196:24

**hundred** 82:11

**hundreds** 22:14

**i**

**idea** 122:15 219:17

identical  71:20
identification
  31:1 38:16
  50:2 75:6
  77:19 90:10
  109:14 114:9
  116:16 118:4
  132:1 140:16
  141:21 145:13
  151:16 153:13
  160:11 167:10
  195:5 204:1
  236:6 237:2
  238:2,12
identified
  130:9
identity  204:12
ignore  200:12
ignoring  111:9
iii  36:24,25
  37:11
imagine  59:12
impact  77:1,8
impacted  116:4
impairs  14:21
imperative
  213:20
implication
  120:19
implications
  92:24 93:4
implicitly
  52:17
important
  27:15,22 28:19

29:8 94:10
106:24 107:5
122:18 172:21
214:9
inclined  215:12
include  18:24
included
  141:13
including  8:11
  17:23 101:15
increase  97:20
  126:5,9
indebtedness
  125:14
independent
  150:7 170:4
  202:22,23
  217:10
independently
  150:6,9 228:19
index  236:1
indicate  34:22
  127:9
indicating
  147:7
individual
  216:7
inflection  60:22
  61:2,7
influencing
  158:24
inform  231:10
  231:17
information
  40:6 58:4,6

79:9,22 147:8
  147:21 163:13
informations
  8:12
input  23:11
  52:20 69:8
  88:22
inside  120:17
insiders  107:8
  107:12
insisted  169:22
instruct  79:11
  82:12,18
instructed  83:5
  176:23 216:17
instruction
  221:24 222:10
instructs  14:9
instrument
  53:16 55:10
  92:25 135:1,6
  135:13,20,22
  136:13 138:11
instruments
  53:16 93:24
  94:18 139:20
  139:23
intended  164:4
intentional
  120:24
intentionally
  104:10
interact  41:5,6
interest  10:4,6
  10:8 23:3 24:3

69:7,16 214:6
  214:12
interested  8:6
  42:6 139:20
  239:17
interests  69:9
  69:13
internal  51:14
  120:12
internally
  120:15 172:17
  221:4 226:16
interpreted
  134:14
interrupt  11:18
  177:14
invest  16:25
  33:21 51:25
  58:16 63:14
  71:4 81:2,7,19
  154:13 156:12
invested  20:8
  24:11 35:2
  45:21 71:6
  98:22 115:22
  156:14 184:1,8
  185:16 186:1
  186:14
investing  41:21
  71:16 78:21
  80:15 81:10
  82:14,21
  127:10 159:2
investment
  1:10 4:5 15:14

**[investment - joe]**

18:5 20:11
21:6 37:3,6,9
37:23 41:4
53:13 55:6,7
58:17,23 63:8
63:11 68:18,19
68:21 69:17,18
70:14 71:4,23
72:4 73:1
80:19 83:3
84:17 87:20
88:4,7 93:5
100:25 109:21
115:3 116:5
124:8 128:14
129:16 130:3
135:10 136:1,3
150:20 152:24
152:25 154:23
155:9 156:11
206:22 207:5
216:23 228:20
**investments**
1:6,7 5:4,20
7:17 20:13,16
20:21 41:3
52:4,11 53:18
54:7 205:24
240:1 241:1
242:1
**investor** 13:17
17:7 20:15,20
21:1,2 24:19
25:6,10 34:1,2
34:4,6,11 35:4

35:8 41:3 69:6
69:16 91:2
101:25 125:18
125:23 128:1
128:24 129:1
135:22 146:8,9
164:17 169:7
172:9 180:16
194:6 198:3
212:16 213:16
216:24 217:9
217:16 218:2
218:13 219:2
227:14,15,20
227:23 228:5
228:25
**investor's**
71:19
**investors** 21:11
24:6 25:16
42:12 45:15
69:7,19,23
70:8,10,16,19
70:23 71:7
72:1,8,10,17,25
73:15 96:2,6
97:21 128:8,16
139:21 158:9
170:4,10,16
177:21 178:10
178:22 179:7
179:11,24
180:3,6,11,24
191:17,22
193:8,22

205:22 208:16
208:17,19
213:13 214:10
219:14,22
220:3 221:17
222:1,7,13,21
223:3,5,7
228:6,13,17
229:1,2,7
232:6 233:24
**invited** 154:14
**involved** 16:23
21:5 26:4
29:16 45:12
51:23 52:9
55:3,6 69:19
82:16 92:22
115:5
**involvement**
52:6 53:5
**iroquois** 1:9,10
4:4,5 196:25
197:9
**isolation** 122:9
**issuable** 111:7
**issuance** 27:5
40:2 99:18
**issue** 142:19
**issued** 134:7,10
137:5 209:17
**issuer** 21:4 26:5
26:6 29:5 40:4
68:19 70:12
71:2 88:10,11
88:19

**issuer's** 232:18
**issuers** 26:20
120:16 233:7
**issues** 117:15
117:19 215:7,9

**j**

**january** 50:18
53:1,19 55:21
56:3,7,8,17
57:11 58:21
59:19 60:19
61:19 62:25
64:14 78:7,14
78:19 80:6,13
80:20,24 81:9
82:2 83:25
84:21 87:16
89:4,9,14,24
**jared** 4:25
**jeff** 11:17 47:19
130:22 171:22
173:20
**jeffrey** 3:6 5:7
143:19,24
**job** 16:6 23:2
41:2,5 166:4
**joe** 35:19 39:4
41:16 42:17
46:1 50:17
57:11 59:18
62:13 64:12
66:11,15,16,18
66:19 75:18
145:25 148:21
152:18 153:21

161:8 190:14 220:2

**john**  4:16

**joint**  216:22

**jonathan**  50:20 57:10 64:14 66:20 75:19 117:1 119:12 146:2 147:24 153:19 161:9 175:21 190:14 195:21 220:2

**judge's**  21:23

**judged**  99:4

**judgment**  24:8 55:3,5 95:4

**june**  189:3 190:9 191:14 191:15 195:22 197:5,8

**k**

**k**  117:3

**kartoon**  1:13

**keep**  43:8 49:4 54:1 61:20 113:21,22,23 210:9,12

**kept**  48:22

**khalouian**  5:15

**kick**  112:16

**kieran**  5:14

**kind**  24:9

**klein**  3:7 64:3 73:20 74:7,14 131:19 204:18

**knee**  229:17

**knew**  197:5,8 197:12

**know**  9:23 12:10 14:11 17:15 21:23 29:25 34:15 37:5,20 38:20 39:5,14,16 41:8 42:25 43:1 44:13,15 44:20 50:5 53:11,14 54:10 55:10 57:20 59:11 61:7,22 62:1,22 64:24 65:2,13 72:20 72:21 75:9 76:22 81:17 84:3 86:5,7 87:23 88:22 89:22 93:14 101:24 102:6,8 105:2,4 107:25 110:4 114:13 116:19,20 118:16,17,25 120:9,25 121:3 121:7 122:12 127:1 128:11 132:7 133:8 134:18 140:20 143:24 147:2 154:4 160:14 162:7,7 165:9

166:18,19 169:21 177:9 181:10 182:7 182:13 183:23 184:5 185:13 186:10 191:16 191:21,24 192:5 193:7,21 199:19 200:19 204:5,10,15 206:20 207:3 215:4 217:21 219:13 221:6 222:22 226:24

**knowing**  92:1 105:17

**knowledge** 129:12 207:12 214:23

**known**  40:14

**l**

**l**  8:23

**l1**  1:10 4:20 197:2,9

**la**  139:6,13

**lane**  1:17 2:14 9:6 10:22 16:8 16:11,13 36:18 38:19 41:14 45:25 50:19 57:12 62:13 64:15 68:8 75:19 117:2 146:1 147:12 149:12 153:20

211:7 216:4 217:4 235:3 236:3 239:9 240:2,4,13 241:2,24 242:2 242:24

**language** 110:18,19,22 111:6 115:6 134:19 141:8 142:21,24

**large**  107:24

**lasts**  30:3

**late**  37:4

**latham**  4:2

**launched**  39:17

**law**  225:8,13,14

**laws**  224:5,19 224:25

**lawsuit**  17:11 17:18

**lawyer**  18:21 33:3,5,7 84:7,9 84:11 234:6,10

**lawyers**  18:13 19:2 216:2

**lead**  20:15,19 20:25 21:2 24:18 25:6,10 25:16 34:1,2,3 34:5 35:4,7 69:6,16 128:24 129:1 146:9 154:16 212:16

| | | | |
|---|---|---|---|
| **leading** 218:9 | **legal** 28:6,8,17 | 156:15,22,24 | **llama** 124:25 |
| **leak** 160:21 | 79:4 92:13,20 | 166:5 202:24 | 125:1,2 126:4 |
| 161:2 164:4,7 | 98:5 111:20 | 206:4,4 213:9 | 126:4,6,6,9,9 |
| 164:18 165:5 | 112:21 215:4 | 214:7 216:16 | 126:16,16 |
| 167:14,16,18 | **legend** 162:19 | 216:18 218:24 | **llc** 1:10 4:5 |
| 168:19 169:6 | **letter** 148:23 | **linda** 50:21 | 12:17 124:25 |
| 169:23 170:11 | 149:2 | 57:13 153:21 | 126:8 |
| 170:13,16,24 | **level** 117:15,19 | **line** 46:4 54:16 | **llp** 2:16 3:2,11 |
| 171:7 172:13 | 157:22 | 79:1 84:22,23 | 4:2,18 5:2,9,18 |
| 172:16,19 | **levels** 23:4 | 125:2 196:16 | 6:2 |
| 173:6 176:3 | **leverage** 54:17 | 196:19,22 | **locate** 163:17 |
| 177:2,22 178:2 | **levin** 144:2 | 199:2,9 211:15 | **location** 7:19 |
| 178:3,4,10,11 | 212:13 | 233:13 241:4,7 | **lock** 102:25 |
| 178:24,25 | **lexington** 4:22 | 241:10,13,16 | 103:3,21,24,25 |
| 179:6,13,22,24 | **liability** 142:7 | 241:19 242:4,7 | 104:5 105:18 |
| 180:4,7,12,17 | 142:14,16,17 | 242:10,13,16 | 105:22,24,25 |
| 180:24 181:23 | 142:18 207:14 | 242:19 | 106:3 107:7,22 |
| 181:25 187:12 | 211:21 221:7 | **lined** 233:16 | 108:3 143:21 |
| 192:11,15,19 | 223:15,24 | **lines** 110:3 | 171:16 199:4 |
| 192:20 194:4,7 | 224:5,13 | 233:20 | 199:14,24 |
| 194:14 196:12 | **liens** 102:12 | **lining** 233:2 | 200:1,6,9,15 |
| 197:5,10,13,18 | **life** 49:15 | **liquid** 54:13 | 202:2 |
| 197:24 198:9 | **likely** 61:23 | **liquidity** 159:7 | **locked** 105:23 |
| 201:3,16 217:5 | 66:24 81:15 | 159:8,21 | **locks** 106:6 |
| 217:12,17,23 | 139:2 148:13 | **listed** 121:9 | **long** 15:18 33:2 |
| 218:2,12,18,22 | 155:6 194:16 | 135:15 195:25 | 40:14 146:19 |
| 219:14,23 | **likes** 43:3 | **listen** 148:23 | 192:2 |
| 220:4 | **limit** 104:17 | **literally** 205:13 | **look** 33:15 47:1 |
| **learned** 17:10 | 126:14 172:8 | **litigation** | 55:24 56:9 |
| **learning** 17:17 | 173:11 | 225:18 226:1 | 62:10 92:23 |
| **leave** 16:11 | **limitations** | 226:10 | 152:11 153:16 |
| 81:17 139:5 | 111:10 | **litman** 6:2 | 159:17,18 |
| **led** 128:7 | **limited** 13:6,9 | **little** 26:12 42:7 | 182:24 198:18 |
| **left** 16:13 | 29:19 69:10 | 82:20 123:13 | **looked** 110:5 |
| | 92:13 156:13 | | |

**looking** 40:3 86:6 146:14 195:8,9 204:16

**looks** 45:7 50:25 110:1

**loophole** 112:22 124:12

**lose** 157:25

**lot** 27:11 32:23 46:22 56:18 89:20 144:16

**lots** 28:4

**love** 42:25 75:25 149:6

**lovells** 5:18

**loves** 146:9

**low** 122:13

**lower** 94:7,8 96:13,14,22,23

**lp** 1:6,7,8,9,11 3:14,15 4:13 5:20 6:3 12:19 12:20,21,23 34:12 39:22 204:24 205:11 205:12 206:6 240:1 241:1 242:1

**lps** 70:14,15 72:7 88:24 157:20 218:23

**lunch** 43:18

**lunchtime** 130:24

**m**

**m** 5:14

**m3a** 1:11 6:3 197:1,9

**made** 29:18 37:23 44:22 48:18 63:8,11 113:1,4,16 182:2 238:19 240:6

**magic** 75:24

**main** 5:21

**maintain** 54:11 54:15

**major** 15:3

**make** 21:5 29:20,22 30:9 37:2 43:2 49:7 64:6 70:5 76:25 78:24 79:18 95:4 102:11 122:22 124:13,20 125:15 126:17 139:15 142:5 156:11,14,24 157:20,24,25 158:1,9 182:20 190:15 202:21 202:22 208:2 208:12,15 233:19

**makes** 156:25 233:9

**making** 29:17 66:24 118:24 124:8 201:25 206:21 207:5

**manage** 12:10 54:13

**managed** 12:7 12:14

**management** 12:7,8,15,16,20 12:21,23 13:12 13:13 34:11,23 104:1 133:23 216:13

**manager** 52:19

**managers** 52:23 214:9

**managing** 53:16

**mandatory** 111:4 112:16

**manhattan** 5:5

**manipulate** 122:12 123:1,4 123:7

**manual** 220:21 220:23

**maquet** 50:21 57:13 153:21

**march** 94:1 98:23 99:19 103:6 104:7 105:20 106:13 107:1 108:5 115:4 117:11

128:4,15 129:6 129:24 134:10 137:5,11 140:1 142:1 146:1 147:11,24 148:20 149:11 155:4 156:3 158:14 159:4 161:10,11,16 161:17 165:21 168:23 169:20 172:11 185:17 186:2 189:17 193:8,22

**mark** 30:10 38:7 49:17 73:18 77:11 90:1 108:22 113:7 118:7 131:15 140:8 141:11 145:2 149:15,15,19 149:20 151:2 153:5 160:3 167:3 194:19 203:17

**marked** 30:24 38:14 49:25 75:4 77:17 90:8 109:12 114:7 116:14 118:2 131:24 140:14 141:19 145:11 151:14 153:11 160:9

**[marked - minutes]**

167:8 195:3
203:24 238:11
238:14
**market** 23:3
24:1 26:13,17
57:2 106:8
134:21,23,23
146:18,24
148:4 173:12
**marketplace**
224:24
**markets** 16:8
16:12,13 40:9
213:20 214:5
**marking** 74:23
**marriage**
239:16
**marshall** 15:2
**martin** 13:3
16:22 52:14
119:18 216:14
216:17 225:3
**master** 1:6,6,8
1:9,11 3:13 4:4
4:12,21 5:20
7:17 85:7,13
86:2 184:8
185:16 190:23
191:2 240:1
241:1 242:1
**match** 149:6
**material** 40:6
58:4,5 99:15
136:2 147:8,20
163:22

**materials** 52:12
**math** 184:19
**matter** 7:15
9:20,22,24
10:25 11:4
84:11 178:12
200:22 225:18
239:18
**mattered** 201:1
201:11
**matters** 18:9
41:1 65:11
66:6 92:13
178:20 204:11
**maturity** 29:24
**max** 178:15
197:15 230:23
**maximum**
172:8 173:11
202:13
**meagher** 5:2
**mean** 22:7,11
26:23 28:4
36:2,25 41:23
51:8 54:23
63:9 66:19,23
69:4 76:22
84:10 87:8
115:20,25
138:23 139:22
147:16 149:18
157:6 163:9
188:14 232:24
234:13

**means** 122:7
148:11
**meant** 36:6,8
36:11 39:24
57:18 61:2
66:11 87:6
122:3 144:9
169:15
**mechanism**
100:9 135:12
135:17
**media** 7:12
39:8 67:22
131:5 174:24
203:7 235:4
**medication**
14:20
**meeting** 43:11
43:16 136:19
136:25 225:10
**meetings** 221:4
221:9 224:22
225:2,5 226:11
226:13
**memo** 226:25
**memorialize**
68:17 130:19
**memorialized**
226:21
**memory** 31:8
51:11 76:11
**memos** 226:23
226:25 227:2
227:10

**mentioned**
90:24
**menu** 139:6
**message** 42:8
**messages** 18:8
19:7,11,13
223:6
**met** 33:3,4,7,9
43:14 85:18
**method** 60:11
**michael** 3:7
**microphones**
7:4
**middle** 140:24
**mil** 154:1
**million** 56:4,13
75:25 123:22
124:15 148:7
152:21
**mind** 11:19
27:4 28:9
29:22 37:6,9
43:8 61:20
62:18,22,23,24
63:5,10,12
166:23 211:9
**minimum**
129:16,22
**mintz** 144:2
212:13
**minus** 54:9
**minute** 157:13
**minutes** 33:10
67:17 173:22
174:2,6 210:15

**[minutes - note]**

210:17 211:13
**mislead**  104:11
**misrepresent...**
  181:4 182:3
  201:8
**misrepresented**
  179:9
**missed**  44:7
**missing**  139:14
**misstates**
  170:20
**mitigate**  136:8
**mitigates**
  112:23
**modified**
  171:16
**molinsky**  1:11
  5:11
**moment**  192:5
**monday**  78:7
  146:19,24
  195:21
**money**  108:16
  124:1 156:15
  156:24 157:1
  157:20,24,25
  157:25 166:3
  166:23
**monitors**
  159:15
**month**  110:23
  111:25 112:13
  122:8,11,11,13
  122:14,15,15
  122:16,16

162:21
**months**  9:15
  16:2 22:14
  30:2 116:1
  165:21,24
**morning**  7:1
  9:6,8 212:2
**motivated**
  156:8
**move**  113:13
  214:13
**moves**  26:11,12
**moving**  132:24
**multiple**
  123:25 220:24
**musclepharm**
  10:3,5,7,9
**mute**  7:7

**n**

**n**  3:1 4:1 5:1
  6:1 8:23,23
**nailed**  152:7
**name**  7:23
  12:14,18 39:19
  42:21 65:2
  132:22
**named**  41:21
**nasdaq**  39:10
**nathoo**  65:3,22
**natively**  204:6
**nature**  20:10
  25:21 93:2
**necessary**
  240:7

**need**  174:1
  228:6,6
**needed**  172:24
**negative**  181:1
  181:6
**negatively**
  180:14 181:12
**negotiate**  171:3
  192:2
**negotiated**
  170:9,16
**negotiating**
  72:6 170:22,24
  188:4
**negotiation**
  27:12 86:25
  189:24 190:1,3
  190:5,11
  191:14,18,23
**negotiator**
  171:8
**neither**  124:24
**net**  85:12 158:9
  190:22 191:4
**netting**  84:24
  85:3,7,13 86:2
  190:23 191:2
**never**  49:14
  66:18 71:19
  84:12 218:5,14
  223:9 234:11
**new**  1:1,18,18
  2:16,17,19 3:5
  3:5,19,19 4:7,7
  4:15,15,24,24

5:6,6,13,13 6:6
  6:6 7:22,22 9:1
  39:10,14 41:16
  43:22 51:25
  55:25 58:23
  80:9 113:13
  239:2,7
**nice**  165:3
  209:20
**nicole**  5:15
**nineteen**  175:9
  194:22
**nizer**  4:18
**nominal**  1:13
**non**  41:1
  135:12
**nonconvertible**
  10:13
**nonlegal**  79:5
**nonpublic**  40:6
  58:4,6 147:8
  147:20
**notary**  2:18
  8:25 239:6
  240:14,21
**note**  7:4 10:14
  29:24 30:6
  85:9,11,12
  86:21,22 93:16
  93:19 109:21
  110:1,6 124:16
  125:12,15,16
  137:5,17,20
  138:3 175:24
  190:25 191:3,7

**[note - offering]**

193:16 194:12 198:3,12
**noted** 8:17 235:6 240:7
**notes** 49:7,10 49:12,14 111:8 124:2 138:19 161:25 188:25
**notice** 2:17
**notices** 120:10 120:19,23
**noticing** 8:14
**number** 7:18 62:4,6 142:15 154:7 159:10 203:7 235:3
**numbers** 54:20 55:2,4
**numeral** 205:15
**numerous** 226:25
**nyc** 43:7

**o**

**o** 4:8 123:18
**oath** 8:3
**object** 10:11 17:2 20:17 21:13 22:5,21 23:7,12,17 25:11,18 26:8 28:2,10,20 29:10 31:20 32:2,11 33:24 35:9 36:3

37:17 45:5,18 47:10 48:19,24 51:20 52:1,7 53:8 55:13 57:3 58:11,25 59:4,20 60:8 60:15 61:4,13 63:1,6 65:23 66:7,13 68:23 69:2,25 70:21 72:2,12,18 73:11 76:14,20 77:2,6 81:12 82:22 83:7,16 85:24 87:12,18 89:10 91:11 93:8,20 94:2 94:11,23 95:9 95:22 96:3,17 97:16 98:4,16 99:1,22 100:21 101:7,18 102:16 103:8 103:22 104:8 106:4,14 107:2 107:15,19 108:7 111:17 111:23 113:2 119:25 120:7 121:5 122:20 123:10 124:5,9 125:8,20,24 126:12,24 127:12 128:5 128:20 129:8

129:18 130:4 130:11 136:4 137:7 138:4,21 139:17 140:4 141:5 143:1,7 144:14 147:4 155:20 156:19 157:2 158:6,18 165:6 169:24 170:6,19 171:5 171:10,21 173:2,15 177:6 179:1,15 180:21 181:16 181:18 184:12 187:13 188:12 191:19 193:11 197:19 199:16 201:5,13 202:10,19 206:1,17,24 207:8,16 208:25 209:15 219:18 220:7 222:2 224:1,9 227:4,8 228:9 229:3,9 230:1 230:14
**objected** 20:23
**objecting** 73:9
**objection** 10:21 10:23 21:22 32:22 48:6 54:21 71:9 79:25 98:8

104:18 105:16 121:12 181:7 209:4 211:23 212:22 213:3 214:2 215:1,20 216:9 217:1,14 218:3,8,20 219:4,24 220:14 221:1 232:22 233:10 234:19
**objections** 8:7 73:7
**obligations** 96:11
**obtained** 129:17 180:25
**obtaining** 180:13
**obviously** 59:9 189:18
**occurred** 89:4 89:9
**odalyss** 6:13 7:23
**offer** 130:10 150:10 201:9
**offered** 21:11 140:1 167:21 179:6 180:9 194:16,17 202:5 217:22
**offering** 21:18 26:23 45:3,10 45:13,21 47:17

**[offering - page]**

98:23 137:6
155:15,19
156:5,10
158:14,16
187:10,24
188:2,23
194:11 202:3
**offerings**  26:21
26:23 45:21
106:9
**officer**  51:16
216:12
**officers**  106:1,7
106:22
**offices**  2:15
**officially**  59:25
60:2
**oh**  74:7 118:23
174:17
**okay**  12:11
32:7 33:2,15
38:5 39:1
41:13 50:7
51:13 55:1
56:10 67:19
73:7,24 75:11
80:9,10 81:25
101:24 105:8
105:15 109:16
110:11 113:5
113:20 114:21
116:22 119:4
132:3 137:1
140:21 144:24
150:22,25

151:18 153:3
153:15 159:24
160:16 164:22
167:1,24,25
174:12,14
175:14 182:25
185:8 186:16
195:10 198:24
204:14,20,22
205:14 206:20
209:19 211:10
213:5 219:7,11
222:9 226:20
231:21 233:22
234:9,13
**once**  57:22
146:24
**ones**  26:24 35:1
**ongoing**  225:18
**open**  39:7 43:8
61:20 81:18
106:8 110:24
111:8 123:18
125:1 165:13
**opens**  146:19
146:24
**operating**
224:13,17,20
**opined**  234:3,7
**opinion**  61:18
61:22 62:19
159:2
**opportunities**
1:7,10 4:13,20

**opportunity**
1:8 3:14 39:21
44:9 140:18
145:7 184:1
186:14 188:6
**option**  162:17
162:20 165:10
166:25
**optionality**
81:18 83:1
**orally**  221:3
**order**  21:24
88:21 165:12
180:4 221:20
**ordinary**  76:16
**original**  136:15
155:10 185:9
185:19 186:6
**outbreak**  89:5
89:8
**outcome**  8:6
239:17
**outline**  21:7
25:16
**outlined**  22:4,8
22:9,10,19
24:12,17
**outlines**  21:3
**outlining**  69:18
**outside**  226:9
**overall**  166:6
**overly**  40:13
**owed**  191:4
**own**  24:8 70:8
107:14 122:12

202:21,22
203:1 206:5
208:4 213:25
215:13,16
217:10,17,18
218:24 228:22
232:19
**owned**  10:10
10:13 107:9
188:11,17,18
188:18 189:1
189:10 205:11
**owners**  13:5
**owning**  38:3

**p**

**p**  3:1,1 4:1,1
5:1,1 6:1,1
**p.m.**  46:1 50:19
64:14 78:8
86:16 131:6,7
131:8,12
149:11 169:2
174:25 175:1,2
175:6 195:22
203:8,9,10,14
210:25 211:1,2
211:6 235:1,6
**page**  34:8
35:16,18 36:16
39:3 41:13
42:15 45:24
50:16 57:7,8
62:11 63:18
64:13 75:16
78:1,2,3 83:20

**[page - percentages]**

83:22 86:14,14
110:10 116:23
119:11 130:16
132:16,24
133:7 140:23
140:25 141:25
143:18 145:22
145:24 147:9
148:15,18
153:17 168:24
175:20 183:1,5
184:22 185:5
185:18 186:5
186:17,24
187:4 195:16
195:18 198:19
198:19,22
220:25 236:2,6
237:2 238:2,12
238:17 241:4,7
241:10,13,16
241:19 242:4,7
242:10,13,16
242:19

**pages**  176:8,21
176:24 177:4
177:17,19
178:4,8 184:5
200:18 208:3,4
208:8,9

**paid**  16:1,3
30:6 157:23
158:2

**pandemic**  19:8

**paper**  60:22

**paragraph**
42:24 44:1
110:13 149:5
152:12 154:12
154:21 199:3

**parallel**  72:4
213:10,13
216:1 229:7
232:17 233:6
234:16

**parameter**
159:16

**parameters**
40:2 139:8
166:6

**paren**  110:24

**parens**  39:7,8
111:9 123:18

**park**  6:4

**part**  21:5 38:25
50:11 95:15,17
96:1,16,19
97:24 117:8
138:3 150:21
152:4 178:7,7
189:11,24,25
190:2 194:5
213:20 220:18
220:18 224:13
224:17

**participants**
213:24

**participate**
61:24 66:22

129:11,12,15
193:5 223:2,4
224:11 232:17
234:16

**participated**
190:11 191:17
191:22 229:1

**participates**
225:1

**participation**
156:3

**particularly**
137:4

**parties**  7:10
10:20 68:4
98:2 103:25
105:23 131:10
175:4 203:12
211:4 215:23
215:25 239:15

**partner**  12:22
16:22 156:23
156:25 206:5,7

**partners**  12:25
13:4,9 29:19
69:10 156:13
156:16,18,22
156:25 166:5
202:24 206:4
213:9 214:8
216:16,18
218:24

**partnership**
13:6,7

**party**  8:4 27:20
98:11

**pass**  213:22
214:12

**past**  142:5

**pay**  124:16,22
135:13

**payment**  85:13
111:4 135:8

**pending**  176:15
176:21

**people**  19:21
24:7 72:22
119:17 120:13
120:20,23,25
123:9 127:10
128:10 144:16
166:19 174:18
175:22 198:9
208:12

**people's**  69:13

**percent**  44:7
55:8 81:23,25
82:20 83:4
158:8 169:7,11
178:14,16
196:17,20,23
197:1,2,2,3,15

**percentage**
54:12 155:10
169:6,19 173:8
217:18

**percentages**
170:3,11
196:13 197:6

**perception** 116:4 136:7

**perfectly** 174:2

**perform** 42:2,3

**performed** 136:11

**period** 104:2 144:4 162:21 192:7

**permit** 93:13

**person** 42:1

**personal** 14:23 40:18 41:7,7 65:4,11,18 66:6 144:22

**persons** 13:8

**perspective** 112:23

**ph** 50:20,21 64:20

**phase** 36:24,25 37:11

**phillips** 4:18

**phone** 22:9,20 25:24 49:2,5,8 49:12 60:1,6 60:14 223:3

**phones** 7:8

**phrase** 142:10

**pile** 113:17

**pin** 20:5

**pipe** 41:16 215:19 227:14 227:21,24 228:5,8,25

**place** 7:10 95:25 126:11 130:23 190:5 208:11,14,19 212:20 223:17 224:16,21 225:6

**placement** 21:4 70:12 232:19 233:24

**placements** 34:20

**plaintiff** 1:4 3:3 7:15 11:5 226:2

**plaintiff's** 230:11 231:1,2

**plaintiffs** 14:7

**pleadings** 230:6

**please** 7:4,7 8:8 8:20 11:8,13 14:11 18:16 24:19 38:7,19 38:20 49:17 50:5 69:20 73:18 75:9 80:1 90:1 102:9 103:14 105:12 108:22 110:10 113:7 114:14 116:20 118:7 124:23 140:8,19 141:11 145:2

151:2 153:5 160:3,14 162:13 167:2 176:15 194:19 203:17 231:25

**plug** 54:20 55:2

**plugging** 55:4

**plural** 127:17

**pocket** 205:8 205:16

**point** 43:19 59:10 60:22 61:3,7,21 62:21 63:4 68:10 83:9,14 86:22 123:17 124:23 126:19 148:9 149:14 152:10 177:4 188:17 200:17 216:4

**points** 25:25 87:1,17 88:3 88:14,20

**policies** 212:20 220:19,20

**policy** 17:20,22 18:1,7 19:6,9 19:21 49:11 220:22 225:8 232:3 233:7

**ponder** 56:19

**portfolio** 52:19 52:22

**portion** 48:4 80:3,7 85:9,10 85:11,14 103:16 105:13 134:22,25 135:13 204:17

**portions** 111:21

**position** 72:16 163:23

**positioned** 89:23

**positions** 54:14 57:6

**positive** 180:18

**possession** 58:3

**possibility** 80:14 81:7 126:11

**possible** 59:3 60:13,17 223:10 232:5

**post** 15:1 102:11

**potential** 58:10 58:14 122:24 122:25 139:16 146:2 207:23 211:21

**potentially** 22:15 48:21 55:9 69:17 78:20 88:11 99:11 123:5 125:19 135:19

**[potentially - procedures]**                                    Page 35

142:14 144:19
207:24
**power** 52:3,6
  52:13 138:1,13
**pr** 146:18
**practice** 216:2
  233:21
**preceded** 20:21
**precedent** 78:9
  97:13 108:4,10
  214:18,23
  215:3,18,24
  216:3,20
  217:24
**precedents**
  78:15
**predated** 43:21
  161:7
**prediction**
  152:9
**prefer** 198:15
**preferred**
  173:5,6
**preparation**
  38:25 50:11
  51:12 53:12
  75:15 77:24
  90:19 145:20
  151:22 160:24
  168:3 195:13
  230:20
**prepare** 161:22
  213:12
**prepared**
  230:11

**preparing**
  229:20 230:12
  231:5,8
**prepayment**
  112:16
**prerogative**
  172:3
**present** 6:12
  8:10 68:4
  131:10 175:4
  203:12 211:4
**presented**
  171:12
**preserve** 17:16
**presumably**
  35:2 63:12
  80:25
**presumed**
  36:10 208:1
**presumption**
  147:6
**pretty** 161:19
**prevent** 107:11
  126:10 212:20
**prevents** 107:8
**previous** 42:2
  154:25,25
  155:2 186:3,14
**previously**
  18:22 57:21
  157:22 168:18
  172:20 238:11
**price** 23:6
  93:14,15,18
  94:7,8,17,17,22

95:13,14,21,21
96:8,8,14,14,23
96:23 97:9,10
97:23,24 99:9
99:10 100:14
100:14 134:21
134:23,23
135:5 136:16
136:18 148:14
154:9 161:20
161:20 166:8
170:13,25
181:14 185:2
**priced** 23:1
**prices** 24:1
**principal** 64:25
  134:22
**principle**
  166:14
**prior** 10:20
  20:9 37:24
  38:2 45:22
  58:19 59:10,14
  62:24 78:13
  80:2 125:3
  130:2 149:2
  157:3 180:22
  227:7
**private** 7:6
  26:10 34:10,15
  159:22
**privilege**
  225:20
**privileged** 79:9
  79:15,21

**privy** 98:18
**pro** 154:14,20
  155:18 169:10
  169:15,22
  170:3 171:4,9
  171:18,20
  172:25 173:4
  200:6
**probability**
  82:14 96:10
  97:20 99:8
  100:13,23
**probably** 39:16
  40:13,16 42:6
  47:7 50:14
  51:1 53:14
  59:24 81:24
  107:24 120:20
  155:6 166:21
  171:24 175:24
  225:11
**problem** 30:4,5
  74:1,2 174:9
  180:8
**procedure**
  220:22 223:19
  223:23 224:14
  224:18
**procedures**
  207:22 208:11
  208:19 213:2,7
  220:6,10,19,20
  222:17 223:12
  223:13,16,19
  223:21 224:21

Page 36

**proceed**  8:22 200:21
**proceeding**  8:8 68:3 131:9 175:3 203:11 211:3
**proceeds** 124:16,22 189:19 191:8
**process**  14:2 39:25 53:18,21 53:22 59:23 96:16,20
**processes** 207:22 208:14
**produced**  49:3 204:6,9
**production** 238:16
**productions** 124:25
**productively** 126:5
**products**  39:9
**profession**  67:3
**professional** 67:3
**profile**  139:16
**profits**  158:8
**prohibited** 18:10 232:18
**prohibiting** 232:3 233:7
**prohibition** 134:7

**prohibits** 232:11
**promissory** 110:1
**properly** 133:19
**proportion** 13:22,23
**proposal** 100:11,15,20 101:1,4 139:3 170:8 171:13
**proposed**  45:10 45:13 47:16 58:16,23 87:20 88:3 93:5 100:2,5 113:1 129:7 130:10 164:7 170:11 170:12 182:15
**proposing** 201:9
**protective** 60:23
**proves**  150:1
**provide**  101:1
**provided**  217:9 217:24 233:15
**providing**  81:5 102:22 128:17 215:17 233:1
**provision** 122:19 137:21 138:2,10,20 139:14,16

169:22 171:4,9 171:18,20,23 172:2,25 173:5 173:13 192:11 226:5
**provisions** 27:14 81:4 85:16 89:22 134:12
**public**  2:18 8:25 26:11,14 47:3 239:6 240:21
**publicly**  220:11 220:16
**puffery**  66:22 66:23
**pull**  104:20 113:16
**pulling**  104:21 104:25
**purchase**  85:9 96:25 97:3,6 97:14 98:24 101:6,13,15 103:6 106:25 110:25 128:3 129:4,7,14 137:13 140:2 148:14 155:3,4 156:5,9 158:13 158:15,25 187:9 191:6 208:9 209:11

**purchased** 106:12 137:16 138:18 155:15 155:18 172:11
**purchasing** 93:25 103:5 104:6 108:4 128:1,18
**purport**  44:23 204:8
**purportedly** 100:4 155:8
**purporting** 102:10 154:8 154:10
**purpose**  68:14 68:16 85:22,23 103:20 106:2 111:9 130:17 164:3 189:4,7 233:3
**purposes**  205:9
**pursuant**  2:17 108:5 111:11 128:2 129:6 134:10 155:25 209:6,9,17
**put**  10:16 18:17 24:25 46:5 47:20,23 56:11 62:14 63:12 95:25 102:11 114:20 143:14 144:24 153:1 166:2,23

**[put - recall]**

171:22 177:17 178:3 222:6 232:8 233:12

**puts** 177:18

**putting** 108:16

**q**

**question** 11:23 14:10,12 21:14 22:8 28:3 31:21 32:3 33:25 35:10 45:6,19 47:11 47:18 48:3 52:2,8 53:9 54:22 55:17 57:4 59:1,5 60:9 61:5,14 66:14,17,19 70:6 73:10 76:21,23 80:2 80:9 95:10 96:4,18 99:3 99:13,23,25 100:16,22 101:8,19 102:17 103:12 103:13,15 104:15 105:10 105:12 110:8 137:10 138:6 149:14,15,19 149:20,21 150:4 157:3 162:3,14 170:20 171:6

172:5 177:12 180:22 182:8 207:2 218:10 224:6 230:16 230:18 232:7 234:1

**questions** 11:24 14:7 31:4 79:1 79:7,12,18 104:13 114:13 149:23 164:24 171:25 173:23 174:8 182:21 211:8,16 217:5 219:7,10 231:11,18,23 234:23

**quid** 200:5

**quo** 200:6

**quote** 43:2 141:1 154:15 154:16

**r**

**r** 3:1 4:1 5:1 6:1 8:23 127:4 241:3,3 242:3 242:3

**radar** 107:25

**raise** 30:2 34:10,16 36:12 44:23 45:3 123:22 124:19 129:22

**raised** 130:9

**raising** 115:19 124:14

**range** 82:9

**rarely** 65:12

**rata** 154:14,20 155:18 169:10 169:15,22 170:3 171:4,9 171:18,20 172:25 173:4

**rate** 134:8,12 134:15

**rather** 165:23 214:24

**rd** 176:2

**reaction** 76:12

**read** 48:5 80:4 80:8 103:17 105:14 148:22 149:2 197:3 198:23,25 231:3,4,8 240:5

**reading** 36:11 114:18 123:23 134:2 149:3 198:22,24 231:10

**really** 16:2 76:18

**reason** 14:13 27:25 36:23 42:13 129:3 175:25 176:2 188:1 196:9

197:16 202:17 241:6,9,12,15 241:18,21 242:6,9,12,15 242:18,21

**reasons** 28:1,5 203:1 218:24

**recall** 11:16 17:4,10 20:4,6 20:10,14 23:24 24:13 29:13 31:10,22,25 32:20 33:2,20 34:3,5 35:1,6,7 36:19 43:14,16 45:9,20 47:9 47:12,14 50:12 51:6,10 56:1,5 56:9 59:2 68:12 76:3,5 76:12 78:12,18 80:11,17 87:15 87:24 90:20,23 91:1,8,17,22 92:1,8,17 93:3 97:11 102:14 102:18,20,24 103:2,19,20 104:3,4 105:17 105:21 107:4 107:21 113:4 114:25 117:10 117:12,18,20 117:23 119:7 129:20,23

130:7,13 132:6
133:12 142:20
142:23 149:1,4
151:24 155:11
155:14,17,24
161:1,5 163:5
163:14 168:5,8
168:11,16
188:8,21 189:4
190:4,10
192:10 196:4
227:25 228:2
**receive** 40:6
72:22 196:10
**received** 57:22
59:18 72:23
233:13,14
**receiving** 51:6
76:3,7,13 77:1
80:17 117:10
151:24 196:4
**recess** 68:1
131:8 175:2
203:10 211:2
**recipients**
196:1
**reckler** 4:8
48:6,10 71:9
98:8 118:18,23
165:2 170:6
181:7 219:24
**reckless** 150:8
**recognize**
112:25 132:17
133:1 183:2,6

186:20,25
187:5
**recollection**
60:5 152:3
**record** 7:2,11
8:13,18 10:17
11:13 14:6
18:17 20:24
30:16,18 38:11
48:5,22 49:22
67:20,23 68:6
68:9 74:9 80:1
80:4,8 103:17
105:14 109:9
114:19,20
131:6,12
174:25 175:6
203:8,14 210:4
210:5,9,23,25
211:6 235:1
239:12
**recorded** 7:13
**recording** 7:9
**records** 49:4
203:22
**red** 110:3,18,23
233:2,13,16,20
**reda** 35:19 39:4
39:15,24 40:15
41:1,16 42:17
44:15 46:1
50:17 51:18
57:11 62:13
64:12 66:3,11
75:18 145:25

148:21 152:18
153:21 161:8
190:14 212:14
220:2
**reda's** 40:10
59:18
**reduce** 94:16
95:13 96:7
97:9 124:17
125:14 135:2,4
135:9,19,21
165:10,11
166:5 173:10
190:22 193:17
**reduced** 97:22
97:23 99:8,9,9
100:15
**reduces** 135:24
135:25
**reducing** 94:21
166:1
**reduction**
95:20
**refer** 40:7
46:13,19,22
79:13 127:6
154:22 198:1
**reference** 33:18
123:14 126:20
142:2 148:19
152:5 183:19
185:19 204:24
**referenced**
101:16 102:3
137:25 219:22

**references**
84:23 123:17
**referencing**
87:10 212:3
**referred** 44:16
47:4 127:1
**referring** 12:13
39:15 40:11
44:20,21 46:10
46:11 61:8
147:3 155:7
157:8 169:17
214:20
**refers** 119:14
154:4,21
183:23 184:6
185:13,15,24
185:25 186:10
186:13
**reflect** 30:16
185:1,6 213:25
233:19
**reflecting**
214:5,8
**reflects** 30:19
69:16
**refreshed** 31:9
**refreshing**
51:11 76:10
**reg** 209:9
**regarding**
47:16 161:5
**register** 76:18
76:23 161:9,14
164:16 179:20

**[register - required]**                                    Page 39

189:16 190:16
191:11 192:6
192:17 198:7
217:11
**registered**
172:12 184:3,9
184:10 188:19
188:22 189:21
198:11,14,17
199:25
**registers** 200:7
**registration**
18:6 162:23
164:6 165:13
165:17 168:20
171:14 177:25
178:6,13,19,22
179:4,18,19,25
180:5,5,13,18
180:25 181:23
181:24 188:7
189:12,13
190:13 192:9
192:22 193:15
194:11 197:14
197:25 198:6
199:11 200:3
200:25 201:2
201:11 202:3,4
202:8,15 209:8
217:19
**regular** 209:5
**regulation**
209:7,7,18

**regulatory**
44:22 226:17
**relate** 11:24,25
92:19 95:7
**related** 8:4 18:9
41:11 101:15
115:2 161:2
168:12 239:15
**relates** 88:5
**relating** 207:4
**relationship**
41:9 65:22
66:1 87:25
88:2
**relatively** 55:25
**release** 170:24
176:15,21
177:20
**releasing** 177:4
**relevant** 112:7
112:8,22
**relied** 206:21
207:4 209:2,10
**relieve** 129:14
**remember** 11:9
17:12 20:20
29:15,16 38:1
43:20 60:10
76:6 78:16
89:17 91:20
92:3,6,15
115:5 133:15
155:22 190:7
192:1 211:15
214:19 217:6

225:15 232:7
232:14 234:1
**remotely** 8:11
**repay** 124:2
**repayment**
135:18
**repeat** 18:16
48:3 80:1
103:13,14
105:11 162:14
**rephrase** 14:12
**reply** 193:18
**report** 230:10
230:19,21,25
231:2,3,10
**reported** 1:23
**reporter** 2:18
7:25 8:20 30:9
38:7 48:8
49:17 73:18
74:18 77:10
90:1,3 108:22
108:24 113:7
118:7,9,20
131:14 140:8
141:11 145:2
151:2 153:5
160:3 167:2,12
175:9,12
194:19,22
203:16,18
210:22 239:6
**represent**
28:14,16 84:15
106:22

**representative**
176:16,22
**representativ...**
213:15
**represented**
84:13 182:4
**representing**
7:24 8:1 14:6
95:11 198:8
214:6 216:7
**represents**
106:19
**reps** 27:12,21
28:5,15,19
**request** 161:8
170:18 173:4,9
181:24 190:15
191:12 192:15
193:13
**requested** 16:2
48:4,9 80:3,7
103:16 105:13
108:1 202:4
216:21
**requesting**
193:6
**requests** 100:2
238:16
**require** 85:16
129:22 192:18
**required** 14:8
125:3 126:20
127:5,16
165:12 180:4
216:20 234:15

**[required - risk]** Page 40

240:14
**requirement**
129:15
**requirements**
139:3
**resale** 162:23
**respect** 17:22
18:8 20:15
42:25 69:8
73:1 80:18
87:17 93:24
111:3 150:10
158:22 159:2
179:13 188:10
188:24 206:23
207:6 219:1
224:25 225:20
225:25 232:5
232:20
**respectively**
93:16
**respond** 50:25
162:6 181:19
181:19
**responding**
171:25
**response** 23:15
51:3 147:22
149:10
**responsible**
52:10
**rest** 24:6 192:3
192:4 197:3
**restate** 220:17

**restrict** 147:19
**restricted**
57:24 146:24
147:3 163:11
178:23,25
**restriction**
171:1
**restrictive**
162:19
**resumed** 68:3
131:9 175:3
203:11 211:3
**retained** 40:3
235:5
**retention** 17:22
**return** 156:12
173:19 198:5
199:10 200:2,4
200:11,23
202:2,7
**returns** 210:21
**review** 31:3,24
32:15,17 33:1
33:11 38:18
50:4 71:21
75:8 86:1
90:14 91:24
102:5 109:7
114:12 116:18
118:15 140:19
145:8 160:13
229:23 230:6
230:10,19
233:4

**reviewed** 31:5
32:13,21 33:13
38:21,24 50:10
71:19 75:14
77:23 86:3
90:18 117:8
145:19 151:21
160:16 229:24
230:4,8
**reviewing**
31:13,15 51:11
52:10 76:9
91:22
**revised** 75:20
86:21 143:21
**revisions**
213:22
**revolved**
225:12
**revolves** 226:2
**richard** 1:11
5:11 6:7 65:17
**richie** 64:20
65:13
**richmond**
239:4
**right** 14:4
19:22,24 20:6
20:22 21:21
40:17 50:15
60:18 61:10
64:10,11 66:2
68:8 69:5 70:6
74:22 77:9
97:21 110:9,12

112:12 114:3
114:15 116:7
119:9 124:12
125:12 127:19
127:20 131:13
140:22 141:9
143:14 145:21
152:11 153:1
153:16 155:8,9
155:25 156:3
157:18,23
158:11 178:1
189:17 190:20
191:1,7 195:15
200:1,4,11,19
201:22 203:2
203:15 204:23
208:6,10
211:22 217:13
219:8 225:19
228:15 233:1
**rights** 137:3
177:25 178:6
178:13,19,23
179:4,18,19
180:1,14,25
189:12,13
192:9 201:15
202:8
**risk** 112:24
115:13,15
116:5 124:17
135:10,19,21
135:24,25
136:8 139:3,7

**[risk - second]**

139:15 159:16 165:11 166:1,5 166:6,24 172:10 212:21
**rob** 84:12,14 88:11,19
**rob's** 121:19
**robert** 78:8 83:22 84:3 86:16 117:1 119:13 142:1
**roll** 122:9
**roman** 205:15
**roughly** 56:15
**round** 24:5 35:3 154:13,24 154:25 155:2
**routed** 120:22
**rule** 111:12 208:23,24
**rules** 18:5 206:21 207:4 207:13 208:21 208:22 211:14 221:6
**runs** 234:16
**runway** 115:17 115:21
**ryan** 1:17 2:14 9:25 10:1,2 36:17 39:4 41:14 42:21 45:25 50:19 57:12 62:12 64:15,19 73:5

75:18,25 79:7 86:25 99:21 117:2,14 146:1 146:7 147:12 147:12 148:21 149:12 153:20 195:25 198:2 235:3 236:3 239:9 240:2,4 240:13 241:2 241:24 242:2 242:24

**s**

**s** 3:1 4:1 5:1 6:1 44:3,6,17,22 164:16 241:3 242:3
**sa** 204:25 205:11
**sale** 221:20
**sales** 66:20 67:2
**salesman** 200:20
**salespeople** 128:9
**satisfied** 100:12 101:22 102:15 102:19,21 108:12
**satisfies** 71:3
**satisfy** 96:5,11 97:8,21 99:7 100:2,3 101:10 139:3,7

**saw** 31:11,12 32:1,4,8 36:12 50:13 51:2 101:20 160:22 168:3 214:15 220:1
**saying** 12:5 66:12 73:9 82:7 98:5 112:17 146:7
**says** 22:24 34:10 35:16,18 35:22 36:16 39:3 42:16 44:5 46:4 64:19 86:20,25 110:23 117:13 121:18 123:21 140:25,25 147:3 148:3,9 149:5 152:13 153:25 154:12 176:7,14 196:16 199:3,9 199:23 200:1 200:23
**scenario** 182:18
**schechs** 64:20
**schechter** 50:20 57:10 61:2 64:15 66:20 75:19 117:1 119:13 146:2 147:25

153:19 161:9 175:21 190:14 195:21 212:13 220:2
**schechter's** 60:19
**scheck** 146:20 164:15
**schedule** 143:21
**scheduled** 225:7
**scheme** 163:22
**schole** 4:10
**school** 15:1,6
**schulte** 18:23
**schultz** 143:19 143:25
**sciaretta** 3:21
**scorned** 222:8
**scratch** 232:9
**sec** 9:20,21,25 18:4 44:23 162:25 206:21 207:4,13 209:10 211:14
**second** 46:4 73:24,24,25,25 78:2 84:23 126:11 145:22 152:12 162:6 175:17 194:4 198:19 199:2 219:6

**[section - sent]**                                                      Page 42

**section**  121:22
   123:18 207:5
   207:13,20
   234:5
**secured**  10:14
   39:6 110:6
   137:4,16 138:3
   138:19
**securities**  20:8
   37:23 38:4
   45:23 47:17
   58:24 73:2
   78:21 80:15,19
   81:11 84:18
   88:4 93:6 96:9
   96:12,25 97:3
   97:5,14 98:23
   98:24 99:18
   101:6,13,14
   103:5,6 104:6
   106:7,12 107:1
   107:9,13,14
   108:5 110:25
   115:3 128:1,3
   128:15,18
   129:5,7,14
   134:9,15,17
   137:4,12,16
   140:1,2 155:3
   155:4 189:1
   194:1 206:23
   207:7 208:9
   209:9,11 219:2
   224:5,18,25
   225:13,14

231:14
**security**  27:19
   93:13 108:17
   109:25 115:13
   115:15 137:20
   159:20 163:11
   163:21
**see**  31:14,19
   32:9 33:17
   34:13 35:20,24
   36:14,20 39:12
   41:3,18 42:18
   43:4,9,25 44:3
   44:11 46:2,7
   50:23 51:4,4
   57:15 59:8,23
   60:24 62:16
   64:17,22 67:4
   71:20 75:21
   76:1 78:10
   83:23 84:2,25
   86:18,25 87:3
   109:20,22
   110:12,14,16
   110:20 111:1,5
   111:13 117:4
   117:16 119:20
   121:10,18,20
   121:25 123:15
   123:19 124:3
   125:5 126:22
   127:7 130:3
   140:22 143:22
   144:6 146:4,16
   146:21,25

147:14 148:1
   148:24 149:8
   149:16 150:16
   152:15 153:23
   154:2,17 169:3
   169:8,12
   175:23 176:4,7
   176:9,17 178:5
   183:19 184:24
   185:11,21,22
   186:8,18
   195:20 196:2
   196:14,19,21
   199:6 200:10
   204:23 205:1
   219:21 233:3
**seeing**  90:20
   119:7 164:20
   168:5
**seek**  69:20 70:9
   70:13 94:16
   95:2,3,12
**seeking**  36:12
   68:19 70:25
   96:22 97:9,18
**seeks**  21:5
**seems**  34:22
   60:2 143:9,12
**seen**  31:6 38:22
   42:2 50:8 67:4
   75:12 77:21
   90:16 109:17
   109:25 110:6
   114:22 117:6
   119:5 129:25

132:4 145:17
   151:19 160:18
   160:20 168:1
   195:11 221:20
**seg**  146:9 164:9
   190:14 212:14
   232:11
**select**  1:6 4:13
**self**  70:17
**sell**  154:8,10
   161:22 162:17
   162:20 163:1,3
   163:13 165:23
   171:1 172:9
   181:13 197:15
   202:14
**selling**  24:2
   104:1 107:9
   159:20 163:9
**send**  82:13,19
   83:5 210:1
   223:6
**sending**  42:8
**senior**  39:6
**sensitive**  7:5
**sent**  19:12
   30:12 41:15
   45:25 49:19
   50:18 51:18
   57:10 64:13
   78:7,14 80:23
   81:16 116:25
   141:14 143:19
   153:19 195:21
   195:24

**[sentence - simulate]** Page 43

| | | | |
|---|---|---|---|
| **sentence** | 93:12 94:16 | 69:11,15 80:18 | **signatory** 208:6 |
| 176:14 200:12 | 95:12 96:7 | 87:11 129:25 | **signature** |
| **separate** 192:8 | 107:24 136:19 | 130:6,9,14,14 | 132:18 133:1,8 |
| 205:4,17,21 | 148:22 149:2 | 130:18 | 176:12,20,24 |
| **september** 1:14 | **shareholders** | **sheets** 21:18 | 177:4,17,18 |
| 1:19 2:9 7:3 | 94:20 95:19 | 68:10 | 178:4,8 183:2 |
| 15:22,23 39:3 | 97:12,19 98:21 | **shelf** 146:8 | 183:6,10 |
| 41:15 42:16 | 101:2,22 103:4 | **shop** 208:20 | 186:21,25 |
| 43:12,13,17 | **shares** 104:2 | **short** 79:25 | 187:5 200:18 |
| 47:16 48:14 | 154:1,7 155:15 | 163:2,3,7,10,13 | 208:3,4,7,9 |
| 58:20 62:19 | 156:5,9 159:10 | 163:19,21 | 239:23 |
| 239:21 | 159:21 161:9 | **shorted** 163:24 | **signatures** |
| **series** 212:2,5 | 161:14,22 | **shorthand** 2:18 | 220:24 |
| **serve** 25:15 | 162:18,18 | 239:6 | **signed** 101:12 |
| **served** 25:6,9 | 163:1,3,6,10,17 | **show** 31:23 | 111:11 177:25 |
| **server** 120:21 | 163:18 164:16 | 32:5,15,25 | 178:6,9,11 |
| **serves** 79:3 | 165:18,25 | 128:12 141:7 | 191:25 194:13 |
| **service** 34:18 | 168:21 171:14 | **showed** 212:1 | 197:13 213:18 |
| 34:20 | 171:16 172:12 | **showing** 143:11 | 217:16,22 |
| **set** 207:20,21 | 172:23 173:7 | **sic** 8:2 20:8 | **significantly** |
| 207:21 211:20 | 179:21 183:20 | 221:25 | 161:19 |
| 211:20 239:10 | 184:23 187:10 | **side** 48:1 153:2 | **signing** 97:12 |
| 239:20 | 188:11,19 | 205:8,16 | 177:22 179:19 |
| **settle** 100:5 | 189:16,21,23 | **sides** 149:25 | 179:24 201:3 |
| **seven** 108:24 | 190:13,16,19 | **sig** 176:7,11 | 201:15 202:2 |
| **seventh** 3:4 | 190:20 191:11 | **sign** 98:10 | 208:4 |
| 112:18 | 192:7,17,22 | 133:13,19,22 | **signs** 178:18 |
| **shaking** 229:16 | 198:7,10,16 | 164:7 180:4,17 | **similar** 36:2,9 |
| **shannon** 3:21 | 199:25 200:7 | 181:22,25 | 36:14 71:17,18 |
| **shape** 75:24 | 217:11,20 | 198:9,13 | 73:16 229:7,12 |
| **share** 53:25 | **sharing** 216:19 | 199:25 200:6 | **simply** 122:22 |
| 111:7 184:11 | 232:4,11,19 | 200:24 202:15 | 126:14 |
| 185:2,6 215:12 | **sheet** 22:11 | 202:18,25 | **simulate** 35:23 |
| **shareholder** | 24:17,25 25:22 | 208:3,7 213:13 | 36:2 |
| 42:4 46:16,20 | 68:15,16,22 | 217:21 220:4 | |

**single** 46:5 62:14 78:24 220:24

**sir** 11:6 12:24 13:14,19 14:19 15:7 18:22 19:5 20:1 119:16 132:23 183:11 184:25

**sit** 51:9 55:15 55:16,19 76:5 107:5

**sitting** 34:6 36:10 44:19

**situation** 46:17 47:13 81:1 82:24 88:17,23 107:5 128:23 129:23 177:10 177:16,24 181:21 182:5 182:11 201:24

**situations** 89:21 126:7 129:21

**six** 30:2 90:3 109:1,2 110:23 111:25 112:13 162:21 165:21 165:24 235:4

**size** 64:21 66:12 146:15 149:6

**skadden** 5:2

**skeptical** 42:1

**sketch** 14:25 54:3,4

**skip** 35:17

**sky** 144:5,10

**slash** 39:8,9

**slate** 5:2

**slowly** 26:11

**smaller** 26:17 26:20

**snickered** 30:20

**sold** 111:11 155:23 163:6 209:9

**solicit** 23:3,10 24:3

**solicitation** 23:16

**somebody** 163:18 232:11

**sooner** 165:23

**sorry** 32:12 63:22 71:13 74:18,23 91:15 136:15 147:12 155:13 162:12 164:2 195:17

**sort** 171:15

**sought** 96:5

**sounds** 150:14

**southern** 1:1

**spa** 105:19 108:5 115:4 123:14 134:11

155:12 193:9 193:23

**speak** 88:13 221:11 227:1 229:13

**speaking** 21:22 44:16 152:8

**speaks** 220:18 221:14

**special** 221:15 221:18,24 222:5,10,18 223:7

**specific** 23:23 23:24 24:13 31:22 47:12 59:7 83:9,15 88:20 102:5 103:25 106:21 107:22,25 110:7 134:18 138:9 166:13 166:16 177:12 223:18,19 226:3 228:2

**specifically** 11:10 29:12 47:5 72:20 76:9 91:5,20 103:19 117:20 133:15 168:7 171:17 196:6 227:6,12,18

**specifics** 20:20 29:16 86:4

92:15 104:3 105:21 177:10 225:16

**specify** 24:19 188:15

**speculate** 121:3 166:22 181:9 181:20 182:1,5 182:10 201:24

**speculating** 121:1

**speculation** 201:21

**speed** 26:2,7,15 89:21

**spell** 11:12

**spoke** 57:21 68:10 137:21 168:18 169:18 211:12,19

**spreadsheet** 204:9

**springing** 192:20

**ss** 239:3

**stage** 37:4

**stamp** 62:5

**stamped** 30:13 30:23 38:9,13 49:20,24 50:16 57:9 73:22 74:16 75:3,17 77:13,16 78:5 83:21 86:15 90:7,12 109:5

**[stamped - swear]**

109:11,23 110:10 114:2,6 116:10,13,24 118:1,13 119:11 131:17 131:23 132:17 132:25 133:7 140:10,13,24 141:15,18 143:18 145:5 145:10,23 148:16 151:4 151:10,13 153:7,10,18 160:5,8 167:4 167:7 168:25 186:17,24 187:4 194:24 195:2,19 236:7 236:9,12,14,17 236:19,21,24 237:4,6,9,11,14 237:16,19,21 237:24 238:4,6

**standard** 216:2 233:21

**standing** 21:24 221:23 222:4 222:10

**start** 15:8,11 89:13

**started** 15:13 15:22 89:12 190:8

**starting** 15:1

**starts** 44:1 146:7 199:1

**state** 2:19 8:8 8:11,16 9:1 239:2,7

**stated** 36:24 221:3

**statement** 162:23 165:13 165:17 168:21 192:22 198:6 199:11 200:3 220:23

**states** 1:1 89:8

**stinson** 5:9

**stipulation** 10:16

**stock** 26:20,25 44:6 45:4 57:25 136:11 136:22 158:14 158:17 159:3,8 161:18 163:7 166:8,18,20 189:9 209:14

**stop** 229:16

**story** 114:18

**straight** 26:24 27:2,3

**straightforward** 15:21

**strategy** 216:23

**street** 3:16 5:21 7:20,21

**stricken** 110:18 110:22

**strike** 48:16 90:24 91:16 103:1 135:2 142:21 158:25 197:6 221:11

**struggling** 37:20

**studios** 1:13

**stuff** 41:8 53:15 179:9

**subject** 34:10 41:16 50:21 57:13 59:9 64:15 75:19 78:9 117:3 143:20 146:2 153:21 176:2 190:25 196:12 223:24 224:12 227:3,11

**subscribed** 108:14 240:16

**subscriber** 34:18,19

**subscription** 34:17 183:20 184:6,22 185:9 185:20 186:6 210:1

**subsequent** 190:1,3,5 192:14

**substance** 73:6 199:5,15 229:14,18

**substantial** 56:22

**substantially** 71:17,18 72:5 72:11 73:15 166:3 213:14 213:15 229:6 229:11

**substantive** 18:2 59:13

**successfully** 215:6 229:19

**suffering** 14:16

**suggest** 203:5

**suggestion** 172:4

**suite** 5:22 6:5

**supposed** 222:6

**sure** 17:19 29:17,22 64:6 67:16 70:5 79:19 83:12 118:24 120:2 122:23 124:14 124:20 172:6,7 182:21 207:10 208:2,12,15

**sushi** 43:8,19

**suspicious** 123:8

**swear** 8:20

**[switch - things]**                                                Page 46

**switch**   149:25
**sworn**   8:24
   239:11 240:16
**swung**   44:7
**system**   19:12
   120:21 215:11
   227:1
**systems**   33:18
   33:21 34:24

**t**

**t**   241:3,3 242:3
   242:3
**tab**   30:12 38:9
   49:18 64:3,4,9
   73:20,22 74:11
   74:12,13,14
   77:12 90:5
   109:4 116:9
   118:12 131:19
   140:11 141:13
   153:7 160:5
   167:4
**tabbed**   145:4
   203:20
**table**   25:2 39:7
   44:10
**take**   7:5,10
   12:6 22:12,13
   31:3 38:18
   49:9,12 50:4
   54:4 56:14
   67:7,10,15
   75:8 90:14
   109:7 114:11
   116:18 118:15

125:13 130:23
139:5 140:18
145:7 160:13
173:22 174:1
175:18 180:9
180:20,23
203:3 209:22
210:8 225:6
**taken**   7:14
   49:14 68:1
   131:8 175:2
   203:10 211:2
**talk**   41:7 65:10
   66:5 118:22
   172:1 221:8
**talked**   172:17
**talking**   21:16
   51:5 70:2
   188:20
**tax**   1:9 3:15
   186:1 204:24
   205:10,11,14
   205:22,25
**teaser**   41:17
**technically**
   16:4 36:25
**tell**   11:7 14:4
   61:6 86:6
**telling**   202:1
**temporarily**
   135:7
**ten**   211:13
**tense**   142:5,6,9
   142:10

**term**   21:17
   22:11 24:17,25
   25:22 26:22
   27:14 68:10,14
   68:16,22 69:10
   69:15 80:18
   87:11 105:22
   106:16,17,18
   106:23 111:16
   111:20,20,22
   125:7,11 127:3
   127:16 129:25
   130:6,8,13,14
   130:17 136:2
   154:20
**terms**   21:3,6,8
   22:3,19 23:6
   23:15 24:7,12
   24:16 25:17
   26:18 27:18
   28:15,17 68:18
   68:20 69:11,18
   69:20,23 70:9
   70:13,20 71:3
   71:8,17,25
   72:6,7,11,25
   73:16 85:15
   86:1,6,9,10,23
   87:7 88:9 94:9
   98:15 101:14
   102:25 104:5
   105:18 107:22
   108:1 125:1
   128:2 129:6,13
   130:19 137:3

137:20 139:25
158:10 179:12
181:11 193:9
193:23 194:4
197:10 213:25
216:20 228:7
229:2,6 234:14
**testified**   9:2
   212:7 217:8
**testify**   14:14,18
   14:21
**testimony**
   18:12,19 19:3
   170:21 229:15
   235:2 239:13
   240:10
**texas**   5:23
**text**   18:8 19:6
   19:13
**thank**   30:21
   35:12 63:22
   75:1 113:12
   119:3 131:21
   141:23 151:18
   184:20 204:3
   204:20 218:15
**thesis**   29:25
**thing**   194:13,16
   203:5 215:4
**things**   46:23
   66:24 150:15
   170:22 187:15
   210:19 211:18
   221:8,21 224:3
   224:7

**[think - transaction]**                                                          Page 47

**think**  16:1
  17:13 34:17,19
  36:23 42:5,21
  47:2 57:20
  61:21 62:11
  64:8 65:3
  70:15 78:25
  82:25 83:3
  85:6 86:24
  108:9,10
  109:19 111:19
  117:8 120:23
  128:22 130:24
  143:3 144:1,16
  144:16 145:4
  150:7,19 151:5
  151:7 154:6
  156:12 162:7
  163:15,15
  164:12 169:17
  171:24 182:16
  182:17 210:18
  211:13 230:8
  234:3,7
**thorough**
  157:15
**thought**  63:15
  150:18 152:23
  156:14
**thousands**
  22:16
**three**  7:20
  22:13 33:5
  64:2 127:18,20
  178:17

**thumbnail**
  14:25
**thursday**  57:11
  64:13
**time**  7:8 8:9
  9:14,15 20:2,4
  20:7 25:8
  31:10 33:6,12
  37:7,10,15
  39:17 45:16
  50:4,12 51:2,8
  51:9 55:24
  58:19 59:17
  61:10,16 62:19
  63:4 67:4,23
  68:6 69:4,12
  75:8 78:14
  81:15 85:17
  88:7 105:19
  112:4,10,12
  114:4 126:18
  127:24 128:19
  131:1 134:21
  134:24 152:24
  152:25 158:2
  160:13,22
  161:18 163:7
  164:19 165:20
  182:13,14
  192:6 194:8,10
  199:5,15
  215:23 216:4
  225:9 227:17
  227:25 228:3
  231:23 235:6

**times**  9:12
  33:14 123:25
**today**  14:14
  18:20 19:4
  36:10 44:19
  51:10 55:15,16
  55:19 76:5,10
  107:6 195:14
  214:15 231:12
  231:18
**todd**  1:3 7:16
  240:1 241:1
  242:1
**toes**  113:22
**together**  56:12
  69:24 70:16
**told**  15:24
  128:9 229:16
**took**  17:16
  190:5 192:2
**toon0011940**
  140:10,13
  237:12
**top**  39:7 44:9
  62:10 64:13
  86:13 116:23
  119:10 143:17
  147:10,23
  175:19,19
**topic**  168:12
**total**  235:3
**totally**  15:20
  86:24
**towards**  64:12
  80:12 84:22

  140:24 147:10
**tracey**  5:24
**tracks**  34:20
**traction**  37:20
**trade**  2:16 3:17
  7:21 178:16
  181:11
**traded**  135:15
  178:15,17
**trading**  57:24
  106:7 107:12
  135:14 147:19
  203:21,23
  238:8
**traditional**
  214:4
**transaction**
  22:17 25:21
  26:2,3,4,7,16
  28:22 29:1,4
  32:19,21,23
  36:13 59:14
  69:5,12 70:24
  75:20 82:13
  83:10,15 92:6
  92:23 106:11
  128:11 138:13
  138:15 139:4
  139:12 161:10
  161:11,16
  168:23 169:20
  172:11 186:2,3
  186:15 189:17
  209:6 213:10
  213:17,23

**[transaction - unused]**

214:1,14 215:5 215:19 216:1 229:5 232:12 232:18,21 233:9 234:16

**transactions** 22:12,13,15 32:25 38:2 72:15 105:25 134:8 176:25 213:24 215:7,9 215:10 216:5 222:1,12,20 227:24 232:5 233:6

**transcript** 210:7 240:5,10

**transferred** 111:11

**treating** 37:13

**tricky** 138:7

**tried** 61:20 86:22 117:14 152:20

**triggered** 120:11

**triggering** 177:3

**trips** 208:20

**true** 19:20 152:10 221:22 239:12 240:9

**trust** 234:11

**truthfully** 14:14

**try** 14:11 21:21 66:25 123:6 174:10 212:3

**trying** 32:7 70:4 80:25 104:10 122:22 124:20 126:10 126:14 142:4,9 157:14 200:21 233:17

**tuesday** 142:1

**tumors** 37:13

**turn** 78:3 83:19 110:10 133:6 136:6,9 165:25 183:1,5 185:18 186:16

**turned** 142:24 168:22

**tvs** 166:20

**twenty** 158:8 203:18

**twersky** 3:2

**two** 9:15 52:18 124:19,19,19 124:19,21 128:9 146:14 174:7 184:5 205:15 231:24

**tying** 172:9

**type** 26:5,6 28:15,17 54:24 55:6 106:17

**types** 32:16 54:7

**typical** 158:10 213:21

**u**

**uh** 123:24 196:24

**ultimately** 172:18

**unable** 14:14 14:17

**under** 18:5 44:24 69:1 96:11 125:22 126:4,15 170:5

**underlined** 110:19 111:6

**underlying** 161:22 168:21 171:14 189:16 189:21,23 190:16

**understand** 14:10 22:12 32:8 36:1 40:10 57:18 79:19 83:2 104:12,16 105:15 115:13 115:15 137:9 146:11 148:6 176:11 206:12 207:1

**understanding** 36:7,21 39:23 51:17 61:1 66:11 71:22

72:9,14 73:14 80:22 85:2,5 87:5 94:25 97:4 98:6 115:17 119:22 120:5 122:3,6 133:24 134:5 144:8 148:10 154:19 164:3 169:14 170:7 176:19 179:3 180:2 185:23 187:8 212:18 215:17 221:11 221:13

**understood** 12:2 22:1 79:23 99:25

**unfeasible** 213:16

**unfunded** 85:8

**uninformative** 231:15

**uninformed** 231:14

**unit** 7:12

**united** 1:1 89:8

**unlimited** 171:2

**unquote** 43:2 141:1

**unsolicited** 19:10

**unused** 122:10

**[use - want]** Page 49

**use** 18:8 19:18 26:22 29:6,7 29:15 120:15 122:9 124:1,15 126:4 215:23 215:24,24 216:3

**used** 57:17 60:11 154:20 215:6 235:4

**using** 70:16 215:5

**usually** 28:16 85:15 103:25 177:8

**utility** 85:19

**utilized** 136:13

**v**

**vacation** 120:18

**vacuum** 99:13

**valid** 163:16

**value** 42:4,12 46:16,20 67:8 67:10 126:6,9

**variable** 134:8 134:11,15

**varies** 13:24

**various** 32:25 88:9

**vary** 13:23

**venture** 185:17

**veritext** 7:24 8:2 235:5

**version** 110:4,5 110:17 143:12

**versions** 110:2

**versus** 7:16 9:25 115:23 142:5,11

**veto** 137:3 138:1,12

**video** 1:17 2:14 7:9,13

**videographer** 7:1,25 8:19 67:21 68:5 131:4,11 174:23 175:5 203:6,13 210:24 211:5 234:25

**videographers** 6:14

**view** 88:22 135:11,25 216:19 233:5 234:17

**viewership** 37:21

**views** 213:25 221:16,25 222:12,19 232:4,12,20

**violate** 224:18 234:4

**violated** 212:19

**violation** 223:14 224:4

234:18

**viso** 3:22

**volume** 173:8 178:15,17

**voluntarily** 167:19 173:14 193:3

**voluntary** 156:6 167:22

**volunteer** 107:23

**volunteered** 193:4

**vote** 93:13 94:16,21 95:12 95:19

**voted** 136:22

**votes** 52:21 95:2

**voting** 52:3,6 52:13 91:9,18 91:21,23,24 92:2,4,7,9,14 92:18,22,24 93:4 94:9 95:6 96:15,19 97:13 98:3,10,11,12 98:15,25 99:15 101:1,5,9,21 136:21

**vs** 240:1 241:1 242:1

**w**

**wait** 165:19 181:18

**waiting** 165:24

**waiver** 131:16 132:11 133:13 133:20,25 138:1,8 139:1 176:3

**wall** 39:5,24 40:5 50:22 57:14,19 59:8 59:10,11,15,17 59:22,25 60:2 60:4,12 64:16 147:19 153:22 188:3

**want** 10:15 12:3 21:19 22:2 39:5 40:5 48:2 56:19 64:20 69:8 70:5,9 71:3 72:8 113:21 120:14 143:4,4 150:2 159:19 161:13,21 164:8 171:7,22 172:12 173:24 177:15 178:13 181:11 182:20 202:25 204:15 209:21 210:6 223:23 228:20

**[wanted - wrote]**                                          Page 50

wanted   36:13
  66:12 72:22
  96:9 124:13
  139:11 143:5
  161:15 162:16
  165:10 166:24
  171:15 173:8
  176:20 179:17
  189:18 193:14
warrant   20:13
  137:1,24
  142:17
warranted
  46:18
warranties
  27:13,21 28:5
  28:16,19
warrants   39:8
  53:15 93:15,19
  95:14 134:6
  138:17 149:7
  162:1 168:22
  171:15 188:18
  188:25 189:16
watching   89:19
watermark
  157:5,7,19,21
watkins   4:2
way   57:17,23
  72:15 95:7
  98:15 100:3,5
  104:14 120:21
  124:18 126:18
  128:16 138:7
  138:10,14

  139:10,11
  142:6 143:6
  146:23 158:1
  164:23 177:8
  187:11 197:22
  210:2 213:8
  222:23,24
  226:8 228:11
  233:12 239:17
ways   79:5
we've   74:1
  168:17 173:20
  207:21,21
  222:22
wednesday
  1:19 41:15
  50:18
week   33:9
  225:12
weekend   146:3
went   15:2,25
  42:7 59:7,11
  59:17,25 60:2
  62:11 68:9
  191:12
west   5:5 6:4
whatsapp
  19:17
whereof   239:19
whispering   7:6
whoa   73:23,23
  73:23 210:3,3
  210:4
wholly   231:13

william   4:8
willing   146:10
  179:21 217:18
willingness
  168:20
win   24:4
wind   43:11
wise   37:21
witness   3:15
  8:21,23 9:20
  21:19 64:2
  67:16 70:5
  71:13 73:8
  78:23 79:23
  104:11 162:4
  162:15 171:23
  174:15,20
  204:3 209:21
  209:25 211:10
  219:11 236:2
  239:9,13,19
word   44:1
  46:18 70:16
  142:9
words   40:13
  42:7 130:15
  234:12
work   15:18
  16:3 18:9
  69:23 70:8,10
  70:11 72:15
  75:24 134:17
  215:11
worked   16:9

working   15:8
  15:11,13 84:7
  88:20,25 89:13
  214:7
works   23:25
  24:9 120:21
  134:20 216:13
world   2:16
  3:17 7:20
  215:4
worse   105:7
worth   57:6
  166:3,21,24
wow   35:22
write   41:20
  43:6 62:14
  226:23
writes   42:19,25
  60:21 75:23
  144:3 169:5
writing   36:19
written   25:22
  125:3 223:16
  223:20 224:15
  224:21 226:22
wrong   152:24
  152:25 177:16
wrote   35:19
  36:2,18,22
  39:4 42:17
  50:14 64:9
  147:13,17
  148:21 149:12
  169:2 226:24

[x - à]                                                      Page 51

| x | z |
|---|---|
| **x**  1:2,14<br>**xair**  11:11,14 | **zero**  46:4 52:3<br>54:17 62:14<br>81:14 82:3,5,8<br>82:10,15,15 |

| y | |
|---|---|
| **y**  8:23<br>**yeah**  24:22<br>108:18 118:20<br>118:23 122:5<br>133:21 148:13<br>150:20 154:11<br>158:11 162:4<br>165:25 174:10<br>175:24 184:17<br>205:2 209:5<br>220:11<br>**year**  15:4 17:13<br>157:23<br>**years**  16:10<br>40:16 42:3<br>227:23<br>**yep**  35:21<br>**yesterday**<br>30:13 31:12,15<br>32:10,18 33:4<br>148:23<br>**york**  1:1,18,18<br>2:16,17,19 3:5<br>3:5,19,19 4:7,7<br>4:15,15,24,24<br>5:6,6,13,13 6:6<br>6:6 7:22,22 9:2<br>43:22 239:2,7 | **zoom**  4:8 5:14<br>5:15 |

| à |
|---|
| **à**  139:6,13 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.