# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD AUGENBAUM,<br><br>Plaintiff,<br><br>v.<br><br>ANSON INVESTMENTS MASTER FUND LP;<br>BRIO CAPITAL MASTER FUND LTD.; BRIO<br>SELECT OPPORTUNITIES FUND, LP; CVI<br>INVESTMENTS, INC.; EMPERY ASSET<br>MASTER, LTD.; EMPERY DEBT<br>OPPORTUNITY FUND, LP; EMPERY TAX<br>EFFICIENT, LP; EMPERY ASSET<br>MANAGEMENT, LP; IROQUOIS MASTER<br>FUND LTD.; IROQUOIS CAPITAL<br>INVESTMENT GROUP, LLC; L1 CAPITAL<br>GLOBAL OPPORTUNITIES MASTER FUND;<br>M3A LP; RICHARD MOLINSKY,<br><br>Defendants,<br><br>-and-<br><br>KARTOON STUDIOS, INC.,<br><br>Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

## DECLARATION OF MICHAEL JAFFA

1.    I am Michael Jaffa, the Chief Operating Officer, General Counsel, and Corporate Secretary of Kartoon Studios, Inc., formerly known as Genius Brands International ("Genius Brands" or the "Company"). I was promoted into the COO position on December 4, 2020.

2.    Prior to that date, and during the period of time that I understand is relevant to this action, I served as the General Counsel & Senior Vice President of Business Affairs of Genius Brands, as well as Corporate Secretary. In both my prior and current role, I report(ed) directly to Andy Heyward, the Chief Executive Officer of Genius Brands.

1

3.    I understand that this action concerns an allegation by Plaintiff Todd Augenbaum that the Defendants in the action—all persons or entities that invested in Genius Brands in March 2020 as described below—formed a so-called "Group" within the meaning of Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with their investments in Genius Brands for some or all of the period between March and August 2020. According to Plaintiff, the Defendants acted as a Group, and, as a result, were "insiders" for purposes of Section 16(b) of the Exchange Act and required to disgorge any "short swing" profits to Genius Brands. I submit this declaration to provide information within my personal knowledge that may be relevant to the issues in this action.

4.    As General Counsel and Senior Vice President, I had an insider's knowledge concerning the operations and finances of Genius Brands in 2020. Along with our then CFO, Bob Denton, I had primary responsibility for the financing transactions undertaken by Genius Brands during the relevant period, working with Genius Brands' outside counsel at Mintz Levin and its placement agent, Special Equities Group ("SEG").

5.    In late 2019 and early 2020, Genius Brands had limited capital and required financing to maintain its operations. As the Company's Form 10-K for 2019 reported, Genius Brands had $305,121 in cash and cash equivalents as of December 31, 2019. The report from the Company's independent auditors for calendar year 2019 stated that "the Company has suffered recurring losses, negative cash flows from operations and has an accumulated deficit that raise substantial doubt about its ability to continue as a going concern." Accordingly, it was vitally important that Genius Brands raise additional funds to support its business in early 2020.

6.    In connection with its efforts to raise additional funds, Genius Brands retained SEG to assist in the process. Genius Brands understood that SEG was representing Genius Brands'

2

interests in seeking investors for a transaction that would be acceptable to Genius Brands. But Genius Brands also understood that the terms of any financing transaction would necessarily reflect the company's difficult financial situation. SEG was successful in its efforts to raise badly needed capital for Company. The first such transaction that Genius Brands entered into in 2020 was a so-called private investment in public equity, or "PIPE", transaction on March 11, 2020 (the "March 11 PIPE").

7.    I worked with SEG and Mintz Levin to negotiate the best terms possible for Genius Brands given its circumstances. I am informed that Plaintiff has argued that the terms of the March 11 PIPE transaction were unduly favorable to the investors. While the financing was more expensive than would have been available to an entity in a stronger financial position, Genius Brands and its advisors sought, and I believe obtained, the best terms that were reasonably available. I believe Genius Brands' interests were well-represented by internal and external advisors in connection with the transactions. That is reflected by the fact that, among other things, Genius Brands was successful in raising close to $100 million to fund its operations during the course of 2020.

8.    Among the placements that Genius Brands entered into was the March 11 PIPE, in which the Defendants participated. I am unaware of any coordination among the Defendants leading up to the March 11 PIPE transaction. Those investors generally communicated with our advisor, SEG, who I understand received comments on the transaction documents from different investors that were sometimes inconsistent and had to be reconciled to bring investors into the deal. At no point during the negotiations of the March 11 PIPE transaction, or at any point thereafter, did Genius Brands consider Defendants to be operating as a Group in connection with their investments.

9.     Under NASDAQ rules, Genius Brands was required to obtain stockholder approval for the March 11, 2020 transaction. To ensure that Genius Brands would be able to raise the necessary funding, Genius Brands entered into a voting agreement with certain large stockholders pursuant to which those stockholders agreed to vote in favor of the transaction. None of the Defendants was a party to the voting agreement.

10.    I am informed that Plaintiff has made certain allegations regarding press releases issued by Genius Brands after March 11, 2020. There was no agreement or other coordination between Genius Brands and any of the Defendants regarding the issuance of any press releases by Genius Brands.

11.    Following the March 11 PIPE transaction, the market price of Genius Brands' common stock increased, modestly at first and then rapidly. The increase in the market price of our Company's stock occurred during a period of significant market volatility that coincided with the first phases of the COVID-19 pandemic.

12.    The Company sought to take advantage of the opportunity created by its appreciating stock price to raise additional capital. To that end, Genius Brands undertook a series of registered direct transactions pursuant to which it issued stock directly to investors in registered transactions. The Company's increased market price allowed the Company to conduct additional offerings under the so-called "baby shelf" rule. Through these offerings, Genius Brands was able to raise additional capital to maintain and develop its ongoing operations, and to position itself to undertake new product-development initiatives as well as to explore strategic acquisitions.

13.    In the lead-up to one of the registered direct offerings in May 2020, investors requested that Genius Brands agree to register the unregistered securities underlying the warrants that had been issued in connection with the March 11 PIPE transaction. It was advantageous for

4

Genius Brands to agree to register the shares underlying the warrants once the opportunity became available a few months after the transaction based on the positive movement in the Company's stock price and the interest expressed by the investors. This was at least in part because Genius Brands was to receive proceeds in the amount of the exercise price of the warrants upon any investor's exercise of its warrants.

14.    Thus, with the assistance of our independent financial and legal advisors, SEG and Mintz Levin, Genius Brands agreed to register the shares underlying the warrants issued in connection with the March 11 PIPE transaction. The Company's concerns with registering shares and potentially flooding the market were resolved by "leak-out" agreements that Genius Brands separately entered into with each investor, executed on May 18, 2020. Today, nearly five years after the fact, I do not recall all of the details surrounding the leak-out agreements and their antecedents. Ultimately, however, Genius Brands required that any investor whose shares would be registered execute a leak-out agreement with the Company. Under the leak-out agreements, each signatory investor agreed not to sell shares unless certain price and volume restrictions were satisfied at the time of sale. In Genius Brands' case, the agreements were to become effective only upon registration of the shares, and were intended to allow for the orderly disposition of the newly-registered and freely tradeable shares. Without such agreements, it was possible that the influx of a substantial number of new shares on the market could have resulted in a rapid decline in the price of Genius Brands' common stock. This could have harmed Genius Brands' stockholders, and it could have harmed the Company by negatively affecting the Company's ability to raise additional financing.

15.    On June 23, 2020, Genius Brands entered into conversion agreements with the holders of convertible notes issues as part of the March 2020 PIPE. Pursuant to the conversion

5

agreements, the noteholders agreed to convert their notes into Genius Brands common stock, and Genius Brands agreed to register the shares to be issued in the conversion. In connection with that transaction, Genius Brands required each converting noteholder whose shares would be registered to execute a leak-out agreement similar in form and substance to the leak-out agreements executed in May. Again, Genius Brands requested this agreement to ensure the orderly disposition of the registered shares and to protect Genius Brands' interests.

16.    Prior to commencing this action, Plaintiff sent a demand to Genius Brands requesting that Genius Brands pursue a claim against the Defendants under Section 16(b) of the Securities Exchange Act. Genius Brands directed its counsel to examine and review the demand and report to management and the Board of Directors concerning it.    Ultimately, the Company determined that Plaintiff's allegations, which hinge on the existence of a Section 13(d) Group among the Defendants, were without merit. Accordingly, Genius Brands determined not to pursue the claim asserted in this action. Notwithstanding, Plaintiff elected to file this action. In doing so, Plaintiff has imposed significant burden and expense on Genius Brands despite Plaintiff's assertion that the lawsuit is being pursued on behalf and for the benefit of Genius Brands.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: _January 13, 2025_

_Michael Jaffa_

Michael Jaffa