# Exhibit 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

Plaintiff,

v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; RICHARD MOLINSKY,

Defendants,

-and-

KARTOON STUDIOS, INC.,

Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**DECLARATION OF RICHARD ABBE**

1.      I am Richard Abbe, a director of Iroquois Master Fund Ltd. ("IMF") and the managing member of Iroquois Capital Investment Group LLC ("ICIG" and together with IMF, "Iroquois").

2.      I am familiar with the facts and circumstances set forth in this Declaration, which I submit in support of Defendants' Joint Motion for Summary Judgment.

**I.      Iroquois**

3.      Iroquois is a hedge fund that currently manages approximately $150 million of

assets.  IMF is an investment fund registered in the Cayman Islands that operates as the feeder fund for the managed assets.  ICIG is a limited liability company registered in Delaware.  Kimberly Page, Leo Abbe, and I are the equity owners of Iroquois.

4.      I have been a director of IMF and the managing member of ICIG since the entities were founded.

5.      Prior to this lawsuit, I personally knew some, but not all, of the managers or principals of the other Defendants.  I also knew Richard Molinsky.  I do not consider any of those individuals to be friends.  Rather, they are competitors and business acquaintances.

## II.      Iroquois' Decisions to Invest in Genius

6.      I have at all times had ultimate authority for all investments made by Iroquois. While I take into consideration the views of other owners of Iroquois (specifically, Kimberly Page and Leo Abbe), I make those investment decisions independently based on what I think is in Iroquois' best financial interests.  My focus is always on the terms of the proposed transactions; any other factors hold little weight in my decision-making.  It does not matter to me (and therefore does not matter to Iroquois) which other investors have participated or will participate in an investment opportunity available to Iroquois.

7.      I made the decisions for Iroquois to participate in a number of investments in Genius Brands International ("Genius" or the "Company") between 2014 and mid-2020.

8.      I have never communicated with any other investor about the price or terms of any transaction in Genius securities, whether to participate in any transaction in Genius securities, or the terms of any transactional document relating to Genius.  And, in deciding whether to invest in a transaction with Genius, I have never considered the fact that any other investor was participating in the transaction.  My investment decisions have always been my own, based on my own

consideration of what is in Iroquois' best interests.  Put differently, I have never coordinated or combined with any other investor for purposes of investing in Genius (or any other issuer, for that matter).

9.      Iroquois did not hold more than 10% of Genius common stock at any time relevant to this action.

### III.    Iroquois' Pre-2020 Investments in Genius

10.      Iroquois has been a long-time investor in Genius.  Iroquois made its initial investment in Genius in 2014, shortly after I was introduced to Andy Heyward, Genius' Chief Executive Officer.

11.      At the time, I viewed Mr. Heyward as a creative individual who was himself investing in the Company, which suggested to me that he was confident in the Company's ability to grow.  In May 2014, Iroquois participated in a PIPE transaction with Genius and acquired convertible preferred stock.  "PIPE" is an acronym for "private investment in public equity".

12.      Over the next five years, Iroquois made several additional investments in Genius, including PIPEs (through which Iroquois obtained convertible notes or warrants that could be exercised into common stock) and registered direct offerings of common stock.  Those additional investments were:

- A PIPE offering of common stock and warrants in October and November 2015;

- A registered direct offering of common stock in October 2017;

- A PIPE offering of warrants in October 2017;

- A registered direct offering of common stock January 2018;

- A PIPE offering of warrants in January 2018; and

- A PIPE offering involving senior secured convertible notes (the "2018 Convertible Notes") and warrants in August 2018.

3

13.    After Iroquois' initial investment in 2014 and prior to Spring 2020, Genius' financial condition deteriorated. The Company continually incurred operating losses and failed to generate value for its shareholders. As a result, Iroquois accumulated a large number of warrants and convertible notes that it had not exercised or converted in to shares of Genius common stock, as it could not have done so profitably. The investments held were underwater and in jeopardy of being a total loss.

**IV.    Iroquois Declares Genius in Default on the 2018 Convertible Notes**

14.    In 2019, Genius continued to have operational and liquidity issues, faced the imminent maturity of the 2018 Convertible Notes (some of which Iroquois held), and, based on my understanding at the time, was on the verge of bankruptcy.

15.    Genius retained Special Equities Group ("SEG") to explore potential financing options for the debt-ridden Company. In or around August 2019, SEG solicited Iroquois' interest to invest in another PIPE transaction. I was reluctant to invest more money in Genius given the state of Iroquois' prior investments, and I certainly had no interest in serving as a lead investor for a PIPE.

16.    Around this time, it also came to my attention that Genius had used recently raised capital to repay only one of the holders of the 2018 Convertible Notes shortly before those notes became due. In Augus 2019, I emailed Andy Heyward and Company management, copying SEG, and declared that the Company was in default. In doing so, I acted independently for Iroquois' own interests, did not discuss this action with any other investors, and did not consider their interests.

17.    Through subsequent negotiations, we resolved this dispute. Genius ultimately agreed to repay, and did repay, the 2018 Convertible Notes in tranches.

## V.    The 2019 Warrant Exercises

18.    In December 2019, SEG contacted me to solicit my participation in a warrant exercise for cash at a reduced price in exchange for the issuance of new warrants. In making the decision to participate in the warrant exercise, I did not communicate with any other Defendant or rely on whether any other Defendant was participating.

## VI.    The March 2020 Transaction

19.    In November 2019, SEG solicited Iroquois' interest again in participating in a Genius PIPE transaction. SEG sent me an email attaching two proposed term sheets. In SEG's email, Joseph Reda stated that "Amin wants you, Shaye, and him to do 3.34 million each." I had no communications with Amin Nathoo or anyone else at Anson about investing in Genius. I also had no communications with Shaye Hirsch or anyone else at Brio about investing in Genius. And I have no reason to believe that anyone at Anson actually told SEG that they wanted Iroquois to participate. I was reluctant to invest in Genius and had no interest in serving as a lead investor for a PIPE. Ultimately, Iroquois did not participate in an investment pursuant to the terms outlined in Mr. Reda's email or the term sheets attached to it.

20.    In January 2020, SEG contacted me by email to inform me of Anson's term sheet for a PIPE transaction and ask about Iroquois' interest in participating. I did not communicate with Anson (or any other investor) about Anson's term sheet. In SEG's email, Joseph Reda stated that Amin Nathoo from Anson wanted Iroquois "in." Again, I had no communications with Mr. Nathoo or anyone else at Anson about investing in Genius. And I have no reason to believe that anyone at Anson actually told SEG that they wanted Iroquois to participate. I believed then, and continue to believe now, that Mr. Reda was simply employing one of his usual sales tactics, but the information I care about is the proposed terms of the investment opportunity being

5

communicated.

21.     In connection with this litigation, I was made aware of a January 23, 2020 email sent by SEG to Ryan Lane of Empery stating that "Amin and richie want you in for size."  SEG sent this email minutes after they sent me the email described in paragraph 20 above.  If SEG's mention of "richie" refers to me, that email is inaccurate.  I never conveyed to SEG (or anyone else) that I wanted Empery "in" the Genius PIPE transaction, and it did not matter to me whether Empery (or any other investor, for that matter) would be in it.  In fact, when SEG sent this email to Empery, I had not even committed to the Genius PIPE transaction myself.

22.     Despite SEG's sales pitch, I did not commit to participate in the March 11, 2020 PIPE transaction (the "March 2020 Transaction") with Genius until one day before closing.  My hesitation was due to my doubts about Genius' ability to turn around its business.  We had not successfully monetized any of our investments with Genius and I had concerns about risking any additional capital.  To that end, on March 10, 2020, I asked SEG about how the Company planned to use the funds from the transaction.  I even told SEG that I might reduce Iroquois' investment because I was dissatisfied with the answers they gave.

23.     I ultimately made the decision for Iroquois to participate in the March 2020 Transaction based on my independent judgment of what was in Iroquois' best interests.  Iroquois invested $1 million in total, of which we funded 60% in cash in March and the remaining 40% in cash in June.  In making this decision, I did not communicate with any other Defendant or rely on whether any other Defendant was participating.

## VII.    The May Registered Direct Offerings

24.     The March 2020 Transaction closed on the eve of the COVID-19 pandemic quarantine.  In late March 2020, after the close of the March 2020 Transaction, SEG reached out

6

to me to solicit Iroquois' investment in a registered direct offering of Genius common stock.  I declined to participate based on my independent judgment of what was in Iroquois' best interests.

25.    Thereafter, as its stock price continued to appreciate, Genius conducted four additional registered direct offerings, on May 7, May 8, May 18, and May 28, 2020.  Iroquois participated in each of these offerings.  Again, I made the decision for Iroquois to participate in these offerings based on my independent judgment of what was in Iroquois' best interests.  I did not communicate with any other Defendant about any of the May registered direct offerings or rely on whether any other Defendant was participating in these offerings.

26.    In connection with this litigation, I was made aware of an internal SEG memorandum dated May 28, 2020, that states, in part, SEG "received a call from Anson and Iroquois asking if the company was willing to sell common stock off its shelf registration statement at $1.50."  I had not seen this memorandum prior to this litigation, nor do I know its listed author, Dan Ripp.  In any event, the statement I have quoted in this paragraph is not accurate if it was meant to mean that SEG received a call from Anson and Iroquois together.  I did not participate in a phone call with SEG and Anson (or any other Defendant, for that matter) about the registered direct offerings or any other investment in Genius.

## VIII.    The May Stockholder Vote

27.    I did not communicate with any Defendant regarding the shareholder vote that took place in connection with Genius' May 15, 2020 Annual Meeting of Stockholders.  Iroquois did not have any shares as of the record date to vote.

## IX.    The Leak-Out Agreements

28.    In May 2020, SEG informed me that Genius offered to register the shares of common stock that would be obtained through the exercise of warrants issued in the March 2020

7

Transaction on the condition that Iroquois sign a leak-out agreement (the "May Leak-Out Agreement"). Pursuant to the May Leak-Out Agreement, Iroquois agreed that, if Genius common stock traded below $1.65, it would not sell shares of Genius common stock exceeding a certain percentage of the trading volume of common stock for 90 days after the share registration.

29. In June 2020, the Company offered to register shares of common stock that would be converted from the convertible notes issued in the March 2020 Transaction in exchange for another leak-out agreement (the "June Leak-Out Agreement'). Under the June Leak-Out Agreement, Iroquois agreed that, if Genius common stock traded below $2.00, it would not sell shares of Genius common stock exceeding a certain percentage of the trading volume for a period of 30 days after the share registration.

30. Although I did not want to enter into the Leak-Out Agreements, I decided independently that it would be in Iroquois' best interests to do so because Genius made those agreements a condition of registering the common stock that Iroquois could obtain from the March 2020 Transaction. Genius' registration of the shares was important to me because Genius' stock price had increased significantly and registration would allow me to sell Iroquois' shares. In making these decisions, I considered the stock prices and trading volumes around the time of signing each Leak-Out Agreement and believed that the agreements were unlikely to impact Iroquois' ability to trade and monetize its position. As it turned out, neither Leak-Out Agreement was triggered on the day the relevant shares were registered because Genius common stock was trading above the price threshold imposed by each agreement.

31. I did not communicate with any other Defendant about the May or June Leak-Out Agreements. And, in deciding to enter into the May and June Leak-Out Agreements and the conversion agreement regarding the convertible notes issued in March, I did not consider whether

8

any other Defendant was agreeing to do so—indeed, at the time that I executed each Leak-Out Agreement, I did not know if any other Defendant would do the same.

## X.    Iroquois' Trading after Share Registration

32.    On June 11, 2020, Genius filed a prospectus with the SEC for the sale of 60,100,617 shares of common stock.

33.    On July 8, 2020, Genius filed a prospectus with the SEC for the sale of 59,523,812 shares of common stock.

34.    I made the decision for Iroquois to trade the shares registered pursuant to the prospectus based on my independent judgment of what was in Iroquois' best interests.  I did not communicate with any other Defendant or rely on whether any other Defendant was selling their shares.

*********************

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: January 14, 2025

Richard Abbe

10