# Exhibit 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

               Plaintiff,                            Civil Action No. 1:22-cv-00249-AS

       v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; RICHARD MOLINSKY,

               Defendants,

      -and-

KARTOON STUDIOS, INC.,

               Nominal Defendant.

## DECLARATION OF RYAN MATTHEW LANE

1.     I, Ryan Matthew Lane, submit this Declaration in support of Defendants' Motion for Summary Judgment. This Declaration is based on my personal knowledge and review of business records.

2.     I am a founder and managing member of the general partner of Empery Asset Management, LP ("EAM"), alongside Martin Hoe. Empery Asset Master, LTD, Empery Debt Opportunity Fund, LP, and Empery Tax Efficient, LP (the "Empery Funds" and together with EAM, "Empery") are investment funds. EAM is the investment manager of the Empery Funds

and has discretionary authority to vote and dispose of securities held by the Empery Funds.

3.      Empery Asset Master, LTD is incorporated in the Cayman Islands.  Empery Asset Management, LP, Empery Debt Opportunity Fund, LP, and Empery Tax Efficient, LP are each limited partnerships formed in Delaware.

4.      In our capacity as managing members of the general partner of EAM, Martin Hoe and I share equal voting and dispositive power with respect to Empery's investments.  In order for Empery to make an investment on behalf of its limited partners, Mr. Hoe and I must agree.

5.      Utilizing my own independent judgment, I made the decision on behalf of Empery to investment in Genius Brands International, Inc. ("Genius" or the "Company"), a public company listed on NASDAQ, and Mr. Hoe approved.  We did not coordinate with any other Defendant when we made this decision.

6.      Empery did not, singularly or in the aggregate, beneficially own 10% or more of Genius securities at any time.

7.      I am familiar with the principals and managers of the Defendants in this action. While I maintain professional relationships with certain of the principals of the investment managers of the other Defendants, they are competitors of Empery.  Empery does not coordinate or discuss its investment decisions with any other investment managers, and it did not do so here. Each and every decision made by Empery with respect to its investment in the Company was made by Empery (and Empery alone).

I.      **Empery Routinely Invests in PIPE Transactions Alongside Parallel Investors**

8.      Empery invests in public companies through a variety of different transaction structures, including via a private investment in public equity ("PIPE").

9.      Since its founding in 2008, Empery has participated in several hundred PIPE

2

transactions.  More than 95% of the PIPE transactions in which Empery participates are "parallel investments," meaning that Empery is participating alongside other investors in those transactions.

10.    Most PIPE transactions begin with a placement agent, retained by an issuer, contacting Empery to gauge its potential interest in a particular investment.  Typically, the placement agent will provide limited details about the issuer, including the sector of the market to which the issuer belongs and its market capitalization.  The placement agent will ask if Empery is interested in "coming over the wall" to receive non-public information about a potential transaction.  If we agree, we will place the issuer on Empery's restricted list and diligence the company and the transaction.

11.    At times, Empery is approached to serve, or will volunteer to serve, as a "lead" investor for a particular financing.  And at other times, Empery is approached to participate in a transaction in which a lead investor has already begun negotiating the terms of the transaction with the issuer and/or the issuer's placement agent.

## II.    Empery is Fiercely Independent

12.    Empery has built a reputation as a fiercely independent investment manager that acts in the best interest of its own limited partners at all times.  Mr. Hoe's and my sole focus is our fiduciary obligations to the limited partners of the Empery Funds.  We are not afraid to demand terms that we deem to be appropriate or necessary for our limited partners, and we are not afraid to walk away from potential transactions in which issuers are unwilling to provide the terms that we require for a particular investment.

13.    Over the course of more than 15 years of PIPE investments, we have learned to focus a significant amount of time on the nuance of terms and specific provisions of the transaction documents.  PIPEs are not cut-and-paste or "form" investment structures.  The terms of an

3

investment can be complex, and documenting those terms in transaction documents, which are often rapidly and dynamically negotiated, can be surprisingly difficult.

14.     For that reason, in 2014, Empery hired Brett Director as in-house counsel.  Mr. Director has over 25 years of experience during which he has worked on hundreds of PIPE transactions.  Prior to joining Empery, Mr. Director worked for many years in the business transactions group of a top law firm in New York City that was specifically known for its expertise in PIPE transactions.  He was also outside counsel to Empery for virtually all of its PIPE investments prior to joining Empery.  Given his experience, Mr. Director is intimately familiar with the terms and provisions necessary to ensure that Empery properly documents the negotiated terms and provisions for the benefit of its limited partners.

15.     Accordingly, Empery routinely conducts a thorough review of the transaction documents before any investment decision is made, and often takes a heavy hand in revising those transaction documents.  That is the case whether Empery is a lead investor or not.

16.     In my role as a managing member of the general partner, I personally evaluate and consider every single transaction that is presented to Empery and determine, based on my own independent professional judgment, whether or not the transaction is an investment that I believe would create value for the limited partners.  As mentioned, I share equal investment voting power with my partner, Mr. Hoe, who also evaluates and considers transactions that are presented to Empery.  We do not coordinate our investment decisions with any other investment manager or investor.

**III.     Lead up to the March 2020 Transaction**

17.     Special Equities Group ("SEG") is a placement agent that brings investment opportunities to Empery with some frequency.  Empery has participated in several transactions,

including PIPE transactions, in which SEG has acted as a placement agent.  Jonathan Schechter and Joe Reda are SEG's principals.  Mr. Schechter and Mr. Reda are business acquaintances of mine.  I know them to be aggressive salesmen.

18. Prior to the March 11, 2020 PIPE transaction (the "March 2020 Transaction"), SEG contacted me several times about a potential Genius capital raise.  Empery previously participated in Genius capital raising transactions, including a 2017 PIPE transaction in which Empery acquired Genius common stock and warrants.

19. In August 2019, Mr. Reda contacted me to see if I had any interest in a Genius transaction.  I told Mr. Reda that there was "no chance" that I would invest in Genius at that time. I did not believe that investing more capital in Genius at that time was in the best interest of the Empery Funds' limited partners.  Thus far, Empery had not made any money on its investments in Genius.

20. In September 2019, Mr. Reda contacted me again.  Despite Mr. Reda's sales efforts, I told him that I would not consider any investment in Genius.  I promptly added Genius to a list of securities that Empery will not trade.  In my communications with Mr. Reda, I facetiously referred to Mr. Heyward as a "dirtbag" and "criminal" because I was displeased with the lack of shareholder value creation.  Mr. Heyward is neither a "dirtbag" nor a "criminal."

21. In December 2019, Mr. Reda contacted me to ask if I wanted to participate in a Genius capital raising transaction whereby existing investors could exercise warrants at a reduced strike price.  Additionally, in exchange for exercising these warrants, the investor would receive new warrants also exercisable at a reduced strike price.  In connection with this transaction, Empery exercised 300,000 of its October 2017 warrants for $0.21 per share in cash and received new 5.5-year warrants exercisable for up to 300,000 shares with an exercise price of $0.21 per

5

share.

22.     I made the decision for Empery to participate in this transaction based on my independent assessment, in coordination with Mr. Hoe, of the transaction terms, which were economically attractive from Empery's standpoint.  I did not communicate, or coordinate, with any other investor (much less any other Defendant) about any aspect of this transaction.  Whether any other Defendant participated in this transaction was not a consideration in my decision-making process.

**IV.     The March 2020 Transaction**

23.     From January 2020 to March 2020, SEG routinely emailed me about participating in what would become the March 2020 Transaction.  Once Empery agrees to "cross the wall," SEG is often relentless when it comes to pushing Empery to commit to an investment amount and close a transaction.  That was certainly the case here.

24.     On January 22, 2020, Empery agreed to "come over the wall" to get information about the proposed Genius PIPE transaction.  Empery decided to consider this investment in Genius because the terms of the proposed investment improved significantly for the benefit of Empery.  In his email to me, Mr. Reda claimed that the lead investor, Anson, wanted Empery in the deal.  I immediately understood that this was a sales tactic, consistent with the way that Mr. Reda communicates, and I disregarded the statement in his email, which I did not believe to be true and was meaningless to me in any event.

25.     That same day, Mr. Reda emailed Empery the term sheet that Anson and Genius negotiated, memorializing the proposed terms of the March 2020 Transaction.  I did not communicate, or coordinate, with any other Defendant (or anyone else) about the terms of the proposed term sheet before Anson and Genius executed it.

6

26.    Over the course of the next four-to-six weeks, Mr. Reda and Mr. Schechter consistently checked in with me to probe about the amount I was committing to the transaction, often proposing amounts that they wanted me to commit.  As my emails reflect, each and every time, I told them, in sum and substance, that the conversation was not worth having until I saw where the lawyers came out on the transaction documents.

27.    Ultimately, when transaction documents were finally prepared and provided to me in early March 2020, Mr. Reda reached out once again, specifically on March 4, 2020, to ask for a commitment amount.  I told Mr. Reda that I needed to discuss the transaction "internally."  One day later, Mr. Reda emailed me about the proposed transaction, suggesting that Empery invest $3 million.  I told Mr. Reda that there was "no chance" Empery would invest that amount in the transaction.  I did not communicate, or coordinate, with any other Defendant about the amount of capital Empery intended to invest in the transaction.

28.    Following extensive negotiation of the transaction documents and once I was satisfied with the details in the documents, Empery made the decision to invest $1.5 million in the March 2020 Transaction.  I did not communicate, or coordinate, with any other Defendant about the price or terms of the transaction documents, including the Stock Purchase Agreement and the ancillary documents thereto.

29.    Empery made this decision because Empery negotiated what it believed to be the most favorable terms given the circumstances for the benefit of its limited partners.  Empery did not communicate, or coordinate, with any other Defendant when it made this decision.  Whether any other Defendant participated in this transaction was not a consideration in my decision-making process.  My decision on behalf of Empery was based solely on whether I thought there was an economic benefit for the Empery Funds' limited partners.  Moreover, I did not tell SEG (or anyone

7

else) that I wanted any other Defendant to participate in any proposed transaction.

## V.    The March and May 2020 Registered Direct Offerings

30.    Following the close of the March 2020 Transaction, SEG contacted me to solicit Empery's investment in a proposed registered direct offering of Genius common stock. Mr. Reda informed me that Anson was participating in the proposed offering. I told Mr. Reda I thought that was "one of the dumbest things I have ever heard" and that Empery "would have no part" in the transaction, given that the March 2020 Transaction just closed, and Mr. Reda was proposing a far inferior structure to what was just completed. Empery did not participate in the March 2020 registered direct offering.

31.    From March 2020 to May 2020, Genius's stock price appreciated with increased volume. Genius conducted four registered direct offerings, on May 7, May 8, May 18, and May 28, 2020. Empery participated in each of these offerings and purchased shares based on its percentage participation in the March 2020 Transaction. I made the decision for Empery to participate in these offerings based on my independent judgment taking into consideration what was in Empery's best interest. I did not communicate, or coordinate, with any other Defendant when I made the decision to participate in these offerings. Again, whether any other Defendant participated in these transactions was not a consideration in my decision-making process. My decision on behalf of Empery was based solely on whether I thought there was an economic benefit to the limited partners.

## VI.    The May 15, 2020 Stockholder Vote

32.    On May 15, 2020, Genius held its Annual Meeting of Stockholders. In connection with the stockholder vote to lower the conversion price on the convertible notes and the exercise price on the warrants issued in the March 2020 Transaction, I did not communicate, or coordinate,

8

with any other Defendant about whether, or how, Empery would vote its shares. Moreover, if, or how, any other Defendant voted its shares was not a consideration in my decision-making process.

## VII. The Leak-Out Agreements

33. When I originally considered participating in the March 2020 Transaction, I did not want the transaction to include registration rights. Empery believed that a registration statement for all of the shares underlying the convertible notes and warrants would be unlikely to pass Securities and Exchange Commission ("SEC") review; therefore, expending the time and resources negotiating resale registration rights for no benefit made no sense. Moreover, I was concerned that the filing of a registration statement might impact the share price of the Company at a point in time when the registration statement was unlikely to receive SEC approval, meaning the filing could impact the stock price for no good reason. I understand that Mr. Director communicated Empery's demands relating to this issue to SEG and Robert Charron, (Anson's outside counsel, who, as counsel to the lead investor, was in charge of drafting the March 2020 transaction documents), along with Mintz Levin, the Company's outside counsel.

34. In May 2020, Genius stock price was starting to move substantially higher, and volume was trending higher. Given this, I contacted SEG to request that Genius register the shares underlying the warrants Empery received in the March 2020 Transaction. I asked for the registration of the shares because the warrants now represented significant value for Empery as they were now substantially "in the money" (common stock trading higher than the exercise price of the warrants). If the shares were not registered, Empery would have had to wait another four months before it could sell these shares as prescribed by SEC Rule 144 ("Rule 144") (*i.e.,* 6 months from the issuance date). That was an obvious and significant risk given the volatile circumstances of the Company and the market for the securities.

35.    I understood that my request would be attractive to the Company given that Empery, upon its election to exercise those warrants, would be required to exercise the warrants for cash (instead of a cashless exercise under the Rule 144 scenario) once the warrant shares were registered for resale.  A cash exercise of the warrants issued in March 2020 Transaction would mean that the proceeds of such exercises would flow directly to the Company, which is exactly what it needed.  The Rule 144 scenarios would have allowed Empery to exercise on a cashless basis, which would have yielded the company zero cash proceeds.

36.    The Company agreed to register the shares provided that Empery agreed to sign a leak-out agreement (the "May Leak-Out Agreement").  I understand that the same offer was made to each of the other Defendants, though I had no communication with any such Defendant.  It is also not surprising to me that my request, if granted by the Company, would lead to the offer being made to each of the other Defendants.  Investors in a parallel transaction are almost exclusively treated equally under the transaction documents based on fundamental principles of fairness.

37.    Under the May Leak-Out Agreement, Empery agreed that, if Genius common stock traded below $1.65, it would not sell shares of Genius common stock exceeding a certain percentage of the trading volume of common stock for 90 days after the share registration.

38.    In June 2020, the Company offered to register shares of common stock issuable upon conversion of the convertible notes issued in the March 2020 Transaction in exchange for another leak-out agreement (the "June Leak-Out Agreement," together with the May Leak-Out Agreement, the "Leak-Out Agreements").  Pursuant to the June Leak-Out agreement, Empery agreed that, if Genius common stock traded below $2.00, it would not sell shares of Genius common stock exceeding a certain percentage of the daily trading volume for a period of 30 days after the share registration.

39.     I agreed to the enter into the Leak-Out Agreements based on my own independent judgment, in coordination with Mr. Hoe, and consideration of the facts and circumstances. I independently concluded that it was economically in the best interest of Empery to enter into the Leak-Out Agreements following my assessment of Genius's stock price, trading volumes and risks.

40.     Frankly, that conclusion was an obvious one. The objective for Empery and its limited partners was to reduce risk exposure to a position that had become disproportionately large for our funds, by realizing profits by selling down our position. Moreover, based on my assessment, I did not believe that the Leak-Out Agreements would significantly restrict Empery's ability to sell its shares, or at all. Without the Leak-Out Agreements, Empery would not have registered shares to sell and therefore ability to sell down the position and reduce exposure. Indeed, the Leak-Out Agreements did not restrict Empery's trading at all because Genius's share price never reached the threshold share price for the restrictions to come into effect.

41.     I did not communicate, or coordinate, with any other Defendant about the terms of the Leak-Out Agreements. In deciding to agree to enter into the Leak-Out Agreements, whether any other Defendant was also agreeing to do so was irrelevant to my decision. My decision on behalf of Empery was based solely on whether I thought there was a benefit to Empery and its limited partners. My goal was to have the ability to reduce the exposure to the position. Registration allowed this and agreeing to the Leak-Out Agreements was a small and obvious compromise.

## IX.    The June 2020 Conversion Agreement

42.     On June 23, 2020, Empery entered into an agreement with Genius whereby Empery exchanged the convertible notes from the March 2020 Transaction for common shares underlying

11

the convertible notes (the "June 2020 Convertible Agreement").

43.    I did not communicate, or coordinate, with any other Defendant about the terms of, or my decision to enter into, the June 2020 Conversion Agreement.  Moreover, in deciding whether to enter into the June 2020 Conversion Agreement, I did not consider whether any other Defendant would do the same.

## VIII.    The June 2020 & July 2020 Prospectus

44.    On June 11, 2020, Genius filed a prospectus with the SEC for the proposed resale of 60,100,617 shares of common stock.

45.    On July 8, 2020, Genius filed a prospectus with the SEC for the proposed resale of 59,523,812 shares of common stock issued upon conversion of the 2020 convertible notes.

46.    Empery sold shares registered pursuant to both the June 11, 2020 and the July 8, 2020 prospectus.  In doing so, I did not communicate, or coordinate, with any other Defendant about my decision to trade those shares.  My decision was based on my own independent professional judgment, and whether any other Defendant decided to do the same was not a consideration in my decision-making process.  My decision on behalf of Empery was based solely on whether I thought there was a benefit to Empery and its limited partners.

_____

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: _January 15, 2025_

_____
Ryan Lane

12