# Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD AUGENBAUM, <br><br> Plaintiff, <br><br> v. <br><br> ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY, <br><br> Defendants, <br><br> -and- <br><br> KARTOON STUDIOS, INC., <br><br> Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

**DECLARATION OF SAM WINER**

1.      I am Sam Winer, an authorized signatory of Heights Capital Management, Inc. ("Heights"), which is the investment advisor to and authorized agent of CVI Investments, Inc. ("CVI").  I submit this declaration in support of CVI's motion for summary judgment in the above-captioned action.  I have personal knowledge of the facts set forth herein and could competently testify to them at trial.

2.      Heights has discretionary authority to manage CVI's investments, including acquiring, voting and disposing of CVI's investments.  I am the person at Heights and

CVI who was principally responsible for making CVI's investment decisions regarding its acquisition, holding and sale of securities issued by Genius Brands International, Inc. ("Genius").[1]

**Plaintiff's Allegations**

3.      I understand that Plaintiff Todd Augenbaum asserts in this action that CVI formed a group with (i) Anson Investment Master Fund LP ("Anson"), (ii) Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund, LP ("Brio"), (iii) Empery Asset Master, LTD, Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP and Empery Asset Management, LP ("Empery"); (iv) Iroquois Master Fund Ltd. and Iroquois Capital Investment Group LLC ("Iroquois"); (v) L1 Capital Global Opportunity Master Fund ("L1 Capital"); (vi) M3A LP ("M3A"); and (vii) Richard Molinsky ("Molinsky") (collectively, the "Purported Group Members") for the purpose of acquiring, holding, voting or disposing of equity securities of Genius.  Plaintiff is wrong.

4.      CVI did not agree to act together with any of the Purported Group Members (or anyone else) for the purpose of acquiring, holding, voting or disposing of equity securities of Genius.  All decisions regarding the acquisition, holding, voting and disposing of Genius securities held by CVI were made by CVI through Heights, principally by me in consultation with my colleagues.

5.      I did not have any discussion or communication with any Purported Group Member regarding Genius or CVI's investment in Genius.  All decisions regarding CVI's investment in Genius were made by me and my colleagues at Heights and for the sole benefit of

---

[1]    My discussions of my investment decisions in this declaration refer to my investment decisions for CVI on behalf of Heights.  I did not personally invest in Genius securities.

CVI.  I did not rely upon the fact that any other Purported Group Member was investing in Genius—to the extent such a fact was even known to me—in making investment decisions with respect to Genius.

6.    While I have met certain individuals affiliated with certain members of the Purported Group on various occasions, I do not regularly interact with any of them.  I do not confer or coordinate any CVI investment decisions or trading activity with any of the Purported Group Members.

7.    My understanding is that the Purported Group Members invest in at least some of the same categories of investments as CVI.  I therefore view the other Purported Group Members as competitors, competing for a finite number of potential transactions.

**The March 11, 2020 Transaction**

8.    In an ordinary year, I evaluate approximately 900 potential transactions. Of those, I determine to invest in approximately 180 transactions.  Approximately 4 transactions per year are brought to my attention by Special Equities Group, LLC ("SEG"), a provider of banking advisory services that served as a placement agent for Genius during the times relevant to this action.

9.    I understand that Plaintiff's proffered expert Max Holmes has made certain allegations regarding an October 10, 2019, electronic mail exchange that I had with Mr. Joe Reda of SEG.  (GD Ex. 31, Holmes Supp. Rep. ¶ 32, citing GD Ex. 119, CVI_0001089.)[2]  In that email exchange, I provided Mr. Reda with my initial impressions of a draft term sheet that SEG had sent to me soliciting CVI's investment in a proposed "PIPE" (private investment in public equity") transaction to raise capital for Genius.  I did not agree in that email exchange that

---

[2]    Citations follow the formats used in Defendants' summary judgment motion papers.

CVI would invest in any transaction involving Genius. To the contrary, I noted that the proposed transaction would "be difficult to do" and likely sought to raise too much capital "[g]iven the Company's market cap and liquidity."

10. Mr. Holmes construes my response to Mr. Reda as "hanging around the hoop" and asserts that "I [was] interested but the terms need[ed] to be sweetened." (GD Ex. 31, Holmes Supp. Rep. ¶ 33.) I do not believe I have ever spoken to Mr. Holmes and his guess at my state of mind does not correctly interpret the exchange. I was not interested in the transaction that was proposed. While I was willing to consider alternative terms, my evaluation would depend on the terms proposed and the then-existing market conditions. I did not agree to do anything further in this email exchange.

11. I also received an email from SEG on January 23, 2020, attaching a different term sheet relating to Genius. (GD Ex. 152, EW-AUG0012979.) While this term sheet did not implement the comments I had provided to SEG on October 10, 2019, I did consider its terms. Mr. Holmes characterizes this email from SEG as a "sales pitch" (GD Ex. 31, Holmes Supp. Rep. ¶ 39), and it is true that I had not agreed to participate in any transaction regarding Genius at that point in time. I did not sign a term sheet relating to this Genius transaction.

12. On January 29, 2020, I responded to SEG's sales pitch by advising that I was "[w]aiting for documents. Devil will be in the details." I observed that the transaction would be "significantly less attractive" if NASDAQ, the stock exchange on which Genius was listed, "impose[d] a floor" on the conversion price contemplated in the transaction. (GD Ex. 163, CVI_0001198.) As that email exchange reflects, at that point in time, I had made no decision regarding whether CVI would invest in a potential Genius transaction.

13.     It was not until March 2, 2020 that I received drafts of certain of the proposed Genius transaction documents from SEG.  Two days later, I informed SEG that "I'll take a look at the documents today and let you know if we want to participate."  (GD Ex. 265, CVI_0001209, at -209.)

14.     On March 5, 2020, I provided comments to SEG on the transaction documents that SEG had provided on March 2, and I indicated that CVI was "[c]ontemplating doing $1 million if the remaining documents look good."  As that email exchange reflects, CVI had not made an investment decision as of this date.  (GD Ex. 195, CVI_0001223, at -224.)

15.     On March 10, 2020, SEG provided me with copies of the proposed transaction documents.  I noted that certain documents were missing, and asked SEG certain questions about the draft documents.  Later that evening, I provided signature pages to SEG to be held pending finalization of the transaction.  (GD Ex. 266, CVI_0001801; GD Ex. 267, EW-AUG0016370.)

16.     In connection with the March 2020 transaction, CVI also provided its consent to the transaction and waived certain rights it had pursuant to the terms of prior investments it had made in Genius.  I provided CVI's signature page to the waivers and consents with the signature pages to the March transaction documents.  CVI determined to execute the waivers and consents independently and based on CVI's best interests.  I did not discuss the waivers and consents with any of the Purported Group Members.

17.     On March 11, 2020, SEG circulated the final executed transaction documents.  (GD Ex. 203, EW-AUG0016222.)

18.     Plaintiffs' proffered expert Mr. Holmes suggests that the terms of the March 11, 2020 transaction were extremely favorable to the investors in that transaction.  In my

view, Mr. Holmes misunderstands the transaction, the economic climate that existed at the time and the nature of investments of this type.

19.     Although the Genius transaction ultimately resulted in a favorable outcome for CVI, CVI had no way of knowing that when it made that investment. I therefore viewed the transaction as extremely risky, and was unwilling to invest more than $1 million of CVI's money in the transaction notwithstanding requests from SEG that CVI invest a larger amount.

20.     In my view, Genius was in an extremely perilous financial situation at the time, with only a few hundred thousand dollars in cash available to fund its operations. It was far from a forgone conclusion that Genius would survive, let alone be a profitable investment for CVI.

21.     In addition, the market was extremely unsteady at the time of that March 11, 2020 investment, as the COVID pandemic had just begun and it was uncertain how long the pandemic would last or how it would affect the market. I certainly had no way of knowing at the time of the transaction whether the investment would prove to be a profitable one.

22.     Ultimately, I decided on behalf of CVI to invest in the March 11, 2020 transaction based on my evaluation of the totality of the facts and circumstances and CVI's best interests. I did not discuss this decision or the investment with any of the Purported Group Members. Nor did I rely upon the fact that any other Purported Group Member was participating in the March 11, 2020 transaction—to the extent such a fact was even known to me—in making this decision.

**Proposed Genius Transactions Subsequent To The March 11, 2020 Transaction**

23.    Following the March 11, 2020 transaction discussed above, the price of Genius's common stock appreciated rapidly.  I understood that the increased price of Genius allowed it to offer additional shares under its shelf registration pursuant to what is known as the "baby shelf" rule promulgated by the U.S. Securities and Exchange Commission.

24.    During that period, SEG contacted me from time to time asking whether CVI wanted to participate in additional transactions with Genius.  I determined to invest in some but not all of the transactions proposed by SEG on behalf of Genius.  I made a determination regarding each investment opportunity based on my evaluation of the facts and circumstances that existed at the time and CVI's best interests.  I did not communicate with any of the other Purported Group Members regarding any of these subsequent transactions.  Nor did I rely upon the fact that any other Purported Group Member was participating in those subsequent transactions—to the extent such a fact was even known to me—in making decisions whether to participate in them.

25.    Plaintiff's proffered expert Mr. Holmes suggests that these subsequent transactions were "gifts" to CVI and the other investors because they were offered at or below the market price on the day of the transaction.  (GD Ex. 31, Holmes Supp. Rep. ¶¶ 52-53.) Plaintiff's expert, however, misunderstands the risks associated with these transactions.  The price of Genius's stock had significantly increased in the spring of 2020.  There certainly was no guarantee that CVI would be able to sell the stock it acquired in these registered direct offerings at the market price that existed on the day the transaction closed, particularly given the instability in the stock market at the time, and the extreme volatility in Genius's stock price at the time.

7

26. Genius requested that CVI agree to enter into two "leak-out" agreements with Genius as a condition of Genius's agreement to register (i) the shares underlying the warrants issued to CVI and (ii) the securities issuable to CVI upon exercise of the convertible note received as part of the March 11, 2020 transaction. I understood that Genius wanted CVI to enter into those agreements so that CVI would not rapidly sell off its Genius stock following registration of those securities and create a sudden downward spike in Genius's stock price.

27. While I would generally prefer that CVI have no restrictions on its ability to trade securities, I understood why Genius wanted those agreements as a condition of registration, and registration of those Genius securities was valuable to CVI. Accordingly, I decided that CVI would enter into these agreements with Genius. I did not communicate with any of the members of the Purported Group Members about the leak-out agreements. Nor did I rely upon the fact that any other Purported Group Member was entering into a leak-out agreement of their own—to the extent such a fact was even known to me—in deciding whether CVI would enter into one.

28. Those leak-out agreements ultimately had no effect on CVI's trading in Genius securities. The restrictions set forth in the leak-out agreements were operative only if Genius's stock price remained below thresholds set forth in those agreements, and as it happened Genius's stock price exceeded those thresholds at all relevant times.

29. At no time between March 11, 2020 and July 8, 2020, did CVI own more than 10% of CVI's common stock.

**CVI Transactions in Genius Securities**

30.    I determined how to manage CVI's investments in Genius based on CVI's best interests.  This primarily involved trading in call options on Genius stock, and purchasing and selling Genius stock for CVI's account.

31.    CVI did not coordinate its trading in Genius securities with any other person or entity.  Nor did CVI communicate with any Purported Group Member regarding its actual or planned trading in Genius securities.  Nor did CVI rely upon the fact that any other Purported Group Member was trading Genius securities—to the extent such a fact was even known to CVI—in making decisions with respect to its own trades.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 14, 2025, in San Francisco, California.

_____
Sam Winer