# Exhibit 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD AUGENBAUM,<br><br>Plaintiff,<br><br>v.<br><br>ANSON INVESTMENTS MASTER FUND LP;<br>BRIO CAPITAL MASTER FUND LTD.; BRIO<br>SELECT OPPORTUNITIES FUND, LP; CVI<br>INVESTMENTS, INC.; EMPERY ASSET<br>MASTER, LTD.; EMPERY DEBT<br>OPPORTUNITY FUND, LP; EMPERY TAX<br>EFFICIENT, LP; EMPERY ASSET<br>MANAGEMENT, LP; IROQUOIS MASTER<br>FUND LTD.; IROQUOIS CAPITAL<br>INVESTMENT GROUP, LLC; L1 CAPITAL<br>GLOBAL OPPORTUNITIES MASTER FUND;<br>M3A LP; RICHARD MOLINSKY,<br><br>Defendants,<br><br>-and-<br><br>KARTOON STUDIOS, INC.,<br><br>Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

## DECLARATION OF SHAYE HIRSCH

1.  I am Shaye Hirsch, Director of Brio Capital Master Fund Ltd. ("Brio Master") and authorized person of Brio Select Opportunities Fund LP ("Brio Select," and together with Brio Master, collectively "Brio").

2.  I submit this declaration based upon personal knowledge set forth in this Declaration and in support of Defendants' Omnibus Memorandum of Law in Support of their Motion for Summary Judgment and Memorandum of Law in Support of Brio's Motion for Summary Judgment.

## I.    Brio

3.    Brio Master is an investment fund that is a Cayman Islands exempted company. Brio Select is an investment fund that is a Delaware limited partnership.

4.    Brio Capital Management LLC ("Brio Capital"), a nonparty to this action, is the investment manager for Brio Master and Brio Select. I am Managing Member of Brio Capital.

5.    As Managing Member of Brio Capital, I have voting and dispositive power over the Genius Brands ("GNUS") shares held by Brio Master and Brio Select.

6.    Brio Capital has approximately $45 million dollars in assets under management.

7.    Prior to this lawsuit, I was familiar with some, but not all, of the other Defendants or individuals associated with the other Defendants. I do not consider any of these individuals to be personal friends, but rather, they are all competitors, and some are business acquaintances.

## II.    Brio's Investments in GNUS

8.    In 2014, Joe Reda ("Reda") of Special Equities Group ("SEG") introduced me to GNUS. Since that introduction to GNUS in 2014, Brio has participated in multiple investment rounds.

9.    At no point between January 27, 2020 and July 8, 2020 was Brio ever a 10% or greater shareholder of GNUS common stock.

10. Other than GNUS, Brio has made less than ten, but at least two investments in which SEG served as the banker.

11. I met Andy Heyward ("Heyward"), the CEO of Genius Brands ("GNUS"), in or around 2014, when Brio made its first investment in GNUS. I communicated with Heyward concerning GNUS, but do not consider him a personal friend.

12. In making investments in GNUS securities for Brio, I primarily dealt with SEG, the placement agent.

2

13. While Brio is represented by Ellenoff Grossman & Schole LLP ("EGS"), EGS primarily provides Brio with general fund advice, including but not limited to fund formation and SEC filings.

14. I was not represented by EGS or any other counsel in making any of Brio's investments into GNUS at issue in this action.

15. All decisions for Brio to invest into GNUS were made independently by me, based on several years of experience in similar deals.

16. When Brio makes an investment decision, my sole concern is whether a particular investment is in Brio's best interest and, if so, what the size, timing, and structure of such an investment should be in order to maximize Brio's interests.

### III.    September 2019 Proposed Transaction and Brio's Proposed Transaction

17. On September 9, 2019, Heyward contacted me subsequent to a conversation he had with Reda about leading a "friends and family" round of investment in GNUS. I understood that I was invited to this round based on my prior investment in GNUS, not because I am a friend or family member of GNUS. The terms "friends and family" is a term loosely used by many bankers as a way to entice investors.

18. Heyward noted that Reda proposed that Amin Nathoo ("Nathoo") of Anson join the round.

19. I do not consider Nathoo to be a personal friend, or even a business acquaintance.

20. I hesitated to participate in the "friends and family" round because (1) I had reservations about Nathoo's involvement because Brio and Anson have different investment strategies and I was under the impression that Anson's strategy included short selling, which Brio does not do, and (2) I was contemplating my own proposed investment into GNUS at the time.

3

21. I asked Robert Charron, an attorney with EGS, for assistance with the documentation and structure of my proposed investment into GNUS.

22. I only discussed the proposed investment with counsel, GNUS and a business associate.

23. I did not discuss this proposal with any of the other Defendants in this matter.

24. Ultimately, my proposed investment was not consummated.

**IV.    September 2019 Extension of Maturity of Convertible Note**

25. On September 26, 2019, Michael Jaffa ("Jaffa") of GNUS emailed me an amendment to the secured convertible notes held by Brio, which would extend the date for payment on the note by two years. I informed Jaffa that a two-year extension was too much.  I was told that Anson negotiated an extension of its secured convertible note, and I wanted the same terms.

26. Brio ultimately agreed to extend the maturity date of the convertible notes Brio acquired in 2018 until the earlier of January 31, 2020 or Genius raising $5 million dollars.

27. I did not communicate with Anson, or any other Defendant about the terms of the foregoing extension before entering into it, nor did I rely on any other Defendant's involvement in deciding whether Brio should agree to the extension.

**V.    December 2019 Warrant Exercise**

28. On December 9, 2019, Jonathan Schechter ("Schecter") of SEG sent me an email informing me that they were working on a warrant exchange for GNUS. Schechter informed me that "In exchange for [Brio] immediately exercising [its] Warrants . . . for $0.21 in cash the company will issue [Brio] a new 5 year Warrant at $0.01 above the current market price at the time of the transaction."

29. I told Schechter that I was interested but needed more information.

30. As of December 9, 2019, Brio held (i) 150,000 registered warrants dated October 4, 2017

4

with a strike price of $3.90; and (ii) 200,000 warrants dated August 17, 2018 with a strike price of $3.00.

31. On December 12, 2019, Schechter informed me that Brio had 350,000 Warrants that were eligible for participation in the December 2019 Warrant Exercise.

32. Brio exercised (1) 150,000 of its October 4, 2017 warrants, and (2) 200,000 of its August 17, 2018 warrants for $0.21 in cash. Brio received new 5.5-year warrants for 200,000 shares.

33. I did not communicate with any other Defendant concerning the December 2019 Warrant Exercise prior to participating in it, nor did I rely on any other Defendant's participation in the December 2019 Warrant Exercise in deciding whether Brio should participate in the December 2019 Warrant Exercise.

## VI.    The March 2020 PIPE Transaction

34. In January 2020, Reda contacted me by email, attaching a version of a proposed term sheet for an investment in GNUS; he requested my comments. Among other things, I commented that the right of participation only seemed to protect Anson, and that I would want Brio to have a 25 to 50 percent right of participation as well.

35. I also informed Reda and Schechter that I would invest $650,000-$700,000 but wanted confirmation that I could place an additional $1,000,000 into the debt deal.

36. I did not communicate with anyone at Anson, or any other Defendant about the term sheet, or how much Brio would invest.

37. This deal went through a number of variations in January and February 2020, prior to settling on final terms in March 2020.

38. In March 2020, following NASDAQ approval, Schechter emailed me the transaction documents, including the March 11, 2020 Stock Purchase Agreement and the Master Netting

5

Agreement.

39. The Stock Purchase Agreement referenced a Voting Agreement and Lock-Up Agreement for Principal Stockholders. I did not communicate with any Defendant about the terms of the Voting Agreement or the Lock-Up Agreement, nor was Brio a party to either of these agreements.

40. Brio entered into the March 11, 2020 Stock Purchase Agreement with Genius.

41. Pursuant to the March 11, 2020 Stock Purchase Agreement, Brio purchased $1,750,000 in convertible notes and 8,333,333 warrants.

42. Prior to entering the Stock Purchase Agreement, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction.

43. Brio entered into the Master Netting Agreement with Genius. Prior to entering the Master Netting Agreement, I did not communicate with any Defendant about its terms, nor did I rely on the involvement of any Defendant in this transaction when deciding whether to enter into the Master Netting Agreement.

44. Brio invested approximately $1.4 million into the March 11, 2020 PIPE Transaction.

45. Brio was not represented by counsel in the March 11, 2020 PIPE Transaction.

VII.    **March 22, 2020 Registered Direct Offering**

46. On March 21, 2020, Reda sent me an email informing me that "Anson . . . and GNUS agreed to terms over the weekend for a common stock deal off the shelf at $0.2568. This will be considered an 'at market' deal for NASDAQ. Anson is buying 9.9% of the company (~$650k) and is bullish after listening to the GNUS conference call on Friday and reading the PR.".

47. On March 22, 2020, Schechter again followed up with me about this.

6

48. I informed Schechter and Reda that Brio would "do $300k" in the proposed registered direct offering.

49. Schechter sent me a stock purchase agreement for this registered direct offering, which I signed.

50. Brio participated in the March 22, 2020 Registered Direct Offering, purchasing 1,168,224 shares.

51. Prior to entering the March 22, 2020 Registered Direct Offering, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction.

## VIII.    May 7, 2020 Registered Direct Offering

52. Brio participated in the May 7, 2020 Registered Direct Offering by entering into a securities purchase agreement.

53. Brio purchased 1,000,000 shares of common stock at $0.35 per share.

54. Prior to entering the May 7, 2020 Registered Direct Offering, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction.

## IX.    May 8, 2020 Registered Direct Offering

55. On May 8, 2020, Brio entered into another securities purchase agreement with GNUS pursuant to which Brio purchased 1,000,000 shares of common stock at $0.454 per share.

56. Prior to entering the May 8, 2020 Registered Direct Offering, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the

involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction.

### X.    May 15, 2020 Stockholder Vote

57. I voted by proxy prior to the May 15, 2020 Annual Shareholder Meeting.

58. I "voted for everything."

59. I did not communicate with anyone at GNUS about my vote prior to voting.

60. I did not communicate with any Defendant prior to the May 15, 2020 vote about any of the matters that were subject to a shareholder vote, nor did I rely on the involvement of any Defendant when deciding Brio's vote.

### XI.    The May 18, 2020 Registered Direct Offering

61. Brio participated in another registered direct offering on May 18, 2020 and purchased 400,000 shares for $1.20 per share.

62. Prior to entering the May 18, 2020 Registered Direct Offering, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction.

63. In connection with the May 18, 2020 Registered Direct Offering, Brio was required to sign a leak-out agreement with Genius to limit the amount of shares that it could sell upon the registration statement becoming effective.

64. Prior to entering the May 18, 2020 Leak-Out Agreement, I did not communicate with any Defendant about its terms, nor did I rely on the involvement of any Defendant when deciding whether Brio should enter into the May 18, 2020 Leak-Out Agreement.

8

## XII.     The May 28, 2020 Registered Direct Offering

65. Brio participated in another registered direct offering on May 28, 2020 and purchased 500,000 shares for $1.50 per share.

66. Prior to entering the May 28, 2020 Registered Direct Offering, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction.

## XIII.     June 2020 Prospectus to Register Genius Shares

67. On June 4, 2020, GNUS filed a registration statement for the sale of 60,100,617 shares of common stock- approximately half of which were obtained by Defendants pursuant to the cashless exercise of previously issued warrants. On June 10, 2020, the SEC filed a notice declaring GNUS's registration statement effective.

68. On June 11, 2020, Genius filed a prospectus for the sale of 60,100,617 shares of common stock.

69. Brio sold about 37% of its GNUS shares.

70. I did not communicate with any Defendant about how many warrants Brio would exercise on a cashless basis before the June 2020 registration statement went effective, nor did I rely on any Defendant exercising warrants when deciding whether and how many warrants Brio would exercise.

71. Prior to selling Brio's GNUS shares, I did not communicate with any Defendant regarding the timing or amount of GNUS shares Brio would sell (or whether Brio would sell shares), nor did I rely on any other Defendant selling its shares (or not selling its shares) in determining whether and in what amount Brio would sell its GNUS shares.

## XIV.    The June 23, 2020 Conversion Agreement and Leak-Out Agreement

72. In June 2020, Brio individually entered into a conversion agreement with GNUS which required that Brio also enter into a leak-out agreement.

73. Prior to entering into the June 23, 2020 Conversion Agreement, I did not communicate with any other Defendant about its terms, nor did I rely on any other Defendant entering (or not entering) a Conversion Agreement when determining whether Brio would enter into the Conversion Agreement.

74. Prior to entering into the Leak-Out Agreement, I did not communicate with any other Defendant about its terms, nor did I rely on any other Defendant entering (or not entering) a Leak-Out Agreement when determining whether Brio would enter into the Leak-Out Agreement.

## XV.    July 8, 2020 Prospectus

75. In July 2020, GNUS filed a prospectus for the proposed sale of shares of common stock by certain investors upon conversion of their respective 2020 convertible notes. After the registration of shares issued upon conversion of the convertible notes became effective, Brio sold roughly 43% of its remaining shares.

76. I did not communicate with any other Defendant about whether Brio would sell GNUS shares, how much Brio would sell, or the timing of Brio's sale of GNUS shares, nor did I rely on any other Defendant selling shares in making my determination for Brio to sell its GNUS shares.

_____

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on:  _JAN 15, 2025_

Shaye Hirsch

10