# Exhibit 11

Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

_____

                                )

TODD AUGENBAUM,                  )

               Plaintiff,  )

          v.                     ) 1:22-cv-00249-AS

ANSON INVESTMENTS MASTER         )

FUND LP, et al.,                 )

               Defendants. )

_____)

DEPOSITION OF AMIN NATHOO

MONDAY, SEPTEMBER 30, 2024

9:30 a.m.

--- This is the VIDEOTAPED 30(b)(6) DEPOSITION of AMIN NATHOO, held via Veritext Legal Solutions' virtual Zoom platform, with all participants attending remotely, on the 30th day of September, 2024.

------------

Court Reporter:  Deana Santedicola, RPR, CSR, CRR

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFF:


     ABRAHAM FRUCHTER & TWERSKY LLP

     450 Seventh Avenue, 38th Floor

     New York, New York 10123

     BY: JEFFREY S. ABRAHAM, Esq.

     jabraham@aftlaw.com

     MICHAEL KLEIN, Esq.

     mklein@aftlaw.com


ON BEHALF OF THE BRIO DEFENDANTS:


     ELLENOFF GROSSMAN & SCHOLE, LLP

     1345 Avenue of the Americas

     New York, NY 10105

     BY: ALDONSA V. JANJIGIAN, Esq.

         ajanjigian@egsllp.com

         JOANNA COHEN, ESQ.

         jcohen@egsllp.com

Page 3

A P P E A R A N C E S (CONT'D):

ON BEHALF OF THE DEFENDANT EMPERY FUNDS:

    FRESHFIELDS BRUCKHAUS DERINGER, LLP
    3 World Trade Center.
    175 Greenwich Street
    New York, NY
    BY: ANDREW GLADSTEIN, Esq.
    andrew.gladstein@freshfields.com
    AMELLA VISO, Esq.
    amella.viso@freshfields.com
    SHANNON SCIARETTA, Esq.
    shannon.sciaretta@freshfields.com

ON BEHALF OF THE IROQUOIS DEFENDANTS:

    LATHAM & WATKINS, LLP
    1271 Avenue of the Americas
    New York, NY 10020
    BY: WILLIAM O. RECKLER, Esq.
    william.reckler@lw.com
    IRIS XIE, Esq.
    iris.xie@lw.com

A P P E A R A N C E S (CONT'D):


ON BEHALF OF ANSON DEFENDANTS AND THE WITNESS:


        HOGAN LOVELLS LLP

        390 Madison Avenue

        New York, NY 10017

        BY: DENNIS TRACEY, Esq.

        dennis.tracey@hoganlovells.com

&

        609 Main St.

        Suite 4200

        Houston, TX 77002

        BY: CATHERINE BRATIC, Esq.

        catherine.bratic@hoganlovells.com


ON BEHALF OF DEFENDANT L1 CAPITAL GLOBAL

OPPORTUNITIES MASTER FUND:


        PHILLIPS NIZER LLP

        485 Lexington Avenue

        New York, NY 10017

        BY: JARED R. CLARK

            jclark@phillipsnizer.com

A P P E A R A N C E S (CONT'D):

ON BEHALF OF THE NOMINAL DEFENDANT KARTOON STUDIOS:

VINSON & ELKINS LLP

555 Mission Street

Suite 2000

San Francisco, CA 94105

BY:  MADISON LO, Esq.

mlo@velaw.com

ON BEHALF OF THE DEFENDANT RICHARD MOLINSKY:

STINSON LLP

1325 Avenue of the Americas

New York, NY 10019

BY: NICOLE KHALOUIAN, Esq.

nicole.khalouian@stinson.com

KIERAN CORCORAN, Esq.

kieran.corcoran@stinson.com

Page 6

A P P E A R A N C E S (CONT'D):


ON BEHALF OF DEFENDANT CVI INVESTMENTS:


SKADDEN ARPS SLATE MEAGHER & FLOM LLP

500 Boylston St.

Boston, MA 02116

BY:  KURT HEMR, Esq.

kurt.hemr@skadden.com


ALSO PRESENT:

PETER GOODALE, Legal Video Specialist

Veritext Legal Solutions

Laura Salvatori, In-House Counsel Anson

Investments

I N D E X


WITNESS:  AMIN NATHOO

                                              PAGES

EXAMINATION BY MR. ABRAHAM................ 15 - 360

EXAMINATION BY MR. TRACEY.................360 - 362

FURTHER EXAMINATION BY MR. ABRAHAM........362 - 363

INDEX OF EXHIBITS

NO.  DESCRIPTION                                         PAGE

Exh 1   Email thread, Bates-stamped EW-AUG0012150

        through EW-AUG0012151..................... 32

Exh 2   Email thread, Bates-stamped ANSON_000002

        through ANSON_000004...................... 48

Exh 3   Email thread, Bates-stamped ANSON_0000337

        through ANSON_0000338..................... 53

Exh 4   Email thread, Bates-stamped ANSON_00000644

        to ANSON_00000646......................... 46

Exh 5   Email thread with attached draft agreement,

        document Bates-stamped ANSON_00003814

        through ANSON_00003820.................... 63

Exh 6   Email thread, Bates-stamped EW-AUG0012436

        through EW-AUG0012438..................... 82

Exh 7   Email thread, document Bates-stamped

        ANSON_00000675 through ANSON_000006676.... 92

Exh 8   One-page email attaching a document on

        the letterhead of Chardan, document

        Bates-stamped ANSON_00000024 through

        ANSON_00000036............................ 103

Exh 9   Email thread, Bates-stamped TOON00017339

        through TOON00017345...................... 107

Exh 10  One-page email, Bates-stamped

        ANSON_00007952............................ 117

INDEX OF EXHIBITS

(CONT'D)

NO.  DESCRIPTION                                          PAGE

Exh 11  Email thread, Bates-stamped ANSON_00002162 through ANSON_00002164.................... 119

Exh 12  Email from Amin Nathoo to Jonathan Schechter dated 12/20/2019, document Bates-stamped ANSON_00002564.............. 124

Exh 13  Email thread with attached term sheet, Bates-stamped ANSON_00005199 through ANSON_00005205............................ 129

Exh 14  Email thread and attached redline Note Term Sheet, Bates-stamped ANSON_00002787 through ANSON_00002794.................... 163

Exh 15  Email thread and attached Note Term Sheet, Bates-stamped EW-AUG0013042 through EW-AUG0013051............................ 171

Exh 16  Email thread attaching draft Term Sheet, Bates-stamped ANSON_00004623 through ANSON_00004633............................ 178

Exh 17  Term Sheet dated January 22, 2020, Bates-stamped ANSON_00003371 through ANSON_00003375............................ 184

Exh 18  Email thread, document Bates-stamped ANSON_00009714 through ANSON_000097717.... 186

Page 10

INDEX OF EXHIBITS

(CONT'D)

NO.  DESCRIPTION                                      PAGE

Exh 19  Email thread, document Bates-stamped
     ANSON_00000805 through ANSON_000008006.... 193

Exh 20  Email thread, document Bates-stamped
     ANSON_00003594 through ANSON_00003603..... 196

Exh 21  Email thread, document Bates-stamped
     ANSON_00000836 through ANSON_00000840..... 202

Exh 22  Email thread with attached Term Sheet,
     document Bates-stamped ANSON_00009954
     through ANSON_00009973.................... 207

Exh 23  One-page email thread, document
     Bates-stamped ANSON_0000684.............. 214

Exh 24  Email thread, document Bates-stamped
     EW-AUG0013509 through EW-AUG0013511....... 217

Exh 25  Email thread, document Bates-stamped
     ANSON_00002904 through ANSON_00002922..... 221

Exh 26  Email thread, document Bates-stamped
     ANSON_00000624 through ANSON_00000643..... 229

Exh 27  Email thread, document Bates-stamped
     ANSON_00002531 through ANSON_00002542..... 231

Exh 28  Email thread, document Bates-stamped
     ANSON_00003516 through ANSON_00003520..... 234

INDEX OF EXHIBITS

(CONT'D)


NO.  DESCRIPTION                                          PAGE

Exh 29  Email thread, document Bates-stamped

     ANSON_00010188 through ANSON_00010198..... 246

Exh 30  Email thread, document Bates-stamped

     ANSON_00001616 through ANSON_00001618..... 250

Exh 31  Email thread, document Bates-stamped

     ANSON_00003960 through ANSON_00003964..... 252

Exh 32  Email thread, document Bates-stamped

     ANSON_00057527 through ANSON_000529....... 253

Exh 33  Email thread attaching Flow of Funds

     Closing Memorandum, document

     Bates-stamped ANSON_00000734 through

     ANSON_0000073440......................... 255

Exh 34  Email thread, document Bates-stamped

     TOON00004341 through TOON000043354........ 261

Exh 35  Email thread, document Bates-stamped

     ANSON_00011023 to ANSON_00011033.......... 266

Exh 36  Email with attached Leak-Out Agreement,

     document Bates-stamped ANSON_00012664

     through ANSON_00012730.................... 268

Page 12

INDEX OF EXHIBITS

(CONT'D)

NO.   DESCRIPTION                                    PAGE

Exh 37  Email thread with attached Waiver and

        Consent signature page, document

        Bates-stamped ANSON_00012931 through

        ANSON_000012935........................... 270

Exh 38  Email thread with several attachments,

        document Bates-stamped ANSON_00012091

        through ANSON_00012166.................... 279

Exh 39  Email thread, document Bates-stamped

        L1_003043 through L1_003052.............. 293

Exh 40  Email thread, document Bates-stamped

        ANSON_00012512 through ANSON_00012519..... 297

Exh 41  Email thread, document Bates-stamped

        ANSON_00029716 through ANSON_00029718..... 300

Exh 42  Email thread, document Bates-stamped

        ANSON_00029690 through ANSON_00029692..... 333

Exh 43  Email with attached Notes to the Files,

        document Bates-stamped EW-AUG0016713

        through EW-AUG0016714..................... 342

Exh 44  Email thread, document Bates-stamped

        ANSON_00031557 through ANSON_000311559.... 346

Exh 45  Email thread, document Bates-stamped

        ANSON_00049440 through ANSON_00049442..... 351

INDEX OF EXHIBITS

(CONT'D)

NO.  DESCRIPTION                                          PAGE

Exh 46  Email thread with attachment, document

   Bates-stamped ANSON_00050251 through

   ANSON_000500258.......................... 354

Exh 47  Email thread with attached Leak-Out

   Agreement, document Bates-stamped

   ANSON_00012765 through ANSON_00012775..... 359

Page 14

-- Upon commencing at 9:41 a.m.

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:41 a.m. on September 30, 2024.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connection of participants.

What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo, taken by counsel for Plaintiff in the matter of Todd Augenbaum vs. Anson Investments Master Fund LP et al., filed in the United States District Court for the Southern District of New York, Civil Action No. 1:22-cv-00249-AS.

This deposition is being conducted remotely using virtual technology.

My name is Peter Goodale, Certified

Page 15

Legal Videographer, representing Veritext Legal Solutions.

The Certified Court Reporter is Deana Santedicola, also from the firm Veritext Legal Solutions.

I am not authorized to administer an oath, and I am not related to any party in this action, nor am I financially interested in the outcome.

Will the court reporter please swear in or affirm the witness, and then counsel may proceed.

AMIN NATHOO; AFFIRMED.

EXAMINATION BY MR. ABRAHAM:

Q.   Good morning, Mr. Nathoo.  Jeff Abraham for the Plaintiff here.

Do you prefer I refer to you as Mr. Nathoo or Amin?

A.   Either is fine with me.

Q.   Okay.  Have you ever been deposed before?

A.   Yes, I have.

Q.   When?

A.   I have been deposed twice in the last two years.

Page 16

Q.   When was the last time you were
deposed?

A.   I believe it was two or three
months ago.  I was a witness in another matter.

Q.   Was Anson a party to that matter?

A.   No, we weren't.

Q.   Do you know the name of that
matter?

A.   I don't recall it off the top of
my head.

Q.   Do you know which company it
concerned?

A.   Honestly, I don't recall.

Q.   Do you recall the subject matter
of your testimony?

A.   I believe it was a dispute between
a company, an investment bank, on fees.

Q.   Do you recall the time before that
you were deposed?

A.   It was sometime in the last two
years.

Q.   Do you recall which investment
bank in the first matter that the dispute related
to?

A.   Alliance Global.

Q.   Do you recall the matter for which you were deposed within the last two years?  Was Anson a party to it?  Let me be more specific.

A.   We weren't.

Q.   Do you recall the subject matter of your testimony in that action?

A.   That one, I do not.

Q.   Were those cases which were brought in United States courts?

A.   Yes, I believe they were.

Q.   So are you familiar with the process here?

A.   Yes, I am.

Q.   So let me just give you my little explanation of the process, which is that I represent the Plaintiff and I will be asking you questions which you are required to answer unless your attorney instructs you not to answer.

If you don't understand the question, please let me know, and I will try to rephrase it or better explain the question.

If there is any reason you need a break to use the facilities or for any other reason, please let me know, and we can go off the record, okay.

Is there any reason you are unable to testify truthfully today?

A.   No.

Q.   Are you suffering from any ailment which would cause you to be unable to testify?

A.   No.

Q.   Are you on any medication which would impair your ability to testify?

A.   No.

Q.   Did you do any preparation in connection with being deposed today?

A.   Yes, I did.

Q.   What was the nature of that preparation?

A.   I met with counsel and reviewed documents and emails.

Q.   Was it one meeting?

A.   Two separate meetings.

Q.   And you reviewed, in addition to emails, other documents; is that correct?

A.   That's correct.

Q.   Do you recall what other documents you reviewed?

A.   I can't recall them off the top of my head, but if you show me documents, perhaps I'll

be able to remember if I have seen them or not.

Q. Did you review Plaintiffs' Response to Defendants' Interrogatories?

A. I don't believe so, no.

Q. Did you review Plaintiffs' Rule 26(a)(1) Statement?

A. I don't believe so, no.

Q. Did you review transaction documents relating to this matter?

A. Not specifically, but there were some other transaction documents in the list of documents that were provided.

Q. Did you review any of the testimony given previously by any of the witnesses in this case?

A. Not as part of the preparation for this deposition, no.

Q. Did you review them in any other context, the --

A. I generally am keeping up with what is happening in the case.

Q. And how do you keep up with what is happening in the case?

A. I am reviewing some of the Court filings that are filed in connection with the case

Page 20

very briefly at a high level.

Q.   Have you reviewed any of the deposition transcripts in this case?

A.   I have seen them at a very high level, but not in detail.

Q.   What do you mean by a "high level"?

A.   I have glanced at them, perhaps read a few of the sentences, but not taken a full detailed review of them.

Q.   Did anybody direct you as to which sentences to review?

A.   No.

Q.   All right.  Let's get a thumbnail sketch, if we can, of your educational background starting with after high school.  Did you go to college?  You know, tell me where you went to college, what you majored in, what year you graduated.

A.   Sure.  I did my undergraduate degree at the University of Waterloo, where I majored in a Bachelor of Mathematics, specializing in computer science.

That was from 1999 to 2004.

I also completed my MBA at the

University of Toronto from 2007 to 2009.

Q.    And what was your first job after college?

A.    I worked at Deloitte in consulting.

Q.    And that was from 2004?

A.    That was from 2004 till 2007.

Q.    And what was your function in Deloitte Consulting?

A.    So I was an analyst on a team that went to clients and looked at their technology infrastructure or other technology matters and, you know, attempted to solve whatever issues they needed help with.

Q.    And did you get another job after you left Deloitte Consulting?

A.    So after I left Deloitte is when I did my MBA, but I did have employment after my MBA, prior to joining Anson.

Q.    And where were you employed prior to joining Anson?  And please start with your first job after you got your MBA, okay.

A.    Sure.  There was only one.  I worked at TD Asset Management on a team that managed all of their US mutual fund product.  I was

an analyst working for the PMs, taking a look at companies and recommending which ones perhaps should be included in the portfolio.

Q.    What are "PMs"?

A.    Portfolio Managers.

Q.    Okay.  And after that, you went to work for Anson?

A.    That's correct.

Q.    And what year did you start working for Anson?

A.    January 2012.

Q.    And when you joined Anson, did you have a title?

A.    We don't utilize titles at Anson, but I was a Portfolio Manager.

Q.    And what are your responsibilities as a Portfolio Manager?

A.    So I was the Portfolio Manager responsible for all direct investments into companies, so reviewing potential companies to invest in, reviewing transaction documents, making the investment and doing the trading of the securities post making of the investment.

Q.    When you started at Anson, did you focus on any particular segment of the market?

Page 23

A.   We are generalists, so we don't focus on any particular sectors, but generally I am focussed on smaller or micro cap companies.

Q.   How would you define "a micro cap company"?

A.   In my mind, a micro cap is 500 million market cap or smaller, but the definition will vary in the industry.

Q.   Is there a category less than micro cap, below micro cap?

A.   There could be, but not one that I have come across.

Q.   Are you still -- do you still function as a Portfolio Manager at Anson?

A.   Among other duties, yes.

Q.   What other duties do you have at Anson at this time?

A.   I am the Chief Compliance Officer for our Toronto Canadian-based investment manager. I'm also a member of our Risk Management Committee, and I also oversee general management of the firm outside of the investment portfolio as well.

Q.   Do you have an equity interest in Anson?  In the management company of Anson I mean to say.

Page 24

A.   Yes, I do.

Q.   What is the magnitude of that equity investment, or equity interest, I should say?

A.   It is around 20 percent.

Q.   Do you know how many other people have an equity interest in Anson's management company?

A.   Well, so we have two management companies, so in the Toronto-based company, there is just myself and one partner, Moez Kassam.

And then on the US-based investment manager, there is one individual that owned that entire US firm.  His name is Tony Moore.

Q.   Is there a relationship between the two investment management companies?

A.   There is no relationship between the companies, but they both co-manage the funds.

Q.   Which funds are you referring to that they co-manage?

A.   So we have six or seven funds.  Would you like me to list them out for you?

Q.   Yes.  You anticipate my next question.  Thank you.

A.   All right, so the first one is

Page 25

Anson Investments Master Fund LP.

And we have Anson East Master Fund LP.

We have Anson Opportunities Master Fund LP.

We have Anson North Star Tactical Equity Fund.

And we have two funds that are parallel called the Arch Anson Real Estate Fund.  We have one that is for non-residents of Canada and one that is for residents of Canada that are side by side.

And we have an Arch Sharia Fund which is a Sharia-compliant fund, again, that is side by side the other two Arch funds.

Q.   Just for the record, when you say "Sharia", what are you referring to?

A.   Sharia is Muslim law, and there are certain investors who will only invest in Sharia-compliant funds, which basically restricts certain investments that the fund can and cannot make.

Q.   Now, who are the investors in Anson Master?  Are they exclusively from Canada?

A.   No.  We have investors from Canada, the United States and overseas.

Q.    Does your Anson management company maintain any offices in the United States?

A.    Sorry, the -- we have two -- we have two management companies.  The --

Q.    The one in which you and Moez Kassam -- is that his name?

A.    That's correct.

Q.    Are equity owners, does that management company have any office in the United States?

A.    No, it does not.

Q.    Does Anson ever make use of the facilities of Mr. Moore's, the one that he is the equity owner of in the United States?

A.    We do not.  He does.

Q.    Does Anson Master Fund LP invest in securities which trade in the United States?

A.    Yes, it does.

Q.    As we sit here today, approximately what percentage of Anson Master Fund LP's securities are traded in the United States?

A.    My best estimate would be about 75 percent.

Q.    Where are the other 25 percent traded?

A.    I believe it is roughly 15 percent Canada and 10 percent rest of the world.

Q.    And I forgot the name of the other -- I'm sorry, which one of the Anson management funds manages Anson Master Fund LP?

A.    Both of the -- so there are two investment managers, Anson Advisors Inc., which is the Canadian entity, and Anson Funds Management LP, which is the US entity.  Both those investment managers co-manage the funds.

Q.    All of the funds?

A.    That's correct.

Q.    Is the structure of two investment advisors tax-driven?

A.    The structure of two investment advisors I believe was regulatory and potentially tax-driven, but it was set up prior to my joining the firm.

Q.    Do you know what regulatory issue motivated having two separate investment advising funds?

A.    My -- again, this was set up before I joined, but my understanding is that a Canadian-based investment advisor needs to be registered with the Ontario Securities Commission,

Page 28

whereas a Texas one does not.

And so from that perspective, there were two separate entities set up.

Q.   All right.  Is it fair to say that you use email to communicate on a regular basis with respect to Anson's business?

A.   Yes, I do.

Q.   Do you ever use any text messaging services?

A.   I do from time to time.

Q.   Which text messaging services do you use from time to time?

A.   So SMS and iMessage, WhatsApp, and the odd time we would also use Signal.

Q.   Does Anson back up its -- strike that.

Does Anson back up the WhatsApp messages used by its personnel?

A.   So when you say "Anson", again, we have two Investment Managers.

The US Investment Manager is an RIA and is required to back up all personal communications and does so into Global Relay.

The Canadian Investment Manager, that is Ontario Securities Commission registered, is not

Page 29

required to do the same and does not do so.

Q.   How about with respect to Signal? Do you back up messages sent on Signal?

A.   Again, the US investment manager would.  The Canadian investment manager is not required to do so and does not.

Q.   Do you recall when you first learned that Anson was a Defendant in this case?

A.   Not specifically.  I believe it was two or three years ago now.

Q.   At that time, did Anson take any steps to preserve documents related to this action?

A.   Yes.  As part of our normal policy, when an action is brought, we send a document hold message to the entire firm, you know, informing them that they must preserve all documents that they have pertaining to the matter.

And as such, we did so in this case as well.

Q.   But any WhatsApp messages and signal messages which occurred prior to that time through the Canadian investment manager would not have been backed up; is that correct?

A.   They would not have been backed up, but any messages that existed on the date that

we learned of the action would have been preserved, and my device was handed over to counsel, where they were downloaded and reviewed by counsel.

Q. Do you recall when your device was handed over to counsel?

A. I don't recall the specific date, but it was sometime ago now.

Q. Do you recall which device was handed over to counsel?

A. My cell phone.

Q. Do you use any other device?

A. No, I do not.

Q. Do you use a personal computer?

A. Yes, I do.

Q. Was that handed over to counsel as well?

A. The personal computer was not, but it is used for email and Bloomberg messages which are already backed up by our system.

Q. Do you have any -- do you own any tablets, computer tablets, like an iPad or --

A. I do not.

Q. I guess this might be a bit much, but do you recall how often you get a new phone, a new device?

A.    My best estimate is every two to three years.

Q.    Do you recall the last time you got a new device?

A.    It would probably be about two years ago now.

Q.    So 2022?

A.    My best guess would be either late '22 or early '23, but I don't recall specifically.

Q.    Do you recall the time before that that you got a new device?

A.    Probably two to three years before that.

Q.    In 2020?

A.    It could have been '19 or '20.  I don't recall.

Q.    Could it have been '21 as well?

A.    I would doubt it, but I am not a hundred percent certain.

Q.    Do you recall which device you owned in 2019 or 2020?

A.    I have had iPhones for at least a decade, so it would have been an iPhone.

Q.    Whatever iteration of iPhone it was?

A.   That's correct.  That's correct.

Q.   All right.  Did you speak to anybody aside from counsel about the testimony you are going to give here today?

A.   No, I have not.

Q.   Anybody at Anson?

A.   I have talked to my partner at Anson about the fact that we have a deposition, but not about the specifics of my testimony.

Q.   Anybody outside of Anson?

A.   No.

MR. ABRAHAM:  All right.  Let's mark as Exhibit 1 a document which I think is in tab 1 of the FTP sent to counsel, and it is Bates-stamped EW-AUG0012150 through 12151.

EXHIBIT NO. 1:  Email thread, Bates-stamped EW-AUG0012150 through EW-AUG0012151.

THE WITNESS:  I have it in front of me.

BY MR. ABRAHAM:

Q.   Have you ever seen this document before?

A.   The first time I saw it was last night, when it was sent to us.

Q.   Who sent it to you?

A.    Our counsel provided it so that we could print it in preparation for this deposition.

Q.    Did you review it at that time?

A.    I did read the documents at a high level.

Q.    Is it fair to say you had never seen this document before that time?

A.    That's correct.

Q.    All right.  If you go to the bottom of the page, it says:

"On August 28, 2019, at 10:26 AM, Joe Reda [...] wrote:

Robert... We met with Amin in Toronto and he has a call with GNUS at 3pm today...He proposed the following...He will split with 1-3 other investors (you, Brio, Iroquois, etc. whoever else wants in or not) $1mil[lion]...2.2mil[lion] shares of common stock off the shelf at $0.46 with 100% warrants at a penny above todays closing price..."

Do you see that?

A.    Yes, I do.

Q.    Do you recall having a meeting

with Mr. Reda in Toronto at the end of August 2019 regarding Genius?

A.    I do not.  I have talked to Mr. Reda many times over the years about the stock, but I don't recall this specific meeting.

Q.    Do you recall any discussions regarding Genius stock at the end of August 2019?

A.    I don't recall any specific conversations.

Q.    Do you recall the reason why -- strike that.

Do you recall whether Genius had a need for capital at the end of August 2019?

A.    I believe that they had some debt that they had taken on that they needed to refinance.  But this company had needed capital pretty much throughout the entire time, since I had been introduced to them about a decade ago, so likely they would have needed capital then as well.

Q.    All right.  When were you first introduced - when I say "you", I mean the Anson Funds - to Genius brands for the first time?

A.    I don't know the precise time, but I believe it would have been in the 2014 or '15 time frame.

Q.    And did Anson make an investment to Genius securities at that time?

A.    We had been invested in Genius securities for quite some time.  I don't remember if we invested the very first time we were introduced to it, but we had been invested in it, I believe, for seven or eight years at least.

Q.    Okay.  Do you recall whether Anson conducted any analysis of Genius's business in connection with investing in Genius's securities in 2014?

A.    I don't recall specifically, but generally we would look at the business of the company, the management team, the stock, the balance sheet, and then make a determination of whether we would want to invest or not.

Q.    Do you recall whether Anson looked at any of those items, the business of the company, the management of the company, the stock of the company and the balance sheet of Genius, in or about August 2019?

A.    I don't recall specifically, but I am sure we would have before making any investment proposals.

Q.    Would Anson have generated any

internal memoranda in connection with any such analysis?

A.   Generally we do not, no.

Q.   Is the analysis memorialized in any way in writing?

A.   Usually it is not, but if it was, it would have been produced as part of our discovery.

Q.   All right.  If you go further in this note, I mean in this email, it says - and I am going on the fourth line of it - it says:

"...$750 k of the use of

proceed [...]"

Do you see that?

A.   Yes, I do.

Q.   "[...] to pay back the 2nd

1/6th of the note that's due 9/16

[...]"

Do you see that?

A.   Yes, I do.

Q.   Do you know which note Mr. Reda is referring to here?

A.   I believe it was a debt investment in the company that Anson and other investors had made sometime I believe early in 2019, or it might

have been late 2018, if I remember correctly.

Q.   Do you recall the nature of that debt investment?

A.   If I remember correctly, it was a convertible note, convertible at a fixed conversion price I believe of $2.50 a share, and it came with some warrants.

Q.   Do you recall whether in the end of August of 2019 Genius Brands needed additional capital in order to make payments on that note?

A.   I do recall that Genius needed to raise capital to make payments.  I just don't remember specific timings of when that need was.

Q.   Do you recall there was an effort to have an offering of common stock prior to this date of August 28th, 2019?

A.   I don't recall specific offers around that time.  I just recall that the company needed continually to raise capital.

Q.   And if you go on in this email, it says:

"He would like Andy's $500k go from your escrow to an actual investment into the company for working capital (JUNIOR DEBT or

Page 38

common)...."

Do you see that?

A.   Yes, I do.

Q.   Do you know what Mr. Reda meant when he made this statement?

A.   I believe at the time Mr. Heyward, who was the CEO of the company, was going to purchase some of the debt, and my preference was that he actually convert that debt to equity to send a strong single -- signal, sorry, to the market of his belief in the prospects of the company.

Q.   At that time, was Genius Brands followed by any securities analysts?

A.   I don't believe that any -- sorry, when you say "analysts", you are referring to sell-side analysts?

Q.   Yes, that is what I am referring to, yes.

A.   I believe the only one that covered it at the time was whoever -- whatever firm SEG was at the time, there was one analyst that worked there.  I believe he was the only one that covered it, but --

Q.   Do you recall the name of --

A.   -- I am -- his name is Jim McIlree.  But again, I am not sure if that was a formal coverage or not.

Q.   Does Anson use the sell-side analysis of SEG in making investment decisions?

A.   We will review sell-side analysts' information that they provide in reports, but we will make our own determination of whether to make the investment or not.

Q.   When was the first time that Anson dealt with SEG?

A.   I believe I first met SEG in either 2013 -- sometime in the 2012 to 2014 time frame.  I had gone to New York and wanted to meet some of the investment banks that participate in these types of financings and had reached out to them to set up a meeting.

Q.   When you say "these type of financings", what are you referring to?

A.   Financings for smaller cap companies.

Q.   And are those financings consisting of the sale of common stock?

A.   They could consist of sale of common stock.  They could also be sale of debt and

Page 40

warrants.  There is a wide variety of different investments.

Q.   Is it fair to say that most of the offerings do not consist of a straight offering of common stock?

A.   Most of the investments we participate in are not straight offerings, yeah. That's correct.

Q.   Around what percent of the offerings do not consist of a straight offering of common stock with SEG?

A.   I would say, over history, again, estimating, about 95 percent of the offerings with SEG would not have been just common stock.

Q.   Do you have any understanding why that is the case?

A.   Companies who are smaller and in need of raising financings, who are a little bit more distressed, generally need to provide additional terms in the financings to entice investors to participate.

Q.   Would you put Genius Brands in 2019 into that category of smaller --

A.   Yes, I would.

Q.   -- and more distressed?

A.   Yes, I would.

Q.   How about prior to 2019, would you have put Genius into that category as well?

A.   Yes, I would.

Q.   If you go on in the email on this page, Bates-stamped 12150, around three lines from the bottom of that paragraph, it says:

"Then we will launch a $5-10mil" - which I understand to be "million" - "CONVERT PIPE [...]"

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding of what the term "convert PIPE" refers to?

A.   My understanding is -- so first of all, the word "PIPE" stands for private investment in a public equity, so a direct investment in a company that is a little bit more negotiated.  And a "convert" is -- refers to a convertible note, so debt that could be convertible into common equity.

Q.   Do you recall any discussions with Mr. Reda about launching a 5 to $10 million convertible PIPE that took place in or about August 28, 2019?

A.   So over the years, Mr. Reda had

reached out to me many times about potentially proposing structures of investment to Genius Brands. I don't recall this one specifically, but we have had many discussions over the years.

Q. By the way, would you consider Mr. Reda a personal friend?

A. No, I do not.

Q. Do you consider him a business associate?

A. I consider him a business associate that I am friendly with.

Q. If you communicate through Anson with Mr. Reda, is it for a business purpose?

A. That's correct. We do talk about other things because I am trying to build a relationship, but it is for a business purpose.

Q. Is the same thing true of Jonathan Schechter?

A. Yes, that's correct.

Q. Do you know Mr. Schechter?

A. Yes, I do.

Q. Do you know him for about as long as you know Mr. Reda?

A. Yes.

Q. Do you know anybody else who works

for SEG?

A.    Right now, I believe there is a gentleman named Tyler Berry, and another individual.  I forget his name, but they call him Scroby [ph].

Q.    What was that again, I'm sorry?

A.    They call him Scroby, but I think it is a short form for his name or -- but I don't know his actual name.

Q.    How about in 2019?  Did you know anybody else who worked with SEG?

A.    I believe there was one more individual named Adam Selkin that worked there at that time, but I don't know for sure if he was there in 2019.  And they also had another individual named Jason DiPaola.  I forget exactly how to pronounce his last name.  But, again, I am not sure if he was there in and around that time.

Q.    And let me direct you back to this email.  After the word "CONVERT PIPE" it has "(of which Amin will do $2-3mil)"; do you see that?

A.    Yes, I do.

Q.    When he refers to "Amin", is it fair to say that is you?

A.    Yes.

Page 44

Q.   And when he says "Amin will do", does he refer to the Anson fund?

A.   Yes.  We only make investments for our funds.  I don't make any of these personally.

Q.   And the email goes on to say:

"[...] after Labor Day and pay

off where ALL THE DEBT" - with "ALL

THE DEBT" being capitalized -

"before the 3rd 1/6th is due on

10/16..."

Do you remember that?

A.   I don't remember that specific proposal.

Q.   Well, do you remember any proposal generated towards the end of 2019 to pay off all the previously existing debt of Genius Brands?

A.   Again, I don't recall any specific proposals, but Mr. Reda was reaching out to me many times to potentially participate in securities of Genius Brands, but I don't recall this specific one.

Q.   Do you recall any general proposals made from August 28, 2019, to the end of 2019, concerning paying off all the debt of Genius Brands?

A.   I recall that generally Mr. Reda was proposing that a convertible note offering be utilized to raise money to pay off all the existing debt.  But again, I don't recall what specific proposals actually were on the table or not.

Q.   Well, taking it away from a proposal, do you recall any plan to pay off Genius Brands' existing debt in or about August 28, 2019?

A.   Nothing concrete.  Mr. Reda, you know, often, you know, to try and drum up business will reach out and say, we should do X, Y and Z for particular companies, but I don't recall in that time period any specific proposal that was concrete enough for us to review coming to play.

Q.   Do you recall the reasons why Mr. Reda was proposing to pay off all the debt of Genius Brands in this email he wrote on August 28, 2019?

A.   Mr. Reda at the time, I remember, was of the opinion that the company's existing debt was what was holding back the stock from performing, and his opinion was if that could -- a new investment could be put in place to repay that existing debt, that perhaps the company could be on stronger footing and survive.

Page 46

That was his job as the investment banker to try and accomplish that.

Q.    Do you recall whether there was any risk to the survival of Genius Brands when Mr. Reda wrote this email on August 28th, 2019?

A.    I don't recall specifically on that date, but there were instances where we had invested in the company.  Otherwise, they would not even had made payroll the following week.  So there were times where it was distressed.  I just don't recall exactly if it was in this time period.

Q.    And had the company not made payroll, is it fair to say it would have had to declare bankruptcy?

A.    Generally that is what companies are forced to do.

Q.    And would that have had any impact on the prior investment or any prior investment by Anson and Genius Brands' debt?

A.    Generally when a company files for bankruptcy, the debt becomes impaired, so while it never happened, I am not sure what would have happened.  But generally, it would have had a negative impact.

Q.    Did Anson ever do any analysis of

what would have happened to the debt of Genius had the company declared bankruptcy?

A.   Nothing specific.  Our assumption was it would be impaired.

Q.   "Impaired" means?

A.   It would not be worth its full par value.

Q.   Any understanding how far below its full par value?

A.   No specific analysis was undertaken, but most of the time for these smaller companies, it is a big hair cut from par value.

Q.   A 50 percent hair cut?

A.   It could be, or more.

Q.   And if you go on in the email, two lines from the bottom it goes:

"That's pretty much it..."

Do you see that?

A.   Yes, I do.

Q.   "Company thinks they have leverage, but they don't..."

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what Mr. Reda meant when he said "leverage" in this

Page 48

context?

A.    I do not.

Q.    Do you recall having any discussions with anybody in Anson in or about August 28th or within the week following August 28th, 2019, concerning a potential new investment in Genius Brands?

A.    I do not recall any conversation.

Q.    All right.  Let me ask you to put that document to the side.  You could flip the page and go to tab 2, which we're going to mark as Exhibit 2, or I'll ask our court reporter to mark as Exhibit 2.

And for the record it is Bates-stamped ANSON_000002 through 000004.

And you can take a chance to review it, if you would like, and once you are done, please let me know.

EXHIBIT NO. 2:  Email thread, Bates-stamped ANSON_000002 through ANSON_000004.

THE WITNESS:  [Witness reviews document.]

I have reviewed it.

BY MR. ABRAHAM:

Q.   All right.  Let me ask you to turn to the first page, which is Bates-stamped 002 at the bottom.  Do you have that?

A.   Yes, I do.

Q.   And on the top of the page, there is an email from Joe Reda sent August 29, 2019, at 7:54 p.m. to Andy Heyward, copying Jonathan Schechter, Bob Denton, Michael Jaffa, and blind copying you; is that correct?

A.   Yes, that's correct.

Q.   And the subject is "Re: Game plan"; do you see that?

A.   Yes.

Q.   Do you recall why Mr. Reda would have blind copied you on this email?

A.   I do not.  You would have to ask him.

Q.   Do you recall receiving this email?

A.   I don't recall it as I sit here today, but that is my email address.

Q.   All right.  On that email, in the second paragraph, it says:

          "Have fun with aegis."

          Do you see that?

A.    Yes, I do.

Q.    Do you recall -- strike that.

Do you know who Aegis is?

A.    Aegis is another investment bank that also does similar financings that SEG does.

Q.    Has Anson ever purchased any investments for which Aegis was the banker?

A.    Yes, we have.

Q.    Do you do as much business with Aegis as you do with SEG?

A.    It is difficult for me to recall, but we do business with Aegis.

Q.    Do you know what Mr. Reda meant when he said "have fun with aegis"?

A.    I don't recall specifically what was occurring between the various different investment banks at the time.

Q.    Do you recall that Aegis had attempted an offering of Genius Brands' common stock in 2019?

A.    I don't recall.  I believe every investment I have made in their stock was through SEG.  I don't recall if other investment banks were involved.

Q.    Okay.  If you go down the page,

there is an email "On Aug[ust] 29, 2019, at 5:46

PM, Joe Reda [...] wrote"; do you see that?

A.   Yes.

Q.   And he writes:

"Gnus team."

Do you see that?

A.   Yes.

Q.   And I believe he writes:

"Shex spoke to all Debt

holders.  We Don't expect major land

mines.  A few bumps in the road."

Do you see that?

A.   Yes, I do.

Q.   Do you recall Mr. Reda speaking to

you about any of the matters referenced in this

email?

A.   I don't recall this specific

investment.  Again, there were many conversations

with Mr. Reda over the years.

Q.   And if you go further down on the

page, towards the bottom, around five lines from

the bottom; do you see that?  It says:

"The game plan is to do a

bigger debt deal after Andy gets

back from Europe."

Page 52

Do you see that?

A.    Yes, I do.

Q.    Do you know what Mr. Reda meant by "game plan"?

A.    No, I do not.

Q.    Do you recall any discussions in August 2019 about a plan to do a bigger debt deal after Mr. Heyward returned from Europe?

A.    I don't have any recollection of this specific proposal.  Again, Mr. Reda had talked to me several times about potentially doing financings for Genius Brands, but I don't recall this specific one.

Q.    Do you know whether he was speaking to other debt investors as well?

A.    I believe Mr. Reda, as part of his business, speaks to many different investors and tries to get the best term sheet for issuers.  So I imagine he would have been for this as well.

Q.    There is a reference there to:
"Get ATW going now."
Do you see that?

A.    That's correct.

Q.    Do you know who "ATW" is?

A.    I believe ATW is another -- I

don't know if it is a fund or one investor, but I believe it is run by a gentleman named Kerry something.

Q.    Kerry Propper?

A.    Yes, that is it.

Q.    Is he a friend of yours?

A.    No.  I don't think I have ever met him.

Q.    Have you ever spoken to him?

A.    I don't believe so.

Q.    So it would be fair to say he is not even a business associate of yours; is that correct?

A.    That's correct.

MR. ABRAHAM:  All right.  Let's turn to the next document, which is tab 3, and I am going to ask the court reporter to mark as Exhibit 3. The document is Bates-stamped ANSON_0000337 through 338.

EXHIBIT NO. 3:  Email thread,
Bates-stamped ANSON_0000337 through
ANSON_0000338.

BY MR. ABRAHAM:

Q.    And take your time to review this document, and when you are done, please let me

Page 54

know.

A.    [Witness reviews document.]

I have reviewed it.

Q.    Okay.  And I think the second email on the first page, which is Bates-stamped 17337, is the first email in the chain, and it is from Joe Reda, the date is September 10, 2019, at 9:49:16 a.m. to Amin Nathoo, copying Jonathan Schechter, subject "GNUS"; do you see that?

A.    Yes, I do.

Q.    And do you see in it he writes:

            "Amin,

             Sadly Andy Heyward has summarily rejected your terms...I am speechless."

Do you see that?

A.    Yes, I do.

Q.    Do you recall Mr. Heyward rejecting the terms of any proposed investment by Anson and Genius securities in the beginning of September 2019?

A.    I don't recall specifically, but over time, you know, we have made several proposals to invest in the company and there have been a few times where the CEO has rejected those proposals.

Page 55

Q.   And on the top email, you write back, from Amin Nathoo 9/10/2019, 9:49:56 a.m., to Kathy Hackett.  You write:

"Please remove from restricted list as per below."

Do you see that?

A.   Yes, I do.

Q.   What is a restricted list?

A.   When -- so the majority of the names on our restricted list are in conjunction with investment banks having called us that they are doing financings for companies or attempting to do a financing of a company, and that would be material non-public information.

And so we add it to our restricted list that then is sent to the entire firm that they, either for the funds or in their personal accounts, are unable to trade in the securities of that issuer while we have that material non-public information.

Q.   Okay.  Let's put that document to the side and move on to the next tab, if we can, which is tab 4, and also Exhibit 4, and it is Bates-stamped ANSON_00000644 to 646.

And take an opportunity, if you would

Page 56

like, to review this document, and please let me know when you are done.

EXHIBIT NO. 4:  Email thread, Bates-stamped ANSON_00000644 to ANSON_00000646.

THE WITNESS:  [Witness reviews document.]

I reviewed it.

BY MR. ABRAHAM:

Q.   Now, on the first page, which is Bates-stamped 644, there is an email from Joe Reda sent September 17th, 2019, at 10:42 a.m., to Amin Nathoo, copying Jonathan Schechter, subject "FW: GNUS bridge debt financing"; do you see that?

A.   Yes, I do.

Q.   Does that mean that Mr. Reda was forwarding to you all the other emails on this page?

A.   I am not sure why he forwarded it to me.  I am not sure what he was trying to send to me or not.

Q.   All right, but can I ask you to answer the question.  Does it mean that Mr. Reda was forwarding those emails to you?

A.   It means that all those other

emails were sent as part of the forward.  I am not sure what his intent was.  You would have to ask him that.

Q.    Well, do you recall reading any of those emails on --

A.    I don't recall these emails.

Q.    Let me finish.  The one thing I should have said at the beginning is please wait for me to finish my question so we'll have a clean record.  We won't talk over each other.

I apologize.

Do you recall the reason why Mr. Reda may have forwarded you those emails on September 17th, 2019?

A.    No, I do not.

Q.    On the top email, it's from Amin Nathoo, 9/17/2019, 10:49:05 a.m., to Joe Reda, copying Jonathan Schechter; do you see that?

A.    Yes, I do.

Q.    And you write "lets do it"; do you see that?

A.    Yes, I do.

Q.    When you wrote "lets do it", what did you mean that you wanted to do?

A.    Again, I don't recall this

Page 58

specific email, but having reviewed the chain, it appears that I made a proposal for a $750,000 investment, and I believe I was affirmatively saying that I was prepared to do it.

Q.    And if you go on the chain, if you go to the next page, which is 645, which is the second page of this document; could I ask you to turn there, please?

A.    Yeah.

Q.    And you see at the bottom there is an email from Jeffrey Schultz sent Monday, September 16th, 2019, at 2:54 p.m., to Robert Charron?

A.    Yes, I do.

Q.    Copying a bunch of people, including Michael Jaffa, Bob Denton, Jonathan Schechter, Shaye Hirsch, Andy Heyward, Joe Reda, Jon Ollwerther, Alan Langer, subject "GNUS bridge debt financing"; do you see that?

A.    Yes, I do.

Q.    Do you know who Jeffrey Schultz is?

A.    I don't know him specifically, but I believe he was counsel to the issuer.

Q.    Do you know who Robert Charron is?

A.   Robert Charron works for Ellenoff Grossman, but in this context, I don't know what his role was.

Q.   Do you recall whether you had retained the services of Ellenoff Grossman with respect to any proposed investment in Genius Brands in September 2019?

A.   I don't believe we had retained Ellenoff Grossman in September of 2019.  I believe that was in early 2020.

Q.   Do you know why Robert Charron was on this email on September 16, 2019?

A.   I am not sure what his role was.

Q.   Do you recognize the name Shaye Hirsch?

A.   I do.

Q.   Who is Shaye Hirsch?

A.   He works at Brio, but I am not sure his exact role.

Q.   Do you know anybody else who works at Brio?

A.   I believe I had met one other person.  I forget his name.  But he had left some time ago.

Q.   Did you ever speak with anybody

else aside from Shaye Hirsch concerning any of Brio's planned investments?

MR. TRACEY:  Objection to the form. You can answer.

THE WITNESS:  I don't believe I have ever talked to anyone at Brio about their proposed investments.

BY MR. ABRAHAM:

Q.   I mean in any security, even aside from Genius Brands.

A.   I don't believe I have interacted with anyone at Brio outside of one or two emails on Genius Brands where an investment bank had copied us onto emails.

Q.   In the email at the bottom of page 645 - it is the second page of this exhibit - it says:

"Hi Rob.  Attached are our client's comments to the GNUS Securities Purchase Agreement, form of Debenture and Security Agreement for the bridge financing.  Please contact me if you want to discuss."

Do you see that?

A.   Yes, I do.

Q.   Did you ever review a GNUS Securities Purchase Agreement in September 2019?

A.   Not that I recall.

Q.   Do you recall reviewing a form of debenture for Genius Brands in September 2019?

A.   Not that I recall.

Q.   Do you recall reviewing a security agreement for Genius Brands in September 2019?

A.   Not that I recall.

Q.   Do you have any understanding what Mr. Schultz meant when he used the phrase "bridge financing" in this context?

A.   In this context, no.

Q.   Do you have any understanding of what "bridge financing" generally means?

A.   Generally, bridge financing is when a company needs a larger financing some time down the road that might take some time to come to fruition and needs a smaller amount of money to bridge them to that larger financing.

Q.   Is it fair to say that when Mr. Reda forwarded this email to you, you learned of any plans by Brio with respect to providing bridge financing?

A.   I don't recall Brio having

Page 62

proposed any bridge financing to Genius Brands.

Q.   Are you sure that they did not?

A.   I am not sure.  I just don't recall being aware of one.

Q.   Do you recall whether Anson actually provided any financing to Genius Brands after the date of this email of September 17th, 2019?

A.   I don't recall specific dates of investments we made.  Again, we have made many such investments into Genius Brands over the years.  I just don't recall the precise dates.

MR. TRACEY:  Jeff, if you are at a convenient breaking point, perhaps we could take a break.

MR. ABRAHAM:  If you want -- I am not at a convenient breaking point, but if you want to take a break, I'll be glad to accommodate you.  Is that what you want?

MR. TRACEY:  If you don't mind.

MR. ABRAHAM:  That is fine.  Let's go off the record.  Is it a five-minute break okay for you?

MR. TRACEY:  Perfect.

MR. ABRAHAM:  Thank you.

Page 63

MR. TRACEY:  Thank you.

THE VIDEOGRAPHER:  This marks the end of Media 1, and we are going off the record at 10:39 a.m.

-- RECESSED AT 10:39 A.M.

-- RESUMED AT 10:52 A.M.

THE VIDEOGRAPHER:  This marks the beginning of Media Unit 2 of the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo.  We are back on the record at 10:53 a.m.

BY MR. ABRAHAM:

Q.    All right, Mr. Nathoo.  I would like to ask you to turn, I believe in your binder, to tab 5, which I am going to ask the court reporter to mark as Exhibit 5.

EXHIBIT NO. 5:  Email thread with attached draft agreement, document Bates-stamped ANSON_00003814 through ANSON_00003820.

BY MR. ABRAHAM:

Q.    The document is Bates-stamped ANSON_0003814 through 3820.

And for the record, the portion of the document Bates-stamped 3814 through 3815 consists

Page 64

of two emails, and the portion of the document

Bates-stamped 3816 through 3820 is a draft

agreement.

A.   I see it.

Q.   And take your time to review this

exhibit, and please let me know when you are done.

A.   [Witness reviews document.]

I have reviewed it.

Q.   All right.  Looking on the first

page of this document, which is Bates-stamped 3814,

the second email on the page is from Joe Reda sent

September 23, 2019, at 9:08 a.m., to Amin Nathoo,

copying Jonathan Schechter, subject "total shot in

the dark", and the "Importance" is "High"; do you

see that?

A.   Yes, I do.

Q.   Do you have any understanding what

the reference of "Importance:  High" is meant to

convey?

A.    I am not sure why Mr. Reda put

"Importance:  High".

Q.   Do you have any understanding of

why he wrote "total shot in the dark"?

A.    Mr. Reda from time to time tries

to get deals done.  I can't say specifically what

he meant in this instance, but he is a salesman that tries to get deals done.

Q.   Did you have a general understanding what the term "total shot in the dark" means?

A.   Yes, I do.

Q.   What is that understanding?

A.   Generally when someone says "total shot in the dark", they believe that whatever they are trying to pursue has a very low likelihood of coming to fruition.

Q.   Do you have any reason to believe that Mr. Reda meant anything different when he used the term "total shot in the dark" in the context of this email?

MR. TRACEY:  Objection, speculation. You can answer.

THE WITNESS:  Oh, sorry.  No, I have no reason to believe it meant something different.

BY MR. ABRAHAM:

Q.   All right.  And getting into the body of the email, it says:

"Amin, There is probably a 0.000% chance Andy accepts this term sheet I created from a culmination

Page 66

of 5 old term sheets I found from
different deals..."

Do you see that?

A.   Yes, I do.

Q.   Did you understand "Andy" to refer
to Andy Heyward there?

A.   Yes, I believe that is the case.

Q.   Do you know what Mr. Reda meant by
a 0.000 chance in the context of this email?

A.   I don't generally like to
speculate, but my understanding is he meant that
there was a very low probability.

Q.   Do you have any understanding why
he believed there was a very low probability that
Mr. Heyward would accept the term sheet that was
proposed?

A.   I am not sure.

Q.   And he goes on to write:
"If you can review and redline
before I send to Kerry and Andy...
Kerry will probably NOT want it to
be this investor friendly..."

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what

Mr. Reda meant by "investor friendly"?

A.    Generally, when Mr. Reda uses that term, he means that the terms of the financing are -- are lucrative, potentially, or protected for investors.

Q.    Do you have any understanding that, in proposing this term sheet, whether SEG was trying to get the best term sheet possible for Genius Brands on September 23, 2019?

A.    Sorry, could you repeat the first part of that question?

Q.    All right.  Do you have any understanding that in proposing this term sheet, which is attached to this email, whether SEG was trying to get the best term sheet possible for Genius Brands?

MR. TRACEY:  Objection, speculation.

THE WITNESS:  I am not sure what SEG was trying to accomplish with this term sheet.

BY MR. ABRAHAM:

Q.    Going further on in this email, it says:

            "Andy will puke on this, but
            wanted to put the kitchen sink in
            and then start from there".

Page 68

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what Mr. Reda meant when he said "Andy will puke on this"?

A.   I don't recall getting -- having received this email, but reading it now, my understanding is he would not have been -- he would not have approved the terms of this deal under the terms in this term sheet.

Q.   Why is that?

MR. TRACEY:  Objection, speculation.

THE WITNESS:  My understanding is that, just like any CEO, he would want terms to be a little bit more friendly for the company.

BY MR. ABRAHAM:

Q.   So is it fair to say the proposed term sheet were not the best term sheet that Genius could have gotten on September 23, 2019?

MR. TRACEY:  Sorry, objection.

THE WITNESS:  I am not sure what term sheet Genius could or could not have gotten.  I can't speak for what other investors may or may not want in terms for financings.

BY MR. ABRAHAM:

Q.    Do you have any understanding who "Kerry" is that is referred to in this email?

A.    I am not sure.  I would be speculating if I --

Q.    Is it Kerry Propper?

A.    It could be, but I am not sure.

Q.    Do you know any other Kerrys?

A.    I do know other Kerrys, but I am not -- again, I am not sure who all works at Genius Brands and whether there was a Kerry there.  I am just uncertain.

Q.    Well, do you have any understanding why Kerry -- why Mr. Reda says:

"Kerry will probably NOT want it to be this investor friendly"?

MR. TRACEY:  Objection.

THE WITNESS:  I am not sure, but reading that today makes me believe that Kerry is not another investor, because most investors would want terms that are investor-friendly.

BY MR. ABRAHAM:

Q.    Would SEG want terms that are investor-friendly?

MR. TRACEY:  Objection.

THE WITNESS:  I don't personally

Page 70

believe that SEG cares.  I think they like to get deals done, and if there are terms that are agreeable between investor and company, I don't think they care what their opinion is on investor-friendliness or not.

BY MR. ABRAHAM:

Q.   So are they -- is SEG trying to get the best deal possible for the company?

MR. TRACEY:  Objection.

THE WITNESS:  You would have to ask them that.  I think SEG is trying to get terms that clear the market and get a deal done.

BY MR. ABRAHAM:

Q.   All right.  Let's go up on the page, the first page, which is Bates-stamped 3814. And it is from Amin Nathoo, which is you, sent 9/23/2019 at 3:21 p.m. to Joe Reda, copying Jonathan Schechter, subject "Re:  total shot in the dark"; do you see that?

A.   Yes, I do.

Q.   And you see it references an attachment "GNUS - draft term sheet 9.23.19"; do you see that as well?

A.   Yes, I do.

Q.   And in the body of the email, it

Page 71

says:

"God bless you if you can convince company to take this..."

Do you see that?

A.    Yes, I do.

Q.    When you wrote that, were you referring to the draft term sheet?

A.    I don't recall this email, but I believe that was the case.

Q.    Why do you believe that to be the case?

A.    Upon reviewing this exhibit that you have provided to me.

Q.    Have you ever seen this exhibit that I provided to you before today?

A.    I don't believe so.

Q.    And the email goes on to say:

"... the only thing I added was shareholder approval."

Do you see that?

A.    Yes, I do.

Q.    Do you know what "shareholder approval" refers to in this context?

A.    Having reviewed the exhibit today, it refers to a proxy that would be put forward to

Page 72

shareholders to approve a financing that resulted in the issuance of more than 20 percent of the shares outstanding, which under exchange rules requires shareholder approval.

Q.   And when you say "exchange rules", are you referring to Nasdaq?

A.    I believe this company -- I believe Genius is listed on Nasdaq, but I believe it is also the same for NYSE.

Q.    And just for the record, I mean, if you turn to the third page of this exhibit, which is Bates-stamped 3816 at the bottom, at least on my copy it is in blue ink.  It says on the left-hand side "shareholder Approval" towards the bottom of the page; do you see that?

A.   Yes, I do.

Q.    And it says to its right:

"Within 45 days of closing, the company shall file a proxy for shareholder approval of issuance of shares underlying the Notes and Warrants due to the Nasdaq 19.99% issuance limitation."

Do you see that?

A.    Yes, I do.

Q.   Is that a provision that you added to this document?

A.   I don't recall at the time, but it appears to be the case from this exhibit.

Q.   Okay.  If you go further up the page, it says "Issuer:  GENIUS BRANDS INTERNATIONAL (NASDAQ: GNUS)"; do you see that?

A.   Yes.

Q.   And underneath it, it says "Investors"; do you see that?

A.   Yes, I do.

Q.   And it says for "Investors":
        "Entities introduced by The
        Special Equities Group, insiders and
        other investors acceptable to the
        Lead Investor and the Issuer."
        Do you see that?

A.   Yes, I do.

Q.   On that first line, the reference to "insiders", do you know who that refers to?

A.   Generally when you are referring to "insiders" of a company, you are referring to management and Board of Directors.

Q.   Do you recall whether there was any plan for any corporate insiders of Genius to

Page 74

invest in this PIPE?

A.    I don't know about this PIPE in particular, but over the years there has been instances where the CEO, Andy Heyward, has invested in the securities of the company.

Q.    Do you recall any discussions concerning whether Andy Heyward would invest in this PIPE?

A.    I don't recall for this specific time period.  My only recollection was more for the March 2020 time period where I was aware that the CEO was going to invest.

Q.    When did you first become aware that Mr. Heyward was going to invest?

A.    Sometime in the days or weeks leading up to the closing of that financing.

Q.    You don't recall the exact date off the top of your head; is that correct?

A.    That's correct.

Q.    But it could have been weeks in advance; is that correct?

MR. TRACEY:  Objection.

THE WITNESS:  It could have been.  I recall that the transaction took some time to come together.

Page 75

BY MR. ABRAHAM:

Q.   Would Mr. Heyward investing in that PIPE be expected to send a signal to the market?

A.   Generally when a CEO of a company invests in a PIPE, it is a strong -- I am looking for the right word, but it shows a strong -- that he has a strong opinion of the outlook of the company, and it could have a positive impact on the stock.

Q.   Do you recall whether you learned that Mr. Heyward was planning to invest in the PIPE before Nasdaq gave approval to the PIPE deal in March 2020?

A.   I don't recall the specific sequence.

Q.   Let me go back to this page here Bates-stamped 3816 and the entry for "Investors". And after "insiders", it goes on to say:

"[...] and other investors acceptable to the Lead Investor and the Issuer."

Do you see that?

A.   Yes, I do.

Q.   Do you know who "Lead Investor"

refers to in this context?

A.   I do not.

Q.   Is it Anson?

A.   I would doubt it.  Generally when there are term sheets where we are proposing to be the lead investor, we put it on our letterhead.

Q.   Okay.  But it is correct, this was a draft prepared by SEG; is that correct?

A.   That's correct.

Q.   Now, when it says "acceptable to the Lead Investor", is that a general term that you - when I say "you", I mean Anson - insists on when they are a lead investor?

A.   I believe it is -- I believe it is in our term sheets that we provide.

Q.   Why is it in the term sheets that you provide?

A.   There are certain -- or there could be certain investors who we believe, you know, are very difficult and, you know, we prefer them not to be a part of any transaction in which we participate.

Q.   What do you mean by "difficult"?

A.   There have been instances in the past where we have been involved in financings for

companies, and other investors, you know, hold up -- hold things up or try to hold the company hostage, and we believe it is to the detriment of our investment, and we would prefer if they weren't a part of investments that we are involved in.

Q.    What do you mean by "hold the company hostage"?

A.    What I meant by that was there are times where other investors will ask for certain things that are extremely onerous and demand that the company meets those terms; otherwise, they will refuse to work with the company if, you know, amendments or things are needed.

And oftentimes, that can be to the detriment of other investors.

Q.    Can you think of any such investors, the identity of any such investors?

A.    Not off the top of my head, but generally, that is what we look out for.

Q.    Do you recall any investments that Anson made in which an investor like that was part of the investment?

A.    I don't remember specific names, but there have been instances where -- that we have been -- or we have had negative impact to our

investment because of actions of others.

Q.   Did that ever occur in the context of -- strike that.

Did that ever occur in the context of Anson's investment in Genius Brands?

A.   Not specifically, nothing specific comes up, but I recall, you know, there were definitely instances where other investors were proposing things that we didn't necessarily agree with.

Q.   Do you recall which other investors made such proposals?

A.   I am not sure which investors it would have come from.  Generally when we receive comments, we are told that it is coming from investors, but we are not -- often not told which investor it is coming from.

Q.   Are you ever told from which investor it is coming from?

A.   There have been times in the past on certain transactions where an investment bank might tell you which investor it is coming from, but it is not always the case.

Q.   Is it sometimes the case?

A.   Sometimes.

Page 79

Q. Do you know what that depends upon?

A. I am not sure. Sometimes the investment bank discloses it, and sometimes they don't.

Q. Let me ask you to turn to the third page of the term sheet in this exhibit or the draft term sheet, which is Bates-stamped 3818 at the bottom right-hand side; do you see that?

A. Yes, I do.

Q. And there is a heading for "Right of Participation"?

A. I see that.

Q. What is a right of participation?

A. A right of participation generally is a right that is afforded to the investors of one transaction to participate in future transactions of the issuer for a certain amount of time and for a certain percentage of that future transaction.

Q. Is that a customary provision in term sheets?

A. I am not sure what you mean by "customary", but it has been in many transactions that we have participated in the past.

Q. What is the purpose of the

Page 80

provision?

A.   In my mind, for when I am -- when I am participating, I like the provision for a couple of reasons.

Number one is if you are investing at a company -- in a company when it is a more precarious time for the company and then prospects improve and they want to do another financing, you want to be able to then participate in that financing if you elect to rather than them being able to just go to another investor at that time. So if you have invested at a time when it is tough for the company, you also want to be able to invest at a time that it might be better.

And the second reason is, while you still have securities of a particular company, if the company wants to do another transaction that would be highly dilutive and detrimental to your initial investment, at least you have the opportunity to participate in that new transaction to more or less, for lack of a better term, average down.

Q.   Okay.  And the next provision on this page is "Prohibition on Variable Rate Securities"; do you see that?

A.   Yes, I do.

Q.   What are variable rate securities?

A.   Generally, variable rate securities refers to a security that is convertible into common stock at a conversion price that is not fixed but rather varies with the moves in the common stock price in the market.

Q.   And the term sheet says for that entry:

"No instruments with non-fixed or floating price features can exist while the Warrants remain outstanding."

Do you see that?

A.   Yes, I do.

Q.   "Also, the Company shall be prohibited from entering into, or effecting draw-downs on, any equity lines of credit or 'at the market' offerings."

Do you see that?

A.   That's correct.

Q.   What are equity lines of credit?

A.   Generally, an equity line of credit is an agreement whereby an issuer and a fund

Page 82

would enter into a pre-arranged agreement whereby the company could issue stock to that investor at their election with certain sizes over certain periods of time.

Q.   Is there a reason you wouldn't want Genius Brands to have an equity line of credit?

A.   As it pertains to our warrants, you know, the value of our warrants relies on the ability of a stock price to go up, and if the company is constantly issuing equity under an equity line of credit, it could very well prevent the stock price from ever going up because of the continuous dilution.  And that would be one reason why you may not want the company to be able to do that.

MR. ABRAHAM:  All right.  Let's move on to the next document, which is at tab 6, which I am going to ask the court reporter to mark as Exhibit 6.

EXHIBIT NO. 6:  Email thread, Bates-stamped EW-AUG0012436 through EW-AUG0012438.

BY MR. ABRAHAM:

Q.   And it is Bates-stamped

Page 83

EW-AUG0012436 through 2438.

A.   I see it.

Q.   If you turn to the second page of this document, which is Bates-stamped 12437, there is a reference to an email "On Sep[tember] 24, 2019, at 6:09 PM, Andy Heyward [...] wrote"; do you see that?

A.   Yes, I do.

Q.   And he writes in the first paragraph:

"Just a quick note to all of the 'A Team'" - and he writes in parens - "(that could be Amin, or Andy, or even Arnold!)."

Do you see that?

A.   Yes, I do.

Q.   Did you have an understanding based upon this email -- strike that.

Did you have an understanding based upon this email that Mr. Heyward was planning to invest in the PIPE financing which was being contemplated at this time?

A.   I don't recall the email from that time, but having reviewed the exhibit, it appears that is the case.

Q.   What in the email makes you believe that is the case?

A.   Towards the bottom paragraph, Mr. Heyward says:

"[...] I stand ready to put my $750,000 money in [...]"

Q.   All right.  Let me ask you to go to the first page of this document, which is Bates-stamped 12436.  And at the bottom of the page there is an email from Amin Nathoo, which is you, and it is sent Tuesday, September 24, 2019, at 3:39 p.m., to Andy Heyward, copying Jonathan Schechter, Joe Reda, Michael Jaffa and Bob Denton, subject "Re: 'A Team'"; do you see that?

A.   Yes, I do.

Q.   And in the first paragraph, you write:

"Were here to help get this done.  I'd love nothing more than to have the company funded and let the team execute."

Do you see that?

A.   Yes, I do.

Q.   When you wrote "were", did you mean "we are"?

Page 85

A.    Yes, I believe I did.

Q.    And "get this done", were you referring to financing?

A.    I believe so, yes.

Q.    Were you referring to the PIPE financing which was planned?

A.    Yes, I believe so.  Again, I don't recall the email, but it appears to be the case from reading the exhibit.

Q.    And is it fair to say that the expectation was that the PIPE financing would get the company funded; is that correct?

A.    It appears to be, yes.

Q.    And there are a series of points you write in this email, and the first -- point 1 says:

"[The] deal can't have anything that will make it harder/impossible to get the bigger debt deal done."

Do you see that?

A.    Yes, I do.

Q.    Do you know what you meant when you said "bigger debt deal"?

A.    I recall from that time period the company needed to do smaller financings until it

Page 86

could get a larger debt refinancing deal done, and since we were -- we had some of the existing debt of the company, we wanted -- we were wanting that refinancing debt to be able to -- to actually be able to get done.

Q.   And you go on in point 1 to write:

"The goal is to get the big debt deal done to fund [the] company, not have this smaller deal stand in the way."

Do you see that?

A.   Yes, I do.

Q.   What do you mean by "stand in the way"?

A.   So again, I believe what I meant at the time was we needed that larger debt financing to actually occur so that our older existing debt could get repaid, and if there were terms in this currently proposed financing that would essentially make it impossible for the company to then later get that bigger debt financing done, that would have been detrimental to us, and that is what I believe I meant when I said "stand in the way".

Q.   Was that a goal that Mr. Heyward

shared in September 2019?

A.   I would -- I am not a hundred percent certain, but I believe so, as he would want the company to survive.

Q.   And under point 3, there is the last paragraph on this page -- well, let's go to point 3.  Point 3 says:

"Terms should be inline with what we had discussed the other week [...]"

Do you see that?

A.   Yes, I do.

Q.   And this email is written to Mr. Heyward; is that correct?

A.   The "To" on the email is to him, but there is several other people cc'd, and I am not always careful when responding to an email to make sure the right person is on the "To" versus the "cc".

Q.   But the ordinary understanding when you write an email to somebody is that -- strike that.

When you write "we had discussed" and you address the email to somebody, the ordinary understanding is that you had discussed this matter

Page 88

with Mr. Heyward; is that correct?

MR. TRACEY:  Objection to the form.

THE WITNESS:  Again, I am not -- when I hit "reply all" in an email, I am not careful about who is in the "To" and the "cc" line.

So it could have been directed at the investment bank; it could have been directed at the CEO.  Like, I don't know, because I don't recall this email.  But I am not always careful that the person in the "To" is exactly who I am writing the email to.

BY MR. ABRAHAM:

Q.  Do you recall having any discussions with Mr. Heyward in September 2019 concerning this proposed investment?

A.  I don't recall particular conversations with Mr. Heyward.  I had spoken to him many times over the years.  I just don't recall within this time period.

Q.  Do you ever text him?

A.  I don't believe so.  I don't believe I ever have.

Q.  Did you ever text anybody about any of Anson's investments in Genius securities?

A.  There could have been some texts

with SEG.  From time to time they communicate with me over text, but I can't say for certain.

Q.   When you say "over text", is that over WhatsApp?

A.   I believe it is generally over iMessage SMS, not WhatsApp.

Q.   Have you ever used WhatsApp to communicate with SEG?

A.   I don't believe so, but I can't say with certainty.

Q.   Have you ever used Signal to communicate with SEG?

A.   Yes, I have.

Q.   Do you know whether those Signal messages were produced in this litigation?

A.   Any messages that would have been -- would have been in my possession would have been produced.

Q.   Do you know whether there would be -- you ever used Signal to communicate with Mr. Heyward concerning Anson's investment in Genius Brands?

A.   I don't believe I have ever communicated over Signal with Mr. Heyward.

Q.   And point 3 goes on to say:

Page 90

"[...] plain vanilla debt,
convertible at same price as my
equity deal, no warrants, nothing
funky."

Do you see that?

A.   Yes, I do.

Q.   What do you mean by "plain vanilla debt"?

A.   Generally when I say "plain vanilla debt", it could mean one of two things.  It could just mean straight debt, where there is only an obligation to repay in cash, or at times I use it to mean a more straightforward convert that has a fixed conversion price but no other variable pricing mechanisms included.

Q.   Okay.  Going further down the page, you write:

"Adhering to these principals
is in everyone's best interest."

Do you see that?

A.   Yes, I do.

Q.   Who are you referring to when you say "everyone"?

A.   Again, I don't recall sending this email, but reading this today, it appears I am

Page 91

referring to Anson and the issuer.

Q.    And you go on to write:

"Despite what the other investor would have people believe, we are not the enemy here."

Do you see that?

A.    Yes, I do.

Q.    Do you know who that other investor was?

A.    I don't recall.

Q.    Was it Brio?

A.    Sorry?

Q.    Was it Shaye Hirsch?

A.    I don't recall.  It could have been.  I just -- I don't recall it right now.

Q.    Do you recall anybody characterizing you as "the enemy" in or about September 24, 2019, as it related to Anson's investments in Genius Brands?

A.    I don't recall specifically.  I know over time there have been -- other funds do talk badly about Anson when they are trying to win a deal for themselves.  We are all competing for the same transactions, so -- but I can't recall specifically in this instance who it is referring

Page 92

to.

Q.   Okay.  Let's go to tab 7.  You can put down this document, or turn the page at least on this document, and we'll mark as Exhibit 7 the document at tab 7, which is Bates-stamped ANSON_00000675 through 676.

EXHIBIT NO. 7:  Email thread, document Bates-stamped ANSON_00000675 through ANSON_000006676.

BY MR. ABRAHAM:

Q.   And do you see there is an email at the bottom of the page from Jim McIlree.  Am I pronouncing that correctly?

A.   I believe so.

Q.   And he is with Chardan; do you see that?

A.   I believe so.

Q.   And it is to undisclosed recipients.  The subject:

"Chardan: Genius Brands International Inc. (GNUS): GNUS (Buy PT$4.50) [...]"

Do you see that?

A.   Yes, I do.

Q.   Do you know what "PT" refers to?

A.    I believe it means price target.

Q.    And do you see -- and then it goes on to say:

"[...] Significant Co-Production Deal for Superhero Kindergarten".

Do you see that?

A.    Yes, I do.

Q.    Do you recall anything about that co-production deal with Superhero Kindergarten?

A.    I don't recall the specifics of that deal, no.

Q.    Do you recall it generally?

A.    I just recall that Superhero Kindergarten was a cartoon that Genius Brands was developing and they were looking for other people to potentially partner with to create it, but I don't recall the specifics of it.

Q.    Did Superhero Kindergarten factor in in any way to Anson's decision whether to purchase Genius Brands securities from October 15, 2019, going forward?

A.    I don't recall the time period, but I remember Superhero Kindergarten featured Arnold Schwarzenegger as a character, and it was

one of the properties that we felt could have -- could catch on with the marketplace and could drive value for Genius Brands.

Q. Did Anson do any independent research into that subject?

A. No, we did not.

Q. Did that in any way motivate Anson's investment?

A. Not on its own, but given that we felt that it was a cartoon that had a chance of success, we thought it would -- it could be positive to our investment.

Q. How would it be positive to Anson's investment?

A. If the cartoon was successful and had good viewership and then the company could then use that to sell consumer products to the children that were watching the cartoon, then that would generate revenue and profits for the company.

Q. How about in terms of driving liquidity for Genius Brands' common stock?

A. Certainly any development that we felt would be positive to the profitability and revenues of the company would then eventually translate into positive movement in the stock.

Page 95

That would be our expectation.

Q.   Did a development have to be positive to the profitability and revenues of the company to generate additional liquidity for Genius Brands' common stock?

A.   Sorry, I am not sure if I understand your question.

Q.   Well, could the prospect of future profitability and revenue for Genius Brands help drive the liquidity of Genius Brands' common stock?

MR. TRACEY:  Objection.

THE WITNESS:  I mean, I guess it could. I am not -- I am not certain of what other investors factor into their decision to buy common stock or not.

BY MR. ABRAHAM:

Q.   Do you know what other factors generate liquidity for a company's common stock?

MR. TRACEY:  Objection.

THE WITNESS:  I mean, again, I don't know what other investors factor into their decision-making process or not, so it could be just about anything.  I -- it is hard for me to say.

BY MR. ABRAHAM:

Q.   Do favourable analyst reports help

generate liquidity for a company's common stock?

MR. TRACEY:  Objection.

THE WITNESS:  Again, I am not sure what people factor into their decision-making process or not, so it is difficult for me to speculate on that.

BY MR. ABRAHAM:

Q.    Did you view the Chardan report referenced in this email as helping to generate liquidity for Genius Brands' common stock?

A.    I don't recall that specific report, but for us generally, we review reports for the information contained therein, and you know, it just helps us in our understanding of the company.

Q.    I understand that you -- that Anson reviews the reports, but my question is, does it view the reports as helping generate liquidity for the company's common stock?

MR. TRACEY:  Objection to the form.

THE WITNESS:  We don't view research reports as generating liquidity.  We view research reports as providing information to the marketplace.

BY MR. ABRAHAM:

Q.    Do you view press releases as

generating liquidity?

MR. TRACEY:  Objection.

THE WITNESS:  Again, I don't view press releases as generating liquidity.  I view it as information that is being put out to the marketplace by a company.  Oftentimes it could be a regulatory requirement for them to press release major developments.

BY MR. ABRAHAM:

Q.   Do you view the process of generating liquidity for small cap stock as different than that for generating liquidity for a larger cap stock?

MR. TRACEY:  Objection.

THE WITNESS:  I am not involved in what companies view as their motives for putting out these press releases, so I am not sure what the -- I am not sure how to even answer your question.

BY MR. ABRAHAM:

Q.   Okay.  Do you -- have you ever heard the term "nano cap stock"?

A.   I have heard the term before.

Q.   Do you know what it refers to?

A.   In my mind, a nano cap and a micro

Page 98

cap are the same thing, but I am not sure what other people in the marketplace differentiate as the difference.

Q.    And what is the threshold for a micro cap stock?

A.    In my mind, it would be, you know, 2, 3, 400 million and smaller.  Again, there is no -- I don't know if there is a real threshold, but in my mind it is a company with a small market cap.

Q.    Would the liquidity for a company with a $200 million market cap be different than for a company with a $20 million market cap?

MR. TRACEY:  Objection.

THE WITNESS:  I think it is dependent case by case.  I have seen many instances of very small companies having very liquid stocks and very large companies having very illiquid stocks.  I think it just really depends.

BY MR. ABRAHAM:

Q.    And what factors influence that liquidity, in your experience?

A.    Truthfully, I am not certain.  It just really depends on what other investors are reviewing about the company and whether they desire

Page 99

to trade.  I can't put myself in the mind of other investors.

Q.    Do you ever try to put yourself in the mind of other investors?

MR. TRACEY:  Objection.

THE WITNESS:  I generally, when stress-testing my own thesis, try to think about what people who have opposing views might be thinking about a stock as part of my own investment process to try and stress-test my own thesis.

But again, it is a very difficult thing to do to try and pretend that you understand what other investors are thinking.

BY MR. ABRAHAM:

Q.    Did you ever stress-test your investment thesis for Genius Brands securities?

A.    Again, "stress-test" is a term I just threw out there, but we definitely reviewed the information available by Genius Brands to validate our investment thesis.  We do that on an ongoing basis at Anson.

Q.    Do you recall how many hours Anson spent reviewing the information available by Genius Brands in or about October 15, 2019?

A.    Specifically at that time period,

Page 100

I couldn't say.

Q.   Would you have done that work yourself?

A.   At that time, the majority of the work would have been done by me.  We have a -- we have analysts at Anson who work with me, but I believe the individual who was here at the time no longer -- is no longer with us.

Q.   Have you ever met Mr. McIlree?

A.   Sorry?

Q.   Have you ever met Mr. Jim McIlree?

A.   Yes, I have.

Q.   On what occasions?

A.   When SEG has had events that they host, whether it be dinners or cocktail events, he has been prevent at some of them.

Q.   How many events have you attended that SEG has hosted?

A.   Over ten years, it would have to be a couple dozen, I would imagine.

Q.   Did you ever meet other investors there?

A.   There have been, at some of those events, other investors present.

Q.   Do you recall which other

investors were present?

A.    I don't recall specific investors at any of the events.  I -- again, it has been over the course of many years that I have attended these events.

Q.    Did you ever meet Richard Molinsky?

A.    I don't believe I have ever met him.

Q.    Did you ever meet Richard Abbe?

A.    I have met Richard Abbe at a couple of conferences.  I don't know if they were SEG events or not.

Q.    Did you ever speak with Mr. Abbe concerning Anson's investment in Genius Brands securities?

A.    No.

Q.    Did you ever learn Mr. Abbe's position with respect to his fund's investment in Genius Brands securities?

MR. TRACEY:  Objection.

THE WITNESS:  I believe Mr. Abbe had been invested in Genius Brands, but I don't know what precisely those are.

Page 102

BY MR. ABRAHAM:

Q.    Do you recall whether Mr. Abbe ever attempted to put Genius Brands into default in 2019?

A.    Not that I recall.  I don't think so.

Q.    Did you ever meet Ryan Lane?

A.    I have met Mr. Lane a couple of times over the years, but it has been a long time since I have last seen him.

Q.    Have you ever invested in any securities for which the Iroquois funds were the lead investors?

A.    I am aware of having been in certain financings where Iroquois might have also been an investor.  I don't know if they were the lead or not.

Q.    Have you ever invested in any securities for which the Empery funds were the lead investor?

A.    Again, I have been invested in financings where Empery was also another investor, but I couldn't say if they were the lead or not.

Q.    Have you ever met Shaye Hirsch in person?

A.   I believe I met him once at a cocktail event about eight or ten years ago.

Q.   Have you ever met Karl-Heinz Grasser in person?

A.   I am not sure who that is.

Q.   Have you ever met Jay Spinner in person?

A.   I don't know if I know who that is.

MR. ABRAHAM:  All right.  Let's ask the reporter to mark as Exhibit 8 the document which is tab 8 in this binder, and it is Bates-stamped ANSON_00000024 through 36.

EXHIBIT NO. 8:  One-page email attaching a document on the letterhead of Chardan, document Bates-stamped ANSON_00000024 through ANSON_00000036.

THE WITNESS:  I see it.

BY MR. ABRAHAM:

Q.   Have you ever seen this document before?

A.   I don't recall if I have seen this or not.

Q.   Well, I am referring to the first page, which is an email.

A.   Again, I don't recall actually receiving this email.

Q.   And the email is from Joe Reda, sent October 15th, 2019, at 6:25 a.m., to Jonathan Schechter, copying Andrew Arno, blind-copying you; do you see that?

A.   I do.

Q.   Do you have any understanding why Mr. Reda would blind copy you on this email?

A.   I am not sure why.

Q.   Do you know who Andrew Arno is?

A.   I do.

Q.   Who is he?

A.   I believe he was -- again, I don't know the exact relationship, but I believe he was one of the partners at SEG, but I don't think he is anymore.

Q.   Did you ever discuss Genius Brands securities with Mr. Arno?

A.   I can't say for certain I haven't, but I don't recall any such conversations.

Q.   All right.  And the document Bates-stamped from 26, which is the third page of this document, to 35, which is the second-to-last page, I believe that is an analyst report; is that

Page 105

correct?

A.    I --

Q.    Actually, say from -- yeah, the page before -- between 24 -- from page 25, which is the page between 24 and 26, from 25 to 35 is the -- is an analyst report by Chardan; is that correct?

A.    It appears to be, yes.

Q.    Do you recall reviewing it in October 2019?

A.    Don't recall the report.

Q.    Did the report factor in in any way to any of Anson brands investment decisions with respect to Genius securities?

A.    Again, I don't recall the specific report, so I am not sure if it would have factored in or not.

Q.    Is it correct that you retained the document in Anson's files?

A.    The document appears to have been attached to an email that was sent to me, and as such, it is automatically archived into our system.

MR. ABRAHAM:  Okay.  I would like to take a break now, five minutes, so can we go off the record, please.

THE VIDEOGRAPHER:  Off the record at

11:44 a.m.

           -- RECESSED AT 11:44 A.M.

           -- RESUMED AT 12:04 P.M.

           THE VIDEOGRAPHER:  This is Media No. 3 of the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo.  Back on the record at 12:05 p.m.

           Go ahead, Counsel.

           BY MR. ABRAHAM:

           Q.  Mr. Nathoo, did you speak to anybody during the two breaks we have had during this deposition?

           A.  I spoke to my counsel.

           Q.  What did you speak to your counsel about?

           MR. TRACEY:  I am going to object and instruct him not to answer.

           BY MR. ABRAHAM:

           Q.  Was it about the substance of your testimony?

           MR. TRACEY:  I am going to object and instruct him not to answer.

           MR. ABRAHAM:  And you will understand if I go to Court and ask for -- ask that your witness be compelled to respond to those questions,

Page 107

right?

MR. TRACEY:  I couldn't hear that.

MR. ABRAHAM:  I said you will understand that I disagree with your instruction and I should feel free to go to Court at an appropriate time to compel a response; is that correct?

MR. TRACEY:  Absolutely.  You can go to the Court any time you want.

EXHIBIT NO. 9:  Email thread, Bates-stamped TOON00017339 through TOON00017345.

BY MR. ABRAHAM:

Q.    Thank you.

All right.  I think we are up to Exhibit 9, which is tab 9 in the binder in front of you, Mr. Nathoo.  Oh, we are up to number 8.  One second.  Did I do that?  Let's go to tab 8, which is Exhibit -- let's mark as Exhibit 8 tab 8.  No, we had marked that already.  We are up to tab 9, I think, which is Exhibit 9.  And it is Bates-stamped TOON00017339 through 17345.

A.    I see it.

Q.    Why don't you take an opportunity to review this document and let me know when you

are done, please.

A.   [Witness reviews document.]

Okay.  I have reviewed it.

Q.   Have you ever seen this document before?

A.   I don't recall the document from the time, but I saw it when the deposition materials were sent to us last night.

Q.   I am going to ask you to turn to the third page of this document, which is Bates-stamped 17341 at the bottom right-hand corner; do you have that?

A.   Yes, I do.

Q.   And at the bottom, there is an email from Joe Reda, Saturday, October 26, 2019, at 9:59 a.m., to Michael Jaffa and Amin Nathoo, copied Jonathan Schechter and Bob Denton, subject "Re: GNUS - Registered Direct"; do you see that?

A.   Yes, I do.

Q.   And in the email Mr. Reda writes:

"Shex, Amin Needs the docs."

Do you see that?

A.   Yes, I do.

Q.   Do you understand that to be the documents relating to the proposed deal referenced

in this email?

A.   Yes, that is my understanding.

Q.   Do you recall receiving those documents?

A.   I don't recall if we even did this deal or not.  I am not sure.

Q.   Why aren't you sure?

A.   We had done several transactions with Genius over the years, and there were several instances where there were potential transactions proposed that never materialized, and I can't recall off the top of my head which ones were the case.

Q.   Do you recall any potential deals that did not materialize?

A.   Yes, there are.  I can recall a couple.

Q.   Do you recall the reasons they didn't materialize?

A.   Generally, if we had proposed a potential transaction for the company, it is because the company did not want to proceed.

Q.   Was it ever that other investors didn't want to proceed?

A.   Not that I recall specifically,

but if the investment bank was proposing a transaction and it could not get it done, it could cause deals to not proceed.  I just can't recall.

Q.   Was Anson's participation in any deal with Genius Brands ever contingent upon the participation of other investors?

A.   Our participation in transactions was contingent upon the deal getting done, but it didn't -- it wasn't contingent on any one specific investor.

Q.   All right.  Let me -- let's go back to this email for a second -- well, more than a second.

The next paragraph says:

"Amin has agreed to do the $504k left on the shelf's 1/3rd rule."

Do you see that?

A.   Yes, I do.

Q.   Do you know what "the shelf's 1/3rd rule" refers to?

A.   I believe it refers to what is commonly known in the industry as a baby shelf limitation which limits the company's ability to utilize a shelf within the last 12 months to

one-third of the public, but there is some
calculation that is based on trailing stock prices
that I can't recall off the top of my head.

Q.   And it goes on to say:

"He will do it alone or split
it with Shaye [...]"

Do you see that?

A.   Yes, I do.

Q.   Does "Shaye" refer to Brio?

A.   I believe it does, yes.

Q.   Do you recall whether Anson split
this deal with Brio?

A.   I don't recall if this deal
occurred, nor do I recall ever doing a transaction
where it was just us and Brio.

Q.   If you turn to the next page,
which is Bates-stamped 17342, please.  And the
first full paragraph on the page says:

"However, the Company wants
more money!!!  One way could be by
using old warrants.  GNUS would love
to max out the 20% rule on a warrant
exchange and or a PIPE before the
debt deal closes, BUT Amin has NOT
agreed to that.  He will keep an

Page 112

open mind on today's call."

Do you see that?

A.   Yes, I do.

Q.   Do you recall any such call that you had regarding that subject?

A.   I don't recall having a call.

Q.   Is it possible you did have that call?

A.   It is possible, yes.

Q.   The next paragraph says:

"Another option is to get Amin some of the pref that Shaye and richie have, but I doubt that can close this quickly...if at all. TBD."

Do you see that?

A.   Yes, I do.

Q.   Do you understand "Shaye" to be referring to Shaye Hirsch?

A.   Yes, I do.

Q.   And who do you understand "richie" as being referring to?

MR. TRACEY:  Objection to form.

BY MR. ABRAHAM:

Q.   You can answer the question unless

there is an instruction not to answer.

A.    If I had to guess, it would be Rich Abbe from Iroquois.

Q.    Why would you guess it to be Richard Abbe from Iroquois?

A.    I believe he has been involved in the company.

Q.    Were you on a first-name basis with Mr. Abbe?

A.    I believe I have seen him at a conference or two over the years.

Q.    Did you ever speak to him directly?

A.    I believe we have had a conversation and said hello.

Q.    But no other direct conversations aside from greetings with Mr. Abbe; is that correct?

A.    Yeah, that's correct.  Just pleasantries at a conference.

Q.    Did you ever have any discussions with Mr. Abbe concerning Genius Brands?

A.    No.

Q.    Were Mr. Abbe's views concerning Genius Brands ever relayed to you by SEG?

Page 114

A.    Sorry, could you repeat that?

Q.    Were Mr. Abbe's views concerning Genius Brands ever communicated to you by SEG?

A.    Not that I recall.

Q.    Were they ever communicated to you in any fashion?

A.    Not that I recall, no.

Q.    So is it fair to say that you had no understanding of what Mr. Abbe's views were with respect to Genius Brands?

A.    Yes, I would believe that is correct, I would not know what his views were.

Q.    And is the same true of Mr. Hirsch and Brio?

A.    Yes, that would be true.

Q.    All right.  Let's go to the first page of this email, please.  And on the top of the page, there is an email from Joe Reda to Amin Nathoo, who I think is you, copying a bunch of people.  The subject is "Re: GNUS - Registered Direct"; do you see that?

A.    Sorry, what page are we on?

Q.    The first page, which at the bottom is -- of this exhibit, the bottom of it is Bates-stamped 17339.

Page 115

A.    Yes.  Okay.  Sorry, I have it.

Q.    Do you see that first email on the page?

A.    Yes, I do.

Q.    And it says in the body of the email:

"The 2:30 call is cancelled.

Amin and Andy speaking now."

Do you see that?

A.    Yes, I do.

Q.    Does that refresh your recollection as to whether you spoke to Andy on October 26, 2019?

A.    I still don't recall whether or not I had a conversation or not.

Q.    Do you recall what the subject matter of that conversation might have been about?

MR. TRACEY:  Objection.

THE WITNESS:  I don't recall the call, so I would not know what the subject matter of a call that I don't know about is.

BY MR. ABRAHAM:

Q.    Would Mr. Heyward be -- strike that.

Would Mr. Heyward be informing Anson

about any material non-public information in that phone call?

MR. TRACEY:  Objection.

THE WITNESS:  Sorry, was the question whether Mr. Heyward would be providing me material non-public information?

BY MR. ABRAHAM:

Q.   Yes.

A.   Again, I don't recall if the call even happened, so I don't know how to answer that question.

Q.   Well, do you -- would Mr. Heyward have been discussing any prospective investment in Genius Brands securities by Anson?

MR. TRACEY:  Objection.

THE WITNESS:  Again, I don't recall if the conversation even occurred.

BY MR. ABRAHAM:

Q.   Do you keep a logbook of telephone calls?

A.   No, I do not.

Q.   Do you know how the phone system at Anson works?

A.   I know how to use the phone.  I am not sure what you are asking.

Page 117

Q. Do you know whether the phone system maintains a list of phone calls?

A. I don't know. I couldn't say.

Q. If you had a call with Mr. Heyward, would you have been required internally at Anson to report the contents of that call to anybody?

A. No.

Q. So there was no compliance procedure at that time at Anson for reporting on the contents of telephone calls; is that correct?

A. If you receive material non-public information on a call, there is a compliance procedure to add this doc to the restricted list.

Q. Okay. We could put this aside now or you could turn the page and we could go to Exhibit 10, which is also tab 10 in the book in front of you.

EXHIBIT NO. 10: One-page email, Bates-stamped ANSON_00007952.

BY MR. ABRAHAM:

Q. And the document is Bates-stamped ANSON_0007952. Do you have that document in front of you?

A. Yes, I do.

Q.   Take a chance to review it, and please let me know when you have finished doing so.

A.   [Witness reviews document.]

I reviewed it.

Q.   And it is an email from Joe Reda to Bob Denton, Amin Nathoo and a series of other people, and the subject is "GNUS - Registered Direct"; do you see that?

A.   Yes, I do.

Q.   And in the body of the email, it says:

"We spoke to Shaye.

He's going to save his money for the debt deal.

Close this one with Amin."

Do you see that?

A.   Yes, I do.

Q.   Does that refresh your recollection as to whether Anson closed this deal with Genius Brands?

A.   No, it does not.  I am still not sure whether it actually went forward or not.

Q.   Okay.  When -- do you know what Mr. Reda is referring to when he mentions "debt deal" in the context of this email?

A.    I don't know what specific deal Mr. Reda was referring to.

Q.    Was he referring to the PIPE deal that eventually went forward in March 2020?

A.    I am not sure if he was referring to that one.  Again, as I have mentioned earlier, Mr. Reda proposed many transactions for Genius over the years.

Q.    Do you know any other deal which Mr. Reda might have been referring to in this email?

A.    I am not sure.

Q.    All right.  Let's put this -- or turn the page, and let's go to tab 11, which we are going to mark as Exhibit 11.

EXHIBIT NO. 11:  Email thread, Bates-stamped ANSON_00002162 through ANSON_00002164.

BY MR. ABRAHAM:

Q.    And it is Bates-stamped ANSON_0002162 through 2164.

A.    I see it.

Q.    Take a chance to review this document, and let me know when you are done, please.

Page 120

A.   [Witness reviews document.]

I reviewed it.

Q.   Have you ever seen this document before?

A.   I don't recall seeing this document before, no.

Q.   And do you see the second email on the page is from Bob Denton, date November 18th, 2019, to Joe Reda, subject "RE:  Warrants"; do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what information is contained in that email?

A.   Sorry, in the second email?

Q.   In the second email, yes.

A.   I am reading it now.  It appears to be a listing of all the warrants outstanding in Genius Brands.

Q.   And on the top of the page, there is an email from Joe Reda, 11/18/2019, at 4:29 p.m., to Amin Nathoo, subject, forward -- or "Fwd: Warrants", in which he says:

"Info you requested."

Do you see that?

A.   Yes, I do.

Q.    Do you recall requesting that information from Mr. Reda?

A.    I don't recall.

Q.    Do you recall requesting that information from anybody?

A.    No, I don't.

Q.    Sitting here today, do you have any understanding why Anson would care about the number of warrants outstanding with respect to Genius Brands in November 2019?

A.    Sitting here today, I could speculate that we just wanted to know how many registered warrants the company had, but --

Q.    Why --

A.    -- that would be a guess.

Q.    Why would Anson want to know how many registered warrants Genius Brands had at that time?

A.    Again, I am just speculating, as you had asked me to do, that the company wanted to use the registered warrants to potentially do a warrant inducement financing.  But again, I am not certain.

Q.    All right.  Let's put that aside and go to tab 12 for a second, but before I do

Page 122

that, why would Anson want to know who the individual holders of the warrants were in November 2019?

MR. TRACEY:  Objection to the form.

THE WITNESS:  Again, I don't recall asking for that information, so I don't recall asking for the individual holders.

BY MR. ABRAHAM:

Q.    But if the company was thinking about doing a warrant inducement exchange, would it make a difference who the individual investors or owners of the warrants were at that time?

A.    I think, from my perspective, the total quantity of warrants is what would matter, not the individual holders.

Q.    But the email in Exhibit 11 from Mr. Denton identifies the investors by name; is that correct?

A.    It does.

Q.    So you don't know why he did so; is that correct?

A.    No, I don't.

Q.    Did you care about who the investors were?

MR. TRACEY:  Objection, asked and

answered.

THE WITNESS:  No.  We cared about the quantity of warrants.  We generally are not caring of who the other investors are.

BY MR. ABRAHAM:

Q.   Did you care about any of the other terms of the warrants?

A.   For the purposes of a warrant inducement, you want to know whether the warrants are registered or not and exercisable.

Q.   Is that the only term that Anson cared about at that time?

A.   Again, I don't recall asking for this information, but if I am speculating, that is what we would be concerned with.

Q.   All right.  If you turn -- if you are on Exhibit 11, turn to the second page of the exhibit, which is Bates-stamped 2163.

A.   I see it.

Q.   And it says:

"In Summary, working backwards [...]"

And it lists a whole bunch of warrants on the left-hand side, and then on the right-hand side it identifies the number and says either "not

registered" or "registered" or "registered?" with a question mark; do you see that?

A.    Yes, I do.

Q.    Do you recall receiving that information in November 2019?

A.    I don't recall receiving any of this information.

Q.    Okay.  Let's then -- let's go to Exhibit 12, which is tab 12, and it is Bates-stamped ANSON_0002564.

EXHIBIT NO. 12:  Email from Amin Nathoo to Jonathan Schechter dated 12/20/2019, document Bates-stamped ANSON_00002564.

THE WITNESS:  I see it.

BY MR. ABRAHAM:

Q.    And there is an email from Amin Nathoo sent 12/20/2019, to Jonathan Schechter, copying Tony Moore, subject "GNUS - Warrant Exchange Legal Opinion"; do you see that?

A.    Yes, I do.

Q.    And in the body of the email, it says:

"Shex, was there a legal opinion given to the transfer agent or anyone else regarding this

Page 125

warrant exchange we just did."

Do you see that?

A.    Yes, I do.

Q.    Does that refresh your recollection as to whether Anson did a warrant exchange?

A.    Again, I don't recall doing -- whether or not we did one, but it appears that one was done.

Q.    So you don't recall the terms upon which the warrant exchange was done, do you?

A.    No, I don't.

Q.    What exactly would the warrant exchange have involved?

A.    Sorry?

Q.    Would the warrant exchange have involved the exercise of any of the warrants?

MR. TRACEY:  Objection to the form.

THE WITNESS:  Again, I don't recall what the specifics of the term were, but generally warrant exchanges do involve that.

BY MR. ABRAHAM:

Q.    Do you recall whether Anson retained any of the shares it acquired in connection with this warrant exchange?

MR. TRACEY:  Objection.

THE WITNESS:  I am not sure exactly what you mean by that question, but sitting here today, we don't hold any Genius shares, so at some point we have disposed of them.

BY MR. ABRAHAM:

Q.   How about in 2019, would you have disposed of them?

MR. TRACEY:  The same objection.

THE WITNESS:  It is possible, but I wouldn't know without referring to our trading records.

BY MR. ABRAHAM:

Q.   In 2019, in December 2019, had Anson lost money overall in its investments in Genius Brands securities?

A.   I honestly wouldn't know whether it was a loss or not.

Q.   Are there any documents it would maintain to determine whether there was a loss or not?

A.   Our system keeps track of P&L by year, so I imagine it could be ascertained.

Q.   Does it -- your system keep track of PL by -- P&L by year for each issuer in which

Page 127

Anson invests?

A.   Yes, by issuer.

Q.   So it would have kept track of P&L for Anson's investment in Genius Brands?

A.   Yes, it would have.

Q.   Do you know whether those documents were produced in the course of this litigation?

A.   I believe every document that we possessed that was requested during the discovery process was produced.

Q.   Does that mean you don't know off the top of your head?

A.   I don't know off the top of my head every single document that was produced, no.

Q.   Did you review the contents of the document production in this case?

A.   I believe I contributed to the response, but our general counsel would have been leading that, that process on our side.

Q.   Who is your general counsel?

A.   Our general counsel is Laura Salvatori, who is sitting next to me here.

Q.   Okay.  And in the email, going back to Exhibit 12, it says:

Page 128

"One of our primes is asking to see a legal opinion on the exchange before taking in the shares from the deal as a transfer from Maxim."

Do you see that?

A.   Yes, I do.

Q.   Who are you referring to as -- when you say "primes"?

A.   When I use the term "primes", it refers to prime brokers, who have custody of investments on behalf of investors.

Q.   And who is Maxim?

A.   Maxim is one of our primes that we deal with.  I believe it refers to Maxim Group LLC, I believe.

Q.   And you mean prime broker; is that correct?

A.   That's correct.

Q.   And Tony Moore is copied on this email; do you see that?

A.   Yes, I do.

Q.   Do you recall why you copied Mr. Moore on this email?

A.   I don't recall why I would have copied him, but he is involved in our operations,

and so perhaps he was the one handling the matter on our side.

Q.   And it is correct that he is located in the United States; correct?

A.   That is correct.

Q.   All right.  Let's turn the page and go to Exhibit 13, if we can, which is also tab 13, and it is a document Bates-stamped -- or it might be more than one document Bates-stamped ANSON_0005199 through 5205.

EXHIBIT NO. 13:  Email thread with attached term sheet, Bates-stamped ANSON_00005199 through ANSON_00005205.

BY MR. ABRAHAM:

Q.   Was Ms. Salvatori employed by Anson in December 2019?

A.   Yes.  I believe she started in April of 2019.

Q.   Was she involved in any way in negotiating any of the documents relating to Anson's investment in Genius Brands?

A.   I believe she had some involvement.

Q.   Was she involved in setting any of the business terms with respect to Anson's

investment in Genius Brands?

A.    No.

Q.    Whose responsibility was that?

A.    That was mine.

Q.    Anybody else's?

A.    No.

Q.    Okay.  Let's go to tab 13, Exhibit 13, which we have just marked a minute ago.

You take your -- take an opportunity to review this exhibit, and please let me know when you are done.

A.    [Witness reviews document.]

I have reviewed it.

Q.    All right.  Have you ever seen the email which is -- the list of emails which are contained in the first part of the document, which are Bates-stamped 5199 through 5201?

A.    I don't recall this email, but I saw it yesterday when we received that.

Q.    How about the draft term sheet contained in ANSON_5202 through 5205; have you ever seen that before?

A.    I don't recall this term sheet in particular, but it is one that appears to have been submitted by Anson, which would have been from me.

Q.   All right.   In that vein, can I ask you to turn to the third page of this exhibit, which is Bates-stamped 5201.   And there is an email from Amin Nathoo sent January 14, 2020, 3:09 p.m., to Joe Reda and Jonathan Schechter, subject "GNUS Term Sheet"; do you see that?

A.   Yes, I do.

Q.   Do you see that in the email you write:

"Here is a proposed term sheet for GNUS.   Let me know what you think."

Do you see that?

A.   Yes, I do.

Q.   Is it your understanding that you are -- in that email you are referring to the term sheet which is in this document Bates-stamped 5202 through 5205?

A.   Assuming that that was the term sheet that was attached to the email, then yes.

Q.   Do you have any reason to believe that there was another term sheet that was attached?

A.   No.

Q.   And if you go -- starting

Page 132

backwards from 5201, if you go to page 5200, there is a reference to an email which you sent on January 4th [sic], 2020, at 3:23 p.m., and you wrote:

"Attached is the updated."

Do you see that?

A.   Yes, I do.

Q.   Okay.  And I assume that references the updated term sheet; is that correct?

A.   That's correct.  Again, I don't know if this is the one that was the updated one or the original one, but it appears that I sent an update to my original one.

Q.   And if you go up the page on 5200, there is an email from Joe Reda sent January 14, 2020, at 3:59 p.m., to Amin Nathoo, and the subject is "Re: GNUS Term Sheet"; do you see that?

A.   Yes, I do.

Q.   And it says:

"Amin, Shex phone [is] not working.  Below are his comments".

Do you see that?

A.   Yes.

Q.   And number one says:

"Repayment of existing debt."

Page 133

Do you see that?

A.    Yeah.

Q.    And it says:

"We need all the HOSTILES out",

with the word "HOSTILES" all

capitalized.

Do you see that?

A.    Yes, I do.

Q.    Do you know to whom Mr. Reda is

referring in the context of this email when he says

"HOSTILES"?

A.    No, I do not.  It wasn't a comment

from me.

Q.    Do you recall any investor being a

hostile?

A.    Not that I recall.

Q.    Do you recall if there were any

investors you did not want to include in this

proposed financing?

A.    I don't recall.

Q.    Were there any investors you

didn't like?

A.    Not that I recall, no.

Q.    Do you know Robert Woolf?

A.    I know who he is.  I don't know if

I have ever met him.

Q.   Who is he?

A.   He used to be -- he used to be someone, I believe, who was at Morgan Stanley, very high up at Morgan Stanley Wealth, I believe, and I believe he does some political analysis on TV around elections, I believe.  I have seen him.

Q.   Do you know whether he had any involvement in Genius Brands?

A.   I believe that he had participated in some of their securities along the way.

Q.   Do you believe he had any involvement in Genius Brands in January 2020?

A.   I am not certain when his involvement started or ended.

Q.   Was he affiliated with an entity called 32 Entertainment; does that ring a bell for you?

A.   The name does sound familiar.  I believe that is his entity, but I couldn't know for certain.

Q.   Do you have any understanding whether Mr. Woolf was viewed as a hostile?

A.   I am not sure.

Q.   Going down the list, number 3

says:

"Interest", and it says "the investors are getting an OID".

Do you see that?

A.   Yes, I do.

Q.   Do you know what "OID" refers to?

A.   Generally, when you are doing a note, "OID" stands for original issue discount.  So you are purchasing the note at a discount to its par value.

Q.   So if the par value is $100, you are paying less than $100; is that correct?

A.   That's correct.

Q.   And Mr. Reda goes on to write:

"That usually is the interest component so I suggest striking."

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what he meant by that in this context?

A.   So reading this today, I believe he means, given that there is an OID, that there should not be an interest rate as well.

Q.   And he goes on to write:

"I PERSONALLY THINK WE SHOULD

MAKE IT COSMETICALLY A 6 MONTH NOTE SO GOD FORBID KERRY's DEAL NEVER HAPPENS WE CAN PAPER THAT TACKS FOR A RESTRUCTURING."

Do you see that?

A.   Yes, I do.

Q.   Do you know what he is referring to when he says "KERRY's DEAL"?

A.   No, I do not.

Q.   Do you know what he is referring to when he says "COSMETICALLY A 6 MONTH NOTE"?

A.   No, I do not.

Q.   He goes on in point 3 to say:

"THEN SAY IF A NEW FINANCING OF AT LEAST $5MIL DOESNT OCCUR IN THE NEXT 60 DAYS THEN YOU GET 100% WARRANTS ON THE BRIDGE AND ONE TIME RESET TO $0.21 ON SHAREHOLDER APPROVAL."

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding why he said that?

A.   I am not sure why.  It appears that he is suggesting potential terms.

Q.   Do you recall whether those terms were ever incorporated in any way into the PIPE deal which took place in March 2020 with Genius Brands?

A.   I don't recall.  The new financing had warrants, so it doesn't appear to match what is being suggested here.

Q.   All right.  Let me -- actually, I need to take a short break, which I will make two minutes, and I would like to get some more questions on the record before lunch.

Is that okay with you and your lawyer?

MR. TRACEY:  What is your timing on lunch, Jeff?  If we are going to --

MR. ABRAHAM:  This document is going to take me a few minutes.  I -- around 1 o'clock, or thereabouts.  Is that okay?

MR. TRACEY:  Yeah, yeah.  That is fine.

MR. ABRAHAM:  Okay.  Thank you.

THE VIDEOGRAPHER:  Off the record at 12:40 p.m.

-- RECESSED AT 12:40 P.M.

-- RESUMED AT 12:43 P.M.

THE VIDEOGRAPHER:  We are back on the record at 12:44 p.m.

Page 138

Go ahead, Counsel.

BY MR. ABRAHAM:

Q.   All right.   On the first page of this Exhibit 13, which is Bates-stamped 5199, there is an email from Joe Reda sent January 14, 2020, at 9:43 p.m., to Amin Nathoo, copying Jonathan Schechter, subject "Re: GNUS Term Sheet"; do you see that?

A.   Yes, I do.

Q.   And in it, it says:

"Two more comments -

1- what happens to the note if there's no recap deal (we get warrants, and proxy lower to .21- I suggest full ratchet as well..)"

Do you see that?

A.   Yes, I do.

Q.   Do you know what "full ratchet" refers to?

A.   I believe it refers to in a security that has a resetting mechanism on the price that if a new transaction occurs at a lower price, the conversion price then, quote/unquote, ratchets down to that price.

Q.   And you see number 2 is "right of

participation"; do you see that?

A.   Yes, I do.

Q.   "[...] this only protects Anson (1.5mm gets 50% right of participation) [...]"

Do you see that?

A.   Yes, I do.

Q.   Do you understand "1.5mm" to be $1.5 million?

A.   That's correct.

Q.   "[...] I would want Brio (or it's designated affiliate) to have 25-50% right of participation as well (assuming minimum of $650k investment in this bridge)".

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding who Brio's designated affiliate might have been?

A.   No, I do not.

Q.   Did you care?

A.   No, I did not.

Q.   And then underneath this, it says "Shaye's comments"; do you see that?

A.   Yes, I do.

Q.   Did you understand points 1 and 2 to be the comments of Shaye Hirsch with respect to the proposed term sheet?

A.   I don't recall this email, but it appears from reading this exhibit that that is the case.

Q.   So is it correct that Mr. Reda was relaying Shaye Hirsch's comments to you on the proposed term sheet through this email?

A.   I understand this email, reading it today, to be terms that would be needed in the deal for that investor to potentially participate.

Q.   But those were Shaye Hirsch's comments; correct?

A.   That is what Mr. Reda appears to say.  I am not sure if it actually came from him or not.

Q.   And Mr. Reda purports to be sending you Mr. Hirsch's comments; is that correct?

A.   It appears to be, yes.

Q.   And then he writes:

"I'm not smart enough."

Do you see that?

A.   That's correct.

Q.   Do you have any understanding what

Mr. Reda meant when he wrote "I'm not smart enough"?

A.   No, I do not.  You would have to ask him.

Q.   Do you have any understanding whether he was mocking Mr. Hirsch?

A.   I am not sure.

Q.   Did Mr. Reda ever mock Mr. Hirsch to you?

A.   Not that I recall.

Q.   All right.  Let's go up the page, please.  There is an email from Amin Nathoo 1/14/2020, 10:01:35 p.m., to Joe Reda, copying Jonathan Schechter, "RE: GNUS Term Sheet", "Attachments:  GNUS - AIMF - Note Term Sheet.docx"; do you see that?

A.   Yes, I do.

Q.   Do you recall sending this email?

A.   I do not recall sending it.

Q.   Do you have any reason to believe you did not send this email?

A.   No, I do not.

Q.   And in the body of the email, it says:

        "Theres no chance anyone else

is getting a right of participation for only $650k."

Do you see that?

A.   Yes, I do.

Q.   Do you recall why you said that?

A.   I don't recall sending the email.

Q.   Well, sitting here today, do you have any understanding as to why Anson would not want to give a right of participation for anybody investing $650,000 in the transaction?

MR. TRACEY:  Objection.

THE WITNESS:  Generally, we view a right of participation as a positive term for an investor, and generally we would want as few other investors to have that positive term, and we would want the best terms for ourselves and not for the other investors.

BY MR. ABRAHAM:

Q.   Under what circumstances would Anson agree that other investors could also have the right of participation?

A.   Generally, that would be an agreement between the company and the other investor, and as long as we were being treated fairly through the process and we were being

afforded similar terms and benefits, you know, it is not in our place to object.

Q.   So is it fair to say that Anson would want the same terms and benefits as the other investors?

MR. TRACEY:  Objection to the form. You can answer.

THE WITNESS:  If we are participating in a transaction, we would want to be afforded the same terms and benefits that other investors are receiving, out of fairness.

BY MR. ABRAHAM:

Q.   Is it just out of fairness, or is it for any other reason as well?

A.   Well, it is generally out of fairness.  If everyone else is doing a secondary and buying a stock at $10 and I am being asked to pay $11, I wouldn't think that is fair and I wouldn't want to participate in that transaction.

Q.   And in the second line of the email -- well, if you go on in the first line, it says:

"if he wants that he has to step up and put up at least the same amount of net new money that I am."

Page 144

Do you see that?

A.   That is correct.

Q.   What did you mean by "net new money"?

A.   Again, I don't recall the email, but my recollection of what was occurring at the time was that funds from this new transaction were being used to repay the prior -- the prior debt that was outstanding of the company, and so net new money would be, you know, investing new money on top of what was being repaid.

Q.   And then you go on to write:

"I don't need the right of participation in this deal... im happy to remove it completely."

Do you see that?

A.   Yes, I do.

Q.   Why did you not need the right of participation in this deal?

A.   Again, I don't recall the email, but if I said that, it would have meant that I was happy with the terms of the deal even without that right of participation and would have participated.

Q.   And the next paragraph says:

"Updated the conversion price."

Page 145

Do you see that?

A.    Yes, that's correct.

Q.    What conversion price are you referring to?

A.    Again, I am not a hundred percent certain, but I believe the term sheet called for debt that was convertible into equity, so reading this email, I understand the conversion price of that debt.

Q.    It -- was the conversion price updated to 21 cents a share?

A.    I would have to check the attachment to confirm.  I'm not sure.

Q.    All right.  Let's go to the attachment, which is Bates-stamped 5202 through 5205.

A.    I see it.

Q.    Have you seen this document before?

A.    I don't recall it, but it has the Anson letterhead on it, so I -- in all likelihood, it would have been prepared by me.

Q.    And this, on page 5202, refers to an "Issuer: Genius Brands Int[ernational] (the 'Company')", and:

"Investors:  Anson Investment
Master Fund LP ([...] [defined as]
'Lead Investor'), and other
institutional and accredited
investors acceptable to the Lead
Investor [...]"

Do you see that?

A.   Yes, I do.

Q.   And the offering size is up to
$5 million; do you see that?

A.   Yes, I do.

Q.   Do you know how you settled on an
offering size of $5 million in connection with this
term sheet?

A.   Sitting here today, I don't know
if it was ever settled as such, but it appears that
that's what I was proposing.

Q.   "[...] of which the Lead
Investor has committed to doing up
to $2,500,000 if the offering is at
least $4,000,000."

Do you see that?

A.   Yes, I do.

Q.   Do you recall the reason why Anson
was willing to do up to 2 and a half million

dollars if the offering was at least $4 million?

A.   My recollection of what was happening at the time was, again, the company needed to raise money to pay off existing debt.  We were able -- we were willing to participate in a transaction in a size that was greater than the debt that we had that was going to be repaid to us, but not if we were the only company -- only investor funding the company because that would not have given the company much cash runway before they needed to raise money again.

And I should add to that.  And we weren't willing to take the risk to do beyond that size.

Q.   And the "Use of Proceeds" is:

"Debt repayment and working capital."

Do you see that?

A.   Yes, I do.

Q.   And underneath, it says "Repayment of Existing Debt"; do you see that?

A.   Yes, that's correct.  Yes, I do.

Q.   And for "Repayment of Existing Debt" it says:

"Existing debt holders must

Page 148

either: 1) invest in this deal at least 167% of the amount of their existing debt and then be repaid on the existing debt, 2) convert their existing debt into common at the current conversion price."

Do you see that?

A.   Yes, I do.

Q.   Do you recall why this provision is contained in this term sheet which Anson prepared?

A.   My recollection of the time was that the company was having difficulty repaying their debt.  We were willing to fund additional funds to repay that debt but, you know, weren't willing to take on additional risk to -- so that everyone else could just get paid back and not -- and have a free ride on our deal.

And so we said we were willing to participate if people either participated and took a risk themselves or converted their stock to equity, thereby taking risk themselves.

Q.   Is it fair to say that you wanted the other existing debt holders to work together with Anson to refinance the debt?

A.   No, I wouldn't say that.

Q.   Why not?

A.   Again, the terms of this term sheet call for a multitude of options that the investors could have taken with their debt.

Q.   Is it correct that both these options reference each of those debt holders reducing their amount of debt they held in Genius Brands?

A.   It does.  It does.  One of the options appears to be reducing the amount of debt that they held.  The other one appears to be raising it.

Q.   Which one is that?

A.   The first one.

Q.   Which one -- which option is the one that appears to be reducing the amount of debt that they held?

A.   The second one, because it would be converting debt into equity.

Q.   And what is the first option, which says:

"[...] invest in this deal at least 167% of the amount of their existing debt and then be repaid on

the existing debt [...]"

What does that accomplish?

A.   Again, we were not willing to take on additional risk to repay other investors, and our opinion was that all investors -- all people who were getting their debt repaid would take on some risk from that.

Q.   Is it correct that the first option also reduces the amount of existing debt which Genius owes?

A.   Yes, the first one reduces the existing debt.

Q.   And if you go to the next page -- well, let's stay on this page for a moment, Bates-stamped 5202.  "Maturity" says:

"The Notes [will] mature 180 days from [the] Closing [...]"

Did you believe that gave the company sufficient runway within which to repay the new debt being incurred through this proposed term sheet?

A.   I don't recall what the runway of the company was at that time.

Q.   Do you recall whether the company was generating positive cash flow at this time?

A.   No.  I believe it was negative cash flow.

Q.   Where did you believe that the company would have the funds to repay these notes within 180 days from closing?

A.   Our belief was that they would raise funds through other means to be able to repay the notes.

Q.   Did you have any understanding as to what those other means would be?

A.   No, I did not.

Q.   Do you have any understanding whether Anson planned to participate in those other means?

A.   We would -- we would not have future plans to invest in a company.  We would assess each investment as it came.

Q.   Did you know whether there were other investors who had such plans to provide an investment in Genius Brands at that time?

A.   No, I do not.

Q.   Let's go to the next page, please. And the second heading on the left is "Registration"; do you see that?

A.   Yes, I do.

Page 152

Q.    And it says:

"The Company will file a universal shelf registration for $50 [million] within 5 days of Closing."

Do you see that?

A.    Yes, I do.

Q.    Do you know what is a universal shelf registration?

A.    A shelf registration is a filing that a company makes with the SEC -- I don't know if permission is the right word, but requesting permission to be able to issue registered securities off of that shelf at some future time after the SEC has reviewed and provided their approval.

Q.    What was the purpose of requesting that the company file a universal shelf registration for $50 million within five days of closing as one of the terms for this financing?

A.    As you had mentioned, the company was negative cash flow, and generally or -- and as I have said, the most likely method of them repaying our debt would be to raise funds in the future, and generally for companies it is easier to

Page 153

raise funds when the securities are registered than when they are unregistered, and requesting this increased the likelihood that the company would be able to raise those funds to repay us.

Q.   Why is it easier for a company to raise funds when its securities are registered?

A.   It just gives additional optionality to investors.  If the securities are registered, meaning they are free trading, they could be sold by those new investors into the market at whatever time they choose.  If they are unregistered, they are prevented from doing so until some future date.

And therefore, that additional optionality of having registered securities makes the deal more enticing for investors.

Q.   And if you go on in the "Registration" entry, the second paragraph says:

"Upon demand by the Lead Investor via email (the 'Demand Date'), within 10 calendar days of such Demand Date, the Company will file a registration statement to register the common shares underlying the Notes ([defined as]

Page 154

the 'Registration Shares') and must use commercially reasonable best efforts to have registration statement effective as soon as practical, but no later than [...] 60 calendar days of the Demand Date."

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what the purpose of that provision was?

A.   I don't recall why it was written this way, but you know, we -- when we participate in security offerings of a company that are not registered, we want the company generally to register them within a certain amount of time.

And so we generally include a registration provision in our term sheets.

Q.   All right.  If you turn the page to the page Bates-stamped 5204, which is, I believe, the next page, the second entry on the page is "Failure to enter into Recap Deal"; do you see that?

A.   Yes, I do.

Q.   Do you know what "recap deal"

refers to in the context of this -- actually, "recap deal" refers back to, am I correct, the forced conversion provision on the prior page, Bates-stamped 5203; do you see that?

A.   I see the forced conversion provision, yes.

Q.   And the forced conversion provision says:

"If the Company completes a subsequent transaction of new debt financing of at least $5,000,000 of new capital ([defined as] the 'Recap Deal' and the securities issued in such transaction the 'Recap Securities'), then the Investors will be forced to exchange their Notes for the Recap Securities."

Do you see that?

A.   Yes, I do.

Q.   Do you recall whether there was any recap deal contemplated at the time that Anson prepared this term sheet?

A.   I don't recall if there was anything being contemplated at that time or not.

Q.   And if not, do you recall the

reason why this term was included, "Forced Conversion", in the term sheet?

A.   I don't recall why this term was included.  Generally we would, again, like more optionality to take cash back for our debt rather than being forced to roll into a new deal.  But I am not sure the sequence of events that led to it being included in the term sheet.

Q.   And --

A.   I'm sorry --

Q.   -- on the "Failure to enter into Recap Deal" on the next page, which is Bates-stamped --

A.   Could I just finish --

Q.   Oh, I'm sorry, I didn't realize you were still answering.

A.   Yeah, I -- that was my mistake. What I meant to say was I imagine that it was something that was requested by the company.

Q.   Why do you imagine that?

A.   Because it would be to their benefit to make the next deal easier to complete if you are not having to raise new money for the company to operate and money to pay off the existing debt.

Q.    And when you say "company", you mean by Andy Heyward?

A.    I mean Genius Brands of which Andy Heyward is the CEO.

Q.    So you believe he requested this term?

A.    I believe -- if I had to sit here and speculate, I believe it would have been suggested by the company because generally we would not box ourselves in by putting something like this on our own.

Q.    But you can't be sure that the company requested this?

A.    No, I cannot.

Q.    Could it have been requested by SEG?

A.    Again, the request could have come to me by SEG, but SEG would have been agents for the company, so in my mind it would have been one and the same.

Q.    Why do you believe that SEG was an agent for the company?

A.    SEG was hired by the company as a placement agent for the financings, so when a placement agent comes to me, I assume that they

have been hired by the company and are working for the company.

Q. And you assume they are speaking on behalf of the company?

A. If they request terms where they say the company is requesting X, Y and Z, I assume they are speaking on behalf of the company.

Q. Let's say they don't specifically reference the company when they ask for terms. Do you assume that they are speaking on behalf of the company?

A. Generally I would.

Q. Is it possible they would be speaking on behalf of anybody else other than the company?

MR. TRACEY: Objection to the form.

THE WITNESS: I mean, I guess you would have to ask them. My assumption is that they are speaking for the company.

BY MR. ABRAHAM:

Q. Could they be speaking for another investor?

MR. TRACEY: Objection.

THE WITNESS: I am not sure.

BY MR. ABRAHAM:

Q. All right. If you look at the "Failure to enter into Recap Deal" header on page Bates-stamped 5204; do you have that?

A. Yes, I do.

Q. It says:

"If the company does not enter into the Recap Deal within 60 days of Closing (the 'Recap Failure Date'), then the Company will promptly file a proxy for shareholder approval to lower the Conversion Price to $0.21."

Do you see that?

A. Yes, I do.

Q. Do you know how that 21 cent price was set?

A. I don't recall.

Q. Was that something that Anson set?

A. I don't recall.

Q. Going down the page, there is a header for "Due Diligence/Legal Fees"; do you see that?

A. Yes, I do.

Q. And it says:

"The Company will pay the Lead

Page 160

Investor's legal fees and expenses related to this transaction up to a maximum of $50,000, which amount shall be withheld by the Lead Investor at closing."

Do you see that?

A.   Yes, I do.

Q.   Had Anson retained legal counsel with respect to this proposed deal in January 2020?

A.   I don't recall if this term sheet was ever signed or not, so I am not sure if we even moved to that stage.

Q.   Do you recall that there came a time where Anson retained any counsel with respect to the March 2020 PIPE deal?

A.   Yes, we did.

Q.   When did that happen?

A.   I don't recall the specific date, but it would have been when there was an agreement of terms between us and the company.

Q.   So prior to the date of agreement on terms, is it correct that Anson had not yet retained any counsel?

A.   I can't say for certain, but generally that is the sequence of events.

Q.    Did you enter into any retention agreement - when I say "you", I mean Anson - with the Ellenoff Grossman firm?

A.    No.  We don't work -- we don't have retainers with them.  We engage them on a transaction-by-transaction basis.

Q.    Did Anson engage Ellenoff Grossman with respect to any transaction it entered into with Genius Brands?

A.    I recall retaining Ellenoff Grossman for the March 2020 transaction.  Aside from that, I am not sure if we retained them on any prior transactions or subsequent ones.

Q.    Do you recall when that retention took place?

A.    No, I do not.

Q.    Do you recall whether it took place prior to March 2020?

A.    I recall that that transaction took some time.  I just couldn't tell you how long that process took.

Q.    Was there a document memorializing the terms of Anson retaining the Ellenoff Grossman firm with respect to the March 2020 PIPE?

A.    I don't recall, no.

Page 162

Q.   Okay.  I think now is a good time to break for lunch.

I don't know.  A half hour, 40 minutes, is that okay?

MR. TRACEY:  Half hour works for us, so --

MR. ABRAHAM:  All right.  A half hour it will be.  See you in a half hour, Mr. Nathoo. Have fun.

THE VIDEOGRAPHER:  This is the end of Media 3.

We are going off the record at 1:11 p.m.

-- RECESSED AT 1:11 P.M.

-- RESUMED AT 1:48 P.M.

THE VIDEOGRAPHER:  This is Media 4 for the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo.

We are going back on the record at 1:49 p.m.

Go ahead, Counsel.

BY MR. ABRAHAM:

Q.   All right, Mr. Nathoo.  You understand you are still under oath; is that correct?

A.   Yes, I do.

Page 163

Q.   All right.  Let me ask you to turn to tab 15 of this binder, and I am going to mark that as Exhibit 14.  So that will shake things up a little bit.  And it is Bates-stamped ANSON_00002787 through 2794.  And I would like you to take an opportunity to review this exhibit, and let me know when you are done, please.

EXHIBIT NO. 14:  Email thread and Attached redline Note Term Sheet, Bates-stamped ANSON_00002787 through ANSON_00002794.

THE WITNESS:  Yes, I reviewed it.

BY MR. ABRAHAM:

Q.   Do you see on the first page of the document -- of the exhibit, rather, which is Bates-stamped 2787, there is an email from Joe Reda sent January 15, 2020, at 11:25 a.m., to Amin Nathoo, subject "RE: GNUS Term Sheet", in which he says:

"Amin, Please review our changes...this assumes we are taking back control

Kerrry won't allow any old money to roll into his deal."

Do you see that?

Page 164

A.   Yes, I do.

Q.   Do you know who "Kerrry" refers to here?

A.   I believe it refers to Kerry Propper from ATW.

Q.   And do you recall any discussions regarding Kerry not allowing any old money to roll into his deal?

A.   I don't recall any discussions.

Q.   Do you have any understanding of what Mr. Reda meant when he says "old money to roll into his deal"?

A.   Reading this today, I believe he means, because certain debt was being repaid with the proceeds of the new debt being funded by the same investors, you essentially had the same old investors in the deal again for the new financing.

Q.   And Kerry wouldn't allow for that; is that correct?

A.   It appears to be, but I never talked to him.

Q.   But Mr. Reda communicated what Mr. Propper's views were; is that correct?

A.   Again, it appears to be, but I am not sure if that is the case.

Page 165

Q.   Do you have any reason to believe that Mr. Reda would have not accurately communicated Kerry's views?

A.   I don't know.  When someone who is a salesman tells me things, I always take things with a grain of salt knowing that he is trying to get a transaction done.

So I am never one hundred percent certain whether it is fully accurate or not.

Q.   Do you know of any circumstances in which Mr. Reda miscommunicated the intentions of another potential party to a deal to you?

A.   Not that I am aware of.

Q.   And on the top of the page, you write in an email sent 1/15/2020 to Joe Reda, subject "RE: GNUS Term Sheet", attachment "GNUS - AIMF - Note Term Sheet redline.docx", you write:

"Cleaned it up a bit.. but essentially left more or less as you had it."

Do you see that?

A.   That's correct.

Q.   Do you recall cleaning up the term sheet?

A.   I don't recall this specific

email, but I recall there was back and forth negotiation with the company on the terms.

Q.   Let me ask you to look -- go on in this document to the page Bates-stamped 2790, which appears to be the first page of the marked-up proposed term sheet.

A.   I see it.

Q.   If -- and it is on Anson's letterhead; is that correct?

A.   That's correct.

Q.   Does that mean to you that it came from Anson?

A.   The original -- it means to me that the original version of this document came from us.  I don't know if this was the response back to us or this was our subsequent edits.  I don't know that.

Q.   All right.  And if you go to the line that says "Maturity", do you see that on the left?

A.   Yes, I do.

Q.   And it says:

"The Notes shall mature 90 days from Closing [...]"

Do you see that?

A.    Yes, I do.

Q.    Did you expect Genius Brands to be able to repay the notes within 90 days of closing?

A.    I expected that if the company agreed to a financing with a 90-day maturity, that they expected that they would be able to repay the notes.

Q.    And did you expect they would be able to repay it with cash flow from operating activities?

A.    At the time, knowing the financial situation of the company, I would have not expected that to be the case.

Q.    Would you have expected them - when I say "them", I mean Genius Brands - to repay the note from subsequent financing activities?

A.    My expectation at the time would have been that they either would have repaid it from subsequent financing activities or equitized the note by allowing it to be converted into common stock.

Q.    Did you have any expectations at that time which of those potential two occurrences was more likely?

A.    No, I did not.

Page 168

Q.   Did you discuss that with anybody else?

A.   Not that I am aware of.

Q.   Let me ask you to turn to the page Bates-stamped 2792, which is the third page of this draft term sheet.

A.   I see it.

Q.   And there is on the left-hand side an entry for "Adjustment at 60 Days"; do you see that?

A.   Yes, I do.

Q.   And it says:

        "In the event this Note is
        still outstanding on the 61st day
        following Closing, the Conversion
        Price on the Notes shall decrease to
        $0.21."

Do you see that?

A.   Yes, I do.

Q.   Did you have any reason to believe at the time of this draft term sheet that the notes would not be outstanding on the 61st day following closing?

A.   I thought that there was a chance that the notes could be outstanding on the 60th

day, but I am unable to predict the future when entering a transaction.

Q.   But I'm asking you, do you have any reason to believe that these notes would not have been outstanding on the 60th day following the transaction closing?

MR. TRACEY:  Objection, asked and answered.

BY MR. ABRAHAM:

Q.   You can answer the question.

A.   Again, there were a multitude of ways for the company to repay the notes, some of which could have occurred within the 60 days.

So at the time, I would not have known whether it would have been outstanding or not at the 60th day.

Q.   Did you have any understanding what the initial conversion price on the notes was expected to be?

A.   Without reviewing the documents, I couldn't recall.

Q.   Well, is it correct if the initial conversion price was higher than 21 cents, that any holder would not have any economic incentive to convert prior to the 61st day?

A.   Sorry, could you repeat that?  I am not sure if I understood that correctly.

Q.   I'll let the court reporter repeat, then.

THE COURT REPORTER:  The last question was:

"Question:  Well, is it correct if the initial conversion price was higher than 21 cents, that any holder would not have any economic incentive to convert prior to the 61st day?"

THE WITNESS:  So I can't speak for the economic interests or decisions of other investors, but for Anson specifically, had the stock price been traded higher than the initial conversion price, that would provide potentially some economic interest to convert at the higher conversion price.

BY MR. ABRAHAM:

Q.   But it would be correct that if they waited until the 61st day, they would get the lower conversion price of 21 cents; is that correct?

A.   If this term was in the actual document, then yes, they would get a lower

conversion price. But at that time, we were unsure where the stock would be trading.

Q. Is it correct that an investor could sell short against the box at that time?

A. I am not sure what you mean by "against the box".

Q. Well, let me ask you, then. Get rid of the term "against the box". Is it correct that an investor could sell Genius Brands stock to take advantage of that higher stock price?

A. From what I recall, there was no provision prohibiting any investor from shorting stock, so yes, theoretically that is possible.

Q. Do you have any recollection how or why 21 cents was referred to as the potential conversion price?

A. I don't recall.

Q. All right. Let me ask you to please skip to tab 21, which I am going to ask the court reporter to mark as Exhibit 15, and it is Bates-stamped EW-AUG0013042 through 13051.

EXHIBIT NO. 15: Email thread and attached Note Term Sheet, Bates-stamped EW-AUG0013042 through EW-AUG0013051.

THE WITNESS: I have it in front of me.

Page 172

BY MR. ABRAHAM:

Q.   And on the first page there is an email from Jonathan Schechter sent 1/21/20 to Amin Nathoo subject "gnus"; do you see that?

A.   Yes, I do.

Q.   And attachment "GNUS - AIMF - Note Term Sheet"; do you see that?

A.   Yes, I do.

Q.   And Mr. Schechter writes:

"Took a look...I took a bunch of stuff from Empery amortizing Note".

Do you see that?

A.   Yes, I do.

Q.   Do you know what Mr. Schechter was referring to when he said "Empery amortizing Note"?

A.   I don't know which Empery amortizing note or what he was referring to there.

Q.   Let me ask you to turn to the third page of this exhibit, which is Bates-stamped 13044.

A.   I have it in front of me.

Q.   Do you recall ever seeing this draft term sheet before?

A.   I don't recall this specific

draft.  There were several iterations.

Q.    But is this the draft term sheet referred to in your email of January 21, 2020, which is at the first page of this exhibit, Bates-stamped 13042?

A.    So that email was from Jonathan Schechter to me.  I don't have any reason to believe that it wasn't the document that was sent.

Q.    All right.  And you see for the "Offering Size" that there is -- it looks like a redline, even though it is not in red, that the amount of the offering is increased to $10 million; do you see that?

A.    Yes, I do.

Q.    Do you recall the circumstances under which the proposed size of the offering was increased to $10 million?

A.    I don't recall the specific conversations, but I believe the company wanted to net itself a larger amount of money to provide additional runway.

Q.    Do you recall why the company wanted to net itself a larger sum of money?

A.    My understanding was they wanted a longer runway before they had to raise money again.

Q. And if you go to "Repayment of Existing Debt", there is a redline or blackline where it says:

"Existing debt old holders must invest in this deal at least 200% of the amount of their existing debt [...]"

Do you see that?

A. Yes, I do.

Q. Do you know whether that was your idea?

A. I can't say for certain, but I would doubt it given that it forced an additional obligation on us that we did not necessarily want at the time. We preferred the optionality, so if we -- we would prefer to be able to decide how much to invest rather than being forced to.

Q. Was Anson ever forced to engage in any transaction with respect to Genius Brands?

A. No.

Q. Were all the transactions in which Anson -- with which Anson engaged in with Genius Brands voluntary on the part of Anson?

A. Yes, they were.

Q. So is it correct that if Anson

Page 175

didn't like these terms, it didn't have to invest; is that correct?

A. That's correct. We didn't have to participate in this. Reading this term sheet, we could have just not gotten repaid on our existing debt.

Q. Was it your expectation that if Anson did not participate in this term sheet, that it would not have gotten paid on its then existing debt from Genius?

A. That was our expectation given that that was what we had specified in the term sheet ourselves.

Q. Did you ever analyze the value of Genius Brands' collateral for the debt as it existed in January 2020?

A. No, I did not.

Q. Do you know if anybody else performed such an analysis?

A. Not that I am aware of.

Q. And if you go on in this term sheet, if you turn the page to the fifth page, I think, which is Bates-stamped 13048 at the bottom; do you see that?

A. Yes, I do.

Q.    And you see there is a provision that says "Price-Based Redemption"; do you see that?

A.    I do.

Q.    And it begins:

"In the event that the VWAP on any trading day is less than 150% of the Floor Price [...] "

Do you see that?

A.    Yes, I do.

Q.    Do you have any understanding of what "VWAP" means?

A.    Generally "VWAP" stands for volume-weighted average price.

Q.    Did you understand this provision to be Empery's amortizing provision?

MR. TRACEY:  Object to form.

THE WITNESS:  I am not sure where the provision originated from.

BY MR. ABRAHAM:

Q.    If that is not Empery's amortizing provision, can you direct me to which provision of this term sheet is Empery's amortizing provision?

MR. TRACEY:  Objection to form.

THE WITNESS:  I am not sure which

Page 177

provisions came from where.  It was sent to me by Jonathan Schechter.  You would have to ask him where he got it from.

BY MR. ABRAHAM:

Q.   Do you view the price-based redemption as an amortizing provision?

A.    I am not exactly -- I haven't read this entire paragraph, so I am not exactly sure what it is saying, so I am not sure if that is what I would consider to mean amortizing.

Q.   Do you want to take your time to read this paragraph so you can answer that question, please.

A.    Please.

[Witness reviews document.]

I have read it, and I think I understand what it says, but it is quite technical.

MR. TRACEY:  Well, let's have a question.

BY MR. ABRAHAM:

Q.   Do you understand this to be an amortizing provision?

A.    I understand this to be that if a certain pricing condition of the stock is met, then the note is required to be amortized by the

company.

Q.   Amortized into what?

A.   Either -- if I am reading this correctly, either cash or stock.

Q.   Okay.  Let's put this document on the side and go to the document which is tab 22, which I am going to ask the court reporter to mark as Exhibit 16.  And that document is Bates-stamped ANSON_0004623 through 4633.

A.   I have it.

EXHIBIT NO. 16:  Email thread attaching draft Term Sheet, Bates-stamped ANSON_00004623 through ANSON_00004633.

BY MR. ABRAHAM:

Q.   And if you go to the second page, which is Bates-stamped 4624, we see there is an email around in the middle of the page from Joe Reda sent January 21, 2020, to Jonathan Schechter and Amin Nathoo, subject "RE: gnus"?

A.   I do.

Q.   And in it he says:

"Wow

Maybe ryan plays now?

Its his term sheet...lol".

Do you see that?

A.    Yes, I do.

Q.    Do you know who Mr. Reda is referring to when he says "ryan"?

A.    I mean, I can hypothesize reading the exhibit.

Q.    Is it Ryan Lane?

A.    That is my understanding.

Q.    Do you know any other Ryan he might have been referring to in this email?

A.    No, I do not.

Q.    And do you know what Mr. Reda meant when he said "Its his term sheet"?

MR. TRACEY:  Objection to form.

THE WITNESS:  No, I do not.

BY MR. ABRAHAM:

Q.    Do you have any understanding what he meant by "Its his term sheet"?

MR. TRACEY:  Same objection.

THE WITNESS:  No, I do not.  I don't know where the term sheet originated from.

BY MR. ABRAHAM:

Q.    And then there is an email from you at the top of the page, from Amin Nathoo, sent Tuesday, January 21, 2020, at 9:35 a.m., to Joe Reda and Jonathan Schechter, subject "RE: gnus"; do

Page 180

you see that?

A.    Yes, I do.

Q.    And you write:

"Does having that price based redemption actually make sense?"

Do you see that?

A.    Yes, I do.

Q.    What do you mean by "price based redemption"?

A.    Having read the exhibit just now, I believe it is referring to that price-based redemption section of the term sheet that you and I just discussed.

Q.    And you go on to say:

"I mean I don't want to kill this company completely."

Do you see that?

A.    That's correct.

Q.    What do you mean by that?

A.    Again, I don't recall sending the email, but I believe I just wanted to ensure that the stock did not have too much pressure and that we were able to have the stock appreciate post the deal.

Q.    So you were objecting to killing

**Page 181**

the company's stock completely; is that correct?

MR. TRACEY:  Object to form.

THE WITNESS:  It appears that I am objecting to terms that would make it difficult for the stock price to go up.

BY MR. ABRAHAM:

Q.   And in the last -- in the next paragraph, you write:

"Last thing we want is people to be able to redeem in 3 months and company gets absolutely screwed."

Do you see that?

A.   Yes, I do.

Q.   Do you recall what you meant by that?

A.   I don't recall writing it.

Q.   Well, looking at it today, do you have any understanding what you meant when you wrote that?

A.   Again, it would be very similar to what I just said.  I didn't want the stock price to have tremendous pressure on it, and then the company not having any ability to finance itself in the future.

Q.   All right.  Let me ask you to turn

to the first page of this exhibit, which is
Bates-stamped 4623 at the bottom.  And there is an
email from you at the top of the page, Amin Nathoo,
sent 1/21/2020, at 5:45 p.m., to Jonathan
Schechter, Joe Reda, Laura Salvatori, "RE: gnus",
"Attachments:  GNUS - AIMF - anson comments
1.21.20.DOCX"; do you see that?

A.   Yes, I do.

Q.   You write:

"A few more comments from me.

The big one is the concept of

an escrow account that holds half

the proceeds that is returned if

they don't get reg effectiveness and

shareholder approval within

6 months."

Do you see that?

A.   Yes, I do:

Q.   What does "reg effectiveness"
refer to?

A.   Reg effectiveness would be the
effectiveness by the SEC of a registration
statement registering the underlying shares of the
securities.

Q.   Let me ask you to turn to the

Page 183

draft term sheet starting on page 4628.

Bates-stamped 4628, rather.

A.    I see it.

Q.    Is that proposed comment reflected within the provision identified as "Escrow" on that page?

A.    Yes, it appears to.

Q.    What was Anson's interest in an escrow account that boasts half the proceeds if the company doesn't get registration effectiveness within -- and shareholder approval within six months?

A.    So one of our abilities to be repaid on our note is the ability to convert that note into stock.  If the underlying shares of that note are not registered, we are not able to sell that stock to realize the proceeds of converting those into shares, and we deemed that to be a risk to our investment and wanted a provision whereby we were protected that if the company was unable to meet these terms, that we would reduce our exposure.  I believe it was in this case by half, by being repaid on half that note.

Q.    So that was Anson's proposal for reducing its exposure; is that correct?

Page 184

A.    It is our proposal for reducing the risk of the investment by having an opportunity to reduce exposure under certain conditions.

Q.    All right.  I am going to ask you to turn to tab 23, which I am going to ask the court reporter to mark as Exhibit 17.  And it is a document Bates-stamped ANSON_0003371 through 3375. Do you see that?

A.    Yes, I do.

EXHIBIT NO. 17:  Term Sheet dated January 22, 2020, Bates-stamped ANSON_00003371 through ANSON_00003375.

BY MR. ABRAHAM:

Q.    Have you ever seen this document before?

A.    Yes, I believe I have.  I believe this is the final term sheet.

Q.    And if I turn to the last page of this document or this exhibit Bates-stamped 3376, is that your signature?

A.    Yes, it is.

Q.    Do you recall signing this document?

A.    I don't recall signing it, but I have no reason to believe that that is not my

Page 185

signature.

Q.   Okay.  And you will see on this document there is a provision for escrow; do you see that?

A.   Yes, I do:

Q.   And the escrow provision, it says:

"In the event that $10,000,000 is raised from the Offering, $4,000,000 from the Offering will be held in an escrow account, only to be released to the Company after (i) shareholder approval, and (ii) effectiveness of the registration statement covering all registrable securities."

Do you see that?

A.   Yes, I do.

Q.   And do you see that differs somewhat from the escrow provision identified in the prior exhibit on the page Bates-stamped 4628?

A.   Yes, I do.

Q.   Do you know the reasons for that difference?

A.   I don't recall the exact conversations, but there was some back and forth

Page 186

with the company on what an escrow account, if any, should look like.

Q.   Do you recall whether any other investors were involved in that back and forth?

A.   Not that I am aware of.

Q.   All right.  Let me ask you to move on to the next document in the binder, which is tab 24 and which I am going to ask the court reporter to mark as Exhibit 18 and which is Bates-stamped ANSON_00009714 through 9717.

EXHIBIT NO. 18:  Email thread, document Bates-stamped ANSON_00009714 through ANSON_000097717.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   And you want to take an opportunity to read this document, please, and let me know when you are done.

A.   [Witness reviews document.]

I have reviewed it.

Q.   I am going to ask you to turn to the second page of this document, which is Bates-stamped 9715.

A.   I have it.

Q.   And at the bottom of the page,

there is an email from Jonathan Schechter sent Thursday, January 23, 2020, to Robert Charron, Charles Phillips, Matthew McCullough, copying Joe Reda and Amin Nathoo, subject "GNUS Updated Term Sheet"; do you see that?

A.    Yes, I do.

Q.    And you see in that email, there is a line that says:

"We also need to add the following:"

Do you see that?

A.    Yes.

Q.    And number 1 is:

"Voting Agreement to approve proposals in proxy".

Do you see that?

A.    Yes, I do.

Q.    Do you recall any discussions regarding that Voting Agreement?

A.    I don't recall any specific discussions, no.

Q.    How about any general discussion?

A.    I recall that the company was going to obtain Voting Agreements from shareholders as a means to provide confidence to us that they

could live up to their obligations under the documents.

Q.   Do you recall whether that was one of the terms of the agreement?

A.   I believe it was a term.  It was part of -- I believe it was in the final agreement, but I can't recall specifically.

Q.   Do you recall any conversations regarding the Voting Agreement?

A.   None specifically, no.

Q.   Were you opposed to the Voting Agreement being included as part of the final deal documents?

A.   Given that we participated in the transaction, I would assume that we were not opposed.

Q.   Now, on January 23, 2020, when Mr. Schechter sent this email, was Robert Charron your - and when I say "your", I mean Anson's - counsel?

A.   I am not certain the date that Robert Charron and EGS were retained, but they did represent us in the March transaction.

Q.   If you go back to the first page of this document, there is an email at -- and

Page 189

Bates-stamped 9714, there is an email indicated at the bottom of the page on January 23, 2020, "Amin Nathoo [...] wrote", and then it is empty; do you see that?

A.   Yes.

Q.   Do you recall what you wrote?

A.   I do not.

Q.   And in the email above it, it is from Joe Reda sent Thursday, January 23, 2020, at 5:33 p.m., to Amin Nathoo, copying Robert Charron, Jonathan Schechter and Matthew McCullough, saying in the first line:

"Is it realistic to get a set of docs to Brett Director in 48 hours?"

Do you see that?

A.   Yes, I do.

Q.   Do you know who Brett Director is?

A.   I believe Brett Director is the general counsel at Empery.

Q.   Do you have any understanding why there was a desire to get a set of documents to Mr. Director in 48 hours?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't know exactly why

Page 190

he -- Mr. Reda wanted to send it to Brett Director within 48 hours.  I presume that he was showing the transaction to Empery.

BY MR. ABRAHAM:

Q.   Did you ever speak to Mr. Director?

A.   No, I have not.

Q.   Did any of your lawyers ever speak to Mr. Director?

MR. TRACEY:  Object to form.

BY MR. ABRAHAM:

Q.   When I say "your lawyers", did any of Anson's lawyers ever speak to Mr. Director with respect to the March 2020 PIPE?

A.   I am not -- I am not certain.

Q.   And the next paragraph says:

"Company out of money.  We need to accelerate closing and nasdaq could take 25 day's from final docs."

Do you see that?

A.   Yes, I do.

Q.   "Yikes", do you see that?

A.   Yes, I do.

Q.   Do you know what Mr. Reda meant to convey when he said "yikes"?

Page 191

A.    No, I do not.

Q.    Were you concerned by Mr. Reda's statement that the company was out of money?

A.    No, I was not.

Q.    And on top of this email, there is an email on January 23, 2020, at 7:29 p.m., where Robert Charron wrote:

"We'll get them out tomorrow [...]"

Do you see that?

A.    Yes, I do.

Q.    Do you recall whether Mr. Charron got out his comments promptly after receiving Mr. Reda's email?

A.    I am not sure when the documents were sent.

Q.    Do you recall any conversations with Mr. Charron concerning the contents of those documents?

A.    Mr. Charron represented Anson at some point for this transaction, so I definitely would have had conversations with him.

Q.    But did Mr. Charron represent Anson at this point in time?

A.    I am not sure.

Q.    Is there a document that would help you generate certainty as to the date on which Anson retained the Ellenoff Grossman firm for this transaction?

A.    There wouldn't be any such document, but my assumption is, if this set of negotiations led to the ultimate March 2020 transaction, that he was representing us at this time.  That is what I would assume.

Q.    Why would you assume that?

A.    Because he was the only lawyer we utilized for the transaction and I would have utilized it -- I would have retained them at -- soon or immediately upon signing of the term sheet. Generally that is how I do things.

Q.    And do you generally use a retention letter or agreement when you retain counsel?

A.    No.  Generally I retain counsel by either calling them or sending them an email asking if they can represent us.

Q.    Did you send any such email to the Ellenoff Grossman firm?

A.    If there was an email, it would have been produced or listed in the documents as a

Page 193

privileged document.

Q.   Did you review the documents which were withheld in this case as privileged?

A.   I did not review them myself directly, no.

Q.   Let me ask you to turn to tab 25, which we are going to mark as Exhibit 19.  And it is Bates-stamped ANSON_0000805 through 806.

A.   I see it.

EXHIBIT NO. 19:  Email thread, document Bates-stamped ANSON_00000805 through ANSON_000008006.

BY MR. ABRAHAM:

Q.   Have you ever seen this document before?

A.   I don't recall it.

Q.   And towards the top of this document, there is an indication of an email:

"On Jan[uary] 24, 2020, at 9:08 AM, Amin Nathoo [...] wrote:

Ya that works... I like orderin in anyways... we can chat at your office... booya!

Ali will be [with] me as well...."

Do you see that?

A.   Yes, I do.

Q.   And does that refer to you having lunch with people from SEG?

A.   Yes, that appears to be the case.

Q.   Why would -- why did you have lunch with people from SEG?

A.   I can't recall specifically on this instance, but generally when I -- because I don't live in New York, when I travel to New York, I try to meet with as many of the [indiscernible] as I possibly can.

Q.   What does "booya" mean in this context?

A.   I don't know if it had a particular meaning.  I think I was just trying to convey excitement.

Q.   Okay.  Let me ask you to go up the page.  And there is an email from Joe Reda sent 1/24/2020, at 9:20 a.m., to Amin Nathoo, subject "Re: Lunch - Monday Feb[ruary] 10?"; do you see that?

A.   Yes, I do.

Q.   And he writes:

"Huge.

Page 195

If Sam comes into gnus we are done."

Do you see that?

A.   Yes, I do.

Q.   Do you know who "Sam" refers to?

A.   I believe he is referring to Sam Winer from Heights.

Q.   And why do you believe he is referring to Sam Winer from Heights?

A.   I believe that -- I believe that Sam had been involved in Genius securities around that time.

Q.   When you say "Heights", are you also referring to CVI?

A.   I believe their fund might be called that, but I don't know the exact relationship.

Q.   Is it also called Susquehanna?

A.   I am not sure.

Q.   All right.  In the email, Mr. Reda goes on to say:

"If not we will go to Waqas [...]"

Do you know how to pronounce that?

A.   I believe it is Waqas.

Q.   Do you know who that is?

A.   He is a principal of another fund. I believe it is called Ayrton now, and I believe he has been at a couple of other places over the years.

Q.   And there is a reference to George, though it appears to be misspelled.  Do you know who George refers to?

A.   I am not entirely certain.

Q.   Do you have any idea who it refers to?

A.   If I had to speculate, I would assume that it was a gentleman named George from Hudson Bay.

Q.   All right.  Let's turn to the next exhibit, which is Exhibit tab 26, and I believe that will -- it will be Exhibit 20.

EXHIBIT NO. 20:  Email thread, document Bates-stamped ANSON_00003594 through ANSON_00003603.

BY MR. ABRAHAM:

Q.   And it is Bates-stamped ANSON_00003594 through 3603.

A.   I have it.

Q.   Let me direct your attention to

the second page of this email -- of this exhibit,

rather, which is Bates-stamped 3595 at the bottom.

And around the middle of the page there is an email

from Amin Nathoo, which is you, sent Friday,

January 24, 2020, to Charles Phillips and Joe Reda,

copying Robert Charron, Jonathan Schechter and

Matthew McCullough, "RE: GNUS Updated Term Sheet";

do you see that?

          A.   Yes, I do.

          Q.   And it says:

               "Redemption should not be

          allowed w/o equity conditions being

          met [...]"

          Does "w/o" mean without?

          A.   Yes.

          Q.   What do you mean by "equity

conditions"?

          A.   Well, equity conditions in

different transactions could mean different things,

but they are a certain set of conditions that must

be met before the company or sometimes the investor

are allowed to do certain things.

          Q.   And then you write:

               "And then given we are getting

          stock at 15% discount, redemption

should be 15% [...] so that we are indifferent between being paid and amortizing out."

Do you see that?

Q.   And then you write:

"Those are my thoughts.. not sure what other folks with think."

Do you see that?

A.   Yes, I do.

Q.   And do you know what "other folks" you are referring to in that context?

A.   I don't recall sending this email, but I believe it was anyone else related to the transaction, company.

Q.   And then you write:

"Reda, maybe check with Richie and Ryan?"

Do you see that?

A.   Yes, I do.

Q.   Does "Richie" refer to Richard Abbe?

A.   I believe so.

Q.   Does "Ryan" refer to Ryan Lane?

A.   Yes, I believe so.

Q.   So is it correct in this email you

Page 199

are asking Mr. Phillips or Mr. Reda to check with Mr. Abbe and Mr. Lane what they think about certain terms of the proposed offer?

MR. TRACEY:  Objection.

THE WITNESS:  It appears that I was suggesting terms that I would want as Anson to complete the transaction, but knowing that the company was going to need other investors to also participate to get the transaction completed, they -- I was suggesting that they ensure that their other investors were going to be comfortable. Otherwise, there would be no transaction to occur.

BY MR. ABRAHAM:

Q.    And that is what you meant by "maybe check"; is that correct?

A.    That's correct.  I was only speaking on behalf of Anson.  I had no way of knowing what other investors would think about my thoughts.

Q.    But you wanted Mr. Reda to communicate with Richie and Ryan about these potential terms; is that correct?

A.    I wanted to -- I wanted Mr. Reda to ensure that he had a book to complete the transaction when we got all the way to the end of

Page 200

negotiating the transaction documents.  Otherwise, it would have been a waste of time for us to go through the process and detrimental to our existing investment.

Q.   But to do that, you wanted him to communicate with Richie and Ryan about these potential terms; is that correct?

A.   To do that, I wanted him to ensure that he had the book with whatever other investors he was showing the transaction to.

Q.   Did you want Mr. Reda to communicate with Richie and Ryan about these potential terms?

A.   I believe --

MR. TRACEY:  Objection to form.

THE WITNESS:  I believe I just answered your question by saying I wanted him to show it to any potential investor that was coming into the transaction.

BY MR. ABRAHAM:

Q.   But you specifically identified Richie and Ryan; is that correct?

A.   It appears so in my email.

Q.   Let me ask you to look at the first page of this exhibit, please, which is

Bates-stamped 3594 at the bottom.

A.    I see it.

Q.    And towards the top middle of the page, there is an email from Charles Phillips sent to you on January 24, 2020, at 3:37 p.m.  Do you see that email?

A.    Yes, I do.

Q.    And he writes:

"Amin

Docs are almost ready to go back out.  Would you like for me to send over to the entire WG and say they're subject to your review?"

Do you see that?

A.    Yes, I do.

Q.    Do you know what "WG" refers to?

A.    When participating in a transaction, "WG" normally stands for working group.

Q.    Do you know who was in the working group for this transaction?

A.    I don't know all the exact people, but working group for transactions would include the lead investor, the lead investor's counsel, the placement agent, the company and company counsel.

Page 202

Q.   But it could have included other people too; is that correct?

A.   Sorry?

Q.   It could have included other people too; is that correct?

A.   The working group, as far as I knew, consisted of Anson, Anson counsel, the placement agent, the company and company counsel.

Q.   All right.  Let me ask you to turn to tab 29, which I am going to ask the court reporter to mark as Exhibit 21.  And it is a document Bates-stamped ANSON_0000836 through 840.

EXHIBIT NO. 21:  Email thread, document Bates-stamped ANSON_00000836 through ANSON_00000840.

THE WITNESS:  I see it.

BY MR. ABRAHAM:

Q.   Do you see at the bottom of that page on 836 there is an email from Robert Charron sent Tuesday, January 28, 2020, at 2:35 p.m., to Jeffrey Schultz, Charles Phillips, Joe Reda; do you see that?

A.   Yes, I do.

Q.   And you are one of the people who is copied on that email; do you see that as well?

Page 203

A.    Yes, I do.

Q.    And the subject is "RE: GNUS - Revised Transaction Documents"; do you see that?

A.    Yes.

Q.    And the body of the email says:

"Investors want to use Schulte forms so disregard what was sent although trying to get them to back down a bit."

Do you see that?

A.    Yes, I do.

Q.    Do you know what "Schulte" refers to?

A.    Schulte is another legal firm.

Q.    And as used in this email, do you know what "investors" refers to?

A.    No, I do not.

Q.    Does it refer to other potential investors in the March 2020 PIPE?

A.    It could.

Q.    You have to answer audibly. Otherwise nothing comes across in the record.

MR. TRACEY:   Objection to form, and he did answer audibly.

BY MR. ABRAHAM:

Page 204

Q.    I couldn't hear it.  I see it now. I apologize.

What else could it refer to aside from other potential investors in the March 2020 PIPE?

MR. TRACEY:  Objection to the form.

THE WITNESS:  I am not sure.

BY MR. ABRAHAM:

Q.    Do you know what other investors might be in play here?

A.    No, I do not.

Q.    Let me ask you to turn to the first page of this exhibit, which is Bates-stamped ANSON_0000836.  And at the top of the page, there is an email from Robert Charron sent 1/31/2020, at 9:38 a.m., to Jeffrey Schultz, Charles Phillips, Joe Reda, copying several people, including you; do you see that?

A.    Yes, I do.

Q.    And the subject is "GNUS - Revised Transaction Documents"; do you see that as well?

A.    Yes, I do.

Q.    And you see in the first paragraph of the email it says:

"Jeff - attached please find the Note and Warrant for the GNUS

transaction."

Do you see that?

A.  Yes.

Q.  "Per Empery the note in
Schulte's form and has been reviewed
by Brett."

Do you see that?

A.  Yes, I do.

Q.  Does that inform your understanding of what investors were being referred to in the email we previously discussed sent by Robert Charron on Tuesday, January 28th?

A.  Reading the exhibit, it appears that investors could have included Empery, but I can't be a hundred percent certain.

Q.  Do you know who else it might have included aside from Empery if you are not a hundred percent certain?

MR. TRACEY:  Objection to form.

THE WITNESS:  No, I do not.

BY MR. ABRAHAM:

Q.  And on the second line, it says:
"For the warrant, he is ok
using our form of warrant provided
the AD provision is the same one

Page 206

used in the note which I have revised to reflect as such."

Do you see that?

A.   Yes, I do.

Q.   What is the "AD provision"?

A.   "AD provision" generally stands for anti-dilution.

Q.   And the email goes on to say:

"I expect to have Brett's comments on the SPA at some point today and once received I'll get them right over to you."

Do you see that?

A.   Yes, I do.

Q.   Did you understand "Brett" there to be referring to Brett Director?

MR. TRACEY:  Object to form.

THE WITNESS:  Given the context of the rest of the paragraph, yes.

BY MR. ABRAHAM:

Q.   Do you recall whether Mr. Director made comments on the SPA?

A.   I am not sure.

MR. TRACEY:  Object to form.

BY MR. ABRAHAM:

Q.   Could I ask you to please turn to tab 30 in this binder, which I am going to ask the court reporter to please mark as Exhibit 22.  And the document is Bates-stamped ANSON_00009954 through 9973.

EXHIBIT NO. 22:  Email thread with attached Term Sheet, document Bates-stamped ANSON_00009954 through ANSON_00009973.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   Let me ask -- let me direct your attention to the fourth page of this exhibit, which is Bates-stamped 9957 at the bottom right-hand part of the document.

A.   Okay.

Q.   Actually, you know what?  Let's skip that.  Let's go to the page Bates-stamped 9956, which is the third page in this document. And there is an email towards the top of the page from Robert Charron sent January 31, 2020; do you see that?

A.   Yes.

Q.   Do you see that you are one of the people copied on that email?

Page 208

A.    Yes.

Q.    And the body of the email says:

"If you consider that the netting agreement is all about the conditional funding then I think the docs are pretty on point."

Do you see that?

A.    Yes, I do.

Q.    Is the "netting agreement" referring to the Master Netting Agreement which was one of the documents in the March 2020 PIPE?

A.    Yes, that is my understanding.

Q.    What is your understanding of why the netting agreement is all about conditional funding?

A.    My understanding was that the Master Netting Agreement was utilized instead of an escrow account so that investors did not have to fund the unfunded portion of the note into an escrow account, but rather held onto the money until such time that it needed to be funded to the company.

Q.    Was that an economic advantage for the investors?

MR. TRACEY:  Object to form.

Page 209

THE WITNESS:  I don't know if it was an economic advantage, but --

BY MR. ABRAHAM:

Q.   Was it a legal advantage for investors?

MR. TRACEY:  Objection.

THE WITNESS:  I am not a lawyer, so I am not sure if there is a legal advantage.

BY MR. ABRAHAM:

Q.   Was there any advantage to that form of transaction?

A.   Off the top of my head, I can't think of the advantage, but I am not as well versed in that transaction document as my lawyers are.

Q.   Do you have any understanding why there wasn't just a straight escrow in this transaction?

A.   I don't recall the specific series of events that led to the change.

Q.   If you go to the prior page, which is Bates-stamped 9955, a little bit below the halfway point on the page, there is an email from Robert Charron sent Monday, February 3, 2020, at 10:40 a.m., to Jeffrey Schultz, Jonathan Schechter, Joe Reda, and I believe you are one of the people

copied on this email; do you see that?

A.    Yes, I do.

Q.    And the subject is "RE: GNUS - Revised Transaction Documents"; do you see that?

A.    Yes.

Q.    And he says:

"Just pinged Brett asking him."

Do you see that?

A.    Yes, I do.

Q.    Do you understand that to be Brett Director?

A.    I believe it to be, yes.

Q.    Do you have any understanding as to why Mr. Charron pinged Brett asking him?

A.    No, I do not.

MR. TRACEY:  Object to form.

BY MR. ABRAHAM:

Q.    Is it that Mr. Charron cared about what Empery's views were on the proposed documentation for this deal?

MR. TRACEY:  Even more objection to form.

THE WITNESS:  I am not sure whether Mr. Charron as a lawyer cared what any investors' views were other than ours.

Page 211

BY MR. ABRAHAM:

Q.   Did you care what Empery's views were on the form of transaction documents in this case?

MR. TRACEY:  Objection.

THE WITNESS:  I did not care what Empery's views were.  I reviewed comments that were sent to me on whether we cared as Anson for our funds.

BY MR. ABRAHAM:

Q.   Did it matter to you whether Empery invested in this deal?

A.   No, it did not.

Q.   Let me ask you to look at the first page of this document.

But before I do so, would this transaction have been able to go forward without Empery participating in it?

MR. TRACEY:  Objection to form.

THE WITNESS:  I am not sure what other investors the placement agent was and wasn't talking to and whether they would have been able to fill the book with or without Empery.  That I am not certain.

BY MR. ABRAHAM:

Page 212

Q.   So on this first page of the document Bates-stamped 9954, there is an email from Robert Charron to Jonathan Schechter and Jeffrey Schultz, and you are one of the people copied.  It is "RE: GNUS - Revised Transaction Documents"; do you see that?

A.   Yes, I do.

Q.   And in it, he says:

"attached is the revised term sheet with a redline against the prior one.  Amin - note that Empery's preference is that the company not file a registration statement but rather rely on 144 in 6 months."

Do you see that?

A.   Yes, I do.

Q.   Was that Anson's preference as well?

A.   At the time Anson's preference was for a registration, which is why we included it in the term sheet in the first place.

Q.   And the email goes on to say:

"I took it out of the TS [...]"

Does that refer to term sheet?

Page 213

A.    Yes, I believe.

Q.    "[...] but note it can be put in the documents fairly easily if you and Shex convince Ryan otherwise."

Do you see that?

A.    Yes, I do.

Q.    Did you ever attempt to convince Ryan otherwise?

A.    No.  I did not have any conversations with Ryan.

Q.    Do you know whether Mr. Schechter attempted to convince Ryan otherwise?

MR. TRACEY:  Object to form.

THE WITNESS:  I am not sure.  You would have to ask him.

BY MR. ABRAHAM:

Q.    Do you know what the final documents reflected?

A.    The final documents, I believe, did not have the registration requirement.

Q.    Let me ask you to please turn to tab 31, which I am going to ask the court reporter to mark as Exhibit 23, and it is a document Bates-stamped ANSON_0000684.

Page 214

EXHIBIT NO. 23:  One-page email thread, document Bates-stamped ANSON_0000684.

MR. TRACEY:  Jeff, before we get into a new document, would you mind if we took a break?

MR. ABRAHAM:  I don't mind at all.

MR. TRACEY:  Okay.  Wow.

MR. ABRAHAM:  Who just asked for that, though?

MR. TRACEY:  You get nicer as the day goes on.  Thank you.

MR. ABRAHAM:  I am as -- I am naturally nice, so that is not possibly true.

THE VIDEOGRAPHER:  This is the end of Media 4.

We are going off the record, and the time is 2:49 p.m.

-- RECESSED AT 2:49 P.M.

-- RESUMED AT 3:06 P.M.

THE VIDEOGRAPHER:  This is Media 5 of the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo.

We are back on the record at 3:07 p.m.

BY MR. ABRAHAM:

Q.   All right, Mr. Nathoo.  I believe we marked as or had the court reporter mark as

Exhibit 23 tab 31 in your binder, and that is a document Bates-stamped ANSON_0000684.

At the bottom of the page, there is a reference to an email sent on February 23, 2020, at 8:34 p.m.  Amin Nathoo wrote:

"How we looking on the GNUS book?  If we're not going to be at the $10[million] perhaps we show it [to] AJ from Obsidian?"

Do you see that?

A.   Yes, I do.

Q.   Who is AJ?

A.   AJ is one of the PMs, I believe, at Obsidian.  I don't know his exact title.

Q.   And Joe Reda writes to you at 8:55 p.m., February 23 -- I should say on February 23, 2020, at 8:55 p.m. Joe Reda wrote:

"We are at $7-13[million].  Everyone gave me ranges and won't firm up until docs are final and nasdaq signed off."

Do you see that?

A.   Yes, I do.

Q.   Do you know who "everyone" refers to?

Page 216

A.   I don't know specifically.  It is the other investors that they were showing the transaction to.

Q.   Did you ever know the identity of those people included within "everyone" in that email of February 23, 2020?

A.   Not on -- not on that email, no.

Q.   How about prior to that email?

A.   No.

Q.   How about after that email?

A.   I know -- not specific to what he was referring to here.  I did come to know at some point thereafter who ultimately participated in the transaction.

Q.   Well, how did you identify AJ as -- from Obsidian as somebody to whom this deal should be shown unless you knew everybody who had given ranges so far?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't know how I would have known.  It could have just been an assumption.

BY MR. ABRAHAM:

Q.   And what would that assumption have been based upon?

MR. TRACEY:  Objection to the form.

Page 217

THE WITNESS:  I don't know if I ever participated in a transaction through SEG that AJ and Obsidian were other investors in.

BY MR. ABRAHAM:

Q.   All right.  Let me ask the court reporter to mark as Exhibit 24 and ask you to turn to tab 32 in your book, which is a document Bates-stamped EW-AUG0013509 through 13511.

THE VIDEOGRAPHER:  Excuse me for interrupting.  It appears that the video of the witness is out of focus.

EXHIBIT NO. 24:  Email thread, document
Bates-stamped EW-AUG0013509 through
EW-AUG0013511.

THE WITNESS:  I think it is an auto-focussed camera.  I am not sure if it is going to...

BY MR. ABRAHAM:

Q.   Do we need to go off the record while this focussing is done?

MR. TRACEY:  No.  I am not sure why.

THE VIDEOGRAPHER:  I didn't think it would take that long, but perhaps we should proceed.

Go ahead.

Page 218

BY MR. ABRAHAM:

Q.   All right.  Did you have a chance to look at the document in tab 32 which I have asked the court reporter to mark as Exhibit 24?

A.   Yes, I have.

Q.   And on the first page of this document, which is Bates-stamped 13509, there is an email reference from you on February 23, 2020, at 9:00 p.m.  Amin Nathoo wrote:

"He could probably make a decision in a day or two.

$1-3[million] is bite size I believe."

Do you see that?

A.   Yes, I do.

Q.   And then the email on top is at 9:01 p.m., the same day, from Joe Reda to Amin Nathoo, "Re: GNUS Book."  And he writes:

"Ok.  I'm happy to show him.  I need his contact info."

Do you see that?

A.   Yes, I do.

Q.   And do you see there is an email on top of that which is from Amin Nathoo sent on 2/24/2020, at 2:04 a.m., to Joe Reda, copying

Page 219

Jonathan Schechter, in which you write -- you give AJ Pomper's contact information, his email address as well as his telephone number; do you see that?

A.   Yes, I do.

Q.   How did you have Mr. Pomper's contact information?

A.   I believe I met him at some conferences in the past, and we had exchanged business cards or contact information.

Q.   Is there a reason you didn't contact him yourself directly to see whether he would be interested in this deal?

A.   I don't talk to other investors about potential or active investments.

Q.   Why is that?

A.   To avoid situations precisely such as this.

Q.   So you mean to say Anson avoids talking directly to investors to avoid being considered a group for purposes of the federal securities laws; is that correct?

A.   Anson avoids talking directly or indirectly to other investors.

Q.   I think you mean to say that Anson seeks to avoid talking indirectly to other

Page 220

investors; is that correct?

MR. TRACEY:  Objection.

THE WITNESS:  Anson -- sorry?  I didn't hear that.

BY MR. ABRAHAM:

Q.    Seeks to avoid talking indirectly to other investors.

MR. TRACEY:  Objection.  You don't have to answer that.  His testimony is what it is.

MR. ABRAHAM:  Are you instructing him not to answer?

MR. TRACEY:  It is not a question.

BY MR. ABRAHAM:

Q.    Is it correct that Anson seeks to avoid talking to other investors to avoid being considered a member of a group for purposes of the federal securities law?

A.    I am not sure what you mean by "seeks to avoid".  We just don't talk to other investors.

Q.    Is that a policy of Anson?

A.    Yes, it is.

Q.    Is it a written policy?

A.    No, it is not.

Q.    Do you know when that policy came

Page 221

about?

A.    Many years ago.

Q.    When did it come about?

A.    I would -- if I had to venture, it has probably been over ten years.

Q.    Do you know whether that policy came about in response to a particular situation?

A.    No.

MR. TRACEY:  Do you mean no, it didn't, or no, you don't know?

THE WITNESS:  No, I don't believe it had any response to any particular specific instance.

BY MR. ABRAHAM:

Q.    Do you have the contact information for any of the other investors in the March 2020 PIPE in your possession?

A.    I would have to -- I would have to check my contact list.  I am not sure.

Q.    Let's mark as Exhibit 25 the document which is attached as tab 33 in the book in front of you, and it is Bates-stamped ANSON_00002904 through 2922.

EXHIBIT NO. 25:  Email thread, document Bates-stamped ANSON_00002904 through

Page 222

ANSON_00002922.

BY MR. ABRAHAM:

Q.    And I would ask you to turn to the third page of this exhibit, which is Bates-stamped 2906 at the bottom.  Do you have that?

A.    Yes, I do.

Q.    And towards -- at the top of the page is an email from Robert Charron to Jeffrey Schultz and Jonathan Schechter on which you are copied, and the subject, "RE: GNUS - Revised Transaction Documents", and it says:

"Jeff - Anson's response to the issues raised last week are as follows:"

Do you see that?

A.    Yes, I do.

Q.    Do you know who raised those issues?

A.    Reading the exhibit, it appears that the company raised the issues.

Q.    Let me point your attention to point 3 in this email.  It says:

"On Llama Anson understands the situation - it is what it is."

Do you recall what that situation was?

A.   I don't recall specifically, but I believe the company already had certain debt or liens against the Llama Llama asset that it could not then grant us a first party lien on.

Q.   Were there any assets in Llama Llama that the company could grant investors a first priority lien on?

A.   I don't recall.

Q.   What impact did it have on the investors of not being able to have a first priority lien on Llama Llama's assets?

A.   I can't speak for other investors, but for Anson, it just meant that in the event that the company was unable to repay a loan, that there was less -- there were fewer assets that we could take control of to get repaid.

Q.   Were you surprised that other parties had a first priority lien on Llama Llama's assets at that time?

A.   It was something I was unaware of, which is why I believe it was brought to my attention.

Q.   Were you upset by that fact?

A.   I don't recall the situation specifically, but based on the email, it does not

Page 224

appear so.

Q.   Do you know what other assets Genius owned at the time that provided security for the debt that investors were contemplating purchasing from Genius in the March 2020 PIPE?

MR. TRACEY:  Object to form.

THE WITNESS:  My understanding, that the other main assets that would secure our investment were the Rainbow Rangers cartoon that they were developing and had the rights to and the Kindergarten Cop cartoon that they had rights to, as well as a catalog of other content, which I can't recall specifically off the top of my head.

BY MR. ABRAHAM:

Q.   Did you form an opinion as to what those assets could be sold for in February 2020?

A.   We did not have an -- we did not have an idea of what it could be sold for.  We didn't do an analysis.

Q.   Let me ask you to look at the first page of this exhibit, which is Bates-stamped 2904 at the bottom right-hand side.

A.   I see it.

Q.   And on the top of the page there is an email from Joe Reda to Robert Charron,

Page 225

Jeffrey Schultz, copying Amin Nathoo and Jonathan Schechter, and the subject is "some due diligence questions from Amin"; do you see that?

A.    Yes, I do.

Q.    And number 1 is:

"What was the logic behind the reg rights?  Amin is fine with it, but confused as to why he agreed to it..."

Do you see that?

A.    Yes, I do.

Q.    Do you recall being confused with respect to the registration rights?

A.    Sorry?

Q.    Do you recall being confused with respect to the reg rights?

A.    So I think, as I mentioned before, Anson prefers to have registration rights in our transactions because it provides additional optionality to be able to sell the stock if you desire to.

And there was a comment that was made to remove it, and we didn't understand why other participants did not want to.

Q.    Did you ultimately go along with

Page 226

what the other participants wanted?

MR. TRACEY:  Object to form.

THE WITNESS:  We ultimately reviewed the transaction, the final transaction that was presented to us, and made the election that it was still in our best interests to participate.

BY MR. ABRAHAM:

Q.   Even though it didn't have reg rights; is that correct?

A.   The final transaction that was presented to us did not have reg rights, but we ultimately decided that it was still in the best interests of our fund to participate.

Q.   And number 2 says:

"Voting Agreements?  What % of the vote does that cover?"

Do you see that?

A.   Yes.

Q.   Do you recall having a concern about what percentage of the vote was covered by the Voting Agreements?

A.   I don't recall specifically, but I do recall wanting to get comfort that the company could deliver on their obligation to obtain a Voting Agreement -- sorry, to obtain shareholder

approval.

Q.    And number 3:

"Record date for shareholder

vote?  When is the earliest that can

be set for?  Amin had a few creative

ideas to get more yes votes".

Do you see that?

A.    Yes, I do.

Q.    Do you recall what creative ideas

you had to get more yes votes?

A.    No, I do not.

Q.    Would Anson have invested in the

March 2020 PIPE if there had been no Voting

Agreement?

MR. TRACEY:  Object to form.

THE WITNESS:  I am not sure.  That

situation wasn't presented to us, so I am not sure

how I would have reacted in that moment.

BY MR. ABRAHAM:

Q.    Is it correct that the condition

for Anson funding the March 2020 PIPE was that the

Voting Agreement would be signed by the principal

stockholders?

A.    From what I recall, it was a

closing condition that the company had to provide.

Page 228

Q.    Why was it a closing condition?

A.    Generally, when there are Voting Agreements as part of a transaction, it is done post signing and it is a closing condition of the transaction.  That is generally how I have always seen them.

Q.    Do you recall any other transactions in which there was a Voting Agreement as one of the closing conditions?

A.    I can't recall specifics off the top of my head, but there have been many others that we have participated in.

Q.    But you can't recall any of them as we sit here today; is that correct?

A.    That's correct.

Q.    Now, is it correct that Anson was the lead investor on this transaction?

A.    Yes, that's correct.

Q.    Does that mean that Anson had the final say on the terms of the transaction from the investors' perspective?

A.    Being a lead investor, that meant that we provided what we felt we would invest, of the terms under which we would invest in the transaction.  We had no involvement in what other

investors did or did not want.

Q.    Let's turn to the next exhibit, which is tab 34, which I am going to ask the court reporter to mark as Exhibit 26.  It is a document Bates-stamped ANSON_0000624 through 643.

EXHIBIT NO. 26:  Email thread, document Bates-stamped ANSON_00000624 through ANSON_00000643.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.    Let me ask you to turn to the second page of this exhibit.  And towards the top of the page, there is an email from Robert Charron sent Monday, February 24, 2020, to Joe Reda, Jeffrey Schultz, copying Amin Nathoo and Jonathan Schechter; do you see that?

A.    Yes, I do.

Q.    And in it, he writes:

"Empery told me that they won't participate in the deal if the company files a registration statement.  They do not want to be named as a selling shareholder."

Do you see that?

A.    Yes, I do.

Page 230

Q.   Do you recall any discussions regarding that subject?

A.   I don't recall any discussions, but I am on the email, so I would have seen it.

Q.   Is Empery's view that they won't participate in the deal if the company files a registration statement the reason that the terms of the deal did not provide for a registration statement?

A.   I don't know what the view of other investors were, so I can't speak to why it ultimately was left out.

Q.   But -- you don't know what the view of other investors are, but you received Mr. Charron's email that we just discussed; is that correct?

A.   I did receive the email from Mr. Charron, correct.

Q.   Do you have any reason to believe that Mr. Charron wasn't being truthful in his email?

A.   No, I do not.

Q.   Did you ever doubt Mr. Charron's truthfulness?

A.   No, I did not.

Page 231

Q.    Let's skip over to tab 37, if we can, and I think that this is going to be Exhibit 27.  And it is Bates-stamped ANSON_0002531 through 2542.

EXHIBIT NO. 27:  Email thread, document Bates-stamped ANSON_00002531 through ANSON_00002542.

THE WITNESS:  Yes, I have it.

BY MR. ABRAHAM:

Q.    And let me direct your attention to the email at the bottom of or towards the lower half of the first page which is Bates-stamped 2531 from Jeffrey Schultz, dated February 28, 2020, to Joe Reda, copying a series of people, including you as well as Ms. Salvatori, subject "RE: GNUS - Revised Transaction Documents"; do you see that?

A.    Sorry, are you talking about the first page?

Q.    The first page, yes, yes.  Do you see that email at the bottom -- the second email on the page?

MR. TRACEY:  What tab are we on?

THE WITNESS:  Exhibit --

BY MR. ABRAHAM:

Q.    We are on tab 37, to my

Page 232

understanding.

MR. TRACEY:  37.

THE WITNESS:  Oh, 37.  I thought you said 47.

MR. ABRAHAM:  I apologize.  I thought I said 37, but now we have cleaned it up.

MR. TRACEY:  Got it.

THE WITNESS:  I see the email at the bottom of that page.  Are you on 2531?

BY MR. ABRAHAM:

Q.   I am.

A.   Okay.

Q.   So we are on the same email.  Take an opportunity to review point 2 of this email, if you can, and let me know when you are done, please.

A.   [Witness reviews document.]

Yeah, I have read point 2.

Q.   All right.  In the third-to-last line, there is a sentence that begins five words in, and it says:

"The Conversion Price for Andy Heyward will need to be at or above the Nasdaq consolidated closing bid price immediately prior to signing definitive documents pursuant to

Nasdaq's Equity Compensation rules."

Do you see that?

A.    Yes, I do.

Q.    Does this reflect an understanding that Mr. Heyward was expected to purchase some of the notes being issued through the March 2020 PIPE?

MR. TRACEY:  Object to form.

THE WITNESS:  Reading this email today, I believe it does indicate that he is considering investing.

BY MR. ABRAHAM:

Q.    Do you know whether there were any factors between February 2020 and March 11, 2020, that would have affected Mr. Heyward's decision whether to purchase any of the notes being issued in the March 2020 PIPE?

A.    I don't know what factors Mr. Heyward did or did not consider.

Q.    Did you want Mr. Heyward to participate in the March 2020 PIPE?

A.    I don't -- I don't believe we wanted or did not want, though it is -- when a CEO invests in a company, it can show his belief in the prospects of the company, which is generally seen as a positive sign.

Page 234

Q.   So if Mr. Heyward invests, it would be a positive for Anson's investment in the March 2020 PIPE; is that correct?

A.   It would be a positive perception on our part and at times the market too.

Q.   Did you have any reason to think the market would not perceive Mr. Heyward investing in the March 2020 PIPE as a positive?

A.   I -- again, I am not sure what other market participants view or don't view. There have been many instances where a CEO invests in a stock and it appears to have no positive implications.

Q.   Let me ask you to go to tab 39, which I guess we'll ask the court reporter to mark as Exhibit 28.  And it is Bates-stamped ANSON_00003516 through 3520.

EXHIBIT NO. 28:  Email thread, document Bates-stamped ANSON_00003516 through ANSON_00003520.

THE WITNESS:  I have it in front of me.

BY MR. ABRAHAM:

Q.   By the way, though, before I go there, on tab 37, the email I just discussed with you from Jeffrey Schultz, have you ever seen that

Page 235

email before?

A.   I don't recall it, but I am on the cc, so --

Q.   Did you review that email in connection with preparing for your deposition today?

A.   I don't believe so.

Q.   Okay.  Then let's go to the next document we have marked, which is tab 39, as Exhibit 28.

Let me ask you to turn to the second page -- actually, the third page of this exhibit, which is Bates-stamped 3518.

A.   I have it in front of me.

Q.   And on that page, there is an indication towards the top third of the page that says:

"On February 28, 2020, at 5:53 PM, Robert [...] Charron [...] wrote:"

Do you see that?

A.   Yes, I do.

Q.   It says:

"Attached for distribution to the investors are the following

Page 236

documents:"

Do you see that?

A.   Yes, I do.

Q.   Do you know which investors Mr. Charron is referring to?

A.   No, I do not.

Q.   Do you know if Anson is one of those investors?

A.   We were the lead investor in the transaction, so we would have already had these agreements in our possession.

Q.   So it would have been investors other than Anson; is that correct?

A.   That is correct.

Q.   And let me ask you to go to the second page of this exhibit, which is Bates-stamped 3517.  And towards the middle of the page it says:

"On February 29, 2020, at 7:27 AM, Robert [...] Charron [...] wrote:"

Do you see that?

A.   Yes.

Q.   And it says:

"Jeff, correct me if I'm wrong but closing will depend on when we

Page 237

have all comments from investors and they are signed off on the documents so I definitely think at this point they need to go out."

Do you see that?

A.    Yes, I do.

Q.    Do you recall whether Mr. Charron received comments from other investors concerning these documents?

A.    I don't recall.

Q.    Do you recall whether the closing of this transaction was dependent upon comments other investors had on these documents?

A.    The closing of a transaction generally depends on each investor being comfortable with the documents they are signing, and so I presume they would need to be reviewed by each investor for themselves.

Q.    All right.  Let me ask you to go to the first page of this exhibit, which is Bates-stamped 0003516.

A.    I see it.

Q.    And at the bottom it says:

"On February 29, 2020, at 7:51 AM, Robert [...] Charron [...]

Page 238

wrote:"

Do you see that?

A.   Yes.

Q.   And he writes:

"Ok, once I have those I'll send to Brett.  Saw your comment from last night."

Do you see that?

A.   Yes, I do.

Q.   Do you understand "Brett" to be Brett Director?

A.   Yes, I do.

Q.   Let me ask you to go further up the page to the first email, please -- oh, before we go, though, let's go to the second email on the page, which is from Amin Nathoo, sent Saturday, February 29, 2020, at 8:53 a.m., to Joe Reda, subject "Re: GNUS - Revised Transaction Documents"; do you see that?

A.   Yes, I do.

Q.   Do you see the second paragraph of this email says:

"My only question was around voting agreements.  What % do we have locked in?"

Page 239

Do you see that?

A.    Yes, I do.

Q.    Why was that a question that you had?

A.    Again, as I had mentioned previously, we wanted to have comfort that the company would be able to deliver on their obligation for shareholder approval, and understanding the situation around Voting Agreements would form -- help form up the basis of our comfort.

Q.    Did Anson want to have the right to enforce those Voting Agreements if necessary?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't believe Anson was a party to the Voting Agreements, and as such, does not have the ability to enforce or not enforce.

BY MR. ABRAHAM:

Q.    So -- but if the documents provide that Anson had the right to enforce, would that be a reflection of the fact that Anson wanted that right to enforce?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't know how to respond to that hypothetical --

Page 240

BY MR. ABRAHAM:

Q.   All right.

A.    -- on something that has never occurred.

Q.   Are you a lawyer?

A.   No, I am not.

Q.   Do you know whether the documents provided for Anson to have a right to enforce the Voting Agreements against the principal stockholders?

MR. TRACEY:  Object to form.

THE WITNESS:  Sorry, I didn't hear the first part of that sentence, but again, I don't know how to respond to a hypothetical that has never been placed to me, or a question that has never been posed to me.

BY MR. ABRAHAM:

Q.    It is not a hypothetical.  I'm asking you whether you know whether the documents for the March 2020 SPA provided for SPA for Anson to have a right to enforce the Voting Agreements against the principal stockholders?

A.   So --

MR. TRACEY:  Object to form, misstates the document.

**Page 241**

THE WITNESS:  Again, I don't believe Anson was a party to that document, so I don't believe it would have any standing to do what you suggest.

BY MR. ABRAHAM:

Q.  But if the documents provided otherwise, you would have standing?

MR. TRACEY:  Object to form.  No.  Come on.  Move on.

BY MR. ABRAHAM:

Q.  No.  Answer the question.

A.  Again, I can't answer a hypothetical of something that has never been posed to me.

Q.  So that issue was never posed to you; is that correct?

MR. TRACEY:  Objection.

THE WITNESS:  I can't recall Anson ever being party to any Voting Agreement.

BY MR. ABRAHAM:

Q.  Did you rely on your lawyers with respect to Anson's ability to enforce the Voting Agreement?

MR. TRACEY:  Object to form.

THE WITNESS:  So I'm having difficulty

**Page 242**

hearing you.

MR. TRACEY:  Yeah, I couldn't hear that either.  Can you repeat it?

BY MR. ABRAHAM:

Q.  Would the -- did the closing documents reflect the terms that Anson wanted to be in the closing documents for the March 2020 PIPE?

MR. TRACEY:  Object to form.  I am not sure I understand it.  If you understand it, you can answer it.

THE WITNESS:  I am not sure exactly what you mean by that question, sir.

MR. TRACEY:  Could you just try to --

BY MR. ABRAHAM:

Q.  All right.  Okay.  Okay.  Coaching instructions are on the record.  If you don't understand the question, that is fine.

What I am trying to ask you is there were closing documents in connection with the March '20 SPA; is that correct?  It was a securities purchase agreement; is that correct?

A.  Was there what?

Q.  Were there any provisions of the Securities Purchase Agreement which Anson found objectionable?

A.   Given that we agreed to sign the Securities Purchase Agreement, we ultimately felt comfortable investing in the transaction given the terms that were provided for in the SPA.

Q.   Were there any provisions of any of the other ancillary agreements entered into at the time of the Securities Purchase Agreement in connection with the March 2020 PIPE which Anson found objectionable?

MR. TRACEY:  Counsel, could you repeat -- I'm having a hard time, and it sounds like you are swallowing the microphone.

BY MR. ABRAHAM:

Q.   Were there any provisions of any of the other ancillary agreements entered into at the time of the March 2020 Securities Purchase Agreement which Anson found objectionable?

MR. TRACEY:  Objection.

Jeff, you may need to come a little bit away from the microphone.  There is a lot of reverb.  I'm sorry.

MR. ABRAHAM:  I'll let the court reporter read it back since you are having a problem hearing me, Dennis.

MR. TRACEY:  Actually, Jeff, that --

Page 244

just for the record, you just sat back 2 more feet, and the reverberating that we are hearing went away.

So I actually think if you stay a foot away from the microphone, the feedback we are getting will go away.

MR. ABRAHAM:  Okay.

[Court Reporter intervenes for clarification.]

[Discussion off the Record.]

[Court Reporter receives instruction re speaker designations on objections/interventions.]

MR. ABRAHAM:  Are you able to read back the last question for clarity for the witness?

And can you hear me correctly now?  Is this good?

MR. TRACEY:  I think you might need to move back.  We are having trouble hearing you.  It really is --

MR. ABRAHAM:  Can you hear me now?

MR. TRACEY:  No.  The closer you go to the microphone, the more feedback we hear, so --

MR. ABRAHAM:  I am pushing the microphone as far as humanly possible away.

MR. TRACEY:  It gets better when you do that.  There you go.  That is better.

[Court Reporter intervenes for clarification.]

MR. ABRAHAM:  Yeah, let's go off the record, please.

[Discussion Off The Record.]

THE VIDEOGRAPHER:  Off the record at 3:43 p.m.

[Discussion Off The Record.]

-- RECESSED AT 3:43 P.M.

-- RESUMED AT 3:52 P.M.

THE VIDEOGRAPHER:  We are back on the record at 3:52 p.m.

Go ahead, Counsel, or court reporter.

MR. ABRAHAM:  Can the court reporter please read back the last question I asked.

THE COURT REPORTER:  The last question I have is:

"Question:  Were there any provisions of any of the other ancillary agreements entered into at the time of the March 2020 Securities Purchase Agreement which Anson found objectionable?"

Page 246

THE WITNESS:  As I stated previously, Anson ultimately did invest in the transaction at the terms that were provided for in the documents, and so we were comfortable with the documents as they were presented to us.

BY MR. ABRAHAM:

Q.  What was the last exhibit I marked?

28.  Okay.

I am going to ask the court reporter to please mark as Exhibit 29 the document at tab 40, which is Bates-stamped ANSON_00010188 through 10198.

EXHIBIT NO. 29:  Email thread, document Bates-stamped ANSON_00010188 through ANSON_00010198.

BY MR. ABRAHAM:

Q.  Do you have that document, Mr. Nathoo?

A.  Yes, I do.

Q.  Can I ask you to please turn to the third page, which is Bates-stamped 10190.

A.  190?  I have it.

Q.  And there is an email from Robert Charron sent March 1, 2020, at 8:34 a.m., to Amin

Nathoo, subject "RE: GNUS - Revised Transaction Documents"; do you see that email?

A.   Yes, I do.

Q.   And it says:

"Amin, you ok with the changes they requested below:"

Do you see that?

A.   Yes, I do.

Q.   Do you understand those changes to be the five points identified in this email?

A.   Yes, I understand that those five points to be the changes that are being posed to me.

Q.   Do you see the last paragraph in the email says:

"Let me know what you think and I'll turn them back to the company and send Brett redlines."

Do you see that?

A.   Yes, I do.

Q.   "Shex, I would definitely send these out to investors when I send to Brett rather than wait on him."

Do you see that?

A.   Yes, I do.

Q.   Did you understand those five comments to have come from Brett?

A.   I don't recall the email from the time, but reading it today, I understand the comments to come from the company, actually.

Q.   And did you understand Brett to have additional comments?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't know what comments other investors may or may not have had.

BY MR. ABRAHAM:

Q.   And if you turn to the first page of this document, which is Bates-stamped 10188, do you see towards the second half of the page it says:

"On March 1, 2020, at 12:36 PM, Robert [...] Charron [...] wrote:"

Do you see that?

A.   Sorry, the first page?  Yes, I do.

Q.   And Robert Charron wrote:

"Very sick mind came up with this structure.  Love the guy but he is truly an evil genius."

Do you see that?

A.   Yes, I do.

Page 249

Q.    And you see there is an email above that from Joe Reda sent Sunday March 1, 2020, at 12:37 p.m., on which you are copied, and he writes:

"Brett.  Lmao."

Do you see that?

A.    Yes, I do.

Q.    Do you see on top of that there is an email from Robert Charron to Joe Reda, on which you are copied, sent March 1, 2020, at 12:38 p.m., and it says:

"No, Adelstein."

Do you see that?

A.    Yes, I do.

Q.    Do you know who Adelstein is?

A.    Adelstein is Michael Adelstein, who is a lawyer at Kelley Drye.

Q.    Do you know what his involvement in this transaction was?

A.    I don't believe he had any.

Q.    But he was the person who came up with this structure in another transaction; is that what this means?

MR. TRACEY:  Objection.

THE WITNESS:  I am not sure.  That

Page 250

would be my assumption given that I don't believe he had any involvement.

BY MR. ABRAHAM:

Q.   Had Anson ever been represented by Mr. Adelstein in any other transaction?

A.   Yes, he has represented us.

Q.   Let me ask you to turn to the document which is tab 41, and which I think I will ask the court reporter to mark as Exhibit 30.  And it is Bates-stamped ANSON_0001616 through 1618.

EXHIBIT NO. 30:  Email thread, document Bates-stamped ANSON_00001616 through ANSON_00001618.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   And at the bottom of the page, it says:

"On March 4, 2020, at 5:54 PM, Jonathan Schechter [...] wrote:"
Do you see that?

A.   Yes, I do.

Q.   "The Investor Note doesn't work right now as drafted as the company won't get the second 4[million] until the 6 month anniversary...we

need to change that so the company gets the additional 4[million] right after the shareholder vote in May..."

Do you see that?

A.    Yes, I do.

Q.    And do you see that you responded to that with the email above from Amin Nathoo sent Wednesday, March 4, 2020, at 4:59 p.m.?

A.    Yes, I do.

Q.    And you see it says:

"That doesn't work for us."

Do you see that?

A.    Yes.

Q.    Why didn't that work for Anson?

A.    The agreement, and we did not want to take additional risk of funding the remaining portion of our investment until such time that we actually had the ability to convert the note into shares and sell them in the market if we wanted to. And in order for us to have done that, we would have needed shareholder approval and either registration effectiveness or six months time passing so that you could sell the note under Rule 144.

Page 252

And the company was proposing that only one of those two requirements be met when we fund the second tranche, and we did not want to take that risk.

Q.   All right.  Let me ask you to turn to tab 42, which I am going to ask the court reporter to mark as Exhibit 31.  And it is document Bates-stamped ANSON_0003960 through 3964.

EXHIBIT NO. 31:  Email thread, document Bates-stamped ANSON_00003960 through ANSON_00003964.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   And it is an email from Jonathan Schechter dated 3/5/2020, sent to Jeffrey Schultz and Amin Nathoo, among others, subject "GNUS - SPA and Form of Secured Convertible Note (March 2020 financing)[with Empery comments]"; do you see that?

A.   Yes, I do.

Q.   And the body of the email says:

"Brett sent some comments to the Warrant...see attached".

Do you see that?

A.   Yes, I do.

Q.   Do you recall receiving those

Page 253

comments?

A.    I don't recall, but I am on the email.

Q.    Would you have reviewed the comments which Mr. Director made?

A.    If the document that was being provided to me was the latest draft of a document which was going to be a transaction document, a transaction we were going to participate in, I am sure I would have reviewed it.

Q.    All right.  Let's go to the document which is tab 43 and which I am going to ask the court reporter to mark as Exhibit 32, and which is Bates-stamped ANSON_00057527 through 529.

                EXHIBIT NO. 32:  Email thread, document

                Bates-stamped ANSON_00057527 through

                ANSON_000529.

                THE WITNESS:  I have it.

                BY MR. ABRAHAM:

                Q.    And towards the top of the first page, which is Bates-stamped 57527, it says:

                "On March 10, 2020, at 6:44 PM,

                Jonathan Schechter [...] wrote:

                    11mm".

                Did you understand that to be

Page 254

11 million?

A.    Yes, I did.

Q.    And he writes in the next paragraph:

"Need you, empery, brio and obsidian...obsidian in Australia so getting later...empery doing final review...shaye celebrating Purim so will get later like you.

I didn't realize you were still on vacay...get home safe".

Do you see that?

A.    Yes, I do.

Q.    Do you have any understanding what Mr. Schechter meant when he said he needed you, Empery, Brio and Obsidian?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't recall this email chain, but having reviewed the exhibit, I had asked Mr. Schechter whether he had all the signature pages ready to actually consummate the transaction, and I believe he was responding to that question.

BY MR. ABRAHAM:

Q.    And if you go further up the page, there is an email from Amin Nathoo sent 3/10/2020,

**Page 255**

to Jonathan Schechter; do you see that?

A.    Yes, I do.

Q.    And in the second paragraph, you write:

"Hopefully they can do some RDs along the way [...]"

Do you see that?

A.    Yes, I do.

Q.    Why were you -- when you say "they", were you referring to Genius Brands?

A.    That's correct, the company.

Q.    And why were you hoping that they could do some registered directs?

A.    I was hoping that they would be able to raise additional capital in an equity form, which would -- if they were able to do that, would strengthen our debt because there would be additional equity behind it.

Q.    All right.  Let's go to the next tab, which is 44, which I am going to ask the court reporter to please mark as Exhibit 33, and it is Bates-stamped ANSON_000734 through 740.

EXHIBIT NO. 33:  Email thread attaching Flow of Funds Closing Memorandum, document Bates-stamped ANSON_00000734

Page 256

through ANSON_0000073440.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.    And if you go to the second page, at the bottom of the page, which is Bates-stamped 735, there is an email from Jonathan Schechter sent Thursday March 12, 2020, 3:22 p.m., to Amin Nathoo and Laura Salvatori, subject "GNUS Closing"; do you see that?

A.    Yes, I do.

Q.    Do you see it says:

"Hi Amin,

Nasdaq has approved the deal.

Please execute the attached closing documents and commence your wire for $263,219.00."

Do you see that?

A.    Yes, I do.

Q.    Do you see that it says:

"Your existing debt ($1,521,781.00)is being repaid and has been netted from the amount you owe ($1,800,000).  I've also deducted the $15,000 you are paying Schulte for the security work done

Page 257

here."

Do you see that?

A.    Yes, I do.

Q.    What security work did Schulte perform for you?

MR. TRACEY:  Object to form.

THE WITNESS:  We retained Schulte to review some of the documents I believe as it pertained to the security around the investor note and the -- as it related to our note from the company.

BY MR. ABRAHAM:

Q.    Does this email accurately reflect the amount of additional cash that Anson had to put into Genius Brands on or about March 12, 2020?

MR. TRACEY:  Objection to form.

THE WITNESS:  I don't recall the precise amount, but I have no reason to believe that it is not correct.

BY MR. ABRAHAM:

Q.    Was that a good deal for Anson?

MR. TRACEY:  Objection to the form.

THE WITNESS:  Are you talking about at the time or --

BY MR. ABRAHAM:

Page 258

Q.   At the time.

MR. TRACEY:  I'm sorry, was what a good deal?

BY MR. ABRAHAM:

Q.   Wiring $263,219, with which the existing debt of $1,521,781 would be repaid for the total amount of the investment of $1,800,000.

A.   We entered into the transaction, so at the time we did believe that it was a positive investment to make for our investors.

Q.   And was one of those reasons because Anson did not reasonably expect to be paid off on the $1,521,781 of existing debt absent new financing for Genius Brands?

A.   Our existing position would have factored into our decision-making, but I am not sure I would characterize it as we were not sure if we would get repaid or not.

Q.   Absent the new financing, do you know how Genius would have been able to pay off the existing debt of over $1.5 million which Genius owed to Anson?

A.   Generally, there are multiple methods for which debt can be extinguished.  One is a repayment by cash, but oftentimes we are also

Page 259

repaid through the conversion of our debt into stock, which was an option available to the company as well.

Q.    Was there a provision in the prior debt providing for conversion of the debt into stock?

A.    I don't recall if it was part of that document already, but there had been instances where debt can be exchanged for stock even if not called for in the initial document.

Q.    Was that a transaction which Anson was considering in or about March 2020?

A.    I don't believe any such transaction such as that was proposed to us at that time.

Q.    Did you ever do any analysis whether the market liquidity for Genius stock would have enabled Anson to sell any common stock it received in exchange for debt at that time?

A.    No, we did not do any analysis on a hypothetical transaction that never existed at the time.

Q.    And if you go to the first page of this exhibit, there is an email from Robert Charron to Jonathan Schechter, Laura Salvatori, Amin

Nathoo, "RE: GNUS Closing", sent 3/12/2020, at 4:17 p.m.; do you see that?

A.   Yes, I do.

Q.   And Mr. Charron writes:

"We can have the company pay it."

Do you know what he is referring to when he says "it"?

A.   I believe he is referring to the legal bill/invoice for representing us in the transaction.

Q.   Is he referring to any invoice from Schulte?

A.   I am not sure, but Schulte did also represent us as part of the transaction.

Q.   And the email goes on to say:

"See attached.  We'll need to see if any investors want money to go through the company or if everything is netted out."

Do you see that?

A.   Yes, I do.

Q.   And I believe attached at 738 is a Flow of Funds Closing Memorandum; do you see that?

A.   Yes, I do.

Page 261

Q.   Do you know who prepared that Flow of Funds Closing Memorandum?

A.   I do not, but on the signature page, there is a placement agent and the company.

Q.   Did you review this Flow of Funds Closing Memorandum at any time?

A.   Not that I recall.

MR. ABRAHAM:  All right.  Let's go to the next document, which is tab 45, which I am going to ask the court reporter to mark as Exhibit 34, and it is Bates-stamped TOON0004341 through 4354.

EXHIBIT NO. 34:  Email thread, document Bates-stamped TOON00004341 through TOON000043354.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   And on the first page there is an email from Michelle Kijik from the Ellenoff Grossman firm to Jonathan Schechter, amongst others, subject "RE: GNUS Closing Working Group"; do you see that?

A.   Yes, I do.

Q.   Do you also see in the "cc" there is a reference to Nathaniel J. Norman of the

Page 262

Schulte Roth firm; do you see that?

A.    Yes, I do.

Q.    Did he act as one of Anson's lawyers in this matter?

A.    I don't recall who specifically from Schulte acted on behalf of us, but Schulte was representing us.

Q.    And in the email, Michelle writes:

"All - Attached please find our invoice in connection with GNUS."

Do you see that?

A.    Yes, I do.

Q.    And do you see that the email below is from March 13, 2020, from Jonathan Schechter to Bob Denton, and it says:

"Anson will [pay] EGS directly. Not the company."

Do you see that?

A.    That's correct.

Q.    Do you recall whether Anson paid EGS directly?

A.    I don't recall ultimately how the flow of funds worked, whether we paid it directly or the company paid it on our behalf.

Q.    Let me ask you to turn to the

Page 263

document, the page Bates-stamped 4353 in this document?

A.    I see it.

Q.    And it looks like an invoice from Ellenoff Grossman; do you see that?

A.    Correct.

Q.    Do you recall ever seeing this document before?

A.    I don't recall it, but I have no reason to believe it wasn't sent to me.

Q.    If it was sent to you, would it be in Anson's document production?

MR. TRACEY:  Object to form.

THE WITNESS:  If it was sent to me, it would either have been in the document production or in the privileged list at the end of the document list, however that works between the lawyers.

BY MR. ABRAHAM:

Q.    Did you view Ellenoff Grossman as being your, Anson's, lawyer in this case?

A.    That's correct.  Ellenoff Grossman was our counsel in this transaction.

Q.    And acting as your counsel, did you view Ellenoff Grossman as your agent?

Page 264

MR. TRACEY:  Object to form.

THE WITNESS:  I am not sure what that means.  I know he was our counsel reviewing, helping us to review documents.

BY MR. ABRAHAM:

Q.   Did Mr. Charron receive comments on your behalf?

MR. TRACEY:  Objection to the form.

THE WITNESS:  I believe Mr. Charron was part of the flow of communication of comments from the company, yes.

BY MR. ABRAHAM:

Q.   So when Mr. Charron wrote, did he write as counsel for Anson?

MR. TRACEY:  Object to form.

THE WITNESS:  I think that when he wrote, if he had said that this was a comment from us, that it would have been representing our views, but I can't say what all communication Mr. Charron had during that time period.

BY MR. ABRAHAM:

Q.   Did Mr. Charron make any comments which did not reflect Anson's views?

MR. TRACEY:  Objection to form.

THE WITNESS:  I am not sure what is the

Page 265

entirety of the comments that Mr. Charron made during that time, so I am not certain that I can answer that question.

BY MR. ABRAHAM:

Q.   Are you aware of any comments which Mr. Charron made which did not reflect Anson's views?

MR. TRACEY:  Object to form.

THE WITNESS:  Again, I am not -- I am not aware of the entire set of comments and I can't recall all the comments that Mr. Charron made during that time, so I am not able to answer that question.

BY MR. ABRAHAM:

Q.   You are not able to answer whether you were aware of something?

MR. TRACEY:  Are you aware of not -- objection.

THE WITNESS:  I am not aware of any comments.

BY MR. ABRAHAM:

Q.   Let me ask you to turn the tab to tab 46, which I am going to ask the court reporter to mark as Exhibit 35, and it is Bates-stamped ANSON_00011023 to 033.

Page 266

EXHIBIT NO. 35:  Email thread, document Bates-stamped ANSON_00011023 to ANSON_00011033.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.    Now, on the first page of this document, it says, towards the middle of the page:

"On March 25, 2020, at 2:56 AM, Andy Heyward [...] wrote:

Amin, I want to thank you again for your faithful support of Genius. We have boatload of news...good news.

We will be rolling it out continuously for the next few weeks. You saw this today...Im sure. Tomorrow we will [give you] some more...."

Do you see that?

A.    Yes, I do.

Q.    Do you recall receiving this email?

A.    I don't recall the email, no.

Q.    So you don't recall any reaction you might have had to this email, do you?

Page 267

A.    I do not.

Q.    Were you expecting good news to come out of Genius at the time Anson made its investment in the March 2020 PIPE?

A.    Generally when you talk to CEOs of companies, they always believe they have good news forthcoming.  I always take that with a grain of salt and didn't know what news, if any, would be forthcoming after this investment.

Q.    All right.  I am going to ask the court reporter to please mark as Exhibit 36 a document which was emailed during a break and I believe is now tab 70 -- or was it emailed?  It was sent by FTP.  It is in the FTP.  Do you have that document?

A.    I do not.

MR. TRACEY:  No, we don't.

MR. ABRAHAM:  Then we'll come back to it later, after we take a break.

MR. TRACEY:  Okay.  Thank you.

BY MR. ABRAHAM:

Q.    But let's go on then -- what did I say this -- whatever I said this was before, I am going to mark this document, which is tab 47, as Exhibit 36.

EXHIBIT NO. 36:  Email with attached Leak-Out Agreement, document Bates-stamped ANSON_00012664 through ANSON_00012730.

MR. TRACEY:  Jeff, just do you know who sent the document?

MR. ABRAHAM:  It wasn't an email.  It was added to the FTP.  I misspoke, okay.  That is my understanding.  But I am here with Mr. Klein, and I will let him get on screen and explain how it was sent, since it wasn't me.

MR. TRACEY:  Okay.  Thank you.

MR. KLEIN:  Hey, all.  Sorry, it was added to the same FTP as the other documents.  If anyone needs it emailed, I can email it.

MR. TRACEY:  And who sent that?  I'm sorry, I'm buried here.

MR. KLEIN:  Nobody sent it.  Ryan Levy sent an FTP site yesterday at around 5:00 p.m --

MR. TRACEY:  Got it.

MR. KLEIN:  -- which had the documents that comprise the binder that is in front of the witness now.  The document --

MS. BRATIC:  If that is just one document, could you email it?

MR. KLEIN:  Yes, I will email it.

MS. BRATIC:  Thank you.

[Court Reporter intervenes for clarification.]

MR. KLEIN:  Can we go off the record for a minute while we sort this out?

MR. TRACEY:  Yes.

THE VIDEOGRAPHER:  This marks the end of Media 5.

We are going off the record at 4:22 p.m.

-- RECESSED AT 4:22 P.M.

-- RESUMED AT 4:33 P.M.

THE VIDEOGRAPHER:  This is Media Unit 6 of the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo.

We are back on the record at 4:33 p.m.

MR. GLADSTEIN:  Thank you.  This is Andy Gladstein from Empery.

I just wanted to throw on the record quickly that during the last session, the New York Metropolitans trailing at the top of the 9th, 7 to 6, had a two-run homer from Francisco Lindor to ultimately win the game and lock up a trip to the playoffs.  I am viewing this as great luck.  I appreciate the opportunity to put this on the

Page 270

record.

Thank you, Jeffrey.

MR. ABRAHAM:  Thank you.  Does that mean I get playoff tickets?

MR. GLADSTEIN:  Drop the case, and we can talk about it.

BY MR. ABRAHAM:

Q.   Nope.  I can buy my own tickets.

Anyway, we are back -- we have been back on the record, and I am going to ask the court reporter to mark as Exhibit 37 the document which Mr. Klein from my office just emailed around and which is Bates-stamped ANSON_00012931 through 12935.

EXHIBIT NO. 37:  Email thread with Attached Waiver and Consent signature page, document Bates-stamped ANSON_00012931 through ANSON_000012935.

THE WITNESS:  I have it in front of me.

BY MR. ABRAHAM:

Q.   All right.  At the bottom of the first page, which is Bates-stamped 12931, there is an email from Jonathan Schechter sent May 8th, 2020, at 11:54 a.m., to Amin Nathoo and Laura Salvatori, subject "GNUS - Over the Wall"; do you

Page 271

see that?

A.    Yes, I do.

Q.    And do you see in the body of the email below some fine print it says:

"12mil shares at $[0.45]."

Do you see that?

A.    Yes, I do.

Q.    And if you turn the page to the second page, which is Bates-stamped 12932, it says:

"Whoever doesn't invest in this round their pro-rata will not be invited in on any future GNUS deals 'as per the lead'".

Do you see that?

A.    Yes, I do.

Q.    Do you have any understanding what "pro-rata" means in this context?

A.    Pro rata generally means that you in a similar ratio that you did something previously.

Q.    Do you know what ratio was being referred to in this sentence?

A.    I don't -- I don't know for certain.  If this was the first transaction post the March transaction, then my understanding was

Page 272

that it was pro rata to the participation in that financing.

Q.   In the March 2020 financing?

A.   Yes, if this was the first, because there was a series of transactions in April, May, June, that I can't recall the specific timeline on.

Q.   And when I say "March 2020 financing", I mean the March '20 PIPE financing through the SPA on March 11, 2020.

A.   Yes.  Again, if this was the first registered direct, then that was my understanding is what it meant.

Q.   Let's say it wasn't the first registered direct.  Would that affect your understanding?

A.   Yes.  My understanding, it was pro rata to the previous investment round prior to this one.  I just can't -- I don't know for certain if the March one was the previous one.

Q.   What is your understanding of what "as per the lead" means?

A.   I am not sure.  I don't -- I don't know who the lead was in this registered direct.

Q.   Was Anson the lead?

Page 273

A.    I don't recall, but I -- reading this email, I would doubt it because we were just taken over the wall and provided this information to us.  I don't know why he would say that to us if we were the lead.

Q.    Do you know whether this was a message that Mr. Schechter sent out to other investors, aside from Anson, as well?

A.    I am not sure what communications Mr. Schechter had with other investors.

Q.    Well, if Anson is not the lead -- well, strike that.

If Anson is the lead, is there any reason to send this email to Anson?

MR. TRACEY:  Objection to the form.

THE WITNESS:  I don't believe so.

BY MR. ABRAHAM:

Q.    Let me ask you to go back to the first page, which is 12931.  And above the email we just referenced, there is one from Amin Nathoo, which is you, sent Friday, May 8th, 2020, at 12:30 p.m., which is a little bit more than a half hour after the email sent at the bottom of the page, to Jonathan Schechter and Laura Salvatori, subject "RE: GNUS - Over the Wall."  You write:

"Thanks.. docs?"

What do you mean by "thanks" in the context of this email?

A.    Again, I don't recall this email specifically, but reading it, I believe it just meant thanks for showing us the deal.

Q.    And if you go up the page, at the top there is an email from Amin Nathoo 5/8/2020 at 12:43:14 p.m., to Jonathan Schechter and Laura Salvatori, subject "GNUS - Over the Wall"; do you see that?

A.    Yes, I do.

Q.    And it says:

"Attached are Anson's signature pages.

Please provide countersigned."

Do you see that?

A.    Yes, I do.

Q.    And if you flip the document, if you are able to, to the fourth page of the exhibit at 12934 - impressive sneeze, by the way, whoever - there is a signature.  Is that your signature?

A.    Yes, it is.

Q.    And it says "Original Subscription Amount:  $3,000,000.00"; do you see that?

Page 275

A.    Yes, I do.

Q.    Does that refresh your recollection as to what "pro-rata" referred to in Mr. Schechter's May 8th, 2020, 11:54 a.m. email?

A.    It doesn't refresh my recollection, but it appears that "pro-rata" -- based on reading the exhibit, it appears that "pro-rata" refers to the debt deal from March 2020.

Q.    All right.  Going to the next page, which is 12935, there is a "Signature of Authorized Signatory of Purchaser"; is that your signature?

A.    Yes, it is.

Q.    And at the bottom of the page, there is "Subscription Amount:  $2,224,600.00"; do you see that?

A.    Yes, I do.

Q.    Does that refer to the payment for the 4,900,000 shares in the line below that?

A.    Yes, it does.

Q.    All right.  Let's go to Exhibit 36, which is tab 47 in the book in front of you, and is Bates-stamped ANSON_00012664 through 12730.

A.    Got it.

Q.   And on the first page of the document, there is an email at the top of the page from Jonathan Schechter 5/16/2020, 5:33 p.m., to Amin Nathoo, copying Robert Charron, and the subject is "GNUS RD"; do you see that?

A.   Yes, I do.

Q.   Does "RD" there refer to registered direct as in a registered direct offering?

A.   Yes, I believe so.

Q.   And there is an attachment "GNUS Form of Leak-Out Agreement 5.2020".  The next one is "WSComparison".  The next one is "GNUS-SPA (RD - May 18, 2020)(Common)".  Do you see that?

A.   Yes, I do.

Q.   And in it, Mr. Schechter says:

       "Here is the SPA and Leak-Out
       (I got from Brett)."

Do you understand that to be Brett Director?

A.   I believe so, yes.

Q.   Do you understand the Leak-Out Agreement to -- form to have come from Mr. Director?

MR. TRACEY:  Object to form.

Page 277

Objection.

THE WITNESS:  I am not sure where Mr. Schechter got it from.  He appears to mention Brett, but I can't say for certain where he got it from.

BY MR. ABRAHAM:

Q.   Did he get the form of Leak-Out Agreement from Anson?

A.   Not that I recall, no.

Q.   Let me ask you to turn to page Bates-stamped 12667.

A.   667?

Q.   Yeah.

A.   Okay.

Q.   And depending on how you cut it, it is either the last paragraph on the page or the second-to-last paragraph on the page, but it starts with the language:

"Each party [...]"

Do you see that?

A.   That's correct.

Q.   Do you see that it says:

"Each party hereto acknowledges that, in view of the uniqueness of the transactions contemplated by

Page 278

this Leak-Out Agreement, the other party or parties hereto may not have an adequate remedy of law for money damages in the event that this Leak-Out Agreement has not been performed in accordance with its terms, and therefore agrees that such other party or parties shall be entitled to seek specific enforcement of the terms hereof in addition to any other remedy it may seek, at law or in equity."

Do you see that?

A.   Yes, I see it.

Q.   Do you know what the impact of that provision?

MR. TRACEY:  Object to form.

THE WITNESS:  I am not a lawyer, but generally it to me means I am going to adhere to the agreement.

BY MR. ABRAHAM:

Q.   Does it mean that the other parties to the Leak-Out Agreement, the other investors, had to adhere to the agreement as well?

UNIDENTIFIED SPEAKER:  Objection.

**Page 279**

MR. TRACEY:  Object to the form, mischaracterizes the document.

THE WITNESS:  My understanding is that the Leak-Out Agreement is an agreement between Anson and the company and no other investor is party to that agreement.

BY MR. ABRAHAM:

Q.    But is it your understanding that the language of the Leak-Out Agreement governs its terms?

MR. TRACEY:  Objection.

UNIDENTIFIED SPEAKER:  Objection.

THE WITNESS:  Sorry, are you asking me if the language of the agreement governs the terms of that agreement?

BY MR. ABRAHAM:

Q.    Yes.

A.    I guess so.  I think that is the case always, unless I am confusing the question.

Q.    Okay.  Thank you.

I am going to ask the court reporter to please mark as Exhibit 38 the document at tab 48 in front of you, which is a document Bates-stamped ANSON_00012091 through 12166.

EXHIBIT NO. 38:  Email thread with

several attachments, document Bates-stamped ANSON_00012091 through ANSON_00012166.

THE WITNESS:  I have it in front of me.

BY MR. ABRAHAM:

Q.    And the first email on the first page, which is Bates-stamped 12091, Jonathan Schechter writes to Amin Nathoo, which is you, on 5/16/2020, copying Robert Charron, subject "GNUS RD".  He writes:

"Take a look at the attached... let's see what others comeback with on the Standstill before we make a final decision."

Do you see that?

A.    I do.

Q.    Do you know what "Standstill" refers to in this context?

A.    In this context, I am not entirely sure, but generally a standstill is a period of time that the company is unable to issue securities following a transaction.

Q.    And when Mr. Schechter refers to "others", do you have any understanding to whom he is referring?

Page 281

A.    No, I do not.

Q.    And if you go down the page, there is an email from Amin Nathoo, which is you, sent Saturday, May 16, 2020, at 8:39 p.m., to Jonathan Schechter "RE: GNUS RD"; do you see that?

A.    Yes, I do.

Q.    And in it, you write:

"So if the aggregate selling amount is 30% of volume, attached shows the % each firm can sell per day."

Do you see that?

A.    Yes, I do.

Q.    What does "aggregate selling amount" refer to?

A.    In this context, the Leak-Out Agreement had called for the total aggregate percentages of all investors to be a certain percentage of daily volume.

Q.    Do you know who prepared these percentages?

A.    I believe it was the placement agent or the company.

Q.    And they communicated to Anson; is that correct?

A.   In -- I don't recall, but in reviewing this exhibit, it appears it was sent to me in the email from Jonathan Schechter at 8:06 p.m.

Q.   Let me ask you to turn the page to the page Bates-stamped 12092 at the bottom.

A.   I see it.

Q.   And at the top of the page there is an email from Amin Nathoo, which is you, sent Saturday May 16, 2020, at 6:06 p.m., to Jonathan Schechter "RE: GNUS RD"; do you see that?

A.   I do.

Q.   And do you see it says:

          "Here are a few of my
          comments/questions."

Do you see that?

A.   Yes, I do.

Q.   And it says:

          "The waiver should have the
          following:"

The first bullet point:

          "Company agrees to file [...]
          registration statement by May 29
          2020".

Do you recall making that comment?

A.    I don't recall making it, but it appears I sent that email.

Q.    Do you recall any reason why Anson would want the resale registration statement filed by May 29, 2020?

A.    Generally, we prefer our securities to be registered over not registered, so a registration statement being filed sooner rather than later is our preference generally.

Q.    Do you see the next bullet point says:

"Company shall be prohibited from issuing any common stock/debt/ etc. from date hereof until 90 days after the registration statement goes effective".

Do you see that?

A.    Yes, I do.

Q.    Do you recall making that comment?

A.    I don't recall sending this email.

Q.    Do you have any understanding why you have requested that as a provision?

A.    Generally in transactions, when you purchase securities of a company, you don't want the company to issue other securities shortly

thereafter and you would like a certain standstill period where the company is unable to issue new securities after your transaction.

Q. Is that to enable you to be able to sell the stock at a higher price?

A. That is to enable the stock to stabilize in the market irrespective of whether or not we intend to sell or not.

Q. Is there an advantage to Anson if the stock stabilizes in the market?

A. Generally, in many transactions, when a transaction is announced, the stock price declines in value, and given that our investment, the profitability of our investment is correlated to the stock price, we generally would prefer the stock price to stabilize or rise.

Q. Do you have any understanding whether the market for Genius Brands' common stock traded in an efficient market?

MR. TRACEY: Object to form.

THE WITNESS: I am not sure precisely what defines an efficient market. In my opinion, all markets are inherently somewhat inefficient.

BY MR. ABRAHAM:

Q. You think the market for Microsoft

stock is inefficient?

MR. TRACEY:  Objection.

THE WITNESS:  I think that each participant in the market has their own views of a fundamental value of a company, and for one reason or another, it could -- the stock could be trading away from what you perceive to be that right fundamental value, for whatever reason.

BY MR. ABRAHAM:

Q.   Did you ever form an opinion as to the fundamental value of Genius Brands' common stock?

A.   No, we did not.

Q.   Did you ever obtain -- strike that.

Did you ever attempt to analyze what the fundamental value of Genius Brands' common stock was in or about May 2020?

A.   Not specifically.  In small companies, it is extremely difficult to ascertain what fundamental value is.  It really is dependent on a variety of factors that are difficult to measure.

And so, and as such, that analysis is often too difficult to perform.  But we try to make

an assessment of whether we feel the value could be higher than it is today.

Q.    All right.  In your email, there is also a header for "Leakout"; do you see that?

A.    Yes, I do.

Q.    And the first bullet point starts by saying:

"The leakout should reference the debt deal SPA, not this new deal, right?"

Do you see that?

A.    Yes, I do.

Q.    Do you recall what you meant when you said that in this context?

A.    I don't recall sending the email, so no.

Q.    And the bullet point goes on to say:

"The leakout needs to apply to all debt investors, regardless of whether or not they participate in this financing, they still need to sign it."

Do you see that?

A.    Yes, I do.

Q. Was that a term that the company wanted in the Leak-Out Agreement?

A. Sorry, the -- that term of the --

Q. Yes, that --

A. Of everyone signing it, is that the question?

Q. Yes. Yes.

MR. TRACEY: Object to form.

THE WITNESS: I believe the company wanted all of the investors to sign a Leak-Out Agreement.

BY MR. ABRAHAM:

Q. Why do you believe that to be the case?

A. I believe that was conveyed to us by the placement agent, that the company has requested investors to sign a Leak-Out Agreement.

Q. Did Mr. Heyward ever tell you that?

A. I don't believe I spoke to Mr. Heyward in or around that time.

Q. Do you recall in what form it was conveyed to you that the company wanted a Leak-Out Agreement?

A. Communications of what the company

Page 288

wanted would have come through the placement agent. I believe during that time, that was the only party I was communicating with regarding this investment.

Q.   Do you know whether the investors gained any benefit from the Leak-Out Agreement?

A.   Sorry?

Q.   Do you know whether investors such as Anson gained any benefit from the Leak-Out Agreement?

A.   I am not sure if that question is actually -- we were able to actually measure whether there was a benefit or not.  Generally our position is we would like flexibility and the ability to trade our position, just like having registered shares, and so our preference is not to have a Leak-Out Agreement.

Q.   Would it be a problem if every investor tried to sell Genius Brands stock at the same time?

MR. TRACEY:  Objection.

UNIDENTIFIED SPEAKER:  Objection.

THE WITNESS:  I -- that is difficult to say.

BY MR. ABRAHAM:

Q.   Why is it difficult to say?

**Page 289**

A.   Well, theoretically, if every single investor that ever owned Genius stock wanted to sell and there were no buyers because everyone was selling, then you would -- the price would go to zero, so I guess that could be problematic.

Q.   Well, it would be -- would it be problematic if all the investors who had purchased Genius debt and obtained warrants in the March 2020 PIPE tried to sell as soon as the securities became registered with the SEC?

MR. TRACEY:  Objection.

THE WITNESS:  Again, I am not -- I don't know what other investors plan or don't plan to do with their stock, so it is a little bit of a hypothetical situation because I don't know if I have ever been in a situation where all investors tried to sell the stock at the same time.

BY MR. ABRAHAM:

Q.   Would it be a concern of Anson if all the investors in the March 2020 debt deal try to sell as soon as the underlying shares of common stock became registered with the SEC?

MR. TRACEY:  Objection --

UNIDENTIFIED SPEAKER:  And --

MR. TRACEY:  -- to form.

Page 290

THE WITNESS:  Our assumption when entering any transaction is that every investor is free to make their own decision to sell or not sell and could potentially be selling at any given time, and we factor that into our risk assessment.

BY MR. ABRAHAM:

Q.   Were you concerned, or should I say was Anson concerned that all investors in the March 2020 debt deal would try to sell as soon as the underlying shares of common stock became registered with the SEC?

MR. TRACEY:  Objection.

You may need to move a little bit away from the microphone.  It sounds like you are swallowing again.

THE WITNESS:  Again, my assumption is that all investors have the ability to sell the stock at any time they want, and we take that into account in our risk assessment of the transaction.

BY MR. ABRAHAM:

Q.   Isn't it correct that having a Leak-Out Agreement would help prop up the price of the common stock?

MR. TRACEY:  Objection to form.

UNIDENTIFIED SPEAKER:  Objection.

Page 291

Jeff, again, it sounds like you are swallowing the microphone.  I'm getting a ton of feedback.

MR. TRACEY:  And I am objecting to the question and not to the fact that we can't hear you.

UNIDENTIFIED SPEAKER:  I'm objecting to both.  That's important.

MR. ABRAHAM:  Well, if you can't hear me, it is hard to object to the question.

UNIDENTIFIED SPEAKER:  If we can hear you but I don't know what you are asking, then I will object anyway, sir.

MR. ABRAHAM:  I'll ask the question again.

Can you hear me now, first of all.

UNIDENTIFIED SPEAKER:  You have got to back up a little bit.  I am still getting reverb.

MR. ABRAHAM:  Can you hear me now?

UNIDENTIFIED SPEAKER:  It's the volume, I think, Jeff.  Maybe --

MR. ABRAHAM:  Can you hear me now?

UNIDENTIFIED SPEAKER:  Way better.

UNIDENTIFIED SPEAKER:  That is better.

MR. TRACEY:  That's better.

Page 292

BY MR. ABRAHAM:

Q.   Isn't it correct that having a Leak-Out Agreement would help prop up the price of Genius Brands' common stock?

UNIDENTIFIED SPEAKER:  Objection to form.

THE WITNESS:  I am not sure what impact the Leak-Out Agreement would have on the stock.  I think it is dependent case by case.

MR. ABRAHAM:  All right.  Let me ask you to take a look at tab 50, which I am going to ask the court reporter to mark as Exhibit 37 [sic] and it is a document Bates-stamped L1_003043 through 3051 [sic].

[Court Reporter intervenes for clarification.]

[Discussion off the record re speaker IDs]

MR. ABRAHAM:  Off the record, yes, let's go off the record entirely.

THE VIDEOGRAPHER:  Off the record at 5:00 p.m.

[Discussion Off The Record.]

THE VIDEOGRAPHER:  We are back on the record at 5:02 p.m.  Go ahead.  Counsel.

**Page 293**

BY MR. ABRAHAM:

Q.   Okay.  I am going to clarify on the record that I am going to ask the court reporter to mark as Exhibit 39 a document at tab 50 of the FTP sent to counsel, which is Bates-stamped L1_003043 through 3052.

EXHIBIT NO. 39:  Email thread, document Bates-stamped L1_003043 through L1_003052.

THE WITNESS:  I have it in front of me.

BY MR. ABRAHAM:

Q.   Have you ever seen this document before?

A.   I believe I saw it during preparation.

Q.   Was your counsel present with you during preparation?

A.   Yes, he was.

Q.   Do you see the email at the top of the first page Bates-stamped 3043 in which Joe Reda writes to David Feldman on Sunday 5/17, subject "GNUS Docs"; do you see that?

A.   Yes, I do.

Q.   Do you know who Mr. Feldman is?

A.   Mr. Feldman runs L1 Capital.

Page 294

Again, I don't know his official title or role.

Q.   Have you ever met Mr. Feldman in person?

A.   Yes, I have.

Q.   Do you have his contact information?

A.   I am not certain.  I would have to check.

Q.   Do you know whether L1 was an investor in the March 2020 PIPE?

A.   I believe he was, in having reviewed some of these documents.

Q.   You will see in the body of the email Mr. Reda writes:

"Amin has his mind made up.

I'm happy to patch him in for

explanation.  You can get all your

debt repaid and not sign leak out.

I'm fine with that if you roll ALL

OF THE MONEY INTO ICNB.  CALLING YOU

SOON."

Do you see that?

A.   Yes, I do.

Q.   Do you recall having your mind made up about any aspect relating to the Leak-Out

Page 295

Agreement in or about May 17, 2020?

MR. TRACEY:  Objection.

THE WITNESS:  No, I do not.

BY MR. ABRAHAM:

Q.   Do you recall demanding that every investor sign the Leak-Out Agreement in or about May 17, 2020?

A.   I recall being asked to be treated fairly, so if I was being asked to consider something, that I just be treated fairly relative to the other investors.

Q.   Is it correct that the alternative to signing the Leak-Out Agreement was that an investor got repaid for all the debt that they had acquired in the March 2020 PIPE?

MR. TRACEY:  Object to form.

THE WITNESS:  I don't recall that being an option presented to me.

BY MR. ABRAHAM:

Q.   Is it correct that one of the provisions of the Leak-Out Agreement prevented the company from repaying the debt which had been issued in the March 2020 PIPE?

MR. GLADSTEIN:  Object to form.

THE WITNESS:  I don't recall

Page 296

specifically if that was in the final agreement, but I remember that being a point that we would have preferred.

BY MR. ABRAHAM:

Q.   Were you concerned that the company raising additional capital on May 18, 2020, could have chosen to take that capital and redeemed the senior notes?

A.   I remember wanting to ensure that the company could not redeem our senior notes given that the stock price in the market was higher than our conversion price and would have preferred, when the time came, to be able to convert that into stock.

Q.   Was that an interest you shared with other investors who had purchased Genius debt in the March 2020 PIPE?

MR. GLADSTEIN:  Object to form.

THE WITNESS:  I am not sure what other investors preferred or not.  I remember that that was Anson's preference for our funds.

BY MR. ABRAHAM:

Q.   And in having that preference, was Anson acting in an economically rational way?

A.   Yes, I believe so, given that we

felt at the time that that would lead to greater proceeds of our investments than being repaid.

MR. ABRAHAM:  I am going to ask the court reporter to please mark as Exhibit 40 a document which is tab 56 and is Bates-stamped ANSON_00012512 through 12519.

EXHIBIT NO. 40:  Email thread, document Bates-stamped ANSON_00012512 through ANSON_00012519.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   Have you ever seen this document before?

A.   I don't recall this document.

Q.   Let me ask you to turn to the second page of this document which is Bates-stamped 12513.

A.   I have it.

Q.   And you see there is an email towards the top of the page from Amin Nathoo, which is you, sent May 17, 2020, at 10:34 a.m., to Jonathan Schechter and Robert Charron, subject "GNUS RD"; do you see that?

A.   Yes, I do.

Q.   And it says:

"Attached are Anson's signature pages to the SPA, Waiver, and Leakout to be held in escrow."

Do you see that?

A.    Yes, I do.

Q.    What do you mean by being held in escrow?

A.    What I mean by that is I am sending the signature pages across, but they at that time can't get used to be crossed with the company to form a binding agreement.

Q.    And you go on to write:

"You may release these pages if the following are true:

1.  Financing is for 7,500,000 shares for a total of $9,000,000".

Do you see that?

A.    Yes, I do.

Q.    "2.  You have received the signed waivers and leakout from all large investors in the deal. (Empery, L1, Iroquois, Heights, Brio, Obsidian, Anson)".

Do you see that?

A.    Yes, I do.

Q.   Did you write that email?

A.   Yes, it appears that I did.  I don't recall it.

Q.   Does point 2 mean that Anson was concerned that the other investors also agreed to the terms of the leak-out?

MR. TRACEY:  I'm sorry, could you repeat that?  I didn't hear it.

BY MR. ABRAHAM:

Q.   Does point 2 mean that Anson was concerned that the other investors mentioned in that point also agreed to the terms of the Leak-Out Agreement?

A.   Reading the -- reading the email point number 2 to me means that we wanted to ensure that we were being treated fairly, and if we were being asked to agree to something with the company, that we not be treated unfairly relative to the other participants.

Q.   And "fairly" in this context means being treated the same?

MR. GLADSTEIN:  Object to form.

THE WITNESS:  To me, "fairly" means that the terms that I was being offered are substantially similar to the terms being offered to

Page 300

other investors.

BY MR. ABRAHAM:

Q.   Did Anson willingly sign the Leak-Out Agreement?

A.   Yes, it did.

Q.   Did Anson ever regret signing the Leak-Out Agreement?

A.   Not that I recall, no.

MR. ABRAHAM:  I am going to ask the court reporter to please mark as Exhibit 41 the document which is at tab 58 and is Bates-stamped ANSON_00029716 through 29718.

EXHIBIT NO. 41:  Email thread, document Bates-stamped ANSON_00029716 through ANSON_00029718.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   And on the first page, which is Bates-stampeded 29716, there is an email from Amin Nathoo sent 5/30/2020 to Moez Kassam "Re: GNUS"; do you see that?

A.   Yes, I do.

Q.   Have you ever seen that email before?

A.   Saw it in preparation for today,

**Page 301**

after you sent it yesterday.

Q.    Do you recall sending this email?

A.    I don't recall sending it.

Q.    And in the email, you write:

"I agree that the company is over valued and over hyped."

Do you see that?

A.    Yes, I do.

Q.    What did you mean by "over hyped"?

A.    In and around May of 2020, the stock of Genius Brands had attracted a lot of attention in the marketplace that had driven the price up.

Q.    And what does it mean to hype a stock?

A.    To me, if someone is hyping a stock, it means they are being overly bullish on the prospects for the stock.

Q.    Do you know of anyone who was being overly bullish about the prospects for Genius stock in or about May 30, 2020?

A.    Nobody directly.  We were following social media at the time, and there were many people posting comments that I thought were overly bullish, but I don't know who those

Page 302

individuals are.

Q.   Is that also a reference to any of the company's press releases?

A.   No.  My reference is about the price action of a stock in the market.

Q.   And when you say "over valued", are you referring to the price of Genius Brands' common stock?

A.   Yes, I am.

Q.   And in the email, you go on to say:

"And chances are this will be back to $0.50 within a year."

Do you see that?

A.   Yes, I do.

Q.   "Most companies like this fail."

Do you see that?

A.   Yes, I do.

Q.   What do you mean by "fail"?

A.   The majority of micro cap companies that we provide financing to are distressed and ultimately do not end up succeeding.

Q.   Is Anson a broker/dealer?

A.   No, it is not.

Q.   Did you expect Genius to fail?

MR. TRACEY:  Objection.

THE WITNESS:  When we enter into transactions, we hope that each of the companies will succeed, but just being a logical person, seeing that the majority of companies will fail, we realized that there was a significant likelihood that it could happen here too.

BY MR. ABRAHAM:

Q.   And in the last paragraph of this email, which is the third paragraph, it says:

"Every single name I do deals with that has a run is probably a good long term short.  But it doesn't mean you can't make money along the way by taking advantage of the liquidity when it comes."

Do you see that?

A.   Yes, I do.

Q.   What do you mean by "liquidity when it comes"?

A.   "Liquidity" refers to the trading volume of the stock.

Q.   Does hyping a stock drive trading volume?

A.   I guess theoretically it could.

Q.   Do you buy with the expectation -- strike that.

Does Anson buy into these deals with the expectation that the price of the stock will be hyped?

A.   No, it does not.  It buys into deals based on our assessment of risk/reward of the terms relative to the risk that is faced by the company.

Q.   Does the reward increase if the stock is hyped?

A.   Theoretically, if that causes the stock price to increase, then yes, the reward I guess would be increased.

Q.   Does the number of press releases sent out by a company correlate with liquidity for the stock?

A.   Not always.  There are many times where companies that put out too many press releases, the market participants see through that and begin to ignore what is being put out by the company.  It really depends on a case by case.

Q.   Is there a number of press releases you would consider too much?

A.   I don't have -- I don't have a

number of what I think is too little or too much.

Q.    Is SEG knowledgeable as to the number of press releases that would be considered too much?

MR. GLADSTEIN:  Object to form.

THE WITNESS:  I think you would have to ask SEG if they have an opinion on that.

BY MR. ABRAHAM:

Q.    How is Anson able to measure reward without modelling the fair value of the company's common stock?

A.    It is -- it is not really a science.  It is a little bit more of an art whereby you try to assess what the -- whether the future value of the company, if the company executes, is going to be higher than it is today.

Q.    Is that --

A.    Usually it is a gut feel.  It is not a model or a science.

Q.    It is not -- is it dependent in any way on prospective future cash flow?

A.    It would be -- you know, future cash flow that a company generates would be one input into the success or lack thereof of a company for sure.

Page 306

Q.    What would be other inputs?

A.    Increased revenues, new products that appeal to a potential acquisitor of the company.  But ultimately, it leads to revenues and profits and cash flows generally.

Q.    All right.  Let me go down the page.  And it says on May 30, 2020, 11:20 a.m., Moez Kassam wrote:

"Be objective!"

Do you see that?

A.    Yes, I do.

Q.    And it says "Begin forwarded message"; do you see that?

A.    Yes.

Q.    And it is from Jonathan Daws?

A.    Yes.

Q.    Date May 29, 2020, to Moez Kassam, subject "GNUS"; do you see that?

A.    Yes, I do.

Q.    Do you know who Jonathan Daws is?

A.    He at the time was a consultant of ours.

Q.    When you say "ours", do you mean Anson?

A.    Yes, that's correct.

**Page 307**

Q.   What was the basis upon which Mr. Daws was compensated?

A.   I believe he was compensated a fixed amount per year to provide his analysis on companies that we asked him to review.

Q.   Do you recall anyone asking Mr. Daws to review Genius Brands?

A.   I do not, but generally the contact with Mr. Daws wasn't -- it wasn't my relationship.

Q.   Whose relationship was it?

A.   I believe it was my partner Moez Kassam's primary relationship.

Q.   And the email from Jonathan Daws says:

"GNUS

I think it's a short."

Do you see that?

A.   Yes, I do.

Q.   And he writes:

"We could even do a report, although given Anson's position in it, that doesn't seem like what you want.  To avoid any conflict, I covered the very small short I had

in it and won't trade it as long as Anson has a long position."

Do you see that?

A.   Yes, I do.

Q.   And he goes on to say:

"They have a long history of hype and misrepresentation that has never led to any significant business."

Do you see that?

A.   Yes, I do.

Q.   Do you agree with that statement?

A.   I am not sure I agree with the way that that sentence is characterized.  The company had failed to meet their targets in the past, but I am not sure if that was hype and misrepresentation.

Q.   He goes on to say:

"I don't think they have anything of substance now."

Do you see that?

A.   Yes, I do.

Q.   Do you disagree with Mr. Daws on that point?

A.   At the time we were making the investments, we felt that the cartoons that they

Page 309

were creating, Rainbow Rangers and Kindergarten -- Superhero Kindergarten had a shot at success.

Q.   And he goes on to say:

"I could be wrong.  Steve Madden shoes went from a stock scam to a large and profitable company, but I don't think this one has much of a chance to be a real business."

Do you see that?

A.   Yes, I do.

Q.   Do you know what he meant by "real business"?

A.   If I had to venture a guess, it would mean a company that actually succeeds in generating profits.

Q.   Is it correct that when Anson sold its stock in June/July/August 2020, the counterparties to Anson's sales were almost always retail investors?

A.   I don't have any way of knowing who was buying our stock.

Q.   Do you know whether there were any major brokerage firms which were issuing analyst reports with respect to Genius Brands' common

**Page 310**

stock?

A.   Not that I recall.

Q.   Do you know of any institutional investor outside of the investors in the March 2020 PIPE that ever expressed an interest in purchasing Genius Brands' common stock in the open market during the period of May 2020 to August 2020?

A.   I don't know who was participating in the market at that time.

Q.   Did any institutional investor ever contact you for information concerning Genius Brands?

A.   Not that I recall.

Q.   Did any Wall Street analyst ever contact you for information concerning Genius Brands?

A.   Not that I recall.

Q.   Mr. Daws goes on to say:
         "Their pitch now is that they
         have 2 hit cartoons ongoing in
         Llama, Llama and Rainbow Rangers,
         and will be rolling out lucrative
         merchandising deals to capitalize on
         it just like Paw Patrol and Peppa
         Pig did.  In addition, they have

**Page 311**

another hit in the making with Stan Lee's Superhero Kindergarten.  They have their own cartoon channel with additional content and distribution covering enormous markets with Amazon Prime, Alibaba, Netflix and Nick Jr.  Getting in front of all these eyeballs will drive merchandise sales and generate substantial growth and profits for the company.  The CEO modestly claims that nobody in the industry (including Disney) has 3 major properties on 3 major distributors like GNUS does."

Do you see that?

A.    Yes, I do.

Q.    And then Mr. Daws goes on to say:

"I think it is mostly nonsense."

Do you see that?

A.    Yes, I do.

Q.    And he goes on to say:

"First, Llama Llama is not their 'property.'  It is based on

Page 312

best selling children's books by Anna Dewdney, who died in 2016 right after the Llama Llama cartoons were launched.  GNUS has produced 2 seasons of the cartoon for Netflix and may have made a million in gross profits per season.  I can't find any news confirming that GNUS will be doing a 3rd season."

Do you see that?

A.   Yes, I do.

Q.   Did you have any information at that time confirming that GNUS would be doing a third season of Llama Llama?

A.   Not that I recall.

Q.   Mr. Daws goes on to say:

"They are relentlessly hyping merchandise rollout, but GNUS doesn't own the rights."

Do you see that?

A.   Yes, I do.

Q.   Did you disagree with Mr. Daws' conclusion that GNUS did not own the rights to Llama Llama?

A.   I remember at the time that Llama

Llama was a -- was licensed -- a licensed piece of content.  I don't believe Genius owned the entire thing.

Q.    And Mr. Daws goes on to say:

"They are acting as agent for licensing, so will get some benefit from merchandising, but it will be limited.  They constantly put out press releases without mentioning they are only agents for the Llama Llama franchise and do not own the underlying intellectual property."

Do you see that?

A.    Yes, I do.

Q.    Do you disagree with anything Mr. Llama said -- do you disagree with anything Mr. Daws said in that sentence?

A.    I do not disagree that they were agents for Llama Llama, but I don't -- it doesn't mean that I necessarily agree with his entire conclusion.

Q.    Do you disagree with Mr. Daws when he says that Genius is putting out press releases without mentioning that they are only agents for the Llama Llama franchise and do not own the

Page 314

underlying intellectual property?

A.    I don't recall what the press releases for Genius said, so I have no basis to -- whether Daws is correct or not.

Q.    When you received this email, did you go and check those facts?

A.    No, I did not.

Q.    Did anybody else at Anson check those facts at that time?

A.    I don't believe so.

Q.    Do you generally consider Mr. Daws to be a reliable source of information?

A.    I don't have enough history with Mr. Daws to know how accurate his analysis is or isn't.

Q.    Do you believe Moez Kassam considers him a reliable source of information?

A.    I believe that Mr. Kassam utilizes him as a source of information.  I don't know how much he values it, quote/unquote.

Q.    The next paragraph goes on to say:

        "Rainbow Rangers is actually

        their property.  Nick Jr has aired

        it for a couple of years and GNUS

        likely made some gross profit in the

deal.  They are claiming they will make a fortune from merchandise being rolled out by major companies like Mattel.  They will even have toys in Walmart starting in August."

Do you see that?

A.   Yes, I do.

Q.   And then he goes on to say:

"But they have been promising this merchandise rollout for 2 years."

Do you see that as well?

A.   Yes, I do.

Q.   And he goes on to say:

"In a 2018 shareholder letter they claimed to have 22 merchandise licensees for Rainbow Rangers, including Mattel.  They said the products would debut in Q3 of 2019 and they had a minimum guarantees from Mattel which would total millions of dollars."

Do you see that?

A.   Yes, I do.

Q.   "In April of 2019, they

announced Nickelodeon had given the green light for Season 2 of Rainbow Rangers and they had 350 merchandise items for more than 20 blue-chip manufacturers hitting the market in July of 2019."

Do you see that?

A.   Yes, I do.

Q.   And it goes on to say:

"Yet for all of 2019, total licensing revenue was only $864k."

Do you see that?

A.   Yes.

Q.   Do you understand "$864k" to be $864,000?

A.   Yes, I do.

Q.   Do you believe Mr. Daws was mistaken as to that fact concerning the total licensing revenues being only $864,000?

A.   I have no basis to believe that it was incorrect.  I imagine he pulled it from a company filing.

Q.   And he goes on to say:

"That was up from the prior year of $414k.  Rainbow Rangers

started its second season in Q4 of 2019, so it was a well known cartoon for the holiday season.  And supposedly they had lots of products out.  So best case scenario they are on a run rate of $400k of licensing per quarter, giving them at most $2 mil per year."

Do you see that?

A.   Yes, I do.

Q.   Do you disagree with anything Mr. Daws said there?

A.   My understanding of the situation of Genius Brands at the time was it was about future growth in revenue based on continued growth in viewership of their products.  And so while Mr. Daws isn't correct that he -- that that -- the current amount of revenue is what they were run rating, I believe that there was a -- there were prospects that revenue could increase in the future.

Q.   But I am asking you specifically about his best case scenario for licensing revenue from Rainbow Rangers.  Do you disagree with anything that Mr. Daws says here?

Page 318

A.   I don't believe that 2 million is a best case scenario.  That is his opinion of what the best case scenario is, but not necessarily mine or anyone else's.

Q.   What was your best case scenario in May 2020?

A.   Again, I believed that there was a realistic chance that the company's cartoons would get a high level of viewership, which would translate into demand from children to purchase the merchandise.

I didn't know what the amount was, but I -- you know, I thought there was a decent shot that it could become a big number.

Q.   Did you ever quantify that amount?

A.   No, I did not.

Q.   Is that reflected in any written material internally at Anson?

A.   No, I do not.

Q.   And he goes on to say:

"But even that may be too much.

In Q1 of 2020, they only reported

Licensing and Royalties of $203k,

which was not just tiny, but even

less than the $350k they did in Q1

of 2019."

Is Mr. Daws' description of the facts correct as contained in that sentence?

A.   I have never verified it, but I have no reason to believe that they weren't.

Q.   Then Mr. Daws goes on to say:

"To support fund raising in 2020, GNUS is once again hyping how much merchandise they will sell with Rainbow Rangers by claiming in their March investor presentation they are going to have products in over 90 countries by companies including Mattel.  Why is it going to be better now if they rolled it out last year?"

Do you see that?

A.   Yes, I do.

Q.   Did you have any expectation that it would be better in 2020 than it was in 2019?

A.   I had -- again, as I have mentioned before, I had an expectation that they had a realistic shot of succeeding by increasing viewership of their cartoons, which would translate into merchandise sale.

Page 320

Q.    Did you ever see any data demonstrating increasing viewership of Genius Brands cartoons by May 2020?

A.    I at some point had seen some television - I believe it was Nielsen data - or heard of it, but I don't recall the specifics of it right now.

Q.    Would that have been reflected in Anson's internal documents?

A.    If it was in a written form, it would have been.  But again, I am not sure if it came in written from or just verbal from the company.

UNKNOWN SPEAKER:  He has got to stop within the next two hours.

MR. ABRAHAM:  I'm sorry, did somebody say something?

MR. TRACEY:  Not on our side, Jeff.

MR. GLADSTEIN:  That sounded a lot like Jerry, though, I have to say.

BY MR. ABRAHAM:

Q.    Let's go to the next paragraph, which says:

"They are hyping Stan Lee's Superhero Kindergarten with Arnold

**Page 321**

Schwarzenegger as their next 'hit.'"

Do you see that?

A.   Yes, I do.

Q.   "In July 2019 they were calling it a potential hit and said it would soon have a broadcast partner."

A.   Yes.

Q.   "They got a division of Alibaba to co-produce it and are now saying it's a major property and the Alibaba relationship is a 'transformational partnership.' They have announced Amazon Prime will be their broadcast partner and they will have shows in the Spring of 2021 with over 400 SKUs of merchandise launched globally."

Do you see that?

A.   Yes, I do.

Q.   "But they didn't mention any financial terms with Amazon, only hyping that they are the largest broadcaster in the US."

Do you see that?

A.   Yes, I do.

Page 322

Q.    Do you disagree with Mr. Daws' statement there?

A.    I am not sure if financial terms were disclosed or not.  I have no reason to believe it is incorrect.

Q.    Did Anson have any knowledge of the financial terms which Genius had with Amazon with respect to Superhero Kindergarten?

A.    Not that I recall.

Q.    Would that have been relevant to determining the fundamental value of Genius Brands' common stock?

A.    Any contract that the company entered into with a potential broadcaster would be an input into fundamental value.

Q.    And he goes on to say:

"While Amazon does produce some of its own content, there is no indication they are paying GNUS for the cartoon."

Do you see that?

A.    Yes, I do.

Q.    Do you know whether Amazon was paying GNUS for the Superhero Kindergarten cartoon?

A.    I am not sure.

Page 323

Q.    Did you ever do any research into that?

A.    No, I did not.

Q.    Would that have been relevant to the fundamental value of Genius Brands' common stock in 2020?

A.    I am not sure.  The goal for Genius Brands was to increase viewership, which when more people watched it, more children watched it, they would have a demand for the consumer products.

So at the time and sitting here today, I believe that even if it was given free to Amazon, if it increased viewership, that still could have been quite positive for the company.

Q.    Did it turn out to be positive for the company?

A.    I don't believe it materialized into significant revenues.

Q.    Let's go to the next paragraph, which is the first full paragraph on the next page Bates-stamped 29718.  And Mr. Daws goes on to say:

"And while they make it sound like Superhero Kindergarten is a sure thing, they have actually been

Page 324

trying to get this going for a decade [...]"

Do you see that?

A.   I do.

Q.   Do you have any reason to disagree with what Mr. Daws says in that sentence?

A.   I have no reason to -- no reason to believe that they weren't trying for some amount of time, no.

Q.   And he goes on to say:

"During that time they have proceeded with two other failed Stan Lee cartoons, Stan Lee's Super Seven and Stan Lee's Cosmic Crusaders."

Do you see that?

A.   Yes.

Q.   Was that an accurate statement by Mr. Daws?

A.   I am not sure.  My knowledge of the company didn't extend to those properties, so I am not sure what they are, to be honest, and whether the company had tried to market them or not.

Q.   When you say "those properties", are you referring to Stan Lee's Super Seven and

Stan Lee's Cosmic Crusaders?

A.   Correct.

Q.   And he goes on to say:

"They think this will be successful as they are going to promote the series on Arnold Schwarzenegger and Stan Lee's social media.  That tactic would seem to be very challenging as it is unclear how many kindergarten age social media followers they have, as Arnold is 72 and Stan Lee died two years ago."

Do you see that?

A.   Yes, I do.

Q.   Is that a source of concern for you?

A.   I am not sure what you mean by "source of concern".  Mr. Daws appears to be disagreeing with a strategic direction the company was going in with the Superhero Kindergarten property.  He, like every market participant, is entitled to his own opinion.

Q.   And then in the next paragraph, Mr. Daws goes on to say:

**Page 326**

"Beyond the 3 current cartoons in production they have a collection of failed animation ventures they have packaged into cartoon channels. They put one channel on Amazon in 2017 for $3.99 per month and CEO Heyward said: 'We believe this transaction will be transformational for the company.'"

Do you see that?

A.   Yes, I do.

Q.   And then he goes on to say:

"They have claimed their two existing channels have had great increases in viewership lately so they can capitalize on the COVID virus."

Do you see that?

A.   Yes, I do.

Q.   "They have been so successful they are merging the two together. Individually they don't seem to have generated much revenue.  Combined, they will try to sell monthly subscriptions on Amazon for $3.99."

Page 327

Do you see that?

A.   Yes, I do.

Q.   "It seems unlikely to lead to much as Amazon will get up to half the fees."

Do you see that?

A.   Yes.

Q.   Do you disagree with that statement by Mr. Daws?

A.   At the time, I, again, thought that the company had cartoons that had a decent shot of success.  It appears that Mr. Daws had his own opinion that was different than that, which he is entitled to have.

Q.   Let's go on to the next paragraph here that starts with the word "they".  Mr. Daws writes:

"They have done all this before with SpacePop in 2016.  SpacePop looks a lot like Rainbow Rangers, but was music oriented and focused on slightly older girls."

Do you see that?

A.   Yes.

Q.   "They got Sony to partner with

Page 328

them and even invest in the company
and pay advance royalties for
distribution of SpacePop, Baby
Genius, Warren Buffets Secret
Millionaires Club, Stan Lee's
Mighty 7 and three others [...]"
Do you see that?

A.    Yes, I do.

Q.    Did you have any knowledge of this having been done before in 2016 with SpacePop at the time that Anson purchased Genius securities in the March 2020 PIPE?

A.    I don't recall if -- when I got this information, whether this was the first I was reading it or not.

Q.    But is it correct that Anson was an investor in Genius since 2014?

A.    I don't recall if it was 2014, but it was sometime in that time period, 2014 to 2016, I believe we first invested.

Q.    So do you recall ever hearing about SpacePop before reading it in Mr. Daws' email?

A.    I can't recall now.  We had -- we had likely had heard of all of Genius Brands'

cartoon properties before this email, but I can't state for certain whether we had heard about SpacePop.

Q.   Did you view SpacePop as a commercial success?

A.   Given that I can't recall SpacePop, I would venture to say it probably wasn't a commercial success.

Q.   And he goes on to say:

"They even got ToyRUs to stock a large selection of SpacePop merchandise.  GNUS used familiar hype: 'The launch features a vast array of products from the SpacePop brand - a hit among tweens with over 10 million YouTube channel views.'"

Do you see that?

A.   Yes, I do.

Q.   It goes on to say:

"The reality for Sony seems to have much less than a hit, as they soon sold their investment and $3,370,315 of the $3,489,583 advance royalties Sony paid for foreign and domestic distribution is still

Page 330

sitting on GNUS books as deferred
revenue."

Do you see that?

A.   Yes, I do.

Q.   Do you believe Mr. Daws was
mistaken in any of his statements in this last
sentence?

A.   I don't have any reason to believe
he was mistaken, but I don't -- I haven't verified
it myself.

Q.   Did anybody else at Anson attempt
to verify that?

A.   Not that I know of.

Q.   And then in the closing paragraph,
he says:

"They seem to be going by the
same hype playbook this time as they
did with Sony.  They are even using
the same business plan, same words
and many of the same cartoons.  I
don't see how it is going to be any
different."

Do you see that?

A.   Yes, I do.

Q.   Did you disagree with Mr. Daws?

Page 331

A.   Again, as I had said before, I thought that the cartoons that the company had at that time had a realistic shot of success.  Of course, I had no way of knowing whether that would actually pan out or not, but I thought there was a decent shot.

Q.   Did you have any intention of holding on to Genius Brands' stock as a long-term investment?

A.   It would depend.  Our trading is dependent on a whole host of factors.  Our --

Q.   Are you --

A.   Our trading is dependent on a whole host of factors:  our future outlook for the stock, the current price in the market, among others.

Q.   Under what circumstances would Genius Brands have -- strike that.

Under what circumstances would Anson have held on to Genius Brands as a long-term investment?

A.   And you are asking me for a hypothetical, so it is difficult to answer.

Q.   Well, at the time that Anson invested in the March 2020 PIPE, did it formulate

any plans under which it would remain a long-term

security holder of Genius Brands?

A.    No, we did not.

Q.    Was it always Anson's intention to

turn over the stock quickly?

A.    Well --

MR. GLADSTEIN:  Object to form.

THE WITNESS:  Again, we would have --

our decisions on trading are dependent on how the

progress of the company was proceeding and the

price of the stock in the market and our view of

the future value of the stock relative to where it

was.

BY MR. ABRAHAM:

Q.    Did Anson ever form a view as to

what a correct fundamental value of Genius Brands'

stock was in May 2020?

A.    No, we did not.

Q.    Why not?

A.    As I mentioned previously,

assessing fundamental value for a small company

like this is a very difficult thing to do, and

truthfully, I think you could come up with any

answer you wanted by changing a few variables.

And so I generally don't see

Page 333

pinpointing a particular value as a fruitful exercise.

MR. ABRAHAM:  All right.  Let me ask the court reporter to please mark as Exhibit 42 a document which is tab 59 in the FTP we sent prior to this deposition.

EXHIBIT NO. 42:  Email thread, document Bates-stamped ANSON_00029690 through ANSON_00029692.

MR. TRACEY:  Jeff, if you don't mind, we would like to take a short break.

MR. ABRAHAM:  A short break, fine. Five minutes?

MR. TRACEY:  Five minutes is good.

Videographer, how much time do we have on the record?

THE VIDEOGRAPHER:  Can I just go off the record for a second?

MR. TRACEY:  Yes.  I'm sorry.

THE VIDEOGRAPHER:  This marks the end of Media 6, and we are going off the record at 5:45 p.m.

-- RECESSED AT 5:45 P.M.

-- RESUMED AT 5:56 P.M.

THE VIDEOGRAPHER:  This marks the

beginning of Media Unit 7 of the video-recorded 30(b)(6) deposition of Anson Investments Master Fund LP by Amin Nathoo.

We are back on the record at 5:57 p.m.

Go ahead, Counsel.

BY MR. ABRAHAM:

Q.   Okay.  Mr. Nathoo, on the document we just marked as Exhibit 42, which is tab 59 in the exhibit binder, on the first page which is Bates-stamped 29690, do you see it says towards the bottom:

"On May 31, 2020, at 5:15 PM, Taheer Datoo [...] wrote:"

Do you see that?

A.   Yes, I do.

Q.   Who is Taheer Datoo?

A.   He is another Portfolio Manager here at Anson.

Q.   Does he report to you?

A.   Yes, he does.

Q.   Does he report to anybody else?

A.   All the Portfolio Managers report to myself and my partner Moez Kassam.

Q.   And Mr. Datoo writes:

"Interesting stuff.  Seems like

Page 335

crystallizing value here should be your number 1 priority."

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what Mr. Datoo meant by "crystallizing value" in the context of this email?

A.   If I had to venture a guess, I believe he meant to hedge the risk of our position.

Q.   And the next paragraph goes on to say:

"Given the new shares issued, is the company eligible for listed options?"

Do you see that?

A.   Yes, I do.

Q.   Do you know whether Genius Brands was eligible for listed options on May 31, 2020?

A.   I do not know.  There is a few criteria that must be met before coming to be eligible, and I am not sure Genius met them.

Q.   Do you know whether there ever came a time that Genius Brands became eligible for listed options?

A.   Yes, they did, because they got

Page 336

the options listed at some point.

Q.    Was Anson involved in any way in getting those options listed?

A.    I don't recall.

Q.    Do you recall who might have been involved in getting those options listed?

A.    There is a chance that we may have asked for it, but I don't recall if we were involved or not.

Q.    Is there a chance that any other investor in the March 2020 PIPE asked for listed options as well?

MR. TRACEY:  Objection to form.

THE WITNESS:  Theoretically, there is a chance.  I don't know what other investors were and were not doing.

BY MR. ABRAHAM:

Q.    And he goes on to say:

"Obviously you run the risk of TLRY v2 [...]"

Do you see that see that?

A.    Yes, I do.

Q.    Do you know what "TLRY" refers to?

A.    Yes.  It is the ticker for Tilray Brands, which is a company we had invested in

Page 337

previously.

Q.   And what was Anson's experience with TLRY?

A.   We had participated in the company while it was still private.  After it came public, we were locked up from selling our position for six months.  As the stock price rose, we hedged our position in the market.

Q.   Did anybody sue Anson over that?

A.   No, they did not.

Q.   Was there any regulatory investigations over that?

A.   No, there were not.

Q.   Why do you think Mr. Datoo mentioned it as a risk of TLRY v2?

A.   When you are long a restricted security and you hedge it with either options or stock, if the stock continues to rise, your prime brokers view that as you losing money because they don't care what you have on the restricted side, and it could lead to margin issues in the liquid part of your portfolio if that were to occur.

Q.   Did Anson have any negative -- strike that.

Did Anson suffer any negative

Page 338

consequences from its options trading in TLRY?

A.   We at some point did have -- our fund was running low on margin, and we covered some of our hedge.

Q.   And he goes on to say:

"[...] but at least having that route is better than nothing?"

Do you see that?

A.   Yes, I do.

Q.   Do you have any understanding what Mr. Datoo meant when he said that?

A.   Again, reading this email now, I believe he said by having -- if there were options listed, at least you had the ability to hedge if you so desired, and always -- and more optionality is better than less optionality, in our view.

Q.   And in the next paragraph, Mr. Datoo says:

"Are there any creative structures here that could be proposed by the syndicate of guys long?"

Do you see that?

A.   Yes, I do.

Q.   Do you know what the word

Page 339

"syndicate" means?

A.   I know what the word "syndicate" generally means, yes.

Q.   Do you know what Mr. Datoo meant by using the word "syndicate of guys long" in this context?

A.   No, I do not.

Q.   Was he referring to Anson and the other purchasers of Genius Brands securities in the March 2020 PIPE?

MR. RECKLER:  Objection to form.

THE WITNESS:  I am not sure.  That would be a question for him.

BY MR. ABRAHAM:

Q.   In reaction, or the email above, Moez Kassam sends May 31, 2020, at 5:24 p.m., to Taheer Datoo "Re: GNUS"; do you see that?

A.   Yes, I do.

Q.   And he writes:

"We've tried

Needs to be at $3 to get options".

Do you see that?

A.   Yes, I do.

Q.   Do you know what Mr. Kassam meant

Page 340

when he said "we've tried"?

A.   I would be guessing, but I imagine it means that we tried to request the listing of options.

Q.   And when he says "needs to be at $3 to get options", does that refer to a trading price of Genius Brands' common stock?

A.   Yes, my understanding is that a stock to be eligible for options needs to be trading above $3 for a certain amount of time before it can be considered.

Q.   What amount of time is that?

A.   Sorry?

Q.   What amount of time is that?

A.   I believe it is five trading days, but I am not a hundred percent certain.

Q.   And in the email above that, on May 31, 2020, at 5:26 p.m., Taheer Datoo wrote:

"Got to think outside the box.

Big dollars at stake here."

Do you see that?

A.   Yes, I do.

Q.   Do you know what Mr. Datoo meant by that?

A.   No, I do not.

Q.   And in the email above that from Moez Kassam at 5/31/2020, at 5:27 p.m., to Taheer Datoo, subject "Re: GNUS", he writes:

"We will get a bunch of borrow [...]"

Do you see that?

A.   Yes.

Q.   Do you know what Mr. Kassam was referring to by "bunch of borrow"?

A.   He is referring to a stock loan that we could utilize then to place short sale hedging transactions in the market.

Q.   Do you know whether Anson managed to get a bunch of borrow in Genius stock in or about May 31st, 2020?

A.   I believe that we had some borrow, but I don't think it was a significant amount, from what I recall.

Q.   And he goes on to say:

"[...] there's a leak out too, spreading the unlock [...]"

Do you see that?

A.   Yes, I do.

Q.   Do you know what he means by "spreading the unlock"?

Page 342

A.    No, I do not.

Q.    And he writes:

"[...] not sure what else can we do

Open to ideas".

Do you see that?

A.    Yes, I do.

Q.    Do you know whether Mr. Kassam ever received any ideas after May 31st, 2020, how to deal with this situation?

A.    I don't know what he did or did not receive.

MR. ABRAHAM:  All right.  Let's go on to tab 60, which I am going to ask the court reporter to mark as Exhibit 43, and it is Bates-stamped EW-AUG0016713 through 16714.

EXHIBIT NO. 43:  Email with attached Notes to the Files, document Bates-stamped EW-AUG0016713 through EW-AUG0016714.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.    And the first page, which is Bates-stamped 16713, is an email from Jonathan Schechter sent 6/2/2020 to Dan Ripp at Bradley

Page 343

Woods and copying Andrew Arno, "Subject: Gnus memo"; do you see that?

A.   Yes, I do.

Q.   Do you know who Dan Ripp is?

A.   No, I do not.

Q.   All right.  Turning to the next page, which is Bates-stamped 16714, there is a memo titled "Notes to the Files"; do you see that?

A.   Yes, I do.

Q.   Do you see it is dated May 28, 2020?

A.   Yes, I do.

Q.   Do you see it is from Dan Ripp and it is "Re: Handling of Genius Brands International (NASDAQ: GNUS)"?

A.   Yes, I see that.

Q.   Do you see the second paragraph on that page?

A.   Yes, I do.

Q.   It starts:

"On May 27 [...] GNUS common stock closed at $1.81.  In pre-market trading on May 28, 202", which I believe is meant to refer to 2020, "the stock was $2.10."

Page 344

Do you see that?

A.    Yes, I do.

Q.    "We received a call from Anson and Iroquois asking if the company was willing to sell common stock off its shelf registration statement at $1.50."

Do you see that?

A.    Yes, I do.

Q.    Do you recall making the call with Iroquois that is mentioned in this memo?

MR. RECKLER:  Objection to form.

THE WITNESS:  I don't.  We would not have called SEG together with any other investor, including Iroquois.

BY MR. ABRAHAM:

Q.    Do you recall making a call to SEG by yourself, asking if the company was willing to sell common stock off its shelf registration statement at $1.50?

A.    I don't recall this specific call, but in and around that time we were calling SEG a few times to see if the company would be willing to sell securities.

Q.    You testified that:

"We would not have called SEG together with any other investor, including Iroquois."

Do you see that?

A.   I --

Q.   Do you remember saying that?

A.   I remember saying that a moment ago, yes.

Q.   Did you know Richard Abbe?

A.   I had met him at conference a couple of times in the past.

Q.   Did you have his contact information?

A.   I am not sure.  I would have to check our -- my contact list.

Q.   Are you absolutely sure you did not call with Iroquois concerning whether the company was willing to sell common stock off its shelf registration statement at $1.50?

A.   Yes, I am quite certain that I would not have done that given that we don't make calls like that with other investors.

Q.   So is it your view that Mr. Ripp's memo is mistaken?

MR. TRACEY:  Objection.

Page 346

THE WITNESS:  Sitting here today and reading it, I believe you are misreading the memo. I would read it as they got two separate calls from two separate investors that were interested in investing in the company.

BY MR. ABRAHAM:

Q.   And would it have been a coincidence that you both asked for an offering of $1.50 a share?

MR. GLADSTEIN:  Object to the form.

MR. TRACEY:  Objection.

THE WITNESS:  I don't recall the conversation, so I am not even certain I even asked for a $1.50 price or not.

MR. ABRAHAM:  Okay.  Let's go on to the next document, which we are going to mark as Exhibit 44, and it is tab 61, and it is Bates-stamped ANSON_00031557 through 31559.

EXHIBIT NO. 44:  Email thread, document Bates-stamped ANSON_00031557 through ANSON_000311559.

THE WITNESS:  I see it.

BY MR. ABRAHAM:

Q.   And at the bottom of the first page, which is Bates-stamped 31557, there is an

Page 347

email from Moez Kassam using his Bloomberg email address; do you see that?

A.    Yes, I see it.

Q.    Do you have a Bloomberg email address too?

A.    I think everyone does who has a Bloomberg terminal.

Q.    Did you use your Bloomberg email address in connection with any investment decision with respect to Genius Brands?

A.    No.  I don't utilize my Bloomberg email other than to receive news alerts that forward to my Anson email.

Q.    And it was sent -- Moez Kassam's email was sent June 15, 2020, at 8:32 a.m., and the subject is "Arnold Schwarzenegger Enters Into Agreement to Become Sign", and I guess the headline is -- of the underlying email is:

"Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International".

Do you see that?

A.    Yes, I do.

Q.    Was that a press release issued by

**Page 348**

Genius Brands?

A.    It appears to be from the press release that is in this exhibit.

Q.    And Moez Kassam on June 15, 2020, further up the page, wrote:

"I'm going to pump you [...] uppppppppppp", with several "p's" after the first "p".

Do you see that?

A.    Yes, I do.

Q.    Do you have any understanding why Mr. Kassam wrote that?

MR. TRACEY:  Objection.

THE WITNESS:  I don't know.  I would be speculating.

BY MR. ABRAHAM:

Q.    Well, does it mean that Mr. Kassam considered Genius Brands to be a pump and dump stock?

MR. TRACEY:  Objection.

THE WITNESS:  No, I don't believe that is what he would have meant.

BY MR. ABRAHAM:

Q.    But he considered it to be a pump stock; is that correct?

**Page 349**

MR. TRACEY:  Objection.

THE WITNESS:  I don't believe so.

BY MR. ABRAHAM:

Q.   Then why did he say "I'm going to pump you [...] upppppppppp"?

MR. TRACEY:  Objection.

THE WITNESS:  I would be speculating, but at the time we had a significant long investment in Genius Brands and seeing this news I imagine excited him.

BY MR. ABRAHAM:

Q.   Do you know -- and going up to the top of the page, there is an email from Sean Kallir; do you see that?

A.   Yes, I do.

Q.   And he is at hgcinvest.com; do you see that?

A.   That's correct.

Q.   Do you know who Sean Kallir is?

A.   Yes, I do.

Q.   Who is he?

A.   He manages another fund here in Toronto.

Q.   What is the name of that fund?

A.   HGC Investments.

Page 350

Q.   Do you know whether HGC Investments had any interest in Genius Brands securities in 2020?

A.   I am quite certain that he did not.  He had come to our offices not too long before this and was just remarking at the investment that we had made.

Q.   And you see copied on the email is dan@parkwoodcapital.ca; do you see that?

A.   Yes, I do.

Q.   Do you know who that is?

A.   "Dan" refers to Dan Sternberg, who runs Parkwood Capital, which is another fund here in Toronto.

Q.   Do you know whether Parkwood Capital had any interest in Genius Brands securities in 2020?

A.   I can't say for certain, but I am pretty sure they did not.

Q.   Why are you pretty certain they did not?

A.   Again, we were all at a lunch together where they were remarking at our investment and they made no indication that they were invested.

Page 351

Q.    Do you know why Mr. Kallir wrote:
"Lol insane"?

A.    I am not sure.

Q.    Let me ask you to go to tab 65 and ask the court reporter to please mark as Exhibit 45 that document which is Bates-stamped ANSON_00049440 through 49442.

EXHIBIT NO. 45:  Email thread, document Bates-stamped ANSON_00049440 through ANSON_00049442.

THE WITNESS:  I see it.

BY MR. ABRAHAM:

Q.    And do you see that there is an email from Jeremy Peskoff on the first page of this document, which is Bates-stamped 49440; do you see that?

A.    Yes, I do.

Q.    Who is Jeremy Peskoff?

A.    Jeremy Peskoff is one of the LPs in our fund.

Q.    Is he personally an LP, or is he an LP through Roth?

A.    Personally an LP.

Q.    Is he involved in making any investment decisions for Anson?

Page 352

A.   No, he is not.

Q.   And he writes to you:

"Lottery ticket worked.  Got to give you guys credit.  Your strategy of buying cheap vol [...]"

Do you see that?

A.   Yeah.

Q.   Do you understand "vol" to mean volume?

A.   Volatility.

Q.   Oh, so you're:

"[...] buying cheap vol[atility] on shitty companies [...]"

Do you see that?

A.   Yes, I do.

Q.   Do you understand "shitty companies" is referring to Genius Brands?

A.   Given the context of the email, I believe that is what he was referring to.

Q.   "[...] complements the [...]" -- he goes on to say:

"[...] complements the fundamental short book very well especially in a buoyant market."

**Page 353**

Do you see that?

A.   Yes, I do.

Q.   So is it correct that Anson had a book of shorts that it traded on?

A.   Anson is a long short fund, so we always have a book of shorts as well as a book of longs.

Q.   And in connection with the shorts, does Anson engage in fundamental analysis?

A.   Yes, it does.

Q.   And how extensive is that fundamental analysis?

A.   Sorry, how expensive is it?

Q.   Extensive with a "t", not "p".

A.   It would depend on the specific stock.  Sometimes it could be very simple.  Sometimes it could be a lot more involved.

Q.   And on the top of the page, Mr. Peskoff writes to you, Amin Nathoo, copying Moez Kassam and Sunny Puri, and he writes:

"Really is.  As an individual who provides himself on understanding the capital markets, I really did not realize this until a few months ago.  Really well done.

Page 354

Also, great job of hedging the gain."

Do you see that?

A.   Yes, I do.

Q.   How did Anson hedge its gain in Genius Brands?

A.   As the stock had risen, we entered into a short position on the stock with borrow that we had secured and we had also traded the options.

MR. ABRAHAM:  All right.  Let's move on to the next document, which is tab 68, which I am going to ask the court reporter to mark as Exhibit 46, and it is Bates-stamped ANSON_00050251 through 50258.

EXHIBIT NO. 46:  Email thread with attachment, document Bates-stamped ANSON_00050251 through ANSON_000500258.

THE WITNESS:  I have it.

BY MR. ABRAHAM:

Q.   And if you go to page 50252, it says "Anson, 20 July 2020, Dear Partner"; do you see that?

A.   Yes, I do.

Q.   Is this an investment newsletter?

A.   Yes, it is.

Page 355

Q.    Let me ask you to go to the third page of this newsletter, which is Bates-stamped 50255.

A.    I have it in front of me.

Q.    And there is a heading that says "Structured Financings"; do you see that?

A.    Yes, I do.

Q.    What does "structured financings" mean in this context?

A.    We use the term "structured financings" to encompass all the direct investments made into issuers.  It could be common stock.  It could be common stock and warrants.  It could be convertibles.  But that entire set of investments is encompassed within structured financings.

Q.    But you are testifying that it could be a straight buy of company stock?

A.    I have done straight buys of common stock within this portfolio as well, yes.

Q.    But would you consider that a structured financing as well?

A.    If it was a direct investment into the company, it would be classified as a structured financing here.

Q.    Let me ask you to look at the

second paragraph here, and let me read it into the record for you:

"The strategy, while generating healthy returns overall, realized an outsized return on a particular investment during the quarter. Warren Buffet, Arnold Schwarzenegger, Jennifer Garner, and Anson's Amin Nathoo."

Do you see that?

A.   Yes, I do.

Q.   "The Commonality?  They teamed up to back Inspector Gadget co-creator Andy Heyward on his new 'Kartoon' Network through his public company, Genius Brands International [...]"

Do you see that?

A.   Yes, I do.

Q.   "The story begins earlier in the year when GNUS was nearly out of cash and had near term debt obligations that threatened the solvency of the company."

Do you see that?

Page 357

A.   Yes.

Q.   Do you believe that to be an accurate statement of fact?

A.   Yes, I believe that at the beginning of 2020 the company was nearly out of cash.

Q.   And it goes on to say:

"Amin--who had previously funded the company a few times-- structured and led a senior secured debt transaction that created blue-sky upside for the investment while also protecting any potential downside."

Do you see that?

A.   Yes, I do.

Q.   Do you have an understanding as to how you protected any potential downside?

A.   Again, you can't protect against all downside, but given that we were senior secured obligation of the company, you are the most protected investor on the cap structure.

Q.   And when it says:

"Amin--who had previously funded the company a few times--

Page 358

structured and led a senior secured debt transaction."

Do you see that?

A.   Yes, I do.

Q.   Who else did you lead in that transaction?

A.   Sorry?

Q.   Who did you lead?

A.   What do you mean by who did we lead?

Q.   Well, it says that you led a senior secured debt transaction.  How did you lead it?

A.   Well, we were the lead investor that negotiated the terms of the company and signed a term sheet.

[Court Reporter intervenes for clarification.]

MR. ABRAHAM:  All right.  We are coming towards -- we are heading towards a close soon.

MR. GLADSTEIN:  No objection.

MR. ABRAHAM:  What, to head towards a close?

MR. GLADSTEIN:  Correct.

MR. ABRAHAM:  Let me take a few minutes

Page 359

off the record, okay.

MR. GLADSTEIN:  Could we take -- you are coming back to -- we are just culling to see if you've got more?  We may be at the end right now?

MR. ABRAHAM:  I might be at the end.  That is correct.

MR. GLADSTEIN:  Okay.

THE VIDEOGRAPHER:  Off the record at 6:22 p.m.

-- RECESSED AT 6:22 P.M.

-- RESUMED AT 6:26 P.M.

THE VIDEOGRAPHER:  We are back on the record at 6:27 p.m.

BY MR. ABRAHAM:

Q.   All right, Mr. Nathoo, I would like to direct your attention to tab 64, which I am going to ask the court reporter to mark as Exhibit 47, and it is a document Bates-stamped ANSON_00012765 through 12775.

EXHIBIT NO. 47:  Email thread with attached Leak-Out Agreement, document Bates-stamped ANSON_00012765 through ANSON_00012775.

THE WITNESS:  I see it.

BY MR. ABRAHAM:

Page 360

Q.    Let me ask you to turn to the page Bates-stamped 12770.

A.    I see it.

Q.    Is that your signature?

A.    Yes, it is.

Q.    Let me ask you to turn to page 12774.  Is that your signature?

A.    Yes, it is.

MR. ABRAHAM:  All right.  I have no further questions at this time.

EXAMINATION BY MR. TRACEY:

Q.    Good.  Well, I have a couple of questions.  This is Dennis Tracey, if the court reporter can hear me okay.

THE VIDEOGRAPHER:  I can hear Mr. Tracey.

MR. TRACEY:  Can the court reporter?

THE VIDEOGRAPHER:  I don't know.

THE COURT REPORTER:  Yes.  So far, so good.

BY MR. TRACEY:

Q.    Okay.  Great.  Thank you.

I would like to direct the witness's attention to what was - one second - what was marked as Exhibit 37.

Page 361

MR. ABRAHAM:  Do you know which tab that is?

MR. TRACEY:  It is tab 70.  It was the document that was emailed.  70.

MR. ABRAHAM:  Okay.

THE WITNESS:  I have it in front of me.

BY MR. TRACEY:

Q.  Okay.  I would like to direct your attention to the email that begins on page ANSON_12931; do you see that?

A.  Yes, I do.

Q.  Okay.  And do you recall that Mr. Abraham asked you some questions about that email?

A.  Yes, I do.

Q.  And that is an email from Jonathan Schechter to you and Laura Salvatori?

A.  That's correct.

Q.  With a copy to Mr. Reda and Linda Mackay; correct?

A.  That's correct.

Q.  And on the following page, page 1293 -- 12932, Mr. Schechter makes a statement:

"Whoever doesn't invest in this

Page 362

round their pro-rata will not be invited in on any future GNUS deals 'as per the lead'".

Do you see that?

A.   Yes, I do.

Q.   And, Mr. Nathoo, at any time did you say in words or substance what Mr. Schechter is saying here?

A.   No --

MR. ABRAHAM:  Objection as to form.

BY MR. TRACEY:

Q.   You can answer.

A.   No, I did not.

MR. TRACEY:  I have no further questions.

FURTHER EXAMINATION BY MR. ABRAHAM:

Q.   All right.  Is it correct that if you go to the first page of this document Bates-stamped 12931 that, after receiving this email, you wrote to Mr. Schechter on May 8th, 2020, at 12:30 p.m. "Thanks"; do you see that?

A.   Yes, I do.

Q.   What did you mean by "thanks"?

A.    I don't recall writing the email, but I believe it was just a thank you for sending

Page 363

the docs to me or --

Q.   Was it a thank you for sending out -- for drafting that email which Mr. Schechter sent at May 8th, 2020, at 11:54 a.m.?

A.   Again, I don't recall sending the email, but I believe I was just being pleasant.

Q.   During the breaks you had today from the deposition, did you discuss the substance of your testimony with counsel?

MR. TRACEY:  I am not going to allow the witness to answer any questions about his conversations with counsel.

MR. ABRAHAM:  Well, the question is a yes or no question for now.

MR. TRACEY:  I am not allowing the witness to testify to what he said to the -- to his counsel.

MR. ABRAHAM:  So let me understand this.  If you guided your client as to how to testify about that document, you feel that is privileged from discovery?

MR. TRACEY:  I am not debating it with you.  You are asking --

MR. ABRAHAM:  Okay.  The deposition -- I am done.  We'll take that up with the Judge.  I

Page 364

think we reached an impasse.

MR. TRACEY:  Thank you.  I think we are done today.

THE VIDEOGRAPHER:  Okay.

MR. ABRAHAM:  Unless somebody else has a question.

THE VIDEOGRAPHER:  Hearing none --

MR. ABRAHAM:  I think we are done.

THE VIDEOGRAPHER:  Going once, going twice.  Okay.  So we are off the record at 6:33 p.m., and this concludes today's testimony given by Amin Nathoo.  We are going -- the total number of Media used was 7 and will be retained by Veritext Legal Solutions.

-- Off the record at 6:33 p.m.

Page 365

CERTIFICATE OF REPORTER

CANADA )

PROVINCE OF ONTARIO   )


I, Deana Santedicola, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in shorthand, using Computer Aided Realtime, to the best of my ability and thereafter reduced to written format under my direction; that reading and signing was requested; that I am neither counsel for, related to, nor employed by any of the parties to the action in which the deposition was taken, and further that I am not related or any employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Deana Santedicola, RPR, CRR, CSR

Commissioner for taking

oaths in the Province of Ontario

**INSTRUCTIONS TO WITNESS**

Read your deposition over carefully.  It is your right to read your deposition and make changes in form or substance.  You should assign a reason in the appropriate column on the erratum sheet for any change made.

After making any changes in form or substance, and which have been noted on the following erratum sheet, along with the reason for any change, sign your name on the erratum sheet and date it.

Then sign your deposition at the end of your testimony in the space provided.  You are signing it subject to the changes you have made in the erratum sheet, which will be attached to the deposition before filing.  You must sign it in front of a witness.  The witness need not be a notary public.  Any competent adult may witness your signature.

Return the original erratum sheet promptly.  Court rules require filing within 30 days after you receive the deposition.

Page 367

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

9/30/2024 - AMIN NATHOO

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____    _____

AMIN NATHOO                                  Date

**Page 368**

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

9/30/2024 - AMIN NATHOO

ACKNOWLEDGEMENT OF DEPONENT

I, AMIN NATHOO, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____   _____

AMIN NATHOO                           Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

**[& - 00012730]**                                          Page 1

| & | | | |
|---|---|---|---|
| **&**  2:4,14 3:18 4:10 5:5 6:5 | **0000073440** 11:16 256:1 | **0000337**  8:7 53:18,21 | 215:2 |
| **0** | **000008006**  10:5 193:12 | **00003371**  9:22 184:12 | **00007952**  8:25 117:20 |
| **0.000**  65:24 66:9 | **00000805**  10:5 193:11 | **00003375**  9:23 184:12 | **0000805**  193:8 |
| **0.21**  136:18 | **00000836**  10:9 202:14 | **0000338**  8:8 53:22 | **0000836**  202:12 204:13 |
| **0.21.**  159:12 168:17 | **00000840**  10:9 202:15 | **00003516**  10:24 234:17,19 | **00009714**  9:25 186:10,12 |
| **0.45**  271:5 | **000012935**  12:7 270:18 | **00003520**  10:24 234:20 | **000097717**  9:25 186:13 |
| **0.46**  33:21 | **00001616**  11:8 250:12 | **00003594**  10:7 196:19,23 | **00009954**  10:11 207:4,8 |
| **0.50**  302:13 | **00001618**  11:8 250:13 | **00003603**  10:7 196:20 | **00009973**  10:12 207:9 |
| **00000024**  8:20 103:13,17 | **00002162**  9:4 119:17 | **00003814**  8:12 63:19 | **00010188**  11:6 246:12,15 |
| **00000036**  8:21 103:17 | **00002164**  9:5 119:18 | **00003820**  8:13 63:20 | **00010198**  11:6 246:16 |
| **000002**  8:5 48:15,20 | **00002531**  10:22 231:6 | **00003960**  11:10 252:10 | **00011023**  11:20 265:25 266:2 |
| **000004**  8:6 48:15,21 | **00002542**  10:22 231:7 | **00003964**  11:10 252:11 | **00011033**  11:20 266:3 |
| **00000624**  10:20 229:7 | **00002564**  9:8 124:13 | **00004623**  9:19 178:13 | **00012091**  12:9 279:24 280:2 |
| **00000643**  10:20 229:8 | **00002787**  9:13 163:4,10 | **00004633**  9:20 178:13 | **00012166**  12:10 280:3 |
| **00000644**  8:9 55:24 56:4 | **00002794**  9:14 163:11 | **00005199**  9:10 129:13 | **00012512**  12:14 297:6,8 |
| **00000646**  8:10 56:5 | **00002904**  10:18 221:23,25 | **00005205**  9:11 129:13 | **00012519**  12:14 297:9 |
| **000006676**  8:17 92:9 | **00002922**  10:18 222:1 | **0000624**  229:5 | **00012664**  11:22 268:3 275:23 |
| **00000675**  8:17 92:6,8 | | **0000684**  10:14 213:25 214:2 | **00012730**  11:23 268:4 |
| **00000734**  11:15 255:25 | | | |

**[00012765 - 11:20]**                                                    Page 2

**00012765** 13:9
  359:19,22
**00012775** 13:9
  359:23
**00012931** 12:6
  270:13,18
**0001616** 250:10
**0002162** 119:21
**0002531** 231:3
**0002564** 124:10
**00029690** 12:18
  333:8
**00029692** 12:18
  333:9
**00029716** 12:16
  300:12,14
**00029718** 12:16
  300:15
**000311559**
  12:23 346:21
**00031557** 12:23
  346:18,20
**0003371** 184:7
**0003516** 237:21
**0003814** 63:23
**0003960** 252:8
**0004623** 178:9
**00049440** 12:25
  351:6,9
**00049442** 12:25
  351:10
**000500258** 13:6
  354:17
**00050251** 13:5
  354:13,17

**0005199** 129:10
**000529** 11:12
  253:17
**00057527** 11:12
  253:14,16
**000734** 255:22
**0007952** 117:23
**002** 49:2
**00249** 1:7
  14:22
**003043** 12:12
  292:13 293:6,8
**003052** 12:12
  293:9
**02116** 6:7
**033** 265:25

---

**1**

**1** 8:3 14:15
  19:6 32:13,13
  32:16 63:3
  85:15 86:6
  137:16 138:12
  140:1 148:1
  187:13 225:5
  246:25 248:16
  249:2,10
  298:15 335:2
**1,521,781** 258:6
  258:13
**1,521,781.00**
  256:21
**1,800,000**
  256:23 258:7
**1-3** 33:16
  218:12

**1.21.20.docx**
  182:7
**1.5** 139:9
  258:21
**1.50** 344:20
  345:19 346:9
  346:14
**1.50.** 344:7
**1.5mm** 139:4,8
**1.81.** 343:22
**1/14/2020**
  141:13
**1/15/2020**
  165:15
**1/21/20** 172:3
**1/21/2020**
  182:4
**1/24/2020**
  194:20
**1/31/2020**
  204:14
**1/3rd** 110:16
  110:21
**1/6th** 36:17
  44:9
**10** 8:24 27:2
  41:22 54:7
  117:17,17,19
  143:17 153:21
  173:12,17
  194:21 215:8
  253:22 329:16
**10,000,000**
  185:7

**10/16** 44:10
**100** 33:21
  135:11,12
  136:16
**10017** 4:7,22
**10019** 5:16
**10020** 3:20
**10105** 2:16
**10123** 2:6
**10188** 248:13
**10190** 246:22
**10198** 246:13
**103** 8:21
**107** 8:23
**10:01:35**
  141:13
**10:26** 33:12
**10:34** 297:21
**10:39** 63:4,5
**10:40** 209:24
**10:42** 56:12
**10:49:05** 57:17
**10:52** 63:6
**10:53** 63:11
**11** 9:4 119:14
  119:15,16
  122:16 123:17
  143:18 233:13
  254:1 272:10
**11/18/2019**
  120:20
**117** 8:25
**119** 9:5
**11:20** 306:7

**[11:25 - 2-3mil]**    Page 3

| | | | |
|---|---|---|---|
| **11:25**  163:17 | **12934**  274:21 | 163:2,17 | **180**  150:16 |
| **11:44**  106:1,2 | **12935**  270:14 | 171:20,22 | 151:5 |
| **11:54**  270:24 | 275:10 | 197:25 198:1 | **184**  9:23 |
| 275:4 363:4 | **12:04**  106:3 | 347:15 348:4 | **186**  9:25 |
| **11mm**  253:24 | **12:05**  106:7 | **15,000**  256:24 | **18th**  120:8 |
| **12**  9:6 110:25 | **12:30**  273:22 | **150**  176:7 | **19**  10:4 31:15 |
| 121:25 124:9,9 | 362:21 | **15th**  104:4 | 193:7,10 |
| 124:11 127:25 | **12:36**  248:16 | **16**  9:18 59:12 | **19.99**  72:22 |
| 256:7 257:15 | **12:37**  249:3 | 178:8,11 281:4 | **190**  246:23 |
| **12/20/2019**  9:7 | **12:38**  249:10 | 282:10 | **193**  10:5 |
| 124:12,17 | **12:40**  137:21 | **1618**  250:10 | **196**  10:7 |
| **12091**  280:7 | 137:22 | **163**  9:14 | **1999**  20:24 |
| **12092**  282:6 | **12:43**  137:23 | **167**  148:2 | **1:11**  162:12,13 |
| **12150**  41:6 | **12:43:14**  274:9 | 149:24 | **1:22**  1:7 14:22 |
| **12151**  32:15 | **12:44**  137:25 | **16713**  342:24 | **1:48**  162:14 |
| **12166**  279:24 | **12mil**  271:5 | **16714**  342:16 | **1:49**  162:19 |
| **124**  9:8 | **13**  9:9 129:7,8 | 343:7 | **1mil**  33:19 |
| **12436**  84:9 | 129:11 130:7,8 | **16th**  58:12 | **2** |
| **12437**  83:4 | 138:4 262:14 | **17**  9:21 184:6 | |
| **12513**  297:17 | **13042**  173:5 | 184:10 295:1,7 | **2**  8:5 48:11,12 |
| **12519**  297:6 | **13044**  172:21 | 297:21 | 48:13,19 63:8 |
| **12667**  277:11 | **13048**  175:23 | **171**  9:17 | 98:7 138:25 |
| **1271**  3:19 | **13051**  171:21 | **17337**  54:6 | 140:1 146:25 |
| **12730**  275:24 | **1325**  5:15 | **17339**  114:25 | 148:4 226:14 |
| **12770**  360:2 | **1345**  2:15 | **17341**  108:11 | 232:14,17 |
| **12774**  360:7 | **13509**  218:7 | **17342**  111:17 | 244:1 298:19 |
| **12775**  359:19 | **13511**  217:8 | **17345**  107:22 | 299:4,10,15 |
| **129**  9:11 | **14**  9:12 131:4 | **175**  3:7 | 310:20 312:5 |
| **1293**  361:23 | 132:15 138:5 | **178**  9:20 | 315:11 316:2 |
| **12931**  270:22 | 163:3,8 | **17th**  56:12 | 317:8 318:1 |
| 273:19 361:10 | **144**  212:14 | 57:14 62:7 | **2,224,600.00** |
| 362:19 | 251:25 | **18**  9:24 186:9 | 275:15 |
| **12932**  271:9 | **15**  7:5 9:15 | 186:11 276:14 | **2,500,000** |
| 361:23 | 27:1 34:24 | 296:6 | 146:20 |
| | 93:21 99:24 | | **2-3mil**  43:21 |

**2.10.**  343:25
**2.2mil**  33:19
**2.50**  37:6
**2/24/2020**
  218:25
**20**  10:6 24:5
  31:15 72:2
  98:13 111:22
  196:17,18
  242:20 272:9
  316:4 354:21
  368:15
**200**  98:12
  174:5
**2000**  5:7
**2004**  20:24
  21:6,7
**2007**  21:1,7
**2009**  21:1
**2012**  22:11
  39:13
**2013**  39:13
**2014**  34:24
  35:11 39:13
  328:17,18,19
**2016**  312:2
  327:19 328:10
  328:19
**2017**  326:6
**2018**  37:1
  315:15
**2019**  31:21
  33:11 34:1,7
  34:13 35:21
  36:25 37:9,16

40:23 41:2,24
43:10,15 44:15
44:23,24 45:8
45:18 46:5
48:6 49:6
50:20 51:1
52:7 54:7,21
56:12 57:14
58:12 59:7,9
59:12 61:2,5,8
62:8 64:12
67:9 68:19
83:6 84:11
87:1 88:14
91:18 93:22
99:24 102:4
104:4 105:9
108:15 115:13
120:9 121:10
122:3 124:5
126:7,14,14
129:16,18
315:19,25
316:6,10 317:2
319:1,20 321:4
**202**  10:9
  343:23
**2020**  9:21
  31:14,21 59:10
  74:11 75:14
  119:4 131:4
  132:3,16
  134:13 137:3
  138:5 160:9,15
  161:11,18,24

163:17 173:3
175:16 178:18
179:24 184:11
187:2 188:17
189:2,9 190:13
191:6 192:7
193:19 197:5
201:5 202:20
203:19 204:4
207:21 208:11
209:23 215:4
215:17 216:6
218:8 221:17
224:5,16
227:13,21
229:14 231:13
233:6,13,13,16
233:20 234:3,8
235:18 236:18
237:24 238:17
240:20 242:7
243:8,16
245:23 246:25
248:16 249:2
249:10 250:18
251:9 252:17
253:22 256:7
257:15 259:12
262:14 266:8
267:4 270:24
272:3,8,10
273:21 275:4,8
276:14 281:4
282:10,24
283:5 285:18

289:8,20 290:9
294:10 295:1,7
295:15,23
296:6,17
297:21 301:10
301:21 306:7
306:17 309:18
310:4,7,7
318:6,22 319:8
319:20 320:3
323:6 328:12
331:25 332:17
334:12 335:18
336:11 339:10
339:16 340:18
341:15 342:9
343:11,25
347:15 348:4
350:3,17
354:21 357:5
362:20 363:4
**2021**  321:16
**2022**  31:7
**2024**  1:14,22
  14:5
**203k**  318:23
**207**  10:12
**21**  10:8 31:17
  138:14 145:11
  159:15 169:23
  170:9,22
  171:15,19
  173:3 178:18
  179:24 202:11
  202:13

**[214 - 31st]**                                                     Page 5

**214**  10:14
**2163**  123:18
**2164**  119:21
**217**  10:16
**22**  9:21 10:10
 31:9 178:6
 184:11 207:3,6
 315:16
**221**  10:18
**229**  10:20
**23**  10:13 31:9
 64:12 67:9
 68:19 184:5
 187:2 188:17
 189:2,9 191:6
 213:24 214:1
 215:1,4,16,17
 216:6 218:8
**231**  10:22
**234**  10:24
**24**  10:15 83:5
 84:11 91:18
 105:4,5 186:8
 193:19 197:5
 201:5 217:6,12
 218:4 229:14
**2438**  83:1
**246**  11:6
**25**  10:17 26:24
 105:4,5 190:18
 193:6 221:20
 221:24 266:8
**25-50**  139:13
**250**  11:8

**252**  11:10
**253**  11:12
**2531**  231:12
 232:9
**2542**  231:4
**255**  11:16
**26**  10:19 19:6
 104:23 105:5
 108:15 115:13
 196:16 229:4,6
**261**  11:18
**263,219**  258:5
**263,219.00.**
 256:16
**266**  11:20
**268**  11:23
**27**  10:21 231:3
 231:5 343:21
**270**  12:7
**2787**  163:16
**279**  12:10
**2790**  166:4
**2792**  168:5
**2794**  163:5
**28**  10:23 33:11
 41:24 44:23
 45:8,17 202:20
 231:13 234:16
 234:18 235:10
 235:18 246:9
 343:10,23
**28th**  37:16 46:5
 48:5,6 205:12
**29**  11:5 49:6
 51:1 202:10

 236:18 237:24
 238:17 246:11
 246:14 282:23
 283:5 306:17
**2904**  224:22
**2906**  222:5
**29079**  365:21
**2922**  221:23
**293**  12:12
**29690**  334:10
**297**  12:14
**29716**  300:19
**29718**  300:12
 323:22
**2:04**  218:25
**2:30**  115:7
**2:35**  202:20
**2:49**  214:16,17
**2:54**  58:12
**2:56**  266:8
**2nd**  36:16

|        **3**        |

**3**  3:6 8:7 53:16
 53:17,20 87:5
 87:7,7 89:25
 98:7 106:4
 134:25 136:13
 162:11 181:10
 209:23 222:22
 227:2 311:13
 311:14 326:1
 339:21 340:6
 340:10
**3,000,000.00**
 274:25

**3,370,315**
 329:23
**3,489,583**
 329:23
**3.99**  326:6
**3.99.**  326:25
**3/10/2020**
 254:25
**3/12/2020**
 260:1
**3/5/2020**
 252:15
**30**  1:14,18 11:7
 14:5,16 63:9
 106:5 162:16
 207:2 214:20
 250:9,11
 269:14 281:9
 301:21 306:7
 334:2 366:22
**300**  12:16
**3043**  293:20
**3051**  292:14
**3052**  293:6
**30th**  1:21
**31**  11:9 207:21
 213:23 215:1
 252:7,9 334:12
 335:18 339:16
 340:18
**31557**  346:25
**31559**  346:18
**31st**  341:15
 342:9

**[32 - 5/16/2020]**

**32** 8:4 11:11 134:17 217:7 218:3 253:13 253:15
**33** 11:13 221:21 255:21 255:23
**333** 12:18
**3375** 184:7
**3376** 184:19
**338** 53:19
**34** 11:17 229:3 261:11,13
**342** 12:21
**346** 12:23
**35** 11:19 104:24 105:5 265:24 266:1
**350** 316:3
**350k** 318:25
**351** 12:25
**3517** 236:17
**3518** 235:13
**3520** 234:17
**354** 13:6
**359** 13:9
**3594** 201:1
**3595** 197:2
**36** 11:21 103:13 267:11 267:25 268:1 275:22
**360** 7:5,6
**3603** 196:23

**362** 7:6,7
**363** 7:7
**37** 12:4 231:1 231:25 232:2,3 232:6 234:24 270:11,15 292:12 360:25
**38** 12:8 279:22 279:25
**3814** 63:25 64:10 70:15
**3815** 63:25
**3816** 64:2 72:12 75:18
**3818** 79:8
**3820** 63:23 64:2
**38th** 2:5
**39** 12:11 234:14 235:9 293:4,7
**390** 4:6
**3964** 252:8
**3:06** 214:18
**3:07** 214:22
**3:09** 131:4
**3:21** 70:17
**3:22** 256:7
**3:23** 132:3
**3:37** 201:5
**3:39** 84:12
**3:43** 245:9,11
**3:52** 245:12,14
**3:59** 132:16

**3pm** 33:15
**3rd** 44:9 312:9

**4**

**4** 8:9 55:23,23 56:3 147:1 162:15 214:14 250:18,24 251:2,9
**4,000,000** 146:21 185:9
**4,900,000** 275:19
**4.50** 92:22
**40** 12:13 162:3 246:11 297:4,7
**400** 98:7 321:16
**400k** 317:6
**41** 12:15 250:8 300:10,13
**414k** 316:25
**42** 12:17 252:6 333:4,7 334:8
**4200** 4:12
**43** 12:19 253:12 342:15 342:17
**4353** 263:1
**4354** 261:12
**44** 12:22 255:20 346:17 346:19
**45** 12:24 72:18 261:9 351:5,8

**450** 2:5
**46** 8:10 13:4 265:23 354:13 354:15
**4623** 182:2
**4624** 178:16
**4628** 183:1,2 185:20
**4633** 178:9
**47** 13:7 232:4 267:24 275:22 359:18,20
**48** 8:6 189:15 189:23 190:2 279:22
**485** 4:21
**49440** 351:15
**49442** 351:7
**4:17** 260:2
**4:22** 269:10,11
**4:33** 269:12,16
**4:59** 251:9
**4th** 132:3

**5**

**5** 8:11 41:22 63:15,16,17 66:1 146:10,13 152:4 214:19 269:9
**5,000,000** 155:11
**5-10mil** 41:9
**5.2020** 276:12
**5/16/2020** 276:3 280:9

**5/17** 293:21
**5/30/2020**
 300:20
**5/31/2020**
 341:2
**5/8/2020** 274:8
**50** 47:13 139:4
 152:4,19
 292:11 293:4
**50,000** 160:3
**500** 6:6 23:7
**500k** 37:22
**50252** 354:20
**50255** 355:3
**50258** 354:14
**504k** 110:16
**5199** 130:17
 138:4
**5200** 132:1,14
**5201** 130:17
 131:3 132:1
**5202** 130:21
 131:17 145:15
 145:23 150:15
**5203** 155:4
**5204** 154:20
 159:3
**5205** 129:10
 130:21 131:18
 145:16
**529** 253:14
**53** 8:8
**555** 5:6
**56** 297:5

**57527** 253:21
**58** 300:11
**59** 333:5 334:8
**5:00** 268:19
 292:22
**5:02** 292:25
**5:15** 334:12
**5:24** 339:16
**5:26** 340:18
**5:27** 341:2
**5:33** 189:10
 276:3
**5:45** 182:4
 333:22,23
**5:53** 235:19
**5:54** 250:18
**5:56** 333:24
**5:57** 334:4
**5mil** 136:15

**6**

**6** 1:18 8:14
 14:16 63:9
 82:18,20,21
 106:5 136:1,11
 162:16 182:16
 212:15 214:20
 250:25 269:13
 269:14,22
 333:21 334:2
**6/2/2020**
 342:25
**60** 136:16
 154:6 159:7
 168:9 169:13
 342:14

**609** 4:11
**60th** 168:25
 169:5,16
**61** 346:17
**61st** 168:14,22
 169:25 170:12
 170:21
**63** 8:13
**64** 359:16
**643** 229:5
**644** 56:11
**645** 58:6 60:16
**646** 55:24
**65** 351:4
**650,000** 142:10
**650k** 139:14
 142:2
**667** 277:12
**676** 92:6
**68** 354:11
**6:06** 282:10
**6:09** 83:6
**6:22** 359:9,10
**6:25** 104:4
**6:26** 359:11
**6:27** 359:13
**6:33** 364:11,16
**6:44** 253:22

**7**

**7** 8:16 92:2,4,5
 92:7 269:21
 328:6 334:1
 364:13
**7,500,000**
 298:15

**7-13** 215:18
**70** 267:13
 361:3,4
**72** 325:12
**735** 256:6
**738** 260:23
**740** 255:22
**75** 26:23
**750** 36:12
**750,000** 58:2
 84:6
**77002** 4:13
**7:27** 236:19
**7:29** 191:6
**7:51** 237:25
**7:54** 49:7

**8**

**8** 8:18 103:11
 103:12,14
 107:17,18,19
 107:19
**806** 193:8
**82** 8:15
**836** 202:19
**840** 202:12
**864,000** 316:15
 316:19
**864k** 316:11,14
**8:06** 282:4
**8:32** 347:15
**8:34** 215:5
 246:25
**8:39** 281:4
**8:53** 238:17

**8:55** 215:16,17
**8th** 270:23
  273:21 275:4
  362:20 363:4

**9**

**9** 8:22 107:10
  107:16,16,20
  107:21
**9,000,000**
  298:16
**9.23.19** 70:22
**9/10/2019** 55:2
**9/16** 36:17
**9/17/2019**
  57:17
**9/23/2019**
  70:17
**9/30/2024**
  367:2 368:2
**90** 166:23
  167:3,5 283:14
  319:13
**92** 8:17
**94105** 5:8
**95** 40:13
**9714** 189:1
**9715** 186:23
**9717** 186:10
**9954** 212:2
**9955** 209:21
**9956** 207:19
**9957** 207:14
**9973** 207:5
**9:00** 218:9

**9:01** 218:17
**9:20** 194:20
**9:30** 1:15
**9:35** 179:24
**9:38** 204:15
**9:41** 14:1,4
**9:43** 138:6
**9:49:16** 54:8
**9:49:56** 55:2
**9:59** 108:16
**9th** 269:21

**a**

**a.m.** 1:15 14:1
  14:4 54:8 55:2
  56:12 57:17
  63:4,5,6,11
  64:12 104:4
  106:1,2 108:16
  163:17 179:24
  194:20 204:15
  209:24 218:25
  238:17 246:25
  270:24 275:4
  297:21 306:7
  347:15 363:4
**abbe** 101:11,12
  101:15,23
  102:2 113:3,5
  113:9,17,22
  198:21 199:2
  345:9
**abbe's** 101:19
  113:24 114:2,9
**abilities** 183:13

**ability** 18:8
  82:10 110:24
  181:23 183:14
  239:17 241:22
  251:19 288:14
  290:17 338:14
  365:11
**able** 19:1 80:9
  80:11,13 82:15
  86:4,5 147:5
  151:7 152:13
  153:4 167:3,6
  167:9 174:16
  180:23 181:10
  183:16 211:17
  211:22 223:10
  225:20 239:7
  244:14 255:15
  255:16 258:20
  265:12,15
  274:20 284:4
  288:11 296:13
  305:9
**above** 33:22
  189:8 232:22
  249:2 251:8
  273:19 339:15
  340:10,17
  341:1
**abraham** 2:4,7
  7:5,7 15:14,16
  32:12,20 48:25
  53:15,23 56:9
  60:8 62:16,21
  62:25 63:12,21

65:20 67:20
68:16,25 69:21
70:6,13 75:1
82:17,24 88:12
92:10 95:16,24
96:7,24 97:9
97:20 98:20
99:14 102:1
103:10,19
105:22 106:9
106:18,23
107:3,13
112:24 115:22
116:7,18
117:21 119:19
122:8 123:5
124:15 125:22
126:6,13
129:14 137:15
137:19 138:2
142:18 143:12
158:20,25
162:7,21
163:13 169:9
170:19 172:1
176:20 177:4
177:20 178:14
179:15,21
181:6 184:13
186:15 190:4
190:10 193:13
196:21 199:13
200:20 202:17
203:25 204:7
205:21 206:20

| | | | |
|---|---|---|---|
| 206:25 207:11 | 284:24 285:9 | **accelerate** | **act** 262:3 |
| 209:3,9 210:17 | 287:12 288:24 | 190:17 | **acted** 262:6 |
| 211:1,10,25 | 289:18 290:6 | **accept** 66:15 | **acting** 263:24 |
| 213:17 214:5,7 | 290:20 291:9 | **acceptable** | 296:24 313:5 |
| 214:11,23 | 291:14,19,22 | 73:15 75:21 | **action** 14:21 |
| 216:22 217:4 | 292:1,10,19 | 76:10 146:5 | 15:8 17:6 |
| 217:18 218:1 | 293:1,11 295:4 | **accepts** 65:24 | 29:12,14 30:1 |
| 220:5,10,13 | 295:19 296:4 | **accommodate** | 302:5 365:15 |
| 221:14 222:2 | 296:22 297:3 | 62:18 | 365:19 |
| 224:14 226:7 | 297:11 299:9 | **accomplish** | **actions** 78:1 |
| 227:19 229:10 | 300:2,9,17 | 46:2 67:19 | **active** 219:14 |
| 231:9,24 232:5 | 303:8 305:8 | 150:2 | **activities** |
| 232:10 233:11 | 320:16,21 | **accordance** | 167:10,16,19 |
| 234:22 239:18 | 332:14 333:3 | 278:6 | **actual** 37:23 |
| 240:1,17 241:5 | 333:12 334:6 | **account** 182:12 | 43:9 170:24 |
| 241:10,20 | 336:17 339:14 | 183:9 185:10 | **actually** 38:9 |
| 242:4,14 | 342:13,22 | 186:1 208:18 | 45:5 62:6 86:4 |
| 243:13,22 | 344:16 346:6 | 208:20 290:19 | 86:17 104:1 |
| 244:7,14,21,24 | 346:15,23 | **accounts** 55:17 | 105:3 118:22 |
| 245:5,16 246:6 | 348:16,23 | **accredited** | 137:8 140:16 |
| 246:17 248:11 | 349:3,11 | 146:4 | 155:1 180:5 |
| 250:3,15 | 351:12 354:10 | **accurate** 165:9 | 207:17 235:12 |
| 252:13 253:19 | 354:19 358:19 | 314:14 324:17 | 243:25 244:4 |
| 254:23 256:3 | 358:22,25 | 357:3 | 248:5 251:19 |
| 257:12,20,25 | 359:5,14,25 | **accurately** | 254:21 288:11 |
| 258:4 261:8,17 | 360:9 361:1,5 | 165:2 257:13 | 288:11 309:15 |
| 263:19 264:5 | 361:13 362:10 | **acknowledge...** | 314:22 323:25 |
| 264:12,21 | 362:16 363:13 | 368:3 | 331:5 |
| 265:4,14,21 | 363:18,24 | **acknowledges** | **ad** 205:25 |
| 266:5 267:18 | 364:5,8 | 277:23 | 206:5,6 |
| 267:21 268:7 | **absent** 258:13 | **acquired** | **adam** 43:13 |
| 270:3,7,20 | 258:19 | 125:24 295:15 | **add** 55:15 |
| 273:17 277:6 | **absolutely** | **acquisitor** | 117:14 147:12 |
| 278:21 279:7 | 107:8 181:11 | 306:3 | 187:9 |
| 279:16 280:5 | 345:16 | | |

**added** 71:18 73:1 268:8,14

**addition** 18:19 278:11 310:25

**additional** 37:9 40:20 95:4 148:14,16 150:4 153:7,14 173:21 174:13 225:19 248:7 251:2,17 255:15,18 257:14 296:6 311:4

**additions** 368:6

**address** 49:21 87:24 219:2 347:2,5,9

**adelstein** 249:12,15,16 249:16 250:5

**adequate** 278:3

**adhere** 278:19 278:24

**adhering** 90:18

**adjustment** 168:9

**administer** 15:6

**adult** 366:19

**advance** 74:21 328:2 329:23

**advantage** 171:10 208:23 209:2,4,8,10,13

284:9 303:15

**advising** 27:20

**advisor** 27:24

**advisors** 27:7 27:14,16

**aegis** 49:24 50:3,4,7,10,12 50:14,18

**affect** 272:15

**affected** 233:14

**affiliate** 139:12 139:19

**affiliated** 134:16

**affirm** 15:11

**affirmatively** 58:3

**affirmed** 15:13

**afforded** 79:16 143:1,9

**aftlaw.com** 2:8 2:10

**age** 325:10

**agent** 124:24 157:22,24,25 201:25 202:8 211:21 261:4 263:25 281:23 287:16 288:1 313:5

**agents** 157:18 313:10,19,24

**aggregate** 281:8,14,17

**ago** 16:4 29:10 30:7 31:6 34:18 59:24 103:2 130:8 221:2 325:13 345:8 353:25

**agree** 14:13 78:9 142:20 299:17 301:5 308:12,13 313:20

**agreeable** 70:3

**agreed** 110:15 111:25 167:5 225:8 243:1 299:5,12

**agreement** 8:11 11:21 13:8 60:20,21 61:2 61:8 63:18 64:3 81:25 82:1 142:23 160:19,21 161:2 187:14 187:19 188:4,6 188:9,12 192:17 208:4,9 208:10,14,17 226:25 227:14 227:22 228:8 241:19,23 242:21,24 243:2,7,17 245:24 251:16 268:2 276:12

276:23 277:8 278:1,5,20,23 278:24 279:4,4 279:6,9,14,15 281:17 287:2 287:11,17,24 288:5,9,16 290:22 292:3,8 295:1,6,13,21 296:1 298:11 299:13 300:4,7 347:17,20 359:21

**agreements** 187:24 226:15 226:21 228:3 236:11 238:24 239:10,13,16 240:9,21 243:6 243:15 245:22

**agrees** 278:7 282:22

**ahead** 106:8 138:1 162:20 217:25 245:15 292:25 334:5

**aided** 365:10

**ailment** 18:4

**aimf** 141:15 165:17 172:6 182:6

**aired** 314:23

**aj** 215:9,12,13 216:15 217:2 219:2

**ajanjigian** 2:18
**al** 1:9 14:20
  367:1 368:1
**alan** 58:18
**aldonsa** 2:17
**alerts** 347:12
**ali** 193:24
**alibaba** 311:6
  321:8,11
**alliance** 16:25
**allow** 163:23
  164:18 363:10
**allowed** 197:12
  197:22
**allowing** 164:7
  167:20 363:15
**alternative**
  295:12
**amazon** 311:6
  321:13,21
  322:7,17,23
  323:13 326:5
  326:25 327:4
**amella** 3:11
**amella.viso**
  3:12
**amendments**
  77:13
**americas** 2:15
  3:19 5:15
**amin** 1:13,19
  7:3 9:6 14:17
  15:13,18 33:13
  43:21,23 44:1
  54:8,12 55:2

56:12 57:16
63:10 64:12
65:23 70:16
83:13 84:10
106:6 108:16
108:21 110:15
111:24 112:11
114:18 115:8
118:6,15
120:21 124:11
124:16 131:4
132:16,20
138:6 141:12
162:17 163:17
163:20 172:3
178:19 179:23
182:3 187:4
189:2,10
193:20 194:20
197:4 201:9
212:11 214:21
215:5 218:9,17
218:24 225:1,3
225:7 227:5
229:15 238:16
246:25 247:5
251:8 252:16
254:25 256:7
256:12 259:25
266:10 269:15
270:24 273:20
274:8 276:4
280:8 281:3
282:9 294:15
297:20 300:19

334:3 353:19
356:9 357:8,24
364:12 367:2
367:24 368:2,4
368:12
**amortized**
  177:25 178:2
**amortizing**
  172:11,16,18
  176:16,21,23
  177:6,10,22
  198:3
**amount** 61:19
  79:18 143:25
  148:2 149:8,11
  149:17,24
  150:9 154:16
  160:3 173:12
  173:20 174:6
  256:22 257:14
  257:18 258:7
  274:25 275:15
  281:9,15 307:4
  317:18 318:12
  318:15 324:8
  340:10,12,14
  341:17
**analysis** 35:9
  36:2,4 39:5
  46:25 47:10
  134:6 175:19
  224:19 259:16
  259:20 285:24
  307:4 314:14
  353:9,12

**analyst** 21:10
  22:1 38:22
  95:25 104:25
  105:6 309:24
  310:14
**analysts** 38:14
  38:16,17 39:6
  100:6
**analyze** 175:14
  285:16
**ancillary** 243:6
  243:15 245:22
**andrew** 3:9
  104:5,11 343:1
**andrew.glads...**
  3:10
**andy** 49:7
  51:24 54:13
  58:17 65:24
  66:5,6,20
  67:23 68:4
  74:4,7 83:6,14
  84:12 115:8,12
  157:2,3 232:21
  266:9 269:18
  356:14
**andy's** 37:22
**animation**
  326:3
**anna** 312:2
**anniversary**
  250:25
**announced**
  284:12 316:1
  321:13

**[anson - anson]** <span style="float:right">Page 12</span>

**anson** 1:8 4:3
6:14 8:5,6,7,8,9
8:10,12,13,17
8:17,20,21,25
9:4,5,8,10,11
9:13,14,19,20
9:22,23,25,25
10:5,5,7,7,9,9
10:11,12,14,18
10:18,20,20,22
10:22,24,24
11:6,6,8,8,10
11:10,12,12,15
11:16,20,20,22
11:23 12:6,7,9
12:10,14,14,16
12:16,18,18,23
12:23,25,25
13:5,6,9,9
14:16,19 16:5
17:3 21:19,21
22:7,10,12,14
22:24 23:14,17
23:24,24 25:1
25:2,3,5,8,23
26:1,12,16,20
27:4,5,7,8
28:15,17,19
29:8,11 32:6,8
32:10 34:21
35:1,8,17,25
36:24 39:4,10
42:12 44:2
46:19,25 48:4
48:15,20,21

50:6 53:18,21
53:22 54:20
55:24 56:4,5
62:5 63:9,19
63:20,23 76:3
76:12 77:21
91:1,22 92:6,8
92:9 94:4
96:16 99:21,22
100:6 103:13
103:17,17
105:12 106:5
111:11 115:25
116:14,23
117:6,10,20,23
118:19 119:17
119:18,21
121:8,16 122:1
123:11 124:10
124:13 125:5
125:23 126:15
127:1 129:10
129:13,13,16
130:21,25
139:3 142:8,20
143:3 145:21
146:1,24
148:10,25
151:13 155:21
159:18 160:8
160:14,22
161:2,7,23
162:16 163:4
163:10,11
166:12 170:15

174:18,22,22
174:23,25
175:8 178:9,13
178:13 182:6
184:7,12,12
186:10,12,13
191:20,24
192:3 193:8,11
193:12 196:19
196:20,23
199:6,17 202:7
202:7,12,14,15
204:13 207:4,8
207:9 211:8
213:25 214:2
214:20 215:2
219:18,22,24
220:3,14,21
221:23,25
222:1,23
223:13 225:18
227:12,21
228:16,19
229:5,7,8
231:3,6,7
234:17,19,20
236:7,13
239:12,15,20
239:21 240:8
240:20 241:2
241:18 242:6
242:24 243:8
243:17 245:25
246:2,12,15,16
250:4,10,12,13

251:15 252:8
252:10,11
253:14,16,17
255:22,25
256:1 257:14
257:21 258:12
258:22 259:11
259:18 262:16
262:20 264:14
265:25 266:2,3
267:3 268:3,4
269:14 270:13
270:18,18
272:25 273:8
273:11,13,14
275:23 277:8
279:5,24 280:2
280:3 281:24
283:3 284:9
288:8 289:19
290:8 296:24
297:6,8,9
298:23 299:4
299:10 300:3,6
300:12,14,15
302:23 304:3
305:9 306:24
308:2 309:17
314:8 318:18
322:6 328:11
328:16 330:11
331:19,24
332:15 333:8,9
334:2,18 336:2
337:9,23,25

339:8 341:13 344:3 346:18 346:20,21 347:13 351:6,9 351:10,25 353:3,5,9 354:5,13,17,17 354:21 359:19 359:22,23 361:10 367:1 368:1

**anson's** 24:7 28:6 78:5 88:24 89:21 91:18 93:20 94:8,14 101:16 105:18 110:4 127:4 129:21 129:25 166:8 183:8,24 188:19 190:12 212:18,20 222:12 234:2 241:22 262:3 263:12,21 264:23 265:7 274:14 296:21 298:1 307:22 309:19 320:9 332:4 337:2 356:9

**answer** 17:17 17:18 56:23 60:4 65:17 97:18 106:17

106:22 112:25 113:1 116:10 143:7 169:10 177:12 203:21 203:24 220:9 220:11 241:11 241:12 242:10 265:3,12,15 331:23 332:24 362:12 363:11

**answered** 123:1 169:8 200:16

**answering** 156:16

**anti** 206:7

**anticipate** 24:23

**anybody** 20:11 32:3,6,10 42:25 43:11 48:4 59:20,25 88:23 91:16 106:11 117:7 121:5 130:5 142:9 158:14 168:1 175:18 314:8 330:11 334:21 337:9

**anymore** 104:17

**anyway** 270:9 291:13

**anyways** 193:22

**apologize** 57:11 204:2 232:5

**appeal** 306:3

**appear** 137:6 224:1

**appears** 58:2 73:4 83:24 85:8,13 90:25 105:7,19 120:16 125:8 130:24 132:12 136:24 140:5 140:15,20 146:16 149:11 149:12,17 164:20,24 166:5 181:3 183:7 194:5 196:7 199:5 200:23 205:13 217:10 222:19 234:12 275:6,7 277:3 282:2 283:2 299:2 325:19 327:12 348:2 365:7

**appended** 368:7

**apply** 286:19

**appreciate** 180:23 269:25

**appropriate** 107:6 366:6

**approval** 71:19 71:23 72:4,14

72:20 75:13 136:19 152:16 159:11 182:15 183:11 185:12 227:1 239:8 251:22

**approve** 72:1 187:14

**approved** 68:9 256:13

**approximately** 26:20

**april** 129:18 272:6 315:25

**arch** 25:8,12,14

**archived** 105:21

**arno** 104:5,11 104:19 343:1

**arnold** 83:14 93:25 320:25 325:6,11 347:16,19 356:7

**arps** 6:5

**arranged** 82:1

**array** 329:14

**art** 305:13

**ascertain** 285:20

**ascertained** 126:23

**aside** 32:3 60:1 60:9 113:17 117:15 121:24

161:11 204:3 205:17 273:8
**asked** 121:20 122:25 143:17 169:7 214:7 218:4 245:17 254:19 295:8,9 299:17 307:5 336:8,11 346:8 346:13 361:13
**asking** 17:16 116:25 122:6,7 123:13 128:1 169:3 192:20 199:1 210:7,14 240:19 279:13 291:12 307:6 317:22 331:22 344:4,18 363:23
**aspect** 294:25
**assess** 151:17 305:14
**assessing** 332:21
**assessment** 286:1 290:5,19 304:7
**asset** 21:24 223:3
**assets** 223:5,11 223:15,19 224:2,8,16
**assign** 366:5

**associate** 42:9 42:11 53:12
**assume** 132:8 157:25 158:3,6 158:10 188:15 192:9,10 196:13
**assumes** 163:21
**assuming** 131:19 139:14
**assumption** 47:3 158:18 192:6 216:21 216:23 250:1 290:1,16
**atility** 352:13
**attached** 8:11 9:9,12,15 10:10 11:21 12:4,19 13:7 60:18 63:18 67:14 105:20 129:12 131:20 131:23 132:5 163:9 171:23 204:24 207:7 212:9 221:21 235:24 252:22 256:14 260:17 260:23 262:9 268:1 270:16 274:14 280:11 281:9 298:1 342:17 359:21 366:16

**attaching** 8:18 9:18 11:13 103:15 178:11 255:23
**attachment** 13:4 70:22 145:13,15 165:16 172:6 276:11 354:16
**attachments** 12:8 141:15 182:6 280:1
**attempt** 213:8 285:16 330:11
**attempted** 21:13 50:19 102:3 213:13
**attempting** 55:12
**attended** 100:17 101:4
**attending** 1:21
**attention** 196:25 207:13 222:21 223:22 231:10 301:12 359:16 360:24 361:9
**attorney** 17:18 365:17
**attracted** 301:11
**atw** 52:21,24 52:25 164:5

**audibly** 203:21 203:24
**audio** 14:12
**aug** 51:1
**aug0012150** 8:3 32:15,17
**aug0012151** 8:4 32:18
**aug0012436** 8:14 82:22 83:1
**aug0012438** 8:15 82:23
**aug0013042** 9:16 171:21,24
**aug0013051** 9:17 171:24
**aug0013509** 10:16 217:8,13
**aug0013511** 10:16 217:14
**aug0016713** 12:20 342:16 342:19
**aug0016714** 12:21 342:20
**augenbaum** 1:5 14:19 367:1 368:1
**august** 33:11 34:1,7,13 35:21 37:9,16 41:24 44:23 45:8,17 46:5 48:5,6 49:6

52:7 309:18
310:7 315:5
**australia** 254:6
**authorized**
15:6 275:11
**auto** 217:16
**automatically**
105:21
**available** 99:19
99:23 259:2
**avenue** 2:5,15
3:19 4:6,21
5:15
**average** 80:21
176:14
**avoid** 219:16
219:19,25
220:6,15,15,19
307:24
**avoids** 219:18
219:22
**aware** 62:4
74:11,13
102:14 165:13
168:3 175:20
186:5 265:5,10
265:16,17,19
**ayrton** 196:3

**b**

**b** 1:18 14:16
63:9 106:5
162:16 214:20
269:14 334:2
**baby** 110:23
328:3

**bachelor** 20:22
**back** 28:15,17
28:22 29:3
36:16 43:19
45:21 51:25
55:2 63:10
75:17 106:6
110:12 127:25
137:24 148:17
155:2 156:5
162:18 163:22
166:1,16
185:25 186:4
188:24 201:11
203:8 214:22
243:23 244:1
244:14,19
245:13,17
247:17 267:18
269:16 270:9
270:10 273:18
291:18 292:24
302:13 334:4
356:13 359:3
359:12
**backed** 29:23
29:24 30:19
**background**
20:15
**backwards**
123:21 132:1
**badly** 91:22
**balance** 35:15
35:20

**bank** 16:17,23
50:4 60:13
78:21 79:4
88:7 110:1
**banker** 46:2
50:7
**bankruptcy**
46:14,21 47:2
**banks** 39:15
50:17,23 55:11
**based** 23:19
24:10,12 27:24
83:18,19 111:2
176:2 177:5
180:4,8,11
216:24 223:25
275:7 304:7
311:25 317:15
**basically** 25:19
**basis** 28:5
99:21 113:8
161:6 239:10
307:1 314:3
316:20
**bates** 8:3,5,7,9
8:12,14,16,20
8:22,24 9:4,8
9:10,13,16,19
9:22,24 10:4,6
10:8,11,14,15
10:17,19,21,23
11:5,7,9,11,15
11:17,19,22
12:6,9,11,13,15
12:17,20,22,24

13:5,8 32:14
32:17 41:6
48:14,20 49:2
53:18,21 54:5
55:24 56:4,11
63:19,22,25
64:2,10 70:15
72:12 75:18
79:8 82:22,25
83:4 84:9 92:5
92:8 103:12,16
104:23 107:11
107:21 108:11
111:17 114:25
117:20,22
119:17,20
123:18 124:10
124:13 129:8,9
129:12 130:17
131:3,17 138:4
145:15 150:15
154:20 155:4
156:13 159:3
163:4,10,16
166:4 168:5
171:21,23
172:20 173:5
175:23 178:8
178:12,16
182:2 183:2
184:7,11,19
185:20 186:10
186:12,23
189:1 193:8,11
196:19,22

197:2 201:1
202:12,14
204:12 207:4,8
207:14,18
209:21 212:2
213:25 214:2
215:2 217:8,13
218:7 221:22
221:25 222:4
224:21 229:5,7
231:3,6,12
234:16,19
235:13 236:16
237:21 246:12
246:15,22
248:13 250:10
250:12 252:8
252:10 253:14
253:16,21
255:22,25
256:5 261:11
261:14 263:1
265:24 266:2
268:3 270:13
270:17,22
271:9 275:23
277:11 279:23
280:2,7 282:6
292:13 293:5,8
293:20 297:5,8
297:16 300:11
300:14,19
323:22 333:8
334:10 342:16
342:19,24

343:7 346:18
346:20,25
351:6,9,15
354:13,16
355:2 359:18
359:22 360:2
362:19
**bay**   196:14
**beginning**
54:20 57:8
63:8 334:1
357:5
**begins**   176:5
232:19 356:20
361:9
**behalf**   2:2,12
3:3,16 4:3,17
5:3,12 6:3
128:11 158:4,7
158:10,14
199:17 262:6
262:24 264:7
**belief**   38:11
151:6 233:23
**believe**   16:3,16
17:10 19:4,7
27:1,16 29:9
34:14,24 35:7
36:23,25 37:6
38:6,15,20,23
39:12 43:2,12
50:21 51:8
52:16,25 53:2
53:10 58:3,24
59:8,9,22 60:5

60:11 63:14
65:9,12,19
66:7 69:18
70:1 71:9,10
71:16 72:7,8,8
76:14,14,19
77:3 84:2 85:1
85:4,7 86:15
86:23 87:3
88:21,22 89:5
89:9,23 91:4
92:14,17 93:1
100:7 101:8,23
103:1 104:14
104:15,25
110:22 111:10
113:6,10,14
114:11 127:9
127:18 128:14
128:15 129:17
129:22 131:21
134:4,5,6,7,10
134:12,20
135:21 138:20
141:20 145:6
150:18 151:1,3
154:21 157:5,7
157:8,21 164:4
164:13 165:1
168:20 169:4
173:8,19
180:11,21
183:22 184:16
184:16,25
188:5,6 189:19

195:6,8,10,10
195:15,25
196:3,3,16
198:13,22,24
200:14,16
209:25 210:12
213:1,20
214:24 215:13
218:13 219:7
221:11 223:2
223:21 230:19
233:9,21 235:7
239:15 241:1,3
249:20 250:1
254:22 257:8
257:18 258:9
259:13 260:9
260:23 263:10
264:9 267:6,13
273:16 274:5
276:10,21
281:22 287:9
287:13,15,20
288:2 293:14
294:11 296:25
307:3,12 313:2
314:10,16,18
316:17,20
317:19 318:1
319:5 320:5
322:4 323:13
323:18 324:8
326:7 328:20
330:5,8 335:9
338:13 340:15

341:16 343:24 346:2 348:21 349:2 352:20 357:2,4 362:25 363:6

**believed**  66:14 318:7

**bell**  134:17

**benefit**  156:22 288:5,8,12 313:6

**benefits**  143:1 143:4,10

**berry**  43:3

**best**  26:22 31:1 31:8 52:18 67:8,15 68:18 70:8 90:19 142:16 154:2 226:6,12 312:1 317:5,23 318:2 318:3,5 365:11

**better**  17:21 80:14,21 245:1 245:2 291:23 291:24,25 319:15,20 338:7,16

**beyond**  147:13 326:1

**bid**  232:23

**big**  47:12 86:7 182:11 318:14 340:20

**bigger**  51:24 52:7 85:19,23 86:21

**bill**  260:10

**binder**  63:14 103:12 107:16 163:2 186:7 207:2 215:1 268:22 334:9

**binding**  298:11

**bit**  30:23 40:18 41:18 68:15 163:4 165:18 203:9 209:21 243:19 273:22 289:14 290:13 291:18 305:13

**bite**  218:12

**blackline**  174:2

**bless**  71:2

**blind**  49:8,15 104:5,9

**bloomberg** 30:18 347:1,4 347:7,8,11

**blue**  72:13 316:4 357:12

**board**  73:23

**boasts**  183:9

**boatload** 266:12

**bob**  49:8 58:16 84:13 108:17 118:6 120:8 262:15

**body**  65:22 70:25 115:5 118:10 124:21 141:23 203:5 208:2 252:20 271:3 294:13

**book**  117:17 199:24 200:9 211:23 215:7 217:7 218:18 221:21 275:22 352:24 353:4,6 353:6

**books**  312:1 330:1

**booya**  193:23 194:13

**borrow**  341:4,9 341:14,16 354:8

**boston**  6:7

**bottom**  33:10 41:7 47:16 49:3 51:21,22 58:10 60:15 72:12,15 79:9 84:3,9 92:12 108:11,14 114:24,24 175:23 182:2 186:25 189:2 197:2 201:1 202:18 207:14 215:3 222:5 224:22 231:11

231:20 232:9 237:23 250:16 256:5 270:21 273:23 275:14 282:6 334:11 346:24

**box**  157:10 171:4,6,8 340:19

**boylston**  6:6

**bradley**  342:25

**brand**  329:15

**brands**  34:22 37:9 38:13 40:22 42:3 44:16,20,25 45:8,17 46:4 46:19 48:7 50:19 52:12 59:6 60:10,13 61:5,8 62:1,6 62:11 67:9,16 69:10 73:6 78:5 82:6 89:22 91:19 92:20 93:15,21 94:3,21 95:5,9 95:10 96:10 99:16,19,24 101:16,21,24 102:3 104:18 105:12 110:5 113:22,25 114:3,10 116:14 118:20

120:18 121:10
121:17 126:16
127:4 129:21
130:1 134:9,13
137:4 145:24
149:9 151:20
157:3 161:9
167:2,15 171:9
174:19,23
175:15 255:10
257:15 258:14
284:18 285:11
285:17 288:18
292:4 301:11
302:7 307:7
309:25 310:6
310:12,16
317:14 320:3
322:11 323:5,8
328:25 331:8
331:18,20
332:2,16
335:17,23
336:25 339:9
340:7 343:14
347:10,21
348:1,18 349:9
350:2,16
352:18 354:6
356:16
**bratic** 4:14
268:24 269:2
**break** 17:22
62:15,18,22
105:23 137:9

162:2 214:4
267:12,19
333:11,12
**breaking** 62:14
62:17
**breaks** 106:11
363:7
**brett** 189:14,18
189:19 190:1
205:6 206:15
206:16 210:7
210:10,14
238:6,10,11
247:18,23
248:2,6 249:5
252:21 276:18
276:19 277:4
**brett's** 206:9
**bridge** 56:14
58:18 60:22
61:11,15,16,20
61:24 62:1
136:17 139:15
**briefly** 20:1
**brio** 2:12 33:17
59:18,21 60:6
60:12 61:23,25
91:11 111:9,12
111:15 114:14
139:11 254:5
254:16 298:23
**brio's** 60:2
139:19
**broadcast**
321:6,14

**broadcaster**
321:23 322:14
**broker** 128:16
302:23
**brokerage**
309:24
**brokers** 128:10
337:19
**brought** 17:9
29:14 223:21
**bruckhaus** 3:5
**buffet** 356:7
**buffets** 328:4
**build** 42:15
**bullet** 282:21
283:10 286:6
286:17
**bullish** 301:17
301:20,25
**bumps** 51:11
**bunch** 58:15
114:19 123:23
172:10 341:4,9
341:14
**buoyant** 352:25
**buried** 268:17
**business** 28:6
35:9,13,18
42:8,10,13,16
45:10 50:9,12
52:17 53:12
129:25 219:9
308:9 309:9,13
330:19

**buy** 92:21
95:14 270:8
304:1,3 355:17
**buyers** 289:3
**buying** 143:17
309:22 352:5
352:12
**buys** 304:6
355:18

**c**

**c** 2:1 3:1 4:1 5:1
6:1
**ca** 5:8
**calculation**
111:2
**calendar**
153:21 154:6
**call** 33:14 43:4
43:7 112:1,4,6
112:8 115:7,19
115:21 116:2,9
117:4,7,13
149:4 344:3,10
344:17,21
345:17
**called** 25:8
55:11 134:17
145:6 195:16
195:18 196:3
259:10 281:17
344:14 345:1
**calling** 192:20
294:20 321:4
344:22

**calls** 116:20 117:2,11 345:22 346:3

**camera** 14:8 217:16

**canada** 25:9,10 25:23,25 27:2 365:2

**canadian** 23:19 27:8,24 28:24 29:5,22

**cancelled** 115:7

**cap** 23:3,4,6,7 23:10,10 39:20 97:11,13,22,25 98:1,5,10,12,13 302:20 357:22

**capital** 4:17 34:13,16,19 37:10,12,19,25 147:17 155:12 255:15 293:25 296:6,7 350:13 350:16 353:23

**capitalize** 310:23 326:16

**capitalized** 44:8 133:6

**cards** 219:9

**care** 70:4 121:8 122:23 123:6 139:21 211:2,6 337:20

**cared** 123:2,12 210:18,24

211:8

**careful** 87:17 88:4,9

**carefully** 366:3

**cares** 70:1

**caring** 123:3

**cartoon** 93:15 94:10,15,18 224:9,11 311:3 312:5 317:2 322:20,24 326:4 329:1

**cartoons** 308:25 310:20 312:3 318:8 319:24 320:3 324:13 326:1 327:11 330:20 331:2

**case** 19:15,21 19:23,25 20:3 29:8,18 40:16 66:7 71:9,11 73:4 78:23,24 83:25 84:2 85:8 98:16,16 109:13 127:17 140:6 164:25 167:13 183:22 193:3 194:5 211:4 263:21 270:5 279:19 287:14 292:9,9 304:22,22 317:5,23 318:2

318:3,5

**cases** 17:8

**cash** 90:12 147:10 150:25 151:2 152:22 156:5 167:9 178:4 257:14 258:25 305:21 305:23 306:5 356:22 357:6

**catalog** 224:12

**catch** 94:2

**category** 23:9 40:23 41:3

**catherine** 4:14

**catherine.bratic** 4:15

**cause** 18:5 110:3

**causes** 304:12

**cc** 87:19 88:5 235:3 261:24

**cc'd** 87:16

**celebrating** 254:8

**cell** 30:10

**cent** 159:15

**center** 3:6

**cents** 145:11 169:23 170:9 170:22 171:15

**ceo** 38:7 54:25 68:14 74:4,12 75:5 88:8 157:4 233:22

234:11 311:11 326:6

**ceos** 267:5

**certain** 25:18 25:20 31:19 76:18,19 77:9 78:21 79:18,19 82:3,3 87:3 89:2 95:13 98:23 102:15 104:20 121:23 134:14,21 145:6 154:16 160:24 164:14 165:9 174:12 177:24 184:3 188:21 190:14 196:9 197:20 197:22 199:2 205:15,18 211:24 223:2 265:2 271:24 272:19 277:4 281:18 284:1 294:7 329:2 340:10,16 345:20 346:13 350:4,18,20

**certainly** 94:22

**certainty** 89:10 192:2

**certificate** 365:1

**certified** 14:25 15:3

**[certify - coincidence]** Page 20

| | | | |
|---|---|---|---|
| **certify** 365:6 | **chardan** 8:19 | 199:15 221:19 | **clear** 70:12 |
| **chain** 54:6 58:1 | 92:15,20 96:8 | 294:8 314:6,8 | **client** 363:19 |
| 58:5 254:19 | 103:16 105:6 | 345:15 | **client's** 60:19 |
| **challenging** | **charles** 187:3 | **chief** 23:18 | **clients** 21:11 |
| 325:9 | 197:5 201:4 | **children** 94:17 | **close** 112:14 |
| **chance** 48:16 | 202:21 204:15 | 318:10 323:9 | 118:15 358:20 |
| 65:24 66:9 | **charron** 58:13 | **children's** | 358:23 |
| 94:10 118:1 | 58:25 59:1,11 | 312:1 | **closed** 118:19 |
| 119:23 141:25 | 187:2 188:18 | **chip** 316:4 | 343:22 |
| 168:24 218:2 | 188:22 189:10 | **choose** 153:11 | **closer** 244:22 |
| 309:9 318:8 | 191:7,12,18,20 | **chosen** 296:7 | **closes** 111:24 |
| 336:7,10,15 | 191:23 197:6 | **circumstances** | **closing** 11:14 |
| **chances** 302:12 | 202:19 204:14 | 142:19 165:10 | 33:22 72:18 |
| **change** 209:19 | 205:12 207:21 | 173:15 331:17 | 74:16 150:17 |
| 251:1 366:7,11 | 209:23 210:14 | 331:19 | 151:5 152:5,20 |
| 367:4,7,10,13 | 210:18,24 | **civil** 14:21 | 159:8 160:5 |
| 367:16,19 | 212:3 222:8 | **claimed** 315:16 | 166:24 167:3 |
| **changes** 163:21 | 224:25 229:13 | 326:13 | 168:15,23 |
| 247:5,9,12 | 230:18,20 | **claiming** 315:1 | 169:6 190:17 |
| 366:5,8,15 | 235:19 236:5 | 319:10 | 227:25 228:1,4 |
| 368:6 | 236:19 237:7 | **claims** 311:12 | 228:9 232:23 |
| **changing** | 237:25 246:25 | **clarification** | 236:25 237:11 |
| 332:24 | 248:17,20 | 244:9 245:4 | 237:14 242:5,7 |
| **channel** 311:3 | 249:9 259:24 | 269:4 292:16 | 242:19 255:24 |
| 326:5 329:16 | 260:4 264:6,9 | 358:18 | 256:8,15 260:1 |
| **channels** 326:4 | 264:13,19,22 | **clarify** 293:2 | 260:24 261:2,6 |
| 326:14 | 265:1,6,11 | **clarity** 244:15 | 261:21 330:14 |
| **character** | 276:4 280:9 | **clark** 4:23 | **club** 328:5 |
| 93:25 | 297:22 | **classified** | **coaching** |
| **characterize** | **charron's** | 355:23 | 242:15 |
| 258:17 | 230:15,23 | **clean** 57:9 | **cocktail** 100:15 |
| **characterized** | **chat** 193:22 | **cleaned** 165:18 | 103:2 |
| 308:14 | **cheap** 352:5,12 | 232:6 | **cohen** 2:19 |
| **characterizing** | **check** 145:12 | **cleaning** | **coincidence** |
| 91:17 | 198:16 199:1 | 165:23 | 346:8 |

**[collateral - company]**

| | | | |
|---|---|---|---|
| **collateral** | **commence** | **committee** | 281:24 |
| 175:15 | 256:15 | 23:20 | **communicating** |
| **collection** | **commencing** | **common** 33:20 | 288:3 |
| 326:2 | 14:1 | 37:15 38:1 | **communication** |
| **college** 20:17 | **comment** | 39:23,25 40:5 | 264:10,19 |
| 20:18 21:3 | 133:12 183:4 | 40:11,14 41:20 | **communicati...** |
| **column** 366:6 | 225:22 238:6 | 50:19 81:5,7 | 28:22 273:9 |
| **combined** | 264:17 282:25 | 94:21 95:5,10 | 287:25 |
| 326:23 | 283:19 | 95:14,18 96:1 | **companies** 22:2 |
| **come** 23:12 | **comments** | 96:10,18 148:5 | 22:20,20 23:3 |
| 61:18 74:24 | 60:19 78:15 | 153:24 167:20 | 24:10,16,18 |
| 78:14 157:17 | 132:21 138:11 | 259:18 276:14 | 26:4 39:21 |
| 216:12 221:3 | 139:24 140:2,8 | 283:13 284:18 | 40:17 45:12 |
| 241:8 243:19 | 140:14,19 | 285:11,17 | 46:15 47:12 |
| 248:2,5 267:3 | 182:6,10 | 289:21 290:10 | 55:12 77:1 |
| 267:18 276:23 | 191:13 206:10 | 290:23 292:4 | 97:16 98:17,18 |
| 288:1 332:23 | 206:22 211:7 | 302:8 305:11 | 152:25 267:6 |
| 350:5 | 237:1,8,12 | 309:25 310:6 | 285:20 302:16 |
| **comeback** | 248:2,5,7,10 | 322:12 323:5 | 302:21 303:3,5 |
| 280:12 | 252:18,21 | 340:7 343:21 | 304:19 307:5 |
| **comes** 78:7 | 253:1,5 264:6 | 344:5,19 | 315:3 319:13 |
| 157:25 195:1 | 264:10,22 | 345:18 355:12 | 352:13,18 |
| 203:22 303:16 | 265:1,5,10,11 | 355:13,19 | **company** 16:11 |
| 303:20 | 265:20 282:15 | **commonality** | 16:17 23:5,24 |
| **comfort** 226:23 | 301:24 | 356:12 | 24:8,10 26:1,9 |
| 239:6,11 | **commercial** | **commonly** | 34:16 35:14,18 |
| **comfortable** | 329:5,8 | 110:23 | 35:19,20 36:24 |
| 199:11 237:16 | **commercially** | **communicate** | 37:18,24 38:7 |
| 243:3 246:4 | 154:2 | 28:5 42:12 | 38:12 41:18 |
| **coming** 45:14 | **commission** | 89:1,8,12,20 | 45:24 46:8,12 |
| 65:11 78:15,17 | 27:25 28:25 | 199:21 200:6 | 46:20 47:2,20 |
| 78:19,22 | **commissioner** | 200:12 | 54:24 55:13 |
| 200:18 335:20 | 365:24 | **communicated** | 61:17 68:15 |
| 358:19 359:3 | **committed** | 89:24 114:3,5 | 70:3,8 71:3 |
| | 146:19 | 164:22 165:3 | 72:7,19 73:22 |

**[company - concerning]**                                                     Page 22

74:5 75:5,9
77:2,7,11,12
80:6,6,7,13,16
80:17 81:16
82:2,11,15
84:20 85:12,25
86:3,9,21 87:4
94:16,19,24
95:4 96:14
97:6 98:9,11
98:13,25
109:21,22
111:19 113:7
121:13,20
122:9 142:23
144:9 145:25
147:3,8,9,10
148:13 150:18
150:23,24
151:4,16 152:2
152:11,18,21
153:3,5,22
154:14,15
155:9 156:19
156:24 157:1,9
157:13,19,22
157:23 158:1,2
158:4,6,7,9,11
158:15,19
159:6,9,25
160:20 166:2
167:4,12
169:12 173:19
173:22 178:1
180:16 181:11

181:23 183:10
183:20 185:11
186:1 187:23
190:16 191:3
197:21 198:14
199:8 201:25
201:25 202:8,8
208:22 212:13
222:20 223:2,6
223:14 226:23
227:25 229:21
230:6 233:23
233:24 239:7
247:17 248:5
250:23 251:1
252:1 255:11
257:11 259:2
260:5,19 261:4
262:17,24
264:11 279:5
280:21 281:23
282:22 283:12
283:24,25
284:2 285:5
287:1,9,16,23
287:25 295:22
296:6,10
298:11 299:17
301:5 304:9,16
304:22 305:15
305:15,23,24
306:4 308:14
309:7,15
311:11 316:22
320:13 322:13

323:15,17
324:20,22
325:20 326:9
327:11 328:1
331:2 332:10
332:21 335:13
336:25 337:4
344:4,18,23
345:18 346:5
355:17,23
356:16,24
357:5,9,21,25
358:15
**company's**
  45:20 95:18
  96:1,18 110:24
  181:1 302:3
  305:11 318:8
**compel** 107:6
**compelled**
  106:25
**compensated**
  307:2,3
**compensation**
  233:1
**competent**
  366:19
**competing**
  91:23
**complements**
  352:21,23
**complete**
  156:22 199:7
  199:24 368:9

**completed**
  20:25 199:9
**completely**
  144:15 180:16
  181:1
**completes**
  155:9
**compliance**
  23:18 117:9,13
**compliant**
  25:13,19
**component**
  135:16
**comprise**
  268:22
**computer**
  20:23 30:13,17
  30:21 365:10
**concept** 182:11
**concern** 226:19
  289:19 325:16
  325:19
**concerned**
  16:12 123:15
  191:2 290:7,8
  296:5 299:5,11
**concerning**
  44:24 48:6
  60:1 74:7
  88:15 89:21
  101:16 113:22
  113:24 114:2
  191:18 237:8
  310:11,15
  316:18 345:17

**concludes**
364:11
**conclusion**
312:23 313:21
**concrete**  45:9
45:13
**condition**
177:24 227:20
227:25 228:1,4
**conditional**
208:5,14
**conditions**
184:3 197:12
197:17,18,20
228:9
**conducted**  14:7
14:23 35:9
**conference**
113:11,20
345:10
**conferences**
101:13 219:8
**confidence**
187:25
**confirm**  145:13
**confirming**
312:8,13
**conflict**  307:24
**confused**  225:8
225:12,15
**confusing**
279:19
**conjunction**
55:10

**connection**
14:9 18:11
19:25 35:10
36:1 125:25
146:13 235:5
242:19 243:8
262:10 347:9
353:8
**consent**  12:5
270:16
**consequences**
338:1
**consider**  42:5,8
42:10 177:10
208:3 233:18
295:9 304:24
314:11 355:20
**considered**
219:20 220:16
305:3 340:11
348:18,24
**considering**
233:9 259:12
**considers**
314:17
**consist**  39:24
40:4,10
**consisted**  202:7
**consisting**
39:23
**consists**  63:25
**consolidated**
232:23
**constantly**
82:11 313:8

**consultant**
306:21
**consulting**  21:5
21:9,16
**consumer**
94:17 323:10
**consummate**
254:21
**cont'd**  3:1 4:1
5:1 6:1 9:2
10:2 11:2 12:2
13:2
**contact**  60:23
218:20 219:2,6
219:9,11
221:15,19
294:5 307:9
310:11,15
345:12,15
**contained**
96:13 120:13
130:16,21
148:10 319:3
**contemplated**
83:22 155:21
155:24 277:25
**contemplating**
224:4
**content**  224:12
311:4 313:2
322:18
**contents**  117:6
117:11 127:16
191:18

**context**  19:19
48:1 59:2
61:12,13 65:14
66:9 71:23
76:1 78:2,4
118:25 133:10
135:20 155:1
194:14 198:11
206:18 271:17
274:3 280:18
280:19 281:16
286:14 299:20
335:7 339:6
352:19 355:9
**contingent**
110:5,8,9
**continually**
37:19
**continue**  14:12
**continued**
317:15
**continues**
337:18
**continuous**
82:14
**continuously**
266:15
**contract**
322:13
**contributed**
127:18
**control**  163:22
223:16
**convenient**
62:14,17

**[conversation - correctly]**                    Page 24

conversation
  48:8 113:15
  115:15,17
  116:17 346:13
conversations
  34:9 51:18
  88:17 104:21
  113:16 173:19
  185:25 188:8
  191:17,22
  213:11 363:12
conversion
  37:5 81:5
  90:14 138:23
  144:25 145:3,8
  145:10 148:6
  155:3,5,7
  156:2 159:12
  168:15 169:18
  169:23 170:8
  170:16,18,22
  171:1,16
  232:21 259:1,5
  296:12
convert  38:9
  41:10,14,19
  43:20 90:13
  148:4 169:25
  170:11,18
  183:14 251:19
  296:13
converted
  148:21 167:20
convertible
  37:5,5 41:19

41:20,23 45:2
81:4 90:2
145:7 252:17
convertibles
  355:14
converting
  149:20 183:17
convey  64:19
  190:25 194:17
conveyed
  287:15,23
convince  71:3
  213:4,8,13
cop  224:11
copied  49:15
  60:13 108:16
  128:19,22,25
  202:25 207:25
  210:1 212:4
  222:10 249:3
  249:10 350:8
copy  72:13
  104:9 361:19
copying  49:7,9
  54:8 56:13
  57:18 58:15
  64:13 70:17
  84:12 104:5,5
  114:19 124:18
  138:6 141:13
  187:3 189:10
  197:6 204:16
  218:25 225:1
  229:15 231:14
  276:4 280:9

343:1 353:19
corcoran  5:19
corner  108:12
corporate
  73:25
correct  18:20
  18:21 22:8
  26:7 27:12
  29:23 32:1,1
  33:8 40:8
  42:14,19 49:9
  49:10 52:23
  53:13,14 74:18
  74:19,21 76:7
  76:8,9 81:22
  85:12 87:14
  88:1 105:1,6
  105:17 107:7
  113:18,19
  114:12 117:11
  122:18,21
  128:17,18
  129:3,4,5
  132:9,10
  135:12,13
  139:10 140:7
  140:14,19,24
  144:2 145:2
  147:22 149:6
  150:8 155:2
  160:22 162:24
  164:19,23
  165:22 166:9
  166:10 169:22
  170:7,20,23

171:3,8 174:25
175:2,3 180:18
181:1 183:25
198:25 199:15
199:16,22
200:7,22 202:2
202:5 219:21
220:1,14 226:9
227:20 228:14
228:15,16,18
230:16,18
234:3 236:13
236:14,24
241:16 242:20
242:21 255:11
257:19 262:19
263:6,22
277:21 281:25
290:21 292:2
295:12,20
306:25 309:17
314:4 317:17
319:3 325:2
328:16 332:16
348:25 349:18
353:3 358:24
359:6 361:18
361:20,21
362:17 368:8
corrections
  368:6
correctly  37:1
  37:4 92:13
  170:2 178:4
  244:16

**correlate**
304:16
**correlated**
284:14
**cosmetically**
136:1,11
**cosmic**  324:14
325:1
**counsel**  6:14
14:18 15:11
18:15 30:2,3,5
30:9,15 32:3
32:14 33:1
58:24 106:8,13
106:14 127:19
127:21,22
138:1 160:8,14
160:23 162:20
188:20 189:20
192:18,19
201:24,25
202:7,8 243:10
245:15 263:23
263:24 264:3
264:14 292:25
293:5,16 334:5
363:9,12,17
365:13,17
**counterparties**
309:19
**countersigned**
274:16
**countries**
319:13

**couple**  80:4
100:20 101:13
102:8 109:17
196:4 314:24
345:11 360:12
**course**  101:4
127:7 331:4
**court**  1:1,25
14:20 15:3,10
19:24 48:12
53:17 63:15
82:19 106:24
107:5,9 170:3
170:5 171:20
178:7 184:6
186:8 202:10
207:3 213:23
214:25 217:5
218:4 229:3
234:15 243:22
244:8,11 245:3
245:15,16,18
246:10 250:9
252:6 253:13
255:20 261:10
265:23 267:11
269:3 270:10
279:21 292:12
292:15 293:3
297:4 300:10
333:4 342:14
351:5 354:12
358:17 359:17
360:13,17,19
366:22

**courts**  17:9
**cover**  226:16
**coverage**  39:3
**covered**  38:21
38:24 226:20
307:25 338:3
**covering**
185:14 311:5
**covid**  326:16
**create**  93:17
**created**  65:25
357:11
**creating**  309:1
**creative**  227:5
227:9 338:19
**creator**  356:14
**credit**  81:19,23
81:25 82:7,12
352:4
**criteria**  335:20
**crossed**  298:10
**crr**  1:25 365:23
**crusaders**
324:14 325:1
**crystallizing**
335:1,6
**csr**  1:25 365:23
**culling**  359:3
**culmination**
65:25
**current**  148:6
317:18 326:1
331:15
**currently**  86:19

**custody**  128:10
**customary**
79:20,23
**cut**  47:12,13
277:15
**cv**  1:7 14:22
**cvi**  6:3 195:14

**d**

**d**  7:1
**daily**  281:19
**damages**  278:4
**dan**  342:25
343:4,13 350:9
350:12,12
**dark**  64:14,23
65:5,9,14
70:19
**data**  320:1,5
**date**  29:25 30:6
37:16 46:7
54:7 62:7
74:17 120:8
153:13,21,22
154:7 159:9
160:18,21
188:21 192:2
227:3 283:14
306:17 366:12
367:24 368:12
**dated**  9:7,21
124:12 184:10
231:13 252:15
343:10
**dates**  62:9,12

**datoo** 334:13 334:16,24 335:6 337:14 338:11,18 339:4,17 340:18,23 341:3
**david** 293:21
**daws** 306:15,20 307:2,7,9,14 308:22 310:18 311:18 312:16 312:22 313:4 313:17,22 314:4,11,14 316:17 317:12 317:17,25 319:2,6 322:1 323:22 324:6 324:18 325:19 325:25 327:9 327:12,16 328:22 330:5 330:25
**day** 1:21 44:6 167:5 168:14 168:22 169:1,5 169:16,25 170:12,21 176:7 214:9 218:11,17 281:11 368:15
**day's** 190:18
**days** 72:18 74:15 136:16

150:17 151:5 152:4,19 153:21 154:6 159:7 166:23 167:3 168:9 169:13 283:14 340:15 366:23
**deal** 51:24 52:7 68:9 70:8,12 75:13 85:17,19 85:23 86:1,8,9 90:3 91:23 93:5,10,12 108:25 109:6 110:5,8 111:12 111:13,24 118:14,19,25 119:1,3,9 128:4,14 136:2 136:8 137:3 138:13 140:12 144:14,19,22 148:1,18 149:23 153:16 154:22,25 155:2,13,21 156:6,12,22 159:2,7 160:9 160:15 163:24 164:8,12,17 165:12 174:5 180:24 188:12 210:20 211:12 216:16 219:12 229:20 230:6,8

256:13 257:21 258:3 274:6 275:8 286:9,10 289:20 290:9 298:21 315:1 342:10
**dealer** 302:23
**deals** 64:25 65:2 66:2 70:2 109:14 110:3 271:12 303:11 304:3,7 310:23 362:2
**dealt** 39:11
**deana** 1:25 15:3 365:5,23
**dear** 354:21
**debating** 363:22
**debenture** 60:21 61:5
**debt** 34:14 36:23 37:3,25 38:8,9 39:25 41:20 44:7,8 44:16,24 45:4 45:8,16,20,24 46:19,21 47:1 51:9,24 52:7 52:15 56:14 58:19 85:19,23 86:1,2,4,8,16 86:18,21 90:1 90:8,10,11 111:24 118:14

118:24 132:25 144:8 145:7,9 147:4,7,16,21 147:24,25 148:3,4,5,14,15 148:24,25 149:5,7,8,11,17 149:20,25 150:1,6,9,12,20 152:24 155:10 156:5,25 164:14,15 174:2,4,6 175:6,10,15 223:2 224:4 255:17 256:20 258:6,13,21,24 259:1,5,5,9,19 275:8 283:13 286:9,20 289:8 289:20 290:9 294:18 295:14 295:22 296:16 356:22 357:11 358:2,12
**debut** 315:19
**decade** 31:23 34:18 324:2
**december** 126:14 129:16
**decent** 318:13 327:11 331:6
**decide** 174:16
**decided** 226:12

**decision**  93:20 95:14,22 96:4 218:11 233:14 258:16 280:14 290:3 347:9
**decisions**  39:5 105:12 170:14 332:9 351:25
**declare**  46:14 368:4
**declared**  47:2
**declines**  284:13
**decrease** 168:16
**deducted** 256:24
**deemed**  183:18 368:6
**default**  102:3
**defendant**  3:3 4:17 5:3,12 6:3 29:8
**defendants** 1:10 2:12 3:16 4:3 19:3
**deferred**  330:1
**define**  23:4
**defined**  146:2 153:25 155:12
**defines**  284:22
**definitely**  78:8 99:18 191:21 237:3 247:21
**definition**  23:8

**definitive** 232:25
**degree**  20:21
**deliver**  226:24 239:7
**deloitte**  21:4,9 21:16,17
**demand**  77:10 153:19,20,22 154:6 318:10 323:10
**demanding** 295:5
**demonstrating** 320:2
**dennis**  4:8 243:24 360:13
**dennis.tracey** 4:9
**denton**  49:8 58:16 84:13 108:17 118:6 120:8 122:17 262:15
**depend**  236:25 331:10 353:15
**dependent** 98:15 237:12 285:21 292:9 305:20 331:11 331:13 332:9
**depending** 277:15
**depends**  14:8 79:1 98:19,24

237:15 304:22
**deponent**  368:3
**deposed**  15:20 15:24 16:2,19 17:2 18:11
**deposition**  1:13 1:18 14:6,16 14:23 19:17 20:3 32:8 33:2 63:9 106:5,12 108:7 162:16 214:20 235:5 269:14 333:6 334:2 363:8,24 365:6,8,15 366:3,4,13,17 366:23
**deringer**  3:5
**description**  8:2 9:3 10:3 11:4 12:3 13:3 319:2
**designated** 139:12,19
**designations** 244:12
**desire**  98:25 189:22 225:21
**desired**  338:15
**despite**  91:3
**detail**  20:5
**detailed**  20:10
**determination** 35:15 39:8

**determine** 126:20
**determining** 322:11
**detriment**  77:3 77:15
**detrimental** 80:18 86:22 200:3
**developing** 93:16 224:10
**development** 94:22 95:2
**developments** 97:8
**device**  30:2,4,8 30:11,25 31:4 31:11,20
**dewdney**  312:2
**died**  312:2 325:12
**difference**  98:3 122:11 185:23
**different**  40:1 50:16 52:17 65:13,19 66:2 97:12 98:12 197:19,19 327:13 330:22
**differentiate** 98:2
**differs**  185:18
**difficult**  50:11 76:20,23 96:5 99:11 181:4

**[difficult - document]**

285:20,22,25
288:22,25
331:23 332:22
**difficulty**
148:13 241:25
**diligence**
159:21 225:2
**dilution** 82:14
206:7
**dilutive** 80:18
**dinners** 100:15
**dipaola** 43:16
**direct** 20:11
22:19 41:17
43:19 108:18
113:16 114:21
118:8 176:22
196:25 207:12
231:10 272:12
272:15,24
276:8,8 355:11
355:22 359:16
360:23 361:8
**directed** 88:6,7
**direction**
325:20 365:12
**directly** 113:13
193:5 219:11
219:19,22
262:16,21,23
301:22
**director** 189:14
189:18,19,23
190:1,5,8,12
206:16,21

210:11 238:11
253:5 276:20
276:24
**directors** 73:23
**directs** 255:13
**disagree** 107:4
308:22 312:22
313:15,16,18
313:22 317:11
317:24 322:1
324:5 327:8
330:25
**disagreeing**
325:20
**disclosed** 322:4
**discloses** 79:4
**discount** 135:8
135:9 197:25
**discovery** 36:8
127:10 363:21
**discuss** 60:23
104:18 168:1
363:8
**discussed** 87:9
87:23,25
180:13 205:11
230:15 234:24
**discussing**
116:13
**discussion**
187:22 244:10
245:7,10
292:17,23
**discussions**
34:6 41:21

42:4 48:4 52:6
74:6 88:14
113:21 164:6,9
187:18,21
230:1,3
**disney** 311:13
**disposed** 126:5
126:8
**dispute** 16:16
16:23
**disregard**
203:7
**distressed**
40:19,25 46:10
302:22
**distribution**
235:24 311:4
328:3 329:25
**distributors**
311:14
**district** 1:1,2
14:20,21
**division** 321:8
**doc** 117:14
**docs** 108:21
189:14 190:19
201:10 208:6
215:20 274:1
293:22 363:1
**document** 8:12
8:16,18,19 9:7
9:24 10:4,6,8
10:11,13,15,17
10:19,21,23
11:5,7,9,11,14

11:17,19,22
12:5,9,11,13,15
12:17,20,22,24
13:4,8 29:15
32:13,21 33:7
48:10,23 53:16
53:18,25 54:2
55:21 56:1,7
58:7 63:18,22
63:25 64:1,7
64:10 73:2
82:18 83:4
84:8 92:3,4,5,7
103:11,15,16
103:20 104:22
104:24 105:18
105:19 107:25
108:2,4,6,10
117:22,23
118:3 119:24
120:1,3,6
124:13 127:9
127:15,17
129:8,9 130:12
130:16 131:17
137:15 145:18
161:22 163:15
166:4,14
170:25 173:8
177:15 178:5,6
178:8 184:7,14
184:19,23
185:3 186:7,11
186:17,19,22
188:25 192:1,6

**[document - educational]** Page 29

193:1,10,14,18
196:18 202:12
202:13 207:4,7
207:15,19
209:14 211:15
212:2 213:24
214:2,4 215:2
217:7,12 218:3
218:7 221:21
221:24 229:4,6
231:5 232:16
234:18 235:9
240:25 241:2
246:11,14,18
248:13 250:8
250:11 252:7,9
253:6,7,8,12,15
255:25 259:8
259:10 261:9
261:13 263:1,2
263:8,12,15,17
266:1,7 267:12
267:15,24
268:2,6,23,25
270:11,17
274:19 276:2
279:2,22,23
280:1 292:13
293:4,7,12
297:5,7,12,14
297:16 300:11
300:13 333:5,7
334:7 342:18
346:16,19
351:6,8,15

354:11,16
359:18,21
361:4 362:18
363:20
**documentation**
210:20
**documents**
18:16,20,22,25
19:9,11,12
22:21 29:12,17
33:4 108:25
109:4 126:19
127:7 129:20
169:20 188:2
188:13 189:22
191:15,19
192:25 193:2
200:1 203:3
204:20 208:11
210:4 211:3
212:5 213:3,19
213:20 222:11
231:16 232:25
236:1 237:2,9
237:13,16
238:18 239:19
240:7,19 241:6
242:6,7,19
246:3,4 247:2
256:15 257:8
264:4 268:14
268:21 294:12
320:9
**doing** 22:22
52:11 55:12

111:14 118:2
122:10 125:8
135:7 143:16
146:19 153:12
254:7 312:9,13
336:16
**dollars** 147:1
315:22 340:20
**domestic**
329:25
**doubt** 31:18
76:4 112:13
174:13 230:23
273:2
**downloaded**
30:3
**downs** 81:18
**downside**
357:14,18,20
**dozen** 100:20
**draft** 8:11 9:18
63:18 64:2
70:22 71:7
76:8 79:8
130:20 168:6
168:21 172:24
173:1,2 178:12
183:1 253:7
**drafted** 250:23
**drafting** 363:3
**draw** 81:18
**drive** 94:3
95:10 303:23
311:8

**driven** 27:14,17
301:12
**driving** 94:20
**drop** 270:5
**drum** 45:10
**drye** 249:17
**due** 36:17 44:9
72:22 159:21
225:2
**duly** 365:8
**dump** 348:18
**duties** 23:15,16

**e**

**e** 2:1,1 3:1,1 4:1
4:1 5:1,1 6:1,1
7:1 367:3,3,3
**earlier** 119:6
356:20
**earliest** 227:4
**early** 31:9
36:25 59:10
**easier** 152:25
153:5 156:22
**easily** 213:3
**east** 25:2
**economic**
169:24 170:10
170:14,17
208:23 209:2
**economically**
296:24
**edits** 166:16
**educational**
20:15

**effecting** 81:18
**effective** 154:4
  283:16
**effectiveness**
  182:14,19,21
  182:22 183:10
  185:13 251:23
**efficient** 284:19
  284:22
**effort** 37:14
**efforts** 154:3
**egs** 188:22
  262:16,21
**egsllp.com** 2:18
  2:20
**eight** 35:7
  103:2
**either** 15:19
  31:8 39:13
  55:17 123:25
  148:1,20
  167:18 178:3,4
  192:20 242:3
  251:22 263:15
  277:16 337:17
**elect** 80:10
**election** 82:3
  226:5
**elections** 134:7
**eligible** 335:13
  335:18,21,23
  340:9
**elkins** 5:5
**ellenoff** 2:14
  59:1,5,9 161:3

161:7,10,23
192:3,23
261:19 263:5
263:20,22,25
**else's** 130:5
  318:4
**email** 8:3,5,7,9
  8:11,14,16,18
  8:22,24 9:4,6,9
  9:12,15,18,24
  10:4,6,8,10,13
  10:15,17,19,21
  10:23 11:5,7,9
  11:11,13,17,19
  11:21 12:4,8
  12:11,13,15,17
  12:19,22,24
  13:4,7 28:5
  30:18 32:16
  36:10 37:20
  41:5 43:20
  44:5 45:17
  46:5 47:15
  48:19 49:6,15
  49:19,21,22
  51:1,16 53:20
  54:5,6 55:1
  56:3,11 57:16
  58:1,11 59:12
  60:15 61:22
  62:7 63:17
  64:11 65:15,22
  66:9 67:14,21
  68:7 69:2
  70:25 71:8,17

82:21 83:5,18
83:20,23 84:1
84:10 85:8,15
87:13,15,17,21
87:24 88:4,9
88:11 90:25
92:7,11 96:9
103:14,25
104:2,3,9
105:20 107:10
108:15,20
109:1 110:12
114:17,18
115:2,6 117:19
118:5,10,25
119:11,16
120:7,13,14,15
120:20 122:16
124:11,16,21
127:24 128:20
128:23 129:11
130:15,18
131:3,8,16,20
132:2,15
133:10 138:5
140:4,9,10
141:12,18,21
141:23 142:6
143:21 144:5
144:20 145:8
153:20 163:8
163:16 165:15
166:1 171:22
172:3 173:3,6
178:11,17

179:9,22
180:21 182:3
186:11 187:1,7
188:18,25
189:1,8 191:5
191:6,14
192:20,22,24
193:10,18
194:19 195:20
196:18 197:1,3
198:12,25
200:23 201:4,6
202:13,19,25
203:5,15
204:14,23
205:11 206:8
207:6,20,25
208:2 209:22
210:1 212:2,23
214:1 215:4
216:6,7,8,10
217:12 218:8
218:16,23
219:2 221:24
222:8,22
223:25 224:25
229:6,13 230:4
230:15,17,21
231:5,11,20,20
232:8,13,14
233:8 234:18
234:24 235:1,4
238:14,15,22
246:14,24
247:2,10,15

**[email - equity]**

248:3 249:1,9 250:11 251:8 252:9,14,20 253:3,15 254:18,25 255:23 256:6 257:13 259:24 260:16 261:13 261:19 262:8 262:13 266:1 266:22,23,25 268:1,7,15,25 269:1 270:15 270:23 271:4 273:2,14,19,23 274:3,4,8 275:4 276:2 279:25 280:6 281:3 282:3,9 283:2,20 286:3 286:15 293:7 293:19 294:14 297:7,19 299:1 299:14 300:13 300:19,23 301:2,4 302:10 303:10 307:14 314:5 328:23 329:1 333:7 335:7 338:12 339:15 340:17 341:1 342:17 342:24 346:19 347:1,1,4,8,12 347:13,15,18

349:13 350:8 351:8,14 352:19 354:15 359:20 361:9 361:14,16 362:20,24 363:3,6

**emailed** 267:12 267:13 268:15 270:12 361:4

**emails** 18:16,20 56:17,24 57:1 57:5,6,13 60:12,14 64:1 130:15

**empery** 3:3 102:19,22 172:11,16,17 189:20 190:3 205:4,14,17 211:12,18,23 229:19 252:18 254:5,7,16 269:18 298:22

**empery's** 176:16,21,23 210:19 211:2,7 212:12 230:5

**employed** 21:20 129:15 365:14,17

**employee** 365:16

**employment** 21:18

**empty** 189:3

**enable** 284:4,6

**enabled** 259:18

**encompass** 355:11

**encompassed** 355:15

**ended** 134:15

**enemy** 91:5,17

**enforce** 239:13 239:17,17,20 239:22 240:8 240:21 241:22

**enforcement** 278:10

**engage** 161:5,7 174:18 353:9

**engaged** 174:22

**enormous** 311:5

**ensure** 180:21 199:10,24 200:8 296:9 299:15

**enter** 82:1 154:22 156:11 159:2,6 161:1 303:2

**entered** 161:8 243:6,15 245:22 258:8 322:14 354:7

**entering** 81:17 169:2 290:2

**enters** 347:16 347:19

**entertainment** 134:17

**entice** 40:20

**enticing** 153:16

**entire** 24:14 29:15 34:17 55:16 177:8 201:12 265:10 313:2,20 355:14

**entirely** 196:9 280:19 292:20

**entirety** 265:1

**entities** 28:3 73:13

**entitled** 278:9 325:23 327:14

**entity** 27:8,9 134:16,20

**entry** 75:18 81:9 153:18 154:21 168:9

**equities** 73:14

**equitized** 167:19

**equity** 23:23 24:3,3,7 25:6 26:8,14 38:9 41:17,20 81:18 81:23,24 82:6 82:11,12 90:3 145:7 148:22 149:20 197:12

**[equity - exhibit]** Page 32

197:16,18
233:1 255:15
255:18 278:12
**ernational**
145:24
**errata** 368:7
**erratum** 366:6
366:10,11,16
366:21
**escrow** 37:23
182:12 183:5,9
185:3,6,10,19
186:1 208:18
208:20 209:16
298:3,7
**especially**
352:25
**esq** 2:7,9,17,19
3:9,11,13,21,23
4:8,14 5:9,17
5:19 6:8
**essentially**
86:20 164:16
165:19
**estate** 25:8
**estimate** 26:22
31:1
**estimating**
40:13
**et** 1:9 14:20
367:1 368:1
**europe** 51:25
52:8
**event** 103:2
168:13 176:6

185:7 223:13
278:4
**events** 100:14
100:15,17,24
101:3,5,14
156:7 160:25
209:19
**eventually**
94:24 119:4
**everybody**
216:17
**everyone's**
90:19
**evil** 248:23
**ew** 8:3,4,14,15
9:16,17 10:16
10:16 12:20,21
32:15,17,18
82:22,23 83:1
171:21,24,24
217:8,13,14
342:16,19,20
**exact** 59:19
74:17 104:15
185:24 195:16
201:22 215:14
**exactly** 43:16
46:11 88:10
125:13 126:2
177:7,8 189:25
242:11
**examination**
7:5,6,7 15:14
360:11 362:16

**exchange** 72:3
72:5 111:23
122:10 124:19
125:1,6,11,14
125:16,25
128:2 155:16
259:19
**exchanged**
219:8 259:9
**exchanges**
125:21
**excited** 349:10
**excitement**
194:17
**exclusively**
25:23
**excuse** 217:9
**execute** 84:21
256:14
**executes**
305:15
**exercisable**
123:10
**exercise** 125:17
333:2
**exh** 8:3,5,7,9,11
8:14,16,18,22
8:24 9:4,6,9,12
9:15,18,21,24
10:4,6,8,10,13
10:15,17,19,21
10:23 11:5,7,9
11:11,13,17,19
11:21 12:4,8
12:11,13,15,17

12:19,22,24
13:4,7
**exhibit** 32:13
32:16 48:12,13
48:19 53:17,20
55:23 56:3
60:16 63:16,17
64:6 71:12,14
71:24 72:11
73:4 79:7
82:19,21 83:24
85:9 92:4,7
103:11,14
107:10,16,19
107:19,21
114:24 117:17
117:19 119:15
119:16 122:16
123:17,18
124:9,11
127:25 129:7
129:11 130:8
130:10 131:2
138:4 140:5
163:3,6,8,15
171:20,22
172:20 173:4
178:8,11 179:5
180:10 182:1
184:6,10,19
185:20 186:9
186:11 193:7
193:10 196:16
196:16,17,18
197:1 200:25

202:11,13
204:12 205:13
207:3,6,13
213:24 214:1
215:1 217:6,12
218:4 221:20
221:24 222:4
222:19 224:21
229:2,4,6,12
231:3,5,23
234:16,18
235:10,12
236:16 237:20
246:7,11,14
250:9,11 252:7
252:9 253:13
253:15 254:19
255:21,23
259:24 261:11
261:13 265:24
266:1 267:11
267:25 268:1
270:11,15
274:20 275:7
275:22 279:22
279:25 282:2
292:12 293:4,7
297:4,7 300:10
300:13 333:4,7
334:8,9 342:15
342:17 346:17
346:19 348:3
351:5,8 354:13
354:15 359:18
359:20 360:25

**exhibits**  8:1 9:1
10:1 11:1 12:1
13:1
**exist**  81:11
**existed**  29:25
175:16 259:21
**existing**  44:16
45:3,8,20,24
86:2,18 132:25
147:4,21,23,25
148:3,4,5,24
149:25 150:1,9
150:12 156:25
174:2,4,6
175:5,9 200:3
256:20 258:6
258:13,15,21
326:14
**expect**  51:10
167:2,8 206:9
258:12 302:25
**expectation**
85:11 95:1
167:17 175:7
175:11 304:1,4
319:19,22
**expectations**
167:22
**expected**  75:3
167:4,6,12,14
169:19 233:5
**expecting**
267:2
**expenses**  160:1

**expensive**
353:13
**experience**
98:22 337:2
**explain**  17:21
268:10
**explanation**
17:15 294:17
**exposure**
183:22,25
184:3
**expressed**
310:5
**extend**  324:20
**extensive**
353:11,14
**extinguished**
258:24
**extremely**
77:10 285:20
**eyeballs**  311:8

**f**

**faced**  304:8
**facilities**  17:23
26:13
**fact**  32:8
223:23 239:21
291:5 316:18
357:3
**factor**  93:19
95:14,21 96:4
105:11 290:5
**factored**
105:15 258:16

**factors**  95:17
98:21 233:13
233:17 285:22
331:11,14
**facts**  314:6,9
319:2
**fail**  302:16,19
302:25 303:5
**failed**  308:15
324:12 326:3
**failure**  154:22
156:11 159:2,8
**fair**  28:4 33:6
40:3 43:24
46:13 53:11
61:21 68:17
85:10 114:8
143:3,18
148:23 305:10
**fairly**  142:25
213:3 295:9,10
299:16,20,23
**fairness**  143:11
143:13,16
**faithful**  266:11
**familiar**  17:11
134:19 329:12
**far**  47:8 202:6
216:18 244:25
360:19
**fashion**  114:6
**favourable**
95:25
**featured**  93:24

**features** 81:11
329:13
**feb** 194:21
**february**
209:23 215:4
215:16,17
216:6 218:8
224:16 229:14
231:13 233:13
235:18 236:18
237:24 238:17
**federal** 219:20
220:17
**feedback** 244:5
244:23 291:3
**feel** 107:5 286:1
305:18 363:20
**fees** 16:17
159:21 160:1
327:5
**feet** 244:1
**feldman** 293:21
293:24,25
294:2
**felt** 94:1,10,23
228:23 243:2
297:1 308:25
**fewer** 223:15
**fifth** 175:22
**file** 72:19 152:2
152:18 153:23
159:10 212:13
282:22
**filed** 14:20
19:25 283:4,8

**files** 12:19
46:20 105:18
229:21 230:6
342:18 343:8
**filing** 152:10
316:22 366:17
366:22
**filings** 19:25
**fill** 211:23
**final** 184:17
188:6,12
190:18 213:18
213:20 215:20
226:4,10
228:20 254:7
280:14 296:1
**finance** 181:23
**financial**
167:11 321:21
322:3,7
**financially** 15:8
365:18
**financing** 55:13
56:14 58:19
60:22 61:12,15
61:16,17,20,24
62:1,6 67:3
72:1 74:16
80:8,10 83:21
85:3,6,11
86:17,19,22
121:22 133:19
136:14 137:5
152:20 155:11
164:17 167:5

167:16,19
252:18 258:14
258:19 272:2,3
272:9,9 286:22
298:15 302:21
355:21,24
**financings**
39:16,19,20,22
40:18,20 50:5
52:12 55:12
68:24 76:25
85:25 102:15
102:22 157:24
355:6,8,11,15
**find** 204:24
262:9 312:7
**fine** 15:19
62:21 137:18
225:7 242:17
271:4 294:19
333:12
**finish** 57:7,9
156:14
**finished** 118:2
**firm** 15:4 23:21
24:14 27:18
29:15 38:21
55:16 161:3,24
192:3,23
203:14 215:20
261:20 262:1
281:10
**firms** 309:24
**first** 16:23 21:2
21:21 24:25

29:7 32:23
34:20,22 35:5
39:10,12 41:15
49:2 54:5,6
56:10 64:9
67:10 70:15
73:19 74:13
83:9 84:8,16
85:15 103:24
111:18 113:8
114:16,23
115:2 130:16
138:3 143:21
149:15,21
150:8,11
163:14 166:5
172:2 173:4
182:1 188:24
189:12 200:25
204:12,22
211:15 212:1
212:22 218:6
223:4,7,10,18
224:21 231:12
231:18,19
237:20 238:14
240:13 248:12
248:19 253:20
259:23 261:18
266:6 270:22
271:24 272:4
272:11,14
273:19 276:1
280:6,6 282:21
286:6 291:16

293:20 300:18
311:24 323:21
328:14,20
334:9 342:23
346:24 348:8
351:14 362:18
**five** 51:21
62:22 105:23
152:19 232:19
247:10,11
248:1 333:13
333:14 340:15
**fixed** 37:5 81:6
81:10 90:14
307:4
**flexibility**
288:13
**flip** 48:10
274:19
**floating** 81:11
**flom** 6:5
**floor** 2:5 176:8
**flow** 11:13
150:25 151:2
152:22 167:9
255:24 260:24
261:1,5 262:23
264:10 305:21
305:23
**flows** 306:5
**focus** 22:25
23:2 217:11
**focused** 327:21
**focussed** 23:3
217:16

**focussing**
217:20
**folks** 198:7,10
**followed** 38:14
**followers**
325:11
**following** 33:16
46:9 48:5
168:15,22
169:5 187:10
235:25 280:22
282:20 298:14
301:23 361:22
366:10
**follows** 222:14
**foot** 244:4
**footing** 45:25
**forbid** 136:2
**forced** 46:16
155:3,5,7,16
156:1,6 174:13
174:17,18
**foregoing**
365:6,8 368:5
**foreign** 329:24
**forget** 43:4,16
59:23
**forgot** 27:3
**form** 43:8 60:3
60:20 61:4
88:2 96:19
112:23 122:4
125:18 143:6
158:16 176:17
176:24 179:13

181:2 189:24
190:9 200:15
203:23 204:5
205:5,19,24
206:17,24
208:25 209:11
210:16,22
211:3,19
213:14 216:19
216:25 224:6
224:15 226:2
227:15 233:7
239:10,10,14
239:23 240:11
240:24 241:8
241:24 242:8
248:8 252:17
254:17 255:15
257:6,16,22
263:13 264:1,8
264:15,24
265:8 273:15
276:12,23,25
277:7 278:17
279:1 284:20
285:10 287:8
287:22 289:25
290:24 292:6
295:16,24
296:18 298:11
299:22 305:5
320:10 332:7
332:15 336:13
339:11 344:12
346:10 362:10

366:5,8
**formal** 39:3
**format** 365:12
**forms** 203:7
**formulate**
331:25
**forth** 166:1
185:25 186:4
**forthcoming**
267:7,9
**fortune** 315:2
**forward** 57:1
71:25 93:22
118:22 119:4
120:21 211:17
347:13
**forwarded**
56:19 57:13
61:22 306:12
**forwarding**
56:17,24
**found** 66:1
242:24 243:9
243:17 245:25
**fourth** 36:11
207:13 274:20
**frame** 34:25
39:14
**franchise**
313:11,25
**francisco** 5:8
269:22
**free** 107:5
148:18 153:9
290:3 323:13

**freshfields** 3:5
**freshfields.com**
  3:10,12,14
**friday** 197:4
  273:21
**friend** 42:6
  53:6
**friendliness**
  70:5
**friendly** 42:11
  66:22 67:1
  68:15 69:15,20
  69:23
**front** 32:19
  107:16 117:18
  117:23 171:25
  172:22 221:22
  234:21 235:14
  268:22 270:19
  275:22 279:23
  280:4 293:10
  311:7 355:4
  361:6 366:18
**fruchter** 2:4
**fruitful** 333:1
**fruition** 61:19
  65:11
**ftp** 32:14
  267:14,14
  268:8,14,19
  293:5 333:5
**full** 20:9 47:6,9
  111:18 138:15
  138:18 323:21

**fully** 165:9
**fun** 49:24 50:14
  162:9
**function** 21:8
  23:14
**fund** 1:9 4:18
  14:17,19 21:25
  25:1,2,3,6,8,12
  25:13,20 26:16
  26:20 27:5
  44:2 53:1
  63:10 81:25
  86:8 106:6
  146:2 148:14
  162:17 195:15
  196:2 208:19
  214:21 226:13
  252:2 269:15
  319:7 334:3
  338:3 349:22
  349:24 350:13
  351:20 353:5
  367:1 368:1
**fund's** 101:20
**fundamental**
  285:5,8,11,17
  285:21 322:11
  322:15 323:5
  332:16,21
  352:24 353:9
  353:12
**funded** 84:20
  85:12 164:15
  208:21 357:9
  357:25

**funding** 147:9
  208:5,15
  227:21 251:17
**funds** 3:3 11:13
  24:18,19,21
  25:7,14,19
  27:5,8,10,11,21
  34:22 44:4
  55:17 91:21
  102:12,19
  144:7 148:15
  151:4,7 152:24
  153:1,4,6
  211:9 255:24
  260:24 261:2,5
  262:23 296:21
**funky** 90:4
**further** 7:7
  36:9 51:20
  67:21 73:5
  90:16 238:13
  254:24 348:5
  360:10 362:14
  362:16 365:16
**future** 79:17,19
  95:8 151:16
  152:14,25
  153:13 169:1
  181:24 271:12
  305:14,21,22
  317:15,21
  331:14 332:12
  362:2
**fw** 56:13

**fwd** 120:21

**g**

**gadget** 356:13
**gain** 354:2,5
**gained** 288:5,8
**game** 49:11
  51:23 52:4
  269:23
**garner** 356:8
**general** 23:21
  44:22 65:3
  76:11 127:19
  127:21,22
  187:22 189:20
**generalists**
  23:1
**generally** 19:20
  23:2 35:13
  36:3 40:19
  45:1 46:15,20
  46:23 61:15,16
  65:8 66:10
  67:2 73:21
  75:5 76:4
  77:19 78:14
  79:15 81:3,24
  89:5 90:9
  93:13 96:12
  99:6 109:20
  123:3 125:20
  135:7 142:12
  142:14,22
  143:15 152:22
  152:25 154:15
  154:17 156:4

157:9 158:12
160:25 176:13
192:15,16,19
194:9 206:6
228:2,5 233:24
237:15 258:23
267:5 271:18
278:19 280:20
283:6,9,23
284:11,15
288:12 306:5
307:8 314:11
332:25 339:3
**generate** 94:19
95:4,18 96:1,9
96:17 192:2
311:9
**generated**
35:25 44:15
326:23
**generates**
305:23
**generating**
96:21 97:1,4
97:11,12
150:25 309:16
356:3
**genius** 34:2,7
34:12,22 35:2
35:3,20 37:9
37:11 38:13
40:22 41:3
42:2 44:16,20
44:24 45:7,17
46:4,19 47:1

48:7 50:19
52:12 54:20
59:6 60:10,13
61:5,8 62:1,6
62:11 67:9,16
68:18,22 69:9
72:8 73:6,25
78:5 82:6
88:24 89:21
91:19 92:20
93:15,21 94:3
94:21 95:4,9
95:10 96:10
99:16,19,23
101:16,21,24
102:3 104:18
105:13 109:9
110:5 113:22
113:25 114:3
114:10 116:14
118:20 119:7
120:18 121:10
121:17 126:4
126:16 127:4
129:21 130:1
134:9,13 137:3
145:24 149:8
150:10 151:20
157:3 161:9
167:2,15 171:9
174:19,22
175:10,15
195:11 224:3,5
248:23 255:10
257:15 258:14

258:20,21
259:17 266:11
267:3 284:18
285:11,17
288:18 289:2,8
292:4 296:16
301:11,20
302:7,25 307:7
309:25 310:6
310:11,15
313:2,23 314:3
317:14 320:2
322:7,11 323:5
323:8 328:4,11
328:17,25
331:8,18,20
332:2,16
335:17,21,23
339:9 340:7
341:14 343:14
347:10,21
348:1,18 349:9
350:2,16
352:18 354:6
356:16
**genius's** 35:9
35:10
**gentleman** 43:3
53:2 196:13
**george** 196:7,8
196:13
**getting** 65:21
68:6 110:8
135:3 142:1
150:6 197:24

244:6 254:7
291:2,18 311:7
336:3,6
**girls** 327:22
**give** 17:14 32:4
142:9 219:1
266:17 352:4
**given** 19:14
94:9 124:24
135:22 147:10
174:13 175:11
188:14 197:24
206:18 216:18
243:1,3 250:1
284:13 290:4
296:10,25
307:22 316:1
323:13 329:6
335:12 345:21
352:19 357:20
364:12 368:9
**gives** 153:7
**giving** 317:7
**glad** 62:18
**gladstein** 3:9
269:17,18
270:5 295:24
296:18 299:22
305:5 320:19
332:7 346:10
358:21,24
359:2,7
**glanced** 20:8
**global** 4:17
16:25 28:23

**[globally - going]** <span style="float:right">Page 38</span>

**globally** 321:17
**gnus** 33:14
51:5 54:9
56:14 58:18
60:19 61:1
70:22 73:7
92:21,21
108:18 111:21
114:20 118:7
124:18 131:5
131:11 132:17
138:7 141:14
141:15 163:18
165:16,16
172:4,6 178:19
179:25 182:5,6
187:4 195:1
197:7 203:2
204:19,25
210:3 212:5
215:6 218:18
222:10 231:15
238:18 247:1
252:16 256:8
260:1 261:21
262:10 270:25
271:12 273:25
274:10 276:5
276:11,13
280:9 281:5
282:11 293:22
297:23 300:20
306:18 307:16
311:15 312:4,8
312:13,18,23

314:24 319:8
322:19,24
329:12 330:1
339:17 341:3
343:1,15,21
356:21 362:2
**go** 14:13 17:24
20:16 33:9
36:9 37:20,22
41:5 47:15
48:11 50:25
51:20 58:5,6
62:21 70:14
73:5 75:17
80:11 82:10
84:7 86:6 87:6
91:2 92:2
105:23 106:8
106:24 107:5,8
107:18 110:11
114:16 117:16
119:14 121:25
124:8 129:7
130:7 131:25
132:1,14 138:1
141:11 143:21
144:12 145:14
150:13 151:22
153:17 162:20
166:3,18 174:1
175:21 178:6
178:15 180:14
181:5 188:24
194:18 195:22
200:2 201:10

207:18 209:20
211:17 217:19
217:25 225:25
234:14,23
235:8 236:15
237:4,19
238:13,15,15
244:6,22 245:2
245:5,15
253:11 254:24
255:19 256:4
259:23 260:19
261:8 267:22
269:5 273:18
274:7 275:21
281:2 289:4
292:20,25
298:12 302:10
306:6 314:6
320:22 323:20
327:15 333:17
334:5 342:13
346:15 351:4
354:20 355:1
362:18
**goal** 86:7,25
323:7
**god** 71:2 136:2
**goes** 44:5 47:16
66:18 71:17
75:19 89:25
93:2 111:4
135:14,24
136:13 195:21
206:8 212:23

214:10 260:16
283:16 286:17
308:5,17 309:4
310:18 311:18
311:23 312:16
313:4 314:21
315:8,14 316:9
316:23 318:20
319:6 322:16
323:22 324:10
325:3,25
326:12 329:9
329:19 335:10
336:18 338:5
341:19 352:22
357:7
**going** 14:4 32:4
36:11 38:7
48:11 52:21
53:16 63:3,15
67:21 74:12,14
82:13,19 90:16
93:22 106:16
106:21 108:9
118:13 119:15
127:24 134:25
137:14,15
147:7 159:20
162:12,18
163:2 171:19
178:7 184:4,5
186:8,21
187:24 193:7
199:8,11
202:10 207:2

**[going - hear]**

213:23 214:15 215:7 217:16 229:3 231:2 246:10 252:6 253:8,9,12 255:20 261:10 265:23 267:10 267:24 269:10 270:10 275:9 278:19 279:21 292:11 293:2,3 297:3 300:9 305:16 319:12 319:14 324:1 325:5,21 330:16,21 333:21 342:14 346:16 348:6 349:4,12 354:12 359:17 363:10 364:9,9 364:12

**good** 14:3 15:15 94:16 162:1 244:17 257:21 258:2 266:12 267:2,6 303:13 333:14 360:12,20

**goodale** 6:12 14:25

**gotten** 68:19,22 175:5,9

**governs** 279:9 279:14

**graduated** 20:19

**grain** 165:6 267:7

**grant** 223:4,6

**grasser** 103:4

**great** 269:24 326:14 354:1 360:22

**greater** 147:6 297:1

**green** 316:2

**greenwich** 3:7

**greetings** 113:17

**gross** 312:6 314:25

**grossman** 2:14 59:2,5,9 161:3 161:7,11,23 192:3,23 261:20 263:5 263:20,22,25

**group** 73:14 128:14 201:19 201:21,23 202:6 219:20 220:16 261:21

**growth** 311:10 317:15,15

**guarantees** 315:20

**guess** 30:23 31:8 95:12 113:2,4 121:15

158:17 234:15 279:18 289:5 303:25 304:14 309:14 335:8 347:17

**guessing** 340:2

**guided** 363:19

**gut** 305:18

**guy** 248:22

**guys** 338:21 339:5 352:4

**h**

**h** 367:3

**hackett** 55:3

**hair** 47:12,13

**half** 146:25 162:3,5,7,8 182:12 183:9 183:22,23 231:12 248:14 273:22 327:4

**halfway** 209:22

**hand** 72:14 79:9 108:11 123:24,24 168:8 207:14 224:22

**handed** 30:2,5 30:9,15

**handling** 129:1 343:14

**happen** 160:17 303:7

**happened** 46:22,23 47:1

116:10

**happening** 19:21,23 147:3

**happens** 136:3 138:12

**happy** 144:15 144:22 218:19 294:16

**hard** 95:23 243:11 291:10

**harder** 85:18

**head** 16:10 18:25 74:18 77:18 109:12 111:3 127:13 127:15 209:12 224:13 228:11 358:22

**header** 159:2 159:21 286:4

**heading** 79:11 151:23 355:5 358:20

**headline** 347:17

**healthy** 356:4

**hear** 107:2 204:1 220:4 240:12 242:2 244:16,21,23 291:5,9,11,16 291:19,22 299:8 360:14 360:15

**[heard - hyping]**

**heard** 14:10 97:22,23 320:6 328:25 329:2

**hearing** 242:1 243:24 244:2 244:19 328:21 364:7

**hedge** 335:9 337:17 338:4 338:14 354:5

**hedged** 337:7

**hedging** 341:12 354:1

**heights** 195:7,9 195:13 298:22

**heinz** 103:3

**held** 1:19 149:8 149:12,18 185:10 208:20 298:3,6 331:20

**hello** 113:15

**help** 21:14 84:18 95:9,25 192:2 239:10 290:22 292:3

**helping** 96:9,17 264:4

**helps** 96:14

**hemr** 6:8

**hereof** 278:10 283:14

**hereto** 277:23 278:2 368:8

**hey** 268:13

**heyward** 38:6 49:7 52:8 54:13,18 58:17 66:6,15 74:4,7 74:14 75:2,12 83:6,20 84:4 84:12 86:25 87:14 88:1,14 88:17 89:21,24 115:23,25 116:5,12 117:5 157:2,4 232:22 233:5,18,19 234:1,7 266:9 287:18,21 326:7 356:14

**heyward's** 233:14

**hgc** 349:25 350:1

**hgcinvest.com** 349:16

**hi** 60:18 256:12

**high** 20:1,4,6 20:16 33:4 64:14,18,21 134:5 318:9

**higher** 169:23 170:9,16,18 171:10 284:5 286:2 296:11 305:16

**highly** 80:18

**hired** 157:23 158:1

**hirsch** 58:17 59:15,17 60:1 91:13 102:24 112:19 114:13 140:2 141:6,8

**hirsch's** 140:8 140:13,19

**history** 40:12 308:6 314:13

**hit** 88:4 310:20 311:1 321:1,5 329:15,21

**hitting** 316:5

**hogan** 4:5

**hoganlovells....** 4:9,15

**hold** 29:15 77:1 77:2,2,6 126:4

**holder** 169:24 170:10 332:2

**holders** 51:10 122:2,7,15 147:25 148:24 149:7 174:4

**holding** 45:21 331:8

**holds** 182:12

**holiday** 317:3

**home** 254:11

**homer** 269:22

**honest** 324:21

**honestly** 16:13 126:17

**hope** 303:3

**hopefully** 255:5

**hoping** 255:12 255:14

**host** 100:15 331:11,14

**hostage** 77:3,7

**hosted** 100:18

**hostile** 133:15 134:23

**hostiles** 133:4,5 133:11

**hour** 162:3,5,7 162:8 273:23

**hours** 99:22 189:15,23 190:2 320:15

**house** 6:14

**houston** 4:13

**hudson** 196:14

**huge** 194:25

**humanly** 244:25

**hundred** 31:19 87:2 145:5 165:8 205:15 205:17 340:16

**hype** 301:14 308:7,16 329:13 330:17

**hyped** 301:6,9 304:5,11

**hyping** 301:16 303:23 312:17 319:8 320:24 321:22

hypothesize 179:4

hypothetical 239:25 240:14 240:18 241:13 259:21 289:15 331:23

**i**

icnb 294:20

idea 174:11 196:10 224:18

ideas 227:6,9 342:5,9

identified 183:5 185:19 200:21 247:10

identifies 122:17 123:25

identify 216:15

identity 77:17 216:4

ids 292:18

ignore 304:21

ii 185:12

illiquid 98:18

imagine 52:19 100:20 126:23 156:18,20 316:21 340:2 349:10

imessage 28:13 89:6

immediately 192:14 232:24

impact 46:17 46:24 75:9 77:25 223:9 278:15 292:7

impair 18:8

impaired 46:21 47:4,5

impasse 364:1

implications 234:13

importance 64:14,18,21

important 291:8

impossible 85:18 86:20

impressive 274:21

improve 80:8

incentive 169:24 170:11

include 133:18 154:17 201:23

included 22:3 90:15 156:1,4 156:8 188:12 202:1,4 205:14 205:17 212:21 216:5

including 58:16 204:16 231:14 311:13 315:18 319:13 344:15 345:3

incorporated 137:2

incorrect 316:21 322:5

increase 304:10 304:13 317:20 323:8

increased 153:3 173:12 173:17 304:14 306:2 323:14

increases 326:15

increasing 319:23 320:2

incurred 150:20

independent 94:4

index 8:1 9:1 10:1 11:1 12:1 13:1

indicate 233:9

indicated 189:1

indication 193:18 235:16 322:19 350:24

indifferent 198:2

indirectly 219:23,25 220:6

indiscernible 194:11

individual 24:13 43:4,13 43:16 100:7 122:2,7,11,15 353:21

individually 326:22

individuals 302:1

inducement 121:22 122:10 123:9

industry 23:8 110:23 311:12

inefficient 284:23 285:1

influence 98:21

info 120:23 218:20

inform 205:9

information 39:7 55:14,20 96:13,22 97:5 99:19,23 116:1 116:6 117:13 120:13 121:2,5 122:6 123:14 124:5,7 219:2 219:6,9 221:16 273:3 294:6 310:11,15 312:12 314:12 314:17,19 328:14 345:13

**informing** 29:16 115:25

**infrastructure** 21:12

**inherently** 284:23

**initial** 80:19 169:18,22 170:8,16 259:10

**ink** 72:13

**inline** 87:8

**input** 305:24 322:15

**inputs** 306:1

**insane** 351:2

**insiders** 73:14 73:20,22,25 75:19

**insists** 76:12

**inspector** 356:13

**instance** 65:1 91:25 194:9 221:13

**instances** 46:7 74:4 76:24 77:24 78:8 98:16 109:10 234:11 259:8

**institutional** 146:4 310:3,10

**instruct** 106:17 106:22

**instructing** 220:10

**instruction** 107:4 113:1 244:11

**instructions** 242:16 366:1

**instructs** 17:18

**instruments** 81:10

**int** 145:24

**intellectual** 313:12 314:1

**intend** 284:8

**intent** 57:2

**intention** 331:7 332:4

**intentions** 165:11

**interacted** 60:11

**interest** 23:23 24:3,7 90:19 135:2,15,23 170:18 183:8 296:15 310:5 350:2,16

**interested** 15:8 219:12 346:4 365:18

**interesting** 334:25

**interests** 170:14 226:6 226:13

**internal** 36:1 320:9

**internally** 117:6 318:18

**international** 73:6 92:21 343:14 347:22 356:16

**internet** 14:8

**interrogatories** 19:3

**interrupting** 217:10

**intervenes** 244:8 245:3 269:3 292:15 358:17

**interventions** 244:13

**introduced** 34:18,21 35:6 73:13

**invest** 22:21 25:18 26:16 35:16 54:24 74:1,7,12,14 75:12 80:13 83:21 148:1 149:23 151:16 174:5,17 175:1 228:23,24 246:2 271:10 328:1 361:25

**invested** 35:3,5 35:6 46:8 74:4

80:12 101:24 102:11,18,21 211:12 227:12 328:20 331:25 336:25 350:25

**investigations** 337:12

**investing** 35:10 75:2 80:5 142:10 144:10 233:10 234:7 243:3 346:5

**investment** 16:17,22 22:22 22:23 23:19,22 24:3,12,16 27:7,9,13,15,20 27:24 28:20,21 28:24 29:4,5 29:22 35:1,23 36:23 37:3,24 39:5,9,15 41:16,17 42:2 45:23 46:1,18 46:18 48:7 50:4,17,22,23 51:18 54:19 55:11 58:3 59:6 60:13 77:4,22 78:1,5 78:21 79:4 80:19 88:7,15 89:21 94:8,12 94:14 99:9,16 99:20 101:16

**[investment - involved]**

101:20 105:12
110:1 116:13
127:4 129:21
130:1 139:15
146:1 151:17
151:20 183:19
184:2 200:4
224:9 234:2
251:18 258:7
258:10 267:4,9
272:18 284:13
284:14 288:3
329:22 331:9
331:21 347:9
349:9 350:7,24
351:25 354:24
355:22 356:6
357:12
**investments**
1:8 6:3,15
14:17,19 22:19
25:1,20 40:2,6
44:3 50:7 60:2
60:7 62:10,11
63:9 77:5,20
88:24 91:19
106:6 126:15
128:11 162:17
214:21 219:14
269:15 297:2
308:25 334:2
349:25 350:2
355:11,14
367:1 368:1

**investor**   53:1
66:22 67:1
69:15,19,20,23
70:3,5 73:16
75:21,25 76:6
76:11,13 77:21
78:17,19,22
80:11 82:2
91:4,9 102:16
102:20,22
110:10 133:14
140:12 142:14
142:24 146:3,6
146:19 147:9
153:20 158:22
160:5 171:3,9
171:12 197:21
200:18 201:24
228:17,22
236:9 237:15
237:18 250:22
257:9 279:5
288:18 289:2
290:2 294:10
295:6,14 310:4
310:10 319:11
328:17 336:11
344:14 345:2
347:21 357:22
358:14
**investor's**
160:1 201:24
**investors**   25:18
25:22,24 33:17
36:24 40:21

52:15,17 67:5
68:23 69:19
73:10,12,15
75:18,20 76:19
77:1,9,15,17,17
78:8,12,13,16
79:16 95:14,21
98:24 99:2,4
99:13 100:21
100:24 101:1,2
102:13 109:23
110:6 122:11
122:17,24
123:4 128:11
133:18,21
135:3 142:15
142:17,20
143:5,10 146:1
146:5 149:5
150:4,5 151:19
153:8,10,16
155:15 164:16
164:17 170:14
186:4 199:8,11
199:18 200:9
203:6,16,19
204:4,8 205:10
205:14 208:18
208:24 209:5
210:24 211:21
216:2 217:3
219:13,19,23
220:1,7,15,20
221:16 223:6
223:10,12

224:4 228:21
229:1 230:11
230:14 235:25
236:4,8,12
237:1,8,13
247:22 248:10
258:10 260:18
273:8,10
278:24 281:18
286:20 287:10
287:17 288:4,7
289:7,13,16,20
290:8,17
295:11 296:16
296:20 298:21
299:5,11 300:1
309:20 310:4
336:15 345:22
346:4
**invests**   75:6
127:1 233:23
234:1,11
**invited**   271:12
362:2
**invoice**   260:10
260:12 262:10
263:4
**involve**   125:21
**involved**   50:24
76:25 77:5
97:15 113:6
125:14,17
128:25 129:19
129:24 186:4
195:11 336:2,6

**[involved - jonathan]**                                    Page 44

336:9 351:24
353:17
**involvement**
129:23 134:9
134:13,15
228:25 249:18
250:2
**ipad** 30:21
**iphone** 31:23
31:24
**iphones** 31:22
**iris** 3:23
**iris.xie** 3:24
**iroquois** 3:16
33:18 102:12
102:15 113:3,5
298:22 344:4
344:11,15
345:3,17
**irrespective**
284:7
**issuance** 72:2
72:20,23
**issue** 27:19
82:2 135:8
152:13 241:15
280:21 283:25
284:2
**issued** 155:13
233:6,15
295:23 335:12
347:25
**issuer** 55:19
58:24 73:6,16
75:22 79:18

81:25 91:1
126:25 127:2
145:24
**issuers** 52:18
355:12
**issues** 21:13
222:13,18,20
337:21
**issuing** 82:11
283:13 309:24
**items** 35:18
316:4
**iteration** 31:24
**iterations**
173:1

**j**

**j** 261:25
**jabraham** 2:8
**jaffa** 49:8
58:16 84:13
108:16
**jan** 193:19
**janjigian** 2:17
**january** 9:21
22:11 131:4
132:3,15
134:13 138:5
160:9 163:17
173:3 175:16
178:18 179:24
184:11 187:2
188:17 189:2,9
191:6 197:5
201:5 202:20
205:12 207:21

**jared** 4:23
**jason** 43:16
**jay** 103:6
**jclark** 4:24
**jcohen** 2:20
**jeff** 15:15 62:13
137:14 204:24
214:3 222:12
236:24 243:19
243:25 268:5
291:1,21
320:18 333:10
**jeffrey** 2:7
58:11,21
202:21 204:15
209:24 212:3
222:8 225:1
229:15 231:13
234:25 252:15
270:2
**jennifer** 356:8
**jeremy** 351:14
351:18,19
**jerry** 320:20
**jim** 39:1 92:12
100:11
**joanna** 2:19
**job** 21:2,15,22
46:1 354:1
**joe** 33:12 49:6
51:2 54:7
56:11 57:17
58:17 64:11
70:17 84:13
104:3 108:15

114:18 118:5
120:9,20 131:5
132:15 138:5
141:13 163:16
165:15 178:17
179:24 182:5
187:3 189:9
194:19 197:5
202:21 204:16
209:25 215:15
215:17 218:17
218:25 224:25
229:14 231:14
238:17 249:2,9
293:20
**joined** 22:12
27:23
**joining** 21:19
21:21 27:17
**jon** 58:18
**jonathan** 9:6
42:17 49:7
54:8 56:13
57:18 58:16
64:13 70:18
84:12 104:4
108:17 124:12
124:17 131:5
138:6 141:14
172:3 173:6
177:2 178:18
179:25 182:4
187:1 189:11
197:6 209:24
212:3 219:1

222:9 225:1 229:15 250:19 252:14 253:23 255:1 256:6 259:25 261:20 262:14 270:23 273:24 274:9 276:3 280:7 281:4 282:3,10 297:22 306:15 306:20 307:14 342:24 361:16

**jr** 311:7 314:23

**judge** 363:25

**july** 309:18 316:6 321:4 354:21

**june** 272:6 309:18 347:15 348:4

**junior** 37:25

**k**

**k** 36:12

**kallir** 349:14 349:19 351:1

**karl** 103:3

**kartoon** 5:3 356:15

**kassam** 24:11 26:6 300:20 306:8,17 314:16,18 334:23 339:16 339:25 341:2,8 342:8 347:1

348:4,12,17 353:20

**kassam's** 307:13 347:14

**kathy** 55:3

**keep** 19:22 111:25 116:19 126:24

**keeping** 19:20

**keeps** 126:22

**kelley** 249:17

**kept** 127:3

**kerrry** 163:23 164:2

**kerry** 53:2,4 66:20,21 69:2 69:5,10,13,14 69:18 164:4,7 164:18

**kerry's** 136:2,8 165:3

**kerrys** 69:7,8

**khalouian** 5:17

**kieran** 5:19

**kieran.corcor...** 5:20

**kijik** 261:19

**kill** 180:15

**killing** 180:25

**kindergarten** 93:6,10,15,19 93:24 224:11 309:2,2 311:2 320:25 322:8 322:24 323:24

325:10,21

**kitchen** 67:24

**klein** 2:9 268:9 268:13,18,21 269:1,5 270:12

**knew** 202:7 216:17

**know** 16:7,11 17:20,24 20:17 21:13 24:6 27:19 29:15 34:23 36:21 38:4 42:20,22 42:23,25 43:9 43:10,14 45:10 45:10 48:18 50:3,13 52:3 52:14,24 53:1 54:1,23 56:2 58:21,23,25 59:2,11,20 64:6 66:8 69:7 69:8 71:22 73:20 74:2 75:25 76:20,20 77:1,12 78:7 79:1 82:9 85:22 88:8 89:14,19 91:8 91:21 92:25 95:17,21 96:13 97:24 98:6,8 101:13,24 102:16 103:8,8 104:11,15

107:25 110:20 114:12 115:20 115:21 116:10 116:22,24 117:1,3 118:2 118:23 119:1,9 119:24 121:12 121:16 122:1 122:20 123:9 126:11,17 127:6,12,14 130:10 131:11 132:11 133:9 133:24,25,25 134:8,20 135:6 136:7,10 138:18 143:1 144:10 146:12 146:15 148:15 151:18 152:8 152:11 154:13 154:25 159:15 162:3 163:6 164:2 165:4,10 166:15,17 172:15,17 174:10 175:18 179:2,8,11,20 185:22 186:18 189:18,25 190:24 194:15 195:5,16,24 196:1,8 198:10 201:16,20,22 203:12,16

**[know - leak]**

204:8 205:16 207:17 209:1 213:12,18 215:14,24 216:1,4,11,12 216:20 217:1 220:25 221:6 221:10 222:17 224:2 230:10 230:13 232:15 233:12,17 236:4,7 239:24 240:7,14,19 247:16 248:9 249:15,18 258:20 260:7 261:1 264:3 267:8 268:5 271:21,23 272:19,24 273:4,6 278:15 280:17 281:20 288:4,7 289:13 289:15 291:12 293:24 294:1,9 301:19,25 305:22 306:20 309:12,23 310:3,8 314:14 314:19 318:12 318:13 322:23 330:13 335:17 335:19,22 336:15,23 338:25 339:2,4

339:25 340:23 341:8,13,24 342:8,11 343:4 345:9 348:14 349:12,19 350:1,11,15 351:1 360:18 361:1

**knowing** 165:6 167:11 199:7 199:18 309:21 331:4

**knowledge** 322:6 324:19 328:9

**knowledgeable** 305:2

**known** 110:23 169:14 216:21 317:2

**kurt** 6:8

**kurt.hemr** 6:9

**l**

**l1** 4:17 12:12 12:12 292:13 293:6,8,9,25 294:9 298:22

**labor** 44:6

**lack** 80:21 305:24

**land** 51:10

**lane** 102:7,8 179:6 198:23 199:2

**langer** 58:18

**language** 277:18 279:9 279:14

**large** 98:18 298:21 309:7 329:11

**larger** 61:17,20 86:1,16 97:13 173:20,23

**largest** 321:22

**late** 31:8 37:1

**lately** 326:15

**latest** 253:7

**latham** 3:18

**launch** 41:8 329:13

**launched** 312:4 321:17

**launching** 41:22

**laura** 6:14 127:22 182:5 256:8 259:25 270:24 273:24 274:9 361:17

**law** 25:17 220:17 278:3 278:12

**laws** 219:21

**lawyer** 137:12 192:11 209:7 210:24 240:5 249:17 263:21 278:18

**lawyers** 190:7 190:11,12 209:14 241:21 262:4 263:18

**lead** 73:16 75:21,25 76:6 76:11,13 102:13,17,19 102:23 146:3,5 146:18 153:19 159:25 160:4 201:24,24 228:17,22 236:9 271:13 272:22,24,25 273:5,12,13 297:1 327:3 337:21 358:5,8 358:10,12,14 362:3

**leading** 74:16 127:20

**leads** 306:4

**leak** 11:21 13:7 268:2 276:12 276:17,22 277:7 278:1,5 278:23 279:4,9 281:16 287:2 287:10,17,23 288:5,8,16 290:22 292:3,8 294:18,25 295:6,13,21 299:6,12 300:4

300:7 341:20 359:21
**leakout** 286:4,8 286:19 298:3 298:20
**learn** 101:19
**learned** 29:8 30:1 61:22 75:11
**led** 156:7 192:7 209:19 308:8 357:10 358:1 358:11
**lee** 324:13 325:12
**lee's** 311:2 320:24 324:13 324:14,25 325:1,7 328:5
**left** 21:16,17 59:23 72:14 110:16 123:24 151:23 165:19 166:20 168:8 230:12
**legal** 1:19 6:12 6:13 15:1,1,4 124:19,23 128:2 159:21 160:1,8 203:14 209:4,8 260:10 364:14
**letter** 192:17 315:15

**letterhead** 8:19 76:6 103:15 145:21 166:9
**level** 20:1,5,7 33:5 318:9
**leverage** 47:21 47:25
**levy** 268:18
**lexington** 4:21
**licensed** 313:1 313:1
**licensees** 315:17
**licensing** 313:6 316:11,19 317:6,23 318:23
**lien** 223:4,7,11 223:18
**liens** 223:3
**light** 316:2
**likelihood** 65:10 145:21 153:3 303:6
**likely** 34:19 152:23 167:24 314:25 328:25
**limitation** 72:23 110:24
**limited** 313:8
**limits** 110:24
**linda** 361:19
**lindor** 269:22
**line** 36:11 73:19 81:24

82:6,12 88:5 143:20,21 166:19 187:8 189:12 205:22 232:19 275:19 367:4,7,10,13 367:16,19
**lines** 41:6 47:16 51:21 81:19,23
**lion** 33:19,19
**liquid** 98:17 337:21
**liquidity** 94:21 95:4,10,18 96:1,10,17,21 97:1,4,11,12 98:11,22 259:17 303:16 303:19,21 304:16
**list** 19:11 24:22 55:5,8,10,15 117:2,14 130:15 134:25 221:19 263:16 263:17 345:15
**listed** 72:8 192:25 335:13 335:18,24 336:1,3,6,11 338:14
**listing** 120:17 340:3
**lists** 123:23

**litigation** 89:15 127:8
**little** 17:14 40:18 41:18 68:15 163:4 209:21 243:19 273:22 289:14 290:13 291:18 305:1,13
**live** 188:1 194:10
**llama** 222:23 223:3,3,5,6,11 223:18 310:21 310:21 311:24 311:24 312:3,3 312:14,14,24 312:24,25 313:1,10,11,16 313:19,19,25 313:25
**llama's** 223:11 223:18
**llc** 128:14
**llp** 2:4,14 3:5 3:18 4:5,20 5:5 5:14 6:5
**lmao** 249:5
**lo** 5:9
**loan** 223:14 341:10
**located** 129:4
**lock** 269:23
**locked** 238:25 337:6

**[logbook - management]**

**logbook** 116:19
**logic** 225:6
**logical** 303:4
**lol** 178:24
  351:2
**long** 42:22
  102:9 142:24
  161:20 217:23
  303:13 308:1,2
  308:6 331:8,20
  332:1 337:16
  338:22 339:5
  349:8 350:5
  353:5
**longer** 100:8,8
  173:25
**longs** 353:7
**look** 22:1 35:13
  77:19 159:1
  166:3 172:10
  186:2 200:24
  211:14 218:3
  224:20 280:11
  292:11 355:25
**looked** 21:11
  35:17
**looking** 64:9
  75:6 93:16
  181:17 215:6
**looks** 173:10
  263:4 327:20
**losing** 337:19
**loss** 126:18,20
**lost** 126:15

**lot** 243:20
  301:11 320:19
  327:20 353:17
**lots** 317:4
**lottery** 352:3
**love** 84:19
  111:21 248:22
**lovells** 4:5
**low** 65:10
  66:12,14 338:3
**lower** 138:14
  138:22 159:11
  170:22,25
  231:11
**lp** 1:9 14:17,19
  25:1,2,4 26:16
  27:5,8 63:10
  106:6 146:2
  162:17 214:21
  269:15 334:3
  351:21,22,23
  367:1 368:1
**lp's** 26:21
**lps** 351:19
**luck** 269:24
**lucrative** 67:4
  310:22
**lunch** 137:11
  137:14 162:2
  194:4,7,21
  350:22
**lw.com** 3:22,24

**m**

**ma** 6:7
**mackay** 361:20
**madden** 309:6
**made** 36:25
  38:5 44:23
  46:9,12 50:22
  54:23 58:2
  62:10,10 77:21
  78:12 206:22
  225:22 226:5
  253:5 265:1,6
  265:11 267:3
  294:15,25
  312:6 314:25
  350:7,24
  355:12 366:7
  366:15 368:5
**madison** 4:6
  5:9
**magnitude**
  24:2
**main** 4:11
  224:8
**maintain** 26:2
  126:20
**maintains**
  117:2
**major** 51:10
  97:8 309:24
  311:13,14
  315:3 321:10
**majored** 20:18
  20:22

**majority** 55:9
  100:4 302:20
  303:5
**make** 25:21
  26:12 35:1,15
  37:10,12 39:8
  39:8 44:3,4
  85:18 86:20
  87:18 122:11
  136:1 137:9
  156:22 180:5
  181:4 218:10
  258:10 264:22
  280:13 285:25
  290:3 303:14
  315:2 323:23
  345:21 366:4
**makes** 69:18
  84:1 152:11
  153:15 361:23
**making** 22:21
  22:23 35:23
  39:5 95:22
  96:4 258:16
  282:25 283:1
  283:19 308:24
  311:1 344:10
  344:17 351:24
  366:8
**manage** 24:18
  24:20 27:10
**managed** 21:25
  341:13
**management**
  21:24 23:20,21

23:24 24:7,9 24:16 26:1,4,9 27:5,8 35:14 35:19 73:23

**manager** 22:15 22:17,18 23:14 23:19 24:13 28:21,24 29:4 29:5,22 334:17

**managers** 22:5 27:7,10 28:20 334:22

**manages** 27:5 349:22

**manufacturers** 316:5

**march** 74:11 75:14 119:4 137:3 160:15 161:11,18,24 188:23 190:13 192:7 203:19 204:4 208:11 221:17 224:5 227:13,21 233:6,13,16,20 234:3,8 240:20 242:7,19 243:8 243:16 245:23 246:25 248:16 249:2,10 250:18 251:9 252:17 253:22 256:7 257:15 259:12 262:14

266:8 267:4 271:25 272:3,8 272:9,10,20 275:8 289:8,20 290:9 294:10 295:15,23 296:17 310:4 319:11 328:12 331:25 336:11 339:10

**margin** 337:21 338:3

**mark** 32:12 48:11,12 53:17 63:16 82:19 92:4 103:11 107:19 119:15 124:2 163:2 171:20 178:7 184:6 186:9 193:7 202:11 207:3 213:24 214:25 217:6 218:4 221:20 229:4 234:15 246:11 250:9 252:7 253:13 255:21 261:10 265:24 267:11 267:24 270:11 279:22 292:12 293:4 297:4 300:10 333:4 342:15 346:16 351:5 354:12

359:17

**marked** 107:20 130:8 166:5 214:25 235:9 246:8 334:8 360:25

**market** 22:25 23:7 38:11 70:12 75:4 81:7,19 98:9 98:12,13 153:11 234:5,7 234:10 251:20 259:17 284:7 284:10,18,19 284:22,25 285:4 296:11 302:5 304:20 310:6,9 316:5 324:22 325:22 331:15 332:11 337:8 341:12 343:23 352:25

**marketplace** 94:2 96:23 97:6 98:2 301:12

**markets** 284:23 311:5 353:23

**marks** 63:2,7 269:8 333:20 333:25

**master** 1:8 4:18 14:17,19 25:1 25:2,3,23

26:16,20 27:5 63:9 106:6 146:2 162:17 208:10,17 214:21 269:15 334:2 367:1 368:1

**match** 137:6

**material** 55:14 55:19 116:1,5 117:12 318:18

**materialize** 109:15,19

**materialized** 109:11 323:18

**materials** 108:8

**mathematics** 20:22

**mattel** 315:4,18 315:21 319:14

**matter** 14:18 16:4,5,8,14,23 17:1,5 19:9 29:17 87:25 115:17,20 122:14 129:1 211:11 262:4

**matters** 21:12 51:15

**matthew** 187:3 189:11 197:7

**mature** 150:16 166:23

**maturity** 150:15 166:19

167:5
**max** 111:22
**maxim** 128:4
128:12,13,14
**maximum**
160:3
**mba** 20:25
21:18,18,22
**mccullough**
187:3 189:11
197:7
**mcilree** 39:2
92:12 100:9,11
**meagher** 6:5
**mean** 20:6
23:24 34:21
36:10 56:16,23
57:24 60:9
72:10 76:12,23
77:6 79:22
84:25 86:13
90:7,10,11,13
95:12,20 126:3
127:12 128:16
144:3 157:2,3
158:17 161:2
166:11 167:15
171:5 177:10
179:4 180:8,15
180:19 188:19
194:13 197:14
197:16,19
219:18,24
220:18 221:9
228:19 242:12

270:4 272:9
274:2 278:22
298:6,8 299:4
299:10 301:9
301:14 302:19
303:14,19
306:23 309:15
313:20 325:18
348:17 352:8
355:9 358:9
362:23
**meaning** 153:9
194:16
**means** 47:5
56:25 61:15
65:5 67:3 93:1
135:22 151:7
151:10,14
164:14 166:13
176:12 187:25
249:23 264:3
271:17,18
272:22 278:19
299:15,20,23
301:17 339:1,3
340:3 341:24
**meant** 38:4
47:25 50:13
52:3 61:11
64:18 65:1,13
65:19 66:8,11
67:1 68:4 77:8
85:22 86:15,23
135:20 141:1
144:21 156:18

164:11 179:12
179:17 181:14
181:18 190:24
199:14 223:13
228:22 254:15
272:13 274:6
286:13 309:12
335:6,9 338:11
339:4,25
340:23 343:24
348:22
**measure**
285:23 288:11
305:9
**mechanism**
138:21
**mechanisms**
90:15
**media** 14:15
63:3,8 106:4
162:11,15
214:14,19
269:9,13
301:23 325:8
325:11 333:21
334:1 364:13
**medication**
18:7
**meet** 39:14
100:21 101:6
101:10 102:7
183:21 194:11
308:15
**meeting** 18:17
33:25 34:5

39:17
**meetings** 18:18
**meets** 77:11
**member** 23:20
220:16
**memo** 343:2,7
344:11 345:24
346:2
**memoranda**
36:1
**memorandum**
11:14 255:24
260:24 261:2,6
**memorialized**
36:4
**memorializing**
161:22
**mention** 277:3
321:20
**mentioned**
119:6 152:21
225:17 239:5
299:11 319:22
332:20 337:15
344:11
**mentioning**
313:9,24
**mentions**
118:24
**merchandise**
311:9 312:18
315:2,10,16
316:3 318:11
319:9,25
321:17 329:12

| | | | |
|---|---|---|---|
| **merchandising** 310:23 313:7 | **micro** 23:3,4,6 23:10,10 97:25 98:5 302:20 | **mine** 130:4 318:3 | **modelling** 305:10 |
| **merging** 326:21 | **microphone** 243:12,20 | **mines** 51:11 | **modestly** 311:11 |
| **message** 29:15 273:7 306:13 | 244:5,23,25 290:14 291:2 | **minimum** 139:14 315:20 | **moez** 24:11 26:5 300:20 |
| **messages** 28:18 29:3,20,21,25 30:18 89:15,16 | **microsoft** 284:25 | **minute** 62:22 130:8 269:6 | 306:8,17 307:12 314:16 334:23 339:16 |
| **messaging** 28:8 28:11 | **middle** 178:17 197:3 201:3 236:17 266:7 | **minutes** 105:23 137:10,16 162:3 333:13 333:14 358:25 | 341:2 347:1,14 348:4 353:20 |
| **met** 18:15 33:13 39:12 53:7 59:22 100:9,11 101:8 101:12 102:8 102:24 103:1,3 103:6 134:1 177:24 197:13 197:21 219:7 252:2 294:2 335:20,21 345:10 | **mighty** 328:6 **mil** 317:8 **million** 23:7 41:10,22 98:7 98:12,13 139:9 146:10,13,25 147:1 152:4,19 173:12,17 215:8,18 218:12 250:24 251:2 254:1 258:21 312:6 318:1 329:16 | **mischaracteri...** 279:2 **miscommuni...** 165:11 **misreading** 346:2 **misrepresent...** 308:7,16 **mission** 5:6 **misspelled** 196:7 **misspoke** 268:8 **misstates** 240:24 | **molinsky** 5:12 101:7 **moment** 150:14 227:18 345:7 **monday** 1:14 58:11 194:21 209:23 229:14 **money** 45:3 61:19 84:6 111:20 118:13 126:15 143:25 144:4,10,10 147:4,11 156:23,24 163:24 164:7 |
| **method** 152:23 **methods** 258:24 **metropolitans** 269:21 **michael** 2:9 49:8 58:16 84:13 108:16 249:16 **michelle** 261:19 262:8 | **millionaires** 328:5 **millions** 315:22 **mind** 23:6 62:20 80:2 97:25 98:6,9 99:1,4 112:1 157:19 214:4,5 248:21 294:15 294:24 333:10 | **mistake** 156:17 **mistaken** 316:18 330:6,9 345:24 **mklein** 2:10 **mlo** 5:10 **mock** 141:8 **mocking** 141:6 **model** 305:19 | 164:11 173:20 173:23,25 190:16 191:3 208:20 260:18 278:3 294:20 303:14 337:19 **month** 136:1,11 250:25 326:6 |

**[monthly - negative]** Page 52

**monthly** 326:24

**months** 16:4 110:25 181:10 182:16 183:12 212:15 251:23 337:7 353:25

**moore** 24:14 124:18 128:19 128:23

**moore's** 26:13

**morgan** 134:4 134:5

**morning** 14:3 15:15

**motivate** 94:7

**motivated** 27:20

**motives** 97:16

**move** 55:22 82:17 186:6 241:9 244:19 290:13 354:10

**moved** 160:12

**movement** 94:25

**moves** 81:6

**multiple** 258:23

**multitude** 149:4 169:11

**music** 327:21

**muslim** 25:17

**mutual** 21:25

**n**

**n** 2:1 3:1 4:1 5:1 6:1 7:1

**name** 14:25 16:7 24:14 26:6 27:3 38:25 39:1 43:4,8,9,17 59:14,23 113:8 122:17 134:19 303:11 349:24 366:11

**named** 43:3,13 43:16 53:2 196:13 229:23

**names** 55:10 77:23

**nano** 97:22,25

**nasdaq** 72:6,8 72:22 73:7 75:13 190:17 215:21 232:23 256:13 343:15

**nasdaq's** 233:1

**nathaniel** 261:25

**nathoo** 1:13,19 7:3 9:6 14:17 15:13,15,18 54:8 55:2 56:13 57:17 63:10,13 64:12 70:16 84:10 106:6,10 107:17 108:16

114:19 118:6 120:21 124:11 124:17 131:4 132:16 138:6 141:12 162:8 162:17,22 163:18 172:4 178:19 179:23 182:3 187:4 189:3,10 193:20 194:20 197:4 214:21 214:24 215:5 218:9,18,24 225:1 229:15 238:16 246:19 247:1 251:8 252:16 254:25 256:7 260:1 269:15 270:24 273:20 274:8 276:4 280:8 281:3 282:9 297:20 300:20 334:3,7 353:19 356:9 359:15 362:6 364:12 367:2,24 368:2 368:4,12

**naturally** 214:11

**nature** 18:13 37:2

**near** 356:22

**nearly** 356:21 357:5

**necessarily** 78:9 174:14 313:20 318:3

**necessary** 239:13 368:7

**need** 17:22 34:12 37:13 40:18,19 133:4 137:9 144:13 144:18 187:9 190:16 199:8 217:19 218:20 232:22 237:4 237:17 243:19 244:18 251:1 254:5 260:17 286:22 290:13 366:18

**needed** 21:14 34:15,16,19 37:9,11,19 77:13 85:25 86:16 140:11 147:4,11 208:21 251:22 254:15

**needs** 27:24 61:17,19 108:21 268:15 286:19 339:21 340:5,9

**negative** 46:24 77:25 151:1

152:22 337:23 337:25

**negotiated** 41:18 358:15

**negotiating** 129:20 200:1

**negotiation** 166:2

**negotiations** 192:7

**neither** 365:13

**net** 143:25 144:3,9 173:20 173:23

**netflix** 311:6 312:5

**netted** 256:22 260:20

**netting** 208:4,9 208:10,14,17

**network** 356:15

**never** 33:6 46:22 109:11 136:2 164:20 165:8 240:3,15 240:16 241:13 241:15 259:21 308:8 319:4

**new** 1:2 2:6,6 2:16 3:8,20 4:7 4:22 5:16 14:21 30:24,25 31:4,11 39:14 45:23 48:6

80:20 136:14 137:5 138:22 143:25 144:3,7 144:9,10 150:19 153:10 155:10,12 156:6,23 164:15,17 194:10,10 214:4 258:13 258:19 269:20 284:2 286:9 306:2 335:12 356:14

**news** 266:12,13 267:2,6,8 312:8 347:12 349:9

**newsletter** 354:24 355:2

**nice** 214:12

**nicer** 214:9

**nick** 311:7 314:23

**nickelodeon** 316:1

**nicole** 5:17

**nicole.khalou...** 5:18

**nielsen** 320:5

**night** 32:24 108:8 238:7

**nizer** 4:20

**nominal** 5:3

**non** 25:9 55:14 55:19 81:10 116:1,6 117:12

**nonsense** 311:20

**nope** 270:8

**normal** 29:13

**normally** 201:18

**norman** 261:25

**north** 25:5

**notary** 366:19 368:13,19

**note** 9:12,15 14:6 36:10,17 36:21 37:5,10 41:19 45:2 83:11 135:8,9 136:1,11 138:12 141:15 163:9 165:17 167:16,20 168:13 171:23 172:6,12,16,18 177:25 183:14 183:15,16,23 204:25 205:4 206:1 208:19 212:11 213:2 250:22 251:19 251:24 252:17 257:9,10

**noted** 366:9 368:7

**notes** 12:19 72:21 150:16 151:4,8 153:25 155:17 166:23 167:3,7 168:16 168:21,25 169:4,12,18 233:6,15 296:8 296:10 342:18 343:8

**november** 120:8 121:10 122:2 124:5

**number** 80:5 107:17 121:9 123:25 132:24 134:25 138:25 187:13 219:3 225:5 226:14 227:2 299:15 304:15,23 305:1,3 318:14 335:2 364:13

**ny** 2:16 3:8,20 4:7,22 5:16

**nyse** 72:9

**o**

**o** 3:21 197:12 197:14

**o'clock** 137:16

**oath** 15:7 162:23

**oaths** 365:25

**object** 106:16 106:21 143:2

**[object - okay]** Page 54

176:17 181:2
189:24 190:9
206:17,24
208:25 210:16
213:14 216:19
224:6 226:2
227:15 233:7
239:14,23
240:11,24
241:8,24 242:8
248:8 254:17
257:6 263:13
264:1,15 265:8
276:25 278:17
279:1 284:20
287:8 291:10
291:13 295:16
295:24 296:18
299:22 305:5
332:7 346:10
**objecting**
180:25 181:4
291:4,7
**objection** 60:3
65:16 67:17
68:12,20 69:16
69:24 70:9
74:22 88:2
95:11,19 96:2
96:19 97:2,14
98:14 99:5
101:22 112:23
115:18 116:3
116:15 122:4
122:25 125:18

126:1,9 142:11
143:6 158:16
158:23 169:7
176:24 179:13
179:18 199:4
200:15 203:23
204:5 205:19
209:6 210:21
211:5,19
216:25 220:2,8
241:17 243:18
249:24 257:16
257:22 264:8
264:24 265:18
273:15 277:1
278:25 279:11
279:12 285:2
288:20,21
289:11,23
290:12,24,25
292:5 295:2
303:1 336:13
339:11 344:12
345:25 346:11
348:13,20
349:1,6 358:21
362:10
**objectionable**
242:25 243:9
243:17 245:25
**objections**
244:13
**objective** 306:9
**obligation**
90:12 174:14

226:24 239:8
357:21
**obligations**
188:1 356:23
**obsidian** 215:9
215:14 216:16
217:3 254:6,6
254:16 298:23
**obtain** 187:24
226:24,25
285:14
**obtained** 289:8
**obviously**
336:19
**occasions**
100:13
**occur** 78:2,4
86:17 136:15
199:12 337:22
**occurred** 29:21
111:14 116:17
169:13 240:4
**occurrences**
167:23
**occurring**
50:16 144:6
**occurs** 138:22
**october** 93:21
99:24 104:4
105:9 108:15
115:13
**odd** 28:14
**offer** 199:3
**offered** 299:24
299:25

**offering** 37:15
40:4,10 45:2
50:19 146:9,13
146:20 147:1
173:10,12,16
185:8,9 276:9
346:8
**offerings** 40:4,7
40:10,13 81:20
154:14
**offers** 37:17
**office** 26:9
193:23 270:12
**officer** 23:18
365:5
**offices** 26:2
350:5
**official** 294:1
**oftentimes**
77:14 97:6
258:25
**oh** 65:18
107:17 156:15
232:3 238:14
352:11
**oid** 135:3,6,8
135:22
**ok** 205:23
218:19 238:5
247:5
**okay** 15:20
17:25 21:22
22:6 35:8
50:25 54:4
55:21 62:22

73:5 76:7
80:23 90:16
92:2 97:21
105:22 108:3
115:1 117:15
118:23 124:8
127:24 130:7
132:8 137:12
137:17,19
162:1,4 178:5
185:2 194:18
207:16 214:6
232:12 235:8
242:15,15
244:7 246:9
267:20 268:8
268:12 277:14
279:20 293:2
334:7 346:15
359:1,7 360:14
360:22 361:5,8
361:12 363:24
364:4,10
**old** 66:1 111:21
163:23 164:7
164:11,16
174:4
**older** 86:17
327:22
**ollwerther**
58:18
**once** 48:17
103:1 206:11
238:5 319:8
364:9

**onerous** 77:10
**ones** 22:2
109:12 161:13
**ongoing** 99:21
310:20
**ontario** 27:25
28:25 365:3,25
**open** 112:1
310:6 342:5
**operate** 156:24
**operating**
167:9
**operations**
128:25
**opinion** 45:20
45:22 70:4
75:8 124:19,24
128:2 150:5
224:15 284:22
285:10 305:7
318:2 325:23
327:13
**opportunities**
4:18 25:3
**opportunity**
55:25 80:20
107:24 130:9
163:6 184:2
186:17 232:14
269:25
**opposed** 188:11
188:16
**opposing** 99:8
**option** 112:11
149:16,21

150:9 259:2
295:18
**optionality**
153:8,15 156:5
174:15 225:20
338:15,16
**options** 149:4,7
149:11 335:14
335:18,24
336:1,3,6,12
337:17 338:1
338:13 339:22
340:4,6,9
354:9
**order** 37:10
251:21
**orderin** 193:21
**ordinary** 87:20
87:24
**oriented**
327:21
**original** 132:12
132:13 135:8
166:13,14
274:24 366:21
**originated**
176:19 179:20
**outcome** 15:9
365:19
**outlook** 75:8
331:14
**outside** 23:22
32:10 60:12
310:4 340:19

**outsized** 356:5
**outstanding**
72:3 81:13
120:17 121:9
144:9 168:14
168:22,25
169:5,15
**overall** 126:15
356:4
**overly** 301:17
301:20,25
**overseas** 25:25
**oversee** 23:21
**owe** 256:23
**owed** 258:22
**owes** 150:10
**own** 30:20 39:8
94:9 99:7,9,10
157:11 270:8
285:4 290:3
311:3 312:19
312:23 313:11
313:25 322:18
325:23 327:13
**owned** 24:13
31:21 224:3
289:2 313:2
**owner** 26:14
**owners** 26:8
122:12

| p |
|---|
| **p** 2:1,1 3:1,1
4:1,1 5:1,1 6:1
6:1 348:8
353:14 |

**[p&l - paragraph]**                                                    Page 56

**p&l** 126:22,25
  127:3
**p's** 348:7
**p.m** 268:19
**p.m.** 49:7 58:12
  70:17 84:12
  106:3,7 120:21
  131:4 132:3,16
  137:21,22,23
  137:25 138:6
  141:13 162:12
  162:13,14,19
  182:4 189:10
  191:6 201:5
  202:20 214:16
  214:17,18,22
  215:5,16,17
  218:9,17 245:9
  245:11,12,14
  249:3,10 251:9
  256:7 260:2
  269:10,11,12
  269:16 273:22
  274:9 276:3
  281:4 282:4,10
  292:22,25
  333:22,23,24
  334:4 339:16
  340:18 341:2
  359:9,10,11,13
  362:21 364:11
  364:16
**packaged**
  326:4

**page** 8:2,18,24
  9:3 10:3,13
  11:4 12:3,5
  13:3 33:10
  41:6 48:10
  49:2,5 50:25
  51:21 54:5
  56:10,18 58:6
  58:7 60:16,16
  64:10,11 70:15
  70:15 72:11,15
  73:6 75:17
  79:7 80:24
  83:3 84:8,9
  87:6 90:17
  92:3,12 103:14
  103:25 104:23
  104:25 105:4,4
  105:5 108:10
  111:16,18
  114:17,18,22
  114:23 115:3
  117:16,19
  119:14 120:8
  120:19 123:17
  129:6 131:2
  132:1,14 138:3
  141:11 145:23
  150:14,14
  151:22 154:19
  154:20,21,22
  155:3 156:12
  159:2,20
  163:14 165:14
  166:4,5 168:4

  168:5 172:2,20
  173:4 175:22
  175:22 178:15
  178:17 179:23
  182:1,3 183:1
  183:6 184:18
  185:20 186:22
  186:25 188:24
  189:2 194:19
  197:1,3 200:25
  201:4 202:19
  204:12,13
  207:13,18,19
  207:20 209:20
  209:22 211:15
  212:1 214:1
  215:3 218:6
  222:4,8 224:21
  224:24 229:12
  229:13 231:12
  231:18,19,21
  232:9 235:12
  235:12,15,16
  236:16,17
  237:20 238:14
  238:16 246:22
  248:12,14,19
  250:16 253:21
  254:24 256:4,5
  259:23 261:4
  261:18 263:1
  266:6,7 270:17
  270:22 271:8,9
  273:19,24
  274:7,20

  275:10,14
  276:1,2 277:10
  277:16,17
  280:7 281:2
  282:5,6,8
  293:20 297:16
  297:20 300:18
  306:7 323:21
  334:9 342:23
  343:7,18
  346:25 348:5
  349:13 351:14
  353:18 354:20
  355:2 360:1,7
  361:9,22,23
  362:18 367:4,7
  367:10,13,16
  367:19
**pages** 7:4
  254:21 274:15
  298:2,9,13
**paid** 148:17
  175:9 198:2
  258:12 262:20
  262:23,24
  329:24
**pan** 331:5
**paper** 136:3
**par** 47:6,9,12
  135:10,11
**paragraph**
  41:7 49:23
  83:10 84:3,16
  87:6 110:14
  111:18 112:10

**[paragraph - percent]** Page 57

144:24 153:18
177:8,12 181:8
190:15 204:22
206:19 238:21
247:14 254:4
255:3 277:16
277:17 303:9
303:10 314:21
320:22 323:20
323:21 325:24
327:15 330:14
335:10 338:17
343:17 356:1
**parallel** 25:7
**parens** 83:13
**parkwood**
350:13,15
**parkwoodcap...**
350:9
**part** 19:16
29:13 36:7
52:16 57:1
67:11 76:21
77:5,21 99:9
130:16 174:23
188:6,12
207:14 228:3
234:5 240:13
259:7 260:15
264:10 337:22
**participant**
285:4 325:22
**participants**
1:20 14:9
225:24 226:1

234:10 299:19
304:20
**participate**
39:15 40:7,21
44:19 76:22
79:17 80:9,20
140:12 143:19
147:5 148:20
151:13 154:13
175:4,8 199:9
226:6,13
229:20 230:6
233:20 253:9
286:21
**participated**
79:24 134:10
144:23 148:20
188:14 216:13
217:2 228:12
337:4
**participating**
80:3 143:8
201:17 211:18
310:8
**participation**
79:12,14,15
110:4,6,7
139:1,5,13
142:1,9,13,21
144:14,19,23
272:1
**particular**
22:25 23:2
45:12 74:3
80:16 88:16

130:24 194:16
221:7,12 333:1
356:5
**parties** 14:13
223:18 278:2,8
278:23 365:14
365:17
**partner** 24:11
32:7 93:17
307:12 321:6
321:14 327:25
334:23 354:21
**partners**
104:16
**partnership**
321:12
**party** 15:7 16:5
17:3 165:12
223:4 239:16
241:2,19
277:19,23
278:2,8 279:6
288:2
**passing** 251:24
**past** 76:25
78:20 79:24
219:8 308:15
345:11
**patch** 294:16
**patrol** 310:24
**paw** 310:24
**pay** 36:16 44:6
44:15 45:3,7
45:16 143:18
147:4 156:24

159:25 258:20
260:5 262:16
328:2
**paying** 44:24
135:12 256:24
322:19,24
**payment**
275:18
**payments**
37:10,12
**payroll** 46:9,13
**penny** 33:22
**people** 24:6
58:15 87:16
91:4 93:16
96:4 98:2 99:8
114:20 118:7
148:20 150:5
181:9 194:4,7
201:22 202:2,5
202:24 204:16
207:25 209:25
212:4 216:5
231:14 301:24
323:9
**peppa** 310:24
**perceive** 234:7
285:7
**percent** 24:5
26:23,24 27:1
27:2 31:19
40:9,13 47:13
72:2 87:3
145:5 165:8
205:15,18

**[percent - please]**

340:16
**percentage**
26:20 79:19
226:20 281:19
**percentages**
281:18,21
**perception**
234:4
**perfect** 62:24
**perform** 257:5
285:25
**performed**
175:19 278:6
**performing**
45:22
**period** 45:13
46:11 74:10,11
85:24 88:19
93:23 99:25
264:20 280:20
284:2 310:7
328:19
**periods** 82:4
**permission**
152:12,13
**person** 59:23
87:18 88:10
102:25 103:4,7
249:21 294:3
303:4
**personal** 28:22
30:13,17 42:6
55:17
**personally** 44:4
69:25 135:25

351:21,23
**personnel**
28:18
**perspective**
28:2 122:13
228:21
**pertained**
257:9
**pertaining**
29:17
**pertains** 82:8
**peskoff** 351:14
351:18,19
353:19
**peter** 6:12
14:25
**ph** 43:5
**phillips** 4:20
187:3 197:5
199:1 201:4
202:21 204:15
**phillipsnizer....**
4:24
**phone** 30:10,24
116:2,22,24
117:1,2 132:20
**phrase** 61:11
**piece** 313:1
**pig** 310:25
**pinged** 210:7
210:14
**pinpointing**
333:1
**pipe** 41:10,14
41:16,23 43:20

74:1,2,8 75:3,6
75:12,13 83:21
85:5,11 111:23
119:3 137:2
160:15 161:24
190:13 203:19
204:4 208:11
221:17 224:5
227:13,21
233:6,16,20
234:3,8 242:7
243:8 267:4
272:9 289:9
294:10 295:15
295:23 296:17
310:5 328:12
331:25 336:11
339:10
**pitch** 310:19
**pl** 126:25
**place** 14:13
41:23 45:23
137:3 143:2
161:15,18
212:22 341:11
**placed** 240:15
**placement**
157:24,25
201:25 202:8
211:21 261:4
281:22 287:16
288:1
**places** 196:4
**plain** 90:1,7,9

**plaintiff** 1:6 2:2
14:18 15:16
17:16
**plaintiffs** 19:2
19:5
**plan** 45:7 49:12
51:23 52:4,7
73:25 289:13
289:13 330:19
**planned** 60:2
85:6 151:13
**planning** 75:12
83:20
**plans** 61:23
151:16,19
332:1
**platform** 1:20
**play** 45:14
204:9
**playbook**
330:17
**playoff** 270:4
**playoffs** 269:24
**plays** 178:23
**pleasant** 363:6
**pleasantries**
113:20
**please** 14:6
15:10 17:20,24
21:21 48:17
53:25 55:4
56:1 57:8 58:8
60:22 64:6
105:24 108:1
111:17 114:17

**[please - present]** Page 59

118:2 119:25 130:10 141:12 151:22 163:7 163:20 171:19 177:13,14 186:17 200:25 204:24 207:1,3 213:22 232:15 238:14 245:6 245:17 246:11 246:21 255:21 256:14 262:9 267:11 274:16 279:22 297:4 300:10 333:4 351:5

**pm** 51:2 83:6 235:19 248:16 250:18 253:22 334:12

**pms** 22:1,4 215:13

**point** 62:14,17 85:15 86:6 87:5,7,7 89:25 126:5 136:13 191:21,24 206:10 208:6 209:22 216:13 222:21,22 232:14,17 237:3 282:21 283:10 286:6 286:17 296:2 299:4,10,12,15

308:23 320:4 336:1 338:2

**points** 85:14 140:1 247:10 247:12

**policy** 29:14 220:21,23,25 221:6

**political** 134:6

**pomper's** 219:2 219:5

**portfolio** 22:3,5 22:15,17,18 23:14,22 334:17,22 337:22 355:19

**portion** 63:24 64:1 208:19 251:18

**posed** 240:16 241:13,15 247:12

**position** 101:20 258:15 288:13 288:14 307:22 308:2 335:9 337:6,8 354:8

**positive** 75:9 94:12,13,23,25 95:3 142:13,15 150:25 233:25 234:2,4,8,12 258:10 323:15 323:16

**possessed** 127:10

**possession** 89:17 221:17 236:11

**possible** 67:8 67:15 70:8 112:7,9 126:10 158:13 171:13 244:25

**possibly** 194:12 214:12

**post** 22:23 180:23 228:4 271:24

**posting** 301:24

**potential** 22:20 48:6 109:10,14 109:21 136:25 165:12 167:23 171:15 199:22 200:7,13,18 203:18 204:4 219:14 306:3 321:5 322:14 357:13,18

**potentially** 27:16 42:1 44:19 52:11 67:4 93:17 121:21 140:12 170:17 290:4

**practical** 154:5

**pre** 82:1 343:23

**precarious** 80:7

**precise** 34:23 62:12 257:18

**precisely** 101:25 219:16 284:21

**predict** 169:1

**pref** 112:12

**prefer** 15:17 76:20 77:4 174:16 283:6 284:15

**preference** 38:8 212:12,18,20 283:9 288:15 296:21,23

**preferred** 174:15 296:3 296:12,20

**prefers** 225:18

**preparation** 18:10,14 19:16 33:2 293:15,17 300:25

**prepared** 58:4 76:8 145:22 148:11 155:22 261:1 281:20

**preparing** 235:5

**present** 6:11 100:24 101:1 293:16

**presentation** 319:11
**presented** 226:5,11 227:17 246:5 295:18
**preserve** 29:12 29:16
**preserved** 30:1
**press** 96:25 97:3,7,17 302:3 304:15 304:19,23 305:3 313:9,23 314:2 347:25 348:2
**pressure** 180:22 181:22
**presume** 190:2 237:17
**pretend** 99:12
**pretty** 34:17 47:17 208:6 350:19,20
**prevent** 82:12 100:16
**prevented** 153:12 295:21
**previous** 272:18,20
**previously** 19:14 44:16 205:11 239:6 246:1 271:20 332:20 337:1

357:8,24
**price** 33:22 37:6 81:5,7,11 82:10,13 90:2 90:14 93:1 138:22,23,23 138:24 144:25 145:3,8,10 148:6 159:12 159:15 168:16 169:18,23 170:8,15,17,18 170:22 171:1 171:10,16 176:2,8,14 177:5 180:4,8 180:11 181:5 181:21 232:21 232:24 284:5 284:12,15,16 289:4 290:22 292:3 296:11 296:12 301:13 302:5,7 304:4 304:13 331:15 332:11 337:7 340:7 346:14
**prices** 111:2
**pricing** 90:15 177:24
**primary** 307:13
**prime** 128:10 128:16 311:6 321:13 337:18

**primes** 128:1,8 128:9,13
**principal** 196:2 227:22 240:9 240:22
**principals** 90:18
**print** 33:2 271:4
**prior** 21:19,20 27:17 29:21 37:15 41:2 46:18,18 144:8 144:8 155:3 160:21 161:13 161:18 169:25 170:11 185:20 209:20 212:11 216:8 232:24 259:4 272:18 316:24 333:5
**priority** 223:7 223:11,18 335:2
**private** 41:16 337:5
**privileged** 193:1,3 263:16 363:21
**pro** 271:11,17 271:18 272:1 272:18 275:3,6 275:8 362:1
**probability** 66:12,14

**probably** 31:5 31:12 65:23 66:21 69:14 218:10 221:5 303:12 329:7
**problem** 243:24 288:17
**problematic** 289:5,7
**procedure** 117:10,14
**proceed** 15:12 36:13 109:22 109:24 110:3 217:24
**proceeded** 324:12
**proceeding** 332:10
**proceeds** 147:15 164:15 182:13 183:9 183:17 297:2
**process** 17:12 17:15 95:22 96:4 97:10 99:10 127:11 127:20 142:25 161:21 200:3
**produce** 321:9 322:17
**produced** 36:7 89:15,18 127:7 127:11,15 192:25 312:4

**[product - public]** Page 61

**product** 21:25
**production**
93:5,10 127:17
263:12,15
326:2
**products** 94:17
306:2 315:19
317:4,16
319:12 323:11
329:14
**profit** 314:25
**profitability**
94:23 95:3,9
284:14
**profitable**
309:7
**profits** 94:19
306:5 309:16
311:10 312:7
**progress**
332:10
**prohibited**
81:17 283:12
**prohibiting**
171:12
**prohibition**
80:24
**promising**
315:9
**promote** 325:6
**promptly**
159:10 191:13
366:22
**pronounce**
43:17 195:24

**pronouncing**
92:13
**prop** 290:22
292:3
**properties** 94:1
311:14 324:20
324:24 329:1
**property**
311:25 313:12
314:1,23
321:10 325:22
**proposal** 44:13
44:14 45:7,13
52:10 58:2
183:24 184:1
**proposals**
35:24 44:18,23
45:5 54:23,25
78:12 187:15
**proposed** 33:15
54:19 59:6
60:6 62:1
66:16 68:17
86:19 88:15
108:25 109:11
109:20 119:7
131:10 133:19
140:3,9 150:20
160:9 166:6
173:16 183:4
199:3 210:19
259:14 338:21
**proposing** 42:2
45:2,16 67:7
67:13 76:5

78:9 110:1
146:17 252:1
**propper** 53:4
69:5 164:5
**propper's**
164:23
**prospect** 95:8
**prospective**
116:13 305:21
**prospects**
38:11 80:7
233:24 301:18
301:20 317:20
**protect** 357:19
**protected** 67:4
183:20 357:18
357:22
**protecting**
357:13
**protects** 139:3
**provide** 39:7
40:19 76:15,17
151:19 170:17
173:20 187:25
227:25 230:8
239:19 274:16
302:21 307:4
**provided** 19:12
33:1 62:6
71:13,15
152:15 205:24
224:3 228:23
240:8,20 241:6
243:4 246:3
253:7 273:3

366:14
**provides**
225:19 353:22
**providing**
61:23 96:22
116:5 259:5
**province** 365:3
365:25
**provision** 73:1
79:20 80:1,3
80:23 148:9
154:11,18
155:3,6,8
171:12 176:1
176:15,16,19
176:22,22,23
177:6,22 183:5
183:19 185:3,6
185:19 205:25
206:5,6 259:4
278:16 283:22
**provisions**
177:1 242:23
243:5,14
245:21 295:21
**proxy** 71:25
72:19 138:14
159:10 187:15
**pt** 92:22,25
**public** 41:17
55:14,19 111:1
116:1,6 117:12
337:5 356:15
366:19 368:19

**puke** 67:23 68:4

**pulled** 316:21

**pump** 348:6,18 348:24 349:5

**purchase** 38:8 60:20 61:2 93:21 233:5,15 242:21,24 243:2,7,16 245:24 283:24 318:10

**purchased** 50:6 289:7 296:16 328:11

**purchaser** 275:11

**purchasers** 339:9

**purchasing** 135:9 224:5 310:5

**puri** 353:20

**purim** 254:8

**purports** 140:18

**purpose** 42:13 42:16 79:25 152:17 154:11

**purposes** 123:8 219:20 220:16

**pursuant** 232:25

**pursue** 65:10

**pushing** 244:24

**put** 40:22 41:3 45:23 48:9 55:21 64:20 67:24 71:25 76:6 84:5 92:3 97:5 99:1,3 102:3 117:15 119:13 121:24 143:24 178:5 213:2 257:14 269:25 304:19 304:21 313:8 326:5

**putting** 97:16 157:10 313:23

## q

**q1** 318:22,25

**q3** 315:19

**q4** 317:1

**quality** 14:7,8

**quantify** 318:15

**quantity** 122:14 123:3

**quarter** 317:7 356:6

**question** 17:19 17:21 24:24 56:23 57:9 67:11 95:7 96:16 97:19 112:25 116:4 116:11 124:2 126:3 169:10

170:5,7 177:13 177:19 200:17 220:12 238:23 239:3 240:15 241:11 242:12 242:17 244:15 245:17,18,20 254:22 265:3 265:13 279:19 287:6 288:10 291:5,10,14 339:13 363:13 363:14 364:6

**questions** 17:17 106:25 137:11 225:3 282:15 360:10,13 361:13 362:15 363:11

**quick** 83:11

**quickly** 112:14 269:20 332:5

**quite** 35:4 177:17 323:15 345:20 350:4

**quote** 138:23 314:20

## r

**r** 2:1 3:1 4:1,23 5:1 6:1 367:3,3

**rainbow** 224:9 309:1 310:21 314:22 315:17 316:2,25 317:24 319:10

327:20

**raise** 37:12,19 45:3 147:4,11 151:7 152:24 153:1,4,6 156:23 173:25 255:15

**raised** 185:8 222:13,17,20

**raising** 40:18 149:13 296:6 319:7

**rangers** 224:9 309:1 310:21 314:22 315:17 316:3,25 317:24 319:10 327:20

**ranges** 215:19 216:18

**rata** 271:11,17 271:18 272:1 272:18 275:3,6 275:8 362:1

**ratchet** 138:15 138:18

**ratchets** 138:24

**rate** 80:24 81:2 81:3 135:23 317:6

**rather** 80:10 81:6 156:5 163:15 174:17 183:2 197:2 208:20 212:14

**[rather - recall]**                                                    Page 63

| | | | |
|---|---|---|---|
| 247:23 283:8 | 346:2 365:12 | 366:6,10 367:6 | 74:6,9,17,24 |
| **rating** 317:19 | **ready** 84:5 | 367:9,12,15,18 | 75:11,15 77:20 |
| **ratio** 271:19,21 | 201:10 254:21 | 367:21 | 78:7,11 83:23 |
| **rational** 296:24 | **real** 25:8 98:8 | **reasonable** | 85:8,24 88:8 |
| **rd** 276:5,7,13 | 309:9,12 | 154:2 | 88:13,16,18 |
| 280:10 281:5 | **realistic** 189:13 | **reasonably** | 90:24 91:10,14 |
| 282:11 297:23 | 318:8 319:23 | 258:12 | 91:15,16,20,24 |
| **rds** 255:5 | 331:3 | **reasons** 45:15 | 93:9,11,13,14 |
| **reach** 45:11 | **reality** 329:20 | 80:4 109:18 | 93:18,23 96:11 |
| **reached** 39:16 | **realize** 156:15 | 185:22 258:11 | 99:22 100:25 |
| 42:1 364:1 | 183:17 254:10 | **recall** 16:9,13 | 101:2 102:2,5 |
| **reaching** 44:18 | 353:24 | 16:14,18,22 | 103:22 104:1 |
| **reacted** 227:18 | **realized** 303:6 | 17:1,5 18:22 | 104:21 105:8 |
| **reaction** 266:24 | 356:4 | 18:24 29:7 | 105:10,14 |
| 339:15 | **really** 98:19,24 | 30:4,6,8,24 | 108:6 109:3,5 |
| **read** 20:9 33:4 | 244:20 285:21 | 31:3,9,10,16,20 | 109:12,14,16 |
| 177:7,12,16 | 304:22 305:12 | 33:25 34:5,6,8 | 109:18,25 |
| 180:10 186:17 | 353:21,24,25 | 34:10,12 35:8 | 110:3 111:3,11 |
| 232:17 243:23 | **realtime** 365:10 | 35:12,17,22 | 111:13,14 |
| 244:14 245:17 | **reason** 17:22 | 37:2,8,11,14,17 | 112:4,6 114:4 |
| 346:3 356:1 | 17:23 18:1 | 37:18 38:25 | 114:7 115:14 |
| 366:3,4 368:5 | 34:10 57:12 | 41:21 42:3 | 115:16,19 |
| **reading** 57:4 | 65:12,19 80:15 | 44:17,20,22 | 116:9,16 120:5 |
| 68:7 69:18 | 82:5,14 131:21 | 45:1,4,7,12,15 | 121:1,3,4 |
| 85:9 90:25 | 141:20 143:14 | 46:3,6,11 48:3 | 122:5,6 123:13 |
| 120:16 135:21 | 146:24 156:1 | 48:8 49:14,18 | 124:4,6 125:7 |
| 140:5,10 145:7 | 165:1 168:20 | 49:20 50:2,11 | 125:10,19,23 |
| 164:13 175:4 | 169:4 173:7 | 50:15,18,21,23 | 128:22,24 |
| 178:3 179:4 | 184:25 219:10 | 51:14,17 52:6 | 130:18,23 |
| 205:13 222:19 | 230:7,19 234:6 | 52:12 54:18,22 | 133:14,16,17 |
| 233:8 248:4 | 257:18 263:10 | 57:4,6,12,25 | 133:20,23 |
| 273:1 274:5 | 273:14 283:3 | 59:4 61:3,4,6,7 | 137:1,5 140:4 |
| 275:7 299:14 | 285:5,8 319:5 | 61:9,25 62:4,5 | 141:10,18,19 |
| 299:14 328:15 | 322:4 324:5,7 | 62:9,12 68:6 | 142:5,6 144:5 |
| 328:22 338:12 | 324:7 330:8 | 71:8 73:3,24 | 144:20 145:20 |

**[recall - reda]**                                                         Page 64

146:24 148:9
150:22,24
154:12 155:20
155:23,25
156:3 159:17
159:19 160:10
160:13,18
161:10,14,17
161:19,25
164:6,9 165:23
165:25 166:1
169:21 171:11
171:17 172:23
172:25 173:15
173:18,22
180:20 181:14
181:16 184:22
184:24 185:24
186:3 187:18
187:20,23
188:3,7,8
189:6 191:12
191:17 193:16
194:8 198:12
206:21 209:18
222:25 223:1,8
223:24 224:13
225:12,15
226:19,22,23
227:9,24 228:7
228:10,13
230:1,3 235:2
237:7,10,11
241:18 248:3
252:25 253:2

254:18 257:17
259:7 261:7
262:5,20,22
263:7,9 265:11
266:21,23,24
272:6 273:1
274:4 277:9
282:1,25 283:1
283:3,19,20
286:13,15
287:22 294:24
295:5,8,17,25
297:14 299:3
300:8 301:2,3
307:6 310:2,13
310:17 312:15
314:2 320:6
322:9 328:13
328:18,21,24
329:6 336:4,5
336:8 341:18
344:10,17,21
346:12 361:12
362:24 363:5
**recap**  138:13
154:22,25
155:2,12,14,17
155:21 156:12
159:2,7,8
**receive**  78:14
117:12 230:17
264:6 342:12
347:12 366:23
**received**  68:7
130:19 206:11

230:14 237:8
259:19 298:19
314:5 342:9
344:3
**receives**  244:11
**receiving**  49:18
104:2 109:3
124:4,6 143:11
191:13 252:25
266:21 362:19
**recessed**  63:5
106:2 137:22
162:13 214:17
245:11 269:11
333:23 359:10
**recipients**
92:19
**reckler**  3:21
339:11 344:12
**recognize**
59:14
**recollection**
52:9 74:10
115:12 118:19
125:5 144:6
147:2 148:12
171:14 275:3,6
**recommending**
22:2
**record**  14:4,14
17:24 25:15
48:14 57:10
62:22 63:3,10
63:24 72:10
105:24,25

106:7 137:11
137:20,25
162:12,18
203:22 214:15
214:22 217:19
227:3 242:16
244:1,10 245:6
245:7,8,10,14
269:5,10,16,19
270:1,10
292:17,19,20
292:21,23,25
293:3 333:16
333:18,21
334:4 356:2
359:1,8,13
364:10,16
**recorded**  14:11
14:16 63:8
106:5 162:16
214:20 269:14
334:1
**recording**  14:7
14:12
**records**  126:12
**red**  173:11
**reda**  33:12 34:1
34:4 36:21
38:4 41:22,25
42:6,13,23
44:18 45:1,9
45:16,19 46:5
47:25 49:6,14
50:13 51:2,14
51:19 52:3,10

**[reda - refresh]**                                                    Page 65

52:16 54:7
56:11,16,23
57:12,17 58:17
61:22 64:11,20
64:24 65:13
66:8 67:1,2
68:4 69:13
70:17 84:13
104:3,9 108:15
108:20 114:18
118:5,24 119:2
119:7,10 120:9
120:20 121:2
131:5 132:15
133:9 135:14
138:5 140:7,15
140:18 141:1,8
141:13 163:16
164:11,22
165:2,11,15
178:18 179:2
179:11,25
182:5 187:4
189:9 190:1,24
194:19 195:20
197:5 198:16
199:1,20,23
200:11 202:21
204:16 209:25
215:15,17
218:17,25
224:25 229:14
231:14 238:17
249:2,9 293:20
294:14 361:19

**reda's** 191:2,14
**redeem** 181:10
296:10
**redeemed**
296:7
**redemption**
176:2 177:6
180:5,9,12
197:11,25
**redline** 9:12
66:19 163:9
173:11 174:2
212:10
**redline.docx**
165:17
**redlines** 247:18
**reduce** 183:21
184:3
**reduced** 365:11
**reduces** 150:9
150:11
**reducing** 149:8
149:11,17
183:25 184:1
**refer** 15:17
44:2 66:5
111:9 182:20
194:3 198:20
198:23 203:18
204:3 212:25
275:18 276:7
281:15 340:6
343:24
**reference** 52:20
64:18 73:19

83:5 132:2
149:7 158:9
196:6 215:4
218:8 261:25
286:8 302:2,4
**referenced**
51:15 96:9
108:25 273:20
**references**
70:21 132:9
**referred** 69:2
171:15 173:3
205:10 271:22
275:3
**referring** 24:19
25:16 36:22
38:16,18 39:19
71:7 72:6
73:21,22 85:3
85:5 90:22
91:1,25 103:24
112:19,22
118:24 119:2,3
119:5,10
126:11 128:7
131:16 133:10
136:7,10 145:4
172:16,18
179:3,9 180:11
195:6,9,14
198:11 206:16
208:10 216:12
236:5 255:10
260:7,9,12
280:25 302:7

324:25 339:8
341:9,10
352:18,20
**refers** 41:14,19
43:23 71:23,25
73:20 76:1
81:4 92:25
97:24 110:21
110:22 128:10
128:14 135:6
138:19,20
145:23 155:1,2
164:2,4 195:5
196:8,10
201:16 203:12
203:16 215:24
275:8 280:18
280:23 303:21
336:23 350:12
**refinance** 34:16
148:25
**refinancing**
86:1,4
**reflect** 206:2
233:4 242:6
257:13 264:23
265:6
**reflected** 183:4
213:19 318:17
320:8
**reflection**
239:21
**refresh** 115:11
118:18 125:4
275:2,5

**[refuse - repeat]**                                      Page 66

| | | | |
|---|---|---|---|
| **refuse** 77:12 | 152:10,19 | 332:12 | 296:20 312:25 |
| **reg** 182:14,19 | 153:18,23 | **relay** 28:23 | 345:6,7 |
| 182:21 225:7 | 154:1,3,18 | **relayed** 113:25 | **remotely** 1:21 |
| 225:16 226:8 | 182:22 183:10 | **relaying** 140:8 | 14:24 |
| 226:11 | 185:13 212:13 | **release** 97:7 | **remove** 55:4 |
| **regarding** 34:2 | 212:21 213:21 | 298:13 347:25 | 144:15 225:23 |
| 34:7 112:5 | 225:13,18 | 348:3 | **repaid** 86:18 |
| 124:25 164:7 | 229:21 230:7,8 | **released** 185:11 | 144:11 147:7 |
| 187:19 188:9 | 251:23 282:23 | **releases** 96:25 | 148:3 149:25 |
| 230:2 288:3 | 283:4,8,15 | 97:4,17 302:3 | 150:6 164:14 |
| **regardless** | 344:6,19 | 304:15,20,24 | 167:18 175:5 |
| 286:20 | 345:19 | 305:3 313:9,23 | 183:14,23 |
| **register** 153:24 | **regret** 300:6 | 314:3 | 223:16 256:21 |
| 154:16 | **regular** 28:5 | **relentlessly** | 258:6,18 259:1 |
| **registered** | **regulatory** | 312:17 | 294:18 295:14 |
| 27:25 28:25 | 27:16,19 97:7 | **relevant** 322:10 | 297:2 |
| 108:18 114:20 | 337:11 | 323:4 | **repay** 45:23 |
| 118:7 121:13 | **rejected** 54:14 | **reliable** 314:12 | 90:12 144:8 |
| 121:17,21 | 54:25 | 314:17 | 148:15 150:4 |
| 123:10 124:1,1 | **rejecting** 54:19 | **relies** 82:9 | 150:19 151:4,7 |
| 124:1 152:13 | **related** 15:7 | **rely** 212:14 | 153:4 167:3,6 |
| 153:1,6,9,15 | 16:23 29:12 | 241:21 | 167:9,15 |
| 154:15 183:16 | 91:18 160:2 | **remain** 81:12 | 169:12 223:14 |
| 255:13 272:12 | 198:13 257:10 | 332:1 | **repaying** |
| 272:15,24 | 365:14,16 | **remaining** | 148:13 152:24 |
| 276:8,8 283:7 | **relating** 19:9 | 251:17 | 295:22 |
| 283:7 288:15 | 108:25 129:20 | **remarking** | **repayment** |
| 289:10,22 | 294:25 | 350:6,23 | 132:25 147:16 |
| 290:11 | **relationship** | **remedy** 278:3 | 147:20,23 |
| **registering** | 24:15,17 42:16 | 278:11 | 174:1 258:25 |
| 182:23 | 104:15 195:17 | **remember** 19:1 | **repeat** 67:10 |
| **registrable** | 307:10,11,13 | 35:4 37:1,4,13 | 114:1 170:1,4 |
| 185:14 | 321:11 | 44:11,12,14 | 242:3 243:11 |
| **registration** | **relative** 295:10 | 45:19 77:23 | 299:8 |
| 151:24 152:3,9 | 299:18 304:8 | 93:24 296:2,9 | |

**[rephrase - return]**

**rephrase** 17:20
**reply** 88:4
**report** 96:8,12
  104:25 105:6
  105:10,11,15
  117:6 307:21
  334:19,21,22
**reported**
  318:22
**reporter** 1:25
  15:3,10 48:12
  53:17 63:16
  82:19 103:11
  170:3,5 171:20
  178:7 184:6
  186:9 202:11
  207:3 213:23
  214:25 217:6
  218:4 229:4
  234:15 243:23
  244:8,11 245:3
  245:15,16,18
  246:10 250:9
  252:7 253:13
  255:21 261:10
  265:23 267:11
  269:3 270:11
  279:21 292:12
  292:15 293:4
  297:4 300:10
  333:4 342:15
  351:5 354:12
  358:17 359:17
  360:14,17,19
  365:1

**reporting**
  117:10
**reports** 39:7
  95:25 96:12,16
  96:17,21,22
  309:25
**represent**
  17:16 188:23
  191:23 192:21
  260:15
**represented**
  191:20 250:4,6
**representing**
  15:1 192:8
  260:10 262:7
  264:18
**request** 157:17
  158:5 340:3
**requested**
  120:23 127:10
  156:19 157:5
  157:13,15
  247:6 283:22
  287:17 365:13
**requesting**
  121:1,4 152:12
  152:17 153:2
  158:6
**require** 366:22
**required** 17:17
  28:22 29:1,6
  117:5 177:25
  368:13
**requirement**
  97:7 213:21

**requirements**
  252:2
**requires** 72:4
**resale** 283:4
**research** 94:5
  96:20,21 323:1
**reset** 136:18
**resetting**
  138:21
**residents** 25:9
  25:10
**respect** 28:6
  29:2 59:6
  61:23 101:20
  105:13 114:10
  121:9 129:25
  140:2 160:9,14
  161:8,24
  174:19 190:13
  225:13,16
  241:22 309:25
  322:8 347:10
**respond** 106:25
  239:25 240:14
**responded**
  251:7
**responding**
  87:17 254:22
**response** 19:3
  107:6 127:19
  166:15 221:7
  221:12 222:12
**responsibilities**
  22:16

**responsibility**
  130:3
**responsible**
  22:19
**rest** 27:2
  206:19
**restricted** 55:4
  55:8,10,15
  117:14 337:16
  337:20
**restricts** 25:19
**restructuring**
  136:4
**resulted** 72:1
**resumed** 63:6
  106:3 137:23
  162:14 214:18
  245:12 269:12
  333:24 359:11
**retail** 309:20
**retain** 192:17
  192:19
**retained** 59:5,8
  105:17 125:24
  160:8,14,23
  161:12 188:22
  192:3,13 257:7
  364:13
**retainers** 161:5
**retaining**
  161:10,23
**retention** 161:1
  161:14 192:17
**return** 356:5
  366:21

**[returned - rise]**                                    Page 68

**returned**  52:8
  182:13
**returns**  356:4
**revenue**  94:19
  95:9 316:11
  317:15,18,20
  317:23 326:23
  330:2
**revenues**  94:24
  95:3 306:2,4
  316:19 323:19
**reverb**  243:21
  291:18
**reverberating**
  244:2
**review**  19:2,5,8
  19:13,18 20:10
  20:12 33:3
  39:6 45:14
  48:16 53:24
  56:1 61:1 64:5
  66:19 96:12
  107:25 118:1
  119:23 127:16
  130:10 163:6
  163:20 193:2,4
  201:13 232:14
  235:4 254:8
  257:8 261:5
  264:4 307:5,7
**reviewed**  18:15
  18:19,23 20:2
  30:3 48:24
  54:3 56:8 58:1
  64:8 71:24

83:24 99:18
  108:3 118:4
  120:2 130:13
  152:15 163:12
  186:20 205:5
  211:7 226:3
  237:17 253:4
  253:10 254:19
  294:12
**reviewing**
  19:24 22:20,21
  61:4,7 71:12
  98:25 99:23
  105:8 169:20
  264:3 282:2
**reviews**  48:22
  54:2 56:6 64:7
  96:16 108:2
  118:3 120:1
  130:12 177:15
  186:19 232:16
**revised**  203:3
  204:19 206:2
  210:4 212:5,9
  222:10 231:16
  238:18 247:1
**reward**  304:7
  304:10,13
  305:10
**ria**  28:21
**rich**  113:3
**richard**  5:12
  101:6,10,12
  113:5 198:20
  345:9

**richie**  112:13
  112:21 198:16
  198:20 199:21
  200:6,12,22
**rid**  171:8
**ride**  148:18
**right**  20:14
  24:25 28:4
  32:2,12 33:9
  34:20 36:9
  43:2 48:9 49:1
  49:22 53:15
  56:22 63:13
  64:9 65:21
  67:12 70:14
  72:17 75:7
  79:9,11,14,15
  79:16 82:17
  84:7 87:18
  91:15 103:10
  104:22 107:1
  107:15 108:11
  110:11 114:16
  119:13 121:24
  123:16,24
  129:6 130:14
  131:1 137:8
  138:3,25 139:4
  139:13 141:11
  142:1,9,13,21
  144:13,18,23
  145:14 152:12
  154:19 159:1
  162:7,22 163:1
  166:18 171:18

173:9 181:25
  184:4 186:6
  195:20 196:15
  202:9 206:12
  207:14 214:24
  217:5 218:2
  224:22 232:18
  237:19 239:12
  239:20,22
  240:2,8,21
  242:15 250:23
  251:2 252:5
  253:11 255:19
  261:8 267:10
  270:21 275:9
  275:21 285:7
  286:3,10
  292:10 306:6
  312:2 320:7
  333:3 342:13
  343:6 354:10
  358:19 359:4
  359:15 360:9
  362:17 366:4
**rights**  224:10
  224:11 225:7
  225:13,16,18
  226:9,11
  312:19,23
**ring**  134:17
**ripp**  342:25
  343:4,13
**ripp's**  345:23
**rise**  284:16
  337:18

**[risen - says]**

**risen** 354:7
**risk** 23:20 46:4
   147:13 148:16
   148:21,22
   150:4,7 183:18
   184:2 251:17
   252:4 290:5,19
   304:7,8 335:9
   336:19 337:15
**road** 51:11
   61:18
**rob** 60:18
**robert** 33:13
   58:12,25 59:1
   59:11 133:24
   187:2 188:18
   188:22 189:10
   191:7 197:6
   202:19 204:14
   205:12 207:21
   209:23 212:3
   222:8 224:25
   229:13 235:19
   236:19 237:25
   246:24 248:17
   248:20 249:9
   259:24 276:4
   280:9 297:22
**role** 59:3,13,19
   294:1
**roll** 156:6
   163:24 164:7
   164:11 294:19
**rolled** 315:3
   319:15

**rolling** 266:14
   310:22
**rollout** 312:18
   315:10
**rose** 337:7
**roth** 262:1
   351:22
**roughly** 27:1
**round** 271:11
   272:18 362:1
**route** 338:7
**royalties**
   318:23 328:2
   329:24
**rpr** 1:25 365:23
**ruary** 194:21
**rule** 19:6
   110:17,21
   111:22 251:25
**rules** 72:3,5
   233:1 366:22
**run** 53:2
   269:22 303:12
   317:6,18
   336:19
**running** 338:3
**runs** 293:25
   350:13
**runway** 147:10
   150:19,22
   173:21,25
**ryan** 102:7
   178:23 179:3,6
   179:8 198:17
   198:23,23

   199:21 200:6
   200:12,22
   213:4,9,11,13
   268:18

**s**

**s** 2:1,7 3:1 4:1
   5:1 6:1 367:3
**sadly** 54:13
**safe** 254:11
**sale** 39:23,24
   39:25 319:25
   341:11
**sales** 309:19
   311:9
**salesman** 65:1
   165:5
**salt** 165:6
   267:8
**salvatori** 6:14
   127:23 129:15
   182:5 231:15
   256:8 259:25
   270:25 273:24
   274:10 361:17
**sam** 195:1,5,6,9
   195:11
**san** 5:8
**santedicola**
   1:25 15:4
   365:5,23
**sat** 244:1
**saturday**
   108:15 238:16
   281:4 282:10

**save** 118:13
**saw** 32:23
   108:7 130:19
   238:6 266:16
   293:14 300:25
**saying** 58:4
   177:9 189:11
   200:17 286:7
   321:9 345:6,7
   362:8
**says** 33:10
   36:10,11 37:21
   41:7 44:1
   49:23 51:22
   60:17 65:8,22
   67:22 69:13
   71:1 72:13,17
   73:6,9,12
   76:10 81:8
   84:4 85:16
   87:7 110:14
   111:18 112:10
   115:5 118:11
   120:22 123:20
   123:25 124:22
   127:25 132:19
   132:24 133:3
   133:10 135:1,2
   136:8,11
   138:10 139:23
   141:24 143:22
   144:24 147:20
   147:24 149:22
   150:15 152:1
   153:18 155:8

159:5,24
163:19 164:11
166:19,22
168:12 174:3
176:2 177:17
178:21 179:3
185:6 187:8
190:15 197:10
203:5 204:23
205:22 208:2
210:6 212:8
222:11,22
226:14 232:20
235:17,23
236:17,23
237:23 238:22
247:4,15
248:15 249:11
250:17 251:11
252:20 253:21
256:11,19
260:8 262:15
266:7 271:4,9
274:13,24
276:16 277:22
282:13,18
283:11 297:25
303:10 306:7
306:12 307:15
313:23 317:25
320:23 324:6
330:15 334:10
338:18 340:5
354:21 355:5
357:23 358:11

**scam** 309:6
**scenario** 317:5
317:23 318:2,3
318:5
**schechter** 9:7
42:18,20 49:8
54:9 56:13
57:18 58:17
64:13 70:18
84:13 104:5
108:17 124:12
124:17 131:5
138:7 141:14
172:3,9,15
173:7 177:2
178:18 179:25
182:5 187:1
188:18 189:11
197:6 209:24
212:3 213:12
219:1 222:9
225:2 229:16
250:19 252:15
253:23 254:15
254:20 255:1
256:6 259:25
261:20 262:15
270:23 273:7
273:10,24
274:9 276:3,16
277:3 280:8,23
281:5 282:3,11
297:22 342:25
361:17,23
362:7,20 363:3

**schechter's**
275:4
**schole** 2:14
**school** 20:16
**schulte** 203:6
203:12,14
256:25 257:4,7
260:13,14
262:1,6,6
**schulte's** 205:5
**schultz** 58:11
58:21 61:11
202:21 204:15
209:24 212:4
222:9 225:1
229:15 231:13
234:25 252:15
**schwarzeneg...**
93:25 321:1
325:7 347:16
347:19 356:8
**sciaretta** 3:13
**science** 20:23
305:13,19
**screen** 14:11
268:10
**screwed** 181:11
**scroby** 43:5,7
**sean** 349:13,19
**season** 312:7,9
312:14 316:2
317:1,3
**seasons** 312:5
**sec** 152:11,15
182:22 289:10

289:22 290:11
**second** 49:23
54:4 58:7
60:16 64:11
80:15 83:3
104:24 107:18
110:12,13
120:7,14,15
121:25 123:17
143:20 149:19
151:23 153:18
154:21 178:15
186:22 197:1
205:22 229:12
231:20 235:11
236:16 238:15
238:21 248:14
250:24 252:3
255:3 256:4
271:9 277:17
297:16 317:1
333:18 343:17
356:1 360:24
**secondary**
143:16
**secret** 328:4
**section** 180:12
**sectors** 23:2
**secure** 224:8
**secured** 252:17
354:9 357:10
357:20 358:1
358:12
**securities** 22:23
26:17,21 27:25

**[securities - see]**                                            Page 71

| | | | |
|---|---|---|---|
| 28:25 35:2,4 | 47:18,22 49:12 | 133:1,7 135:4 | 201:14 202:16 |
| 35:10 38:14 | 49:25 51:2,6 | 135:17 136:5 | 202:18,22,25 |
| 44:19 54:20 | 51:12,22 52:1 | 136:20 138:8 | 203:3,10 204:1 |
| 55:18 60:20 | 52:22 54:9,11 | 138:16,25 | 204:17,20,22 |
| 61:2 74:5 | 54:16 55:6 | 139:1,6,16,24 | 205:2,7 206:3 |
| 80:16,25 81:2 | 56:14 57:18,21 | 140:23 141:16 | 206:13 207:22 |
| 81:4 88:24 | 58:10,19 60:24 | 142:3 144:1,16 | 207:24 208:7 |
| 93:21 99:16 | 64:4,15 66:3 | 145:1,17 146:7 | 210:1,4,8 |
| 101:17,21 | 66:23 68:1 | 146:10,22 | 212:6,16 213:6 |
| 102:12,19 | 70:19,21,23 | 147:18,21 | 215:10,22 |
| 104:19 105:13 | 71:4,20 72:15 | 148:7 151:24 | 218:14,21,23 |
| 116:14 126:16 | 72:24 73:7,10 | 152:6 154:8,23 | 219:3,11 |
| 134:11 152:14 | 73:17 75:23 | 155:4,5,18 | 222:15 224:23 |
| 153:1,6,8,15 | 79:9,13 80:25 | 159:13,21 | 225:3,10 |
| 155:13,15,17 | 81:14,21 83:2 | 160:6 162:8 | 226:17 227:7 |
| 182:24 185:15 | 83:7,15 84:14 | 163:14,25 | 229:16,24 |
| 195:11 219:21 | 84:22 85:20 | 165:21 166:7 | 231:16,20 |
| 220:17 242:20 | 86:11 87:11 | 166:19,25 | 232:8 233:2 |
| 242:24 243:2,7 | 90:5,20 91:6 | 168:7,9,18 | 235:21 236:2 |
| 243:16 245:24 | 92:11,15,23 | 172:4,7,13 | 236:21 237:5 |
| 280:21 283:7 | 93:2,7 103:18 | 173:9,13 174:8 | 237:22 238:2,8 |
| 283:24,25 | 104:6 107:23 | 175:24 176:1,2 | 238:19,21 |
| 284:3 289:9 | 108:18,22 | 176:9 178:16 | 239:1 247:2,7 |
| 328:11 339:9 | 110:18 111:7 | 178:25 180:1,6 | 247:14,19,24 |
| 344:24 350:3 | 112:2,16 | 180:17 181:12 | 248:14,18,24 |
| 350:17 | 114:21 115:2,9 | 182:7,17 183:3 | 249:1,6,8,13 |
| **security**  60:9 | 118:8,16 | 184:8 185:2,4 | 250:20 251:5,7 |
| 60:21 61:7 | 119:22 120:7 | 185:16,18 | 251:11,13 |
| 81:4 138:21 | 120:10,24 | 187:5,7,11,16 | 252:18,22,23 |
| 154:14 224:3 | 123:19 124:2 | 189:4,16 | 254:12 255:1,7 |
| 256:25 257:4,9 | 124:14,19 | 190:20,22 | 256:9,11,17,19 |
| 332:2 337:17 | 125:2 128:2,5 | 191:10 193:9 | 257:2 260:2,17 |
| **see**  33:23 36:14 | 128:20 131:6,8 | 194:1,21 195:3 | 260:18,21,24 |
| 36:19 38:2 | 131:13 132:6 | 197:8 198:4,8 | 261:22,24 |
| 41:11 43:21 | 132:17,22 | 198:18 201:2,6 | 262:1,11,13,18 |

**[see - senior]**                                                                Page 72

| | | | |
|---|---|---|---|
| 263:3,5 266:19 | 332:25 334:10 | 33:7 71:14 | 171:4,9 183:16 |
| 271:1,3,6,14 | 334:14 335:3 | 98:16 102:10 | 225:20 251:20 |
| 274:11,17,25 | 335:15 336:21 | 103:20,22 | 251:24 259:18 |
| 275:16 276:5 | 336:21 338:8 | 108:4 113:10 | 281:10 284:5,8 |
| 276:14 277:20 | 338:23 339:17 | 120:3 130:14 | 288:18 289:3,9 |
| 277:22 278:13 | 339:23 340:21 | 130:22 134:7 | 289:17,21 |
| 278:14 280:12 | 341:6,22 342:6 | 145:18 184:14 | 290:3,3,9,17 |
| 280:15 281:5 | 343:2,8,10,13 | 193:14 228:6 | 319:9 326:24 |
| 281:12 282:7 | 343:16,17 | 230:4 233:24 | 344:5,19,24 |
| 282:11,13,16 | 344:1,8,23 | 234:25 293:12 | 345:18 |
| 283:10,17 | 345:4 346:22 | 297:12 300:23 | **selling** 229:23 |
| 286:4,11,24 | 347:2,3,23 | 320:4 | 281:8,14 289:4 |
| 293:19,22 | 348:9 349:14 | **seg** 38:22 39:5 | 290:4 312:1 |
| 294:13,22 | 349:17 350:8,9 | 39:11,12 40:11 | 337:6 |
| 297:19,23 | 351:11,13,15 | 40:14 43:1,11 | **send** 29:14 |
| 298:4,17,24 | 352:6,15 353:1 | 50:5,10,23 | 38:10 56:20 |
| 300:21 301:7 | 354:3,22 355:6 | 67:7,14,18 | 66:20 75:3 |
| 302:14,17 | 356:10,18,25 | 69:22 70:1,7 | 141:21 190:1 |
| 303:17 304:20 | 357:15 358:3 | 70:11 76:8 | 192:22 201:12 |
| 306:10,13,18 | 359:3,24 360:3 | 89:1,8,12 | 238:6 247:18 |
| 307:18 308:3 | 361:10 362:4 | 100:14,18 | 247:21,22 |
| 308:10,20 | 362:21 | 101:14 104:16 | 273:14 |
| 309:10 311:16 | **seeing** 120:5 | 113:25 114:3 | **sending** 90:24 |
| 311:21 312:10 | 172:23 263:7 | 157:16,18,18 | 140:19 141:18 |
| 312:20 313:13 | 303:5 349:9 | 157:21,23 | 141:19 142:6 |
| 315:6,12,23 | **seek** 278:9,12 | 194:4,7 217:2 | 180:20 192:20 |
| 316:7,12 317:9 | **seeks** 219:25 | 305:2,7 344:14 | 198:12 283:20 |
| 319:17 320:1 | 220:6,14,19 | 344:17,22 | 286:15 298:9 |
| 321:2,18,24 | **seem** 307:23 | 345:1 | 301:2,3 362:25 |
| 322:21 324:3 | 325:8 326:22 | **segment** 22:25 | 363:2,5 |
| 324:15 325:14 | 330:16 | **selection** | **sends** 339:16 |
| 326:10,18 | **seems** 327:3 | 329:11 | **senior** 296:8,10 |
| 327:1,6,23 | 329:20 334:25 | **selkin** 43:13 | 357:10,20 |
| 328:7 329:17 | **seen** 14:10 19:1 | **sell** 38:17 39:4 | 358:1,12 |
| 330:3,21,23 | 20:4 32:21 | 39:6 94:17 | |

**sense** 180:5
**sent** 29:3 32:14
  32:24,25 49:6
  55:16 56:12
  57:1 58:11
  64:11 70:16
  84:11 104:4
  105:20 108:8
  124:17 131:4
  132:2,12,15
  138:5 163:17
  165:15 172:3
  173:8 177:1
  178:18 179:23
  182:4 187:1
  188:18 189:9
  191:16 194:19
  197:4 201:4
  202:20 203:7
  204:14 205:11
  207:21 209:23
  211:8 215:4
  218:24 229:14
  238:16 246:25
  249:2,10 251:8
  252:15,21
  254:25 256:6
  260:1 263:10
  263:11,14
  267:14 268:6
  268:11,16,18
  268:19 270:23
  273:7,21,23
  281:3 282:2,9
  283:2 293:5

297:21 300:20
  301:1 304:16
  333:5 342:25
  347:14,15
  363:4
**sentence**
  232:19 240:13
  271:22 308:14
  313:17 319:3
  324:6 330:7
**sentences** 20:9
  20:12
**sep** 83:5
**separate** 18:18
  27:20 28:3
  346:3,4
**september** 1:14
  1:21 14:5 54:7
  54:21 56:12
  57:14 58:12
  59:7,9,12 61:2
  61:5,8 62:7
  64:12 67:9
  68:19 84:11
  87:1 88:14
  91:18
**sequence** 75:16
  156:7 160:25
**series** 85:14
  118:6 209:18
  231:14 272:5
  325:6
**services** 28:9
  28:11 59:5

**session** 269:20
**set** 27:17,22
  28:3 39:17
  159:16,18
  189:13,22
  192:6 197:20
  227:5 265:10
  355:14
**setting** 129:24
**settled** 146:12
  146:16
**seven** 24:21
  35:7 324:13,25
**seventh** 2:5
**several** 12:8
  52:11 54:23
  87:16 109:8,9
  173:1 204:16
  280:1 348:7
**shake** 163:3
**shannon** 3:13
**shannon.scia...**
  3:14
**share** 37:6
  145:11 346:9
**shared** 87:1
  296:15
**shareholder**
  71:19,22 72:4
  72:14,20
  136:18 159:11
  182:15 183:11
  185:12 226:25
  227:3 229:23
  239:8 251:3,22

315:15
**shareholders**
  72:1 187:24
**shares** 33:20
  72:3,21 125:24
  126:4 128:3
  153:24 154:1
  182:23 183:15
  183:18 251:20
  271:5 275:19
  288:15 289:21
  290:10 298:16
  335:12
**sharia** 25:12,13
  25:16,17,19
**shaye** 58:17
  59:14,17 60:1
  91:13 102:24
  111:6,9 112:12
  112:18,19
  118:12 140:2,8
  140:13 254:8
**shaye's** 139:24
**sheet** 9:9,13,15
  9:18,21 10:10
  35:15,20 52:18
  65:25 66:15
  67:7,8,13,15,19
  68:10,18,18,22
  70:22 71:7
  79:7,8 81:8
  129:12 130:20
  130:23 131:6
  131:10,17,20
  131:22 132:9

**[sheet - situation]**                                    Page 74

132:17 138:7
140:3,9 141:14
145:6 146:14
148:10 149:4
150:21 155:22
156:2,8 160:10
163:9,18
165:16,17,24
166:6 168:6,21
171:23 172:7
172:24 173:2
175:4,8,13,22
176:23 178:12
178:24 179:12
179:17,20
180:12 183:1
184:10,17
187:5 192:14
197:7 207:7
212:10,22,25
358:16 366:7
366:10,11,16
366:21
**sheet.docx**
141:15
**sheets** 66:1
76:5,15,16
79:21 154:18
**shelf** 33:20
110:23,25
152:3,9,10,14
152:18 344:6
344:19 345:19
**shelf's** 110:16
110:20

**shex** 51:9
108:21 124:23
132:20 213:4
247:21
**shitty** 352:13
352:17
**shoes** 309:6
**short** 43:8
137:9 171:4
303:13 307:17
307:25 333:11
333:12 341:11
352:24 353:5
354:8
**shorthand**
365:10
**shorting**
171:12
**shortly** 283:25
**shorts** 353:4,6
353:8
**shot** 64:13,23
65:4,9,14
70:18 309:2
318:13 319:23
327:12 331:3,6
**show** 18:25
200:17 215:8
218:19 233:23
**showing** 190:2
200:10 216:2
274:6
**shown** 216:17
**shows** 75:7
281:10 321:15

**sic** 132:3
292:12,14
**sick** 248:21
**side** 25:10,11
25:13,14 38:17
39:4,6 48:10
55:22 72:14
79:9 123:24,25
127:20 129:2
168:8 178:6
224:22 320:18
337:20
**sign** 233:25
243:1 286:23
287:10,17
294:18 295:6
300:3 347:17
366:11,13,17
**signal** 28:14
29:2,3,21
38:10 75:3
89:11,14,20,24
**signatory**
275:11
**signature** 12:5
184:20 185:1
254:20 261:3
270:16 274:14
274:22,22
275:10,12
298:1,9 360:4
360:7 365:21
366:20
**signed** 160:11
215:21 227:22

237:2 298:20
358:15
**significant** 93:4
303:6 308:8
323:19 341:17
347:20 349:8
**signing** 184:22
184:24 192:14
228:4 232:24
237:16 287:5
295:13 300:6
365:13 366:15
**similar** 50:5
143:1 181:20
271:19 299:25
**simple** 353:16
**single** 38:10
127:15 289:2
303:11
**sink** 67:24
**sir** 242:12
291:13
**sit** 26:19 49:20
157:7 228:14
**site** 268:19
**sitting** 121:7,11
126:3 127:23
142:7 146:15
323:12 330:1
346:1
**situation**
167:12 221:7
222:24,25
223:24 227:17
239:9 289:15

**[situation - specific]**                                    Page 75

289:16 317:13
342:10
**situations**
219:16
**six** 24:21
183:11 251:23
337:6
**size** 146:9,13
147:6,14
173:10,16
218:12
**sizes** 82:3
**skadden** 6:5
**skadden.com**
6:9
**sketch** 20:15
**skip** 171:19
207:18 231:1
**skus** 321:16
**sky** 357:12
**slate** 6:5
**slightly** 327:22
**small** 97:11
98:9,17 285:19
307:25 332:21
**smaller** 23:3,7
39:20 40:17,23
47:11 61:19
85:25 86:9
98:7
**smart** 140:22
141:1
**sms** 28:13 89:6
**sneeze** 274:21

**social** 301:23
325:7,10
**sold** 153:10
224:16,18
309:17 329:22
**solutions** 1:19
6:13 15:2,5
364:14
**solve** 21:13
**solvency**
356:24
**somebody**
87:21,24
216:16 320:16
364:5
**somewhat**
185:19 284:23
**sony** 327:25
329:20,24
330:18
**soon** 154:4
192:14 289:9
289:21 290:9
294:21 321:6
329:22 358:20
**sooner** 283:8
**sorry** 26:3 27:4
38:10,15 43:6
65:18 67:10
68:20 91:12
95:6 100:10
114:1,22 115:1
116:4 120:14
125:15 156:10
156:15 170:1

202:3 220:3
225:14 226:25
231:17 240:12
243:21 248:19
258:2 268:13
268:17 279:13
287:3 288:6
299:7 320:16
333:19 340:13
353:13 358:7
**sort** 269:6
**sound** 134:19
323:23
**sounded**
320:19
**sounds** 243:11
290:14 291:1
**source** 314:12
314:17,19
325:16,19
**southern** 1:2
14:21
**spa** 206:10,22
240:20,20
242:20 243:4
252:16 272:10
276:13,17
286:9 298:2
**space** 366:14
**spacepop**
327:19,19
328:3,10,22
329:3,4,7,11,14
**speak** 32:2
59:25 68:23

101:15 106:10
106:14 113:12
170:13 190:5,7
190:12 223:12
230:11
**speaker** 244:12
278:25 279:12
288:21 289:24
290:25 291:7
291:11,17,20
291:23,24
292:5,17
320:14
**speaking** 51:14
52:15 115:8
158:3,7,10,14
158:19,21
199:17
**speaks** 52:17
**special** 73:14
**specialist** 6:12
**specializing**
20:22
**specific** 17:3
30:6 34:5,8
37:13,17 44:12
44:17,20 45:4
45:13 47:3,10
51:17 52:10,13
58:1 62:9 74:9
75:15 77:23
78:6 96:11
101:2 105:14
110:9 119:1
160:18 165:25

**[specific - stamped]**                                    Page 76

172:25 173:18
187:20 209:18
216:11 221:12
272:6 278:9
344:21 353:15
**specifically**
19:10 29:9
31:9 35:12,22
42:3 46:6
50:15 54:22
58:23 64:25
78:6 91:20,25
99:25 109:25
158:8 170:15
188:7,10 194:8
200:21 216:1
223:1,25
224:13 226:22
262:5 274:5
285:19 296:1
317:22
**specifics** 32:9
93:11,18
125:20 228:10
320:6
**specified**
175:12
**speculate** 66:11
96:5 121:12
157:8 196:12
**speculating**
69:4 121:19
123:14 348:15
349:7

**speculation**
65:16 67:17
68:12
**speechless**
54:15
**spent** 99:23
**spinner** 103:6
**split** 33:16
111:5,11
**spoke** 51:9
106:13 115:12
118:12 287:20
**spoken** 53:9
88:17
**spreading**
341:21,25
**spring** 321:15
**st** 4:11 6:6
**stabilize** 284:7
284:16
**stabilizes**
284:10
**stage** 160:12
**stake** 340:20
**stamped** 8:3,5
8:7,9,12,14,16
8:20,22,24 9:4
9:8,10,13,16,19
9:22,24 10:4,6
10:8,11,14,15
10:17,19,21,23
11:5,7,9,11,15
11:17,19,22
12:6,9,11,13,15
12:17,20,22,24

13:5,8 32:14
32:17 41:6
48:14,20 49:2
53:18,21 54:5
55:24 56:4,11
63:19,22,25
64:2,10 70:15
72:12 75:18
79:8 82:22,25
83:4 84:9 92:5
92:8 103:12,16
104:23 107:11
107:21 108:11
111:17 114:25
117:20,22
119:17,20
123:18 124:10
124:13 129:8,9
129:12 130:17
131:3,17 138:4
145:15 150:15
154:20 155:4
156:13 159:3
163:4,10,16
166:4 168:5
171:21,23
172:20 173:5
175:23 178:8
178:12,16
182:2 183:2
184:7,11,19
185:20 186:10
186:12,23
189:1 193:8,11
196:19,22

197:2 201:1
202:12,14
204:12 207:4,8
207:14,18
209:21 212:2
213:25 214:2
215:2 217:8,13
218:7 221:22
221:25 222:4
224:21 229:5,7
231:3,6,12
234:16,19
235:13 236:16
237:21 246:12
246:15,22
248:13 250:10
250:12 252:8
252:10 253:14
253:16,21
255:22,25
256:5 261:11
261:14 263:1
265:24 266:2
268:3 270:13
270:17,22
271:9 275:23
277:11 279:23
280:2,7 282:6
292:13 293:5,8
293:20 297:5,8
297:16 300:11
300:14 323:22
333:8 334:10
342:16,19,24
343:7 346:18

346:20,25
351:6,9,15
354:13,16
355:2 359:18
359:22 360:2
362:19
**stampeded**
300:19
**stan** 311:1
320:24 324:12
324:13,14,25
325:1,7,12
328:5
**stand** 84:5
86:10,13,24
**standing** 241:3
241:7
**stands** 41:16
135:8 176:13
201:18 206:6
**standstill**
280:13,17,20
284:1
**stanley** 134:4,5
**star** 25:5
**start** 21:21
22:9 67:25
**started** 22:24
129:17 134:15
317:1
**starting** 20:16
131:25 183:1
315:5
**starts** 277:17
286:6 327:16

343:20
**state** 329:2
**stated** 246:1
**statement** 19:6
38:5 153:23
154:4 182:23
185:14 191:3
212:14 229:22
230:7,9 282:23
283:4,8,15
308:12 322:2
324:17 327:9
344:6,20
345:19 357:3
361:24
**statements**
330:6
**states** 1:1 14:20
17:9 25:25
26:2,10,14,17
26:21 129:4
**stay** 150:14
244:4
**step** 143:24
**steps** 29:12
**sternberg**
350:12
**steve** 309:5
**stinson** 5:14
**stinson.com**
5:18,20
**stock** 33:20
34:4,7 35:14
35:19 37:15
39:23,25 40:5

40:11,14 45:21
50:20,22 75:10
81:5,7 82:2,10
82:13 94:21,25
95:5,10,15,18
96:1,10,18
97:11,13,22
98:5 99:9
111:2 143:17
148:21 167:21
170:15 171:2,9
171:10,13
177:24 178:4
180:22,23
181:1,5,21
183:15,17
197:25 225:20
234:12 259:2,6
259:9,17,18
283:13 284:5,6
284:10,12,15
284:16,18
285:1,6,12,18
288:18 289:2
289:14,17,22
290:10,18,23
292:4,8 296:11
296:14 301:11
301:15,17,18
301:21 302:5,8
303:22,23
304:4,11,13,17
305:11 309:6
309:18,22
310:1,6 322:12

323:6 329:10
331:8,15 332:5
332:11,12,17
337:7,18,18
340:7,9 341:10
341:14 343:22
343:25 344:5
344:19 345:18
348:19,25
353:16 354:7,8
355:12,13,17
355:19
**stockholders**
227:23 240:10
240:22
**stocks** 98:17,18
**stop** 320:14
**story** 356:20
**straight** 40:4,7
40:10 90:11
209:16 355:17
355:18
**straightforward**
90:13
**strategic**
325:20
**strategy** 352:4
356:3
**street** 3:7 5:6
310:14
**strengthen**
255:17
**stress** 99:7,10
99:15,17

**strike** 28:15 34:11 50:2 78:3 83:18 87:22 115:23 273:12 285:14 304:2 331:18 337:24
**striking** 135:16
**strong** 38:10 75:6,7,8
**stronger** 45:25
**structure** 27:13 27:15 248:22 249:22 357:22
**structured** 355:6,8,10,15 355:21,23 357:10 358:1
**structures** 42:2 338:20
**studios** 5:3
**stuff** 172:11 334:25
**subject** 16:14 17:5 49:11 54:9 56:13 58:18 64:13 70:18 84:14 92:19 94:5 108:17 112:5 114:20 115:16 115:20 118:7 120:9,21 124:18 131:5 132:16 138:7

163:18 165:16 172:4 178:19 179:25 187:4 194:20 201:13 203:2 204:19 210:3 222:10 225:2 230:2 231:15 238:18 247:1 252:16 256:8 261:21 270:25 273:25 274:10 276:5 280:9 293:21 297:22 306:18 341:3 343:1 347:16 366:15
**submitted** 130:25
**subscribed** 368:14
**subscription** 274:24 275:15
**subscriptions** 326:25
**subsequent** 155:10 161:13 166:16 167:16 167:19
**substance** 106:19 308:19 362:7 363:8 366:5,9
**substantial** 311:10

**substantially** 299:25
**succeed** 303:4
**succeeding** 302:22 319:23
**succeeds** 309:15
**success** 94:11 305:24 309:3 327:12 329:5,8 331:3
**successful** 94:15 325:5 326:20
**sue** 337:9
**suffer** 337:25
**suffering** 18:4
**sufficient** 150:19
**suggest** 135:16 138:15 241:4
**suggested** 137:7 157:9
**suggesting** 136:25 199:6 199:10
**suite** 4:12 5:7
**sum** 173:23
**summarily** 54:14
**summary** 123:21
**sunday** 249:2 293:21

**sunny** 353:20
**super** 324:13 324:25
**superhero** 93:5 93:10,14,19,24 309:2 311:2 320:25 322:8 322:24 323:24 325:21
**support** 266:11 319:7
**supposedly** 317:4
**sure** 20:20 21:23 35:23 39:2 43:14,18 46:22 56:19,20 57:2 59:13,19 62:2,3 64:20 66:17 67:18 68:21 69:3,6,9 69:17 78:13 79:3,22 87:18 95:6 96:3 97:17,18 98:1 103:5 104:10 105:15 109:6,7 116:25 118:22 119:5,12 126:2 134:24 136:24 140:16 141:7 145:13 156:7 157:12 158:24 160:11 161:12 164:25 170:2

171:5 176:18 176:25 177:8,9 191:15,25 195:19 198:7 204:6 206:23 209:8 210:23 211:20 213:15 217:16,21 220:18 221:19 227:16,17 234:9 242:9,11 249:25 253:10 258:17,17 260:14 264:2 264:25 266:16 272:23 273:9 277:2 280:20 284:21 288:10 292:7 296:19 305:25 308:13 308:16 320:11 322:3,25 323:7 323:25 324:19 324:21 325:18 335:21 339:12 342:3 345:14 345:16 350:19 351:3

**surprised** 223:17

**survival** 46:4

**survive** 45:25 87:4

**susquehanna** 195:18

**swallowing** 243:12 290:15 291:2

**swear** 15:10

**sworn** 365:8 368:14

**syndicate** 338:21 339:1,2 339:5

**system** 30:19 105:21 116:22 117:2 126:22 126:24

**t**

**t** 353:14 367:3 367:3

**tab** 32:13 48:11 53:16 55:22,23 63:15 82:18 92:2,5 103:12 107:16,18,19 107:20 117:17 119:14 121:25 124:9 129:8 130:7 163:2 171:19 178:6 184:5 186:8 193:6 196:16 202:10 207:2 213:23 215:1 217:7 218:3 221:21 229:3 231:1,22,25 234:14,24 235:9 246:11

250:8 252:6 253:12 255:20 261:9 265:22 265:23 267:13 267:24 275:22 279:22 292:11 293:4 297:5 300:11 333:5 334:8 342:14 346:17 351:4 354:11 359:16 361:1,3

**table** 45:5

**tablets** 30:21 30:21

**tacks** 136:3

**tactic** 325:8

**tactical** 25:5

**taheer** 334:13 334:16 339:17 340:18 341:2

**take** 14:13 29:11 48:16 53:24 55:25 61:18 62:14,18 64:5 71:3 105:23 107:24 118:1 119:23 130:9,9 137:9 137:16 147:13 148:16 150:3,6 156:5 163:5 165:5 171:10 177:11 186:16 190:18 217:23

223:16 232:13 251:17 252:3 267:7,19 280:11 290:18 292:11 296:7 333:11 358:25 359:2 363:25

**taken** 14:17 20:9 34:15 149:5 273:3 365:6,9,15

**talk** 42:14 57:10 91:22 219:13 220:19 267:5 270:6

**talked** 32:7 34:3 52:10 60:6 164:21

**talking** 211:22 219:19,22,25 220:6,15 231:17 257:23

**target** 93:1

**targets** 308:15

**tax** 27:14,17

**tbd** 112:15

**td** 21:24

**team** 21:10,24 35:14 51:5 83:12 84:14,21

**teamed** 356:12

**technical** 177:17

**technology** 14:24 21:11,12

**telephone**
  116:19 117:11
  219:3
**television** 320:5
**tell** 20:17 78:22
  161:20 287:18
**tells** 165:5
**tember** 83:5
**ten** 100:19
  103:2 221:5
**term** 9:9,13,15
  9:18,21 10:10
  41:14 52:18
  65:4,14,24
  66:1,15 67:3,7
  67:8,13,15,19
  68:10,18,18,21
  70:22 71:7
  76:5,11,15,16
  79:7,8,21
  80:21 81:8
  97:22,23 99:17
  123:11 125:20
  128:9 129:12
  130:20,23
  131:6,10,16,19
  131:22 132:9
  132:17 138:7
  140:3,9 141:14
  141:15 142:13
  142:15 145:6
  146:14 148:10
  149:3 150:20
  154:18 155:22
  156:1,2,3,8

157:6 160:10
163:9,18
165:16,17,23
166:6 168:6,21
170:24 171:8
171:23 172:7
172:24 173:2
175:4,8,12,21
176:23 178:12
178:24 179:12
179:17,20
180:12 183:1
184:10,17
187:4 188:5
192:14 197:7
207:7 212:9,22
212:25 287:1,3
303:13 331:8
331:20 332:1
355:10 356:22
358:16
**terminal** 347:7
**terms** 40:20
  54:14,19 67:3
  68:9,10,14,24
  69:20,22 70:2
  70:11 77:11
  86:19 87:8
  94:20 123:7
  125:10 129:25
  136:25 137:1
  140:11 142:16
  143:1,4,10
  144:22 149:3
  152:20 158:5,9

160:20,22
161:23 166:2
175:1 181:4
183:21 188:4
199:3,6,22
200:7,13
228:20,24
230:7 242:6
243:4 246:3
278:7,10
279:10,14
299:6,12,24,25
304:8 321:21
322:3,7 358:15
**test** 99:10,15,17
**testified** 344:25
**testify** 18:2,5,8
  363:16,20
**testifying**
  355:16
**testimony**
  16:15 17:6
  19:14 32:3,9
  106:20 220:9
  363:9 364:11
  365:7,9 366:14
  368:9
**testing** 99:7
**texas** 28:1
**text** 28:8,11
  88:20,23 89:2
  89:3
**texts** 88:25
**thank** 24:24
  62:25 63:1

107:14 137:19
214:10 266:10
267:20 268:12
269:2,17 270:2
270:3 279:20
360:22 362:25
363:2 364:2
**thanks** 274:1,2
  274:6 362:21
  362:23
**theoretically**
  171:13 289:1
  303:25 304:12
  336:14
**thereabouts**
  137:17
**thereof** 305:24
**thereto** 365:18
**thesis** 99:7,10
  99:16,20
**thing** 42:17
  57:7 71:18
  98:1 99:11
  181:9 313:3
  323:25 332:22
**things** 42:15
  77:2,10,13
  78:9 90:10
  163:3 165:5,5
  192:15 197:19
  197:22
**think** 32:13
  43:7 53:7 54:4
  70:1,4,11
  77:16 98:15,19

**[think - time]**

99:7 102:5
104:16 107:15
107:21 114:19
122:13 131:12
135:25 143:18
162:1 175:23
177:16 194:16
198:7 199:2,18
208:5 209:13
217:15,22
219:24 225:17
231:2 234:6
237:3 244:4,18
247:16 250:8
264:16 279:18
284:25 285:3
291:21 292:9
305:1,6 307:17
308:18 309:8
311:19 325:4
332:23 337:14
340:19 341:17
347:6 364:1,2
364:8
**thinking** 99:9
99:13 122:9
**thinks** 47:20
**third** 72:11
79:7 104:23
108:10 111:1
131:2 168:5
172:20 207:19
222:4 232:18
235:12,16
246:22 303:10

312:14 355:1
**thought** 94:11
168:24 232:3,5
301:24 318:13
327:10 331:2,5
**thoughts** 198:6
199:19
**thread** 8:3,5,7
8:9,11,14,16,22
9:4,9,12,15,18
9:24 10:4,6,8
10:10,13,15,17
10:19,21,23
11:5,7,9,11,13
11:17,19 12:4
12:8,11,13,15
12:17,22,24
13:4,7 32:16
48:19 53:20
56:3 63:17
82:21 92:7
107:10 119:16
129:11 163:8
171:22 178:11
186:11 193:10
196:18 202:13
207:6 214:1
217:12 221:24
229:6 231:5
234:18 246:14
250:11 252:9
253:15 255:23
261:13 266:1
270:15 279:25
293:7 297:7

300:13 333:7
346:19 351:8
354:15 359:20
**threatened**
356:23
**three** 16:3
29:10 31:2,12
41:6 328:6
**threshold** 98:4
98:8
**threw** 99:18
**throw** 269:19
**thumbnail**
20:14
**thursday** 187:2
189:9 256:7
**ticker** 336:24
**ticket** 352:3
**tickets** 270:4,8
**till** 21:7
**tilray** 336:24
**time** 16:1,18
23:17 28:10,10
28:12,12,14
29:11,21 31:3
31:10 32:23
33:3,7 34:17
34:22,23,25
35:2,4,5 37:18
38:6,13,21,22
39:10,13 43:14
43:18 45:13,19
46:11 47:11
50:17 53:24
54:23 59:24

61:17,18 64:5
64:24,24 73:3
74:10,11,24
79:18 80:7,11
80:12,14 82:4
83:22,24 85:24
86:16 88:19
89:1,1 91:21
93:23 99:25
100:4,7 102:9
107:6,9 108:7
117:10 121:18
122:12 123:12
136:17 144:7
147:3 148:12
150:23,25
151:20 152:14
153:11 154:16
155:21,24
160:14 161:20
162:1 167:11
167:17,23
168:21 169:14
171:1,4 174:15
177:11 191:24
192:9 195:12
200:2 208:21
212:20 214:16
223:19 224:3
243:7,11,16
245:23 248:4
251:18,23
257:24 258:1,9
259:15,19,22
261:6 264:20

265:2,12 267:3 280:21 287:21 288:2,19 289:17 290:4 290:18 296:13 297:1 298:10 301:23 306:21 308:24 310:9 312:13,25 314:9 317:14 323:12 324:9 324:11 327:10 328:11,19 330:17 331:3 331:24 333:15 335:23 340:10 340:12,14 344:22 349:8 360:10 362:6

**timeline** 272:7

**times** 34:4 42:1 44:19 46:10 52:11 54:25 77:9 78:20 88:18 90:12 102:9 234:5 304:18 344:23 345:11 357:9 357:25

**timing** 137:13

**timings** 37:13

**tiny** 318:24

**title** 22:13 215:14 294:1

**titled** 343:8

**titles** 22:14

**tlry** 336:20,23 337:3,15 338:1

**today** 18:2,11 26:19 32:4 33:15 49:21 69:18 71:15,24 90:25 121:7,11 126:4 135:21 140:11 142:7 146:15 164:13 181:17 206:11 228:14 233:8 235:6 248:4 266:16 286:2 300:25 305:16 323:12 346:1 363:7 364:3

**today's** 112:1 364:11

**todays** 33:22

**todd** 1:5 14:18 367:1 368:1

**together** 74:25 148:24 326:21 344:14 345:2 350:23

**told** 78:15,16 78:18 229:19

**tomorrow** 191:8 266:17

**ton** 291:2

**tony** 24:14 124:18 128:19

**took** 41:23 74:24 137:3 148:20 161:15 161:17,20,21 172:10,10 212:24 214:4

**toon0000433...** 11:18 261:15

**toon00004341** 11:18 261:14

**toon00017339** 8:22 107:11,22

**toon00017345** 8:23 107:12

**toon0004341** 261:11

**top** 16:9 18:24 49:5 55:1 57:16 74:18 77:18 109:12 111:3 114:17 120:19 127:13 127:14 144:11 165:14 179:23 182:3 191:5 193:17 201:3 204:13 207:20 209:12 218:16 218:24 222:7 224:13,24 228:11 229:12 235:16 249:8 253:20 269:21 274:8 276:2 282:8 293:19

297:20 349:13 353:18

**toronto** 21:1 23:19 24:10 33:14 34:1 349:23 350:14

**total** 64:13,23 65:4,8,14 70:18 122:14 258:7 281:17 298:16 315:21 316:10,18 364:12

**tough** 80:12

**towards** 44:15 51:21 72:14 84:3 193:17 201:3 207:20 222:7 229:12 231:11 235:16 236:17 248:14 253:20 266:7 297:20 334:10 358:20,20,22

**toyrus** 329:10

**toys** 315:5

**tracey** 4:8 7:6 60:3 62:13,20 62:24 63:1 65:16 67:17 68:12,20 69:16 69:24 70:9 74:22 88:2 95:11,19 96:2 96:19 97:2,14

98:14 99:5
101:22 106:16
106:21 107:2,8
112:23 115:18
116:3,15 122:4
122:25 125:18
126:1,9 137:13
137:18 142:11
143:6 158:16
158:23 162:5
169:7 176:17
176:24 177:18
179:13,18
181:2 189:24
190:9 199:4
200:15 203:23
204:5 205:19
206:17,24
208:25 209:6
210:16,21
211:5,19
213:14 214:3,6
214:9 216:19
216:25 217:21
220:2,8,12
221:9 224:6
226:2 227:15
231:22 232:2,7
233:7 239:14
239:23 240:11
240:24 241:8
241:17,24
242:2,8,13
243:10,18,25
244:18,22

245:1 248:8
249:24 254:17
257:6,16,22
258:2 263:13
264:1,8,15,24
265:8,17
267:17,20
268:5,12,16,20
269:7 273:15
276:25 278:17
279:1,11
284:20 285:2
287:8 288:20
289:11,23,25
290:12,24
291:4,25 295:2
295:16 299:7
303:1 320:18
333:10,14,19
336:13 345:25
346:11 348:13
348:20 349:1,6
360:11,13,16
360:17,21
361:3,7 362:11
362:14 363:10
363:15,22
364:2
**track** 126:22,24
127:3
**trade** 3:6 26:17
55:18 99:1
288:14 308:1
**traded** 26:21
26:25 170:16

284:19 353:4
354:9
**trading** 22:22
126:11 153:9
171:2 176:7
285:6 303:21
303:23 331:10
331:13 332:9
338:1 340:6,10
340:15 343:23
**trailing** 111:2
269:21
**tranche** 252:3
**transaction**
19:8,11 22:21
74:24 76:21
79:17,19 80:17
80:20 109:21
110:2 111:14
138:22 142:10
143:9,19 144:7
147:6 155:10
155:14 160:2
161:6,6,8,11,19
165:7 169:2,6
174:19 188:15
188:23 190:3
191:21 192:4,8
192:12 198:14
199:7,9,12,25
200:1,10,19
201:18,21
203:3 204:20
205:1 209:11
209:14,17

210:4 211:3,17
212:5 216:3,14
217:2 222:11
226:4,4,10
228:3,5,17,20
228:25 231:16
236:10 237:12
237:14 238:18
243:3 246:2
247:1 249:19
249:22 250:5
253:8,9 254:21
258:8 259:11
259:14,21
260:11,15
263:23 271:24
271:25 280:22
284:3,12 290:2
290:19 326:8
357:11 358:2,6
358:12
**transactions**
78:21 79:17,23
91:24 109:8,10
110:7 119:7
161:13 174:21
197:19 201:23
225:19 228:8
272:5 277:25
283:23 284:11
303:3 341:12
**transcript**
368:5,9
**transcripts**
20:3

**transfer** 124:24 128:4
**transformatio...** 321:12 326:8
**translate** 94:25 318:10 319:24
**travel** 194:10
**treated** 142:24 295:8,10 299:16,18,21
**tremendous** 181:22
**tried** 288:18 289:9,17 324:22 339:20 340:1,3
**tries** 52:18 64:24 65:2
**trip** 269:23
**trouble** 244:19
**true** 42:17 114:13,15 214:12 298:14 368:8
**truly** 248:23
**truthful** 230:20
**truthfully** 18:2 98:23 332:23
**truthfulness** 230:24
**try** 17:20 45:10 46:2 77:2 99:3 99:7,10,12 194:11 242:13 285:25 289:20

290:9 305:14 326:24
**trying** 42:15 56:20 65:10 67:8,15,19 70:7,11 91:22 165:6 194:16 203:8 242:18 324:1,8
**ts** 212:24
**tuesday** 84:11 179:24 202:20 205:12
**turn** 49:1 53:15 58:8 63:14 72:11 79:6 83:3 92:3 108:9 111:16 117:16 119:14 123:16,17 129:6 131:2 154:19 163:1 168:4 172:19 175:22 181:25 182:25 184:5 184:18 186:21 193:6 196:15 202:9 204:11 207:1 213:22 217:6 222:3 229:2,11 235:11 246:21 247:17 248:12 250:7 252:5 262:25 265:22

271:8 277:10 282:5 297:15 323:16 332:5 360:1,6
**turning** 343:6
**tv** 134:6
**tweens** 329:15
**twersky** 2:4
**twice** 15:24 364:10
**two** 15:25 16:3 16:20 17:2 18:18 24:9,16 25:7,14 26:3,4 27:6,13,15,20 28:3,20 29:10 31:1,5,12 47:15 60:12 64:1 90:10 106:11 113:11 137:9 138:11 167:23 218:11 252:2 269:22 320:15 324:12 325:12 326:13 326:21 346:3,4
**tx** 4:13
**tyler** 43:3
**type** 39:18
**types** 39:16

**u**

**uary** 193:19
**ultimate** 192:7
**ultimately** 216:13 225:25

226:3,12 230:12 243:2 246:2 262:22 269:23 302:22 306:4
**unable** 18:1,5 55:18 169:1 183:20 223:14 280:21 284:2
**unaware** 223:20
**uncertain** 69:11
**unclear** 325:9
**under** 68:9 72:3 82:11 87:5 142:19 162:23 173:16 184:3 188:1 228:24 251:24 331:17,19 332:1 365:12
**undergraduate** 20:20
**underlying** 72:21 153:25 182:23 183:15 289:21 290:10 313:12 314:1 347:18
**underneath** 73:9 139:23 147:20
**understand** 17:19 41:9

**[understand - value]**                                        Page 85

66:5 95:7
96:15 99:12
106:23 107:4
108:24 112:18
112:21 139:8
140:1,10 145:8
162:23 176:15
177:17,21,23
206:15 210:10
225:23 238:10
242:9,9,17
247:9,11 248:1
248:4,6 253:25
276:19,22
316:14 352:8
352:17 363:18
**understanding**
27:23 40:15
41:13,15 47:8
47:24 61:10,14
64:17,22 65:4
65:7 66:11,13
66:25 67:6,13
68:3,8,13 69:1
69:12 83:17,19
87:20,25 96:14
104:8 109:2
114:9 120:12
121:8 131:15
134:22 135:19
136:22 139:18
140:25 141:5
142:8 151:9,12
154:10 164:10
169:17 173:24

176:11 179:7
179:16 181:18
189:21 205:10
208:12,13,16
209:15 210:13
224:7 232:1
233:4 239:9
254:14 268:9
271:16,25
272:12,16,17
272:21 279:3,8
280:24 283:21
284:17 317:13
335:5 338:10
340:8 348:11
353:23 357:17
**understands**
222:23
**understood**
170:2
**undertaken**
47:11
**undisclosed**
92:18
**unfairly**  299:18
**unfunded**
208:19
**unidentified**
278:25 279:12
288:21 289:24
290:25 291:7
291:11,17,20
291:23,24
292:5

**uniqueness**
277:24
**unit**  14:15 63:8
269:13 334:1
**united**  1:1
14:20 17:9
25:25 26:2,9
26:14,17,21
129:4
**universal**  152:3
152:8,18
**university**
20:21 21:1
**unknown**
320:14
**unlock**  341:21
341:25
**unquote**  138:23
314:20
**unregistered**
153:2,12
**unsure**  171:1
**update**  132:13
**updated**  132:5
132:9,11
144:25 145:11
187:4 197:7
**upppppppppp**
348:7 349:5
**upset**  223:23
**upside**  357:12
**use**  17:23 26:12
28:5,8,12,14
30:11,13 36:12
39:4 90:12

94:17 116:24
121:21 128:9
147:15 154:2
192:16 203:6
347:8 355:10
**used**  28:18
30:18 61:11
65:13 89:7,11
89:20 134:3,3
144:8 203:15
206:1 298:10
329:12 364:13
**uses**  67:2
**using**  14:24
111:21 205:24
330:18 339:5
347:1 365:10
**ust**  51:1
**usually**  36:6
135:15 305:18
**utilize**  22:14
110:25 341:11
347:11
**utilized**  45:3
192:12,13
208:17
**utilizes**  314:18

| v |
| --- |

**v**  1:7 2:17
**v2**  336:20
337:15
**vacay**  254:11
**validate**  99:20
**value**  47:7,9,12
82:9 94:3

135:10,11
175:14 284:13
285:5,8,11,17
285:21 286:1
305:10,15
322:11,15
323:5 332:12
332:16,21
333:1 335:1,6
**valued** 301:6
302:6
**values** 314:20
**vanilla** 90:1,7
90:10
**variable** 80:24
81:2,3 90:14
**variables**
332:24
**varies** 81:6
**variety** 40:1
285:22
**various** 50:16
**vary** 23:8
**vast** 329:13
**vein** 131:1
**velaw.com** 5:10
**venture** 221:4
309:14 329:7
335:8
**ventures** 326:3
**verbal** 320:12
**verified** 319:4
330:9
**verify** 330:12

**veritext** 1:19
6:13 15:1,4
364:14
**versed** 209:13
**version** 166:14
**versus** 87:18
**video** 6:12
14:12,16 63:8
106:5 162:16
214:20 217:10
269:14 334:1
**videographer**
14:3 15:1 63:2
63:7 105:25
106:4 137:20
137:24 162:10
162:15 214:13
214:19 217:9
217:22 245:8
245:13 269:8
269:13 292:21
292:24 333:15
333:17,20,25
359:8,12
360:15,18
364:4,7,9
**videotaped**
1:18
**view** 96:8,17,20
96:21,25 97:3
97:4,10,16
142:12 177:5
230:5,10,14
234:10,10
263:20,25

277:24 329:4
332:11,15
337:19 338:16
345:23
**viewed** 134:23
**viewership**
94:16 317:16
318:9 319:24
320:2 323:8,14
326:15
**viewing** 269:24
**views** 99:8
113:24 114:2,9
114:12 164:23
165:3 210:19
210:25 211:2,7
264:18,23
265:7 285:4
329:16
**vinson** 5:5
**virtual** 1:20
14:24
**virtually** 14:7
**virus** 326:17
**viso** 3:11
**vol** 352:5,8,13
**volatility**
352:10
**volume** 176:14
281:9,19
291:20 303:22
303:24 352:9
**voluntary**
174:23

**vote** 226:16,20
227:4 251:3
**votes** 227:6,10
**voting** 187:14
187:19,24
188:9,11
226:15,21,25
227:13,22
228:2,8 238:24
239:9,13,16
240:9,21
241:19,22
**vs** 14:19 367:1
368:1
**vwap** 176:6,12
176:13

**w**

**w** 197:12,14
**wait** 57:8
247:23
**waited** 170:21
**waiver** 12:4
270:16 282:19
298:2
**waivers** 298:20
**wall** 270:25
273:3,25
274:10 310:14
**walmart** 315:5
**want** 35:16
60:23 62:16,17
62:19 66:21
68:14,24 69:14
69:20,22 80:8
80:9,13 82:6

82:15 87:3
107:9 109:22
109:24 121:16
122:1 123:9
133:18 139:11
142:9,14,16
143:4,9,19
154:15 174:14
177:11 180:15
181:9,21
186:16 199:6
200:11 203:6
225:24 229:1
229:22 233:19
233:22 239:12
251:16 252:3
260:18 266:10
283:4,25
290:18 307:24
**wanted**  39:14
57:24 67:24
86:3 121:12,20
148:23 173:19
173:23,24
180:21 183:19
190:1 199:20
199:23,23
200:5,8,17
226:1 233:22
239:6,21 242:6
251:20 269:19
287:2,10,23
288:1 289:2
299:15 332:24

**wanting**  86:3
226:23 296:9
**wants**  33:18
80:17 111:19
143:23
**waqas**  195:22
195:25
**warrant**  111:22
121:22 122:10
123:8 124:18
125:1,5,11,13
125:16,21,25
204:25 205:23
205:24 252:22
**warrants**  33:21
37:7 40:1
72:22 81:12
82:8,9 90:3
111:21 120:9
120:17,22
121:9,13,17,21
122:2,12,14
123:3,7,9,23
125:17 136:17
137:6 138:14
289:8 355:13
**warren**  328:4
356:7
**waste**  200:2
**watched**  323:9
323:9
**watching**  94:18
**waterloo**  20:21
**watkins**  3:18

**way**  36:5 42:5
86:10,14,24
93:20 94:7
105:12 111:20
129:19 134:11
137:2 154:13
199:17,25
234:23 255:6
274:21 291:23
296:24 303:15
305:21 308:13
309:21 331:4
336:2
**ways**  169:12
**we've**  339:20
340:1
**wealth**  134:5
**wednesday**
251:9
**week**  46:9 48:5
87:9 222:13
**weeks**  74:15,20
266:15
**weighted**
176:14
**went**  20:17
21:11 22:6
118:22 119:4
244:2 309:6
**wg**  201:12,16
201:18
**whatsapp**
28:13,17 29:20
89:4,6,7

**wide**  40:1
**william**  3:21
**william.reckler**
3:22
**willing**  146:25
147:5,13
148:14,16,19
150:3 344:5,18
344:23 345:18
**willingly**  300:3
**win**  91:22
269:23
**winer**  195:7,9
**wire**  256:16
**wiring**  258:5
**withheld**  160:4
193:3
**witness**  4:3 7:3
14:10 15:11
16:4 32:19
48:22,22 54:2
56:6,6 60:5
64:7 65:18
67:18 68:13,21
69:17,25 70:10
74:23 88:3
95:12,20 96:3
96:20 97:3,15
98:15 99:6
101:23 103:18
106:25 108:2
115:19 116:4
116:16 118:3
120:1 122:5
123:2 124:14

**[witness - wrote]**

125:19 126:2
126:10 130:12
142:12 143:8
158:17,24
163:12 170:13
171:25 176:18
176:25 177:15
179:14,19
181:3 186:14
186:19 189:25
199:5 200:16
202:16 204:6
205:20 206:18
207:10 209:1,7
210:23 211:6
211:20 213:15
216:20 217:1
217:11,15
220:3 221:11
224:7 226:3
227:16 229:9
231:8,23 232:3
232:8,16 233:8
234:21 239:15
239:24 240:12
241:1,18,25
242:11 244:15
246:1 248:9
249:25 250:14
252:12 253:18
254:18 256:2
257:7,17,23
261:16 263:14
264:2,9,16,25
265:9,19 266:4

268:23 270:19
273:16 277:2
278:18 279:3
279:13 280:4
284:21 285:3
287:9 288:22
289:12 290:1
290:16 292:7
293:10 295:3
295:17,25
296:19 297:10
299:23 300:16
303:2 305:6
332:8 336:14
339:12 342:21
344:13 346:1
346:12,22
348:14,21
349:2,7 351:11
354:18 359:24
361:6 363:11
363:16 365:7,9
366:1,18,18,19
**witness's**
  360:23
**witnesses**  19:14
**woods**  343:1
**woolf**  133:24
  134:23
**word**  41:16
  43:20 75:7
  133:5 152:12
  327:16 338:25
  339:2,5

**words**  232:19
  330:19 362:7
**work**  22:7
  77:12 100:2,5
  100:6 148:24
  161:4 250:22
  251:12,15
  256:25 257:4
**worked**  21:4,24
  38:23 43:11,13
  262:23 352:3
**working**  22:1
  22:10 37:25
  123:21 132:21
  147:16 158:1
  201:18,20,23
  202:6 261:21
**works**  42:25
  59:1,18,20
  69:9 116:23
  162:5 193:21
  263:17
**world**  3:6 27:2
**worth**  47:6
**wow**  178:22
  214:6
**write**  55:1,3
  57:20 66:18
  84:17 85:15
  86:6 87:21,23
  90:17 91:2
  131:9 135:14
  135:24 144:12
  165:15,17
  180:3 181:8

182:9 197:23
198:5,15 219:1
255:4 264:14
273:25 281:7
298:12 299:1
301:4
**writes**  51:4,8
  54:11 83:9,12
  108:20 140:21
  172:9 194:24
  201:8 215:15
  218:18 229:18
  238:4 249:4
  254:3 260:4
  262:8 280:8,10
  293:21 294:14
  307:20 327:17
  334:24 339:19
  341:3 342:2
  352:2 353:19
  353:20
**writing**  36:5
  88:10 181:16
  362:24
**written**  87:13
  154:12 220:23
  318:17 320:10
  320:12 365:12
**wrong**  236:24
  309:5
**wrote**  33:12
  45:17 46:5
  51:2 57:23
  64:23 71:6
  83:6 84:24

**[wrote - zoom]**                                                                   Page 89

132:4 141:1
181:19 189:3,6
191:7 193:20
215:5,17 218:9
235:20 236:20
238:1 248:17
248:20 250:19
253:23 264:13
264:17 266:9
306:8 334:13
340:18 348:5
348:12 351:1
362:20
**wscomparison**
276:13

**x**

**x**   7:1 45:11
158:6
**xie**   3:23

**y**

**y**   45:11 158:6
**ya**   193:21
**yeah**   40:7 58:9
105:3 113:19
133:2 137:18
137:18 156:17
232:17 242:2
245:5 277:13
352:7
**year**   20:18 22:9
126:23,25
302:13 307:4
316:25 317:8
319:16 356:21

**years**   15:25
16:21 17:2
29:10 31:2,6
31:12 34:4
35:7 41:25
42:4 51:19
62:11 74:3
88:18 100:19
101:4 102:9
103:2 109:9
113:11 119:8
196:5 221:2,5
314:24 315:11
325:12
**yesterday**
130:19 268:19
301:1
**yikes**   190:22,25
**york**   1:2 2:6,6
2:16 3:8,20 4:7
4:22 5:16
14:21 39:14
194:10,10
269:20
**youtube**   329:16

**z**

**z**   45:11 158:6
**zero**   289:5
**zoom**   1:20

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.