# Exhibit 12

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No.: 1:22-cv-00249-VM
-----------------------------------------X
TODD AUGENBAUM,

                              PLAINTIFF,

          -against-
ANSON INVESTMENTS MASTER FUND LP,
BRIO CAPITAL MASTER FUND LTD, BRIO SELECT
OPPORTUNITIES FUND, LP, CVI INVESTMENTS,
INC., EMPERY ASSET MASTER, LTD.,
EMPERY DEBT OPPORTUNITY FUND, LP,
EMPERY TAX EFFICIENT, LP, EMPERY ASSET
MANAGEMENT, LP, IROQUOIS MASTER FUND
LTD., IROQUOIS CAPITAL INVESTMENT GROUP,
LLC, L1 CAPITAL GLOBAL OPPORTUNITIES
MASTER FUND, M3A LP, RICHARD MOLINKSY
and GENIUS BRANDS INTERNATIONAL, INC.,
                    DEFENDANTS.
               -and-
KARTOON STUDIOS, INC.,
                    NOMINAL DEFENDANT.
-----------------------------------------X

     REMOTE VIDEO-RECORDED DEPOSITION of
ANDREW CHIN, an Expert located in Cary,
North Carolina, on December 13, 2024
at 12:05 p.m., pursuant to a Notice and
to the Federal Rules of Civil Procedure,
before Dawn Matera, a Certified Shorthand
Reporter and Notary Public of the State
of New York.

Page 2

APPEARANCES:

ABRAHAM, FRUCHTER & TWERSKY, LLP
Attorneys for Plaintiff Todd Augenbaum
    450 7th Avenue, 38th Floor
    New York, New York 10123

BY:   JEFFREY ABRAHAM, ESQ.
      jabraham@aftlaw.com
BY:   MICHAEL J. KLEIN, ESQ.
      mklein@aftlaw.com


HOGAN LOVELLS US LLP
Attorneys for Defendant
Anson Investments Master Fund LP
    390 Madison Avenue
    New York, New York 10017

BY:   ELIZABETH COCHRANE, ESQ.
      elizabeth.cochrane@hoganlovels.com
BY:   CATHERINE BRATIC, ESQ.
      catherine.bratic@hoganlovels.com
      609 Main Street
      Suite 4200
      Houston, Texas 77002

ELLENOFF, GROSSMAN & SCHOLE, LLP
Attorneys for Defendants
Brio Capital Master Fund LTD and
Brio Select Opportunities Fund, LP
    1345 Avenue of the Americas
    11th Floor
    New York, New York 10105
BY:   JOHN BRILLING HORGAN, ESQ.
      jhorgan@egsllp.com

A P P E A R A N C E S (Continued):

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Attorneys for Defendant CVI Investments, Inc.
          One Manhattan West
          New York, New York 10001
BY:   JEFFREY GEIER, ESQ.
          jeffrey.geier@skadden.com

FRESHFIELDS, BRUCKHAUS, DERINGER, LLP
Attorneys for Defendants Empery Asset Master, LTD, Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, Empery Asset Management, LP
          175 Greenwich Street
          3 World Trade Center, 52nd Floor
          New York, New York 10007

BY:   SHANNON SCIARETTA, ESQ.
          shannon.sciaretta@freshfields.com

LATHAM & WATKINS, LLP
Attorneys for Defendants Iroquois Master Fund LTD, Iroquois Capital Investment Group, LLC,
          1271 Avenue of the Americas
          New York, New York 10020

BY:   WILLIAM RECKLER, ESQ.
          william.reckler@lw.com

Page 4

A P P E A R A N C E S (Continued):

PHILLIPS NIZER LLP
Attorneys for Defendants
L1 Capital Global Opportunities Master
Fund
        485 Lexington Avenue
        New York, New York 10017
BY:    JARED R. CLARK, ESQ.
        jclark@phillipsnizer.com

LITMAN, ASCHE & GIOIELLA, LLP
Attorneys for Defendants M3A LP
        140 Broadway, Suite 38
        New York, New York 10005

BY:    RICHARD ASCHE, ESQ.

Also Present:

Jeff Menton, Videographer
Brett Director, Ameriprise

                    *       *       *

Page 5

(The following documents were marked.)

(Exhibit 1, Expert Report of Andrew Chin, was so marked for identification, as of this date.)

(Exhibit 2, Article, was so marked for identification, as of this date.)

THE VIDEOGRAPHER:  Good afternoon, we are going on the record at approximately 12:05 p.m. on December the 13th, 2024.  Please note this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connections of participants.  What is seen from witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is video media disk one of the video-recorded deposition of Andrew Chin taken by counsel for the Defendant in the matter of Todd

Page 6

Augenbaum versus Anson Investments Master Fund LP, et al.  This case is filed in the United States District Court, Southern District of New York.  Case number 1:22-CV-00249.  This deposition is being conducted remotely using virtual technology.

My name is Jeff Menton.  I am the certified videographer.  The court reporter is Dawn Matera and we are both from Veritext New York.

All counsel consent to this remote video arrangement and waive any objections to this manner of reporting.

If there are any objections to the court reporter swearing in the witness remotely and this remote video arrangement, please state them now.

Not hearing any objections, all counsel have been noted on the stenographic record.  The court reporter will now proceed to swear the witness.

Page 7

ANDREW CHIN

A N D R E W   C H I N, the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY MS. BRATIC:

Q.    Good afternoon, Dr. Chin.  Do you prefer Dr. Chin or Mr. Chin?

A.    Professor Chin maybe.

Q.    We'll do professor.  Nice to meet you, Professor.  My name is Catherine Bratic.  I am a counsel at Hogan Lovells and I am representing Anson which is one of the defendants in this case.  It is nice to meet you remotely.

A.    Nice to meet you.

Q.    Now, we are taking your deposition remotely.  Do you have a good connection where you are today?

A.    I believe so, yes.

Q.    Now, where are you connecting from?

A.    Cary, North Carolina at my home.

Q.    Are you alone in the room?

Page 8

ANDREW CHIN

A.    I am.

Q.    I am sure you're familiar with Zoom as we all have become over the past few years.  But if you have any trouble with your connection or mine or just trouble hearing me or understanding a question, please let me know.  We have the court reporter and the videographer just like a normal deposition.  But I think my understanding is that it's better for us to take pauses, you know, give verbal responses when you can instead of a nod of the head so the court reporter can get it.  And then we will try not to talk over each other of course so that the court reporter does not get upset with us.

A.    Of course.

Q.    Now, are you familiar with Genius, if I refer to that to mean Genius Brands and Kartoon Studios, that company, those companies?

A.    I actually am not.

Q.    You understand this case

ANDREW CHIN

involves a series of investments in a company called Genius Brands International?

A.    Yes.

Q.    And that company is now called Kartoon Studios?

A.    I didn't know that.

Q.    Okay.  Well, that's good. That's why I wanted to check to just make sure we are clear on the terms.  I will refer to that company as Genius.

A.    All right.

Q.    And you're familiar with the defendants in this case, the investors, Anson, Emperi, Iroquois, L1 and 3A, Richard Molinsky, CVI?

A.    Those are names of investors that I analyzed, yes, but I don't know any of them substantively.

Q.    I will just use the word "defendants" to refer to all of those companies, if that's good for you?

A.    All right.

Q.    When were you retained in this

Page 10

ANDREW CHIN

matter?

MR. KLEIN:  Can I instruct the witness.  She's not asking you to look it up in your files or check any computer.  Please don't do that.

THE WITNESS:  Oh, don't do that. Oh.

MR. KLEIN:  You're here to testify as to your recollection.

A.    I see, okay.  Okay.  As I sit here, I think it was in early October.

Q.    That's fine, thank you.  Do you remember if there was an engagement letter that you signed?

A.    Yes, there was.

Q.    Was that signed with plaintiff's counsel?

MR. KLEIN:  Object to form.

Q.    I will rephrase.

Who signed that engagement letter with you?

A.    Oh, I believe Fideris did or an official from Fideris.

Q.    Have you signed any other

Page 11

ANDREW CHIN

engagement letters on this matter?

A.    No.

Q.    What is your relationship with Fideris?

A.    I am an independent consultant.

Q.    Have you worked with them before?

A.    I have not, no.

Q.    Have you ever testified as an expert before you were retained in this case?

A.    No.

Q.    Have you ever been deposed before today?

A.    Just in connection with an insurance adjustment for car accident.

Q.    That was a personal issue or were you working as an expert witness?

A.    No, that was personal.  My own accident.

Q.    Are you familiar with your obligations as an expert witness to act independently and testify truthfully today?

Page 12

ANDREW CHIN

A.    I am.  And I guess I should add that of course I'm not testifying on behalf of my university or law school, but my own independent opinions.

Q.    Now, do you know the individual plaintiff in this case, Todd Augenbaum?

A.    No, I don't.

Q.    Are you familiar with the counsel for the plaintiff Jeff Abraham, Michael Klein who are here today and their law firm?

A.    I think I met them for the first time in a conference call, you know, just in preparation for this.

Q.    So that was in the context of this engagement.  You never worked with them before?

A.    No.  No.

Q.    Are you familiar with counsel for any of the defendants in this matter?

A.    No.

Q.    Well, how are you being compensated by -- well, let me ask you this, who is compensating you for your

ANDREW CHIN

work on this case?

A.    I believe Fideris.

Q.    How are they compensating you?

MR. KLEIN:  Objection to form.

A.    I guess according to their engagement letter, I invoice them at the end of each month in which I do work on this matter and they have, I guess, 30 days to pay.  And they've done that with respect to the October work by transfer of funds.

Q.    Okay.  Do you charge them an hourly rate?

A.    I do.

Q.    You say in your report that's $600 an hour; is that correct?

A.    That's correct.

Q.    In your report you referred to that as your usual consulting rate?

A.    Right.

Q.    Do you have any other rates that you charge?

A.    I have --

MR. KLEIN:  Objection to form.

Page 14

ANDREW CHIN

You could answer.

A.    Okay.  I have done consulting on a patent law matter several years ago at a lower rate.  But it's been adjusted upward for inflation and just rising fees and the nature of my expertise.

Q.    And that previous matter, were you serving as an expert witness?

A.    I was a potential expert witness.  But I think I was primarily advising the client regarding their -- an argument that they were preparing to make on appeal.

Q.    Was that -- well, what kind of work were you performing for them?

A.    It was mostly legal analysis. There was some analysis of some filings before the USPTO.  And some -- it wasn't a very technical invention, so there was some factual analysis as well.

Q.    How many hours have you spent so far on this case?

A.    Gosh, somewhere between 30 and 40 I would say.

Page 15

ANDREW CHIN

Q.    Would that include preparation of your report as well as preparation for the deposition today?

A.    It includes the report.  The preparation for today has not been extensive.

Q.    Did you meet with anybody to prepare for your deposition today?

A.    Yes, there was a conference call with two of the attorneys here today as well as the contact I had, I have been having with Fideris.

Q.    And who is that contact?

A.    Robert Chang.

Q.    Robert Chang.  Is he an attorney?

A.    I don't believe so.  We haven't discussed anything that would require that by him.

Q.    How long was that meeting with Richard Chang?

MR. KLEIN:  Objection to form.

A.    About half an hour.

Q.    Is that the only meeting you

Page 16

ANDREW CHIN

had to prepare for your deposition today?

A.     That is.

Q.     Have you done anything else to prepare?

A.     I've refreshed my recollection of the report and the article that you'd have as an exhibit as well.  Not much more than that.

Q.     Has anyone given you any information to review before you testified today?

A.     No.

Q.     Have you reviewed the reports of the other experts in this case?

A.     I have not.

Q.     Are you aware that there are other expert witnesses in this case?

A.     Well, I am now because there was a report in the exhibits you sent me.

Q.     Was today the first time you saw that report?

A.     It is, yes.

Q.     Now, in terms of the preparation of your report, what did your

Page 17

ANDREW CHIN

work consist of?

A.    So I had an online calculator and unfortunately over the years the university has migrated to a different mainframe platform since that ended up not being available for this.  So I, the work included some programming the algorithms from scratch and then, you know, verifying, validating them and inputting data from various spreadsheets that a Mr. Kevin Jewell was sending me.

Q.    How long -- let me back that up.

So when was that online calculator developed?

A.    The article is 2016.  I think there was actually a previous iteration that was done.  So probably the first version was 2013.  And then the version that's in the article was 2015.

Q.    Who developed that first version in 2013?

A.    Well, there is a very nice Capstone course that is offered I think

Page 18

ANDREW CHIN

for senior undergraduates in UNC in the computer science department.  And the instructor, I don't know if they still do this, because she's retired, the instructor was Diane Pozefsky, and she invited people in the local community and professors at other departments at UNC to come in and give pitches to these students.  And they would work in teams of three or four and they would develop according to the client's specifications.

And so I got turned down for a lot of the projects, but there was interest in producing this Short-Swing Profits Calculator, and so I had a very good team that worked with me on kind of a lot of the little details as well and implemented online and it was working at the time this article was published.

But a few years later there was some migration and the students had gone and -- I think I made it through one migration, but I just struggled to port the code over and the university kept

Page 19

ANDREW CHIN

moving things around.

Q.    I think you mentioned the client.  How did that project come about?  Did you come with it yourself or were you working on behalf of a client at the time?

A.    No, I was just wanting this as a piece of the article, the project for the article.

The article is arguing that for fact patterns that are more extensive than six-month period or involving some traits that might be outside the statute of the limitations, that one might need to do something a little more sophisticated than the lowest in and highest out algorithm Smolowe and I wanted to make it easy to the extent, you know, a counterargument is that, you know, this is too mathematically sophisticated for Courts to deal with, you know, to provide a tool for Courts and parties.

Q.    And do you remember how long it

Page 20

ANDREW CHIN

took you and those students to come up with the algorithm in 2013?

A.    Well, the students didn't come up with the algorithm.  Actually the algorithm was -- I developed it as a student in law school back in 1997, I think.  And they just implemented the algorithm and some of the calendrical details, you know, because months are of different lengths, that ended up getting a little hairy.

So it was a semester-long project.  I don't know many hours they put into it, but they did a good job.

Q.    When you say implemented, do you mean coded?

A.    I do, yes.

Q.    What language did they use for that code?

A.    I believe they used C++.  But they might have used Python.

Q.    And then you mentioned there was a new iteration of that program in 2015; is that correct?

Page 21

ANDREW CHIN

A.    Yeah.  So I asked for them to add bells and whistles.  They are discussed in the article, too.  One was to help with the migration and it was that version that also kind of added the Jammies way of dealing with the varying month lengths and then the automated search of the SEC filings as well.

Q.    Can you explain what that automated search of the SEC filings did?

A.    Yeah.  It's been a while since I ran it.  But I think it used the public -- kind of scraped the SEC directory where they post the insider trade files and it pulled out the dates of the trades, the shares, the share prices and did a calculation.  It didn't do any legal analysis, but it just kind of was a kind of proof of concept that we could go directly from the SEC filings.

Q.    Do you still have a copy of that code from 2015?

A.    I do not.  I would have to try to get in touch with the team.  They are

Page 22

ANDREW CHIN

mentioned in the acknowledgments paper. So I don't know if they've held onto the code. But if I spent a whole semester working on it, they probably would, so.

Q.    So for the purpose of your engagement for this case, you wrote a new code; is that correct?

A.    I did, yes.

Q.    About how long did it take you to write that?

A.    I had, let's see, I think overall maybe six to eight hours.

Q.    How did that code compare to the code that you had in 2015?

MR. KLEIN:    Objection to form.

A.    I actually didn't review the final code. I would imagine that with the calendrical complications and the SEC scraping, you know, what I wrote is much less complex. I would guess, if I had to guess, maybe a quarter or less of the number of lines of code that the students wrote.

Q.    Can you explain that

Page 23

ANDREW CHIN

calendrical issue and how it's addressed
in your current version of your code?

A.      I actually dispensed with that
part.  While I was waiting for the data
to come in I did write a module or
actually a function, a Boolean function
that would check within the mean or
within the doctrines of the Jammies case,
which I think, you know, there are like
seven dates that are potentially affected
because of the different length of
months.  Six months to February.  August
31st, six months from August 29th to
31st, February 28th, dealing with leap
years and those sorts of things.  So I
coded that part up in case I needed it.

But when I got the data it was
clear that all of the dates were within a
single six-month period and that function
wouldn't come into play at all.

Q.      And what language did you use
to write this version of the code?

A.      Python.

Q.      I apologize if this question

Page 24

ANDREW CHIN

comes off as rude, I do not intend it that way.  Why was it that you were able to write this version of the code yourself when previously you needed to work with others to write the code?

MR. KLEIN:  Objection to form.

A.    I probably could have coded the other project.  I realized back then that it would be fairly involved.

I wanted it to be hosted on the UNC mainframe to be available via the web.  I knew it was going to be too unwieldily since it required linear programming.  It would be unwieldy to implement in Javascript, although I might give it a fresh try but I thought at the time, you know, Professor Pozefsky had this wonderful course that seems like a suitable project for a team of students and they made it very usable.

And unfortunately, I've taken it offline, but the documentation and the article kind of describes the user interface and how it worked.  And it

Page 25

ANDREW CHIN
would have been pretty extensive work for me to put all of that together.

But in terms of going from a Thomas-separated value spreadsheet to a calculation, that's pretty straightforward, especially given that there weren't any calendrical details I had to worry about.

Q.    When did that online calculator cease to be online?

A.    Gosh.  Probably 2018.

Q.    So it was online from 2016 to 2018; is that fair?

A.    Yes.

Q.    Do you have any information on how that online calculator was used during that period?

MR. KLEIN:  Object to the form.

A.    I had given some talks on the paper.  I did some demos on it.  I don't know that it was used by anyone actually involved in the litigation.

When an attorney that was at a CLE that I presented this got in touch

Page 26

ANDREW CHIN

and he told me he had been playing around with it and we, we had I think a lunch meeting where he was asking me, you know, did I develop in different ways. But that conversation didn't go anywhere. We didn't talk after the lunch, so.

Q.    So are you aware of this code ever being used in any litigation?

A.    I am not, no.

Q.    Are you aware of it ever being cited in any cases?

MR. KLEIN:  Objection to form.

A.    You mean, by it you mean the implementation on the mainframe?  Are you talking about my algorithm in general?

Q.    Yeah, I am talking about that code, the online calculator that was available.

A.    No, I am not aware that anyone used it specifically to calculate the damages in the litigation.

Q.    So that was beyond my vocabulary there.  I didn't mean to introduce confusion.

Page 27

ANDREW CHIN

Now, talking about the transactions in this case, was the algorithm necessary to match your transactions or could that have been done without creating an algorithm?

MR. KLEIN:  Objection to form.

A.    Well, I guess I will ask you to define, you know, what your understanding by algorithm in that question.

Q.    Could you have matched these transactions by hand?

MR. KLEIN:  Objection to form.

A.    It would have been very time consuming and perhaps error prone, but I could have.

The trading patterns were comparable to those in the Gratz case and that was done by hand.  And as I point out in my article that, you know, that was replete with errors and they actually didn't come up with the results they intended.

So if you take me back to pre-computer technology, that's a little

Page 28

ANDREW CHIN

bit of evidence that that probably wouldn't have been a good idea.

Q.   Would you say these transactions were fairly complex?

MR. KLEIN:  Object to form.

A.   The calculation, you know, within my scope of work, the calculation I did was relatively simple.  I have no opinion on the complexity of what it took to get to produce the spreadsheets I was given.  But my part was relatively simple.

Q.   Was the underlying data simple or -- you referred to the Gratz case, that's why I am asking.

MR. KLEIN:  Object to form.

A.   Yeah, can you restate for me?

Q.   The underlying data you examined itself, can you elaborate on the basis for analogizing that data to the Gratz case?

A.   Just in terms of the number of trades.  Doing it by hand there would still be some significant sorting tasks

ANDREW CHIN

required.

Some of the errors in the Gratz calculations were mismatches.  There were lower per-share outstanding purchases or higher per-share sales that the person missed while writing in the ledger in pen and had to match them up, so.

Q.    Now, when you were first engaged were you assigned a particular task or question that you were supposed to answer?

A.    I was asked to calculate the short-swing profits according to my understanding of how to do that.  And I was told I am going to get a trading pattern that will give me all of the information I need to do that, the dates of the trades, the per-share prices that are either direct or imputed and all I had to do was the algorithmic part.

Q.    And were you asked to write an algorithm, write a code to perform that analysis?

MR. KLEIN:  Objection to form.

Page 30

ANDREW CHIN

To the extent that you were asked anything by counsel either directly or indirectly, please don't reveal any privileged information.

THE WITNESS:  Sure.

A.    I wasn't asked, you know, specifically to write code.  After I realized that the, using the online calculator was going to be a dead end and I would have to write this from scratch, I had an exchange with Mr. Chang just telling him, you know --

MR. KLEIN:  Doctor, I am going to ask you to not reveal any of the details of that.  Can we leave it at exchange with Mr. Chang?

THE WITNESS:  Yeah, okay.

MS. BRATIC:  Mr. Klein, to be clear, my understanding is Mr. Chang is not an attorney.

MR. KLEIN:  He's a consultant for plaintiff's counsel at the very least and we communicate with him and I think that's work product.

Page 31

ANDREW CHIN

MS. BRATIC: Okay. Have you all engaged Mr. Chang? Does he -- what was the relationship between your firm and Mr. Chang?

MR. KLEIN: I understand to be the same as your firm and Cornerstone.

Q. After you performed your initial analysis, Professor Chin, did you share of a draft of your results with anyone?

A. I shared a summary of my results with Kevin Jewell.

Q. And how many drafts of your results did you go through?

A. Somewhere around, I would say just roughly 5 to 10.

Q. What changed in each of those results broadly?

MR. KLEIN: Be very broad here.

A. Well, since I was just sending him the bottom line calculations, there were changes in those numbers every time.

You know, we went through several iterations of different data. I

Page 32

ANDREW CHIN

did some debugging as well.

Q.    So let me ask it again, maybe a different way.

Were you changing -- when you went through different versions of your results, were you changing the code or was the source data changing?

MR. KLEIN:  Objection to form.

A.    On different occasions, you know, one or the other.

There were some issues with like the form in which the data was provided to me, wasn't matching my parser, for example, and had to clean that up to get it to work properly.

Q.    Were you instructed to make any changes during that process?

A.    No.

Q.    Now, how was your report itself drafted?

A.    I drafted it myself.

Q.    Did you show any drafts of that report to anyone?

A.    No.  Just sent the report

Page 33

ANDREW CHIN
directly to Fideris, to Mr. Chang.

Q.    And did they ask you to make any changes to your report?

A.    Not that I can recall.  If there were any, they were cosmetic.

Q.    All right.  Now, you mentioned working with Kevin Jewell for your report; is that correct?

A.    Yes.

Q.    How do you know Mr. Jewell?

MR. KLEIN:  Objection to form.

A.    Only through this engagement. He was my contact for the data.

Q.    Okay.  Do you know what his occupation is?

A.    I don't specifically.  All I know that he's a consultant that the firm retained in this matter.  I assume he has some relevant expertise.

Q.    And what firm are you referring to when you say "the firm"?

A.    The -- well, I guess -- I don't know if he was retained by Fideris or the plaintiff's attorneys, but I assume he

Page 34

ANDREW CHIN
was chosen for his expertise, so.

Q.    Okay.  Do you know when
Mr. Jewell began working on this matter?

A.    I don't.

Q.    And how did Mr. Jewell assist
you in preparing the report?

MR. KLEIN:  Objection to form.

A.    He didn't.  He didn't.  Once we
confirmed that the bottom line amounts
were consistent, I just wrote up what I
had independently.

Q.    Okay.  Do you know when
Mr. Jewell began working on this case?

A.    I don't.

MR. KLEIN:  Object to form.

Q.    So you say in your report that
Mr. Jewell provided the transaction data
and two Excel workbooks that you use in
your report; is that correct?

A.    Yes.

MR. KLEIN:  If you're going to
ask him about the details of his
report, it might help to show it to
him, but I will leave that to you.

Page 35

ANDREW CHIN

MS. BRATIC:   I am happy to pull it up, if you would like.

A.     I do now.

Q.     And you cite here, "Mr. Jewell provided the transaction data to me in two Excel workbook files"?

A.     Yes.

Q.     Is that the transaction data that you relied on for your calculations?

A.     Yes.

Q.     Were there different versions of that data that you reviewed?

A.     Yes.

Q.     About how many versions did you see?

A.     Again, in the neighborhood of 5 to 10.

Q.     Have you produced all of the data that Mr. Jewell provided to you with your report?

A.     I have not, no.

Q.     Do you know how Mr. Jewell prepared that transaction data?

A.     Well, kind of a rough idea of

Page 36

ANDREW CHIN

what would be required to do that, but I don't know if he did that personally or how.

Q.    You don't know how he prepared these Excel workbook files?

A.    No, I don't know what he did on his end.

Q.    Did you do anything to verify this data yourself?

A.    Verify them as to whether they corresponded to facts on the ground?

Q.    Yes, if they were accurate?

A.    No.

Q.    Besides these Excel workbook files -- you cite in paragraph 36 to documentation in the form of a Word document that Mr. Jewell gave you; do you see that?

A.    Right, yes.

Q.    What documentation -- can elaborate on what that documentation was?

A.    Yeah, he was explaining the column headers in the Excel workbook. Generally a couple of sentences kind of

Page 37

ANDREW CHIN

or just lines, sort of explaining in clearer terms as to what the columns signified.

Q.    And you also say he gave you a specification of the Smolowe algorithm?

A.    Yes, that was very brief.  Just basically the lowest and highest out.  My understanding is that is what he used to come up with the figures on his side.

Q.    What figures did Mr. Jewell come up with on his side?

A.    I actually don't know.  I believe our correspondence in terms of exchanging figures was limited to my sending him my bottom line numbers and then him writing back sort of saying whether we were in agreement or not.  And if we weren't, I went and debugged and tried to clarify understanding of what the columns meant.

Q.    Did you rely on any instructions in terms of how to apply Smolowe beyond what was contained in this Word document?

Page 38

ANDREW CHIN

A.    Well, it didn't teach me how to apply Smolowe.  So if you ask me how I -- how I learned the Smolowe algorithm, that was back in corporate law in law school.

Q.    Well, how did you use the specification that Mr. Jewell provided to you?

A.    I didn't other than understanding that that is what Mr. Jewell was doing on his end and how he understood the assignment.

Q.    And did you produce this Word document with your report?

A.    I did not.

Q.    I am going to take this down but happy -- let me know if you need me to put it up again.  I only have so many screens up.

A.    Thank you.

Q.    Now, how long have you been working with Fideris Partners?

A.    Just for this engagement, so again in early October, I think is when we started.

Page 39

ANDREW CHIN

Q.    Have you ever been in contact with them before this engagement?

A.    I have not, no.  Let's see, I think I did, earlier in the summer I filed an addition for rulemaking with the SEC and I believe Mr. Abraham may have been one of the people I contacted just to let him know I filed it.  But that was about it.

Q.    When was that approximately?

A.    I filed, I think, mid-June with the SEC and I thought that it would be helpful to have some comments expressing interest in the proposal, which was basically to have the SEC clarify that the lowest and highest out algorithm only achieves the maximum possible profit recovery within six months and that linear programming offered a more robust alternative.

And I thought that plaintiffs' attorneys in 16(b) cases would be the natural group to approach for possible comments.

Page 40

ANDREW CHIN

So I think I identified maybe 8 to 10 frequent 16(b) plaintiffs' attorneys and e-mailed them.

And I apologize, I don't, as I am sitting here, I don't remember if Mr. Abraham was one of them.  If he was, then he was one of the people I sent this form e-mail to.

Q.    Do you remember if you had any follow-up discussions with Mr. Abraham about that?

A.    No.  He didn't reply.

Q.    Was that a public -- you said it was a brief you filed?

A.    Yes, the petition for rulemaking is on the SEC website.

Q.    Any reason you reached out to plaintiffs' attorneys in particular and left defense counsel out of the mix?

A.    Well, defense counsels aren't as much repeat players, I would say, in this type of litigation.  It's hard to know ex ante who is going to be a defendant in these types of cases.

Page 41

ANDREW CHIN

But beyond that, of course, there is a natural alignment of interest given using the linear programming can only increase recoveries beyond the lowest and highest out algorithm.

Q.    Going back to your relationship with Fideris, did anyone else at Fideris work on your report?

A.    No.

Q.    Did you discuss your report with anyone else at Fideris?

A.    No.

Q.    Did anyone else besides Mr. Jewell assist you in the preparation of your report?

A.    I got kind of a template as to form for Fideris, but that was it.

Q.    Was it a template for the form of your written report?

A.    Yes.

Q.    All right.  I will put up on your screen, I am going to just go through your CV at the back of your report which is Appendix A.

Page 42

ANDREW CHIN

A.    Okay.

Q.    I assume you know it, but I will put it up on the screen for everyone's benefit.

First of all, is this CV still accurate?

A.    It is, yes.

Q.    And you're currently an adjunct professor at the University of North Carolina?

A.    I am actually a permanent faculty member at the law school.  So I hold the title of distinguished professor.  My adjunct professorship is a courtesy appointment at the School of Information and Library Science.

Q.    Apologies and thank you for clarifying that.

So you're a professor at both the School of Law and the School of Information and Library Science?

A.    Yes.  Again, it's just a courtesy appointment at SILS.

Q.    What courses do you teach at

Page 43

ANDREW CHIN

both of those schools?

A.    I don't teach at SILS.  On occasion -- well, I regularly teach patent law and antitrust law, and in recent years, every year, I have been teaching this seminar on artificial intelligence and the law.

Classes I teach occasionally are contracts, intellectual property, international intellectual property and, let's see, there is cyber law seminar and I think that's it.

Q.    Have you ever taught a course on securities regulation or enforcement?

A.    I have not.

Q.    Did you work with anyone at UNC, including student and faculty members, in preparing your report?

MR. KLEIN:  Objection to form.

A.    I did not.

Q.    Did you discuss the report with any of those people?

A.    No.

Q.    Under legal experience on your

Page 44

ANDREW CHIN

resume, you list a few positions

including an associate at Skadden Arps.

Do you see that?

A.    Yes.

Q.    During your time at Skadden

Arps, did you work on any securities

cases?

A.    I don't believe so.

Q.    Have you, outside of your work

as a professor, have you -- do you have

any legal experience other than what is

listed here on your CV?

MR. KLEIN:  Objection to form.

A.    In terms of practice legal

experience?

Q.    Yes.

A.    Well, I filed amicus briefs,

you know, in various matters.  In terms

of representing clients, no, my bar

memberships are inactive.

Q.    Thank you.  You answered the

question better than I asked it.

How long have your bar

memberships been inactive?

Page 45

ANDREW CHIN

A.    I activated the California one for several years while I was filing amicus briefs with the Supreme Court.  I think it's been inactive for the last two years.

My Virginia bar membership has been inactive, I believe since I started at UNC, which is 2001.

Q.    Let me go to page 20 of your report then.  You list here the three data sources that you relied on.  Are those two the Excel files and the Word document that we discussed earlier?

A.    Yes.

Q.    Do you know what sources Mr. Jewell used to prepare these Excel documents?

A.    I do not.

Q.    Going back to that Word document that Mr. Jewell provided you, did the specifications contained in that Word document determine how you wrote your code in any way?

A.    No.  I'm sorry, you said in any

Page 46

ANDREW CHIN

way.  I guess in terms of parsing the columns and identifying the variables. So the parser part did rely on his characterizations of the column headings.

Q.    Okay.  Now, were each transactions that Mr. Jewell gave you limited to a specific time period?

MR. KLEIN:  Objection to form.

A.    Could you clarify that, please?

Q.    Do you remember what time period was covered by the Excel files that Mr. Jewell provided to you?

A.    I don't.  That actually wasn't material to the calculation because all of them were within six months.  So I didn't pay close attention to the dates other than determining that they were within a single six-month period.

I don't, as I sit here, recall which six-month period it was.  I do recall that it was within the statute of limitations, though.

Q.    It's not a gotcha question. Let's go to paragraph 38 of your report.

Page 47

ANDREW CHIN

You said, "All of the trades in both workbook files are indicated to have taken place between March 11 and July 8, 2020"?

A.    Okay, yeah, that sounds, that sounds right.

Q.    So did you make any changes to those workbook files in terms of the dates of the transactions?

A.    I didn't change the workbook files at all.

Q.    Okay.  Did you look at any transactions that were outside of this time period?

A.    No.

Q.    Are you taking any position on whether the defendants were part of a group as of these dates?

MR. KLEIN:  Objection to form.

A.    No, I wouldn't know.

Q.    If these dates were not accurate, would that impact your calculations?

MR. KLEIN:  Objection to form.

Page 48

ANDREW CHIN

A.    Inaccurate in what way?

Q.    If the Court were to decide that the defendants were not a group as of these dates, but perhaps were a group as of different dates, would that impact your resulting calculations?

MR. KLEIN:  Objection to form.

A.    Certainly, you know, you can vary dates so that they, some fall outside the statute of limitations.  That would impact things.  If the period exceeds six months it impacts things.

So, yeah, yeah, a change in the dates could conceivably change the numbers.

Q.    Did you perform any alternative analysis with different dates in it?

A.    I did not.

Q.    And did the two workbook files contain transaction data for all of the defendants in this case?

MR. KLEIN:  Objection to form.

A.    I wouldn't know.

Q.    Do you know what defendants had

ANDREW CHIN

transaction data included in those workbook files?

A.    Sorry, do I know?

Q.    Which defendants' transaction data was reflected in those workbook files?

A.    Only the labels they were given in the spreadsheets.

Q.    Have you performed any alternative analysis to determine if you removed one or multiple defendants from your calculations what the results would be?

A.    I broke out the grand total recovery by each defendant, so it would be easy to do if you're asking if we remove one of the defendants, what does it add up to.  That's just taking that line out of the table.

Q.    Do you have any opinion on whether different configurations of defendants would cross the 10 percent threshold provided under Section 16(b)?

MR. KLEIN:  Objection to form.

Page 50

ANDREW CHIN

A.    I don't know what their holdings were, so I wouldn't have a basis for that sort of analysis.

Q.    Now, going to paragraph 13 of your report, this is my own highlighting and it's not from your report.

A.    Sure.

MR. KLEIN:  Can I note for the stenographic record that you were highlighting materials in the report that has been displayed on the screen.

MS. BRATIC:  That's why I deleted it.

MR. KLEIN:  Just wanted to clarify the record.

Q.    Professor Chin, you say in paragraph 13 of your report that you apply the -- you wrote, "two variants of a program that under (2) applies the Smolowe algorithm to each of these groups, calculating and totaling the recoverable profits from matched pairs of transactions and sales."

Do you see that?

ANDREW CHIN

A.    Yes.

Q.    What do you mean by the Smolowe algorithm?

A.    That's the lowest in, highest out algorithm that Judge Clark stated. And I think he stated more carefully than it's been read since then; that this lowest in, highest out calculation is correct, at least as to traits within a single six-month period.

Q.    And Judge Clark did not use a computer program in Smolowe, did he?

        MR. KLEIN:  Objection to form.

A.    No, it was a very short trading pattern.

Q.    Have you used the code that you wrote in this case in any other context?

        MR. KLEIN:  Objection to form.

A.    No.

Q.    Apologies, I didn't hear your answer.

A.    No.

Q.    Did you ask anyone to review your code to check it for inaccuracies?

Page 52

ANDREW CHIN

A.    No.

Q.    Now, going to page 20 of your report, you say here that you relied on three academic articles; do you see that?

A.    Yes, although the note was just for, I believe, a relatively incidental comment.

MR. KLEIN:  Object to form.  I will note he says he considered them, not that he relied upon them.

THE WITNESS:  Yes.

Q.    So the primary articles that you considered were the first two?

A.    Yes.

Q.    And those are both articles that you wrote?

A.    Yes.

Q.    Let me go to paragraph 33 of your report.  You say here, "My correctness proof of the Smolowe algorithm and The Learned Hand Unformula for the Short-Swing Liability in the Washington Law Review therefore provides formal verification of both Variant 1 and

Page 53

ANDREW CHIN

Variant 2"?

MR. KLEIN:  Object to form.  I think you paraphrased that and didn't quite read it right.

MS. BRATIC:  I believe I omitted the specific citation.  Would you like to read it into the record?

MR. KLEIN:  No, it's fine.  I am just noting it.

Q.   Professor Chin, this article that you cite in paragraph 33, is that an article that you wrote?

A.   Yes.

Q.   Now, the algorithm that you relied on -- sorry, the code that you wrote for this case was not available in 2016; is that correct?

A.   That's right.

Q.   So this Washington Law Review article did not analyze the code that you wrote in this case?

A.   Not line by line, no.

Q.   Well, not at all because it didn't exist at the time, right?

Page 54

ANDREW CHIN

A.    Right.  If you're describing the lines of code at that level of abstraction, concretely the program did not exist.

Q.    But this article did not provide formal verification for your code?

A.    It provided formal verification -- well, so computer science teaches that verification occurs at different levels of granularity and abstraction.  And at the level of algorithmically correctness, that is formal verification.

And I identify the lines that substantiate each of the steps of the algorithm in the next section.

Q.    In computer science, can you formally verify a code ex ante before it exists?

A.    That is not a usage of formal verification that computer science, at least in academia, would use.  There is -- there are a couple of books that I

Page 55

ANDREW CHIN

reference that are standard text teaching formal verification. And they are dealing with software verification at the level that I address them in this article.

So they don't debug lines of code. That's a different discipline.

Q. Is the code you wrote different than the basic lowest in/highest out formula?

A. I guess you would need to clarify that. There is parsing steps. There is output steps. There are obvious differences.

Q. I am going to put up on your screen, this will be Exhibit 2 to the deposition. Is this the article that you're referring to in paragraph 33 in your report?

A. Yes.

Q. And this is the article that you said provided correctness proof of the Smolowe algorithm?

A. Yes.

Page 56

ANDREW CHIN

Q.    Now, this article refers to the Smolowe formula.  Is that -- does that have the same meaning as Smolowe algorithm as you use that term in your report?

A.    Yes.

Q.    And just to clarify that point, I would like to go to footnote 6.  You say, "The formula will be referred to hereinafter as the Smolowe formula or the formula and the more common designation, the Smolowe rule, will not be used in order to avoid unintended connotations of legal authority in light of the formula's questionable applicability in complex cases."

A.    Yes.

Q.    In what circumstances would you consider the formula to be of questionable applicability?

A.    Well, that's the central pieces of the article, which is that it is a fallible formula when you have a trading pattern that exceeds six months or has

Page 57

ANDREW CHIN

trades that are outside the statute of limitations that might be matchable with trades earlier in the pattern.

Q.    Is your formula susceptible to those same complications?

A.    Well, there are still complications.  But the approach I used addresses those complications prior to the optimization step.

Q.    And so to summarize, I am trying to put this in terms that lawyers can understand a little bit better, so please correct me if this is not an accurate summary.

When implementing your code, you made modifications in order to address the concerns that you had identified with the Smolowe formula; is that a fair assessment?

MR. KLEIN:  Objection to form.

A.    No, that's not correct.  My position is that the Smolowe formula is actually accurate in the case of the facts presented, because all of the

Page 58

ANDREW CHIN

trades take place within a single six-month period.  So the complications that I address with the linear programming algorithm are not necessary.

And in fact the article proves that the Smolowe algorithm is adequate for those simpler fact patterns.  So that's where the formal verification comes from.

Q.    And did you try to address those potential complications in the code that you wrote for this case?

MR. KLEIN:  Objection to form.

A.    Again, I wrote this Boolean function that would identify which pairs of -- you could identify two pairs, a pair of trades and it would tell you the Boolean value true or false, are they matchable in the sense that they are within six months under the doctrines that are applicable.  But that complication doesn't arise with these patterns which are all within six months.

Q.    Would you feel comfortable

Page 59

ANDREW CHIN

applying the code that you wrote in case to a transaction set that was longer than six months?

A.    I would not.

MR. KLEIN:  Objection to form.

Q.    Would you feel comfortable applying the code that you wrote in this case to a transaction set that involved dates potentially outside the statute of limitations?

A.    I would not.  Again, I will need to clarify what you mean by code I wrote for this case.

I do have this separate function which I didn't include in the code that I ran, so it would be relatively a straightforward manner to implement that function and then do a call to a linear programming algorithm.

So, again, as to the code I ran for this case, that wouldn't be appropriate for the complications, but I did write the key module that would be necessary to address those complications.

Page 60

ANDREW CHIN

Q. Okay. And for the sake of simplicity, I will try to limit my questions and you can limit your answers to just the code that you produced that's on record for the case.

A. Okay.

Q. Are there any other scenarios in which you would not feel comfortable applying that code due to potential complications?

MR. KLEIN: Objection to form.

A. Well, I mean, there is the rule of garbage in/garbage out, right? So if the data is inaccurate, then my outputs are going to be inaccurate.

Q. And you said you didn't do anything to verify that the data was accurate, correct?

A. I didn't verify it with facts on the ground, yeah.

Q. Okay. Now, you say in your report that Mr. Jewell provided validation for your conclusions by writing his own computer code; is that

Page 61

ANDREW CHIN

correct?

A.    Yes.  Well, did I say -- I don't recall whether I referred to him as having written code.  I assume that's what he would need to do, that he didn't do it by hand.  But whatever calculations he did, he did independently.

Q.    Did you rely on Mr. Jewell's validation?

MR. KLEIN:  Objection to form.

A.    Yeah, can you -- can you -- did I rely on it?  I mean I refer to it in the report, so in order to make that statement I needed to learn from Mr. Jewell that our figures were broadly in agreement.

Q.    And you said you have not seen Mr. Jewell's program code?

MR. KLEIN:  Objection to form.

A.    I don't know whether -- again, I don't have a basis for knowing that he wrote a program.

I think the paragraph you're showing me are words that he implemented

Page 62

ANDREW CHIN

the Smolowe algorithm, which he didn't use pencil or paper, I assume he didn't because he works faster than one would need to do it by hand.

Q.   So when you say here, "I have not seen Mr. Jewell's program code," you're saying now that you're not sure if he even had a code?

A.   Well, if he wrote code I have not seen it.

Q.   So you have also not reviewed his code or his pen and paper calculations, if that's what he preferred, to say whether that was accurate?

MR. KLEIN:  Objection to form.

A.   I haven't reviewed his code, no.

Q.   You referred to the results of Mr. Jewell's implementation of the Smolowe algorithm; do you see that in paragraph 34?

A.   Can you repeat the question?

Q.   You referred to Mr. Jewell's

Page 63

ANDREW CHIN

results in this paragraph; are you referring to his total profit calculations?

A.    Yeah, the -- sorry, I got something popped up on the screen, okay.

I am referring to comparisons that he made on his side between the bottom line numbers I gave him and what he had come up with.  But he never told me, you know, what his exact figures were.

Q.    And so you haven't seen his results at any time?

A.    No.  The only information I have about his results are that we came close ultimately.

Q.    Now, did you and Mr. Jewell exchange a single set -- sorry, let me rephrase that to not use the word "exchange."

You said you and Mr. Jewell went through a number of iterations of this process; is that correct?

MR. KLEIN:  Object to the form.

Page 64

ANDREW CHIN

A.    What do you mean by "this process"?

Q.    You referred earlier to 5 or 10 different versions of the code and input data that you ran.  Do you recall that?

A.    I wouldn't say that there were 5 to 10 versions of the code.  The 5 to 10 is inclusive of varying versions of the data as well.

Q.    How many different validations did you run with Mr. Jewell?

MR. KLEIN:  Objection to form.

A.    So by validation, you mean sending him my bottom line numbers?  You know, again, probably 5 to 10.

Q.    And the first 5 to 10 times you sent that, did those results agree within 10 cents or less?

MR. KLEIN:  Objection to form.

A.    Some of them did, some of them didn't.

Q.    And you haven't disclosed the results of those prior validations in your report, correct?

Page 65

ANDREW CHIN

A.    No.

MR. KLEIN:  Object to form.

Q.    Now, you refer in paragraph 35 to the term "Chevron" and "Loper Bright" as the names of the two Excel workbook files.

A.    Right.

Q.    Who told you to use those terms?

MR. KLEIN:  Object to form.

A.    I believe they were referred to in the documentation that Mr. Jewell gave me.

Q.    And you say that this refers to calculations pertaining to the application of 17 CFR 240.16(b)-6 in the aftermath of Loper Bright Enterprises versus Raimondo?

A.    I just figured that out from context.  I am not an administrative law professor.  But I am aware in sort of broad terms about the potential impact of Loper Bright on agency rulings.

Q.    Are you provided any legal

Page 66

ANDREW CHIN

opinion on how the Loper Bright decision affects the decision of discourageable profits under 16(b)?

A.   I am not.  I am just using that to identify and provide my understanding as to why there were two different workbooks.

Q.   Are you providing any legal opinion on how to address different transactions in terms of how to calculate discourageable profits under the current SEC rules?

A.   I am not.

Q.   Since you signed your report on October 15th, have you in any way updated the analyses in your report?

A.   No.

Q.   Are there any changes to your opinions?

A.   No.

Q.   Have you discovered any errors either in your report or in your code that you ran to get your conclusions?

A.   No.

Page 67

ANDREW CHIN

MS. BRATIC:  Let me take a break here.  If we can go off the record. Maybe we can take 10 minutes?

MR. KLEIN:  Sure.

THE VIDEOGRAPHER:  This will be the end of video media disk number one.  The time is 1:20 p.m.  And we are going off the video record.

(Off the record.)

THE VIDEOGRAPHER:  We are back on the video record.  The time is 1:27 p.m.  Please proceed.

MS. BRATIC:  I have no further questions and I heard someone say they did, but I didn't hear who it is.

MR. KLEIN:  It's Klein.

MS. BRATIC:  Go ahead.

BY MR. KLEIN:

Q.    Okay.  Professor Chin, we spoke briefly during the break, correct?  I asked you one question before the videographer?

A.    If I am doing okay, yes.

Q.    And we had no other

Page 68

ANDREW CHIN

correspondence during the break?

A.    Yeah.

Q.    Do you recall about 15 minutes ago you were asked -- and I think the time stamp on the stenographic record is 13:10:35 more or less, I am trying to read this question exactly, Ms. Bratic asked.

"Question:  Would you feel comfortable applying the code you wrote in this case to a transaction set that was longer than six months?"

And your answer is "I would not."

Do you recall that?

A.    Yes.

Q.    You code that you wrote -- I'm sorry, is that for the reasons described in the Smolowe, in your Law Review article?

A.    It is.  And I may be an unusual person, my response to that question is it may be unusual because I am pretty heavily invested in promoting the

Page 69

ANDREW CHIN

correctness of my approach for the more complicated trading secret patterns.  But I am not aware that there is anyone else as invested as I am in that.

Q.    If you applied that code to a period that was longer than six months, would this code still give you a disgorgement number?

A.    It would, yes.

Q.    That disgorgement number per se wouldn't necessarily be the highest possible disgorgement number for the reasons discussed in the law review article, correct?

A.    That's correct, yes.

Q.    And if the trades here were longer than six months, would you have written the code differently so that it applied to the processes discussed in your law review article?

MS. BRATIC:  Objection to form.

A.    Yes.

Q.    Let me reask the question.  If the relevant period here were longer than

Page 70

ANDREW CHIN

six months, could you have written the code differently such that it applied to the algorithm?

MS. BRATIC:  Objection to form.

A.    I was making a start toward that before I saw the data.  So, yes, I am confident that I could have finished if it was necessary.

Q.    You were asked the same question about dates.  Essentially the same question, whether you would feel comfortable running the code if the dates were potentially outside the statute of limitation; do you recall that?

A.    Yes.

Q.    And you said you would not feel comfortable applying the code?

A.    Yes.

Q.    Is that for the same reasons that we just discussed?

A.    Yes, it is.

Q.    Any other reason?

MS. BRATIC:  Objection to form.

A.    No.  No.  By comfortable, I

Page 71

ANDREW CHIN

would say that if you do run the Smolowe algorithm on these more complicated trading patterns, as we said, we do get a disgorgement number which may or may not be correct.  You know, sometimes, you know, by happy accident it will give you the correct number.  And I would feel comfortable that a Court would approve it given the heavy precedents supporting Smolowe.

But again, I am pretty wedded to my argument that this true holding of Gratz and Smolowe, that it's maximum disgorgeable profit, that is the real -- it's the real rule.  The Second Circuit never endorsed the lowest in/highest out algorithm.

Q.    I think I have one last question.  That is when you say correct number, do you mean the same thing when you say maximum disgorgeable profit?

MS. BRATIC:  Objection to form.

A.    I do.

MR. KLEIN:  I have no further

Page 72

ANDREW CHIN

questions.

MS. BRATIC:  No follow-up for me.

MR. KLEIN:  Thank you for your time, Professor.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Are you ready to conclude this deposition?

MR. KLEIN:  Just stay on, the videographer is going to take us off the record.

THE VIDEOGRAPHER:  This concludes today's testimony given by Andrew Chin.  The total number of media disks was two and will be retained by Veritext New York.  The time is 1:31 p.m. and we are going off the video record.

(Time noted:  1:31 p.m.)

Page 73

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

12/13/2024 - ANDREW CHIN

ACKNOWLEDGEMENT OF DEPONENT

I, ANDREW CHIN, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.


_____    _____

ANDREW CHIN                         Date

*If notary is required


SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.



_____

NOTARY PUBLIC

Page 74

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of December, 2024.

_____
DAWN MATERA

*        *        *

Page 75

I N D E X

Witness                                              Page

ANDREW CHIN

Examination By Ms. Bratic                      8
              Mr. Klein                        68

E X H I B I T S

                                                     Page

Exhibit 1 Expert Report of Andrew              5
          Chin
Exhibit 2 Article                              5

-oOo-

Page 76

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

12/13/2024 - ANDREW CHIN

          E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____  _____

ANDREW CHIN                           Date

**[& - activated]**

| & | | | |
|---|---|---|---|
| **&** | 2:4,19 3:3,16 4:9 | | |

**0**

**00249** 1:3 6:6

**1**

**1** 5:3 52:25 75:8
**10** 31:17 35:18 40:3 49:23 64:4,8,9,16,17 64:19 67:4
**10001** 3:6
**10005** 4:10
**10007** 3:12
**10017** 2:12 4:6
**10020** 3:18
**10105** 2:22
**10123** 2:5
**11** 47:4
**11th** 2:21
**12/13/2024** 73:2 76:2
**1271** 3:18
**12:05** 1:21 5:11
**13** 1:20 50:5,18
**1345** 2:21
**13:10:35** 68:7
**13th** 5:12
**140** 4:10
**15** 68:4

**15th** 66:16
**16** 39:23 40:3 49:24 66:4
**17** 65:17
**175** 3:11
**18th** 74:18
**1997** 20:7
**1:20** 67:8
**1:22** 1:3 6:6
**1:31** 72:18,20

**2**

**2** 5:6 50:20 53:2 55:17 75:10
**20** 45:10 52:3 73:17
**2001** 45:9
**2013** 17:20,23 20:3
**2015** 17:21 20:25 21:23 22:15
**2016** 17:17 25:13 53:18
**2018** 25:12,14
**2020** 47:5
**2024** 1:20 5:12 74:19
**240.16** 65:17
**28th** 23:15
**29th** 23:14

**3**

**3** 3:12
**30** 13:9 14:24
**31st** 23:14,15
**33** 52:19 53:12 55:19
**34** 62:23
**35** 65:4
**36** 36:16
**38** 4:10 46:25
**38th** 2:5
**390** 2:12
**3a** 9:16

**4**

**40** 14:25
**4200** 2:16
**450** 2:5
**485** 4:5

**5**

**5** 31:17 35:17 64:4,8,8,16,17 75:8,10
**52nd** 3:12
**5777** 74:21

**6**

**6** 56:9 65:17
**600** 13:17
**609** 2:16
**68** 75:5

**7**

**77002** 2:17
**7th** 2:5

**8**

**8** 40:2 47:4 75:4

**a**

**able** 24:3
**abraham** 2:4,6 12:10 39:7 40:7,11
**abstraction** 54:4,13
**academia** 54:24
**academic** 52:5
**accident** 11:17 11:21 71:7
**accurate** 36:13 42:7 47:23 57:15,24 60:19 62:16
**achieves** 39:18
**acknowledge...** 73:3
**acknowledg...** 22:2
**act** 11:23
**action** 1:3 74:14
**activated** 45:2

**[actually - application]** Page 2

**actually** 8:24 17:18 20:5 22:17 23:4,7 25:22 27:21 37:13 42:12 46:14 57:24
**add** 12:2 21:3 49:19
**added** 21:6
**addition** 39:6
**additions** 73:6
**address** 55:5 57:18 58:4,11 59:25 66:10
**addressed** 23:2
**addresses** 57:9
**adequate** 58:7
**adjunct** 42:9 42:15
**adjusted** 14:5
**adjustment** 11:17
**administrative** 65:21
**advising** 14:12
**affected** 23:11
**affects** 66:3
**aftermath** 65:18
**afternoon** 5:10 7:7
**aftlaw.com** 2:7 2:8

**agency** 65:24
**ago** 14:4 68:5
**agree** 5:21 64:18
**agreement** 37:18 61:17
**ahead** 67:18
**al** 6:3 73:1 76:1
**algorithm** 19:18 20:3,5,6 20:9 26:16 27:4,6,10 29:23 37:6 38:4 39:17 41:6 50:21 51:4,6 52:22 53:15 54:18 55:24 56:5 58:5,7 59:20 62:2,22 70:4 71:3,18
**algorithmic** 29:21
**algorithmically** 54:14
**algorithms** 17:9
**alignment** 41:3
**alternative** 39:21 48:17 49:11
**americas** 2:21 3:18

**ameriprise** 4:17
**amicus** 44:18 45:4
**amounts** 34:10
**analogizing** 28:21
**analyses** 66:17
**analysis** 14:17 14:18,21 21:19 29:24 31:9 48:18 49:11 50:4
**analyze** 53:21
**analyzed** 9:19
**andrew** 1:19 5:4,24 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1

60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,15 73:2,4 73:13 75:3,8 76:2,24
**anson** 1:7 2:11 6:2 7:13 9:16 73:1 76:1
**answer** 14:2 29:12 51:22 68:14
**answered** 44:22
**answers** 60:4
**ante** 40:24 54:20
**antitrust** 43:5
**anybody** 15:8
**apologies** 42:18 51:21
**apologize** 23:25 40:5
**appeal** 14:14
**appended** 73:8
**appendix** 41:25
**applicability** 56:16,21
**applicable** 58:22
**application** 65:17

**[applied - bratic]**

applied  69:6,20 70:3

applies  50:20

apply  37:23 38:3 50:19

applying  59:2,8 60:10 68:11 70:18

appointment  42:16,24

approach  39:24 57:8 69:2

appropriate  59:23

approve  71:9

approximately  5:11 39:11

arguing  19:11

argument  14:13 71:13

arps  3:3 44:3,7

arrangement  6:14,20

article  5:6 16:7 17:17,21 18:20 19:9,10,11 21:4 24:24 27:20 53:11,13 53:21 54:6 55:6,18,22 56:2,23 58:6 68:21 69:15,21 75:10

articles  52:5,13 52:16

artificial  43:7

asche  4:9,11

asked  21:2 29:13,22 30:3 30:7 44:23 67:22 68:5,9 70:10

asking  10:4 26:4 28:16 49:17

assessment  57:20

asset  1:8,9 3:9 3:11

assigned  29:10

assignment  38:12

assist  34:6 41:15

associate  44:3

assume  33:19 33:25 42:3 61:5 62:3

attention  46:17

attorney  15:17 25:24 30:21

attorneys  2:4 2:11,19 3:4,9 3:16 4:4,9 15:11 33:25 39:23 40:4,19

audio  5:19

augenbaum  1:4 2:4 6:2 12:7 73:1 76:1

august  23:13 23:14

authority  56:15

automated  21:8,11

available  17:7 24:12 26:19 53:17

avenue  2:5,12 2:21 3:18 4:5

avoid  56:14

aware  16:17 26:8,11,20 65:22 69:4

**b**

b  39:23 40:3 49:24 65:17 66:4 75:7

back  17:13 20:7 24:9 27:24 37:17 38:5 41:7,24 45:20 67:11

bar  44:20,24 45:7

basic  55:10

basically  37:8 39:16

basis  28:21 50:3 61:22

began  34:4,14

behalf  12:4 19:6

believe  7:20 10:23 13:3 15:18 20:21 37:14 39:7 44:9 45:8 52:7 53:6 65:12

bells  21:3

benefit  42:5

better  8:12 44:23 57:13

beyond  26:23 37:24 41:2,5

bit  28:2 57:13

blood  74:14

books  54:25

boolean  23:7 58:15,19

bottom  31:22 34:10 37:16 63:9 64:15

brands  1:12 8:22 9:3

bratic  2:15 7:6 7:12 30:19 31:2 35:2 50:13 53:6 67:2,14,18 68:8 69:22 70:5,24 71:23

72:3 75:4
**break** 67:2,21 68:2
**brett** 4:17
**brief** 37:7 40:15
**briefly** 67:21
**briefs** 44:18 45:4
**bright** 65:5,18 65:24 66:2
**brilling** 2:23
**brio** 1:7,7 2:20 2:20
**broad** 31:20 65:23
**broadly** 31:19 61:16
**broadway** 4:10
**broke** 49:15
**bruckhaus** 3:9

**c**

**c** 2:2 3:2 4:2 7:2 20:21
**calculate** 26:21 29:13 66:11
**calculating** 50:22
**calculation** 21:18 25:6 28:7,8 46:15 51:9

**calculations** 29:4 31:22 35:10 47:24 48:7 49:13 61:7 62:14 63:4 65:16
**calculator** 17:3 17:16 18:16 25:10,17 26:18 30:10
**calendrical** 20:9 22:19 23:2 25:8
**california** 45:2
**call** 12:14 15:11 59:20
**called** 9:3,6
**camera** 5:15
**capital** 1:7,10 1:11 2:20 3:17 4:4
**capstone** 17:25
**car** 11:17
**carefully** 51:7
**carolina** 1:20 7:23 42:11
**cary** 1:19 7:23
**case** 6:3,6 7:15 8:25 9:15 11:12 12:7 13:2 14:23 16:15,18 22:7 23:9,17 27:3 27:18 28:15,22

34:14 48:22 51:18 53:17,22 57:24 58:13 59:2,9,14,22 60:6 68:12
**cases** 26:12 39:23 40:25 44:8 56:17
**catherine** 2:15 7:12
**catherine.bratic** 2:15
**cease** 25:11
**center** 3:12
**central** 56:22
**cents** 64:19
**certainly** 48:9
**certification** 74:2
**certified** 1:23 6:10
**certify** 74:6,12
**cfr** 65:17
**chang** 15:15,16 15:22 30:12,17 30:20 31:3,5 33:2
**change** 47:11 48:14,15 76:4 76:7,10,13,16 76:19
**changed** 31:18
**changes** 31:23 32:18 33:4

47:8 66:19 73:7
**changing** 32:5 32:7,8
**characterizati...** 46:5
**charge** 13:13 13:23
**check** 9:10 10:5 23:8 51:25
**chevron** 65:5
**chin** 1:19 5:4 5:24 7:1,7,8,8,9 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 31:9 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1,17 51:1 52:1 53:1 53:11 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1

**[chin - connection]**                                        Page 5

67:1,20 68:1 69:1 70:1 71:1 72:1,15 73:2,4 73:13 75:3,9 76:2,24

**chosen** 34:2

**circuit** 71:16

**circumstances** 56:19

**citation** 53:7

**cite** 35:5 36:16 53:12

**cited** 26:12

**civil** 1:3,22

**clarify** 37:20 39:16 46:10 50:16 55:13 56:8 59:13

**clarifying** 42:19

**clark** 4:7 51:6 51:12

**classes** 43:9

**cle** 25:25

**clean** 32:15

**clear** 9:11 23:19 30:20

**clearer** 37:3

**client** 14:12 19:4,6

**client's** 18:12

**clients** 44:20

**close** 46:17 63:17

**cochrane** 2:13

**code** 18:25 20:20 21:23 22:4,8,14,15,18 22:23 23:3,23 24:4,6 26:8,18 29:23 30:8 32:7 45:24 51:17,25 53:16 53:21 54:3,8 54:20 55:8,9 57:16 58:12 59:2,8,13,17,21 60:5,10,25 61:5,19 62:7,9 62:10,13,18 64:5,8 66:23 68:11,18 69:6 69:8,19 70:3 70:13,18

**coded** 20:17 23:17 24:8

**column** 36:24 46:5

**columns** 37:3 37:21 46:3

**come** 18:9 19:4 19:5 20:2,4 23:6,21 27:22 37:10,12 63:10

**comes** 24:2 58:10

**comfortable** 58:25 59:7

60:9 68:11 70:13,18,25 71:9

**comment** 52:8

**comments** 39:14,25

**common** 56:12

**communicate** 30:24

**community** 18:7

**companies** 8:23 9:23

**company** 8:22 9:3,6,12

**comparable** 27:18

**compare** 22:14

**comparisons** 63:7

**compensated** 12:24

**compensating** 12:25 13:4

**complete** 73:9

**complex** 22:21 28:5 56:16

**complexity** 28:10

**complicated** 69:3 71:3

**complication** 58:23

**complications** 22:19 57:6,8,9 58:3,12 59:23 59:25 60:11

**computer** 10:6 18:3 27:25 51:13 54:10,19 54:23 60:25

**conceivably** 48:15

**concept** 21:20

**concerns** 57:18

**conclude** 72:9

**concludes** 72:14

**conclusions** 60:24 66:24

**concretely** 54:4

**conducted** 5:13 6:7

**conference** 12:14 15:10

**confident** 70:8

**configurations** 49:22

**confirmed** 34:10

**confusion** 26:25

**connecting** 7:21

**connection** 7:19 8:6 11:16

connections 5:16
connotations 56:14
consent 6:13
consider 56:20
considered 52:10,14
consist 17:2
consistent 34:11
consultant 11:6 30:22 33:18
consulting 13:20 14:3
consuming 27:15
contact 15:12 15:14 33:14 39:2
contacted 39:8
contain 48:21
contained 37:24 45:22
context 12:16 51:18 65:21
continue 5:20
continued 3:2 4:2
contracts 43:10
conversation 26:6
copy 21:22

cornerstone 31:7
corporate 38:5
correct 13:17 13:18 20:25 22:8 33:9 34:20 51:10 53:18 57:14,22 60:19 61:2 63:24 64:25 67:21 69:15,16 71:6,8,20 73:9
corrections 73:6
correctness 52:21 54:14 55:23 69:2
corresponded 36:12
corresponden... 37:14 68:2
cosmetic 33:6
counsel 5:24 6:13,22 7:12 10:18 12:10,20 30:3,23 40:20
counsels 40:21
counterargu... 19:20
couple 36:25 54:25
course 8:16,19 12:3 17:25 24:19 41:2

43:14
courses 42:25
court 1:2 6:5 6:10,18,23 8:9 8:14,17 45:4 48:3 71:9
courtesy 42:16 42:24
courts 19:22,23
covered 46:12
creating 27:6
cross 49:23
current 23:3 66:12
currently 42:9
cv 1:3 6:6 41:24 42:6 44:13
cvi 1:8 3:4 9:17
cyber 43:12

**d**

d 7:2 75:2
damages 26:22
data 17:11 23:5 23:18 28:14,19 28:21 31:25 32:8,13 33:14 34:18 35:6,9 35:13,20,24 36:10 45:12 48:21 49:2,6 60:15,18 64:6 64:10 70:7

date 5:5,8 73:13 76:24
dates 21:16 23:11,19 29:18 46:17 47:10,19 47:22 48:5,6 48:10,15,18 59:10 70:11,13
dawn 1:23 6:11 74:4,22
day 73:17 74:18
days 13:10
dead 30:10
deal 19:22
dealing 21:7 23:15 55:4
debt 1:9 3:10
debug 55:7
debugged 37:19
debugging 32:2
december 1:20 5:12 74:18
decide 48:3
decision 66:2,3
declare 73:4
deemed 73:7
defendant 1:16 2:11 3:4 5:25 40:25 49:16
defendants 1:13 2:19 3:9 3:16 4:4,9 7:14

**[defendants - empery]**

9:15,22 12:21 47:18 48:4,22 48:25 49:5,12 49:18,23

**defense** 40:20 40:21

**define** 27:9

**deleted** 50:14

**demos** 25:21

**department** 18:3

**departments** 18:8

**depends** 5:15

**deponent** 73:3

**deposed** 11:14

**deposition** 1:18 5:13,23 6:7 7:18 8:10 15:4 15:9 16:2 55:18 72:9

**deringer** 3:9

**described** 68:19

**describes** 24:24

**describing** 54:2

**designation** 56:12

**details** 18:18 20:10 25:8 30:16 34:23

**determine** 45:23 49:11

**determining** 46:18

**develop** 18:11 26:5

**developed** 17:16,22 20:6

**diane** 18:6

**differences** 55:15

**different** 17:5 20:11 23:12 26:5 31:25 32:4,6,10 35:12 48:6,18 49:22 54:12 55:8,9 64:5,11 66:7,10

**differently** 69:19 70:3

**direct** 29:20

**directly** 21:21 30:4 33:2

**director** 4:17

**directory** 21:15

**discipline** 55:8

**disclosed** 64:23

**discourageable** 66:3,12

**discovered** 66:22

**discuss** 41:11 43:22

**discussed** 15:19 21:4 45:14

69:14,20 70:21

**discussions** 40:11

**disgorgeable** 71:15,22

**disgorgement** 69:9,11,13 71:5

**disk** 5:22 67:7

**disks** 72:16

**dispensed** 23:4

**displayed** 50:12

**distinguished** 42:14

**district** 1:2,2 6:4,5

**doctor** 30:14

**doctrines** 23:9 58:21

**document** 36:18 37:25 38:14 45:14,21 45:23

**documentation** 24:23 36:17,21 36:22 65:13

**documents** 5:2 45:18

**doing** 28:24 38:11 67:24

**dr** 7:7,8

**draft** 31:10

**drafted** 32:21 32:22

**drafts** 31:14 32:23

**due** 60:10

**duly** 7:3 74:8

**e**

**e** 2:2,2 3:2,2 4:2 4:2 7:2 40:4,9 75:2,7 76:3,3,3

**earlier** 39:5 45:14 57:4 64:4

**early** 10:12 38:24

**easy** 19:19 49:17

**efficient** 1:9 3:10

**egsllp.com** 2:23

**eight** 22:13

**either** 29:20 30:3 66:23

**elaborate** 28:20 36:22

**elizabeth** 2:13

**elizabeth.coc...** 2:14

**ellenoff** 2:19

**emperi** 9:16

**empery** 1:8,9,9 1:9 3:9,10,10 3:11

**ended** 17:6 20:11

**endorsed** 71:17

**enforcement** 43:15

**engaged** 29:10 31:3

**engagement** 10:14,21 11:2 12:17 13:7 22:7 33:13 38:23 39:3

**enterprises** 65:18

**errata** 73:8

**error** 27:15

**errors** 27:21 29:3 66:22

**especially** 25:7

**esq** 2:6,8,13,15 2:23 3:7,13,19 4:7,11

**essentially** 70:11

**et** 6:3 73:1 76:1

**everyone's** 42:5

**evidence** 28:2

**ex** 40:24 54:20

**exact** 63:11

**exactly** 68:8

**examination** 7:6 75:4

**examined** 7:4 28:20

**example** 32:15

**exceeds** 48:13 56:25

**excel** 34:19 35:7 36:6,15 36:24 45:13,17 46:12 65:6

**exchange** 30:12 30:17 63:19,21

**exchanging** 37:15

**exhibit** 5:3,6 16:8 55:17 75:8,10

**exhibits** 16:20

**exist** 53:25 54:5

**exists** 54:21

**experience** 43:25 44:12,16

**expert** 1:19 5:3 11:11,19,23 14:9,10 16:18 75:8

**expertise** 14:7 33:20 34:2

**experts** 16:15

**explain** 21:10 22:25

**explaining** 36:23 37:2

**expressing** 39:14

**extensive** 15:7 19:12 25:2

**extent** 19:19 30:2

---

**f**

---

**fact** 19:12 58:6 58:8

**facts** 36:12 57:25 60:20

**factual** 14:21

**faculty** 42:13 43:18

**fair** 25:14 57:20

**fairly** 24:10 28:5

**fall** 48:10

**fallible** 56:24

**false** 58:19

**familiar** 8:3,20 9:14 11:22 12:9,20

**far** 14:23

**faster** 62:4

**february** 23:13 23:15

**federal** 1:22

**feel** 58:25 59:7 60:9 68:10 70:12,17 71:8

**fees** 14:6

**fideris** 10:23,24 11:5 13:3 15:13 33:2,24 38:22 41:8,8

41:12,18

**figured** 65:20

**figures** 37:10 37:11,15 61:16 63:11

**filed** 6:4 39:6,9 39:12 40:15 44:18

**files** 10:5 21:16 35:7 36:6,16 45:13 46:12 47:3,9,12 48:20 49:3,7 65:7

**filing** 45:3

**filings** 14:18 21:9,11,21

**final** 22:18

**fine** 10:13 53:9

**finished** 70:8

**firm** 12:12 31:4 31:7 33:18,21 33:22

**first** 7:3 12:14 16:21 17:19,22 29:9 42:6 52:14 64:17

**flom** 3:3

**floor** 2:5,21 3:12

**follow** 40:11 72:3

**following** 5:2

follows 7:5
footnote 56:9
foregoing 73:5
form 10:19
  13:5,25 15:23
  22:16 24:7
  25:19 26:13
  27:7,13 28:6
  28:17 29:25
  32:9,13 33:12
  34:8,16 36:17
  40:9 41:18,19
  43:20 44:14
  46:9 47:20,25
  48:8,23 49:25
  51:14,19 52:9
  53:3 57:21
  58:14 59:6
  60:12 61:11,20
  62:17 63:25
  64:13,20 65:3
  65:11 69:22
  70:5,24 71:23
formal 52:25
  54:7,9,15,22
  55:3 58:9
formally 54:20
formula 55:11
  56:3,10,11,12
  56:20,24 57:5
  57:19,23
formula's
  56:15

forth 74:8
four 18:11
frequent 40:3
fresh 24:17
freshfields 3:9
freshfields.com
  3:14
fruchter 2:4
function 23:7,7
  23:20 58:16
  59:16,19
fund 1:7,7,8,9
  1:10,11 2:11
  2:20,20 3:10
  3:17 4:5 6:3
  73:1 76:1
funds 13:12
further 67:14
  71:25 74:12

**g**

garbage 60:14
  60:14
geier 3:7
general 26:16
generally 36:25
genius 1:12
  8:21,21 9:3,12
getting 20:11
gioiella 4:9
give 8:13 18:9
  24:17 29:17
  69:8 71:7

given 16:10
  25:7,20 28:12
  41:4 49:8
  71:10 72:14
  73:10 74:10
global 1:11 4:4
go 5:21 21:21
  26:6 31:15
  41:23 45:10
  46:25 52:19
  56:9 67:3,18
going 5:10
  24:13 25:4
  29:16 30:10,14
  34:22 38:16
  40:24 41:7,23
  45:20 50:5
  52:3 55:16
  60:16 67:9
  72:11,18
good 5:9 7:7,18
  9:9,23 18:17
  20:15 28:3
gosh 14:24
  25:12
gotcha 46:24
grand 49:15
granularity
  54:12
gratz 27:18
  28:15,22 29:3
  71:14
greenwich 3:11

grossman 2:19
ground 36:12
  60:21
group 1:10
  3:17 39:24
  47:19 48:4,5
groups 50:22
guess 12:2 13:6
  13:9 22:21,22
  27:8 33:23
  46:2 55:12

**h**

h 7:2 75:7 76:3
hairy 20:12
half 15:24
hand 27:12,19
  28:24 52:22
  61:7 62:5
  74:18
happy 35:2
  38:17 71:7
hard 40:23
head 8:14
headers 36:24
headings 46:5
hear 51:21
  67:16
heard 5:17
  67:15
hearing 6:21
  8:7
heavily 68:25

heavy 71:10
held 22:3
help 21:5 34:24
helpful 39:14
hereinafter 56:11
hereto 73:8
hereunto 74:17
higher 29:6
highest 19:18 37:8 39:17 41:6 51:5,9 55:10 69:12 71:17
highlighting 50:6,11
hogan 2:10 7:13
hoganlovels.... 2:14,15
hold 42:14
holding 71:13
holdings 50:3
home 7:24
horgan 2:23
hosted 24:11
hour 13:17 15:24
hourly 13:14
hours 14:22 20:14 22:13
houston 2:17

**i**

idea 28:3 35:25
identification 5:5,7
identified 40:2 57:19
identify 54:16 58:16,17 66:6
identifying 46:3
imagine 22:18
impact 47:23 48:6,12 65:23
impacts 48:13
implement 24:16 59:19
implementati... 26:15 62:21
implemented 18:19 20:8,16 61:25
implementing 57:16
imputed 29:20
inaccuracies 51:25
inaccurate 48:2 60:15,16
inactive 44:21 44:25 45:5,8
incidental 52:7
include 15:2 59:16

included 17:8 49:2
includes 15:5
including 43:18 44:3
inclusive 64:9
increase 41:5
independent 11:6 12:5
independently 11:24 34:12 61:8
indicated 47:3
indirectly 30:4
individual 12:6
inflation 14:6
information 16:11 25:16 29:18 30:5 42:17,22 63:15
initial 31:9
input 64:5
inputting 17:11
insider 21:15
instruct 10:3
instructed 32:17
instructions 37:23
instructor 18:4 18:6
insurance 11:17

intellectual 43:10,11
intelligence 43:8
intend 24:2
intended 27:23
interest 18:15 39:15 41:3
interested 74:15
interface 24:25
international 1:12 9:4 43:11
internet 5:16
introduce 26:25
invention 14:20
invested 68:25 69:5
investment 1:10 3:17
investments 1:7,8 2:11 3:5 6:2 9:2 73:1 76:1
investors 9:15 9:18
invited 18:7
invoice 13:7
involved 24:10 25:23 59:9
involves 9:2
involving 19:13

**iroquois** 1:10 1:10 3:16,17 9:16
**issue** 11:18 23:2
**issues** 32:12
**iteration** 17:18 20:24
**iterations** 31:25 63:23

**j**

**j** 2:8
**jabraham** 2:7
**jammies** 21:7 23:9
**jared** 4:7
**javascript** 24:16
**jclark** 4:7
**jeff** 4:16 6:9 12:10
**jeffrey** 2:6 3:7
**jeffrey.geier** 3:7
**jewell** 17:12 31:13 33:8,11 34:4,6,14,18 35:5,20,23 36:18 37:11 38:7,11 41:15 45:17,21 46:7 46:13 60:23 61:16 63:18,22

64:12 65:13
**jewell's** 61:9,19 62:7,21,25
**jhorgan** 2:23
**job** 20:15
**john** 2:23
**judge** 51:6,12
**july** 47:4
**june** 39:12

**k**

**kartoon** 1:15 8:22 9:7
**kept** 18:25
**kevin** 17:12 31:13 33:8
**key** 59:24
**kind** 14:15 18:17 21:6,14 21:19,20 24:24 35:25 36:25 41:17
**klein** 2:8 10:3,9 10:19 12:11 13:5,25 15:23 22:16 24:7 25:19 26:13 27:7,13 28:6 28:17 29:25 30:14,19,22 31:6,20 32:9 33:12 34:8,16 34:22 43:20 44:14 46:9

47:20,25 48:8 48:23 49:25 50:9,15 51:14 51:19 52:9 53:3,9 57:21 58:14 59:6 60:12 61:11,20 62:17 63:25 64:13,20 65:3 65:11 67:5,17 67:17,19 71:25 72:5,10 75:5
**knew** 24:13
**know** 8:8,12 9:8,19 12:6,15 17:10 18:4 19:20,21,23 20:10,14 22:3 22:20 23:10 24:18 25:22 26:4 27:9,20 28:7 30:7,13 31:24 32:11 33:11,15,18,24 34:3,13 35:23 36:3,5,7 37:13 38:17 39:9 40:24 42:3 44:19 45:16 47:21 48:9,24 48:25 49:4 50:2 61:21 63:11 64:16 71:6,7

**knowing** 61:22

**l**

**l1** 1:11 4:4 9:16
**labels** 49:8
**language** 20:19 23:22
**latham** 3:16
**law** 12:4,12 14:4 20:7 38:5 38:5 42:13,21 43:5,5,8,12 52:24 53:20 65:21 68:20 69:14,21
**lawyers** 57:12
**leap** 23:15
**learn** 61:15
**learned** 38:4 52:22
**leave** 30:16 34:25
**ledger** 29:7
**left** 40:20
**legal** 14:17 21:19 43:25 44:12,15 56:15 65:25 66:9
**length** 23:12
**lengths** 20:11 21:8
**letter** 10:15,22 13:7

**[letters - meeting]**                                   Page 12

| | | | |
|---|---|---|---|
| **letters** 11:2 | **litman** 4:9 | **m** | **matchable** 57:3 |
| **level** 54:3,13 | **little** 18:18 | | 58:20 |
| 55:5 | 19:16 20:12 | **m3a** 1:11 4:9 | **matched** 27:11 |
| **levels** 54:12 | 27:25 57:13 | **made** 18:23 | 50:23 |
| **lexington** 4:5 | **llc** 1:11 3:17 | 24:21 57:17 | **matching** 32:14 |
| **liability** 52:23 | **llp** 2:4,10,19 | 63:8 73:6 | **matera** 1:23 |
| **library** 42:17 | 3:4,9,16 4:3,9 | **madison** 2:12 | 6:11 74:4,22 |
| 42:22 | **local** 18:7 | **mail** 40:9 | **material** 46:15 |
| **light** 56:15 | **located** 1:19 | **mailed** 40:4 | **materials** 50:11 |
| **limit** 60:3,4 | **long** 15:21 | **main** 2:16 | **mathematically** |
| **limitation** | 17:13 19:25 | **mainframe** | 19:21 |
| 70:15 | 20:13 22:10 | 17:6 24:12 | **matter** 5:25 |
| **limitations** | 38:21 44:24 | 26:15 | 10:2 11:2 |
| 19:15 46:23 | **longer** 59:3 | **make** 9:10 | 12:21 13:9 |
| 48:11 57:3 | 68:13 69:7,18 | 14:13 19:19 | 14:4,8 33:19 |
| 59:11 | 69:25 | 32:17 33:3 | 34:4 74:16 |
| **limited** 37:15 | **look** 10:4 47:13 | 47:8 61:14 | **matters** 44:19 |
| 46:8 | **loper** 65:5,18 | **making** 70:6 | **maximum** |
| **line** 31:22 | 65:24 66:2 | **management** | 39:18 71:14,22 |
| 34:10 37:16 | **lot** 18:14,18 | 1:10 3:11 | **meagher** 3:3 |
| 49:20 53:23,23 | **lovells** 2:10 | **manhattan** 3:5 | **mean** 8:21 |
| 63:9 64:15 | 7:13 | **manner** 6:15 | 20:17 23:8 |
| 76:4,7,10,13,16 | **lower** 14:5 29:5 | 59:18 | 26:14,14,24 |
| 76:19 | **lowest** 19:17 | **march** 47:4 | 51:3 59:13 |
| **linear** 24:14 | 37:8 39:17 | **marked** 5:2,4,7 | 60:13 61:13 |
| 39:20 41:4 | 41:6 51:5,9 | **marriage** 74:14 | 64:2,14 71:21 |
| 58:4 59:20 | 55:10 71:17 | **master** 1:7,7,8 | **meaning** 56:4 |
| **lines** 22:23 37:2 | **lp** 1:7,8,9,9,10 | 1:10,11 2:11 | **meant** 37:21 |
| 54:3,16 55:7 | 1:11 2:11,20 | 2:20 3:10,17 | **media** 5:22 |
| **list** 44:2 45:11 | 3:10,10,11 4:9 | 4:4 6:3 73:1 | 67:7 72:16 |
| **listed** 44:13 | 6:3 73:1 76:1 | 76:1 | **meet** 7:11,15,16 |
| **litigation** 25:23 | **lunch** 26:3,7 | **match** 27:4 | 15:8 |
| 26:9,22 40:23 | **lw.com** 3:20 | 29:8 | **meeting** 15:21 |
| | | | 15:25 26:4 |

**member** 42:13
**members** 43:19
**membership** 45:7
**memberships** 44:21,25
**mentioned** 19:3 20:23 22:2 33:7
**menton** 4:16 6:9
**met** 12:13
**michael** 2:8 12:11
**mid** 39:12
**migrated** 17:5
**migration** 18:22,24 21:5
**mine** 8:6
**minutes** 67:4 68:4
**mismatches** 29:4
**missed** 29:7
**mix** 40:20
**mklein** 2:8
**modifications** 57:17
**module** 23:6 59:24
**molinksy** 1:11
**molinsky** 9:17
**month** 13:8 19:13 21:8

23:20 46:19,21 51:11 58:3
**months** 20:10 23:13,13,14 39:19 46:16 48:13 56:25 58:21,24 59:4 68:13 69:7,18 70:2
**moving** 19:2
**multiple** 49:12

**n**

**n** 2:2 3:2 4:2 7:2,2 75:2
**name** 6:9 7:11
**names** 9:18 65:6
**natural** 39:24 41:3
**nature** 14:7
**necessarily** 69:12
**necessary** 27:4 58:5 59:25 70:9 73:7
**need** 19:15 29:18 38:17 55:12 59:13 61:6 62:5
**needed** 23:17 24:5 61:15
**neighborhood** 35:17

**never** 12:17 63:10 71:17
**new** 1:2,25 2:5 2:5,12,12,22,22 3:6,6,12,12,18 3:18 4:6,6,10 4:10 6:5,12 20:24 22:7 72:17 74:5
**nice** 7:10,15,16 17:24
**nizer** 4:3
**nod** 8:14
**nominal** 1:16
**normal** 8:10
**north** 1:20 7:23 42:10
**notary** 1:24 7:4 73:14,21 74:4
**note** 5:12 50:9 52:6,10
**noted** 6:22 72:20 73:7
**notice** 1:21
**noting** 53:10
**number** 6:6 22:23 28:23 63:23 67:7 69:9,11,13 71:5,8,21 72:15
**numbers** 31:23 37:16 48:16 63:9 64:15

**o**

**o0o** 75:13
**object** 10:19 25:19 28:6,17 34:16 52:9 53:3 63:25 65:3,11
**objection** 13:5 13:25 15:23 22:16 24:7 26:13 27:7,13 29:25 32:9 33:12 34:8 43:20 44:14 46:9 47:20,25 48:8,23 49:25 51:14,19 57:21 58:14 59:6 60:12 61:11,20 62:17 64:13,20 69:22 70:5,24 71:23
**objections** 6:15 6:17,21
**obligations** 11:23
**obvious** 55:14
**occasion** 43:4
**occasionally** 43:9
**occasions** 32:10
**occupation** 33:16

**occurs** 54:11
**october** 10:12
  13:11 38:24
  66:16
**offered** 17:25
  39:20
**official** 10:24
**offline** 24:23
**oh** 10:7,8,23
**okay** 9:9 10:11
  10:11 13:13
  14:3 30:18
  31:2 33:15
  34:3,13 42:2
  46:6 47:6,13
  60:2,7,22 63:6
  67:20,24
**omitted** 53:6
**once** 34:9
**online** 17:3,15
  18:19 25:10,11
  25:13,17 26:18
  30:9
**opinion** 28:10
  49:21 66:2,10
**opinions** 12:5
  66:20
**opportunities**
  1:8,11 2:20 4:4
**opportunity**
  1:9 3:10
**optimization**
  57:10

**order** 56:14
  57:17 61:14
**outcome** 74:15
**output** 55:14
**outputs** 60:15
**outside** 19:14
  44:10 47:14
  48:11 57:2
  59:10 70:14
**outstanding**
  29:5
**overall** 22:13
**own** 11:20 12:5
  50:6 60:25

**p**

**p** 2:2,2 3:2,2
  4:2,2
**p.m.** 1:21 5:11
  67:8,13 72:18
  72:20
**page** 45:10
  52:3 75:2,7
  76:4,7,10,13,16
  76:19
**pair** 58:18
**pairs** 50:23
  58:16,17
**paper** 22:2
  25:21 62:3,13
**paragraph**
  36:16 46:25
  50:5,18 52:19
  53:12 55:19

  61:24 62:23
  63:2 65:4
**paraphrased**
  53:4
**parser** 32:15
  46:4
**parsing** 46:2
  55:13
**part** 23:5,17
  28:12 29:21
  46:4 47:18
**participants**
  5:16
**particular**
  29:10 40:19
**parties** 5:21
  19:24 74:13
**partners** 38:22
**past** 8:4
**patent** 14:4
  43:5
**pattern** 29:17
  51:16 56:25
  57:4
**patterns** 19:12
  27:17 58:8,24
  69:3 71:4
**pauses** 8:12
**pay** 13:10
  46:17
**pen** 29:7 62:13
**pencil** 62:3
**people** 18:7
  39:8 40:8

  43:23
**percent** 49:23
**perform** 29:23
  48:17
**performed** 31:8
  49:10
**performing**
  14:16
**period** 19:13
  23:20 25:18
  46:8,12,19,21
  47:15 48:12
  51:11 58:3
  69:7,25
**permanent**
  42:12
**person** 29:6
  68:23
**personal** 11:18
  11:20
**personally** 36:3
**pertaining**
  65:16
**petition** 40:16
**phillips** 4:3
**phillipsnizer....**
  4:7
**piece** 19:9
**pieces** 56:22
**pitches** 18:9
**place** 5:20 47:4
  58:2
**plaintiff** 1:5 2:4
  12:7,10

**[plaintiff's - pull]**                                                Page 15

**plaintiff's**
  10:18 30:23
  33:25
**plaintiffs** 39:22
  40:3,19
**platform** 17:6
**play** 23:21
**players** 40:22
**playing** 26:2
**please** 5:12
  6:20 8:8 10:6
  30:4 46:10
  57:14 67:13
**point** 27:19
  56:8
**popped** 63:6
**port** 18:24
**position** 47:17
  57:23
**positions** 44:2
**possible** 39:18
  39:24 69:13
**post** 21:15
**potential** 14:10
  58:12 60:10
  65:23
**potentially**
  23:11 59:10
  70:14
**pozefsky** 18:6
  24:18
**practice** 44:15
**pre** 27:25

**precedents**
  71:10
**prefer** 7:8
**preferred**
  62:15
**preparation**
  12:15 15:2,3,6
  16:25 41:15
**prepare** 15:9
  16:2,5 45:17
**prepared** 35:24
  36:5
**preparing**
  14:13 34:7
  43:19
**present** 4:14
**presented**
  25:25 57:25
**pretty** 25:2,6
  68:24 71:12
**previous** 14:8
  17:18
**previously** 24:5
**prices** 21:18
  29:19
**primarily**
  14:11
**primary** 52:13
**prior** 57:9
  64:24
**privileged** 30:5
**probably** 17:19
  22:5 24:8
  25:12 28:2

  64:16
**procedure** 1:22
**proceed** 6:24
  67:13
**process** 32:18
  63:24 64:3
**processes** 69:20
**produce** 28:11
  38:13
**produced**
  35:19 60:5
**producing**
  18:15
**product** 30:25
**professor** 7:9
  7:10,11 24:18
  31:9 42:10,15
  42:20 44:11
  50:17 53:11
  65:22 67:20
  72:6
**professors** 18:8
**professorship**
  42:15
**profit** 39:18
  63:3 71:15,22
**profits** 18:16
  29:14 50:23
  66:4,12
**program** 20:24
  50:20 51:13
  54:4 61:19,23
  62:7

**programming**
  17:8 24:15
  39:20 41:4
  58:5 59:20
**project** 19:4,9
  20:14 24:9,20
**projects** 18:14
**promoting**
  68:25
**prone** 27:15
**proof** 21:20
  52:21 55:23
**properly** 32:16
**property** 43:10
  43:11
**proposal** 39:15
**proves** 58:6
**provide** 19:23
  54:7 66:6
**provided** 32:14
  34:18 35:6,20
  38:7 45:21
  46:13 49:24
  54:9 55:23
  60:23 65:25
**provides** 52:24
**providing** 66:9
**public** 1:24 7:4
  21:14 40:14
  73:21 74:4
**published**
  18:20
**pull** 35:2

**[pulled - report]**                                                                    Page 16

| | | | |
|---|---|---|---|
| **pulled** 21:16 | **rate** 13:14,20 | **recoverable** | 53:16 |
| **purchases** 29:5 | 14:5 | 50:23 | **rely** 37:22 46:4 |
| **purpose** 22:6 | **rates** 13:22 | **recoveries** 41:5 | 61:9,13 |
| **pursuant** 1:21 | **reached** 40:18 | **recovery** 39:19 | **remember** |
| **put** 20:15 25:3 | **read** 51:8 53:5 | 49:16 | 10:14 19:25 |
| 38:18 41:22 | 53:8 68:8 73:5 | **refer** 8:21 9:12 | 40:6,10 46:11 |
| 42:4 55:16 | **ready** 72:8 | 9:22 61:13 | **remote** 1:18 |
| 57:12 | **real** 71:15,16 | 65:4 | 6:14,19 |
| **python** 20:22 | **realized** 24:9 | **reference** 55:2 | **remotely** 6:7,19 |
| 23:24 | 30:9 | **referred** 13:19 | 7:15,18 |

| | | | |
|---|---|---|---|
| **q** | **reask** 69:24 | 28:15 56:10 | **remove** 49:18 |
| **quality** 5:14,15 | **reason** 40:18 | 61:4 62:20,25 | **removed** 49:12 |
| **quarter** 22:22 | 70:23 76:6,9 | 64:4 65:12 | **repeat** 40:22 |
| **question** 8:8 | 76:12,15,18,21 | **referring** 33:21 | 62:24 |
| 23:25 27:10 | **reasons** 68:19 | 55:19 63:3,7 | **rephrase** 10:20 |
| 29:11 44:23 | 69:14 70:20 | **refers** 56:2 | 63:20 |
| 46:24 62:24 | **recall** 33:5 | 65:15 | **replete** 27:21 |
| 67:22 68:8,10 | 46:20,22 61:4 | **reflected** 49:6 | **reply** 40:13 |
| 68:23 69:24 | 64:6 68:4,16 | **refreshed** 16:6 | **report** 5:3 |
| 70:11,12 71:20 | 70:15 | **regarding** | 13:16,19 15:3 |
| **questionable** | **recent** 43:6 | 14:12 | 15:5 16:7,20 |
| 56:16,21 | **reckler** 3:19 | **regularly** 43:4 | 16:22,25 32:20 |
| **questions** 60:4 | **recollection** | **regulation** | 32:24,25 33:4 |
| 67:15 72:2 | 10:10 16:6 | 43:15 | 33:9 34:7,17 |
| **quite** 53:5 | **record** 5:10,21 | **related** 74:13 | 34:20,24 35:21 |

| | | | |
|---|---|---|---|
| **r** | 6:23 50:10,16 | **relationship** | 38:14 41:9,11 |
| **r** 2:2 3:2 4:2,7 | 53:8 60:6 67:3 | 11:4 31:4 41:7 | 41:16,20,25 |
| 7:2 76:3,3 | 67:9,10,12 | **relatively** 28:9 | 43:19,22 45:11 |
| **raimondo** | 68:6 72:12,19 | 28:12 52:7 | 46:25 50:6,7 |
| 65:19 | 74:10 | 59:18 | 50:11,18 52:4 |
| **ran** 21:13 | **recorded** 1:18 | **relevant** 33:20 | 52:20 55:20 |
| 59:17,21 64:6 | 5:18,23 | 69:25 | 56:6 60:23 |
| 66:24 | **recording** 5:14 | **relied** 35:10 | 61:14 64:25 |
| | 5:19 | 45:12 52:4,11 | 66:15,17,23 |

**[report - several]**

75:8
**reporter** 1:24
6:11,18,24 8:9
8:15,17
**reporting** 6:16
**reports** 16:14
**representing**
7:13 44:20
**require** 15:19
**required** 24:14
29:2 36:2
73:14
**respect** 13:11
**response** 68:23
**responses** 8:13
**restate** 28:18
**resulting** 48:7
**results** 27:22
31:10,13,15,19
32:7 49:13
62:20 63:2,14
63:16 64:18,24
**resume** 44:2
**retained** 9:25
11:11 33:19,24
72:17
**retired** 18:5
**reveal** 30:5,15
**review** 16:11
22:17 51:24
52:24 53:20
68:20 69:14,21
**reviewed** 16:14
35:13 62:12,18

**richard** 1:11
4:11 9:17
15:22
**right** 9:13,24
13:21 33:7
36:20 41:22
47:7 53:5,19
53:25 54:2
60:14 65:8
**rising** 14:6
**robert** 15:15,16
**robust** 39:20
**room** 7:25
**rough** 35:25
**roughly** 31:17
**rude** 24:2
**rule** 56:13
60:13 71:16
**rulemaking**
39:6 40:17
**rules** 1:22
66:13
**rulings** 65:24
**run** 64:12 71:2
**running** 70:13

**s**

**s** 2:2 3:2 4:2
75:7 76:3
**sake** 60:2
**sales** 29:6
50:24
**saw** 16:22 70:7

**saying** 37:17
62:8
**says** 52:10
**scenarios** 60:8
**schole** 2:19
**school** 12:4
20:7 38:5
42:13,16,21,21
**schools** 43:2
**sciaretta** 3:13
**science** 18:3
42:17,22 54:10
54:19,23
**scope** 28:8
**scraped** 21:14
**scraping** 22:20
**scratch** 17:9
30:11
**screen** 5:18
41:23 42:4
50:12 55:17
63:6
**screens** 38:19
**se** 69:11
**search** 21:9,11
**sec** 21:9,11,14
21:21 22:19
39:7,13,16
40:17 66:13
**second** 71:16
**secret** 69:3
**section** 49:24
54:18

**securities** 43:15
44:7
**see** 10:11 22:12
35:16 36:19
39:4 43:12
44:4 50:25
52:5 62:22
**seems** 24:19
**seen** 5:17 61:18
62:7,11 63:13
**select** 1:7 2:20
**semester** 20:13
22:4
**seminar** 43:7
43:12
**sending** 17:12
31:21 37:16
64:15
**senior** 18:2
**sense** 58:20
**sent** 16:20
32:25 40:8
64:18
**sentences** 36:25
**separate** 59:15
**separated** 25:5
**series** 9:2
**serving** 14:9
**set** 59:3,9 63:19
68:12 74:8,18
**seven** 23:11
**several** 14:4
31:25 45:3

**[shannon - summer]**

shannon  3:13
shannon.scia...
  3:14
share  21:17
  29:5,6,19
  31:10
shared  31:12
shares  21:17
short  18:15
  29:14 51:15
  52:23
shorthand  1:23
show  32:23
  34:24
showing  61:25
side  37:10,12
  63:8
signature  74:21
signed  10:15,17
  10:21,25 66:15
significant
  28:25
signified  37:4
sils  42:24 43:3
simple  28:9,13
  28:14
simpler  58:8
simplicity  60:3
single  23:20
  46:19 51:11
  58:2 63:19
sit  10:11 46:20
sitting  40:6

six  19:13 22:13
  23:13,14,20
  39:19 46:16,19
  46:21 48:13
  51:11 56:25
  58:3,21,24
  59:4 68:13
  69:7,18 70:2
skadden  3:3
  44:3,6
skadden.com
  3:7
slate  3:3
smolowe  19:18
  37:6,24 38:3,4
  50:21 51:3,13
  52:21 55:24
  56:3,4,11,13
  57:19,23 58:7
  62:2,22 68:20
  71:2,11,14
software  55:4
sophisticated
  19:17,22
sorry  45:25
  49:4 53:16
  63:5,19 68:19
sort  37:2,17
  50:4 65:22
sorting  28:25
sorts  23:16
sounds  47:6,7
source  32:8

sources  45:12
  45:16
southern  1:2
  6:5
specific  46:8
  53:7
specifically
  26:21 30:8
  33:17
specification
  37:6 38:7
specifications
  18:12 45:22
spent  14:22
  22:4
spoke  67:20
spreadsheet
  25:5
spreadsheets
  17:11 28:11
  49:9
stamp  68:6
standard  55:2
start  70:6
started  38:25
  45:8
state  1:24 6:20
  74:5
stated  51:6,7
statement
  61:15
states  1:2 6:4
statute  19:14
  46:22 48:11

  57:2 59:10
  70:14
stay  72:10
stenographic
  6:23 50:10
  68:6
step  57:10
steps  54:17
  55:13,14
straightforward
  25:7 59:18
street  2:16 3:11
struggled  18:24
student  20:7
  43:18
students  18:10
  18:22 20:2,4
  22:23 24:20
studios  1:15
  8:22 9:7
subscribed
  73:16
substantiate
  54:17
substantively
  9:20
suitable  24:20
suite  2:16 4:10
summarize
  57:11
summary  31:12
  57:15
summer  39:5

**supporting** 71:10

**supposed** 29:11

**supreme** 45:4

**sure** 8:3 9:11 30:6 50:8 62:8 67:5

**susceptible** 57:5

**swear** 6:24

**swearing** 6:18

**swing** 18:15 29:14 52:23

**sworn** 7:3 73:16 74:8

**t**

**t** 75:7 76:3,3

**table** 49:20

**take** 5:20 8:12 22:10 27:24 38:16 58:2 67:2,4 72:11

**taken** 5:24 24:22 47:4

**talk** 8:16 26:7

**talking** 26:16 26:17 27:2

**talks** 25:20

**task** 29:11

**tasks** 28:25

**taught** 43:14

**tax** 1:9 3:10

**teach** 38:2 42:25 43:3,4,9

**teaches** 54:11

**teaching** 43:7 55:2

**team** 18:17 21:25 24:20

**teams** 18:10

**technical** 14:20

**technology** 6:8 27:25

**tell** 58:18

**telling** 30:13

**template** 41:17 41:19

**term** 56:5 65:5

**terms** 9:11 16:24 25:4 28:23 37:3,14 37:23 44:15,19 46:2 47:9 57:12 65:10,23 66:11

**testified** 7:5 11:10 16:12

**testify** 10:10 11:24

**testifying** 12:3

**testimony** 72:14 73:10 74:7,10

**texas** 2:17

**text** 55:2

**thank** 10:13 38:20 42:18 44:22 72:5,7

**thing** 71:21

**things** 19:2 23:16 48:12,13

**think** 8:11 10:12 12:13 14:11 17:17,25 18:23 19:3 20:8 21:13 22:12 23:10 26:3 30:25 38:24 39:5,12 40:2 43:13 45:5 51:7 53:4 61:24 68:5 71:19

**thomas** 25:5

**thought** 24:17 39:13,22

**three** 18:11 45:11 52:5

**threshold** 49:24

**time** 12:14 16:21 18:20 19:7 24:18 27:14 31:23 44:6 46:8,11 47:15 53:25 63:14 67:8,12 68:6 72:6,18 72:20

**times** 64:17

**title** 42:14

**today** 7:19 11:15,25 12:11 15:4,6,9,11 16:2,12,21

**today's** 72:14

**todd** 1:4 2:4 5:25 12:7 73:1 76:1

**together** 25:3

**told** 26:2 29:16 63:10 65:9

**took** 20:2 28:10

**tool** 19:23

**total** 49:15 63:3 72:15

**totaling** 50:22

**touch** 21:25 25:25

**toward** 70:6

**trade** 3:12 21:16

**trades** 21:17 28:24 29:19 47:2 57:2,4 58:2,18 69:17

**trading** 27:17 29:16 51:15 56:24 69:3 71:4

**traits** 19:14 51:10

**[transaction - video]**

**transaction**
34:18 35:6,9
35:24 48:21
49:2,5 59:3,9
68:12
**transactions**
27:3,5,12 28:5
46:7 47:10,14
50:24 66:11
**transcript** 73:5
73:10 74:9
**transfer** 13:11
**tried** 37:20
**trouble** 8:5,7
**true** 58:19
71:13 73:9
74:9
**truthfully**
11:24
**try** 8:16 21:24
24:17 58:11
60:3
**trying** 57:12
68:7
**turned** 18:13
**twersky** 2:4
**two** 15:11
34:19 35:7
45:5,13 48:20
50:19 52:14
58:17 65:6
66:7 72:16
**type** 40:23

**types** 40:25

**u**

**ultimately**
63:17
**unc** 18:2,8
24:12 43:18
45:9
**under** 43:25
49:24 50:20
58:21 66:4,12
**undergraduates**
18:2
**underlying**
28:14,19
**understand**
8:25 31:6
57:13
**understanding**
8:7,11 27:9
29:15 30:20
37:9,20 38:10
66:6
**understood**
38:12
**unformula**
52:22
**unfortunately**
17:4 24:22
**unintended**
56:14
**united** 1:2 6:4
**university** 12:4
17:5 18:25

42:10
**unusual** 68:22
68:24
**unwieldily**
24:14
**unwieldy** 24:15
**updated** 66:16
**upset** 8:18
**upward** 14:6
**usable** 24:21
**usage** 54:22
**use** 9:21 20:19
23:22 34:19
38:6 51:12
54:24 56:5
62:3 63:20
65:9
**used** 20:21,22
21:13 25:17,22
26:9,21 37:9
45:17 51:17
56:13 57:8
**user** 24:24
**using** 6:8 30:9
41:4 66:5
**uspto** 14:19
**usual** 13:20

**v**

**validating**
17:10
**validation**
60:24 61:10
64:14

**validations**
64:11,24
**value** 25:5
58:19
**variables** 46:3
**variant** 52:25
53:2
**variants** 50:19
**various** 17:11
44:19
**vary** 48:10
**varying** 21:7
64:9
**verbal** 8:13
**verification**
52:25 54:7,10
54:11,15,23
55:3,4 58:9
**verify** 36:9,11
54:20 60:18,20
**verifying** 17:10
**veritext** 6:12
72:17
**version** 17:20
17:20,23 21:6
23:3,23 24:4
**versions** 32:6
35:12,15 64:5
64:8,9
**versus** 6:2
65:19
**video** 1:18 5:19
5:22,23 6:14
6:19 67:7,9,12

72:19
**videographer**
4:16 5:9 6:10
8:9 67:6,11,23
72:8,11,13
**virginia** 45:7
**virtual** 6:8
**virtually** 5:14
**vm** 1:3
**vocabulary**
26:24
**vs** 73:1 76:1

**w**

**w** 7:2
**waiting** 23:5
**waive** 6:14
**wanted** 9:10
19:19 24:11
50:15
**wanting** 19:8
**washington**
52:24 53:20
**watkins** 3:16
**way** 21:7 24:3
32:4 45:24
46:2 48:2
66:16 74:15
**ways** 26:5
**web** 24:13
**website** 40:17
**wedded** 71:12
**went** 31:24
32:6 37:19

63:23
**west** 3:5
**whereof** 74:17
**whistles** 21:3
**william** 3:19
**william.reckler**
3:20
**witness** 5:17
6:19,25 7:2
10:4,7 11:19
11:23 14:9,11
30:6,18 52:12
72:7 74:7,11
74:17 75:2
**witnesses** 16:18
**wonderful**
24:19
**word** 9:21
36:17 37:25
38:13 45:13,20
45:23 63:20
**words** 61:25
**work** 13:2,8,11
14:16 17:2,8
18:10 24:6
25:2 28:8
30:25 32:16
41:9 43:17
44:7,10
**workbook** 35:7
36:6,15,24
47:3,9,11
48:20 49:3,6
65:6

**workbooks**
34:19 66:8
**worked** 11:7
12:17 18:17
24:25
**working** 11:19
18:19 19:6
22:5 33:8 34:4
34:14 38:22
**works** 62:4
**world** 3:12
**worry** 25:9
**write** 22:11
23:6,23 24:4,6
29:22,23 30:8
30:11 59:24
**writing** 29:7
37:17 60:25
**written** 41:20
61:5 69:19
70:2
**wrote** 22:7,20
22:24 34:11
45:23 50:19
51:18 52:17
53:13,17,22
55:9 58:13,15
59:2,8,14
61:23 62:10
68:11,18

**x**

**x** 1:3,16 75:2,7

**y**

**yeah** 21:2,12
26:17 28:18
30:18 36:23
47:6 48:14,14
60:21 61:12
63:5 68:3
**year** 43:6
**years** 8:5 14:4
17:4 18:21
23:16 43:6
45:3,6
**york** 1:2,25 2:5
2:5,12,12,22,22
3:6,6,12,12,18
3:18 4:6,6,10
4:10 6:5,12
72:17 74:5

**z**

**zoom** 8:4

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.