# Exhibit 13

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

TODD AUGENBAUM,                    )
                                   )
                                   )
            Plaintiff,             )
                                   )No. 1:22-cv-00249-VM
                                   )
vs.                                )
                                   )
                                   )
ANSON INVESTMENTS MASTER FUND )
LP, et al.,                        )
                                   )
                                   )
            Defendants.            )

VIDEO-RECORDED DEPOSITION OF ANDY HEYWARD

VIA ZOOM

October 9, 2024

Reported by:  Dana Peabody, RDR, CRR, CSR No. 6332

Page 2

Deposition of Andy Heyward, taken on behalf of Plaintiff, via Zoom, commencing at 9:29 a.m., on October 9, 2024, before Dana Peabody, CSR No. 6332.

APPEARANCES:


For Plaintiff:
        JEFFREY S. ABRAHAM, ESQ.
        MICHAEL KLEIN, ESQ.
        ABRAHAM, FRUCHTER & TWERSKY, LLP
        450 Seventh Ave., 38th Floor
        New York, NY 10123
        jabraham@aftlaw.com

For CVI Investments:
        KURT WILLIAM HEMR, ESQ.
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        500 Boylston St., 23rd Floor
        Boston, MA 02116
        kurt.hemr@skadden.com

        JEFFREY S. GEIER, ESQ.
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        One Manhattan West, 395 9th Avenue
        New York, NY 10001
        jeffrey.geier@skadden.com

For Iroquois defendants:
        LATHAM & WATKINS, LLP
        WILLIAM O. RECKLER, ESQ.
        IRIS XIE, ESQ.
        555 Eleventh Street, NW, Suite 1000
        Washington DC 20004
        william.reckler@lw.com

Page 3

For Brio defendants:
        ALDONSA V. JANJIGIAN, ESQ.
        JOANNA COHEN, ESQ.
        JOHN BRILLING HORGAN, ESQ.
        ELLENOFF, GROSSMAN & SCHOLE
        1345 Avenue of the Americas
        New York, NY 10105
        ajanjigian@egsllp.com


For Empery defendants:
        ANDREW GLADSTEIN, ESQ.
        AMELLO VISO, ESQ., ESQ.
        FRESHFIELDS, BRUCKHAUS, DERINGER, LLP
        175 Greenwich Street
        3 World Trade Center, 51st Floor
        New York NY 10007
        andrew.gladstein@freshfields.com


For Anson Investments:
        CATHERINE BRATIC, ESQ.
        DENNIS TRACEY, ESQ.
        HOGAN LOVELLS, LLP
        609 Main Street, Suite 4200
        Houston, TX 77002
        Catherine.bratic@hoganlovells.com


For L1 Capital Global Opportunities Master Fund:
        JARED CLARK, ESQ.
        PHILLIPS NIZER, LLP
        485 Lexington Ave., 14th Floor
        New York, NY 10017
        jclark@phillipsnizer.com


For Richard Molinsky:
        KIERAN M. CORCORAN, ESQ.
        NICOLE KHALOUIAN, ESQ.
        STINSON, LLP
        1325 Avenue of the Americas
        New York, NY 10019
        kieran.corcoran@stinson.com

Page 4

For Kartoon Studios:

MICHAEL L. CHARLSON, ESQ.

MADISON LO, ESQ.

VINSON & ELKINS, LLP

555 Mission Street, Ste. 2000

San Francisco, CA 94105

mlo@velaw.com

For M3A LP:

RICHARD MILTON ASCHE, ESQ.

LITMAN ASCHE & GIOIELLA LLP

350 Central Park West, Ste. 10F

New York, NY 10025

Richardasche@lagnyc.com

Also Present:  Anthony Gulino, Videographer; Laura
Salvatori, General Counsel, Anson; Michael Jaffa,
General Counsel, Kartoon; Brett Director

Page 5

I N D E X

E X A M I N A T I O N S

WITNESS                                                      PAGE
ANDY HEYWARD
MR. KLEIN                                                    12
MR. GLADSTEIN                                                118
MR. KLEIN                                                    127

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Emails, IRO-AUG-0003286 through 3288 | 26 |
| Exhibit 2 | Engagement letter as filed with EDGAR | 28 |
| Exhibit 3 | Text messages, TOON00020104 and 105 | 34 |
| Exhibit 4 | Emails, TOON00017138 through 17154 | 40 |
| Exhibit 5 | Text messages, T00N00020106 to 107 | 44 |
| Exhibit 6 | Text messages, TOON00020120 and 21 | 52 |
| Exhibit 7 | Emails, TOON00017182 through 186 | 58 |
| Exhibit 8 | Emails, TOON00011336 through 11338 | 61 |

Page 6

Exhibit 9        Text messages, TOON00020122 and      65
                 123

Exhibit 10       Emails, EW-AUG0012436 through 438     70

Exhibit 11       Emails, EW-AUG0012652 and 53         73

Exhibit 12       Emails, TOON00019071                 73

Exhibit 13       Emails, TOON00011823 through 827     77

Exhibit 14       Emails, 17809 to 811                 77

Exhibit 15       Emails, EW-AUG0013527 and 528        80

Exhibit 16       Email with attachment,               81
                 TOON00014733 through 35

Exhibit 17       Emails, TOON00014743 through 45      83

Exhibit 18       Securities Purchase Agreement,       87
                 TOON00000001

Exhibit 19       Text messages, TOON00020139 and      92
                 40

Exhibit 20       Emails, TOON00019988 through 94      95

Exhibit 21       Text messages, TOON00020122         104
                 through 126

Exhibit 22       Emails, TOON00014794 through 796    106

Exhibit 23       Test messages, TOON00020135 and     107
                 136

Page 7

Exhibit 24    Emails, CVI_0002065 and 2066    110

Exhibit 25    Leak-Out Agreement, TOON00014699    114
              to 14702

Exhibit 26    Form 4    115

Page 8

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning, everyone. We are going on the record at 9:29 a.m. Pacific Daylight Time on October 9, 2024.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connection of participants.

What is seen from the witness and heard onscreen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Andy Heyward in the matter of Todd Augenbaum vs. Anson Investments Master Fund LP, et al., filed in the United States District Court, Southern District of New York.  And the Case Number is 1:22-CV-00249.

This deposition is being conducted remotely using virtual technology.  My name is Anthony Gulino representing Veritext Legal Solutions, and I'm the videographer.  The court reporter is Dana Peabody from the firm Veritext

Legal Solutions.  I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. KLEIN:  This is Michael Klein of Abraham, Fruchter & Twersky for the plaintiff.  With me is Jeffrey Abraham of Abraham, Fruchter & Twersky for the plaintiff.

Can we put on -- can we agree to put on appearances for the defending counsel, and then everyone else will just appear on the stenographic record?

UNIDENTIFIED SPEAKER:  I think that might be a problem as not all of us are logged into the Zoom, so I think we should do it orally.

MR. KLEIN:  Fine.

MR. CHARLSON:  Michael Charlson from Vinson & Elkins.  With me is Madison Lo of Vinson & Elkins.

MR. GLADSTEIN:  Andy Gladstein for Empery Funds, defendant.  With me -- or sorry -- on the

Zoom is Amella Viso.

And just for the record, I want to make sure that I think some or all of the defendants have served cross-notices for this deposition.

MR. RECKLER:  William Reckler of Latham & Watkins on behalf of the Iroquois defendants.

MR. TRACEY:  Dennis Tracey from Hogan Lovells on behalf of Anson defendants, and with me is my colleague, Katherine Bratic and Morris --

MR. HORGAN:  John Horgan, Ellenoff, Grossman & Schole, on behalf of the Brio defendants. With me on the Zoom, I saw my colleague, Aldonsa Janjigian.  It's possible that Joanna Cohen, also with EGS, is on the Zoom.

MR. JAFFA:  I'm Michael Jaffa.  I'm the general counsel for Kartoon Studios.

MR. TRACEY:  This is Dennis Tracey.  I just want to note for the record, and hopefully with all counsel's consent, that an objection by a single defendant will be applicable to all defendants?

MR. ABRAHAM:  That's fine.

MR. TRACEY:  And including the nominal defendant in that regard.

MR. ABRAHAM:  Nominal defendant would be different.

MR. KLEIN:  Can we agree to that except with respect to the nominal defendant?

MR. TRACEY:  No, Michael.  I think it's with -- including the nominal defendant.  If the nominal defendant's counsel objects, that will be considered an objection on behalf of all the rest.

MR. ABRAHAM:  That's fine.  But if the other defendants object, I'm not sure it should be an objection on behalf of the nominal.

MR. GLADSTEIN:  That makes sense.

MR. TRACEY:  That's fine.

MR. CHARLSON:  That's fine.

UNIDENTIFIED SPEAKER:  Can we go -- are we on record right now?

UNIDENTIFIED SPEAKER:  We're on the record.

UNIDENTIFIED SPEAKER:  Why would that be the case that you can only object to form?  And the form of the question would work for both?  It doesn't make any sense to not have --

MR. KLEIN:  All right, fine.

UNIDENTIFIED SPEAKER:  -- universal.

MR. CHARLSON:  It doesn't make any sense.

MR. CLARK:  Jared Clark, Phillips Nizer, for L1 Capital Global Opportunities Master Fund.

MR. CORCORAN:  Kieran Corcoran from Stinson, LLP, for defendant Richard Molinsky, and my colleague, Nicole Khalouian, is on Zoom with me.

MR. GEIER:  Jeffrey Geier and Kurt Hemr from Skadden Arps for CVI Investments.

MR. KLEIN:  Anybody else?

MR. CHARLSON:  Michael, I apologize for being somewhat confused.  Are we in the mode where an objection for one is an objection for all, including the nominal defendant, or do I have to keep saying "join" all day?

MR. ABRAHAM:  If it's an objection as to form, you don't have to join.  How's that?

MR. CHARLSON:  All right.  That's fair.

MR. KLEIN:  Can the court reporter swear in the witness?


ANDY HEYWARD,
having been duly sworn, or affirmed, was examined and testified as follows


EXAMINATION
BY MR. KLEIN:

Q.   Good morning, Mr. Heyward.

A.   Good morning.

Q.   I don't think we were introduced formally, but we've been on the Zoom for a few minutes.

Have you ever been deposed before?

A.   I have.

Q.   How many times?

A.   I don't know.

Q.   Approximately?

A.   Half a dozen.

Q.   Is it fair to assume you're familiar with the process here?

A.   I am.

Q.   Okay.  I represent plaintiff.  I'll be asking you questions which you're required to answer unless your attorney instructs you not to answer.

If you don't understand a question, please let me know, and I'll try to rephrase or better explain the question.

I'm happy to take breaks at your convenience, or at mutual convenience, with the understanding that if there's a question outstanding, you should answer the question before we take a break unless there's an issue of privilege implicated.

Is that okay?

A.   That's good.

Q.    Is there any reason that you're unable to testify truthfully today?

A.    No.

Q.    Okay.  You are at the office of Hogan Lovells in Los Angeles, correct?

A.    I guess so.  I didn't look at the law firm's name outside.

Q.    Okay.  Do you know who else is in the room with you?

A.    I just met everybody in the room.

Q.    Are you familiar with the litigation in which your deposition is being taken?

A.    Generally familiar.

Q.    Do you know generally -- do you know who the defendants are in the litigation?

A.    Some of them.

Q.    Which ones do you know?

A.    Well, I'm going to -- I'm not certain, but I'll say what I believe.  The Anson Fund, Brio, Iroquois, Empery, Rich Molinsky.  I probably missed a few.

Q.    If I suggested that CVIL1 and M3A are the other defendants, does that sound right to you?

A.    I'm not sure.

Q.    Okay, fine.

Have you spoken with any of the defendants since this case was filed in January of 2021?

MR. CHARLSON:  Object to form.

Michael, can we just -- when you refer to "defendants," can we just make the record clear that you're referring to the defendants apart from the nominal defendant so that there's no confusion as to whether he's had conversations with himself?

MR. KLEIN:  Sure.  Yeah, when I refer to "defendants," I'm referring to defendants other than the nominal defendant.

And with respect to the nominal defendant, I understand that Genius Brands changed its name to Kartoon Studios in June of 2023, but because the events that are relevant to this action occurred before that time, the exhibits that we're going to look at use the company's old name.  So I plan to refer to "Genius Brands" today or "the company" for the sake of consistency.

Is that okay with you?

MR. CHARLSON:  Yes.

MR. KLEIN:  Okay.  So I'm referring to the investment funds and not Genius Brands when I use the term "defendants."

MR. CHARLSON:  Yes.

BY MR. KLEIN:

Q. The question that was outstanding is have you spoken to any of the defendants since this case was filed?

MR. CHARLSON: Objection to the form.

BY MR. KLEIN:

Q. Do you recall the question?

A. No, I don't.

Q. Have you spoken with any of the defendants since January of 2021?

A. I don't know who all the defendants are, so you'd have to ask me individually what you'd like.

Q. Have you spoken with Anson since January of 2021?

A. I'm not sure.

Q. Let me try to streamline this line of questioning.

You had said the defendants that you recall were Anson, Brio, Empery, Iroquois, and Mr. Molinsky?

A. Yes.

Q. Have you spoken with any of them about this lawsuit?

Did you hear the question?

A.   I have.  I'm thinking.

The question is have I spoken with any of them about the lawsuit?

Q.   Yes.

A.   To the best of my knowledge, the answer is no.

Q.   Have you spoken with Special Equities Group about the lawsuit?

MR. RECKLER:  Objection to form.  Reckler.

THE WITNESS:  I'm not sure.

BY MR. KLEIN:

Q.   Do you understand what I mean when I say "Special Equities Group"?

A.   I do.

Q.   You understand we're referring to primarily to Jonathan Schecter and Joe Reda?

A.   That's correct.

Q.   And any one of their affiliates?

A.   That's correct.

Q.   Have you spoken with CVI about this lawsuit?

A.   I don't know who CVI is.

Q.   Okay.  Anyone from Susquehanna Securities?  Have you spoken with anyone about -- from Susquehanna Securities about this lawsuit?

A.    I don't know who that is.

Q.    Okay.  Are you generally aware that in this lawsuit, the plaintiff seeks to recover defendants' short-swing profits from trading in Genius Brands securities for the company?

MR. GLADSTEIN:  Object to form. Gladstein.

THE WITNESS:  What was your question?

BY MR. KLEIN:

Q.    We can strike the question.

When did you first become affiliated with Genius Brands or its predecessor?

A.    I'm not precisely sure.

Q.    Do you recall that in or around 2013 a company called A Squared merged with another company to become Genius Brands, Incorporated?

A.    Generally speaking, yes.

Q.    And you became the CEO of the combined company.  Is that correct?

A.    Correct.

MR. RECKLER:  Objection to form.  Reckler.

BY MR. KLEIN:

Q.    And you were one of the largest combined shareholders of the company?

MR. RECKLER:  Objection to form.  Reckler.

Are we going to lead all day?  Because if so, I'll just have a standing objection to leading questions.

THE WITNESS:  I'm not certain.

MR. RECKLER:  I'm going to have a standing objection to leading questions then.

Michael, do you agree to that, or would you like me to keep objecting?

MR. KLEIN:  You can keep objecting.

MR. RECKLER:  Okay.

BY MR. KLEIN:

Q.   Have you worked for any companies other than Genius Brands since 2015?

MR. CHARLSON:  I object to the form.  Charlson.  Sorry.

BY MR. KLEIN:

Q.   Have you raised capital for any companies other than Genius Brands since 2015?

A.   No.

Q.   Does Genius Brands have a policy with respect to retention of documents and electronic communications?

A.   I don't know.

Q.   Does Genius Brands have a policy with respect to the destruction of documents?

A.   I don't know.

Q.   Does Genius Brands have any policy with respect to the use of text messages to discuss business?

A.   I don't know.

Q.   Do you use text messages to discuss business?

MR. GLADSTEIN:  Object to form. Gladstein.

BY MR. KLEIN:

Q.   Do you use text messages to discuss Genius Brands business?

MR. CHARLSON:  Same objection.  Charlson.

THE WITNESS:  Possibly.  I'm not sure.

BY MR. KLEIN:

Q.   Do you use text messages outside of work?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  Yes.

BY MR. KLEIN:

Q.   What services do you use to send text messages?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  What is a "service"?

BY MR. KLEIN:

Q.   Do you use WhatsApp?

A.   Yes.

Q.   Do you use Telegram?

A.   No.

Q.   Do you use a text message app that's just on your phone?

What kind of cell phone do you have?

A.   I have an Apple.

Q.   Do you use an app called Messages or something like that?

A.   I don't know what the -- I don't know what it's called.

Q.   Okay.  At the time when Genius Brands was formed, the company was -- did the company have revenue?

A.   Excuse me.  I'm going to turn off my phone.

MR. GLADSTEIN:  That's the first time in this transcript we actually should mark the transcript.  Gladstein.

MR. CHARLSON:  I'm sorry, Michael.  I think your question got lost.

MR. KLEIN:  One second.

///

BY MR. KLEIN:

Q.   Let's jump ahead to around 2019.

Do you recall at that time that Genius Brands had worked closely with the Special Equities Group to fund its operations?

MR. GLADSTEIN:  Object to form.

MR. CHARLSON:  Object to form.  Charlson.

BY MR. KLEIN:

Q.   Did you hear the question?

A.   Could you repeat it?

Q.   Sure.

MR. KLEIN:  Can the court reporter read back the question?

(The requested portion was read back.)

THE WITNESS:  Generally speaking.

BY MR. KLEIN:

Q.   Do you recall that there had been a series of capital raises?

A.   In 2019?

Q.   Leading up to 2019.

A.   I'm not sure.

Q.   Do you recall that in February -- in or around February 19th of 2019 the company raised capital?

A.   No.

Q.   Do you recall that the company entered into a First Amendment Waiver and Consent with respect to certain securities on or about February 19th of 2019?

A.    I don't know what a First Amendment Waiver and Consent is.

MR. KLEIN:  Okay.  I'm going to ask the court reporter -- strike that.

BY MR. KLEIN:

Q.   Do you recall in around August of 2019, Genius Brands sought to engage in a public offering of securities through Aegis?

MR. RECKLER:  Object to form.  Reckler.

THE WITNESS:  I don't recall the dates.

BY MR. KLEIN:

Q.   Do you recall the company engaged -- are you familiar with an investment banker or banking outfit called Aegis?

A.   Generally, yes.

Q.   Do you recall that the company engaged Aegis with respect to a public offering of securities?

MR. RECKLER:  Object to form.  Leading.

MR. CHARLSON:  Object to form.  Charlson.

THE WITNESS:  I'm not clear on that.

Page 24

BY MR. KLEIN:

Q.   Did Genius Brands have any relationship with Aegis at any time?

A.   Yes.

Q.   What was the relationship?

A.   We were speaking to them about raising money.

Q.   All right.  In what way -- what ways were you speaking to them about raising money?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know what the question is, "what ways."  What does that mean?

BY MR. KLEIN:

Q.   Your statement was about raising money. By what means did the company speak to Aegis about raising money?

MR. CHARLSON:  Object to the form. Charlson.

BY MR. KLEIN:

Q.   You can answer when there's an objection.

A.   I don't really understand the question.

Q.   Okay.  That's fine.

Did the company speak to Aegis about a public offering of securities?

Page 25

A.   I'm not sure.

Q.   Did the company speak to Aegis about a private offering of securities?

A.   I'm not sure.

Q.   Do you recall any successful offerings of securities with Aegis by the company?

MR. RECKLER:  Object to form.  Reckler.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.   Okay.  Do you recall the company filed Form S-1 Registration Statement in the summer of 2019?

A.   I don't know what a Form F1 registration statement is.

Q.   Do you recall the company proposed an initial -- a public offering of securities in the summer of 2019?

MR. GLADSTEIN:  Object to form. Gladstein.

You could make it a lot easier by using the word "if."

BY MR. KLEIN:

Q.   Do you recall whether the company proposed an initial public offering of securities in the summer of 2019?

A.    No, I don't.

Q.    Could we turn to Tab 1 in your binder.

MR. KLEIN:  For the record, Tab 1 is a document Bates-stamped IRO-AUG-0003286 through 3288. Can we mark that as Exhibit 1.

(Exhibit 1 marked for identification.)

BY MR. KLEIN:

Q.    My first question after you've had a chance to review the document is whether you've ever seen this document before.

A.    What was the question again?

Q.    The question is whether you've ever seen the document before.

A.    I don't recall.

Q.    Or any part of the document.

A.    I don't recall.

Q.    Okay.  Do you see that the original message in this email string, which is on the second page, the page that is a Bates stamp which -- on the bottom right that ends in 3287, and it says, "Original message from Andy Heyward to Rich Abbe," "Subject" is, "Hey, Rich...are you available to speak today or tomorrow?"

MR. CHARLSON:  Mike, I think our binder was assembled incorrectly.  That is not what Tab 1

was.  Hang on a second.

MR. KLEIN:  Can you tell me what Tab 1 is?

MR. CHARLSON:  I think we're -- you want the document that's -- IRO-AUG --

MR. KLEIN:  There was tab 0.

MR. CHARLSON:  Yeah, okay.  I think he was looking at tab 0, so you might want to ask again about Tab 1.

MR. KLEIN:  Just for the record, I'm sorry, and so the record is clear, what you had as Tab 1 -- and, Michael Charlson, you may be able to answer this -- but Tab 1, there is -- appears to be an engagement letter as filed with EDGAR dated February 14, 2019.  Is that correct?

MR. CHARLSON:  I think that's what you were just referring to as Tab 0, Michael, but it was in our binder as Tab 1.

MR. KLEIN:  Okay.

MS. LO:  Behind is --

MR. CHARLSON:  Okay.  All right.  But we're now looking at Tab 1, which is IRO-AUG-3286 to 88.  Is that right?

MR. KLEIN:  Correct.

MR. CHARLSON:  And that's the document that was marked as Exhibit 1?

MR. KLEIN:  Yes.

MR. CHARLSON:  Okay.  It's this one that he wants to know if you recognize, Andy.  I'm sorry for the confusion.

THE WITNESS:  Okay.

MR. KLEIN:  And, Michael, while the witness is reviewing the document, as I understand the record there, the witness was looking at Tab 0 and says that he doesn't recall having seen it before.  Is that --

MR. CHARLSON:  That's correct.  That's correct.

MR. KLEIN:  Okay.  Just for the court reporter -- I don't mean to distract you, now Mr. Heyward.  For the court reporter, can we mark Tab 0 as Exhibit 2 just so the record is clear?

(Exhibit 2 marked for identification.)

MR. CHARLSON:  Is there a particular part of Exhibit 1 that you want the witness to look at? The email string doesn't include him at all.

MR. KLEIN:  The email starting at the third or fourth email, it does include him, I think.

MR. CHARLSON:  It does, later on.

BY MR. KLEIN:

Q.    The question is whether he's seen the

email string before.

MR. RECKLER:  Object to form.  Reckler.

THE WITNESS:  Was there a question?

MR. CHARLSON:  Do you recall seeing this document is his question.

THE WITNESS:  Okay.  So I'm going to read the document.

MR. CHARLSON:  Okay.  Read the document.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.    If we can go to the second page, there's a Bates Number ending in 3287.  It says, "Original message from Andy Heyward," and then in brackets "aheyward@gnusbrands.com."  Is that your email address?

A.    Yes.

Q.    Okay.

A.    It was my email address.

Q.    At the relevant time-specific period, it was your relevant email address, correct?

A.    (Nodding head.)

Q.    Could anyone else send messages from that email address?

MR. CHARLSON:  Object to the form.  Charlson.

Page 30

THE WITNESS:  I'm not sure.

BY MR. KLEIN:

Q.   Do you have an assistant who sent messages for you?

A.   Possibly.

Q.   Okay.  If your assistant sent messages for you, was it at your request?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I believe so.

BY MR. KLEIN:

Q.   Are you aware of any instance in which any assistant you've ever had has sent a message on your behalf without your permission?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not sure.

BY MR. KLEIN:

Q.   It looks like the email subject is, "Hey, Rich, are you available to speak today or tomorrow?" Is that right?

A.   What was the question?

Q.   You sent an email on -- it looks like you sent an email on January 7, 2019, at 4:58 p.m., to Richard Abbe saying, "Hey, Rich, are you available

to speak today or tomorrow?" in the subject heading with no text.  Is that correct?

    A.    Well, that's what it -- what I'm reading.

    Q.    Do you have any reason to think you didn't send that email?

    A.    No.

    Q.    And Mr. Abbe replies -- this is on page ending in 3286, "Hey, Andy.  I'm still waiting for your bankers to propose something per your last email."

        MR. CHARLSON:  Now, wait a minute.  I have to object there.  That -- what you call a reply is seven months later according to the document. Object to the form.  Charlson.

        MR. KLEIN:  July 1st.

        MR. CHARLSON:  Yes, the first one is January the 7th, and the one you said is a reply is July the 1st.

        MR. KLEIN:  Okay.  We can strike calling it a reply.  I'll change the question.

BY MR. KLEIN:

    Q.    Mr. Abbe continues the email string on July 1st saying, "I'm still waiting for your bankers to propose something per your last email."

        Do you see that?

A.   I do see that.

Q.   Okay.  And then you reply, "Okay.  I'm out of the office now.  I will be in in about an hour and circle up with them.  Happy for us to talk directly as well, if you wish."

The question is, did you talk to Mr. Abbe?

MR. RECKLER:  Objection to form.  Reckler.

THE WITNESS:  I don't recall.

BY MR. KLEIN:

Q.   Have you ever spoken with Mr. Abbe?

A.   I have.

Q.   When was the last time you recall speaking with Mr. Abbe?

A.   I don't know.

Q.   Was it within the last three years?

MR. RECKLER:  Objection to form.  Asked and answered.  Reckler.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   The email string then deviates -- it looks like you didn't receive the messages, but there's an email from Joe Reda to Abbe saying, "He hired Aegis when he has a 12-month exclusive with us.  Moron.  Fight time."

Do you know what that refers to?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not certain.

BY MR. KLEIN:

Q.  Do you have any understanding of what that refers to?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not certain.

BY MR. KLEIN:

Q.  Did the company have an exclusive anything with Special Equities Group at that time?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.  Did the company hire Aegis at that time?

MR. CHARLSON:  Object to the form. Charlson.

BY MR. KLEIN:

Q.  Let me change the question.

Do you understand what Mr. Reda means when he says "he hired Aegis"?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not certain.

BY MR. KLEIN:

Q.   Mr. Heyward, I've noticed that you've sneezed and used tissues a few times.  I assume you have a cold.

Are you on any cold medication today?

MR. RECKLER:  Object to the form, although Mr. Charlson can do that, if he wants.

THE WITNESS:  I couldn't hear you clearly. I'm sorry.

MR. RECKLER:  I think you're sniffling too much for plaintiff's counsel.

BY MR. KLEIN:

Q.   No, it's not that you're sniffling.  Your sniffling is fine.  I wanted to know whether you're on any cold medication.

A.   No, I'm not.

Q.   Can we skip to Tab 4 in the binder and mark that as Exhibit 3.

(Exhibit 3 marked for identification.)

MR. KLEIN:  Tab 4, for the record; is TOON00020104 and 105.

BY MR. KLEIN:

Q.   First question is whether you recognize this document.

A.   No, I do not.

Q.   This appears to be a text message string between you and Shaye Hirsch.  Is that correct?  Sorry.  That's on the page ending 104.

A.   What was the question?

MR. CHARLSON:  It's Shaye Hirsch.  And it would be 105.

MR. KLEIN:  It's 104 and 105, I think.

THE WITNESS:  It appears to be.

BY MR. KLEIN:

Q.   The first message is from Shaye Hirsch, and it says, "She's reached out to me about Amin doing RD deal now.  I told him Brio would do it alongside him.  Let me know if you want to discuss."

Do you see that?

A.   I do.

Q.   Do you understand what the word "she's" there means?

A.   No, I do not.

Q.   Do you think that might be Shex?

MR. GLADSTEIN:  Object to form.  Gladstein.

THE WITNESS:  I have no idea.

BY MR. KLEIN:

Q.   Why would Shaye Hirsch send this message?

MR. HORGAN:  Objection to form.  Horgan.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   Do you know who Amin is?

MR. GLADSTEIN:  Object to form, and you know his name at this point, no?  It's not Amin --

BY MR. KLEIN:

Q.   I'm sorry.  I mispronounced it.

Do you know who Amin is?

A.   I believe so, yes.

Q.   Who do you believe Amin is?

A.   I believe Amin is with the Anson Group.

Q.   And it continues to say, "Doing RD deal now."

Do you know what an RD deal is?

A.   No.

Q.   Do you know what a registered direct deal is?

A.   Not precisely.

Q.   Do you know generally?

A.   I could speculate.

Q.   What's your understanding of what a registered direct deal is?

A.   My understanding is it's some form of money raise.

Page 37

Q.    In exchange for what?

A.    I don't know.

Q.    Okay.  You respond, "At dinner with Regina...we'll be back at hotel in 30 minutes. Available then...."

Do you see that?

A.    I do.

Q.    The phone number that's on there, is that your personal cell phone number?

A.    That is.

Q.    Is that also your work cell phone number?

A.    That is.

Q.    Do you have more than one cell phone?

A.    I do.

Q.    Do you use any other cell phone number than this for work purposes?

A.    I'm not sure.

Q.    Do you text with any cell phone number other than this number?

A.    I'm not sure.

Q.    Did you have more than one cell phone number in 2019 and 2020?

A.    I'm not sure.

Q.    And when I say "more than one cell phone number," I should be more precise.

Did you have more than one cell phone?

A.   I do.

Q.   Do you know whether you and Shaye Hirsch ever spoke -- well, sorry.

If you skip down a few messages, you wrote -- you write, "Tried on phone.  No answr," which I assume means answer.  Is that correct?

A.   I don't know.

Q.   "Am back in my hotel."

Do you see that?

A.   I do.

Q.   Okay.  And then Mr. Hirsch responds. "Okay.  We'll call you in 10 or 15."

Did Mr. Hirsch call you?

A.   I don't recall.

Q.   Have you spoken to Mr. Hirsch before?

A.   I have.

Q.   Have you spoken to him on several occasions?

MR. GLADSTEIN:  Object to form. Gladstein.

BY MR. KLEIN:

Q.   How many times have you spoken to Mr. Hirsch?

MR. GLADSTEIN:  There you go.

Page 39

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   When you speak to Mr. Hirsch, do you speak about Genius Brands?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not -- the question is not really clear to me.

BY MR. KLEIN:

Q.   Have you spoken to Mr. Hirsch -- are you friends with Mr. Hirsch?

A.   No.

Q.   Did you speak to Mr. Hirsch about personal matters?

MR. CHARLSON:  Object to the form. Charlson.

BY MR. KLEIN:

Q.   Have you ever spoken to Mr. Hirsch about personal matters?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  What are "personal matters"?

BY MR. KLEIN:

Q.   Did this call have a business purpose?

MR. GLADSTEIN:  Object to the form.

Gladstein.

THE WITNESS:  I don't recall.

BY MR. KLEIN:

Q.   Do your calls with Mr. Hirsch have a business purpose?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I couldn't hear you clearly. Could you restate your question?

BY MR. KLEIN:

Q.   Yeah.  Do your calls with Mr. Hirsch have a business purpose?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not sure.

BY MR. KLEIN:

Q.   Does -- can we go to Tab 5?

MR. CHARLSON:  Tab 5?

MR. KLEIN:  Yeah, and I believe it's Exhibit 4.

For the record, while Mr. Heyward is reviewing the document, to the extent he wants, it's -- Exhibit 4 is Bates-stamped TOON00017138 through 17154.

(Exhibit 4 marked for identification.)

BY MR. KLEIN:

Q.   And I'd like to draw your attention to the page with the Bates Number ending in 17147 to start. There's a message that says, "Andy said he would have it for me this a.m. after he was done sailing." And then -- do you see that message?

A.   Yes, I do.

Q.   If you skip to the message that follows that, which is on the preceding page, 17146, it looks like there's a response from you.

Do you see that?

A.   I'm afraid the chronology is not clear. And I don't understand what you have asked saying that do I see a message from me responding to that?

MR. CHARLSON:  I think he's talking about this.

BY MR. KLEIN:

Q.   Do you see the bottom email on that page? It says, "On Aug 31, 2019, at 9:31 a.m., Andy Heyward," and it has your email address, and it says "wrote."

Do you see that?

A.   Yes.

Q.   Okay.  And you write, "Andy has not been sailing since Wednesday.  He has been selling."

Page 42

A.   Yes.

Q.   What were you selling?

MR. CHARLSON:  Object to the form.
Charlson.

I have to say, this is a ten-page email
string.  You're asking him about a very small part
of it.  The rest of it, it doesn't -- is there no
context here?  I apologize for my lack of
information.  I haven't been attending all these
depositions, but that strikes me as a touch unfair.
So I object.

MR. KLEIN:  I marked the document, and I
told the witness -- I'm pointing the witness to
pages.  The witness is free to review whatever it is
he wants to review.

Mr. Charlson, if you can leave your
objections to form consistent with the judge --

MR. CHARLSON:  All right, fine.  I object
to the form.

BY MR. KLEIN:

Q.   Do you see that you wrote, "Andy has not
been sailing since Wednesday, he has been selling"?

A.   I see that.

Q.   Do you understand what you meant when you
wrote "he has been selling"?

A.    No.

Q.    And then it discusses an office move, and after that, it says, "Nobody is more focused on getting money than me because if we run out of cash, I will be the one writing a check to keep the lights on," and starting at, "BECAUSE IF WE RUN OUT OF CASH," it's in all caps.  Do you see that?

A.    I do.

Q.    Do you understand what you meant by that?

MR. GLADSTEIN:  Object -- maybe I just -- sorry.  This is Gladstein.

Michael, could you be a little more clearer in your -- maybe it's just an audio.  Was that question did you understand or do you understand?

MR. KLEIN:  No, do you.

MR. GLADSTEIN:  Okay.  I just didn't hear that.  I apologize.

MR. KLEIN:  No, it's fine.

THE WITNESS:  Could I suggest also maybe that you speak either louder or closer to your mic because when the court reporter spoke when we asked to have something reread or repeated, it was very clear.

MR. KLEIN:  That's fine.  I've moved the

Page 44

microphone closer to me.  Is this better?  Is this better?

THE WITNESS:  It's okay.  It's fine.

MR. GLADSTEIN:  Do you have the last question, or do you want it read back?

THE WITNESS:  If there's a question pending, could you repeat it or read it back?

MR. KLEIN:  The question is -- can the court reporter read back the question?

(The requested portion was read back.)

THE WITNESS:  So those are two different questions.  Do you see that?  The answer is yes.

Do I understand what I meant by that?  The answer is I'm not sure.

BY MR. KLEIN:

Q.  Can we skip to Tab 7 in your binder.  I think this is Exhibit 5.

(Exhibit 5 marked for identification.)

MR. KLEIN:  And, for the record, it appears to be a text string between Mr. Heyward and Shaye Hirsch, and the Bates stamp is T00N00020106 to 107.

BY MR. KLEIN:

Q.  The first question after -- whenever you're ready is, have you seen this document before?

Page 45

A.    No, I have not.

Q.    Okay.  Now, direct your attention to the one, two, three, four, five -- sixth text message which purports to be from you on, I believe, September 8, 2019, at 10:19 p.m.

Do you see that?

A.    I do.

Q.    It's -- it starts -- well, it's in response to a message from Shaye Hirsch saying, "Did you speak to Reda?"

Do you see that?

A.    I do.

Q.    And you write back, "Yes."  "Reda" is Joe Reda from Special Equities Group, right?

MR. CHARLSON:  Object to the form. Charlson.

BY MR. KLEIN:

Q.    Do you know who Reda is?

A.    I do.

Q.    Who's Reda?

A.    Reda is Joe Reda.

Q.    Who does he work for?

A.    I am not 100 percent clear, so I could speculate for you.

Q.    Please.

A.   It could be SEG Group.

Q.   Could it be anyone else that you can think of?

A.   It could be Dawson James.

Q.   Anyone else?

MR. GLADSTEIN:  Object to form.  What are we doing here?  We know who Reda works for.  Let's move on.  Gladstein.

BY MR. KLEIN:

Q.   You write, "Told him I was thinking to do the bridge myself with my own group, which would be on let's agree just terms."

Do you see that?

A.   I do.

Q.   Do you understand what you meant by that, by "bridge"?

MR. CHARLSON:  Object to the form. Charlson.

BY MR. KLEIN:

Q.   What do you understand the word "bridge" to mean in your text message?

MR. CHARLSON:  Object to the form. Charlson.

I mean, the witness has said he does not recognize this document.  There's no foundation for

your question.

THE WITNESS:  I'm not sure.

BY MR. KLEIN:

Q.    Do you believe you sent this text message?

A.    I'm not sure.

Q.    Do you recall that you were considering --
do you recall Genius Brands potential funding
options since September of 2019?

A.    No, I don't.

Q.    Okay.  Do you understand what you meant
by -- do you understand what this text message means
with the words "my own group"?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  No, I don't.

MR. KLEIN:  Next document.  We've been
going for almost an hour.  Can we take a break for a
few minutes?

MR CHARLSON:  Sure.

MR. KLEIN:  Ten?

MR. GLADSTEIN:  Great.

THE VIDEOGRAPHER:  We can go off the
record?

The time is 10:28 a.m., and it's the end
of Media Unit Number 1.

Page 48

(Recess.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 10:45 a.m., and it's the start of Media Unit Number 2.

BY MR. KLEIN:

Q.   Mr. Heyward, do you recall any discussions in September of 2019 about obtaining financing for Genius Brands?

A.   No, I don't.

Q.   Would showing you documents refresh your recollection?

A.   I don't know.

Q.   Did you do anything to prepare for the deposition today?

A.   Yes.

Q.   What did you do?

A.   I met yesterday with my two co-counsels next to me.

Q.   Who -- can you identify them?

A.   Mr. Charlson and Ms. Lo.

Q.   Did you review documents during that meeting?  We can start with yes or no.

MR CHARLSON:  We're not doing that, Michael.  We're not doing that, okay?  The witness is going to answer your questions, but you're not

going to harass him.  He is thinking about what happened yesterday, and he'll answer your question.

MR. KLEIN:  That's fine.

THE WITNESS:  So yes, I understand this is a very serious matter, and I want to give due thought and make sure that I'm able to answer it to the best of my ability correctly and thoroughly, so could you repeat your question once more?

BY MR. KLEIN:

Q.   Sure.

MR. KLEIN:  And, Mr. Charlson, I wasn't trying to harass the witness.  I was trying to limit the question.  The question was, did you review any documents with your counsel?

A.   Well, could you clarify the word "review"?

Q.   Did your counsel show you any documents?

A.   Yes.

Q.   Did your counsel show you documents that were produced in this litigation?

A.   I'm not sure.

Q.   Which documents did your counsel show you?

A.   I don't remember.

Q.   Do you recall any of them?

A.   No.

Q.   Prior to yesterday, did you meet with your

Page 50

counsel to discuss this deposition?

A.    Yes.

Q.    When prior to yesterday did you meet with your counsel to discuss this deposition?

A.    Last week.

Q.    Do you recall what day last week?

A.    No, I don't.

Q.    Was that meeting in person?

A.    No, it was not.

Q.    Was that meeting by telephone?

A.    Yes, it was.

Q.    Was there video?

A.    I believe so.

Q.    Did your counsel send you any documents in advance of that meeting?

A.    I don't recall.

Q.    Did your counsel display any documents on the video screen during that meeting?

A.    I don't recall.

Q.    Prior to the meeting we were discussing last week, did you meet with your counsel to prepare for this deposition?

A.    I don't believe so.  I'm going to say I don't recall because I'm not sure.

Q.    Do you recall any document that your

counsel showed you?

A.    No, I do not.

Q.    Did your counsel show you any text messages?

MR. GLADSTEIN:  Object to form.  "Text message" would be a document, and I don't know why we're doing this at this length.  You've asked these questions.  Move on.

MR. KLEIN:  If you can keep your objections to form --

MR. GLADSTEIN:  I would like to keep this deposition limited.  We have a nonparty witness in the seat, and we are wasting time, so let's get to relevant topics --

MR. KLEIN:  Just object to form, and it will move it faster.

MR. GLADSTEIN:  Great.  Let's move it faster.  We can agree.

BY MR. KLEIN:

Q.    I understand you don't recall any specific documents that your counsel showed you.  Is that correct?

A.    That is correct.

Q.    Do you generally recall the form the documents took?

A.   No, I don't.

Q.   You don't recall whether you reviewed emails?

A.   No, I don't.

Q.   Can we turn to the document at Tab 8?

MR. CHARLSON:  Tab 8?

MR. KLEIN:  Yes, which is Bates-stamped TOON00020120 and 21.

For the record, can I ask the court reporter, is this Exhibit 6?

THE REPORTER:  That's what I have.

(Exhibit 6 marked for identification.)

BY MR. KLEIN:

Q.   Do you have any reason to believe that you didn't send the first text message in this string, Mr. Heyward?

MR. CHARLSON:  Object to the form.

THE WITNESS:  What was your question again?

BY MR. KLEIN:

Q.   The question is, do you have any reason to believe that you didn't send the first text message in this string?

A.   I'm not sure.

Q.   Are you aware -- did anyone search your

phone in connection with discovery in this case?

A.   I don't know.  I'd have to talk to -- check with my counsel.

Q.   Okay.

MR. CHARLSON:  We did.

MR. KLEIN:  And these text messages are from his phone, Mr. Charlson?

MR. CHARLSON:  That's correct.

BY MR. KLEIN:

Q.   The first text message starts, "I had an email" -- sorry -- "I had a email from Reda subsequent to a conversation with him about leading a friends and family round."

What do you understand "friends and family round" to mean?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I only have a general understanding, not a precise understanding.

BY MR. KLEIN:

Q.   What is your general understanding?

A.   Friends and family contributing money, investing.

Q.   What does "friends" mean in that context?

MR. CHARLSON:  Object to the form.

Page 54

Charlson.

THE WITNESS:  I'm not sure.

BY MR. KLEIN:

Q.   What does "family" mean in that context?

MR. CHARLSON:  Object to the form.

Charlson.

THE WITNESS:  Relatives.

BY MR. KLEIN:

Q.   Do you know who "friends" refers to generally?

MR. CHARLSON:  Object to the form.

Charlson.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.   What relatives does "family" refer to?

MR. CHARLSON:  Object to the form.

Charlson.

THE WITNESS:  I'm not certain.

BY MR. KLEIN:

Q.   Did Genius Brands ever raise money from your family members?

A.   How are you defining "family members"?

Q.   People with whom you have a familial relationship.

MR. CHARLSON:  Objection to form.

Page 55

THE WITNESS:  That's kind of a tocology.
I would say --
BY MR. KLEIN:
Q.  I'm trying to understand the word "family"
as it appears on this page.
You testified that your general
understanding is that -- I said what does family
refer to, and you said I'm not certain.
I'm sorry.  Has Genius Brands ever raised
money from anyone who you consider to be part of
your family?
A.  You'd have to define "family" for me, what
you mean there.  That's kind of a loose word.
Q.  Okay.  Did Genius Brands raise money from
your parents?
A.  From my parents?
Q.  Yes.
A.  No, my parents are deceased.  They have no
money.
Q.  Did Genius Brands raise any money from any
of your siblings?
A.  No, I have one sibling, and I support her.
She has no money.
Q.  Has Genius Brands raised money from -- do
you have any children, sir?

A.   I do.

Q.   Has Genius Brands raised money from any of your children?

A.   No, it has not.

MR. GLADSTEIN:  Object to form. Gladstein.

BY MR. KLEIN:

Q.   Do you have a spouse?

A.   Do I have a cat?

Q.   Spouse.

A.   Yes, I do have a spouse.

Q.   Has Genius Brands raised money from your spouse?

A.   No, it has not.

Q.   Has Genius Brands raised money from your spouse's family?

MR. GLADSTEIN:  Object to form. Gladstein.  And here we go again with the wasting time.

MR. KLEIN:  Keep it to form.

MR. GLADSTEIN:  Keep it to relevant questions.

THE WITNESS:  Has Genius Brands raised money from my spouse's family?

///

Page 57

BY MR. KLEIN:

Q. Yes.

A. No.

Q. Has Genius Brands raised money from your brother-in-law?

MR. GLADSTEIN: Object to form. Gladstein.

THE WITNESS: I don't have a brother-in-law.

BY MR. KLEIN:

Q. Okay. Did you ever have a brother-in-law?

A. I did.

Q. Did Genius Brands -- in 2019, did you have a brother-in-law?

A. No.

Q. Okay. 2020?

A. No.

Q. Okay. If you look at Number 5 on the page ending in 121 that we're looking at, it says, "His presence will be small, and he will not be able to exert any problems."

Do you understand -- who do you understand that -- "his" to refer to?

MR. CHARLSON: Object to the form. Charlson.

Page 58

THE WITNESS:  I don't know.

MR. KLEIN:  Can we skip to Tab 10 and mark it as Exhibit 7?

(Exhibit 7 marked for identification.)

MR. KLEIN:  For the record, Exhibit 7 is Bates-stamped TOON00017182 through 186, and I am only going to ask --

BY MR. KLEIN:

Q.   Do you have Tab 10 in front of you, sir?

A.   I do.

Q.   I want to refer you to the first email or the top email on page 17182.  It says, "The problem with doing that is we are unnecessarily spending money we don't need to.  We only need to be paying Robert Wolf and Rich Abbe."

Do you see that?

A.   I do.

Q.   Who's Robert Wolf?

A.   Robert Wolf is -- what do you mean, who is Robert Wolf?

Q.   Do you know a person named Robert Wolf?

A.   I do.

Q.   Can you tell me about the person you know as -- is Robert Wolf an investor in Genius Brands securities?

Page 59

A.   Is he?

Q.   Was he ever?

A.   Yes.

Q.   Okay.  In September of 2019, was he an investor in Genius Brands?

A.   I don't know.

Q.   Did Mr. Abbe -- you wrote, "And Rich Abbe."

Is that a reference to the Iroquois fund?

A.   Was it a reference to Iroquois fund?

Q.   Do you understand Mr. Abbe to be the principal -- or do you understand Mr. Abbe to be affiliated with the Iroquois fund?

MR. RECKLER:  Objection to form.  Leading. Let's not ask leading questions, Michael.

BY MR. KLEIN:

Q.   Was Mr. Abbe an investor in Genius Brands?

MR. RECKLER:  Objection to form, lacks foundation.

THE REPORTER:  Is that Reckler speaking?

MR. KLEIN:  Yes.

MR. RECKLER:  Yes, yes, Reckler.  I'm sorry ma'am.

BY MR. KLEIN:

Q.   Mr. Heyward, are you generally familiar

with Genius Brands investors?

A.   Generally familiar, yes.

Q.   To your knowledge, was Mr. Abbe ever personally an investor in Genius Brands?

A.   I don't know.

Q.   To your knowledge, was Mr. Abbe ever affiliated with an investor with Genius Brands?

A.   I believe so.

Q.   Which investor?

A.   Which investor?

Q.   With which investor in Genius Brands was Mr. Abbe affiliated?

A.   I believe, Iroquois.

Q.   So when you write, "We only need to be paying Robert Wolf," what did you mean?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   And then it says, "And Rich Abbe."

By "Rich Abbe" there, did you mean Iroquois?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.    Okay.  Turn to Tab 13.  I'm sorry.  Turn to Tab 14.

MR. KLEIN:  Tab 14, for the record, is a document Bates-stamped TOON00011336 through 11338.  And that's Exhibit 8.

(Exhibit 8 marked for identification.)

MR. KLEIN:  Tab 14, for those who have the documents, and I would like to point your attention to the first -- the top email on page 11336.

BY MR. KLEIN:

Q.    The subject is "Re bridge."  And it's responding to a message from Joe Reda that says, "Be careful what you agree to.  Without Amin's sign-off, it doesn't mean much."  You write "fully aware."

Do you see that?

A.    I do.

Q.    What did it mean, "Without Amin's signature, it doesn't mean much"?

MR. CHARLSON:  Object to the form.  Charlson.

BY MR. KLEIN:

Q.    Strike that.

"Without Amin's sign-off, it doesn't mean much."

MR. CHARLSON:  Same objection.

THE WITNESS:  Are you talking about two different people?  Because you said Amin, and then you said Amin.

BY MR. KLEIN:

Q.   Amin.  I'm sorry.

The message says, "Without Amin's sign-off, it doesn't mean much," the message you're responding to.

Do you see that?

A.   I do.

Q.   Do you understand what that means?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I do not.

BY MR. KLEIN:

Q.   Did you understand what it means when you wrote back "fully aware"?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I don't recall.

BY MR. KLEIN:

Q.   Okay.  The next line says, "Amin and everyone will be benefited by this bridge."

Do you see that?

Page 63

A.    I do.

Q.    Who did you mean when you wrote "everyone"?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.    The subject is "Re bridge."

Do you know what "bridge" means in this context?

A.    I believe so.

Q.    What do you believe "bridge" refers to in this context?

A.    Well, I'm not a finance person, and I'm not a legal person, so I'm just giving you my layman's understanding.  I would presume it means interim financing.

Q.    So do you recall why the company needed it -- well, strike that.

Did Genius need a bridge at this point?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.    Did Genius need financing at this time?

Page 64

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.  Did Genius want financing at this time?

A.  I don't know.

Q.  Do you see, a couple lines down, you write, "I have worked hard to create a win/win for all parties as opposed to a lose/lose for all parties"?

A.  What's the question?  Do I see that?

Q.  Yes.

A.  Yes, I do.

Q.  Who were "all parties"?

A.  I don't know.

MR. CHARLSON:  Object to the form.
Charlson.

BY MR. KLEIN:

Q.  Do you recall what you meant when you wrote "all parties"?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.  Do you see under that, it says, "Including

SEG"?

A.    Yes.

Q.    Do you understand that to mean Special Equities Group?

A.    Yes.

Q.    And it continues, "Which now has an unobstructed path to go raise new money."

What did you mean by that?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

MR. KLEIN:  Can we move on to Tab 15?  Tab 15 is Bates-stamped TOON00020122 and 123.

(Exhibit 9 marked for identification.)

BY MR. KLEIN:

Q.    Do you have any reason to believe that this is not a text message string between you and Shaye Hirsch?

A.    I don't know.  I would have to read it first.

Q.    You can read it.

Have you read it?

A.    I have.

Q.    Do you have any reason to believe that this is not a text message string between you and

Shaye Hirsch?

A.   I'm not sure.

Q.   Do you see on the top of the page, it purports to be a text message from you at 7:31 p.m., on September 23, 2019?

A.   Yes, I see that.

Q.   And it says, "Please have Robert."

Do you know who "Robert" refers to?

A.   No.

Q.   "Send the final document to Mike Jaffa."

Who's Mike Jaffa?

A.   Mike Jaffa is our general counsel.

Q.   And then it says "ASAP so he can send to Shex."

Is that Jonathan Schechter from Special Equities Group?

A.   Yes.

I want to correct something.  Mike Jaffa is our general counsel and chief operating officer.

Q.   And then it says "send to Shex," which is Jonathan Schechter, I think you said, "or Amin."

Do you see that?

A.   I see that, yes.

Q.   And then that's Mr. Nathoo of Anson?  Is that right?

A.   Pardon me?

Q.   That's a reference to Mr. Nathoo of Anson, right?

A.   I believe so.

Q.   Do you understand what you meant by the sentence, "They want to see it and not have any surprises added"?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.   Do you know whether this refers to the bridge loan?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.   Strike that.  I'm sorry.  I asked a bad question.

Do you know whether this refers to potential bridge financing?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

///

BY MR. KLEIN:

Q. Do you know whether this refers to potential financing of Genius Brands?

MR. CHARLSON: Object to the form. Charlson.

THE WITNESS: No, I do not know.

BY MR. KLEIN:

Q. I just want to go back to the name "Robert" there.

Do you know if that could have been Robert Charron of the Ellenoff firm?

A. Robert who?

Q. Do you know anyone named Robert who -- as you sit here now, can you think of anyone named Robert who that could refer to?

MR. CHARLSON: Object to the form.

THE WITNESS: No.

BY MR. KLEIN:

Q. Okay.

MR. GLADSTEIN: Is this a good chance to say, "What about Bob?" Gladstein.

BY MR. KLEIN:

Q. Do you know anyone named Bob?

A. I do.

Q. Who's Bob?

A.   I know several people named Bob.

Q.   Do you know anyone with respect to Genius who could be that Robert?

MR. CHARLSON:  Object to the form.

BY MR. KLEIN:

Q.   Quick question.  Do you know anyone named Robert who's affiliated with -- who had any relationship with Shaye or -- strike the question.

Do you know anyone named Robert who you would have asked Shaye Hirsch to send final -- ask to send final -- do you know who this reference to "Robert" is and "please have Robert send the final document"?

MR. CHARLSON:  Object to the form.
Charlson.

MR. GLADSTEIN:  Objection.

THE WITNESS:  Listen, I don't want to be disrespectful, and I am not, but that question was -- that would make Kamala Harris look literate. I couldn't understand anything you said.  It was incomprehensible.  There were, like, five questions in there.  It was a salad.

BY MR. KLEIN:

Q.   You don't know who "Robert" refers to, correct?

Page 70

A.    No, I don't.

Q.    And you have no idea who "Robert" could refer to?

MR. HORGAN:  Objection.  That's Horgan.

BY MR. KLEIN:

Q.    Do you have a best guess as to who Robert --

MR. HORGAN:  Objection.  That's Horgan.

BY MR. KLEIN:

Q.    Let's move to the next document.  Let's move to Tab 16.  We'll mark that as Exhibit 10.

(Exhibit 10 marked for identification.)

MR. KLEIN:  EW-AUG0012436 through 438.

BY MR. KLEIN:

Q.    And I want to call your attention to the first email in this email string, which looks like it's an email from you dated September 24, 2019, at 6:09 p.m.

Do you see that?

A.    The first email in the string?

Q.    First temporal email.  I apologize.

A.    Second page.

Q.    Do you see, it looks like you write, "That starts with announcing we have taken care of the debt.  It is what I call the fart in the room."

A.   Yes, I see that.

Q.   Why did you call the debt "the fart in the room"?

MR. CHARLSON:  Object to the form. Charlson.

BY MR. KLEIN:

Q.   Why did you write that?

A.   I don't know.

Q.   And then it continues, "It is a windbreak that hold back everything else from igniting.  Once that is done, we will hold an investor conference call and start releasing news."

What did that mean?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   If you skip down a bit, you discuss -- it looks like you discuss some developments in the company, and then it says, "This barely scratches the surface, and, of course, I am not allowed to share anything that is not already public knowledge."

And the question is, what did you mean, "this barely scratches the surface"?

Page 72

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   Okay.  The next paragraph starts, "The time is here now to get this finished," with "NOW" being in capital letters.

Do you see that?

A.   I do see that.

Q.   It continues, "As we're running out of cash."

Let me ask, was the company running out of cash at that time?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   It continues, "I stand ready to put my $750,000 money in, as I have always said."

Do you recall what that refers to?

A.   No, I don't.

Q.   And then it continues at the end, it says, "That will be part of the news flow as well."

Do you know what that refers to?

MR. CHARLSON:  Object to the form.

Page 73

Charlson.

THE WITNESS:  No, I don't.

MR. KLEIN:  All right.  I'll skip to Tab 18.  That will be Exhibit 11.

(Exhibit 11 marked for identification.)

MR. KLEIN:  It's an email string, EW-AUG0012652 and 53.

BY MR. KLEIN:

Q.    It looks like there's an -- the email chain starts from you, and it says, "Should we worry about inviting certain people to do a presentation for fear of them seeing this PIPE coming and then shorting the stock?"

And then Mr. Reda replies, "Don't let anyone you're not comfortable with come."

And you write back, "Rich Molinsky?"

Were you saying you were not comfortable with Rich Molinsky coming to the PIPE pitch?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

MR. KLEIN:  Let's skip to Tab 19 and mark that as Exhibit 12.

(Exhibit 12 marked for identification.)

MR. KLEIN:  It's a document Bates -- email

string Bates-stamped TOON00019071, and it's one page.

BY MR. KLEIN:

Q.   The bottom email is from you to Mr. Jaffa and Reda, and it CC's Jonathan Schechter, Bob Denton, and John Ollwerther.

I think we've spoken about Mr. Jaffa. Who's Mr. Denton?

A.   Mr. Denton was our previous CFO.

Q.   Okay.  And I think you said Mr. Jaffa is now -- I'm sorry.  You said CFO.

And who is Mr. Ollwerther?

A.   Mr. Ollwerther is an employee in -- currently Kartoon Studios, then Genius Brands.

Q.   What does he do?

A.   What does he do when?  Today?

Q.   Sure, let's start with today.

A.   Today, he's in charge of business development.

Q.   And what was his position January of 2020?

A.   I'm not certain.

Q.   You begin the email by saying, "Did you find out from Mintz if I can loan the money" -- it says "form," but I think it means "from" -- which they can do the deal?"

Do you see that?

A.    I do see that.

Q.    What did you mean by that?

A.    I don't know.

Q.    Okay.  The subject is -- is it "Simon Chehebar"?

A.    What was the question?

Q.    Am I pronouncing it right?

The subject is "SImon C," and then it continues, "Chehebar," I believe?

A.    Yes.

Q.    Is that a person?

A.    That is.

Q.    Is it pronounced Simon or Simone?

A.    It's pronounced Simon in English, I believe, Simone in Spanish.

Q.    Okay.  Who is Simon Chehebar?

A.    Simon Chehebar is a former brother-in-law of mine.

Q.    Was he your brother-in-law in 2020?

A.    I don't believe so.

Q.    How did you know Simon Chehebar in 2020?

A.    How did I know him --

Q.    Strike the question.

Was he your brother-in-law before or after

2020?

A.    Before.

Q.    Okay.   When did he stop being your brother-in-law?

A.    I'm going to guess approximately -- approximately 2008.

Q.    Okay.   And then there's a reference to Abraham Chehebar in the email.

Who is Abraham Chehebar?

A.    Abraham Chehebar -- I'm not sure.

Q.    Was Simon Chehebar an investor in Genius Brands in 2020?

A.    I'm not sure.

Q.    Did Simon Chehebar have any affiliations with any investment vehicles that were investors in Genius Brands in 2020?

MR. CHARLSON:   Object to the form.

THE WITNESS:   Possibly.

BY MR. KLEIN:

Q.    Okay.   What investment vehicles?

A.    I don't know.

MR. KLEIN:   Can we move to Tab 20?   I'm marking as Exhibit 13 Tab 20, email string Bates-stamped TOON00011823 through 827.   The subject is "Re:  Wires."

(Exhibit 13 marked for identification.)

BY MR. KLEIN:

Q.   Do you see that?

A.   Yes, I see that.

Q.   Do you see the email on the first page comes from you and has a picture that says "Miracle Worker"?

A.   Yes, I see that.

Q.   What did you mean by "Miracle Worker"?

A.   I don't know.

MR. KLEIN:  Can we move to Tab 21?  I'm marking as Exhibit 14 Tab 21, Bates stamp 17809 to 811.

(Exhibit 14 marked for identification.)

BY MR. KLEIN:

Q.   Do you see the first page is an email from you?  It says, "What you asked me to do is something I do not have cash for"?

A.   Yes, I see that.

Q.   And it continues, "I don't even know if I have the ability to create liquidity for now because I'm too leveraged with too many things going on"?

And then it says you have a wedding coming up and no available cash.

And then it lists some investments you

Page 78

made in the company.

It says, "Bought $2 million of shares from Amy."

Who's Amy?

MR. CHARLSON:  Object to the form.  Charlson.

THE WITNESS:  Amy is my ex-wife.

BY MR. KLEIN:

Q.   Okay.  Do you recall why you bought $2 million of shares from your ex-wife?

A.   No, I don't.

Q.   Was Amy related to the Chehebars?

A.   No, she was not.

Q.   Okay.  Was there another ex-wife that was related to the Chehebars?

A.   Yes.

Q.   Who was that?  Strike the question.

It says, "After that, bought $500,000 worth of debt from Robert Wolf."

Do you recall that?

A.   No.

Q.   Okay.  It says, "Put in $750,000 alongside Amin."

Do you see that?

A.   I see that.

Q.   Do you recall that investment?

A.   Are you referring to Amin, I presume?

Q.   Yes, Amin, yes.  I'm sorry.

A.   And your question was?

Q.   Your email says, "Put in $750,000 alongside Amin."

Do you see that?

A.   I do see that.

Q.   Do you recall putting in $750,000 alongside Amin?

A.   No.

MR. CHARLSON:  Object to the form. Charlson.

MR. TRACEY:  Objection.  Tracey.

BY MR. KLEIN:

Q.   Do you understand what you meant by that text, by that bullet point?

MR. TRACEY:  Same objection.  Tracey.

MR. CHARLSON:  Same objection.  Charlson.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.   And then it says, "Loaned the company $525,000 personally."  It says "loaned" in quotes.

Do you see that?

A.   I do see that.

Q.   What did that mean?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

MR. KLEIN:  Can we skip to Tab 23?  23 is an email string Bates-stamped EW-AUG0013527 and 528.

(Exhibit 15 marked for identification.)

BY MR. KLEIN:

Q.   There's an email dated February 24, 2020, from you where you write, "Please review attachment. Give me your notes.  We want to be ready for the Normandy invasion."

Do you see that?

A.   I do see that.

Q.   What did you mean by "the Normandy Invasion"?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   The next paragraph says, "We will put out an additional release on the same day and additional release of big news which we have not released heretofore for each of the following seven days."

Do you recall what that refers to?

Page 81

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  No, I do not.

BY MR. KLEIN:

Q.    The next page -- then the next paragraph -- I'm sorry -- says, "Separately, I met yesterday with two of Brio's investors, and they are enthusiastically in."

Do you see that?

A.    I do see that.

Q.    Who were the Brio investors that you referenced?

A.    I don't know.

Q.    Do you see in response to your message, Joe Reda says, "I wouldn't start Normandy invasion until a week or two before the record date for shareholder vote"?

A.    Yes, I see that.

Q.    Does that refresh your recollection by what you meant by "Normandy Invasion"?

A.    No.

MR. KLEIN:  Okay.  Let's go to Tab 24.
We'll mark it as Exhibit 16.

(Exhibit 16 marked for identification.)

MR. KLEIN:  For the record, this is an

email with attachment, Bates-stamped TOON00014733 through 35.

BY MR. KLEIN:

Q.   The subject says "Press Release."

Do you recall having seen this before?

A.   No.

Q.   It says, "We have a lot of" -- the third line says, "We have a lot of exciting release coming."  And the next line says, "But this is the one that kicks everything off."

What did that refer to?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   If you'd turn to the next page, do you see what looks like it's an attachment to the email? And it takes what looks like the form of a Genius Brands press release?

A.   Yes.

Q.   The subheading says, "Chairman and CEO Andy Heyward invested additional dollars X.X million in the transaction."

Do you see that?

A.   I do see that.

Q.    At this time, do you recall being prepared to invest in a transaction?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I do not.

MR. KLEIN:  Go to Tab 25, Exhibit 17.

(Exhibit 17 marked for identification.)

MR. KLEIN:  This is an email string.  The subject is "Re:  Lineups SHK," and the Bates stamp is TOON00014743 through 45.

BY MR. KLEIN:

Q.    Do you understand what "Lineups SHK" means?

A.    Not sure.  I mean, I could speculate, but I don't know what --

Q.    Please.  Do you see it looks like you started this email string on March 3rd, 2020, at 7:26 p.m., on the second page?

MR. RECKLER:  It looks like Joe Reda started this email chain.

BY MR. KLEIN:

Q.    There's a Joe Reda message of 4:28 p.m. Below that, it says, "On March 3, 2020, at 7:26 p.m., Andy Heyward wrote."

Do you see that?

MR. CHARLSON:  There's nothing there.

THE WITNESS:  I see that there's nothing there.

BY MR. KLEIN:

Q.   Right.  And do you see that Mr. Reda -- well, do you see that Mr. Reda replies to that nothing?

MR. CHARLSON:  Object to the form. Listen, Michael, this is your deposition.  You guys can do what you want, but it might help if you actually establish that the witness remembered any of this stuff before you start asking a bunch of questions about its content.  And that's why I'm objecting consistently to all of these questions on form basis.  They lack any foundation, and I don't understand their point.

BY MR. KLEIN:

Q.   Do you recall signing -- well, do you see Mr. Reda writes, "Get all your friends and family to sign all those docs tonight"?

A.   Is the question do I see it?

Q.   Yes.

A.   Yes, I see it.

Q.   Do you know what Mr. Reda meant by that message?

Page 85

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No.

BY MR. KLEIN:

Q.   Do you recall -- do you see -- the first email on this string, you write, "We will have Simon, Roberto, and Moise"?

A.   What was the question?

Q.   Do you see that you wrote, "We will have Simon, Roberto, and Moise"?

MR. CHARLSON:  Objection to form.

THE WITNESS:  Yes, I see it.

BY MR. KLEIN:

Q.   When you wrote "Simon," did you mean Simon Chehebar?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I presume so.

BY MR. KLEIN:

Q.   Why do you presume so?

A.   Well, let me just share with you something that might help provide you with some context for this.

I get about 200 emails a day, on average, 365 days a year.  That would be about 700,000 --

Page 86

70,000 -- excuse me -- 70 -- I have to do the arithmetic -- 70,000 emails a year.  This is five years ago.  Almost five years ago.  I've had over 350,000 emails since this time.  I couldn't tell you 350,000 emails ago do I remember this email let alone anything in context in what they're talking about.

I can speculate on any of this stuff, but it would be no more than speculation.

Q.   Do you recall that Genius did a financing in March of 2020?

A.   No, I don't.

Q.   Okay.

MR. KLEIN:  Could we take a break for a couple minutes?

MR. CHARLSON:  Sure.

THE VIDEOGRAPHER:  We're going to go off the record.  The time is 11:38 a.m., and it's the end of Media Unit Number 2.

(Recess.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 11:51 a.m., and this is the start of Media Unit Number 3.

BY MR. KLEIN:

Q.   Mr. Heyward, if I can call your attention

Page 87

to tab 29, which I'm marking as Exhibit 18.

(Exhibit 18 marked for identification.)

BY MR. KLEIN:

Q.    It is a very long document, TOON00000001, and my first question is does this refresh your recollection at all as to a March 2020 Securities Purchase Agreement?

MR. CHARLSON:  Wait a minute.  If you want to refresh his recollection, it has to go to the question you previously asked.  If you just want to ask him do you know what this is, you can ask him that.

BY MR. KLEIN:

Q.    Do you know what this is?

A.    It looks like about a 200-page document. So do you want me to read it?

Q.    No, I don't want you to read the whole thing.

A.    How am I going to answer you if I know what it is if I haven't looked at it?

Q.    One of the last questions I had asked was whether you recall that Genius did a financing in March of 2020.

Do you recall that?

A.    No, I don't.

Page 88

Q.   Okay.  That was a question I asked right before the break.  So I'll ask the question again. Does this refresh your recollection that Genius did a financing in March of 2020?

A.   To answer your question, I would have to read it.  Do you want me to do that?

Q.   No, I don't want you to read the whole thing.

A.   Do you want me to read --

Q.   The first page says "March 11, 2020."  The first line, it says "Securities Purchase Agreement, the, quote, 'agreement' dated as of March 11, 2020."

A.   I see that.

Q.   Does that refresh your recollection -- and then it says, "By and among Genius Brands International, Inc., a Nevada corporation," which it defines as, "'the company' and the investors listed on the schedule of buyers attached hereto."

Does that refresh your recollection that Genius did a financing in March of 2020?

A.   No, it does not.

Q.   Can you turn to -- can you turn to the Bates Page that ends in 559?

A.   Turn to the page that ends in 559?

Q.   Yeah, it's -- I'm sorry.  I'm referring to

Page 89

the Bates numbers on the bottom right-hand corner of the document.

A.   Yes.

Q.   Do you see this purports to be a voting agreement dated as of March 3, 2020?

A.   Yes, I see it.

Q.   Do you recall this voting agreement?

A.   No, I do not.

Q.   Okay.  Can you turn to the page ending in 565?  Is that your signature?

A.   It appears to be.

Q.   Can you turn to the page ending in 582?

A.   Yes.

Q.   Is that your signature?

A.   It appears to be.

Q.   Page 590, there's a reference to Leister Capital.  I'm not sure if I'm pronouncing that right.  L-E-I-S-T-E-R Capital Limited?

A.   Did you say go to 590?

Q.   Yes.

A.   And what was the question?

Q.   The question was do you see there's a reference to Leister Capital Limited?

A.   Yes.

Q.   Do you know what that is?

A.   No.

Q.   Do you recognize the signature on that page?

A.   No.

Q.   Okay.  Can you skip -- or do you know who Michael -- last name is M-A-L-I-A-N-I -- is?

A.   Yes.

Q.   Who's Mr. Maliani?

A.   He is an animation director.

Q.   If you turn to page 597, can you let me know if you recognize his signature on that page?

A.   No, I do not.

Q.   Okay.  Turn to the page ending 607.

A.   Did you say 607?

Q.   607, yes, sir.

Do you see it purports to be a Lock-Up Agreement?

A.   Yes.

Q.   Do you know what a Lock-Up Agreement is?

A.   Not exactly.

Q.   Generally?

A.   It's clearly a term of art, and I'm not a lawyer, and I don't know what that is -- means exactly, so I'm going to say no.

Q.   Do you have any understanding as to what

Page 91

it means?

A.   Broad and general.

Q.   Can you share with me your broad and general understanding?

A.   Well, I'm going to speculate and ad-lib that a Lock-Up Agreement is some form of an agreement that prevents a party from doing something.

Q.   Okay.  Do you know what this lock-up -- well, okay.  Are you familiar with the term "Leak-Out Agreement"?

A.   No, I'm not.

Q.   If you turn to page ending 610, is that your signature?

A.   Not sure.

Q.   Okay.  Do you recognize the other -- do you recognize either signature on the page?

A.   Well, I can read the other signature, of course.

Q.   Okay.  And do you recognize that as Michael Jaffa's?

A.   I read that's what it says.  I don't recognize his signature.  I'm not a handwriting expert.

Q.   Were you the president of A Squared in

Page 92

March of 2020?

A.   I'm not sure.

Q.   Okay.  If you turn to page ending in 614, can you tell me if you recognize your signature?

A.   Possibly.

MR. KLEIN:  Can we go to Tab 30?  It's Exhibit 19.

(Exhibit 19 marked for identification.)

MR. KLEIN:  And, for the record, it is Bates-stamped TOON00020139 and 40.

BY MR. KLEIN:

Q.   Do you see this looks like a text message from you to Jonathan Schechter and then a response from Jonathan Schechter?

Are you still reviewing the document?

A.   Pardon me?

Q.   I asked if you were still reviewing the document?

A.   Yes, I've read it.

Q.   Okay.  On the fifth line of the text message from you, it says, "One thing I've learned over the last couple years, at great pain, is whenever a toxic feature is put into a document, it comes back to haunt me later on."

Do you see that?

Page 93

A.   I do.

Q.   What did you mean by that?

MR. CHARLSON:  Object to the form.

BY MR. KLEIN:

Q.   What did you mean by "toxic feature"?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   The next line says, "Nobody else I know on our group will sign it."

Do you see that?

A.   I do see that.

Q.   What did you mean by "our group"?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.   The next line says, "I'm literally standing here about to put $1 million into this company."

Do you see that?

A.   It says, "I'm literally standing here about to put $1 million into the company."

Q.   Yes, I'm sorry.  I stand corrected.  It

says "the" and not "this."

          What company were you referring to?

     A.   I don't know.

     Q.   It says, "Please be my friend and sell this."

          Do you know what "this" refers to?

     A.   No, I don't.

     Q.   The next sentence says, "My brother-in-law, Simon Chehebar, and his brothers will never sell anyway if I ask them to sit patiently."

          Do you see that?

     A.   I do see that.

     Q.   Did you consider Mr. Chehebar to be your brother-in-law at that time?

     A.   Not technically; however, I would sometimes still refer to him as such.

     Q.   Who are his brothers?

     A.   His brothers are passed away, and I'm not sure of their names.  I'll double-check.

     Q.   Were they alive at this time?

     A.   Yes.  I presume they were.  It was five years ago.  I -- I'm not sure.

     Q.   What did you mean that they will never sell anyway if you ask them to sit patiently?

Page 95

A.    I don't know.

MR. KLEIN:    Can we jump to Tab 32?
Exhibit 20.

(Exhibit 20 marked for identification.)

MR. KLEIN:    For the record, it's
Bates-stamped TOON00019988 through 94.

BY MR. KLEIN:

Q.    And the top email is from Michael Jaffa,
and it says, "Dear Jeff.  Please see Andy's notes to
the PR attached."

Do you see that?

A.    I do see that.

Q.    Okay.  If you skip to the attachment,
which is -- begins at Bates Number 19992, it looks
like a redline of a document.

Do you see that?

MR. CHARLSON:    I'm going to interpose an
objection here.  Just hang on just a minute.  I want
to take a careful look at this document.  It strikes
me that it is privileged and may have been
inadvertently produced.  One moment, please.

MR. ABRAHAM:    What's the basis for
privilege?

MR. CHARLSON:    Jeffrey Schultz at Mintz
Levin was counsel to the company.

Page 96

THE REPORTER:  May I ask which counsel was just speaking?

MR. CHARLSON:  Charlson.

And, I gather, this was the subject of a motion with Judge Subramanian, and he overruled our assertion of privilege, so I withdraw the objection.

Go ahead and ask your question.

THE WITNESS:  One moment while I refresh this tea, please.

BY MR. KLEIN:

Q.  The first question was just do you see that page 19 -- the page with the Bates Number ending in 19992 looks like redlines of a press release?

A.  I don't see redlines on this page.

Q.  Are we looking at the page TOON00019 -- 19992?

A.  Yes, they're strikeouts.  They're not red --

THE WITNESS:  He said redline.

BY MR. KLEIN:

Q.  Do you see changes on this page?

A.  I do.

Q.  Did these changes reflect your understanding of the facts at the time?

MR. CHARLSON:  Object as to form.
Charlson.

THE WITNESS:  No, they don't.

BY MR. KLEIN:

Q.    Why not?

A.    I don't recognize this document.

Q.    Okay.  Assuming it was your notes to the PR attached, as Michael Jaffa said, did you try to be accurate in Genius Brands' press releases?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I don't recall this document.

BY MR. KLEIN:

Q.    I understand you don't recall this document.

Stepping away from this document, and you edited press releases for Genius Brands.

A.    What?

Q.    Did you edit proposed press releases for Genius Brands?

A.    Yes.

Q.    When you did so, did you try to accurately reflect the facts as you understood them?

A.    Yes, yes, I do.

Q.   Always?

A.   Yes.

MR. KLEIN:  It's about 3:10 in New York. And we haven't eaten lunch because we didn't know what was gonna happen on that end.  I think this might be a prudent time to break for lunch so that we can kind of crunch down on our documents and everyone can eat.

Does that work for everybody?

MR. GLADSTEIN:  Well, what are we -- what's our time on the record, please?

THE VIDEOGRAPHER:  Off the record, Counsel?

MR. GLADSTEIN:  No, don't go off the record yet, please.  Stay on the record.

What is our time on the record, please?

MR. KLEIN:  If we're going to stay on the record for this, it's not going to be my time, it will be yours.

MR. GLADSTEIN:  Great, Michael. Fantastic.  It will be my time.  You cracked the case.

Please tell me the time on the record.

THE VIDEOGRAPHER:  I can't give you the time on record, Counsel, if we're still going.  I

have to go off to find it.

MR. ABRAHAM:  Can we go off the record and find out how much time?

THE VIDEOGRAPHER:  Counsel?

MR. GLADSTEIN:  That's fine.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:10 p.m., and it's the end of Media Unit Number 3.

(Recess.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 12:11 p.m., and it's the start of Media Unit Number 4.

MR. GLADSTEIN:  So I understand we've been on the record for two hours and ten minutes.  I'd like to understand what your estimate is for the remainder of the examination.

MR. KLEIN:  I can't provide that now.

MR. HORGAN:  Well, you've got an hour and 20 minutes.

MR. KLEIN:  I understand that --

MR. HORGAN:  Are you going to use all of it?  That's Horgan, by the way.

MR. KLEIN:  I understand that's your position that I have an hour and 20 minutes left.  I don't know whether I'm going to use all of it.  I

Page 100

don't agree that I have an hour 20 minutes left.
And if you let me go look through documents, I'll be
able to --

MR. GLADSTEIN:  I'm going to let you, and,
in fact, this conversation is on my time, so I'm
trying to help you out here, but I'm also trying to
understand what we're doing.  And, I mean, are you
going to endeavor to try to wrap things -- to move
things along and wrap them up?

MR. ABRAHAM:  Andrew, it's Jeff Abraham.

MR. GLADSTEIN:  Let me finish, Jeff, and
then you can -- because we're on the record.

I don't think anybody is going to sit here
and be unreasonable, Michael.  If you need more time
than three and a half hours, we can certainly have
that conversation.  But I would like you to try to
endeavor in the spirit of fairness to get this done.
Because we've sat here for two hours and heard very,
very few questions that have anything to do with
allegations that relate to this case.

MR. ABRAHAM:  All right.  Andy, can I just
say something?  Jeff Abraham.

MR. GLADSTEIN:  Please.  Thank you.

MR. ABRAHAM:  Forget about how you
characterize things.  It was our deposition.  We're

going to try to move things along as quickly as reasonably possible because we're on East Coast time, the witness is on West Coast time, and we want to get home, just like you want to get home.

MR. GLADSTEIN:  Okay.

MR. ABRAHAM:  We're going to try to move it along.  Some things are outside of our control. We're trying to move it along as fast as we can, okay?

MR. GLADSTEIN:  Thank you, Jeff.

MR. ABRAHAM:  You're welcome.

Can we go off the record so we can get lunch?

MR. GLADSTEIN:  Yes, sir.

MR. CHARLSON:  So one hour?  Are we taking an hour?

MR. ABRAHAM:  We can do less than an hour if that's okay with the witness.  That will help us get out of Dodge, you know, earlier.

MR. GLADSTEIN:  45 minutes.  We'll be back at 1:00.

It should be noted that that was Jeff Abraham's time.

MR. ABRAHAM:  That is not agreed upon. It's a matter of dispute.

Page 102

MR. CHARLSON:  We'll be back at 1:00.

THE VIDEOGRAPHER:  We're going to go off the record.  The time is 12:13 p.m., and it's the end of Media Unit Number 4.

(Luncheon recess.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 1:12 p.m., and it's the start of Media Unit Number 5.

BY MR. KLEIN:

Q.   Welcome back, Mr. Heyward.

Did you have any discussions about your testimony with counsel during lunch?

A.   No, I don't.

Q.   Okay.  I just want to go back to -- you had testified that you receive about 200 emails a day.

Do you recall that?

A.   I do.

Q.   Okay.  Do you read all of those emails?

A.   I try to.  If they're not spam, I do.

Q.   What percentage of those emails do you respond to?

A.   I have no idea.

Q.   How do you choose which emails you respond to?

Page 103

MR. GLADSTEIN:  Object to form.

THE REPORTER:  Who was that speaking, please?  I'm sorry.

MR. GLADSTEIN:  No, that's my fault.  Gladstein.

THE WITNESS:  What was the question?

BY MR. KLEIN:

Q.  How do you choose which emails you respond to?

MR. CHARLSON:  I'm going to object to the form too.  What are we doing here, Michael?  We're here to answer questions that have something to do with this case.  This has nothing to do with this case.  This is harassment.  This is a nonparty witness who is here to try to answer your questions as best he can.  He doesn't have a great recollection of emails from five years ago.  That doesn't give you cause to start insinuating stuff about what his email reading habits are for crying out loud.  Ask him a question that means something.

MR. KLEIN:  Can the court reporter read back the last question?

(The requested portion was read back.)

MR. CHARLSON:  Object to the form.  Charlson.

Page 104

THE WITNESS:  I didn't have a protocol.

MR. KLEIN:  Okay.  Can we turn to Tab 41 and mark that as, I believe, Exhibit 21?

THE REPORTER:  Yes.

MR. KLEIN:  Thank you.

(Exhibit 21 marked for identification.)

(Discussion off the record.)

THE WITNESS:  What tab did he say?

BY MR. KLEIN:

Q.   Sorry, Tab 41.  And I have a question about a text message that it looks like you sent on March 17, 2020, at 3:38 a.m.

MR. CHARLSON:  3:38 GMT.

MR. KLEIN:  I'm sorry.  Just for the record, the document is Bates-stamped TOON00020122 through 126.

BY MR. KLEIN:

Q.   And about a dozen text messages down, it says, "3/17/2020, 3:38 a.m.," just for identification purposes, and the time is showing GMT.  "You guys solved the most complex formula."

Do you see that?

A.   I do.

Q.   What did you mean by that?

A.   I --

Page 105

MR. CHARLSON:  Object to the form.

THE WITNESS:  -- don't know.

BY MR. KLEIN:

Q.    If you skip to a message, two more pages, 3/17/2020, 5:34 p.m. is how it's identified in the string.  It's page ending 20125.

MR. CHARLSON:  What was the time again, please?

MR. KLEIN:  5:34 p.m.

BY MR. KLEIN:

Q.    Do you see you write, "We have more stories stockpiled than we can get out for at least six weeks," with two exclamation marks?

A.    Yes.

Q.    What does "stories" mean?

A.    I don't know.  I don't know.

MR. KLEIN:  Okay.  We'll move to Tab 43.

BY MR. KLEIN:

Q.    I'm sorry.  Before we go to Tab 43, do you recall in May of 2020, the company -- in May and June -- strike that.

Do you recall in May and June of 2020 the company had several offerings of securities?

A.    No, I don't.

Q.    Okay.  Do you recall what was happening

Page 106

with the company stock price in May and June of 2020?

A.    No, I don't.

Q.    Can you turn to Tab 45?

MR. KLEIN:    We'll mark Tab 45 as Exhibit 22.    And, for the record, an email string between Andy Heyward, Jonathan Schechter, Michael Jaffa, and Joe Reda, and others, and the subject is "Re: GNUS."    The Bates is TOON00014794 through 796.

(Exhibit 22 marked for identification.)

BY MR. KLEIN:

Q.    Do you see in the top email -- well, after you've had a chance to review the message, the top email you write, "We already have -- you realize that we already have our board approval for this."

Do you know what that refers to?

MR. CHARLSON:    Object to the form. Charlson.

THE WITNESS:    You said after I read the email.  Do you want me to read it?

BY MR. KLEIN:

Q.    Yes, by all means.

A.    Do you want me to read the whole chain?

Q.    Sure, there's not much more than the first page.

Have you had a chance to review the message?

A.    Yes, I have.

Q.    The top email in the email string, you write at 12:39:06 a.m. on 5/8/2020, "You realize that we ALREADY have our board approval for this," with the "ALREADY" capitalized.

Do you see that?

A.    Yes, I do.

Q.    What did you mean by "this"?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I'm not sure if you realize there are five emails in this chain.  I'm only copied on one of them.  I don't know.

MR. KLEIN:  Can we go back to Tab 43 for a minute?  I'm going to mark that as Exhibit 23.

(Exhibit 23 marked for identification.)

MR. KLEIN:  For the record, it's a text string dated May 7, 2020, and Bates-stamped TOON00020135 and 136.

BY MR. KLEIN:

Q.    And my question at first is about a message that's -- the time stamp of 8:37 p.m. from you.  It says, "Stock went up 30 percent on Mattel

Walmart news.  And then it doubled."

Do you see that message?

A.    I do.

Q.    It continues, "And then it doubled again from yesterday to today on news of the channel launch coming June 15th."

A.    I do.

Q.    Do you recall what the Mattel Walmart news was?

A.    I'm not sure.

Q.    Do you recall the stock going up 30 percent in one day?

A.    No.

Q.    Do you recall the stock doubling on any day?

A.    No.

Q.    Do you know what the reference to "channel launch" refers to?

A.    I believe I do.

Q.    What do you believe it is?

A.    The launch of Kartoon Channel.

Q.    How long had that been planned?

A.    How long has that been planned?

Q.    How long was it planned before May 7th of 2020?

Page 109

A.    I don't know.

Q.    Was it planned for months?

A.    I don't know.

Q.    Do you know whether this was some of the backup news referenced in a prior message?

A.    I don't.

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  I don't know.

BY MR. KLEIN:

Q.    It looks like the other participant in this string of text messages is Paul Walker.

Do you see that?

A.    I do.

Q.    Who is Mr. Walker?

A.    He's a manager.

Q.    What do you mean?

A.    Coproducer with us and a manager, talent manager.

Q.    Is he an investor in Genius Brands?

A.    No.  To the best of my knowledge, I'll say no.

Q.    Appreciate it.

Turn to Tab 47, which is an email string dated May 18, 2020, bearing the Bates stamp

CVI_0002065 and 2066.

(Exhibit 24 marked for identification.)

BY MR. KLEIN:

Q.   My question for you after you've had a chance to review it is whether you recall receiving this email from Mr. Reda?

MR. CHARLSON:  Are you marking that as 24, Michael?

MR. KLEIN:  I am.

THE WITNESS:  Would you like me to read this?

BY MR. KLEIN:

Q.   You can read it as much as you like.  My question is whether you recognize the email.

A.   I have to read it to tell you if I recognize it.

Q.   Okay.  Then you can read it.

Have you had a chance to read the email?

A.   Yes I have.

Q.   Do you recall receiving it?

A.   No.

Q.   You see it says, "Congratulations on an epic comeback"?

A.   Yes.

Q.   Do you recall what that epic comeback was?

MR. CHARLSON:  Object to the form.
Charlson.

BY MR. KLEIN:

Q.   Do you know what that means?

MR. CHARLSON:  Object to the form.
Charlson.

THE WITNESS:  I would have to speculate
only.

BY MR. KLEIN:

Q.   Okay.  Do you see the next line starts,
"From $17K in the bank in February and $14 million
of debt to $17 million in the bank and hopefully no
debt soon"?

A.   Yes, I see that.

Q.   Do you recall that being the case in May
of 2020?

A.   No.

MR. CHARLSON:  Object to the form.
Charlson.

BY MR. KLEIN:

Q.   I think the answer was no.  Is that
correct?

A.   That is correct.

Q.   You understand the reference to "hopefully
no debt soon"?

Page 112

MR. CHARLSON:  Same objection.

THE WITNESS:  Yes, I understand that reference.

BY MR. KLEIN:

Q.   What do you understand it to mean?

A.   What I understand it to mean is he sent me an email saying hopefully there will be no debt soon.

Q.   You understand if there was a plan at that time pursuant to which the company would have no debt soon?

MR. CHARLSON:  Object to the form.

THE WITNESS:  No, I don't.

BY MR. KLEIN:

Q.   Okay.  Do you see two paragraphs down, it talks about -- it says, "SEG has an amazing -- has amazing relationships with the small basket of companies and investors because they're all part of the SEG family"?

Do you have an understanding as to what "SEG family" means?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I don't.

///

BY MR. KLEIN:

Q.   Are you friends with Mr. Reda?

MR. CHARLSON:  Object to the form.

BY MR. KLEIN:

Q.   Do you consider Mr. Reda a friend?

A.   Business friend.

Q.   Do you consider Mr. Schechter a friend?

A.   Business friend.

Q.   What do you mean when you say "business friend"?

A.   Business relationship and we're friendly.

Q.   Is it correct that Mr. Reda inspired a Kartoon character?

A.   That would be a mischaracterization.

Q.   Is there any relationship between Mr. Reda and any Kartoon characters from Genius Brands?

MR. GLADSTEIN:  Object to the form. Gladstein.

THE WITNESS:  You'd have to clarify what you mean.

BY MR. KLEIN:

Q.   That's okay.  I will move on.

MR. KLEIN:  Can we look at Tab 48, which is Bates-stamped TOON00014699 to 14702?  It's titled "Leak-Out Agreement," and it's Exhibit 25.

(Exhibit 25 marked for identification.)

BY MR. KLEIN:

Q.    Do you recall ever -- let me know when you've had a chance to review the document.

A.    Do you want me to read the whole document?

Q.    You don't have to read the whole document. My question is whether you've ever seen a document like this.

A.    Like this?

Q.    Have you ever seen a document like this, yes.  First question:  Have you ever seen this document?

A.    I don't recall.

Q.    Okay.  Have you ever seen a Leak-Out Agreement before?

A.    I don't know.

Q.    Do you recall any board level discussions of a Leak-Out Agreement at any time?

A.    No --

Q.    By "board," I mean the board of Genius Brands.

A.    No, I do not recall anything of that.

Q.    Do you recall any discussions about a Leak-Out Agreement with Special Equities Group at any time?

MR. CHARLSON:  I'm sorry.  You kind of garbled at the end there.

BY MR. KLEIN:

Q.    Do you recall any discussions about a Leak-Out Agreement with Special Equities Group at any time?

A.    No, I don't.

MR. KLEIN:  Can we turn to tab 49?  And it's a Form 4 from the SEC and mark it as Exhibit 26.

(Exhibit 26 marked for identification.)

BY MR. KLEIN:

Q.    It's a Form 4, and it looks like it's signed by you and dated June 25, 2020.

Do you recall having seen this document before?

A.    No, I don't.

Q.    Okay.  Do you see Table 1, which is titled "Nonderivative Securities Acquired, Disposed of, or Beneficially Owned"?

A.    Yes.

Q.    Do you see there's a column numbered 3 and a sub column in that that says "Code"?

A.    Yes, I see that.

Q.    Okay.  And do you see under that, there

Page 116

are two transactions with the code S and then each has a Footnote 1 and 2?

A.   Yes, I see that.

Q.   Are you aware that code S in column 3 of Form 4 means sale?

A.   No, I'm not.

Q.   Do you recall selling Genius Brands securities in June of 2020?

MR. CHARLSON:  Object to the form. Charlson.

THE WITNESS:  No, I have not sold Genius Brands securities, ever.

BY MR. KLEIN:

Q.   Do you recall a cashless exercise of Genius Brands once?

A.   No.

Q.   Can you look at footnotes 1 and 2, in green, at the bottom of the page, if it's printed in color?

A.   Yes.

Q.   Does that refresh your recollection as to any cashless exercise of Genius Brands securities that you might have had?

A.   No, it doesn't.

MR. KLEIN:  Can we take five minutes so I

can talk to Mr. Abraham?

MR. CHARLSON:  It's okay here.

MR. KLEIN:  Thank you.

MR. CHARLSON:  I mean, with me.  I don't speak for everyone.  I speak for the witness.

MR. ABRAHAM:  You are a very powerful speaker, Michael.

MR. CHARLSON:  I am a powerful speaker, and I have a lot of good thoughts, but I don't speak for everyone.

MR. GLADSTEIN:  We've only been going a few minutes.  I assume that we're --

MR. KLEIN:  Yes, you assume correctly.

MR. GLADSTEIN:  All right.  Then go right ahead.

THE VIDEOGRAPHER:  Okay.  We're going to go off the record.  The time is 1:36 p.m.  It's the end of Media Unit Number 5.

(Recess.)

THE VIDEOGRAPHER:  Okay.  Going back on the record.  The time is 1:46 p.m.  It's the start of Media Unit Number 6.

MR. KLEIN:  At this time, I pass the witness.

EXAMINATION

BY MR. GLADSTEIN:

Q.   Mr. Heyward, very nice to meet you.  My name is Andy Gladstein.  I represent the Empery Funds.

Before being in the room today, have you and I ever met?

A.   No, we haven't.

Q.   And have you and I ever discussed the case in any manner at all?

A.   No, we haven't.

Q.   Okay.  And that includes in person and on any other form of communication?

A.   No, we have not.

Q.   Okay.  Mr. Heyward, you were asked a number of questions through the first few hours this morning, but one of the answers you provided in your testimony is that you are not a lawyer and not a finance expert.

Do you remember saying that?

A.   Yes.

Q.   What do you consider to be your area of expertise?

A.   I -- when people ask me what do I do, the first thing I say is I write cartoons.  I used to

write cartoons, but I don't really do that as a career anymore.  By way of background, I could share with you I started off as a writer at Hanna-Barbera. I used to write Scooby-Doo, the Smurfs, and the Flintstones, and eventually I started my own company, and I would write the shows, develop the characters, direct the voices, everything to do with model sheets.  I don't do finance and legal, but if you asked me to correct a storyboard, you could tie my hands behind my back and blindfold me, and I could do it for you.

Q.   Thank you.

Some of the names you just mentioned are cartoons or movies that have subsequently been produced that have received national acclaim, correct?

A.   Yes.

Q.   And you've worked with actors like Matthew Broderick.  Is that right?

A.   Yes.

Q.   Okay.  Is it fair to describe what you just discussed as being an expert in the creative arts, or is there another term you would use for it?

MR. KLEIN:  Objection to form.

THE WITNESS:  Yes, you could say that.

BY MR. GLADSTEIN:

Q.    Okay.  And does that mean that -- I want to focus you on the years 2019 to 2020, if I can.

Does that mean that Genius did not have personnel in the C-suite, so to speak, that had expertise in both legal and financial areas?

MR. KLEIN:  Object to the form.

THE WITNESS:  In the C-suite?  We've always had a CFO and a general counsel.

BY MR. GLADSTEIN:

Q.    And do you recall who the CFO and general counsel in 2020 for Genius were?

A.    Yes, I do.

Q.    Who were those two individuals?

A.    The general counsel was Mike Jaffa, and the CFO was Robert Denton.

Q.    Okay.  Let's start with Mr. Jaffa.

Can you describe for us just some of his roles and responsibilities as GC of the company in 2020?

A.    Yes.  Well, I have to frame it by saying he is today our GC and COO, and, candidly, he assumed many of the COO responsibilities at that time prior to him officially having that role.

So what were his responsibilities?

Page 121

Everything to do with the business affairs and legal matters of the company as it related to the Hollywood community, as it related to the investment community, and as it related to the internal employee play base.

Q.    And the other individual you mentioned, I believe, was Mr. Denton.  Is that correct?

A.    That's correct.

Q.    And can you just -- same question there.  Can you describe some of his roles and responsibilities as CFO in 2012?

A.    Yes.  He was -- he had oversight for the financial affairs of the company.  He did everything from accounts receivable, accounts payable, accounting, everything to do with any outward financings of the company.  As we were a public company, he worked with the general counsel when they filled out public filings.  Pretty much they worked hand in hand, together, the two of them, on all matters to do with the business and finance of the company.

Q.    Now, one of the -- those matters relating to business and finance that we've discussed earlier this morning were finances -- financings that were conducted by Genius in 2020.

Do you know what I'm referring to when I say that?

A.    No.

MR. KLEIN:  Object to the form.

BY MR. GLADSTEIN:

Q.    Do you remember being asked some questions about whether Genius entered into an SPA in 2020 with certain investors?

A.    Yes, yes, I do remember those.

Q.    And based on your review of the documents, do you recall that Genius entered into a transaction for financing in or around 2020?

MR. KLEIN:  Object to the form.

THE WITNESS:  Yeah, I don't recall those specifics.  It's not what I do in the company.

BY MR. GLADSTEIN:

Q.    Okay.  Do you recall that the company entered into a transaction with investors that included Anson and Brio and a few of the other names that you mentioned?

MR. KLEIN:  Object to the form.

THE WITNESS:  Do I recall that they entered into a --

BY MR. GLADSTEIN:

Q.    I'll rephrase the question.

Page 123

At any time in or around 2020, do you have a recollection that Genius did a financing or were -- acquired financing or money from a series of -- or -- from different investors?

MR. KLEIN:  Objection as to form.

MR. CHARLSON:  I'm going to object to the form.

BY MR. GLADSTEIN:

Q.   Okay.

MR. CHARLSON:  That was Charlson.  Sorry.

BY MR. GLADSTEIN:

Q.   You saw some emails earlier this morning that included either a 200 or 900-page document.  I believe that involved Genius, correct?

A.   Yes.

Q.   Okay.  To the extent -- is that the type of document you think that the company would just sign without deliberation or consulting with experts?

MR. KLEIN:  Object to the form.

THE WITNESS:  No, that would be unimaginable.

BY MR. GLADSTEIN:

Q.   Okay.  So bringing it back to the CFO and the general counsel of the company, do you have any

recollection as to -- actually, strike that question.  I apologize.

Do you have any recollection as to who was in the weeds and who was in the details of the transactions that were discussed with plaintiff's counsel this morning?

MR. KLEIN:  Object to the form.

THE WITNESS:  I would say Mr. Jaffa, Mr. Denton, and they engaged outside counsel they worked with.

BY MR. GLADSTEIN:

Q.    Okay.  Do you remember who that outside counsel was?

A.    I believe so.

Q.    Might that have been Mintz Levin?  Does that ring a bell?

A.    Yes.

MR. KLEIN:  Objection to form.

BY MR. GLADSTEIN:

Q.    Do you remember the name of the law firm that worked as outside counsel?

A.    The one you just said, Mintz Levin.

Q.    Thank you.

And did the company receive advice from anyone else besides Mintz Levin in connection with

Page 125

any financial transactions that it did in or around 2020?  Scratch that.

Who is SEG?  Special Equities Group?

MR. KLEIN:  Object to the form.

THE WITNESS:  They were our bankers.

BY MR. GLADSTEIN:

Q.   Okay.  And when you say they were your bankers, they were your bankers for what?

A.   We used them to raise money for us.

Q.   Okay.  And did you have an understanding of whether your general counsel and your CFO were working with both Mintz Levin and SEG together?

MR. KLEIN:  Objection to form.

THE WITNESS:  I'm not sure how to -- I don't know how they work together.  They worked -- they were in dialogue through the process.

BY MR. GLADSTEIN:

Q.   What do you mean by that, "dialogue through the process"?  That's what I'm trying to get at, at a very high level.

A.   At a very high level --

MR. CHARLSON:  I'm going to object to the form.  That was Charlson.

THE WITNESS:  At a very high level --

MR. KLEIN:  Objection.

Page 126

THE WITNESS:  I would say that Mr. Jaffa and Mr. Denton interacted with our counsel at Mintz Levin -- Jeff Schultz, I believe, is his name -- and they had interaction and dialogue with SEG.

The details and specifics and whatnot were -- they would know.  It's not what I did.

MR. GLADSTEIN:  No further questions. Thank you very much.

THE WITNESS:  Thank you.

MR. CHARLSON:  Does anyone else have questions for the witness?

MR. KLEIN:  Any questions?

Hearing none, can you give us just two minutes, and then we might be done?

THE VIDEOGRAPHER:  So we're going off the record.  The time is 1:57 p.m., and it's the end of Media Unit Number 6.

(Recess.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 2:01 p.m.  This is the start of Media Unit Number 7.

MR. KLEIN:  I have a few very quick questions for you, Mr. Heyward, and I think we may be done for the day.

///

EXAMINATION

BY MR. KLEIN:

Q.   Mr. Gladstein just asked you a few questions.  Among the first questions he asked you was whether you'd met or spoken to him before today.

Do you recall that?

A.   I do.

Q.   Did you speak to Mr. Gladstein or any other counsel today about the subject of your testimony?

A.   You mean other than in this room?

Q.   During breaks in the deposition.

A.   No, we didn't talk about anything.  They went to lunch, I went out on a walk.

Q.   You'd spoken about Mr. Jaffa and Mr. Denton a little bit.

Do you recall that?

A.   I do.

Q.   To your knowledge, did Mr. Jaffa ever take any action relating to financing for Genius Brands without discussing it with you first?

MR. CHARLSON:  I'm going to object to form.  Charlson.

THE WITNESS:  That question I don't understand.  He said did he ever take any action

without discussing it with me first?

You mean which I found out about subsequently later?

BY MR. KLEIN:

Q.   Yes.

A.   I don't know.

Q.   Did he have authority to raise funds without consulting with you?

MR. CHARLSON:   Object to the form. Charlson.

THE WITNESS:   Well, he's a C-suite officer of the company.  I don't know if that provides that authority or not.  And -- I don't know.

BY MR. KLEIN:

Q.   Okay.  If I asked you the same questions with respect to Mr. Denton, would your answers be the same?

A.   Yes, I would be -- yes.

MR. KLEIN:   All right.  Thank you for your time, Mr. Heyward.

THE WITNESS:   Thank you.  Thank you very much.

THE VIDEOGRAPHER:   We are off the record -- we are off the record at 2:04 p.m. Pacific Daylight Time.  This concludes today's testimony

**Page 129**

given by Andy Heyward.  The total number of media units used was seven and will be retained by Veritext Legal Solutions.

(At 2:04 p.m. the proceedings were concluded.)

Page 130

CERTIFICATE

I, Dana Peabody, a California Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in any way interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name at Yuma, Arizona, this 22nd day of October, 2024.

_____

_____
Dana Peabody
CSR No. 6332

Page 131

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

10/9/2024 - ANDY HEYWARD

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____


_____    _____

ANDY HEYWARD                            Date

**Page 132**

TODD AUGENBAUM vs.

ANSON INVESTMENTS MASTER FUND LP, et al.

10/9/2024 - ANDY HEYWARD

ACKNOWLEDGEMENT OF DEPONENT

I, ANDY HEYWARD, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____     _____

ANDY HEYWARD                          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.


_____

NOTARY PUBLIC

**[& - 2019]**                                                    Page 1

**&**

**&**  2:9,13,16,19
3:3 4:3,7 9:10
9:11,22,22
10:5,11

**0**

**0**  27:5,7,16
28:8,16
**0002065**  7:1
110:1
**0003286**  5:10
26:4
**00249**  1:6 8:20
**02116**  2:14

**1**

**1**  5:10 8:15
25:11 26:2,3,5
26:6,25 27:2,8
27:11,12,17,21
27:25 28:19
47:25 93:20,24
115:18 116:2
116:17
**10**  6:3 38:13
58:2,9 70:11
70:12
**10/9/2024**
131:2 132:2
**100**  45:23
**1000**  2:21
**10001**  2:17
**10007**  3:9
**10017**  3:18

**10019**  3:22
**10025**  4:8
**10105**  3:4
**10123**  2:10
**104**  6:21 35:4,8
**105**  5:14 34:22
35:7,8
**106**  6:23
**107**  5:18 6:24
44:22
**10:19**  45:5
**10:28**  47:24
**10:45**  48:3
**10f**  4:7
**11**  6:4 73:4,5
88:10,12
**110**  7:1
**11336**  61:10
**11338**  5:24
61:5
**114**  7:3
**115**  7:5
**118**  5:6
**11:38**  86:18
**11:51**  86:22
**12**  5:5 6:6
32:23 73:23,24
**121**  57:19
**123**  6:1 65:13
**126**  6:21
104:16
**127**  5:6
**12:10**  99:7
**12:11**  99:11

**12:13**  102:3
**12:39:06**  107:5
**13**  6:7 61:2
76:23 77:1
**1325**  3:22
**1345**  3:4
**136**  6:25
107:21
**14**  6:9 27:14
61:3,4,8 77:12
77:14 111:11
**14702**  7:3
113:24
**14th**  3:17
**15**  6:10 38:13
65:12,13 80:7
**15th**  108:6
**16**  6:12 70:11
81:23,24
**17**  6:14 83:6,7
104:12 111:12
**17146**  41:9
**17147**  41:3
**17154**  5:16
40:24
**17182**  58:12
**175**  3:8
**17809**  6:9
77:12
**17k**  111:11
**18**  6:15 73:4
87:1,2 109:25
**186**  5:22 58:6
**19**  6:17 73:22
92:7,8 96:12

**19992**  95:14
96:13,17
**19th**  22:23 23:4
**1:00**  101:21
102:1
**1:12**  102:7
**1:22**  1:6 8:20
**1:36**  117:17
**1:46**  117:21
**1:57**  126:16
**1st**  31:15,18,23

**2**

**2**  5:12 28:16,17
48:4 78:2,10
86:19 116:2,17
**20**  6:19 76:22
76:23 95:3,4
99:19,24 100:1
132:15
**200**  85:24
87:15 102:15
123:13
**2000**  4:3
**20004**  2:21
**2008**  76:6
**2012**  121:11
**20125**  105:6
**2013**  18:14
**2015**  19:13,18
**2019**  22:2,19,20
22:23 23:4,10
25:12,17,25
27:14 30:24
37:22 41:19
45:5 47:8 48:7

**[2019 - 6:09]**

57:13 59:4
66:5 70:17
120:3
**2020**   37:22
57:16 74:20
75:20,22 76:1
76:12,16 80:9
83:17,23 86:11
87:6,23 88:4
88:10,12,20
89:5 92:1
104:12 105:20
105:22 106:2
107:20 108:25
109:25 111:16
115:14 116:8
120:3,12,20
121:25 122:7
122:12 123:1
125:2
**2021**   15:2
16:10,15
**2023**   15:14
**2024**   1:18 2:3
8:5 130:22
**2066**   7:1 110:1
**21**   5:20 6:21
52:8 77:11,12
104:3,6
**22**   6:23 106:6
106:10
**22nd**   130:21
**23**   6:24 66:5
80:5,5 107:17
107:18

**23rd**   2:13
**24**   7:1 70:17
80:9 81:22
110:2,7
**25**   7:3 83:6
113:25 114:1
115:14
**26**   5:10 7:5
115:10,11
**28**   5:12
**28850**   130:23
**29**   87:1
**2:01**   126:20
**2:04**   128:24
129:4

**3**

**3**   3:9 5:14
34:19,20 83:23
86:23 89:5
99:8 115:22
116:4
**3/17/2020**
104:19 105:5
**30**   37:4 92:6
107:25 108:11
**31**   41:19
**32**   95:2
**3286**   27:21
31:8
**3287**   26:20
29:12
**3288**   5:10 26:4
**34**   5:14
**35**   6:12 82:2

**350**   4:7
**350,000**   86:4,5
**365**   85:25
**38th**   2:9
**395**   2:16
**3:10**   98:3
**3:38**   104:12,13
104:19
**3rd**   83:17

**4**

**4**   5:16 7:5
34:18,21 40:20
40:23,25 99:12
102:4 115:9,13
116:5
**40**   5:16 6:18
92:10
**41**   104:2,10
**4200**   3:13
**43**   105:17,19
107:16
**438**   6:3 70:13
**44**   5:18
**45**   6:14 83:10
101:20 106:4,5
**450**   2:9
**47**   109:24
**48**   113:23
**485**   3:17
**49**   115:8
**4:28**   83:22
**4:58**   30:24

**5**

**5**   5:18 40:17,18
44:17,18 57:18
102:8 117:18
**5/8/2020**   107:5
**500**   2:13
**500,000**   78:18
**51st**   3:9
**52**   5:20
**525,000**   79:23
**528**   6:10 80:6
**53**   6:4 73:7
**555**   2:21 4:3
**559**   88:23,24
**565**   89:10
**58**   5:22
**582**   89:12
**590**   89:16,19
**597**   90:10
**5:34**   105:5,9

**6**

**6**   5:20 52:10,12
117:22 126:17
**607**   90:13,14,15
**609**   3:13
**61**   5:23
**610**   91:13
**614**   92:3
**6332**   1:23 2:3
130:25
**65**   6:1
**6:09**   70:18

**[7 - allegations]**

**7**

**7**   5:22 30:24
44:16 58:3,4,5
107:20 126:21
**70**   6:3 86:1
**70,000**   86:1,2
**700,000**   85:25
**73**   6:4,6
**750,000**   72:19
78:22 79:5,9
**77**   6:7,9
**77002**   3:14
**796**   6:23 106:9
**7:26**   83:18,24
**7:31**   66:4
**7th**   31:17
108:24

**8**

**8**   5:23 45:5
52:5,6 61:6,7
**80**   6:10
**81**   6:12
**811**   6:9 77:13
**827**   6:7 76:24
**83**   6:14
**87**   6:15
**88**   27:22
**8:37**   107:24

**9**

**9**   1:18 2:3 6:1
8:5 65:14
**900**   123:13
**92**   6:17

**94**   6:19 95:6
**94105**   4:4
**95**   6:19
**9:29**   2:2 8:4
**9:31**   41:19
**9th**   2:16

**a**

**a.m.**   2:2 8:4
41:5,19 47:24
48:3 86:18,22
104:12,19
107:5
**abbe**   26:21
30:25 31:7,22
32:6,10,13,22
58:15 59:7,8
59:11,12,17
60:3,6,12,20,21
**ability**   49:7
77:21
**able**   27:11 49:6
57:20 100:3
**abraham**   2:8,9
9:10,11,11
10:21,24 11:7
12:12 76:8,9
76:10 95:22
99:2 100:10,10
100:21,22,24
101:6,11,17,24
117:1,6
**abraham's**
101:23
**acclaim**   119:15

**accounting**
121:15
**accounts**
121:14,14
**accurate**   97:9
**accurately**
97:23
**acknowledge...**
132:3
**acquired**
115:19 123:3
**action**   9:2
15:15 127:20
127:25
**actors**   119:18
**actually**   21:20
84:11 124:1
**ad**   91:5
**added**   67:7
**additional**
80:22,22 82:22
**additions**   132:6
**address**   29:15
29:18,20,23
41:20
**advance**   50:15
**advice**   124:24
**aegis**   23:12,18
23:21 24:3,16
24:24 25:2,6
32:22 33:17,23
**affairs**   121:1
121:13
**affiliated**   18:11
59:13 60:7,12

69:7
**affiliates**   17:18
**affiliations**   9:7
76:14
**affirmed**   12:19
**afraid**   41:12
**aftlaw.com**
2:10
**ago**   86:3,3,5
94:23 103:17
**agree**   8:13 9:13
11:1 19:7
46:12 51:18
61:14 100:1
**agreed**   101:24
**agreement**   6:15
7:3 87:7 88:11
88:12 89:5,7
90:17,19 91:6
91:7,11 113:25
114:15,18,24
115:5
**ahead**   22:2
96:7 117:15
**aheyward**
29:14
**ajanjigian**   3:5
**al**   1:9 8:18
131:1 132:1
**aldonsa**   3:2
10:12
**alive**   94:21
**allegations**
100:20

**[allowed - aug0012652]** Page 4

| | | | |
|---|---|---|---|
| **allowed** 71:21 | **andy's** 95:9 | **app** 21:6,10 | 119:9 122:6 |
| **alongside** 35:14 | **angeles** 14:5 | **appear** 9:15 | 127:3,4 128:15 |
| 78:22 79:6,10 | **animation** 90:9 | **appearance** 9:5 | **asking** 13:13 |
| **amazing** | **announcing** | **appearances** | 42:6 84:12 |
| 112:16,17 | 70:24 | 2:5 9:6,14 | **assembled** |
| **amella** 10:1 | **anson** 1:8 3:11 | **appears** 27:12 | 26:25 |
| **amello** 3:7 | 4:23 8:17 10:8 | 35:2,9 44:20 | **assertion** 96:6 |
| **amendment** | 14:19 16:14,20 | 55:5 89:11,15 | **assistant** 30:3,6 |
| 23:2,5 | 36:12 66:24 | **appended** | 30:13 |
| **americas** 3:4 | 67:2 122:19 | 132:7 | **assume** 13:9 |
| 3:22 | 131:1 132:1 | **apple** 21:9 | 34:4 38:7 |
| **amin** 35:12 | **answer** 13:13 | **applicable** | 117:12,13 |
| 36:4,6,9,11,12 | 13:14,21 17:5 | 10:20 | **assumed** |
| 62:3,4,6,23 | 24:21 27:12 | **appreciate** | 120:23 |
| 66:21 78:23 | 38:7 44:12,14 | 109:23 | **assuming** 97:7 |
| 79:2,3,6,10 | 48:25 49:2,6 | **approval** | **attached** 88:18 |
| **amin's** 61:14 | 87:19 88:5 | 106:15 107:6 | 95:10 97:8 |
| 61:18,24 62:7 | 103:12,15 | **approximately** | **attachment** |
| **amy** 78:3,4,7 | 111:21 | 13:7 76:5,6 | 6:12 80:10 |
| 78:12 | **answered** | **area** 118:22 | 82:1,17 95:13 |
| **andrew** 3:7 | 32:17 | **areas** 120:6 | **attending** 42:9 |
| 100:10 | **answers** 118:17 | **arithmetic** 86:2 | **attention** 41:2 |
| **andrew.glads...** | 128:16 | **arizona** 130:21 | 45:2 61:9 |
| 3:10 | **answr** 38:6 | **arps** 2:13,16 | 70:15 86:25 |
| **andy** 1:16 2:1 | **anthony** 4:22 | 12:5 | **attorney** 9:8 |
| 5:5 8:16 9:24 | 8:23 | **art** 90:22 | 13:14 |
| 12:18 26:21 | **anybody** 12:6 | **arts** 119:23 | **audio** 8:12 |
| 28:3 29:13 | 100:13 | **asap** 66:13 | 43:13 |
| 31:8 41:4,19 | **anymore** 119:2 | **asche** 4:6,7 | **aug** 5:10 26:4 |
| 41:24 42:21 | **anyway** 94:10 | **asked** 32:16 | 27:4,21 41:19 |
| 82:22 83:24 | 94:25 | 41:13 43:22 | **aug0012436** |
| 100:21 106:7 | **apart** 15:6 | 51:7 67:18 | 6:3 70:13 |
| 118:4 129:1 | **apologize** 12:7 | 69:10 77:17 | **aug0012652** |
| 131:2,24 132:2 | 42:8 43:18 | 87:10,21 88:1 | 6:4 73:7 |
| 132:4,12 | 70:21 124:2 | 92:17 118:15 | |

**aug0013527**
  6:10 80:6
**augenbaum**  1:4
  8:17 131:1
  132:1
**august**  23:10
**authority**  128:7
  128:13
**available**  26:22
  30:20,25 37:5
  77:24
**ave**  2:9 3:17
**avenue**  2:16 3:4
  3:22
**average**  85:24
**aware**  18:2
  30:12 52:25
  61:15 62:18
  116:4

### b

**b**  5:8
**back**  22:13,14
  37:4 38:9 44:5
  44:7,9,10
  45:13 48:2
  62:18 68:8
  71:10 73:16
  86:21 92:24
  99:10 101:20
  102:1,6,10,14
  103:22,23
  107:16 117:20
  119:10 123:24
  126:19

**background**
  119:2
**backup**  109:5
**bad**  67:18
**bank**  111:11,12
**banker**  23:17
**bankers**  31:9
  31:23 125:5,8
  125:8
**banking**  23:17
**barbera**  119:3
**barely**  71:20,25
**base**  121:5
**based**  122:10
**basis**  84:15
  95:22
**basket**  112:17
**bates**  26:4,19
  29:12 40:23
  41:3 44:21
  52:7 58:6 61:5
  65:13 73:25
  74:1 76:24
  77:12 80:6
  82:1 83:9
  88:23 89:1
  92:10 95:6,14
  96:12 104:15
  106:9 107:20
  109:25 113:24
**bearing**  109:25
**beginning**  9:7
**begins**  95:14
**behalf**  2:1 10:6
  10:8,11 11:6,9

  30:14
**believe**  14:19
  30:10 36:10,11
  36:12 40:19
  45:4 47:4
  50:13,23 52:14
  52:22 60:8,13
  63:11,12 65:16
  65:24 67:4
  75:10,16,21
  104:3 108:19
  108:20 121:7
  123:14 124:14
  126:3
**bell**  124:16
**beneficially**
  115:20
**benefited**  62:24
**best**  17:5 49:7
  70:6 103:16
  109:21
**better**  13:16
  44:1,2
**big**  80:23
**binder**  26:2,24
  27:17 34:18
  44:16
**bit**  71:18
  127:16
**blindfold**
  119:10
**board**  106:15
  107:6 114:17
  114:20,20

**bob**  68:21,23
  68:25 69:1
  74:5
**boston**  2:14
**bottom**  26:20
  41:18 74:4
  89:1 116:18
**bought**  78:2,9
  78:18
**boylston**  2:13
**brackets**  29:13
**brands**  15:13
  15:18,23 18:5
  18:12,16 19:13
  19:18,20,24
  20:2,12 21:14
  22:4 23:11
  24:2 39:4 47:7
  48:8 54:20
  55:9,14,20,24
  56:2,12,15,23
  57:4,13 58:24
  59:5,17 60:1,4
  60:7,11 68:3
  74:14 76:12,16
  82:19 88:15
  97:9,18,21
  109:20 113:16
  114:21 116:7
  116:12,15,22
  127:20
**bratic**  3:12
  10:9
**break**  13:22
  47:17 86:14

**[break - charlson]** Page 6

88:2 98:6
**breaks** 13:18 127:12
**brett** 4:24
**bridge** 46:11,16 46:20 61:12 62:24 63:8,9 63:12,20 67:13 67:21
**brilling** 3:3
**bringing** 123:24
**brio** 3:1 10:11 14:19 16:20 35:13 81:11 122:19
**brio's** 81:7
**broad** 91:2,3
**broderick** 119:19
**brother** 57:5,9 57:11,14 75:18 75:20,25 76:4 94:9,15
**brothers** 94:9 94:18,19
**bruckhaus** 3:8
**bullet** 79:17
**bunch** 84:12
**business** 20:4,7 20:12 39:24 40:5,12 74:18 113:6,8,9,11 121:1,20,23

**buyers** 88:18

**c**

**c** 75:9 120:5,8 128:11
**ca** 4:4
**california** 130:4
**call** 31:12 38:13,14 39:24 70:15,25 71:2 71:12 86:25
**called** 18:15 21:10,13 23:18
**calling** 31:19
**calls** 40:4,11
**camera** 8:8
**candidly** 120:22
**capital** 3:16 11:25 19:17 22:18,24 72:7 89:17,18,23
**capitalized** 107:7
**caps** 43:7
**care** 70:24
**career** 119:2
**careful** 61:14 95:19
**cartoons** 118:25 119:1 119:14
**case** 8:19 11:18 15:2 16:3 53:1 98:22 100:20

103:13,14 111:15 118:9
**cash** 43:4,7 72:11,13 77:18 77:24
**cashless** 116:14 116:22
**cat** 56:9
**catherine** 3:12
**catherine.bratic** 3:14
**cause** 103:18
**cc's** 74:5
**cell** 21:8 37:9 37:11,13,15,18 37:21,24 38:1
**center** 3:9
**central** 4:7
**ceo** 18:18 82:21
**certain** 14:18 19:4 23:3 33:3 33:9 34:1 54:18 55:8 73:11 74:21 122:8
**certainly** 100:15
**certificate** 130:1
**certified** 130:4
**certify** 130:5,15
**cfo** 74:9,11 120:9,11,16 121:11 123:24 125:11

**chain** 73:10 83:20 106:23 107:14
**chairman** 82:21
**chance** 26:9 68:20 106:13 107:1 110:5,18 114:4
**change** 31:20 33:21 131:4,7 131:10,13,16 131:19
**changed** 15:13
**changes** 96:22 96:24 132:6
**channel** 108:5 108:17,21
**character** 113:13
**characterize** 100:25
**characters** 113:16 119:7
**charge** 74:18
**charlson** 4:2 9:21,21 11:12 11:23 12:7,14 15:3,21,25 16:5 19:14,15 20:13,13,17,18 20:23,24 21:22 22:7,7 23:24 23:24 24:10,11 24:18,19 26:24

27:3,6,11,15,20
27:24 28:2,11
28:18,23 29:4
29:8,24,25
30:8,9,15,16
31:11,14,16
33:1,2,7,8,13
33:14,18,19,24
33:25 34:8
35:6 39:5,6,15
39:16,20,21
40:6,7,13,14,18
41:15 42:3,4
42:16,18 45:15
45:16 46:17,18
46:22,23 47:13
47:14,19 48:20
48:23 49:11
52:6,17 53:5,7
53:8,16,17,25
54:1,5,6,11,12
54:16,17,25
57:24,25 60:16
60:17,23,24
61:20,21 62:1
62:13,14,19,20
63:4,5,21,22
64:1,2,16,17,21
64:22 65:9,10
67:8,9,14,15,22
67:23 68:4,5
68:16 69:4,14
69:15 71:4,5
71:14,15 72:1
72:2,14,15,25

73:1,19,20
76:17 78:5,6
79:12,13,19,19
80:2,3,17,18
81:1,2 82:12
82:13 83:3,4
84:1,8 85:1,2
85:11,16,17
86:16 87:8
93:3,6,7,15,16
95:17,24 96:3
96:3 97:1,2,10
97:11 101:15
102:1 103:10
103:24,25
104:13 105:1,7
106:17,18
107:11,12
109:7,8 110:7
111:1,2,5,6,18
111:19 112:1
112:12,22,23
113:3 115:1
116:9,10 117:2
117:4,8 123:6
123:10,10
125:22,23
126:10 127:22
127:23 128:9
128:10
**charron**  68:11
**check**  43:5 53:3
  94:20
**chehebar**  75:6
  75:10,17,18,22

76:8,9,10,11,14
85:15 94:9,14
**chehebars**
  78:12,15
**chief**  66:19
**children**  55:25
  56:3
**choose**  102:24
  103:8
**chronology**
  41:12
**circle**  32:4
**clarify**  49:15
  113:19
**clark**  3:16
  11:24,24
**clear**  15:5
  23:25 27:10
  28:16 39:8
  41:12 43:24
  45:23
**clearer**  43:13
**clearly**  34:9
  40:8 90:22
**closely**  22:4
**closer**  43:21
  44:1
**coast**  101:2,3
**code**  115:23
  116:1,4
**cohen**  3:2 10:13
**cold**  34:5,6,16
**colleague**  10:9
  10:12 12:3

**color**  116:19
**column**  115:22
  115:23 116:4
**combined**
  18:18,23
**come**  73:15
**comeback**
  110:23,25
**comes**  77:6
  92:24
**comfortable**
  73:15,17
**coming**  73:12
  73:18 77:23
  82:9 108:6
**commencing**
  2:2
**communication**
  118:13
**communicati...**
  19:22
**community**
  121:3,4
**companies**
  19:12,17
  112:18
**company**  15:18
  18:5,15,15,19
  18:24 21:15,15
  22:23 23:1,16
  23:20 24:16,24
  25:2,6,10,15,23
  33:11,17 63:18
  71:20 72:12
  78:1 79:22

**[company - dana]** Page 8

88:17 93:21,24 94:2 95:25 105:20,23 106:1 112:10 119:6 120:19 121:2,13,16,17 121:21 122:15 122:17 123:17 123:25 124:24 128:12

**company's** 15:17

**complete** 132:9

**complex** 104:21

**concluded** 129:5

**concludes** 128:25

**conducted** 8:7 8:21 121:25

**conference** 71:11

**confused** 12:8

**confusion** 15:7 28:4

**congratulations** 110:22

**connection** 8:8 53:1 124:25

**consent** 10:19 23:2,6

**consider** 55:10 94:14 113:5,7 118:22

**considered** 11:6

**considering** 47:6

**consistency** 15:19

**consistent** 42:17

**consistently** 84:14

**consulting** 123:18 128:8

**content** 84:13

**context** 42:8 53:24 54:4 63:10,13 85:22 86:6

**continue** 8:12

**continues** 31:22 36:13 65:6 71:9 72:10,18,22 75:10 77:20 108:4

**contributing** 53:22

**control** 101:7

**convenience** 13:19,19

**conversation** 53:12 100:5,16

**conversations** 15:8

**coo** 120:22,23

**copied** 107:15

**coproducer** 109:18

**corcoran** 3:20 12:1,1

**corner** 89:1

**corporation** 88:16

**correct** 14:5 17:17,19 18:19 18:20 27:14,23 28:11,12 29:20 31:2 35:3 38:7 51:22,23 53:8 66:18 69:25 111:22,23 113:12 119:9 119:16 121:7,8 123:14 132:8

**corrected** 93:25

**corrections** 132:6

**correctly** 49:7 117:13

**counsel** 4:23,24 9:6,14 10:16 11:5 34:12 49:14,16,18,21 50:1,4,14,17,21 51:1,3,21 53:3 66:12,19 95:25 96:1 98:13,25 99:4 102:12 120:9,12,15 121:17 123:25

124:6,9,13,21 125:11 126:2 127:9 130:16

**counsel's** 10:19

**counsels** 48:17

**couple** 64:7 86:15 92:22

**course** 71:21 91:19

**court** 1:1 8:18 8:24 12:15 22:12 23:8 28:13,15 43:22 44:9 52:9 103:21

**cracked** 98:21

**create** 64:8 77:21

**creative** 119:22

**cross** 10:4

**crr** 1:23

**crunch** 98:7

**crying** 103:19

**csr** 1:23 2:3 130:25

**currently** 74:14

**cv** 1:6 8:20

**cvi** 2:12 7:1 12:5 17:20,22 110:1

**cvil1** 14:22

**d**

**d** 5:1

**dana** 1:23 2:3 8:25 130:4,24

**[date - document]**

**date** 81:16 131:24 132:12
**dated** 27:13 70:17 80:9 88:12 89:5 107:20 109:25 115:14
**dates** 23:14
**dawson** 46:4
**day** 12:11 19:1 50:6 80:22 85:24 102:16 108:12,15 126:24 130:21 132:15
**daylight** 8:5 128:25
**days** 80:24 85:25
**dc** 2:21
**deal** 35:13 36:13,15,17,23 74:25
**dear** 95:9
**debt** 70:25 71:2 78:19 111:12 111:13,25 112:7,11
**deceased** 55:18
**declare** 132:4
**deemed** 132:6
**defendant** 9:25 10:20,23,24 11:2,4 12:2,10 15:7,11,12

**defendant's** 11:5
**defendants** 1:10 2:19 3:1,6 10:3,6,8,11,20 11:8 14:15,23 15:1,5,6,10,10 15:24 16:3,9 16:11,19 18:4
**defending** 9:14
**define** 55:12
**defines** 88:17
**defining** 54:22
**deliberation** 123:18
**dennis** 3:12 10:7,17
**denton** 74:6,8,9 120:16 121:7 124:9 126:2 127:16 128:16
**depends** 8:7
**deponent** 132:3
**deposed** 13:3
**deposition** 1:16 2:1 8:6,16,21 10:4 14:12 48:14 50:1,4 50:22 51:12 84:9 100:25 127:12
**depositions** 42:10
**deringer** 3:8

**describe** 119:21 120:18 121:10
**description** 5:9
**destruction** 19:25
**details** 124:4 126:5
**develop** 119:6
**development** 74:19
**developments** 71:19
**deviates** 32:20
**dialogue** 125:16,18 126:4
**different** 10:25 44:11 62:3 123:4
**dinner** 37:3
**direct** 36:17,23 45:2 119:7
**direction** 130:13
**directly** 32:5
**director** 4:24 90:9
**discovery** 53:1
**discuss** 20:3,6 20:11 35:14 50:1,4 71:18 71:19
**discussed** 118:9 119:22 121:23

124:5
**discusses** 43:2
**discussing** 50:20 127:21 128:1
**discussion** 104:7
**discussions** 48:6 102:11 114:17,23 115:4
**display** 50:17
**disposed** 115:19
**dispute** 101:25
**disrespectful** 69:18
**distract** 28:14
**district** 1:1,2 8:18,19
**docs** 84:20
**document** 26:4 26:9,10,13,15 27:4,24 28:7 29:5,7,8 31:13 34:25 40:22 42:12 44:25 46:25 47:16 50:25 51:6 52:5 61:5 66:10 69:13 70:10 73:25 87:4,15 89:2 92:15,18,23 95:15,19 97:6

**[document - examined]** Page 10

97:13,16,17
104:15 114:4,5
114:6,7,10,12
115:15 123:13
123:17
**documents**
19:21,25 48:10
48:21 49:14,16
49:18,21 50:14
50:17 51:21,25
61:9 98:7
100:2 122:10
**dodge** 101:19
**doing** 35:13
36:13 46:7
48:23,24 51:7
58:13 91:7
100:7 103:11
**dollars** 82:22
**doo** 119:4
**double** 94:20
**doubled** 108:1
108:4
**doubling**
108:14
**dozen** 13:8
104:18
**draw** 41:2
**due** 49:5
**duly** 12:19
130:7

**e**

**e** 5:1,3,8 89:18
89:18 131:3,3
131:3

**earlier** 101:19
121:23 123:12
**easier** 25:20
**east** 101:2
**eat** 98:8
**eaten** 98:4
**edgar** 5:12
27:13
**edit** 97:20
**edited** 97:18
**egs** 10:14
**egsllp.com** 3:5
**either** 43:21
91:17 123:13
**electronic**
19:21
**eleventh** 2:21
**elkins** 4:3 9:22
9:23
**ellenoff** 3:3
10:10 68:11
**email** 6:12
26:18 28:20,21
28:22 29:1,14
29:18,20,23
30:19,23,24
31:5,10,22,24
32:20,22 41:18
41:20 42:5
53:11,11 58:11
58:12 61:10
70:16,16,17,20
70:21 73:6,9
73:25 74:4,22
76:8,23 77:5

77:16 79:5
80:6,9 82:1,17
83:8,17,20
85:6 86:5 95:8
103:19 106:6
106:12,14,20
107:4,4 109:24
110:6,14,18
112:7
**emails** 5:10,16
5:22,23 6:3,4,6
6:7,9,10,14,19
6:23 7:1 52:3
85:24 86:2,4,5
102:15,19,21
102:24 103:8
103:17 107:14
123:12
**empery** 3:6
9:24 14:20
16:20 118:4
**employee** 74:13
121:5
**endeavor** 100:8
100:17
**ends** 26:20
88:23,24
**engage** 23:11
**engaged** 23:16
23:20 124:9
**engagement**
5:12 27:13
**english** 75:15
**entered** 23:1
122:7,11,18,23

**enthusiastical...**
81:8
**epic** 110:23,25
**equities** 17:7,13
22:4 33:12
45:14 65:4
66:16 114:24
115:5 125:3
**errata** 132:7
**esq** 2:8,8,12,15
2:20,20 3:2,2,3
3:7,7,7,12,12
3:16,20,21 4:2
4:2,6
**establish** 84:11
**estimate** 99:15
**et** 1:9 8:17
131:1 132:1
**events** 15:15
**eventually**
119:5
**everybody**
14:10 98:9
**ew** 6:3,4,10
70:13 73:7
80:6
**ex** 78:7,10,14
**exactly** 90:20
90:24
**examination**
12:22 99:16
118:1 127:1
**examined**
12:19 130:6

**[except - floor]** Page 11

except 11:1
exchange 37:1
exciting 82:8
exclamation
  105:13
exclusive 32:23
  33:11
excuse 21:17
  86:1
exercise 116:14
  116:22
exert 57:21
exhibit 5:9,10
  5:12,14,16,18
  5:20,22,23 6:1
  6:3,4,6,7,9,10
  6:12,14,15,17
  6:19,21,23,24
  7:1,3,5 26:5,6
  27:25 28:16,17
  28:19 34:19,20
  40:20,23,25
  44:17,18 52:10
  52:12 58:3,4,5
  61:6,7 65:14
  70:11,12 73:4
  73:5,23,24
  76:23 77:1,12
  77:14 80:7
  81:23,24 83:6
  83:7 87:1,2
  92:7,8 95:3,4
  104:3,6 106:5
  106:10 107:17
  107:18 110:2

113:25 114:1
  115:10,11
exhibits 15:16
expert 91:24
  118:19 119:22
expertise
  118:23 120:6
experts 123:19
explain 13:17
extent 40:22
  123:16

**f**

f1 25:13
fact 100:5
facts 96:25
  97:24
fair 12:14 13:9
  119:21
fairness 100:17
familial 54:23
familiar 13:9
  14:11,13 23:17
  59:25 60:2
  91:10
family 53:13,14
  53:22 54:4,15
  54:21,22 55:4
  55:7,11,12
  56:16,24 84:19
  112:19,21
fantastic 98:21
fart 70:25 71:2
fast 101:8
faster 51:16,18

fault 103:4
fear 73:12
feature 92:23
  93:5
february 22:22
  22:23 23:3
  27:14 80:9
  111:11
fifth 92:20
fight 32:24
filed 5:12 8:18
  15:2 16:4
  25:10 27:13
filings 121:18
filled 121:18
final 66:10
  69:10,11,12
finance 63:14
  118:19 119:8
  121:20,23
finances 121:24
financial 120:6
  121:13 125:1
financially 9:2
financing 48:7
  63:17,25 64:5
  67:21 68:3
  86:10 87:22
  88:4,20 122:12
  123:2,3 127:20
financings
  121:16,24
find 74:23 99:1
  99:3

fine 9:20 10:21
  11:7,11,12,21
  14:25 24:23
  34:15 42:18
  43:19,25 44:3
  49:3 99:5
finish 100:11
finished 72:6
firm 8:25 68:11
  124:20
firm's 14:7
first 18:11
  21:19 23:2,5
  26:8 31:16
  34:24 35:11
  44:24 52:15,22
  53:10 58:11
  61:10 65:20
  70:16,20,21
  77:5,16 85:5
  87:5 88:10,11
  96:11 106:24
  107:23 114:11
  118:16,25
  127:4,21 128:1
five 45:3 69:21
  86:2,3 94:22
  103:17 107:14
  116:25
flintstones
  119:5
flom 2:13,16
floor 2:9,13 3:9
  3:17

**[flow - genius]**                                          Page 12

**flow** 72:23
**focus** 120:3
**focused** 43:3
**following** 80:24
**follows** 12:20
  41:8
**footnote** 116:2
**footnotes**
  116:17
**foregoing**
  130:7 132:5
**forget** 100:24
**form** 7:5 11:18
  11:19 12:13
  15:3 16:5 17:9
  18:6,21,25
  19:14 20:8,17
  20:23 22:6,7
  23:13,23,24
  24:10,18 25:7
  25:11,13,18
  29:2,24 30:8
  30:15 31:14
  32:7,16 33:1,7
  33:13,18,24
  34:7 35:21
  36:1,5,24
  38:20 39:5,15
  39:20,25 40:6
  40:13 42:3,17
  42:19 45:15
  46:6,17,22
  47:13 51:5,10
  51:15,24 52:17
  53:16,25 54:5

54:11,16,25
56:5,17,20
57:6,24 59:14
59:18 60:16,23
61:20 62:13,19
63:4,21 64:1
64:16,21 65:9
67:8,14,22
68:4,16 69:4
69:14 71:4,14
72:1,14,25
73:19 74:24
76:17 78:5
79:12 80:2,17
81:1 82:12,18
83:3 84:8,15
85:1,11,16
91:6 93:3,6,15
97:1,10 103:1
103:11,24
105:1 106:17
107:11 109:7
111:1,5,18
112:12,22
113:3,17 115:9
115:13 116:5,9
118:13 119:24
120:7 122:4,13
122:21 123:5,7
123:20 124:7
124:18 125:4
125:13,23
127:23 128:9
**formally** 13:1

**formed** 21:15
**former** 75:18
**formula** 104:21
**forth** 130:11
**found** 128:2
**foundation**
  46:25 59:19
  84:15
**four** 45:3
**fourth** 28:22
**frame** 120:21
**francisco** 4:4
**free** 42:14
**freshfields** 3:8
**freshfields.com**
  3:10
**friend** 94:4
  113:5,6,7,8,10
**friendly** 113:11
**friends** 39:11
  53:13,14,22,24
  54:9 84:19
  113:2
**front** 58:9
**fruchter** 2:9
  9:10,11
**fully** 61:15
  62:18
**fund** 1:8 3:16
  8:17 11:25
  14:19 22:5
  59:9,10,13
  131:1 132:1
**funding** 47:7

**funds** 9:25
  15:23 118:5
  128:7
**further** 126:7
  130:15

**g**

**garbled** 115:2
**gather** 96:4
**gc** 120:19,22
**geier** 2:15 12:4
  12:4
**general** 4:23,24
  10:16 53:18,21
  55:6 66:12,19
  91:2,4 120:9
  120:11,15
  121:17 123:25
  125:11
**generally** 14:13
  14:14 18:2,17
  22:15 23:19
  36:20 51:24
  54:10 59:25
  60:2 90:21
**genius** 15:13,18
  15:23 18:5,12
  18:16 19:13,18
  19:20,24 20:2
  20:11 21:14
  22:3 23:11
  24:2 39:4 47:7
  48:8 54:20
  55:9,14,20,24
  56:2,12,15,23
  57:4,13 58:24

59:5,17 60:1,4
60:7,11 63:20
63:25 64:5
68:3 69:2
74:14 76:11,16
82:18 86:10
87:22 88:3,15
88:20 97:9,18
97:21 109:20
113:16 114:20
116:7,11,15,22
120:4,12
121:25 122:7
122:11 123:2
123:14 127:20
**getting** 43:4
**gioiella** 4:7
**give** 49:5 80:11
  98:24 103:18
  126:13
**given** 129:1
  132:9
**giving** 63:15
**gladstein** 3:7
  5:6 9:24,24
  11:10 18:6,7
  20:8,9 21:19
  21:21 22:6
  25:18,19 35:21
  35:22 36:5
  38:20,21,25
  39:25 40:1
  43:10,11,17
  44:4 46:6,8
  47:21 51:5,11

51:17 56:5,6
56:17,18,21
57:6,7 68:20
68:21 69:16
98:10,14,20
99:5,13 100:4
100:11,23
101:5,10,14,20
103:1,4,5
113:17,18
117:11,14
118:2,4 120:1
120:10 122:5
122:16,24
123:8,11,23
124:11,19
125:6,17 126:7
127:3,8
**global** 3:16
  11:25
**gmt** 104:13,21
**gnus** 106:9
**gnusbrands.c...**
  29:14
**go** 8:13 11:13
  29:11 38:25
  40:17 47:22
  56:18 65:7
  68:8 81:22
  83:6 86:17
  87:9 89:19
  92:6 96:7
  98:14 99:1,2
  100:2 101:12
  102:2,14

105:19 107:16
117:14,17
**going** 8:4 14:18
  15:16 19:1,5
  21:17 23:7
  29:6 47:17
  48:2,25 49:1
  50:23 58:7
  76:5 77:22
  86:17,21 87:19
  90:24 91:5
  95:17 98:17,18
  98:25 99:6,10
  99:21,25 100:4
  100:8,13 101:1
  101:6 102:2,6
  103:10 107:17
  108:11 117:11
  117:16,20
  123:6 125:22
  126:15,19
  127:22
**gonna** 98:5
**good** 8:3 12:24
  12:25 13:25
  68:20 117:9
**great** 47:21
  51:17 92:22
  98:20 103:16
**green** 116:18
**greenwich** 3:8
**grossman** 3:3
  10:11
**group** 17:8,13
  22:5 33:12

36:12 45:14
46:1,11 47:12
65:4 66:16
93:11,14
114:24 115:5
125:3
**guess** 14:6 70:6
  76:5
**gulino** 4:22
  8:23
**guys** 84:9
  104:21

**h**

**h** 5:8 131:3
**habits** 103:19
**half** 13:8
  100:15
**hand** 89:1
  121:19,19
**hands** 119:10
**handwriting**
  91:23
**hang** 27:1
  95:18
**hanna** 119:3
**happen** 98:5
**happened** 49:2
**happening**
  105:25
**happy** 13:18
  32:4
**harass** 49:1,12
**harassment**
  103:14

**hard** 64:8
**harris** 69:19
**haunt** 92:24
**he'll** 49:2
**head** 29:21
**heading** 31:1
**hear** 16:25 22:9
  34:9 40:8
  43:17
**heard** 8:10
  100:18
**hearing** 126:13
**help** 84:10
  85:22 100:6
  101:18
**hemr** 2:12 12:4
**hereto** 88:18
  132:8
**heretofore**
  80:24
**hereunto**
  130:20
**hey** 26:22
  30:19,25 31:8
**heyward** 1:16
  2:1 5:5 8:16
  12:18,24 26:21
  28:15 29:13
  34:3 40:21
  41:20 44:20
  48:6 52:16
  59:25 82:22
  83:24 86:25
  102:10 106:7
  118:3,15

126:23 128:20
129:1 131:2,24
132:2,4,12
**high** 125:20,21
  125:24
**hire** 33:17
**hired** 32:22
  33:23
**hirsch** 35:3,6
  35:11,25 38:3
  38:12,14,16,24
  39:3,10,11,13
  39:18 40:4,11
  44:21 45:9
  65:18 66:1
  69:10
**hogan** 3:13
  10:7 14:4
**hoganlovells....**
  3:14
**hold** 71:10,11
**hollywood**
  121:3
**home** 101:4,4
**hopefully** 10:18
  111:12,24
  112:7
**horgan** 3:3
  10:10,10 36:1
  36:1 70:4,4,8,8
  99:18,21,22
**hotel** 37:4 38:9
**hour** 32:3
  47:17 99:18,24
  100:1 101:15

101:16,17
**hours** 99:14
  100:15,18
  118:16
**houston** 3:14
**how's** 12:13

**i**

**idea** 35:23 70:2
  102:23
**identification**
  26:6 28:17
  34:20 40:25
  44:18 52:12
  58:4 61:7
  65:14 70:12
  73:5,24 77:1
  77:14 80:7
  81:24 83:7
  87:2 92:8 95:4
  104:6,20
  106:10 107:18
  110:2 114:1
  115:11
**identified**
  105:5
**identify** 48:19
**igniting** 71:10
**implicated**
  13:23
**inadvertently**
  95:21
**include** 28:20
  28:22
**included**
  122:19 123:13

**includes** 118:12
**including** 10:22
  11:4 12:10
  64:25
**incomprehen...**
  69:21
**incorporated**
  18:16
**incorrectly**
  26:25
**individual**
  121:6
**individually**
  16:12
**individuals**
  120:14
**information**
  42:9
**initial** 25:16,24
**insinuating**
  103:18
**inspired** 113:12
**instance** 30:12
**instructs** 13:14
**interacted**
  126:2
**interaction**
  126:4
**interested** 9:2
  130:17
**interim** 63:17
**internal** 121:4
**international**
  88:16

internet 8:8
interpose 95:17
introduced
  13:1
invasion 80:12
  80:16 81:15,20
invest 83:2
invested 82:22
investing 53:23
investment
  15:23 23:17
  76:15,20 79:1
  121:3
investments
  1:8 2:12 3:11
  8:17 12:5
  77:25 131:1
  132:1
investor 58:24
  59:5,17 60:4,7
  60:9,10,11
  71:11 76:11
  109:20
investors 60:1
  76:15 81:7,11
  88:17 112:18
  122:8,18 123:4
inviting 73:11
involved
  123:14
iris 2:20
iro 5:10 26:4
  27:4,21
iroquois 2:19
  10:6 14:20

16:20 59:9,10
59:13 60:13,22
issue 13:22

j

jabraham 2:10
jaffa 4:23
  10:15,15 66:10
  66:11,12,18
  74:4,7,10 95:8
  97:8 106:7
  120:15,17
  124:8 126:1
  127:15,19
jaffa's 91:21
james 46:4
janjigian 3:2
  10:13
january 15:2
  16:10,14 30:24
  31:17 74:20
jared 3:16
  11:24
jclark 3:18
jeff 95:9 100:10
  100:11,22
  101:10,22
  126:3
jeffrey 2:8,15
  9:11 12:4
  95:24
jeffrey.geier
  2:17
joanna 3:2
  10:13

joe 17:16 32:22
  45:13,21 61:13
  81:15 83:19,22
  106:8
john 3:3 10:10
  74:6
join 12:11,13
jonathan 17:16
  66:15,21 74:5
  92:13,14 106:7
judge 42:17
  96:5
july 31:15,18
  31:23
jump 22:2 95:2
june 15:14
  105:21,22
  106:1 108:6
  115:14 116:8

k

kamala 69:19
kartoon 4:1,24
  10:16 15:14
  74:14 108:21
  113:13,16
katherine 10:9
keep 12:11 19:8
  19:9 43:5 51:9
  51:11 56:20,21
khalouian 3:21
  12:3
kicks 82:10
kieran 3:20
  12:1

kieran.corcor...
  3:23
kind 21:8 55:1
  55:13 98:7
  115:1
klein 2:8 5:5,6
  9:9,9,20 11:1
  11:21 12:6,15
  12:23 15:9,22
  16:1,6 17:11
  18:9,22 19:9
  19:11,16 20:10
  20:15,20 21:1
  21:24 22:1,8
  22:12,16 23:7
  23:9,15 24:1
  24:14,20 25:9
  25:22 26:3,7
  27:2,5,9,18,23
  28:1,6,13,21,24
  29:10 30:2,11
  30:18 31:15,19
  31:21 32:9,19
  33:4,10,16,20
  34:2,13,21,23
  35:8,10,24
  36:3,7 38:22
  39:2,9,17,23
  40:3,10,16,19
  41:1,17 42:12
  42:20 43:16,19
  43:25 44:8,15
  44:19,23 45:17
  46:9,19 47:3
  47:16,20 48:5

**[klein - learned]**                                                    Page 16

49:3,9,11 51:9
51:15,19 52:7
52:13,20 53:6
53:9,20 54:3,8
54:14,19 55:3
56:7,20 57:1
57:10 58:2,5,8
59:16,21,24
60:19 61:1,4,8
61:11,22 62:5
62:16,22 63:7
63:24 64:4,18
64:24 65:12,15
67:11,17 68:1
68:7,18,22
69:5,23 70:5,9
70:13,14 71:6
71:17 72:4,17
73:3,6,8,22,25
74:3 76:19,22
77:2,11,15
78:8 79:15,21
80:5,8,20 81:4
81:22,25 82:3
82:15 83:6,8
83:11,21 84:4
84:17 85:4,13
85:19 86:14,24
87:3,13 92:6,9
92:11 93:4,9
93:18 95:2,5,7
96:10,21 97:4
97:14 98:3,17
99:17,20,23
102:9 103:7,21

104:2,5,9,14,17
105:3,9,10,17
105:18 106:5
106:11,21
107:16,19,22
109:10 110:3,9
110:12 111:3,9
111:20 112:4
112:14 113:1,4
113:21,23
114:2 115:3,8
115:12 116:13
116:25 117:3
117:13,23
119:24 120:7
122:4,13,21
123:5,20 124:7
124:18 125:4
125:13,25
126:12,22
127:2 128:4,14
128:19
**know**   13:6,16
14:8,14,14,17
16:11 17:22
18:1 19:23
20:1,5 21:12
21:12 23:5
24:12 25:13
28:3 32:14,18
32:25 33:15
34:15 35:14
36:2,4,6,9,15
36:17,20 37:2
38:3,8 39:1

45:18 46:7
48:12 51:6
53:2 54:9 58:1
58:21,23 59:6
60:5,18,25
63:6,9,23 64:3
64:6,15 65:11
65:19 66:8
67:12,20,24
68:2,6,10,13,23
69:1,2,6,9,11
69:24 71:8,16
72:3,16,24
73:21 75:4,22
75:23 76:21
77:10,20 80:4
80:19 81:13
82:14 83:15
84:24 87:11,14
87:19 89:25
90:5,11,19,23
91:9 93:8,10
93:17 94:3,6
95:1 98:4
99:25 101:19
105:2,16,16
106:16 107:15
108:17 109:1,3
109:4,9 111:4
114:3,16 122:1
125:15 126:6
128:6,12,13
**knowledge**
17:5 60:3,6
71:23 109:21

127:19
**kurt**   2:12 12:4
**kurt.hemr**   2:14

**l**

**l**   4:2 89:18 90:6
**l1**   3:16 11:25
**lack**   42:8 84:15
**lacks**   59:18
**lagnyc.com**   4:8
**largest**   18:23
**latham**   2:19
10:5
**launch**   108:6
108:18,21
**laura**   4:22
**law**   14:6 57:5,9
57:11,14 75:18
75:20,25 76:4
94:9,15 124:20
**lawsuit**   16:24
17:3,8,21,25
18:3
**lawyer**   90:23
118:18
**layman's**   63:16
**lead**   19:1
**leading**   19:2,6
22:20 23:23
53:12 59:14,15
**leak**   7:3 91:11
113:25 114:14
114:18,24
115:5
**learned**   92:21

**[leave - marked]**

leave  42:16
left  99:24 100:1
legal  8:23 9:1
  63:15 119:8
  120:6 121:1
  129:3
leister  89:16,23
length  51:7
letter  5:12
  27:13
letters  72:7
level  114:17
  125:20,21,24
leveraged
  77:22
levin  95:25
  124:15,22,25
  125:12 126:3
lexington  3:17
lib  91:5
lights  43:5
limit  49:12
limited  51:12
  89:18,23
line  16:17
  62:23 82:8,9
  88:11 92:20
  93:10,19
  111:10 131:4,7
  131:10,13,16
  131:19
lines  64:7
lineups  83:9,12
liquidity  77:21

listed  88:17
listen  69:17
  84:9
lists  77:25
literally  93:19
  93:23
literate  69:19
litigation  14:11
  14:15 49:19
litman  4:7
little  43:12
  127:16
llp  2:9,13,16,19
  3:8,13,17,21
  4:3,7 12:2
lo  4:2 9:22
  27:19 48:20
loan  67:13
  74:23
loaned  79:22
  79:23
lock  90:16,19
  91:6,9
logged  9:18
long  87:4
  108:22,23,24
look  14:6 15:17
  28:19 57:18
  69:19 95:19
  100:2 113:23
  116:17
looked  87:20
looking  27:7,21
  28:8 57:19
  96:16

looks  30:19,23
  32:20 41:10
  70:16,23 71:19
  73:9 82:17,18
  83:16,19 87:15
  92:12 95:14
  96:13 104:11
  109:11 115:13
loose  55:13
los  14:5
lose  64:9,9
lost  21:23
lot  25:20 82:7,8
  117:9
loud  103:20
louder  43:21
lovells  3:13
  10:8 14:5
lp  1:9 4:5 8:17
  131:1 132:1
lunch  98:4,6
  101:13 102:12
  127:14
luncheon  102:5
lw.com  2:22

**m**

m  3:20 5:3 90:6
m3a  4:5 14:22
ma  2:14
ma'am  59:23
made  78:1
  132:5
madison  4:2
  9:22

main  3:13
make  10:2
  11:20,23 15:5
  25:20 49:6
  69:19
makes  11:10
maliani  90:8
manager
  109:16,18,19
manhattan
  2:16
manner  118:10
march  83:17,23
  86:11 87:6,23
  88:4,10,12,20
  89:5 92:1
  104:12
mark  21:20
  26:5 28:15
  34:19 58:2
  70:11 73:22
  81:23 104:3
  106:5 107:17
  115:9
marked  26:6
  27:25 28:17
  34:20 40:25
  42:12 44:18
  52:12 58:4
  61:7 65:14
  70:12 73:5,24
  77:1,14 80:7
  81:24 83:7
  87:2 92:8 95:4
  104:6 106:10

**[marked - minutes]**

107:18 110:2
114:1 115:11

**marking** 76:23
77:12 87:1
110:7

**marks** 105:13

**master** 1:8 3:16
8:17 11:25
131:1 132:1

**mattel** 107:25
108:8

**matter** 8:16
49:5 101:25

**matters** 39:14
39:19,22 121:2
121:20,22

**matthew**
119:18

**meagher** 2:13
2:16

**mean** 17:12
24:13 28:14
46:21,24 53:15
53:24 54:4
55:13 58:19
60:15,21 61:15
61:18,19,24
62:8 63:2 65:3
65:8 71:13,24
75:3 77:9 80:1
80:15 83:14
85:14 93:2,5
93:14 94:24
100:7 104:24
105:15 107:10

109:17 112:5,6
113:9,20
114:20 117:4
120:2,4 125:18
127:11 128:2

**means** 24:16
33:22 35:18
38:7 47:11
62:12,17 63:9
63:16 74:24
83:13 90:23
91:1 103:20
106:22 111:4
112:21 116:5

**meant** 42:24
43:9 44:13
46:15 47:10
64:19 67:5
79:16 81:20
84:24

**media** 8:15
47:25 48:4
86:19,23 99:7
99:12 102:4,8
117:18,22
126:17,21
129:1

**medication**
34:6,16

**meet** 49:25
50:3,21 118:3

**meeting** 48:22
50:8,10,15,18
50:20

**members** 54:21
54:22

**mentioned**
119:13 121:6
122:20

**merged** 18:15

**message** 21:6
26:18,21 29:13
30:13 35:2,11
35:25 41:4,6,8
41:14 45:3,9
46:21 47:4,11
51:6 52:15,22
53:10 61:13
62:7,8 65:17
65:25 66:4
81:14 83:22
84:25 92:12,21
104:11 105:4
106:13 107:2
107:24 108:2
109:5

**messages** 5:14
5:18,20 6:1,17
6:21,24 20:3,6
20:11,16,22
21:10 29:22
30:3,6 32:21
38:5 51:4 53:6
104:18 109:12

**met** 14:10
48:17 81:6
118:7 127:5

**mic** 43:21

**michael** 2:8 4:2
4:23 9:9,21
10:15 11:3
12:7 15:4 19:7
21:22 27:11,16
28:6 43:12
48:24 59:15
84:9 90:6
91:21 95:8
97:8 98:20
100:14 103:11
106:7 110:8
117:7

**microphone**
44:1

**mike** 26:24
66:10,11,12,18
120:15

**million** 78:2,10
82:22 93:20,24
111:11,12

**milton** 4:6

**mine** 75:19

**mintz** 74:23
95:24 124:15
124:22,25
125:12 126:2

**minute** 31:11
87:8 95:18
107:17

**minutes** 13:2
37:4 47:18
86:15 99:14,19
99:24 100:1
101:20 116:25

117:12 126:14
**miracle** 77:6,9
**mischaracteri...**
  113:14
**mispronounced**
  36:8
**missed** 14:20
**mission** 4:3
**mlo** 4:4
**mode** 12:8
**model** 119:8
**moise** 85:7,10
**molinsky** 3:20
  12:2 14:20
  16:21 73:16,18
**moment** 95:21
  96:8
**money** 24:7,9
  24:15,17 36:25
  43:4 53:22
  54:20 55:10,14
  55:19,20,23,24
  56:2,12,15,24
  57:4 58:14
  65:7 72:19
  74:23 123:3
  125:9
**month** 32:23
**months** 31:13
  109:2
**morning** 8:3
  12:24,25
  118:17 121:24
  123:12 124:6

**moron** 32:23
**morris** 10:9
**motion** 96:5
**move** 43:2 46:8
  51:8,16,17
  65:12 70:10,11
  76:22 77:11
  100:8 101:1,6
  101:8 105:17
  113:22
**moved** 43:25
**movies** 119:14
**mutual** 13:19

**n**

**n** 5:1,3,3 90:6
**name** 8:22 14:7
  15:13,17 36:6
  68:8 90:6
  118:4 124:20
  126:3 130:21
**named** 58:21
  68:13,14,23
  69:1,6,9
**names** 94:20
  119:13 122:19
**nathoo** 66:24
  67:2
**national** 119:15
**necessary**
  132:7
**need** 58:14,14
  60:14 63:20,25
  100:14
**needed** 63:18

**neither** 130:15
**nevada** 88:16
**never** 94:10,24
**new** 1:2 2:10,17
  3:4,9,18,22 4:8
  8:19 65:7 98:3
**news** 71:12
  72:23 80:23
  108:1,5,8
  109:5
**nice** 118:3
**nicole** 3:21 12:3
**nizer** 3:17
  11:24
**nodding** 29:21
**nominal** 10:22
  10:24 11:2,4,5
  11:9 12:10
  15:7,11,12
**nonderivative**
  115:19
**nonparty** 51:12
  103:14
**normandy**
  80:12,15 81:15
  81:20
**notary** 132:13
  132:19
**note** 8:6 10:18
**noted** 101:22
  132:7
**notes** 80:11
  95:9 97:7
**noticed** 34:3

**notices** 10:4
**noticing** 9:8
**number** 8:19
  29:12 37:8,9
  37:11,15,18,19
  37:22,25 41:3
  47:25 48:4
  57:18 86:19,23
  95:14 96:12
  99:8,12 102:4
  102:8 117:18
  117:22 118:16
  126:17,21
  129:1
**numbered**
  115:22
**numbers** 89:1
**nw** 2:21
**ny** 2:10,17 3:4
  3:9,18,22 4:8

**o**

**o** 2:20 5:3
**object** 11:8,18
  15:3 18:6
  19:14 20:8,17
  20:23 22:6,7
  23:13,23,24
  24:10,18 25:7
  25:18 29:2,24
  30:8,15 31:12
  31:14 33:1,7
  33:13,18,24
  34:7 35:21
  36:5 38:20
  39:5,15,20,25

**[object - outstanding]**

40:6,13 42:3
42:11,18 43:10
45:15 46:6,17
46:22 47:13
51:5,15 52:17
53:16,25 54:5
54:11,16 56:5
56:17 57:6,24
60:16,23 61:20
62:13,19 63:4
63:21 64:1,16
64:21 65:9
67:8,14,22
68:4,16 69:4
69:14 71:4,14
72:1,14,25
73:19 76:17
78:5 79:12
80:2,17 81:1
82:12 83:3
84:8 85:1,16
93:3,6,15 97:1
97:10 103:1,10
103:24 105:1
106:17 107:11
109:7 111:1,5
111:18 112:12
112:22 113:3
113:17 116:9
120:7 122:4,13
122:21 123:6
123:20 124:7
125:4,22
127:22 128:9

**objecting**   19:8
  19:9 84:14
**objection**   10:19
  11:6,9 12:9,9
  12:12 16:5
  17:9 18:21,25
  19:2,6 20:13
  24:21 32:7,16
  36:1 54:25
  59:14,18 62:1
  69:16 70:4,8
  79:14,18,19
  85:11 95:18
  96:6 112:1
  119:24 123:5
  124:18 125:13
  125:25
**objections**   9:4
  42:17 51:10
**objects**   11:5
**obtaining**   48:7
**occasions**   38:19
**occurred**   15:15
**october**   1:18
  2:3 8:5 130:22
**offering**   23:11
  23:21 24:25
  25:3,16,24
**offerings**   25:5
  105:23
**office**   14:4 32:3
  43:2
**officer**   66:19
  128:11

**officially**
  120:24
**okay**   13:12,24
  14:4,8,25
  15:20,22 17:23
  18:2 19:10
  21:14 23:7
  24:23 25:10
  26:17 27:6,18
  27:20 28:2,5
  28:13 29:6,8
  29:17 30:6
  31:19 32:2,2
  37:3 38:12,13
  41:24 43:17
  44:3 45:2
  47:10 48:24
  53:4 55:14
  57:11,16,18
  59:4 61:2
  62:23 68:19
  72:5 74:10
  75:5,17 76:3,7
  76:20 78:9,14
  78:22 81:22
  86:13 88:1
  89:9 90:5,13
  91:9,10,16,20
  92:3,20 95:13
  97:7 101:5,9
  101:18 102:14
  102:19 104:2
  105:17,25
  110:17 111:10
  112:15 113:22

114:14 115:18
  115:25 117:2
  117:16,20
  118:12,15
  119:21 120:2
  120:17 122:17
  123:9,16,24
  124:12 125:7
  125:10 128:15
**old**   15:17
**ollwerther**   74:6
  74:12,13
**once**   49:8 71:10
  116:15
**ones**   14:17
**onscreen**   8:11
**operating**
  66:19
**operations**   22:5
**opportunities**
  3:16 11:25
**opposed**   64:9
**options**   47:8
**orally**   9:19
**original**   26:17
  26:21 29:12
**outcome**   9:3
  130:18
**outfit**   23:18
**outside**   14:7
  20:16 101:7
  124:9,12,21
**outstanding**
  13:21 16:2

**[outward - pointing]**                                       Page 21

outward 121:15
overruled 96:5
oversight 121:12
own 46:11 47:12 119:5
owned 115:20

**p**

p.m. 30:24 45:5 66:4 70:18 83:18,22,24 99:7,11 102:3 102:7 105:5,9 107:24 117:17 117:21 126:16 126:20 128:24 129:4
pacific 8:4 128:24
page 5:4,9 26:19,19 29:11 31:7 35:4 41:3 41:9,18 42:5 55:5 57:18 58:12 61:10 66:3 70:22 74:2 77:5,16 81:5 82:16 83:18 87:15 88:10,23,24 89:9,12,16 90:3,10,11,13 91:13,17 92:3 96:12,12,15,16

96:22 105:6 106:25 116:18 123:13 131:4,7 131:10,13,16 131:19
pages 42:14 105:4
pain 92:22
paragraph 72:5 80:21 81:6
paragraphs 112:15
pardon 67:1 92:16
parents 55:15 55:16,18
park 4:7
part 26:15 28:18 42:6 55:10 72:23 112:18
participant 109:11
participants 8:9
particular 28:18
parties 8:13 64:9,10,14,20
party 9:1 91:7 130:16
pass 117:23
passed 94:19

path 65:7
patiently 94:11 94:25
paul 109:12
payable 121:14
paying 58:14 60:15
peabody 1:23 2:3 8:25 130:4 130:24
pending 44:7
people 54:23 62:3 69:1 73:11 118:24
percent 45:23 107:25 108:12
percentage 102:21
period 29:19
permission 30:14
person 50:8 58:21,23 63:14 63:15 75:12 118:12
personal 37:9 39:13,19,22
personally 60:4 79:23
personnel 120:5
phillips 3:17 11:24
phillipsnizer.... 3:18

phone 21:7,8 21:18 37:8,9 37:11,13,15,18 37:21,24 38:1 38:6 53:1,7
picture 77:6
pipe 73:12,18
pitch 73:18
place 8:13 130:11
plaintiff 1:5 2:2 2:7 9:10,12 13:12 18:3
plaintiff's 34:12 124:5
plan 15:17 112:9
planned 108:22 108:23,24 109:2
play 121:5
please 8:6 9:5 13:15 45:25 66:7 69:12 80:10 83:16 94:4 95:9,21 96:9 98:11,15 98:16,23 100:23 103:3 105:8
point 36:6 61:9 63:20 79:17 84:16
pointing 42:13

**[policy - questioning]**

policy  19:20,24 20:2
portion  22:14 44:10 103:23
position  74:20 99:24
possible  10:13 101:2
possibly  20:14 30:5 76:18 92:5
potential  47:7 67:21 68:3
powerful  117:6 117:8
pr  95:10 97:8
preceding  41:9
precise  37:25 53:19
precisely  18:13 36:19
predecessor 18:12
prepare  48:13 50:21
prepared  83:1
presence  57:20
present  4:22
presentation 73:11
president  91:25
press  82:4,19 96:13 97:9,18 97:20

presume  63:16 79:2 85:18,20 94:22
pretty  121:18
prevents  91:7
previous  74:9
previously 87:10
price  106:1
primarily 17:16
principal  59:12
printed  116:18
prior  49:25 50:3,20 109:5 120:24 130:6
private  25:3
privilege  13:22 95:23 96:6
privileged 95:20
probably  14:20
problem  9:18 58:12
problems  57:21
proceeding  9:4
proceedings 8:1 129:4 130:7,10,17
process  13:10 125:16,19
produced 49:19 95:21 119:15

profits  18:4
pronounced 75:14,15
pronouncing 75:8 89:17
propose  31:9 31:24
proposed  25:15 25:23 97:20
protocol  104:1
provide  85:22 99:17
provided 118:17
provides 128:12
prudent  98:6
public  23:11,21 24:25 25:16,24 71:22 121:16 121:18 132:19
purchase  6:15 87:7 88:11
purports  45:4 66:4 89:4 90:16
purpose  39:24 40:5,12
purposes  37:16 104:20
pursuant 112:10
put  9:13,13 72:18 78:22 79:5 80:21

92:23 93:20,24
putting  79:9

**q**

quality  8:7,8
question  11:19 13:15,17,20,21 16:2,7,25 17:2 18:8,10 21:23 22:9,13 24:13 24:22 26:8,11 26:12 28:25 29:3,5 30:22 31:20 32:6 33:21 34:24 35:5 39:7 40:9 43:14 44:5,6,8 44:9,24 47:1 49:2,8,13,13 52:18,21 64:11 67:19 69:6,8 69:18 71:24 75:7,24 78:17 79:4 84:21 85:8 87:5,10 88:1,2,5 89:21 89:22 96:7,11 103:6,20,22 104:10 107:23 110:4,14 114:7 114:11 121:9 122:25 124:2 127:24
questioning 16:18

**questions** 13:13 19:3,6 44:12 48:25 51:8 56:22 59:15 69:21 84:13,14 87:21 100:19 103:12,15 118:16 122:6 126:7,11,12,23 127:4,4 128:15
**quick** 69:6 126:22
**quickly** 101:1
**quote** 88:12
**quotes** 79:23

**r**

**r** 89:18 131:3,3
**raise** 36:25 54:20 55:14,20 65:7 125:9 128:7
**raised** 19:17 22:23 55:9,24 56:2,12,15,23 57:4
**raises** 22:18
**raising** 24:6,9 24:15,17
**rd** 35:13 36:13 36:15
**rdr** 1:23
**reached** 35:12
**read** 22:12,14 29:6,8 44:5,7,9 44:10 65:19,21

65:22 87:16,17 88:6,7,9 91:18 91:22 92:19 102:19 103:21 103:23 106:19 106:20,23 110:10,13,15 110:17,18 114:5,6 132:5
**reading** 31:3 103:19
**ready** 44:25 72:18 80:11
**realize** 106:14 107:5,13
**really** 24:22 39:8 119:1
**reason** 14:1 31:4 52:14,21 65:16,24 131:6 131:9,12,15,18 131:21
**reasonably** 101:2
**recall** 16:7,20 18:14 22:3,17 22:22 23:1,10 23:14,16,20 25:5,10,15,23 26:14,16 28:9 29:4 32:8,12 38:15 40:2 47:6,7 48:6 49:23 50:6,16 50:19,24,25

51:20,24 52:2 62:21 63:18 64:19 72:20 78:9,20 79:1,9 80:25 82:5 83:1 84:18 85:5 86:10 87:22,24 89:7 97:12,15 102:17 105:20 105:22,25 108:8,11,14 110:5,20,25 111:15 114:3 114:13,17,22 114:23 115:4 115:15 116:7 116:14 120:11 122:11,14,17 122:22 127:6 127:17
**receivable** 121:14
**receive** 32:21 102:15 124:24
**received** 119:15
**receiving** 110:5 110:20
**recess** 48:1 86:20 99:9 102:5 117:19 126:18
**reckler** 2:20 10:5,5 17:9,9

18:21,21,25,25 19:5,10 23:13 23:13,23 25:7 25:7 29:2,2 32:7,7,16,17 34:7,11 59:14 59:18,20,22,22 83:19
**recognize** 28:3 34:24 46:25 90:2,11 91:16 91:17,20,23 92:4 97:6 110:14,16
**recollection** 48:11 81:19 87:6,9 88:3,14 88:19 103:17 116:21 123:2 124:1,3
**record** 8:4,14 9:7,16 10:2,18 11:14,16 15:5 26:3 27:9,10 28:8,16 34:21 40:21 44:19 47:23 48:3 52:9 58:5 61:4 81:16,25 86:18 86:22 92:9 95:5 98:11,12 98:15,15,16,18 98:23,25 99:2 99:6,11,14 100:12 101:12

**[record - responsibilities]**                                      Page 24

102:3,7 104:7
104:15 106:6
107:19 117:17
117:21 126:16
126:20 128:24
128:24
**recorded** 1:16
8:11,15
**recording** 8:7
8:12
**recover** 18:3
**red** 96:19
**reda** 17:16
32:22 33:22
45:10,13,14,18
45:20,21,21
46:7 53:11
61:13 73:14
74:5 81:15
83:19,22 84:5
84:6,19,24
106:8 110:6
113:2,5,12,15
**redline** 95:15
96:20
**redlines** 96:13
96:15
**refer** 15:4,9,18
54:15 55:8
57:23 58:11
68:15 70:3
82:11 94:17
**reference** 59:9
59:10 67:2
69:11 76:7

89:16,23
108:17 111:24
112:3
**referenced**
81:12 109:5
**referring** 15:6
15:10,22 17:15
27:16 79:2
88:25 94:2
122:1
**refers** 32:25
33:6 54:9
63:12 66:8
67:12,20 68:2
69:24 72:20,24
80:25 94:6
106:16 108:18
**reflect** 96:24
97:24
**refresh** 48:10
81:19 87:5,9
88:3,14,19
96:8 116:21
**regard** 10:23
**regina** 37:4
**registered**
36:17,23
**registration**
25:11,13
**relate** 100:20
**related** 9:1
78:12,15 121:2
121:3,4 130:16
**relating** 121:22
127:20

**relationship**
24:2,5 54:24
69:8 113:11,15
**relationships**
112:17
**relatives** 54:7
54:15
**release** 80:22
80:23 82:4,8
82:19 96:14
**released** 80:23
**releases** 97:9
97:18,20
**releasing** 71:12
**relevant** 15:15
29:19,20 51:14
56:21
**remainder**
99:16
**remember**
49:22 86:5
118:20 122:6,9
124:12,20
**remembered**
84:11
**remotely** 8:22
**repeat** 22:10
44:7 49:8
**repeated** 43:23
**rephrase** 13:16
122:25
**replies** 31:7
73:14 84:6
**reply** 31:12,17
31:20 32:2

**reported** 1:23
**reporter** 8:25
12:15 22:12
23:8 28:14,15
43:22 44:9
52:10,11 59:20
96:1 103:2,21
104:4 130:5
**represent**
13:12 118:4
**representing**
8:23
**request** 30:7
**requested**
22:14 44:10
103:23
**required** 13:13
132:13
**reread** 43:23
**respect** 11:2
15:12 19:21,25
20:3 23:3,21
69:2 128:16
**respond** 37:3
102:22,24
103:8
**responding**
41:14 61:13
62:9
**responds** 38:12
**response** 41:10
45:9 81:14
92:13
**responsibilities**
120:19,23,25

**[responsibilities - see]**                                          Page 25

121:11

**rest**  11:6 42:7

**restate**  40:9

**retained**  129:2

**retention**  19:21

**revenue**  21:16

**review**  26:9
42:14,15 48:21
49:13,15 80:10
106:13 107:1
110:5 114:4
122:10

**reviewed**  52:2

**reviewing**  28:7
40:22 92:15,17

**rich**  14:20
26:21,22 30:20
30:25 58:15
59:7 60:20,21
73:16,18

**richard**  3:20
4:6 12:2 30:25

**richardasche**
4:8

**right**  11:14,21
12:14 14:23
24:8 26:20
27:20,22 30:21
42:18 45:14
66:25 67:3
73:3 75:8 84:5
88:1 89:1,18
100:21 117:14
117:14 119:19
128:19

**ring**  124:16

**robert**  58:15,18
58:19,20,21,24
60:15 66:7,8
68:9,10,12,13
68:15 69:3,7,9
69:12,12,24
70:2,7 78:19
120:16

**roberto**  85:7,10

**role**  120:24

**roles**  120:19
121:10

**room**  14:8,10
70:25 71:3
118:6 127:11

**round**  53:13,15

**run**  43:4,6

**running**  72:10
72:12

**s**

**s**  2:8,15 5:3,8
25:11 89:18
116:1,4 131:3

**sailing**  41:5,25
42:22

**sake**  15:19

**salad**  69:22

**sale**  116:5

**salvatori**  4:23

**san**  4:4

**sat**  100:18

**saw**  10:12
123:12

**saying**  12:11
30:25 31:23
32:22 41:13
45:9 73:17
74:22 112:7
118:20 120:21

**says**  26:20 28:9
29:12 33:23
35:12 41:4,19
41:20 43:3
57:19 58:12
60:20 61:13
62:7,23 64:25
66:7,13,20
71:20 72:22
73:10 74:24
77:6,17,23
78:2,18,22
79:5,22,23
80:21 81:6,15
82:4,7,8,9,21
83:23 88:10,11
88:15 91:22
92:21 93:10,19
93:23 94:1,4,8
95:9 104:19
107:25 110:22
112:16 115:23

**schechter**
66:15,21 74:5
92:13,14 106:7
113:7

**schecter**  17:16

**schedule**  88:18

**schole**  3:3
10:11

**schultz**  95:24
126:3

**scooby**  119:4

**scratch**  125:2

**scratches**  71:20
71:25

**screen**  50:18

**search**  52:25

**seat**  51:13

**sec**  115:9

**second**  21:24
26:18 27:1
29:11 70:22
83:18

**securities**  6:15
17:23,25 18:5
23:3,12,22
24:25 25:3,6
25:16,24 58:25
87:6 88:11
105:23 115:19
116:8,12,22

**see**  26:17 31:25
32:1 35:15
37:6 38:10
41:6,11,14,18
41:22 42:21,23
43:7 44:12
45:6,11 46:13
58:16 61:16
62:10,25 64:7
64:11,25 66:3
66:6,22,23

67:6 70:19,23 71:1 72:8,9 75:1,2 77:3,4,5 77:8,16,19 78:24,25 79:7 79:8,24,25 80:13,14 81:9 81:10,14,18 82:16,24,25 83:16,25 84:2 84:5,6,18,21,23 85:5,9,12 88:13 89:4,6 89:22 90:16 92:12,25 93:12 93:13,22 94:12 94:13 95:9,11 95:12,16 96:11 96:15,22 104:22 105:11 106:12 107:8 108:2 109:13 110:22 111:10 111:14 112:15 115:18,22,24 115:25 116:3

**seeing** 29:4 73:12

**seeks** 18:3

**seen** 8:10 26:10 26:12 28:9,25 44:25 82:5 114:7,10,11,14 115:15

**seg** 46:1 65:1 112:16,19,21 125:3,12 126:4

**sell** 94:4,10,25

**selling** 41:25 42:2,22,25 116:7

**send** 20:21 29:22 31:5 35:25 50:14 52:15,22 66:10 66:13,20 69:10 69:11,12

**sense** 11:10,20 11:23

**sent** 30:3,6,13 30:23,24 47:4 104:11 112:6

**sentence** 67:6 94:8

**separately** 81:6

**september** 45:5 47:8 48:7 59:4 66:5 70:17

**series** 22:17 123:3

**serious** 49:5

**served** 10:4

**service** 20:25

**services** 20:21

**set** 130:11

**seven** 31:13 80:24 129:2

**seventh** 2:9

**several** 38:18 69:1 105:23

**share** 71:22 85:21 91:3 119:2

**shareholder** 81:17

**shareholders** 18:24

**shares** 78:2,10

**shaye** 35:3,6,11 35:25 38:3 44:21 45:9 65:18 66:1 69:8,10

**sheets** 119:8

**shex** 35:20 66:14,20

**shk** 83:9,12

**short** 18:4

**shorthand** 130:5,12

**shorting** 73:13

**show** 49:16,18 49:21 51:3

**showed** 51:1,21

**showing** 48:10 104:20

**shows** 119:6

**sibling** 55:22

**siblings** 55:21

**sign** 61:14,24 62:8 84:20 93:11 123:18

**signature** 61:19 89:10,14 90:2 90:11 91:14,17 91:18,23 92:4 130:23

**signed** 115:14

**signing** 84:18

**simon** 75:5,9 75:14,15,17,18 75:22 76:11,14 85:7,10,14,14 94:9

**simone** 75:14 75:16

**single** 10:19

**sir** 55:25 58:9 90:15 101:14

**sit** 68:14 94:10 94:25 100:13

**six** 105:13

**sixth** 45:3

**skadden** 2:13 2:16 12:5

**skadden.com** 2:14,17

**skip** 34:18 38:5 41:8 44:16 58:2 71:18 73:3,22 80:5 90:5 95:13 105:4

**slate** 2:13,16

**small** 42:6 57:20 112:17

**smurfs**  119:4
**sneezed**  34:4
**sniffling**  34:11
  34:14,15
**sold**  116:11
**solutions**  8:24
  9:1 129:3
**solved**  104:21
**somewhat**  12:8
**soon**  111:13,25
  112:8,11
**sorry**  9:25
  19:15 21:22
  27:10 28:3
  34:10 35:4
  36:8 38:4
  43:11 53:11
  55:9 59:23
  61:2 62:6
  67:18 74:11
  79:3 81:6
  88:25 93:25
  103:3 104:10
  104:14 105:19
  115:1 123:10
**sought**  23:11
**sound**  14:23
**southern**  1:2
  8:19
**spa**  122:7
**spam**  102:20
**spanish**  75:16
**speak**  24:16,24
  25:2 26:23
  30:20 31:1

  39:3,3,13
  43:21 45:10
  117:5,5,9
  120:5 127:8
**speaker**  9:17
  11:13,15,17,22
  117:7,8
**speaking**  18:17
  22:15 24:6,9
  32:12 59:20
  96:2 103:2
**special**  17:7,13
  22:4 33:12
  45:14 65:3
  66:15 114:24
  115:5 125:3
**specific**  29:19
  51:20
**specifics**
  122:15 126:5
**speculate**  36:21
  45:24 83:14
  86:8 91:5
  111:7
**speculation**
  86:9
**spending**  58:13
**spirit**  100:17
**spoke**  38:4
  43:22
**spoken**  15:1
  16:3,9,14,23
  17:2,7,20,24
  32:10 38:16,18
  38:23 39:10,18

  74:7 127:5,15
**spouse**  56:8,10
  56:11,13
**spouse's**  56:16
  56:24
**squared**  18:15
  91:25
**st**  2:13
**stamp**  26:19
  44:21 77:12
  83:9 107:24
  109:25
**stamped**  26:4
  40:23 52:7
  58:6 61:5
  65:13 74:1
  76:24 80:6
  82:1 92:10
  95:6 104:15
  107:20 113:24
**stand**  72:18
  93:25
**standing**  19:2,5
  93:20,23
**start**  41:3 48:3
  48:22 71:12
  74:17 81:15
  84:12 86:23
  99:11 102:7
  103:18 117:21
  120:17 126:20
**started**  83:17
  83:20 119:3,5
**starting**  28:21
  43:6

**starts**  45:8
  53:10 70:24
  72:5 73:10
  111:10
**state**  9:5,6
**statement**
  24:15 25:11,14
**states**  1:1 8:18
**stay**  98:15,17
**ste**  4:3,7
**stenographic**
  9:15
**stepping**  97:17
**stinson**  3:21
  12:2
**stinson.com**
  3:23
**stock**  73:13
  106:1 107:25
  108:11,14
**stockpiled**
  105:12
**stop**  76:3
**stories**  105:12
  105:15
**storyboard**
  119:9
**streamline**
  16:17
**street**  2:21 3:8
  3:13 4:3
**strike**  18:10
  23:8 31:19
  61:23 63:19
  67:18 69:8

75:24 78:17
105:21 124:1
**strikeouts**
96:18
**strikes** 42:10
95:19
**string** 26:18
28:20 29:1
31:22 32:20
35:2 42:6
44:20 52:15,23
65:17,25 70:16
70:20 73:6
74:1 76:23
80:6 83:8,17
85:6 105:6
106:6 107:4,20
109:12,24
**studios** 4:1
10:16 15:14
74:14
**stuff** 84:12 86:8
103:18
**sub** 115:23
**subheading**
82:21
**subject** 26:22
30:19 31:1
61:12 63:8
75:5,9 76:24
82:4 83:9 96:4
106:8 127:9
**subramanian**
96:5

**subscribed**
130:21 132:14
**subsequent**
53:12
**subsequently**
119:14 128:3
**successful** 25:5
**suggest** 43:20
**suggested**
14:22
**suite** 2:21 3:13
120:5,8 128:11
**summer** 25:11
25:17,25
**supervision**
130:14
**support** 55:22
**sure** 10:3 11:8
14:24 15:9
16:16 17:10
18:13 20:14
22:11,21 25:1
25:4 30:1,17
37:17,20,23
40:15 44:14
47:2,5,19 49:6
49:10,20 50:24
52:24 54:2
66:2 74:17
76:10,13 83:14
86:16 89:17
91:15 92:2
94:20,23
106:24 107:13
108:10 125:14

**surface** 71:21
71:25
**surprises** 67:7
**susquehanna**
17:23,25
**swear** 12:15
**swing** 18:4
**sworn** 12:19
130:7 132:14

**t**

**t** 5:3,8 89:18
131:3,3
**t00n00020106**
5:18 44:21
**tab** 26:2,3,25
27:2,5,7,8,11
27:12,16,17,21
28:8,16 34:18
34:21 40:17,18
44:16 52:5,6
58:2,9 61:2,3,4
61:8 65:12,12
70:11 73:3,22
76:22,23 77:11
77:12 80:5
81:22 83:6
87:1 92:6 95:2
104:2,8,10
105:17,19
106:4,5 107:16
109:24 113:23
115:8
**table** 115:18
**take** 8:13 13:18
13:22 47:17

86:14 95:19
116:25 127:19
127:25
**taken** 2:1 14:12
70:24 130:10
130:12
**takes** 82:18
**talent** 109:18
**talk** 32:4,6 53:2
117:1 127:13
**talking** 41:15
62:2 86:6
**talks** 112:16
**tea** 96:9
**technically**
94:16
**technology**
8:22
**telegram** 21:4
**telephone**
50:10
**tell** 27:2 58:23
86:4 92:4
98:23 110:15
**temporal** 70:21
**ten** 42:5 47:20
99:14
**term** 15:24
90:22 91:10
119:23
**terms** 46:12
**test** 6:24
**testified** 12:20
55:6 102:15

**[testify - toon00020139]**

| | | | |
|---|---|---|---|
| **testify** 14:2 130:8 | 28:22 31:4 34:11 35:8,20 41:15 44:17 46:2 66:21 68:14 74:7,10 74:24 98:5 100:13 111:21 123:17 126:23 | 105:7 107:24 112:10 114:18 114:25 115:6 117:17,21,23 120:24 123:1 126:16,20 128:20,25 130:11 | **toon00000001** 6:16 87:4 **toon00011336** 5:23 61:5 **toon00011823** 6:7 76:24 **toon00014699** 7:3 113:24 |
| **testimony** 102:12 118:18 127:10 128:25 132:9 | | | |
| **text** 5:14,18,20 6:1,17,21 20:3 20:6,11,16,21 21:6 31:2 35:2 37:18 44:20 45:3 46:21 47:4,11 51:3,5 52:15,22 53:6 53:10 65:17,25 66:4 79:17 92:12,20 104:11,18 107:19 109:12 | **thinking** 17:1 46:10 49:1 **third** 28:22 82:7 **thoroughly** 49:7 **thought** 49:6 **thoughts** 117:9 **three** 32:15 45:3 100:15 **tie** 119:9 | **times** 13:5 34:4 38:23 **tissues** 34:4 **titled** 113:24 115:18 **tocology** 55:1 **today** 14:2 15:18 26:23 30:20 31:1 34:6 48:14 74:16,17,18 108:5 118:6 120:22 127:5,9 | **toon00014733** 6:12 82:1 **toon00014743** 6:14 83:10 **toon00014794** 6:23 106:9 **toon00017138** 5:16 40:23 **toon00017182** 5:22 58:6 **toon00019** 96:16 |
| **thank** 100:23 101:10 104:5 117:3 119:12 124:23 126:8,9 128:19,21,21 | **time** 8:5 9:5 15:16 21:14,19 22:3 24:3 29:19 32:12,24 33:12,17 47:24 48:3 51:13 56:19 63:25 64:5 72:6,13 83:1 86:4,18 86:22 94:15,21 96:25 98:6,11 98:16,18,21,23 98:25 99:3,7 99:11 100:5,14 101:3,3,23 102:3,7 104:20 | **today's** 128:25 **todd** 1:4 8:16 131:1 132:1 **together** 121:19 125:12 125:15 **told** 35:13 42:13 46:10 **tomorrow** 26:23 30:20 31:1 **tonight** 84:20 **took** 51:25 | **toon00019071** 6:6 74:1 **toon00019988** 6:19 95:6 **toon00020104** 5:14 34:22 **toon00020120** 5:20 52:8 **toon00020122** 6:1,21 65:13 104:15 **toon00020135** 6:24 107:21 **toon00020139** 6:17 92:10 |
| **thereof** 130:18 | | | |
| **thing** 87:18 88:8 92:21 118:25 | | | |
| **things** 77:22 100:8,9,25 101:1,7 | | | |
| **think** 9:17,19 10:3 11:3 13:1 21:23 26:24 27:3,6,15 | | | |

**[top - videographer]**

top 58:12 61:10 66:3 95:8 106:12,13 107:4
topics 51:14
total 129:1
touch 42:10
toxic 92:23 93:5
tracey 3:12 10:7,7,17,17,22 11:3,11 79:14 79:14,18,18
trade 3:9
trading 18:4
transaction 82:23 83:2 122:11,18
transactions 116:1 124:5 125:1
transcribed 130:13
transcript 21:20,21 132:5 132:9
tried 38:6
true 132:8
truth 130:8,8,9
truthfully 14:2
try 13:16 16:17 97:8,23 100:8 100:16 101:1,6 102:20 103:15

trying 49:12,12 55:4 100:6,6 101:8 125:19
turn 21:17 26:2 52:5 61:2,2 82:16 88:22,22 88:24 89:9,12 90:10,13 91:13 92:3 104:2 106:4 109:24 115:8
twersky 2:9 9:10,11
two 44:11 45:3 48:17 62:2 81:7,16 99:14 100:18 105:4 105:13 112:15 116:1 120:14 121:19 126:13
tx 3:14
type 123:16
typewriting 130:13

**u**

unable 14:1
under 64:25 115:25 130:13
understand 13:15 15:13 17:12,15 24:22 28:7 33:22 35:17 41:13 42:24 43:9,14 43:15 44:13

46:15,20 47:10 47:11 49:4 51:20 53:14 55:4 57:22,22 59:11,12 62:12 62:17 65:3 67:5 69:20 79:16 83:12 84:16 97:15 99:13,15,20,23 100:7 111:24 112:2,5,6,9 127:25
understanding 13:20 33:5 36:22,24 53:19 53:19,21 55:7 63:16 90:25 91:4 96:25 112:20 125:10
understood 97:24
unfair 42:10
unidentified 9:17 11:13,15 11:17,22
unimaginable 123:22
unit 8:15 47:25 48:4 86:19,23 99:8,12 102:4 102:8 117:18 117:22 126:17 126:21

united 1:1 8:18
units 129:2
universal 11:22
unnecessarily 58:13
unobstructed 65:7
unreasonable 100:14
use 15:17,23 20:3,6,11,16,21 21:2,4,6,10 37:15 99:21,25 119:23
used 34:4 118:25 119:4 125:9 129:2
using 8:22 25:20

**v**

v 3:2
vehicles 76:15 76:20
velaw.com 4:4
veritext 8:23,25 129:3
video 1:16 8:12 8:15 50:12,18
videographer 4:22 8:3,24 47:22 48:2 86:17,21 98:12 98:24 99:4,6 99:10 102:2,6 117:16,20

126:15,19
128:23
**vinson** 4:3 9:22
9:22
**virtual** 8:22
**virtually** 8:7
**viso** 3:7 10:1
**vm** 1:6
**voices** 119:7
**vote** 81:17
**voting** 89:4,7
**vs** 1:7 8:17
131:1 132:1

**w**

**wait** 31:11 87:8
**waiting** 31:8,23
**waiver** 23:2,5
**walk** 127:14
**walker** 109:12
109:15
**walmart** 108:1
108:8
**want** 10:2,18
27:3,7 28:19
35:14 44:5
49:5 58:11
64:5 66:18
67:6 68:8
69:17 70:15
80:11 84:10
87:8,10,16,17
88:6,7,9 95:18
101:3,4 102:14
106:20,23
114:5 120:2

**wanted** 34:15
**wants** 28:3
34:8 40:22
42:15
**washington**
2:21
**wasting** 51:13
56:18
**watkins** 2:19
10:6
**way** 24:8 99:22
119:2 130:17
**ways** 24:8,13
**we've** 13:2
47:16 74:7
99:13 100:18
117:11 120:8
121:23
**wedding** 77:23
**wednesday**
41:25 42:22
**weeds** 124:4
**week** 50:5,6,21
81:16
**weeks** 105:13
**welcome**
101:11 102:10
**went** 107:25
127:14,14
**west** 2:16 4:7
101:3
**whatnot** 126:5
**whatsapp** 21:2
**whereof** 130:20

**wife** 78:7,10,14
**william** 2:12,20
10:5
**william.reckler**
2:22
**win** 64:8,8
**windbreak**
71:9
**wires** 76:25
**wish** 32:5
**withdraw** 96:6
**witness** 5:4
8:10 12:16
17:10 18:8
19:4 20:14,19
20:25 22:15
23:14,25 24:12
25:8 28:5,7,8
28:19 29:3,6,9
30:1,10,17
32:8,18 33:3,9
33:15 34:1,9
35:9,23 36:2
39:1,7,22 40:2
40:8,15 42:13
42:13,14 43:20
44:3,6,11
46:24 47:2,15
48:24 49:4,12
51:12 52:18
53:18 54:2,7
54:13,18 55:1
56:23 57:8
58:1 60:18,25
62:2,15,21

63:6,23 64:3
64:23 65:11
67:10,16,24
68:6,17 69:17
71:16 72:3,16
73:2,21 76:18
78:7 79:20
80:4,19 81:3
82:14 83:5
84:2,11 85:3
85:12,18 93:8
93:17 96:8,20
97:3,12 101:3
101:18 103:6
103:15 104:1,8
105:2 106:19
107:13 109:9
110:10 111:7
112:2,13,24
113:19 116:11
117:5,24
119:25 120:8
122:14,22
123:21 124:8
125:5,14,24
126:1,9,11
127:24 128:11
128:21 130:6
130:20
**wolf** 58:15,18
58:19,20,21,24
60:15 78:19
**word** 25:21
35:17 46:20
49:15 55:4,13

**[words - zoom]**                                                    Page 32

**words**  47:12

**work**  11:19
20:16 37:11,16
45:22 98:9
125:15

**worked**  19:12
22:4 64:8
119:18 121:17
121:19 124:10
124:21 125:15

**worker**  77:7,9

**working**
125:12

**works**  46:7

**world**  3:9

**worry**  73:10

**worth**  78:19

**wrap**  100:8,9

**write**  38:6
41:24 45:13
46:10 60:14
61:15 64:8
70:23 71:7
73:16 80:10
85:6 105:11
106:14 107:5
118:25 119:1,4
119:6

**writer**  119:3

**writes**  84:19

**writing**  43:5

**wrote**  38:6
41:21 42:21,25
59:7 62:18
63:2 64:20

83:24 85:9,14

**x**

**x**  5:1,3,8

**x.x**  82:22

**xie**  2:20

**y**

**yeah**  15:9 27:6
40:11,19 88:25
122:14

**year**  85:25 86:2

**years**  32:15
86:3,3 92:22
94:23 103:17
120:3

**yesterday**
48:17 49:2,25
50:3 81:7
108:5

**york**  1:2 2:10
2:17 3:4,9,18
3:22 4:8 8:19
98:3

**yuma**  130:21

**z**

**zoom**  1:17 2:2
9:19 10:1,12
10:14 12:3
13:2

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.