# Exhibit 48

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2018**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____

**000-54389**
**Commission file number**
**GENIUS BRANDS INTERNATIONAL, INC.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **20-4118216** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**8383 Wilshire Blvd Suite 412**
**Beverly Hills, CA 90211**
**310-273-4222**
(Address and telephone number of principal executive offices)

_____

(Former name, former address and former fiscal year, if changed since last report)
Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of Exchange where registered |
|---|---|
| **Common Stock, par value $0.001 per share** | **The Nasdaq Capital Market** |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically, every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or such shorter period that the registrant was required to submit such files). Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in the definitive proxy or information statement incorporated by reference in Part III of this Form 10-K or amendment to Form 10-K. Yes ☐ No ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a small reporting company. See definition of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer | ☐ |
| Non-accelerated filer ☒ | | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's voting and non-voting common stock held by non-affiliates of the registrant as of June 29, 2018 (the last business day of the most recently completed second fiscal quarter) was approximately $13,400,293, computed by reference to the last sale price of $2.38 for the common stock on the Nasdaq Capital Market reported for such date.

As of March 30, 2019, there were 10,432,718 shares of the registrant's common stock, par value $0.001 per share, were outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

**Genius Brands International, Inc.**
**Table of Contents**

|  |  | Page Number |
|---|---|---|
| **PART I.** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 13 |
| Item 2. | Properties | 13 |
| Item 3. | Legal Proceedings | 13 |
| Item 4. | Mine Safety Disclosures | 13 |
| **PART II.** | | |
| Item 5. | Market For Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 14 |
| Item 6. | Selected Financial Data | 15 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 15 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 26 |
| Item 8. | Financial Statements and Supplementary Data | 26 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 26 |
| Item 9A. | Controls and Procedures | 26 |
| Item 9B. | Other Information | 27 |
| **PART III.** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 28 |
| Item 11. | Executive Compensation | 34 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 38 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 41 |
| Item 14. | Principal Accounting Fees and Services | 43 |
| **PART IV.** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 44 |
| Item 16 | Form 10-K Summary | 45 |
| Signatures | | |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K (including the section regarding Management's Discussion and Analysis and Results of Operation) contains forward-looking statements regarding our business, financial condition, results of operations and prospects. Words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates" and similar expressions or variations thereof are intended to identify forward-looking statements, but are not deemed to represent an all-inclusive means of identifying forward-looking statements as denoted in this Annual Report on Form 10-K. Additionally, statements concerning future matters are forward-looking statements. These statements include, among other things, statements regarding:

- our ability to generate revenue or achieve profitability;
- our ability to obtain additional financing on acceptable terms, if at all;
- fluctuations in the results of our operations from period to period;
- general economic and financial conditions;
- our ability to anticipate changes in popular culture, media and movies, fashion and technology;
- competitive pressure from other distributors of content and within the retail market;
- our reliance on and relationships with third-party production and animation studios;
- our ability to market and advertise our products;
- our reliance on third-parties to promote our products;
- our ability to keep pace with technological advances;
- performance of our information technology and storage systems;
- a disruption or breach of our internal computer systems;
- our ability to retain key personnel;
- the impact of federal, state or local regulations on us or our vendors and licensees;
- our ability to protect and defend against litigation, including intellectual property claims;
- the volatility of our stock price;
- the marketability of our stock;
- our broad discretion to invest or spend the proceeds of our financings in ways with which our stockholders may not agree and may have limited ability to influence; and
- other risks and uncertainties, including those listed in Item 1A, "Risk Factors."

Although forward-looking statements in this Annual Report on Form 10-K reflect the good faith judgment of our management, such statements can only be based on facts and factors currently known by us. Consequently, forward-looking statements are inherently subject to risks and uncertainties and actual results and outcomes may differ materially from the results and outcomes discussed in or anticipated by the forward-looking statements. Factors that could cause or contribute to such differences in results and outcomes include, without limitation, those specifically addressed under the heading "Risks Factors" in Item 1A. below, as well as those discussed elsewhere in this Annual Report on Form 10-K. Readers are urged not to place undue reliance on these forward-looking statements, which speak only as of the date of this Annual Report on Form 10-K. We file reports with the Securities and Exchange Commission ("SEC") and our electronic filings with the SEC (including our Annual Reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and any amendments to these reports) are available free of charge on the SEC's website at http://www.sec.gov. You can also read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You can obtain additional information about the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330.

We undertake no obligation to revise or update any forward-looking statements in order to reflect any event or circumstance that may arise after the date of this Annual Report on Form 10-K, except as required by law. Readers are urged to carefully review and consider the various disclosures made throughout the entirety of this Annual Report on Form 10-K, which are designed to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

**PART I**

**Item 1.        Business.**

**Overview**

Genius Brands International, Inc. ("we," "us," "our," or the "Company") is a global content and brand management company that creates and licenses multimedia content. Led by industry veterans, we distribute our content in all formats as well as a broad range of consumer products based on our characters. In the children's media sector, our portfolio features "content with a purpose" for toddlers to tweens, which provides enrichment as well as entertainment. New intellectual property titles include the preschool property *Rainbow Rangers*, which debuted in November 2018 on Nickelodeon and preschool property *Llama Llama,* which debuted on Netflix in January 2018 and was renewed by Netflix for a second season. Our library titles include the award winning *Baby Genius,* - adventure comedy *Thomas Edison's Secret Lab*® and Warren Buffett's *Secret Millionaires Club,* created with and starring iconic investor Warren Buffett which is distributed across our Genius Brands Network on Comcast's Xfinity on Demand, AppleTV, Roku, Amazon Fire, YouTube, Amazon Prime, Cox, Dish, Sling and Zumo as well as Connected TV. We are also developing an all-new animated series, *Stan Lee's Superhero Kindergarten* with Stan Lee's Pow! Entertainment.

In addition, we act as licensing agent for Penguin Young Readers, a division of Penguin Random House LLC who owns or controls the underlying rights to *Llama Llama*, leveraging our existing licensing infrastructure to expand this brand into new product categories, new retailers, and new territories.

**Our Products**

***Original Content***

We own and produce original content that is meant to entertain and enrich toddlers to tweens as well as families. It is generally a three-year cycle from the inception of an idea, through production of the content and development and distribution of a range of consumer products to retail, creating an inevitable lag time between the creation of the intellectual property to the realization of economic benefit of those assets. Our goal is to maintain a robust and diverse portfolio of brands, appealing to various interests and ages, featuring evergreen topics with global appeal. Our portfolio of intellectual property can be licensed, re-licensed, and exploited for years to come, with revenue derived from multiple sources and territories. Our portfolio of original content includes:

*Content in Production*

*Rainbow Rangers*: From Shane Morris, the writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, Rainbow *Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. We have partnered with Mattel Inc.'s Fisher Price Toys as the master toy partner for the new series, and Viacom's Nick Jr. has licensed the series for broadcast in the US. International broadcast agreements are currently being negotiated in numerous territories.

*Llama Llama Season 2*: We completed production of fifteen half-hour animated episodes in 2017 which premiered on Netflix in early 2018. Netflix ordered a second season of *Llama Llama* consisting of ten half-hour animated episodes. Back for Season 2 are *Llama Llama*'s creators including Oscar-winning director Rob Minkoff (*The Lion King*), director Saul Blinkoff (*Doc McStuffins*), showrunner Joe Purdy, art director Ruben Aquino (*Frozen*) and Emmy-winning producers Jane Startz and Andy Heyward. Based on the *NY Times* #1 best-selling children's books of the same name, the animated series centers on young Llama Llama's first steps in growing up and facing childhood milestones. Each episode is structured around a childhood milestone and a life lesson learned by Llama Llama and his friends, told with a sense of humor, vitality, and understanding.

1

*Content in Development*

*Superhero Kindergarten*: In conjunction with Stan Lee's POW! Entertainment, we are developing an animated pre-school series with the current title of "Superhero Kindergarten." Superhero Kindergarten tells the story of a classroom filled with kids with superpowers and how they learn to use those powers to fight against the forces of evil while still dealing with all of the issues that come from being 6 years old.

*Baby Genius*: For more than ten years, *Baby Genius* has earned worldwide recognition for creating award-winning products for toddlers. Its catalogue of 500 songs, 125 music videos, and toys features classic nursery rhymes, learning songs, classical music, holiday favorites and more. Recognizing a need in the marketplace for established pre-school content, the Baby Genius channel was launched featuring the award-winning collection of Baby Genius Videos along with third party content providers sharing the Genius Brands "Content with a Purpose" message. The Baby Genius brand is synonymous with safe, enriching content for preschoolers and is being re-launched as a life style brand incorporating a new website, content and consumer products designed with today's family in mind.

*Already Released Content*

*Rainbow Rangers: We completed 26 half hour episodes in February of 2019 and the series premiered on Nick Jr. in November 2018. The series was created by* Shane Morris, the co-writer of *Frozen*, and Rob Minkoff, the director of *The Lion King*, Rainbow *Rangers* is an animated series about the adventures of seven magical girls from Kaleidoscopia, a fantastic land on the other side of the rainbow. The Rangers serve as Earth's guardians and first-responders. When there's trouble for the people or animals of the Earth, the Rangers ride a rainbow across the sky to save the day. A global licensing program is in place and the first products will be introduced to the market in second quarter of 2019.

*Llama Llama*: We completed production of fifteen half-hour animated episodes in 2017 which premiered on Netflix in early 2018. *Llama Llama*'s creators include Oscar-winning director Rob Minkoff (*The Lion King*), director Saul Blinkoff (*Doc McStuffins*), showrunner Joe Purdy, art director Ruben Aquino (*Frozen*) and Emmy-winning producers Jane Startz and Andy Heyward. Based on the *NY Times* #1 best-selling children's books of the same name, the animated series centers on young Llama Llama's first steps in growing up and facing childhood milestones. Each episode is structured around a childhood milestone and a life lesson learned by Llama Llama and his friends, told with a sense of humor, vitality, and understanding. The global licensing program was unveiled in June 2016 at the Licensing Expo held in Las Vegas.

*SpacePop*: *SpacePop* is a music and fashion driven animated property that has garnered over 17 million views and over 63,000 subscribers since its launch in May 2016. With 108 three-minute webisodes produced, *SpacePop* had a best-in-class production team which included Steve Banks (head writer and story editor of *Sponge Bob Square Pants*) as content writer; Han Lee (*Pink Fizz, Bobby Jack*) for original character designs; multiple Grammy Award-winning producer and music veteran Ron Fair (Fergie, Mary J. Blige, Black Eyed Peas, Pussycat Dolls, Christina Aguilera and more), singer-songwriter Stefanie Fair (founding member of RCA's girl group Wild Orchid with Fergie) for the original *SpacePop* theme music; and veteran music producer and composer John Loeffler (Kidz Bop, Pokemon) for original songs. *SpacePop* products range from apparel and accessories, to beauty, cosmetics, candy, books and music.

*Thomas Edison's Secret Lab*: *Thomas Edison's Secret Lab* is a STEM-based comedy adventure series by Emmy-nominated writer Steve Banks (*SpongeBob Square Pants*), multi-Emmy Award-winning writer Jeffrey Scott (*Dragon Tales*), and Emmy Award-winning producer Mark Young (*All Dogs Go To Heaven 2*). The series includes 52 eleven-minute episodes as well as 52 ninety-second original music videos produced by Grammy Award-winning producer Ron Fair. The animated series follows the adventures of Angie, a 12-year-old prodigy who, along with her young science club, discovers Thomas Edison's secret lab.

Warren Buffett's *Secret Millionaire's Club*: With 26 thirty-minute episodes and 26 four-minute webisodes, this animated series features Warren Buffett who acts as a mentor to a group of entrepreneurial kids who have international adventures that lead them to encounter neighborhood and community problems to solve. Warren Buffett's *Secret Millionaire's Club* empowers kids by helping them learn about the business of life and the importance of developing healthy life habits at an early age.

2

**Licensed Content**

In addition to the wholly-owned or partially-owned properties listed above, we represent *Llama Llama* in the licensing and merchandising space.

**Genius Brands Network**

Seeing a need for a destination devoted to providing "Content with a Purpose," we launched the Genius Brands Network comprised of the Kid Genius Cartoon Network and Baby Genius TV. The network is distributed across multiple platforms including advertising supported video-on-demand ("AVOD"), subscription video-on-demand ("SVOD") and over-the-top platforms ("OTT") providing kids and parents a clear choice in premium entertaining, enriching and engaging programming.

The Kid Genius Cartoon Network provides smart TV for kids. Our shows are designed for kids to tweens and anyone in between. Our Kid Genius Cartoon Network exposes kids to new and intriguing subjects that stimulate their senses and imagination on a daily basis. Parents will enjoy watching their kids be entertained with enriching and educational series. Featured series include *Dino Squad, Thomas Edison's Secret Lab, Inspector Gadget* and more. The Kid Genius Cartoon Channel Plus was launched in September 2017 on Amazon Prime. Kid Genius Cartoon Channel Plus is a subscription video-on-demand service available for $3.99 per month to the approximately 80 million Amazon Prime members. The channel features a variety of owned and licensed content.

Baby Genius TV provides enriching and entertaining content for toddlers through preschoolers. Toddlers to preschoolers learn lessons through music and characters that ignite their imagination. Parents will feel safe knowing that their littles ones are enjoying the educational content of our shows. Series include *Baby Genius, Rainbow Valley Fire Department, The New Adventures of Madeline* and more.

**Distribution**

*Content*

Today's global marketplace and the manner in which content is consumed has evolved to a point where we believe there is only one viable strategy, ubiquity. Kids today expect to be able to watch what they want whenever they want and wherever they want. As such, content creators now must offer direct access on multiple fronts. This includes not only linear broadcast but also digital platforms. We have strong ties to and actively solicit placement for our content from the largest linear broadcasters such as Nickelodeon, The Disney Channel, Cartoon Network, Sprout, and PBS. Similarly, on the digital side, we are partnered with Comcast's Xfinity platform as well as AppleTV, Roku, Samsung TV, Amazon Fire, Amazon Prime, Netflix, YouTube, Cox, Dish, Sling and Zumo as well as Connected TV. We replicate this model of ubiquity around the world defining content distribution strategies by market that blends the best of linear, VOD, and digital distribution.

Finally, we expanded our long-term strategic partnership with Sony Pictures Home Entertainment from domestic to global in January 2017. On August 31, 2018 Sony Pictures Home Entertainment assigned all of its rights and interest in our programs to Alliance Entertainment, LLC ("AEC").

*Consumer Products*

A source of our revenue is our licensing and merchandising activities from our underlying intellectual property content. We work directly in licensing properties to a variety of manufacturers, wholesalers, and retailers. We currently have across all brands in excess of 49 licensees and hundreds of licensed products scheduled to enter the market. Products bearing our marks can be found in a wide variety of retail distribution outlets reaching consumers in retailers such as Wal-Mart, Target, Barnes & Noble, The Home Depot, Old Navy, Amazon.com and many more. We often negotiate dedicated retail space on a direct basis with retailers that will include branded signage to give our brands prominence and clear communication with the consumer. License agreements that we enter into often include financial guarantees and commitments from the manufacturers guaranteeing a minimum stream of revenue for us. As licensed merchandise is sold at retail, these advances and/or minimum guarantees can earn out at which point we could earn additional revenue.

**Marketing**

We believe that generating awareness and consumer interest in our brands requires a 360-degree approach to marketing. Beyond the content creation and distribution, consumers must become engaged with the content in all aspects of their lives. Successful marketing campaigns for our brands have included utilizing influencers (individuals with a strong, existing social media presence who drive awareness of our brands to their followers), social media marketing, and participating in cross promotional consumer product campaigns. We deploy digital and print advertising to support the brands as well as work with external media relations professionals to promote our efforts to both consumer and trade. We regularly initiate grass roots marketing campaigns and strategic partnerships with brands that align and offer value to us. Our Genius Brands Network, with distribution in over 80 million households, provides reach for cross promotion of content and consumer products.

**Competition**

We compete against other creators of children's content including Disney, Nickelodeon, PBS Kids, and Sesame Street as well as other small and large creators. In the crowded children's entertainment space, we compete with these other creators for both content distribution across linear, VOD, and digital platforms as well as retail shelf space for our licensed products. To compete, we are focused on our strategic positioning of "content with a purpose" which we believe is a point of differentiation embraced by the industry, as well as parents and educators. Additionally, the Kid Genius Cartoon Network, Baby Genius TV, and Kid Genius Cartoon Channel Plus enables us to increase the awareness of our brands through an owned platform.

**Customers and Licensees**

Typically, our business is not reliant on one or a few major customers; however, in 2018 one customer accounted for 20% of our revenue. In 2017, over 80% of our revenue was attributable to the recognition of revenues earned from Netflix upon the delivery of the first season of *Llama Llama*. As of December 31, 2018, we had partnered with over 60 consumer products licensees going to market with nearly 300 stock keeping units ("SKU"). As of the same date, we licensed our content to over 40 broadcasters in over 90 territories globally as well as a number of VOD and online platforms that have a global reach. This broad cross-section of customers includes companies such as Comcast, Netflix, Sony, YouTube, Mattel, Target, Penguin Publishing, Manhattan Toys, Roku, Apple TV, Amazon, Google, Bertelsmann Music Group, Discovery International, and others both domestically and internationally.

**Government Regulation**

The FCC requires broadcast networks to air a required number of hours of Educational and Informational content (E/I). We are subject to online distribution regulations, namely the FTC's Children's Online Privacy Protection Act (COPPA) which regulates the collection of information of children younger than 13 years old.

We are currently subject to regulations applicable to businesses generally, including numerous federal and state laws that impose disclosure and other requirements upon the origination, servicing, enforcement and advertising of credit accounts, and limitations on the maximum amount of finance charges that may be charged by a credit provider. Although credit to some of our customers is provided by third parties without recourse to us based upon a customer's failure to pay, any restrictive change in the regulation of credit, including the imposition of, or changes in, interest rate ceilings, could adversely affect the cost or availability of credit to our customers and, consequently, our results of operations or financial condition. Licensed toy products are subject to regulation under the Consumer Product Safety Act and regulations issued thereunder. These laws authorize the Consumer Product Safety Commission (the "CPSC") to protect the public from products which present a substantial risk of injury. The CPSC can require the manufacturer of defective products to repurchase or recall such products. The CPSC may also impose fines or penalties on manufacturers or retailers. Similar laws exist in some states and other countries in which we plan to market our products. Although we do not manufacture and may not directly distribute toy products, a recall of any of the products may adversely affect our business, financial condition, results of operations and prospects.

4

We also maintain websites which include our corporate website located at www.gnusbrands.com, as well as www.spacepopgirls.com, www.kidgeniustv.com, www.babygenius.com, www.smckids.com, www.slam7.com, and www.edisonsecretlab.com. These websites are subject to laws and regulations directly applicable to Internet communications and commerce, which is a currently developing area of the law. The United States has enacted Internet laws related to children's privacy, copyrights and taxation. However, laws governing the Internet remain largely unsettled. The growth of the market for Internet commerce may result in more stringent consumer protection laws, both in the United States and abroad, that place additional burdens on companies conducting business over the Internet. We cannot predict with certainty what impact such laws will have on our business in the future. In order to comply with new or existing laws regulating Internet commerce, we may need to modify the manner in which we conduct our website business, which may result in additional expense.

Because our products are manufactured by third parties and licensees, we are not significantly impacted by federal, state and local environmental laws and do not have significant costs associated with compliance with such laws and regulations.

**Employees**

As of December 31, 2018, we had 24 full-time equivalent employees and one contracted part-time employee. We employ on an outsourced, as-needed basis, contractors in the fields of investor relations, public relations, accounting and production.

**Intellectual Property**

As of December 31, 2018, we own the following properties and related trademarks: SpacePop, *Secret Millionaires Club*, *Thomas Edison's Secret Lab,* "Baby Genius", "Kid Genius", "Wee Worship", "A Squared", and "Kaflooey", as well as several other names and trademarks on characters that had been developed for our content and brands. Additionally, we have trademark applications pending for *Rainbow Rangers*.

As of December 31, 2018, we hold 14 registered trademarks in multiple classes in the United States as well as additional trademarks in the United States that are associated with our other brands. We also have a number of registered and pending trademarks in Europe, Australia, China, Japan and Mexico and other countries in which our products are sold.

As of December 31, 2018, we also held 126 motion picture, 13 sound recordings, and two literary work copyrights related to our video, music and written work products.

We have 50/50 ownership agreements with the following partners and their related brands: Martha Stewart's *Martha & Friends*; and Gisele Bündchen's *Gisele & the Green Team.*

In addition to the wholly-owned or partially-owned properties listed above, we represent *Llama Llama* in the licensing and merchandising space.

**Company Information**

We were incorporated in California on January 3, 2006 and reincorporated in Nevada in October 2011. We commenced operations in January 2006, assuming all of the rights and obligations of our then Chief Executive Officer, under an Asset Purchase Agreement between us and Genius Products, Inc., in which we obtained all rights, copyrights, and trademarks to the brands "Baby Genius," "Kid Genius," "123 Favorite Music" and "Wee Worship," and all then existing productions under those titles. In October 2011, we (i) changed our domicile to Nevada from California, and (ii) changed our name to Genius Brands International, Inc. from Pacific Entertainment Corporation (the "Reincorporation"). In connection with the Reincorporation, we changed our trading symbol from "PENT" to "GNUS."

Our principal executive offices are located at 8383 Wilshire Blvd., Suite 412, Beverly Hills, California 90211. Our telephone number is 310-273-4222. We maintain an Internet website at www.gnusbrands.com. The information contained on, connected to or that can be accessed via our website is not part of this prospectus.

**Item 1A.        Risk Factors.**

The following discussion of risk factors contains forward-looking statements. These risk factors may be important to understanding any statement in this Form 10-K or elsewhere. The following information should be read in conjunction with Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the consolidated financial statements and related notes beginning on Page F-1 of this Form 10-K.

Our business, financial condition and operating results can be affected by a number of factors, whether currently known or unknown, including but not limited to those described below. Any one or more of such factors could directly or indirectly cause our actual results of operations and financial condition to vary materially from past or anticipated future results of operations and financial condition. Any of these factors, in whole or in part, could materially and adversely affect our business, financial condition, results of operations and stock price.

Because of the following factors, as well as other factors affecting our financial condition and operating results, past financial performance should not be considered to be a reliable indicator of future performance, and investors should not use historical trends to anticipate results or trends in future periods.

**RISKS RELATING TO OUR BUSINESS**

**We have incurred net losses since inception.**

We have a history of operating losses and incurred net losses in each fiscal quarter since our inception. For the year ended December 31, 2018, we generated net revenues of $993,452 and incurred a net loss of $9,003,901, while for the previous year, we generated net revenue of $5,335,728 and incurred a net loss of $4,908,736. These losses, among other things, have had an adverse effect on our results of operations, financial condition, stockholders' equity, net current assets and working capital.

We will need to generate additional revenue and/or reduce costs to achieve profitability. We are beginning to generate revenues derived from our existing properties, properties in production, and new brands being introduced into the marketplace. However, the ability to sustain these revenues and generate significant additional revenues or achieve profitability will depend upon numerous factors some of which are outside of our control.

**We will need additional financing to continue our operations. If we are unable to obtain additional financing on acceptable terms, we will need to curtail or cease our development plans and operations.**

As of December 31, 2018, we had approximately $3,085,026 of available cash, cash equivalents, and restricted cash. Additional funds may be required to fund operations and repay our outstanding debt which could be raised through the issuance of equity securities and/or debt financing. There is no assurance that any type of financing on terms acceptable to us will be available or will otherwise occur. Debt financing must be repaid regardless of whether we generate revenues or cash flows from operations and may be secured by substantially all of our assets. Any equity financing or debt financing that requires the issuance of warrants or other equity securities to the lender would cause the percentage ownership by our current stockholders to be diluted, which dilution may be substantial. Also, any additional equity securities issued may have rights, preferences or privileges senior to those of existing stockholders. Any equity financing at a price below the then current conversion price of our Series A Convertible Preferred Stock will result in an adjustment to the conversion ratio, applicable to such securities, resulting in the issuance of additional shares of our common stock upon the conversion of our Series A Convertible Preferred Stock, which would further dilute our other stockholders.

**If we are not able to obtain sufficient capital, we may then be forced to limit the scope of our operations.**

We expect that as our business continues to evolve we will need additional working capital. If adequate additional debt and/or equity financing is not available on reasonable terms or at all, we may not be able to continue to expand our business, and we will have to modify our business plans accordingly. These factors could have a material adverse effect on our future operating results and our financial condition.

If we reach a point where we are unable to raise needed additional funds to continue as a going concern, we could be forced to cease our activities and dissolve our company. In such an event, we will need to satisfy various creditors and other claimants, severance, lease termination and other dissolution-related obligations.

6

**Our revenues and results of operations may fluctuate from period to period.**

Cash flow and projections for any entertainment company producing original content can be expected to fluctuate until the animated content and ancillary consumer products are in the market and could fluctuate thereafter even when the content and products are in the marketplace. There is significant lead time in developing and producing animated content before that content is in the marketplace. Unanticipated delays in entertainment production can delay the release of the content into the marketplace. Structured retail windows that dictate when new products can be introduced at retail are also out of our control. While we believe that we have mitigated this in part by creating a slate of properties at various stages of development or production as well as representing certain established brands which contribute immediately to cash flow, any delays in the production and release of our content and products or any changes in the preferences of our customers could result in lower than anticipated cash flows.

As with our cash flows, our revenues and results of operations depend significantly upon the appeal of our content to our customers, the timing of releases of our products and the commercial success of our products, none of which can be predicted with certainty. Accordingly, our revenues and results of operations may fluctuate from period to period. The results of one period may not be indicative of the results of any future period. Any quarterly fluctuations that we report in the future may not match the expectations of market analysts and investors. This could cause the price of our common stock to fluctuate.

Production cost will be amortized according to the individual film forecasting methodology. If estimated remaining revenue is not sufficient to recover the unamortized production costs, the unamortized production costs will be written down to fair value. In any given quarter, if we lower our previous forecast with respect to total anticipated revenue, we would be required to adjust amortization of related production costs. These adjustments would adversely impact our business, operating results and financial condition.

**Changes in the United States, global or regional economic conditions could adversely affect the profitability of our business.**

A decrease in economic activity in the United States or in other regions of the world in which we do business could adversely affect demand for our products, thus reducing our revenue and earnings. A decline in economic conditions could reduce demand for and sales of our products. In addition, an increase in price levels generally, or in price levels in a particular sector, could result in a shift in consumer demand away from the animated content and consumer products we offer, which could also decrease our revenues, increase our costs, or both.

**Inaccurately anticipating changes and trends in popular culture, media and movies, fashion, or technology can negatively affect our sales.**

While trends in the toddler to tween sector change quickly, we respond to trends and developments by modifying, refreshing, extending, and expanding our product offerings on an on-going basis. However, we operate in extremely competitive industries where the ultimate appeal and popularity of content and products targeted to this sector can be difficult to predict. We believe our focus on "content with a purpose" serves an underrepresented area of the toddler to tween market; however, if the interest of our audience trends away from our current properties toward other offerings based on current media, movies, animated content or characters, and if we fail to accurately anticipate trends in popular culture, movies, media, fashion, or technology, our products may not be accepted by children, parents, or families and our revenues, profitability, and results of operations may be adversely affected.

**We face competition from a variety of retailers that sell similar merchandise and have better resources than we do.**

The industries in which we operate are competitive, and our results of operations are sensitive to, and may be adversely affected by, competitive pricing, promotional pressures, additional competitor offerings and other factors, many of which are beyond our control. Indirectly through our licensing arrangements, we compete for retailers as well as other outlets for the sale and promotion of our licensed merchandise. Our primary competition comes from competitors such as The Walt Disney Company, Nickelodeon Studios, and the Cartoon Network.

We have sought a competitive advantage by providing "content with a purpose" which are both entertaining and enriching for children and offer differentiated value that parents seek in making purchasing decisions for their children. While we do not believe that this value proposition is specifically offered by our competitors, our competitors have greater financial resources and more developed marketing channels than we do which could impact our ability, through our licensees, to secure shelf space thereby decreasing our revenues or affecting our profitability and results of operations.

**The production of our animated content is accomplished through third-party production and animation studios around the world, and any failure of these third-parties could negatively impact our business.**

As part of our business model to manage cash flows, we have partnered with a number of third-party production and animation studios around the world for the production of our new content in which these partners fund the production of the content in exchange for a portion of revenues generated in certain territories. We are reliant on our partners to produce and deliver the content on a timely basis meeting the predetermined specifications for that product. The delivery of inferior content could result in additional expenditures by us to correct any problems to ensure marketability. Further, delays in the delivery of the finished content to us could result in our failure to deliver the product to broadcasters to which it has been pre-licensed. While we believe we have mitigated this risk by aligning the economic interests of our partners with ours and managing the production process remotely on a daily basis, any failures or delays from our production partners could negatively affect our profitability.

**If we fail to honor our obligations under our outstanding secured convertible notes or the terms of our third-party supplier or loan agreements, our business may be materially adversely affected.**

On August 17, 2018, the Company entered into a Securities Purchase Agreement (the "Purchase Agreement") with certain investors (the "Investors"), pursuant to which the Company agreed to sell (i) an aggregate principal amount of $4.50 million in secured convertible notes, convertible into shares of our common stock, at a conversion price of $2.50 per share (the "Secured Convertible Notes") and (ii) warrants to purchase 1,800,000 shares of our common stock at an exercise price of $3.00 per share (the "Warrants," and, together with the Secured Convertible Notes, the "Securities"). We received approximately $4,500,000 in gross proceeds from the Offering.

We are obligated under our secured convertible notes due August 20, 2019 (the "Convertible Notes"), which collectively had an outstanding unamortized book balance of approximately $2,688,153 as of December 31, 2018, and a total fair value upon issuance of $4,464,200. The Convertible Notes accrue interest of 10% per annum. The Convertible Notes, including interest accrued thereon, are convertible at any time until a Convertible Note is no longer outstanding, in whole or in part, at the option of the holders into shares of our common stock at a conversion price of $2.50 per share. We are obligated to make periodic payments on such debt obligations to each noteholder; and we can elect to make such payments either in cash or in stock. In addition, we have granted a security interest to the noteholders in all of our tangible and intangible personal property to secure our obligations under the Convertible Notes.

The Convertible Notes mature on August 20, 2019. If we fail to meet certain conditions under the terms of the Convertible Notes, we will be obligated to repay in cash any principal amount, interest and any other sum arising under the Convertible Notes that remains outstanding on the maturity date. We currently do not have enough cash and cash equivalents to repay the Convertible Notes in cash. If not earlier converted, we will need to obtain additional financing or refinance the Convertible Notes prior to the maturity date.

On January 10, 2017, we entered into an amendment of our home entertainment Distribution Agreement with Sony pursuant to which, among other things, Sony agreed to pay $1,489,583 which was owed and payable by us to DADC for certain disk manufacturing and replication services, thereby terminating the agreement with DADC.

8

In connection with such transaction, we (i) granted Sony home entertainment rights in territories worldwide in addition to the United States and Canada and (ii) issued Sony 301,231 shares of our common stock at $4.945 per share, Sony's exclusive territory for exercising its home entertainment distribution rights under the distribution agreement was extended from the United States and Canada to worldwide, and the amount of advances subject to recoupment by Sony out of royalty payments that would otherwise be due to us under the Distribution Agreement was increased by the amount of the payment to DADC. Future cash flow from the distributed products under the distribution agreement, if any, will be impacted by the additional recoupment obligation and additional rights granted. In connection with the above issuance of our shares, we entered into a subscription agreement with Sony, that became effective as of January 17, 2017. On August 31, 2018 Sony Pictures Home Entertainment assigned all of its rights title and interest in the Company's programs to Alliance Entertainment, LLC ("AEC").

**We may be required to pay significant penalties if we are not able to meet our obligations under our outstanding registration rights agreements.**
We have entered into registration rights agreements in connection with certain of our securities offerings. We may be obligated to pay liquidated damages if we do not meet our obligations under those agreements.

If we are required to pay significant amounts, such as the liquidated damages described above, under these or future registration rights agreements, it could have a material adverse effect on our financial condition and ability to finance our operations.

**Failure to successfully market or advertise our products could have an adverse effect on our business, financial condition and results of operations.**
Our products are marketed worldwide through a diverse spectrum of advertising and promotional programs. Our ability to sell products is dependent in part upon the success of these programs. If we or our licensees do not successfully market our products or if media or other advertising or promotional costs increase, these factors could have an adverse effect on our business, financial condition, and results of operations.

**The failure of others to promote our products may adversely affect our business.**
The availability of retailer programs relating to product placement, co-op advertising and market development funds, and our ability and willingness to pay for such programs, are important with respect to promoting our properties. In addition, although we may have agreements for the advertising and promotion of our products through our licensees, we will not be in direct control of those marketing efforts and those efforts may not be done in a manner that will maximize sales of our products and may have a material adverse effect on our business and operations.

**We may not be able to keep pace with technological advances.**
The entertainment industry in general, and the music and motion picture industries in particular, continue to undergo significant changes, primarily due to technological developments. Because of the rapid growth of technology, shifting consumer tastes and the popularity and availability of other forms of entertainment, it is impossible to predict the overall effect these factors could have on potential revenue from, and profitability of, distributing entertainment programming. As it is also impossible to predict the overall effect these factors could have on our ability to compete effectively in a changing market, if we are not able to keep pace with these technological advances, our revenues, profitability and results from operations may be materially adversely affected.

**Failure in our information technology and storage systems could significantly disrupt the operation of our business.**
Our ability to execute our business plan and maintain operations depends on the continued and uninterrupted performance of our information technology ("IT") systems. IT systems are vulnerable to risks and damages from a variety of sources, including telecommunications or network failures, malicious human acts and natural disasters. Moreover, despite network security and back-up measures, some of our and our vendors' servers are potentially vulnerable to physical or electronic break-ins, including cyber-attacks, computer viruses and similar disruptive problems. These events could lead to the unauthorized access, disclosure and use of non-public information. The techniques used by criminal elements to attack computer systems are sophisticated, change frequently and may originate from less regulated and remote areas of the world. As a result, we may not be able to address these techniques proactively or implement adequate preventative measures. If our computer systems are compromised, we could be subject to fines, damages, litigation and enforcement actions, and we could lose trade secrets, the occurrence of which could harm our business. Despite precautionary measures to prevent unanticipated problems that could affect our IT systems, sustained or repeated system failures that interrupt our ability to generate and maintain data could adversely affect our ability to operate our business.

**Our internal computer systems, or those of our collaborators or other contractors or consultants, may fail or suffer security breaches, which could result in a material disruption and cause our business and reputation to suffer.**

In the ordinary course of business, our internal computer systems and those of our current and any future collaborators and other contractors or consultants are vulnerable to damage from computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. While we do not believe that we have experienced any such material system failure, accident or security breach to date, if such an event were to occur and cause interruptions in our operations, it could adversely affect our business operations, whether due to a loss of our trade secrets or other proprietary information or other similar disruptions. Any such access, disclosure or other loss of such information could result in legal claims or proceedings and damage our reputation.

**Loss of key personnel may adversely affect our business.**

Our success greatly depends on the performance of our executive management team, including Andy Heyward, our Chief Executive Officer. The loss of the services of any member of our core executive management team or other key persons could have a material adverse effect on our business, results of operations and financial condition.

**Our management team currently owns a substantial interest in our voting stock.**

As of March 29, 2019, our management team and Board of Directors beneficially own or control (including conversions, options or warrants exercisable or convertible within 60 days) a combined 2,250,122 or 20.02%, of our shares currently outstanding (including conversions, options or warrants exercisable or convertible within 60 days). Sales of significant amounts of shares held by our directors and executive officers, or the prospect of these sales, could adversely affect the market price of our common stock. Additionally, management has the ability to control any proposals submitted to shareholders, including corporate actions and board changes which may not be in accordance with the votes of other shareholders.

**Litigation may harm our business or otherwise distract management.**

Substantial, complex or extended litigation could cause us to incur large expenditures and could distract management. For example, lawsuits by licensors, consumers, employees or stockholders could be very costly and disrupt business. While disputes from time to time are not uncommon, we may not be able to resolve such disputes on terms favorable to us.

**Our vendors and licensees may be subject to various laws and government regulations, violation of which could subject these parties to sanctions which could lead to increased costs or the interruption of normal business operations that could negatively impact our financial condition and results of operations.**

Our vendors and licensees may operate in a highly regulated environment in the US and international markets. Federal, state and local governmental entities and foreign governments may regulate aspects of their businesses, including the production or distribution of our content or products. These regulations may include accounting standards, taxation requirements (including changes in applicable income tax rates, new tax laws and revised tax law interpretations), product safety and other safety standards, trade restrictions, regulations regarding financial matters, environmental regulations, advertising directed toward children, product content, and other administrative and regulatory restrictions. While we believe our vendors and licensees take all the steps necessary to comply with these laws and regulations, there can be no assurance that they are compliant or will be in compliance in the future. Failure to comply could result in monetary liabilities and other sanctions which could increase our costs or decrease our revenue resulting in a negative impact on our business, financial condition and results of operations.

10

**Protecting and defending against intellectual property claims may have a material adverse effect on our business.**

Our ability to compete in the animated content and entertainment industry depends, in part, upon successful protection of our proprietary and intellectual property. We protect our property rights to our productions through available copyright and trademark laws and licensing and distribution arrangements with reputable companies in specific territories and media for limited durations. Despite these precautions, existing copyright and trademark laws afford only limited, or no, practical protection in some jurisdictions. It may be possible for unauthorized third parties to copy and distribute our productions or portions of our productions. In addition, although we own most of the music and intellectual property included in our products, there are some titles which the music or other elements are in the public domain and for which it is difficult or even impossible to determine whether anyone has obtained ownership or royalty rights. It is an inherent risk in our industry that people may make such claims with respect to any title already included in our products, whether or not such claims can be substantiated. If litigation is necessary in the future to enforce our intellectual property rights, to protect our trade secrets, to determine the validity and scope of the proprietary rights of others or to defend against claims of infringement or invalidity. Any such litigation could result in substantial costs and the resulting diversion of resources could have an adverse effect on our business, operating results or financial condition.

**RISKS RELATING TO OUR COMMON STOCK**

**Our stock price may be subject to substantial volatility, and stockholders may lose all or a substantial part of their investment.**

Our common stock currently trades on the Nasdaq Capital Market. There is limited public float, and trading volume historically has been low and sporadic. As a result, the market price for our common stock may not necessarily be a reliable indicator of our fair market value. The price at which our common stock trades may fluctuate as a result of a number of factors, including the number of shares available for sale in the market, quarterly variations in our operating results, actual or anticipated announcements of new releases by us or competitors, the gain or loss of significant customers, changes in the estimates of our operating performance, market conditions in our industry and the economy as a whole.

**If we fail to maintain effective internal controls over financial reporting, the price of our common stock may be adversely affected.**

Our internal control over financial reporting may have weaknesses and conditions that could require correction or remediation, the disclosure of which may have an adverse impact on the price of our common stock. We are required to establish and maintain appropriate internal controls over financial reporting. Failure to establish those controls, or any failure of those controls once established, could adversely affect our public disclosures regarding our business, prospects, financial condition or results of operations.

Rules adopted by the SEC pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 require an annual assessment of internal controls over financial reporting, and for certain issuers an attestation of this assessment by the issuer's independent registered public accounting firm. The standards that must be met for management to assess the internal controls over financial reporting as effective are evolving and complex, and require significant documentation, testing, and possible remediation to meet the detailed standards. We expect to incur significant expenses and to devote resources to Section 404 compliance on an ongoing basis. It is difficult for us to predict how long it will take or costly it will be to complete the assessment of the effectiveness of our internal control over financial reporting for each year and to remediate any deficiencies in our internal control over financial reporting. As a result, we may not be able to complete the assessment and remediation process on a timely basis. In addition, management's assessment of internal controls over financial reporting may identify weaknesses and conditions that need to be addressed in our internal controls over financial reporting or other matters that may raise concerns for investors. Any actual or perceived weaknesses and conditions that need to be addressed in our internal control over financial reporting or disclosure of management's assessment of our internal controls over financial reporting may have an adverse impact on the price of our common stock.

**We are authorized to issue "blank check" preferred stock without stockholder approval, which could adversely impact the rights of holders of our common stock.**

Our Articles of Incorporation authorize us to issue up to 10,000,000 shares of blank check preferred stock. Any additional preferred stock that we issue in the future may rank ahead of our common stock in terms of dividend priority or liquidation premiums and may have greater voting rights than our common stock. In addition, such preferred stock may contain provisions allowing those shares to be converted into shares of common stock, which could dilute the value of common stock to current stockholders and could adversely affect the market price, if any, of our common stock. In addition, the preferred stock could be utilized, under certain circumstances, as a method of discouraging, delaying or preventing a change in control of our company. Although we have no present intention to issue any additional shares of authorized preferred stock, there can be no assurance that we will not do so in the future.

**We do not expect to pay dividends in the future and any return on investment may be limited to the value of our common stock.**

We do not currently anticipate paying cash dividends in the foreseeable future. The payment of dividends on our common stock will depend on earnings, financial condition and other business and economic factors affecting it at such time as our Board of Directors may consider relevant. Our current intention is to apply net earnings, if any, in the foreseeable future to increasing our capital base and development and marketing efforts. There can be no assurance that we will ever have sufficient earnings to declare and pay dividends to the holders of our common stock, and in any event, a decision to declare and pay dividends is at the sole discretion of our Board of Directors. If we do not pay dividends, our common stock may be less valuable because the return on investment will only occur if its stock price appreciates.

**Our outstanding Series A Convertible Preferred Stock contains anti-dilution provisions that, if triggered, could cause substantial dilution to our then-existing common stock holders which could adversely affect our stock price.**

Our outstanding Series A Convertible Preferred Stock contains anti-dilution provisions to benefit the holders thereof. As a result, if we, in the future, issue common stock or grant any rights to purchase our common stock or other securities convertible into our common stock for a per share price less than the then existing conversion price of the Series A Convertible Preferred Stock, an adjustment to the then current conversion price would occur. This reduction in the conversion price could result in substantial dilution to our then-existing common stockholders as well as give rise to a beneficial conversion feature reported on our statement of operations. Either or both of which could adversely affect the price of our common stock.

**Offers or availability for sale of a substantial number of shares of our common stock may cause the price of our common stock to decline.**

If our stockholders sell substantial amounts of our common stock in the public market upon the expiration of any statutory holding period under Rule 144, or shares issued upon the exercise of outstanding options or warrants, it could create a circumstance commonly referred to as an "overhang" and, in anticipation of which, the market price of our common stock could fall. The existence of an overhang, whether or not sales have occurred or are occurring, also could make more difficult our ability to raise additional financing through the sale of equity or equity-related securities in the future at a time and price that we deem reasonable or appropriate.

In general, under Rule 144, a non-affiliated person who has held restricted shares of our common stock for a period of six months may sell into the market all of their shares, subject to us being current in our periodic reports filed with the Commission.

As of March 29, 2019, approximately 7,614,160 shares of common stock of the 10,432,718 shares of common stock issued and outstanding are free trading. Additionally, as of March 29, 2019, there are 1,000,000 shares of common stock underlying the Series A Convertible Preferred Stock that could be sold pursuant to Rule 144. As of the same date, there are 6,876,041 shares of common stock underlying outstanding warrants that could be sold pursuant to Rule 144 to the extent permitted by any applicable vesting requirements as well as 1,861,030 shares of common stock underlying registered warrants. Lastly, as of March 30, 2019, there are 1,259,415 shares of common stock underlying outstanding options granted and 908,252 shares reserved for issuance under our Genius Brands International, Inc. Amended 2015 Incentive Plan, all of which are unregistered but will become eligible for sale in the public market to the extent permitted by any applicable vesting requirements and Rule 144 under the Securities Act of 1933, as amended (the "Securities Act").

**Concentration of ownership among our existing officers, directors and principal stockholders may prevent other stockholders from influencing significant corporate decisions and depress our stock price.**

Based on the number of shares outstanding as of March 29, 2019, our officers, directors and stockholders who hold at least 5% of our stock beneficially own a combined total of approximately 58.16% of our outstanding common stock, including shares of common stock subject to preferred shares, stock options, and warrants that are currently convertible or exercisable or will be convertible or exercisable within 60 days after December 31, 2018. If these officers, directors, and principal stockholders or a group of our principal stockholders act together, they will be able to exert a significant degree of influence over our management and affairs and control matters requiring stockholder approval, including the election of directors and approval of mergers, business combinations or other significant transactions. The interests of one or more of these stockholders may not always coincide with our interests or the interests of other stockholders. For instance, officers, directors, and principal stockholders, acting together, could cause us to enter into transactions or agreements that we would not otherwise consider. Similarly, this concentration of ownership may have the effect of delaying or preventing a change in control of our company otherwise favored by our other stockholders.

**Item 1B.        Unresolved Staff Comments.**

None.

**Item 2.        Properties**.

We leased 3,251 square feet of general office space at 301 North Canon Drive, Suite 305, Beverly Hills, CA 90210 pursuant to a 35-month sub-lease that commenced on May 1, 2015. Upon the end of the amended lease on January 26, 2019, we relocated our offices. We paid rent of $136,542 annually, subject to annual escalations of 3%.

On February 6, 2018, we entered into a lease for 6,969 square feet of general office space at 131 South Rodeo Drive, Suite 250, Beverly Hills, CA 90212 pursuant to a 91-month lease that commenced on May 25, 2018. We will pay rent of $364,130 annually, subject to annual escalations of 3.5%.

Effective January 21, 2019, we entered into a sublease for the 6,969 square feet of general office space located at 131 South Rodeo Drive, Suite 250, Beverly Hills, CA 90212 pursuant to an 83-month sublease that commenced on February 4, 2019. The subtenant will pay us rent of $422,321 annually, subject to annual escalations of 3.5%.

On December 28, 2018, we entered into a lease for 5,765 square feet of general office space at 8383 Wilshire Blvd., Suite 412, Beverly Hills, CA 90211 pursuant to a 6-month lease that commenced January 28, 2019. We will pay rent of $24,501 monthly.

On January 30, 2019, we entered into a lease for 5,838 square feet of general office space at 190 Cannon Drive, Suite 400, Beverly Hills, CA 90210 pursuant to a 96-month lease that is scheduled to commence on August 1, 2019. We will pay rent of $392,316 annually, subject to annual escalations of 3.5%.

**Item 3.        Legal Proceedings.**

By Kids For Kids, Co. The Company has a pending claim in the United States District Court for the Southern District of New York in connection with failure of a licensee By Kids For Kids, Co. to pay royalties pursuant to a memorandum of understanding dated August 2010 on sponsorship monies relating to promotions involving Secret Millionaires Club. The Company believes it is entitled to at least $150,000.

We are not party to any other litigation in any court, and management is not aware of any contemplated proceeding by any governmental authority against us.

**Item 4.        Mine Safety Disclosures.**

Not applicable.

13

**PART II**

**Item 5.        Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

**Market Information**

Our common stock began trading on the Nasdaq Capital Market under the symbol "GNUS" on November 21, 2016. Prior to that, our common stock traded on the OTCQB of the OTC Markets Group Inc. under the same symbol.

The last reported closing price for our common stock on the Nasdaq Capital Market on March 29, 2019 was $1.97 per share.

**Stockholders**

As of March 29, 2019, the number of shares of common stock outstanding was 10,432,718. As of March 29, 2019, there were approximately 176 record holders of our shares of issued and outstanding common stock. This number does not include persons or entities that hold their stock in nominee or "street" name through various brokerage firms.

**Dividends**

We have never declared or paid dividends on our common stock. Moreover, we currently intend to retain any future earnings for use in our business and, therefore, do not anticipate paying any dividends on our common stock in the foreseeable future.

**Equity Compensation Plan Information**

On September 18, 2015, the Company adopted the Genius Brands International, Inc. 2015 Incentive Plan (the "2015 Plan"). The 2015 Plan was approved by our stockholders in September 2015. The 2015 Plan as approved by the stockholders authorized the issuance up to an aggregate of 150,000 shares of common stock. On December 14, 2015, the Board of Directors voted to amend the 2015 Plan to increase the total number of shares that can be issued under the 2015 Plan by 1,293,334 from 150,000 shares to 1,443,334 shares. The increase in shares available for issuance under the 2015 Plan was approved by stockholders on February 3, 2016. On May 18, 2017, the Board of Directors voted to amend the 2015 Plan to increase the total number of shares that can be issued under the 2015 Plan by 223,333 shares from 1,443,334 shares to an aggregate of 1,667,667 shares. The increase in shares available for issuance under the 2015 Plan was approved by the stockholders on July 25, 2017.

On September 6, 2018, the Board of Directors voted to amend the 2015 Plan to increase the total number of shares that can be issued under the 2015 Plan by 500,000 shares from 1,667,667 shares to an aggregate of 2,167,667 shares. The increase in shares available for issuance under the 2015 Plan was approved by the Company's stockholders on October 2, 2018.

The following table reflects, as of December 31, 2018, compensation plans pursuant to which we are authorized to issue options, warrants or other rights to purchase shares of its common stock, including the number of shares issuable under outstanding options, warrants and rights issued under the plans and the number of shares remaining available for issuance under the plans.

| Plan category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-average exercise price of outstanding options, warrants and rights | (c) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 1,259,415 | $ 7.39 | 907,252 |
| Equity compensation plans not approved by shareholders | – | – | – |
| Total | 1,294,045 | $ 7.39 | 907,252 |

14

**Issuances of Unregistered Sales of Securities**

During the year ended December 31, 2018, the Company issued 470,001 shares of common stock pursuant to the conversion of 1,410 shares of Series A Convertible Preferred Stock at a conversion price of $3.00.

These securities were issued solely to "accredited investors" in reliance on the exemption from registration afforded by Section 4(a)(2) of the Securities Act.

- On August 13, 2018, the Company issued 180,683 shares of the Company's common stock valued at $2.64 per share to the same provider for production services.
- On September 18, 2018, the Company issued 306,000 shares of the Company's common stock valued at $2.17 per share to the same provider for production services.
- On October 17, 2018, the Company issued 58,614 shares of the Company's common stock valued at $2.45 per share to various providers for investor relations services.
- On November 1, 2018, the Company issued 100,000 shares of the Company's common stock valued at $2.27 per share to the same provider for production services.
- On November 15, 2018, the Company issued 23,148 shares of the Company's common stock valued at $2.16 per share for investor relations services.
- On December 31, 2018, the Company issued 60,000 shares of the Company's common stock valued at $2.16 per as part of a mediation settlement representing participation amounts allegedly due.
- These securities were issued in reliance on the exemption from registration afforded by Section 4(a)(2) of the Securities Act.

**Item 6.        Selected Financial Data**

As a "smaller reporting company," as defined by Item 10 of Regulation S-K, we are not required to provide information required by this Item.

**Item 7.        Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our results of operations, financial condition and liquidity and capital resources should be read in conjunction with our audited financial statements and related notes for the years ended December 31, 2018 and 2017. Certain statements made or incorporated by reference in this report and our other filings with the Securities and Exchange Commission, in our press releases and in statements made by or with the approval of authorized personnel constitute forward looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and are subject to the safe harbor created thereby. Forward looking statements reflect intent, belief, current expectations, estimates or projections about, among other things, our industry, management's beliefs, and future events and financial trends affecting us. Words such as "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," "may," "will" and variations of these words or similar expressions are intended to identify forward looking statements. In addition, any statements that refer to expectations, projections or other characterizations of future events or circumstances, including any underlying assumptions, are forward looking statements. Although we believe the expectations reflected in any forward-looking statements are reasonable, such statements are not guarantees of future performance and are subject to certain risks, uncertainties and assumptions that are difficult to predict. Therefore, our actual results could differ materially and adversely from those expressed in any forward-looking statements as a result of various factors. These differences can arise as a result of the risks described above in the section entitled "Item 1A. Risk Factors" and elsewhere in this report, as well as other factors that may affect our business, results of operations, or financial condition. Forward looking statements in this report speak only as of the date hereof, and forward-looking statements in documents incorporated by reference speak only as of the date of those documents. Unless otherwise required by law, we undertake no obligation to publicly update or revise these forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks and uncertainties, we cannot assure you that the forward-looking statements contained in this report will, in fact, transpire.*

15

**Overview**

The management's discussion and analysis is based on our financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires us to make certain estimates and judgments that affect the reported amounts of assets, liabilities and expenses and related disclosure of contingent assets and liabilities. Management bases its estimates on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions and conditions.

**Our Business**

**Overview** Genius Brands International, Inc. ("we," "us," "our," or the "Company") is a global content and brand management company that creates and licenses multimedia content. Led by proven industry leaders, we distribute our content in all formats as well as a broad range of consumer products based on our characters. In the children's media sector, our portfolio features "content with a purpose" for toddlers to tweens, which provides enrichment as well as entertainment. New intellectual property titles include the preschool property *Rainbow Rangers*, which debuted in November 2018 on Nickelodeon and preschool property *Llama Llama*; which debuted on Netflix in January 2018 and was renewed by Netflix for a second season. Our library titles include the award winning *Baby Genius*, - adventure comedy *Thomas Edison's Secret Lab®* and Warren Buffett's *Secret Millionaires Club*, created with and starring iconic investor Warren Buffett which is distributed across our Genius Brands Network on Comcast's Xfinity on Demand, AppleTV, Roku, Amazon Fire, YouTube, Amazon Prime, Cox, Dish, Sling and Zumo as well as Connected TV. We are also developing an all-new animated series, *Stan Lee's Superhero Kindergarten* with Stan Lee's Pow! Entertainment.

In addition, we act as licensing agent for Penguin Young Readers, a division of Penguin Random House LLC who owns or controls the underlying rights to *Llama Llama*, leveraging our existing licensing infrastructure to expand this brand into new product categories, new retailers, and new territories.

**Recent Developments**

*February 2019 Sale of Common Stock and Warrants*

On February 19, 2019, the Company entered into a securities purchase agreement with a certain accredited investor pursuant to which we sold 945,894 shares of common stock and warrants to purchase up to 945,894 shares of our common stock, or the registered warrants, to such investor (the "February 2019 Offering"). The Company received $1,757,552 of net proceeds from this offering. Each share of common stock was accompanied by a registered warrant to purchase one share of common stock at an exercise price of $2.12. Each share of common stock and accompanying registered warrant were sold at a combined purchase price of $2.12. The shares of common stock and registered warrants were purchased together and were issued separately and were immediately separable upon issuance. In a concurrent private placement, we also sold to the purchaser in the February 2019 Offering, unregistered warrants to purchase up to 945,894 shares of our common stock.

*Amendment, Waiver and Consent*

In connection with the February 2019 Offering and concurrent private placement, we entered into an amendment, waiver and consent agreement, or the "Amendment, Waiver and Consent Agreement," with certain holders of our 10% Secured Convertible Notes due August 20, 2019, which were issued pursuant a securities purchase agreement, dated August 17, 2018, by and among the Company and the purchasers identified on the signature pages thereto, or the notes purchase agreement. Pursuant to the Amendment, Waiver and Consent Agreement, such holders agreed to amend the notes purchase agreement, waive any applicable rights and remedies under the notes purchase agreement, and consent to the February 2019 Offering and concurrent private placement. In consideration for such Amendment, Waiver and Consent Agreement, we agreed to issue all holders of our 10% Secured Convertible Notes due August 20, 2019 warrants to purchase up to an aggregate amount 1,800,000 shares of our comment stock. Such warrants have an exercise price of $2.55 per share, will become exercisable commencing six months and one day from the date of issuance and will expire five (5) years from the date of issuance.

*Series A Convertible Preferred Stock Price Adjustment*

As a result of this offering, the conversion price of our outstanding Series A Convertible Preferred Stock was adjusted to $2.12.

**Financings**

*Securities Purchase Agreement*

On August 17, 2018, the Company entered into a securities purchase agreement (the "August 2018 Purchase Agreement") with certain investors, pursuant to which the Company agreed to sell (i) an aggregate principal amount of $4.50 million in secured convertible notes, convertible into shares of our common stock, at an initial conversion price of $2.50 per share (the "Secured Convertible Notes") and (ii) warrants to purchase 1,800,000 shares of our common stock at an exercise price of $3.00 per share. We received $4,186,054 in net proceeds from the offering.

*Production Loans*

On September 28, 2018, Llama Productions LLC, a California limited liability company ("Llama") a wholly-owned subsidiary of the Company, entered into a Loan and Security Agreement (the "Loan and Security Agreement") with Bank Leumi USA (the "Lender"), pursuant to which the Lender agreed to make a secured loan in an aggregate amount not to exceed $4,231,989 to Llama (the "Loan"). The proceeds of the Loan were or will be used to pay the majority of the expenses of producing, completing and delivering two 22-minute episodes and sixteen 11-minute episodes of the second season of the animated series *Llama Llama* to be initially exhibited on Netflix.

In addition, on September 28, 2018, Llama and Lender entered into Amendment No. 2 to Loan and Security Agreement, effective as of August 27, 2018, by and between Llama and the Lender (the "Amendment"). Pursuant to the Amendment, the original Loan and Security Agreement, dated as of August 5, 2016 and amended as of November 7, 2017 (the "Original Loan and Security Agreement"), was amended to (i) reduce the loan commitment thereunder to $1,768,010, which is a reduction of $3,075,406 from the original loan commitment under the Original Loan and Security Agreement and (ii) include the Llama Llama season two obligations under the Loan and Security Agreement as obligations under the Original Loan and Security Agreement.

The Maturity Date of the Prime Rate Loan facility and LIBOR Loan facility is March 31, 2021.

*January 2018 Private Placement*

On January 8, 2018, we entered into a securities purchase agreement with certain accredited investors pursuant to which we sold approximately $1,596,340 net, of common stock and warrants to such investors (the "January 2018 Private Placement"). We issued and sold warrants to purchase 592,000 shares of common stock at an exercise price of $3.00 per share. In addition, we issued to Chardan Capital Markets, LLC, as placement agent, warrants to purchase 93,000 shares of common stock at an exercise price of $3.00 per share.

**Results of Operations**

*Years Ended December 31, 2018 and 2017*

Our summary results for the years ended December 31, 2018 and 2017 are below.

17

*Revenues*

Revenues

| | Twelve Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | December 31, 2017 | $ Change | % Change |
| Television & Home Entertainment | $ 323,709 | $ 4,815,491 | $ (4,491,782) | -93% |
| Licensing & Royalties | 449,385 | 472,134 | (22,749) | -5% |
| Advertising Sales | 217,999 | 38,779 | 179,220 | 462% |
| Product Sales | 2,359 | 9,324 | (6,965) | -75% |
| **Total Revenue** | **$ 993,452** | **$ 5,335,728** | **$ (4,342,276)** | **-81%** |

Television & Home Entertainment revenue is generated from distribution of our properties for broadcast on television, VOD, or SVOD in domestic and international markets and the sale of DVDs for home entertainment through our partners. Fluctuations in Television & Home Entertainment revenue occur period over period based on the achievement of revenue recognition criteria such as the start of a license period and the delivery of the content to the customer. During the year ended December 31, 2018 compared to December 31, 2017, Television & Home Entertainment revenue decreased $4,491,782 or 93%, primarily due to the revenue generated in 2017 from the delivery of the Llama Llama property content without comparable activity in 2018. These decreases were further due to the cumulative effect adjustment made as a result of adopting the new accounting standard, ASC 606. The impact of the adoption reduced revenues for the twelve months ended December 31, 2018 by $54,734.

Licensing and royalty revenue include items for which we license the rights to our copyrights and trademarks of our brands and those of the brands for which we act as a licensing agent. During the year ended December 31, 2018 compared to December 31, 2017, this category decreased $22,749, or 5%, primarily due to decreases in music licensing revenues offset by increased revenue generated from Rainbow Rangers and Llama Llama properties in 2018. These increases were partially offset by the cumulative effect adjustment made as a result of adopting the new accounting standard, ASC 606. The impact of the adoption reduced revenues for the twelve months ended December 31, 2018 by $134,000.

Advertising sales are generated on the Kid Genius Cartoon Channel in the form of either flat rate promotions or advertising impressions served. Advertising sales increased by $179,220, or 462%, during the twelve months ended December 31, 2018 compared to the twelve months ended December 31, 2017 primarily due to the addition of new distribution partners, increased advertising impressions served and additional ad campaigns in 2018. This was a result of our efforts to continue to grow this area of the business through new distribution channels and with new partners.

Product sales represent physical products in which we hold intellectual property rights such as trademarks and copyrights to the characters and which are manufactured and sold by us directly. During the year ended December 31, 2018, product sales associated with Warren Buffett's Secret Millionaire Club decreased by $6,965, or 75%, due to the lack of attendance and resulting lost sales at the Berkshire Hathaway annual shareholder meeting in 2018.

*Expenses*

| | Twelve Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | December 31, 2017 | $ Change | % Change |
| Marketing and Sales | $ 738,122 | $ 662,373 | $ 75,749 | 11% |
| Direct Operating Costs | 1,536,722 | 4,257,427 | (2,720,705) | -64% |
| General and Administrative | 4,982,779 | 5,329,718 | (346,939) | -7% |
| Impairment Loss | 1,740,000 | – | 1,740,000 | N/A |
| Interest Expense | 1,019,376 | 3,227 | 1,016,149 | N/A |
| **Total Operating Expenses** | **$ 10,016,999** | **$ 10,252,745** | **$ (235,746)** | **-2%** |

18

Marketing and sales expenses increased $75,749, or 11% for the twelve months ended December 31, 2018 compared to December 31, 2017 primarily due to an increase in marketing and advertising expenses to promote the *Rainbow Rangers* property.

Direct operating costs include costs of our product sales, unamortizable post-production costs, film and television cost amortization expense, and participation expense related to agreements with various animation studios, post-production studios, writers, directors, musicians or other creative talent with which we are obligated to share net profits of the properties on which they have rendered services. Direct operating costs for the twelve months ended December 31, 2018 decreased $2,720,705, or 64% compared to the twelve months ended December 31, 2017. During the twelve months ended December 31, 2018, we recorded film and television cost amortization expense of $1,079,723 and participation expense of $397,988, compared to the twelve months ended December 31, 2017 where we recorded expenses of $2,534,835 and $777,444, respectively. The decreases in direct operating costs in the year ended December 31, 2018 compared to the prior year reflect decreases in film amortization expense, participation expense and dubbing costs related to the delivery of *Llama Llama* to Netflix in the fourth quarter of 2017 without comparable activity in 2018.

General and administrative expenses consist primarily of salaries, employee benefits, share-based compensation related to stock options, insurances, rent, depreciation and amortization as well as other professional fees related to finance, accounting, legal and investor relations. General and administrative costs for twelve months ended December 31, 2018 decreased $346,939, or 7%, compared to the same period in 2017. This decrease is primarily due to a decrease in share-based compensation expense of $680,546 due to a reversal of inception to date expenses on non-vested options for terminated employees. It is offset by increases in salaries and wages of $210,508, investor relations fees of $161,863, and rent expense of $199,896. Fluctuations in other general and administrative expenses comprise the balance of the variance.

In connection with the Merger in 2013, the Company acquired $1,740,000 of Identifiable Artistic-Related Assets. These assets, related to certain properties owned by A Squared and assumed by the Company, were valued using an independent firm. Based on certain legal, regulatory, contractual, and economic factors, the Company has deemed these assets to be indefinite-lived. Hence, pursuant to FASB ASC 350-30, these assets are not subject to amortization and are tested annually for impairment. As of December 31, 2018, the Company performed an analysis and determined the Identifiable Artistic-Related Intangible Assets no longer have value and as a result has recognized $1,740,000 of impairment expense related to the Identifiable Artistic-Related Intangible Assets.

Interest expense for the twelve months ended December 31, 2018 increased $1,016,149, compared to the same period in 2017. This increase is due to the interest expense and the amortization of the debt issue costs, the amortization of the debt discount related to the $4,500,000 of Senior Convertible Notes and interest charged on the *Llama Llama Season 1* production loan. Interest was capitalized into the costs of production in 2017 prior to the completion in December 2017.

**Liquidity and Capital Resources**

*Working Capital*

As of December 31, 2018, we had current assets of $5,579,582, including cash, cash equivalents, and restricted cash of 3,085,026, and current liabilities of $4,607,919, resulting in working capital of $971,663, compared to a working capital of $8,041,279 as of December 31, 2017.

Increases in working capital were the result of three transactions:

*January 2018 Private Placement*

On January 8, 2018, the Company entered into the January 2018 Private Placement. We issued and sold warrants to purchase 592,000 shares of common stock at an exercise price of $3.00 per share. In addition, we issued to Chardan Capital Markets, LLC, as placement agent, warrants to purchase 93,000 shares of common stock at an exercise price of $3.00 per share. The Company received $1,596,340 in net proceeds from this transaction.

19

*Securities Purchase Agreement*

On August 17, 2018, the Company entered into the August 2018 Purchase Agreement with certain investors, pursuant to which the Company agreed to sell (i) the Secured Convertible Notes and (ii) the Warrants. We received $4,186,054 in net proceeds from the offering.

*Production Loans*

On September 28, 2018, Llama, a wholly-owned subsidiary of the Company, entered into the Loan and Security Agreement with the Lender, pursuant to which the Lender agreed to make the Loan, not to exceed $4,231,989, to Llama. The proceeds of the Loan were or will be used to pay the majority of the expenses of producing, completing and delivering two 22-minute episodes and sixteen 11-minute episodes of the second season of the animated series *Llama Llama* to be initially exhibited on Netflix.

In addition, on September 28, 2018, Llama and Lender entered into the Amendment to the Loan and Security Agreement. Pursuant to the Amendment, the Original Loan and Security Agreement was amended to (i) reduce the loan commitment thereunder to $1,768,010, which is a reduction of $3,075,406 from the original loan commitment under the Original Loan and Security Agreement and (ii) include the Llama Llama season two obligations under the Loan and Security Agreement as obligations under the Original Loan and Security Agreement.

The Maturity Date of the Prime Rate Loan facility and LIBOR Loan facility is March 31, 2021.

The uses of working capital were the costs of production and marketing of *Rainbow Rangers* and general corporate overhead.

*Comparison of Cash Flows for the Years Ended December 31, 2018 and 2017*

Our total cash, cash equivalents, and restricted cash were $3,085,026 and $7,498,072 at December 31, 2018 and 2017, respectively.

| Comparison of Cash Flows | Twelve Months Ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2018 | December 31, 2017 | $ Change | % Change |
| Cash used by operations | $ (8,008,010) | $ (7,186,870) | $ (821,140) | 11% |
| Cash used in investing activities | (42,985) | (107,193) | 64,208 | -60% |
| Cash provided in financing activities | 3,637,949 | 11,904,214 | (8,266,265) | -69% |
| **Increase (decrease) in cash** | **$ (4,413,046)** | **$ 4,610,151** | **$ (9,023,197)** | **-196%** |

During the year ended December 31, 2018, our primary sources of cash were from the $1,596,340 raised from the January 2018 Private Placement, the issuance of $4,186,054 of Senior Secured Notes and the September Production Loans. During the year ended December 31, 2017, our primary sources of cash were $3,401,924 in net proceeds from the Private Transaction, $5,699,534 in net proceeds from the October 2017 Registered Direct Offering, and $2,802,756 in net proceeds from the *Llama Llama* production facility.

*Operating Activities*

Cash used in operating activities for the twelve months ended December 31, 2018 was $8,008,008 as compared to cash used in operating activities of $7,186,870 during the prior period. The increase in cash used in operating activities is primarily the result of production costs incurred for the production of Rainbow Rangers, decreases in accounts receivable due to collections from the Llama Llama broadcast agreement and the lease deposit in 2018.

20

*Investing Activities*

Cash used in investing activities for the twelve months ended December 31, 2018 was $42,985 as compared to a use of $107,193 for the twelve months ended December 31, 2017. Investing activities include the development of certain intangible assets and the purchase of furniture and equipment in 2018.

*Financing Activities*

Cash generated from financing activities for the twelve months ended December 31, 2018 was $3,637,949 as compared to $11,904,214 generated in the comparable period in 2017. During the twelve months ended December 31, 2018, the sources of cash generated from financing activities were the $1,596,340 in net proceeds from the warrant exchange and $4,186,054 in net proceeds from the issuance of Senior Secured Notes. The use of cash was the repayment of the production facility in the amount of $2,144,445.

**Capital Expenditures**

As of December 31, 2018, we do not have any material commitments for capital expenditures.

**Critical Accounting Policies**

Our accounting policies are described in the notes to the financial statements. Below is a summary of the critical accounting policies, among others, that management believes involve significant judgments and estimates used in the preparation of its financial statements.

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of Genius Brands International, Inc., its wholly-owned subsidiaries A Squared and Llama Productions as well as its interest in Stan Lee Comics, LLC ("Stan Lee Comics"). All significant inter-company balances and transactions have been eliminated in consolidation.

*Goodwill and Intangible Assets*

Goodwill represents the excess of purchase price over the estimated fair value of net assets acquired in business combinations accounted for by the purchase method. In accordance with FASB ASC 350 Intangibles Goodwill and Other, goodwill and certain intangible assets are presumed to have indefinite useful lives and are thus not amortized, but subject to an impairment test annually or more frequently if indicators of impairment arise. We complete the annual goodwill and indefinite-lived intangible asset impairment tests at the end of each fiscal year. To test for goodwill impairment, we are required to estimate the fair market value of each of our reporting units, of which we have one. While we may use a variety of methods to estimate fair value for impairment testing, our primary method is discounted cash flows. We estimate future cash flows and allocations of certain assets using estimates for future growth rates and our judgment regarding the applicable discount rates. Changes to our judgments and estimates could result in a significantly different estimate of the fair market value of the reporting units, which could result in an impairment of goodwill or indefinite lived intangible assets in future periods.

Other intangible assets have been acquired, either individually or with a group of other assets, and were initially recognized and measured based on fair value. In accordance with FASB ASC 350 Intangible Assets, the costs of new product development and significant improvement to existing products are capitalized while routine and periodic alterations to existing products are expensed as incurred. Annual amortization of these intangible assets is computed based on the straight-line method over the remaining economic life of the asset.

21

*Film and Television Costs*

We capitalize production costs for episodic series produced in accordance with FASB ASC 926-20 Entertainment-Films – Other Assets – Film Costs. Accordingly, production costs are capitalized at actual cost and then charged against revenue based on the initial market revenue evidenced by a firm commitment over the period of commitment. We expense all capitalized costs that exceed the initial market firm commitment revenue in the period of delivery of the episodes.

We capitalize production costs for films produced in accordance with FASB ASC 926-20 Entertainment-Films – Other Assets – Film Costs. Accordingly, production costs are capitalized at actual cost and then charged against revenue quarterly as a cost of production based on the relative fair value of the film(s) delivered and recognized as revenue. We evaluate our capitalized production costs annually and limit recorded amounts by our ability to recover such costs through expected future sales.

Additionally, for both episodic series and films, from time to time, we develop additional content, improved animation and bonus songs/features for our existing content. After the initial release of the film or episodic series, the costs of significant improvement to existing products are capitalized while routine and periodic alterations to existing products are expensed as incurred.

*Debt and Attached Equity Linked Instruments*

The Company measures issued debt on an amortized cost basis, net of debt premium/discount and debt issuance costs amortized using the effective interest rate method or the straight-line method when the latter does not lead to materially different results.

The Company accounts for the proceeds from the issuance of convertible notes payable in accordance with FASB ASC 470-20 Debt with Conversion and Other Options. Pursuant to FASB ASC 470-20, the intrinsic value of the embedded conversion feature (beneficial conversion interest), which is in the money on the commitment date is included in the discount to debt and amortized to interest expense over the term of the note agreement. When the conversion option is not separated, the Company accounts for the entire convertible instrument including debt and the conversion feature as a liability.

The Company analyzes freestanding equity-linked instruments including warrants attached to debt to conclude whether the instrument meets the definition of the derivative and whether it is considered indexed to the Company's own stock. If the instrument is not considered indexed to Company's stock, it is classified as an asset or liability recorded at fair value. If the instrument is considered indexed to Company's stock, the Company analyzes additional equity classification requirements per ASC 815-40 Contract's in Entity's Own Equity. When the requirements are met the instrument is recorded as part of Company's equity, initially measured based on its relative fair value with no subsequent re-measurement. When the equity classification requirements are not met, the instrument is recorded as an asset or liability, measured at fair value with subsequent changes in fair value recorded in earnings.

When required, the Company also considers the bifurcation guidance for embedded derivatives per FASB ASC 815-15 Embedded Derivatives.

*Revenue Recognition*

On January 1, 2018, the Company adopted the new accounting standard ASC 606 (Topic 606), Revenue from Contracts with Customers and all the related amendments ("new revenue standard") using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606, while prior period amounts are not adjusted and continue to be reported in accordance with our historic accounting under ASC 605, (Topic 605).

22

Accordingly, on January 1, 2018 the Company recorded a cumulative effect adjustment to beginning accumulated deficit in the amount of $206,245. The impact to our financial statements for the year ended December 31, 2018, 2018 resulting from the adoption of Topic 606 as of January 1, 2018 was a reduction of revenue in the amount of $188,734, and a corresponding reduction in costs in the amount of $52,269, from the amounts reported. The amounts prior to adoption were not recognized pursuant to Topic 606 and would have been reported pursuant to Topic 605.

Changes to the opening balances in prepaid and other assets, film and television costs, total assets, accrued expenses, deferred revenue and total liabilities resulting from the adoption of the new guidance were as follows (thousands):

| | December 31, 2017 | | Impact Of Adoption | | January 1, 2018 |
|---|---|---|---|---|---|
| Prepaid and Other Assets | $ | 265 | $ | 15 | $ | 280 |
| Film and Television Costs, net | $ | 2,777 | $ | (219) | $ | 2,558 |
| Total assets | $ | 27,713 | $ | (204) | $ | 27,509 |
| Participations Payable | $ | 1,718 | $ | (1) | $ | 1,717 |
| Deferred Revenue | $ | 5,085 | $ | (409) | $ | 4,676 |
| Total liabilities | $ | 12,673 | $ | (410) | $ | 12,263 |

The Company performed its analysis of its existing revenue contracts and has completed its new revenue accounting policy documentation under the new standard. The Company has identified the following six material and distinct performance obligations:

- License rights to exploit Functional Intellectual Property (Functional Intellectual Property or "functional IP" is defined as intellectual property that has significant standalone functionality, such as the ability be played or aired. Functional intellectual property derives a substantial portion of its utility from its significant standalone functionality.)
- License rights to exploit Symbolic Intellectual Property (Symbolic Intellectual Property or "symbolic IP" is intellectual property that is not functional as it does not have significant standalone use and substantially all of the utility of symbolic IP is derived from its association with the entity's past or ongoing activities, including its ordinary business activities, such as the Company's licensing and merchandising programs associated with its animated content.)
- Options to renew or extend a contract at fixed terms. (While this performance obligation is not significant for the Company's current contracts, it could become significant in the future.)
- Options on future seasons of content at fixed terms. (While this performance obligation is not significant for the Company's current contracts, it could become significant in the future.)
- Fixed fee advertising revenue generated from the Genius Brands Network.
- Variable fee advertising revenue generated from the Genius Brands Network.

As a result of the change, beginning January 1, 2018, the Company began recognizing revenue related to licensed rights to exploit functional IP in two ways. For minimum guarantees, the Company recognizes fixed revenue upon delivery of content and the start of the license period. For functional IP contracts with a variable component, the Company estimates revenue such that it is probable there will not be a material reversal of revenue in future periods. Revenue under these types of contracts was previously recognized when royalty statements were received. The Company began recognizing revenue related to licensed rights to exploit symbolic IP substantially similarly to functional IP. Although it has a different recognition pattern from functional IP, the valuation method is substantially the same, depending on the nature of the license.

23

The Company sells advertising on its Kid Genius channel in the form of either flat rate promotions or impressions served. For flat rate promotions with a fixed term, the Company recognizes revenue when all five revenue recognition criteria under FASB ASC 606 are met. For impressions served, the Company delivers a certain minimum number of impressions on the channel to the advertiser for which the advertiser pays a contractual CPM per impression. Impressions served are reported to the Company on a monthly basis, and revenue is reported in the month the impressions are served.

The Company recognizes revenue related to product sales when (i) the seller's price is substantially fixed, (ii) shipment has occurred causing the buyer to be obligated to pay for product, (iii) the buyer has economic substance apart from the seller, and (iv) there is no significant obligation for future performance to directly bring about the resale of the product by the buyer.

Prior to the adoption of Topic 606, the Company recognized revenue in accordance with FASB ASC 926-605 Entertainment-Films – Revenue Recognition. Accordingly, we recognize revenue when (i) persuasive evidence of a sale with a customer exists, (ii) the film is complete and has been delivered or is available for delivery, (iii) the license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale, (iv) the arrangement fee is fixed or determinable, and (v) collection of the arrangement fee is reasonably assured.

Our licensing and royalty revenue represent revenue generated from license agreements that are held in conjunction with third parties that are responsible for collecting fees due and remitting to us our share after expenses. Revenue from licensed products is recognized when realized or realizable based on royalty reporting received from licensees. Licensing income that we recognize as an agent is in accordance with FASB ASC 605-45 Revenue Recognition – Principal Agent. Accordingly, our revenue is our gross billings to our customers less the amounts we pay to suppliers for their products and services.

We sell advertising on our Genius Brands Network in the form of either flat rate promotions or impressions served. For flat rate promotions with a fixed term, we recognize revenue when all five revenue recognition criteria under FASB ASC 605 are met. For impressions served, we deliver a certain minimum number of impressions on the channel to the advertiser for which the advertiser pays a contractual CPM per impression. Impressions served are reported to us on a monthly basis, and revenue is reported in the month the impressions are served.

Prior to the adoption of Topic 606, we recognized revenue related to product sales when (i) the seller's price is substantially fixed, (ii) shipment has occurred causing the buyer to be obligated to pay for product, (iii) the buyer has economic substance apart from the seller, and (iv) there is no significant obligation for future performance to directly bring about the resale of the product by the buyer as required by FASB ASC 605 Revenue Recognition.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods.

**Recent Accounting Pronouncements**

In February 2016, the FASB issued Accounting Standards Update ("ASU") 2016-02, "Leases." The standard requires lessees to recognize the assets and liabilities that arise from leases on the balance sheet. A lessee should recognize in the statement of financial position a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying asset for the lease term. The new guidance is effective for annual and interim reporting periods beginning after December 15, 2018. In July 2018, the FASB issued ASU 2018-11, Leases (Topic 842), Targeted Improvements, which allows for an additional optional transition method where comparative periods presented in the financial statements in the period of adoption will not be restated and instead those periods will be presented under existing guidance in accordance with ASC 840, Leases. Management will use this optional transition method. As of January 1, 2019, management recorded lease liability of $ 2,071,903, right-of-use asset of $ 2,029,677, a reversal of previously recorded deferred rent of $37,920 and the increase in accumulated deficit of $ 4,306.

24

*Debt and Attached Equity-Linked Instruments*

In November 2016, the FASB issued Accounting Standards Update ("ASU") 2016-18, "Statement of Cash Flows – Restricted Cash a consensus of the FASB Emerging Issues Task Force." This standard requires restricted cash and cash equivalents to be included with cash and cash equivalents on the statement of cash flows under a retrospective transition approach. The guidance will become effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted. We have prospectively adopted ASU 2016-18. The impact to our consolidated financial position, results of operations and cash flows was minimal.

In January 2017, the FASB issued Accounting Standards Update ("ASU") 2017-04, "Simplifying the Test for Goodwill Impairment", which requires an entity to perform a one-step quantitative impairment test, whereby a goodwill impairment loss will be measured as the excess of a reporting unit's carrying amount over its fair value (not to exceed the total goodwill allocated to that reporting unit). It eliminates Step 2 of the current two-step goodwill impairment test, under which a goodwill impairment loss is measured by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. The standard is effective January 1, 2020, with early adoption as of January 1, 2017 permitted. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In July 2017, the FASB issued ASU No. 2017-11 addressing, among other matters, accounting for certain financial instruments. One of the amendments in this guidance intended to reduce the complexity associated with the issuer's accounting for certain financial instruments with characteristics of liabilities and equity. Specifically, the Board determined that a down round feature (as defined) would no longer cause a freestanding equity-linked financial instrument (or an embedded conversion option) to be accounted for as a derivative liability at fair value with changes in fair value recognized in current earnings. ASU 2017-11 is effective for public business entities for fiscal year beginning after December 15, 2018. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13"), which changes the fair value measurement disclosure requirements of ASC 820. The update removes some disclosures, modifies others, and adds some new disclosure requirements. The amendments in this ASU are effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019 with early adoption permitted. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, Compensation – Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting ("ASU 2018-07"), which supersedes ASC 505-05 and expands the scope of ASC 718 to include all share-based payment arranges related to the acquisition of goods and services from both nonemployees and employee. As a result, most of the guidance in ASC 718 associated with employee share-based payments, including most of its requirements related to classification and measurement, applies to nonemployee share-based payment arrangements. ASC 2018-07 is effective for all entities for fiscal year beginning after December 15, 2018, and interim periods within that fiscal year. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In March 2019, the FASB issued ASU No. 2019-02, Entertainment-Films-Other Assets-Film Costs (Subtopic 926-20) and Entertainment-Broadcasters Intangibles-Goodwill and Other (Subtopic 920-350). The update aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The amendments also require that an entity reassess estimates of the use of a film in a film group and account for any changes prospectively. The amendments in this update require that an entity test a film or license agreement for program material within the scope of Subtopic 920-350 for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. For public business entities, the amendments in this update are effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

Various other accounting pronouncements have been recently issued, most of which represented technical corrections to the accounting literature or were applicable to specific industries/transactions or special circumstances and are not expected to have a material effect on our financial position, results of operations, or cash flows.

**Off Balance Sheet Arrangements**

We have no off-balance sheet arrangements.

**Item 7A.        Quantitative and Qualitative Disclosures about Market Risk**

As a "smaller reporting company," as defined by Item 10 of Regulation S-K, we are not required to provide information required by this Item.

**Item 8.        Financial Statements and Supplementary Data**

    The financial statements are included herein commencing on page F-1.

**Item 9.        Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A.        Controls and Procedures**

**Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act as a process designed by, or under the supervision of, our principal executive officer and principal financial officer and effected by our board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of our assets;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

Because of our inherent limitations, our internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework (2013 Framework)*.

26

Based on this assessment, our management, with the participation of our Chief Executive Officer (principal executive officer) and our Chief Financial Officer (principal financial and accounting officer), has concluded that, as of December 31, 2018, our internal control over financial reporting were not effective based on those criteria.

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the ''Exchange Act''). Disclosure controls and procedures include, without limitation, controls and procedures that are designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based upon our evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were not effective for the three months ended December 31, 2018 in ensuring that information that we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms.

In the course of our review of our consolidated financial results for the three months ended September 30, 2018, we identified a potential material weakness in our internal control over financial reporting related to our failure to adequately evaluate the accounting treatment for the warrants issued in conjunction with the convertible notes in a timely manner.

Management is in the process of conducting further review of our internal control policy to ensure it can effectively implement controls to evaluate complex accounting issues in the future. We replaced our Controller and are taking further steps to appropriately and timely evaluate complex accounting issues in the future.

**Changes in Internal Control over Financial Reporting**

In addition to hiring a new controller, management has hired outside consultants who are experts in the field of accounting to assist management in identifying changes in the accounting rules and to assist in accounting for the changes and the accounting treatment of any new transactions the Company is contemplating or has entered into.

**Item 9B.        Other Information**

None.

**PART III**

**Item 10.        Directors, Executive Officers and Corporate Governance**

**Board of Directors, Executive Officers, Promoters and Control Persons**

The following table sets forth information about our directors and executive officers as of March 30, 2019:

| Name | Age | Position |
|------|-----|----------|
| Andy Heyward | 70 | Chief Executive Officer and Chairman of the Board of Directors |
| Robert L. Denton | 59 | Chief Financial Officer |
| Michael A. Jaffa | 53 | General Counsel, Corporate Secretary |
| Bernard Cahill * | 53 | Director |
| Joseph "Gray" Davis * | 76 | Director |
| P. Clark Hallren * | 57 | Director |
| Michael Klein | 71 | Director |
| Margaret Loesch * | 73 | Director |
| Lynne Segall* | 66 | Director |
| Anthony Thomopoulos * | 81 | Director |

_____

\* Denotes directors who are "independent" under applicable SEC and Nasdaq rules.

Our directors hold office until the earlier of their death, resignation or removal or until their successors have been elected and qualified.

**Background Information**

*Andy Heyward, 70,* has been the Company's Chief Executive Officer since November 2013 and the Company's Chairman of the Board since December 2013. Mr. Heyward co-founded DIC Animation City in 1983 and served as its Chief Executive Officer until its sale in 1993 to Capital Cities/ ABC, Inc. which was eventually bought by The Walt Disney Company in 1995. Mr. Heyward ran the company while it was owned by The Walt Disney Company until 2000 when Mr. Heyward purchased DIC Entertainment L.P. and DIC Productions L.P, corporate successors to the DIC Animation City business, with the assistance of Bain Capital and served as the Chairman and Chief Executive Officer of their acquiring company DIC Entertainment Corporation, until he took the company public on the AIM. He sold the company in 2008. Mr. Heyward co-founded A Squared Entertainment LLC in 2009 and has served as its Co-President since inception. Mr. Heyward earned a Bachelor of Arts degree in Philosophy from UCLA and is a member of the Producers Guild of America, the National Academy of Television Arts and the Paley Center (formerly the Museum of Television and Radio). Mr. Heyward gave the Commencement address in 2011 for the UCLA College of Humanities and was awarded the 2002 UCLA Alumni Association's Professional Achievement Award. He has received multiple Emmys and other awards for Children's Entertainment. He serves on the Board of Directors of the Cedars Sinai Medical Center. Mr. Heyward has produced over 5,000 half hour episodes of award winning entertainment, among them *Inspector Gadget*; *The Real Ghostbusters*; *Strawberry Shortcake*; *Care Bears*; *Alvin and the Chipmunks*; *Hello Kitty's Furry Tale Theater; The Super Mario Brothers Super Show; The Adventures of Sonic the Hedgehog*; *Sabrina The Animated Series*; *Captain Planet and the Planeteers*; *Liberty's Kids*, and many others. Mr. Heyward was chosen as a director because of his extensive experience in children's entertainment and as co-founder of A Squared Entertainment.

*Robert L. Denton, 59,* Mr. Denton has been our Chief Financial Officer since April 18, 2018. He served as the Chief Financial Officer of Atlys, Inc. a next-gen media technology company from 2011 to 2018. He has over 30 years of experience as a financial executive, specifically in the entertainment industry. He began his career in 1982 with Ernst & Young handling filings with the Securities and Exchange Commission, including initial public offerings. He left Ernst & Young in 1990 to work as Vice President and Chief Accounting Officer for LIVE Entertainment, Inc. In 1996, LIVE was acquired by Artisan Entertainment, Inc., and, in December 2000, Mr. Denton was promoted to Executive Vice President of Finance and CAO. Mr. Denton also served as the COO of Artisan Home Entertainment, where he directed all financial reporting, budgeting and forecasting, manufacturing and distribution of the Home Entertainment Division. Mr. Denton left Artisan at the end of 2003 and joined DIC Entertainment Corporation to serve as their Chief Financial Officer. At DIC, he directed the three-year financial audit, due diligence and preparation of the company's Admission Documents, and he was responsible for all monthly financial reporting to the Board of Directors as well as the semi-annual reporting to the AIM Exchange of the London Stock Exchange. Mr. Denton left DIC in February 2009 after completing the acquisition and transition of DIC to the Cookie Jar Company. Mr. Denton served as the Chief Financial Officer of Gold Circle Films from 2009 to 2011. From 2009 to 2014, Mr. Denton also owned and operated three Assisted Living Facilities for the Elderly, to help better care for his mother. Mr. Denton is a Certified Public Accountant and a member of the American Institute of Certified Public Accountants and the California Society of Certified Public Accountants.

*Michael A. Jaffa, 53,* has been the General Counsel and Corporate Secretary of the Company since April 2018. From January 2017 through April 2018, Mike served as Thoughtful Media Group's (TMG) General Counsel and Global Head of Business Affairs. TMG is a multichannel network focused on Asian markets. At TMG, Mr. Jaffa oversaw all of TMG's legal matters, established the framework for TMG's continued growth in international markets, including a franchise plan, the formation of a regional headquarters in South East Asia and assisted with M&A transactions. From September 2013 through December 2016, Mr. Jaffa worked as the Head of Business Affairs for DreamWorks Animation Television, and before that served in a similar role at Hasbro Studios from December 2009 through September 2013. Mr. Jaffa has over 20 years of experience handling licensing, production, merchandising, complex international transactions and employment issues for large and small entertainment companies and technology startups.

*Bernard Cahill, 53,* has been a Director of the Company since December 2013. Mr. Cahill is the founding partner of ROAR, LLC, an entertainment consulting firm, which he founded in 2004 and is the founding partner of Cahill Law Offices, an entertainment law firm, which he founded in 1995. Mr. Cahill is the founder of Unicorn Games LLC, which was sold to Hasbro, Inc. in 2000. Mr. Cahill holds a Bachelor's of Science degree in Biology from Illinois State University and a Juris Doctorate from the John Marshall Law School. Mr. Cahill is a member of the Tennessee State and Illinois State Bar. Mr. Cahill was chosen to be a director based on his expertise in the entertainment field.

*Joseph "Gray" Davis, 76,* has been a Director of the Company since December 2013. Mr. Davis served as the 37th governor of California from 1998 until 2003. Mr. Davis currently serves as "Of Counsel" in the Los Angeles, California office of Loeb & Loeb LLP. Mr. Davis has served on the Board of Directors of DIC Entertainment and is a member of the bi-partisan Think Long Committee, a Senior Fellow at the UCLA School of Public Affairs and Co-Chair of the Southern California Leadership Counsel. Mr. Davis received his undergraduate degree from Stanford University and received his Juris Doctorate from Columbia Law School. Mr. Davis served as lieutenant governor of California from 1995-1998, California State Controller from 1987-1995 and California State Assemblyman from 1982-1986. Mr. Davis was chosen as a director of the Company based on his knowledge of corporate governance.

*P. Clark Hallren, 57,* has been a Director of the Company since May 2014. Since August 2013, Mr. Hallren has been a realtor with HK Lane/Christie's International Real Estate and since August 2012, Mr. Hallren has served as an outside consultant to individuals and entities investing or operating in the entertainment industry. From August 2012 to August 2014, Mr. Hallren was a realtor with Keller Williams Realty and from August 2009 to August 2012, Mr. Hallren founded and served as managing partner of Clear Scope Partners, an entertainment advisory company. From 1986 to August 2009, Mr. Hallren was employed by JP Morgan Securities Inc. in various capacities, including as Managing Director of the Entertainment Industries Group. In his roles with JP Morgan Securities, Mr. Hallren was responsible for marketing certain products to his clients, including but not limited to, syndicated senior debt, public and private subordinated debt, public and private equity, securitized and credit enhanced debt, interest rate derivatives, foreign currency and treasury products. Mr. Hallren holds Finance, Accounting and Economics degrees from Oklahoma State University. He also currently holds Series 7, 24 and 63 securities licenses. Mr. Hallren was chosen as a director of the Company based on his knowledge and experience in the entertainment industry as well as in banking and finance.

*Micheal Kiein*, 71, was appointed as a Director of the Company since March 7, 2019. Mr. Klein is an accomplished executive, entrepreneur, and financier with substantial experience in media and entertainment, investment banking, professional sports, venture capital funding, and real estate. Prior to starting Camden Capital Management, LLC (CCM), Mr. Klein, since 1996, has led Klein Investment Group after assuming 100% ownership of (and renaming) Iacocca Capital Partners, L.P., where he was Managing Partner from 1994 to 1996. From 1984 to 1993, Mr. Klein was a managing director at Bear Stearns & Company, where he founded and co-directed the Media-Entertainment Group, and Gruntal & Company, where he was Senior Managing Director and a member of the Executive Committee. From 1974 to 1982, Mr. Klein supplied prime time and mini-series content to the major television networks through his company, Michael Klein Productions. Also, during that time, he was an owner and a senior executive officer of the San Diego Chargers, an NFL Football franchise. Mr. Klein has significant experience in the area of corporate financings. He has executed and participated in financing deals, both public and private, ranging from $5 million to over $2 billion. His real estate ventures in Southern California include a 600-acre development in North San Diego, which he sold in various stages. He also has led several real estate ventures in Southern California including the Water Gardens phase two in Santa Monica. Mr. Klein was chosen as a director of the Company based on his knowledge and experience in the entertainment industry as well as in banking and finance.

*Margaret Loesch, 73,* has been a Director of the Company since March 2015 and the Executive Chairman of the Genius Brands Network since December 2016. Beginning in 2009 through 2014, Ms. Loesch, served as Chief Executive Officer and President of The Hub Network, a cable channel for children and families, including animated features. The Company has, in the past, provided The Hub Network with certain children's programming. From 2003 through 2009 Ms. Loesch served as Co-Chief Executive Officer of The Hatchery, a family entertainment and consumer product company. From 1998 through 2001 Ms. Loesch served as Chief Executive Officer of the Hallmark Channel, a family related cable channel. From 1990 through 1997 Ms. Loesch served as the Chief Executive Officer of Fox Kids Network, a children's programming block and from 1984 through 1990 served as the Chief Executive Officer of Marvel Productions, a television and film studio subsidiary of Marvel Entertainment Group. Ms. Loesch obtained her Bachelor of Science from the University of Southern Mississippi. Ms. Loesch was chosen to be a director based on her 40 years of experience at the helm of major children and family programming and consumer product channels.

*Lynne Segall, 66,* has been a Director of the Company since December 2013. Ms. Segall has served as the Senior Vice President and 6Publisher of The Hollywood Reporter since June 2011. From 2010 to 2011, Ms. Segall was the Senior Vice President of Deadline Hollywood. From June 2006 to May 2010, Ms. Segall served as the Vice President of Entertainment, Fashion & Luxury advertising at the Los Angeles Times. In 2005, Ms. Segall received the Women of Achievement Award from The Hollywood Chamber of Commerce and the Women in Excellence Award from the Century City Chamber of Commerce. In 2006, Ms. Segall was recognized by the National Association of Women with its Excellence in Media Award. Ms. Segall was chosen to be a director based on her expertise in the entertainment industry.

*Anthony Thomopoulos, 81,* has been a Director of the Company since February 2014. Mr. Thomopoulos served as the Chairman of United Artist Pictures from 1986 to 1989 and formed Thomopoulos Pictures, an independent production company of both motion pictures and television programs in 1989 and has served as its Chief Executive Officer since 1989. From 1991 to 1995, Mr. Thomopoulos was the President of Amblin Television, a division of Amblin Entertainment. Mr. Thomopoulos served as the President of International Family Entertainment, Inc. from 1995 to 1997. From June 2001 to January 2004, Mr. Thomopoulos served as the Chairman and Chief Executive Officer of Media Arts Group, a NYSE listed company. Mr. Thomopoulos served as a state commissioner of the California Service Corps. under Governor Schwarzenegger from 2005 to 2008. Mr. Thomopoulos is also a founding partner of Morning Light Productions. Since he founded it in 2008, Mr. Thomopoulos has operated Thomopoulos Productions and has served as a consultant to BKSems, USA, a digital signage company. Mr. Thomopoulos is an advisor and a member of the National Hellenic Society and holds a degree in Foreign Service from Georgetown University and sat on its Board of Directors from 1978 to 1988. Mr. Thomopoulos was chosen as a director of the Company based on his entertainment industry experience.

**Family Relationships**

There are no family relationships between any of our directors and our executive officers. Amy Moynihan Heyward resigned from the Company's board effective March 1, 2019.

**Corporate Governance**

**General**

We believe that good corporate governance is important to ensure that the Company is managed for the long-term benefit of our stockholders. This section describes key corporate governance practices that we have adopted.

**Board Leadership Structure and Role in Risk Oversight**

The Board of Directors has responsibility for establishing broad corporate policies and reviewing our overall performance rather than day-to-day operations. The primary responsibility of our Board of Directors is to oversee the management of our company and, in doing so, serve the best interests of the company and our stockholders. The Board of Directors selects, evaluates and provides for the succession of executive officers and, subject to stockholder election, directors. It reviews and approves corporate objectives and strategies and evaluates significant policies and proposed major commitments of corporate resources. Our Board of Directors also participates in decisions that have a potential major economic impact on our company. Management keeps the directors informed of company activity through regular communication, including written reports and presentations at Board of Directors and committee meetings.

Although we have not adopted a formal policy on whether the Chairman and Chief Executive Officer positions should be separate or combined, we have traditionally determined that it is in the best interest of the Company and its shareholders to partially combine these roles. Due to the small size of the Company, we believe it is currently most effective to have the Chairman and Chief Executive Officers positions combined.

The Company currently has eight directors, including Mr. Heyward, its Chairman, who also serves as the Company's Chief Executive Officer. The Chairman and the Board are actively involved in the oversight of the Company's day to day activities.

**16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires our officers, directors, and any persons who own more than 10% of common stock, to file reports of ownership of, and transactions in, our common stock with the SEC and furnish copies of such reports to us. Based solely on our review of the copies of such forms and amendments thereto furnished to us and on written representations from our officers, directors, and any person whom we understand owns more than 10% of our common stock, we found that during 2018, all Section 16(a) filing were made with the SEC on a timely basis.

**Code of Conduct and Ethics**

We have adopted a Corporate Code of Conduct and Ethics and Whistleblower Policy that applies to all of our officers, directors and employees. A copy of the Code of Conduct and Ethics may be obtained, free of charge, by submitting a written request to the Company or on our website at *www.gnusbrands.com*. Disclosure regarding any amendments to, or waivers from, provisions of the code of conduct and ethics that apply to our directors, principal executive and financial officers will be posted on the "Investor Relations-Corporate Governance" section of our website at *www.gnusbrands.com* or included in a Current Report on Form 8-K within four business days following the date of the amendment or waiver.

**Board Committees**

During 2018, our Board of Directors held four meetings.

The following table sets forth the three standing committees of our Board and the members of each committee and the number of meetings held by our Board of Directors and the committees during 2018:

| Director | Board | Audit Committee | Compensation Committee | Nominating Committee |
|---|---|---|---|---|
| Andy Heyward | Chair | | | |
| Bernard Cahill | X | X | | |
| Joseph "Gray" Davis | X | | | |
| P. Clark Hallren | X | Chair | X | |
| Amy Moynihan Heyward | X | | | |
| Margaret Loesch | X | | | |
| Lynne Segall | X | | | Chair |
| Anthony Thomopoulos | X | X | Chair | |
| Meetings in 2018: | 4 | 5 | 6 | 1 |

To assist it in carrying out its duties, the Board of Directors has delegated certain authority to an Audit Committee, a Compensation Committee and a Nominating Committee as the functions of each are described below.

**Audit Committee**

Messrs. Hallren, Cahill, and Thomopoulos serve on our Audit Committee. Our Audit Committee's main function is to oversee our accounting and financial reporting processes, internal systems of control, independent auditor relationships and the audits of our financial statements. The Audit Committee's responsibilities include:

- selecting, hiring, and compensating our independent auditors;
- evaluating the qualifications, independence and performance of our independent auditors;
- overseeing and monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters;
- approving the audit and non-audit services to be performed by our independent auditor;
- reviewing with the independent auditor the design, implementation, adequacy and effectiveness of our internal controls and our critical accounting policies; and
- preparing the report that the SEC requires in our annual proxy statement.

The Board of Directors has adopted an Audit Committee Charter and the Audit Committee reviews and reassesses the adequacy of the Charter on an annual basis. The Audit Committee members meet Nasdaq's financial literacy requirements and are independent under applicable SEC and Nasdaq rules, and the board has further determined that Mr. Hallren (i) is an "audit committee financial expert" as such term is defined in Item 407(d) of Regulation S-K promulgated by the SEC and (ii) also meets Nasdaq's financial sophistication requirements.

**Compensation Committee**

Messrs. Thomopoulos and Hallren serve on the Compensation Committee and are independent under the applicable SEC and Nasdaq rules. Our Compensation Committee's main functions are assisting our Board of Directors in discharging its responsibilities relating to the compensation of outside directors, the Chief Executive Officer and other executive officers, as well as administering any stock incentive plans, we may adopt. The Compensation Committee's responsibilities include the following:

- reviewing and recommending to our board of directors the compensation of our Chief Executive Officer and other executive officers, and the outside directors;
- conducting a performance review of our Chief Executive Officer;
- reviewing our compensation policies; and
- if required, preparing the report of the Compensation Committee for inclusion in our annual proxy statement.

The Board of Directors has adopted a Compensation Committee Charter and the Compensation Committee reviews and reassesses the adequacy of the Charter on an annual basis.

The Compensation Committee's policy is to offer our executive officers competitive compensation packages that will permit us to attract and retain highly qualified individuals and to motivate and reward these individuals in an appropriate fashion aligned with the long-term interests of our Company and our stockholders.

***Compensation Committee Risk Assessment.*** We have assessed our compensation programs and concluded that our compensation practices do not create risks that are reasonably likely to have a material adverse effect on us.

**Nominating Committee**

Ms. Segall serves on our Nominating Committee. The Nominating Committee's responsibilities include:

- identify qualified individuals to serve as members of the Company's board of directors;
- review the qualifications and performance of incumbent directors;
- review and consider candidates who may be suggested by any director or executive officer or by any stockholder of the Company;
- review considerations relating to board composition, including size of the board, term and age limits, and the criteria for membership on the board;

The Board of Directors has adopted a Nominating Committee Charter which the Nominating Committee reviews and reassesses the adequacy of the Charter on an annual basis.

**Item 11.        Executive Compensation**

**Executive Compensation**

The following table provides information regarding the total compensation for services rendered in all capacities that was earned during the fiscal year indicated by our named executive officers for fiscal year 2018 and 2017.

**Summary Compensation Table**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) (1) | Option Awards ($) (1) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Andy Heyward (2) | 2018 | 212,500 | – | – | – | – | 212,500 |
| Chief Executive Officer | 2017 | 200,000 | 500 | – | – | 140,000 | 340,500 |
| Robert L. Denton (3) | 2018 | 156,871 | – | – | 130,242 | 55,512 | 342,625 |
| Chief Financial Officer | 2017 | – | – | – | – | – | – |
| Gregory B. Payne (4) | 2018 | 221,059 | | – | – | – | 221,059 |
| Former Chief Operating Officer | 2017 | 225,000 | 500 | – | – | – | 225,500 |
| and Corporate Secretary | | | | | | | |
| Michael A. Jaffa (5) | 2018 | 159,375 | – | – | 155,517 | – | 314,892 |
| General Counsel | 2017 | – | – | – | – | – | – |
| and Corporate Secretary | | | | | | | |

(1)    The aggregate fair value of the stock awards and stock option awards on the date of grant was computed in accordance with FASB ASC Topic 718.

(2)    In association with the Merger,  Mr. Heyward was appointed Chief Executive Officer of the Company on November 15, 2013. Per his employment agreement, Mr. Heyward is entitled to an annual salary of $200,000. Mr. Heyward entered into a new five-year employment agreement on November 16, 2018. Under his new employment agreement, Mr. Heyward is entitled to an annual salary of $300,000.

On October 1, 2016, Llama Productions LLC entered into an animation production services agreement with Mr. Heyward for services as a producer for which he is to receive $186,000 through the course of production of the Company's animated series *Llama Llama.*

(3)   Effective April 18, 2018, the Company entered into an employment agreement with Mr. Denton, whereby Mr. Denton agreed to serve as the Company's Chief Financial Officer for a period of two years, with a mutual option for an additional one-year period, in consideration for an annual salary of $225,000. Mr. Denton received $5,550 for consulting services prior to becoming the CFO. Mr. Denton also received $49,962 in relocation expenses for his relocation from Salt Lake City Utah to Los Angeles California.

On September 26, 2018, the Company granted Mr. Denton 85,088 stock options with strike prices of $2.09, a term of five years, and vesting ranging from one to three years after the grant date anniversary.

(4)   In association with the Merger, Mr. Payne was appointed Corporate Secretary of the Company for which he is entitled to an annual salary of $175,000. Mr. Payne's annual compensation was increased to $190,000 on October 1, 2016. On July 13, 2017, the Company entered into an employment agreement with Mr. Payne, whereby Mr. Payne agreed to serve as the Company's Chief Operating Officer for a period of one year, with a mutual option for an additional one-year period, in consideration for an annual salary of $225,000.

On February 28, 2018, the Company entered into an agreement with Mr. Payne pursuant to which Mr. Payne and the Company agreed to the cessation of Mr. Payne's employment with the Company upon the earlier to occur of the following: (1) once Mr. Payne's replacement has been found, after a two-week transition period (the "Transition Period") or (2) May 31, 2018 (the "End Date"). The Agreement provides that until the end of the Transition Period, Mr. Payne shall receive his full salary and benefits and that upon the End Date, Mr. Payne shall be entitled to receive a payment equal to the greater of (1) 50% of his remaining current salary or (2) three months of his current salary, plus, in either case, payment of accrued vacation and California employee entitlements.

(5)   Effective April 16, 2018, the Company entered into an employment agreement with Mr. Jaffa, whereby Mr. Jaffa agreed to serve as the Company's General Counsel and Senior Vice President of Business Affairs for a period of year in consideration for an annual salary of $225,000. On June 7, 2018, Mr. Jaffa was elected as the Company's Corporate Secretary.

**Outstanding Equity Awards at Fiscal Year**

The following table sets forth outstanding stock option awards as of December 31, 2018 to each of the named executive officers. As of December 31, 2018, the Company has not granted any stock awards to its executive officers or any other employees other than Mr. Denton and Mr. Jaffa noted below.

| Name | Number of securities underlying unexercised options (#) exercisable | Number of securities underlying unexercised options (#) unexercisable | Equity incentive plan awards: Number of securities underlying unexercised unearned options (#) | | Option exercise price ($) | Option expiration date |
|---|---|---|---|---|---|---|
| Andy Heyward | 125,000 | – | – | $ | 6.00 | 12/14/20 |
| | 250,000 | – | – | $ | 9.00 | 12/14/20 |
| | 68,750 | – | – | $ | 12.00 | 12/14/20 |
| | 5,000 | – | – | $ | 2.82 | 10/18/20 |
| Gregory B. Payne | – | – | – | | – | – |
| Robert L. Denton (1) | | | 85,088 | $ | 2.09 | 9/25/2023 |
| Michael A. Jaffa (2) | | | 85,088 | $ | 2.09 | 9/25/2023 |

_____

(1)   Mr. Denton's options vest one third per year for three years.

(2)   Mr. Jaffa's options vest one third per year over three years.

**Retirement Benefits**

As of December 31, 2018, we did not provide any retirement plans to our executive officers or employees.

**Potential Payments upon Termination or Change-in-Control**

As of December 31, 2018, we did not provide for any potential payments upon termination or change of control except for those described in the employment agreements below.

**Narrative Disclosure to Summary Compensation Table**

On November 15, 2013, the Company entered into an employment agreement with Andy Heyward (the "Andy Heyward Employment Agreement"), whereby Mr. Heyward agreed to serve as the Company's Chief Executive Officer for a period of five years, subject to renewal, in consideration for an annual salary of $200,000. Additionally, under the terms of the Andy Heyward Employment Agreement, Mr. Heyward shall be eligible for an annual bonus if the Company meets certain criteria, as established by the Board of Directors. Mr. Heyward shall be entitled to reimbursement of reasonable expenses incurred in connection with his employment and the Company may take out and maintain during the term of his tenure a life insurance policy in the amount of $1,000,000. During the term of his employment and under the terms of the Andy Heyward Employment Agreement, Mr. Heyward shall be entitled to be designated as composer on all music contained in the programming produced by the Company and to receive composer's royalties from applicable performing rights societies.

On November 16, 2018, the Company entered into an amended and restated employment agreement with Andy Heyward (the "Andy Heyward Employment Agreement"), whereby Mr. Heyward agreed to serve as the Company's Chief Executive Officer for a period of five years, subject to renewal, in consideration for an annual salary of $300,000, and an award of 70,000 stock options. Mr. Heyward is also eligible to be paid a producing fee equal to $12,400 per half hour episode for each series produced, controlled and distributed by the Company, and for which he provides material production services provided as the executive producer. Additionally, under the terms of the Andy Heyward Employment Agreement, Mr. Heyward shall be eligible for an annual bonus if the Company meets certain criteria, as established by the Board of Directors. Mr. Heyward shall be entitled to reimbursement of reasonable expenses incurred in connection with his employment and the Company may take out and maintain during the term of his tenure a life insurance policy in the amount of $1,000,000. During the term of his employment and under the terms of the Andy Heyward Employment Agreement, Mr. Heyward shall be entitled to be designated as composer on all music contained in the programming produced by the Company and to receive composer's royalties from applicable performing rights societies. Upon a change in control or sale of the Company, or termination without cause or resignation with good cause, all of Mr. Heyward's options would vest on an accelerated basis. In the event of Mr. Heyward's death or resignation all compensation then currently due would be payable to his estate.

On July 13, 2017, the Company entered into an employment agreement with Gregory B. Payne (the "Gregory B. Payne Employment Agreement"), whereby Mr. Payne agreed to serve as the Company's Chief Operating Officer for a period of one year, with a mutual option for an additional one-year period, in consideration for an annual salary of $225,000. Under the terms of the Gregory B Payne Employment Agreement, Mr. Payne shall be entitled to an annual discretionary bonus based on his performance. Additionally, the Gregory B. Payne Employment Agreement may be terminated either (i) upon the end of the term, (ii) at any time by the Company for Cause (as defined in the Gregory B. Payne Employment Agreement) or (iii) upon an event of retirement, death or disability. Upon the termination or expiration of the Gregory B. Payne Employment Agreement and for a period of three years thereafter, certain amounts paid to Mr. Payne, including any discretionary bonus and stock based compensation, but excluding his base salary, reimbursement of certain expenses, and paid time off days, will be subject to the Company's clawback right upon the occurrence of certain events which are adverse to the Company. On February 28, 2018, the Company entered into an agreement with Mr. Payne pursuant to which Mr. Payne and the Company agreed to the cessation of Mr. Payne's employment with the Company upon the earlier to occur of the following: (1) once Mr. Payne's replacement has been found, after a two-week transition period (the "Transition Period") or (2) May 31, 2018 (the "End Date"). The Agreement provides that until the end of the Transition Period, Mr. Payne shall receive his full salary and benefits and that upon the End Date, Mr. Payne shall be entitled to receive a payment equal to the greater of (1) 50% of his remaining current salary or (2) three months of his current salary, plus, in either case, payment of accrued vacation and California employee entitlements. Mr. Payne left the Company at the end of April 2018.

On March 26, 2018, the Company entered into an agreement with Michael Jaffa in which Mr. Jaffa would assume the role of General Counsel and Senior Vice President of Business Affairs commencing on April 16, 2018. Mr. Jaffa will be entitled to be paid a salary at the annual rate of $225,000 per year. The term of the agreement is one year with a mutual option for two additional one-year periods. In addition, Mr. Jaffa will be entitled to receive a grant of stock options and an annual discretionary bonus based on his performance. In the event of Mr. Jaffa's death or resignation all compensation then currently due would be payable to his estate.

On March 30, 2018, the Company entered into an Employment Agreement with Robert Denton (the "Robert Denton Employment Agreement"), whereby Mr. Denton agreed to serve as the Company's Chief Financial Officer, effective as of April 18, 2018 for a period of two years with a mutual option for an additional one-year period, in consideration for an annual salary of $225,000. Under the terms of the Robert Denton Employment Agreement, Mr. Denton shall be entitled to an annual discretionary bonus based on his performance. The Robert Denton Employment Agreement may be terminated either (i) upon the end of the term, (ii) at any time by the Company for "Cause" (as defined in the Robert Denton Employment Agreement) or (iii) upon an event of retirement, death or disability. Upon the termination or expiration of Mr. Denton's employment with the Company and for a period of three years thereafter, certain amounts paid to Mr. Denton, including any discretionary bonus and stock based compensation, but excluding his base salary and reimbursement of certain expenses, will be subject to the Company's clawback right upon the occurrence of certain events which are adverse to the Company, including a restatement of financial statements. In the event of Mr. Denton's death or resignation all compensation then currently due would be payable to his estate.

**Director Compensation**

The following table sets forth with respect to the named directors, compensation information inclusive of equity awards and payments made for the year ended December 31, 2018 in the director's capacity as director.

| Name | Year | Fees Earned ($) (1) | Stock Awards ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Andy Heyward | 2018 | 15,000 | | | | 15,000 |
| Bernard Cahill | 2018 | 12,500 | | | | 12,500 |
| Joseph "Gray" Davis | 2018 | 20,000 | | | | 20,000 |
| P. Clark Hallren | 2018 | 20,000 | | | 10,000  (2) | 30,000 |
| Amy Moynihan Heyward | 2018 | 17,500 | | | | 17,500 |
| Margaret Loesch | 2018 | 15,000 | | | | 15,000 |
| Lynne Segall | 2018 | 15,000 | | | | 15,000 |
| Anthony Thomopoulos | 2018 | 20,000 | | | | 20,000 |

_____

(1)  Directors earn $5,000 for each meeting attended physically, $2,500 per meeting for each meeting attended telephonically, and nothing for non-attendance. These cash payments are paid to the Board member at the subsequent board meeting.

(2)  On October 4, 2018, Mr. Hallren received $10,000 for consulting services provided to the Company.

**Item 12.      Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The following table shows the beneficial ownership of shares of our $0.001 par value common stock as of March 29, 2019 known by us through transfer agent and other records held by: (i) each person who beneficially owns 5% or more of the shares of common stock then outstanding; (ii) each of our directors; (iii) each of our named executive officers; and (iv) all of our current directors and executive officers as a group.

38

The information in this table reflects "beneficial ownership" as defined in Rule 13d-3 of the Exchange Act. To our knowledge and unless otherwise indicated, each stockholder has sole voting power and investment power over the shares listed as beneficially owned by such stockholder, subject to community property laws where applicable. Percentage ownership is based on 10,432,718 shares of common stock outstanding as of March 29, 2019. Unless otherwise indicated in the footnotes to the following table, each person named in the table has sole voting and investment power and that person's address is c/o 8383 Wilshire Blvd. Suite 412, Beverly Hills, CA 90211.

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | | Percent of Class (1) |
|---|---|---|---|
| **Directors and Named Executive Officers** | | | |
| Andy Heyward | 2,031,786 | (2) | 18.31% |
| Amy Moynihan Heyward | 448,750 | (3) | * |
| Gregory B. Payne | – | | – |
| Robert L. Denton | 28,363 | (13) | * |
| Michael Klein | 76,020 | (19) | * |
| Bernard Cahill | 29,230 | (4) | * |
| Joseph "Gray" Davis | 11,251 | (5) | * |
| P. Clark Hallren | 11,251 | (5) | * |
| Michael Jaffa | 28,363 | (14) | * |
| Margaret Loesch | 11,251 | (5) | * |
| Lynne Segall | 11,251 | (5) | * |
| Anthony Thomopoulos | 11,366 | (6) | * |
| All current executive officers and directors as a group (consisting of 10 persons) | 2,250,122 | | 20.02% |
| **5% Stockholders** | | | |
| A Squared Holdings LLC | 990,728 | | 9.50% |
| Bard Associates, Inc. (7) | 949,949 | (8) | 6.23% |
| Brio Capital Management LLC (9) | 870,914 | (10) | 7.96% |
| Anson Investments Master Fund, LP (11) | 1,065,894 | (12) | 9.9% |
| HBA Entertainment Trade Co. Limited (15) | 643,302 | (16) | 6.17% |
| Iroquois Capital Management LLC and related entities (17) | 936,094 | (18) | 8.31% |

_____

* Indicates ownership less than 1%

(1) Applicable percentage ownership is based on 10,432,718 shares of common stock outstanding as of March 29, 2019, together with securities exercisable or convertible into shares of common stock within 60 days of March 29, 2019. Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities. Shares of common stock that a person has the right to acquire beneficial ownership of upon the exercise or conversion of options, convertible stock, warrants or other securities that are currently exercisable or convertible or that will become exercisable or convertible within 60 days of March 29, 2019 are deemed to be beneficially owned by the person holding such securities for the purpose of computing the number of shares beneficially owned and percentage of ownership of such person, but are not treated as outstanding for the purpose of computing the percentage ownership of any other person.

(2) Consists of (i) 990,728 shares of common stock held by A Squared Holdings LLC over which Andy Heyward holds sole voting and dispositive power; (ii) 47,170 shares of common stock issuable upon conversion of 100 shares of the Company's Series A Convertible Preferred Stock; (iii) 377,237 shares of common stock held by Andy Heyward; (iv) 1,234 shares held by Heyward Living Trust; (v) 166,667 shares issuable upon exercise of warrants held by Andy Heyward; (vi) 448,750 shares of common stock issuable now or within 60 days of March 29, 2018, upon the exercise of stock options granted to Andy Heyward.

(3) Consists of 448,750 shares of common stock issuable now or within 60 days of March 29, 2019, upon the exercise of stock options granted to Amy Moynihan Heyward.

(4) Includes (i) 13,812 shares of common stock owned directly by Bernard Cahill; (ii) 4,167 shares of common stock owned by Mr. Cahill's spouse, and (iii) 11,251 shares of common stock issuable now or within 60 days of March 29, 2018 upon the exercise of stock options granted to Mr. Cahill.

(5) Consists of 11,251 shares of common stock issuable now or within 60 days of March 29, 2018 upon the exercise of stock options granted.

(6) Consists of (i) 115 shares of common stock and (ii) 11,251 shares of common stock issuable now or within 60 days of March 30, 2018 upon the exercise of stock options granted to Mr. Thomopoulos.

(7) The address of this beneficial owner is 135 South LaSalle Street, Suite 3700, Chicago, Illinois 60603. Bard Associates, Inc. has the sole voting and dispositive power over the shares. This beneficial owner acts as an investment adviser in accordance with Section 340.13d-1(b) (1)(ii)(E).

(8) Consists of (i) 649,935 shares of common stock and (ii) 300,014 shares issuable upon exercise of warrants. The warrants may not be exercised to the extent that the holder or any of its affiliates would own more than 4.99% of the outstanding common stock of the Company after such exercise. The number of shares deemed beneficially owned is limited accordingly.

(9) The address of this beneficial owner is 100 Merrick Road, Suite, 401 W. Rockville Center, NY 11570. Brio Capital Master Fund Ltd. has sole voting and dispositive power over the shares.

(10) Includes shares of common stock, shares of common stock issuable upon conversion of Series A Convertible Preferred Stock, and shares of common stock issuable upon exercise of certain warrants held by Brio Capital Master Fund Ltd. This stockholder owns 300 shares of the Company's Series A Convertible Preferred Stock which are convertible into 141,509 shares of common stock, 200,000 shares upon the conversion of the $500,000 of Senior Convertible Notes as well as warrants which are exercisable into 671,766 shares of common stock. The Series A Convertible Preferred Stock and the Senior Convertible Notes may not be converted to the extent that the holder or any of its affiliates would own more than 9.99% of the outstanding common stock of the Company after such conversion, and the Series A Convertible Preferred Stock may not be voted to the extent that the holder or any of its affiliates would control more than 9.99% of the voting power of the Issuer. The number of shares deemed beneficially is limited accordingly. The warrants may not be exercised to the extent that the holder or any of its affiliates would own more than 4.99% of the outstanding common stock of the Company after such exercise. The number of shares deemed beneficially owned is limited accordingly.

(11) The address of this beneficial owner is 155 University Avenue, Suite 207, Toronto, Ontario, Canada, M5H 3B7. Anson Investments Master Fund LP has sole voting and dispositive power over the shares.

(12) Includes 945,894 shares of common stock and 720,000 shares of common stock issuable upon the conversion of $1,800,000 of Senior Convertible Notes and 3,840,147 shares of common stock issuable upon exercise of certain warrants held by Anson Investments Master Fund, LP. the Convertible Notes may not be converted to the extent that the holder or any of its affiliates would own more than 9.99% of the outstanding common stock of the Company after such conversion. The warrants may not be exercised to the extent that the holder or any of its affiliates would own more than 4.99% of the outstanding common stock of the Company after such exercise. The number of shares deemed beneficially owned is limited accordingly.

40

(13) Consists of 28,363 shares of common stock issuable upon exercise of stock options granted to Mr. Denton on June 7, 2018.

(14) Consists of 28,363 shares of common stock issuable upon exercise of stock options granted to Mr. Jaffa on June 7, 2018.

(15) The address of this beneficial owner is No. 6 A, Building 45 Mei Zhi Guo Garden, Suzhou, Jiangsu, China HBA Entertainment Trade Co., Limited George Yu has the sole voting and dispositive power over the shares.

(16) Consists of shares of common stock.

(17) The address of this beneficial owner is 205 East 42nd Street, 20th Floor, New York, New York 10017. Based on the Schedule 13G jointly filed with the SEC by Iroquois Capital Management L.L.C. ("Iroquois"), Richard Abbe and Kimberly Page on February 14, 2019.

(18) Consists of (i) 102,886 shares of common stock, (ii) 113,208 shares of common stock issuable upon conversion of 240 shares of Series A Convertible Preferred Stock, (iii) 280,000 shares of common stock issuable upon the conversion of $700,000 of Senior Secured Convertible Notes and (iv) 908,472 shares of common stock issuable upon the exercise of certain warrants. The Series A Convertible Preferred Stock and the Senior Secured Convertible Notes may not be converted to the extent that the holder or any of its affiliates would own more than 9.99% of the outstanding common stock of the Company after such conversion. The Series A Convertible Preferred Stock may not be voted to the extent that the holder or any of its affiliates would control more than 9.99% of the voting power of the Issuer. The number of shares deemed beneficially is limited accordingly. The warrants may not be exercised to the extent that the holder or any of its affiliates would own more than 4.99% of the outstanding common stock of the Company after such exercise. The number of shares deemed beneficially owned is limited accordingly.

(19) Consists of 55,000 shares of common stock and 21,020 shares of common stock issuable upon exercise of certain warrants.

**Item 13.    Certain Relationships and Related Transactions, and Director Independence**

**Certain Relationships and Related Party Transactions**

Commission regulations define the related person transactions that require disclosure to include any transaction, arrangement or relationship in which the amount involved exceeds the lesser of $120,000 or 1% of the average of our total assets at year-end for the last two completed fiscal years in which we were or are to be a participant and in which a related person had or will have a direct or indirect material interest. A related person is: (i) an executive officer, director or director nominee of the Company, (ii) a beneficial owner of more than 5% of our common stock, (iii) an immediate family member of an executive officer, director or director nominee or beneficial owner of more than 5% of our common stock, or (iv) any entity that is owned or controlled by any of the foregoing persons or in which any of the foregoing persons has a substantial ownership interest or control. Described below are certain transactions or relationships between us and certain related persons.

On April 21, 2016, the Company entered into a merchandising and licensing agreement with Andy Heyward Animation Art ("AHAA"), whose principal is Andy Heyward, the Company's Chief Executive Officer. The Company entered into a customary merchandise license agreement with AHAA for the use of characters and logos related to Warren Buffett's *Secret Millionaires Club* and *Stan Lee's Mighty 7* in connection with certain products to be sold by AHAA. The terms and conditions of such license are customary within the industry, and the Company earns an arm-length industry standard royalty on all sales made by AHAA utilizing the licensed content. No amounts were earned during the year ended December 31, 2018, under this agreement.

On July 25, 2016, the Company entered into a consulting agreement with Foothill Entertainment, Inc. ("Foothill"), an entity whose Chairman is Gregory Payne, our former corporate secretary. The Company has engaged Foothill Entertainment, Inc. for a term of six months to assist in the distribution and commercial exploitation of its audiovisual content as well as for the preparation and attendance on behalf of the Company at the MIPJR and MIPCOM markets in Cannes. Foothill receives $12,500 per month for these services. This agreement was extended on a month to month basis through and terminated on January 31, 2018. As of March 31, 2018, Foothill owed the Company $17,784 that Foothill collected on the Company's behalf for a content license. Greg Payne owed the Company $2,939 for expenses. These amounts were repaid on April 30, 2018.

41

On October 1, 2016, Llama Productions LLC entered into an animation production services agreement with Mr. Heyward for services as a producer for which he is to receive $186,000 through the course of production of the Company's animated series *Llama Llama.* From October 1, 2016 through December 31, 2017, Mr. Heyward has been paid $186,000. No amounts were paid during the year ended December 31, 2018 under this agreement.

As of December 31, 2017, Gregory B. Payne, individually and via his ownership position in Foothill, owed to the Company $5,558 for expenditures made during the fourth quarter of 2017 related to the Brand Licensing Europe ("BLE") and MIPCOM tradeshows. In addition, during the fourth quarter of 2017, Foothill acted as an agent on the Company's behalf in licensing certain of our animated programs to certain broadcast networks for which Foothill owed to the Company $7,517 in license fees to be paid by the broadcaster to Foothill. Subsequent to the end of the period, the Company received a payment of $7,517 from Foothill as satisfaction of the open licensing invoice. Additionally, on February 28, 2018, Mr. Payne and the Company entered into an agreement whereby, among other things, Mr. Payne was entitled to be reimbursed for 100% of his expenses incurred at the BLE and MIPCOM tradeshows resulting in the Company owning to Mr. Payne $827. As of December 31, 2018, Gregory B. Payne, no amounts are due to or from Mr. Payne or Foothill.

On August 31, 2018 Llama Productions LLC entered into an animation production services agreement with Mr. Heyward for services as a producer for which he is to receive $124,000 through the course of production of the Company's animated series *Llama Llama. Season 2.* As of December 31, 2018 Mr., Heyward is owed $43,510, which is included in the Due To Related Party line item in our consolidated balance sheet.

Pursuant to his employment agreement dated November 16, 2018, Mr. Heyward is entitled to an Executive Producer fee of $12,400 per half hour episode for each episode her provides services as an executive producer. The first identified series under this employment agreement is *Rainbow Rangers.* As of December 31, 2018, nineteen half hours had been delivered and accordingly Mr. Heyward is owed $235,600, which is included in the Due To Related Party line item in our consolidated balance sheet.

Except as otherwise indicated herein, there have been no other related party transactions, or any other transactions or relationships required to be disclosed pursuant to Item 404 and Item 407(a) of Regulation S-K.

**Review, Approval or Ratification of Transactions with Related Persons**

Pursuant to the written charter of our Audit Committee, the Audit Committee is responsible for reviewing and approving all transactions both in which (i) we are participant and (ii) any parties related to us, including our executive officers, our directors, beneficial owners of more than 5% of our securities, immediate family members of the foregoing persons and any other persons who our Board of Directors determines may be considered related parties under Item 404 of Regulation S-K, has or will have a direct or indirect material interest. All the transactions described in this section occurred prior to the adoption of the Audit Committee's charter.

**Independence of the Board of Directors**

Our determination of the independence of our directors is made using the definition of "independent" contained in the listing standards of the Nasdaq Capital Market. On the basis of information solicited from each director, the board has determined that each of each of Messrs. Cahill, Davis, Hallren, Klein and Thomopoulos as well as Ms. Segall and Ms. Loesch are independent directors within the meaning of such rules.

**Item 14.        Principal Accounting Fees and Services**
**Principal Accountant Fees and Services**
The following table sets forth fees billed to us by our independent registered public accounting firm for the years ended December 31, 2018 and 2017 for (i) services rendered for the audit of our annual financial statements and the review of our quarterly financial statements, (ii) services rendered that are reasonably related to the performance of the audit or review of our financial statements that are not reported as Audit Fees, and (iii) services rendered in connection with tax preparation, compliance, advice and assistance.

|  | 2018 | | 2017 |
|---|---|---|---|
| Audit Fees | $ | 95,000 | $ | 74,000 |
| Audit-Related Fees | | – | | 7,500 |
| Tax Fees | | 13,501 | | 7,000 |
| Other Fees | | – | | 18,768 |
| **Total Fees** | **$** | **108,501** | **$** | **107,268** |

Our policy is to pre-approve all audit and permissible non-audit services performed by the independent registered public accounting firm. These services may include audit services, audit-related services, tax services and other services, as follows:

- *Audit* services include audit work performed in the preparation of financial statements, as well as work that generally only the independent auditor can reasonably be expected to provide, including comfort letters, statutory audits, and attest services and consultation regarding financial accounting and/or reporting standards.
- *Audit-Related* services are for assurance and related services that are traditionally performed by the independent auditor, including due diligence related to mergers and acquisitions, employee benefit plan audits, and special procedures required to meet certain regulatory requirements.
- *Tax* services include all services performed by the independent auditor's tax personnel except those services specifically related to the audit of the financial statements, and includes fees in the areas of tax compliance, tax planning, and tax advice.
- *Other Fees* are those associated with services not captured in the other categories. The Company generally does not request such services from the independent auditor.

Under our policy, pre-approval is generally provided for particular services or categories of services, including planned services, project-based services and routine consultations. In addition, the Board of Directors may also pre-approve particular services on a case-by-case basis. Our Board of Directors approved all services that our independent registered public accounting firm provided to us in the past two fiscal years.

**PART IV**

**Item 15.        Exhibits, Financial Statement Schedules**

**Financial Statements**

See Index to Consolidated Financial Statements at Item 8 herein.

Financial Statement Schedules have been omitted as they are either not required, not applicable, or the information is otherwise included.

**EXHIBIT INDEX**

| | |
|---|---|
| 2.1 | Agreement and Plan of Reorganization between Genius Brands International, Inc., A Squared Entertainment LLC, A Squared Holdings LLC and A2E Acquisition LLC dated November 15, 2013 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 20, 2013) |
| 3.1 | Articles of Incorporation of Genius Brands International Inc., as amended (Incorporated by reference to the Company's Current Report on Form 8-K, filed with the SEC on December 2, 2011) |
| 3.2 | Bylaws of Genius Brands International, Inc., as amended (Incorporated by reference to the Company's Current Report on Form 8-K, filed with the SEC on October 21, 2011) |
| 4.1 | Form of Placement Agent Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 19, 2014) |
| 4.2 | Form of Warrant (November 2015) (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 4, 2015) |
| 4.3 | Form of Subordinated Indenture  (Incorporated by reference from Registration Statement on Form S-3 filed with the SEC on November 25, 2016) |
| 4.4 | Form of Reload Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 13, 2017) |
| 4.5 | Form of Market Price Warrant  (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 13, 2017) |
| 4.6 | Form of Investor Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on October 3, 2017) |
| 4.7 | Form of Investor Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on January 8, 2018) |
| 4.8 | Form of Secured Convertible Note (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on August 17, 2018) |
| 4.9 | Form of Common Stock Purchase Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on August 17, 2018) |
| 4.10 | Form of Registered Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2019) |
| 4.11 | Form of Private Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2019) |
| 4.12 | Form of Waiver Warrant (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 15, 2019) |
| 10.1† | 2008 Stock Option Plan (Incorporated by reference from Registration Statement on Form 10 filed with the SEC on May 4, 2011) |
| 10.2† | First Amendment to 2008 Stock Option Plan (Incorporated by reference from Registration Statement on Form 10 filed with the SEC on May 4, 2011) |
| 10.3† | Second Amendment to 2008 Stock Option Plan (Incorporated by reference from Registration Statement on Form 10 filed with the SEC on May 4, 2011) |
| 10.4† | Form of Stock Option Grant Notice (Incorporated by reference from Registration Statement on Form 10 filed with the SEC on May 4, 2011) |
| 10.5 | Form of Registration Rights Agreement between Genius Brands International, Inc. and the Investors signatory thereto (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 20, 2013) |
| 10.6† | Employment Agreement dated November 15, 2013 between Genius Brands International, Inc. and Andrew Heyward (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 20, 2013) |
| 10.7 | Engagement Letter dated November 15, 2013 between Genius Brands International, Inc. and ROAR LLC (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 20, 2013) |
| 10.8 | Form of Securities Purchase Agreement (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 19, 2014) |

44

| | |
|---|---|
| 10.9 | Form of Registration Rights Agreement (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on May 19, 2014) |
| 10.10† | Genius Brands International, Inc. 2015 Incentive Plan, as amended (Incorporated by reference to the Company's Quarterly Report on Form 10-Q filed on November 14, 2017) |
| 10.11 | Form of Securities Purchase Agreement (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 4, 2015) |
| 10.12 | Form of Registration Rights Agreement (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 4, 2015) |
| 10.13 | Loan and Security Agreement dated August 5, 2016 between Genius Brands International, Inc. and Llama Productions LLC (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on August 12, 2016) |
| 10.14 | Subscription Agreement dated January 17, 2017 between Genius Brands International, Inc. and Sony DADC USA, Inc. (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on January 17, 2017) |
| 10.15 | Form of Warrant Exercise Agreement dated February 9, 2017 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on February 10, 2017) |
| 10.16 | Securities Purchase Agreement dated October 3, 2017 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on October 3, 2017) |
| 10.17 | Securities Purchase Agreement dated January 8, 2018 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on January 8, 2018) |
| 10.18† | Employment Agreement dated April 18, 2018 between Genius Brands International, Inc. and Robert Denton (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on April 5, 2018) |
| 10.19 | Securities Purchase Agreement dated August 17, 2018 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on August 17, 2018) |
| 10.20 | Registration Rights Agreement dated August 17, 2018 (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on August 17, 2018) |
| 10.21 | Loan and Security Agreement dated September 28, 2018, by and between Llama Productions LLC and Bank Leumi USA (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on October 4, 2018) |
| 10.22 | Amendment No. 2 to Loan and Security Agreement, effective as of August 27, 2018, by and between Llama Productions LLC and Bank Leumi USA (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on October 4, 2018) |
| 10.23 | Amended and Restated Employment Agreement dated November 16, 2018 between Genius Brands International, Inc. and Andrew Heyward (Incorporated by reference to the Company's Current Report on Form 8-K filed with the SEC on November 19, 2018) |
| 10.24* | Employment Agreement dated April 16, 2018 between Genius Brands International, Inc. and Michael Jaffa |
| 21.1* | List of Subsidiaries |
| 23.1* | Consent of Squar Milner LLP |
| 31.1* | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 |
| 31.2* | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes Oxley Act of 2002 |
| 32.1* | Certification of the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2* | Certification of the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Schema Document |
| 101.CAL* | XBRL Calculation Linkbase Document |
| 101.DEF* | XBRL Definition Linkbase Document |
| 101.LAB* | XBRL Label Linkbase Document |
| 101.PRE* | XBRL Presentation Linkbase Document |

_____

| | |
|---|---|
| * | Filed herewith. |
| &dagger; | Management contract or compensatory plan or arrangement. |

**Item 16.**     **Form 10-K Summary**

None

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  | Genius Brands International, Inc. |
|---|---|---|
| April 1, 2019 | By: | /s/ Andy Heyward |
|  |  | Andy Heyward |
|  |  | Chief Executive Officer (Principal Executive Officer) |
| April 1, 2019 |  | /s/ Robert L. Denton |
|  |  | Robert L. Denton |
|  |  | Chief Financial Officer (Principal Financial and Accounting Officer) |

46

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Andy Heyward and Robert L. Denton, jointly and severally, attorney-in-fact, with the power of substitution in any and all capacities, to sign any amendments to this Annual Report on Form 10-K and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorney-in-fact, or substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | |
|---|---|
| /s/ Andy Heyward | April 1, 2019 |
| Andy Heyward | |
| Chief Executive Officer (Principal Executive Officer) | |
| /s/Robert L. Denton | April 1, 2019 |
| Robert L. Denton | |
| Chief Financial Officer (Principal Financial and Accounting Officer) | |
| /s/ Michael Klein | April 1, 2019 |
| Michael Klein | |
| Director | |
| /s/ Bernard Cahill | April 1, 2019 |
| Bernard Cahill | |
| Director | |
| /s/ Joseph "Gray" Davis | April 1, 2019 |
| Joseph "Gray" Davis | |
| Director | |
| /s/ P. Clark Hallren | April 1, 2019 |
| P. Clark Hallren | |
| Director | |
| /s/ Lynne Segall | April 1, 2019 |
| Lynne Segall | |
| Director | |
| /s/ Anthony Thomopoulos | April 1, 2019 |
| Anthony Thomopoulos | |
| Director | |
| /s/ Margaret Loesch | April 1, 2019 |
| Margaret Loesch | |
| Director | |

47

**GENIUS BRANDS INTERNATIONAL, INC.**
**INDEX TO FINANCIAL STATEMENTS**

|  | Page No. |
|---|---|
| **Audited Financial Statements for the Year Ended December 31, 2018 and 2017** | |
| REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | F-2 |
| CONSOLIDATED FINANCIAL STATEMENTS | |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Statements of Comprehensive Loss | F-5 |
| Consolidated Statements of Stockholders' Equity | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |

F-1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Stockholders and the Board of Directors of Genius Brands International, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Genius Brands International, Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, the related consolidated statements of operations, comprehensive loss, stockholders' equity and cash flows for the years then ended, and the related notes to the consolidated financial statements (collectively, the &l

dquo;financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

**Going Concern Uncertainty**

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company has suffered rec

urring losses, negative cash flows from operations and has an accumulated deficit that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States of America) ("PCAOB") and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Squar Milner LLP

We have served as the Company's auditor since 2016.

Los Angeles, California

April 1, 2019

**Genius Brands International, Inc. And Subsidiaries**
**Consolidated Balance Sheets**
**As of December 31, 2018, and December 31, 2017**

| | | December 31, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets:** | | | | |
| Cash and Cash Equivalents | $ | 2,684,483 | $ | 6,929,399 |
| Restricted Cash | | 400,543 | | 568,673 |
| Accounts Receivable, net | | 2,160,296 | | 2,893,902 |
| Other Receivable | | 20,902 | | 160,545 |
| Inventory, net | | 15,816 | | 17,589 |
| Prepaid and Other Assets | | 297,542 | | 264,818 |
| Total Current Assets | | 5,579,582 | | 10,834,926 |
| Property and Equipment, net | | 75,634 | | 94,666 |
| Accounts Receivable | | – | | 1,687,500 |
| Other Receivable | | – | | 96,327 |
| Film and Television Costs, net | | 8,166,131 | | 2,777,088 |
| Lease Deposits | | 325,000 | | – |
| Intangible Assets, net | | 89,988 | | 1,856,280 |
| Goodwill | | 10,365,806 | | 10,365,805 |
| **Total Assets** | $ | **24,602,141** | $ | **27,712,592** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current Liabilities: | | | | |
| Accounts Payable | $ | 694,740 | $ | 453,201 |
| Accrued Expenses | | 52,865 | | 1,020,457 |
| Participations Payable | | 669,380 | | 697,513 |
| Deferred Revenue | | 874,503 | | 453,927 |
| Senior Secured Convertible Notes, net | | 1,831,847 | | – |
| Due To Related Parties | | 346,759 | | – |
| Accrued Salaries and Wages | | 137,825 | | 168,549 |
| Total Current Liabilities | | 4,607,919 | | 2,793,647 |
| Long Term Liabilities: | | | | |
| Deferred Revenue | | 4,051,253 | | 4,631,456 |
| Production Facility, net | | 2,178,198 | | 4,322,643 |
| Disputed Trade Payable | | 925,000 | | 925,000 |
| **Total Liabilities** | | **11,762,370** | | **12,672,746** |
| Stockholders' Equity | | | | |
| Preferred Stock, $0.001 par value, 10,000,000 shares authorized, respectively; 2,120 and 3,530 shares issued and outstanding, respectively | | 2 | | 4 |
| Common Stock, $0.001 par value, 233,333,334 shares authorized, respectively; 9,457,859 and 7,610,794 shares issued and outstanding, respectively | | 9,458 | | 7,611 |
| Additional Paid in Capital | | 63,537,915 | | 56,588,846 |
| Accumulated Deficit | | (50,702,486) | | (41,551,497) |
| Accumulated Other Comprehensive Loss | | (5,118) | | (5,118) |
| Total Equity | | 12,839,771 | | 15,039,846 |
| **Total Liabilities and Stockholders' Equity** | $ | **24,602,141** | $ | **27,712,592** |

The accompanying notes are an integral part of these financial statements.

F-3

**Genius Brands International, Inc. And Subsidiaries**
**Consolidated Statements of Operations**
**Years Ended December 31, 2018 and 2017**

|  | Twelve Months Ended | |
|---|---|---|
|  | December 31, 2018 | December 31, 2017 |
| Revenues: | | |
| Licensing & Royalties | $ 449,385 | $ 472,134 |
| Television & Home Entertainment | 323,709 | 4,815,491 |
| Advertising Sales | 217,999 | 38,779 |
| Product Sales | 2,359 | 9,324 |
| Total Revenues | 993,452 | 5,335,728 |
| Operating Expenses: | | |
| Marketing and Sales | 738,122 | 662,373 |
| Direct Operating Costs | 1,536,722 | 4,257,427 |
| General and Administrative | 4,982,779 | 5,329,718 |
| Impairment Loss | 1,740,000 | – |
| Total Operating Expenses | 8,997,623 | 10,249,518 |
| Loss from Operations | (8,004,171) | (4,913,790) |
| Other Income (Expense): | | |
| Other Income | 19,646 | 8,281 |
| Interest Expense | (1,019,376) | (3,227) |
| Net Other Income (Expense) | (999,730) | 5,054 |
| Loss before Income Tax Expense | (9,003,901) | (4,908,736) |
| Income Tax Expense | – | – |
| Net Loss | (9,003,901) | (4,908,736) |
| Beneficial Conversion Feature on Preferred Stock | (353,333) | – |
| Net Loss Applicable to Common Shareholders | $ (9,357,234) | $ (4,908,736) |
| Net Loss per Common Share (Basic And Diluted) | $ (1.07) | $ (0.81) |
| Weighted Average Shares Outstanding (Basic and Diluted) | 8,758,694 | 6,084,732 |

The accompanying notes are an integral part of these financial statements.

F-4

**Genius Brands International, Inc. And Subsidiaries**
**Consolidated Statements of Comprehensive Loss**
**Years Ended December 31, 2018 and 2017**

| | Twelve Months Ended | |
| --- | --- | --- |
| | December 31, 2018 | December 31, 2017 |
| Net Loss | $ (9,003,901) | $ (4,908,736) |
| Beneficial Conversion Feature on Preferred Stock | (353,333) | – |
| Other Comprehensive Loss, Net of Tax: | – | (2,360) |
| Comprehensive Net Loss to Common Shareholders | $ (9,357,234) | $ (4,911,096) |

The accompanying notes are an integral part of these financial statements.

F-5

**Genius Brands International, Inc. And Subsidiaries**
**Consolidated Statements of Stockholders' Equity**
**Years Ended December 31, 2018 and 2017**

| | Common Stock | | Preferred Stock | | Additional Paid-In Capital | Accumulated Deficit | Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| **Balance, December 31, 2016** | 4,010,649 | $ 4,011 | 4,895 | $ 5 | $46,697,029 | $ (36,642,761) | $ (2,758) | $10,055,526 |
| Issuance of Common Stock in Warrant Exchange, net | 1,171,689 | 1,172 | – | – | 3,400,752 | – | – | 3,401,924 |
| Issuance of Common Stock in Registered Direct Offering, net | 1,647,691 | 1,648 | – | – | 5,697,886 | – | – | 5,699,534 |
| Conversion of Preferred Shares | 455,000 | 455 | (1,365) | (1) | (454) | – | – | |
| Issuance of Common Stock for Services | 24,534 | 24 | – | – | 129,976 | – | – | 130,000 |
| Issuance of Common Shares for Debt Extinguishment | 301,231 | 301 | – | – | (301) | – | – | – |
| Share Based Compensation | – | – | – | – | 663,958 | – | – | 663,958 |
| Net Loss | – | – | – | – | – | (4,908,736) | – | (4,908,736) |
| Comprehensive Loss | – | – | – | – | – | – | (2,360) | (2,360) |
| **Balance, December 31, 2017** | **7,610,794** | **7,611** | **3,530** | **4** | **56,588,846** | **(41,551,497)** | **(5,118)** | **15,039,846** |
| Cumulative effect of adoption ASC 606 | – | – | – | – | – | 206,245 | – | 206,245 |
| Issuance of Common Stock in Registered Direct Offering, net | 592,000 | 592 | – | – | 1,595,749 | – | – | 1,596,341 |
| Conversion of Preferred Shares | 470,001 | 470 | (1,410) | (2) | (469) | – | – | – |
| Issuance of Common Stock for Services | 785,064 | 785 | – | – | 1,984,822 | – | – | 1,985,607 |
| Share Based Compensation | – | – | – | – | (16,588) | – | – | (16,588) |
| Value of Beneficial Conversion Feature | – | – | – | – | 353,333 | (353,333) | – | – |
| Value of Beneficial Conversion Feature on Secured Convertible Notes | – | – | – | – | 1,561,111 | – | – | 1,561,111 |
| Discount on Senior Secured Notes | – | – | – | – | 1,471,111 | – | – | 1,471,111 |
| Net Loss | – | – | – | – | – | (9,003,901) | – | (9,003,901) |
| **Balance, December 31, 2018** | **9,457,859** | **$ 9,458** | **2,120** | **$ 2** | **$63,537,915** | **$ (50,702,486)** | **$ (5,118)** | **$12,839,771** |

The accompanying notes are an integral part of these financial statements.

F-6

**Genius Brands International, Inc. And Subsidiaries**
**Consolidated Statements of Cash Flows**
**Years Ended December 31, 2018 and 2017**

| | December 31, 2018 | | December 31, 2017 | |
|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | |
| Net Loss | $ | (9,003,901) | $ | (4,908,736) |
| Adjustments to Reconcile Net Loss to Net Cash Used in Operating Activities: | | | | |
| Amortization of Film and Television Costs | | 1,079,723 | | 2,534,835 |
| Depreciation and Amortization Expense | | 88,309 | | 125,918 |
| Accretion of Discount on Preferred Convertible Notes | | 678,015 | | – |
| Bad Debt Expense | | 2,400 | | 66,502 |
| Stock Issued for Services | | 322,605 | | 130,000 |
| Stock Compensation Expense | | (16,588) | | 663,958 |
| Loss on Impairment of Assets | | 1,740,000 | | – |
| Decrease (Increase) in Operating Assets: | | | | |
| Accounts Receivable, net | | 2,418,706 | | (4,527,354) |
| Other Receivable | | 235,970 | | (256,872) |
| Inventory, net | | 1,773 | | (11,027) |
| Prepaid Expenses & Other Assets | | (18,049) | | 94,577 |
| Lease Deposits | | (325,000) | | – |
| Film and Television Costs, net | | (5,025,236) | | (2,825,426) |
| Increase (Decrease) in Operating Liabilities: | | | | |
| Accounts Payable | | 241,537 | | (266,645) |
| Accrued Salaries and Wages | | (30,724) | | 35,722 |
| Deferred Revenue | | 249,524 | | 489,189 |
| Participations Payable | | (28,133) | | – |
| Due To Related Parties | | 346,759 | | – |
| Disputed Trade Payable - Long Term | | – | | – |
| Accrued Expenses | | (965,700) | | 1,468,489 |
| Net Cash Used in Operating Activities | | (8,008,010) | | (7,186,870) |
| **Cash Flows from Investing Activities:** | | | | |
| Investment in Intangible Assets, net | | (21,358) | | (44,793) |
| Investment in Property and Equipment, net | | (21,627) | | (62,400) |
| Net Cash Used in Investing Activities | | (42,985) | | (107,193) |
| **Cash Flows from Financing Activities:** | | | | |
| Proceeds from Warrant Exchange, Net | | – | | 3,401,924 |
| Proceeds from Sale of Common Stock, Net | | 1,596,340 | | 5,699,534 |
| Proceeds from Senior Secured Convertible Notes, net | | 4,186,054 | | – |
| Repayment of Production Facility, Net | | (2,144,445) | | 2,802,756 |
| Net Cash Provided by Financing Activities | | 3,637,949 | | 11,904,214 |
| Net (Decrease) Increase in Cash, Cash Equivalents, and Restricted Cash | | (4,413,046) | | 4,610,151 |
| Beginning Cash, Cash Equivalents, and Restricted Cash | | 7,498,072 | | 2,887,921 |
| **Ending Cash, Cash Equivalents, and Restricted Cash** | **$** | **3,085,026** | **$** | **7,498,072** |
| Supplemental Disclosures of Cash Flow Information: | | | | |
| Cash Paid for Interest | $ | 271,244 | $ | 3,227 |
| Schedule of Non-Cash Financing and Investing Activities | | | | |
| Issuance of Common Stock for services rendered | $ | 1,985,607 | $ | – |
| Issuance of Common Stock in Relation to Sony Transaction | $ | – | $ | 1,489,583 |
| Beneficial Conversion Feature | $ | 353,333 | $ | 0 |

The accompanying notes are an integral part of these financial statements.

F-7

**Genius Brands International, Inc. And Subsidiaries**

**Notes to Consolidated Financial Statements**

**December 31, 2018**

**Note 1: Organization and Business**

*Organization and Nature of Business*

Genius Brands International, Inc. ("we," "us," "our," or the "Company") is a global content and brand management company that creates and licenses multimedia content. Led by industry veterans, we distribute our content in all formats as well as a broad range of consumer products based on our characters. In the children's media sector, our portfolio features "content with a purpose" for toddlers to tweens, which provides enrichment as well as entertainment. New intellectual property titles include the preschool property *Rainbow Rangers*, which debuted in November 2018 on Nickelodeon and preschool property *Llama Llama*; which debuted on Netflix in January 2018 and was renewed by Netflix for a second season. Our library titles include the award winning *Baby Genius*, - adventure comedy *Thomas Edison's Secret Lab*® and Warren Buffett's *Secret Millionaires Club*, created with and starring iconic investor Warren Buffett which is distributed across our Genius Brands Network on Comcast's Xfinity on Demand, AppleTV, Roku, Amazon Fire, YouTube, Amazon Prime, Cox, Dish, Sling and Zumo as well as Connected TV.

In addition, we act as licensing agent for Penguin Young Readers, a division of Penguin Random House LLC who owns or controls the underlying rights to *Llama Llama*, leveraging our existing licensing infrastructure to expand this brand into new product categories, new retailers, and new territories.

The Company commenced operations in January 2006, assuming all the rights and obligations of its then Chief Executive Officer, under an Asset Purchase Agreement between the Company and Genius Products, Inc., in which the Company obtained all rights, copyrights, and trademarks to the brands "Baby Genius," "Kid Genius," "123 Favorite Music" and "Wee Worship," and all then existing productions under those titles. In October 2011, the Company (i) changed its domicile to Nevada from California, and (ii) changed its name to Genius Brands International, Inc. from Pacific Entertainment Corporation (the "Reincorporation"). In connection with the Reincorporation, the Company changed its trading symbol from "PENT" to "GNUS".

*Liquidity and Going Concern*

Historically, the Company has incurred net losses. For the years ended December 31, 2018 and 2017, the Company reported net losses of $9,003,901 and $4,908,736, respectively. The Company reported net cash used in operating activities of $8,008,010 and $7,186,870 for the years ended December 31, 2018 and 2017, respectively. As of December 31, 2018, the Company had an accumulated deficit of $50,702,486 and total stockholders' equity of $12,839,771. As a result, the Company will require additional capital to fund its operations and execute its business plan. As of December 31, 2018, the Company had cash, cash equivalents, and restricted cash of $3,085,026, which is not sufficient to fund the Company's planned operations and production through one year after the date the consolidated financial statements are issued, and accordingly, there is substantial doubt about the Company's ability to continue as a going concern.

The analysis used to determine the Company's ability as a going concern does not include cash sources outside the Company's direct control that management expects to be available within the next 12 months. Management is in negotiations to obtain new long-term financing and has a long history of successful capital raises with its investment bank group that will be leading the upcoming round. Both the Company and the Investment banking group are confident in their ability to raise sufficient capital to meet the Company's obligations and fund its production slate for the coming twelve months. There is inherent uncertainty and business risks that the Company will be able to raise such additional capital. The Company also expects revenue from operations to increase in the third quarter and for the subsequent quarters based on executed licensing agreements. These consolidated financial statements have been prepared on a going concern basis and do not include any adjustments to the amounts and classification of

assets and liabilities that may be necessary in the event the Company can no longer continue as a going concern.

During 2018, the company completed three transactions that enhanced cash and working capital balances:

*January 2018 Private Placement*

On January 8, 2018, the Company entered into a Securities Purchase Agreement with certain accredited investors pursuant to which the Company sold approximately $1,596,341 net, of common stock and warrants to such investors (the "January 2018 Private Placement"). The Company issued and sold warr

ants to purchase 592,000 shares of common stock at an exercise price of $3.00 per share. In addition, the company issued to Chardan Capital Markets, LLC, as placement agent, warrants to purchase 93,000 shares of common stock at an exercise price of $3.00 per share.

*Securities Purchase Agreement*

On August 17, 2018, the Company entered into a Securities Purchase Agreement (the "August 2018 Purchase Agreement") with certain investors, pursuant to which the Company agreed to sell (i) an aggregate principal amount of $4.50 million in secured convertible notes, convertible into shares of our common stock, at a conversion price o

f $2.50 per share (the "Secured Convertible Notes") and (ii) warrants to purchase 1,800,000 shares of our common stock at an exercise price of $3.00 per share (the "Warrants," and, together with the Secured Convertible Notes, the "Securities"). The Company received approximately $4,186,054 in net proceeds from the offering.

*Production Loans*

On September 28, 2018, Llama Productions LLC, a California limited liability company ("Llama") a wholly-owned subsidiary of the Company, entered into a Loan and Security Agreement (the "Loan and Security Agreement") with Bank Leumi USA (the "Lender"), pursuant to which the Lender agreed to make a secured loan in the aggregate amount of $4,186,054, to Llama (the "Loan"). The proceeds of the Loan were or will be used to pay the majority of the expenses of producing, completing and delivering two 22-minute episodes and sixteen 11-minute episodes of the second season of the animated series *Llama Llama* to be initially exhibited on Netflix.

In addition, on September 28, 2018, Llama and Lender entered into Amendment No. 2 to the Loan and Security Agreement, effective as of August 27, 2018, by and between Llama and the Lender (the "Amendment"). Pursuant to the Amendment, the original Loan and Security Agreement, dated as of August 5, 2016 and amended as of November 7, 2017 (the "Original Loan and Security Agreement"), was amended to (i) reduce the loan commitment thereunder to $1,768,010, which is a reduction of $3,075,406 from the original loan commitment under the Original Loan and Security Agreement and (ii) include the Llama Llama season two obligations under the Loan and Security Agreement as obligations under the Original Loan and Security Agreement.

The Maturity Date of the Prime Rate Loan facility and LIBOR Loan facility is March 31, 2021.

Subsequent to the end of the year, on February 19, 2019, the Company entered into a Securities Purchase Agreement with an accredited investor pursuant to which the Company sold approximately $2,000,000 of common stock and warrants to such investor (the "February 2019 Private Placement"). See note 17.

F-9

While the Company believes that its anticipated cash balances, working capital, and deal pipeline will be sufficient to fund operations for the next twelve mon
ths, there can be no assurance that cash flows from operations will continue to improve in the near future or will not deteriorate during that period. If the Company is unable to attain profitable operati
ons and attain positive operating cash flows, it may need to (i) seek additional funding, (ii) scale back its development or production plans, or (iii) reduce certain operations.

**Note 2: Summary of Significant Accounting Policies**

*Basis of Presentation*

The accompanying 2018 and 2017 consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America.

*Principles of Consolidation*

The accompanying consolidate
d financial statements include the accounts of Genius Brands International, Inc., its wholly-owned subsidiaries A Squared LLC, Llama Productions LLC and Rainbow Rangers Productions LLC, as well as its interest in Stan Lee Comics, LLC ("Stan Lee Comics"). All significant inter-company balances and transactions have been eliminated in consolidation.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted account
ing principles in the United States of America ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting periods.

*Financial Statement Rec
lassification*

Certain account balances from prior periods have been reclassified in these consolidated financial statements to conform to current period classifications.

*Cash, Cash Equivalents, and Restricted Cash*

The Company considers all highly liquid debt instruments with initial maturities of three months or less to be cash equivalents. As of December 31, 2018, and 2017, restricted cash totaled $400,543 and $568,673 which represented funds held in a cash account to be used solely for the production of *Llama Llama* as a condition of its loan agreement with Bank Leumi USA.

F-10

*Allowance for Doubtful Accounts*

Accounts receivable are presented on the balance sheets net of estimated uncollectible amounts. The Company assesses its accounts receivable balances on a quarterly basis to determine collectability and records an allowance for estimated uncollectible

accounts in an amount approximating anticipated losses based on historical experience and future expectations. Individual uncollectible accounts are written off against the allowance when collection of the individual accounts appears doubtful. The Company had an allowance for doubtful accounts of $0 and $110,658 as of December 31, 2018 and December 31, 2017.

*Inventories*

Inventories are stated at the lower of average cost or net realizable value and consist of finished goods such as DVDs, CD

s and other products. A reserve for slow-moving and obsolete inventory is established for all inventory deemed potentially non-saleable. The current inventory is considered properly valued and saleable. The Company concluded that there was an appropriate reserve for slow moving and obsolete inventory of $26,097 at both December 31, 2018 and December 31, 2017.

*Property and Equipment*

Property and equipment are recorded at cost. Depreciation on property and equipment is computed using the straight-line method over the estimated useful lives of the assets, which

range from two to seven years. Maintenance, repairs, and renewals, which neither materially add to the value of the assets nor appreciably prolong their lives, are charged to expense as incurred. Gains and losses from any dispositions of property and equipment are reflected in the statement of operations.

*Goodwill and Intangible Assets*

Goodwill represents the excess of purchase price over the estimated fair value of net assets acquired in business combinations accounted for by the purchase method. In accordance with FASB ASC 350 Intangibles Goodwill and Other, goodwill and certain intangible assets are presumed to have indefinite useful lives and are thus not amortized, but subject to an impairment test annually or more frequently if indicators of impairment arise. The Company completes the annual goodwill and indefinite-lived intangible asset impairment tests at the end of each fiscal year. To test for goodwill impairment, we are required to estimate the fair market value of each of our reporting units, of which we have one. While we may use a variety of methods to estimate fair value for impairment testing, our primary method is discounted cash flows. We estimate future cash flows and allocations of certain assets using estimates for future growth rates and our judgment regarding the applicable discount rates. Changes to our judgments and estimates could result in a significantly different estimate of the fair market value of the reporting units, which could result in an impairment of goodwill or indefinite lived intangible assets in future periods.

Other intangible assets have been acquired, either individually or with a group of other assets, and were initially recognized and measured based on fair value. Annual amortization of these intangible assets is computed based on the straight-line method over the remaining economic life of the asset.

*Film and Television Costs*

The Company capitalizes production costs for episodic series produced in accordance with FASB ASC 926-20 Entertainment-Films - Other Assets - Film Costs. Accordingly, production costs are capitalized at actual cost and then charged against revenue based on the initial market revenue evidenced by a firm commitment over the period of commitment. The Company expenses all capitalized costs that exceed the initial market firm commitment revenue in the period of delivery of the episodes.

The Company capitalizes production costs for films produced in accordance with FASB ASC 926-20 Entertainment-Films - Other Assets - Film Costs. Accordingly, production costs are capitalized at actual cost and then charged against revenue quarterly as a cost of production based on the relative fair value of the film(s) delivered and recognized as revenue. The Company evaluates its capitalized production costs annually and limits recorded amounts by their ability to recover such costs through expected future sales.

F-11

Additionally, for both episodic seri

es and films, from time to time, the Company develops additional content, improved animation and bonus songs/features for its existing content. After the initial release of the film or episodic series, the costs of significant improvement to existing products are capitalized while routine and periodic alterations to existing products are expensed as incurred.

*Debt and Attached Equity-Linked Instruments*

The Company measures issued debt on an amortized cost basis, net of debt premium/discount and debt issuance costs amortized using the effective interest rate method or the straight-line method when the latter does not lead to materially different results.

The Company accounts for the proceeds from the issuance of convertible notes payable in accordance with FASB ASC 470-20 Debt with Conversion and Other Options. Pursuant to FASB ASC 470-20, the intrinsic value of the embedded conversion feature (beneficial conversion interest), which is in the money on the commitment date is included in the discount to debt and amortized to interest expense over the term of the note agreement. When the conversion option is not separated, the Company accounts for the entire convertible instrument including debt and the conversion feature as a liability.

The Company analyzes freestanding equity-linked instruments including warrants attached to debt to conclude whether the instrument meets the definition of the derivative and whether it is considered indexed to the Company's own stock. If the instrument is not considered indexed to Company's stock, it is classified as an asset or liability recorded at fair value. If the instrument considered indexed to Company's stock, the Company analyzes additional equity classification requirements per ASC 815-40 Contract's in Entity's Own Equity. When the requirements are met the instrument is recorded as part of the Company's equity, initially measured based on its relative fair value with no subsequent re-measurement. When the equity classification requirements are not met, the instrument is recorded as an asset or liability and is measured at fair value with subsequent changes in fair value recorded in earnings.

When required, the Company also considers the bifurcation guidance for embedded derivatives per FASB ASC 815-15 Embedded Derivatives.

*Revenue Recognition*

On January 1, 2018, the Company adopted the new accounting standard ASC 606 (Topic 606), Revenue from Contracts with Customers and all the related amendments ("new revenue standard") using the modified retrospective method applied to those contracts which were not completed as of January 1, 2018. Results for reporting periods beginning after January 1, 2018 are presented under Topic 606, while prior period amounts are not adjusted and continue to be reported in accordance with our historic accounting under ASC 605, (Topic 605).

Accordingly, on January 1, 2018 the Company recorded a cumulative effect adjustment to beginning accumulated deficit in the amount of $206,245. The impact to our financial statements for the year ended December 31, 2018 resulting from the adoption of Topic 606 as of January 1, 2018 was a reduction of revenue in the amount of $188,734 and a corresponding reduction in costs in the amount of $52,269 from the amounts reported. The amounts prior to adoption were not recognized pursuant to Topic 606 and would have been reported pursuant to Topic 605.

Changes to the opening balances in prepaid and other assets, film and television costs, total assets, accrued expenses, deferred revenue and total liabilities resulting from the adoption of the new guidance were as follows (thousands):

| | December 31, 2017 | | Impact of Adoption | | January 1 2018 |
|---|---|---|---|---|---|
| Prepaid and Other Assets | $ | 265 | $ | 15 | $ | 280 |
| Film and Television Costs, net | $ | 2,777 | $ | (219) | $ | 2,558 |
| Total assets | $ | 27,713 | $ | (204) | $ | 27,509 |
| Participations Payable | $ | 1,718 | $ | (1) | $ | 1,717 |
| Deferred Revenue | $ | 5,085 | $ | (409) | $ | 4,676 |
| Total liabilities | $ | 12,673 | $ | (410) | $ | 12,263 |

F-12

The Company performed its analysis of its existing revenue contracts and has completed its new revenue accounting policy documentation under the new standard. The Company has identified the following six material and distinct performance obligations:

- License rights to exploit Functional Intellectual Property (Functional Intellectual Property or "functional IP" is defined as intellectual property that has significant standalone functionality, such as the ability be played or aired. Functional intellectual property derives a substantial portion of its utility from its significant standalone functionality.)
- License rights to exploit Symbolic Intellectual Property (Symbolic Intellectual Property or "symbolic IP" is intellectual property that is not functional as it does not have significant standalone use and substantially all of the utility of symbolic IP is derived from its association with the entity's past or ongoing activities, including its ordinary business activities, such as the Company's licensing and merchandising programs associated with its animated content.)
- Options to renew or extend a contract at fixed terms. (While this performance obligation is not significant for the Company's current contracts, it could become significant in the future.)
- Options on future seasons of content at fixed terms. (While this performance obligation is not significant for the Company's current contracts, it could become significant in the future.)
- Fixed fee advertising revenue generated from the Genius Brands Network
- Variable fee advertising revenue generated from the Genius Brands Network

As a result of the change, beginning January 1, 2018, the Company began recognizing revenue related to licensed rights to exploit functional IP in two ways. For minimum guarantees, the Company recognizes fixed revenue upon delivery of content and the start of the license period. For functional IP contracts with a variable component, the Company estimates revenue such that it is probable there will not be a material reversal of revenue in future periods. Revenue under these types of contracts was previously recognized when royalty statements were received. The Company began recognizing revenue related to licensed rights to exploit symbolic IP substantially similarly to functional IP. Although it has a different recognition pattern from functional IP, the valuation method is substantially the same, depending on the nature of the license.

The Company sells advertising on its Kid Genius channel in the form of either flat rate promotions or impressions served. For flat rate promotions with a fixed term, the Company recognizes revenue when all five revenue recognition criteria under FASB ASC 606 are met. For impressions served, the Company delivers a certain minimum number of impressions on the channel to the advertiser for which the advertiser pays a contractual CPM per impression. Impressions served are reported to the Company on a monthly basis, and revenue is reported in the month the impressions are served.

The Company recognizes revenue related to product sales when (i) the seller's price is substantially fixed, (ii) shipment has occurred causing the buyer to be obligated to pay for product, (iii) the buyer has economic substance apart from the seller, and (iv) there is no significant obligation for future performance to directly bring about the resale of the product by the buyer.

Prior to the adoption of Topic 606,we recognized revenue in accordance with FASB ASC 926-605 Entertainment-Films - Revenue Recognition. Accordingly, we recognize revenue when (i) persuasive evidence of a sale with a customer exists, (ii) the film is complete and has been delivered or is available for delivery, (iii) the license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale, (iv) the arrangement fee is fixed or determinable, and (v) collection of the arrangement fee is reasonably assured.

F-13

Our licensing and royalty revenue represent revenue generated from license agreements that are held in conjunction with third parties that are responsible for collecting fees due and remitting to us our share after expenses. Revenue from licensed products is recognized when realized or realizable based on royalty reporting received from licensees. Licensing income that we recognize as an agent is in accordance with FASB ASC 605-45 Revenue Recognition - Principal Agent. Accordingly, our revenue is our gross billings to our customers less the amounts we pay to suppliers for their products and services.

We sell advertising on our Genius Brands Network in the form of either flat rate promotions or impressions served. For flat rate promotions with a fixed term, we recognize revenue when all five revenue recognition criteria under FASB ASC 605 are met. For impressions served, we deliver a certain minimum number of impressions on the channel to the advertiser for which the advertiser pays a contractual CPM per impression. Impressions served are reported to us on a monthly basis, and revenue is reported in the month the impressions are served.

Prior to the adoption of Topic 606, recognized revenue related to product sales when

(i) the seller's price is substantially fixed, (ii) shipment has occurred causing the buyer to be obligated to pay for product, (iii) the buyer has economic substance apart from the seller, and (iv) there is no significant obligation for future performance to directly bring about the resale of the product by the buyer as required by FASB ASC 605 Revenue Recognition.

*Direct Operating Costs*

Direct operating costs include costs of our product sales, non-capitalizable film costs, film and television cost amortization expense, and participation expense related to agreements with various animation studios, post-production studios, writers, directors, musicians or other creative talent with which we are obligated to share net profits of the properties on which they have rendered services.

*Share-Based Compensation*

As required by FASB ASC 718 - Stock Compensation, the Company recognizes an expense related to the fair value of our share-based compensation awards, including stock options, using the Black-Scholes calculation as of the date of grant. The Company has elected to use the graded attribution method for awards which are in-substance, multiple awards based on the vesting schedule. The Company's accounting policy elected for forfeitures is not to estimate the number of awards that are expected to vest. Instead, the Company accounts for forfeitures when they occur. The Company issues authorized shares available for the issuance under 2015 Plan upon employees' exercise of their stock options.

*Earnings Per Share*

Basic earnings (loss) per common share ("EPS") is calculated by dividing net income (loss) applicable to common shareholders by the weighted average number of shares of common stock outstanding for the period. Diluted EPS is calculated by dividing net income (loss) applicable to c ommon shareholders by the weighted average number of shares of common stock outstanding, plus the assumed exercise of all dilutive securities using the treasury stock or "as converted" method, as appropriate. During periods of net loss, all common stock equivalents are excluded from the diluted EPS calculation because they are antidilutive.

*Income Taxes*

Deferred income tax assets and liabilities are recognized based on differences between the financial statement and tax basis of assets and liabilities using presently enacted tax rates. At each balance sheet date, the Company evaluates the available evidence about future taxable income and other possible sources of realization of deferred tax assets and records a valuation allowance that reduces the deferred tax assets to an amount that represents management's best estimate of the amount of such deferred tax assets that more likely than not will be realized.

F-14

*Concentration of Risk*

The Company's cash is maintained at two financial institutions and from time to time the balances for this account exceed the Federal Deposit Insurance Corporation's ("FDIC") insured amount. Balances on interest bearing deposits at banks in the United States are insured by the FDIC up to $250,000 per account. As of December 31, 2018, the Company had three accounts with a combined uninsured balance of $2,183,875. As of December 31, 2017, the Company had four accounts with a combined uninsured balance of $6,379,322.

For fiscal year 2018, the Company had one customer whose total revenue exceeded 10% of the total consolidated revenue. This customer accounted for 20% of total revenue and represented 8.5% of accounts receivable. For fiscal year 2017, the Company had one customer whose total revenue exceeded 10% of the total consolidated revenue. That customer accounted for 84% of total revenue and represented 98% of accounts receivable.

The major customer for the year ended December 31, 2018 is not the same as the major customer at December 31, 2017. There is significant financial risk associated with a dependence upon a small number of customers. The Company periodically assesses the financial strength of these customers and establishes allowances for any anticipated bad debt. At December 31, 2018 and 2017, no allowance for bad debt has been established for the major customers as these amounts are expected to be fully collectible.

*Fair value of financial instruments*

The carrying amounts of cash, receivables, accounts payable, and accrued liabilities approximate fair value due to the short-term maturity of the instruments. The carrying amount of long-term receivables approximate fair value due to the contractual nature of the obligation, payment schedule, and the current interest and inflation rate environments. The carrying amount of the Production Loan Facility approximates fair value since the debt carries a variable interest rate that is tied to either the current Prime or LIBOR rates plus an applicable spread.

We previously adopted FASB ASC 820 for financial instruments measured at fair value on a recurring basis. FASB ASC 820 defines fair value, establishes a framework for measuring fair value in accordance with U.S. GAAP and expands disclosures about fair value measurements.

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. FASB ASC Topic 820 establishes a three-tier fair value hierarchy which prioritizes the inputs used in measuring fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to unobservable inputs (level 3 measurements). These tiers include:

- Level 1, defined as observable inputs such as quoted prices for identical instruments in active markets;
- Level 2, defined as inputs other than quoted prices in active markets that are either directly or indirectly observable such as quoted prices for similar instruments in active markets or quoted prices for identical or similar instruments in markets that are not active; and
- Level 3, defined as unobservable inputs in which little or no market data exists, therefore requiring an entity to develop its own assumptions, such as valuations derived from valuation techniques in which one or more significant inputs or significant value drivers are unobservable.

*Recent Accounting Pronouncements*

In February 2016, the FASB issued Accounting Standards Update (ASU) 2016-02, "Leases." The standard requires lessees to recognize the assets and liabilities that arise from leases on the balance sheet. A lessee should recognize in the statement of financial position a liability to make lease payments (the lease liability) and a right-of-use asset representing its right to use the underlying asset for the lease term. The new guidance is effective for annual and interim reporting periods beginning after December 15, 2018.

In July 2018, the FASB issued ASU 2018-11, Leases (Topic 842), Targeted Improvements, which allows for an additional optional transition method where comparative periods presented in the financial statements in the period of adoption will not be restated and instead those periods will be presented under existing guidance in accordance with ASC 840, Leases. Management will use this optional transition method. As of January 1, 2019, management recorded lease liability of $2,071,903, right-of-use asset of $2,029,677, a reversal of previously recorded deferred rent of $37,920 and the increase in accumulated deficit of $4,306.

F-15

In November 2016, the FASB issued Accounting Standards Update 2016-18, "Statement of Cash Flows - Restricted Cash a consensus of the FASB Emerging Issues Task Force." This standard requires restricted cash and cash equivalents to be included with cash and cash equivalents on the statement of cash flows under a retrospective transition approach. The guidance became effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted. We have prospectively adopted ASU 2016-18. The impact to our consolidated financial position, results of operations and cash flows was minimal.

In January 2017, the FASB issued Accounting Standards Update 2017-04, "Simplifying the Test for Goodwill Impairment", which requires an entity to perform a one-step quantitative impairment test, whereby a goodwill impairment loss will be measured as the excess of a reporting unit's carrying amount over its fair value (not to exceed the total goodwill allocated to that reporting unit). It eliminates Step 2 of the current two-step goodwill impairment test, under which a goodwill impairment loss is measured by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. The standard is effective January 1, 2020, with early adoption as of January 1, 2017 permitted. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In July 2017, the FASB issued ASU No. 2017-11 addressing, among other matters, accounting for certain financial instruments. One of the amendments in this guidance intended to reduce the complexity associated with the issuer's accounting for certain financial instruments with characteristics of liabilities and equity. Specifically, the Board determined that a down round feature (as defined) would no longer cause a freestanding equity-linked financial instrument (or an embedded conversion option) to be accounted for as a derivative liability at fair value with changes in fair value recognized in current earnings. ASU 2017-11 is effective for public business entities for fiscal year beginning after December 15, 2018. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement ("ASU 2018-13"), which changes the fair value measurement disclosure requirements of ASC 820. The update removes some disclosures, modifies others, and add some new disclosure requirements. The amendments in this ASU are effective for all entities for fiscal years, and interim period within those fiscal years, beginning after December 15, 2019 with early adoption permitted. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, Compensation – Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting ("ASU 2018-07"), which supersedes ASC 505-05 and expands the scope of ASC 718 to include all share-based payment arranges related to the acquisition of goods and services from both nonemployees and employee. As a result, most of the guidance in ASC 718 associated with employee share-based payments, including most of its requirements related to classification and measurement, applies to nonemployee share-based payment arrangements. ASC 2018-07 is effective for all entities for fiscal year beginning after December 15, 2018, and interim periods within that fiscal year. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

In March 2019, the FASB issued ASU No. 2019-02, Entertainment-Films-Other Assets-Film Costs (Subtopic 926-20) and Entertainment-Broadcasters Intangibles-Goodwill and Other (Subtopic 920-350). The update aligns the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. The amendments also require that an entity reassess estimates of the use of a film in a film group and account for any changes prospectively. The amendments in this update require that an entity test a film or license agreement for program material within the scope of Subtopic 920-350 for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. For public business entities, the amendments in this update are effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. We are currently evaluating the potential impact of adopting this guidance on our consolidated financial statements.

Various other accounting pronouncements have been recently issued, most of which represented technical corrections to the accounting literature or were applicable to specific industries/transactions or special circumstances and are not expected to have a material effect on our financial position, results of operations, or cash flows.

F-16

**Note 3: Property and Equipment, Net**

The Company has property and equipment as follows as of December 31, 2018 and 2017:

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Furniture and Equipment | $ 12,385 | $ 12,385 |
| Computer Equipment | 138,883 | 117,256 |
| Leasehold Improvements | – | 176,903 |
| Software | 15,737 | 15,737 |
| Property and Equipment, Gross | 167,005 | 322,281 |
| Less Accumulated Depreciation | (91,371) | (227,615) |
| **Property and Equipment, Net** | $ 75,634 | $ 94,666 |

During the years ended December 31, 2018 and December 31, 2017, the Company recorded depreciation expense of $40,659 and $70,396.

**Note 4: Film and Television Costs, Net**

As of December 31, 2018, the Company had net Film and Television Costs of $8,166,131 compared to $2,777,088 at December 31, 2017. The increase relates primarily to the production and development of *Rainbow Rangers Season 1* and *Llama Llama Season 2* offset by the amortization of film costs associated with the revenue recognized for *Space Pop, Thomas Edison's Secret Lab*, and *Llama Llama Season 1* and *Rainbow Rangers.*

During the years ended December 31, 2018 and December 31, 2017, the Company recorded Film and Television Cost amortization expense of $1,079,723 and $2,534,835, respectively.

The following table highlights the activity in Film and Television Costs as of December 31, 2018 and 2017:

| | Total |
|---|---|
| Film and Television Costs, Net as of December 31, 2016 | $ 2,260,964 |
| Additions to Film and Television Costs | 2,863,076 |
| Capitalized Interest | 187,883 |
| Film Amortization Expense | (2,534,835) |
| Film and Television Costs, Net as of December 31, 2017 | 2,777,088 |
| Cumulative Effect of Adoption of ASC 606 | (219,472) |
| Additions to Film and Television Costs | 6,644,728 |
| Capitalized Interest | 43,510 |
| Film Amortization Expense | (1,079,723) |
| Film and Television Costs, Net as of December 31, 2018 | $ **8,166,131** |

**Note 5: Goodwill and Intangible Assets, Net**

*Goodwill*

In 2013, the Company recognized $10,

365,805 in Goodwill, representing the excess of the fair value of the consideration over net identifiable assets acquired. Pursuant to FASB ASC 350-20, Goodwill is not subject to amortization but is subject to annual review to determine if certain events warrant impairment to the Goodwill asset. Through December 31, 2018, the Company has not recognized any impairment to Goodwill.

*Intangible Assets, Net*

The Company had the following intangible assets as of December 31, 2018 and 2017:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Identifiable Artistic-Related Assets (a) | – | $ 1,740,000 |
| Trademarks (b) | $ 129,831 | 129,831 |
| Product Masters (b) | 64,676 | 64,676 |
| Other Intangible Assets (b) | 272,529 | 251,171 |
| Intangible Assets, Gross | 467,036 | 2,185,678 |
| Less Accumulated Amortization (c) | (377,048) | (329,398) |
| Intangible Assets, Net | $ 89,988 | $ 1,856,280 |

(a) In connection with the Merger in 2013, the Company acquired $1,740,000 of Identifiable Artistic-Related Assets. These assets, related to certain properties owned by A Squared and assumed by the Company, were valued using an independent firm. Based on certain legal, regulatory, contractual, and economic factors, the Company has deemed these assets to be indefinite-lived. Hence, pursuant to FASB ASC 350-30, these assets are not subject to amortization and are tested annually for impairment. As of December 31, 2018, the Company performed an analysis and determined the Identifiable Artistic-Related Intangible Assets no longer have value and as a result has recognized $1,740,000 of impairment expense related to the Identifiable Artistic-Related Intangible Assets.

(b) Pursuant to FASB ASC 350-30-35, the Company reviews these intangible assets periodically to determine if the value should be retired or impaired due to recent events. Through December 31, 2018, the Company has not recognized any impairment expense related to these assets.

(c) During the years ended December 31, 2018 and December 31, 2017, the Company recognized, $47,650 and $55,520, respectively, in amortization expense related to the Trademarks, Product Masters, and Other Intangible Assets.

Expected future intangible asset amortization as of December 31, 2018 is as follows:

| Fiscal Year: | |
|---|---|
| 2019 | $ 38,405 |
| 2020 | 37,825 |
| 2021 | 9,698 |
| 2022 | 1,861 |
| 2023 | 1,465 |
| Remaining | 734 |
| **Total** | **$ 89,988** |

F-18

**Note 6: Deferred Revenue**

As of December 31, 2018, and 2017, the Company had total short term and long term deferred revenue of $4,925,756 and $5,085,383, respectively. Deferred revenue includes both (i) variable fee contracts with licensees and customers in which the Company had collected advances and minimum guarantees against future royalties and (ii) fixed fee contracts. The Company recognizes revenue related to these contracts when all revenue recognition criteria have been met. Included in the deferred revenue balance as of December 31, 2018 is the $2,000,000 advance against future royalty that Sony paid to the Company in the first quarter of 2017 as well as $1,489,583 attributable to the expansion of distribution rights acquired by Sony through the January 2017 Sony Transactions.

**Note 7: Accrued Liabilities - Current**

As of December 31, 2018, and 2017, the Company had the following current accrued liabilities:

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Accrued Salaries and Wages (a) | $ 137,825 | $ 168,549 |
| Other Accrued Expenses (b) | 52,865 | 1,020,457 |
| Total Accrued Liabilities – Current | $ 190,690 | $ 1,189,006 |

  (a)  Accrued Salaries and Wages represent accrued vacation payable to employees.
  (b)  Other Accrued Expenses include estimates of expenses incurred but not yet recorded. The majority of the balance in Other Accrued Expenses at year ended December 31, 2017 relates to estimates of final dubbing costs for our Llama Llama property.

**Note 8: Secured Convertible Notes**

On August 17, 2018, the Company entered into a Securities Purchase Agreement (the "Purchase Agreement") with certain investors (the "Investors"), pursuant to which the Company agreed to sell (i) an aggregate principal amount of $4.50 million in secured convertible notes, convertible into shares of our common stock, at a conversion price of $2.50 per share (the "Secured Convertible Notes") and (ii) warrants to purchase 1,800,000 shares of our common stock at an exercise price of $3.00 per share (the "Warrants," and, together with the Secured Convertible Notes, the "Securities"). We received approximately $4,500,000 in gross proceeds from the Offering.

The Secured Convertible Notes are our senior secured obligations and are secured by certain tangible and intangible property of the Company as described in the Purchase Agreement. Unless earlier converted or redeemed, the Secured Convertible Notes will mature on August 20, 2019. The Secured Convertible Notes bear interest at a rate of 10% per annum and are convertible at any time until a Secured Convertible Note is no longer outstanding, in whole or in part, at the option of the holders into shares of common stock at a conversion price of $2.50 per share. The Secured Convertible Notes have a beneficial ownership limitation such that none of the Investors have the right to convert any portion of their Secured Convertible Notes if the Investor (together with its affiliates or any other persons acting together as a group with the Investor) would beneficially own in excess of 9.99% of the number of shares of our common stock outstanding immediately after giving effect to the issuance of our common stock issuable upon conversion of such Secured Convertible Notes. In addition, the Secured Convertible Notes provide for a conversion cap such that we may not issue any shares of our common stock upon conversion of Secured Convertible Notes which would exceed the aggregate number of shares of our common stock we could issue upon conversion of the Secured Convertible Notes without breaching our obligations, if any, under Nasdaq Stock Market LLC rules and regulations.

Interest under the Secured Convertible Notes is payable in arrears beginning on September 1, 2018 and thereafter on each of December 1, 2018, March 1, 2019, June 1, 2019 and at maturity when all amounts outstanding under the Secured Convertible Notes become due and payable. Subject to certain equity conditions, we may force a conversion of the debt into equity. We may redeem the Secured Convertible Notes at any time prior to maturity. If we do not meet such equity conditions at maturity, we are obligated to repay in cash one-sixth of the then outstanding principal amount of the Secured Convertible Notes each month for the six months following the date of maturity, with the first such payment due on the date of maturity, followed by payments each month thereafter.

The Secured Convertible Notes contain certain negative covenants, including prohibitions on the incurrence of indebtedness or liens. The Secured Convertible Notes also contain standard and customary events of default including, but not limited to, failure to make payments when due, failure to observe or perform covenants or agreements contained in the Secured Convertible Notes or the bankruptcy or insolvency of the Company or any of our subsidiaries. The Company was in compliance with these covenants as of December 31, 2018.

On the date of issuance, the Secured Convertible Notes were convertible into common stock at $2.50 per share, or at a conversion price below the closing market price of $2.55. This "discount" is considered a beneficial conversion feature for accounting purposes. The allocation of carrying basis between the Warrants issued and the Secured Convertible Notes was determined based on relative fair value. The discount of the initial conversion price from market related to the beneficial conversion feature of the debt was $1,561,111, and such amount was recorded as a reduction of debt and increase in additional paid-in capital. The discount will be amortized as additional interest over the term of the loan.

The Warrants entitle the holders to purchase 1,800,000 shares of common stock. The Warrants were not exercisable until after six months from the date of issuance and expire five and half years from the date of issuance. The Warrants have an exercise price of $3.00 per share. In the event of a "Fundamental Transaction" (as defined in the Warrants), the Investors have the right to receive the value of the Warrants as determined in accordance with the Black Scholes option pricing model. The Warrants are considered indexes to the Company's own stock pursuant to ASC 815-40. The Warrants also met the additional equity classification requirements and accordingly are accounted for as part o
f the Company's equity.

During the year ended December 31, 2018, the Company recognized $678,016 of discount amortization which is included in interest expense.

**Note 9: Production Loan Facility**

On August 8, 2016, Llama Productions closed a $5,275,000 multiple draw-down, secured, non-recourse, non-revolving credit facility (the "Facility") with Bank Leumi USA to produce its animated series Llama Llama, (the "Series") which is configured as fifteen half-hour episodes comprised of thirty 11-minute programs that were delivered to Netflix in fall 2017. The Facility is secured by the license fees the Company will receive from Netflix for the delivery of the Series as well as the Company's copyright in the Series. The Facility has a term of 40 months and has an interest rate of either Prime plus 1% or one, three, or six-month LIBOR plus 3.25%. As a condition of the loan agreement with Bank Leumi, the Company deposited $1,000,000 into a cash account to be used solely to produce the Series. Additionally, the Facility contains certain standard affirmative and negative non-financial covenants such as maintaining certain levels of production insurance and providing standard financial reports. As of December 31, 2018, the Company was in compliance with these covenants.

On September 28, 2018, Llama Productions LLC, a California limited liability company ("Llama") and a wholly-owned subsidiary of the Company, entered into a Loan and Security Agreement (the "Loan and Security Agreement") with Bank Leumi USA (the "Lender"), pursuant to which the Lender agreed to make a secured loan in an aggregate amount not to exceed $4,231,989 to Llama (the "Loan"). The proceeds of the Loan will be used to pay the majority of the expenses of producing, completing and delivering two 22-minute episodes and sixteen 11- minute episodes of the second season of the animated series Llama Llama to be initially exhibited on Netflix.

To secure payment of the Loan, Llama has granted to the Lender a continuing security interest in and against, generally, all of its tangible and intangible assets, which includes all seasons of the Llama Llama animated series.

F-20

Under the Loan and Security Agreement, Llama can request revolving loan advances under (a) the Prime Rate Loan facility and (b) the LIBOR Loan facility, each as further described in the Loan and Security Agreement attached as an exhibit hereto. Prime Rate Loan advances shall bear interest, on the outstanding balance thereof, at a fluctuating per annum rate equal to 1.0% plus the Prime Rate (as such term is defined in the Loan and Security Agreement), provided that in no event shall the interest rate applicable to Prime Rate Loans be less than 4.0% per annum. LIBOR Loan advances shall bear interest, on the outstanding balance thereof, for the period commencing on the funding date and ending on the date which is one (1), three (3) or six (6) months thereafter, at a per annum rate equal to 3.25% plus the LIBOR determined for the applicable Interest Period (as such terms are defined in the Loan and Security Agreement), provided that in no event shall the interest rate applicable to LIBOR Loans be less than 3.25% per annum. The Maturity Date of the Prime Rate Loan facility and LIBOR Loan facility is March 31, 2021. Interest rates on advances under the Loan and Security Agreement were between 5.53% and 6.14% as of December 31, 2018.

In addition, on September 28, 2018, Llama and Lender entered into Amendment No. 2 to Loan and Security Agreement, effective as of August 27, 2018, by and between Llama and the Lender (the "Amendment"). Pursuant to the Amendment, the original Loan and Security Agreement, dated as of August 5, 2016 and amended as of November 7, 2017 (the "Original Loan and Security Agreement"), was amended to (i) reduce the loan commitment thereunder to $1,768,010, which is a reduction of $3,075,406 from the original loan commitment under the Original Loan and Security Agreement and (ii) include the Llama Llama season two obligations under the Loan and Security Agreement as obligations under the Original Loan and Security Agreement.

As of December 31, 2018, the Company had gros

s outstanding borrowing under the facility of $2,241,759 against which financing costs of $63,561 were applied resulting in net borrowings of $2,178,198. As of December 31, 2017, the Company had gross outstanding borrowings under the facility of $4,436,528 against which financing costs of $113,885 were applied resulting in net borrowings of $4,322,643.

**Note 10: Disputed Trade Payable**

As part of the merger in 2013, the Company assumed certain liabilities from a previous member of

A Squared which has claimed certain liabilities totaling $925,000. The Company disputes the basis for this liability. As of September 30, 2018, the Company believes that the statute of limitations applicable to the assertion of any

legal claim relating to the collection of these liabilities has expired and therefore believes this liability is not owed.

**Note 11: Stockholders' Equity**

*Common Stock*

As of December 31, 2018, the total number of authorized shares of common stock was 233,333,334.

On October 6, 2016, the Board of Directors of the Company authorized a reverse stock split in preparation for the Company's anticipated up listing on the NASDAQ Capital Market.

On November 4, 2016, the Company filed a certificate of change to the Company's Articles of Incorporation with the Secretary of State of the State of Nevada to effect a one-for-three reverse stock split of the Company's issued and outstanding common stock. As a result of the 2016 Reverse Split, every three shares of the Company's issued and outstanding common stock were automatically combined and reclassified into one share of the Company's common stock. The 2016 Reverse Split affected all issued and outstanding shares of common stock, as well as common stock underlying stock options and warrants outstanding. No fractional shares were issued in connection with the 2016 Reverse Split. Stockholders who would otherwise have held a fractional share of common stock received an increase to their common stock as the common stock was rounded up to a full share. The total number of authorized shares of common stock was reduced from 700,000,000 to 233,333,334 in conjunction with the 2016 Reverse Split. The 2016 Reverse Split became effective on November 9, 2016.

On February 9, 2017, the Company entered into the Private Transaction pursuant to the Agreement with certain holders of the Original Warrants. Pursuant to the Agreement, the holders of the Original Warrants and the Company agreed that such Original Warrant holders would exercise their Original Warrants in full, and the Company would issue to each such holder new warrants. (See Note 13 for additional information about these warrants.) In association with the Private Transaction, the Company issued 1,171,689 shares of common stock upon exercise of a portion of the Original Warrants for which it received gross proceeds of $3,866,573 and recording offering costs of $464,649 for net proceeds of $3,401,924.

As of December 31, 2018, and 2017, there were 9,457,859 and 7,610,794 shares of common stock outstanding, respectively. Below are the changes to the Company's common stock during the year ended December 31, 2018:

Year Ended December 31, 2018

- On May 7, 2018, the Company issued 277,508 shares of the Company's common stock valued at $2.81 per share for production services.
- On August 13, 2018, the Company issued 180,683 shares of the Company's common stock valued at $2.64 per share to the same provider for production services.
- On September 18, 2018, the Company issued 141,014 shares of the Company's common stock valued at $2.17 per share to the same provider for production services.
- On October 17, 2018, the Company issued 58,614 shares of the Company's common stock valued at $2.45 per share to various providers for investor relations services.
- On November 1, 2018, the Company issued 44,097 shares of the Company's common stock valued at $2.27 per share to the same provider for production services.
- On November 15, 2018, the Company issued 23,148 shares of the Company's common stock valued at $2.16 per share for investor relations services.
- On December 31, 2018, the Company issued 60,000 shares of the Company's common stock valued at $2.16 per as part of a mediation settlement representing participation amounts due.
- On various dates during the year ended December 31, 2018, the Company issued 470,001 shares of the Company's common stock pursuant to the conversion of 1,410 shares of Series A Convertible Preferred Stock at a conversion price of $3.00.

Year Ended December 31, 2017

- In connection with the January 2017 Sony Transactions, we issued Sony 301,231 shares of our common stock at $4.945 per share.
- On January 17, 2017, we issued to a consultant 10,112 shares of our common stock at $4.945 per share in connection with the January 2017 Sony Transactions.
- On February 9, 2017, the Company issued 1,171,689 shares of common stock in connection with the Private Transaction.
- On March 14, 2017, the Company issued 8,410 shares of common stock valued at $5.95 per share to a consultant for services rendered.
- On August 1, 2017, the Company issued 6,012 shares of common stock valued at $4.99 per share to a consultant for services rendered.
- On October 3, 2017, the Company sold, in a registered direct offering, 1,647,691 shares of common stock at an offering price of $3.90 per share and, in a concurrent private placement, warrants to purchase an aggregate of 1,647,691 shares of common stock for gross proceeds of approximately $6,425,995 before deducting the placement agent fee and related offering expenses.
- On various dates during the year ended December 31, 2017, the Company issued 455,000 shares of the Company's common stock pursuant to the conversion of 1,365 shares of Series A Convertible Preferred Stock at a conversion price of $3.00.

*Preferred Stock*

The Company has 10,000,000 shares of preferred stock authorized with a par value of $0.001 per share. The Board of Directors is authorized, subject to any limitations prescribed by law, without further vote or action by our stockholders, to issue from time to time shares of preferred stock in one or more series. Each series of preferred stock will have such number of shares, designations, preferences, voting powers, qualifications and special or relative rights or privileges as shall be determined by our Board of Directors, which may include, among others, dividend rights, voting rights, liquidation preferences, conversion rights and preemptive rights.

As of December 31, 2018, and 2017, there were 2,120 and 3,530 shares of Series A Convertible Preferred Stock outstanding, respectively.

On May 12, 2014, the Board of Directors authorized the designation of a class of preferred stock as "Series A Convertible Preferred Stock". On May 14, 2014, the Company filed the Certificate of Designation, Preferences and Rights of the 0% Series A Convertible Preferred Stock with the Secretary of State of the State of Nevada.

Each share of the Series A Convertible Preferred Stock is convertible into shares of the Company's common stock, par value $0.001 per share, based on a conversion calculation equal to the Base Amount divided by the conversion price. The Base Amount is defined as the sum of (i) the aggregate stated value of the Series A Convertible Preferred Stock to be converted and (ii) all unpaid dividends thereon. The stated value of each share of the Series A Convertible Preferred Stock is $1,000 and the initial conversion price is $6.00 per share, subject to adjustment in the event of stock splits, dividends and recapitalizations. Additionally, in the event the Company issues shares of its common stock or common stock equivalents at a per share price that is lower than the conversion price then in effect, the conversion price shall be adjusted to such lower price, subject to certain exceptions. The Company is prohibited from effecting a conversion of the Series A Convertible Preferred Stock to the extent that as a result of such conversion, the investor would beneficially own more than 9.99% in the aggregate of the issued and outstanding shares of the Company's common stock, calculated immediately after giving effect to the issuance of shares of common stock upon conversion of the Series A Convertible Preferred Stock. The shares of Series A Convertible Preferred Stock possess no voting rights.

On May 14, 2014, we entered into securities purchase agreements with certain accredited investors pursuant to which we sold an aggregate of 6,000 shares of our then newly designated Series A Convertible Preferred Stock at a price of $1,000 per share for gross proceeds to us of $6,000,000. Related to the sale, we incurred offering costs of $620,085 resulting in net proceeds of $5,379,915. The transaction closed on May 15, 2014.

As the conversion price of the Series A Convertible Preferred Stock on a converted basis was below the market price of the common stock on the closing date, this resulted in a beneficial conversion feature recorded as an "imputed" dividend of $2,010,000. In addition, during the fourth quarter of 2015, in connection with the 2015 Private Placement in which the Company's common stock was sold at $3.00 per share, the conversion price of the Series A Convertible Preferred Stock decreased to $3.00. This decrease resulted in an additional beneficial conversion feature of $3,383,850 recognized as of the time of the 2015 Private Placement.

On August 17, 2018, in connection with the Securities Purchase Agreement in which the Secured Convertible Notes are convertible into shares of the Company's common stock at $2.50 per share, the conversion price of the Series A Convertible Preferred Stock decreased to $2.50. This decrease resulted in a beneficial conversion feature of $353,333 which was recognized on August 17, 2018.

In the future, issuance of common stock or the grant of any rights to purchase our common stock or other securities converti

ble into our common stock for a per share price less than the then existing conversion price of the Series A Convertible Preferred Stock would result in an adjustment to the then current conversion price of the Series A Convertible Preferred Stock. This reduction would give rise to a beneficial conversion feature recorded as an "imputed" dividend.

**Note 12: Stock Options**

On September 18, 2015, the Company adopted the Genius Brands International, Inc. 2015 Incentive Plan (the "2015 Plan"). The 2015 Plan was approved by our stockholders in September 2015. The 2015 Plan as approved by the stockholders authorized the issuance up to an aggregate of 150,000 shares of common stock. On December 14, 2015, the Board of Directors voted to amend the 2015 Plan to increase the total number of shares that can be issued under the 2015 Plan by 1,293,334 from 150,000 shares to 1,443,334 shares. The increase in shares available for issuance under the 2015 Plan was approved by stockholders on February 3, 2016. On May 18, 2017, the Board of Directors voted to amend the 2015 Plan to increase the total number of shares that can be issued under the 2015 Plan by 223,333 shares from 1,443,334 shares to an aggregate of 1,666,667 shares. The increase in shares available for issuance under the 2015 Plan was approved by the stockholders on July 25, 2017. On September 6, 2018, the Board of Directors voted to amend the 2015 Plan to increase the total number of shares that can be issued under the 2015 Plan by 500,000 shares from 1,667,667 shares to an aggregate of 2,167,667 shares. The increase in shares available for issuance under the 2015 Plan was approved by the Company's stockholders on October 2, 2018.

F-23

The following table summarizes the changes in the Company's stock option plan during the year ended December 31, 2018:

| | Options Outstanding Number of Shares | Exercise Price Per Share | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value | | Weighted Average Exercise Price Per Share |
|---|---|---|---|---|---|---|
| Balance at December 31, 2016 | 1,373,554 | $2.82 - $12.00 | 3.99 years | $ | 280,642.00 | $ 8.14 |
| Options Granted | – | | | | | |
| Options Exercised | – | | | | | |
| Options Cancelled | 79,509 | $2.70 | | | | |
| Options Expired | – | | | | | |
| Balance at December 31, 2017 | 1,294,045 | $2.09 - $12.00 | 2.99 years | $ | – | $ 8.14 |
| Options Granted | 170,176 | $2.09 | 4.55 years | $ | – | $ 2.09 |
| Options Exercised | – | | | | | |
| Options Cancelled | 57,294 | $9.00 - $12.00 | 3.56 years | $ | – | $ 10.08 |
| Options Expired | 147,512 | $2.80 - $6.00 | | $ | – | $ 4.30 |
| Balance at December 31, 2018 | 1,259,415 | $2.09 - $12.00 | 2.50 years | $ | – | $ 7.39 |
| Exercisable December 31, 2017 | 1,070,869 | $2.70 - $9.00 | 2.96 years | $ | – | $ 7.44 |
| Exercisable December 31, 2018 | 1,089,239 | $2.70 - $9.00 | 2.70 years | $ | – | $ 8.32 |

During the year ended December 31, 2018, the Company granted options to purchase 170,176 shares of common stock to officers. These stock options generally vest between one and three years. The fair value of these options was determined to be $285,760 using the Black-Scholes option pricing model based on the following assumptions:

| | |
|---|---|
| Exercise Price | $2.09 |
| Dividend Yield | 0% |
| Volatility | 61% - 62% |
| Risk-free interest rate | 2.52% - 2.57% |
| Expected life of options | 3.5 years |

During the years ended December 31, 2018 and 2017, the Company recognized ($16,588) and $663,958 in share-based compensation expense, respectively. The unvested share-based compensation as of December 31, 2018 was $238,871 which will be recognized through the second quarter of 2019 assuming the underlying grants are not cancelled or forfeited.

**Note 13: Warrants**

The Company has warrants outstanding to purchase up to 5,899,389 shares and 3,414,389 shares at December 31, 2018 and 2017, respectively.

In connection with the sale of the Company's Series A Convertible Preferred Stock in May 2014, Chardan Capital Markets LLC ("Chardan") acted as sole placement agent in consideration for which it received a cash fee of $535,000 and a warrant to purchase up to 100,002 shares of the Company's common stock. These warrants are exercisable immediately, have an exercise price of $6.00 per share, and have a five-year term.

In connection with the 2015 Private Placement, the Company issued to accredited investors the Original Warrants to purchase up to an aggregate of 1,443,362 shares of common stock for a purchase price of $3.00 per share. The Original Warrants are exercisable into shares of common stock for a period of five (5) years from issuance at an initial exercise price of $3.30 per share, subject to adjustment in the event of stock splits, dividends and recapitalizations. The Original Warrants are exercisable immediately. The Company is prohibited from effecting an exercise of the warrants to the extent that as a result of such exercise, the holder would beneficially own more than 4.99% (subject to increase up to 9.99% upon 61 days' notice) in the aggregate of the issued and outstanding shares of common stock, calculated immediately after giving effect to the issuance of shares of common stock upon exercise of the warrant.

In connection with the 2015 Private Placement, Chardan acted as sole placement agent in consideration for which it received a cash fee of $300,000 and a warrant to purchase up to 141,668 shares of the Company's common stock. These warrants are exercisable immediately, have an exercise price of $3.60 per share, and have a five-year term.

On February 9, 2017, the Company entered into the Private Transaction pursuant to the Agreement with certain holders of the Original Warrants. Pursuant to the Agreement, the holders of the Original Warrants and the Company agreed that such Original Warrant holders would exercise their Original Warrants in full, and the Company would issue to each such holder new warrants, with the new warrants being identical to the Original Warrants except that the termination date of such new warrants is February 10, 2022 (the "Reload Warrants"). In addition, depending on the number of Original Warrants exercised by all holders of the Original Warrants, the Company also agreed to issue to the holders another new warrant, identical to the Original Warrant except that the exercise price of such warrant is $5.30 and such warrant is not exercisable until August 10, 2017 (the "Market Price Warrants" and together with the Reload Warrants, the "New Warrants").

The Company received gross proceeds of $3,866,573 from the exercise of the Original Warrants and issued Reload Warrants to purchase an aggregate of 799,991 shares of the Company's common stock and Market Price Warrants to purchase an aggregate of 371,699 shares of the Company's common stock. In association with the Private Transaction, the Company recorded $1,402,174, representing the difference in the fair market value of the Original Warrants and the New Warrants, as an adjustment to additional paid-in capital.

Chardan acted as financial advisor on the Private Transaction in consideration for which Chardan received $363,617, Chardan and its designees were issued New Warrants for 115,000 shares of the Company's common stock.

On October 3, 2017, the Company sold, in a registered direct offering, 1,647,691 shares of common stock at an offering price of $3.90 per share and, in a concurrent private placement, warrants to purchase an aggregate of 1,647,691 shares of common stock for gross proceeds of approximately $6,425,995 before deducting the placement agent fee and related offering expenses.

On January 10, 2018, the Company issued warrants for 685,000 shares of the Company's common stock in connection with the January 2018 Private Placement. The warrants were issued to the parties who purchased the Company's common stock, as well as to Chardan and its designees who acted as placement agents of the deal. The warrants expire in five years and were exercisable immediately at an exercise price of $3.00 per share.

On August 17, 2018, the Company issued warrants for 1,800,000 shares of the Company's common stock in conjunction with the August 17, 2018 Securities Purchase Agreement. The warrants were issued to the parties who purchased the Company's Secured Convertible Notes. The Warrants are not exercisable until after six months from the date of issuance and expire five and half years from the date of issuance. The Warrants have an exercise price of $3.00 per share. In the event of a "Fundamental Transaction" (as defined in the Warrants), the Investors have the right to receive the value of the Warrants as determined in accordance with the Black Scholes option pricing model. The Warrants are considered indexed to the Company's own stock pursuant to ASC 815-40. The Warrants also met additional equity classification requirements and accordingly are accounted for as part of Company's equity.

The allocation of carrying basis between the Warrants issued and the Secured Convertible Notes was determined based on relative valuation. The carrying basis attributable to the Warrants to acquire common stock was $1,471,111 and was calculated using the Black-Scholes option pricing model.

The following table summarizes the changes in the Company's outstanding warrants during the year ended December 31, 2018:

| | Warrants Outstanding Number of Shares | | Exercise Price per Share | Weighted Average Remaining Contractual Life | | Weighted Average Exercise Price per Share | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|---|
| Balance at December 31, 2017 | 3,414,389 | $ | 3.30 - 6.00 | 4.21 years | $ | 3.92 | – |
| Warrants Granted | 2,485,000 | $ | 3.00 | 4.46 years | | 3.00 | – |
| Warrants Exercised | – | | – | – | | – | – |
| Warrants Expired | – | | – | – | | – | – |
| Balance at December 31, 2018 | 5,899,389 | $ | 3.00 – 6.00 | 3.74 years | | – | – |
| Exercisable December 31, 2017 | 3,414,389 | $ | 3.30 - 6.00 | 4.21 years | $ | 3.92 | – |
| Exercisable December 31, 2018 | 5,899,389 | $ | 3.30 - 6.00 | 3.74 years | $ | 3.53 | – |

**Note 14: Income Taxes**

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carry forwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Net deferred tax liabilities consist of the following components as of December 31, 2018 and 2017:

| | | 2018 | | 2017 |
|---|---|---|---|---|
| Deferred tax assets: | | | | |
| NOL Carryover | $ | 8,278,500 | $ | 6,406,000 |
| Bad Debt Reserve | | – | | 31,000 |
| Inventory Reserve | | 7,300 | | 7,300 |
| Deferred Rent | | 10,600 | | – |
| Accrued Compensated Absences | | 37,100 | | 46,100 |
| Charitable Contributions | | 6,900 | | 3,500 |
| Subtotal | | 8,340,400 | | 6,493,900 |
| Valuation Allowance | | (7,619,300) | | (6,458,800) |
| Deferred tax liabilities: | | | | |
| Convertible Notes | | (658,800) | | – |
| Depreciation and Amortization | | (49,100) | | (16,500) |
| Prepaid Expenses | | (13,200) | | (18,600) |
| Net Deferred Tax Asset | $ | – | $ | – |

F-26

The income tax provision differs from the amount of income tax determined by applying the U.S. federal tax rate to pretax income from continuing operations for the years ended December 31, 2018 and 2017 due to the following:

| | 2018 | 2017 |
|---|---|---|
| Income Tax Expense Computed at the Statutory Federal Rate | $ (1,890,800) | $ (1,669,000) |
| State Income Taxes, Net of Federal Tax Effect | (506,700) | – |
| Meals and Entertainment | 5,200 | 10,600 |
| Stock Options | (3,500) | 225,700 |
| Intangible Assets | 365,400 | – |
| Tax Cut and Job Act Impact | – | 2,809,700 |
| Other | 21,400 | 1,600 |
| Valuation Allowance | 2,009,000 | (1,378,600) |
| | $ – | $ – |

At December 31, 2018, the Company had Federal net operating loss carry forwards of approximately $30,053,000 and state net operating loss carry forwards of approximately $28,172,000 that may be offset against future taxable income from the year 2028 through 2038. No tax benefit has been reported in the December 31, 2018 financial statements since the potential tax benefit is offset by a valuation allowance of the same amount.

Due to the change in ownership provisions of the Tax Reform Act of 1986, net operating loss carry forwards for Federal income tax reporting purposes are subject to annual limitations. Should a change in ownership occur, net operating loss carry forwards may be limited as to use in future years.

The Company accounts for income taxes in accordance with Accounting Standards Codification Topic 740, Income Taxes ("Topic 740"), which requires the recognition of deferred tax liabilities and assets at currently enacted tax rates for the expected future tax consequences of events that have been included in the financial statements or tax returns. A valuation allowance is recognized to reduce the net deferred tax asset to an amount that is more likely than not to be realized.

Topic 740 provides guidance on the accounting for uncertainty in income taxes recognized in a company's financial statements. Topic 740 requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position. If the more-likely-than-not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements.

The Company includes interest and penalties arising from the underpayment of income taxes in the statements of operation in the provision for income taxes. As of December 31, 2018, the Company had no accrued interest or penalties related to uncertain tax positions.

On December 22, 2017, the United States federal government enacted the Tax Cuts and Jobs Act (the "2017 Act"). The 2017 Act will have pervasive financial reporting implications for all companies with U.S. operations, including reduction of the U.S. federal corporate tax rate from 35 percent to 21 percent. We reviewed and incorporated the new tax bill implications through 2017 financial statements. We remeasured the deferred taxes at new corporation rate of 21%, which reduced the net deferred tax assets, before valuation allowance, by approximately $2,809,700. Due to full valuation allowance, the change in deferred taxes was fully offset by the change in valuation allowance. The 2017 Act has no significant impact on the 2017 financial statements.

During the year ended December 31, 2018, the Company completed its accounting for the effects of the Tax Act which had no significant impact on the 2018 financial statement.

The Company files income tax returns in the U.S. federal jurisdiction and in the state of California. The Company is currently subject to U.S. federal, state and local, or non-U.S. income tax examinations by tax authorities since inception of the Company.

F-27

**Note 15: Commitments and Contingencies**

The Company has various contractual obligations, which are recorded as liabilities in our consolidated financial statements. Other items, such as certain purchase commitments and other executory contracts are not recognized as liabilities in our consolidated financial statements but are required to be disclosed in the footnotes to the financial statements. For example, the Company is contractually committed to make certain minimum lease payments for the use of property under its operating lease. In addition, the Company has contractual commitments for employment agreements of certain employees.

During the first quarter of 2018, the Company entered into an agreement for new office space to which it relocated its operations upon the expiration of its prior lease. Effective May 25, 2018, the Company began leasing approximately 6,969 square feet of general office space at 131 S Rodeo Drive, Suite 250, Beverly Hills, California 90212 pursuant to a 91-month lease. The Company will pay $364,130 annually, subject to annual escalations of 3.5%.

Rental expenses incurred for operating leases during the years ended December 31, 2018 and 2017 were $343,347 and $143,451, respectively.

The following is a schedule of future minimum contractual obligations as of December 31, 2018, under the Company's operating leases and employment agreements:

|  | 2019 | 2020 | 2021 | 2022 | 2023 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Operating Leases | $ 369,923 | $ 382,871 | $ 396,271 | $ 410,141 | $ 424,495 | $ 978,315 | $ 2,962,016 |
| Employment Contracts | 635,808 | 393,595 | 322,950 | 322,950 | 282,581 | – | 1,957,884 |
| **Total** | **$1,005,731** | **$ 776,466** | **$ 719,221** | **$ 733,091** | **$ 707,077** | **$ 978,315** | **$4,919,860** |

In addition to employment agreements and operating leases, in the normal course of its business, the Company enters into various agreements associated with its individual properties. Some of these agreements call for the potential future payment of royalties or "profit" participations for either (i) the use of third party intellectual property, such as the case with *Stan Lee and the Mighty 7* and *Llama Llama* among others, in which the Company is obligated to share net profits with the underlying rights holders on a certain basis as defined in the respective agreements or (ii) services rendered by animation studios, post-production studios, writers, directors, musicians or other creative talent for which the Company is obligated to share with these service providers a portion of the net profits of the properties on which they have rendered services, as defined in each respective agreement.

Additionally, other agreements contain options to acquire rights to intellectual property and would require payment to the rights holders contingent upon the Company securing minimum production, broadcast, or other financing commitments from third parties.

Lastly, for its Genius Brands Network, the Company licenses content for exhibition for which the Company is obligated to pay between 35% and 100% of revenues from the channel allocated to the aforementioned content after the deduction of certain direct operating expenses.

**Note 16: Related Party Transactions**

On April 21, 2016, the Company entered into a merchandising and licensing agreement with Andy Heyward Animation Art ("AHAA"), whose principal is Andy Heyward, the Company's Chief Executive Officer. The Company entered into a customary merchandise license agreement with AHAA for the use of characters and logos related to Warren Buffett's *Secret Millionaires Club* and *Stan Lee's Mighty 7* in connection with certain products to be sold by AHAA. The terms and conditions of such license are customary within the industry, and the Company earns an arm's-length industry standard royalty on all sales made by AHAA utilizing the licensed content. During the years ended December 31, 2018 and 2017, the Company earned $0 and $96 in royalties from this agreement, respectively.

F-28

On October 1, 2016, Llama Productions LLC entered into an animation production services agreement with Mr. Heyward for services as a producer for which he is to receive $186,000 through the course of production of the Company's animated series *Llama Llama.* From October 1, 2016 through December 31, 2017, Mr. Heyward has been paid $186,000.

On August 31, 2018 Llama Productions LLC entered into an animation production services agreement with Mr. Heyward for services as a producer for which he is to receive $124,000 through the course of production of the Company's animated series *Llama Llama. Season 2.* As of December 31, Mr. Heyward is owed $45,310, which is included in the Due To Related Party line item on our consolidated balance sheet.

Pursuant to his employment agreement dated November 16, 2018, Mr. Heyward is entitled to an Executive Producer fee of $12,400 per half hour episode for each episode he provides services as an executive producer. The first identified series under this employment agreement is *Rainbow Rangers.* As of December 31, 2018, nineteen half hours had been delivered and accordingly Mr. Heyward is owed $235,600, which is included in the Due To Related Party line item on our consolidated balance sheet.

On July 25, 2016, the Company entered into a consulting agreement with Foothill Entertainment, Inc. ("Foothill"), an entity whose Chairman is Gregory Payne, our corporate secretary. The Company has engaged Foothill Entertainment, Inc. for a term of six months to assist in the distribution and commercial exploitation of its audiovisual content as well as for the preparation and attendance on behalf of the Company at the MIPJR and MIPCOM markets in Cannes. The agreement continues on a month-to-month basis following the initial term. Foothill receives $12,500 per month for these services. Subsequent to the end of the period, the consulting agreement with Foothill was terminated effective January 31, 2018.

As of December 31, 2017, Gregory B. Payne, individually and via his ownership position in Foothill, owed to the Company $5,558 for expenditures made during the fourth quarter of 2017 related to the Brand Licensing Europe ("BLE") and MIPCOM tradeshows. In addition, during the fourth quarter of 2017, Foothill acted as an agent on the Company's behalf in licensing certain of our animated programs to certain broadcast networks for which Foothill owed to the Company $7,517 in license fees to be paid by the broadcaster to Foothill. Subsequent to the end of the period, the Company received a payment of $7,517 from Foothill as satisfaction of the open licensing invoice. Additionally, on February 28, 2018, Mr. Payne and the Company entered i

nto an agreement whereby, among other things, Mr. Payne was entitled to be reimbursed for 100% of his expenses incurred at the BLE and MIPCOM tradeshows resulting in the Company owing to Mr. Payne $827. As of December 31, 2018, no amounts are due to or from Mr. Payne or Foothill.

**Note 17: Subsequent Events**

Pursuant to FASB ASC 855, Management has evaluated all events and transactions that occurred from December 31, 2018 through the date of issuance of these financial statements. During this period, we did not have any significant subsequent events, except as disclosed below:

*February 2019 Sale of Securities and Warrants*

On February 19, 2019, the Company entered into a securities purchase agreement with a certain accredited investor pursuant to which we sold 945,894 shares of common stock and warrants to purchase up to 945,894 shares of our common stock, or the registered warrants, to such investor (the "February 2019 Offering"). The Company received $1,757,552 in net proceeds from this offering. Each share of common stock was accompanied by a registered warrant to purchase one share of common stock at an exercise price of $2.12. Each share of common stock and accompanying registered warrant were sold at a combined purchase price of $2.12. The shares of common stock and registered warrants were purchased together and were issued separately and were immediately separable upon issuance. In a concurrent private placement, the Company also sold to the purchaser in the February 2019 Offering, warrants to purchase up to 945,894 shares of our common stock, or the private warrants.

*Amendment, Waiver and Consent*

In connection with the February 2019 Offering and concurrent private placement, we entered into an amendment, waiver and consent agreement, or the "Amendment, Waiver and Consent Agreement," with certain holders of our 10% Secured Convertible Notes due August 20, 2019, which were issued pursuant a securities purchase agreement, dated August 17, 2018, by and among the Company and the purchasers identified on the signature pages thereto, or the notes purchase agreement. Pursuant to the Amendment, Waiver and Consent Agreement, such holders agreed to amend the notes purchase agreement, waive any applicable rights and remedies under the notes purchase agreement, and consent to the February 2019 Offering and concurrent private placement. In consideration for s

uch Amendment, Waiver and Consent Agreement, we agreed to issue such holders warrants to purchase up to an aggregate amount 1,800,000 shares of our comment stock. Such warrants have an exercise price of $2.55 per share, will become exercisable commencing six months and one day from the date of issuance and will expire five (5) years from the date of issuance.

*Series A Convertible Pref*
*erred Stock Price Adjustment*

As a result of this offering, the conversion price of our outstanding Series A Convertible Preferred Stock will be adjusted to $2.12.

*Leases*

Effective January 21, 2019, we entered into sublease for the 6,969 square feet of general office space located at 131 South Rodeo Drive, Suite 250, Beverly Hills, CA 90212 pursuant to an 83-month sublease that commenced on February 4, 2019. The subtenant will pay us rent of $422,321 annually, subject to annual escalations of 3.5%.

On December 28, 2018, we entered into lease for 5,765 square feet of general office space at 8383 Wilshire Blvd., Suite 412, Beverly Hills, CA 90211 pursuant to a 6-month lease that commenced January 28, 2019. We will pay rent of $24,501 monthly.

On January 30, 2019, we entered into lease for 5,838 square feet of general office space at 190 Cannon Drive, Suite 400, Beverly Hills, CA 90210 pursuant to a 96-month lease that is scheduled to commence on August 1, 2019. We will pay rent of $392,316 annually, subject to annual escalations of 3.5%.

*Company Stock Options*

At the board meeting on March 7, 2019, the Board of Directors approved the granting of options, to all persons employed as of December 31, 2018. It gave such person the option to purchase 81,000 shares of the Company's Common Stock at a price of $1.99 which was the closing price on that date.

*Shares Issued For Services*

On January 10, 2019, the Company issued 17,200 shares of the Company's common stock valued at $2.44 per share for investor relations services.
On January 17, 2019, the Company issued 11,765 shares of the Company's common stock valued at $2.55 per share for investor relations services.

F-30