# Exhibit 61

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**
**FORM 8-K**
**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
Date of Report (Date of earliest event reported): March 11, 2020
**GENIUS BRANDS INTERNATIONAL, INC.**
(Exact name of registrant as specified in its charter)

| **Nevada** | **000-54389** | **20-4118216** |
|---|---|---|
| (State or other jurisdiction of Incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |
| **190 N. Canon, 4th Fl.** **Beverly Hills, CA** | | **90210** |
| (Address of principal executive offices) | | (Zip Code) |

Registrant's telephone number, including area code: (310) 273-4222

_____
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.001 per share** | **GNUS** | **The Nasdaq Capital Market** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01. Entry into a Material Definitive Agreement.**

*Private Placement*

On March 11, 2020, Genius Brands International, Inc. (the "Company") and certain accredited investors (each an "Investor" and collectively, the "Investors") entered into a Securities Purchase Agreement (the "SPA") pursuant to which the Company agreed to sell and issue (1) Senior Secured Convertible Notes to the Investors in the aggregate principal amount of $13,750,000 (each, a "Note" and collectively, the "Notes") and $11,000,000 funding amount (reflecting an original issue discount of $2,750,000) and (2) warrants to purchase 65,476,190 shares of the Company's common stock, par value $0.001 per share (the "Common Stock"), exercisable for a period of five years at an initial exercise price of $0.26 per share (each a "Warrant" and collectively, the "Warrants"), for consideration consisting of (i) a cash payment of $7,000,000, and (ii) full recourse cash secured promissory notes payable by the Investors to the Company (each, an "Investor Note" and collectively, the "Investor Notes") in the principal amount of $4,000,000 (the "Investor Notes Principal") (collectively, the "Financing"). Andy Heyward, the Company's Chairman and Chief Executive Officer, participated as an Investor and invested $1,000,000 in connection with the Financing, all of which will be paid at the closing and not pursuant to an Investor Note.

The closing of the sale and issuance of the Notes, the Warrants and the Placement Agent Warrants described below is expected to occur on or before March 16, 2020 (the "Closing Date"). The maturity date of the Notes is September 30, 2021 and the maturity date of the Investor Notes is March 11, 2060.

The SPA contains certain representations and warranties, covenants and indemnities customary for similar transactions. In addition, the Company agreed to the following additional covenants including, but not limited to: (i) the Company shall hold a stockholder meeting (the "Stockholder Meeting"), by no later than May 15, 2020, to approve the issuance of shares of Common Stock issuable under the Notes and pursuant to the terms of the SPA for the purposes of compliance with the stockholder approval rules of The Nasdaq Stock Market ("Stockholder Approval") and the Company will be obligated to continue to seek Stockholder Approval every 90 days until such approval is obtained, (ii) until the date that the Notes are no longer outstanding, the Company will not issue, offer, sell or grant any equity or equity-linked security, subject to certain limited exceptions described in the SPA, unless (A) Stockholder Approval has been obtained prior thereto and (B) (i) at least 75% of the gross proceeds in excess of the first $2,000,000 of gross proceeds of all subsequent Financings consummated prior to the six month anniversary of the Closing Date are first applied to the redemption of the Notes (pro-rata based on an Investor's Purchase Price which redemption may be waiver by an Investor and it will not increase the pro-rata percentage of any other Investors) or (ii) at least 75% of the gross proceeds of any such subsequent placement consummated after the six month anniversary of the Closing Date are first applied to the redemption of the Notes (pro-rata), (iii) the Company shall use its best efforts to effectuate the transactions contemplated by the Voting Agreements executed by the Company and the stockholders who hold in the aggregate approximately 40% of the outstanding shares of Common Stock which require that such stockholders vote in favor of the proposals voted on at the Stockholder Meeting, and (iv) promptly securing the listing of certain shares issuable pursuant to the transaction documents and maintaining the listing of the shares of Common Stock on an eligible market.

In addition, pursuant to the terms of the SPA, the Notes and the Warrants, the Company agreed that the following will apply or become effective only following Stockholder Approval: (1) the conversion price of the Notes shall be reduced to $0.21 per share and may be further reduced to any amount and for any period of time deemed appropriate by the board of directors of the Company, (2) the exercise price of the Warrants shall be immediately reduced to $0.21 per share and may be further reduced to any amount and for any period of time deemed appropriate by the board of directors of the Company, (3) the Notes and Warrants shall each have full ratchet anti-dilution protection for subsequent financings (subject to certain exceptions), (4) existing warrant holders that are participating in the Financing (representing warrants to purchase an aggregate of 8,715,229 shares of Company Common Stock) will have their existing warrants' exercise prices reduced to $0.21 and (5) the investors shall have a most favored nations right which provides that if the Company enters into a subsequent financing, then the Investors (together with their affiliates) at their sole discretion shall have the ability to exchange their Notes on a $1 for $1 basis into securities issued in the new transaction. Additionally, in the event that any warrants or options (or any similar security or right) issued in a subsequent financing include any terms more favorable to the holders thereof (less favorable to the Company) than the terms of the Warrants, the Warrants shall be automatically amended to include such more favorable terms.

In addition, for as long as any Notes or Warrants remain outstanding, the Company will not (i) issue or sell any rights, warrants or options to subscribe for or purchase Common Stock or directly or indirectly convertible into or exchangeable or exercisable for Common Stock at a price which varies or may vary with the market price of the Common Stock, including by way of one or more reset(s) to any fixed price, unless the conversion, exchange or exercise price of any such security cannot be less than the then applicable Conversion Price with respect to the Common Stock into which any Notes are convertible or redeemable or the then applicable Exercise Price (as defined in the Warrants) with respect to the Common Stock into which any Warrant is exercisable or (ii) enter into, or effect any transaction under, any agreement, including, but not limited to, an equity line of credit, an "at-the-market" offering or similar agreement, whereby the Company may issue securities at a future determined price.

The SPA obligates the Company to indemnify each Investor and various related parties for certain losses including those resulting from (i) any misrepresentation or breach of any representation or warranty made by the Company, (ii) any breach of any obligation of the Company, and (iii) certain claims by third parties.

The SPA requires the Company to pay an expense allowance to the lead Investor, not to exceed $75,000 in the aggregate, for all costs and expenses incurred by the lead Investor or its designees in connection with the transactions contemplated by the transaction documents. The Company will use the net proceeds from the sale of the Notes and the Warrants, after deducting placement agent commissions, to repay certain outstanding convertible notes, fund production, pay legal fees and for general corporate purposes.

***The Notes***

*Principal Amount*

The aggregate principal amount of the Notes is $13,7500,000.

*Maturity Date*

Unless earlier converted or redeemed, the Notes mature September 30, 2021 (the "Maturity Date").

*Interest and Payment of Interest*

The Notes will be issued at a 20% original issue discount and shall not bear interest unless and until an Event of Default (as described below and as further described in the Notes) has occurred, in which event the Notes will bear interest at a rate of 18% (the "Default Rate"). Interest on the Notes is computed on the basis of a 360-day year and twelve 30-day months. Accrued and unpaid interest is payable by way of inclusion of such interest in the Conversion Amount (as defined below) or upon any redemption occurring prior to the Maturity Date, including, without limitation, upon any Bankruptcy Event of Default (as defined in the Notes). Interest shall cease to accrue on the calendar day immediately following the date of cure, provided, however, that such Event of Default shall not be deemed cured unless and until any accrued and unpaid Interest shall be paid to the Investor.

*Amortization of Principal*

The Notes provide that the Company will repay the principal amount of Notes in equal monthly installments of $1/12^{th}$ of the principal amount of the Notes beginning October 31, 2020 and the last business day of each calendar month anniversary thereafter (each an "Installment Date"). On each Installment Date, assuming the Equity Conditions described below are met and Stockholder Approval has been obtained, all or some of the Installment Amount (as defined in the Notes) shall be converted into shares of Common Stock, provided however that the Company may elect prior to any Installment Date to pay all or a portion of the installment amount in cash, as described below.

The Company may elect to pay each monthly Installment Amount in (i) cash (a "Company Redemption" and such cash payment, the "Company Installment Redemption Price") equal to 100% of the portion of such Installment Amount which the Company elects or is required to redeem pursuant to a Company Redemption (the "Company Redemption Amount") or (ii) if (a) the Equity Conditions described below are satisfied or waived and (b) the Company so elects and Stockholder Approval has been obtained, by conversion of all or some of an Installment Amount into Common Stock (a "Company Conversion"). To the extent that the Company elects to pay an Installment Amount in shares of Common Stock, then (A) twenty-three (23) trading days prior to the applicable Installment Date (each such date being a "Pre-Installment Date"), the Company shall deliver to the Investor(s) a number of shares of Common Stock (each such quantity being a "Pre-Installment Share Amount") equal to the Installment Amount being paid in shares of Common Stock divided by the lower of (i) the then prevailing Conversion Price or (ii) the Market Price (as defined below) determined on the applicable Pre-Installment Date, and (B) on the applicable Installment Date, the Company shall deliver to the Investor a number of shares of Common Stock equal to (a) the amount of the applicable Installment Amount being paid in shares of Common Stock divided by the lower of (i) the then prevailing Conversion Price or (ii) the Market Price determined on the applicable Installment Date, less (b) any applicable Pre-Installment Share Amount delivered pursuant to the applicable Installment Amount. "Market Price" means 85% of the arithmetic average of the five (5) lowest daily Weighted Average Prices of the Common Stock during the twenty (20) consecutive Trading Day period ending on the Trading Day immediately preceding the applicable date of determination, subject to adjustments for any stock split, stock dividend, stock combination, reclassification or other similar transaction during such measuring period.

With respect to any given date of determination, the "Equity Conditions" include:

(i) on each day during the period beginning thirty (30) Trading Days immediately prior to the applicable date of determination and ending on and including the applicable date of determination (the "Equity Conditions Measuring Period"), the shares of Common Stock issuable pursuant to the Notes and upon exercise of the Warrants (the "Underlying Securities") shall be registered for resale pursuant to one or more registration statements filed with the Securities and Exchange Commission (the "SEC") or eligible for sale pursuant to Rule 144 promulgated under the Securities Act of 1933 (the "Securities Act") (or a successor rule thereto) (collectively, "Rule 144");

(ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Nasdaq Capital Market (the "Principal Market") or any other eligible market and shall not have been suspended from trading on such exchange or market nor shall delisting or suspension by such exchange or market been threatened (with delisting reasonably likely to occur after giving effect to all applicable notice, appeal, cure, compliance and hearing periods), commenced or pending either (A) in writing by such exchange or market or (B) by falling below the then effective minimum listing maintenance requirements of such exchange or market;

(iii) during the Equity Conditions Measuring Period, the Company shall have delivered shares of Common Stock pursuant to the terms of the Notes and shares of Common Stock upon exercise of the Warrants to the holders on a timely basis as set forth in the Notes and the Warrants, respectively;

(iv) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions may be issued in full without violating the Notes and the rules or regulations of the Principal Market or any other applicable eligible market;

(v) during the Equity Conditions Measuring Period, the Company shall not have failed to timely make any payments within five (5) business days of when such payment is due pursuant to any transaction document;

(vi) during the Equity Conditions Measuring Period, there shall not have occurred either (A) the public announcement of a pending, proposed or intended Fundamental Transaction (as defined in the Notes) which has not been abandoned, terminated or consummated, (B) an Event of Default or (C) an event that with the passage of time or giving of notice would constitute an Event of Default or Triggering Event (as defined in the Notes);

4

(vii) the Company shall have no knowledge of any fact that would cause (x) one or more registration statements not to be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the terms of the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, or (y) any shares of Common Stock issuable pursuant to the terms of the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, not to be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (or any successor thereto) promulgated under the Securities Act, provided that no Public Information Failure has occurred, and any applicable state securities laws;

(viii) during the Equity Conditions Measuring Period, the Company otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any transaction document in any material respect (other than representations or warranties subject to material adverse effect or materiality, which may not be breached in any respect);

(ix) during the Equity Conditions Measuring Period, the Investor shall not have been in possession of any material, nonpublic information received from the Company, any subsidiary or its respective agent or affiliates;

(x) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions are duly authorized and listed and eligible for trading without restriction on an eligible market;

(xi) the average daily dollar trading volume of the Common Stock as reported by Bloomberg during the twenty (20) Trading Days immediately prior to the applicable date of determination shall be at least $100,000; and

(xii) on each Trading Day during the Equity Conditions Measuring Period, the closing price of the Common Stock equals or exceeds $0.05 (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction occurring after the March 11, 2020).

Any holder of a Note may, by notice to the Company, accelerate future installment payments to any applicable Installment Date, in which case the Company will deliver shares of Common Stock for the conversion of such accelerated payments (the "Accelerated Amount"), regardless of whether the Installment Amount scheduled to be paid on such applicable Installment Date shall be paid in cash, shares of Common Stock or a combination thereof. In the event that the Investor delivers one or more such notices of acceleration, the aggregated Accelerated Amount shall not be greater than six (6) times such Investor's pro rata amount.

If the Company fails to redeem the Company Redemption Amount on the applicable Installment Date by payment of the Company Installment Redemption Price on such date, then at the option of the Investor designated in writing to the Company (any such designation shall be deemed a "Conversion Notice" pursuant to the Notes), (i) the Investor shall have the rights set forth in the Notes as if the Company failed to pay the applicable Company Installment Redemption Price and all other rights as an Investor in the Notes (including, without limitation, such failure constituting an Event of Default described in the Notes) and (ii) the Investor may require the Company to convert all or any part of the Company Redemption Amount at the Company Conversion Price as in effect on the applicable Installment Date.

Subject to certain beneficial ownership limitations, until the Company Installment Redemption Price is paid in full, the Company Redemption Amount may be converted, in whole or in part, by the Investor into Common Stock. In the event the Investor elects to convert all or any portion of the Company Redemption Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Redemption Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid on the final Installment Date, unless the Investor otherwise indicates and allocates among any Installment Dates in the applicable Conversion Notice.

5

*Optional Redemption at Company's Election*

At any time after the date of issuance of the Notes, the Company will have the right to redeem a portion or all of the Notes in cash at a price equal to (i) so long as there has been no Equity Conditions Failure during the period beginning on the date on which the Company provided notice of such redemption through the trading day immediately before the date the Company makes the entire redemption payment, 110% of the Conversion Amount to be redeemed and (ii) if an Equity Conditions Failure occurs (which is not waived in writing by the holder) at any time during the period beginning on the date on which the Company provided notice of such redemption through the trading day immediately before the date the Company makes the entire redemption payment, the greater of (x) 125% of the Conversion Amount to be redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest closing price of the Common Stock on any trading day during the period commencing on the date immediately preceding the date on which the Company provided notice of such redemption and ending on the trading day immediately before the date the Company makes the entire redemption payment, by (II) the lowest Conversion Price in effect during such period.

*Conversion of the Notes*

Each Convertible Note is convertible, at the option of the Note holder, into shares of Common Stock at an initial Conversion Price of $1.375, subject to adjustment as provided in the Notes; provided, however, upon receipt of Stockholder Approval, the Conversion Price shall be $0.21, subject to adjustment as provided in the Notes.

On or after the date Nasdaq Stockholder Approval is obtained, if the Company issues or sells, or the Company publicly announces the issuance or sale of, any shares of Common Stock, or convertible securities or options issuable or exchangeable into Common Stock (a "New Issuance"), under which such Common Stock is sold for a consideration per share less than the Conversion Price then in effect, the Conversion Price of the Notes will be adjusted to the New Issuance price in accordance with the formulas provided in the Notes. Any such adjustment will not apply with respect to the issuance of Excluded Securities (as defined in the Notes). Upon Stockholder Approval, the Conversion Price may be further reduced to any amount and for any period of time deemed appropriate by the board of directors of the Company.

*Beneficial Ownership Limitations Issuance*

In addition to the conversion limitations described above, shares of Common Stock may not be issued under the Notes and the Investor may not have the right to any shares of Common Stock otherwise issuable pursuant to the terms of the Note if, after giving effect to the conversion or issuance, the Investor together with its affiliates would beneficially own in excess of 4.99% of the outstanding shares of Common Stock, unless otherwise indicated by an Investor on the Closing Date. At the Investor's option, the ownership limitation blocker may be raised or lowered to any other percentage not in excess of 9.99%, as applicable, except that any raise will only be effective upon 61-days' prior notice to the Company.

*Covenants*

The Company will make certain negative covenants in the Notes, pursuant to which the Company agrees not to, and will cause each of its subsidiaries not to: (a) incur or guarantee, assume or suffer to exist any indebtedness, other than permitted indebtedness; (b) allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets of the Company or any of its subsidiaries other than certain permitted liens; (c) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents all or any portion of any indebtedness other than the Notes if at the time such payment is due or is otherwise made or, after giving effect to such payment, an Event of Default has occurred and is continuing; (d) redeem, repurchase or declare or pay any cash dividend or distribution on any of its capital stock; (e) redeem or repurchase its equity interests (except on a pro rata basis among all holders thereof); (f) declare or pay any cash dividend or distribution on any equity interest of the Company or of its subsidiaries; (g) make any changes in the nature of its business nor modify the Company's or any of its subsidiaries' corporate structure or purpose; (h) encumber, license or otherwise allow any liens on any intellectual property other than certain permitted liens; (i) enter into, renew, extend or be a party to, any transaction or series of related transactions with any affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its subsidiaries than would be obtainable in a comparable arm's length transaction with a person that is not an affiliate thereof; or (j) issue any Notes or any other securities that would cause a breach or default under the Notes or the Warrant.

The Company will make certain affirmative covenants in the Notes, pursuant to which the Company agrees to, and will cause each of its subsidiaries to: (a) maintain and preserve its existence, rights and privileges, and become or remain, and cause each of its subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary; (b) maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder; (c) maintain all of its intellectual property rights that are necessary or material to the conduct of its business; (d) maintain certain insurance coverage, (e) cause such subsidiary formed on or after the Subscription Date to execute, and deliver to each holder of Notes a guaranty agreement and all other security documents as requested by Required Holders, as applicable, and (f) notify the Investors in writing whenever an Equity Conditions Failure occurs other than with respect to clauses (xi) and (xii) of the definition of "Equity Conditions" set forth above, and simultaneously with the delivery of such notice, file a Current Report on Form 8-K with the SEC to state such fact. In addition, the Company's net loss (calculated on an accrual basis in accordance with GAAP and adjust by reversing any and all equity or derivative liability gains and losses) in any calendar month shall not exceed $550,000 (the "Monthly Cash Burn Amount"). The Monthly Cash Burn Amount shall not include any of the following: (i) the placement agent fees in connection with the sale of the Notes and Warrants, (ii) fees of the Company and investor legal counsels in connection with the sale of the Notes and Warrants not to exceed $150,000 in the aggregate, (iii) existing Indebtedness in the amount of $2,866,665 and (iv) outstanding fees of legal counsel not to exceed $350,000. On every fifteenth (15th) day of each calendar month, the Company is required to deliver a written notice to the Investor certifying whether (x) it has complied with the foregoing and (y) it reasonably expects to comply with the foregoing while the Notes remain outstanding and (ii) in the event the Company is not able to certify as to clause (x) or (y) above, it shall simultaneously with the delivery of such notice to the Investors, file a Current Report on Form 8-K with the SEC to state such fact.

*Events of Default*

The Notes will contain standard and customary Events of Default including but not limited to: (i) the suspension of the Common Stock from trading on an eligible market for a period of two (2) consecutive trading days or for more than an aggregate of ten (10) trading days in any 365-day period or the failure to maintain the listing of the Common Stock on an eligible market; (ii) failure to make conversions or satisfy notice requirements regarding non-compliance with conversion requests of the Notes; (iii) failure to make payments when due under the Notes; (iv) the occurrence of any default (after lapse of any applicable cure periods) under, redemption of or acceleration prior to maturity of at least an aggregate of $100,000 of indebtedness of the Company or any of its subsidiaries, (v) breaches of representations and warranties in any material respect or breaches of covenants or other terms of the transaction documents that are not cured if can be cured; (vi) a final judgment or judgments for the payment of money aggregating in excess of $100,000, (vii) bankruptcy or insolvency; (viii) any breach or failure in any material respect to comply with the conversion or redemption provisions or covenants in the Notes; (ix) material failure to perform or comply with any material covenant or agreement contained in the Security Agreement; (x) certain customary events of default relating to the security interests and the collateral; (xi) a false or inaccurate certification by the Company that the Equity Conditions are satisfied or that there has been no Equity Conditions Failure or as to whether any Event of Default has occurred; (xii) a Material Adverse Effect has occurred; (xiii) the Company fails to remove any restrictive legend on any certificate or any shares of Common Stock issued to the holder upon conversion or exercise when required by such securities or the SPA, unless otherwise then prohibited by applicable federal securities laws, and any such failure remains uncured for at least five (5) consecutive Trading Days; and (xiv) any default under the other Notes.

Following an Event of Default, the Investor may require the Company to redeem all or any portion of the Notes. The redemption amount must immediately be paid in cash at a price equal to the Event of Default Redemption Price.

The Company must immediately redeem the Notes in cash upon the occurrence of a Bankruptcy Event of Default.

The Event of Default Redemption Price will be computed as a price equal to the greater of (x) 125% of the principal, interest and late charges to be redeemed (the "Conversion Amount") and (y) the product of (A) the Conversion Amount and (B) the quotient determined by dividing (I) the greatest Closing Price of the Common Stock during the period beginning on the date immediately preceding such Event of Default and ending on the date the Investor delivers the Event of Default Redemption Notice, by (II) the lowest Conversion Price in effect during such period.

*Fundamental Transactions*

If, at any time while a Note is outstanding, a Fundamental Transaction (as defined in the Notes) occurs or is consummated, then, upon any subsequent conversion of the Note, the Investor shall have the right to receive, for each share of Common Stock that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, at the option of the Investor, the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "Alternate Consideration") receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Note is convertible immediately prior to such Fundamental Transaction. The definition of Fundamental Transactions includes, but is not limited to, mergers, a sale of all or substantially all of the Company's assets, certain tender offers and other transactions that result in a Change of Control (as defined in the Notes).

The Notes will require the Company to cause any successor entity involved in a Change of Control in which the Company is not the survivor to assume in writing all of the Company's obligations under the Notes.

Further, in connection with a Change of Control, a noteholder may require us to redeem all or any portion of each Convertible Note. The Change of Control redemption price per share will equal the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding the earlier to occur of (x) the consummation of the Change of Control and (y) the public announcement of such Change of Control and ending on the date the Holder delivers the Change of Control Redemption Notice, by (II) the lowest Conversion Price in effect during such period.

***Security Agreement and Guarantee Agreement***

The Company and each of its current and future subsidiaries (collectively, the "Grantors") also entered into a Security Agreement (the "Security Agreement") with Anson Investments Master Fund LP, as collateral agent (the "Collateral Agent"), and the Investors. Pursuant to the Security Agreement, the Investors were granted a first priority perfected security interest in all personal property of the Grantors (except for interests in Llama Production, LLC) to secure all of the Company's obligations under the SPA, the Notes, the Warrants, the Investor Notes, the Investor Note Purchase Agreement (as defined below), the Master Netting Agreement, the Guarantee Agreement (as defined below), the Lock-Up Agreements, the Voting Agreement and the other Transaction Documents (as defined in the SPA) (collectively, the "Transaction Documents"). In addition, in connection with the Security Agreement, certain subsidiaries of the Company (the "Guarantors") executed a guarantee agreement (the "Guarantee Agreement"), pursuant to which the Guarantors agreed to guarantee and act as surety for the payment of the Notes and other of the Company's obligations under the Transaction Documents. The Notes will rank senior to all outstanding and future indebtedness of the Company and its subsidiaries except with respect to indebtedness of Llama Productions LLC until all of the Company's obligations under the Notes are paid in full.

*Investor Warrant*

In addition to the Notes, the Company will issue the 5-year Warrants for the purchase of an aggregate of 65,476,190 shares of Common Stock (the "Warrant Shares"), at an exercise price of $0.26 per share, provided, however, that immediately following the Stockholder Approval, the exercise price shall be reduced to equal $0.21. Upon Stockholder Approval, the exercise price of the Warrants may be further reduced to any amount and for any period of time deemed appropriate by the board of directors of the Company. The number of Warrant Shares and exercise price are each subject to adjustment provided under the Warrants. If, at the time of exercise of the Warrant, there is no effective registration statement registering, or no current prospectus available for, the issuance of the Warrant Shares to the Investor, then the Warrant may also be exercised, in whole or in part, by means of a "cashless exercise". The Warrant may not be exercised if, after giving effect to the exercise the Investor, together with its Attribution Parties (as defined in the Warrant), would beneficially own in excess of 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to the issuance of the Warrant Shares. At the Investor's option, the ownership limitation blocker may be raised or lowered to any other percentage not in excess of 9.99%, as applicable, except that any raise will only be effective upon 61-days' prior notice to the Company.

On or after the date Stockholder Approval is obtained, if the Company issues or sells, or the Company publicly announces the issuance or sale of, any shares of Common Stock, or convertible securities or options issuable or exchangeable into Common Stock (a "New Issuance"), under which such Common Stock is sold for a consideration per share less than the exercise price then in effect, the exercise price of the Warrant will be adjusted to the New Issuance price in accordance with the formulas provided in the Warrant. Any such adjustment will not apply with respect to the issuance of Excluded Securities (as defined in the Warrant). Upon any adjustment to the exercise price, the number of Warrant Shares that may be purchased upon exercise of the Warrant will be increased or decreased proportionally, so that after such adjustment the aggregate exercise price payable for the adjusted number of Warrant Shares will be the same as the aggregate exercise price in effect immediately prior to such adjustment.

In addition, if the Company enters into a Fundamental Transaction (as defined in the Warrants) at any time that a Warrant is outstanding, then, upon any subsequent exercise of the Warrant, the Investor will have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which the Warrant is exercisable immediately prior to such Fundamental Transaction, provided, further, that if holders of Common Stock are not offered or paid any consideration in such Fundamental Transaction, such holder of Common Stock will be deemed to have received common stock of the successor entity (which entity may be the Company following such Fundamental Transaction) in such Fundamental Transaction.

*Investor Notes*

The Investor Notes will be issued pursuant to an Investor Note Purchase Agreement between the Company and the Investors (the "Investor Note Purchase Agreement") and are payable in full on March 11, 2060. The Investor's obligation to pay the Company the Investor Notes Principal pursuant to the Investor Notes is to be secured by $4,000,000, in the aggregate, in cash, cash equivalents, any Group of Ten ("G10") currency and any notes or other securities issued by any G10 country. The Company will receive the applicable portion of the Investor Notes Principal then due upon each voluntary or mandatory prepayment of the Investor Notes. The Investors may, at their option and at any time, voluntarily prepay the Investor Notes, in whole or in part. The Investor Notes are also subject to mandatory prepayment, in whole or in part, upon the occurrence of one or more of the following mandatory prepayment events:

(1) Mandatory Prepayment upon Conversion of Notes – At any time (i) if the Company receives a conversion notice from an Investor in which all, or any part of the Notes to be converted included any Restricted Principal (as defined therein), and (ii) the Investor receives a confirmation from the Company's transfer agent that it has been irrevocably instructed by the Company to deliver to the Investor the shares of Common Stock to be issued pursuant to the conversion notice, then such Investor will be required to prepay the Investor Note, on a dollar-for-dollar basis, for each conversion of any Restricted Principal of a Note held by the Investor.

(2) Forced Mandatory Prepayment – The Company may require an Investor to prepay the Investor Notes by delivering a mandatory prepayment notice to the Investor, subject to (i) certification by the Company in writing to the Investor on or after the date that the shares issuable upon the conversion in full of the Notes (ignoring for such purpose any conversion limitations therein) can be sold, assigned or transferred pursuant to Rule 144 and prior to the eighteen-month anniversary of the Closing Date, and (ii) the simultaneous filing of such certification with the SEC as an exhibit attached to a Current Report on Form 8-K that (a) the Cash Burn Milestone has been met, (b) Stockholder Approval has been obtained (the covenants in (a) and (b), the "Mandatory Covenants"), and (c) no Event of Default, or event that with the passage of time or giving of notice would constitute an Event of Default, then exists. Notwithstanding the foregoing, the Company shall not deliver a Forced Mandatory Prepayment Notice unless it simultaneously (i) delivers a Forced Mandatory Prepayment Notice (as defined in each other Investor Note), pro rata, to each other Investor (as defined in each other Investor Note) and (ii) files the Forced Mandatory Prepayment Notice with the SEC as an exhibit attached to a Current Report on Form 8-K.

The Investor Notes will also contains certain offset rights of the Company and the Investors, which if exercised, would reduce the amount outstanding under the Notes and the Investor Notes by the same amount and, accordingly, the cash proceeds received by the Company from the Investors pursuant to the Financing. These offset rights are triggered by specific occurrences that could jeopardize an Investor's investment and include the following:

- Optional Offset Right – if the Company has not satisfied the Mandatory Covenants in accordance with their terms or (II) at any time on or after the occurrence of an Event of Default (as defined in the Note), a Change of Control (as defined in the Note) or a Company Optional Redemption (as defined in the Note), each Investor is entitled to satisfy and cancel any principal and related accrued and unpaid interest and any other amounts owed by such Investor to the Company under such Investor's Investor Note (and under the Note Purchase Agreement, the Notes and the SPA (together with the Investor Notes, the "Underlying Agreements")) by cancelling an equal amount of principal amount under such Investor's Note (or any amounts owed by the Company to such Investor under the Underlying Agreements).

- Optional Offset upon Investor Event of Default – If the Company accelerates the debt owed by an Investor to the Company under such Investor's Investor Note after an Investor event of default thereunder, in lieu of making any payment under the Investor Note in cash, such Investor is entitled to satisfy and cancel all or any part of the principal owed by such Investor to the Company under such Investor's Investor Note by the concurrent cancellation of an equal amount owed under the related Notes, provided that no default netting shall occur with respect to any Mandatory Prepayment Amount that the Investor fails to properly prepay in violation of the Investor Note.

- Automatic Offset at Maturity – On the maturity date of an Investor Note, the outstanding principal amount owed by an Investor to the Company under such Investor Note shall be satisfied and cancelled in exchange for the cancellation of an equal amount owed the Company to such Investor under the related Note.

- Automatic Offset Upon Prohibited Transfer of an Investor Note – Upon the occurrence of a Prohibited Transfer (as defined in the Investor Note), then, (i) all of the outstanding principal of such Investor Note will be automatically deemed satisfied in full and cancelled, and (ii) 75% of the remaining Restricted Principal under the related Note will be automatically cancelled (with the remaining 25% of the Restricted Principal of such Investor's Note automatically becoming unrestricted principal thereunder).

Upon any of the foregoing offsets, any accrued and unpaid interest under the Investor Notes will be automatically cancelled with respect to the portion of the principal of the Investor Notes being offset and cancelled.

If any provision of an Investor Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction or other similar authority, such Investor Note will be automatically terminated and all remaining payment obligations hereunder of the Investor to the Company shall be automatically cancelled.

*Master Netting Agreement*

At the closing, the Company and the Investors will enter into a Master Netting Agreement (the "Master Netting Agreement") for the purpose of clarifying for each party its right to offset obligations that may arise under the SPA, the Investor Note, the Notes and the Investor Note Purchase Agreement upon the occurrence of certain events, including as described above.

*Voting Agreement*

As a condition to closing the Financing, existing stockholders representing an aggregate of 10,035,861 shares (or approximately 40%) of our outstanding Common Stock (collectively, the "Principal Stockholders"), have executed Voting Agreements with the Company. Pursuant to the Voting Agreement, the Principal Stockholders agree to vote all of their shares of Common Stock in favor of the Company's issuance of the securities at the Stockholder Meeting.

*Lockup Agreement*

As a condition to closing the Financing, the Principal Stockholders will have executed a Lockup Agreement with the Company. Pursuant to the Lockup Agreement, the Principal Stockholders agreed that from the date thereof until ninety (90) days following the one year anniversary of the Closing Date, each Principal Stockholder will not and will cause all affiliates (as defined in Rule 144 promulgated under the 1933 Act) of the Principal Stockholder, or any person with whom the Principal Stockholder or any affiliate of the Principal Stockholder is acting as a group, not to, (i) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase, make any short sale or otherwise dispose of or agree to dispose of, directly or indirectly, any shares of Common Stock or Common Stock Equivalents (as defined in the SPA), or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Securities and Exchange Act of 1934, as amended and the rules and regulations of the SEC promulgated thereunder with respect to any shares of Common Stock or Common Stock Equivalents owned directly by the Principal Stockholder (including holding as a custodian) or with respect to which the Principal Stockholder has beneficial ownership within the rules and regulations of the SEC (collectively, the "Principal Stockholder's Shares"), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of the Principal Stockholder's Shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of shares of Common Stock or other securities, in cash or otherwise, (iii) make any demand for or exercise any right or cause to be filed a registration statement, including any amendments thereto, with respect to the registration of any shares of Common Stock or Common Stock Equivalents or (iv) publicly disclose the intention to do any of the foregoing.

*Placement Agent*

The Special Equities Group, LLC, a division of Bradley Woods & Co. Ltd., acted as the exclusive placement agent for the transaction (the "Placement Agent") pursuant to the terms of an Engagement Letter, dated March 10, 2020, between the Company and the Placement Agent. At the closing, the Company will pay the Placement Agent a cash fee of $700,000 and will pay an additional cash fee of $400,000 if the Company receives the additional funding from the prepayment of the Investor Notes by the Investors. The Company will pay the Placement Agent warrants to purchase 6,547,619 shares of Common Stock at an initial exercise price of $0.26 per share at closing, which shall be in the same form as the Warrants issued to the Investors (collectively, the "Placement Agent Warrants").

*Other Terms*

The SPA, the Notes, the Security Agreement, the Guarantee Agreement, the Warrants, the Investor Notes, the Investor Note Purchase Agreement and the Master Netting Agreement contain customary provisions for agreements and documents of this nature, such as representations, warranties, closing conditions, covenants, and indemnification and contribution obligations, as applicable. The foregoing descriptions of the SPA, the Notes, the Security Agreement, the Guarantee Agreement, the Warrants, the Placement Agent Warrants, the Investor Notes, the Investor Note Purchase Agreement and the Master Netting Agreement do not purport to describe all of the terms and provisions thereof and are qualified in their entirety by reference to the SPA, the combined form of Notes, the form of Security Agreement, the form of Guarantee Agreement, the form of Warrant, the form of Placement Agent Warrant, the form of Investor Note, the form of Investor Note Purchase Agreement and the form of Master Netting Agreement which are filed as Exhibits 10.1, 4.1, 10.2, 10.3, 4.3, 4.4, 4.2, 10.4 and 10.5, respectively, to this Current Report on Form 8-K and are incorporated herein by reference.

11

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information included in Item 1.01 of this Current Report on Form 8-K is hereby incorporated by reference into this Item 2.03.

As described in Item 1.01 above, which is hereby incorporated by reference into this Item 2.03, on the Closing Date, pursuant to the SPA, the Company completed the sale and issuance of the Notes and the Warrants, for consideration received by the Company on the Closing Date consisting of (i) a cash payment of $7,000,000, and (ii) the Investor Notes in the aggregate principal amount of $4,000,000.

**Item 3.02. Unregistered Sales of Equity Securities.**

The information included in Items 1.01 and 2.03 of this Current Report on Form 8-K is hereby incorporated by reference into this Item 3.02.

The issuance of the Notes and the Warrants and the issuance of the shares of Common Stock issuable upon conversion of the Notes and exercise of the Warrants will be exempt from registration under Securities Act Section 4(a)(2) and Securities Act Rule 506(b). The Investors are sophisticated and represented in writing that they were accredited investors and acquired the securities for their own accounts for investment purposes. A legend will be placed on the Notes, the Warrants and the stock certificates issued upon conversion of the Notes and exercise of the Warrants, subject to the terms of the transaction documents, stating that the securities have not been registered under the Securities Act and cannot be sold or otherwise transferred without registration or an exemption therefrom.

The issuance of the Placement Agent Warrant and the shares of Common Stock issuable upon exercise of Placement Agent Warrant will be exempt from registration under Securities Act Section 4(a)(2), because the Company will issue it to one sophisticated and accredited recipient and the Company will place a legend on the warrant certificate stating that the issuance of it and the shares of Common Stock underlying it has not been registered under the Securities Act and cannot be sold or otherwise transferred without registration or an exemption therefrom.

**Item 3.03. Material Modification to Rights of Security Holders.**

The information included in Item 1.01 of this Current Report on Form 8-K is hereby incorporated by reference into this Item 3.03.

**Item 9.01. Financial Statements and Exhibits.**

**(d) Exhibits**

| Exhibit No. | Description |
| --- | --- |
| 4.1 | Form of Senior Secured Convertible Note issued by the Company |
| 4.2 | Form of Investor Note issued by the Investor |
| 4.3 | Form of Investor Warrant |
| 4.4 | Form of Placement Agent Warrant |
| 10.1 | Form of Securities Purchase Agreement, dated March 11, 2020, by and between the Company and the Investors signatory thereto |
| 10.2 | Form of Security Agreement |
| 10.3 | Form of Guarantee Agreement |
| 10.4 | Form of Investor Note Purchase Agreement |
| 10.5 | Form of Master Netting Agreement |
| 10.6 | Form of Voting Agreement |
| 10.7 | Form of Lock-Up Agreement |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

|  |  |  |
|---|---|---|
|  | GENIUS BRANDS INTERNATIONAL, INC. | |
| Date: March 11, 2020 | By: | /s/ Andy Heyward |
|  | Name: | Andy Heyward |
|  | Title: | Chief Executive Officer |

**Exhibit 4.1**

**[FORM OF SENIOR SECURED CONVERTIBLE NOTE]**

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD OR ELIGIBLE TO BE SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 3(c)(iii) AND 18(a) HEREOF. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 3(c)(iii) OF THIS NOTE.**

**THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT ("OID"). PURSUANT TO TREASURY REGULATION §1.1275-3(b)(1), ROBERT DENTON, A REPRESENTATIVE OF THE COMPANY HEREOF WILL, BEGINNING TEN DAYS AFTER THE ISSUANCE DATE OF THIS NOTE, PROMPTLY MAKE AVAILABLE TO THE HOLDER UPON REQUEST THE INFORMATION DESCRIBED IN TREASURY REGULATION §1.1275-3(b)(1)(i). HE MAY BE REACHED AT TELEPHONE NUMBER (310) 499-2410.**

**GENIUS BRANDS INTERNATIONAL, INC.**

**SENIOR SECURED CONVERTIBLE NOTE**

Issuance Date: March [ ], 2020      Original Principal Amount: U.S. $[ ]

Initial Unrestricted Principal: U.S. $[ ][1]

      **FOR VALUE RECEIVED**, Genius Brands International, Inc., a Nevada corporation (the "**Company**"), hereby promises to pay to [BUYER] or registered assigns (the "**Holder**") in cash and/or in shares of Common Stock (as defined below) the amount set forth above as the Original Principal Amount (as reduced pursuant to the terms hereof pursuant to redemption, conversion, amortization or otherwise, the "**Principal**") when due, whether upon the Maturity Date (as defined below), on any Installment Date with respect to the Installment Amount due on such Installment Date, acceleration, redemption or otherwise (in each case in accordance with the terms hereof) and to pay default interest ("**Interest**") on any outstanding Principal at the applicable Default Rate to the extent it accrues pursuant to Section 2 at any time from the date set out above as the Issuance Date (the "**Issuance Date**") until the same becomes due and payable, whether upon an Interest Date (as defined below), any Installment Date, the Maturity Date, acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). This Senior Secured Convertible Note (including all Senior Secured Convertible Notes issued in exchange, transfer or replacement hereof, this "**Note**") is one of an issue of Senior Secured Convertible Notes issued pursuant to the Securities Purchase Agreement on the Closing Date (collectively, the "**Notes**" and such other Senior Secured Convertible Notes, the "**Other Notes**"). Certain capitalized terms used herein are defined in Section 32.

---

[1] Insert Holder's Pro Rata Amount of NTD $12.5-$4 is $7.5.

1

(1) PAYMENTS OF PRINCIPAL; PREPAYMENT. The Company acknowledges and agrees that this Note was issued at an original issue discount and that any Principal amount that reflects such original issue discount shall be Unrestricted Principal and Initial Unrestricted Principal hereunder. On each Installment Date, the Company shall pay to the Holder an amount equal to the Installment Amount due on such Installment Date in accordance with Section 8. On the Maturity Date, if any portion of this Note remains outstanding after giving effect to any Company Conversions and Company Redemptions occurring on or prior to such date in accordance with Section 8, the Company shall pay to the Holder an amount in cash representing all outstanding Principal, accrued and unpaid Interest and accrued, if any, and unpaid Late Charges (as defined in Section 26(b)), if any, on such Principal and Interest, except that any Restricted Principal hereunder shall be satisfied on the Maturity Date (in lieu of a cash payment) by Maturity Netting (as defined below). The "**Maturity Date**" shall be September [30], 2021[2] (the "**Scheduled Maturity Date**"), as may be extended at the option of the Holder (i) in the event that, and for so long as, an Event of Default (as defined in Section 4(a)) shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 1) or any event shall have occurred and be continuing on the Maturity Date (as may be extended pursuant to this Section 1) that with the passage of time and the failure to cure would result in an Event of Default, (ii) through the date that is ten (10) Business Days after the consummation of a Change of Control in the event that a Change of Control is publicly announced or a Change of Control Notice (as defined in Section 5(b)) is delivered prior to the Maturity Date and (iii) to such date elected by the Holder pursuant to a Deferral Notice in accordance with Section 8(d) in the event the Holder elects to submit such a Deferral Notice electing to defer the last Installment Date hereunder beyond the Scheduled Maturity Date. Other than as specifically permitted by this Note, the Company may not prepay any portion of the outstanding Principal, accrued and unpaid Interest or accrued and unpaid Late Charges on Principal and Interest, if any.

(a) Securities Contract. The Company and the Holder hereby acknowledge and agree that the Securities Purchase Agreement and the Note Purchase Agreement (as defined in the Securities Purchase Agreement) each is a "securities contract" as defined in 11 U.S.C. § 741 and that the Holder shall have all rights in respect of this Note, the Master Netting Agreement (as defined in the Securities Purchase Agreement), the Investor Note, the Securities Purchase Agreement and the Note Purchase Agreement as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), including, without limitation, all rights of credit, deduction, setoff, offset, and netting (collectively, "**Netting**" or "**Net**") as are available under this Note, the Master Netting Agreement and the Investor Note and all Netting provisions of this Note, the Investor Note and the Master Netting Agreement, including without limitation the provisions set forth in Section 7 of the Investor Note, are hereby incorporated in this Note and made a part hereof as if such provisions were set forth herein.

(b) Investor Prepayments; No Share Issuance or Sales until Fully Paid. Upon the consummation of any Investor Prepayment, the aggregate outstanding Restricted Principal under this Note shall automatically become Unrestricted Principal hereunder, on a dollar-for-dollar basis, in an amount equal to the aggregate amount of cash paid in such Investor Prepayment. Notwithstanding anything herein to the contrary, the shares of Common Stock issuable upon conversion of Restricted Principal hereunder shall not be required to be issued by the Company until such portion of the Investor Note equivalent to the Restricted Principal subject to such conversion has been fully paid pursuant to an Investor Prepayment or otherwise (to the Company or to such other Persons as directed by the Company in writing) and such Restricted Principal becomes Unrestricted Principal in accordance with the preceding sentence.

(c) Prohibited Transfer or Severability Reduction. Upon any Prohibited Transfer (as defined in the Investor Note) of the Investor Note, (x) the Investor Note shall be deemed paid in full and shall be null and void, and (y) 80% of the remaining Restricted Principal of this Note shall be automatically cancelled with the remaining 20% of the Restricted Principal of this Note automatically becoming Unrestricted Principal hereunder.

(d) Investor Netting Right Reduction. Upon any exercise by the Holder of Investor Netting Rights, the Restricted Principal hereunder shall automatically and simultaneously be reduced, on a dollar-for-dollar basis, by such portion of the aggregate principal of the Investor Note cancelled pursuant to such Investor Netting Rights.

(e) Single Integrated Transaction. The Company hereby acknowledges and agrees that (i) the Holder shall be entitled to exercise the Investor Netting Rights through any means permissible under applicable law, including without limitation, Netting and (ii) the obligations of the Holder under the Investor Note and the obligations of the Company under this Note arise in a single integrated transaction and constitute related and interdependent obligations within such transaction.

_____

[2] Insert date that is the last Trading Day of the calendar month on the 18 month anniversary of the Issuance Date.

2

(f) <u>Grant of Security Interest</u>. In addition to the security interest granted to the Collateral Agent for the benefit of the Holder and the holders of the Other Notes pursuant to the Security Documents, the Company hereby grants and pledges to the Holder a continuing security interest in the Investor Note of the Holder, including any and all cash, proceeds, funds, credits, rights and other assets therein or arising therefrom, from time to time, and any additions, dividends, profits and interest in the foregoing and any replacements or substitutions therefore (collectively, the "**Investor Note Collateral**") to secure prompt repayment of any and all amounts outstanding hereunder from time to time and to secure prompt performance by the Company of each of its covenants and duties under this Note. Such security interest constitutes a valid, first priority security interest in the Investor Note Collateral, and will constitute a valid, first priority security interest in later-acquired Investor Note Collateral. Notwithstanding any filings undertaken related to the Holder's rights under the Nevada Uniform Commercial Code, the Holder's Lien on the Investor Note Collateral shall remain in effect for so long as any Restricted Principal remains outstanding.

(g) <u>Order of Conversion and/or Redemption</u>. Notwithstanding anything herein to the contrary, at any time after no Initial Unrestricted Principal remains outstanding, with respect to any partial conversion or redemption hereunder, as applicable, the Company shall convert or redeem, as applicable, <u>First</u>, all accrued and unpaid Late Charges on any Principal and Interest hereunder and under any other Notes held by such Holder, <u>Second</u>, all accrued and unpaid Interest hereunder and under any other Notes held by such Holder, <u>Third</u>, all other amounts owed (other than Principal) hereunder and under any other Notes held by such Holder and, <u>Fourth</u>, all Principal (other than Restricted Principal) outstanding hereunder and under any other Notes held by such Holder, in each case, immediately prior to any such conversion or redemption, as applicable, in each case, allocated pro rata among this Note and such other Notes held by such Holder.

(2) <u>INTEREST</u>. No Interest shall accrue hereunder unless and until an Event of Default has occurred. From and after the occurrence and during the continuance of any Event of Default, Interest shall accrue hereunder at eighteen percent (18.0%) per annum (the "**Default Rate**") and shall be computed on the basis of a 360-day year and twelve 30-day months and shall be payable, if applicable, in arrears on the last Business Day of any Calendar Quarter during which Interest accrues hereunder (an "**Interest Date**") to the record holder of this Note in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holder in writing to the Company. Accrued and unpaid Interest, if any, shall also be payable prior to an Interest Date by way of inclusion of the Interest in the Conversion Amount (as defined in Section 3(b)(i)) on each (i) Conversion Date (as defined in Section 3(c)(i)) in accordance with Section 3(c)(i) and/or (ii) upon any redemption hereunder occurring prior to the Maturity Date, including, without limitation, upon a Bankruptcy Event of Default redemption. In the event that an Event of Default is subsequently cured (and no other Event of Default then exists (including, without limitation, for the Company's failure to pay such Interest at the Default Rate on the Maturity Date)), Interest shall cease to accrue hereunder as of the calendar day immediately following the date of such cure; <u>provided</u> that the Interest as calculated and unpaid during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of such cure of such Event of Default; <u>provided</u>, <u>further</u>, that for the purpose of this Section 2, such Event of Default shall not be deemed cured unless and until any accrued and unpaid Interest shall be paid to the Holder.

(3) <u>CONVERSION OF NOTES</u>. At any time or times after the Issuance Date, this Note shall be convertible into shares of Common Stock, on the terms and conditions set forth in this Section 3.

(a) <u>Conversion Right</u>. Subject to the provisions of Section 3(d), at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount.

3

(b) Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i) "**Conversion Amount**" means the sum of (A) the portion of the Principal to be converted, amortized, redeemed or otherwise with respect to which this determination is being made, (B) accrued and unpaid Interest, if any, with respect to such Principal and (C) accrued and unpaid Late Charges, if any, with respect to such Principal and Interest.

(ii) "**Conversion Price**" means, as of any Conversion Date or other date of determination, $1.375, subject to adjustment as provided herein; provided, however, upon receipt of Nasdaq Stockholder Approval, $0.21, subject to adjustment as provided herein.

(c) Mechanics of Conversion.

(i) Optional Conversion. To convert any Conversion Amount into shares of Common Stock on any date (a "**Conversion Date**"), the Holder shall (A) transmit by facsimile or electronic mail (or otherwise deliver), for delivery on or prior to 11:59 p.m., New York time, on such date, a copy of an executed notice of conversion in the form attached hereto as Exhibit I (a "**Conversion Notice**") to the Company and (B) if required by Section 3(c)(iii), but without delaying the Company's requirement to deliver shares of Common Stock on the applicable Share Delivery Date (as defined below), surrender this Note to a common carrier for delivery to the Company as soon as practicable on or following such date (or an indemnification undertaking with respect to this Note in the case of its loss, theft, destruction or mutilation in compliance with the procedures set forth in Section 20(b)). Each Conversion Notice shall indicate, at the Holder's sole discretion, the portion of the Initial Unrestricted Amount and/or the Other Unrestricted Amount of this Note being converted. Also, in lieu of indicating the portion of the Initial Unrestricted Amount and/or the Other Unrestricted Amount that the Holder elects to convert, the Holder may indicate in a Conversion Notice the number of shares of Common Stock it seeks to receive upon conversion of any portion of this Note (and the percentage of such Conversion Amount that the Holder elects to allocate to the Initial Unrestricted Amount and the percentage of such Conversion Amount that the Holder elects to allocate to the Other Unrestricted Amount) and the reduction of the Conversion Amount pursuant to such conversion shall be determined at the end of such Conversion Date by multiplying such number of shares of Common Stock by the applicable Conversion Price. No ink-original Conversion Notice shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Conversion Notice be required. On or before the first (1st) Business Day following the date of delivery of a Conversion Notice, the Company shall transmit by facsimile or electronic mail a confirmation of receipt of such Conversion Notice to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the earlier of (i) the second (2nd) Trading Day and (ii) the number of Trading Days comprising the Standard Settlement Period, in each case, following the date on which the Holder has delivered a Conversion Notice to the Company (a "**Share Delivery Date**"), the Company shall (x) provided that the Transfer Agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer Program and (A) the Conversion Shares are subject to an effective resale registration statement in favor of the Holder or (B) if converted at a time when Rule 144 would be available for immediate resale of the Conversion Shares by the Holder, credit such aggregate number of Conversion Shares to which the Holder is entitled pursuant to such exercise to the Holder's or its designee's balance account with DTC through its Deposit / Withdrawal At Custodian system, or (y) if (A) the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or (B) the Conversion Shares are not subject to an effective resale registration statement in favor of the Holder and, if converted at a time when Rule 144 would not be available for immediate resale of the Conversion Shares by the Holder, issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled. If this Note is physically surrendered for conversion as required by Section 3(c)(iii) and the outstanding Principal of this Note is greater than the Principal portion of the Conversion Amount being converted, then the Company shall as soon as practicable and in no event later than three (3) Business Days after delivery of this Note and at its own expense, issue and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal not converted. The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the applicable Conversion Date, irrespective of the date such Conversion Shares are credited to the Holder's account with DTC or the date of delivery of the certificates evidencing such Conversion Shares, as the case may be. In the event that the Holder elects to convert a portion of the Principal amount of this Note prior to any applicable Installment Date, the Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder to the Holder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

4

(ii) <u>Company's Failure to Timely Convert</u>. If the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to the Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program or if converted, at a time when the Conversion Shares are not subject to an effective resale registration statement in favor of the Holder and Rule 144 would not be available for immediate resale of the Conversion Shares by the Holder, or credit the Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program and (a) the Conversion Shares are subject to an effective resale registration statement in favor of the Holder or (b) if converted at a time when Rule 144 would be available for immediate resale of the Conversion Shares by the Holder, for the number of shares of Common Stock to which the Holder is entitled upon the Holder's conversion of any Conversion Amount (a "**Conversion Failure**"), then (A) the Company shall pay damages to the Holder for each Trading Day of such Conversion Failure in an amount equal to 1.0% of the product of (1) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, and (2) any trading price of the Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Conversion Date and ending on the applicable Share Delivery Date and (B) the Holder, upon written notice to the Company, may void its Conversion Notice with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Conversion Notice; <u>provided</u> that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 3(c)(ii) or otherwise. In addition to the foregoing, if the Company shall fail on or prior to the applicable Share Delivery Date to issue and deliver a certificate to the Holder, if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, or credit the Holder's balance account with DTC, if the Transfer Agent is participating in the DTC Fast Automated Securities Transfer Program, for the number of shares of Common Stock to which the Holder is entitled upon the Holder's conversion of any Conversion Amount or on any date of the Company's obligation to deliver shares of Common Stock as contemplated pursuant to clause (y) below, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of Common Stock issuable upon such conversion that the Holder is entitled to receive from the Company and has not received from the Company in connection with such Conversion Failure (a "**Buy-In**"), then the Company shall, within three (3) Trading Days after the Holder's request and in the Holder's discretion, either (x) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "**Buy-In Price**"), at which point the Company's obligation to issue and deliver such certificate or credit the Holder's balance account with DTC for the shares of Common Stock to which the Holder is entitled upon the Holder's conversion of the applicable Conversion Amount shall terminate, or (y) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such shares of Common Stock or credit the Holder's balance account with DTC for such shares of Common Stock and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the price at which the sell order giving rise to such purchase obligation was executed.

(iii) <u>Registration; Book-Entry</u>. The Company shall maintain a register (the "**Register**") for the recordation of the names and addresses of the holders of each Note and the Initial Unrestricted Principal, Other Unrestricted Principal and Restricted Principal (and stated interest thereon) held by such holders (the "**Registered Notes**"). The entries in the Register shall be conclusive and binding for all purposes absent manifest error. The Company and the holders of the Notes shall treat each Person whose name is recorded in the Register as the owner of a Note for all purposes, including, without limitation, the right to receive payments of Principal and Interest, if any, hereunder, notwithstanding notice to the contrary. A Registered Note may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Upon its receipt of a request to assign or sell all or part of any Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 20. Notwithstanding anything to the contrary in this Section 3(c)(iii), the Holder may assign any Note or any portion thereof to an Affiliate of the Holder or a Related Fund of the Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); <u>provided</u>, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until the Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless (A) the full Conversion Amount represented by this Note is being converted or (B) the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Initial Unrestricted Principal, Other Unrestricted Principal, Interest and Late Charges, if any, converted and/or paid (as the case may be) or Restricted Principal becoming unrestricted and the dates of such conversions, Investor Prepayments and/or payments (as the case may be) or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion. If the Company does not update the Register to record such Principal, Interest and Late Charges converted and/or paid (as the case may be) or Restricted Principal becoming unrestricted and the dates of such conversions, Investor Prepayment and/or payments (as the case may be) within two (2) Business Days of such occurrence, then the Register shall be automatically deemed updated to reflect such occurrence.

(iv) <u>Pro Rata Conversion; Disputes</u>. In the event that the Company receives a Conversion Notice from the Holder and one or more holders of Other Notes for the same Conversion Date and the Company can convert some, but not all, of such portions of this Note and/or Other Notes submitted for conversion, the Company, subject to Section 3(d), shall convert from the Holder and each holder of Other Notes electing to have Notes converted on such date a pro rata amount of such holder's pro rata amount of such holder's portion of the Note and its Other Notes submitted for conversion based on the Principal amount of this Note and the Other Notes submitted for conversion on such date by such holder relative to the aggregate Principal amount of this Note and all Other Notes submitted for conversion on such date. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 25.

(d) <u>Conversion Limitations</u>;

(i) <u>Beneficial Ownership</u>. Notwithstanding anything to the contrary contained herein, the Company shall not issue any shares of Common Stock pursuant to the terms of this Note, and the Holder shall not have the right to any shares of Common Stock otherwise issuable pursuant to the terms of this Note and such issuance shall be null and void and treated as if never made, to the extent that after giving effect to such issuance, the Holder together with the other Attribution Parties collectively would beneficially own in excess of [4.99] [9.99][3]% (the "**Maximum Percentage**") of the shares of Common Stock outstanding immediately after giving effect to such issuance. For purposes of the foregoing sentence, the aggregate number of shares of Common Stock beneficially owned by the Holder and the other Attribution Parties shall include the number of shares of Common Stock held by the Holder and all other Attribution Parties plus the number of shares of Common Stock issuable upon conversion of this Note with respect to which the determination of such sentence is being made, but shall exclude shares of Common Stock which would be issuable upon (i) conversion of the remaining, nonconverted portion of this Note beneficially owned by the Holder or any of the other Attribution Parties and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any convertible notes or convertible preferred stock or warrants, including the Warrants) beneficially owned by the Holder or any other Attribution Party subject to a limitation on conversion or exercise analogous to the limitation contained in this Section 3(d)(i). For purposes of this Section 3(d)(i), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act. For purposes of determining the number of outstanding shares of Common Stock the Holder may acquire upon the conversion of the Note without exceeding the Maximum Percentage, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (i) the Company's most recent Annual Report on Form 10-K, Quarterly Report on Form 10-Q, Current Report on Form 8-K or other public filing with the SEC, as the case may be, (ii) a more recent public announcement by the Company or (iii) any other written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding (the "**Reported Outstanding Share Number**"). If the Company receives a Conversion Notice from the Holder at a time when the actual number of outstanding shares of Common Stock is less than the Reported Outstanding Share Number, the Company shall notify the Holder in writing of the number of shares of Common Stock then outstanding and, to the extent that such Conversion Notice would otherwise cause the Holder's beneficial ownership, as determined pursuant to this Section 3(d)(i), to exceed the Maximum Percentage, the Holder must notify the Company of a reduced number of shares of Common Stock to be purchased pursuant to such Conversion Notice. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Trading Day confirm orally and in writing or by electronic mail to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Note, by the Holder and any other Attribution Party since the date as of which the Reported Outstanding Share Number was reported. In the event that the issuance of shares of Common Stock to the Holder upon conversion of this Note results in the Holder and the other Attribution Parties being deemed to beneficially own, in the aggregate, more than the Maximum Percentage of the number of outstanding shares of Common Stock (as determined under Section 13(d) of the Exchange Act), the number of shares so issued by which the Holder's and the other Attribution Parties' aggregate beneficial ownership exceeds the Maximum Percentage (the "**Excess Shares**") shall be deemed null and void and shall be cancelled ab initio, and the Holder shall not have the power to vote or to transfer the Excess Shares. Upon delivery of a written notice to the Company, the Holder may from time to time increase or decrease the Maximum Percentage to any other percentage not in excess of 9.99% as specified in such notice; provided that (i) any such increase in the Maximum Percentage will not be effective until the sixty-first (61st) day after such notice is delivered to the Company and (ii) any such increase or decrease will apply only to the Holder and the other Attribution Parties and not to any other holder of Notes that is not an Attribution Party of the Holder. For purposes of clarity, the shares of Common Stock issuable pursuant to the terms of this Note in excess of the Maximum Percentage shall not be deemed to be beneficially owned by the Holder for any purpose including for purposes of Section 13(d) or Rule 16a-1(a)(1) of the Exchange Act. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 3(d)(i) to the extent necessary to correct this paragraph (or any portion of this paragraph) which may be defective or inconsistent with the intended beneficial ownership limitation contained in this Section 3(d)(i) or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitation contained in this paragraph may not be waived and shall apply to a successor holder of this Note.

_____
[3] Insert Maximum Percentage as indicated on the Buyer's signature page attached to the Securities Purchase Agreement.

6

(4) RIGHTS UPON EVENT OF DEFAULT.

(a) Event of Default. Each of the following events shall constitute an **"Event of Default"** and each of the events in clauses (vi) and (vii) shall constitute a **"Bankruptcy Event of Default"**:

(i) (A) the suspension of the Common Stock from trading on an Eligible Market for a period of two (2) consecutive Trading Days or for more than an aggregate of ten (10) Trading Days in any 365-day period or (B) the failure of the Common Stock to be listed on an Eligible Market;

(ii) the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within five (5) Business Days after the applicable Conversion Date or (B) notice, written or oral, to the Holder or any holder of the Other Notes, including by way of public announcement or through any of its agents, at any time, of its intention not to comply with a request for conversion of this Note or any Other Notes into shares of Common Stock that is tendered in accordance with the provisions of this Note or the Other Notes, other than pursuant to Section 3(d) (and analogous provisions under the Other Notes);

(iii) at any time following the tenth (10th) consecutive Business Day that the Holder's Authorized Share Allocation is less than the Holder's Pro Rata Amount of the applicable Required Reserve Amount (as defined in the Securities Purchase Agreement);

(iv) the Company's failure to pay to the Holder any amount of Principal, Interest, Late Charges, Redemption Price or other amounts when and as due under this Note or any other Transaction Document, except, in the case of a failure to pay Interest and/or Late Charges when and as due, in which case only if such failure continues for a period of at least an aggregate of two (2) Business Days;

(v) the occurrence of any default (after lapse of any applicable cure periods) under, redemption of or acceleration prior to maturity of at least an aggregate of $150,000 of Indebtedness of the Company or any of its Subsidiaries other than with respect to this Note or any Other Notes;

(vi) the Company or any of its Subsidiaries, pursuant to or within the meaning of Title 11, U.S. Code, or any similar federal, foreign or state law for the relief of debtors (collectively, **"Bankruptcy Law"**), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a **"Custodian"**), (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(vii) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries;

(viii) a final judgment or judgments for the payment of money aggregating in excess of $100,000 are rendered against the Company or any of its Subsidiaries and which judgments are not, within sixty (60) days after the entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $100,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company or such Subsidiary (as the case may be) will receive the proceeds of such insurance or indemnity within thirty (30) days of the issuance of such judgment;

7

(ix) other than as specifically set forth in another clause of this Section 4(a), the Company or any of its Subsidiaries breaches any representation, warranty, in any material respect (other than representations or warranties subject to Material Adverse Effect or materiality, which may not be breached in any respect), covenant or other term or condition of any Transaction Document, except, in the case of a breach of a covenant or other term or condition of any Transaction Document which is curable, only if such breach remains uncured for a period of at least five (5) consecutive Business Days;

(x) any breach or failure in any material respect to comply with either Sections 8, 16 or 17 of this Note;

(xi) the Company or any Subsidiary shall materially fail to perform or comply with any covenant or agreement contained in the Security Agreement to which it is a party;

(xii) any material provision of this Note or any Security Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company or any Subsidiary intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by the Company or any Subsidiary or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Company or any Subsidiary shall deny in writing that it has any liability or obligation purported to be created under any Security Document;

(xiii) this Note, any Security Document or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien (as defined in Section 16(b)) in favor of the Holder or the Collateral Agent for the benefit of the holders of the Notes on the Investor Note Collateral and any Collateral purported to be covered hereby and thereby;

(xiv) any bank at which any deposit account, blocked account, or lockbox account of the Company or any Subsidiary is maintained shall fail to comply with any material term of any deposit account, blocked account, lockbox account or similar agreement to which such bank is a party or any securities intermediary, commodity intermediary or other financial institution at any time in custody, control or possession of any investment property of the Company or any Subsidiary shall fail to comply with any of the terms of any investment property control agreement to which such Person is a party (it being understood that only accounts pursuant to which the Collateral Agent has requested account control agreements should be subject to this clause (xv));

(xv) any material damage to, or loss, theft or destruction of, any Collateral or a material amount of property of the Company, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of the Company or any Subsidiary, if any such event or circumstance would reasonably be expected to have a Material Adverse Effect;

(xvi) a false or inaccurate certification (including a false or inaccurate deemed certification) by the Company that the Equity Conditions are satisfied or that there has been no Equity Conditions Failure or as to whether any Event of Default has occurred;

(xvii) any Material Adverse Effect occurs;

8

(xviii) the Company fails to remove any restrictive legend on any certificate or any shares of Common Stock issued to the Holder upon conversion or exercise (as the case may be) of any Securities and when required by such Securities or the Securities Purchase Agreement, unless otherwise then prohibited by applicable federal securities laws, and any such failure remains uncured for at least five (5) consecutive Trading Days; or

(xix) any Event of Default (as defined in the Other Notes) occurs with respect to any Other Notes.

(b) <u>Redemption Right</u>. Upon the occurrence of an Event of Default with respect to this Note or any Other Note, the Company shall within one (1) Business Day deliver written notice thereof via facsimile or electronic mail and overnight courier (an "**Event of Default Notice**") to the Holder. At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Holder may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of this Note by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note the Holder is electing to require the Company to redeem. Each portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding such Event of Default and ending on the date the Holder delivers the Event of Default Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**Event of Default Redemption Price**"). Redemptions required by this Section 4(b) shall be made in accordance with the provisions of Section 12. To the extent redemptions required by this Section 4(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 4, but subject to Section 3(d), until the Event of Default Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 4(b) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. In the event of a partial redemption of this Note pursuant hereto, the Principal amount redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Event of Default Redemption Notice. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 4(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption premium due under this Section 4(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(c) <u>Mandatory Redemption upon Bankruptcy Event of Default</u>. Notwithstanding anything to the contrary herein, and notwithstanding any conversion that is then required or in process, upon any Bankruptcy Event of Default, whether occurring prior to or following the Maturity Date, the Company shall immediately pay to the Holder an amount in cash representing 125% of all outstanding Principal, accrued and unpaid Interest, if any, and accrued and unpaid Late Charges, if any, on such Principal and Interest, in addition to any and all other amounts due hereunder (the "**Bankruptcy Event of Default Redemption Price**"), without the requirement for any notice or demand or other action by the Holder or any other Person, except that any Restricted Principal then outstanding hereunder shall be satisfied through Bankruptcy Event of Default Netting (as defined in the Investor Note) (in lieu of such cash payment hereunder); provided that the Holder may, in its sole discretion, waive such right to receive payment upon a Bankruptcy Event of Default, in whole or in part, and any such waiver shall not affect any other rights of the Holder hereunder, including any other rights in respect of such Bankruptcy Event of Default, any right to conversion, and any right to payment of the Event of Default Redemption Price or any other Redemption Price, as applicable.

9

(5) RIGHTS UPON FUNDAMENTAL TRANSACTION AND CHANGE OF CONTROL.

(a) Assumption. If, at any time while this Note is outstanding, a Fundamental Transaction occurs or is consummated, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each share of Common Stock that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder (without regard to any limitation in Section 3(d) on the conversion of this Note), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "**Alternate Consideration**") receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Note is convertible immediately prior to such Fundamental Transaction (without regard to any limitation in Section 3(d) on the conversion of this Note). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Note following such Fundamental Transaction. The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "**Successor Entity**") to assume in writing all of the obligations of the Company under this Note in accordance with the provisions of this Section 4(a) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Note a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Note which is convertible for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon conversion of this Note (without regard to any limitations on the conversion of this Note) prior to such Fundamental Transaction, and with a conversion price which applies the conversion price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such conversion price being for the purpose of protecting the economic value of this Note immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Note referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Note with the same effect as if such Successor Entity had been named as the Company herein.

(b) Redemption Right. No sooner than twenty (20) days nor later than fifteen (15) days prior to the consummation of a Change of Control, but not prior to the public announcement of such Change of Control, the Company shall deliver written notice thereof via facsimile or electronic mail and overnight courier to the Holder (a "**Change of Control Notice**"). At any time during the period beginning on the earlier to occur of (x) any oral or written agreement by the Company or any of its Subsidiaries, upon consummation of which the transaction contemplated thereby would reasonably be expected to result in a Change of Control, (y) the Holder becoming aware of a Change of Control if the Change of Control Notice is not delivered to the Holder in accordance with the immediately preceding sentence (as applicable) and (z) the Holder's receipt of a Change of Control Notice and ending twenty (20) Trading Days after the date of the consummation of such Change of Control, the Holder may require the Company to redeem (a "**Change of Control Redemption**") all or any portion of this Note by delivering written notice thereof ("**Change of Control Redemption Notice**") to the Company, which Change of Control Redemption Notice shall indicate the Conversion Amount the Holder is electing to require the Company to redeem. The portion of this Note subject to redemption pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to the greater of (x) 125% of the Conversion Amount being redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding the earlier to occur of (x) the consummation of the Change of Control and (y) the public announcement of such Change of Control and ending on the date the Holder delivers the Change of Control Redemption Notice, by (II) the lowest Conversion Price in effect during such period (the "**Change of Control Redemption Price**"). Redemptions required by this Section 5 shall be made in accordance with the provisions of Section 12 and shall have priority to payments to stockholders in connection with a Change of Control. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(d), until the Change of Control Redemption Price is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. In the event of a partial redemption of this Note pursuant hereto, the Principal amount redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Change of Control Redemption Notice. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Change of Control redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

10

(6) <u>DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS</u>.

(a) <u>Distribution of Assets</u>. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, Options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions (<u>provided</u>, <u>however</u>, that to the extent that the Holder's right to participate in any such Distribution would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Distribution to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Distribution (and beneficial ownership) to such extent) and the portion of such Distribution shall be held in abeyance for the Holder until such time or times as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such rights (and any rights under this Section 6(a) on such initial rights or on any subsequent such rights to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(b) <u>Purchase Rights</u>. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (<u>provided</u>, <u>however</u>, that to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, then the Holder shall not be entitled to participate in such Purchase Right to such extent (and shall not be entitled to beneficial ownership of such shares of Common Stock as a result of such Purchase Right (and beneficial ownership) to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time or times as its right thereto would not result in the Holder and the other Attribution Parties exceeding the Maximum Percentage, at which time or times the Holder shall be granted such right (and any Purchase Right granted, issued or sold on such initial Purchase Right or on any subsequent Purchase Right to be held similarly in abeyance) to the same extent as if there had been no such limitation).

(7) <u>ADJUSTMENTS TO CONVERSION PRICE</u>. The Conversion Price will be subject to adjustment from time to time as provided in this Section 7.

(a) <u>Adjustment of Conversion Price upon Issuance of Common Stock</u>. If and whenever on or after the date Nasdaq Stockholder Approval is obtained, the Company issues or sells, or in accordance with this Section 7(a) is deemed to have issued or sold, or the Company publicly announces the issuance or sale of, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock issued or sold, or in accordance with this Section 7(a) is deemed to have been issued or sold, by the Company (x) in connection with any Excluded Securities (other than clause (vii) therein), (y) for which the Holder received a Distribution in at least an equivalent amount pursuant to Section 6(a) and (z) adjusting the Conversion Price pursuant to Section 7(b)), for a consideration per share (the "**New Issuance Price**") less than a price (the "**Applicable Price**") equal to the Conversion Price in effect immediately prior to such issue or sale or deemed issuance or sale (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance the Conversion Price then in effect shall be reduced to an amount equal to the New Issuance Price. For purposes of determining the adjusted Conversion Price under this Section 7(a), the following shall be applicable:

11

(i) <u>Issuance of Options</u>. If the Company in any manner grants or sells, or the Company publicly announces the issuance or sale of, any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 7(a)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion exercise or exchange of any Convertible Security issuable upon exercise of such Option. No further adjustment of the Conversion Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities.

(ii) <u>Issuance of Convertible Securities</u>. If the Company in any manner issues or sells, or the Company publicly announces the issuance or sale of, any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 7(a)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security. No further adjustment of the Conversion Price shall be made upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Conversion Price has been or is to be made pursuant to other provisions of this Section 7(a), no further adjustment of the Conversion Price shall be made by reason of such issue or sale.

(iii) <u>Change in Option Price or Rate of Conversion</u>. If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exchangeable or exercisable for shares of Common Stock increases or decreases at any time, the Conversion Price in effect at the time of such increase or decrease shall be adjusted to the Conversion Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 7(a)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 7(a) shall be made if such adjustment would result in an increase of the Conversion Price then in effect.

12

(iv) <u>Calculation of Consideration Received</u>. If any Option and/or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "**Primary Security**", and such Option and/or Convertible Security and/or Adjustment Right, the "**Secondary Securities**" and together with the Primary Security, each a "**Unit**"), together comprising one integrated transaction (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing), the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be the lowest of (x) the purchase price of such Unit, (y) if such Primary Security is an Option and/or Convertible Security, the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise or conversion of the Primary Security in accordance with Section 7(a)(i) or 7(a)(ii) above and (z) the lowest Weighted Average Price of the Common Stock on any Trading Day during the three (3) Trading Day period immediately following the public announcement of such Dilutive Issuance (for the avoidance of doubt, if such public announcement is released prior to the opening of the Principal Market on a Trading Day, such Trading Day shall be the first Trading Day in such three (3) Trading Day period). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration other than cash received therefor will be deemed to be the net amount received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such publicly traded securities on the date of receipt of such publicly traded securities. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Required Holders. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five (5) Business Days after the tenth (10th) day following the Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Required Holders. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company. Notwithstanding anything to the contrary contained in this Section 7(a), if the New Issuance Price calculated pursuant to this Section 7(a) would result in a price less than $0.0001, the New Issuance Price shall be deemed to be $0.0001.

(v) <u>Record Date</u>. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

(vi) <u>No Readjustments</u>. For the avoidance of doubt, in the event the Conversion Price has been adjusted pursuant to this Section 7(a) and the Dilutive Issuance that triggered such adjustment does not occur, is not consummated, is unwound or is cancelled after the facts for any reason whatsoever, in no event shall the Conversion Price be readjusted to the Conversion Price that would have been in effect if such Dilutive Issuance had not occurred or been consummated.

(b) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Subscription Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Subscription Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased. Any adjustment under this Section 7(b) shall become effective at the close of business on the date the subdivision or combination becomes effective.

13

(c) <u>Voluntary Adjustment by Company</u>. Subject to receipt of Nasdaq Stockholder Approval, the Company may at any time during the term of this Note, with the prior written consent of the Required Holders, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(8) <u>COMPANY CONVERSION OR REDEMPTION</u>.

(a) <u>General</u>. On each applicable Installment Date provided there has been no Equity Conditions Failure and the Nasdaq Stockholder Approval has been obtained, the Company shall pay to the Holder of this Note the applicable Installment Amount due on such date by converting all or some of such Installment Amount into Common Stock, in accordance with this Section 8 (a "**Company Conversion**"); <u>provided</u>, <u>however</u>, that the Company may, at its option following written notice to the Holder as set forth below, pay the Installment Amount by redeeming such Installment Amount in cash (a "**Company Redemption**") or by any combination of a Company Conversion and a Company Redemption so long as all of the outstanding applicable Installment Amount due on any Installment Date shall be converted and/or redeemed by the Company on the applicable Installment Date, subject to the provisions of this Section 8. Notwithstanding anything herein to the contrary, if on an Installment Date there has been an Equity Conditions Failure or the Company has not obtained Nasdaq Stockholder Approval, the Company shall be required to pay the Installment Amount in cash only. On or prior to the date which is the twenty-third (23rd) Trading Day prior to each Installment Date (each, an "**Installment Notice Due Date**"), the Company shall deliver written notice (each, a "**Company Installment Notice**" and the date all of the holders receive such notice is referred to as the "**Company Installment Notice Date**"), to each holder of Notes which Company Installment Notice shall (i) either (A) confirm that the applicable Installment Amount of the Holder's Note shall be converted to Common Stock in whole or in part pursuant to a Company Conversion (such amount to be converted, the "**Company Conversion Amount**") or (B) (1) state that the Company elects to redeem for cash, or is required to redeem for cash in accordance with the provisions of the Notes, in whole or in part, the applicable Installment Amount pursuant to a Company Redemption and (2) specify the portion of such Installment Amount which the Company elects or is required to redeem pursuant to a Company Redemption (such amount to be redeemed, the "**Company Redemption Amount**") and the portion of such Installment Amount that is the Company Conversion Amount, which amounts, when added together, must equal the applicable Installment Amount and (ii) if the Installment Amount is to be paid, in whole or in part, in Common Stock pursuant to a Company Conversion, certify that no Equity Conditions Failure has occurred as of the applicable Company Installment Notice Date. Each Company Installment Notice shall be irrevocable. If the Company does not timely deliver a Company Installment Notice in accordance with this Section 8, then the Company shall be deemed to have delivered an irrevocable Company Installment Notice confirming a Company Conversion and shall be deemed to have certified that there shall not have occurred an Equity Conditions Failure in connection with such Company Conversion as of the applicable Company Installment Notice Date. Except as expressly provided in this Section 8, the Company shall convert and/or redeem the applicable Installment Amount of this Note pursuant to this Section 8 and the corresponding Installment Amounts of the Other Notes pursuant to the corresponding provisions of the Other Notes in the same ratio of the Installment Amount being converted and/or redeemed hereunder. The Company Conversion Amount (whether set forth in the Company Installment Notice or by operation of this Section 8) shall be converted in accordance with Section 8(b) and the Company Redemption Amount shall be redeemed in accordance with Section 8(c). Notwithstanding anything herein to the contrary, in the event of any partial conversion or redemption of this Note, the Conversion Amount converted or redeemed shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in a written notice to the Company.

14

(b) <u>Mechanics of Company Conversion</u>. If the Company delivers a Company Installment Notice and confirms, or is deemed to have confirmed, in whole or in part, a Company Conversion in accordance with Section 8(a), then (1) contemporaneously with the delivery of the Company Installment Notice on the applicable Company Installment Notice Date, the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate for) a number of shares of Common Stock (the "**Initial Pre-Installment Conversion Shares**") equal to the quotient of (x) the Company Conversion Amount related to the applicable Installment Date divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock, (2) in addition, in the event the Holder delivers an Acceleration Notice (as defined in Section 8(e)) by no later than the Trading Day immediately prior to the applicable Installment Date, on the Trading Day immediately following delivery of such Acceleration Notice (such date, the "**Additional Pre-Installment Conversion Shares Date**") the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate for) a number of shares of Common Stock (the "**Additional Pre-Installment Conversion Shares**" and together with the Initial Pre-Installment Conversion Shares, the "**Pre-Installment Conversion Shares**") equal to the quotient of (x) the Accelerated Amount(s) (as defined in Section 8(e)) set forth in such Acceleration Notice divided by (y) the Initial Company Pre-Installment Conversion Price then in effect, rounded to the nearest whole share of Common Stock and (3) on the applicable Installment Date, the Company shall, or shall direct the Transfer Agent to, credit the Holder's account with DTC (or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the Holder a certificate) for an additional number of shares of Common Stock, if any, equal to the Installment Balance Conversion Shares; <u>provided</u>, that no Equity Conditions Failure has occurred (or waived in writing by the Holder) on each day during the period commencing on such Company Installment Notice Date through the applicable Installment Date. On the second (2nd) Trading Day immediately after the end of the applicable Measuring Period, the Company shall deliver a written notice setting forth the calculation of the Installment Balance Conversion Shares (and the calculation of the component parts of such calculation) to the Holder and the holders of the Other Notes. If an Event of Default occurs during the period from any Company Installment Notice Date through the applicable Installment Date, the Holder may elect an Event of Default Redemption in accordance with Section 4(b) without being required to return to the Company any Pre-Installment Conversion Shares previously delivered to the Holder. All Pre-Installment Conversion Shares and Installment Balance Conversion Shares shall be fully paid and nonassessable shares of Common Stock (rounded to the nearest whole share). If an Equity Conditions Failure occurs as of the applicable Company Installment Notice Date, then unless the Company has elected to redeem such Installment Amount, the Company Installment Notice shall indicate that unless the Holder waives the Equity Conditions Failure, the Installment Amount shall be redeemed for cash. If the Company confirmed (or is deemed to have confirmed by operation of Section 8(a)) the conversion of the applicable Company Conversion Amount, in whole or in part, and there was no Equity Conditions Failure as of the applicable Company Installment Notice Date (or is deemed to have certified that there is no Equity Conditions Failure in connection with any such conversion by operation of Section 8(a)) but an Equity Conditions Failure occurred between the applicable Company Installment Notice Date and any time through the applicable Installment Date (the "**Interim Installment Period**"), the Company shall provide the Holder a subsequent written notice to that effect. If an Equity Conditions Failure occurs (unless waived in writing by the Holder) during such Interim Installment Period, then at the option of the Holder designated in writing to the Company, the Holder may require the Company to do either one or both of the following: (i) the Company shall redeem all or any part designated by the Holder of the Company Conversion Amount (such designated amount is referred to as the "**First Redemption Amount**") on such Installment Date and the Company shall pay to the Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash equal to 125% of such First Redemption Amount and/or (ii) the Company Conversion shall be null and void with respect to all or any part designated by the Holder of the unconverted Company Conversion Amount and the Holder shall be entitled to all the rights of a holder of this Note with respect to such amount of the Company Conversion Amount; <u>provided</u>, <u>however</u>, that the Conversion Price for such unconverted Company Conversion Amount shall thereafter be adjusted to equal the lesser of (A) the Company Conversion Price as in effect on the date on which the Holder voided the Company Conversion and (B) the Company Conversion Price as in effect on the date on which the Holder delivers a Conversion Notice relating thereto. If the Company fails to redeem any First Redemption Amount on or before the applicable Installment Date by payment of such amount on the applicable Installment Date, then the Holder shall have the rights set forth in Section 12(a) as if the Company failed to pay the applicable Company Installment Redemption Price (as defined below) and all other rights under this Note (including, without limitation, such failure constituting an Event of Default described in Section 4(a)(iv)). Notwithstanding anything to the contrary in this Section 8(b), but subject to the limitations set forth in Section 3(d), until the Company credits the Holder's account with DTC, or if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issues and delivers to the Holder a certificate for, the shares of Common Stock representing the Company Conversion Amount to the Holder, the Company Conversion Amount may be converted by the Holder into Common Stock pursuant to Section 3. In the event that the Holder elects to convert the Company Conversion Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Conversion Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

15

(c) <u>Mechanics of Company Redemption</u>. If the Company elects a Company Redemption in accordance with Section 8, then the Company Redemption Amount which is to be paid to the Holder on the applicable Installment Date shall be redeemed by the Company and the Company shall pay to the Holder on such Installment Date, by wire transfer of immediately available funds, an amount in cash (the "**Company Installment Redemption Price**") equal to 100% of the Company Redemption Amount. If the Company fails to redeem the Company Redemption Amount on the applicable Installment Date by payment of the Company Installment Redemption Price on such date, then at the option of the Holder designated in writing to the Company (any such designation shall be deemed a "**Conversion Notice**" pursuant to Section 3(c) for purposes of this Note), (i) the Holder shall have the rights set forth in Section 12(a) as if the Company failed to pay the applicable Company Installment Redemption Price and all other rights as a Holder of Notes (including, without limitation, such failure constituting an Event of Default described in Section 4(a)(iv)) and (ii) the Holder may require the Company to convert all or any part of the Company Redemption Amount at the Company Conversion Price as in effect on the applicable Installment Date. Conversions required by this Section 8(c) shall be made in accordance with the provisions of Section 3(c). Notwithstanding anything to the contrary in this Section 8(c), but subject to Section 3(d), until the Company Installment Redemption Price is paid in full, the Company Redemption Amount may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. In the event the Holder elects to convert all or any portion of the Company Redemption Amount prior to the applicable Installment Date as set forth in the immediately preceding sentence, the Company Redemption Amount so converted shall be deducted in reverse order starting from the final Installment Amount to be paid hereunder on the final Installment Date, unless the Holder otherwise indicates and allocates among any Installment Dates hereunder in the applicable Conversion Notice.

(d) <u>Deferred Installment Amount</u>. Notwithstanding any provision of this Section 8 to the contrary, the Holder may from time to time, at its option and in its sole discretion, deliver a written notice (a "**Deferral Notice**") to the Company no later than the Business Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of an Installment Amount payable on such Installment Date deferred (such amount(s) deferred, the "**Deferral Amount**") until (i) any subsequent Installment Date selected by the Holder, in its sole discretion, in which case, the Deferral Amount shall be added to, and become part of, the Installment Amount to be paid on such subsequent Installment Date or (ii) until the last Business Day of any calendar month following the last Installment Date occurring hereunder, which date may be after the Scheduled Maturity Date hereunder. Any Deferral Notice delivered by the Holder pursuant to this Section 8(d) shall set forth (i) the Deferral Amount and (ii) the date that such Deferral Amount shall now be payable.

(e) <u>Accelerated Installment Amount</u>. Notwithstanding any provision of this Section 8 to the contrary, the Holder may, at its option and in its sole discretion, deliver a written notice to the Company (an "**Acceleration Notice**") no later than the Trading Day immediately prior to the applicable Installment Date electing to have the payment of all or any portion of any or all Installment Amount(s) scheduled to be paid on future Installment Dates after the applicable Installment Date accelerated (such amount(s) accelerated, the "**Accelerated Amount(s)**") to be paid on the applicable Installment Date pursuant to a Company Conversion, in which case, such Accelerated Amount(s) shall be added to, and become part of, the Installment Amount as such Installment Amount may have been increased pursuant to the terms hereof, payable on such applicable Installment Date by including such Accelerated Amount(s) in the Installment Amount for the applicable Installment Date and shall be payable in Common Stock regardless of whether the Installment Amount scheduled to be paid on such applicable Installment Date in accordance with the provisions of this Section 8 shall be paid in cash, shares of Common Stock or a combination thereof; <u>provided</u>, <u>however</u>, that in the event that the Holder delivers one or more Acceleration Notice(s) with respect to an Installment Date, the aggregate Accelerated Amount(s) with respect to such Installment Date shall not be greater than six (6) times the Holder's Pro Rata Amount of $[1,041,666]. Any Acceleration Notice delivered by the Holder pursuant to this Section 8(e) shall set forth (i) the Accelerated Amount(s) and (ii) the date that such Accelerated Amount should have been paid if not for the Holder's right to accelerate such Installment Amount(s) pursuant to this Section 8(e).

16

(9) <u>OPTIONAL REDEMPTION AT THE COMPANY'S ELECTION</u>. At any time after the Issuance Date, the Company shall have the right to redeem a portion or all of the Conversion Amount (as defined in the Notes) then remaining under this Note, the Other Notes (the "**Company Optional Redemption Amount**") as designated in the Company Optional Redemption Notice on the Company Optional Redemption Date (each as defined below) (a "**Company Optional Redemption**"). This Note and the Other Notes subject to redemption pursuant to this Section 9 shall be redeemed by the Company on the Company Optional Redemption Date in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the Holder in writing to the Company at a price equal to: (i) so long as there has been no Equity Conditions Failure during the period beginning on the Company Optional Redemption Notice Date (as defined below) through the Company Optional Redemption Date (as defined below), 110% of the Conversion Amount to be redeemed and (ii) if an Equity Conditions Failure occurs (which is not waived in writing by the Holder) at any time during the period beginning on the Company Optional Redemption Notice Date through the Company Optional Redemption Date (the "**Company Optional Redemption Interim Period**"), the greater of (x) 125% of the Conversion Amount to be redeemed and (y) the product of (A) the Conversion Amount being redeemed and (B) the quotient determined by dividing (I) the greatest Closing Price of the shares of Common Stock during the period beginning on the date immediately preceding the Company Optional Redemption Notice Date and ending on the Company Optional Redemption Date, by (II) the lowest Conversion Price in effect during such period (the "**Company Optional Redemption Price**"). The Company may exercise its right to require redemption under this Section 9 by delivering a ten (10 Trading Days prior written notice thereof by facsimile or electronic mail and overnight courier to the Holder and all, but not less than all, of the holders of the Other Notes (the "**Company Optional Redemption Notice**" and the date all of the holders of the Notes received such notice is referred to as the "**Company Optional Redemption Notice Date**"). The Company Optional Redemption Notice shall be irrevocable. The Company Optional Redemption Notice shall (i) state the date on which the Company Optional Redemption shall occur (the "**Company Optional Redemption Date**"), which date shall be the tenth (10th) Trading Day immediately following the Company Optional Redemption Notice Date, (ii) state the aggregate Conversion Amount of the Notes which the Company has elected to be subject to Company Optional Redemption from the Holder and all of the holders of the Other Notes pursuant to this Section 9 (and analogous provisions under the Other Notes) on the Company Optional Redemption Date, (iii) state the applicable Company Optional Redemption Price in the event: (x) no Equity Conditions Failure occurs during the Company Optional Redemption Interim Period and (y) an Equity Conditions Failure has occurred or will occur (which is not waived in writing by the Holder) during the Company Optional Redemption Interim Period. If the Company confirmed that there was no such Equity Conditions Failure as of the Company Optional Redemption Notice Date but an Equity Conditions Failure occurs at any time during the Company Optional Redemption Interim Period, the Company shall provide the Holder a subsequent written notice to that effect. Notwithstanding anything to the contrary in this Section 9, until the Company Optional Redemption Price is paid, in full, the Company Optional Redemption Amount may be converted, in whole or in part, by the Holder into shares of Common Stock pursuant to Section 3. All Conversion Amounts converted by the Holder after the Company Optional Redemption Notice Date shall reduce the Company Optional Redemption Amount of this Note required to be redeemed on the Company Optional Redemption Date, unless the Holder otherwise indicates in the applicable Conversion Notice. Company Optional Redemptions made pursuant to this Section 9 shall be made in accordance with Section 12. To the extent redemptions required by this Section 9 are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 9, the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. If the Company elects to cause a Company Optional Redemption pursuant to Section 9, then it must simultaneously take the same action in the same proportion with respect to the Other Notes.

(10) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

17

(11) RESERVATION OF AUTHORIZED SHARES.

(a) Reservation. The Company shall initially reserve out of its authorized and unissued shares of Common Stock a number of shares of Common Stock for each of this Note, the Other Notes and the Warrants equal to at least the Required Reserve Amount to effect the conversion of this Note and the Other Notes and the exercise of the Warrants, without regard to any limitations on conversion or exercise set forth herein or therein. So long as any of this Note, the Other Notes or the Warrants are outstanding, the Company shall take all action necessary to reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of this Note and the Other Notes and the exercise of the Warrants the Required Reserve Amount. The Required Reserve Amount of shares of Common Stock reserved for conversions of this Note and the Other Notes and for exercise of the Warrants shall be allocated pro rata among the Holder, the holders of the Other Notes and the holders of the Warrants based on the Principal amount of this Note and the Other Notes held by each Purchaser on the Closing Date (the "**Authorized Share Allocation**"). In the event that the Holder shall sell or otherwise transfer any portion of this Note or Warrants, the transferee shall be allocated a pro rata portion of the Holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Notes and Warrants shall be allocated to the holders of the remaining Notes and Warrants, pro rata based on the shares of Common Stock issuable upon conversion of the Notes and exercise of the Warrants then held by such holders (without regard to any limitations on the conversion of the Notes and exercise of the Warrants).

(b) Insufficient Authorized Shares. Without limiting the generality of the provisions set forth in Section 4(m) of the Securities Purchase Agreement, if at any time while any of the Notes remain outstanding the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve for issuance upon conversion of the Notes at least a number of shares of Common Stock equal to the applicable Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the applicable Required Reserve Amount for the Notes then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than sixty (60) days after the occurrence of such Authorized Share Failure, the Company shall either (x) obtain the majority written consent of its stockholders for the approval of an increase in the number of authorized shares of Common Stock and provide each stockholder with an information statement or (y) hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its best efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its Board of Directors to recommend to the stockholders that they approve such proposal. Notwithstanding the foregoing, if during any such time of an Authorized Share Failure, the Company is able to obtain the written consent of a majority of the shares of its issued and outstanding Common Stock to approve the increase in the number of authorized shares of Common Stock, the Company may satisfy this obligation by obtaining such consent and submitting for filing with the SEC an Information Statement on Schedule 14C. If, upon any conversion of this Note, the Company does not have sufficient authorized shares to deliver in satisfaction of such conversion, then unless the Holder elects to rescind such attempted conversion, the Holder may require the Company to pay to the Holder within three (3) Trading Days of the applicable attempted conversion, cash in an amount equal to the product of (i) the number of shares of Common Stock that the Company is unable to deliver pursuant to this Section 11, and (ii) the highest Closing Price of the Common Stock during the period beginning on the date of the applicable Conversion Date and ending on the date the Company makes the applicable cash payment.

18

(12) REDEMPTIONS.

(a) Mechanics. The Company shall deliver the applicable Event of Default Redemption Price to the Holder within three (3) Business Days after the Company's receipt of the Holder's Event of Default Redemption Notice; provided that upon a Bankruptcy Event of Default, the Company shall deliver the applicable Bankruptcy Event of Default Redemption Price in accordance with Section 4(c) (as applicable, the "**Event of Default Redemption Date**"). If the Holder has submitted a Change of Control Redemption Notice in accordance with Section 5(b), the Company shall deliver the applicable Change of Control Redemption Price to the Holder (i) concurrently with the consummation of such Change of Control if such notice is received prior to the consummation of such Change of Control and (ii) within three (3) Business Days after the Company's receipt of such notice otherwise (such date, the "**Change of Control Redemption Date**"). The Company shall deliver the applicable Company Installment Redemption Price to the Holder on the applicable Installment Date. The Company shall deliver the applicable Company Optional Redemption Price to the Holder on the applicable Company Optional Redemption Date. The Company shall pay the applicable Redemption Price to the Holder in cash by wire transfer of immediately available funds pursuant to wire instructions provided by the holder in writing to the Company on the applicable due date. In the event of a redemption of less than all of the Conversion Amount of this Note, the Company shall promptly cause to be issued and delivered to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal which has not been redeemed and any accrued Interest on such Principal which shall be calculated as if no Redemption Notice has been delivered. In the event that the Company does not pay a Redemption Price to the Holder within the time period required, at any time thereafter and until the Company pays such unpaid Redemption Price in full, the Holder shall have the option, in lieu of redemption, to require the Company to promptly return to the Holder all or any portion of this Note representing the Conversion Amount that was submitted for redemption and for which the applicable Redemption Price has not been paid. Upon the Company's receipt of such notice, (x) the applicable Redemption Notice shall be null and void with respect to such Conversion Amount, (y) the Company shall immediately return this Note, or issue a new Note (in accordance with Section 20(d)) to the Holder representing such Conversion Amount to be redeemed and (z) the Conversion Price of this Note or such new Notes shall be adjusted to the lesser of (A) the Conversion Price as in effect on the date on which the applicable Redemption Notice is voided and (B) the lowest Closing Price of the Common Stock during the period beginning on and including the date on which the applicable Redemption Notice is delivered to the Company and ending on and including the date on which the applicable Redemption Notice is voided. The Holder's delivery of a notice voiding a Redemption Notice and exercise of its rights following such notice shall not affect the Company's obligations to make any payments of Late Charges which have accrued prior to the date of such notice with respect to the Conversion Amount subject to such notice.

(b) Redemption by Other Holders. Upon the Company's receipt of notice from any of the holders of the Other Notes for redemption or repayment as a result of an event or occurrence substantially similar to the events or occurrences described in Section 4(b) or Section 5(b) or pursuant to corresponding provisions set forth in the Other Notes (each, an "**Other Redemption Notice**"), the Company shall immediately, but no later than one (1) Business Day of its receipt thereof, forward to the Holder by facsimile or electronic mail a copy of such notice. If the Company receives a Redemption Notice and one or more Other Redemption Notices, during the seven (7) Business Day period beginning on and including the date which is three (3) Business Days prior to the Company's receipt of the Holder's Redemption Notice and ending on and including the date which is three (3) Business Days after the Company's receipt of the Holder's Redemption Notice and the Company is unable to redeem all principal, interest and other amounts designated in such Redemption Notice and such Other Redemption Notices received during such seven (7) Business Day period, then the Company shall redeem a pro rata amount from the Holder and each holder of the Other Notes based on the Principal amount of this Note and the Other Notes submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven (7) Business Day period.

(c) Insufficient Assets. If upon a Redemption Date, the assets of the Company are insufficient to pay the applicable Redemption Price, the Company shall (i) take all appropriate action reasonably within its means to maximize the assets available for paying the applicable Redemption Price, (ii) redeem out of all such assets available therefor on the applicable Redemption Date the maximum possible portion of the applicable Redemption Price that it can redeem on such date, a pro rata among the Holder and the holders of the Other Notes to be redeemed in proportion to the aggregate Principal amount of this Note and the Other Notes outstanding on the applicable Redemption Date and (iii) following the applicable Redemption Date, at any time and from time to time when additional assets of the Company become available to pay the balance of the applicable Redemption Price of this Note and the Other Notes, the Company shall use such assets, at the end of the then current fiscal quarter, to pay the balance of such Redemption Price of this Note and the Other Notes, or such portion thereof for which assets are then available, on the basis set forth above at the applicable Redemption Price, and such assets will not be used prior to the end of such fiscal quarter for any other purpose. Interest on the Principal amount of this Note and the Other Notes that have not been redeemed shall continue to accrue until such time as the Company redeems this Note and the Other Notes. The Company shall pay to the Holder the applicable Redemption Price without regard to the legal availability of funds unless expressly prohibited by applicable law or unless the payment of the applicable Redemption Price could reasonably be expected to result in personal liability to the directors of the Company.

19

(13) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(14) <u>SECURITY</u>. This Note and the Other Notes are secured to the extent and in the manner set forth herein and in the Security Documents.

(15) <u>RANK</u>. All payments due under this Note (a) shall rank *pari passu* with all Other Notes and (b) shall be senior to all other Indebtedness of the Company and its Subsidiaries.

(16) <u>NEGATIVE COVENANTS</u>. Until all of the Notes have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall not, and the Company shall not permit any of its Subsidiaries without the prior written consent of the Required Holders to, directly or indirectly:

(a) incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness;

(b) allow or suffer to exist any mortgage, lien, pledge, charge, security interest or other encumbrance upon or in any property or assets (including accounts and contract rights) owned by the Company or any of its Subsidiaries (collectively, "**Liens**") other than Permitted Liens;

(c) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (other than this Note and the Other Notes), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made or, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing;

(d) redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (including, without limitation Permitted Indebtedness other than this Note and the Other Notes), by way of payment in respect of principal of (or premium, if any) such Indebtedness. For clarity, such restriction shall not preclude the payment of regularly scheduled interest payments which may accrue under such Permitted Indebtedness;

(e) redeem or repurchase its Equity Interests (except on a pro rata basis among all holders thereof);

(f) declare or pay any cash dividend or distribution on any Equity Interest of the Company or of its Subsidiaries;

(g) make, any material change in the nature of its business as described in the Company's most recent Annual Report filed on Form 10-K with the SEC or modify its corporate structure or purpose;

(h) encumber, license or otherwise allow any Liens on any Intellectual Property, including, without limitation, any claims for damage by way of any past, present, or future infringement of any of the foregoing, in each case, other than Permitted Liens;

(i) enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, license, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof; or

(j) issue any Notes (other than as contemplated by the Securities Purchase Agreement), or issue any other securities that would cause a breach or default under the Notes.

20

(17) <u>AFFIRMATIVE COVENANTS</u>.

(a) Until all of the Notes have been converted, redeemed or otherwise satisfied in full in accordance with their terms, the Company shall, and the Company shall, except with respect to clause (vi) below, cause each Subsidiary to, unless otherwise agreed to by the Required Holders, directly and indirectly:

(i) maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except in the case that any such failure to so maintain, preserve or comply has not had and is not reasonably likely to have, a Material Adverse Effect;

(ii) maintain and preserve all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except in the case that any such failure to so maintain, preserve or comply has not had, and is not reasonably likely to have, a Material Adverse Effect;

(iii) take all action necessary or advisable to maintain all of the Intellectual Property that is necessary or material to the conduct of its business in full force and effect;

(iv) maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated;

(v) cause such Subsidiary formed on or after the Subscription Date to execute, and deliver to each holder of Notes a guaranty agreement substantially in the form of the Guarantee Agreement (as defined in the Securities Purchase Agreement) and all other Security Documents as requested by Required Holders, as applicable; and

(vi) notify the Holder and the holders of the Other Notes in writing whenever an Equity Conditions Failure occurs other than with respect to clauses (xi) and (xii) of the definition of "Equity Conditions", and simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes, file a Current Report on Form 8-K with the SEC to state such fact.

(b) <u>Cash Burn Covenant</u>. So long as the Notes are outstanding, the Company's net loss (calculated on an accrual basis in accordance with GAAP and adjust by reversing any and all equity or derivative liability gains and losses) in any calendar month shall not exceed $550,000 (the "<u>Monthly Cash Burn Amount</u>"). The Monthly Cash Burn Amount shall not include any of the following: (i) the placement agent fees in connection the sale of the Notes and Warrants, (ii) fees of the Company and investor legal counsels in connection with the sale of the Notes and Warrants not to exceed $150,000 in the aggregate for the transaction contemplated under the Securities Purchase Agreement and publicly marketed offerings and $100,000 for any subsequent registered direct offerings, (iii) existing Indebtedness in the amount of $2,866,665 and (iv) outstanding fees of legal counsel not to exceed $350,000. On every fifteenth (15th) day of each calendar month (or if such day is not a Business Day, the next following day that is a Business Day) the Company shall: (i) deliver a written notice to the Holder and each holder of the Other Notes certifying whether (x) it has complied with the foregoing and (y) it reasonably expects to comply with the foregoing while this Note or the Other Notes remain outstanding and (ii) in the event the Company is not able to certify as to clause (x) or (y) above, it shall simultaneously with the delivery of such notice to the Holder and the holders of the Other Notes, file a Current Report on Form 8-K with the SEC to state such fact.

(18) <u>VOTE TO ISSUE, OR CHANGE THE TERMS OF, NOTES</u>. The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting of the Required Holders shall be required for any change or amendment or waiver of any provision to this Note or any of the Other Notes. Any change, amendment or waiver by the Company and the Required Holders shall be binding on the Holder of this Note and all holders of the Other Notes.

(19) <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred by the Holder without the consent of the Company, subject only to the provisions of Section 2(f) of the Securities Purchase Agreement.

(20) <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 20(d) and subject to Section 3(c)(iii)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less than the entire outstanding Principal is being transferred, a new Note (in accordance with Section 20(d)) to the Holder representing the outstanding Principal not being transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of Section 3(c)(iii) following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form (but without any obligation to post a surety or other bond) and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 20(d)) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 20(a) or Section 20(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest and Late Charges, if any, on the Principal and Interest of this Note, from the Issuance Date.

(21) <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. The Company covenants to the Holder that there shall be no characterization concerning this instrument other than as expressly provided herein. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

22

(22) <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(23) <u>CONSTRUCTION; HEADINGS</u>. This Note shall be deemed to be jointly drafted by the Company and all the Buyers and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(24) <u>FAILURE OR INDULGENCE NOT WAIVER</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(25) <u>DISPUTE RESOLUTION</u>. In the case of a dispute as to the determination of the Closing Price or the Weighted Average Price or the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Day of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within one (1) Business Day of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within one (1) Business Day submit via facsimile or electronic mail (a) the disputed determination of the Closing Price or the Weighted Average Price to an independent, reputable investment bank selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed, or (b) the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(26) <u>NOTICES; PAYMENTS</u>.

(a) <u>Notices</u>. Whenever notice is required to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least five (5) Business Days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) <u>Payments</u>. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions; <u>provided</u>, that the Holder may elect to receive a payment of cash by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Buyers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement). Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding day which is a Business Day. Any amount of Principal or other amounts due under the Transaction Documents which is not paid when due shall result in a late charge being incurred and payable by the Company in an amount equal to interest on such amount at the rate of eighteen percent (18.0%) per annum from the date such amount was due until the same is paid in full ("**Late Charge**").

23

(27) CANCELLATION. After all Principal, accrued Interest and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(28) WAIVER OF NOTICE. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Securities Purchase Agreement.

(29) GOVERNING LAW; JURISDICTION; JURY TRIAL. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address set forth in Section 9(f) of the Securities Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. Nothing contained herein shall be deemed or operate to preclude the Holder from bringing suit or taking other legal action against the Company in any other jurisdiction to collect on the Company's obligations to the Holder, to realize on any collateral or any other security for such obligations, or to enforce a judgment or other court ruling in favor of the Holder. **THE COMPANY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(30) SEVERABILITY. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(31) DISCLOSURE. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall contemporaneously with any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

24

(32) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" shall have the meaning ascribed to such term in Rule 405 of the Securities Act.

(b) "**Attribution Parties**" means, collectively, the following Persons: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Section 13(d) of the Exchange Act. For clarity, the purpose of the foregoing is to subject collectively the Holder and all other Attribution Parties to the Maximum Percentage.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(e) "**Buyers**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(f) "**Calendar Quarter**" means each of: the period beginning on and including January 1 and ending on and including March 31; the period beginning on and including April 1 and ending on and including June 30; the period beginning on and including July 1 and ending on and including September 30; and the period beginning on and including October 1 and ending on and including December 31.

(g) "**Change of Control**" means any Fundamental Transaction other than (i) any reorganization, recapitalization or reclassification of the Common Stock in which holders of the Company's voting power immediately prior to such reorganization, recapitalization or reclassification continue after such reorganization, recapitalization or reclassification to hold publicly traded securities and, directly or indirectly, are, in all material respect, the holders of the voting power of the surviving entity (or entities with the authority or voting power to elect the members of the board of directors (or their equivalent if other than a corporation) of such entity or entities) after such reorganization, recapitalization or reclassification or (ii) pursuant to a migratory merger effected solely for the purpose of changing the jurisdiction of incorporation of the Company.

(h) "**Closing Price**" means, for any security as of any date, the last closing trade price for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing trade price, then the last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing price or last trade price of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices). If the Closing Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

25

(i) "**Closing Date**" shall have the meaning set forth in the Securities Purchase Agreement, which date is the date the Company initially issued Notes pursuant to the terms of the Securities Purchase Agreement.

(j) "**Collateral**" has the meaning ascribed to such term in the Security Documents.

(k) "**Collateral Agent**" has the meaning ascribed to such term in the Security Documents.

(l) "**Common Stock**" means (i) the Company's shares of Common Stock, par value $0.001 per share, and (ii) any share capital into which such Common Stock shall have been changed or any share capital resulting from a reclassification of such Common Stock.

(m) "**Company Conversion Price**" means as of any date of determination, that price which shall be the lower of (i) the Conversion Price then in effect and (ii) the Market Price as of such date of determination.

(n) "**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto.

(o) "**Conversion Shares**" means shares of Common Stock issuable by the Company pursuant to the terms of any of the Notes, including any related Interest and Late Charges so converted, amortized or redeemed.

(p) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(q) "**Eligible Market**" means the Principal Market, The New York Stock Exchange, The NASDAQ Global Market, The NASDAQ Global Select Market, or the NYSE American.

26

      (r) "**Equity Conditions**" means each of the following conditions: (i) on each day during Equity Conditions Measuring Period, either (x) one or more registration statements filed shall be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, and there shall not have been any suspension of such registration statement(s) or (y) all shares of Common Stock issuable pursuant to the terms of this Note and the Other Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, shall be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (assuming that all Warrants were exercised pursuant to a Cashless Exercise (as defined in the Warrants), provided that no Public Information Failure has occurred, and without the need for registration under any applicable federal or state securities laws; (ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Principal Market or any other Eligible Market and shall not have been suspended from trading on such exchange or market nor shall delisting or suspension by such exchange or market been threatened (with delisting reasonably likely to occur after giving effect to all applicable notice, appeal, cure, compliance and hearing periods), commenced or pending either (A) in writing by such exchange or market or (B) by falling below the then effective minimum listing maintenance requirements of such exchange or market; (iii) during the Equity Conditions Measuring Period, the Company shall have delivered shares of Common Stock pursuant to the terms of this Note and the Other Notes and shares of Common Stock upon exercise of the Warrants to the holders on a timely basis as set forth in Section 3(c) hereof (and analogous provisions under the Other Notes) and Section 1(a) of the Warrants; (iv) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions may be issued in full without violating Section 3(d) hereof and the rules or regulations of the Principal Market or any other applicable Eligible Market; (v) during the Equity Conditions Measuring Period, the Company shall not have failed to timely make any payments within five (5) Business Days of when such payment is due pursuant to any Transaction Document; (vi) during the Equity Conditions Measuring Period, there shall not have occurred either (A) the public announcement of a pending, proposed or intended Fundamental Transaction which has not been abandoned, terminated or consummated, (B) an Event of Default or (C) an event that with the passage of time or giving of notice would constitute an Event of Default or Triggering Event; (vii) the Company shall have no knowledge of any fact that would cause (x) one or more registration statement(s) not to be effective and available for the resale of all remaining shares of Common Stock issuable pursuant to the terms of the Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, or (y) any shares of Common Stock issuable pursuant to the terms of this Note and the Other Notes and upon exercise of the Warrants (in each case, without giving effect to any limitation on conversion or exercise set forth herein and therein), including the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions, not to be eligible for sale without restriction pursuant to Rule 144 (other than with respect to Rule 144(i)) (or any successor thereto) promulgated under the Securities Act, provided that no Public Information Failure has occurred, and any applicable state securities laws; (viii) during the Equity Conditions Measuring Period, the Company otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document in any material respect (other than representations or warranties subject to Material Adverse Effect or materiality, which may not be breached in any respect); (ix) during the Equity Conditions Measuring Period, the Holder shall not have been in possession of any material, nonpublic information received from the Company, any Subsidiary or its respective agent or affiliates; (x) the shares of Common Stock issuable upon conversion of the Conversion Amount that is subject to the applicable Company Conversion or Company Optional Redemption, as applicable, requiring the satisfaction of the Equity Conditions are duly authorized and listed and eligible for trading without restriction on an Eligible Market; (xi) the average daily dollar trading volume of the Common Stock as reported by Bloomberg during the twenty (20) Trading Days immediately prior to the applicable date of determination shall be at least $100,000; and (xii) on each Trading Day during the Equity Conditions Measuring Period, the Closing Price of the Common Stock equals or exceeds $0.05 (as adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction occurring after the Subscription Date).

27

(s) "**Equity Conditions Failure**" means that on any applicable date of determination, the Equity Conditions have not each been satisfied or waived in writing by the Holder; provided, however, that the Equity Condition set forth in clause (iv) of such definition is not waivable by the Holder.

(t) "**Equity Conditions Measuring Period**" means each day during the period beginning thirty (30) Trading Days immediately prior to the applicable date of determination and ending on and including the applicable date of determination.

(u) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, Options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(v) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(w) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, reorganization, recapitalization, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the Subscription Date calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

28

(x) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(y) "**Group**" means a "group" as that term is used in Section 13(d) of the Exchange Act and as defined in Rule 13d-5 thereunder.

(z) "**Indebtedness**" of any Person means, without duplication (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services, including (without limitation) "capital leases" in accordance with GAAP (other than trade payables entered into in the ordinary course of business consistent with past practice), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all monetary obligations under any leasing or similar arrangement which, in connection with GAAP, consistently applied for the periods covered thereby, is classified as a capital lease, (vii) all indebtedness referred to in clauses (i) through (vi) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any mortgage, deed of trust, lien, pledge, charge, security interest or other encumbrance of any nature whatsoever in or upon any property or assets (including accounts and contract rights) with respect to any asset or property owned by any Person, even though the Person which owns such assets or property has not assumed or become liable for the payment of such indebtedness, and (viii) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (i) through (vii) above.

(aa) "**Initial Company Pre-Installment Conversion Price**" means, with respect to any Company Installment Notice Date, that price which shall be the lower of (i) the then Conversion Price then in effect and (ii) the Market Price as of the applicable Company Installment Notice Date.

(bb) "**Initial Unrestricted Principal**" means any Principal outstanding under this Note that is not Restricted Principal outstanding under this Note as of the Issuance Date.

(cc) "**Installment Amount**" means with respect to each Installment Date, an amount equal to the sum of the (i) the lesser of (A) $[_____][4] and (B) the Principal amount of this Note outstanding on such Installment Date, (ii) any Deferral Amount deferred pursuant to Section 8(d) and included in such Installment Amount, (iii) any Accelerated Amount accelerated pursuant to Section 8(e) and included in such Installment Amount and (iv) accrued and unpaid Interest with respect to such Principal and accrued and unpaid Late Charges, if any, with respect to such Principal and Interest, as any such Installment Amount for each Holder may be reduced pursuant to the terms hereof, whether upon conversion, redemption or otherwise. provided, however, that any Installment Amount payable hereunder shall first be allocated to the Initial Unrestricted Amounts until all of the Initial Unrestricted Amounts have been amortized and only after the Initial Unrestricted Amounts shall be amortized in full shall any Installment Amounts be allocated to the Other Unrestricted Amounts. In the event the Holder shall sell or otherwise transfer or assign any portion of this Note, the transferee shall be allocated a pro rata portion of each unpaid Installment Amount hereunder

(dd) "**Installment Balance Conversion Shares**" means, for any Installment Date, a number of shares of Common Stock equal to (i) the Post-Installment Conversion Shares for such date minus (ii) the amount of any Pre-Installment Conversion Shares delivered in respect of the applicable Installment Date; provided, that in the event that the amount of Pre-Installment Conversion Shares exceeds the amount of Post-Installment Conversion Shares for such Installment Date (such excess, the "**Installment Conversion Shares Excess**"), the applicable Installment Balance Conversion Shares shall equal zero (0) for such Installment Date and any Installment Conversion Shares Excess shall reduce the number of Pre- Installment Conversion Shares payable on the immediately following Company Installment Notice Date or Additional Pre-Installment Conversion Shares Date, if any, on a share for share basis.

_____

[4] Holders' Pro-Rata portion of [$1,041,666] assuming fully subscribed at $12.5 million principal amount.

29

(ee) **"Installment Date"** means each of October 31, 2020[5] and the last Business Day of every calendar month anniversary thereafter through and including the Maturity Date.

(ff) **"Intellectual Property"** has the meaning ascribed to such term in the Security Agreement.

(gg) **"Investor Netting Rights"** means the rights of Investor Optional Netting and Automatic Netting (each as defined in the Investor Note).

(hh) **"Investor Note"** means that certain promissory note of the Holder issued to the Company at the Closing Date, pursuant to the Securities Purchase Agreement, with an aggregate principal amount outstanding equal to the Restricted Principal outstanding hereunder and secured by a cash amount set forth in a bank account of the Holder (or its affiliates) at least equal to the Restricted Principal outstanding hereunder.

(ii) **"Investor Notes"** means those certain promissory notes of the holders of Notes issued to the Company at the Closing Date, pursuant to the Securities Purchase Agreement.

(jj) **"Investor Prepayment"** means any Prepayment (as defined in the Investor Note) of the Investor Note.

(kk) **"Lead Investor"** means Anson Investment Master Fund LP.

(ll) **"Market Price"** means 85% of the arithmetic average of the five (5) lowest daily Weighted Average Prices of the Common Stock during the Measuring Period. All such determinations to be appropriately adjusted for any stock split, stock dividend, stock combination, reclassification or other similar transaction during such Measuring Period.

(mm) **"Material Adverse Effect"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(nn) **"Maturity Netting"** has the meaning ascribed to such term in the Investor Notes.

(oo) **"Measuring Period"** means the twenty (20) consecutive Trading Day period ending on the Trading Day immediately preceding the applicable date of determination.

(pp) **"Nasdaq Stockholder Approval" has the meaning ascribed to such term in the Securities Purchase Agreement.**

(qq) **"Options"** means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

_____

[5] NTD –7 months following the closing date.

(rr) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes, (ii) trade payables incurred in the ordinary course of business consistent with past practice, (iii) unsecured Indebtedness incurred by the Company that is made expressly subordinate in right of payment to the Indebtedness evidenced by this Note, as reflected in a written agreement acceptable to the Required Holders and approved by the Required Holders in writing, and which Indebtedness does not provide at any time for (a) the payment, prepayment, repayment, repurchase or defeasance, directly or indirectly, of any principal or premium, if any, thereon until ninety-one (91) days after the Maturity Date or later and (b) total interest and fees at a rate in excess of eight percent (8.0%) per annum, (iv) the Indebtedness existing on the Issuance Date and set forth on Schedule 3(ss) attached to the Securities Purchase Agreement, and (v) Indebtedness secured by Permitted Liens described in clauses (iv) of the definition of Permitted Liens.

(ss) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods and (viii) Liens incurred in connection with Permitted Indebtedness and (ix) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix).

(tt) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(uu) "**Post-Installment Conversion Shares**" means, for any Installment Date and without taking into account the delivery of any Pre-Installment Conversion Shares, that number of shares of Common Stock equal to the applicable Company Conversion Amount (including, without limitation, the addition of any Accelerated Amounts to such Company Conversion Amount in accordance with Section 8(e)) on such Installment Date divided by the Company Conversion Price as in effect on the applicable Installment Date, rounded up to the nearest whole share of Common Stock.

(vv) "**Principal Market**" means The Nasdaq Capital Market.

(ww) "**Pro Rata Amount**" means a fraction (i) the numerator of which is the original principal amount of the Holder's Note issued to the Holder pursuant to the Securities Purchase Agreement and (ii) the denominator of which is the aggregate original principal amount of all Notes issued to the Buyers pursuant to the Securities Purchase Agreement.

(xx) "**Public Information Failure**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(yy) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, the Change of Control Redemption Dates, the Installment Dates and the Company Optional Redemption Date, as applicable, each of the foregoing, individually, a Redemption Date.

31

(zz)  "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, the Change of Control Redemption Notices, the Company Installment Notices and the Company Optional Redemption Notice, each of the foregoing, individually, a Redemption Notice.

(aaa)  "**Redemption Prices**" means, collectively, the Event of Default Redemption Prices, the Change of Control Redemption Prices, the Company Installment Redemption Prices and the Company Optional Redemption Price, each of the foregoing, individually, a Redemption Price.

(bbb)  "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(ccc)  "**Required Holders**" means the holders of Notes representing at least 66% of the aggregate principal amount of the Notes then outstanding and shall include the Lead Investor so long as the Lead Investor or any of its Affiliates holds any Notes.

(ddd)  "**Restricted Principal**" means, initially Principal outstanding in the amount of $4,000,000, subject to reduction as provided herein, including, without limitation, pursuant to Investor Prepayments, Maturity Netting or Investor Netting Rights.

(eee)  "**SEC**" means the United States Securities and Exchange Commission.

(fff)  "**Securities Act**" means the Securities Act of 1933, as amended.

(ggg)  "**Securities Purchase Agreement**" means that certain securities purchase agreement dated as of the Subscription Date by and among the Company and the investors listed on the signature pages attached thereto pursuant to which the Company issued the Notes and Warrants, as amended from time to time.

(hhh)  "**Security Agreement**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(iii)  "**Security Documents**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(jjj)  "**Standard Settlement Period**" means the standard settlement period, expressed in a number of Trading Days, on the principal securities exchange or securities market on which the Common Stock is then traded as in effect on the date of delivery of the applicable Conversion Notice.

(kkk)  "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(lll)  "**Subscription Date**" means March [ ], 2020.

(mmm)  "**Subsidiary**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(nnn)  "**Trading Day**" means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock on such day, then on the principal securities exchange or securities market on which the Common Stock is then traded.

32

(ooo) **"Transaction Documents"** has the meaning ascribed to such term in the Securities Purchase Agreement.

(ppp) **"Warrants"** has the meaning ascribed to such term in the Securities Purchase Agreement, and shall include all warrants issued in exchange therefor or replacement thereof.

(qqq) **"Weighted Average Price"** means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market during the period beginning at 9:30:01 a.m., New York Time (or such other time as the Principal Market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as the Principal Market publicly announces is the official close of trading) as reported by Bloomberg through its "Volume at Price" function, or, if the foregoing does not apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York Time (or such other time as such market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as such market publicly announces is the official close of trading) as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing price and the lowest closing ask price of any of the market makers for such security as reported in the OTC Link or Pink Open Market (f/k/a OTC Pink) published by OTC Markets Group, Inc. (or a similar organization or agency succeeding to its functions of reporting prices). If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or other similar transaction during the applicable calculation period.

(rrr) **"Unrestricted Date"** means any date on which all or any portion of the Restricted Principal becomes Unrestricted Principal.

(sss) **"Unrestricted Principal"** means any Principal outstanding under this Note that is not Restricted Principal outstanding under this Note.

[Signature Page Follows]

33

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

GENIUS BRANDS INTERNATIONAL, INC.

By:_____

Name:

Title:

34

**EXHIBIT I**

**GENIUS BRANDS INTERNATIONAL, INC.**
**CONVERSION NOTICE**

Reference is made to the Senior Secured Convertible Note (the "**Note**") issued to the undersigned by Genius Brands International, Inc., a Nevada corporation (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock par value $0.001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of Conversion: _____

Aggregate Conversion Amount to be converted or number of Conversion Shares to
be issued upon conversion: _____

Please confirm the following information:

Conversion of Initial Unrestricted Amount: ☐            Conversion of Other Unrestricted Amount: ☐

Conversion Price: _____

If Aggregate Conversion Amount is provided above, number of shares of
Common Stock to be issued: _____

Percentage of conversion to constitute Initial Unrestricted Amount: _____

Percentage of conversion to constitute Other Unrestricted Amount: _____

Please issue the Common Stock into which the Note is being converted to the Holder, or for its benefit, as follows:

£ Check here if requesting delivery as a certificate to the following name and to the following address:

Issue to: _____

Address: _____

Facsimile Number and Electronic Mail: _____

35

£ Check here if requesting delivery by Deposit/Withdrawal at Custodian as follows:

DTC Participant: _____

DTC Number: _____

Account Number: _____

By its delivery of this Conversion Notice, the undersigned represents and warrants to the Company that in giving effect to the conversion evidenced hereby the undersigned will not beneficially own in excess of the number of shares of Common Stock (determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended) permitted to be owned under Section 3(d)(i) of this Note.

Authorization: _____

By: _____

Title: _____

Dated: _____

Account Number: _____
(if electronic book entry transfer)

Transaction Code Number: _____
(if electronic book entry transfer)

Installment Amounts to be reduced and amount of reduction:

36

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Conversion Notice and hereby directs VStock Transfer, LLC to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions dated March __, 2020 from the Company and acknowledged and agreed to by VStock Transfer, LLC.

GENIUS BRANDS INTERNATIONAL, INC.

By:_____

Name:

Title:

37

Exhibit 4.2

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SUCH STATE SECURITIES LAWS, OR AN EXEMPTION FROM REGISTRATION THEREUNDER, IN EACH CASE, TO THE EXTENT APPLICABLE HERETO.**

SECURED PROMISSORY NOTE

New York, New York

$[ ]                                                                                    March __, 2020

FOR VALUE RECEIVED, [INVESTOR] (the "**Investor**") hereby promises to pay to Genius Brands International, Inc., a Nevada corporation (the "**Company**"), on the date set forth below, (i) the principal amount of [ ] Dollars ($[ ]) and (ii) interest on the unpaid principal balance hereof at the rate set forth herein (collectively, the "**Obligations**"). This Promissory Note (this "**Note**") has been issued pursuant to the Note Purchase Agreement, dated as of March [●], 2020 (the "**Subscription Date**"), by and among the Company and the Investor (as amended, modified, supplemented, extended, renewed, restated or replaced from time to time, the "**Note Purchase Agreement**") as payment in part of the purchase price of that certain Senior Secured Convertible Note of the Company, with an initial aggregate principal amount of $[ ] (as such note may be amended, modified, supplemented, extended, renewed, restated or replaced from time to time in accordance with the terms thereof, the "**Note**"), issued pursuant to that certain Securities Purchase Agreement, dated as of March 11, 2020, by and among the Company and the investors party thereto (as amended, modified, supplemented, extended, renewed, restated or replaced from time to time, the "**Securities Purchase Agreement**"). Capitalized terms not defined herein shall have the meaning as set forth in the Note. NEITHER THIS NOTE NOR ANY INTEREST HEREIN MAY BE PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED, WHETHER BY THE COMPANY, OPERATION OF LAW, COURT ORDER OR OTHERWISE, WITHOUT THE EXPRESS PRIOR WRITTEN CONSENT OF THE INVESTOR. ANY SUCH PURPORTED ASSIGNMENT OR TRANSFER WITHOUT SUCH CONSENT SHALL BE NULL AND VOID.

1. <u>Payment of Principal</u>. The principal amount of this Note (the "**Principal**"), together with all unpaid interest accrued thereon and any other Obligations payable hereunder, shall be due and payable in full upon March __, 2060 (the "**Maturity Date**"); provided, that the Maturity Date shall be automatically extended by one (1) calendar day for each calendar day after March __, 2021 (the "**Scheduled Note Maturity Date**"), if any, that all, or any part, of the Note remains outstanding.

2. <u>Payment of Interest</u>. The unpaid Principal balance due hereunder shall bear interest (the "**Interest**") at an annual rate equal to 0% (the "**Interest Rate**"). Subject to Sections 3 and 7 below, Interest shall be payable and due upon the Maturity Date. All interest shall be computed on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days (including the first day but excluding the last day) elapsed.

1

3. <u>Prepayment Prior to the Maturity Date</u>.

(a) <u>Optional Prepayment</u>. The Investor may, at its option at any time on or after the date hereof, prepay, in whole or in part, without premium or penalty, the Obligations under this Note (each, an "**Optional Prepayment**").

(b) <u>Mandatory Prepayment</u>. Upon any Mandatory Prepayment Event (as defined below), the Investor shall promptly prepay such aggregate outstanding Principal of this Note equal to the applicable Mandatory Prepayment Amount (as defined below) with respect to such Mandatory Prepayment Event (each, a "**Mandatory Prepayment**", and together with each Optional Prepayment, each a "**Prepayment**"). Notwithstanding the foregoing, the Investor (or its designee) shall not effect the conversion of any Restricted Principal unless and until the Investor shall have either (x) delivered such Mandatory Prepayment Amount to the Company or (y) delivered irrevocable instructions to the Investor's bank, broker or other financial institution to wire such Mandatory Prepayment Amount to the Company from an account with at least an amount of cash or other Eligible Assets (as defined below) equal to such Mandatory Prepayment Amount.

(c) <u>Forced Mandatory Prepayment</u>. If, on or after the date that the shares issuable upon the conversion in full of the Notes (ignoring for such purpose any conversion limitations therein) can be sold, assigned or transferred pursuant to Rule 144 and prior to the eighteen-month anniversary of the Closing Date, the Company certifies in writing to the Investor, and simultaneously files such certification with the SEC as an exhibit attached to a Current Report on Form 8-K, (i) the Cash Burn Certification set forth in Section 17(b) of the Note indicating compliance with the initial Cash Burn Milestones (as defined in the Securities Purchase Agreement), (ii) the Company has obtained the Nasdaq Stockholder Approval (as defined in the Securities Purchase Agreement) (the covenants referenced in clauses (i) and (ii), the "**Mandatory Covenants**") and (iii) that no Event of Default, or event that with the passage of time or giving of notice would constitute an Event of Default, then exists (clauses (i), (ii) and (iii), collectively, the "**Forced Mandatory Prepayment Conditions**"), then the Company may require a Forced Mandatory Prepayment hereunder by delivery of written notice to the Investor (the "**Forced Mandatory Prepayment Notice**", and the date the Forced Mandatory Prepayment Notice is delivered to the Investor, the "**Forced Mandatory Prepayment Notice Date**"). The Forced Mandatory Prepayment Notice shall (i) state the date on which the Forced Mandatory Prepayment shall occur (the "**Forced Mandatory Prepayment Date**"), which Forced Mandatory Prepayment Date shall be the second (2nd) Trading Day immediately after the Forced Mandatory Prepayment Notice Date (or such other date as mutually determined by the Company and the Investor), (ii) certify that each of the Forced Mandatory Prepayment Conditions is satisfied (or specify if any such Forced Mandatory Prepayment Condition is not satisfied, with an acknowledgement that unless each of such Forced Mandatory Prepayment Conditions is waived in writing by the Investor, in its sole discretion, such Forced Mandatory Prepayment Notice will be invalid) and (iii) state the amount of such Forced Mandatory Prepayment (the "**Forced Mandatory Prepayment Amount**"), which Forced Mandatory Prepayment Amount shall not exceed the lesser of (x) the Investor's Pro Rata Amount of $4,000,000 and (y) any remaining Principal outstanding hereunder on such Forced Mandatory Prepayment Date; provided, that, in no event, may the Company effect more than one (1) Forced Mandatory Prepayment hereunder. Notwithstanding the foregoing, the Company shall not deliver a Forced Mandatory Prepayment Notice hereunder unless it simultaneously (i) delivers a Forced Mandatory Prepayment Notice (as defined in each other Investor Note), pro rata, to each other Investor (as defined in each other Investor Note) and (ii) files the Forced Mandatory Prepayment Notice with the SEC as an exhibit attached to a Current Report on Form 8-K.

2

(d) Mechanics of Prepayments. All Prepayments hereunder shall be made in cash, by wire transfer, in U.S. dollars and immediately available funds, in accordance with the wire instructions delivered to the Investor by the Company on or prior to such date of such Prepayment. At the option of the Company, prepayments may be made directly to the Company or to such other Persons as the Company may direct in its wire instructions.

(e) Cancellation of Interest upon Prepayment. Notwithstanding anything herein to the contrary, upon any Prepayment prior to the Maturity Date (including, without limitation, any Mandatory Prepayment), the aggregate cash amount in such Prepayment shall be applied entirely to and against any outstanding Principal under this Note, and any accrued and unpaid Interest with respect to the Principal prepaid shall be automatically cancelled as of the date of such prepayment.

(f) Definitions. For the purpose of this Note, the following definitions shall apply:

(i) "**Forced Mandatory Prepayment**" means, as applicable, the Mandatory Prepayment required to be made by an Investor hereunder on a Forced Mandatory Prepayment Date pursuant to a Forced Mandatory Prepayment Notice.

(ii) "**Mandatory Prepayment Amount**" means, as applicable, any Mandatory Prepayment Conversion Amount (as defined below) or the Forced Mandatory Prepayment Amount (as defined below).

(iii) "**Mandatory Prepayment Event**" means, as applicable:

(x) with respect to any Restricted Principal of the Note designated to be converted in a Conversion Notice (such aggregate amount of Principal then outstanding hereunder equal to such Restricted Principal of the Note designated to be converted in such Conversion Notice, each, a "**Mandatory Prepayment Conversion Amount**"), both (A) the Company's receipt of such Conversion Notice thereunder executed by the Investor in which all, or any part, of the principal of the Note to be converted includes any Restricted Principal and (B) the Investor's receipt from the Company of written confirmation that the Company's transfer agent (the "**Transfer Agent**") has been irrevocably instructed by the Company to deliver to the Investor (or its designee) the shares of Common Stock to be issued pursuant to such Conversion Notice in accordance with Section 3(c) of the Note (in each case, as adjusted, if applicable, to reflect the withdrawal of any Conversion Notice, in whole or in part, by the Investor, whether pursuant to Section 3(c)(ii) of the Note or otherwise); or

3

(y) with respect to the Forced Mandatory Prepayment Notice delivered to the Investor in compliance with Section 3(c) above, the occurrence of the Forced Mandatory Prepayment Date; provided, that if on the Forced Mandatory Prepayment Date a Forced Mandatory Prepayment Condition is not satisfied, unless such Forced Mandatory Prepayment Condition is waived in writing by the Investor, the Forced Mandatory Prepayment Date shall not occur and the Forced Mandatory Prepayment Notice shall be automatically cancelled and shall be null and void.

(iv) **"Pro Rata Amount"** means a fraction (i) the numerator of which is the original principal amount of the Note of the Investor and (ii) the denominator of which is the aggregate original principal amount of all Notes issued to the initial purchasers pursuant to the Securities Purchase Agreement.

4. Defaults.

(a) the Investor shall be deemed in default hereunder upon the occurrence of any of the following (a **"Default"**):

(i) Failure to Pay Principal or Interest. The failure of the Investor to pay, when due, all or any part of any Principal or Interest, if any, required to be made hereunder; or

(ii) Bankruptcy, etc. The Investor shall have entered against it by a court having jurisdiction thereof a decree or order for relief in respect to the Investor in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official shall be appointed for the Investor or for any substantial part of the Investor's property, or the winding up or liquidation of the Investor's affairs shall have been ordered; or the Investor shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or the Investor shall consent to the entry of an order for such relief in an involuntary case under any such law, or any such involuntary case shall commence, and not be dismissed within sixty (60) days; or the Investor shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar official for the Investor or for any substantial part of the Investor's property, or make any general assignment for the benefit of creditors.

(b) Consequence of Default. Upon the occurrence of a Default, the outstanding Obligations hereunder shall, at the option of the Company, become immediately due and payable (each, an **"Investor Note Acceleration"**). Notwithstanding the foregoing, if there shall occur a Default under Section 4(a)(ii) above, the entire outstanding Obligations hereunder shall automatically become immediately due and payable without any action on the part of the Company and the Investor shall be deemed to have elected Default Netting with respect to the maximum amount of its Obligations outstanding hereunder as permitted pursuant to Section 7(f) below. Upon the occurrence of a Default, the Company shall also have all the rights and remedies of a secured party on default under Article 9 of the Uniform Commercial Code of the State of New York with respect to the Collateral (as hereinafter defined).

5. <u>Representations and Warranties of the Investor</u>. The Investor represents and warrants to the Company as follows as of the date hereof: (a) the Investor has the power and authority to execute, deliver and perform all obligations in accordance herewith; (b) the execution, delivery and performance by the Investor of this Note are within the Investor's legal powers, and do not contravene any law or any contractual restriction binding on or affecting the Investor; (c) no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Investor of this Note; (d) this Note constitutes the legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, except to the extent enforceability is limited by bankruptcy, insolvency, fraudulent conveyance, moratorium and other laws for the protection of creditors generally and by general equitable principles; and (e) there is no pending or, to the Investor's knowledge, threatened action or proceeding affecting the Investor before any governmental agency or arbitrator with respect to the transactions contemplated by this Note or which may materially adversely affect the property, assets or condition (financial or otherwise) of the Investor.

6. <u>Security</u>.

(a) <u>Grant of Security Interest</u>. As security for the due and prompt payment and performance of all payment obligations under this Note and any modifications, replacements and extensions hereof (collectively, "**Secured Obligations**"), the Investor hereby pledges and grants a security interest to the Company in all of the Investor's right, title, and interest in and to, initially at least $[ ], in the aggregate, (i) in cash, (ii) cash equivalents and/or (iii) any Group of Ten ("**G10**") currency and any notes or other securities issued by any G10 country (collectively, the "**Eligible Assets**"), in each case, held by the Investor in the bank or brokerage accounts described on  <u>Schedule I</u> attached hereto (the "**Collateral**", and such account or accounts, as applicable, collectively, the "**Collateral Account**"), subject to reduction upon any reduction, offset or cancellation of this Note. So long as any Restricted Principal (as defined in the Note) remains outstanding under the Note, the Investor shall keep Collateral in the Collateral Account with a fair market value of at least the amount of Restricted Principal then outstanding.

(b) <u>Change in Collateral Account</u>. The Investor may, with at least five (5) Trading Days' notice to the Company, move the Collateral from an account or accounts of the Investor to a new account or accounts (the "**New Collateral Account**") at a financial institution selected by the Investor, (but if such financial institution is not listed as a permitted financial institution on <u>Schedule II</u> attached hereto, subject to the consent of the Company, not to be unreasonably withheld), and upon such move, such New Collateral Account shall be the Collateral Account for all purposes hereunder.

7. <u>Netting Rights</u>.

(a) <u>Securities Contract</u>. The Company and the Investor hereby acknowledge and agree that the Securities Purchase Agreement and the Note Purchase Agreement each is a "securities contract" as defined in 11 U.S.C. § 741 and that Investor shall have all rights in respect of the Investor Note, the Note, the Master Netting Agreement, the Securities Purchase Agreement and the Note Purchase Agreement as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), including, without limitation, all rights of credit, deduction, setoff, offset, recoupment, and netting (collectively, "**Netting**" or "**Net**") as are available under this Note, the Note and the Master Netting Agreement.

(b) <u>Investor Optional Netting</u>. Notwithstanding anything herein to the contrary, the Investor may, (I) at any time after the date hereof, if the Company has not satisfied the Mandatory Covenants in accordance with their terms or (II) at any time on or after the occurrence of an Event of Default (as defined in the Note), a Change of Control (as defined in the Note) or a Company Optional Redemption (as defined in the Note) (in each case, whether or not a Redemption Notice (as defined in the Note) has been delivered by the Investor to the Company with respect thereto), the Investor, at its sole discretion, by written notice (each, a "**Investor Optional Netting Election Notice**") to the Company, Net, in whole or in part, any Unpaid Amount (as defined in the Master Netting Agreement) owed by the Investor to the Company under this Note or any other Underlying Agreement (as defined in the Master Netting Agreement) against (across or within each or all of the Underlying Agreements) (x) any Unpaid Amounts owed by the Company to the Investor under the Notes or (y) any Unpaid Amounts owed by the Company to the Investor under any other Underlying Agreement, as set forth in such written notice (each, an "**Investor Optional Netting**"); provided, that no Investor Optional Netting shall occur hereunder with respect to any Mandatory Prepayment Amount that the Investor fails to properly prepay hereunder in violation of this Note. Each Investor Optional Netting shall occur on such applicable date as set forth by the Investor in the applicable Investor Optional Netting Election Notice. Upon any Investor Optional Netting, (x) such portion of Principal subject to such Investor Optional Netting shall be deemed surrendered and concurrently cancelled as of the date of such Investor Optional Netting and (y) any accrued and unpaid Interest hereunder with respect to such portion of Principal subject to such Investor Optional Netting shall be automatically cancelled as of the date of such Investor Optional Netting. Each Investor Optional Netting shall be effective upon the date the Investor delivers written notice to the Company of the Investor's election to effect such Investor Optional Netting. Upon any Investor Optional Netting, any accrued and unpaid Interest hereunder with respect to such portion of Principal being satisfied in such Investor Optional Netting shall be automatically cancelled as of the date of such Investor Optional Netting.

(c) <u>Automatic Netting at Maturity</u>. Notwithstanding anything herein to the contrary, at the Maturity Date (as defined in the Note), if any amounts remain outstanding under the Note and hereunder, the Investor shall automatically Net such part of the outstanding obligations under the Note equal to the aggregate Principal then outstanding hereunder (the "**Remaining Principal Amount**") by the cancellation of the Remaining Principal Amount of the outstanding obligations under the Note in exchange for the surrender and concurrent cancellation of the aggregate Principal then outstanding hereunder (the "**Maturity Netting**"). Upon any Maturity Netting, any accrued and unpaid Interest hereunder with respect to such portion of Principal being cancelled in such Maturity Netting shall be automatically cancelled as of the date of such Maturity Netting and, thereafter, this Note shall be deemed to be paid in full and shall be null and void. The Maturity Netting shall automatically occur on the Maturity Date (as defined in the Note).

(d) <u>Automatic Netting Upon any Bankruptcy Event of Default</u>. Notwithstanding anything herein to the contrary, upon any Bankruptcy Event of Default under the Note, the Investor shall automatically Net such part of the outstanding obligations under the Note equal to the Remaining Principal Amount by the cancellation of the Remaining Principal Amount of the outstanding obligations under the Note in exchange for the surrender and concurrent cancellation of the aggregate Principal then outstanding hereunder (each, a "**Bankruptcy Event of Default Netting**"). Upon any Bankruptcy Event of Default Netting, any accrued and unpaid Interest hereunder with respect to such portion of Principal being satisfied in such Bankruptcy Event of Default Netting shall be automatically cancelled as of the date of such Bankruptcy Event of Default Netting and, thereafter, this Note shall be deemed to be paid in full and shall be null and void. Each Bankruptcy Event of Default Netting shall be effective upon the date of the earliest occurrence of a Bankruptcy Event (as defined in the Note) under the Note.

(e) <u>Automatic Netting Upon Prohibited Transfers of this Note</u>. If for any reason, this Note or any interest herein is pledged, assigned or transferred to any Person other than the Company without the prior written consent of the Investor, whether by contract, operation of law, court order or otherwise (each, a "**Prohibited Transfer**"), the Investor shall automatically Net such part of the outstanding obligations under the Note equal to 75% of the remaining Restricted Principal then outstanding under the Note with the remaining 25% of the Restricted Principal of the Note automatically becoming unrestricted principal thereunder in exchange for the surrender and concurrent cancellation of the aggregate Principal then outstanding hereunder (each, a "**Prohibited Transfer Netting**", and together with each Bankruptcy Event of Default Netting and each Maturity Netting, each an "**Automatic Netting**"). Upon any Prohibited Transfer, any accrued and unpaid Interest hereunder shall be automatically cancelled as of the date of such Prohibited Transfer and, thereafter, this Note shall be deemed to be paid in full and shall be null and void.

(f) <u>Default Netting</u>. Notwithstanding anything herein to the contrary, Investor may, at any time on or after the occurrence of any Investor Note Acceleration, at its sole discretion, by written notice to the Company (each, a "**Default Netting Electing Notice**"), in lieu of making any payment under this Note in cash, Net all, or any part, of the outstanding obligations under the Note by the cancellation of such portion of the outstanding obligations under the Note as set forth in such written notice in exchange for the surrender and concurrent cancellation of an equal amount of Principal hereunder (each, a "**Default Netting**") provided, that, solely with respect to any Investor Note Acceleration arising pursuant to a default under Section 4(a)(i) above, no Default Netting shall occur hereunder with respect to any Mandatory Prepayment Amount that the Investor fails to properly prepay hereunder in violation of this Note. Each Default Netting shall occur on such applicable date as set forth by the Investor in the Default Netting Election Notice. Upon any Default Netting, any accrued and unpaid Interest hereunder shall be automatically cancelled as of the date of such Default Netting. Each Default Netting shall be effective upon the date the Investor delivers notice to the Company of the Investor's election to effect such Netting.

7

(g) <u>Investor Netting Rights; Single Integrated Transaction</u>. The Company hereby acknowledges and agrees that (i) the Investor shall be entitled to exercise its rights of Investor Optional Netting, Automatic Netting and Default Netting through any means permissible under applicable law, including without limitation, set-off and Netting and (ii) the Obligations of the Investor hereunder and the obligations of the Company under the Note issued pursuant to the Securities Purchase Agreement arise in a single integrated transaction and constitute related and interdependent obligations within such transaction.

8. <u>Miscellaneous.</u>

(a) <u>Full Recourse</u>. The parties hereby acknowledge and agree that this Note is a full recourse obligation of the Investor.

(b) <u>No Oral Waivers or Modifications</u>. No provision of this Note may be waived or modified orally, but only in a writing signed by the Company and the Investor.

(c) <u>Governing Law</u>. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereto hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the Borough of Manhattan in the City of New York, New York, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.

(d) <u>No Severability</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction or other similar authority (a "**Severability Event**"), this entire Note shall be automatically terminated and shall thereafter be null and void and all remaining payment obligations hereunder of the Investor to the Company shall be automatically cancelled, *ab initio*.

8

(e) <u>Currency</u>. Principal and interest due hereunder shall be payable in lawful money of the United States of America and shall be payable to the Company at the address of the Company, or at such other address as may be specified in a written notice to the Investor given by the Company. The Company has provided the Investor with wire transfer instructions pursuant to which payments may be made under this Note and such wire transfer instruction shall be valid for the entire period of this Note.

(f) <u>Weekend; Holidays</u>. If any payment on this Note shall become due on a Saturday, Sunday or a bank or legal holiday in the State of New York, such payment shall be made on the next succeeding business day in the State of New York.

(g) <u>Usury</u>. If interest payable under this Note is in excess of the maximum permitted by law, the interest chargeable hereunder shall be reduced to the maximum amount permitted by law and any excess over the maximum amount permitted by law shall be credited to the Principal balance of this Note and applied to the same and not to the payment of Interest.

(h) <u>Remedies</u>.

(i) No failure on the part of the Company to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Company of any right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. In addition, the exercise of any right or remedy of the Company at law or equity or under this Note shall not be deemed to be an election of Company's rights or remedies under this Note or at law or equity.

(ii) No failure on the part of the Investor to exercise, and no delay in exercising, any right, power or remedy hereunder (including, without limitation, any Netting permitted hereunder) shall operate as a waiver thereof; nor shall any single or partial exercise by the Investor of any right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies herein provided are cumulative and are not exclusive of any remedies provided by law. In addition, the exercise of any right or remedy of the Investor at law or equity or under this Note shall not be deemed to be an election of Investor's rights or remedies under this Note or at law or equity.

(i) <u>Waiver of Presentment</u>. The Investor hereby waives presentment, diligence, protest and demand, notice of protest, demand and dishonor and nonpayment of this Note.

*[Signature Page Follows]*

9

IN WITNESS WHEREOF, this Note has been executed as of the date first written above.

**[INVESTOR]**

By: _____

Name:

Title:

Agreed and accepted as of
this _____ day of March, 2020 by:
**GENIUS BRANDS INTERNATIONAL, INC.**

By:_____

Name:

Title:

10

**Schedule I**
**Collateral Account**

Financial Institution:
Address of Financial Institution:
Account Number:
Account Name:

11

**Schedule II**
**Permitted Financial Institutions**

Pershing LLC or any of their affiliates
HSBC NA, or any of their affiliates
BNP Paribas, or any of their affiliates
UBS AG or any of their affiliates
Citibank NA or any of their affiliates
Bank of America Merrill Lynch or any of their affiliates
Deutsche Bank, AG or any of their affiliates
Fidelity Investments, FMR LLC or any of their affiliates
Morgan Stanley or any of their affiliates
First Republic Bank or any of their affiliates

12

Exhibit 4.3

**EXHIBIT B**

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

**COMMON STOCK PURCHASE WARRANT**

**GENIUS BRANDS INTERNATIONAL, INC.**

Warrant Shares: _____           Initial Exercise Date: _____, 20__

THIS COMMON STOCK PURCHASE WARRANT (the "Warrant") certifies that, for value received, _____ or its assigns (the "Holder") is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time on or after the date hereof (the "Initial Exercise Date") and on or prior to 5:00 p.m. (New York City time) on _____ [1] (the "Termination Date") but not thereafter, to subscribe for and purchase from Genius Brands International, Inc., a Nevada corporation (the "Company"), up to _____ shares (as subject to adjustment hereunder, the "Warrant Shares") of Common Stock. The purchase price of one share of Common Stock under this Warrant shall be equal to the Exercise Price, as defined in Section 2(b).

Section 1. Definitions. In addition to the terms defined elsewhere in this Agreement, the following terms have the meanings indicated in this Section 1:

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

"Bid Price" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the bid price of the Common Stock for the time in question (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b) if OTCQB or OTCQX is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on OTCQB or OTCQX as applicable, (c) if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported on The Pink Open Market (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Securities then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

---

[1] Insert the date that is the five (5) year anniversary of the Initial Exercise Date, provided that, if such date is not a Trading Day, insert the immediately following Trading Day.

1

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Commission" means the United States Securities and Exchange Commission.

"Convertible Securities" means any stock or securities (other than Options (as defined below)) convertible into or exercisable or exchangeable for shares of Common Stock.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Liens" means a lien, charge pledge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Options" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Purchase Agreement" means that certain Securities Purchase Agreement, dated March 11, 2020, by and among the Company and the buyers signatory thereto pursuant to which this Warrant is issued.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Trading Day" means a day on which the Common Stock is traded on a Trading Market.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market or the New York Stock Exchange (or any successors to any of the foregoing).

"Transfer Agent" means VStock Transfer LLC, the current transfer agent of the Company, with a mailing address of 18 Lafayette Place, Woodmere, New York 11598 and a facsimile number of (646) 536-3179, and any successor transfer agent of the Company.

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b) if OTCQB or OTCQX is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on OTCQB or OTCQX as applicable, (c) if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported on the Pink Open Market (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Securities then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

Section 2. Exercise.

a) Exercise of Warrant. Exercise of the purchase rights represented by this Warrant may be made, in whole or in part, at any time or times on or after the Initial Exercise Date and on or before the Termination Date by delivery to the Company of a duly executed facsimile copy or PDF copy submitted by e-mail (or e-mail attachment) of the Notice of Exercise in the form annexed hereto (the "Notice of Exercise"). Within the earlier of (i) two (2) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period (as defined in Section 2(d)(i) herein) following the date of exercise as aforesaid, the Holder shall deliver the aggregate Exercise Price for the shares specified in the applicable Notice of Exercise by wire transfer or cashier's check drawn on a United States bank unless the cashless exercise procedure specified in Section 2(c) below is specified in the applicable Notice of Exercise. No ink-original Notice of Exercise shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Notice of Exercise be required. Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company until the Holder has purchased all of the Warrant Shares available hereunder and the Warrant has been exercised in full, in which case, the Holder shall surrender this Warrant to the Company for cancellation within three (3) Trading Days of the date on which the final Notice of Exercise is delivered to the Company. Partial exercises of this Warrant resulting in purchases of a portion of the total number of Warrant Shares available hereunder shall have the effect of lowering the outstanding number of Warrant Shares purchasable hereunder in an amount equal to the applicable number of Warrant Shares purchased. The Holder and the Company shall maintain records showing the number of Warrant Shares purchased and the date of such purchases. The Company shall deliver any objection to any Notice of Exercise within one (1) Business Day of receipt of such notice. **The Holder and any assignee, by acceptance of this Warrant, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Warrant Shares hereunder, the number of Warrant Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof.**

b) Exercise Price. The exercise price per share of Common Stock under this Warrant shall be $0.26, subject to adjustment hereunder (the "Exercise Price") provided, however, immediately following the Nasdaq Stockholder Approval, the Exercise Price shall be reduced, and only reduced, to equal $0.21, subject to adjustment hereunder.

3

c) <u>Cashless Exercise</u>. If at the time of exercise hereof there is no effective registration statement registering, or the prospectus contained therein is not available for the issuance of the Warrant Shares to the Holder, then this Warrant may also be exercised, in whole or in part, at such time by means of a "cashless exercise" in which the Holder shall be entitled to receive a number of Warrant Shares equal to the quotient obtained by dividing $[(A-B)(X)]$ by $(A)$, where:

(A) = as applicable: (i) the VWAP on the Trading Day immediately preceding the date of the applicable Notice of Exercise if such Notice of Exercise is (1) both executed and delivered pursuant to Section 2(a) hereof on a day that is not a Trading Day or (2) both executed and delivered pursuant to Section 2(a) hereof on a Trading Day prior to the opening of "regular trading hours" (as defined in Rule 600(b)(68) of Regulation NMS promulgated under the federal securities laws) on such Trading Day, (ii) at the option of the Holder, either (y) the VWAP on the Trading Day immediately preceding the date of the applicable Notice of Exercise or (z) the Bid Price of the Common Stock on the principal Trading Market as reported by Bloomberg L.P. as of the time of the Holder's execution of the applicable Notice of Exercise if such Notice of Exercise is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter (including until two (2) hours after the close of "regular trading hours" on a Trading Day) pursuant to Section 2(a) hereof or (iii) the VWAP on the date of the applicable Notice of Exercise if the date of such Notice of Exercise is a Trading Day and such Notice of Exercise is both executed and delivered pursuant to Section 2(a) hereof after the close of "regular trading hours" on such Trading Day;

(B) = the Exercise Price of this Warrant, as adjusted hereunder; and

(X) = the number of Warrant Shares that would be issuable upon exercise of this Warrant in accordance with the terms of this Warrant if such exercise were by means of a cash exercise rather than a cashless exercise.

If Warrant Shares are issued in such a cashless exercise, the parties acknowledge and agree that in accordance with Section 3(a)(9) of the Securities Act, the Warrant Shares shall take on the characteristics of the Warrants being exercised, and the holding period of the Warrant Shares being issued may be tacked on to the holding period of this Warrant. The Company agrees not to take any position contrary to this Section 2(c).

Notwithstanding anything herein to the contrary, on the Termination Date, this Warrant shall be automatically exercised via cashless exercise pursuant to this Section 2(c).

4

d) <u>Mechanics of Exercise</u>.

i. <u>Delivery of Warrant Shares Upon Exercise</u>. The Company shall cause the Warrant Shares purchased hereunder to be transmitted by the Transfer Agent to the Holder by crediting the account of the Holder's or its designee's balance account with The Depository Trust Company through its Deposit or Withdrawal at Custodian system ("<u>DWAC</u>") if the Company is then a participant in such system and either (A) there is an effective registration statement permitting the issuance of the Warrant Shares to or resale of the Warrant Shares by the Holder or (B) the Warrant Shares are eligible for resale by the Holder without volume or manner-of-sale limitations pursuant to Rule 144 (assuming cashless exercise of the Warrants), and otherwise by physical delivery of a certificate, registered in the Company's share register in the name of the Holder or its designee, for the number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the address specified by the Holder in the Notice of Exercise by the date that is the earliest of (i) two (2) Trading Days after the delivery to the Company of the Notice of Exercise, (ii) one (1) Trading Day after delivery of the aggregate Exercise Price to the Company and (iii) the number of Trading Days comprising the Standard Settlement Period after the delivery to the Company of the Notice of Exercise (such date, the "<u>Warrant Share Delivery Date</u>"). Upon delivery of the Notice of Exercise, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date of delivery of the Warrant Shares, provided that payment of the aggregate Exercise Price (other than in the case of a cashless exercise) is received within the earlier of (i) two (2) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period following delivery of the Notice of Exercise. If the Company fails for any reason to deliver to the Holder the Warrant Shares subject to a Notice of Exercise by the Warrant Share Delivery Date, the Company shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $1,000 of Warrant Shares subject to such exercise (based on the VWAP of the Common Stock on the date of the applicable Notice of Exercise), $10 per Trading Day (increasing to $20 per Trading Day on the fifth Trading Day after such liquidated damages begin to accrue) for each Trading Day after such Warrant Share Delivery Date until such Warrant Shares are delivered or Holder rescinds such exercise. The Company agrees to maintain a transfer agent that is a participant in the FAST program so long as this Warrant remains outstanding and exercisable. As used herein, "<u>Standard Settlement Period</u>" means the standard settlement period, expressed in a number of Trading Days, on the Company's primary Trading Market with respect to the Common Stock as in effect on the date of delivery of the Notice of Exercise.

ii. <u>Delivery of New Warrants Upon Exercise</u>. If this Warrant shall have been exercised in part, the Company shall, at the request of a Holder and upon surrender of this Warrant certificate, at the time of delivery of the Warrant Shares, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical with this Warrant.

iii. <u>Rescission Rights</u>. If the Company fails to cause the Transfer Agent to transmit to the Holder the Warrant Shares pursuant to Section 2(d)(i) by the Warrant Share Delivery Date, then the Holder will have the right to rescind such exercise.

5

iv. <u>Compensation for Buy-In on Failure to Timely Deliver Warrant Shares Upon Exercise</u>. In addition to any other rights available to the Holder, if the Company fails to cause the Transfer Agent to transmit to the Holder the Warrant Shares in accordance with the provisions of Section 2(d)(i) above pursuant to an exercise on or before the Warrant Share Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) or the Holder's brokerage firm otherwise purchases, shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Shares which the Holder anticipated receiving upon such exercise (a "<u>Buy-In</u>"), then the Company shall (A) pay in cash to the Holder the amount, if any, by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (1) the number of Warrant Shares that the Company was required to deliver to the Holder in connection with the exercise at issue times (2) the price at which the sell order giving rise to such purchase obligation was executed, and (B) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of Warrant Shares for which such exercise was not honored (in which case such exercise shall be deemed rescinded) or deliver to the Holder the number of shares of Common Stock that would have been issued had the Company timely complied with its exercise and delivery obligations hereunder. For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (A) of the immediately preceding sentence the Company shall be required to pay the Holder $1,000. The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In and, upon request of the Company, evidence of the amount of such loss. Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver shares of Common Stock upon exercise of the Warrant as required pursuant to the terms hereof.

v. <u>No Fractional Shares or Scrip</u>. No fractional shares or scrip representing fractional shares shall be issued upon the exercise of this Warrant. As to any fraction of a share which the Holder would otherwise be entitled to purchase upon such exercise, the Company shall, at its election, either pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Exercise Price or round up to the next whole share.

vi. <u>Charges, Taxes and Expenses</u>. Issuance of Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of such Warrant Shares, all of which taxes and expenses shall be paid by the Company, and such Warrant Shares shall be issued in the name of the Holder or in such name or names as may be directed by the Holder; <u>provided</u>, <u>however</u>, that, in the event that Warrant Shares are to be issued in a name other than the name of the Holder, this Warrant when surrendered for exercise shall be accompanied by the Assignment Form attached hereto duly executed by the Holder and the Company may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto. The Company shall pay all Transfer Agent fees required for same-day processing of any Notice of Exercise and all fees to the Depository Trust Company (or another established clearing corporation performing similar functions) required for same-day electronic delivery of the Warrant Shares.

vii. <u>Closing of Books</u>. The Company will not close its stockholder books or records in any manner which prevents the timely exercise of this Warrant, pursuant to the terms hereof.

6

e) <u>Holder's Exercise Limitations</u>. The Company shall not effect any exercise of this Warrant, and a Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 2 or otherwise, to the extent that after giving effect to such issuance after exercise as set forth on the applicable Notice of Exercise, the Holder (together with the Holder's Affiliates, and any other Persons acting as a group together with the Holder or any of the Holder's Affiliates (such Persons, "<u>Attribution Parties</u>")), would beneficially own in excess of the Beneficial Ownership Limitation (as defined below). For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its Affiliates and Attribution Parties shall include the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Holder or any of its Affiliates or Attribution Parties and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other Common Stock Equivalents) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Holder or any of its Affiliates or Attribution Parties. Except as set forth in the preceding sentence, for purposes of this Section 2(e), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by the Holder that the Company is not representing to the Holder that such calculation is in compliance with Section 13(d) of the Exchange Act and the Holder is solely responsible for any schedules required to be filed in accordance therewith. To the extent that the limitation contained in this Section 2(e) applies, the determination of whether this Warrant is exercisable (in relation to other securities owned by the Holder together with any Affiliates and Attribution Parties) and of which portion of this Warrant is exercisable shall be in the sole discretion of the Holder, and the submission of a Notice of Exercise shall be deemed to be the Holder's determination of whether this Warrant is exercisable (in relation to other securities owned by the Holder together with any Affiliates and Attribution Parties) and of which portion of this Warrant is exercisable, in each case subject to the Beneficial Ownership Limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 2(e), in determining the number of outstanding shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as reflected in (A) the Company's most recent periodic or annual report filed with the Commission, as the case may be, (B) a more recent public announcement by the Company or (C) a more recent written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Company shall within one Trading Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder or its Affiliates or Attribution Parties since the date as of which such number of outstanding shares of Common Stock was reported. The "<u>Beneficial Ownership Limitation</u>" shall be [9.99/4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon exercise of this Warrant. The Holder, upon notice to the Company, may increase or decrease the Beneficial Ownership Limitation provisions of this Section 2(e), provided that the Beneficial Ownership Limitation in no event exceeds 9.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of this Warrant held by the Holder and the provisions of this Section 2(e) shall continue to apply.

Any increase in the Beneficial Ownership Limitation will not be effective until the 61st day after such notice is delivered to the Company. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 2(e) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of this Warrant.

7

Section 3. Certain Adjustments.

a) Stock Dividends and Splits. If the Company, at any time while this Warrant is outstanding: (i) pays a stock dividend or otherwise makes a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of this Warrant), (ii) subdivides outstanding shares of Common Stock into a larger number of shares, (iii) combines (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (iv) issues by reclassification of shares of the Common Stock any shares of capital stock of the Company, then in each case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event, and the number of shares issuable upon exercise of this Warrant shall be proportionately adjusted such that the aggregate Exercise Price of this Warrant shall remain unchanged. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b) Adjustment of Exercise Price upon Issuance of Common Stock. If and whenever on or after the date Nasdaq Stockholder Approval is obtained, the Company issues or sells, or in accordance with this Section 3(b) is deemed to have issued or sold, or the Company publicly announces the issuance or sale of, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock issued or sold, or in accordance with this Section 3(b) is deemed to have been issued or sold, by the Company (x) in connection with any Excluded Securities, (y) for which the Holder received a Distribution in at least an equivalent amount pursuant to Section 3(d) and (z) adjusting the Exercise Price pursuant to Section 3(a)), for a consideration per share (the "New Issuance Price") less than a price (the "Applicable Price") equal to the Exercise Price in effect immediately prior to such issue or sale or deemed issuance or sale (the foregoing a "Dilutive Issuance"), then immediately after such Dilutive Issuance the Exercise Price then in effect shall be reduced to an amount equal to the New Issuance Price. For purposes of determining the adjusted Exercise Price under this Section 3(b), the following shall be applicable:

(i) Issuance of Options. If the Company in any manner grants or sells, or the Company publicly announces the issuance or sale of, any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 3(b)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion exercise or exchange of any Convertible Security issuable upon exercise of such Option. No further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities.

8

(ii) <u>Issuance of Convertible Securities</u>. If the Company in any manner issues or sells, or the Company publicly announces the issuance or sale of, any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 3(b)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security. No further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Exercise Price has been or is to be made pursuant to other provisions of this Section 3(b), no further adjustment of the Exercise Price shall be made by reason of such issue or sale.

(iii) <u>Change in Option Price or Rate of Conversion</u>. If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exchangeable or exercisable for shares of Common Stock increases or decreases at any time, the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 3(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 3(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

9

(iv) <u>Calculation of Consideration Received</u>. If any Option and/or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "<u>Primary Security</u>", and such Option and/or Convertible Security and/or Adjustment Right, the "<u>Secondary Securities</u>" and together with the Primary Security, each a "<u>Unit</u>"), together comprising one integrated transaction (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing), the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be the lowest of (x) the purchase price of such Unit, (y) if such Primary Security is an Option and/or Convertible Security, the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise or conversion of the Primary Security in accordance with Section 3(b)(i) or 3(b)(ii) above and (z) the lowest VWAP during the three (3) Trading Day period immediately following the public announcement of such Dilutive Issuance (for the avoidance of doubt, if such public announcement is released prior to the opening of the principal Trading Market on a Trading Day, such Trading Day shall be the first Trading Day in such three (3) Trading Day period). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration other than cash received therefor will be deemed to be the net amount received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such publicly traded securities on the date of receipt of such publicly traded securities. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Required Holders. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "<u>Valuation Event</u>"), the fair value of such consideration will be determined within five (5) Business Days after the tenth (10th) day following the Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Required Holders. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company. Notwithstanding anything to the contrary contained in this Section 3(b), if the New Issuance Price calculated pursuant to this Section 3(b) would result in a price less than $0.001, the New Issuance Price shall be deemed to be $0.001.

(v) <u>Record Date</u>. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

10

(vi) <u>No Readjustments</u>. For the avoidance of doubt, in the event the Exercise Price has been adjusted pursuant to this Section 3(b) and the Dilutive Issuance that triggered such adjustment does not occur, is not consummated, is unwound or is cancelled after the facts for any reason whatsoever, in no event shall the Exercise Price be readjusted to the Exercise Price that would have been in effect if such Dilutive Issuance had not occurred or been consummated.

c) <u>Subsequent Rights Offerings</u>. In addition to any adjustments pursuant to Section 3(a) above, if at any time the Company grants, issues or sells any Common Stock Equivalents or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of shares of Common Stock (the "<u>Purchase Rights</u>"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Beneficial Ownership Limitation) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (provided, however, that, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder exceeding the Beneficial Ownership Limitation, then the Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such shares of Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Beneficial Ownership Limitation).

d) <u>Pro Rata Distributions</u>. During such time as this Warrant is outstanding, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "<u>Distribution</u>"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Beneficial Ownership Limitation) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (provided, however, that, to the extent that the Holder's right to participate in any such Distribution would result in the Holder exceeding the Beneficial Ownership Limitation, then the Holder shall not be entitled to participate in such Distribution to such extent (or in the beneficial ownership of any shares of Common Stock as a result of such Distribution to such extent) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Beneficial Ownership Limitation).

11

e) Fundamental Transaction. If, at any time while this Warrant is outstanding, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person, (ii) the Company (and all of its Subsidiaries, taken as a whole), directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of 50% or more of the outstanding Common Stock, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off, merger or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (each a "Fundamental Transaction"), then, upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder (without regard to any limitation in Section 2(e) on the exercise of this Warrant), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "Alternate Consideration") receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such Fundamental Transaction (without regard to any limitation in Section 2(e) on the exercise of this Warrant). For purposes of any such exercise, the determination of the Exercise Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Exercise Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. Notwithstanding anything to the contrary, in the event of a Fundamental Transaction, the Company or any Successor Entity (as defined below) shall, at the Holder's option, exercisable at any time concurrently with, or within 30 days after the later of (x) the date of consummation of the Fundamental Transaction and (y) the date of the public announcement of the applicable Fundamental Transaction, purchase this Warrant from the Holder by paying to the Holder an amount of cash equal to the Black Scholes Value (as defined below) of the remaining unexercised portion of this Warrant on the date of the consummation of such Fundamental Transaction; provided, however, that, if the Fundamental Transaction is not within the Company's control, including not approved by the Company's Board of Directors, Holder shall only be entitled to receive from the Company or any Successor Entity, as of the date of consummation of such Fundamental Transaction, the same type or form of consideration (and in the same proportion), at the Black Scholes Value of the unexercised portion of this Warrant, that is being offered and paid to the holders of Common Stock of the Company in connection with the Fundamental Transaction, whether that consideration be in the form of cash, stock or any combination thereof, or whether the holders of Common Stock are given the choice to receive from among alternative forms of consideration in connection with the Fundamental Transaction; provided, further, that if holders of Common Stock of the Company are not offered or paid any consideration in such Fundamental Transaction, such holder of Common Stock will be deemed to have received common stock of the Successor Entity (which entity may be the Company following such Fundamental Transaction) in such Fundamental Transaction. "Black Scholes Value" means the value of this Warrant based on the Black-Scholes Option Pricing Model obtained from the "OV" function on Bloomberg, L.P. ("Bloomberg") determined as of the day of consummation of the applicable Fundamental Transaction for pricing purposes and reflecting (A) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the time between the date of the public announcement of the applicable

12

Fundamental Transaction and the Termination Date, (B) an expected volatility equal to the greater of 100% and the 100 day volatility obtained from the HVT function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the public announcement of the applicable Fundamental Transaction, (C) the underlying price per share used in such calculation shall be the greater of (i) the sum of the price per share being offered in cash, if any, plus the value of any non-cash consideration, if any, being offered in such Fundamental Transaction and (ii) the greater of (x) the last VWAP immediately prior to the public announcement of such Fundamental Transaction and (y) the last VWAP immediately prior to the consummation of such Fundamental Transaction and (D) a remaining option time equal to the time between the date of the public announcement of the applicable Fundamental Transaction and the Termination Date and (E) a zero cost of borrow. The payment of the Black Scholes Value will be made by wire transfer of immediately available funds (or such other consideration) within five Business Days of the Holder's election (or, if later, on the effective date of the Fundamental Transaction). The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "Successor Entity") to assume in writing all of the obligations of the Company under this Warrant and the other Transaction Documents in accordance with the provisions of this Section 3(e) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant which is exercisable for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Warrant and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein.

f) Calculations. All calculations under this Section 3 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 3, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

g) Notice to Holder.

i. Adjustment to Exercise Price. Whenever the Exercise Price is adjusted pursuant to any provision of this Section 3, the Company shall promptly deliver to the Holder by facsimile or email a notice setting forth the Exercise Price after such adjustment and any resulting adjustment to the number of Warrant Shares and setting forth a brief statement of the facts requiring such adjustment.

13

ii. Notice to Allow Exercise by Holder. If (A) the Company shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock, (C) the Company shall authorize the granting to all holders of the Common Stock rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company (and all of its Subsidiaries, taken as a whole) is a party, any sale or transfer of all or substantially all of the assets of the Company, or any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property, or (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, then, in each case, the Company shall cause to be delivered by facsimile or email to the Holder at its last facsimile number or email address as it shall appear upon the Warrant Register of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice. To the extent that any notice provided in this Warrant constitutes, or contains, material, non-public information regarding the Company or any of the Subsidiaries, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K. The Holder shall remain entitled to exercise this Warrant during the period commencing on the date of such notice to the effective date of the event triggering such notice except as may otherwise be expressly set forth herein.

h) Voluntary Adjustment By Company. Subject to receipt of Nasdaq Stockholder Approval and the rules and regulations of the Trading Market, the Company may at any time during the term of this Warrant, subject to the prior written consent of the Holder, reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

Section 4. Transfer of Warrant.

a) Transferability. Subject to compliance with any applicable securities laws and the conditions set forth in Section 4(d) hereof and to the provisions of Section 4.1 of the Purchase Agreement, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Company or its designated agent, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled. Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company unless the Holder has assigned this Warrant in full, in which case, the Holder shall surrender this Warrant to the Company within three (3) Trading Days of the date on which the Holder delivers an assignment form to the Company assigning this Warrant in full. The Warrant, if properly assigned in accordance herewith, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

14

b) <u>New Warrants</u>. This Warrant may be divided or combined with other Warrants upon presentation hereof at the aforesaid office of the Company, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the Holder or its agent or attorney. Subject to compliance with Section 4(a), as to any transfer which may be involved in such division or combination, the Company shall execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants to be divided or combined in accordance with such notice. All Warrants issued on transfers or exchanges shall be dated the Initial Exercise Date and shall be identical with this Warrant except as to the number of Warrant Shares issuable pursuant thereto.

c) <u>Warrant Register</u>. The Company shall register this Warrant, upon records to be maintained by the Company for that purpose (the "<u>Warrant Register</u>"), in the name of the record Holder hereof from time to time. The Company may deem and treat the registered Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, absent actual notice to the contrary.

d) <u>Transfer Restrictions</u>. If, at the time of the surrender of this Warrant in connection with any transfer of this Warrant, the transfer of this Warrant shall not be either (i) registered pursuant to an effective registration statement under the Securities Act and under applicable state securities or blue sky laws or (ii) eligible for resale without volume or manner-of-sale restrictions or current public information requirements pursuant to Rule 144, the Company may require, as a condition of allowing such transfer, that the Holder or transferee of this Warrant, as the case may be, comply with the provisions of Section 5.7 of the Purchase Agreement.

e) <u>Representation by the Holder</u>. The Holder, by the acceptance hereof, represents and warrants that it is acquiring this Warrant and, upon any exercise hereof, will acquire the Warrant Shares issuable upon such exercise, for its own account and not with a view to or for distributing or reselling such Warrant Shares or any part thereof in violation of the Securities Act or any applicable state securities law, except pursuant to sales registered or exempted under the Securities Act.

<u>Section 5</u>. <u>Miscellaneous</u>.

a) <u>No Rights as Stockholder Until Exercise; No Settlement in Cash</u>. This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of the Company prior to the exercise hereof as set forth in Section 2(d)(i), except as expressly set forth in Section 3. Without limiting any rights of a Holder to receive Warrant Shares on a "cashless exercise" pursuant to Section 2(c) or to receive cash payments pursuant to Section 2(d)(i) and Section 2(d)(iv) herein, in no event shall the Company be required to net cash settle an exercise of this Warrant.

b) <u>Loss, Theft, Destruction or Mutilation of Warrant</u>. The Company covenants that upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant or any stock certificate relating to the Warrant Shares, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which, in the case of the Warrant, shall not include the posting of any bond), and upon surrender and cancellation of such Warrant or stock certificate, if mutilated, the Company will make and deliver a new Warrant or stock certificate of like tenor and dated as of such cancellation, in lieu of such Warrant or stock certificate.

c) <u>Saturdays, Sundays, Holidays, etc</u>. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

d) <u>Authorized Shares</u>.

The Company covenants that, during the period the Warrant is outstanding, it will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of the Warrant Shares upon the exercise of any purchase rights under this Warrant. The Company further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of issuing the necessary Warrant Shares upon the exercise of the purchase rights under this Warrant. The Company will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation, or of any requirements of the Trading Market upon which the Common Stock may be listed. The Company covenants that all Warrant Shares which may be issued upon the exercise of the purchase rights represented by this Warrant will, upon exercise of the purchase rights represented by this Warrant and payment for such Warrant Shares in accordance herewith, be duly authorized, validly issued, fully paid and nonassessable and free from all taxes, liens and charges created by the Company in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment. Without limiting the generality of the foregoing, the Company will (i) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (ii) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant and (iii) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof, as may be, necessary to enable the Company to perform its obligations under this Warrant.

Before taking any action which would result in an adjustment in the number of Warrant Shares for which this Warrant is exercisable or in the Exercise Price, the Company shall obtain all such authorizations or exemptions thereof, or consents thereto, as may be necessary from any public regulatory body or bodies having jurisdiction thereof.

e) <u>Jurisdiction</u>. All questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement.

f) <u>Restrictions</u>. The Holder acknowledges that the Warrant Shares acquired upon the exercise of this Warrant, if not registered, and the Holder does not utilize cashless exercise, will have restrictions upon resale imposed by state and federal securities laws.

16

g) Nonwaiver and Expenses. No course of dealing or any delay or failure to exercise any right hereunder on the part of Holder shall operate as a waiver of such right or otherwise prejudice the Holder's rights, powers or remedies. Without limiting any other provision of this Warrant or the Purchase Agreement, if the Company willfully and knowingly fails to comply with any provision of this Warrant, which results in any material damages to the Holder, the Company shall pay to the Holder such amounts as shall be sufficient to cover any costs and expenses including, but not limited to, reasonable attorneys' fees, including those of appellate proceedings, incurred by the Holder in collecting any amounts due pursuant hereto or in otherwise enforcing any of its rights, powers or remedies hereunder.

h) Notices. Any notice, request or other document required or permitted to be given or delivered to the Holder by the Company shall be delivered in accordance with the notice provisions of the Purchase Agreement.

i) Limitation of Liability. No provision hereof, in the absence of any affirmative action by the Holder to exercise this Warrant to purchase Warrant Shares, and no enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the purchase price of any Common Stock or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

j) Remedies. The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Warrant. The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.

k) Successors and Assigns. Subject to applicable securities laws, this Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors and permitted assigns of the Company and the successors and permitted assigns of Holder. The provisions of this Warrant are intended to be for the benefit of any Holder from time to time of this Warrant and shall be enforceable by the Holder or holder of Warrant Shares.

l) Amendment. This Warrant may be modified or amended or the provisions hereof waived with the written consent of the Company and the Holder.

m) Severability. Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

n) Headings. The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*(Signature Page Follows)*

17

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed by its officer thereunto duly authorized as of the date first above indicated.

**GENIUS BRANDS INTERNATIONAL, INC.**

By:_____

Name:

Title:

18

**NOTICE OF EXERCISE**

TO: GENIUS BRANDS INTERNATIONAL, INC.

(1) The undersigned hereby elects to purchase _____ Warrant Shares of the Company pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

(2) Payment shall take the form of (check applicable box):

[ ] in lawful money of the United States; or

[ ] if permitted the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c).

(3) Please issue said Warrant Shares in the name of the undersigned or in such other name as is specified below:

_____

The Warrant Shares shall be delivered to the following DWAC Account Number:

_____
_____
_____

(4) Accredited Investor. The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

[SIGNATURE OF HOLDER]

Name of Investing Entity: _____

*Signature of Authorized Signatory of Investing Entity*: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

Date: _____

19

**EXHIBIT B**

ASSIGNMENT FORM

*(To assign the foregoing Warrant, execute this form and supply required information. Do not use this form to purchase shares.)*

FOR VALUE RECEIVED, the foregoing Warrant and all rights evidenced thereby are hereby assigned to

Name: _____

_____

(Please Print)

Address: _____

_____

(Please Print)

_____

Phone Number: _____

Email Address: _____

Dated: _____ __, _____

Holder's Signature: _____

Holder's Address: _____

20

Exhibit 4.4

**EXHIBIT B**

NEITHER THIS SECURITY NOR THE SECURITIES FOR WHICH THIS SECURITY IS EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND, ACCORDINGLY, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. THIS SECURITY AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN SECURED BY SUCH SECURITIES.

**COMMON STOCK PURCHASE WARRANT**
**GENIUS BRANDS INTERNATIONAL, INC.**

Warrant Shares: _____                                    Initial Exercise Date: _____, 20__

THIS COMMON STOCK PURCHASE WARRANT (the "Warrant") certifies that, for value received, _____ or its assigns (the "Holder") is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time on or after the date hereof (the "Initial Exercise Date") and on or prior to 5:00 p.m. (New York City time) on _____[1] (the "Termination Date") but not thereafter, to subscribe for and purchase from Genius Brands International, Inc., a Nevada corporation (the "Company"), up to _____ shares (as subject to adjustment hereunder, the "Warrant Shares") of Common Stock. The purchase price of one share of Common Stock under this Warrant shall be equal to the Exercise Price, as defined in Section 2(b).

Section 1. Definitions. In addition to the terms defined elsewhere in this Agreement, the following terms have the meanings indicated in this Section 1:

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with a Person, as such terms are used in and construed under Rule 405 under the Securities Act.

"Bid Price" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the bid price of the Common Stock for the time in question (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b) if OTCQB or OTCQX is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on OTCQB or OTCQX as applicable, (c) if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported on The Pink Open Market (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Securities then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

---

[1] Insert the date that is the five (5) year anniversary of the Initial Exercise Date, provided that, if such date is not a Trading Day, insert the immediately following Trading Day.

1

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day except any Saturday, any Sunday, any day which is a federal legal holiday in the United States or any day on which banking institutions in the State of New York are authorized or required by law or other governmental action to close.

"Commission" means the United States Securities and Exchange Commission.

"Convertible Securities" means any stock or securities (other than Options (as defined below)) convertible into or exercisable or exchangeable for shares of Common Stock.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Liens" means a lien, charge pledge, security interest, encumbrance, right of first refusal, preemptive right or other restriction.

"Options" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

"Person" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"Proceeding" means an action, claim, suit, investigation or proceeding (including, without limitation, an informal investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"Purchase Agreement" means that certain Securities Purchase Agreement, dated March 11, 2020, by and among the Company and the buyers signatory thereto pursuant to which this Warrant is issued.

"Rule 144" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended or interpreted from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same purpose and effect as such Rule.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Trading Day" means a day on which the Common Stock is traded on a Trading Market.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market or the New York Stock Exchange (or any successors to any of the foregoing).

2

"Transfer Agent" means VStock Transfer LLC, the current transfer agent of the Company, with a mailing address of 18 Lafayette Place, Woodmere, New York 11598 and a facsimile number of (646) 536-3179, and any successor transfer agent of the Company.

"VWAP" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time)), (b) if OTCQB or OTCQX is not a Trading Market, the volume weighted average price of the Common Stock for such date (or the nearest preceding date) on OTCQB or OTCQX as applicable, (c) if the Common Stock is not then listed or quoted for trading on OTCQB or OTCQX and if prices for the Common Stock are then reported on the Pink Open Market (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported, or (d) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Securities then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

Section 2. Exercise.

a) Exercise of Warrant. Exercise of the purchase rights represented by this Warrant may be made, in whole or in part, at any time or times on or after the Initial Exercise Date and on or before the Termination Date by delivery to the Company of a duly executed facsimile copy or PDF copy submitted by e-mail (or e-mail attachment) of the Notice of Exercise in the form annexed hereto (the "Notice of Exercise"). Within the earlier of (i) two (2) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period (as defined in Section 2(d)(i) herein) following the date of exercise as aforesaid, the Holder shall deliver the aggregate Exercise Price for the shares specified in the applicable Notice of Exercise by wire transfer or cashier's check drawn on a United States bank unless the cashless exercise procedure specified in Section 2(c) below is specified in the applicable Notice of Exercise. No ink-original Notice of Exercise shall be required, nor shall any medallion guarantee (or other type of guarantee or notarization) of any Notice of Exercise be required. Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company until the Holder has purchased all of the Warrant Shares available hereunder and the Warrant has been exercised in full, in which case, the Holder shall surrender this Warrant to the Company for cancellation within three (3) Trading Days of the date on which the final Notice of Exercise is delivered to the Company. Partial exercises of this Warrant resulting in purchases of a portion of the total number of Warrant Shares available hereunder shall have the effect of lowering the outstanding number of Warrant Shares purchasable hereunder in an amount equal to the applicable number of Warrant Shares purchased. The Holder and the Company shall maintain records showing the number of Warrant Shares purchased and the date of such purchases. The Company shall deliver any objection to any Notice of Exercise within one (1) Business Day of receipt of such notice. **The Holder and any assignee, by acceptance of this Warrant, acknowledge and agree that, by reason of the provisions of this paragraph, following the purchase of a portion of the Warrant Shares hereunder, the number of Warrant Shares available for purchase hereunder at any given time may be less than the amount stated on the face hereof.**

b) Exercise Price. The exercise price per share of Common Stock under this Warrant shall be $0.26, subject to adjustment hereunder (the "Exercise Price") provided, however, immediately following the Nasdaq Stockholder Approval, the Exercise Price shall be reduced, and only reduced, to equal $0.21, subject to adjustment hereunder.

3

c) <u>Cashless Exercise</u>. If at the time of exercise hereof there is no effective registration statement registering, or the prospectus contained therein is not available for the issuance of the Warrant Shares to the Holder, then this Warrant may also be exercised, in whole or in part, at such time by means of a "cashless exercise" in which the Holder shall be entitled to receive a number of Warrant Shares equal to the quotient obtained by dividing $[(A-B)(X)]$ by $(A)$, where:

(A) = as applicable: (i) the VWAP on the Trading Day immediately preceding the date of the applicable Notice of Exercise if such Notice of Exercise is (1) both executed and delivered pursuant to Section 2(a) hereof on a day that is not a Trading Day or (2) both executed and delivered pursuant to Section 2(a) hereof on a Trading Day prior to the opening of "regular trading hours" (as defined in Rule 600(b)(68) of Regulation NMS promulgated under the federal securities laws) on such Trading Day, (ii) at the option of the Holder, either (y) the VWAP on the Trading Day immediately preceding the date of the applicable Notice of Exercise or (z) the Bid Price of the Common Stock on the principal Trading Market as reported by Bloomberg L.P. as of the time of the Holder's execution of the applicable Notice of Exercise if such Notice of Exercise is executed during "regular trading hours" on a Trading Day and is delivered within two (2) hours thereafter (including until two (2) hours after the close of "regular trading hours" on a Trading Day) pursuant to Section 2(a) hereof or (iii) the VWAP on the date of the applicable Notice of Exercise if the date of such Notice of Exercise is a Trading Day and such Notice of Exercise is both executed and delivered pursuant to Section 2(a) hereof after the close of "regular trading hours" on such Trading Day;

(B) = the Exercise Price of this Warrant, as adjusted hereunder; and

(X) = the number of Warrant Shares that would be issuable upon exercise of this Warrant in accordance with the terms of this Warrant if such exercise were by means of a cash exercise rather than a cashless exercise.

If Warrant Shares are issued in such a cashless exercise, the parties acknowledge and agree that in accordance with Section 3(a)(9) of the Securities Act, the Warrant Shares shall take on the characteristics of the Warrants being exercised, and the holding period of the Warrant Shares being issued may be tacked on to the holding period of this Warrant. The Company agrees not to take any position contrary to this Section 2(c).

Notwithstanding anything herein to the contrary, on the Termination Date, this Warrant shall be automatically exercised via cashless exercise pursuant to this Section 2(c).

4

d) Mechanics of Exercise.

      i. Delivery of Warrant Shares Upon Exercise. The Company shall cause the Warrant Shares purchased hereunder to be transmitted by the Transfer Agent to the Holder by crediting the account of the Holder's or its designee's balance account with The Depository Trust Company through its Deposit or Withdrawal at Custodian system ("DWAC") if the Company is then a participant in such system and either (A) there is an effective registration statement permitting the issuance of the Warrant Shares to or resale of the Warrant Shares by the Holder or (B) the Warrant Shares are eligible for resale by the Holder without volume or manner-of-sale limitations pursuant to Rule 144 (assuming cashless exercise of the Warrants), and otherwise by physical delivery of a certificate, registered in the Company's share register in the name of the Holder or its designee, for the number of Warrant Shares to which the Holder is entitled pursuant to such exercise to the address specified by the Holder in the Notice of Exercise by the date that is the earliest of (i) two (2) Trading Days after the delivery to the Company of the Notice of Exercise, (ii) one (1) Trading Day after delivery of the aggregate Exercise Price to the Company and (iii) the number of Trading Days comprising the Standard Settlement Period after the delivery to the Company of the Notice of Exercise (such date, the "Warrant Share Delivery Date"). Upon delivery of the Notice of Exercise, the Holder shall be deemed for all corporate purposes to have become the holder of record of the Warrant Shares with respect to which this Warrant has been exercised, irrespective of the date of delivery of the Warrant Shares, provided that payment of the aggregate Exercise Price (other than in the case of a cashless exercise) is received within the earlier of (i) two (2) Trading Days and (ii) the number of Trading Days comprising the Standard Settlement Period following delivery of the Notice of Exercise. If the Company fails for any reason to deliver to the Holder the Warrant Shares subject to a Notice of Exercise by the Warrant Share Delivery Date, the Company shall pay to the Holder, in cash, as liquidated damages and not as a penalty, for each $1,000 of Warrant Shares subject to such exercise (based on the VWAP of the Common Stock on the date of the applicable Notice of Exercise), $10 per Trading Day (increasing to $20 per Trading Day on the fifth Trading Day after such liquidated damages begin to accrue) for each Trading Day after such Warrant Share Delivery Date until such Warrant Shares are delivered or Holder rescinds such exercise. The Company agrees to maintain a transfer agent that is a participant in the FAST program so long as this Warrant remains outstanding and exercisable. As used herein, "Standard Settlement Period" means the standard settlement period, expressed in a number of Trading Days, on the Company's primary Trading Market with respect to the Common Stock as in effect on the date of delivery of the Notice of Exercise.

      ii. Delivery of New Warrants Upon Exercise. If this Warrant shall have been exercised in part, the Company shall, at the request of a Holder and upon surrender of this Warrant certificate, at the time of delivery of the Warrant Shares, deliver to the Holder a new Warrant evidencing the rights of the Holder to purchase the unpurchased Warrant Shares called for by this Warrant, which new Warrant shall in all other respects be identical with this Warrant.

      iii. Rescission Rights. If the Company fails to cause the Transfer Agent to transmit to the Holder the Warrant Shares pursuant to Section 2(d)(i) by the Warrant Share Delivery Date, then the Holder will have the right to rescind such exercise.

5

iv. <u>Compensation for Buy-In on Failure to Timely Deliver Warrant Shares Upon Exercise</u>. In addition to any other rights available to the Holder, if the Company fails to cause the Transfer Agent to transmit to the Holder the Warrant Shares in accordance with the provisions of Section 2(d)(i) above pursuant to an exercise on or before the Warrant Share Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) or the Holder's brokerage firm otherwise purchases, shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Shares which the Holder anticipated receiving upon such exercise (a "<u>Buy-In</u>"), then the Company shall (A) pay in cash to the Holder the amount, if any, by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (1) the number of Warrant Shares that the Company was required to deliver to the Holder in connection with the exercise at issue times (2) the price at which the sell order giving rise to such purchase obligation was executed, and (B) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of Warrant Shares for which such exercise was not honored (in which case such exercise shall be deemed rescinded) or deliver to the Holder the number of shares of Common Stock that would have been issued had the Company timely complied with its exercise and delivery obligations hereunder. For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (A) of the immediately preceding sentence the Company shall be required to pay the Holder $1,000. The Holder shall provide the Company written notice indicating the amounts payable to the Holder in respect of the Buy-In and, upon request of the Company, evidence of the amount of such loss. Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver shares of Common Stock upon exercise of the Warrant as required pursuant to the terms hereof.

v. <u>No Fractional Shares or Scrip</u>. No fractional shares or scrip representing fractional shares shall be issued upon the exercise of this Warrant. As to any fraction of a share which the Holder would otherwise be entitled to purchase upon such exercise, the Company shall, at its election, either pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Exercise Price or round up to the next whole share.

vi. <u>Charges, Taxes and Expenses</u>. Issuance of Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of such Warrant Shares, all of which taxes and expenses shall be paid by the Company, and such Warrant Shares shall be issued in the name of the Holder or in such name or names as may be directed by the Holder; <u>provided</u>, <u>however</u>, that, in the event that Warrant Shares are to be issued in a name other than the name of the Holder, this Warrant when surrendered for exercise shall be accompanied by the Assignment Form attached hereto duly executed by the Holder and the Company may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto. The Company shall pay all Transfer Agent fees required for same-day processing of any Notice of Exercise and all fees to the Depository Trust Company (or another established clearing corporation performing similar functions) required for same-day electronic delivery of the Warrant Shares.

vii. <u>Closing of Books</u>. The Company will not close its stockholder books or records in any manner which prevents the timely exercise of this Warrant, pursuant to the terms hereof.

6

e) Holder's Exercise Limitations. The Company shall not effect any exercise of this Warrant, and a Holder shall not have the right to exercise any portion of this Warrant, pursuant to Section 2 or otherwise, to the extent that after giving effect to such issuance after exercise as set forth on the applicable Notice of Exercise, the Holder (together with the Holder's Affiliates, and any other Persons acting as a group together with the Holder or any of the Holder's Affiliates (such Persons, "Attribution Parties")), would beneficially own in excess of the Beneficial Ownership Limitation (as defined below). For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its Affiliates and Attribution Parties shall include the number of shares of Common Stock issuable upon exercise of this Warrant with respect to which such determination is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (i) exercise of the remaining, nonexercised portion of this Warrant beneficially owned by the Holder or any of its Affiliates or Attribution Parties and (ii) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any other Common Stock Equivalents) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Holder or any of its Affiliates or Attribution Parties. Except as set forth in the preceding sentence, for purposes of this Section 2(e), beneficial ownership shall be calculated in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder, it being acknowledged by the Holder that the Company is not representing to the Holder that such calculation is in compliance with Section 13(d) of the Exchange Act and the Holder is solely responsible for any schedules required to be filed in accordance therewith. To the extent that the limitation contained in this Section 2(e) applies, the determination of whether this Warrant is exercisable (in relation to other securities owned by the Holder together with any Affiliates and Attribution Parties) and of which portion of this Warrant is exercisable shall be in the sole discretion of the Holder, and the submission of a Notice of Exercise shall be deemed to be the Holder's determination of whether this Warrant is exercisable (in relation to other securities owned by the Holder together with any Affiliates and Attribution Parties) and of which portion of this Warrant is exercisable, in each case subject to the Beneficial Ownership Limitation, and the Company shall have no obligation to verify or confirm the accuracy of such determination. In addition, a determination as to any group status as contemplated above shall be determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder. For purposes of this Section 2(e), in determining the number of outstanding shares of Common Stock, a Holder may rely on the number of outstanding shares of Common Stock as reflected in (A) the Company's most recent periodic or annual report filed with the Commission, as the case may be, (B) a more recent public announcement by the Company or (C) a more recent written notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding. Upon the written or oral request of a Holder, the Company shall within one Trading Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Warrant, by the Holder or its Affiliates or Attribution Parties since the date as of which such number of outstanding shares of Common Stock was reported. The "Beneficial Ownership Limitation" shall be [9.99/4.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock issuable upon exercise of this Warrant. The Holder, upon notice to the Company, may increase or decrease the Beneficial Ownership Limitation provisions of this Section 2(e), provided that the Beneficial Ownership Limitation in no event exceeds 9.99% of the number of shares of the Common Stock outstanding immediately after giving effect to the issuance of shares of Common Stock upon exercise of this Warrant held by the Holder and the provisions of this Section 2(e) shall continue to apply.

Any increase in the Beneficial Ownership Limitation will not be effective until the 61st day after such notice is delivered to the Company. The provisions of this paragraph shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this Section 2(e) to correct this paragraph (or any portion hereof) which may be defective or inconsistent with the intended Beneficial Ownership Limitation herein contained or to make changes or supplements necessary or desirable to properly give effect to such limitation. The limitations contained in this paragraph shall apply to a successor holder of this Warrant.

Section 3. Certain Adjustments.

a) Stock Dividends and Splits. If the Company, at any time while this Warrant is outstanding: (i) pays a stock dividend or otherwise makes a distribution or distributions on shares of its Common Stock or any other equity or equity equivalent securities payable in shares of Common Stock (which, for avoidance of doubt, shall not include any shares of Common Stock issued by the Company upon exercise of this Warrant), (ii) subdivides outstanding shares of Common Stock into a larger number of shares, (iii) combines (including by way of reverse stock split) outstanding shares of Common Stock into a smaller number of shares, or (iv) issues by reclassification of shares of the Common Stock any shares of capital stock of the Company, then in each case the Exercise Price shall be multiplied by a fraction of which the numerator shall be the number of shares of Common Stock (excluding treasury shares, if any) outstanding immediately before such event and of which the denominator shall be the number of shares of Common Stock outstanding immediately after such event, and the number of shares issuable upon exercise of this Warrant shall be proportionately adjusted such that the aggregate Exercise Price of this Warrant shall remain unchanged. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such dividend or distribution and shall become effective immediately after the effective date in the case of a subdivision, combination or re-classification.

b) Adjustment of Exercise Price upon Issuance of Common Stock. If and whenever on or after the date Nasdaq Stockholder Approval is obtained, the Company issues or sells, or in accordance with this Section 3(b) is deemed to have issued or sold, or the Company publicly announces the issuance or sale of, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock issued or sold, or in accordance with this Section 3(b) is deemed to have been issued or sold, by the Company (x) in connection with any Excluded Securities (other than clause (vii) therein), (y) for which the Holder received a Distribution in at least an equivalent amount pursuant to Section 3(d) and (z) adjusting the Exercise Price pursuant to Section 3(a)), for a consideration per share (the "New Issuance Price") less than a price (the "Applicable Price") equal to the Exercise Price in effect immediately prior to such issue or sale or deemed issuance or sale (the foregoing a "Dilutive Issuance"), then immediately after such Dilutive Issuance the Exercise Price then in effect shall be reduced to an amount equal to the New Issuance Price. For purposes of determining the adjusted Exercise Price under this Section 3(b), the following shall be applicable:

(i) Issuance of Options. If the Company in any manner grants or sells, or the Company publicly announces the issuance or sale of, any Options and the lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of any such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 3(b)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Options or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the granting or sale of such Option, upon exercise of such Option and upon conversion exercise or exchange of any Convertible Security issuable upon exercise of such Option. No further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities.

8

(ii) <u>Issuance of Convertible Securities</u>. If the Company in any manner issues or sells, or the Company publicly announces the issuance or sale of, any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance or sale of such Convertible Securities for such price per share. For the purposes of this Section 3(b)(ii), the "lowest price per share for which one share of Common Stock is issuable upon the conversion or exchange or exercise thereof" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security less any consideration paid or payable by the Company with respect to such one share of Common Stock upon the issuance or sale of the Convertible Security and upon the conversion or exchange or exercise of such Convertible Security. No further adjustment of the Exercise Price shall be made upon the actual issuance of such shares of Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Exercise Price has been or is to be made pursuant to other provisions of this Section 3(b), no further adjustment of the Exercise Price shall be made by reason of such issue or sale.

(iii) <u>Change in Option Price or Rate of Conversion</u>. If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or exchangeable or exercisable for shares of Common Stock increases or decreases at any time, the Exercise Price in effect at the time of such increase or decrease shall be adjusted to the Exercise Price which would have been in effect at such time had such Options or Convertible Securities provided for such increased or decreased purchase price, additional consideration or increased or decreased conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 3(b)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Subscription Date are increased or decreased in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the shares of Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such increase or decrease. No adjustment pursuant to this Section 3(b) shall be made if such adjustment would result in an increase of the Exercise Price then in effect.

9

(iv) <u>Calculation of Consideration Received</u>. If any Option and/or Convertible Security is issued in connection with the issuance or sale or deemed issuance or sale of any other securities of the Company (as determined by the Holder, the "<u>Primary Security</u>", and such Option and/or Convertible Security and/or Adjustment Right, the "<u>Secondary Securities</u>" and together with the Primary Security, each a "<u>Unit</u>"), together comprising one integrated transaction (or one or more transactions if such issuances or sales or deemed issuances or sales of securities of the Company either (A) have at least one investor or purchaser in common, (B) are consummated in reasonable proximity to each other and/or (C) are consummated under the same plan of financing), the aggregate consideration per share of Common Stock with respect to such Primary Security shall be deemed to be the lowest of (x) the purchase price of such Unit, (y) if such Primary Security is an Option and/or Convertible Security, the lowest price per share for which one share of Common Stock is at any time issuable upon the exercise or conversion of the Primary Security in accordance with Section 3(b)(i) or 3(b)(ii) above and (z) the lowest VWAP during the three (3) Trading Day period immediately following the public announcement of such Dilutive Issuance (for the avoidance of doubt, if such public announcement is released prior to the opening of the principal Trading Market on a Trading Day, such Trading Day shall be the first Trading Day in such three (3) Trading Day period). If any shares of Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration other than cash received therefor will be deemed to be the net amount received by the Company therefor. If any shares of Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of such consideration received by the Company will be the fair value of such consideration, except where such consideration consists of publicly traded securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such publicly traded securities on the date of receipt of such publicly traded securities. If any shares of Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or publicly traded securities will be determined jointly by the Company and the Required Holders. If such parties are unable to reach agreement within ten (10) days after the occurrence of an event requiring valuation (the "<u>Valuation Event</u>"), the fair value of such consideration will be determined within five (5) Business Days after the tenth (10th) day following the Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Required Holders. The determination of such appraiser shall be final and binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company. Notwithstanding anything to the contrary contained in this Section 3(b), if the New Issuance Price calculated pursuant to this Section 3(b) would result in a price less than $0.001, the New Issuance Price shall be deemed to be $0.001.

(v) <u>Record Date</u>. If the Company takes a record of the holders of shares of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in shares of Common Stock, Options or in Convertible Securities or (B) to subscribe for or purchase shares of Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be.

10

(vi) <u>No Readjustments</u>. For the avoidance of doubt, in the event the Exercise Price has been adjusted pursuant to this Section 3(b) and the Dilutive Issuance that triggered such adjustment does not occur, is not consummated, is unwound or is cancelled after the facts for any reason whatsoever, in no event shall the Exercise Price be readjusted to the Exercise Price that would have been in effect if such Dilutive Issuance had not occurred or been consummated.

c) <u>Subsequent Rights Offerings</u>. In addition to any adjustments pursuant to Section 3(a) above, if at any time the Company grants, issues or sells any Common Stock Equivalents or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of shares of Common Stock (the "<u>Purchase Rights</u>"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Beneficial Ownership Limitation) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights (<u>provided</u>, <u>however</u>, that, to the extent that the Holder's right to participate in any such Purchase Right would result in the Holder exceeding the Beneficial Ownership Limitation, then the Holder shall not be entitled to participate in such Purchase Right to such extent (or beneficial ownership of such shares of Common Stock as a result of such Purchase Right to such extent) and such Purchase Right to such extent shall be held in abeyance for the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Beneficial Ownership Limitation).

d) <u>Pro Rata Distributions</u>. During such time as this Warrant is outstanding, if the Company shall declare or make any dividend or other distribution of its assets (or rights to acquire its assets) to holders of shares of Common Stock, by way of return of capital or otherwise (including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (a "<u>Distribution</u>"), at any time after the issuance of this Warrant, then, in each such case, the Holder shall be entitled to participate in such Distribution to the same extent that the Holder would have participated therein if the Holder had held the number of shares of Common Stock acquirable upon complete exercise of this Warrant (without regard to any limitations on exercise hereof, including without limitation, the Beneficial Ownership Limitation) immediately before the date of which a record is taken for such Distribution, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the participation in such Distribution (<u>provided</u>, <u>however</u>, that, to the extent that the Holder's right to participate in any such Distribution would result in the Holder exceeding the Beneficial Ownership Limitation, then the Holder shall not be entitled to participate in such Distribution to such extent (or in the beneficial ownership of any shares of Common Stock as a result of such Distribution to such extent) and the portion of such Distribution shall be held in abeyance for the benefit of the Holder until such time, if ever, as its right thereto would not result in the Holder exceeding the Beneficial Ownership Limitation).

11

e) Fundamental Transaction. If, at any time while this Warrant is outstanding, (i) the Company, directly or indirectly, in one or more related transactions effects any merger or consolidation of the Company with or into another Person, (ii) the Company (and all of its Subsidiaries, taken as a whole), directly or indirectly, effects any sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of its assets in one or a series of related transactions, (iii) any, direct or indirect, purchase offer, tender offer or exchange offer (whether by the Company or another Person) is completed pursuant to which holders of Common Stock are permitted to sell, tender or exchange their shares for other securities, cash or property and has been accepted by the holders of 50% or more of the outstanding Common Stock, (iv) the Company, directly or indirectly, in one or more related transactions effects any reclassification, reorganization or recapitalization of the Common Stock or any compulsory share exchange pursuant to which the Common Stock is effectively converted into or exchanged for other securities, cash or property, or (v) the Company, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off, merger or scheme of arrangement) with another Person or group of Persons whereby such other Person or group acquires more than 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (each a "Fundamental Transaction"), then, upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, at the option of the Holder (without regard to any limitation in Section 2(e) on the exercise of this Warrant), the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "Alternate Consideration") receivable as a result of such Fundamental Transaction by a holder of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such Fundamental Transaction (without regard to any limitation in Section 2(e) on the exercise of this Warrant). For purposes of any such exercise, the determination of the Exercise Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Exercise Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. Notwithstanding anything to the contrary, in the event of a Fundamental Transaction, the Company or any Successor Entity (as defined below) shall, at the Holder's option, exercisable at any time concurrently with, or within 30 days after the later of (x) the date of consummation of the Fundamental Transaction and (y) the date of the public announcement of the applicable Fundamental Transaction, purchase this Warrant from the Holder by paying to the Holder an amount of cash equal to the Black Scholes Value (as defined below) of the remaining unexercised portion of this Warrant on the date of the consummation of such Fundamental Transaction; provided, however, that, if the Fundamental Transaction is not within the Company's control, including not approved by the Company's Board of Directors, Holder shall only be entitled to receive from the Company or any Successor Entity, as of the date of consummation of such Fundamental Transaction, the same type or form of consideration (and in the same proportion), at the Black Scholes Value of the unexercised portion of this Warrant, that is being offered and paid to the holders of Common Stock of the Company in connection with the Fundamental Transaction, whether that consideration be in the form of cash, stock or any combination thereof, or whether the holders of Common Stock are given the choice to receive from among alternative forms of consideration in connection with the Fundamental Transaction; provided, further, that if holders of Common Stock of the Company are not offered or paid any consideration in such Fundamental Transaction, such holder of Common Stock will be deemed to have received common stock of the Successor Entity (which entity may be the Company following such Fundamental Transaction) in such Fundamental Transaction. "Black Scholes Value" means the value of this Warrant based on the Black-Scholes Option Pricing Model obtained from the "OV" function on Bloomberg, L.P. ("Bloomberg") determined as of the day of consummation of the applicable Fundamental Transaction for pricing purposes and reflecting (A) a risk-free interest rate corresponding to the U.S. Treasury rate for a period equal to the time between the date of the public announcement of the applicable

12

Fundamental Transaction and the Termination Date, (B) an expected volatility equal to the greater of 100% and the 100 day volatility obtained from the HVT function on Bloomberg (determined utilizing a 365 day annualization factor) as of the Trading Day immediately following the public announcement of the applicable Fundamental Transaction, (C) the underlying price per share used in such calculation shall be the greater of (i) the sum of the price per share being offered in cash, if any, plus the value of any non-cash consideration, if any, being offered in such Fundamental Transaction and (ii) the greater of (x) the last VWAP immediately prior to the public announcement of such Fundamental Transaction and (y) the last VWAP immediately prior to the consummation of such Fundamental Transaction and (D) a remaining option time equal to the time between the date of the public announcement of the applicable Fundamental Transaction and the Termination Date and (E) a zero cost of borrow. The payment of the Black Scholes Value will be made by wire transfer of immediately available funds (or such other consideration) within five Business Days of the Holder's election (or, if later, on the effective date of the Fundamental Transaction). The Company shall cause any successor entity in a Fundamental Transaction in which the Company is not the survivor (the "Successor Entity") to assume in writing all of the obligations of the Company under this Warrant and the other Transaction Documents in accordance with the provisions of this Section 3(e) pursuant to written agreements in form and substance reasonably satisfactory to the Holder and approved by the Holder (without unreasonable delay) prior to such Fundamental Transaction and shall, at the option of the Holder, deliver to the Holder in exchange for this Warrant a security of the Successor Entity evidenced by a written instrument substantially similar in form and substance to this Warrant which is exercisable for a corresponding number of shares of capital stock of such Successor Entity (or its parent entity) equivalent to the shares of Common Stock acquirable and receivable upon exercise of this Warrant (without regard to any limitations on the exercise of this Warrant) prior to such Fundamental Transaction, and with an exercise price which applies the exercise price hereunder to such shares of capital stock (but taking into account the relative value of the shares of Common Stock pursuant to such Fundamental Transaction and the value of such shares of capital stock, such number of shares of capital stock and such exercise price being for the purpose of protecting the economic value of this Warrant immediately prior to the consummation of such Fundamental Transaction), and which is reasonably satisfactory in form and substance to the Holder. Upon the occurrence of any such Fundamental Transaction, the Successor Entity shall succeed to, and be substituted for (so that from and after the date of such Fundamental Transaction, the provisions of this Warrant and the other Transaction Documents referring to the "Company" shall refer instead to the Successor Entity), and may exercise every right and power of the Company and shall assume all of the obligations of the Company under this Warrant and the other Transaction Documents with the same effect as if such Successor Entity had been named as the Company herein.

f) Calculations. All calculations under this Section 3 shall be made to the nearest cent or the nearest 1/100th of a share, as the case may be. For purposes of this Section 3, the number of shares of Common Stock deemed to be issued and outstanding as of a given date shall be the sum of the number of shares of Common Stock (excluding treasury shares, if any) issued and outstanding.

g) Notice to Holder.

i. Adjustment to Exercise Price. Whenever the Exercise Price is adjusted pursuant to any provision of this Section 3, the Company shall promptly deliver to the Holder by facsimile or email a notice setting forth the Exercise Price after such adjustment and any resulting adjustment to the number of Warrant Shares and setting forth a brief statement of the facts requiring such adjustment.

13

ii. Notice to Allow Exercise by Holder. If (A) the Company shall declare a dividend (or any other distribution in whatever form) on the Common Stock, (B) the Company shall declare a special nonrecurring cash dividend on or a redemption of the Common Stock, (C) the Company shall authorize the granting to all holders of the Common Stock rights or warrants to subscribe for or purchase any shares of capital stock of any class or of any rights, (D) the approval of any stockholders of the Company shall be required in connection with any reclassification of the Common Stock, any consolidation or merger to which the Company (and all of its Subsidiaries, taken as a whole) is a party, any sale or transfer of all or substantially all of the assets of the Company, or any compulsory share exchange whereby the Common Stock is converted into other securities, cash or property, or (E) the Company shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, then, in each case, the Company shall cause to be delivered by facsimile or email to the Holder at its last facsimile number or email address as it shall appear upon the Warrant Register of the Company, at least 20 calendar days prior to the applicable record or effective date hereinafter specified, a notice stating (x) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of the Common Stock of record to be entitled to such dividend, distributions, redemption, rights or warrants are to be determined or (y) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close, and the date as of which it is expected that holders of the Common Stock of record shall be entitled to exchange their shares of the Common Stock for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange; provided that the failure to deliver such notice or any defect therein or in the delivery thereof shall not affect the validity of the corporate action required to be specified in such notice. To the extent that any notice provided in this Warrant constitutes, or contains, material, non-public information regarding the Company or any of the Subsidiaries, the Company shall simultaneously file such notice with the Commission pursuant to a Current Report on Form 8-K. The Holder shall remain entitled to exercise this Warrant during the period commencing on the date of such notice to the effective date of the event triggering such notice except as may otherwise be expressly set forth herein.

h) Voluntary Adjustment By Company. Subject to receipt of Nasdaq Stockholder Approval and the rules and regulations of the Trading Market, the Company may at any time during the term of this Warrant, subject to the prior written consent of the Holder, reduce the then current Exercise Price to any amount and for any period of time deemed appropriate by the board of directors of the Company.

Section 4. Transfer of Warrant.

a) Transferability. Subject to compliance with any applicable securities laws and the conditions set forth in Section 4(d) hereof and to the provisions of Section 4.1 of the Purchase Agreement, this Warrant and all rights hereunder (including, without limitation, any registration rights) are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Company or its designated agent, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by the Holder or its agent or attorney and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee or assignees, as applicable, and in the denomination or denominations specified in such instrument of assignment, and shall issue to the assignor a new Warrant evidencing the portion of this Warrant not so assigned, and this Warrant shall promptly be cancelled. Notwithstanding anything herein to the contrary, the Holder shall not be required to physically surrender this Warrant to the Company unless the Holder has assigned this Warrant in full, in which case, the Holder shall surrender this Warrant to the Company within three (3) Trading Days of the date on which the Holder delivers an assignment form to the Company assigning this Warrant in full. The Warrant, if properly assigned in accordance herewith, may be exercised by a new holder for the purchase of Warrant Shares without having a new Warrant issued.

14

b) New Warrants. This Warrant may be divided or combined with other Warrants upon presentation hereof at the aforesaid office of the Company, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the Holder or its agent or attorney. Subject to compliance with Section 4(a), as to any transfer which may be involved in such division or combination, the Company shall execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants to be divided or combined in accordance with such notice. All Warrants issued on transfers or exchanges shall be dated the Initial Exercise Date and shall be identical with this Warrant except as to the number of Warrant Shares issuable pursuant thereto.

c) Warrant Register. The Company shall register this Warrant, upon records to be maintained by the Company for that purpose (the "Warrant Register"), in the name of the record Holder hereof from time to time. The Company may deem and treat the registered Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof or any distribution to the Holder, and for all other purposes, absent actual notice to the contrary.

d) Transfer Restrictions. If, at the time of the surrender of this Warrant in connection with any transfer of this Warrant, the transfer of this Warrant shall not be either (i) registered pursuant to an effective registration statement under the Securities Act and under applicable state securities or blue sky laws or (ii) eligible for resale without volume or manner-of-sale restrictions or current public information requirements pursuant to Rule 144, the Company may require, as a condition of allowing such transfer, that the Holder or transferee of this Warrant, as the case may be, comply with the provisions of Section 5.7 of the Purchase Agreement.

e) Representation by the Holder. The Holder, by the acceptance hereof, represents and warrants that it is acquiring this Warrant and, upon any exercise hereof, will acquire the Warrant Shares issuable upon such exercise, for its own account and not with a view to or for distributing or reselling such Warrant Shares or any part thereof in violation of the Securities Act or any applicable state securities law, except pursuant to sales registered or exempted under the Securities Act.

Section 5. Miscellaneous.

a) No Rights as Stockholder Until Exercise; No Settlement in Cash. This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of the Company prior to the exercise hereof as set forth in Section 2(d)(i), except as expressly set forth in Section 3. Without limiting any rights of a Holder to receive Warrant Shares on a "cashless exercise" pursuant to Section 2(c) or to receive cash payments pursuant to Section 2(d)(i) and Section 2(d)(iv) herein, in no event shall the Company be required to net cash settle an exercise of this Warrant.

b) Loss, Theft, Destruction or Mutilation of Warrant. The Company covenants that upon receipt by the Company of evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant or any stock certificate relating to the Warrant Shares, and in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to it (which, in the case of the Warrant, shall not include the posting of any bond), and upon surrender and cancellation of such Warrant or stock certificate, if mutilated, the Company will make and deliver a new Warrant or stock certificate of like tenor and dated as of such cancellation, in lieu of such Warrant or stock certificate.

15

c) <u>Saturdays, Sundays, Holidays, etc.</u> If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

d) <u>Authorized Shares.</u>

The Company covenants that, during the period the Warrant is outstanding, it will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of the Warrant Shares upon the exercise of any purchase rights under this Warrant. The Company further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of issuing the necessary Warrant Shares upon the exercise of the purchase rights under this Warrant. The Company will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation, or of any requirements of the Trading Market upon which the Common Stock may be listed. The Company covenants that all Warrant Shares which may be issued upon the exercise of the purchase rights represented by this Warrant will, upon exercise of the purchase rights represented by this Warrant and payment for such Warrant Shares in accordance herewith, be duly authorized, validly issued, fully paid and nonassessable and free from all taxes, liens and charges created by the Company in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

Except and to the extent as waived or consented to by the Holder, the Company shall not by any action, including, without limitation, amending its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment. Without limiting the generality of the foregoing, the Company will (i) not increase the par value of any Warrant Shares above the amount payable therefor upon such exercise immediately prior to such increase in par value, (ii) take all such action as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares upon the exercise of this Warrant and (iii) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof, as may be, necessary to enable the Company to perform its obligations under this Warrant.

Before taking any action which would result in an adjustment in the number of Warrant Shares for which this Warrant is exercisable or in the Exercise Price, the Company shall obtain all such authorizations or exemptions thereof, or consents thereto, as may be necessary from any public regulatory body or bodies having jurisdiction thereof.

e) <u>Jurisdiction.</u> All questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement.

f) <u>Restrictions.</u> The Holder acknowledges that the Warrant Shares acquired upon the exercise of this Warrant, if not registered, and the Holder does not utilize cashless exercise, will have restrictions upon resale imposed by state and federal securities laws.

16

g) <u>Nonwaiver and Expenses</u>. No course of dealing or any delay or failure to exercise any right hereunder on the part of Holder shall operate as a waiver of such right or otherwise prejudice the Holder's rights, powers or remedies. Without limiting any other provision of this Warrant or the Purchase Agreement, if the Company willfully and knowingly fails to comply with any provision of this Warrant, which results in any material damages to the Holder, the Company shall pay to the Holder such amounts as shall be sufficient to cover any costs and expenses including, but not limited to, reasonable attorneys' fees, including those of appellate proceedings, incurred by the Holder in collecting any amounts due pursuant hereto or in otherwise enforcing any of its rights, powers or remedies hereunder.

h) <u>Notices</u>. Any notice, request or other document required or permitted to be given or delivered to the Holder by the Company shall be delivered in accordance with the notice provisions of the Purchase Agreement.

i) <u>Limitation of Liability</u>. No provision hereof, in the absence of any affirmative action by the Holder to exercise this Warrant to purchase Warrant Shares, and no enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the purchase price of any Common Stock or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

j) <u>Remedies</u>. The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, will be entitled to specific performance of its rights under this Warrant. The Company agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.

k) <u>Successors and Assigns</u>. Subject to applicable securities laws, this Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors and permitted assigns of the Company and the successors and permitted assigns of Holder. The provisions of this Warrant are intended to be for the benefit of any Holder from time to time of this Warrant and shall be enforceable by the Holder or holder of Warrant Shares.

l) <u>Amendment</u>. This Warrant may be modified or amended or the provisions hereof waived with the written consent of the Company and the Holder.

m) <u>Severability</u>. Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

n) <u>Headings</u>. The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

*********************

*(Signature Page Follows)*

17

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed by its officer thereunto duly authorized as of the date first above indicated.

**GENIUS BRANDS INTERNATIONAL, INC.**

By:_____

Name:

Title:

18

**NOTICE OF EXERCISE**

TO: GENIUS BRANDS INTERNATIONAL, INC.

(1) The undersigned hereby elects to purchase _____ Warrant Shares of the Company pursuant to the terms of the attached Warrant (only if exercised in full), and tenders herewith payment of the exercise price in full, together with all applicable transfer taxes, if any.

(2) Payment shall take the form of (check applicable box):

[ ] in lawful money of the United States; or

[ ] if permitted the cancellation of such number of Warrant Shares as is necessary, in accordance with the formula set forth in subsection 2(c), to exercise this Warrant with respect to the maximum number of Warrant Shares purchasable pursuant to the cashless exercise procedure set forth in subsection 2(c).

(3) Please issue said Warrant Shares in the name of the undersigned or in such other name as is specified below:

_____

The Warrant Shares shall be delivered to the following DWAC Account Number:

_____

_____

_____

(4) Accredited Investor. The undersigned is an "accredited investor" as defined in Regulation D promulgated under the Securities Act of 1933, as amended.

[SIGNATURE OF HOLDER]

Name of Investing Entity: _____

*Signature of Authorized Signatory of Investing Entity*: _____

Name of Authorized Signatory: _____

Title of Authorized Signatory: _____

Date: _____

19

**EXHIBIT B**

ASSIGNMENT FORM

*(To assign the foregoing Warrant, execute this form and supply required information. Do not use this form to purchase shares.)*

FOR VALUE RECEIVED, the foregoing Warrant and all rights evidenced thereby are hereby assigned to

Name: _____

_____

(Please Print)

Address: _____

_____

(Please Print)

_____

Phone Number: _____

Email Address: _____

Dated: _____ __, _____

Holder's Signature: _____

Holder's Address: _____

20

Exhibit 10.1

**SECURITIES PURCHASE AGREEMENT**

**SECURITIES PURCHASE AGREEMENT** (the "**Agreement**"), dated as of March 11, 2020, by and among Genius Brands International, Inc., a Nevada corporation (the "**Company**"), and the investors listed on the Schedule of Buyers attached hereto (individually, a "**Buyer**" and collectively, the "**Buyers**").

**WHEREAS**:

A. The Company and the Buyers desire to enter into this transaction to purchase (i) the Notes (as defined below) pursuant to an exemption from the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "**1933 Act**"), afforded by Section 4(a)(2) of the 1933 Act, or Rule 506(b) of Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**SEC**") and (ii) the Warrants (as defined below) pursuant to an exemption from the registration requirements of Section 5 of the 1933 Act afforded by Section 4(a)(2) of the 1933 Act, or Rule 506(b) of Regulation D.

B. The Company has authorized (i) a new series of senior secured convertible notes of the Company, in the aggregate original principal amount of $13,750,000, in the form attached hereto as <u>Exhibit A</u> (the "**Notes**"), which Notes shall be convertible into shares of the Company's voting common stock, par value $0.001 per share (the "**Common Stock**") in accordance with the terms of the Notes (all shares of Common Stock issued or issuable pursuant to the terms of the Notes, including, without limitation, upon conversion or otherwise, collectively, the "**Note Conversion Shares**") and (ii) warrants, in the form attached hereto as <u>Exhibit B</u>, representing the right to acquire a number of shares of Common Stock determined in accordance with the terms and conditions set forth therein (the "**Warrants**") (such shares issuable upon exercise of the Warrants, collectively, the "**Warrant Shares**").

C. The Notes, the Note Conversion Shares, the Warrants and the Warrant Shares are collectively referred to herein as the "**Securities**."

D. The Notes will rank senior to all outstanding and future indebtedness of the Company, and its Subsidiaries (as defined below), will be guaranteed by all direct and indirect Subsidiaries of the Company other than Llama Productions LLC, currently formed or formed in the future (the "**Subsidiary Guarantors**"), as evidenced by a guarantee agreement, in the form attached hereto as <u>Exhibit C</u> (as amended or modified from time to time in accordance with its terms, the "**Guarantee Agreement**"), and will be secured by a first priority perfected security interest (subject to Permitted Liens under and as defined in the Notes) in all of the current and future assets of the Company and the Subsidiary Guarantors, currently formed or formed in the future, as evidenced by a pledge and security agreement, in the form attached hereto as <u>Exhibit D</u> (as amended or modified from time to time in accordance with its terms, the "**Security Agreement**" and together with the Guarantee Agreement and any ancillary documents related thereto, collectively, the "**Security Documents**").

E. On or prior to the Closing Date (as defined below), the Company and each Buyer, separately, shall enter into a Note Securities Purchase Agreement, in the form attached hereto as <u>Exhibit E</u> (each as amended, modified, supplemented, extended, renewed, restated or replaced from time to time, collectively, the "**Note Purchase Agreements**"), pursuant to which the Company shall acquire a secured promissory note issued by the applicable Buyer (each, an "**Investor Note**", and collectively, the "**Investor Notes**") as full payment of the Note Purchase Price (as defined below) hereunder.

1

F. On or prior to the Closing Date, the Company and each Buyer, separately, shall enter into that certain Master Netting Agreement, in the form attached hereto as Exhibit F (the "**Master Netting Agreement**"), to provide further clarification of their rights (but not, in the case of each such Buyer only, its obligation) to Net (as defined below) certain Obligations (as defined in the Master Netting Agreement) arising under and across this Agreement, the Investor Note, the Notes and the Note Purchase Agreement and to treat the Master Netting Agreement, this Agreement, the Investor Note, the Notes and the Note Purchase Agreement as a single agreement for the purposes set forth herein and to treat this Agreement and the Note Purchase Agreement each as a "securities contract" (11 U.S.C. § 741) or other similar agreement.

**NOW, THEREFORE**, the Company and each Buyer hereby agree as follows:

1. PURCHASE AND SALE OF NOTES AND WARRANTS.

(a) Purchase of Notes and Warrants. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to each Buyer, and each Buyer, severally, but not jointly, agrees to purchase from the Company on the Closing Date, (i) a Note in the original principal amount as is set forth opposite such Buyer's name in column (8) of the Schedule of Buyers attached hereto and (ii) Warrants to acquire the Warrant Shares as set forth opposite such Buyer's name in column (9) of the Schedule of Buyers attached hereto (the "**Closing**").

(b) Purchase Price. The aggregate purchase price for the Notes and the Warrants to be purchased by each Buyer at the Closing (the "**Purchase Price**") shall be the amount set forth opposite each Buyer's name in column (7) of the Schedule of Buyers (less, in the case of the Lead Investor (as defined in the Notes), any amounts withheld pursuant to Section 4(e)). The Principal of the Notes includes an original issue discount of 20% of the aggregate principal amount of Notes issued and will be included in the aggregate principal of the Note for no additional consideration. The Buyers shall pay an aggregate of $11,000,000 for an aggregate of $13,750,000 of principal amount of Notes and related Warrants to be purchased by the Buyers at the Closing. Each Buyer's Purchase Price shall consist of (i) a cash portion equal to 60% of such Buyer's Purchase Price ("**Cash Purchase Price**"), which amount is set forth opposite each Buyer's name in column (3) of the Schedule of Buyers, and (ii) the issuance by such Buyer of an Investor Note with an original a principal amount equal to 40% of such Buyer's Purchase Price ("**Note Purchase Price**"), which Note Purchase Price is amount set forth opposite each Buyer's name in column (5) of the Schedule of Buyers. At the Closing, an authorized person of such Buyer shall certify in a written certificate, in the form attached hereto as Exhibit G (the "**Investor Collateral Certificate**"), that as of the Closing Date the bank account described on Schedule I to such Investor Note, which secures such Investor Note in accordance therewith, contains at least the Note Purchase Price of Eligible Assets (as defined in the Investor Note) as of the Closing Date. The Buyers and the Company agree that the Notes and the Warrants constitute an "investment unit" for purposes of Section 1273(c)(2) of the Internal Revenue Code of 1986, as amended (the "**Code**"). The Buyers and the Company mutually agree that the allocation of the issue price of such investment unit between the Notes and the Warrants in accordance with Section 1273(c)(2) of the Code and Treasury Regulation Section 1.1273-2(h) shall be $100 per $1,000 of Purchase Price to be allocated to the Warrants and the balance of each $1,000 of Purchase Price to be allocated to the Notes, and neither the Buyers nor the Company shall take any position inconsistent with such allocation in any tax return or in any judicial or administrative proceeding in respect of taxes.

(c) Closing Date. The date and time of the Closing (the "**Closing Date**") shall be 10:00 a.m., New York City time, on the date hereof (or such other date and time as is mutually agreed to by the Company and each Buyer) after notification of satisfaction (or waiver) of the conditions to the Closing set forth in Sections 6 and 7 below at the offices of Ellenoff Grossman & Schole LLP, 1345 Avenue of the Americas, New York, New York 10105. The Closing may also be undertaken remotely by electronic transfer of Closing documentation.

2

(d) <u>Form of Payment</u>. On the Closing Date, each Buyer shall acquire the portion of the Notes equal to the original principal amount as is set forth opposite such Buyer's name in column (8) of the schedule of Buyers attached hereto in accordance with the instructions of the Company in the Flow of Funds Letter, with each Buyer (or its designee) maintaining physical possession of a duly executed Investor Note of such Buyer, in such original principal amount as is set forth across from such Buyer's name in column (5) of the Schedule of Buyers attached hereto, issued pursuant to the Note Purchase Agreement of such Buyer, both as payment for the Restricted Principal of, and as Collateral (as defined in the Notes) securing, such Notes to be issued and sold to such Buyer at the Closing. The Company shall deliver to each Buyer (A) a Note in the original principal amount as is set forth opposite such Buyer's name in column (8) of the schedule of Buyers attached hereto and with an Initial Unrestricted Principal as set forth opposite such Buyer's name in column (4) of the schedule of Buyers attached hereto and (B) Warrants to acquire the Warrant Shares as set forth opposite such Buyer's name in column (9) of the Schedule of Buyers attached hereto.

(e) <u>Securities Contract; Netting Safe Harbor</u>. The Company hereby acknowledges and agrees that the rights and obligations of each Buyer under the Note Purchase Agreement of such Buyer, under the Investor Note of such Buyer, under the Note to be issued hereunder to such Buyer and the rights and obligations of the Company hereunder, under each such Investor Note, under each such Note and under each such Note Purchase Agreement, respectively, arise in a single integrated transaction and constitute related and interdependent obligations within such transaction. The Company and each Buyer, severally, hereby acknowledge and agree that this Agreement and the Note Purchase Agreement each are a "securities contract" as defined in 11 U.S.C. § 741 and that each such Buyer shall have all rights in respect of the Master Netting Agreement, this Agreement, the Investor Note, the Notes and the Note Purchase Agreement as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), including, without limitation, all rights of credit, deduction, setoff, offset, recoupment, and netting (collectively, "**Netting**" or "**Net**") as are available under the Master Netting Agreement, this Agreement, the Investor Note, the Notes and the Note Purchase Agreement, and all Netting provisions of the Master Netting Agreement, each Note and each Investor Note, including without limitation the provisions set forth in Section 7 of each Investor Note, are hereby incorporated in this Agreement and made a part hereof as if such provisions were set forth herein.

2. <u>BUYER'S REPRESENTATIONS AND WARRANTIES</u>. Each Buyer, severally and not jointly, represents and warrants with respect to only itself that, as of the date hereof and as of the Closing Date:

(a) <u>Validity; Enforcement</u>. This Agreement has been duly and validly authorized, executed and delivered on behalf of such Buyer and shall constitute the legal, valid and binding obligations of such Buyer enforceable against such Buyer in accordance with its terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(b) <u>No Conflicts</u>. The execution, delivery and performance by such Buyer of this Agreement and the consummation by such Buyer of the transactions contemplated hereby will not (i) result in a violation of the organizational documents of such Buyer or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Buyer is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to such Buyer, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights or violations which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Buyer to perform its obligations hereunder.

(c) <u>No Public Sale or Distribution</u>. Such Buyer is (i) acquiring the Notes and the Warrants and (ii) will acquire the Warrant Shares upon exercise of the Warrants (other than pursuant to a Cashless Exercise (as defined in the Warrants)), respectively, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act; <u>provided</u>, <u>however</u>, that by making the representations herein, such Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act. Such Buyer is acquiring the Securities hereunder in the ordinary course of its business. Such Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person (as defined below) to distribute any of the Securities. For purposes of this Agreement, "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and any government or any department or agency thereof.

(d) <u>Accredited Investor Status</u>. Such Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D.

(e) <u>Experience of Such Buyer</u>. Such Buyer, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and has so evaluated the merits and risks of such investment. Such Buyer is able to bear the economic risk of an investment in the Securities and, at the present time, is able to afford a complete loss of such investment.

(f) <u>Reliance on Exemptions</u>. Such Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and such Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of such Buyer to acquire the Securities.

(g) <u>Information</u>. Such Buyer acknowledges that it has had the opportunity to review the Transaction Documents (including all exhibits and schedules thereto) and such Buyer has had access to the SEC Documents (as defined in Section 3(qq)). Such Buyer and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities that have been requested by such Buyer. Such Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company. Neither such inquiries nor any other due diligence investigations conducted by such Buyer or its advisors, if any, or its representatives shall modify, amend or affect such Buyer's right to rely on the Company's representations and warranties contained herein. Such Buyer understands that its investment in the Securities involves a high degree of risk. Such Buyer has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Securities.

(h) <u>No Governmental Review</u>. Such Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(i) <u>Transfer or Resale</u>. Such Buyer understands that: (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, (B) such Buyer shall have delivered to the Company an opinion of counsel selected by such Buyer, in a form reasonably acceptable to the Company, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration, or (C) such Buyer provides the Company with reasonable assurance that such Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A promulgated under the 1933 Act, as amended, (or a successor rule thereto) (collectively, "**Rule 144**"); (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the Person) through whom the sale is made may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other Person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder. Notwithstanding the foregoing, the Securities may be pledged in connection with a bona fide margin account or other loan or financing arrangement secured by the Securities and such pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Buyer effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document (as defined below), including, without limitation, this Section 2(i).

(j) <u>No General Solicitation</u>. Such Buyer represents and warrants that: (i) the Buyer was contacted regarding the sale of the Securities by the Company (or an authorized agent or representative thereof) with whom the Buyer had a prior substantial pre-existing relationship and (ii) no Securities were offered or sold to it by means of any form of general advertising or, to such Buyer's knowledge, general solicitation, and in connection therewith, the Buyer did not (A) receive or review any advertisement, article, notice or other communication published in a newspaper or magazine or similar media or broadcast over television or radio, whether closed circuit, or generally available; or (B) attend any seminar meeting or industry investor conference whose attendees were invited by any general solicitation or general advertising; or (C) observe any website or filing of the Company with the SEC in which any offering of securities by the Company was described and as a result learned of any offering of securities by the Company.

4

(k) <u>Fees</u>. Such Buyer has taken no action that would give rise to any claim by any person for brokerage commissions, finders' fees or the like relating to this Agreement or the transactions contemplated hereby.

(l) <u>Certain Transactions and Confidentiality</u>. Other than consummating the transactions contemplated hereunder, such Buyer has not, nor has any Person acting on behalf of or pursuant to any understanding with such Buyer, directly or indirectly executed any purchases or sales, including short sales, of the securities of the Company during the period commencing as of the time that such Buyer first received a term sheet (written or oral) from the Company or any other Person representing the Company setting forth the material terms of the transactions contemplated hereunder and ending immediately prior to the execution hereof. Notwithstanding the foregoing, in the case of a Buyer that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Buyer's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Buyer's assets, the representation set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement. Other than to other Persons party to this Agreement or to such Buyer's representatives, including, without limitation, its officers, directors, partners, legal and other advisors, employees, agents and affiliates, such Buyer has maintained the confidentiality of all disclosures made to it in connection with this transaction (including the existence and terms of this transaction). Notwithstanding the foregoing, for the avoidance of doubt, nothing contained herein shall constitute a representation or warranty, or preclude any actions, with respect to locating or borrowing shares in order to effect short sales or similar transactions in the future.

(m) <u>Residency</u>. If such Buyer is an entity, such Buyer's principal executive offices are, and if such Buyer is a natural person, such Buyer's principal residence is, in the jurisdiction set forth immediately below such Buyer's name on the signature page hereto, and all communications between such Buyer and the Company regarding the transactions contemplated by this Agreement took place within or from the state of such principal executive offices or principal residence.

(n) <u>Legends</u>. Such Buyer understands that the certificates or other instruments representing the Notes and the Warrants and, until such time as the resale of the Note Conversion Shares and the Warrant Shares have been registered under the 1933 Act, the stock certificates representing the Note Conversion Shares and the Warrant Shares, except as set forth below, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such stock certificates):

[NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE  [CONVERTIBLE] [EXERCISABLE] HAVE BEEN] [THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN] REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A FORM REASONABLY ACCEPTABLE TO THE COMPANY, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of the Securities upon which it is stamped or issue to such holder by electronic delivery at the applicable balance account at The Depository Trust Company ("**DTC**"), if (i) such Securities are registered for resale under the 1933 Act, (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with an opinion of counsel, in a form reasonably acceptable to the Company, to the effect that such sale, assignment or transfer of the Securities may be made without registration under the applicable requirements of the 1933 Act, or (iii) the Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A. The Company shall be responsible for the fees of VStock Transfer LLC (including any successor transfer agent, the "**Transfer Agent**") and all DTC fees associated with such issuance. The Company shall cause its counsel to issue a legal opinion to the Transfer Agent promptly if required by the Transfer Agent, and/or to any Buyer if requested by such Buyer, to effect the removal of the legend hereunder. If the Company shall fail for any reason or for no reason to issue to the holder of the Securities within two (2) Trading Days after the occurrence of any of (i) through (iii) above (the initial date of such occurrence, the "**Legend Removal Date**"), a certificate without such legend to such holder or to issue such Securities to such holder by electronic delivery at the applicable balance account at DTC, and if on or after such Trading Day the holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the holder of such Securities that the holder anticipated receiving without legend from the Company (a "**Buy-In**"), then the Company shall, within three (3) Trading Days after the holder's request and in the holder's discretion, either (i) pay cash to the holder in an amount equal to the holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased (the "**Buy-In Price**"), at which point the Company's obligation to deliver such unlegended Securities shall terminate, or (ii) promptly honor its obligation to deliver to the holder such unlegended Securities as provided above and pay cash to the holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) any trading price of the shares of Common Stock selected by the Holder in writing as in effect at any time during the period beginning on the applicable Legend Removal Date and the date the Company makes the applicable cash payment. The Company shall be responsible for the fees of its transfer agent and all DTC fees associated with such issuance.

(o) Bad Actor Disclosure. Such Buyer hereby acknowledges and agrees that it has received and reviewed the disclosure set forth on Annex I attached hereto a reasonable time prior to the time that such Buyer has agreed to purchase the Securities.

The Company acknowledges and agrees that each Buyer does not make or has not made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in this Section 2.

3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY. The Company represents and warrants to each of the Buyers that, as of the date hereof and as of the Closing Date:

(a) Organization. The Company has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Nevada, with corporate power and authority to own or lease its properties and conduct its business as described in the SEC Documents. The Company has no subsidiaries (which for purposes of this Agreement means any entity in which the Company, directly or indirectly, owns any of the capital stock or holds an equity or similar interest) other than Rainbow Rangers Productions LLC and the subsidiaries as set forth on Exhibit 21.1 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018 (collectively, the "**Subsidiaries**"). Each of the Subsidiaries has been duly organized and is validly existing as an entity in good standing under the laws of the jurisdiction of its organization, with corporate power and authority to own or lease its properties and conduct its business as described in the SEC Documents. The Subsidiaries are the only subsidiaries, direct or indirect, of the Company. The Company and each of the Subsidiaries are duly qualified to transact business in all jurisdictions in which the conduct of their business requires such qualification, except where the failure to be so qualified would not reasonably be expected to result in any material adverse effect on, or any development that would reasonably be expected to result in a material adverse effect, in or affecting (i) the business, properties, assets, liabilities, operations, results of operations, condition (financial or otherwise) or business prospects of the Company and of the Subsidiaries, individually or taken as a whole, whether or not occurring in the ordinary course of business, or (ii) on the transactions contemplated hereby or the other Transaction Documents or by the agreements and instruments to be entered into in connection herewith or therewith, or (iii) on the authority or ability of the Company to perform its obligations under the Transaction Documents or (iv) on the legality, validity, binding effect or enforceability of any of the Transaction Documents (collectively a "**Material Adverse Effect**"). The outstanding shares of capital stock of each of the Subsidiaries have been duly authorized and validly issued, are fully paid and non-assessable and are owned by the Company or another Subsidiary free and clear of all liens, encumbrances and equities and claims; and no options, warrants or other rights to purchase, agreements or other obligations to issue or other rights to convert any obligations into shares of capital stock or ownership interests in the Subsidiaries are outstanding.

6

(b) <u>Authorization; Enforcement; Validity</u>. The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, the Notes, the Warrants, the Investor Note, the Note Purchase Agreement, the Master Netting Agreement, the Security Documents, the Irrevocable Transfer Agent Instructions (as defined in Section 5(b)), the Lock-Up Agreements (as defined in Section 7(xiv)), the Voting Agreement (as defined in Section 4(q)) and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "**Transaction Documents**") and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Notes and the Warrants, the reservation for issuance and the issuance of the Note Conversion Shares issuable pursuant to the terms of the Notes, and the reservation for issuance and the issuance of the Warrant Shares issuable upon exercise of the Warrants have been duly authorized by the Company's Board of Directors, and no further filing, consent, or authorization is required by the Company's Board of Directors or its stockholders (other than the Nasdaq Stockholder Approval (as defined below). This Agreement and the other Transaction Documents have been duly executed and delivered by the Company, and constitute the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies. Each of the Subsidiaries party to any of the Transaction Documents has the requisite power and authority to enter into and perform its obligations under such Transaction Documents, as applicable. The execution and delivery by the Subsidiaries party to any of the Transaction Documents of such Transaction Documents and the consummation by such Subsidiaries of the transactions contemplated thereby have been duly authorized by such Subsidiaries' respective boards of directors (or other applicable governing body) and (other than filings as may be required by state securities agencies) no further filing, consent, or authorization is required by such Subsidiaries, their respective boards of directors (or other applicable governing body) or stockholders (or other applicable owners of equity of such Subsidiaries). The Transaction Documents to which any of the Subsidiaries are parties have been duly executed and delivered by such Subsidiaries, and constitute the legal, valid and binding obligations of such Subsidiaries, enforceable against them in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(c) <u>Issuance of Securities</u>. The outstanding shares of Common Stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable; the Securities to be issued and sold by the Company have been duly authorized and when issued and paid for as contemplated herein in accordance with the terms of the Transaction Documents will be free from all taxes, liens and charges with respect to the issue thereof, validly issued, fully paid and non-assessable; and no preemptive rights of stockholders exist with respect to any of the Securities or the issue and sale thereof. The Company has duly authorized and reserved for issuance a number of shares of Common Stock for the conversion of the Notes and exercise of the Warrants equal to the sum of (i) the number of shares of Common Stock issuable pursuant to the terms of the Notes assuming a Conversion Price (as defined in each of the Notes) equal to $1.375 without regard to any limitation on issuances set forth in the Notes and (ii) 100% of the number of shares of Common Stock as shall be necessary to effect the exercise in full of all of the Warrant then outstanding without regard to any limitation on exercise set forth therein and assuming that all of the Buyers' Investor Notes have been paid, or deemed to be paid, in full (the "**Required Reserve Amount**"). The offering or sale of the Securities as contemplated by this Agreement gives rise to any rights, other than those which have been waived or satisfied, for or relating to the registration of any shares of Common Stock. Upon issuance pursuant to the terms of the Notes or exercise in accordance with the Warrants, as the case may be, the Note Conversion Shares and the Warrant Shares, respectively, will be validly issued, fully paid and nonassessable and free from all preemptive or similar rights, taxes, liens and charges with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock.

(d) <u>Equity Capitalization</u>. As of the date hereof and as of the Closing Date, the Company has or will have, as the case may be, an authorized, issued and outstanding capitalization as is set forth in <u>Schedule 3(d)</u> hereto, and such authorized capital stock conforms in all material respects to the description thereof set forth in the SEC Documents. The Common Stock conform in all material respects to the description thereof contained in the SEC Documents. If certificated, the form of the Note Conversion Shares and the Warrant Shares, as applicable, will conform in all material respects to the corporate law of the jurisdiction of the Company's incorporation. As of the date hereof, the authorized capital stock of the Company as is set forth on <u>Schedule 3(d)</u> hereto. All of such outstanding shares have been, or upon issuance will be, validly issued and are fully paid and nonassessable. Except as disclosed on <u>Schedule 3(d)</u> hereto, (i) none of the Company's capital stock is subject to preemptive rights or any other similar rights or any liens or encumbrances suffered or permitted by the Company; (ii) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any shares of capital stock of the Company or any of its Subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any shares of capital stock of the Company or any of its Subsidiaries; (iii) there are no material outstanding debt securities, notes, credit agreements, credit facilities or other agreements, documents or instruments evidencing Indebtedness (as defined in the Notes) of the Company or any of its Subsidiaries or by which the Company or any of its Subsidiaries is or may become bound; (iv) there are no financing statements securing obligations in any material amounts, either singly or in the aggregate, filed in connection with the Company or any of its Subsidiaries; (v) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of their securities under the 1933 Act; (vi) there are no outstanding securities or instruments of the Company or any of its Subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to redeem a security of the Company or any of its Subsidiaries; (vii) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Securities; (viii) the Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement; and (ix) the Company and its Subsidiaries have no liabilities or obligations required to be disclosed in the SEC Documents but not so disclosed in the SEC Documents, other than those incurred in the ordinary course of the Company's or any of its Subsidiary's respective businesses and which, individually or in the aggregate, do not or would not have a Material Adverse Effect. <u>Schedule 3(d)</u> set forth the material terms of any outstanding warrants of the Company, including, without limitation, the exercise price, put rights or other special features and expiration date thereof.

(e) <u>Disclosure</u>. Except with respect to the material terms and conditions of the transactions contemplated by the Transaction Documents, the Company confirms that neither it nor any other Person acting on its behalf has provided any of the Buyers or their agents or counsel with any information that constitutes or would reasonably be expected to constitute material, nonpublic information concerning the Company or any of its Subsidiaries which is not otherwise disclosed in the SEC Documents or that will not be included in the 8-K Filing (as defined in Section 4(i)). The Company understands and confirms that each of the Buyers will rely on the foregoing representations in effecting transactions in securities of the Company. As of the date of this Agreement, all disclosure provided to the Buyers regarding the Company or any of its Subsidiaries, their business and the transactions contemplated hereby, including the Schedules to this Agreement, furnished by or on behalf of the Company does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Each press release issued by the Company or any of its Subsidiaries during the twelve (12) months preceding the date hereof did not at the time of release contain any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary in order to make such statements therein, in the light of the circumstances in which they were made, not misleading. No event or circumstance has occurred or information exists with respect to the Company or any of its Subsidiaries or its or their business, properties, liabilities, prospects, operations (including results thereof) or conditions (financial or otherwise), which, under applicable law, rule or regulation, requires public disclosure at or prior to the date hereof or announcement by the Company but which has not been so publicly announced or disclosed or will be disclosed in the 8-K Filing. The Company does not have any agreement or understanding with any Buyer with respect to the transactions contemplated by the Transaction Documents other than as specified in the Transaction Documents.

(f) <u>Weaknesses or Changes in Internal Accounting Controls</u>. Except as set forth in <u>Schedule 3(f)</u> hereto, neither the Company nor any of the Subsidiaries is aware of (i) any material weakness in its internal control over financial reporting or (ii) change in internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

8

(g) Sarbanes-Oxley. Solely to the extent that the Sarbanes-Oxley Act of 2002, as amended, and the rules and regulations promulgated by the SEC and The Nasdaq Capital Market (the "**Principal Market**"), if applicable, thereunder (collectively, the "**Sarbanes-Oxley Act**") has been applicable to the Company, there is and has been no failure on the part of the Company to comply in all respects with any provision of the Sarbanes-Oxley Act. The Company has taken all necessary actions to ensure that it is in compliance in all respects with all provisions of the Sarbanes-Oxley Act that are in effect with respect to which the Company is required to comply and is actively taking steps to ensure that it will be in compliance with the other provisions of the Sarbanes-Oxley Act which will become applicable to the Company.

(h) Absence of Litigation. There is no action, suit, proceeding, inquiry or investigation before or by the Principal Market, any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company, threatened against or affecting the Company or any of its Subsidiaries, the Common Stock or any of the Company's Subsidiaries or any of the Company's or its Subsidiaries' officers or directors, whether of a civil or criminal nature or otherwise, in their capacities as such, except as set forth in Schedule 3(h). The matters set forth in Schedule 3(h) would not reasonably be expected to have a Material Adverse Effect.

(i) Title. The Company and the Subsidiaries have good and marketable title to all of the material properties and assets reflected in the consolidated financial statements hereinabove described or described in the SEC Documents, subject to no lien, mortgage, pledge, charge or encumbrance of any kind except those reflected in such financial statements or described in the SEC Documents or which are not material in amount or would not materially interfere with the use to be made of such properties or assets. The Company and the Subsidiaries occupy their leased properties under valid and binding leases conforming in all material respects to the description thereof set forth in the SEC Documents.

(j) Tax Status. Except for matters that would not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect, the Company and each of its Subsidiaries (i) has timely made or filed all foreign, federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has timely paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and (iii) has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company and its Subsidiaries know of no basis for any such claim, which has had or would reasonably be expected to have a Material Adverse Effect.

(k) Absence of Certain Changes. Except as disclosed in Schedule 3(k), since December 31, 2018, neither the Company nor any of its Subsidiaries has, (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, in excess of $100,000 or (iii) had capital expenditures, individually or in the aggregate, in excess of $100,000. The Company and the Subsidiaries have no material contingent obligations which are not disclosed in the Company's consolidated financial statements which are included in the SEC Documents. Neither the Company nor any of its Subsidiaries has taken any steps to seek protection pursuant to any bankruptcy law nor does the Company have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy proceedings or any actual knowledge of any fact that would reasonably lead a creditor to do so. The Company and its Subsidiaries, individually and on a consolidated basis, after giving effect to the transactions contemplated hereby to occur at the Closing, will not be Insolvent (as defined below). For purposes of this Agreement, "**Insolvent**" means, with respect to any Person, (i) the present fair saleable value of such Person's assets is less than the amount required to pay such Person's total Indebtedness, (ii) such Person is unable to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, (iii) such Person intends to incur or believes that it will incur debts that would be beyond its ability to pay as such debts mature or (iv) such Person has unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted.

9

(l) <u>No Conflicts</u>. Neither the Company nor any of the Subsidiaries is, or with the giving of notice or lapse of time or both, will be after giving effect to the execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Securities), (i) in violation of its certificate of incorporation, bylaws, any certificate of designations or other organizational documents or (ii) in violation of or in default (or an event which with notice or lapse of time or both would become a default) in any respect under, or give to others any rights of termination, amendment, acceleration or cancellation of under any agreement, indenture, mortgage, deed of trust, lease, contract, indenture or other agreement or instrument or obligation to which the Company or any Subsidiary is a party or by which the Company or any Subsidiary, or any of their respective properties, is bound that have not been waived or (iii) in violation of any law, rule, regulation, order, judgment, writ or decree of any court or of any government, regulatory body or administrative agency or other governmental body having jurisdiction (including U.S. federal and state securities laws and regulations and the rules and regulations of the Principal Market applicable to the Company or any of its Subsidiaries) or by which any property or asset of the Company or any of its Subsidiaries is bound or affected, and, solely with respect to clauses (ii) and (iii), which violation, conflict, breach or default, individually or in the aggregate, would have a Material Adverse Effect.

(m) <u>Contracts</u>. There is no document, contract or other agreement required to be described in the SEC Documents which is not described or filed as required by the 1933 Act or the Rules and Regulations. Each description of a contract, document or other agreement in the SEC Documents accurately reflects in all material respects the terms of the underlying contract, document or other agreement. Each contract, document or other agreement described in the SEC Documents is in full force and effect and is valid and enforceable by and against the Company in accordance with its terms (except as rights to indemnity and contribution thereunder may be limited by federal or state securities laws and matter of public policy and except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general equitable principle). Neither the Company nor any of its Subsidiaries nor, to the Company's knowledge, any other party is in default in the observance or performance of any term or obligation to be performed by it under any such agreement or any other agreement or instrument to which the Company or its Subsidiaries is a party or by which the Company or its Subsidiaries or their respective properties or businesses may be bound, and no event has occurred which with notice or lapse of time or both would constitute such a default, in any such case in which the default or event, individually or in the aggregate, would have a Material Adverse Effect.

(n) <u>Regulatory Approvals</u>. Each approval, consent, order, authorization, designation, declaration or filing by or with any regulatory, administrative or other governmental body necessary in connection with the execution and delivery by the Company of this Agreement and the consummation of the transactions herein contemplated (except such additional steps as may be required by the SEC, the Financial Industry Regulatory Authority, Inc. (FINRA) or such additional steps as may be required under state securities or Blue Sky laws) has been obtained or made and is in full force and effect.

(o) <u>Conduct of Business; Regulatory Permits</u>. Neither the Company nor any of its Subsidiaries is in violation of any term of or in default under the articles of incorporation of the Company ("**Articles of Incorporation**"), bylaws of the Company (the "**Bylaws**"), any certificate of designations, preferences or rights of any other outstanding series of preferred stock of the Company or any of its Subsidiaries or their organizational charter, certificate of formation or certificate of incorporation or bylaws, respectively. Neither the Company nor any of its Subsidiaries is in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to the Company or its Subsidiaries and neither the Company nor any of its Subsidiaries will conduct its business in violation of any of the foregoing, except in all cases for possible violations which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The Company has satisfied all eligibility requirements necessary to enable its Common Stock to be listed or quoted on one or more Eligible Markets (as defined in the Warrants). During the one (1) year prior to the date hereof, (i) the Common Stock has been listed or designated for quotation on the Principal Market or another Eligible Market, (ii) trading in the Common Stock has not been suspended by the SEC or the Principal Market and (iii) except as disclosed in <u>Schedule 3(o)</u>, the Company has received no communication, written or oral, from the SEC or the Principal Market (or other Eligible Market on which the Common Stock was previously listed) regarding the suspension or delisting of the Common Stock from such Principal Market or other Eligible Market. The Company and its Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses, except where the failure to possess such certificates, authorizations or permits would not have, individually or in the aggregate, a Material Adverse Effect, and neither the Company nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit. Without limiting the generality of the foregoing, except as set forth on <u>Schedule 3(u)</u>, neither the Company not any of its Subsidiaries is in violation of any of the rules, regulations or requirements of the Principal Market and has no knowledge of any facts or circumstances that would reasonably lead to delisting or suspension of the Common Stock by the Principal Market in the foreseeable future.

10

(p) <u>Intellectual Property</u>. Except as set forth on <u>Schedule 3(p)</u>, the Company and each of the Subsidiaries hold all material licenses, certificates and permits from governmental authorities which are necessary to the conduct of their businesses in the manner in which they are being conducted; the Company and the Subsidiaries each own or possess sufficient rights to use all patents, patent rights, trademarks, trade names, service marks, service names, copyrights, know-how (including trade secrets and other unpatented and unpatentable proprietary or confidential information, systems or procedures) and other intellectual property or proprietary rights, including licenses to any of the foregoing ("**Intellectual Property**") necessary to carry on their business in all material respects in the manner in which it is being conducted. Except as set forth on <u>Schedule 3(p)</u>, none of the Company's or its Subsidiaries' registered Intellectual Property that is material to their businesses has expired, terminated or been abandoned. The Company has taken all steps reasonably necessary to secure ownership interests in Intellectual Property created for it by any contractors. There are no outstanding options, licenses or agreements of any kind relating to the Intellectual Property of the Company or its Subsidiaries that are required to be described in the SEC Documents and are not described therein in all material respects. Neither the Company nor any of its Subsidiaries is a party to or bound by any options, licenses or agreements with respect to the Intellectual Property of any other person or entity that are required to be set forth in the SEC Documents and are not described therein in all material respects. None of the Intellectual Property used by the Company or any of its Subsidiaries and material to their businesses has been obtained or is being used by the Company or any of its Subsidiaries (i) in material violation of any contractual obligation binding on the Company or any of its Subsidiaries, or to the Company's knowledge, any of the Company's or any of its Subsidiaries' officers, directors or employees, or (ii) otherwise in violation of the rights of any persons; neither the Company nor any of its Subsidiaries has infringed or conflicted with any Intellectual Property of any person or entity; the Company has not received any written communications alleging that the Company or any of its Subsidiaries has violated, infringed or conflicted with, or, by conducting their businesses as set forth in the SEC Documents, would violate, infringe or conflict with, any of the Intellectual Property of any other person or entity. The Company knows of no infringement by others of Intellectual Property owned by or licensed to the Company. The Company and each of its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their Intellectual Property.

(q) <u>Manipulation of Prices</u>. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken or may take, directly or indirectly, any action designed to cause or to result, or that would reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent (as defined in Section 3(ee)), sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) other than the Agent, paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

(r) <u>Investment Company Act</u>. Neither the Company nor any of its Subsidiaries is, and upon consummation of the sale of the Securities will not be, an "investment company," an affiliate of an "investment company," a company controlled by an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended.

(s) <u>Internal Accounting Controls</u>.

(i) Except as disclosed in <u>Schedule 3(s)</u> hereto, the Company and each of the Subsidiaries maintains a system of internal accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP consistently applied throughout the periods involved and to maintain accountability for assets and liabilities; (iii) access to assets or incurrence of liabilities is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets and liabilities is compared with existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any differences.

11

(ii) The Company has established and maintains "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the 1934 Act); except as disclosed in Schedule 3(s)(ii) hereto, the Company's "disclosure controls and procedures" are effective in ensuring that all information (both financial and non-financial) required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, including, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is accumulated and communicated to the Company's management, including its principal executive officer or officers and its principal financial officer or officers, as appropriate, to allow timely decisions regarding required disclosure. Except as disclosed in the SEC Documents, during the twelve (12) months prior to the date hereof neither the Company nor any of its Subsidiaries has received any notice or correspondence from any accountant relating to any material weakness in any part of the system of internal accounting controls of the Company or any of its Subsidiaries.

(t) Industry and Market Data. The statistical, industry-related and market-related data included in the SEC Documents are based on or derived from sources which the Company reasonably and in good faith believes are reliable and accurate, and such data agree in all material respects with the sources from which they are derived.

(u) Compliance with Anti-Money Laundering Laws. The operations of the Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements and all other applicable U.S. and non-U.S. anti-money laundering laws, rules and regulations, including, but not limited to, those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the United States Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, and the United States Money Laundering Control Act of 1986 (18 U.S.C. §§1956 and 1957), as amended, as well as the implementing rules and regulations promulgated thereunder, and the applicable money laundering statutes of all applicable jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency or self-regulatory body (collectively, the "**Anti-Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(v) No Conflicts with Sanctions Laws. Neither the Company nor any of its Subsidiaries, nor any director, officer, employee, affiliate, nor to the Company's knowledge, any agent or other person associated with or acting on behalf of the Company or any of its Subsidiaries or affiliates is, or is directly or indirectly owned or controlled by, a Person that is currently the subject or the target of any sanctions administered or enforced by the U.S. government including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**OFAC**") or the U.S. Departments of State or Commerce and including, without limitation, the designation as a "Specially Designated National" or on the "Sectoral Sanctions Identifications List" (collectively, "**Blocked Persons**"), the United Nations Security Council, the European Union, Her Majesty's Treasury or any other relevant sanctions authority (collectively, "**Sanctions Laws**"); neither the Company, any of its Subsidiaries, nor any director, officer, employee, agent, affiliate or other person associated with or acting on behalf of the Company or any of its Subsidiaries or affiliates, is located, organized or resident in a country or territory that is the subject or target of a comprehensive embargo or Sanctions Laws prohibiting trade with the country or territory, including, without limitation, Crimea, Cuba, Iran, North Korea, Sudan and Syria (each, a "**Sanctioned Country**"); the Company maintains in effect and enforces policies and procedures designed to ensure compliance by the Company and its Subsidiaries with applicable Sanctions Laws; neither the Company, any of its Subsidiaries, nor any director, officer, employee, agent, affiliate or other person associated with or acting on behalf of the Company or any of its Subsidiaries or affiliates, acting in any capacity in connection with the operations of the Company, conducts any business with or for the benefit of any Blocked Person or engages in making or receiving any contribution of funds, goods or services to, from or for the benefit of any Blocked Person, or deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to any applicable Sanctions Laws; no action of the Company or any of its Subsidiaries in connection with (i) the execution, delivery and performance of this Agreement and the other Transaction Documents, (ii) the issuance and sale of the Securities, or (iii) the direct or indirect use of proceeds from the Securities or the consummation of any other transaction contemplated hereby or by the other Transaction Documents or the fulfillment of the terms hereof or thereof, will result in the proceeds of the transactions contemplated hereby and by the other Transaction Documents being used, or loaned, contributed or otherwise made available, directly or indirectly, to any Subsidiary, joint venture partner or other person or entity, for the purpose of (i) unlawfully funding or facilitating any activities of or business with any person that, at the time of such funding or facilitation, is the subject or target of Sanctions Laws, (ii) unlawfully funding or facilitating any activities of or business in any Sanctioned Country or (iii) in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions Laws. For the past five (5) years, the Company and its Subsidiaries have not knowingly engaged in and are not now knowingly engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions Laws or with any Sanctioned Country.

12

(w) <u>Anti-Bribery</u>. Neither the Company nor any of the Subsidiaries has made any contribution or other payment to any official of, or candidate for, any federal, state or foreign office in violation of any law which violation is required to be disclosed in the SEC Documents.  Neither the Company, nor any of its Subsidiaries or affiliates, nor any director, officer, employee, nor to the Company's knowledge, any agent or other person associated with or acting on behalf of the Company, or any of its Subsidiaries or affiliates, has (i) used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee, to any employee or agent of a private entity with which the Company does or seeks to do business or to foreign or domestic political parties or campaigns, (iii) violated or is in violation of any provision of any applicable law or regulation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions or any applicable provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), the U.K. Bribery Act 2010, or any other similar law of any other jurisdiction in which the Company operates its business, including, in each case, the rules and regulations thereunder (the "**Anti-Bribery Laws**"), (iv) taken, is currently taking or will take any action in furtherance of an offer, payment, gift or anything else of value, directly or indirectly, to any person while knowing that all or some portion of the money or value will be offered, given or promised to anyone to improperly influence official action, to obtain or retain business or otherwise to secure any improper advantage or (v) otherwise made any offer, bribe, rebate, payoff, influence payment, unlawful kickback or other unlawful payment; the Company and each of its respective Subsidiaries has instituted and has maintained, and will continue to maintain, policies and procedures reasonably designed to promote and achieve compliance with the laws referred to in (iii) above and with this representation and warranty; none of the Company, nor any of its Subsidiaries or affiliates will directly or indirectly use the proceeds of the convertible securities or lend, contribute or otherwise make available such proceeds to any subsidiary, affiliate, joint venture partner or other person or entity for the purpose of financing or facilitating any activity that would violate the laws and regulations referred to in (iii) above; there are, and have been, no allegations, investigations or inquiries with regard to a potential violation of any Anti-Bribery Laws by the Company, its Subsidiaries or affiliates, or any of their respective current or former directors and officers, current employees, or to the Company's knowledge, any of their respective former employees, stockholders, representatives or agents, or other persons acting or purporting to act on their behalf.

(x) <u>Insurance</u>. The Company and each of the Subsidiaries carry, or are covered by, insurance by insurers of recognized financial responsibility in such amounts and covering such losses and risks as is adequate for the conduct of their respective businesses and the value of their respective properties and as is customary for companies engaged in similar businesses. Neither the Company nor any such Subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers, in each case, as may be necessary to continue its business at a cost that, individually or in the aggregate, do not or would not reasonably be expected to have a Material Adverse Effect.

(y) <u>Employee Benefits</u>. The Company and each Subsidiary is in compliance in all material respects with all presently applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, including the regulations and published interpretations thereunder ("**ERISA**"); no "reportable event" (as defined in ERISA) has occurred with respect to any "pension plan" (as defined in ERISA) for which the Company and each Subsidiary would have any material liability; the Company and each Subsidiary has not incurred and does not expect to incur material liability under (i) Title IV of ERISA with respect to termination of, or withdrawal from, any "pension plan" or (ii) Sections 412 or 4971 of the Code; and each "pension plan" for which the Company or any Subsidiary would have any liability that is intended to be qualified under Section 401(a) of the Code is so qualified in all material respects and nothing has occurred, whether by action or by failure to act, which would cause the loss of such qualification.

(z) <u>Employee Relations</u>.

(i) Neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or employs any member of a union. The Company and its Subsidiaries believe that their relations with their employees are good. Except as set forth on <u>Schedule 3(z)</u>, no executive officer of the Company or any of its Subsidiaries (as defined in Rule 501(f) of the 1933 Act) has notified the Company or any such Subsidiary that such officer intends to leave the Company or any such Subsidiary or otherwise terminate such officer's employment with the Company or any such Subsidiary. No current executive officer or other key employee of the Company or any of its Subsidiaries is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement, non-competition agreement, or any other contract or agreement or any restrictive covenant, and the continued employment of each such executive officer or other key employee (as the case may be) does not subject the Company or any of its Subsidiaries to any liability with respect to any of the foregoing matters, except where such violation would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

13

(ii) The Company and its Subsidiaries are in compliance with all federal, state, local and foreign laws and regulations respecting labor, employment and employment practices and benefits, terms and conditions of employment and wages and hours, except where failure to be in compliance would not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(aa) Transactions with Affiliates. Except as set forth on Schedule 3(aa), none of the officers, directors or employees of the Company or any of its Subsidiaries is presently a party to any transaction with the Company or any of its Subsidiaries (other than for ordinary course services as employees, officers or directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer, director or employee or, to the knowledge of the Company or any of its Subsidiaries, any corporation, partnership, trust or other entity in which any such officer, director, or employee has a substantial interest or is an officer, director, employee, trustee or partner.

(bb) Environmental Laws. The Company and its Subsidiaries (A) are in compliance in all material respects with all Environmental Laws (as defined below), (B) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (C) are in compliance in all material respects with all terms and conditions of any such permit, license or approval where, in each of the foregoing clauses (A), (B) and (C), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. The term "**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "**Hazardous Materials**") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(cc) 1934 Act Registration. The Company has taken no action designed to, or likely to have the effect of, terminating the registration of the Common Stock under the 1934 Act, nor has the Company received any notification that the SEC is contemplating terminating such registration.

(dd) No Integrated Offering. The Company has not sold or issued any securities that would be integrated with the offering of the Securities contemplated by this Agreement pursuant to the 1933 Act, the Rules and Regulations or the interpretations thereof by the SEC. None of the Company, its Subsidiaries, any of their affiliates, and any Person acting on their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of (i) the 1933 Act which would require the registration of the Securities under the 1933 Act, or (ii) to require approval of stockholders of the Company for purposes of any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated.

(ee) Brokerage Fees; Commissions. Except as described in Schedule 3(ee) hereto, neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person that would give rise to a valid claim against the Company or the Buyers for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Securities. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or broker's commissions (other than for persons engaged by any Buyer or its investment advisor) relating to or arising out of the transactions contemplated hereby. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, attorney's fees and out-of-pocket expenses) arising in connection with such claim (other than for claims made by Persons engaged by the Buyers). The Company acknowledges that it has engaged The Special Equities Group, LLC a division of Bradley Woods & Co. Ltd. (the "**Agent**") as placement agent in connection with the sale of the Securities. Other than the Agent, neither the Company nor any of its Subsidiaries has engaged any placement agent or other agent in connection with the sale of the Securities.

14

(ff) <u>Consents</u>. Other than as described in Section 3(b) hereof, or as have been previously obtained, filed or made, neither the Company nor any of its Subsidiaries is required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by the Transaction Documents, in each case in accordance with the terms hereof or thereof. The Company and its Subsidiaries are unaware of any facts or circumstances that might prevent the Company from obtaining or effecting any of the registration, application or filings pursuant to the preceding sentence.

(gg) <u>Acknowledgment Regarding Buyer's Purchase of Securities</u>. Anything in this Agreement or elsewhere herein to the contrary notwithstanding, the Company acknowledges and agrees that each Buyer is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby and thereby and that no Buyer is (i) an officer or director of the Company or any of its Subsidiaries, (ii) an "affiliate" of the Company or any of its Subsidiaries (as defined in Rule 405 of the 1933 Act) or (iii) to the knowledge of the Company, a "beneficial owner" of more than 10% of the shares of Common Stock (as defined for purposes of Rule 13d-3 of the 1934 Act). The Company further acknowledges that no Buyer is acting as a financial advisor or fiduciary of the Company or any of its Subsidiaries (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby, and any advice given by a Buyer or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to such Buyer's purchase of the Securities. The Company further represents to each Buyer that the Company's decision to enter into the Transaction Documents has been based solely on the independent evaluation by the Company and its representatives.

(hh) <u>Dilutive Effect</u>. The Company understands and acknowledges that the number of Note Conversion Shares issuable pursuant to the terms of the Notes and the number of Warrant Shares issuable upon exercise of the Warrants will increase in certain circumstances. The Company further acknowledges that its obligations to issue (i) Note Conversion Shares in accordance with this Agreement and the Notes and (ii) Warrant Shares upon exercise of the Warrants in accordance with this Agreement and the Warrants are, in each case, absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other stockholders of the Company.

(ii) <u>Application of Takeover Protections; Rights Agreement</u>. The Company and its board of directors have taken all necessary action, if any, in order to render inapplicable the Company's issuance of the Securities and any Buyer's ownership of the Securities from the provisions of any control share acquisition, interested stockholder, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Articles of Incorporation or the laws of the state of its incorporation which is or could become applicable to any Buyer as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of Securities and each Buyer's ownership of the Securities. Except as set forth in the SEC Documents, the Company does not have any stockholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company.

(jj) <u>Subsidiary Rights</u>. The Company or one of its Subsidiaries has the unrestricted right to vote, and (subject to limitations imposed by applicable law) to receive dividends and distributions on, all capital securities of its Subsidiaries as owned by the Company or such Subsidiary.

(kk) <u>Off Balance Sheet Arrangements</u>. There is no transaction, arrangement, or other relationship between the Company and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its 1934 Act filings and is not so disclosed or that otherwise would be reasonably likely to have a Material Adverse Effect.

(ll) <u>Transfer Taxes</u>. On the Closing Date, all stock transfer or other similar taxes (other than income or similar taxes) which are required to be paid in connection with the sale and transfer of the Securities to be sold to each Buyer hereunder will be, or will have been, fully paid or provided for by the Company, and all laws imposing such taxes will be or will have been complied with.

15

(mm) <u>Acknowledgement Regarding Buyers' Trading Activity</u>. The Company acknowledges and agrees (i) that none of the Buyers has been asked to agree, nor has any Buyer agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term; (ii) that past or future open market or other transactions by any Buyer, including, without limitation, short sales or "derivative" transactions, before or after the closing of the transactions contemplated by this Agreement or future transactions, may negatively impact the market price of the Company's publicly-traded securities; (iii) that any Buyer, and counter parties in "derivative" transactions to which any such Buyer is a party, directly or indirectly, presently may have a "short" position in the Common Stock; and (iv) that such Buyer shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that (a) one or more Buyers may engage in hedging and/or trading activities at various times during the periods that the Securities are outstanding, including, without limitation, during the period that the value of the Note Conversion Shares and the Warrant Shares deliverable with respect to Securities are being determined and (b) such hedging and/or trading activities (if any) could reduce the value of the existing stockholders' equity interests in the Company at and after the time that the hedging and/or trading activities are being conducted. The Company acknowledges that such aforementioned hedging and/or trading activities do not constitute a breach of this Agreement, the Notes, the Warrants or any of the documents executed in connection herewith.

(nn) <u>U.S. Real Property Holding Corporation</u>. Neither the Company, nor any of its Subsidiaries, is or has ever been a U.S. real property holding corporation within the meaning of Section 897 of the Code and the Company and each Subsidiary shall so certify upon any Buyer's request.

(oo) <u>Shell Company Status</u>. The Company is not, and has not been since August 1, 2008, an issuer identified in Rule 144(i)(1) of the 1933 Act.

(pp) <u>Bank Holding Company</u>. Neither the Company nor any of its Subsidiaries or affiliates is subject to the Bank Holding Company Act of 1956, as amended (the "**BHCA**") and to regulation by the Board of Governors of the Federal Reserve System (the "**Federal Reserve**"). Neither the Company nor any of its Subsidiaries or affiliates owns or controls directly or indirectly, five percent or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve. Neither the Company nor any of its Subsidiaries or affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(qq) <u>SEC Documents; Financial Statements</u>. During the two (2) years prior to the date hereof, the Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the 1934 Act (all of the foregoing filed prior to the date hereof, and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "**SEC Documents**"). As of their respective filing dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. As of their respective filing dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with GAAP, consistently applied during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

(rr) <u>Placement Agent Agreement</u>. The Company has entered into a Placement Agent Agreement, dated as of March 10, 2020, with the Agent that contains certain representations, warranties, covenants and agreements of the Company. Such representations, warranties, covenants and agreements are for the benefit of and may be relied upon by the Buyers, each of which shall be a third-party beneficiary thereof.

16

(ss) <u>Indebtedness and Other Contracts</u>. Except as set forth on <u>Schedule 3(ss)</u>, neither the Company nor any of its Subsidiaries, (i) has any outstanding Indebtedness, (ii) is a party to any contract, agreement or instrument, the violation of which, or default under which, by the other party(ies) to such contract, agreement or instrument would reasonably be expected to result in a Material Adverse Effect, (iii) is in violation of any term of, or in default under, any contract, agreement or instrument relating to any Indebtedness, except where such violations and defaults would not result, individually or in the aggregate, in a Material Adverse Effect, or (iv) is a party to any contract, agreement or instrument relating to any Indebtedness, the performance of which, in the judgment of the Company's officers, has or is expected to have a Material Adverse Effect. <u>Schedule 3(ss)</u> provides a detailed description of the material terms of any such outstanding Indebtedness, including, without limitation, descriptions of any defaults, forbearances, accounts receivable and accounts payable thereunder.

(tt) <u>Stock Option Plans</u>. Each stock option granted by the Company was granted (i) in accordance with the terms of the applicable Company stock option plan and (ii) with an exercise price at least equal to the fair market value of the Common Stock on the date such stock option would be considered granted under GAAP consistently applied during the periods involved and applicable law. No stock option granted under the Company's stock option plan has been backdated. The Company has not knowingly granted, and there is no and has been no Company policy or practice to knowingly grant, stock options prior to, or otherwise knowingly coordinate the grant of stock options with, the release or other public announcement of material information regarding the Company or its Subsidiaries or their financial results or prospects.

(uu) <u>No Disagreements with Accountants and Lawyers</u>. There are no material disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company and the Company is current with respect to any fees owed to its accountants and lawyers which could affect the Company's ability to perform any of its obligations under any of the Transaction Documents.

(vv) <u>Private Placement</u>. Assuming the accuracy of the Buyers' representations and warranties set forth in Section 2, no registration under the 1933 Act is required for the offer and sale of the Securities by the Company to the Buyers as contemplated hereby.

(ww) <u>No General Solicitation</u>. Neither the Company nor any Person acting on behalf of the Company has offered or sold any of the Securities by any form of general solicitation or general advertising. The Company has offered the Securities for sale only to the Buyers and certain other "accredited investors" within the meaning of Rule 501 under the 1933 Act.

(xx) <u>No Disqualification Events</u>. Except as disclosed on Annex I attached hereto, with respect to Securities to be offered and sold hereunder in reliance on Rule 506(b) under the 1933 Act, none of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the offering hereunder, any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the 1933 Act) connected with the Company in any capacity at the time of sale (each, an "**Issuer Covered Person**" and, together, "**Issuer Covered Persons**") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the 1933 Act (a "**Disqualification Event**"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Company has exercised reasonable care to determine whether any Issuer Covered Person is subject to a Disqualification Event. The Company has complied, to the extent applicable, with its disclosure obligations under Rule 506(e), and has furnished to the Buyers a copy of any disclosures provided in Annex I.

(yy) <u>Other Covered Persons</u>. The Company is not aware of any Person (other than the Agent) that has been or will be paid (directly or indirectly) remuneration for solicitation of Buyers or potential purchasers in connection with the sale of any Securities.

(zz) <u>Ranking of Notes</u>. Except for existing indebtedness set forth on Schedule 3(zz), no Indebtedness of the Company, at the Closing, will be senior to, or pari passu with, the Notes in right of payment, whether with respect to payment or redemptions, interest, damages, upon liquidation or dissolution or otherwise.

17

4. <u>COVENANTS.</u>

(a) <u>Best Efforts</u>. Each party shall use its best efforts timely to satisfy each of the covenants and the conditions to be satisfied by it as provided in Sections 6 and 7 of this Agreement.

(b) <u>Form D and Blue Sky</u>. The Company agrees to file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof to each Buyer promptly after such filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the Securities for sale to the Buyers at the Closing pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to the Buyers on or prior to the Closing Date. The Company shall make all filings and reports relating to the offer and sale of the Securities required under applicable securities or "Blue Sky" laws of the states of the United States following the Closing Date.

(c) <u>Use of Proceeds</u>. The Company will use the proceeds from the sale of the Securities solely as set forth on Schedule 4(c).

(d) <u>Listing</u>. The Company shall promptly secure the listing of all of the Warrant Shares, Note Conversion Shares and any capital stock of the Company issued or issuable with respect to the Warrant Shares, the Warrants, the Note Conversion Shares or the Notes, in each case as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise without regard to any limitations on the exercise of Warrants and on the conversion of the Note Conversion Shares (the "**Underlying Shares**") on the Principal Market or on any other Eligible Market (as defined in the Warrants) on which the Common Stock is then listed or quoted (subject to official notice of issuance) and during the Reporting Period shall maintain the listing of all Underlying Shares from time to time issuable under the terms of the Transaction Documents on the Principal Market or any other Eligible Market on which the Common Stock is then listed or quoted. During the Reporting Period the Company shall maintain the authorization for quotation of the Common Stock on the Principal Market or any other Eligible Market on which the Common Stock is then listed or quoted. During the Reporting Period, the Company shall not take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock on the Principal Market or on any other Eligible Market on which the Common Stock is then listed or quoted. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(d).

(e) <u>Fees</u>. The Company shall pay an expense allowance to the Lead Investor or its designee(s) for all costs and expenses incurred in connection with the transactions contemplated by the Transaction Documents (including all legal fees and disbursements in connection therewith, documentation and implementation of the transactions contemplated by the Transaction Documents and due diligence in connection therewith) not reimbursed by the Company on or prior to the Closing, which amount shall not exceed in the aggregate $75,000 and which amount, at the option of such Buyer, may be withheld by such Buyer from its Cash Purchase Price at the Closing. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or broker's commissions (other than for Persons engaged by any Buyer) relating to or arising out of the transactions contemplated hereby, including, without limitation, any fees or commission payable to the Agent. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, reasonable attorney's fees and out-of-pocket expenses) arising in connection with any claim relating to any such payment. Except as otherwise set forth in the Transaction Documents, each party to this Agreement shall bear its own expenses in connection with the sale of the Securities to the Buyers.

(f) <u>Pledge of Securities</u>. The Company acknowledges and agrees that the Securities may be pledged by any holder of Securities (an "**Investor**") in connection with a bona fide margin agreement or other loan or financing arrangement that is secured by the Securities. Any such pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Investor effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document. The Company hereby agrees to execute and deliver such documentation as a pledgee of the Securities may reasonably request in connection with a pledge of the Securities to such pledgee by an Investor.

(g) <u>Reporting Status</u>. Until the date on which the Investors shall have sold all of the Note Conversion Shares and the Warrant Shares and none of the Notes or the Warrants are outstanding (the "**Reporting Period**"), the Company shall timely file all reports required to be filed with the SEC pursuant to the 1934 Act, and the Company shall not terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would no longer require or otherwise permit such termination.

(h) <u>Financial Information</u>. The Company agrees to send the following to each Investor during the Reporting Period (i) unless the following are filed with the SEC through EDGAR and are available to the public through the EDGAR system, within one (1) Business Day after the filing thereof with the SEC, a copy of its Annual Reports on Form 10-K, any Quarterly Reports on Form 10-Q, any Current Reports on Form 8-K (or any analogous reports under the 1934 Act) and any registration statements (other than on Form S-8) or amendments filed pursuant to the 1933 Act, (ii) on the same day as the release thereof, facsimile or e-mailed copies of all press releases issued by the Company or any of its Subsidiaries and (iii) copies of any notices and other information made available or given to the stockholders of the Company generally, contemporaneously with the making available or giving thereof to the stockholders. As used herein, "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(i) <u>Disclosure of Transactions and Other Material Information</u>. On or before the Disclosure Time (as defined below), the Company shall file a Current Report on Form 8-K describing the terms of the transactions contemplated by the Transaction Documents in the form required by the 1934 Act and attaching the material Transaction Documents (including, without limitation, this Agreement (and all schedules and exhibits to this Agreement), the form of Notes, the form of Warrants, the form of Lock-Up Agreement, the form of Voting Agreement, the Security Documents, the form of Investor Note, the form of Master Netting Agreement and the form of Note Purchase Agreement) as exhibits to such filing (including all attachments, the "**8-K Filing**"). As of immediately following the filing of the 8-K Filing with the SEC, no Buyer shall be in possession of any material, nonpublic information received from the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents, that is not disclosed in the 8-K Filing or in prior filings with the SEC. In addition, effective upon the filing of the 8-K Filing, the Company acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents, on the one hand, and any of the Buyers or any of their affiliates, on the other hand, shall terminate and be of no further force or effect. The Company shall not, and shall cause each of its Subsidiaries and its and each of their respective officers, directors, employees, affiliates and agents, not to, provide any Buyer with any material, nonpublic information regarding the Company or any of its Subsidiaries from and after the date hereof without the express written consent of such Buyer and agreement of Buyer to keep such information confidential. If a Buyer has, or believes it has, received any such material, nonpublic information regarding the Company or any of its Subsidiaries provided in breach of the preceding sentence, it shall provide the Company with written notice thereof in which case the Company shall, within two (2) Trading Days (as defined in the Warrants) of receipt of such notice, make public disclosure of any such material, nonpublic information provided in breach of the preceding sentence. In the event of a breach of the foregoing covenant by the Company, any of its Subsidiaries, or any of its or their respective officers, directors, employees, affiliates and agents, in addition to any other remedy provided herein or in the Transaction Documents, a Buyer shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such material, nonpublic information without the prior approval by the Company, its Subsidiaries, or any of its or their respective officers, directors, employees, affiliates or agents; <u>provided</u>, <u>however</u> that the Company shall not be in breach of the foregoing as it relates to Section 4(o)(iii) so long as the Company satisfies its obligations under Section 4(o)(iii)(8). No Buyer shall have any liability to the Company, its Subsidiaries, or any of its or their respective officers, directors, employees, affiliates or agents for any such disclosure. To the extent that the Company, its Subsidiaries or any of its or their respective officers, directors, employees, affiliates or agents delivers any material, nonpublic information to a Buyer without such Buyer's prior written consent, the Company hereby covenants and agrees that such Buyer shall not have any duty of confidentiality to the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents with respect to, or a duty to the Company, any of its Subsidiaries or any of their respective officers, directors, employees, affiliates or agents not to trade on the basis of, such material, nonpublic information. Subject to the foregoing, neither the Company, its Subsidiaries nor any Buyer shall issue any press releases or any other public statements with respect to the transactions contemplated hereby (other than filings required by a Buyer pursuant to Section 13 or Section 16 of the 1934 Act), without the prior consent of the Company, with respect to any press release of any Buyer, or without the prior consent of each Buyer, with respect to any press release of the Company; <u>provided</u>, <u>however</u>, that the Company shall be entitled, without the prior approval of any Buyer, to make any press release or other public disclosure with respect to such transactions (i) in substantial conformity with the 8-K Filing and contemporaneously therewith and (ii) as is required by applicable law, regulation or any Eligible Market on which the Company's securities are then listed or quoted (provided that in the case of clause (i) each Buyer shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release). Without the prior written consent of any applicable Buyer, neither the Company nor any of its Subsidiaries or affiliates shall disclose the name of such Buyer in any filing, announcement, release or otherwise other than disclosure relating to a Buyer solely on information disclosed from such Buyer's filings made pursuant to Section 13 of the 1934 Act. As used herein, "**Disclosure Time**" means, (i) if this Agreement is signed after 8:30 a.m. (New York City time) and before midnight (New York City time) on any Trading Day, 8:31 a.m. (New York City time) on the second (2nd) Trading Day immediately following the date hereof, unless otherwise instructed as to an earlier time by the Agent, or (ii) if this Agreement is signed between midnight (New York City time) and 8:30 a.m. (New York City time) on any Trading Day, no later than 8:31 a.m. (New York City time) on the Trading Day immediately following the date hereof, unless otherwise instructed as to an earlier time by the Agent.

19

(j) <u>Additional Notes and Warrants; Variable Securities</u>. For so long as any Notes or Warrants remain outstanding, the Company will not issue any Notes or Warrants other than to the Buyers as contemplated hereby and the Company shall not issue any other securities that would cause a breach or default under the Notes or the Warrants. For so long as any Notes or Warrants remain outstanding, the Company shall not, in any manner, (i) issue or sell any rights, warrants or options to subscribe for or purchase Common Stock or directly or indirectly convertible into or exchangeable or exercisable for Common Stock at a price which varies or may vary with the market price of the Common Stock, including by way of one or more reset(s) to any fixed price, unless the conversion, exchange or exercise price of any such security cannot be less than the then applicable Conversion Price with respect to the Common Stock into which any Notes are convertible or redeemable or the then applicable Exercise Price (as defined in the Warrants) with respect to the Common Stock into which any Warrant is exercisable or (ii) enter into, or effect any transaction under, any agreement, including, but not limited to, an equity line of credit, an "at-the-market" offering or similar agreement, whereby the Company may issue securities at a future determined price. Any Buyer shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages.

(k) <u>Corporate Existence</u>. For so long as any Notes or Warrants remain outstanding, the Company shall maintain its corporate existence and shall not be party to any Fundamental Transaction (as defined in the Notes and the Warrants) unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Notes and the Warrants.

(l) <u>Reservation of Shares</u>. So long as any Buyer owns any Securities, the Company shall take all action necessary to at all times have authorized, and reserved for issuance the applicable Required Reserve Amount. Upon any increase in the number of authorized or unreserved shares of Common Stock of the Company following the date hereof, the Company shall use such increased number of authorized shares to satisfy its obligations to keep the Final Required Reserve Amount of shares reserved for the Securities before reserving or using shares for any other purpose. The initial number of shares of Common Stock reserved for conversion or redemption of the Notes and for exercise of the Warrants and each increase in the number of shares so reserved shall be allocated pro rata among the Buyers, based on the total number of shares of Common Stock issuable upon conversion pursuant to the terms of the Notes and upon exercise of the Warrants (without regard to any limitations in exercise) issued to each Buyer on the Closing Date (the "**Authorized Share Allocation**"). In the event that a Buyer shall sell or otherwise transfer any of its Notes or Warrants, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Notes or Warrants shall be allocated to the holders of the remaining Notes and Warrants, pro rata based on the Note Conversion Shares issuable pursuant to the terms of the Notes and the Warrant Shares issuable upon exercise of the Warrants then held by such holders (without regard to any limitations on the conversion or redemption of the Notes or on the exercise of the Warrants).

(m) <u>Conduct of Business</u>. The business of the Company and its Subsidiaries shall not be conducted in violation of any law, ordinance or regulation of any governmental entity, including, without limitation, FCPA and other applicable Anti-Bribery Laws, OFAC regulations and other applicable Sanctions Laws, and Anti-Money Laundering Laws.

(i) Neither the Company, nor any of its Subsidiaries or affiliates, directors, officers, employees, representatives or agents shall:

(a) conduct any business or engage in any transaction or dealing with or for the benefit of any Blocked Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Blocked Person;

(b) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked or subject to blocking pursuant to the applicable Sanctions Laws;

(c) use any of the proceeds of the transactions contemplated by this Agreement to finance, promote or otherwise support in any manner any illegal activity, including, without limitation, any Anti-Money Laundering Laws, Sanctions Laws, or Anti-Bribery Laws; or

(d) violate, attempt to violate, or engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the Anti-Money Laundering Laws, Sanctions Laws, or Anti-Bribery Laws.

(ii) The Company shall maintain in effect and enforce policies and procedures designed to ensure compliance by the Company and its Subsidiaries and their directors, officers, employees, agents representatives and affiliates with the Sanctions Laws and Anti-Bribery Laws.

20

(iii) The Company will promptly notify the Buyers in writing if any of the Company, or any of its Subsidiaries or affiliates, directors, officers, employees, representatives or agents, shall become a Blocked Person, or become directly or indirectly owned or controlled by a Blocked Person.

(iv) The Company shall provide such information and documentation as the Buyers or any of their affiliates may require to satisfy compliance with the Anti-Money Laundering Laws, Sanctions Laws, or Anti-Bribery Laws.

(v) The covenants set forth above shall be ongoing for so long as any Notes or Warrants remain outstanding. The Company shall promptly notify the Buyers in writing should it become aware (a) of any changes to these covenants, or (b) if it cannot comply with the covenants set forth herein. The Company shall also promptly notify the Buyers in writing should they become aware of an investigation, litigation or regulatory action relating to an alleged or potential violation of the Anti-Money Laundering Laws, Sanctions Laws, and Anti-Bribery Laws.

(n) Lock-Up. The Company shall not amend or waive any provision of the Lock-Up Agreements except to extend the term of the lock-up period contained therein and shall enforce the provisions of the Lock-Up Agreements in accordance with their terms. If any party to a Lock-Up Agreement breaches any provision of a Lock-Up Agreement, the Company shall promptly use its best efforts to seek specific performance of the terms of such Lock-Up Agreement.

(o) Additional Issuances of Securities.

(i) For purposes of this Section 4(o), the following definitions shall apply.

(1) "**Approved Stock Plan**" means any employee benefit plan which has been approved by the Board of Directors of the Company, pursuant to which the Company's securities may be issued to any employee, officer or director for services provided to the Company.

(2) "**Convertible Securities**" means any stock or securities (other than Options (as defined below)) convertible into or exercisable or exchangeable for shares of Common Stock.

(3) "**Excluded Securities**" means any Common Stock issued or issuable: (i) under any Approved Stock Plan, (ii) upon exercise of the Warrants; provided, that the terms of such Warrants are not amended, modified or changed on or after the date hereof, (iii) upon conversion, exercise or exchange of any Options or Convertible Securities which are outstanding on the day immediately preceding the date hereof; provided, that such issuance of Common Stock upon exercise of such Options or Convertible Securities is made pursuant to the terms of such Options or Convertible Securities in effect on the date immediately preceding the date hereof or in accordance with the terms of the Transaction Documents and such Options or Convertible Securities are not amended, modified or changed to decrease the exercise price, exchange price or conversion price of such Options or Convertible Securities or otherwise increase the number of shares issuable under such Options or Convertible Securities (in each case, other than in connection with stock splits or distributions) on or after the date hereof other than in accordance with the terms of the Transaction Documents and (iv) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors of the Company, provided that such securities are issued as "restricted securities" (as defined in Rule 144) and carry no registration rights that require or permit the filing of any registration statement in connection therewith during the prohibition period in Section 4(o)(ii) herein, and provided that any such issuance shall only be to a Person (or to the equityholders of a Person) which is, itself or through its subsidiaries, an operating company or an owner of an asset in a business synergistic with the business of the Company and shall provide to the Company additional benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities, (v) securities issued as payment for investment banking services provided to the Company, including warrants to purchase shares of Common Stock to the placement agent relating to the offering of the Securities, (vi) securities issued to third party vendors as payment for goods and services, the Company's consultants, vendors and animation partners, provided that such securities are issued as "restricted securities" (as defined in Rule 144) and carry no registration rights that require or permit the filing of any registration statement in connection therewith during the prohibition period in Section 4(o)(ii) herein, and (vii) shares of Common Stock and warrants to purchase Common Stock in an equity financing sold at a purchase price equal to or greater than the "Minimum Price" as defined under the rules of the Principal Market, and (viii) securities issued or issuable to the Buyers and their assigns pursuant to this Agreement, the Notes or the Warrants and other Transaction Documents or upon exercise, conversion or exchange of any such securities, provided, that such issuance of Common Stock upon exercise of such Options or Convertible Securities is made pursuant to the terms of such Options or Convertible Securities in effect on the date immediately preceding the date hereof or in accordance with the terms of the Transaction Documents and such Options or Convertible Securities are not amended, modified or changed to decrease the exercise price, exchange price or conversion price of such Options or Convertible Securities or otherwise increase the number of shares issuable under such Options or Convertible Securities (in each case, other than in connection with stock splits or distributions) on or after the date hereof other than in accordance with the terms of the Transaction Documents.

21

(4) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(5) "**Common Stock Equivalents**" means, collectively, Options and Convertible Securities.

(ii) From the date hereof until the date that the Notes are no longer outstanding, the Company will not (A) directly or indirectly, file any registration statement with the SEC other than registration statements on Form S-8, (B) directly or indirectly, offer, sell, grant any option to purchase, or otherwise dispose of (or announce any offer, sale, grant or any option to purchase or other disposition of) any of its or its Subsidiaries' equity or equity equivalent securities, including without limitation any debt, preferred stock or other instrument or security that is, at any time during its life and under any circumstances, convertible into or exchangeable or exercisable for shares of Common Stock or Common Stock Equivalents (any such offer, sale, grant, disposition or announcement being referred to as a "**Subsequent Placement**"), or (C) be party to any solicitations, negotiations or discussions with regard to the foregoing unless (A) Nasdaq Stockholder Approval has been obtained prior thereto and (B) (i) at least 75% of the gross proceeds in excess of the first $2,000,000 of gross proceeds of all Subsequent Placements consummated prior to the six month anniversary of the Closing Date are first applied to the redemption of the Notes (pro-rata based on a Buyer's Purchase Price which redemption may be waived by a Buyer and it will not increase the pro-rata percentage of any other Buyers) or (ii) at least 75% of the gross proceeds of any such Subsequent Placement consummated after the six month anniversary of the Closing Date are first applied to the redemption of the Notes (pro-rata based on a Buyer's Purchase Price which redemption may be waived by a Buyer and it will not increase the pro-rata percentage of any other Buyers). Notwithstanding the foregoing, the restrictions above shall not apply with respect to issuances of Excluded Securities (other than clause (vii) therein).

(p) Stockholder Approvals.

(i) As promptly as practicable after the date hereof, the Company shall provide each stockholder entitled to vote at the next special or annual meeting of stockholders of the Company (the "**Stockholder Meeting**"), which shall be promptly called and held not later than May 15, 2020 (the "**Stockholder Meeting Deadline**"), a proxy statement, substantially in the form which has been previously reviewed by the Buyers, soliciting each such stockholder's affirmative vote at the Stockholder Meeting for approving the Company's issuance or potential issuance of the Note Conversion Shares and the Warrant Shares as described in the Transaction Documents and the other actions requiring stockholder approval as described in the Transaction Documents in accordance with applicable law, the provisions of the Bylaws and the rules and regulations of the Principal Market (such affirmative approval being referred to herein as the "**Nasdaq Stockholder Approval**"), and the Company shall use its reasonable best efforts to solicit its stockholders' approval of such resolutions and to cause the Board of Directors of the Company to recommend to the stockholders that they approve such resolutions. The Company shall be obligated to use its reasonable best efforts to obtain the Nasdaq Stockholder Approval by the Stockholder Meeting Deadline. If, despite the Company's reasonable best efforts the Nasdaq Stockholder Approval is not obtained on or prior to the Stockholder Meeting Deadline, the Company shall cause an additional Stockholder Meeting to be held every ninety (90) days thereafter until such Nasdaq Stockholder Approval is obtained.

(q) Voting Agreement. The Company shall use its best efforts to effectuate the transactions contemplated by the Voting Agreement, in the form attached hereto as Exhibit H (the "**Voting Agreement**"), executed by the Company and the stockholders set forth on Schedule 4(q) (collectively, the "**Principal Stockholders**") who hold in the aggregate a percentage of the outstanding shares of Common Stock that is acceptable to the Required Holders (as defined below). The Company hereby covenants to use reasonable best efforts to cause additional stockholders to execute the Voting Agreement (or sign additional voting agreements on substantially the same form as the Voting Agreement, which when executed will be deemed for purposes of this Agreement to be included in the definition of Voting Agreement) and to promptly notify the Buyers of any such additional stockholders signing the Voting Agreement or such additional Voting Agreements. The Company shall not amend or waive any provision of the Voting Agreement and shall enforce the provisions of the Voting Agreement in accordance with its terms. If any of the Principal Stockholders breach any provisions of the Voting Agreement, the Company shall promptly use its best efforts to seek specific performance of the terms of the Voting Agreement in accordance with Section 4.02 thereof. In addition, if the Company receives any notice from any of the Principal Stockholders pursuant to the Voting Agreement, the Company shall promptly, but in no event later than two (2) Business Days, deliver a copy of such notice to each Buyer.

(r) FAST Compliance. While any Securities are outstanding, the Company shall maintain a transfer agent that participates in the DTC Fast Automated Securities Transfer Program.

22

(s) <u>Company's Operations</u>. While any Notes or Warrants are outstanding, the Company and each of its Subsidiaries shall (i) not be an "investment company," and affiliate of an "investment company," a company controlled by an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended; (ii) not become a U.S. real property holding corporation within the meaning of Section 897 of the Code (and the Company and each Subsidiary shall so certify upon any Buyer's request); (iii) not become subject to the BHCA or regulation by the Federal Reserve; (iv) not own or control, directly or indirectly, five percent or more of the outstanding shares of any class of voting securities or twenty-five percent or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve; and (v) not exercise a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

(t) <u>Integration</u>. None of the Company, its Subsidiaries, their affiliates and any Person acting on their behalf shall sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in Section 2 of the 1933 Act) that would be integrated with the offer or sale of the Securities in a manner that would require the registration under the 1933 Act of the sale of the Securities or that would be integrated with the offer or sale of the Securities for purposes of the rules and regulations of any Eligible Market such that it would require shareholder approval prior to the closing of such other transaction.

(u) <u>Public Information</u>. At any time during the period commencing from the six (6) month anniversary of the Closing Date and ending at such time that all of the Securities, if a registration statement is not available for the resale of all of the Securities, may be sold without restriction or limitation pursuant to Rule 144 and without the requirement to be in compliance with Rule 144(c)(1), if the Company shall (i) fail for any reason to satisfy the requirements of Rule 144(c)(1), including, without limitation, the failure to satisfy the current public information requirement under Rule 144(c) or (ii) if the Company has ever been an issuer described in Rule 144(i)(1)(i) or becomes such an issuer in the future, and the Company shall fail to satisfy any condition set forth in Rule 144(i)(2) (a "**Public Information Failure**") then, as partial relief for the damages to any holder of Securities by reason of any such delay in or reduction of its ability to sell the Securities (which remedy shall not be exclusive of any other remedies available at law or in equity), the Company shall pay to each such holder an amount in cash equal to two percent (2.0%) of the Purchase Price of such holder's Securities on the day of a Public Information Failure and on every thirtieth day (pro-rated for periods totaling less than thirty days) thereafter until the earlier of (i) the date such Public Information Failure is cured and (ii) such time that such Public Information Failure no longer prevents a holder of Securities from selling such Securities pursuant to Rule 144 without any restrictions or limitations. The payments to which a holder shall be entitled pursuant to this Section 4(u) are referred to herein as "**Public Information Failure Payments**." Public Information Failure Payments shall be paid on the earlier of (I) the last day of the calendar month during which such Public Information Failure Payments are incurred and (II) the third Business Day after the event or failure giving rise to the Public Information Failure Payments is cured. In the event the Company fails to make Public Information Failure Payments in a timely manner, such Public Information Failure Payments shall bear interest at the rate of 1.5% per month (prorated for partial months) until paid in full.

(v) <u>Notice of Disqualification Events</u>. The Company will notify the Buyers in writing, prior to the Closing Date of (i) any Disqualification Event relating to any Issuer Covered Person and (ii) any event that would, with the passage of time, become a Disqualification Event relating to any Issuer Covered Person.

(w) <u>Certain Transactions and Confidentiality</u>. Each Buyer, severally and not jointly with the other Buyers, covenants that neither it nor any affiliate acting on its behalf or pursuant to any understanding with it will execute any purchases or sales, including short sales of any of the Company's securities during the period commencing with the execution of this Agreement and ending at such time that the transactions contemplated by this Agreement are first publicly announced pursuant to the 8-K Filing as described in Section 4(i). Each Buyer, severally and not jointly with the other Buyers, covenants that until such time as the transactions contemplated by this Agreement are publicly disclosed by the Company pursuant to the 8-K Filing as described in Section 4(i), such Buyer will maintain the confidentiality of the existence and terms of this transaction and the information included in the disclosure schedules, if any. Notwithstanding the foregoing and notwithstanding anything contained in this Agreement to the contrary, the Company expressly acknowledges and agrees that (i) no Buyer makes any representation, warranty or covenant hereby that it will not engage in effecting transactions in any securities of the Company after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to 8-K Filing as described in Section 4(i), (ii) no Buyer shall be restricted or prohibited from effecting any transactions in any securities of the Company in accordance with applicable securities laws from and after the time that the transactions contemplated by this Agreement are first publicly announced pursuant to the 8-K Filing as described in Section 4(i) and (iii) no Buyer shall have any duty of confidentiality or duty not to trade in the securities of the Company to the Company or its Subsidiaries after the issuance of the 8-K Filing as described in Section 4(i). Notwithstanding the foregoing, in the case of a Buyer that is a multi-managed investment vehicle whereby separate portfolio managers manage separate portions of such Buyer's assets and the portfolio managers have no direct knowledge of the investment decisions made by the portfolio managers managing other portions of such Buyer's assets, the covenant set forth above shall only apply with respect to the portion of assets managed by the portfolio manager that made the investment decision to purchase the Securities covered by this Agreement.

23

(x) <u>Collateral Agent</u>.

(i) Each Buyer hereby (a) appoints Anson Investments Master Fund LP, a Buyer, as the collateral agent hereunder and under the Security Documents (in such capacity, the "**Collateral Agent**"), and (b) authorizes the Collateral Agent (and its officers, directors, employees and agents) to take such action on such Buyer's behalf in accordance with the terms hereof and thereof. The Collateral Agent shall not have, by reason hereof or pursuant to any Security Documents, a fiduciary relationship in respect of any Buyer. Neither the Collateral Agent nor any of its officers, directors, employees and agents shall have any liability to any Buyer for any action taken or omitted to be taken in connection hereof or the Security Documents except to the extent caused by its own gross negligence or willful misconduct, and each Buyer agrees to defend, protect, indemnify and hold harmless the Collateral Agent and all of its officers, directors, employees and agents (collectively, the "**Collateral Agent Indemnitees**") from and against any losses, damages, liabilities, obligations, penalties, actions, judgments, suits, fees, costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Collateral Agent Indemnitee, whether direct, indirect or consequential, arising from or in connection with the performance by such Collateral Agent Indemnitee of the duties and obligations of Collateral Agent pursuant hereto or any of the Security Documents.

(ii) The Collateral Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Transaction Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(iii) The Collateral Agent may resign from the performance of all its functions and duties hereunder and under the Notes and the Security Documents at any time by giving at least ten (10) Business Days prior written notice to the Company and each holder of the Notes. Such resignation shall take effect upon the acceptance by a successor Collateral Agent of appointment as provided below. Upon any such notice of resignation, the holders of a majority of the outstanding principal amount of Notes shall appoint a successor Collateral Agent. Upon the acceptance of the appointment as Collateral Agent, such successor Collateral Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Collateral Agent, and the retiring Collateral Agent shall be discharged from its duties and obligations under this Agreement, the Notes and the Security Agreement. After any Collateral Agent's resignation hereunder, the provisions of this Section 4(x) shall inure to its benefit. If a successor Collateral Agent shall not have been so appointed within said ten (10) Business Day period, the retiring Collateral Agent shall then appoint a successor Collateral Agent who shall serve until such time, if any, as the holders of a majority of the outstanding principal amount of Notes appoints a successor Collateral Agent as provided above.

(iv) The Company hereby covenants and agrees to take all actions as promptly as practicable reasonably requested by either the holders of a majority of the outstanding principal amount of Notes or the Collateral Agent (or its successor), from time to time pursuant to the terms of this Section 4(y), to secure a successor Collateral Agent satisfactory to such requesting part(y)(ies), in their sole discretion, including, without limitation, by paying all fees of such successor Collateral Agent, by having the Company agree to indemnify any successor Collateral Agent and by each of the Company executing a collateral agency agreement or similar agreement and/or any amendment to the Security Documents reasonably requested or required by the successor Collateral Agent.

(y) Within ten (10) Business Days after Closing, if requested by the Collateral Agent, the Collateral Agent shall have received the results of searches (including comparable searches in any jurisdiction outside the United States) for any effective UCC financing statements, tax liens or judgment liens filed against the Company or any of the Subsidiary Guarantors or any property of any of the foregoing, which results shall not show any such liens (other than Permitted Liens acceptable to the Collateral Agent).

(z) Within thirty (30) Business Days after Closing, the Company shall provide to the Buyers evidence of (i) the termination of any security interest in Intellectual Property filed with the United States Patent and Trademark Office or the United States Copyright Office and covering any intellectual property of the Company and the Subsidiary Guarantors, and (ii) UCC-3 termination statements for all UCC-1 financing statements covering any portion of the Collateral.

24

(aa) Within thirty (30) calendar days after Closing (or such later date as determined by the Collateral Agent in its sole discretion), the Collateral Agent shall have received control agreements, in form and substance satisfactory to the Collateral Agent, with respect to all deposit accounts of the Grantors (as defined in the Security Agreement) as required by Section 5(i) of the Security Agreement, duly executed by the applicable Grantors and the applicable bank or financial institution.

(bb) <u>Closing Documents</u>. On or prior to fourteen (14) calendar days after the Closing Date, the Company agrees to deliver, or cause to be delivered, to each Buyer a complete closing set (which may be solely in electronic format) of the executed copies of the Transaction Documents, Securities and other documents required to be delivered to any party pursuant to Section 7 hereof.

(cc) <u>Existing Warrants</u>. Immediately following the date that the Nasdaq Stockholder Approval is obtained, the Company shall reduce the exercise price of the Existing Warrants held by each Buyers to equal $0.21 (subject to adjustment for forward and reverse stock splits and the like after the date hereof). "<u>Existing Warrants</u>" means those certain common stock purchase Warrants issued by the Company and held by certain Purchasers as set forth in column 10 of the Schedule of Buyers attached hereto.

(dd) <u>Most Favored Nation Provision</u>. Following the date that Nasdaq Stockholder Approval is obtained until such time as no Buyer holds any of the Notes, in the event of any issuance by the Company or any of its Subsidiaries of Common Stock or Common Stock Equivalents for cash consideration, Indebtedness or a combination of units thereof (a "**Subsequent Financing**"), upon written notice to the Company by such Buyer within five (5) Trading Days after the consummation of such Subsequent Financing, each Buyer (together with its Affiliates) having an aggregate Purchase Price at the Closing of at least $1,000,000 shall have the right to tender, all or in part, the principal amount of Notes held by such Buyer (but not the Warrants, which shall remain outstanding) to the Company in lieu of a cash subscription for such Common Stock or Common Stock Equivalents. By way of example, if the Company undertakes a Subsequent Financing of Senior Secured Convertible Notes and warrants, each Buyer shall have the right to participate in such Subsequent Financing and use the surrender of its Notes as consideration, on a $1 for $1 basis, in lieu of cash consideration. Nothing hereunder shall prohibit the Buyer from converting its Notes into Conversion Shares up until the time that such Notes are tendered. Additionally, in the event that any warrants or options (or any similar security or right) issued in a Subsequent Financing include any terms more favorable to the holders thereof (less favorable to the Company) than the terms of the Warrants, the Warrants shall be automatically amended to include such more favorable terms. This Section 4(dd) shall not apply with respect to any Excluded Securities (other than clause (vii) therein). Between the time period of 4:00 pm (New York City time) and 6:00 pm (New York City time) on the Trading Day immediately prior to the Trading Day of the expected announcement of the Subsequent Financing (or, if the Trading Day of the expected announcement of the Subsequent Financing is the first Trading Day following a holiday or a weekend (including a holiday weekend), between the time period of 4:00 pm (New York City time) on the Trading Day immediately prior to such holiday or weekend and 2:00 pm (New York City time) on the day immediately prior to the Trading Day of the expected announcement of the Subsequent Financing), the Company shall deliver to each Buyer a written notice of the Company's intention to effect a Subsequent Financing, which notice shall describe in reasonable detail the proposed terms of such Subsequent Financing, the amount of proceeds intended to be raised thereunder and the Person or Persons through or with whom such Subsequent Financing is proposed to be effected and shall include a term sheet and transaction documents relating thereto as an attachment. The Company obligation under this Section 4(dd) may be waived by written waivers of at least 51% in interest of such Buyers that are eligible to participate hereunder.

(ee) <u>Llama Productions LLC, Bank Leumi USA</u>. The Company agrees that it will not amend or modify any of the terms of the Loan and Security Agreement by and among the Company, Llama Productions LLC and Bank Leumi USA, or any of the other agreements or instruments entered in connection therewith, without first obtaining the prior written consent of the Required Holders.

(ff) <u>Heyward Producer Fees</u>. Until the Notes are no longer outstanding, Andrew Heyward shall not be paid, or accrue, any executive producer fees (or similar or like types of compensation or arrangements), directly or indirectly, from the Company with respect to any project undertaken, directly or indirectly, by the Company.

5. REGISTER; TRANSFER AGENT INSTRUCTIONS.

(a) Register. The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate by notice to each holder of Securities), a register for the Notes and the Warrants in which the Company shall record the name and address of the Person in whose name the Notes and the Warrants have been issued (including the name and address of each transferee), the number of Notes held by such Person, the number of Note Conversion Shares issued and issuable pursuant to the terms of the Notes and the number of Warrant Shares issuable upon exercise of the Warrants held by such Person. The Company shall keep the register open and available at all times during business hours for inspection of any Buyer or its legal representatives.

(b) Transfer Agent Instructions. The Company shall issue irrevocable instructions to the Transfer Agent to issue certificates or credit shares to the applicable balance accounts at DTC, registered in the name of each Buyer or its respective nominee(s), for the Note Conversion Shares and the Warrant Shares in such amounts as specified from time to time by each Buyer to the Company pursuant to the terms of the Notes or exercise of the Warrants, in the form attached hereto as Exhibit I (the "**Irrevocable Transfer Agent Instructions**"). The Company represents and warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5 will be given by the Company to the Transfer Agent, and any subsequent transfer agent with respect to the Securities, and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the other Transaction Documents. In the event that such sale, assignment or transfer involves the Note Conversion Shares or the Warrant Shares sold, assigned or transferred pursuant to an effective registration statement or pursuant to Rule 144, the Transfer Agent shall issue such Note Conversion Shares or the Warrant Shares to the Buyer, assignee or transferee, as the case may be, without any restrictive legend. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyers. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5, that the Buyers shall be entitled, in addition to all available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

6. CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

The obligation of the Company hereunder to issue and sell the Notes and the related Warrants to each Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing each Buyer with prior written notice thereof:

(i) Such Buyer shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Company.

(ii) Such Buyer shall have duly executed and delivered to the Company an Investor Collateral Certificate and issued an Investor Note to the Company in such original principal amount as is set forth across from such Buyer's name in column (5) of the Schedule of Buyers attached hereto, which shall be held by such Buyer as Collateral for the obligations of the Company under the Note issued to such Buyer hereunder

(iii) Such Buyer and each other Buyer shall have delivered to the Company the Cash Purchase Price (less, in the case of the Lead Investor, the amounts withheld pursuant to Section 4(e)) by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company.

(iv) The representations and warranties of such Buyer shall be true and correct in all respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such specified date), and such Buyer shall have performed, satisfied and complied in all respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by such Buyer at or prior to the Closing Date.

(v) No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

26

7. <u>CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE.</u>

The obligation of each Buyer hereunder to purchase the Notes and the related Warrants at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for each Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(i) The Company shall have duly executed and delivered to such Buyer (i) each of the Transaction Documents, (ii) the Notes (allocated in such amounts as such Buyer shall request) being purchased by such Buyer at the Closing pursuant to this Agreement, and (iii) the Warrants (allocated in such amounts as such Buyer shall request) being purchased by such Buyer at the Closing pursuant to this Agreement.

(ii) Such Buyer shall have received the opinion of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C., the Company's counsel, dated as of the Closing Date, in the form attached hereto as <u>Exhibit J</u>.

(iii) The Company shall have delivered to such Buyer a copy of the Irrevocable Transfer Agent Instructions, which instructions shall have been delivered to and acknowledged in writing by the Transfer Agent.

(iv) The Company shall have delivered to such Buyer a certificate evidencing the formation and good standing of the Company and each of its Subsidiary Guarantors in such entity's jurisdiction of formation issued by the Secretary of State (or comparable office) of such jurisdiction, as of a date within ten (10) days of the Closing Date.

(v) The Company shall have delivered to such Buyer a certificate evidencing the Company's qualification as a foreign corporation and good standing issued by the Secretary of State (or comparable office) of the State of California, as of a date within ten (10) days of the Closing Date.

(vi) The Company shall have delivered to such Buyer a certified copy of the Articles of Incorporation as certified by the Secretary of State of the State of Nevada (or a fax or pdf copy of such certificate) within ten (10) days of the Closing Date.

(vii) The Company shall have delivered to such Buyer a certificate, executed by the Secretary of the Company and dated as of the Closing Date, as to (i) the resolutions consistent with Section 3(d) as adopted by the Company's Board of Directors in a form reasonably acceptable to such Buyer, (ii) the Company's Articles of Incorporation and (iii) the Company's Bylaws, each as in effect at the Closing, in the form attached hereto as <u>Exhibit K</u>.

(viii) The representations and warranties of the Company shall be true and correct in all respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such specified date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Closing Date. Such Buyer shall have received a certificate, executed by the Chief Executive Officer or Chief Financial Officer of the Company, dated as of the Closing Date, to the foregoing effect and as to such other matters as may be reasonably requested by such Buyer in the form attached hereto as <u>Exhibit L</u>.

(ix) The Company shall have delivered to such Buyer a letter from the Transfer Agent certifying the number of shares of Common Stock outstanding as of a date within five (5) days before the Closing Date.

(x) The Common Stock (I) shall be designated for quotation or listed on the Principal Market and (II) shall not have been suspended, as of the Closing Date, by the SEC or the Principal Market from trading on the Principal Market, nor shall suspension by the SEC or the Principal Market have been threatened, as of the Closing Date, either (A) in writing by the SEC or the Principal Market or (B) by falling below the minimum listing maintenance requirements of the Principal Market.

(xi) The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Securities and the transactions contemplated by the Transactions Documents and all payments thereunder.

27

(xii) No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

(xiii) Since the date of this Agreement, no event or series of events shall have occurred that reasonably could be expected to result in a Material Adverse Effect.

(xiv) The Company shall have delivered to each Buyer a lock-up agreement, in the form attached hereto as Exhibit M, executed and delivered by each of the Persons listed on Schedule 7(xv) (collectively, the "**Lock-Up Agreements**").

(xv) The Voting Agreement shall have been executed and delivered to such Buyer by the Company and each of the Principal Stockholders representing in the aggregate a percentage of the outstanding shares of Common Stock acceptable to the Required Holders.

(xvi) The Company shall have delivered a letter on the letterhead of the Company (the "**Flow of Funds Letter**") (x) duly executed by the Chief Executive Officer of the Company, setting forth the wire amounts of each Buyer and the wire transfer instructions of the Company with respect to the Cash Purchase Price set forth in column (3) of the Schedule of Buyers attached hereto and (y) directing each Buyer (or its designee) to maintain physical possession of a duly executed Investor Note of such Buyer, in such original principal amount as is set forth across from such Buyer's name in column (5) of the Schedule of Buyers attached hereto, issued pursuant to the Note Purchase Agreement of such Buyer, both as payment for, and as Collateral securing, such Note to be issued and sold to such Buyer at the Closing.

(xvii) Each of the Subsidiary Guarantors shall have executed and delivered to such Buyer the Guarantee Agreement.

(xviii) The Collateral Agent shall have received evidence satisfactory to the Collateral Agent of the filing of appropriate financing statements on Form UCC-1 in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by the Security Agreement.

(xix) The Collateral Agent shall have received the Security Agreement, duly executed by the Company and each of the Subsidiary Guarantors, together with (A) the original stock certificates representing all of the equity interests and all promissory notes required to be pledged thereunder, accompanied by undated stock powers and alonges executed in blank and other proper instruments of transfer and (B) any copyright, patent and trademark agreements required by the terms of the Security Agreement.

(xx) The Company shall have delivered to such Buyer a perfection certificate, in the form attached hereto as Exhibit N, duly completed and executed by the Company and each of the Subsidiary Guarantors (the "**Perfection Certificate**").

(xxi) The Company shall have delivered to such Buyer such other documents relating to the transactions contemplated by this Agreement as such Buyer or its counsel may reasonably request.

8. TERMINATION. In the event that the Closing shall not have occurred with respect to a Buyer on or before five (5) Business Days from the date hereof due to the Company's or such Buyer's failure to satisfy the conditions set forth in Sections 6 and 7 above (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date by delivering a written notice to that effect to each other party to this Agreement and without liability of any party to any other party; provided, however, that if this Agreement is terminated pursuant to this Section 8, the Company shall remain obligated to reimburse the Lead Investor or its designee(s), as applicable, for the expenses described in Section 4(e) above.

28

9. MISCELLANEOUS.

(a) <u>Governing Law; Jurisdiction; Jury Trial</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(b) <u>Counterparts</u>. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile or .pdf signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile or .pdf signature.

(c) <u>Headings</u>. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) <u>Severability</u>. If any provision of this Agreement is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(e) <u>Entire Agreement; Amendments</u>. This Agreement and the other Transaction Documents supersede all other prior oral or written agreements between the Buyers, the Company, their affiliates and Persons acting on their behalf with respect to the matters discussed herein, and this Agreement, the other Transaction Documents and the instruments referenced herein and therein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended or waived other than by an instrument in writing signed by the Company and the holders of at least 66% of the aggregate number of shares of Common Stock issued and issuable under the Notes and the Warrants (without regard to any restriction or limitation on the conversion or redemption of the Notes or on the exercise of the Warrants contained therein) and shall include the Lead Investor so long as the Lead Investor or any of its affiliates holds Notes with a principal amount not less than $1 million (the "**Required Holders**"), and any amendment or waiver to this Agreement made in conformity with the provisions of this Section 9(e) shall be binding on all Buyers and holders of Securities as applicable; provided, that the provisions of Sections 4(z) and 4(aa) cannot be amended without the additional prior written approval of the Collateral Agent or its successor. No such amendment shall be effective to the extent that it applies to less than all of the holders of the applicable Securities then outstanding. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration (other than the reimbursement of legal fees) also is offered to all of the parties to the Transaction Documents, the holders of the Notes and holders of the Warrants, as the case may be. The Company has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents. Without limiting the foregoing, the Company confirms that, except as set forth in this Agreement, no Buyer has made any commitment or promise or has any other obligation to provide any financing to the Company or otherwise.

29

(f) <u>Notices</u>. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon delivery, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party) or by electronic mail; or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses, facsimile numbers and e-mail addresses for such communications shall be:

If to the Company:

Genius Brands International, Inc.

190 N. Canon Drive, 4th Fl.

Beverly Hills, CA 90210

Telephone: (310) 273-4222

Attention: Robert Denton, CFO

E-mail: bdenton@gnusbrands.com

with a copy (for informational purposes only) to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

666 Third Avenue

New York, New York 10017

Telephone: (212) 692-6732

Attention: Jeffrey Schultz, Esq.

E-mail: jschultz@mintz.com

If to the Transfer Agent:

VStock Transfer LLC

18 Lafayette Place

Woodmere, New York 11598

Telephone: (212) 828-8436

Attention: Allison Niccolls

E-mail: info@vstocktransfer.com

If to a Buyer, to its address, facsimile number and e-mail address set forth on the Schedule of Buyers, with copies to such Buyer's representatives as set forth on the Schedule of Buyers,

with a copy (for informational purposes only) to:

Telephone:

Facsimile:

Attention:

E-mail:

or to such other address, facsimile number and/or e-mail address and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine or e-mail containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

30

Case 1:22-cv-00249-AS    Document 232-61    Filed 01/15/25    Page 135 of 228

(g) <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any purchasers of the Notes or the Warrants. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the Required Holders, including by way of a Fundamental Transaction (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Notes and the Warrants). A Buyer may assign some or all of its rights hereunder without the consent of the Company, in which event such assignee shall be deemed to be a Buyer hereunder with respect to such assigned rights.

(h) <u>No Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, except for the Agent who is expressly permitted to rely on the representations and warranties set forth herein, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, other than the Indemnitees (as defined below) referred to in Section 9(k), who shall have the right to enforce the obligations of the Company with respect to such section, or the Agent.

(i) <u>Survival</u>. Unless this Agreement is terminated under Section 8, the representations and warranties of the Company and the Buyers contained in Sections 2 and 3, and the agreements and covenants set forth in Sections 4, 5 and 9 shall survive the Closing until such time as Buyer no longer holds Notes and Warrants. Each Buyer shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j) <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as are reasonably necessary in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k) <u>Indemnification</u>.

(i) In consideration of each Buyer's execution and delivery of the Transaction Documents and acquiring the Securities thereunder and in addition to all of the Company's other obligations under the Transaction Documents, the Company shall defend, protect, indemnify and hold harmless each Buyer and each other holder of the Securities and all of their stockholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing Persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the **"Indemnitees"**) from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the **"Indemnified Liabilities"**), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of the Transaction Documents or any other certificate, instrument or document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, (iii) any disclosure made by such Buyer pursuant to Section 4(i) or (iv) the status of such Buyer or holder of the Securities as an investor in the Company pursuant to the transactions contemplated by the Transaction Documents. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.

31

(ii) Promptly after receipt by an Indemnitee under this Section 9(k) of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving an Indemnified Liability, such Indemnitee shall, if a claim for indemnification in respect thereof is to be made against any indemnifying party under this Section 9(k), deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnitee; provided, however, that an Indemnitee shall have the right to retain its own counsel with the fees and expenses of not more than one counsel for such Indemnitee to be paid by the indemnifying party, if, in the reasonable opinion of the Indemnitee, the representation by such counsel of the Indemnitee and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnitee and any other party represented by such counsel in such proceeding. Legal counsel referred to in the immediately preceding sentence shall be selected by the Required Holders. The Indemnitee shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or Indemnified Liabilities by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnitee that relates to such action or Indemnified Liabilities. The indemnifying party shall keep the Indemnitee fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable to any Indemnitee for (a) any settlement of any action, claim or proceeding effected without its prior written consent, provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent or (b) to the extent, but only to the extent that a loss, claim, damage or liability is solely attributable to any Indemnitee's breach of any of the representations, warranties, covenants or agreements made by such Indemnitee in this Agreement or in the other Transaction Documents. No indemnifying party shall, without the prior written consent of the Indemnitee, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnitee of a release from all liability in respect to such Indemnified Liabilities or litigation. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnitee with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnitee under this Section 9(k), except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

(iii) The indemnification required by this Section 9(k) shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Liabilities are incurred.

(iv) The indemnity agreements contained herein shall be in addition to (x) any cause of action or similar right of the Indemnitee against the indemnifying party or others, and (y) any liabilities the indemnifying party may be subject to pursuant to the law.

(l) No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(m) Remedies. Each Buyer and each holder of the Securities shall have all rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to the Buyers. The Company therefore agrees that the Buyers shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without posting a bond or other security.

(n) Rescission and Withdrawal Right. Notwithstanding anything to the contrary contained in (and without limiting any similar provisions of) the Transaction Documents, whenever any Buyer exercises a right, election, demand or option under a Transaction Document and the Company does not timely perform its related obligations within the periods therein provided, then such Buyer may rescind or withdraw, in its sole discretion from time to time upon written notice to the Company, any relevant notice, demand or election in whole or in part without prejudice to its future actions and rights.

32

(o) <u>Payment Set Aside</u>. To the extent that the Company makes a payment or payments to the Buyers hereunder or pursuant to any of the other Transaction Documents or the Buyers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

(p) <u>Independent Nature of Buyers' Obligations and Rights</u>. The obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any other Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any other Buyer under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Buyer pursuant hereto or thereto, shall be deemed to constitute the Buyers as, and the Company acknowledges, and each Buyer confirms, that the Buyers do not so constitute, a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Buyers are in any way acting in concert or as a group, and the Company will not assert any such claim with respect to such obligations or the transactions contemplated by the Transaction Documents and the Company acknowledges, and each Buyer confirms, that the Buyers are not acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. The Company acknowledges and each Buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors. Each Buyer shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Buyer to be joined as an additional party in any proceeding for such purpose.

**[Signature Page Follows]**

33

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**

**GENIUS BRANDS INTERNATIONAL, INC.**

By: _____

Name:

Title:

*[Signature Page to Securities Purchase Agreement]*

34

**IN WITNESS WHEREOF,** each Buyer and the Company have caused their respective signature page to this Securities Purchase Agreement to be duly executed as of the date first written above.

**BUYERS:**

By: _____

Name:

Title:

Maximum Percentage:          ☐ 4.99%

☐ 9.99%

35

**SCHEDULE OF BUYERS**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| Buyer | Address, Facsimile Number and Email | Cash Purchase Price | Initial Unrestricted Principal (col (3) x 1.25 plus 0.25 x column col (5) | Note Purchase Price | Initial Restricted Principal (col (5)) | Aggregate Purchase Price | Principal Amount (col (7) x1.25) | Warrants (col. (8)/$0.21 | Existing Warrants | Legal Representative's Address and Emails |
| TOTAL | | | | | | | | | | |

36

**EXHIBITS**

| | |
|---|---|
| Exhibit A | Form of Note |
| Exhibit B | Form of Warrant |
| Exhibit C | Form of Guarantee Agreement |
| Exhibit D | Form of Security Agreement |
| Exhibit E | Form of Note Purchase Agreement |
| Exhibit F | Form of Master Netting Agreement |
| Exhibit G | Form of Investor Collateral Certificate |
| Exhibit H | Form of Voting Agreement |
| Exhibit I | Form of Irrevocable Transfer Agent Instructions |
| Exhibit J | Form of Opinion of Company's Counsel |
| Exhibit K | Form of Secretary's Certificate |
| Exhibit L | Form of Officer's Certificate |
| Exhibit M | Form of Lock-Up Agreement |
| Exhibit N | Form of Perfection Certificate |

**SCHEDULES**

| | |
|---|---|
| Schedule 3(d) | Equity Capitalization |
| Schedule 3(f) | Weaknesses or Changes in Internal Accounting Controls |
| Schedule 3(h) | Absence of Litigation |
| Schedule 3(k) | Absence of Certain Changes |
| Schedule 3(o) | Conduct of Business; Regulatory Permits |
| Schedule 3(p) | Intellectual Property |
| Schedule 3(s) | Internal Accounting Controls |
| Schedule 3(s)(ii) | Disclosure Controls |
| Schedule 3(z) | Employee Relations |
| Schedule 3(aa) | Transactions with Affiliates |
| Schedule 3(ee) | Brokerage Fees; Commissions |
| Schedule 3(ss) | Indebtedness and Other Contracts |
| Schedule 3(zz) | Ranking of Notes |
| Schedule 4(c) | Use of Proceeds |
| Schedule 4(q) | Principal Stockholders |
| Schedule 7(xv) | Parties to Lock-Up Agreement |

Annex 1 – No Disqualification Events
None

Schedule 3(d) – Equity Capitalization

As of March 9, 2020:

Common Stock, $0.001 par value, 233,333,334 shares authorized. 25,549,152 shares issued and outstanding.

Preferred Stock, $0.001 par value, 10,000,000 shares authorized. 430 shares issued and outstanding.

Warrants to purchase 11,174,620 shares of Common Stock as follows:

| | Registered or Unregistered | Grant Date | Expiration Date | Term in Year | | Exercise Price | Vesting Date | Warrants Outstanding | Warrants Exercisable |
|---|---|---|---|---|---|---|---|---|---|
| Total | R | 11/02/15 | 11/03/20 | 5 | $ | 3.30 | 10/29/15 | 380,006 | 380,006 |
| Total | U | 02/10/17 | 08/11/22 | 5 | $ | 5.30 | 02/10/17 | 1,294,190 | 1,294,190 |
| Total | U | 01/10/18 | 01/10/23 | 5 | $ | 3.00 | 01/10/18 | 685,000 | 685,000 |
| Total | R | 08/17/18 | 08/17/23 | 5 | $ | 3.00 | 08/17/18 | 239,950 | 239,950 |
| Total | U | 02/19/19 | 02/19/24 | 5 | $ | 2.55 | 02/19/19 | 1,800,000 | 1,800,000 |
| Total | U | 07/22/19 | 01/22/25 | 5 | $ | 1.14 | 07/22/19 | 1,800,000 | 1,800,000 |
| Total | R | 10/28/19 | 10/28/24 | 5 | $ | 0.76 | 10/28/19 | 477,474 | 477,474 |
| Total | U | 10/28/19 | 10/28/24 | 5 | $ | 0.76 | 10/28/19 | 46,421 | – |
| Total | U | 01/23/20 | 07/24/25 | 5 | $ | 0.34 | 07/27/20 | 3,951,364 | – |

Options to purchase 2,166,667 shares authorized. 1,314,662 shares issued and outstanding. 852,005 options available for future grant.

The Company is contemplating issuing $1 million worth of common stock to Arnold Schwarzenegger as advance payment against future royalties for his participation in the production, distribution and marketing of Stan Lee's Superhero Kindergarten.

39

Schedule 3(f) – Weakness or Changes in Internal Accounting Controls
None

40

Schedule 3(h) – Absence of Litigation
None

41

Schedule 3(k) – Absence of Certain Changes
None

42

Schedule 3(o) – Conduct of Business: Regulatory Permits

On September 4, 2019, the Company received a notification letter from The Nasdaq Stock Market ("Nasdaq") informing the Company that for the last 30 consecutive business days, the bid price of the Company's Common Stock had closed below $1.00 per share, which is the minimum required closing bid price for continued listing on The Nasdaq Capital Market pursuant to Listing Rule 5550(a)(2).

On March 3, 2020, the Company received a notification letter from Nasdaq informing the Company that it is eligible for an additional 180 calendar day period, or until August 31, 2020 to regain compliance. The determination was based on the Company meeting the continued listing requirement for market value of publicly held shares and all other applicable requirements for initial listing on the Capital Market with the exception of the bid price requirement, and the Company's written notice of its intention to cure the deficiency during the second compliance period by effecting a reverse stock split, if necessary.

To regain compliance, the closing bid price of the Company's Common Stock must be at least $1.00 per share for a minimum of ten consecutive business days. If the Company does not regain compliance by August 31, 2020, the Company may be eligible for additional time to regain compliance or if the Company is otherwise not eligible, the Company may request a hearing before a Hearings Panel.

43

Schedule 3(p) - Intellectual Property

| SERIES TITLE | CLAIMANT | ADDL CLAIMANT | Episode/Webisode Title | Reg. Number |
|---|---|---|---|---|
| Baby Genius | Pacific Entertainment Corp. | NA | Favorite Children's Songs | PA0001646055 |
| Baby Genius | Genius Products, Inc. | NA | Favorite Nursery Rhymes | PA0001323783 |
| Baby Genius | Pacific Entertainment Corp. | NA | Favorite Counting Songs | PA0001646050 |
| Baby Genius | Pacific Entertainment Corp. | NA | Baby Animals | PA0001646047 |
| Baby Genius | Genius Products, Inc. | NA | Mozart & Friends | PA0001079721 |
| Baby Genius | Genius Products, Inc. | NA | Mozart & Friends Sleepytime | PA0001086678 |
| Baby Genius | Pacific Entertainment Corp. | NA | Trip to San Diego Zoo | PA0001646075 |
| Baby Genius | Genius Products, Inc. | NA | Animal Adventures | PA0001323782 |
| Baby Genius | Genius Products, Inc. | NA | Underwater Adventures | PA0001323784 |
| Baby Genius | Genius Products, Inc. | NA | Four Seasons | PA0001080040 |
| Baby Genius | Pacific Entertainment Corp. | NA | Baby Animals | PA0001646048 |
| Baby Genius | Pacific Entertainment Corp. | NA | Favorite Singalongs | SR0000628484 |
| Baby Genius | Pacific Entertainment Corp. | NA | Favorite Children's Songs | SR0000628480 |
| Baby Genius | Pacific Entertainment Corp. | NA | Favorite Singalongs | SR0000628482 |
| Baby Genius | Pacific Entertainment Corp. | NA | Trip to San Diego Zoo | SR0000628479 |
| Baby Genius | Pacific Entertainment Corp. | NA | Favorite Counting Songs | SR0000628481 |
| Baby Genius | Genius Products, Inc. | NA | Mozart & Friends | PA0001080157 |
| Baby Genius | Genius Products, Inc. | NA | Mozart & Friends Sleepytime | PA0001086366 |
| Baby Genius | Genius Products, Inc. | NA | Four Seasons | PA0001079713 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Acid Rain | PA0001797735 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Bloomin' Algae | PA0001797737 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Creeping Development | PA0001797773 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Cynical E-Cycler | PA0001797734 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Degraded Grassland | PA0001797732 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Factory Fishing Fiasco | PA0001797739 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Flammable Forest | PA0001797781 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Flying Fly Ash | PA0001797738 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Green Gig | PA0001797777 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Illicit Arsenic | PA0001797776 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Invasive Vector | PA0001797774 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Lawless Loggers | PA0001797770 |

44

Schedule 3(p) - Intellectual Property

| SERIES TITLE | CLAIMANT | ADDL CLAIMANT | Episode/Webisode Title | Reg. Number |
|---|---|---|---|---|
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Leopard Elixir | PA0001797771 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Migration Menace | PA0001797762 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Missing March | PA0001797768 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Nuclear Waste Conundrum | PA0001797765 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Pacific Plastic | PA0001797764 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Pernicious Plan | PA0001797780 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Pesticide Pest | PA0001797763 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Plundered Paradise | PA0001797772 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Poisonous Pollen | PA0001797733 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Ransacked Reef | PA0001797761 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Storm Drain Sludge | PA0001797778 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Strip-Mined Mountain | PA0001797769 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Tundra Thaw | PA0001797736 |
| Gisele and the Green Team (web) | A Squared Entertainment LLC | Xing Xing Digital | The Case of the Watery Diversion | PA0001797779 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Llama Llama Lemonade and Stage Fright | PA0002107443 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Coach Llama Llama and Jealous Nelly | PA0002096466 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Zoom Zoom Zoom and Lost Tooth | PA0002105918 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Last Day of Summer and Bully Goat | PA0002105901 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Forgotten Fuzzy and Home with Mama | PA0002105922 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Llama Llama Red Pajama and Time to Share | PA0002105920 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Llama Llama Shopping Drama and Lucky Pajamas | PA0002105915 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Snow Show and Secret Santa | PA0002105909 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Spring Fever and Happy Birthday Llama Llama | PA0002105912 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Sleepover at Gilroy's and Noisy Neighbor | PA0002096467 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Beach Day and Mama Llama's Mother's Day | PA0002096463 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Saving Luna's Necklace and Let's Go Camping | PA0002096462 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Llama Llama and the Babysitter and Job Day | PA0002096461 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Llama Llama Loves to Read and I Heart You! | PA0002096460 |
| Llama Llama | Genius Brands International, Inc. | Telegael Teoranta | Llama Llama Trick or Treat and Boat Float | PA0002096464 |
| Martha & Friends (TV) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Back to School | PA0001786400 |

45

Schedule 3(p) - Intellectual Property

| SERIES TITLE | CLAIMANT | ADDL CLAIMANT | Episode/Webisode Title | Reg. Number |
|---|---|---|---|---|
| Martha & Friends (TV) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha and the Christmas Tree | PA0001786405 |
| Martha & Friends (TV) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha and the Magnificent Egg | PA0001786404 |
| Martha & Friends (TV) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha's Fourth | PA0001786401 |
| Martha & Friends (TV) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha's Halloween | PA0001786402 |
| Martha & Friends (TV) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Thanksgiving | PA0001786406 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Cool Craft Armoire | PA0001787819 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Cupcake Calendar | PA0001787149 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Dinner Table Dilemma | PA0001787824 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Eggstravaganza | PA0001787830 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Fab Felt Holiday | PA0001787823 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Family Game Night | PA0001787821 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Francesca and Sharkey's Party | PA0001787808 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha and the Allergic Kids | PA0001787829 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha and the Fashion Statement | PA0001787815 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha and the New Old Jeans | PA0001786404 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha and the Pumpkin Shortage | PA0001787155 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Martha's Kitchen Science | PA0001787812 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Rockin' Regatta | PA0001787811 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Scrappy Birthday | PA0001787809 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Sew What? | PA0001787810 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Spa Sleepover | PA0001787826 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Sweet Charity Craft Sale | PA0001787818 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Thanksgiving Trivia | PA0001787152 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | The Puppet Show | PA0001787827 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | To Snow Days | PA0001787825 |
| Martha & Friends (web) | A Squared Elxsi Entertainment LLC | Xing Xing Digital | Valentine's Day | PA0001787822 |
| Rainbow Rangers | Genius Brands International, Inc. | NA | Meet the Team | TX0008823916 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Go with the Rainbow Floe; Northern Lights | PA0002185039 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Tree Hugger; Turtle in a Net | PA0002185055 |

46

Schedule 3(p) - Intellectual Property

| SERIES TITLE | CLAIMANT | ADDL CLAIMANT | Episode/Webisode Title | Reg. Number |
|---|---|---|---|---|
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | When Beetles Bark; Pollution Island | PA0002185043 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Monarch Migration; That Sinking Feeling | PA0002185072 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Rabbit Roundup; Uninvited Guest | PA0002185049 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Sludge Stream/Lost Island | PA0002185074 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Duck Duck Oops; Lost Island | PA0002175931 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Divided We Fall; White-Nosed Bats | PA0002185077 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Land Ho; The Strongest Spider | PA0002185064 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Flash Flood; Steer Me in the Right Direction | PA0002185061 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Rangers Raise a Condor; Pony Party | PA0002185071 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Case of the Missing Class Pet; Bee Safe | PA0002185079 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Chimp in Kaleidoscopia; Pigeon Problems | PA0002185054 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Henpecked; Rangers in Space | PA0002185047 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | Rockin' Rainbow Colors | TX0008823940 |
| Rainbow Rangers | Genius Brands International, Inc. | Telegael Teoranta | To the Rescue | TX0008823934 |
| Rainbow Rangers | Genius Brands International, Inc. | NA | The Quest for the Confetti Crystal | TX0008838107 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | A Gift Shop Too Far | PA0001981655 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Big Things Come in Micro Packages | PA0001981687 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Camp Bigfoot | PA0001981684 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Down and Out in Beijing | PA0001981651 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Far Out Future | PA0001981675 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | For Pete's Pets Sake | PA0001981686 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Get a Clue, Dude | PA0001981670 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Goooooooooaaaaall | PA0001981669 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Just Say Snow | PA0001981664 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Listen to the Music | PA0001981653 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Nebraska Yankee in King Arthur's Court Pt 1 | PA0001981658 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Nebraska Yankee in King Arthur's Court Pt 2 | PA0001981662 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Nebraska Yankee in King Arthur's Court Pt 3 | PA0001981663 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Paranormally We Don't Do Things Like This | PA0001981654 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Sing Between the Lines | PA0001981673 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Avast Ye Downloads! | PA0001819480 |

47

Schedule 3(p) - Intellectual Property

| SERIES TITLE | CLAIMANT | ADDL CLAIMANT | Episode/Webisode Title | Reg. Number |
|---|---|---|---|---|
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Sweeeeet! | PA0001981660 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Fashion Bot Fiasco | PA0001981671 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | The Final Financial Frontier | PA0001981656 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | The Gift | PA0001981674 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | To Herring is Human | PA0001981665 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Be Cool to Your School | PA0001799030 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Cost of Giving | PA0001799032 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Elena's Shaqtastic Adventure | PA0001799030 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | When Pigs Fly | PA0001799035 |
| Secret Millionaires Club (TV) | Genius Brands International, Inc. | Xing Xing Digital | Neither a Borrower Nor a Lender Be Dude | PA0001799280 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Lemons to Lemonade | PA0001712094 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Car Wash Caper | PA0001712089 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Walking the Dog | PA0001712091 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Lawn & Order | PA0001712090 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | What's So Funny? | PA0001712093 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | House of Cards | PA0001712088 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Debt of a Salesman | PA0001712082 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | The Big Trade-Off | PA0001712076 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | The Trouble with Credit Cards | PA0001712077 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Gotta Dance! | PA0001712083 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | It Takes Two | PA0001712085 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Special Delivery | PA0001712084 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Learn, Baby, Learn | PA0001712087 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Sorry I Can't Hair You | PA0001712080 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | The High Cost of High Demand | PA0001712079 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Why Pay More? | PA0001712078 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Tough Cookies | PA0001712081 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | All Fall Up! | PA0001712086 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Are You Experienced? | PA0001716508 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Don't Just Say No | PA0001716510 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Design for Success | PA0001716511 |

Schedule 3(p) - Intellectual Property

| SERIES TITLE | CLAIMANT | ADDL CLAIMANT | Episode/Webisode Title | Reg. Number |
|---|---|---|---|---|
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Too Good to be True | PA0001716513 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | The Domino Effect | PA0001716516 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Mental for Rental | PA0001717906 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | The Real Skinny | PA0001717905 |
| Secret Millionaires Club (web) | A Squared Entertainment LLC | Xing Xing Digital | Cancel My Reputation | PA0001717903 |
| Secret Millionairs Club (book) | A Squared Entertainment LLC | Xing Xing Digital | Warren Buffett's 26 Secrets to Success | TX0007780685 |
| SpacePOP | Genius Brands International, Inc. | Telegael Teoranta | Not Your Average Princesses | TX0008336651 |
| SpacePOP | Genius Brands International, Inc. | Telegael Teoranta | Princess Power | PA0002066614 |
| SpacePOP | Genius Brands International, Inc. | Telegael Teoranta | SpacePOP Takes Off | PA0002066616 |
| SpacePOP | Genius Brands International, Inc. | | Rocking the Resistance | TX0008521101 |
| Stan Lee and the Mighty Seven | Stan Lee Comics LLC | NA | Movie | PAu003649043 |
| Stan Lee's Superhero Kindergarten | Genius Brands International, Inc. | NA | Trailer | PAu004001429 |

Trademarks
Registered and Pending

| | |
|---|---|
| United States (USPTO) | A SQUARED ENTERTAINMENT |
| United States (USPTO) | A SQUARED |
| United States (USPTO) | BABY GENIUS |
| United States (USPTO) | BABY GENIUS |
| United States (USPTO) | BABY GENIUS |
| United States (USPTO) | BABY GENIUS |
| United States (USPTO) | KAFLOOEY |
| United States (USPTO) | KID GENIUS |
| United States (USPTO) | KID GENIUS |
| United States (USPTO) | RAINBOW RANGERS |
| United States (USPTO) | RAINBOW RANGERS |
| Australia (IPA) | RAINBOW RANGERS |
| Canada (CIPO) | RAINBOW RANGERS |
| European Union (EUIPO) | RAINBOW RANGERS |
| United Kingdom (UKIPO) | RAINBOW RANGERS |
| Mexico (IMPI) | RAINBOW RANGERS |
| China (CNIPA) | RAINBOW RANGERS |
| New Zealand (IPONZ) | RAINBOW RANGERS |
| China (CNIPA) | RAINBOW RANGERS (Chinese Char) |
| China (CNIPA) | RAINBOW RANGERS (logo) |
| United States (USPTO) | SECRET MILLIONAIRES CLUB |
| United States (USPTO) | SPACE POP |
| United States (USPTO) | SPACE POP |
| United States (USPTO) | THOMAS EDISON'S SECRET LAB |
| United States (USPTO) | THOMAS EDISON'S SECRET LAB |

49

Schedule 3(s)– Internal Accounting Controls
None

50

Schedule 3(s)(ii) Disclosure Controls
None

51

Schedule 3(z) – Employee Relations
None

52

Schedule 3(aa) – Transactions With Affiliates

On August 31, 2018, Llama Productions LLC entered into an animation production services agreement with Mr. Heyward for services as a producer for which he is to receive $124,000 through the course of production of the Company's animated series *Llama Llama Season 2.* As of September 30, 2019, Mr. Heyward was paid $124,000.

Pursuant to his employment agreement dated November 16, 2018, Mr. Heyward is entitled to an Executive Producer fee of $12,400 per half hour episode for each episode he provides services as an executive producer. The first identified series under this employment agreement is *Rainbow Rangers.* As of September 30, 2019, twenty-six half hours had been delivered and, accordingly, Mr. Heyward is owed $322,400.

Pursuant to his employment agreement dated November 16, 2018, Mr. Heyward is entitled to an Executive Producer fee of $12,400 per half hour episode for each episode he provides services as an executive producer. The second identified series under this employment agreement is the twenty-six half hour episodes of *Rainbow Rangers: Season 2.* During the six months ended December 31, 2019, 13 episodes had been delivered and accordingly Mr. Heyward is owed $161,200.

On September 17, 2019, Mr. Heyward purchased $500,000 of the Secured Convertible Notes from another holder. The Company did not receive any proceeds from this transaction.

As of December 31, 2019, Andy Heyward is owed $99,208 for reimbursable expenses.

On October 2, 2019, the Company and Mr. Heyward entered into a stock purchase agreement (the "Stock Purchase Agreement") pursuant to which Mr. Heyward agreed to purchase 1,000,000 shares of Common Stock, in a private placement for an aggregate purchase price of $760,000, or $0.76 per share (the "Private Placement"). The Private Placement closed on October 3, 2019.

53

Schedule 3(ee) – Brokerage Fees; Commissions

The Special Equities Group, LLC, a division of Bradley Woods & Co. Ltd., are acting as the placement agent and will receive 10% of the net proceeds in cash, and warrants to purchase common stock equaling 10% of the total warrants issued in conjunction with this offering.

Schedule 3(ss) – Indebtedness and Other Contracts

**SENIOR CONVERTIBLE NOTES**

We are obligated under our Secured Convertible Notes, which collectively had an outstanding unamortized book balance of approximately $2,866,666 as of February 6, 2020. The Secured Convertible Notes accrue interest of 10% per annum. The Secured Convertible Notes, including interest accrued thereon, are convertible at any time until a Secured Convertible Note is no longer outstanding, in whole or in part, at the option of the holders into shares of our Common Stock at a conversion price of $1.515 per share. We are obligated to make periodic payments on such debt obligations to each noteholder. In addition, we have granted a security interest to the noteholders in all of our tangible and intangible personal property to secure our obligations under the Secured Convertible Notes.

The Secured Convertible Notes matured on August 20, 2019. We failed to meet certain conditions under the terms of the Secured Convertible Notes and are obligated to repay in cash the then outstanding principal amount of the Secured Convertible Notes in full by the six-month anniversary of the date of maturity. On August 20, 2019, pursuant to the Secured Convertible Notes, the Company elected to make six equal monthly principal payments of $750,000.

On September 17, 2019, the Company's Chief Executive Officer, Andy Heyward, purchased $500,000 of the Secured Convertible Notes from another holder. The Company did not receive any proceeds from this transaction.

On September 20, 2019, the Company and the holders of $1,958,334 of the Secured Convertible Notes, extended the maturity date of those Secured Convertible Notes until January 31, 2020. The Company also agreed to pay the 10% interest to the holders monthly instead of quarterly.

On September 20, 2019, the Company and the holders of $687,500 of the Secured Convertible Notes, extended the maturity date of those Secured Convertible Notes until August 20, 2021. The Company also agreed to pay the 10% interest to the holders monthly instead of quarterly.

The remaining balance of $883,332 under the Secured Convertible Notes not extended were partially repaid, including interest, in three monthly installments of $220,883, with the last payment currently due.

**Production Facility**

On September 28, 2018, Llama Productions LLC, a California limited liability company ("Llama") and a wholly-owned subsidiary of the Company, entered into a Loan and Security Agreement (the "Loan and Security Agreement") with Bank Leumi USA (the "Lender"), pursuant to which the Lender agreed to make a secured loan in an aggregate amount not to exceed $4,231,989 to Llama (the "Loan"). The proceeds of the Loan will be used to pay the majority of the expenses of producing, completing and delivering two 22-minute episodes and sixteen 11- minute episodes of the second season of the animated series *Llama Llama* to be initially exhibited on Netflix.

To secure payment of the Loan, Llama has granted to the Lender a continuing security interest in and against, generally, all of its tangible and intangible assets, which includes all seasons of the *Llama Llama* animated series.

As of February 6, 2020, the Company had gross outstanding borrowing under the facility of $3,182,985 against which financing costs of $132,569 were applied resulting in net borrowings of $3,050,416.

Schedule 3(zz) – Ranking of Notes

The current Senior Convertible Note Holders have a first position lien on all assets of the of the company and a second position lien on the assets of Llama Llama Productions until the bank is repaid. Once the bank is repaid the lien shifts to first position.

City National Bank as lender under the Production Facility Loan Agreement has a first priority lien on all of the assets of Llama Llama Productions LLC until such time the loan is repaid in full.

56

Schedule 4(c) – Use of Proceeds

| | | March Closing | | September Closing |
|---|---|---:|---|---:|
| Total Deal | $ | 11,000,000 | $ | – |
| Note Receivable amount from Investors | | 4,000,000 | | – |
| Net Cash Available | | 7,000,000 | | 4,000,000 |
| SEG Fees at 10% | | 700,000 | | 400,000 |
| Legal Fees | | 150,000 | | – |
| Senior Convertible Notes Principal | | 2,866,665 | | – |
| Senior Convertible Notes Interest | | 47,124 | | – |
| Outstanding Legal Fees | | 350,000 | | – |
| Advance from Andy Heyward | | 350,000 | | – |
| Net Working Capital available | $ | 2,536,211 | $ | 3,600,000 |

Schedule 4(q) – Principal Stockholders

| Name | Number of Shares Held |
| --- | --- |
| Andy Heyward | 2,369,199 |
| Silverado Holdings LDC | 1,590,476 |
| Leister Capital Limited | 1,585,714 |
| Hana Resources (BAHAMAS) LTD | 1,585,714 |
| Mike Maliani/HBA Entertainment Trade Co. Limited | 1,414,030 |
| A Squared Holdings LLC | 990,728 |

58

Schedule 7(xv) – Parties to Lock-Up Agreements
Andy Heyward 2,369,199
A Squared Holdings LLC 990,728

59

Exhibit 10.2

**PLEDGE AND SECURITY AGREEMENT**

        **PLEDGE AND SECURITY AGREEMENT**, dated as of March __, 2020 (this "**Agreement**"), made by **Genius Brands International, Inc.**, a Nevada corporation (the "**Company**"), and each other Subsidiary of the Company hereafter becoming party hereto (together with the Company, each a "**Grantor**" and, collectively, the "**Grantors**"), in favor of Anson Investments Master Fund LP, in its capacity as collateral agent (in such capacity, the "**Collateral Agent**") for the Buyers (as defined below) party to the Securities Purchase Agreement, dated as of March 11, 2020 (as amended, restated or otherwise modified from time to time, the "**Securities Purchase Agreement**").

**W I T N E S S E T H:**

        WHEREAS, the Company and each party listed as a "Buyer" on the Schedule of Buyers (as such schedule may be amended, restated or otherwise modified from time to time) attached thereto, each a "**Buyer**", and collectively, the "**Buyers**") are parties to the Securities Purchase Agreement, pursuant to which the Company shall be required to sell, and the Buyers shall purchase or have the right to purchase, the "**Notes**" (as defined in the Securities Purchase Agreement);

        WHEREAS, it is a condition precedent to the Buyers consummating the transactions contemplated by the Securities Purchase Agreement that the Grantors execute and deliver to the Collateral Agent this Agreement providing for the grant to the Collateral Agent for the benefit of the Buyers of a security interest in all personal property of the Grantors to secure all of the Company's obligations under the Securities Purchase Agreement and the "Notes" (as defined therein) issued pursuant thereto (as such Notes may be amended, restated, replaced or otherwise modified from time to time in accordance with the terms thereof, collectively, the "**Notes**") and the other Transaction Documents (as defined in the Securities Purchase Agreement);

        WHEREAS, the Grantors (i) are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with the credit needed from time to time by one often being provided through financing obtained by the other Grantors and the ability to obtain such financing being dependent on the successful operations of the Grantors and (ii) will receive a mutual benefit from the proceeds received by the Company in respect of the issuance of the Notes; and

        WHEREAS, each Grantor has determined that the execution, delivery and performance of this Agreement directly benefits, and are in the best interest of the Company and such Grantor.

        NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Buyers to perform under the Securities Purchase Agreement, each Grantor agrees with the Collateral Agent, for the benefit of the Buyers, as follows:

        SECTION 1. <u>Definitions</u>.

Reference is hereby made to the Securities Purchase Agreement and the Notes for a statement of the terms thereof. All terms used in this Agreement and the recitals hereto which are defined in the Securities Purchase Agreement, the Notes or in Articles 8 or 9 of the Uniform Commercial Code (the "**Code**") as in effect from time to time in the State of New York, and which are not otherwise defined herein shall have the same meanings herein as set forth therein; <u>provided</u> that terms used herein which are defined in the Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

1

The following terms shall have the respective meanings provided for in the Code: "Accounts", "Account Debtor", "Cash Proceeds", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Security", "Record", "Security Account", "Software", and "Supporting Obligations".

As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"**Collateral**" shall have the meaning set forth in Section 2 hereof.

"**Copyright Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any rights with respect to any copyright (including, without limitation, all Copyright Licenses set forth in Schedule II hereto).

"**Copyrights**" means all domestic and foreign copyrights, whether registered or not, including, without limitation, all copyright rights throughout the universe (whether now or hereafter arising) in any and all media (whether now or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression (including computer software and internet website content), and all other general intangibles of like nature, now or hereafter owned, acquired, licensed, used or held for use by any Grantor (including, without limitation, all copyrights described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all renewals thereof.

"**Event of Default**" means (i) any defined event of default under any one or more of the Transaction Documents, in each instance, after giving effect to any notice, grace, or cure periods provided for in the applicable Transaction Document, (ii) the failure by the Company to pay any amounts when due under the Notes or any other Transaction Document, or (iii) the breach of any representation, warranty or covenant by any Grantor under this Agreement.

"**Existing Issuer**" has the meaning specified therefor in the definition of the term "Pledged Shares".

"**Guaranty**" means the Guarantee Agreement, dated as of the date hereof, by [ ] in favor of the Buyers and the Collateral Agent.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code (Chapter 11 of Title 11 of the United States Code) or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property**" means the Copyrights, Trademarks, Patents and Other Proprietary Rights.

"**Licenses**" means the Copyright Licenses, the Trademark Licenses, the Patent Licenses and all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any rights with respect to any Other Proprietary Rights.

"**Lien**" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

2

"**Obligations**" shall have the meaning set forth in <u>Section 3</u> hereof.

"**Other Proprietary Rights**" means all inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how and formulae, and all other intellectual or proprietary rights, in any jurisdiction through the world, of any Grantor, now or hereafter owned, acquired, licensed, used or held for use.

"**Patent Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to make, use, offer for sale, sell or import any invention covered by any Patent (including, without limitation, all Patent Licenses set forth in <u>Schedule II</u> hereto).

"**Patents**" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, and other general intangibles of like nature, of any Grantor, now or hereafter owned, acquired, licensed, used or held for use (including, without limitation, all domestic and foreign letters patent, design patents, utility patents and industrial designs described in <u>Schedule II</u> hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office, or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all reissues, divisionals, continuations, continuations in part, reexaminations, or extensions thereof.

"**Permitted Liens**" shall have the meaning set forth in the Notes.

"**Pledged Debt**" means the indebtedness described in Schedule VII hereto and all indebtedness from time to time owned or acquired by a Grantor, the Promissory Notes and other Instruments evidencing any or all of such indebtedness, and all interest, cash, Instruments, Investment Property, financial assets, securities, capital stock, other equity interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness.

"**Pledged Interests**" means, collectively, (a) the Pledged Debt, (b) the Pledged Shares and (c) all security entitlements in any and all of the foregoing.

"**Pledged Issuer**" has the meaning specified therefor in the definition of the term "Pledged Shares".

"**Pledged Shares**" means (a) the shares of capital stock or other equity interests described in Schedule VIII hereto, whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, issued by the Persons described in such Schedule VIII (the "<u>Existing Issuers</u>"), (b) the shares of capital stock or other equity interests at any time and from time to time acquired by a Grantor of any and all Persons now or hereafter existing (such Persons, together with the Existing Issuers, being hereinafter referred to collectively as the "**Pledged Issuers**" and each individually as a "**Pledged Issuer**"), whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, and (c) the certificates representing such shares of capital stock, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, Instruments, Investment Property, financial assets, securities, capital stock, other equity interests, stock options and commodity contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property (including, without limitation, any stock dividend and any distribution in connection with a stock split) from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such capital stock.

"**Trademark Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right with respect to any Trademark (including, without limitation, all Trademark Licenses described in <u>Schedule II</u> hereto).

3

"**Trademarks**" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired, licensed, used or held for use by any Grantor (including, without limitation, all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers described in Schedule II hereto), all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all renewals thereof, together with all goodwill of the business symbolized by any of the foregoing and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of the foregoing are used.

SECTION 2. Grant of Security Interest. As collateral security for the payment, performance and observance of all of the Obligations, each Grantor hereby pledges and assigns to the Collateral Agent (and its agents and designees) for the benefit of the Buyers, and grants to the Collateral Agent (and its agents and designees) for the benefit of the Buyers a continuing security interest in, all personal property of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as the "**Collateral**"):

all Accounts;

all Chattel Paper (whether tangible or electronic);

the Commercial Tort Claims specified on Schedule VI hereto;

all Deposit Accounts (including, without limitation, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Collateral Agent or a Buyer or any affiliate, representative, agent or correspondent of the Collateral Agent or a Buyer;

all Documents;

all Equipment;

all Fixtures;

all General Intangibles (including, without limitation, all Payment Intangibles);

all Goods;

all Instruments (including, without limitation, Promissory Notes and each certificated Security);

all Inventory;

all Investment Property;

all Intellectual Property and all Licenses;

all Letter-of-Credit Rights;

all Supporting Obligations;

all Pledged Interests;

4

all other tangible and intangible personal property of such Grantor (whether or not subject to the Code), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 or are otherwise necessary or helpful in the collection or realization thereof; and

all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral;

in each case, howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise). Notwithstanding anything to the contrary herein, the security interest granted herein shall not attach to, and no security interest is granted hereunder in, (i) any Trademark application filed on an intent to use basis until such time as an Amendment to Allege Use or Statement of Use, as applicable, if filed and accepted by the United States Patent and Trademark Office, solely if and to the extent the grant of a security interest in such application would result in the voiding or abandonment, or impair the validity or enforceability, of such application or any registration that issues therefrom, or (ii) any of the foregoing where the granting of a security interest thereon is prohibited by applicable law (so long as (x) such prohibition was not put in place with the intention of excluding such property from Collateral, and (y) that immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, all such right, title and interest as if such provision had never been in effect).

Notwithstanding anything herein to the contrary, in no event shall the Collateral include, and the Company shall be deemed not to have granted a security interest in, any of the Company's right, title and interest in the issued and outstanding equity interests of Llama Productions LLC.

SECTION 3.  Security for Obligations. The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (collectively, the "**Obligations**"):

the prompt payment by each Grantor, as and when due and payable (by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all amounts from time to time owing by it in respect of the Securities Purchase Agreement, the Notes, the Guaranty and the other Transaction Documents, including, without limitation, (A) all principal of and interest on the Notes (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Grantor, whether or not the payment of such interest is unenforceable or is not allowable due to the existence of such Insolvency Proceeding), (B) all amounts from time to time owing by such Grantor under the Guaranty, and (C) all fees, commissions, expense reimbursements, indemnifications and all other amounts due or to become due under any of the Transaction Documents; and

the due performance and observance by each Grantor of all of its other obligations from time to time existing in respect of any of the Transaction Documents for so long as the Notes are outstanding.

SECTION 4.  Representations and Warranties. Each Grantor represents and warrants as follows:

Schedule I hereto sets forth (i) the exact legal name of such Grantor, and (ii) the organizational identification number of such Grantor or states that no such organizational identification number exists.

There is no pending or written notice threatening any action, suit, proceeding or claim affecting such Grantor before any governmental authority or any arbitrator, or any order, judgment or award by any governmental authority or arbitrator, that may adversely affect the grant by such Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral, or the exercise by the Collateral Agent of any of its rights or remedies hereunder.

5

All Federal, state and local tax returns and other reports required by applicable law to be filed by such Grantor have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon such Grantor or any property of such Grantor (including, without limitation, all federal income and social security taxes on employees' wages) and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with United States generally accepted accounting principles consistently applied ("**GAAP**").

All Equipment, Fixtures, Goods and Inventory of such Grantor now existing are, and all Equipment, Fixtures, Goods and Inventory of such Grantor hereafter existing will be, located and/or based at the addresses specified therefor in Schedule III hereto, except that such Grantor will give the Collateral Agent not less than 30 days' prior written notice of any change of the location of any such Collateral, other than to locations set forth on Schedule III and with respect to which the Collateral Agent has filed financing statements and otherwise fully perfected its Liens thereon. Such Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule III hereto. None of the Accounts is evidenced by Promissory Notes or other Instruments. Set forth in Schedule IV hereto is a complete and accurate list, as of the date of this Agreement, of (i) each Promissory Note, Security and other Instrument owned by each Grantor and (ii) each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Account and a description of the purpose of each such Account. Set forth in Schedule II hereto is a complete and correct list of each trade name used by each Grantor and the name of, and each trade name used by, each person from which such Grantor has acquired any substantial part of the Collateral.

Such Grantor has delivered or made available to the Collateral Agent complete and correct copies of each License described in Schedule II hereto, including all schedules and exhibits thereto, which represents all of the Licenses existing on the date of this Agreement. Each such License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of such Grantor or any of its affiliates in respect thereof. Each material License now existing is, and any material License entered into in the future will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, suretyship or other similar laws and equitable principles (regardless of whether enforcement is sought in equity or in law). No default under any material License by any such party has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of any such party.

Such Grantor owns and controls, or possesses a valid and enforceable right to use, all Intellectual Property, and such Intellectual Property constitutes all trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity, and other intellectual property or proprietary rights necessary to conduct its business in substantially the same manner as conducted as of the date hereof. Schedule II hereto sets forth a true and complete list of all (i) registered Copyrights, issued Patents, Trademarks (including, without limitation, any Internet domain names and the registrar and expiry date of each such Internet domain name), and all applications for any of the foregoing, owned, used or held for use by such Grantor as of the date hereof and (ii) Licenses. To the knowledge of each Grantor, all such Intellectual Property of such Grantor is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part. Except as set forth in Schedule II, no such Intellectual Property is the subject of any licensing or franchising agreement. To the knowledge of such Grantor, such Grantor is not now infringing, misappropriating or otherwise in conflict with any trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity, or other intellectual property or proprietary rights of others in any material respect, and to the knowledge of such Grantor, no other Person is now infringing, misappropriating or otherwise in conflict with, in any material respect, any Intellectual Property. Such Grantor has not received any notice that it is infringing, misappropriating or otherwise conflicting with the trademarks, patents, copyrights, inventions, trade secrets, proprietary information and technology, know-how, formulae, rights of publicity or other intellectual property or proprietary rights of any other Person.

6

Such Grantor is and will be at all times the sole and exclusive owner of, or otherwise has and will have adequate rights in, the Collateral free and clear of any Liens, except for Permitted Liens. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except (A) such as may have been filed in favor of the Collateral Agent relating to this Agreement, and (B) such as may have been filed to perfect any Permitted Liens.

The exercise by the Collateral Agent of any of its rights and remedies hereunder will not contravene any law or any contractual restriction binding on or otherwise affecting such Grantor or any of its properties and will not result in or require the creation of any Lien, upon or with respect to any of its properties.

No authorization or approval or other action by, and no notice to or filing with, any governmental authority or other regulatory body, or any other Person, is required for (i) the grant by such Grantor, or the perfection, of the security interest purported to be created hereby in the Collateral, or (ii) the exercise by the Collateral Agent of any of its rights and remedies hereunder, except (A) for the filing under the Uniform Commercial Code as in effect in the applicable jurisdiction of the financing statements, all of which financing statements, have been duly filed and are in full force and effect, (B) with respect to the perfection of the security interest created hereby in the Intellectual Property, for the recording of the appropriate Intellectual Property Security Agreement, substantially in the form of Exhibit A hereto, as applicable, in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, and (C) with respect to the perfection of the security interest created hereby in foreign Intellectual Property, for registrations and filings in jurisdictions located outside of the United States and covering rights in such jurisdictions relating to the Intellectual Property and Licenses.

This Agreement creates in favor of the Collateral Agent a legal, valid and enforceable security interest in the Collateral, as security for the Obligations. The Collateral Agent's having possession of all Instruments and cash constituting Collateral from time to time, the recording of the appropriate Intellectual Property Security Agreement executed pursuant hereto in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, and the filing of the financing statements and the other filings and recordings, as applicable, described in Schedule V hereto and, with respect to the Intellectual Property hereafter existing or acquired, and not covered by an appropriate Intellectual Property Security Agreement, the recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, of appropriate security agreements, result in the perfection of such security interests. Such security interests are, or in the case of Collateral in which such Grantor obtains rights after the date hereof, will be, perfected, first priority security interests, subject only to Permitted Liens and the recording of such instruments of assignment. Such recordings and filings and all other action necessary or desirable to perfect and protect such security interest have been duly taken, except for the Collateral Agent's having possession of Instruments and cash constituting Collateral after the date hereof and the other filings and recordations described in Section 4(l) hereof.

As of the date hereof, such Grantor does not hold any Commercial Tort Claims nor is such Grantor aware of any such pending claims, except for such claims described in Schedule VI.

Each of the Grantors (other than the Company) is a wholly-owned Subsidiary of the Company and are the only Subsidiaries of the Company, as of the date hereof.

7

SECTION 5. <u>Covenants as to the Collateral</u>. So long as any of the Obligations shall remain outstanding, unless the Collateral Agent shall otherwise consent in writing:

<u>Further Assurances</u>. Each Grantor will at its expense, at any time and from time to time, promptly execute and deliver all further instruments and documents and take all further action that the Collateral Agent may reasonably request in order to: (i) perfect and protect the security interest purported to be created hereby; (ii) enable the Collateral Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise effect the purposes of this Agreement, including, without limitation: (A) marking conspicuously all Chattel Paper and each License and, at the request of the Collateral Agent, each of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Collateral Agent, indicating that such Chattel Paper, License or Collateral is subject to the security interest created hereby, (B) delivering and pledging to the Collateral Agent hereunder each Promissory Note, Security, Chattel Paper or other Instrument, now or hereafter owned by such Grantor, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Collateral Agent, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, as may be necessary or desirable or that the Collateral Agent may request in order to perfect and preserve the security interest purported to be created hereby, (D) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral in each case as the Collateral Agent may reasonably request, all in reasonable detail, (E) if any Collateral shall be in the possession of a third party, notifying such Person of the Collateral Agent's security interest created hereby and obtaining a written acknowledgment from such Person that such Person holds possession of the Collateral for the benefit of the Collateral Agent, which such written acknowledgement shall be in form and substance satisfactory to the Collateral Agent, (F) if at any time after the date hereof, such Grantor acquires or holds any Commercial Tort Claim, promptly notifying the Collateral Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Collateral Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance satisfactory to the Collateral Agent, (G) upon the acquisition after the date hereof by such Grantor of any motor vehicle or other Equipment subject to a certificate of title or ownership (other than a Motor Vehicle or Equipment that is subject to a purchase money security interest), causing the Collateral Agent to be listed as the lienholder on such certificate of title or ownership and delivering evidence of the same to the Collateral Agent in accordance with the Securities Purchase Agreement; and (H) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable, in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.

<u>Location of Equipment and Inventory</u>. Each Grantor will keep the Equipment and Inventory at the locations specified therefor in <u>Section 4(d)</u> hereof or, upon not less than thirty (30) days' prior written notice to the Collateral Agent accompanied by a new <u>Schedule III</u> hereto indicating each new location of the Equipment and Inventory, at such other locations in the United States.

<u>Condition of Equipment</u>. Each Grantor will maintain or cause the Equipment (necessary or useful to its business) to be maintained and preserved in good condition, repair and working order, ordinary wear and tear excepted, and will forthwith, or in the case of any loss or damage to any material Equipment of such Grantor within a commercially reasonable time after the occurrence thereof, make or cause to be made all repairs, replacements and other improvements in connection therewith which are necessary or desirable, consistent with past practice, or which the Collateral Agent may reasonably request to such end. Such Grantor will promptly furnish to the Collateral Agent a statement describing in reasonable detail any such loss or damage to any such Equipment.

<u>Taxes, Etc.</u> Each Grantor agrees to pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Equipment and Inventory, except to the extent the validity thereof is being contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves in accordance with GAAP have been set aside for the payment thereof.

8

Insurance.

(i) Each Grantor will, at its own expense, maintain insurance (including, without limitation, commercial general liability and property insurance) with respect to the Equipment and Inventory in such amounts, against such risks, in such form and with responsible and reputable insurance companies or associations as is required by any governmental authority having jurisdiction with respect thereto or as is carried by such Grantor as of the date hereof and in any event, in amount, adequacy and scope reasonably satisfactory to the Collateral Agent. Unless otherwise agreed to by the Collateral Agent, each such policy for liability insurance shall provide for all losses to be paid on behalf of the Collateral Agent and such Grantor as their respective interests may appear, and each policy for property damage insurance shall provide for all losses to be adjusted with, and paid directly to, the Collateral Agent. Unless otherwise agreed to by the Collateral Agent, each such policy shall in addition (A) name the Collateral Agent as an additional insured party thereunder (without any representation or warranty by or obligation upon the Collateral Agent) as their interests may appear, (B) contain an agreement by the insurer that any loss thereunder shall be payable to the Collateral Agent on its own account notwithstanding any action, inaction or breach of representation or warranty by such Grantor, (C) provide that there shall be no recourse against the Collateral Agent for payment of premiums or other amounts with respect thereto, and (D) provide that at least 30 days' prior written notice of cancellation, lapse, expiration or other adverse change shall be given to the Collateral Agent by the insurer. Such Grantor will, if so requested by the Collateral Agent, deliver to the Collateral Agent original or duplicate policies of such insurance and, as often as the Collateral Agent may reasonably request, a report of a reputable insurance broker with respect to such insurance. Such Grantor will also, at the request of the Collateral Agent, execute and deliver instruments of assignment of such insurance policies and cause the respective insurers to acknowledge notice of such assignment.

(ii) Reimbursement under any liability insurance maintained by a Grantor pursuant to this Section 5(e) may be paid directly to the Person who shall have incurred liability covered by such insurance. In the case of any loss involving damage to Equipment or Inventory, any proceeds of insurance maintained by a Grantor pursuant to this Section 5(e) shall be paid to the Collateral Agent (except as to which paragraph (iii) of this Section 5(e) is not applicable), such Grantor will make or cause to be made the necessary repairs to or replacements of such Equipment or Inventory, and any proceeds of insurance maintained by such Grantor pursuant to this Section 5(e) shall be paid by the Collateral Agent to such Grantor as reimbursement for the costs of such repairs or replacements.

(iii) All insurance payments in respect of such Equipment or Inventory shall be paid to the Collateral Agent and applied as specified in Section 7(b) hereof.

Provisions Concerning the Accounts and the Licenses.

(iv) Each Grantor will (A) give the Collateral Agent at least 30 days' prior written notice of any change in such Grantor's name, identity or organizational structure, (B) maintain its jurisdiction of incorporation as set forth in Section 4(a) hereto, (C) immediately notify the Collateral Agent upon obtaining an organizational identification number, if on the date hereof such Grantor did not have such identification number, and (D) keep adequate records concerning the Accounts and Chattel Paper and permit representatives of the Collateral Agent during normal business hours on reasonable notice to such Grantor, to inspect and make abstracts from such Records and Chattel Paper.

(v) Each Grantor will, except as otherwise provided in this subsection (f), continue to collect, at its own expense, all amounts due or to become due under the Accounts. In connection with such collections, such Grantor may (and, at the Collateral Agent's direction, will) take such action as such Grantor or the Collateral Agent may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that the Collateral Agent shall have the right at any time, upon the occurrence and during the continuance of an Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Collateral Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by law, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. After receipt by a Grantor of a notice from the Collateral Agent that the Collateral Agent has notified, intends to notify, or has enforced or intends to enforce a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Collateral Agent in the same form as so received (with any necessary endorsement) to be held as cash collateral and applied as specified in Section 7(b) hereof, and (B) such Grantor will not adjust, settle or compromise the amount or payment of any Account or release wholly or partly any Account Debtors or obligor thereof or allow any credit or discount thereon. In addition, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent may (in its sole and absolute discretion) direct any or all of the banks and financial institutions with which such Grantor either maintains a Deposit Account or a lockbox or deposits the proceeds of any Accounts to send immediately to the Collateral Agent by wire transfer (to such account as the Collateral Agent shall specify, or in such other manner as the Collateral Agent shall direct) all or a portion of such securities, cash, investments and other items held by such institution. Any such securities, cash, investments and other items so received by the Collateral Agent shall (in the sole and absolute discretion of the Collateral Agent) be held as additional Collateral for the Obligations or distributed in accordance with Section 7 hereof.

9

(vi) Upon the occurrence and during the continuance of any breach or default under any material License referred to in Schedule II hereto by any party thereto other than a Grantor, the Grantor party thereto will, promptly after obtaining knowledge thereof, give the Collateral Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto and thereafter will take reasonable steps to protect and preserve its rights and remedies in respect of such breach or default, or will obtain or acquire an appropriate substitute License.

(vii) Each Grantor will, at its expense, promptly deliver to the Collateral Agent a copy of each notice or other communication received by it by which any other party to any material License referred to in Schedule II hereto purports to exercise any of its rights or affect any of its obligations thereunder, together with a copy of any reply by such Grantor thereto.

(viii) Each Grantor will exercise promptly and diligently each and every right which it may have under each material License (other than any right of termination) and will duly perform and observe in all respects all of its obligations under each material License and will take all action reasonably necessary to maintain such Licenses in full force and effect. No Grantor will, without the prior written consent of the Collateral Agent, cancel, terminate, amend or otherwise modify in any respect, or waive any provision of, any material License referred to in Schedule II hereto.

Transfers and Other Liens.

(ix) No Grantor will sell, assign (by operation of law or otherwise), lease, license, exchange or otherwise transfer or dispose of any of the Collateral, except (A) Inventory in the ordinary course of business and (B) worn-out or obsolete assets not necessary to the business.

(x) No Grantor will create, suffer to exist or grant any Lien upon or with respect to any Collateral other than a Permitted Lien.

Intellectual Property.

(xi) If applicable, each Grantor shall, upon the Collateral Agent's written request, duly execute and deliver the applicable Intellectual Property Security Agreement in the form attached hereto as Exhibit A. Each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action necessary to maintain all of the Intellectual Property in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force and free from any claim of abandonment for non-use, and such Grantor will not (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Intellectual Property may become invalidated. Each Grantor will (A) cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property, including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees in the ordinary course of business and (B) take commercially reasonable steps to protect, maintain and enforce all other Intellectual Property. If any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, such Grantor shall (x) upon learning of such infringement, misappropriation, dilution or other violation, promptly notify the Collateral Agent and (y) to the extent such Grantor shall deem appropriate under the circumstances, in the exercise of its reasonable judgment, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as such Grantor shall deem appropriate under the circumstances, in the exercise of its reasonable judgment, to maintain, enforce and protect such Intellectual Property. Each Grantor shall furnish to the Collateral Agent from time to time upon its request statements and schedules further identifying and describing the Intellectual Property and Licenses and such other reports in connection with the Intellectual Property and Licenses as the Collateral Agent may reasonably request, all in reasonable detail and promptly upon request of the Collateral Agent, following receipt by the Collateral Agent of any such statements, schedules or reports, such Grantor shall modify this Agreement by amending Schedule II hereto, as the case may be, to include any Intellectual Property and License, as the case may be, which becomes part of the Collateral under this Agreement and shall execute and authenticate such documents, including, without limitation, the applicable Intellectual Property Security Agreements, and do such acts as shall be necessary or, in the judgment of the Collateral Agent, desirable to subject such Intellectual Property and Licenses to the Lien and security interest created by this Agreement. Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, such Grantor may not abandon or otherwise permit any Intellectual Property to become invalid without the prior written consent of the Collateral Agent, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated by a third party, such Grantor will take such action as the Collateral Agent shall deem appropriate under the circumstances to maintain, enforce and protect such Intellectual Property.

10

(xii) In no event shall a Grantor, either itself or through any agent, employee, licensee or designee, file an application for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof unless it gives the Collateral Agent prior written notice thereof. In the event that, after the date hereof, a Grantor acquires any registration, or application for the registration, of any Trademark or Copyright, or any issued Patent, or application for any Patent, such Grantor shall provide the Collateral Agent written notice thereof with thirty (30) days of acquiring such Trademark, Copyright or Patent, as applicable. Upon request of the Collateral Agent, each Grantor shall execute, authenticate and deliver any and all assignments, agreements, instruments, documents and papers, including, without limitation, the applicable Intellectual Property Security Agreements, as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest hereunder in the foregoing Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby, and such Grantor hereby appoints the Collateral Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations).

(xiii) Upon the Collateral Agent's request, each Grantor shall cause each domain registrar where any of such Grantor's Internet domain names are registered, whether as of the date of this Agreement or at any time hereafter, to execute and deliver to the Collateral Agent a domain name control agreement, in form and substance reasonably satisfactory to the Collateral Agent, duly executed by such Grantor and such domain registrar, or enter into other arrangements in form and substance satisfactory to the Collateral Agent, pursuant to which such domain registrar shall irrevocably agree, inter alia, that it will comply at any time with the instructions originated by the Collateral Agent to such domain registrar directing substitution of the Collateral Agent or its designee as the registered owner of such Internet domain names, without further consent of such Grantor, which instructions the Collateral Agent will not give to such domain registrar in the absence of a continuing Event of Default.

Deposit, Commodities and Securities Accounts. Upon the Collateral Agent's request and unless otherwise agreed by Agent, each Grantor shall cause each bank and other financial institution with an account referred to in Schedule IV hereto to execute and deliver to the Collateral Agent a control agreement, in form and substance reasonably satisfactory to the Collateral Agent, duly executed by such Grantor and such bank or financial institution, or enter into other arrangements in form and substance satisfactory to the Collateral Agent, pursuant to which such institution shall irrevocably agree, inter alia, that (i) it will comply at any time with the instructions originated by the Collateral Agent to such bank or financial institution directing the disposition of cash, Commodity Contracts, securities, Investment Property and other items from time to time credited to such account, without further consent of such Grantor, which instructions the Collateral Agent will not give to such bank or other financial institution in the absence of a continuing Event of Default, (ii) all cash, Commodity Contracts, securities, Investment Property and other items of such Grantor deposited with such institution shall be subject to a perfected, first priority security interest in favor of the Collateral Agent, (iii) any right of set off, banker's Lien or other similar Lien, security interest or encumbrance shall be fully waived as against the Collateral Agent, and (iv) upon receipt of written notice from the Collateral Agent during the continuance of an Event of Default, such bank or financial institution shall immediately send to the Collateral Agent by wire transfer (to such account as the Collateral Agent shall specify, or in such other manner as the Collateral Agent shall direct) all such cash, the value of any Commodity Contracts, securities, Investment Property and other items held by it. Without the prior written consent of the Collateral Agent, such Grantor shall not make or maintain any Deposit Account, Commodity Account or Securities Account except for the accounts set forth in Schedule IV hereto. The provisions of this paragraph 5(i) shall not apply to (i) Deposit Accounts for which the Collateral Agent is the depositary and (ii) Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of a Grantor's salaried employees.

Motor Vehicles.

(xiv) Each Grantor shall deliver to the Collateral Agent originals of the certificates of title or ownership for all motor vehicles owned by it with the Collateral Agent listed as lienholder, for the benefit of the Buyers.

11

(xv) Each Grantor hereby appoints the Collateral Agent as its attorney-in-fact, effective the date hereof and terminating upon the termination of this Agreement, for the purpose of (A) executing on behalf of such Grantor title or ownership applications for filing with appropriate state agencies to enable motor vehicles now owned or hereafter acquired by such Grantor to be retitled and the Collateral Agent listed as lienholder thereof, (B) filing such applications with such state agencies, and (C) executing such other documents and instruments on behalf of, and taking such other action in the name of, such Grantor as the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof (including, without limitation, for the purpose of creating in favor of the Collateral Agent a perfected Lien on the motor vehicles and exercising the rights and remedies of the Collateral Agent hereunder). This appointment as attorney-in-fact is coupled with an interest and is irrevocable until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations).

(xvi) Any certificates of title or ownership delivered pursuant to the terms hereof shall be accompanied by odometer statements for each motor vehicle covered thereby.

(xvii) So long as no Event of Default shall have occurred and be continuing, upon the request of such Grantor, the Collateral Agent shall execute and deliver to such Grantor such instruments as such Grantor shall reasonably request to remove the notation of the Collateral Agent as lienholder on any certificate of title for any motor vehicle; provided, however, that any such instruments shall be delivered, and the release effective, only upon receipt by the Collateral Agent of a certificate from such Grantor stating that such motor vehicle is to be sold or has suffered a casualty loss (with title thereto passing to the casualty insurance company therefor in settlement of the claim for such loss) and the amount that such Grantor will receive as sale proceeds or insurance proceeds. Any proceeds of such sale or casualty loss shall be paid to the Collateral Agent hereunder immediately upon receipt, to be applied to the Obligations then outstanding.

Control. Each Grantor hereby agrees to take any or all action that may be necessary or desirable or that the Collateral Agent may request in order for the Collateral Agent to obtain control in accordance with Sections 9-105 – 9-107 of the Code with respect to the following Collateral: (i) Electronic Chattel Paper, (ii) Investment Property, (iii) Pledged Interests and (iv) Letter-of-Credit Rights.

Inspection and Reporting. Each Grantor shall permit the Collateral Agent, or any agent or representatives thereof or such professionals or other Persons as the Collateral Agent may designate, not more than once a year in the absence of an Event of Default, (i) to examine and make copies of and abstracts from such Grantor's records and books of account, (ii) to visit and inspect its properties, (iii) to verify materials, leases, Instruments, Accounts, Inventory and other assets of such Grantor from time to time, (iii) to conduct audits, physical counts, appraisals and/or valuations, examinations at the locations of such Grantor. Each Grantor shall also permit the Collateral Agent, or any agent or representatives thereof or such professionals or other Persons as the Collateral Agent may designate to discuss such Grantor's affairs, finances and accounts with any of its officers subject to the execution by the Collateral Agent or its designee(s) of a mutually agreeable confidentiality agreement.

Future Subsidiaries. If any Grantor shall hereafter create or acquire any Subsidiary, simultaneously with the creation of acquisition of such Subsidiary, such Grantor shall cause such Subsidiary to become a party to this Agreement as an additional "Grantor" hereunder and to become a party to the Guaranty as an additional "Guarantor" thereunder, and to duly execute and/or deliver such opinions of counsel and other documents, in form and substance acceptable to the Collateral Agent, as the Collateral Agent shall reasonably request with respect thereto.

12

SECTION 6. Additional Provisions Concerning the Collateral.

Each Grantor hereby (i) authorizes the Collateral Agent to file one or more Uniform Commercial Code financing or continuation statements, and amendments thereto, relating to the Collateral (including, without limitation, financing statements describing the Collateral as "all assets" or "all personal property" or words of similar effect) and (ii) ratifies such authorization to the extent that the Collateral Agent has filed any such financing or continuation statements, or amendments thereto, prior to the date hereof. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

Each Grantor hereby irrevocably appoints the Collateral Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time in the Collateral Agent's discretion, so long as an Event of Default shall have occurred and is continuing, to take any action and to execute any instrument which the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of such Grantor under Section 5 hereof), including, without limitation, (i) to obtain and adjust insurance required to be paid to the Collateral Agent pursuant to Section 5(e) hereof, (ii) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other instruments, documents and chattel paper in connection with clause (i) or (ii) above, (iv) to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of the Collateral Agent and the Buyers with respect to any Collateral, and (v) to execute assignments, licenses and other documents to enforce the rights of the Collateral Agent and the Buyers with respect to any Collateral. This power is coupled with an interest and is irrevocable until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations).

For the purpose of enabling the Collateral Agent to exercise rights and remedies hereunder, at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies upon and during an Event of Default, and for no other purpose, each Grantor hereby grants to the Collateral Agent, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, assign, license or sublicense any Intellectual Property now owned or hereafter acquired by such Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof. Notwithstanding anything contained herein to the contrary, but subject to the provisions of the Securities Purchase Agreement that limit the right of such Grantor to dispose of its property and Section 5(h) hereof, so long as no Event of Default shall have occurred and be continuing, such Grantor may exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of its business. In furtherance of the foregoing, unless an Event of Default shall have occurred and be continuing, the Collateral Agent shall from time to time, upon the request of a Grantor, execute and deliver any instruments, certificates or other documents, in the form so requested, which such Grantor shall have certified are appropriate (in such Grantor's judgment) to allow it to take any action permitted above (including relinquishment of the license provided pursuant to this clause (c) as to any Intellectual Property). Further, upon the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations), the Collateral Agent (subject to Section 10(f) hereof) shall release and reassign to such Grantor all of the Collateral Agent's right, title and interest in and to the Intellectual Property, all without recourse, representation or warranty whatsoever. The exercise of rights and remedies hereunder by the Collateral Agent shall not terminate the rights of the holders of any licenses or sublicenses theretofore granted by such Grantor in accordance with the second sentence of this clause (c). Each Grantor hereby releases the Collateral Agent from any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Collateral Agent under the powers of attorney granted herein other than actions taken or omitted to be taken through the Collateral Agent's gross negligence or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

13

If a Grantor fails to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement or obligation, in the name of such Grantor or the Collateral Agent, and the expenses of the Collateral Agent incurred in connection therewith shall be payable by such Grantor pursuant to Section 8 hereof and shall be secured by the Collateral.

The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the Licenses and otherwise with respect to any of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Collateral Agent of any of its rights hereunder shall not release such Grantor from any of its obligations under the Licenses or otherwise in respect of the Collateral, and (iii) the Collateral Agent shall not have any obligation or liability by reason of this Agreement under the Licenses or with respect to any of the other Collateral, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of such Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

SECTION 7. Remedies Upon Event of Default. If any Event of Default shall have occurred and be continuing:

The Collateral Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also may (i) take absolute control of the Collateral, including, without limitation, transfer into the Collateral Agent's name or into the name of its nominee or nominees (to the extent the Collateral Agent has not theretofore done so) and thereafter receive, for the benefit of the Collateral Agent, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or part of its respective Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place or places to be designated by the Collateral Agent that is reasonably convenient to both parties, and the Collateral Agent may enter into and occupy any premises owned or leased by such Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Collateral Agent's rights and remedies hereunder or under law, without obligation to such Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable and/or (B) lease, license or dispose of the Collateral or any part thereof upon such terms as the Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale or any other disposition of its respective Collateral shall be required by law, at least ten (10) days' notice to such Grantor of the time and place of any public sale or the time after which any private sale or other disposition of its respective Collateral is to be made shall constitute reasonable notification. The Collateral Agent shall not be obligated to make any sale or other disposition of any Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor hereby waives any claims against the Collateral Agent and the Buyers arising by reason of the fact that the price at which its respective Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Collateral Agent accepts the first offer received and does not offer such Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of such Collateral be marshalled upon any sale (public or private) thereof. Each Grantor hereby acknowledges that (i) any such sale of its respective Collateral by the Collateral Agent shall be made without warranty, (ii) the Collateral Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, and (iii) such actions set forth in clauses (i) and (ii) above shall not adversely affect the commercial reasonableness of any such sale of Collateral. In addition to the foregoing, (1) upon written notice to any Grantor from the Collateral Agent, such Grantor shall cease any use of the Intellectual Property or any Trademark similar to any Trademark contained in the Collateral for any purpose described in such notice; (2) the Collateral Agent may, at any time and from time to time, upon 10 days' prior notice to such Grantor, license, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine to the extent consistent with any restrictions or conditions imposed upon such Grantor with respect to such Intellectual Property by license or other contractual arrangement; and (2) the Collateral Agent may, at any time, pursuant to the authority granted in Section 6 hereof (such authority being effective upon the occurrence and during the continuance of an Event of Default), execute and deliver on behalf of such Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country.

14

Any cash held by the Collateral Agent as Collateral and all Cash Proceeds received by the Collateral Agent in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Collateral Agent, be held by the Collateral Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 8 hereof) in whole or in part by the Collateral Agent against, all or any part of the Obligations in such order as the Collateral Agent shall elect, consistent with the provisions of the Securities Purchase Agreement. Any surplus of such cash or Cash Proceeds held by the Collateral Agent and remaining after the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations) shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which the Collateral Agent and the Buyers are legally entitled, each Grantor shall be liable for the deficiency, together with interest thereon at the highest rate specified in any of the applicable Transaction Documents for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Collateral Agent to collect such deficiency.

Each Grantor hereby acknowledges that if the Collateral Agent complies with any applicable state, provincial, or federal law requirements in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

The Collateral Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Collateral Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that each Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, such Grantor hereby irrevocably waives the benefits of all such laws.

SECTION 8. Indemnity and Expenses.

Each Grantor agrees, jointly and severally, to defend, protect, indemnify and hold the Collateral Agent and each of the Buyers, jointly and severally, harmless from and against any and all claims, damages, losses, liabilities, obligations, penalties, fees, costs and expenses (including, without limitation, reasonable legal fees, costs, expenses, and disbursements of such Person's counsel) to the extent that they arise out of or otherwise result from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely and directly from such Person's gross negligence or willful misconduct, as determined by a final judgment of a court of competent jurisdiction.

Each Grantor agrees, jointly and severally, to, upon demand, pay to the Collateral Agent the amount of any and all costs and expenses, including the reasonable fees, costs, expenses and disbursements of counsel for the Collateral Agent and of any experts and agents (including, without limitation, any collateral trustee which may act as agent of the Collateral Agent), which the Collateral Agent may incur in connection with (i) the preparation, negotiation, execution, delivery, recordation, administration, amendment, waiver or other modification or termination of this Agreement subject to and to the extent under Section 4(f) of the Securities Purchase Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any Collateral, (iii) the exercise or enforcement of any of the rights of the Collateral Agent hereunder, or (iv) the failure by any Grantor to perform or observe any of the provisions hereof.

15

SECTION 9. <u>Notices, Etc.</u> All notices and other communications provided for hereunder shall be in writing and shall be mailed (by certified mail, postage prepaid and return receipt requested), telecopied or delivered, if to a Grantor at its address specified below and if to the Collateral Agent to it, at its address specified below; or as to any such Person, at such other address as shall be designated by such Person in a written notice to such other Person complying as to delivery with the terms of this <u>Section 9</u>. All such notices and other communications shall be effective (a) if sent by certified mail, return receipt requested, when received or five days after deposited in the mails, whichever occurs first, (b) if telecopied or sent by electronic mail, when transmitted (during normal business hours), or (c) if delivered, upon delivery.

SECTION 10. <u>Miscellaneous.</u>

No amendment of any provision of this Agreement shall be effective unless it is in writing and signed by each Grantor and the Collateral Agent, and no waiver of any provision of this Agreement, and no consent to any departure by a Grantor therefrom, shall be effective unless it is in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

No failure on the part of the Collateral Agent to exercise, and no delay in exercising, any right hereunder or under any of the other Transaction Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Collateral Agent or any Buyer provided herein and in the other Transaction Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Collateral Agent or any Buyer under any of the other Transaction Documents against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any of the other Transaction Documents against such party or against any other Person, including but not limited to, any Grantor.

To the extent permitted by applicable law, each Grantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Obligations and this Agreement and any requirement that the Collateral Agent exhaust any right or take any action against any other Person or any Collateral. Each Grantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this <u>Section 10(c)</u> is knowingly made in contemplation of such benefits. The Grantors hereby waive any right to revoke this Agreement, and acknowledge that this Agreement is continuing in nature and applies to all Obligations, whether existing now or in the future.

No Grantor may exercise any rights that it may now or hereafter acquire against any other Grantor that arise from the existence, payment, performance or enforcement of any Grantor's obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Collateral Agent against any Grantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Grantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations). If any amount shall be paid to a Grantor in violation of the immediately preceding sentence at any time prior to the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations), such amount shall be held in trust for the benefit of the Collateral Agent and shall forthwith be paid to the Collateral Agent to be credited and applied to the Obligations and all other amounts payable under the Transaction Documents, whether matured or unmatured, in accordance with the terms of the Transaction Documents, or to be held as Collateral for any Obligations or other amounts payable under the Transaction Documents thereafter arising.

Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or thereof or affecting the validity or enforceability of such provision in any other jurisdiction.

16

This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations), and (ii) be binding on each Grantor and all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code and shall inure, together with all rights and remedies of the Collateral Agent and the Buyers hereunder, to the benefit of the Collateral Agent and the Buyers and their respective permitted successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, without notice to any Grantor, the Collateral Agent and the Buyers may assign or otherwise transfer their rights and obligations under this Agreement and any of the other Transaction Documents, to any other Person and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Collateral Agent and the Buyers herein or otherwise. Upon any such assignment or transfer, all references in this Agreement to the Collateral Agent or any such Buyer shall mean the assignee of the Collateral Agent or such Buyer. None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Collateral Agent, and any such assignment or transfer without the consent of the Collateral Agent shall be null and void.

Upon the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations), (i) this Agreement and the security interests created hereby shall terminate and all rights to the Collateral shall revert to the respective Grantor that granted such security interests hereunder, and (ii) the Collateral Agent will, upon such Grantor's request and at such Grantor's expense, (A) return to such Grantor such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and (B) execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination, all without any representation, warranty or recourse whatsoever.

THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, EXCEPT AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.

ANY LEGAL ACTION, SUIT OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY DOCUMENT RELATED THERETO MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, AND APPELLATE COURTS THEREOF, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GRANTOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH GRANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION, SUIT OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

EACH GRANTOR AND (BY ITS ACCEPTANCE OF THE BENEFITS OF THIS AGREEMENT) THE COLLATERAL AGENT WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR OTHER ACTION OF THE PARTIES HERETO.

Nothing contained herein shall affect the right of the Collateral Agent to serve process in any other manner permitted by law or commence legal proceedings or otherwise proceed against any Grantor or any property of such Grantor in any other jurisdiction.

Each Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together constitute one in the same Agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

17

IN WITNESS WHEREOF, each Grantor has caused this Agreement to be executed and delivered by its officer thereunto duly authorized, as of the date first above written.

**GENIUS BRANDS INTERNATIONAL, INC.**, a Nevada corporation

By: _____

Name: _____

Title: _____

Address for Notices:

Email: bdenton@gnusbrands.com

Facsimile: (310) 273-4202

**A SQUARED ENTERTAINMENT LLC**, a Delaware limited liability company

By: _____

Name: _____

Title: _____

**RAINBOW RANGERS PRODUCTIONS LLC**, a California limited liability company

By: _____

Name: _____

Title: _____

ACCEPTED BY:

By: _____

Name: _____

Title: _____

Address: _____

18

SCHEDULE I

LEGAL NAMES; ORGANIZATIONAL IDENTIFICATION NUMBERS; STATES OR JURISDICTION OF ORGANIZATION

| Legal Name | State of Organization | Type of Organization | Organizational Identification Number |
|---|---|---|---|

I-1

SCHEDULE II


INTELLECTUAL PROPERTY AND LICENSES; TRADE NAMES

A.    COPYRIGHTS
B.    PATENTS
C.    TRADEMARKS
D.    OTHER PROPRIETARY RIGHTS
E.    TRADE NAMES
F.    NAME OF, AND EACH TRADE NAME USED BY, EACH PERSON FROM WHICH A GRANTOR HAS ACQUIRED ANY SUBSTANTIAL PART OF THE COLLATERAL WITHIN THE PRECEDING FIVE YEARS

II-1

SCHEDULE III
LOCATIONS

| Grantor | Location | Description |
|---|---|---|

III-1

SCHEDULE IV

PROMISSORY NOTES, SECURITIES, DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITIES ACCOUNTS

A. Promissory Notes:

B. Securities and Other Instruments:

C. Deposit Accounts, Securities Accounts and Commodities Accounts:

| Grantor | Name and Address of Institution Maintaining Account | Account Number | Type of Account |
|---|---|---|---|

IV-1

SCHEDULE V
UCC-1 FINANCING STATEMENTS

| Name of Grantor | Secretary of State |
|---|---|
|  |  |

V-1

SCHEDULE VI
COMMERCIAL TORT CLAIMS

VI-1

SCHEDULE VII

PLEDGED DEBT

| Grantor | Name of Maker | Description | Original Principal Amount |
|---------|---------------|-------------|---------------------------|

VII-1

SCHEDULE VIII

PLEDGED SHARES

| Grantor | Name of Pledged Issuer | Percentage of Outstanding Shares/Units | Class | Certificate Number |
|---|---|---|---|---|
| | | | | |

VIII-1

<u>EXHIBIT A</u>

<u>[TRADEMARK] [PATENT] [COPYRIGHT] SECURITY AGREEMENT</u>

WHEREAS, _____ (the "<u>Assignor</u>") [has adopted, used and is using, and holds all right, title and interest in and to, the trademarks and service marks listed on the annexed <u>Schedule 1A</u>, which trademarks and service marks are registered or applied for in the United States Patent and Trademark Office (the "<u>Trademarks</u>")] [holds all right, title and interest in the letter patents, design patents and utility patents, and all applications therefor, listed on the annexed <u>Schedule 1A</u>, which patents are issued or applied for in the United States Patent and Trademark Office (the "<u>Patents</u>")] [holds all right, title and interest in the copyrights listed on the annexed <u>Schedule 1A</u>, which copyrights are registered or applied for in the United States Copyright Office (the "<u>Copyrights</u>")];

WHEREAS, the Assignor has entered into a Pledge and Security Agreement, dated as of [__], 2020 (as amended, restated or otherwise modified from time to time the "<u>Security Agreement</u>"), in favor of _____, as collateral agent for certain buyers (the "<u>Assignee</u>");

WHEREAS, pursuant to the Security Agreement, the Assignor has assigned and granted to the Assignee for the benefit of the Buyers (as defined in the Security Agreement) a continuing security interest in all right, title and interest of the Assignor in, to and under the [Trademarks, together with, among other things, the good-will of the business symbolized by the Trademarks] [Patents] [Copyrights], including, without limitation, all applications, registrations and recordings thereof, as applicable, and all proceeds thereof, including, without limitation, any and all causes of action which may exist by reason of infringement, misappropriation or other violation thereof and any and all damages arising from past, present and future infringements, misappropriations or other violations thereof (the "<u>Collateral</u>"), to secure the payment, performance and observance of the "Obligations" (as defined in the Security Agreement);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Assignor does hereby pledge, convey, sell, assign, transfer and set over unto the Assignee and grants to the Assignee for the benefit of the Buyers a continuing security interest in the Collateral.

The Assignor does hereby further acknowledge and affirm that the rights and remedies of the Assignee with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of a conflict between any provision of this [Trademark][Patent][Copyright] Security and the Security Agreement, the terms of the Security Agreement shall govern.

IN WITNESS WHEREOF, the Assignor has caused this [Trademark][Patent][Copyright] Security Agreement to be duly executed by its officer thereunto duly authorized as of _____, 2020

**[GRANTOR]**

By:_____

Name:

Title:

A-1

SCHEDULE 1A TO [TRADEMARK][PATENT][COPYRIGHT] SECURITY AGREEMENT

[Trademarks and Trademark Applications]
[Patent and Patent Applications]
[Copyright and Copyright Applications]
Owned by _____

A-2

Exhibit 10.3

**EXHIBIT D**
**FORM OF GUARANTY**

GUARANTY (this "**Guaranty**"), dated as of [ ], 2020, made by each of the undersigned (each a "**Guarantor**", and collectively, the "**Guarantors**"), in favor of the Buyers (as defined below) party to the Securities Purchase Agreement referenced below.

**W I T N E S S E T H :**

WHEREAS, Genius Brands International, Inc., a Nevada corporation, (the "**Company**"), and each party listed as a "Buyer" on the Schedule of Buyers attached to the Securities Purchase Agreement (each a "**Buyer**", and collectively, the "**Buyers**") are parties to that certain Securities Purchase Agreement, dated as of March 11, 2020, (the "**Securities Purchase Agreement**"), pursuant to which, among other things, the Buyers shall purchase from the Company certain senior secured convertible Notes (collectively, the "**Notes**");

WHEREAS, the Buyers have requested, and the Guarantors have agreed, that the Guarantors shall execute and deliver to the Buyers a guaranty guaranteeing all of the obligations of the Company under the Securities Purchase Agreement, the Notes, the Security Documents, any Perfection Certificate and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Note or any other obligation (collectively, the "**Transaction Documents**");

WHEREAS, pursuant to a Pledge and Security Agreement, dated as of [ ], 2020, (as the same has been, and may be, amended from time to time, the "**Security Agreement**"), the Company and the Guarantors have granted to , as collateral agent for the Buyers (in such capacity, the "**Collateral Agent**"), a security interest in and lien on certain assets to secure their respective obligations under this Guaranty, the Securities Purchase Agreement, the Notes and the other Transaction Documents; and

WHEREAS, each Guarantor has determined that the execution, delivery and performance of this Guaranty directly benefits, and is in the best interest of, such Guarantor.

NOW, THEREFORE, in consideration of the premises and the agreements herein and for other consideration, the sufficiency of which is hereby acknowledged, each Guarantor hereby agrees with each Buyer as follows:

SECTION 1. Definitions. Reference is hereby made to the Securities Purchase Agreement and the Notes for a statement of the terms thereof. All terms used in this Guaranty which are defined in the Securities Purchase Agreement or the Notes and not otherwise defined herein shall have the same meanings as set forth therein.

1

SECTION 2. Guaranty. The Guarantors, jointly and severally, hereby unconditionally and irrevocably, guarantee (a) the punctual payment, as and when due and payable, by stated maturity or otherwise, of all obligations and any other amounts now or hereafter owing by the Company in respect of the Securities Purchase Agreement, the Notes and the other Transaction Documents, including, without limitation, all interest that accrues after the commencement of any proceeding commenced by or against any the Company or any Guarantor under any provision of the Bankruptcy Code (Chapter 11 of Title 11 of the United States Code) or under any other bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, or extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief (an "**Insolvency Proceeding**"), whether or not the payment of such interest is unenforceable or is not allowable due to the existence of such Insolvency Proceeding, and all fees, commissions, expense reimbursements, indemnifications and all other amounts due or to become due under any of the Transaction Documents, and any and all expenses (including reasonable counsel fees and expenses) reasonably incurred by the Buyers or the Collateral Agent in enforcing any rights under this Guaranty (such obligations, to the extent not paid by the Company, being the "**Guaranteed Obligations**") and (b) the punctual and faithful performance, keeping, observance and fulfillment by the Company of all of the agreements, conditions, covenants and obligations of the Company contained in the Securities Purchase Agreement, the Notes and the other Transaction Documents. Without limiting the generality of the foregoing, each Guarantor's liability hereunder shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Company to the Buyers under the Securities Purchase Agreement and the Notes but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Guarantor or the Company (each, a "**Transaction Party**").

SECTION 3. Guaranty Absolute; Continuing Guaranty; Assignments.

(a) The Guarantors, jointly and severally, guarantee that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Transaction Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Buyers with respect thereto. The obligations of each Guarantor under this Guaranty are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against any Guarantor to enforce such obligations, irrespective of whether any action is brought against any Transaction Party or whether any Transaction Party is joined in any such action or actions. The liability of any Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives, to the extent permitted by law, any defenses it may now or hereafter have in any way relating to, any or all of the following:

(i) any lack of validity or enforceability of any Transaction Document or any agreement or instrument relating thereto;

(ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Transaction Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Transaction Party or otherwise;

(iii) any taking, exchange, release or non-perfection of any collateral with respect to the Guaranteed Obligations, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations; or

2

(iv) any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Transaction Party.

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by any Buyer or any other Person upon the insolvency, bankruptcy or reorganization of any Transaction Party or otherwise, all as though such payment had not been made.

(b) This Guaranty is a continuing guaranty and shall (i) remain in full force and effect until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations) and payment of all other amounts payable under this Guaranty (excluding any inchoate or unmatured contingent indemnification obligations) and (ii) be binding upon each Guarantor and its respective successors and assigns. This Guaranty shall inure to the benefit of and be enforceable by the Buyers and their respective successors, and permitted pledgees, transferees and assigns. Without limiting the generality of the foregoing sentence, any Buyer may pledge, assign or otherwise transfer all or any portion of its rights and obligations under and subject to the terms of any Transaction Document to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to such Buyer herein or otherwise, in each case as provided in the Securities Purchase Agreement or such Transaction Document. Notwithstanding the foregoing and for the avoidance of doubt, this Guaranty will expire and each Guarantor will be released from its obligation hereunder upon the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations) and payment of all other amounts payable under this Guaranty (excluding any inchoate or unmatured contingent indemnification obligations).

SECTION 4. Waivers. To the extent permitted by applicable law, each Guarantor hereby waives promptness, diligence, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that the Buyers or the Collateral Agent exhaust any right or take any action against any Transaction Party or any other Person or any Collateral. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 4 is knowingly made in contemplation of such benefits. The Guarantors hereby waive any right to revoke this Guaranty, and acknowledge that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

SECTION 5. <u>Subrogation</u>. No Guarantor may exercise any rights that it may now or hereafter acquire against any Transaction Party or any other guarantor that arise from the existence, payment, performance or enforcement of any Guarantor's obligations under this Guaranty, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Buyers or the Collateral Agent against any Transaction Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Transaction Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations) and payment of all other amounts payable under this Guaranty (excluding any inchoate or unmatured contingent indemnification obligations). If any amount shall be paid to a Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty, such amount shall be held in trust for the benefit of the Buyers and shall forthwith be paid ratably to the Buyers to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Transaction Documents, or to be held as collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising. If (a) any Guarantor shall make payment to the Buyers of all or any part of the Guaranteed Obligations, and (b) the Buyers receive the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations) and payment of all other amounts payable under this Guaranty (excluding any inchoate or unmatured contingent indemnification obligations), the Buyers will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

SECTION 6. <u>Representations, Warranties and Covenants</u>.

(a) Each Guarantor hereby represents and warrants as of the date first written above as follows:

(i) Each Guarantor (A) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization as set forth on the signature pages hereto, (B) has all requisite corporate, limited liability company or limited partnership power and authority to conduct its business as now conducted and as presently contemplated and to execute and deliver this Guaranty and each other Transaction Document to which such Guarantor is a party, and to consummate the transactions contemplated hereby and thereby and (C) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary except where the failure to be so qualified would not result in a Material Adverse Effect.

4

(ii) The execution, delivery and performance by each Guarantor of this Guaranty and each other Transaction Document to which such Guarantor is a party (A) have been duly authorized by all necessary corporate, limited liability company or limited partnership action, (B) do not and will not contravene its charter or by-laws, its limited liability company or operating agreement or its certificate of partnership or partnership agreement, as applicable, or any applicable law or any contractual restriction binding on such Guarantor or its properties do not and will not result in or require the creation of any lien (other than pursuant to any Transaction Document) upon or with respect to any of its properties, and (C) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any material permit, license, authorization or approval applicable to it or its operations or any of its properties.

(iii) No authorization or approval or other action by, and no notice to or filing with, any governmental authority is required in connection with the due execution, delivery and performance by such Guarantor of this Guaranty or any of the other Transaction Documents to which such Guarantor is a party (other than expressly provided for in any of the Transaction Documents).

(iv) Each of this Guaranty and the other Transaction Documents to which such Guarantor is or will be a party, when delivered, will be, a legal, valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, suretyship or other similar laws and equitable principles (regardless of whether enforcement is sought in equity or at law).

(v) There is no pending or, to the best knowledge of such Guarantor, threatened action, suit or proceeding against such Guarantor or to which any of the properties of such Guarantor is subject, before any court or other governmental authority or any arbitrator that (A) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (B) relates to this Guaranty or any of the other Transaction Documents to which such Guarantor is a party or any transaction contemplated hereby or thereby.

(vi) Such Guarantor (A) has read and understands the terms and conditions of the Securities Purchase Agreement, the Notes and the other Transaction Documents, and (B) now has and will continue to have independent means of obtaining information concerning the affairs, financial condition and business of the Company and the other Transaction Parties, and has no need of, or right to obtain from the Collateral Agent or any Buyer, any credit or other information concerning the affairs, financial condition or business of the Company or the other Transaction Parties that may come under the control of the Collateral Agent or any Buyer.

(b) Each Guarantor covenants and agrees that until the complete conversion of all of the Company's obligations under the Notes to equity securities of the Company and/or indefeasible payment in full in cash of all obligations under the Notes (together with any matured indemnification obligations as of the date of such conversion and/or payment, but excluding any inchoate or unmatured contingent indemnification obligations) and payment of all other amounts payable under this Guaranty (excluding any inchoate or unmatured contingent indemnification obligations), it will comply with each of the covenants (except to the extent applicable only to a public company) which are set forth in <u>Section 4</u> of the Securities Purchase Agreement as if such Guarantor were a party thereto.

5

SECTION 7. <u>Right of Set-off</u>. Upon the occurrence and during the continuance of any Event of Default, the Collateral Agent and any Buyer may, and is hereby authorized to, at any time and from time to time, without notice to the Guarantors (any such notice being expressly waived by each Guarantor) and to the fullest extent permitted by law, set-off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by any Buyer to or for the credit or the account of any Guarantor against any and all obligations of the Guarantors now or hereafter existing under this Guaranty or any other Transaction Document, irrespective of whether or not Collateral Agent or any Buyer shall have made any demand under this Guaranty or any other Transaction Document and although such obligations may be contingent or unmatured. Collateral Agent and each Buyer agrees to notify the relevant Guarantor promptly after any such set-off and application made by such Buyer, provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Collateral Agent or any Buyer under this <u>Section 7</u> are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Collateral Agent or such Buyer may have under this Guaranty or any other Transaction Document in law or otherwise.

SECTION 8. <u>Notices, Etc.</u> All notices and other communications provided for hereunder shall be in writing and shall be mailed (by overnight mail or by certified mail, postage prepaid and return receipt requested), telecopied, sent via electronic mail, sent via overnight courier or delivered, if to any Guarantor, to the address for such Guarantor set forth on the signature page hereto, or if to any Buyer, to it at its respective address set forth in the Securities Purchase Agreement; or as to any Person at such other address as shall be designated by such Person in a written notice to such other Person complying as to delivery with the terms of this <u>Section 8</u>. All such notices and other communications shall be effective (i) if mailed (by certified mail, postage prepaid and return receipt requested), when received or three Business Days after deposited in the mails, whichever occurs first; (ii) if telecopied, when transmitted and confirmation is received, provided it is transmitted during regular business hours on a Business Day and, if not, on the next Business Day; (iii) if sent via electronic mail, when transmitted (provided that such sent electronic mail is kept on file (whether electronically or otherwise) by the sending party and the sending party does not immediately receive an automatically generated message from the recipient's electronic mail server that such electronic mail could not be delivered to such recipient), (d) if sent via overnight courier service, one Business Day after deposit with an overnight courier service, or (iii) if delivered by hand, upon delivery, provided it is delivered during regular business hours on a Business Day and, if not, on the next Business Day.

SECTION 9. <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY OTHER TRANSACTION DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH GUARANTOR HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE BUYERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST EACH GUARANTOR IN ANY OTHER JURISDICTION. ANY GUARANTOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY AND THE OTHER TRANSACTION DOCUMENTS.

6

SECTION 10. <u>WAIVER OF JURY TRIAL, ETC</u>. EACH GUARANTOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS GUARANTY OR THE OTHER TRANSACTION DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS GUARANTY OR THE OTHER TRANSACTION DOCUMENTS, AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH GUARANTOR CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY BUYER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY BUYER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH GUARANTOR HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BUYERS ENTERING INTO THE OTHER TRANSACTION DOCUMENTS.

SECTION 11. <u>Taxes</u>.

(a) All payments made by any Guarantor hereunder or under any other Transaction Document shall be made in accordance with the terms of the respective Transaction Document and shall be made without set-off, counterclaim, deduction or other defense. All such payments shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, <u>excluding</u> taxes imposed on the net income of any Buyer by the jurisdiction in which such Buyer is organized or where it has its principal lending office (all such nonexcluded taxes, levies, imposts, deductions, charges, withholdings and liabilities, collectively or individually, "**Taxes**"). If any Guarantor shall be required to deduct or to withhold any Taxes from or in respect of any amount payable hereunder or under any other Transaction Document:

(i) the amount so payable shall be increased to the extent necessary so that after making all required deductions and withholdings (including Taxes on amounts payable to any Buyer pursuant to this sentence) each Buyer receives an amount equal to the sum it would have received had no such deduction or withholding been made,

(ii) such Guarantor shall make such deduction or withholding,

(iii) such Guarantor shall pay the full amount deducted or withheld to the relevant taxation authority in accordance with applicable law, and

(iv) as promptly as possible thereafter, such Guarantor shall send the Buyers an official receipt (or, if an official receipt is not available, such other documentation as shall be satisfactory to the Buyers, as the case may be) showing payment. In addition, each Guarantor agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to, this Agreement or any other Transaction Document (collectively, "**Other Taxes**").

(b) Each Guarantor hereby indemnifies and agrees to hold the Collateral Agent and each Buyer (each an "**Indemnified Party**") harmless from and against Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 11</u>) paid by any Indemnified Party as a result of any payment made hereunder or from the execution, delivery, registration or enforcement of, or otherwise with respect to, this Agreement or any other Transaction Document, and any liability (including penalties, interest and expenses for nonpayment, late payment or otherwise) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted. This indemnification shall be paid within 30 days from the date on which such Buyer makes written demand therefor, which demand shall identify the nature and amount of such Taxes or Other Taxes.

(c) If any Guarantor fails to perform any of its obligations under this <u>Section 11</u>, such Guarantor shall indemnify the Collateral Agent and each Buyer for any taxes, interest or penalties that may become payable as a result of any such failure. The obligations of the Guarantors under this <u>Section 11</u> shall survive the termination of this Guaranty and the payment of the Obligations and all other amounts payable hereunder.

7

SECTION 12. Miscellaneous.

(a) Each Guarantor will make each payment hereunder in lawful money of the United States of America and in immediately available funds to each Buyer, at such address specified by such Buyer from time to time by notice to the Guarantors.

(b) Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Required Holders. Any amendment or waiver effected in accordance with this Section 12 shall be binding upon each Buyer and holder of Securities and the Company.

(c) No failure on the part of the Collateral Agent or any Buyer to exercise, and no delay in exercising, any right hereunder or under any other Transaction Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder or under any Transaction Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Collateral Agent and the Buyers provided herein and in the other Transaction Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Collateral Agent and the Buyers under any Transaction Document against any party thereto are not conditional or contingent on any attempt by the Collateral Agent or any Buyer to exercise any of their respective rights under any other Transaction Document against such party or against any other Person.

(d) Any provision of this Guaranty that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(e) This Guaranty shall (i) be binding on each Guarantor and its respective successors and assigns, and (ii) inure, together with all rights and remedies of the Collateral Agent and the Buyers hereunder, to the benefit of the Collateral Agent and the Buyers and their respective successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, the Collateral Agent and any Buyer may assign or otherwise transfer its rights and obligations under the Securities Purchase Agreement or any other Transaction Document to any other Person in accordance with the terms thereof, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Collateral Agent or such Buyer, as the case may be, herein or otherwise. None of the rights or obligations of any Guarantor hereunder may be assigned or otherwise transferred without the prior written consent of each Buyer.

(f) This Guaranty reflects the entire understanding of the transaction contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, entered into before the date hereof.

(g) Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(h) This Guaranty may be executed by each party hereto on a separate counterpart, each of which when so executed and delivered shall be an original, but all of which together shall constitute one agreement. Delivery of an executed counterpart by facsimile or other method of electronic transmission shall be equally effective as delivery of an original executed counterpart.

(i) THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, each Guarantor has caused this Guaranty to be executed by its respective duly authorized officer, as of the date first above written.

**GENIUS BRANDS INTERNATIONAL, INC.**, a Nevada corporation

By:_____

    Name:

    Title:

Address for Notices:

Attention: Robert L. Denton, CFO

Email: bdenton@gnusbrands.com

Facsimile: (310) 273-4202

**A SQUARED ENTERTAINMENT LLC**, a Delaware limited liability company

By: _____

Name:

Title:

**RAINBOW RANGERS PRODUCTIONS LLC**, a California limited liability company

By: _____

Name:

Title:

9

Exhibit 10.4

### NOTE PURCHASE AGREEMENT

**NOTE PURCHASE AGREEMENT** (the "**Agreement**"), dated as of March [●], 2020, by and among Genius Brands International, Inc., a Nevada corporation with offices located at 190 N. Canon Drive, 4th Fl., Beverly Hills, CA 90210 (the "**Company**") and the investor signatory hereto (the "**Investor**").

**WHEREAS**:

A. Concurrently herewith, the Company, the Investor and certain other investors (the "**Other Investors**", and together with the Investor, the "**Investors**") have entered into that certain Securities Purchase Agreement, dated March 11, 2020, pursuant to which, among other things, the Investors shall acquire certain senior secured convertible notes (the "**Notes**) of the Company (the "**Securities Purchase Agreement**").

B. The Company and the Investor are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "**1933 Act**"), as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the 1933 Act.

C. The Investor has authorized the issuance of a new secured promissory Investor Note in substantially the form attached hereto as **Exhibit A**, pursuant to the terms set forth herein (collectively, the "**Investor Note**").

D. The Investor wishes to purchase Notes from the Company pursuant to the Securities Purchase Agreement and to issue the Investor Note in full satisfaction of the Note Purchase Price (as defined in the Securities Purchase Agreement), and the Company wishes to (x) sell Notes to the Investor, (y) acquire the Investor Note in full satisfaction of the Note Purchase Price and (z) pledge the Investor Note to the Investor as collateral for its obligations under the Notes.

E. The Investor Note will be secured by a first priority security interest in certain Eligible Assets (as defined in the Investor Note) (collectively, the "**Collateral**") held in one or more collateral accounts of the Investor described in the Investor Note (the "**Collateral Account**").

F. Concurrently herewith, each of the Company and the Investor are entering into that certain Master Netting Agreement, in substantially the form attached hereto as **Exhibit B** (the "**Master Netting Agreement**"), to provide further clarification of the Investor's right (but not, in the case of Investor only, its obligation) to Net (as defined below) certain Obligations (as defined in the Master Netting Agreement) arising under and across this Agreement, the Investor Note, the Notes and the Securities Purchase Agreement (collectively, the "**Underlying Agreements**") and to treat the Master Netting Agreement, this Agreement and the other Underlying Agreements as a single agreement for the purposes set forth herein and this Agreement and the Securities Purchase Agreement each as a "securities contract" (11 U.S.C. § 741), or other similar agreements.

1

**NOW, THEREFORE**, the Company and the Investor hereby agree as follows:

1. **PURCHASE AND SALE OF INVESTOR NOTE.**

(a) <u>Investor Note</u>. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 5 and 6 below, the Investor agrees to issue and sell to the Company, and the Company agrees to purchase from the Investor on the Closing Date (as defined below), such aggregate principal amount of Investor Note as is set forth on the signature page of the Investor attached hereto in full satisfaction of the Note Purchase Price under the Securities Purchase Agreement (the "**Closing**").

(b) <u>Closing</u>. The Closing of the purchase of the Investor Note by the Company shall occur at the offices of Ellenoff Grossman & Schole LLP, 1345 Avenue of the Americas, New York, New York 10105. The date and time of the Closing (the "**Closing Date**") shall be 10:00 a.m., New York time, on the first (1st) Business Day on which the conditions to the Closing set forth in Sections 5 and 6 below are satisfied or waived (or such other date or time as is mutually agreed to by the Company and the Investor). The Closing may also be undertaken remotely by electronic transfer of Closing documentation. As used herein "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

(c) <u>Delivery of Investor Note in Satisfaction of Note Purchase Price; Securities Contract; Netting Safe Harbor</u>. On the Closing Date, the Investor shall duly execute the Investor Note, registered in the name of the Company, in full satisfaction of the Note Purchase Price pursuant to the Securities Purchase Agreement, and, in accordance with the instructions of the Company in the Flow of Funds Letter (as defined in the Securities Purchase Agreement), the Investor shall maintain physical possession of the Investor Note as Collateral (as defined in the Note) securing the Note. For the avoidance of doubt, the Investor Note is deemed simultaneously delivered (x) by the Investor to the Company at the Closing hereunder and (y) delivered by the Company to the Investor at the Closing (as defined in the Securities Purchase Agreement) under the Securities Purchase Agreement, as Collateral for the Note purchased by the Investor thereunder. Other than the issuance of the Note to the Investor pursuant to the Securities Purchase Agreement, the Company shall not be required to pay any additional consideration for the issuance of the Investor Note hereunder. The Company hereby acknowledges and agrees that the rights and obligations of the Investor under the Master Netting Agreement, hereunder and under the other Underlying Agreements and the rights and obligations of the Company under the Master Netting Agreement, hereunder and under the other Underlying Agreements arise in a single integrated transaction and constitute related and interdependent obligations within such transaction. The Company and the Investor hereby acknowledge and agree that this Agreement and the Securities Purchase Agreement each is a "securities contract" as defined in 11 U.S.C. § 741 and that Investor shall have all rights in respect of the Master Netting Agreement, this Agreement and the other Underlying Agreements as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), including, without limitation, all rights of credit, deduction, setoff, offset, recoupment, and netting (collectively, "**Netting**" or "**Net**") as are available under the Master Netting Agreement, this Agreement and the other Underlying Agreements, and all Netting provisions of the Note, the Master Netting Agreement and the Investor Note, including without limitation the provisions set forth in Section 7 of the Investor Note, are hereby incorporated in this Agreement and made a part hereof as if such provisions were set forth herein.

2

2. **COMPANY'S REPRESENTATIONS AND WARRANTIES**.

The Company represents and warrants, as of the date hereof and as of the Closing Date in which the Company is purchasing the Investor Note hereunder, that:

(a) <u>No Sale or Distribution</u>. The Company is acquiring the Investor Note for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof. The Company does not presently have any agreement or understanding, directly or indirectly, with any Person (as defined in the Securities Purchase Agreement) to distribute any of the Investor Note.

(b) <u>Sophisticated Investor</u>. The Company is a sophisticated investor (as described in Rule 506(b)(2)(ii) of Regulation D), and has such knowledge and experience in business and financial matters that it is capable of evaluating the merits and risks of an investment in the Investor Note.

(c) <u>Reliance on Exemptions</u>. The Company understands that the Investor Note is being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Investor is relying in part upon the truth and accuracy of, and the Company's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Company set forth herein in order to determine the availability of such exemptions and the eligibility of the Company to acquire the Investor Note.

(d) <u>Information</u>. The Company and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Investor and materials relating to the offer and sale of the Investor Note that have been requested by the Company. The Company and its advisors, if any, have been afforded the opportunity to ask questions of the Investor. Neither such inquiries nor any other due diligence investigations conducted by the Company or its advisors, if any, or its representatives shall modify, amend or affect the Company's right to rely on the Investor's representations and warranties contained herein. The Company understands that its investment in the Investor Note involves a high degree of risk. The Company has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Investor Note.

(e) <u>No Governmental Review</u>. The Company understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Investor Note or the fairness or suitability of the investment in the Investor Note nor have such authorities passed upon or endorsed the merits of the offering of the Investor Note.

(f) <u>Transfer or Resale</u>. The Company understands that: (i) the Investor Note has not been and is not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred without the consent of the Investor (and any Prohibited Transfer (as defined in the Investor Note) shall be subject to certain recoupment rights and netting against the Note to be issued to the Investor concurrently with the Closing hereunder) and (ii) neither the Investor nor any other Person is under any obligation to register the Investor Note under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder.

3

(g) <u>Legends</u>. The Company understands that the certificates or other instruments representing the Investor Note shall bear any legend required by the "blue sky" laws of any state and a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such stock certificates):

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE OFFERED OR SOLD IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SUCH STATE SECURITIES LAWS, OR AN EXEMPTION FROM REGISTRATION THEREUNDER, IN EACH CASE, TO THE EXTENT APPLICABLE HERETO.

3. **REPRESENTATIONS AND WARRANTIES OF THE INVESTOR.**

The Investor represents and warrants to the Company as of the date hereof and as of the Closing Date as follows:

(a) <u>Authorization; Enforcement; Validity</u>. The Investor has the requisite corporate power and authority to enter into and perform its obligations under this Agreement and the Investor Note and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "**Transaction Documents**") and to issue the Investor Note in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Investor and the consummation by the Investor of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Investor Note has been duly authorized by the Investor's board of directors, investment manager or other governing body and no further filing, consent, or authorization is required by the Investor. This Agreement and the other Transaction Documents have been duly executed and delivered by the Investor, and constitute the legal, valid and binding obligations of the Investor, enforceable against the Investor in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(b) <u>Issuance of Investor Note</u>. The issuance of the Investor Note is duly authorized and upon issuance in accordance with the terms of the Transaction Documents shall be free from all taxes, liens and charges with respect to the issue thereof. Assuming the accuracy of each of the representations and warranties set forth in Section 2 of this Agreement, the offer and issuance by the Investor of the Investor Note is exempt from registration under the 1933 Act.

4

(c) <u>No Conflicts</u>. The execution, delivery and performance of the Transaction Documents by the Investor and the consummation by the Investor of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Investor Note) will not (i) result in a violation of the Investor's organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) in any respect under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Investor is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including foreign, federal and state securities laws and regulations) applicable to the Investor or by which any property or asset of the Investor is bound or affected, except, in the case of clause (ii) and (iii) above, for such violations, conflicts, breaches, defaults, losses, terminations of rights thereof, or accelerations which, in the aggregate, would not reasonably be expected to have a Material Adverse Effect (as defined below). "**Material Adverse Effect**" means any material adverse effect on (i) the business, properties, assets, liabilities, operations (including results thereof) or condition (financial or otherwise) of the Investor, (ii) the transactions contemplated hereby or in any of the other Transaction Documents or (iii) the authority or ability of the Company or any of its Subsidiaries (as defined in the Securities Purchase Agreement) to perform any of their respective obligations under any of the Transaction Documents.

(d) <u>Consents</u>. The Investor is not required to obtain any consent, authorization or order of, or make any filing or registration with, any government, court, regulatory, self-regulatory, administrative agency or commission or other governmental agency, authority or instrumentality, domestic or foreign, of competent jurisdiction (a "**Governmental Authority**") or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by the Transaction Documents, in each case in accordance with the terms hereof or thereof. The Investor is unaware of any facts or circumstances that might prevent the Investor from obtaining or effecting any of the registration, application or filings pursuant to the preceding sentence.

(e) <u>No General Solicitation</u>. The Investor has not engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Investor Note.

(f) <u>No Integrated Offering</u>. Neither the Investor nor any Person acting on its behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of the issuance of the Investor Note under the 1933 Act, whether through integration with prior offerings or otherwise. Neither the Investor nor any Person acting on their behalf will take any action or steps referred to in the preceding sentence that would require registration of the issuance of any of the Investor Note under the 1933 Act.

(g) <u>Sufficient Collateral</u>. As of the Closing Date the bank and/or brokerage account(s) described on Schedule I to the Investor Note, which Collateral secures the Investor Note in accordance therewith, contains at least the Note Purchase Price of Eligible Assets as of the Closing Date.

(h) <u>Full Recourse</u>. The Investor Note is a full recourse obligation of the Investor.

5

4. **COVENANTS.**

(a) <u>Reasonable Best Efforts</u>. Each party shall use its reasonable best efforts timely to satisfy each of the conditions to be satisfied by it as provided in Sections 5 and 6 of this Agreement.

(b) <u>Fees</u>. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or broker's commissions relating to or arising out of the transactions contemplated hereby. The Company shall pay, and hold the Investor harmless against, any liability, loss or expense (including, without limitation, reasonable attorney's fees and out-of-pocket expenses) arising in connection with any claim relating to any such payment. Except as otherwise set forth in the Transaction Documents or the Securities Purchase Agreement, each party to this Agreement shall bear its own expenses in connection with the sale of the Investor Note to the Investors.

(c) <u>Taxes</u>. The Company will pay, and save and hold the Investor harmless from any and all liabilities (including interest and penalties) with respect to, or resulting from any delay or failure in paying, stamp and other taxes (other than income taxes), if any, which may be payable or determined to be payable on the execution and delivery or acquisition of the Investor Note.

5. **CONDITIONS TO THE INVESTOR'S OBLIGATION TO SELL.** The obligation of the Investor hereunder to issue and sell the Investor Note to the Company at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Investor's sole benefit and may be waived by the Investor at any time in its sole discretion by providing the Company with prior written notice thereof:

(a) The Company shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Investor.

(b) All conditions to the Investor's closing of the transactions contemplated by the Securities Purchase Agreement shall have been satisfied (except for such conditions waived in writing by the Investor) and the Investor Note is being issued hereunder in full satisfaction of the Note Purchase Price.

(c) The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such specified date), and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

6. **CONDITIONS TO THE COMPANY'S OBLIGATION TO PURCHASE.** The obligation of the Company hereunder to purchase the Investor Note at the Closing in satisfaction, in full, of the Note Purchase Price is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing the Investor with prior written notice thereof:

6

(a) The Investor shall have (A) duly executed and delivered to the Company (A) each of the Transaction Documents (to the extent contemplated to be executed by the Investor pursuant to its terms) and (B) duly executed the Investor Note.

(b) All conditions to the Company's closing of the transactions contemplated by the Securities Purchase Agreement shall have been satisfied (except for such conditions waived in writing by the Company) and the Investor Note is being issued hereunder in full satisfaction of the Note Purchase Price.

(c) The representations and warranties of the Investor shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date, which shall be true and correct as of such specified date), and the Investor shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Investor at or prior to the Closing Date.

(d) The Investor shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Investor Note.

7. **TERMINATION.**

In the event that the Closing shall not have occurred on or prior to the termination of the Securities Purchase Agreement, this Agreement shall automatically terminate.

8. **MISCELLANEOUS.**

(a) <u>Governing Law; Jurisdiction; Jury Trial</u>.

All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(b) Counterparts.

This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(c) Headings; Gender.

The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement. Unless the context clearly indicates otherwise, each pronoun herein shall be deemed to include the masculine, feminine, neuter, singular and plural forms thereof. The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

(d) Severability.

If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) Entire Agreement; Amendments.

This Agreement, the Securities Purchase Agreement, the other Transaction Documents (as defined herein) and the Transaction Documents (as defined in the Securities Purchase Agreement) and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein supersede all other prior oral or written agreements between the Investors, the Company, its Subsidiaries, their affiliates and Persons acting on their behalf solely with respect to the matters contained herein and therein, and this Agreement, the other Transaction Documents (as defined herein) and the Transaction Documents (as defined in the Securities Purchase Agreement), the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein contain the entire understanding of the parties solely with respect to the matters covered herein and therein. For clarification purposes, the Recitals are part of this Agreement. No provision of this Agreement may be amended or waived other than by an instrument in writing signed by the Company, the Investor and the Required Holders.

8

(f) <u>Notices</u>.

Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement shall be governed by the provisions of Section 9(f) of the Securities Purchase Agreement.

(g) <u>Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. No party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party.

(h) <u>No Third Party Beneficiaries</u>.

This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

(i) <u>Survival</u>.

The representations, warranties, agreements and covenants shall survive each Closing. The Investor shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j) <u>Further Assurances</u>.

Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k) <u>Construction</u>.

The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

**[Signature Page Follows]**

9

    **IN WITNESS WHEREOF,** the Investor and the Company have caused their respective signature page to this Note Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**

**GENIUS BRANDS INTERNATIONAL, INC.**

By: _____

Name:

Title:

10

**IN WITNESS WHEREOF,** the Investor and the Company have caused their respective signature page to this Note Purchase Agreement to be duly executed as of the date first written above.

**INVESTORS:**

**[INVESTOR]**

By: _____

Name:

Title:

**Aggregate Principal Amount of Investor Note:**

$_____

Exhibit 10.5

## MASTER NETTING AGREEMENT

**MASTER NETTING AGREEMENT** (the "**Agreement**"), dated as of March __, 2020, by and among Genius Brands International, Inc., a Nevada corporation (the "**Company**") and the investor signatory hereto (the "**Investor**", and together with the Company, the "**Parties**" and each a "**Party**").

**WHEREAS**, concurrently herewith, (i) the Parties and certain other investors have entered into that certain Securities Purchase Agreement, dated March 11, 2020 (the "**Securities Purchase Agreement**"), pursuant to which, among other things, the Investor shall acquire a Note (as defined in the Securities Purchase Agreement) issued by the Company, which is guaranteed by certain of the Company's subsidiaries and secured by, among other things, a first priority perfected lien in the Investor Note (as defined below) and (ii) the Parties have entered into that certain Note Purchase Agreement, dated March [●], 2020, pursuant to which, among other things, the Company shall acquire a secured promissory note (the "**Investor Note**") issued by the Investor (the "**Note Purchase Agreement**"), which is secured by certain Eligible Assets (as defined in the Investor Note), as payment of the purchase price of the Note pursuant to the Securities Purchase Agreement. The Note Purchase Agreement, the Investor Note, the Note and the Securities Purchase Agreement are collectively referred to herein as the "**Underlying Agreements**";

**WHEREAS**, each Party desires to provide in this Master Netting Agreement for, among other things, further clarification of its right (but not, in the case of the Investor only, its obligation) to Net (as defined below) all Obligations (as defined below) arising under the Underlying Agreements upon the occurrence of (i) with respect to the Investor, at the Investor's sole discretion, from and after the occurrence of either (A) any Investor Note Acceleration (as defined in the Investor Note), any Redemption Date (as defined in the Note) with respect to any redemption of the Note of the Investor (solely to the extent the applicable Outstanding Amount (as defined in the Note) subject to redemption includes Restricted Principal (as defined in the Note)), any Event of Default (as defined in the Note) or any Change of Control (as defined in the Note) (in each case, whether or not a Default then exists or the Investor has effected an Acceleration) or (B) if the Company has not satisfied the Cash Burn Covenants (as defined in the Investor Note) in accordance with their terms (the "**Initial Netting Date**") or (ii) automatically upon the occurrence of the Maturity Date (as defined in the Note), upon any Bankruptcy Event of Default (as defined in the Note) or any Prohibited Transfer (as defined in the Investor Note), in each case, and recover against the other Party under and across the Underlying Agreements as herein specified and to treat this Agreement and the Underlying Agreements as a single agreement for the purposes set forth herein and the Note Purchase Agreement and the Securities Purchase Agreement each as a "securities contract" (11 U.S.C. § 741), or other similar agreements; and

**WHEREAS,** the Parties desire that the provisions of each Underlying Agreement remain in force under each applicable Underlying Agreement to the extent such provisions are not expressly superseded or amended hereby.

**NOW THEREFORE,** in consideration of the mutual agreements herein made and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party agrees as follows:

**1. Single Agreement.** This Agreement is entered into in reliance on the Parties' agreement that for the purposes set forth herein this Agreement and the Underlying Agreements form a single integrated agreement between the Parties, and the Parties would not otherwise enter into this Agreement and the Underlying Agreements. The Company and the Investor hereby acknowledge and agree (a) that the Note Purchase Agreement and the Securities Purchase Agreement each are a "securities contract" as defined in 11 U.S.C. § 741 and that Investor shall have all rights in respect of the Underlying Agreements as are set forth in 11 U.S.C. § 555 and 11 U.S.C. § 362(b)(6), and (b) that this Agreement is a "master netting agreement" as that term is used in 11 U.S.C. § 362(b)(27) and 11 U.S.C. § 561 and is a "master agreement" as that term is used in 11 U.S.C. § 362(b)(6) and that Investor shall have all rights in respect of this Agreement (and in respect of the Underlying Agreements as incorporated herein) as are set forth in 11 U.S.C. § 362(b)(27), 11 U.S.C. § 561, and 11 U.S.C. § 362(b)(6), including in respect of both the foregoing clause (a) and the foregoing clause (b), without limitation, all rights of credit, deduction, setoff, offset, recoupment, and netting (collectively, "**Netting**" or "**Net**") as set forth in this Agreement, the Investor Note and the Note.

1

**2. Definitions**. Terms capitalized herein but not defined herein shall have the meanings given to such terms in the Securities Purchase Agreement. In the event of any conflict or inconsistency between a term defined herein and in any of the Underlying Agreements, such term as used in this Agreement shall govern and have the meaning ascribed to it in this Agreement for the purposes of this Agreement. All references to "$" shall be to lawful currency of the United States of America, unless otherwise specified. All references to Sections, Exhibits, and other provisions are to Sections, Exhibits and other provisions of this Agreement unless otherwise expressly stated. The following terms used in this Agreement are defined as follows:

"**Acceleration**" means the acceleration, exercise of redemption rights, required redemption, exercise of prepayment rights or the occurrence of the Maturity Date (as defined in the Note or Investor Note, as applicable), in whole or in part, of the Note or the Investor Note, as applicable, in accordance with this Agreement or the applicable Underlying Agreement.

"**Bankruptcy Code**" means Title 11 of the U.S. Bankruptcy Code.

"**Default**" means, as applicable, a Default (as defined in the Investor Note) or an Event of Default (as defined in the Note).

"**Netting Party**" means the Party exercising the right to effect any Netting hereunder or under the applicable Underlying Agreement.

"**Other Party**" means the Party other than the Netting Party.

"**Obligation**" or "**Obligations**" means, with respect to a Party, each and every present or future payment or performance obligation or liability of such Party under this Agreement or an Underlying Agreement, whether fixed, matured, unmatured, liquidated, or unliquidated.

"**Unpaid Amounts**" means, as of any date of determination, the Obligations owed by one Party to the other under such Underlying Agreements that have not been paid as of the date of determination, whether or not such amounts are then due and payable and without regard to the fair market value of the Note or the Investor Note at such time, as applicable.

**3. Netting**.

(a) <u>Optional Netting</u>. Upon the occurrence of any event that gives the Investor the right to effect an Investor Optional Netting (as defined in the Investor Note), the Investor may, at the Investor's sole discretion, by delivery of written notice to the Company, Net (each, an "**Optional Netting**") any Unpaid Amount owed by the Investor to the Company under the Investor Note or any other Underlying Agreement against (across or within each or all of the Underlying Agreements) (x) any Unpaid Amounts owed by the Company to the Investor under the Notes or (y) any Unpaid Amounts owed by the Company to the Investor under any other Underlying Agreement.

(b) <u>Automatic Netting</u>. Upon the occurrence of an Acceleration either occurring in connection with (i) a Bankruptcy Event of Default, (ii) the Maturity Date or (iii) any Prohibited Transfer, in each case, with respect to any Unpaid Amounts then owed by the Investor to the Company under the Investor Note and subject to such applicable Netting pursuant to the terms of the Investor Note (such related aggregate amount of Restricted Principal (as defined in the Note) of the Note subject to such applicable Netting, each an "**Acceleration Amount**"), the Company shall, without further notice to the Investor, Net an Acceleration Amount of Restricted Principal owed by the Company to the Investor under the Note against an amount of Principal (as defined in the Investor Note) then outstanding under the Investor Note equal to such Acceleration Amount.

2

(c) <u>Miscellaneous</u>.

(i) If an Unpaid Amount is unascertainable, the Investor may, acting in a commercially reasonable manner, estimate the Unpaid Amount thereof and Net in respect of the estimate, subject to accounting to the Company when the Unpaid Amount is ascertained. For the avoidance of doubt, except with the written consent of the Investor to a different application of Netting against any Unpaid Amounts, in the event of Optional Netting pursuant to paragraph (a) above, if Unpaid Amounts exist with respect to both the Notes and other Underlying Agreements, the Netting shall be applied first to obligations under such other Underlying Agreements (until such obligations are satisfied in full) and thereafter to obligations under the Notes.

(ii) All Netting provisions of the Investor Note, including without limitation the provisions set forth in Section 7 of the Investor Note, are hereby incorporated in this Agreement and made a part hereof as if such provisions were set forth herein.

(iii) The right of Netting provided for in this Section 3 is in addition to but without duplication of, and not in limitation of, any other right or remedy available to the Parties, whether arising under this Agreement or any Underlying Agreement, the Guarantee Agreement (as defined in the Securities Purchase Agreement) or other Security Documents (as defined in the Securities Purchase Agreement), or any other agreement, under applicable law, in equity, or otherwise. The Netting provided in this Section 3 shall be permitted without regard to fair market value of the Note or the Investor Note at any given time of determination and without giving effect to equitable subordination or any other condition effecting the rank or priority of any Obligations under any Underlying Agreement.

(iv) The Netting Party shall give the Other Party notice of any Netting pursuant to this Section 3, as soon as practicable thereafter, <u>provided</u> that failure to give such notice shall not affect the validity of the Netting.

**4. Representations and Warranties.** As of the later of (x) the Closing Date (as defined in the Securities Purchase Agreement) and (y) the Closing Date (as defined in the Note Purchase Agreement) (such later date, the "**Effective Date**"), each Party represents and warrants to the other Party that (i) it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation, formation, or organization and any other jurisdictions where its activities so require, except to the extent that the failure to be in good standing would not reasonably be expected to have a Material Adverse Effect, has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary actions to authorize such execution, delivery, and performance; (ii) the person signing this Agreement on its behalf was duly authorized to do so on its behalf on the Effective Date; (iii) this Agreement and the Underlying Agreements to which it is a party constitute its legal, valid, and binding obligations, enforceable against it in accordance with their terms, subject to applicable bankruptcy, reorganization, insolvency, conservatorship, receivership, moratorium, or other similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law); (iv) its execution and delivery of this Agreement does not contravene, or constitute a default under, any provision of applicable law or regulation (including, without limitation, any order, decree, judgment, injunction, or other judicial or governmental restriction applicable to such Party or any portion of its assets) or of the organizational documents of such Party, or of any material agreement, judgment, injunction, order, decree or other instrument binding upon such Party or result in the creation or imposition of any lien on any asset of such Party other than as provided herein; and (v) the jurisdiction of the Company's incorporation, formation, or organization and the location of its chief executive office are correctly set forth in the Underlying Agreements.

**5. Interpretation**. The Parties intend that (a) this Agreement constitute and be deemed to be a "master netting agreement" (or any substantially similar term) and that the Parties be deemed to be "master netting agreement participants" (or any substantially similar term) within the meaning of, and as such terms are used in, any law, rule, regulation, statute, or order applicable to the Parties' rights herein, whether now or hereafter enacted or made applicable, including, but not limited to, the Bankruptcy Code at 11 U.S.C. §§ 101(25), 101(47), 101(53B), 741(7) and 761(4); and (b) all Netting effectuated pursuant to this Agreement or any Underlying Agreement, be governed by the following Bankruptcy Code sections in the event of the bankruptcy of either Party: (i) Sections 555, 556, 559 and 560; (ii) Section 362(b)(6), (7) and/or (17); (iii) Sections 546(e)-(g); and (iv) Section 548(d)(2). The Parties also agree that such Netting contemplated hereunder or under any Underlying Agreement arise under "securities contracts" and constitute "settlement payments" as set forth in Sections 101 and 741 of the Bankruptcy Code. The Parties further intend that the Underlying Agreements constitute "securities contracts" as such term is defined in the Bankruptcy Code. Moreover, with respect to any Underlying Agreement, each Party thereto constitutes a "stockbroker", "financial institution" or "securities clearing agency" within the meaning of, and as such terms are used in the Bankruptcy Code and/or any law, rule, regulation, statute, or order applicable to the Parties' rights herein, whether now or hereafter enacted or made applicable.

**6. Conflicts and Inconsistencies.** In the event of any conflict or inconsistency between any provision of this Agreement and any provision of any Underlying Agreement concerning the matters set forth in this Agreement, the provisions of this Agreement shall govern.

**7. Miscellaneous.**

(a) **Governing Law; Jurisdiction; Jury Trial**. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.

(b) **Counterparts**. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof.

(c) **Headings; Gender**. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement. Unless the context clearly indicates otherwise, each pronoun herein shall be deemed to include the masculine, feminine, neuter, singular and plural forms thereof. The terms "including," "includes," "include" and words of like import shall be construed broadly as if followed by the words "without limitation." The terms "herein," "hereunder," "hereof" and words of like import refer to this entire Agreement instead of just the provision in which they are found.

4

(d)  **Severability**. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. The Parties intend that this Agreement be construed to give full effect to the intent of the Parties with respect to the Netting provisions contained herein. If any portion of the Netting contemplated herein shall be in any respect deemed or held to be invalid, illegal, or unenforceable, all other provisions of this Agreement shall survive.

(e)  **Amendments**. No provision of this Agreement may be amended or waived other than by an instrument in writing signed by the Company and the Investor.

(f)  **Notices**. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement shall be governed by the provisions of Section 9(f) of the Securities Purchase Agreement.

(g)  **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. No party may assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party.

(h)  **No Third Party Beneficiaries**. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person (as defined in the Securities Purchase Agreement).

(i)  **Survival**. The representations, warranties, agreements and covenants shall survive the Effective Date. The Investor shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

(j)  **Further Assurances**. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

(k)  **Construction**. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

(l)  **No Waiver**. A failure or delay in exercising any right, power, or privilege in respect of any Underlying Agreement or this Agreement will not be presumed to operate as a waiver of that right, power, or privilege, and a single or partial exercise of any right, power, or privilege will not be presumed to preclude any subsequent or further exercise of that right, power, or privilege, or the exercise of any other right, power, or privilege.

(m)  **Term**. This Agreement shall continue in effect from the Effective Date until terminated by agreement of the Parties or, if earlier, such time as no Investor Note remains outstanding.

**[Signature Page Follows]**

5

    **IN WITNESS WHEREOF,** the Investor and the Company have caused their respective signature page to this Master Netting Agreement to be duly executed as of the date first written above.

**COMPANY:**

**GENIUS BRANDS INTERNATIONAL, INC.**

By:

    Name:

    Title:

6

**IN WITNESS WHEREOF,** the Investor and the Company have caused their respective signature page to this Master Netting Agreement to be duly executed as of the date first written above.

**INVESTOR:**
**[INVESTOR]**

By:

    Name:
    Title:

7

Exhibit 10.6

VOTING AGREEMENT

VOTING AGREEMENT, dated as of March __, 2020 (this "**Agreement**"), by and between Genius Brands International, Inc., a Nevada corporation (the "**Company**"), and the stockholder listed on the signature page hereto under the heading "**Stockholder**".

WHEREAS, the Company and certain investors (each, an "**Investor**", and collectively, the "**Investors**") have entered into a Securities Purchase Agreement, dated as of March __ 2020 (the "**Securities Purchase Agreement**"), pursuant to which, among other things, the Company has agreed to issue and sell to the Investors and the Investors have agreed to purchase (i) Senior Secured Convertible Notes which are convertible into shares of common stock of the Company, par value $0.001 per share (the "**Common Stock**") and (ii) warrants, which are exercisable to purchase shares of Common Stock.

WHEREAS, as of the date hereof, the Stockholder owns at least _____ shares of Common Stock, which represents at least ___% of the total issued and outstanding capital stock of the Company; and

WHEREAS, as a condition to the willingness of the Investors to enter into the Securities Purchase Agreement and to consummate the transactions contemplated thereby (collectively, the "**Transaction**"), the Investors have required that the Stockholder agree, and in order to induce the Investors to enter into the Securities Purchase Agreement, the Stockholder has agreed, to enter into this Agreement with respect to all the Common Stock now owned and which may hereafter be acquired by the Stockholder prior to the date the Company obtains Nasdaq Stockholder Approval (as defined in the Securities Purchase Agreement) (such date the "**Stockholder Approval Date**") and any other securities, if any, which the Stockholder is currently entitled to vote, or after the date hereof, becomes entitled to vote prior to the Stockholder Approval Date, at any meeting of stockholders of the Company (the "**Other Securities**").

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

1. <u>Voting Agreement</u>. Subject to the last sentence of this Section 1.01, each Stockholder hereby agrees that at any meeting of the stockholders of the Company, however called, and in any action by written consent of the Company's stockholders, the Stockholder shall vote its shares of Common Stock and its Other Securities, if applicable: (a) in favor of the Nasdaq Stockholder Approval; and (b) against any proposal or any other corporate action or agreement that would result in a breach of any covenant, representation or warranty or any other obligation or agreement of the Company under the Securities Purchase Agreement or which could result in any of the conditions to the Company's obligations under the Securities Purchase Agreement not being fulfilled, as determined in good faith by the Company's officers or board of directors. The Stockholder acknowledges receipt and review of a copy of the Securities Purchase Agreement and the other Transaction Documents (as defined in the Securities Purchase Agreement). The obligations of the Stockholder under this Section 1.01 shall terminate on the date immediately following the Stockholder Approval Date.

1

2. <u>Representations and Warranties of the Stockholder</u>. The Stockholder hereby represents and warrants to each of the Investors as follows:

(a) <u>Authority Relative to This Agreement</u>. The Stockholder has all necessary legal capacity, power and authority to execute and deliver this Agreement and to perform his or its obligations hereunder. This Agreement has been duly executed and delivered by such Stockholder and, assuming due authorization, execution and delivery of this Agreement by the Company, constitutes a legal, valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with its terms, except (a) as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or similar laws now or hereafter in effect relating to, or affecting generally the enforcement of creditors' and other obligees' rights, (b) where the remedy of specific performance or other forms of equitable relief may be subject to certain equitable defenses and principles and to the discretion of the court before which the proceeding may be brought, and (c) where rights to indemnity and contribution thereunder may be limited by applicable law and public policy.

(b) <u>No Conflict</u>. The execution and delivery of this Agreement by the Stockholder does not, and the performance of this Agreement by the Stockholder shall not, (i) conflict with or violate any federal, state or local law, statute, ordinance, rule, regulation, order, judgment or decree applicable to such Stockholder or by which the Common Stock or the Other Securities owned by the Stockholder are bound or affected or (ii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, or result in the creation of a lien or encumbrance on any of the Common Stock or the Other Securities owned by the Stockholder, if any, pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which the Stockholder is a party or by which the Stockholder or the Common Stock or Other Securities owned by the Stockholder are bound.

(c) The execution and delivery of this Agreement by the Stockholder does not, and the performance of this Agreement by the Stockholder shall not, require any consent, approval, authorization or permit of, or filing with or notification to, any governmental entity by the Stockholder.

(d) <u>Title to the Stock</u>. As of the date hereof, the Stockholder is the owner of the number of shares of Common Stock set forth opposite its name on <u>Appendix A</u> attached hereto, entitled to vote, without restriction, on all matters brought before holders of capital stock of the Company, which shares of Common Stock represent on the date hereof the percentage of the outstanding stock and voting power of the Company set forth on such Appendix. Such Common Stock are all the securities of the Company owned, either of record or beneficially, by the Stockholder. Such shares of Common Stock are owned free and clear of all security interests, liens, claims, pledges, options, rights of first refusal, agreements, limitations on the Stockholder's voting rights, charges and other encumbrances of any nature whatsoever. The Stockholder has not appointed or granted any proxy, which appointment or grant is still effective, with respect to its shares of Common Stock or Other Securities, if any, owned by the Stockholder.

2

3. <u>Covenants</u>. The Stockholder hereby covenants as follows:

(a) <u>No Disposition or Encumbrance of Stock</u>. The Stockholder hereby covenants and agrees that, until the Stockholder Approval Date, except as contemplated by this Agreement, the Stockholder shall not offer or agree to sell, transfer, tender, assign, hypothecate or otherwise dispose of, grant a proxy or power of attorney with respect to, or create or permit to exist any security interest, lien, claim, pledge, option, right of first refusal, agreement, limitation on such Stockholder's voting rights (except for such agreements or limitations that would not adversely affect the Stockholder's ability to perform its obligations under this Agreement), charge or other encumbrance of any nature whatsoever ("**Encumbrance**") with respect to its shares of Common Stock or Other Securities, directly or indirectly, initiate, solicit or encourage any person to take actions which could reasonably be expected to lead to the occurrence of any of the foregoing; <u>provided</u>, <u>however</u>, that the Stockholder may assign, sell or transfer any Common Stock or Other Securities provided that any such recipient of the Common Stock or Other Securities has delivered to the Company a written agreement in form and substance substantially similar to this Agreement.

(b) <u>Company Cooperation</u>. The Company hereby covenants and agrees that it will not, and such Stockholder irrevocably and unconditionally acknowledges and agrees that the Company will not (and waives any rights against the Company in relation thereto), recognize any Encumbrance or agreement on any of the Common Stock or Other Securities subject to this Agreement unless the provisions of Section 3.01 have been complied with.

4. <u>Miscellaneous</u>.

(a) <u>Further Assurances</u>. The Stockholder will execute and deliver such proxies, powers of attorney and similar documents and instruments and take all further action as may be reasonably necessary in order to consummate the transactions contemplated by Section 1.01 hereof.

(b) <u>Specific Performance</u>. The parties hereto agree that irreparable damage would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the Company shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity.

(c) <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the Company and the Stockholders with respect to the subject matter hereof and supersedes all prior agreements and understandings, both written and oral, among the Company and the Stockholders with respect to the subject matter hereof.

3

(d) <u>Amendment</u>. The provisions of this Agreement may not be amended or waived, nor may this Agreement be terminated by the Company other than pursuant to the provisions of Section 4.07.

**(e)** <u>Severability</u>. If any provision of this Agreement is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(f) <u>Governing Law</u>. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. The parties hereby agree that all actions or proceedings arising directly or indirectly from or in connection with this Agreement shall be litigated only in the Supreme Court of the State of New York or the United States District Court for the Southern District of New York located in New York County, New York. The parties consent to the jurisdiction and venue of the foregoing courts and consent that any process or notice of motion or other application to any of said courts or a judge thereof may be served inside or outside the State of New York or the Southern District of New York by registered mail, return receipt requested, directed to the party being served at its address set forth on the signature ages to this Agreement (and service so made shall be deemed complete three (3) days after the same has been posted as aforesaid) or by personal service or in such other manner as may be permissible under the rules of said courts. Each of the Company and each Stockholder irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such suit, action, or proceeding brought in such a court and any claim that suit, action, or proceeding has been brought in an inconvenient forum. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(g) <u>Termination</u>. This Agreement shall terminate on the date immediately following the Stockholder Approval Date. In the event that (i) the Stockholder fully complies with its obligations pursuant to Sections 1.01, 3.01 and 4.01, and (ii) the Nasdaq Stockholder Approval are obtained by the Company, then the Stockholder shall not have any further liability hereunder for any action, failure to act, event, circumstance or condition, whether the same shall occur before or after the Stockholder Approval Date.

**[Signature Page Follows]**

4

IN WITNESS WHEREOF, each Stockholder and the Company has duly executed this Agreement.

**THE COMPANY:**

**GENIUS BRANDS INTERNATIONAL, INC.**

By: _____

Name: _____

Title: _____

Dated: March __, 2020

Address: _____

5

|  | **STOCKHOLDER:** |
| --- | --- |
|  | **Exact Name of Stockholder** |
|  | **Authorized Signature** |
|  | **Title** |
| Dated: March __, 2020 |  |
|  | Address: |
|  | 6 |

**APPENDIX A**

| Stockholder | Common Stock Owned | Percentage of Stock Outstanding |
|---|---|---|
| | | |

7

Exhibit 10.7

**GENIUS BRANDS INTERNATIONAL, INC.**
March __, 2020

Genius Brands International, Inc.
190 N. Canon, 4th Floor
Beverly Hills, CA 90210
Telephone: (310) 273-4222
Facsimile: (310) 273-4202
Attention: Robert L. Denton
E-mail: bdenton@gnusbrands.com

Re: Genius Brands International, Inc. - Lock-Up Agreement

Dear Sirs:

This Lock-Up Agreement is being delivered to you in connection with the Securities Purchase Agreement (the "**Securities Purchase Agreement**"), dated as of March 11, 2020 by and among Genius Brands International, Inc. (the "**Company**") and the investors party thereto (the "**Buyers**"), with respect to the issuance of (i) a new series of senior secured convertible notes of the Company, which are convertible into shares of Common Stock and (ii) warrants which will be exercisable to purchase shares of Common Stock. Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement.

In order to induce the Buyers to enter into the Securities Purchase Agreement, the undersigned agrees that, commencing on the date hereof until ninety (90) days following the one year anniversary of the Closing Date (as defined in the Securities Purchase Agreement) (the "**Lock-Up Period**"), the undersigned will not, and will cause all affiliates (as defined in Rule 144 promulgated under the 1933 Act) of the undersigned, or any person with whom the undersigned or any affiliate of the undersigned is acting as a group, not to, (i) sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase, make any short sale or otherwise dispose of or agree to dispose of, directly or indirectly, any shares of Common Stock or Common Stock Equivalents, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Securities and Exchange Act of 1934, as amended and the rules and regulations of the Securities and Exchange Commission promulgated thereunder with respect to any shares of Common Stock or Common Stock Equivalents owned directly by the undersigned (including holding as a custodian) or with respect to which the undersigned has beneficial ownership within the rules and regulations of the Securities and Exchange Commission (collectively, the "**Undersigned's Shares**"), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any of the Undersigned's Shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of shares of Common Stock or other securities, in cash or otherwise, (iii) make any demand for or exercise any right or cause to be filed a registration statement, including any amendments thereto, with respect to the registration of any shares of Common Stock or Common Stock Equivalents or (iv) publicly disclose the intention to do any of the foregoing.

The foregoing restriction is expressly agreed to preclude the undersigned, and any affiliate of the undersigned and any person with whom the undersigned or any affiliate of the undersigned is acting as a group, from engaging in any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Undersigned's Shares even if the Undersigned's Shares would be disposed of by someone other than the undersigned. Such prohibited hedging or other transactions would include, without limitation, any short sale or any purchase, sale or grant of any right (including, without limitation, any put or call option) with respect to any of the Undersigned's Shares or with respect to any security that includes, relates to, or derives any significant part of its value from the Undersigned's Shares.

1

Notwithstanding the foregoing, the undersigned may transfer the Undersigned's Shares (a) (i) as a *bona fide* gift or gifts, including to charitable organizations or charitable trusts, provided that the donee or donees thereof (other than a charitable organization or charitable trust transferee) agree to be bound in writing by the restrictions set forth herein, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned, including pursuant to any will or intestate succession upon the death of the undersigned, provided that the trustee of the trust agrees to be bound in writing by the restrictions set forth herein, and provided further that any such transfer shall not involve a disposition for value, (iii) by operation of law, such as pursuant to a qualified domestic order or in connection with a divorce settlement or other court order or (iv) if any affiliate of the undersigned is a corporation, partnership, limited liability company, trust or other business entity, (1) to another corporation, partnership, limited liability company, trust or other business entity that is a direct or indirect affiliate of the undersigned or (2) as distributions to the partners, limited liability company members or stockholders of such corporation, partnership, limited liability company, trust or other business entity, or holders of similar equity interest in such entity, provided, in each case, that the transferee or transferees thereof agree to be bound in writing by the restrictions set forth herein; or (b) to any third-party pledgee in a *bona fide* transaction as collateral to secure obligations pursuant to lending or other arrangements between such third parties (or their affiliates or designees) and the undersigned and/or its affiliates or any similar arrangement relating to a financing arrangement for the benefit of the undersigned and/or its affiliates, provided that, upon foreclosure on the pledged Undersigned's shares, any such pledgee or other party agrees to be bound in writing by the restrictions set forth herein. In addition, the foregoing shall not apply to (x) the acquisition or exercise of any stock option issued pursuant to the Company's existing equity incentive plans, provided that any securities issued upon such acquisition or exercise, as applicable, shall then become subject to the restrictions set forth herein, or (y) the entry into any plan, contract or instruction complying with Rule 10b5-1 of the 1934 Act, provided that sales under any such new trading plan do not occur during the Lock-Up Period and to the extent a public announcement or filing under the 1934 Act, if any, is required of or voluntarily made by or on behalf of the undersigned or the Company regarding the establishment of such plan, such announcement or filing will include a statement to the effect that no transfer of the Undersigned's Shares may be made under such plan during the Lock-Up Period. For purposes of this Lock-Up Agreement, "immediate family" shall mean any relationship by blood, marriage or adoption, not more remote than first cousin. The undersigned also agrees and consents to the entry of stop transfer instructions with the Company's transfer agent (the "**Transfer Agent**") and registrar against the transfer of the Undersigned's Shares except in compliance with the foregoing restrictions.

Notwithstanding the foregoing, the undersigned shall be permitted to make transfers, sales, tenders or other dispositions of the Undersigned's Shares to a bona fide third party pursuant to a tender or exchange offer for securities of the Company or other transaction, including, without limitation, a merger, consolidation or other business combination, involving a change in control that, in each case, has been approved by the Board of Directors of the Company (including, without limitation, entering into any lock-up, voting or similar agreement pursuant to which the undersigned may agree to transfer, sell, tender or otherwise dispose of the Undersigned's Shares in connection with any such transaction, or vote any of the Undersigned's Shares in favor of any such transaction), provided that all of the Undersigned's Shares subject to this Lock-Up Agreement that are not so transferred, sold, tendered or otherwise disposed of remain subject to this Lock-Up Agreement; and provided, further, that it shall be a condition of transfer, sale, tender or other disposition that if such tender offer or other transaction is not completed, any of the Undersigned's Shares subject to this Lock-Up Agreement shall remain subject to the restrictions herein.

In order to enforce this covenant, the Company shall impose irrevocable stop-transfer instructions preventing the Transfer Agent from effecting any actions in violation of this Lock-Up Agreement.

The undersigned acknowledges that the execution, delivery and performance of this Lock-Up Agreement is a material inducement to each Buyer to complete the transactions contemplated by the Securities Purchase Agreement and that the Company shall be entitled to specific performance of the undersigned's obligations hereunder. The undersigned hereby represents that the undersigned has the power and authority to execute, deliver and perform this Lock-Up Agreement, that the undersigned has received adequate consideration therefor and that the undersigned will indirectly benefit from the closing of the transactions contemplated by the Securities Purchase Agreement.

The undersigned understands and agrees that this Lock-Up Agreement is irrevocable and shall be binding upon the undersigned's heirs, legal representatives, successors, and assigns.

This Lock-Up Agreement may be executed in two counterparts, each of which shall be deemed an original but both of which shall be considered one and the same instrument.

This Lock-Up Agreement will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflicting provision or rule (whether of the State of New York, or any other jurisdiction) that would cause the laws of any jurisdiction other than the State of New York to be applied. In furtherance of the foregoing, the internal laws of the State of New York will control the interpretation and construction of this Lock-Up Agreement, even if under such jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

*[Remainder of page intentionally left blank]*

2

Very truly yours,

_____
Exact Name of Shareholder

_____
Authorized Signature

_____
Title

Agreed to and Acknowledged:
**GENIUS BRANDS INTERNATIONAL, INC.**
By: _____
    Name:
    Title:

3