**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

              Plaintiff,

    v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; RICHARD MOLINSKY,

              Defendants,

    -and-

KARTOON STUDIOS, INC.,

              Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' OMNIBUS MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page(s)

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iv

PRELIMINARY STATEMENT ....................................................................................... 1

SUMMARY OF UNDISPUTED FACTS ........................................................................ 3

     A.     Late 2019:  Genius's Desperate Need for Financing ................................. 3

     B.     January 2020:  Genius Explores a "PIPE" Transaction ........................... 3

     C.     March 2020:  The PIPE Transaction Closes and Genius Issues Convertible
               Notes and Warrants to Defendants ........................................................... 4

     D.     March-May 2020: Genius's Stock Price Soars and Genius Raises
               Additional Capital through Registered Direct Transactions .................... 6

     E.     May-June 2020: Genius Offers to Register the Shares That Each
               Defendant Received from Warrants and Convertible Notes on the
               Condition that the Defendant Enter into a Leak-Out Agreement ............ 6

PERTINENT PROCEDURAL HISTORY .......................................................................7

APPLICABLE LEGAL STANDARDS ........................................................................... 8

     A.     Summary Judgment ................................................................................... 8

     B.     Section 16(b) of the Securities Exchange Act ......................................... 8

ARGUMENT .................................................................................................................. 10

I.     THERE IS NO TRIABLE ISSUE OF A SECTION 16(b) GROUP AMONG THE
     DEFENDANTS ...................................................................................................10

     A.     The Record Evidence Establishes that Defendants Made Independent
               Investment Decisions Without Coordination ........................................... 10

     B.     The Record Shows That Defendants Made Independent, Parallel
               Investments .............................................................................................. 13

     C.     Arbitrarily Characterizing Defendants as a Group Would Not Further
               Section 16(b)'s Purpose ........................................................................... 14

D.     Plaintiff's Argument that the Terms of the March 2020 Transaction Are Not "Industry Standard" is a Red-Herring ................................................. 16

II.     THE SUMMARY JUDGMENT RECORD REFUTES PLAINTIFF'S THEORY OF GROUP FORMATION ......................................................................... 19

    A.     None of the Defendants' Activity Prior to the March 2020 Transaction Supports the Existence of a Group .................................................. 19

       1.     Anson Did Not Enter a Group with Genius's CEO Heyward Merely by Executing the Term Sheet ........................................ 19

       2.     Brio, Empery, CVI and Iroquois Did Not Join a Group by Independently Deciding Whether to Consent to the March 2020 Transaction ............................................................................... 20

    B.     The March 2020 Transaction Terms Do Not Show the Existence of a Section 16(b) Group ................................................................ 21

       1.     The Transaction Documents Do Not Contemplate Coordination Among the Defendants ....................................................... 21

       2.     The Voting and Lock-Up Agreements between the Company and Other Shareholders Do Not Create a Group Among the Defendants ........ 22

       3.     The Voting Agreements Did Not Make Defendants Beneficial Owners of Principal Shareholders' Shares ................................. 24

    C.     The May 2020 Registered Direct Transactions Did Not Give Rise to a Group ...................................................................................... 25

    D.     Salesmanship in SEG's Solicitation of Defendants' Investments Does Not Make Defendants a Group .......................................................... 27

    E.     Each Defendant's Independent Decision to Execute Leak-Out Agreements in Exchange for Early Registration of Their Shares Did Not Create a Group ...................................................................................... 28

    F.     Defendants' Provisions of Waivers and Consents and the Conversion Agreements Likewise Fail to Raise a Viable Inference of a Group ............ 32

III.     PLAINTIFF HAS FAILED TO ESTABLISH THAT DEFENDANTS MET THE TEN PERCENT TEST AT ANY PARTICULAR RELEVANT TIME ...................... 32

    A.     Plaintiff's Failure to Show the Existence of a Group Until the Execution of the SPA or the Execution of the Leak-Out Agreements Entitles Defendants, at a Minimum, to Partial Summary Judgment ................................. 33

B.    Plaintiff Has Failed to Offer Evidence Showing That the Putative Group
Continued Through July 8, 2020 ...........................................................................33

C.    Plaintiff's Analysis Does Not Establish That Each Alleged Permutation of
The Group Would Exceed The 10 Percent Threshold at All Relevant
Times......................................................................................................................35

CONCLUSION........................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Augenbaum v. Anson Invs. Master Fund LP et al.*,
   2024 WL 263208 (S.D.N.Y. Jan. 24, 2024) ....................................................................31–32

*Bennigson v. Huntsman*,
   2013 WL 5348461 (S.D.N.Y. Sept. 24, 2013)........................................................................9

*Boyle v. United States*,
   556 U.S. 938 (2009).............................................................................................................12

*Cartica Mgmt., LLC v. Corpbanca, S.A.*,
   50 F. Supp. 3d 477 (S.D.N.Y. 2014)...............................................................................24, 25

*Chechele v. Scheetz*,
   819 F. Supp. 2d 342 (S.D.N.Y. 2011)...................................................................8–9, 11, 23

*Chechele v. Scheetz*,
   466 F. App'x 39 (2d Cir. 2012) .........................................................................................8–9

*CSX Corp. v. Child's Inv. Fund Mgmt. (UK) LLP*,
   654 F.3d 276 (2d Cir. 2011)............................................................................................10, 17

*Donoghue v. Centillium Commc'ns, Inc.*,
   959 F.3d 541 (2d Cir. 2020)...................................................................................................9

*Donoghue v. Centillium Commc'ns, Inc.*,
   2006 WL 775122 (S.D.N.Y. Mar. 28, 2006) ..........................................................................9

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 544 (S.D.N.Y. 2014)...................................................................................11

*Foremost-McKesson, Inc. v. Provident Sec. Co.*,
   423 U.S. 232 (1976).................................................................................................9, 33, 34

*Greenberg v. Hudson Bay Master Fund Ltd.*,
   2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015)..............................................................30

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
   156 F.3d 305 (2d Cir. 1998)...................................................................................................9

*Harlen Assocs. v. Inc. Vill. of Mineola*,
   273 F.3d 494 (2d Cir. 2001).................................................................................................15

*Jaffer v. Hirji*,
   887 F.3d 111 (2d Cir. 2018)...................................................................................................8

*Kern County Land Co. v. Occidental Petroleum Corp.*,
411 U.S. 582 (1973)........................................................................................................15

*Litzler v. CC Invs., L.D.C.*,
411 F. Supp. 2d 411 (S.D.N.Y. 2006)................................................................10, 11, 25–26

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*,
223 F. Supp. 2d 435 (S.D.N.Y. 2001)................................................................................26

*Lowinger v. Morgan Stanley & Co. LLC*,
841 F.3d 122 (2d Cir. 2016)...................................................................................... *passim*

*Magma Power Co. v. Dow Chem. Co.*,
136 F.3d 316 (2d Cir. 1998).............................................................................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).........................................................................................................12

*McKinney v. City of Middletown*,
49 F.4th 730 (2d Cir. 2022) ...............................................................................................8

*Morales v. Freund,*
163 F.3d 76 (2d Cir. 1999)...............................................................................................18

*Morales v. New Valley Corp.*,
999 F. Supp. 470 (S.D.N.Y. 1998) ...................................................................................18

*Morales v. Quintel Ent., Inc.*,
249 F.3d 115 (2d Cir. 2001).........................................................................................9, 34

*Nano Dimension Ltd. v. Murchinson Ltd.*,
681 F. Supp. 3d 168 (S.D.N.Y. July 10, 2023)..................................................................11

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)........................................................................................10, 34

*Rubenstein v. Int'l Value Advisers, LLC*,
363 F. Supp. 3d 379 (S.D.N.Y. 2019)..................................................................................9

*Saeli v. Chautauqua Cnty.*,
36 F.4th 445 (2d Cir. 2022) .............................................................................................26

*Schaffer v. CC Invs., LDC*,
153 F. Supp. 2d 484 (S.D.N.Y. 2001)..........................................................................21–22

*Sec. & Exch. Comm'n v. Honig*,
2023 WL 6386918 (S.D.N.Y. Sept. 29, 2023)...................................................................25

v

*Sharp v. Navistar Int'l Corp.*,
  2020 WL 7062557 (N.D. Ill. Nov. 30, 2020) ..................................................26

*Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*,
  575 F.3d 199 (2d Cir. 2009)...........................................................................8

**Statutes, Rules, and Regulations**

15 U.S.C. § 78m(d)(3) .......................................................................................10

15 U.S.C. § 78p(b) .........................................................................................1, 32

17 C.F.R. § 230.144(d)(1)(i) (2024) ..................................................................4

17 C.F.R. § 240.13d–5(b)(1)(i) (2024) ............................................................28

17 C.F.R. § 240.16a–1(a)(1) (2024) ..............................................................9–10

Fed. R. Civ. P. 56(a) ..........................................................................................8

Exchange Act Rule 13d-5(b)(1)........................................................................10

Exchange Act Rule 16a-1(a)(1) .........................................................................9

SEC Rule 144..................................................................................................7

SEC Rule 144(d)(1)(i).......................................................................................4

Securities Exchange Act Section 16(b), 15 U.S.C. § 78p(b) ............................... *passim*

**Other Authorities**

*Filing and Disclosure Requirements Relating to Beneficial Ownership*, Securities
  Act No. 5, 925 (Apr. 21, 1978)........................................................................7

SEC Division of Corporation Finance, Compliance and Disclosure
  Interpretations: Exchange Act Section 16 and Related Rules and Forms, at
  Question & Answer 105.06 (Oct. 7, 2022) ......................................................24

SEC Division of Corporation Finance, Compliance and Disclosure
  Interpretations: Exchange Act Section 16 and Related Rules and Forms, at
  Question & Answer 110.02 (April 24, 2009) ...................................................34

## PRELIMINARY STATEMENT

In March 2020, on the eve of the nationwide COVID-19 shutdown, Genius[1] was on "death's doorstep," with just $18,000 left in the bank.  To raise capital and stave off bankruptcy, Genius entered into the March 2020 Transaction with Defendants—seven investment firms and one individual investor.  The economic risks underlying the investments drove the negotiated terms, and each Defendant made its own independent decision to invest.  Those incredibly risky investments paid off.  In the following months, and following several additional offerings, Genius emerged from the brink of bankruptcy with its shares trading as high as thirty times the conversion price of Defendants' notes, giving each Defendant the opportunity to sell its own shares at a substantial profit.  This lawsuit followed, asserting both long-rejected and novel theories that Defendants acted as a "group" in making their investments, and demanding disgorgement of their profits pursuant to Section 16(b) of the Securities Exchange Act, 15 U.S.C. § 78p(b).

The Court cautioned at the pleading stage, that Plaintiff "must find evidence to support his claims in discovery," such as "emails and meetings among the defendants and a coordinated strategy relating to Genius Securities."  (Dkt. No. 142 at 9.)  Following comprehensive discovery, the evidence is now in.  Its silence is deafening.  There is no evidence of communication among Defendants, no evidence of a meeting attended by Defendants, and no evidence of a coordinated strategy.  To the contrary, every fact witness in this case—from each of the eight Defendants, the placement agent that negotiated the transaction on the company's behalf, and Genius, the company that theoretically stands to receive hundreds of millions of dollars if Plaintiff prevails—testified that each Defendant made its own independent investment decisions and was not acting as part of

---

[1]  Capitalized terms have the meanings ascribed to them in Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF"), filed herewith.  Citations to "GD Ex." refer to exhibits to the Transmittal Declaration of Andrew D. Gladstein, Esq. filed herewith. All emphases are added except where otherwise indicated.

a group.  Defendants' communications and trading patterns confirm that conclusion.

This Court warned Plaintiff that he would have an "uphill climb" if "discovery doesn't reveal anything beyond industry-standard contracts and parallel investments."  (Dkt. No. 142 at 9.)  But that is all that discovery has revealed.  Undeterred, Plaintiff now claims there was a group because certain terms of the March 2020 Transaction documents were not "industry-standard."  But those terms are not unusual, and even if Plaintiff's characterization were true, it is irrelevant.  The issue is whether Defendants coordinated their investments in furtherance of a common objective.  Section 16(b) certainly does not prescribe the use of particular transaction terms.

Plaintiff also asserts that "leak-out" agreements executed by Defendants in May and June 2020 are evidence of a group.  They are not.  Each Defendant independently agreed, *at Genius's request*, to limit the volume of shares that it could sell if and when stock prices fell below given thresholds.  The Second Circuit has held that a lock-up agreement between multiple shareholders and an issuer does not raise an inference of a group.  Here, there is not even a single agreement:  Each Defendant signed its *own* leak-out agreement (the functional equivalent of a lock-up agreement) directly with Genius.

It is precisely in circumstances where, as here, there is an utter failure of proof, and undisputed facts, that summary judgment in Defendants' favor is appropriate.  Plaintiff points to a handful of unremarkable aspects of Defendants' independent investments and concludes that there must have been a group.  But those independent decisions by sophisticated investment managers (and the lone individual) were driven not by coordination but by common economic and market forces.  There is simply no evidence of coordinated activity.  To hold otherwise would open the door to triable group issues in virtually any parallel transaction and threaten the survival of not only this critical marketplace for public companies in need of capital, but others as well.

## SUMMARY OF UNDISPUTED FACTS

### A.  Late 2019:  Genius's Desperate Need for Financing

Genius is a NASDAQ-traded media company specializing in children's programming. (SUMF ¶¶ 1–2.)  In late 2019, Genius desperately needed financing to avoid bankruptcy, including so that it could avoid defaulting on senior secured convertible notes issued in its 2018 PIPE transaction.  (SUMF ¶¶ 31–32.)  After a failed public offering led by investment bank Aegis Capital Corp., Genius turned to SEG to seek private financing.  (SUMF ¶ 34.)  SEG is a placement agent and investment bank that regularly advises microcap and nanocap companies on financing transactions, including PIPE transactions.  (SUMF ¶ 35.)  SEG's principals are Joe Reda ("Reda") and Jonathan Schechter ("Schechter").  (SUMF ¶ 36.)

In September 2019, SEG began exploring short term solutions to Genius's need for capital. (SUMF ¶ 43.)  Those efforts included a "friends and family" round (which failed); repricing certain existing warrants from prior transactions to induce holders of those warrants to exercise; extending the maturity date on the 2018 Convertible Notes; a direct transaction with Genius's Chief Executive Officer ("CEO"); and a registered direct transaction with Anson, a longtime Genius shareholder.  (SUMF ¶¶ 43, 44, 52, 57, 65, 67.)

### B.  January 2020:  Genius Explores a "PIPE" Transaction

SEG sought to find a longer-term capital solution for Genius, including by exploring transactions with Genius's institutional shareholders.  (SUMF ¶¶ 72, 75, 83, 92.)  By mid-January 2020, Anson sent SEG a proposed term sheet contemplating a $3 million investment by Anson "as a lead investor" in a "PIPE" transaction.  (SUMF ¶ 95.)  "PIPE," or "private investment in public equity," means a privately-negotiated transaction in a company with publicly-issued securities, as distinguished from a public offering of securities to the market.  (SUMF ¶ 22.)

A final term sheet was executed on January 22, 2022 (the "Term Sheet").  (SUMF ¶ 108.)

3

SEG immediately began to market the transaction to potential investors. (SUMF ¶ 116.) Ultimately, each Defendant—without any coordination on their part—independently indicated an interest in the transaction and was provided additional information on the condition they keep that information confidential. (SUMF ¶¶ 118, 121.) Draft documents were prepared for the transaction, and some—but not all—Defendants communicated their comments on the draft documents to Genius through SEG. (SUMF ¶¶ 142–43.)

There is no evidence of any emails, calls, or meetings among any Defendants while the March 2020 Transaction was being negotiated and documented. (SUMF ¶¶ 172–74.) That is not surprising: SEG's corporate representative, Schechter, testified that Defendants "wouldn't want to be on a call with one another. They don't like one another. They're competitors." (SUMF ¶ 16 (GD Ex. 16, Schechter Dep. 246:14–17).)

### C. March 2020:  The PIPE Transaction Closes and Genius Issues Convertible Notes and Warrants to Defendants

The March 2020 Transaction closed on March 11, 2020, and Genius issued senior Convertible Notes and Warrants to Defendants in varying quantities. (SUMF ¶¶ 166–67.) The convertible notes issued by Genius were debt obligations that Genius owed to the various Defendants, and which Defendants could convert to Genius stock at a specified price. (SUMF ¶¶ 167–68.) The warrants were option instruments that permitted Defendants to purchase specified amounts of stock from Genius at a specified price. (SUMF ¶ 167.) Under an SEC rule, because the Genius shares that could be purchased using the warrants were not registered with the SEC at the time of the March 2020 Transaction, Defendants who purchased Genius shares using those warrants could not sell those shares until at least a six-month waiting period had passed or a resale registration statement was filed and declared effective by the SEC. *See* SEC Rule 144(d)(1)(i), 17 C.F.R. § 230.144(d)(1)(i) (2024).

4

The March 2020 Transaction included the following provisions:

(i)    In the governing Securities Purchase Agreement ("March SPA"), Genius explicitly disclaimed that the Defendants were part of a Section 16(b) "group." (GD Ex. 204, TOON00000001, -050–51.)

(ii)   Because Genius "could potentially be issuing more than 20 percent of [its] outstanding stock at a discount" as a result of the transaction, Genius would need shareholder approval for the transaction under NASDAQ's rules. (SUMF ¶¶ 178–79 (GD Ex. 16, Schechter Dep. 268:18–22).) The March SPA accordingly required Genius to enter into Voting Agreements with certain shareholders who together held 40% of Genius's outstanding common stock, including Genius's CEO (the "Principal Stockholders"). (SUMF ¶ 181.) In those Voting Agreements, obtained by Genius, Principal Stockholders agreed with Genius to vote all of their shares in favor of the March 2020 Transaction. (SUMF ¶ 182.)

(iii)  Genius also obtained Lock-Up Agreements from Principal Stockholders, which precluded them from selling shares of the Company's common stock until 90 days after the one-year anniversary of the closing date of the March 2020 Transaction in order to foster an orderly marketplace. (SUMF ¶ 188.)

(iv)   Each Defendant also entered into a Master Netting Agreement, which did not provide for "netting" of gains, losses, payments or obligations among Defendants. (SUMF ¶ 195-96.)

None of the Defendants was a party to any of the Voting Agreements or Lock-Up Agreements. There is no evidence that any Defendant requested either of those agreements. (SUMF ¶¶ 185, 193.)

5

### D. March-May 2020: Genius's Stock Price Soars and Genius Raises Additional Capital through Registered Direct Transactions

After the March 2020 Transaction closed, Genius's stock price increased significantly as the broader stock market recovered. (SUMF ¶ 199.) Genius took advantage of the increase in its stock price to raise capital in a series of registered direct offerings. (*Id.*) A "registered direct offering" means that an issuer (here, Genius) is selling securities registered with the SEC directly to investors, typically through a placement agent (here, SEG). (SUMF ¶ 66 (GD Ex. 16, Schechter Dep. 24:6–25:4).)

In Genius's first such offering, in March 2020, only two Defendants—Brio and Anson—chose to participate. (SUMF ¶ 205.) No other Defendant invested. (*Id.*) A representative of Empery explained to SEG that it was "a dumb investment . . . that [Empery] would have no part of." (SUMF ¶¶ 206–07 (GD Ex. 23, Lane Dep. 149:10–150:8, 150:18–21).)

In May 2020, Genius's stock price rose again and SEG facilitated four additional registered direct offerings on Genius's behalf. (SUMF ¶¶ 199, 214, 227, 254, 269.) Some Defendants participated in some of these offerings; others did not. (*Id.*)

There is no evidence of any emails, calls, or meetings among any Defendants concerning those registered direct offerings. (SUMF ¶¶ 172–73, 217–18.) Each Defendant made its own investment decisions with respect to each of those offerings. (SUMF ¶¶ 217–19, 229–31, 255–57, 273–75.)

### E. May-June 2020: Genius Offers to Register the Shares That Each Defendant Received from Warrants and Convertible Notes on the Condition that the Defendant Enter into a Leak-Out Agreement

In light of Genius's rising stock price, Empery contacted SEG to request that Genius consider registering the shares from the warrants Empery received in the March 2020 Transaction so that those shares would become freely tradeable immediately, rather than after the expiration of

the six-month waiting period prescribed by SEC Rule 144.  (GD Ex. 8, Lane Decl. ¶¶ 34–35.)

Given the significant volume of shares connected to the outstanding warrants, Genius and SEG were concerned about the impact that sales of those shares could have on the trading price of Genius's stock.  (SUMF ¶¶ 244–45.)  Genius decided to offer each Defendant the opportunity to have its shares registered provided that Defendant execute a bilateral leak-out agreement with Genius to limit the number of shares that Defendant could sell *if* Genius's stock price was below a given level.  (SUMF ¶¶ 239, 241–42, 261.)  Each Defendant independently decided to accept this offer, and each signed a separate Leak-Out Agreement with the Company on May 18, 2020.  (SUMF ¶¶ 258, 262–63.)

In June 2020, Genius offered each Defendant a chance to register another tranche of its shares—*i.e.*, the shares the Defendant obtained through conversion of the 2020 Convertible Notes—on that same condition.  (SUMF ¶¶ 286, 291.)  Each Defendant chose to accept that offer, and executed a separate leak-out agreement as Genius requested.  (SUMF ¶ 294.)

There is no evidence of any emails, calls, or meetings among any Defendants concerning those Leak-Out Agreements.  (SUMF ¶ 297.)  Each Defendant made its own decisions with respect to each of those Leak-Out Agreements.  (SUMF ¶ 298.)

As it happened, Genius's stock price remained above the "trigger" set in the Leak-Out Agreements throughout the period that those agreements were in effect, and so those agreements did not constrain any Defendant's sale of Genius stock.  (SUMF ¶¶ 261, 296.)

## PERTINENT PROCEDURAL HISTORY

Plaintiff initially demanded that Genius pursue a Section 16(b) claim against the Defendants.  (SUMF ¶ 5.)  Genius conducted an internal investigation, concluded that such a claim would be meritless, and declined to bring one.  (*Id.*)

On January 11, 2022, Plaintiff brought this action, alleging a single claim against

Defendants under Section 16(b).  (Dkt. No. 1.)  That complaint was dismissed.  (Dkt. No. 101.)

On May 1, 2023, Plaintiff filed his Amended Complaint (Dkt. No. 105), and Defendants again moved to dismiss the action.  (Dkt. No. 123–24.)  This Court concluded that the allegations were sufficient to survive that motion.  (Dkt. No. 142.)  The Court cautioned, however, that Plaintiff "must find evidence" such as "emails and meetings" or a "coordinated strategy relating to Genius Securities" to avoid an "uphill climb on summary judgment."  (*Id.* at 9.)

After comprehensive discovery, there is no competent evidence of coordination among Defendants.  Accordingly, entry of summary judgment in Defendants' favor is now appropriate.

APPLICABLE LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant 'bears the initial burden of showing that there is no genuine dispute as to a material fact.'"  *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018)).  "But where 'the burden of proof at trial would fall on the nonmoving party,' the moving party can shift the initial burden by 'point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'"  *Jaffer*, 887 F.3d at 114 (alteration in original) (quoting *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009)).  Here, Defendants respectfully submit that the lack of evidence warrants such burden shifting.

### B.  Section 16(b) of the Securities Exchange Act

Section 16(b) "imposes strict liability on insiders, including officers, directors, and beneficial owners of more than 10% of a company's securities, who realize short-swing profits."  *Chechele v. Scheetz,* 819 F. Supp. 2d 342, 345 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir.

8

2012).    Short-swing profits are generated from "the purchase and sale (or vice versa) of a company's stock within a six-month period by persons deemed to be 'insiders'. . . ." *Id.* (internal quotations and citation omitted).    Section 16(b) requires that any such profits be disgorged to the issuer of the stock. *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).    Thus, to establish liability under Section 16(b), a plaintiff must prove "that there was (1) a purchase and (2) a sale of securities (3) by [an insider] (4) within a six-month period."    *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

The statute is prophylactic in nature, as it "was enacted to prevent corporate insiders from using non-public information to 'speculate in the stock of the corporations to which they owe a fiduciary duty.'" *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 388 (S.D.N.Y. 2019) (quoting *Donoghue v. Centillium Commc'ns, Inc.,* No. 05 Civ. 4082 (WHP), 2006 WL 775122, at *2 (S.D.N.Y. Mar. 28, 2006)), *aff'd*, 959 F.3d 541 (2d Cir. 2020).    Accordingly, the Supreme Court has emphasized that Section 16(b)'s strict-liability regime must be confined within "narrowly drawn limits," *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251–52 (1976), and is reluctant "to exceed a literal, mechanical application of the statute." *Bennigson v. Huntsman*, No. 13 Civ. 452 (KBF), 2013 WL 5348461, at *5 (S.D.N.Y. Sept. 24, 2013).

Here, it is undisputed that no Defendant beneficially owned more than 10% of the Company's stock at any relevant time. (SUMF ¶ 19.)    Accordingly, Defendants cannot be liable here under Section 16(b) unless they acted as a "group":

(i)    Exchange Act Rule 16a-1(a)(1) provides that "for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities," the term "beneficial owner" means "any person who is deemed a beneficial owner pursuant to section 13(d)" of the Exchange Act.    17 C.F.R.

9

§ 240.16a–1(a)(1) (2024).

(ii)    Section 13(d), in turn, provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."  15 U.S.C. § 78m(d)(3).

(iii)    Exchange Act Rule 13d-5(b)(1), promulgated under that subsection, provides that "[w]hen two or more persons ***agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer***, the group formed thereby shall be deemed to have acquired beneficial ownership . . . of all equity securities of that issuer beneficially owned by any such persons."  17 C.F.R. § 240.13d–5(b)(1)(i) (2024) (emphasis added); *see also Roth v. Jennings*, 489 F.3d 499, 507–08 (2d Cir. 2007).

While the agreement contemplated by Rule 13d-5(b)(1) can be formal or informal, the "touchstone of a group . . . is that the members combined in furtherance of a common objective." *CSX Corp. v. Child's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011) (quoting *Roth*, 489 F.3d at 508).  As explained below, there was no such combination or coordination here.

## ARGUMENT

### I.    THERE IS NO TRIABLE ISSUE OF A SECTION 16(b) GROUP AMONG THE DEFENDANTS

#### A.  The Record Evidence Establishes that Defendants Made Independent Investment Decisions Without Coordination

It is well settled that participation in parallel in an investment transaction, standing alone, does not give rise to the existence of a "group," even if the investors appoint a lead draftsperson and coordinate in the negotiation and preparation of the transaction documents. *Litzler v. CC Invs., L.D.C.,* 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) ("General allegations of parallel investments

by institutional investors do not suffice to plead a 'group.'"); *see also Nano Dimension Ltd. v. Murchinson Ltd.,* 681 F. Supp. 3d 168, 182 (S.D.N.Y. 2023) ("allegations of parallel investment decisions or pre-existing relationships also do not suffice to plead a group," finding no 13(d) group); *In re Facebook, Inc., IPO Sec. & Derivative Litig.,* 986 F. Supp. 2d 544, 552–53, 555 (S.D.N.Y. 2014) (dismissing Section 16(b) claims); *Chechele*, 819 F. Supp. 2d at 349, 351 (same). The Court warned Plaintiff that he would "face an uphill climb on summary judgment" if he failed to uncover "emails and meetings among the defendants and a coordinated strategy relating to Genius securities" during discovery. (Dkt. No. 142 at 9.) Plaintiff fails to do so.

*Litzler* is particularly instructive. There, three institutional investors participating in a private investment transaction with an issuer appointed a single lawyer to negotiate the transaction documents with the issuer. *Litzler*, 411 F. Supp. 2d at 415. The defendants met at the issuer's headquarters for a due diligence session, communicated with each other, and held meetings to discuss negotiations of the transaction. *Id.* at 412. The court answered the question of whether those investors constituted a Section 16(b) group "clearly 'no,'" and entered summary judgment in favor of the defendants. *Id.* Critically, each of the *Litzler* defendants conducted their own due diligence and made their own purchase decision, including "when and how to convert their preferred shares to common stock," and so the court concluded that the fact that the defendants coordinated to negotiate the transaction documents was insufficient to raise a triable issue regarding the existence of a group. *Id.* at 415–16. "More than such cooperative activity has to be alleged and proved to show that the investors were motivated by 'a desire to affect control,' or by some other indicia of concerted activity." *Id.* (quoting *Filing and Disclosure Requirements Relating to Beneficial Ownership*, Securities Act No. 5,925, at *19 (Apr. 21, 1978).)

Here, by contrast, even that minimal level of coordination among Defendants is absent.

11

The extensive record is bereft of any evidence of a group, let alone evidence sufficient to create a triable issue. Rather, the uncontested testimony of all seven investment managers and the lone individual who participated in the transaction is that each made their own independent investment decisions with respect to the March 2020 Transaction, the follow-on registered direct transactions, and in agreeing to parallel leak-out restrictions to obtain early registration of their shares. (SUMF ¶¶ 170–74, 208–10, 217–19, 229–31, 247, 249, 255–57, 264–65, 273–75.) SEG and Genius both unequivocally agree. (SUMF ¶¶ 164–65.)

There is no evidence of calls, emails or meetings among the Defendants. The transaction terms did not contemplate or require coordination among the Defendants. The Defendants did not coordinate their investment strategies, which, for competitive institutional funds like those present here, is highly proprietary. And even when the bulk of the shares issued in the March 2020 Transaction became freely tradeable, Defendants' selling was *not* coordinated. They employed different trading strategies, and sold in different amounts and on different days.

The mere possibility of coordination, unsupported by any affirmative evidence that such coordination occurred, is not sufficient to avoid summary judgment. Yet that is all there is here, and summary judgment is therefore warranted. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 of the [Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently.") (citation omitted); *see also Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009) (proof that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates . . . would not be enough to show that the individuals were members of an enterprise").

12

**B. The Record Shows That Defendants Made Independent, Parallel Investments**

*First*, every fact witness testified that the institutional fund Defendants are competitors that made their own independent investment decisions, relying only on the judgment of their own principals in deciding whether to participate. (SUMF ¶¶ 16, 18.) This evidence is uncontested.

*Second*, during the entire period in which Plaintiff alleges that Defendants acted as a group, there is not a single communication between any set of Defendants regarding Genius's securities.[2] Each Defendant communicated separately with Genius's placement agent, SEG, to whom some Defendants—but not all—passed comments to draft transaction documents and otherwise negotiated the terms demanded by their own funds. (SUMF ¶¶ 94–106, 145–47.)

*Third*, SEG, the placement agent that handled Genius's various financings in 2020 and had more insight into the dynamics between each of the Defendants than any other witness in the case (GD Ex. 16, Schechter Dep. 38:1-39:13), vehemently rejected the notion that Defendants were acting as a group, (*Id.* 53:3-54:16). One of SEG's two principals, Schechter, a corporate attorney who has worked on more than 600 PIPE transactions, testified that "each investor had their own trading strategy. They're not coordinating with anyone else. They don't care what any[one] else is doing." (SUMF ¶ 165 (GD Ex. 16, Schechter Dep. 66:18–67:13).) As Schechter explained, "these defendants are competitors. They don't particularly like one another." (*Id.* at 63:10–18.) It is therefore not surprising that discovery has revealed numerous communications evincing mutual distrust and dislike among Defendants.[3]

---

[2] The single SEG memo in May 2020 referencing a supposed "call from Anson and Iroquois" does not change this conclusion, for reasons explained at p. 26 below. (SUMF ¶ 270 (GD Ex. 252, EW-AUG0016714, -714).)

[3] *E.g.*, (SUMF ¶¶ 46, 49, 96, 206 (GD Ex. 101, BRIO_006287, -287 ("My thoughts are I do t [sp] trust [Amin]."); GD Ex. 214, EMPGNUS0001789, -789 ("[Anson] is buying common in the face of the convert we just did!?!? like one of the dumbest things I have ever heard."); GD

13

**Fourth,** Defendants used different investment and trading strategies. Notwithstanding each Defendant's decision to participate in the March 2020 Transaction and certain subsequent transactions, the other aspects of each Defendant's purchase and sales strategy varied significantly. (SUMF ¶ 305.) Some Defendants continued to increase their positions in Genius, while others sold shares on the day they acquired them to keep their net holdings even. (SUMF ¶ 306.) Defendants also sold stock at different times, as shown by the "wide range" in the correlation of individual Defendants' daily net trading activity. (SUMF ¶ 307 (GD Ex. 26, Marcus Rep. ¶¶ 30–34).) And Defendants employed different trading and risk-hedging strategies, with Defendants differing on whether and to what extent they engaged in short sales, private sales, and options trading. (SUMF ¶ 308.) These differences confirm that there was no coordinated "group."

For decades, courts in this District and elsewhere have assured investors that they would not be subject to Section 16(b) for making independent but parallel investment decisions. *See supra* pp. 10–12. Here, each Defendant made its own independent decisions as to whether it would participate in each of Genius's 2020 offerings, and each Defendant sold Genius's shares thereafter based on their own independent selling decisions. Characterizing Defendants' conduct here as "group" conduct and not granting summary judgment would raise serious doubts in the minds of investment managers about the viability of participation in parallel investments, which could fundamentally impair the ability of distressed small companies to raise funds.

### C. Arbitrarily Characterizing Defendants as a Group Would Not Further Section 16(b)'s Purpose

Plaintiff's "mere speculation and conjecture" that Defendants must have acted as a group,

---

Ex. 143, EW-AUG0000524, -525 ("Below are [Jonathan Schechter's] comments . . . We need all the HOSTILES out. We owe 1/6th left. We should take all those guys out. (richie [Abbe], wolf, etc)."); GD Ex. 104, TOON00011312, -312 ("We should pay off Abbe and wolf IN FULL. Why have to negotiate with them going forward. Let's only do business with people that like you.").)

premised wholly on the terms to which Defendants agreed in the March 2020 Transaction, is insufficient to survive a motion for summary judgment. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). The facts that (1) Genius offered investors terms Plaintiff contends were favorable to make a risky investment and (2) each Defendant required as a condition of its investment that it receive terms no worse than those offered to other investors do not establish group conduct. Both practices are common in the industry, (SUMF ¶¶ 17, 176, 313), and have never been found to support Section 16(b) liability.

"Because Section 16(b) operates regardless of intent and calculates 'profits' in an automatic and non-intuitive way, [the Second Circuit] ha[s] cautioned that Section 16(b) is a 'blunt instrument' to be confined within 'narrowly drawn limits.'" *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122, 129 (2d Cir. 2016) (footnote omitted) (quoting *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 (2d Cir. 1998)). The Supreme Court has held "under the[] strict terms" of Section 16(b), "the prevailing view is to apply the statute ***only when its application would serve its goals***." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 595 (1973) (emphasis added). And the goal of Section 16(b) is clear: "to prevent the defined insiders from profiting from short-swing variations in share price." *Lowinger*, 841 F.3d at 129. Defendants here were not "insiders" in any respect.

The SEC filed an amicus brief in *Lowinger* advocating against the imposition of Section 16(b) liability because it "would have nothing to do with the allaying of concerns about changes in control but would greatly raise the costs, and reduce the number, of IPOs." *Id.* at 132. So too here: If multiple investors did not make parallel investments on substantially the same terms, placement agents could not successfully organize financing for distressed small companies. Imposing profit-disgorgement on participants in PIPE transactions who seek to invest on terms

15

identical to their co-investors would "greatly raise the costs, and reduce the number, of" PIPE transactions. *Id.*

While the Court need not consider expert testimony to reach that conclusion, Defendants note that both Michael Maline ("Maline"), a Covington & Burling LLP capital markets partner, and Michael Weisbach ("Weisbach"), a chaired professor of Finance at The Ohio State University—retained as expert witnesses here by Defendants—confirmed Schechter's observation that it is standard in the marketplace for potential investors to demand and receive the most favorable terms offered to other investors. As Schechter explained, "[i]f each investor had their own transaction with different terms, the industry would be over." (SUMF ¶ 17 (GD Ex. 16, Schechter Dep. 55:15–56:11).) As Weisbach explains, the transaction terms "are the product of supply and demand" under the unique circumstances of the company and the market at the time, and "are consistent with normal capital market activity in which each investor acts rationally and in their own best interest." (SUMF ¶ 309 (GD Ex. 28, Weisbach Rep. ¶¶ 11–12).) Maline notes that while there may be upsides to investing in a given nanocap company, those are "far outweighed by the risks associated with an investment . . . including the high likelihood that the company may go bankrupt." (SUMF ¶ 314 (GD Ex. 27, Maline Rep. ¶ 27).) Accordingly, terms "substantially similar to those contained in the Transaction Documents" are often required to "incentivize investors to take on the risk of such investments, or materially reduce the risks that otherwise would have prevented investors from considering, let alone making, an investment in such a company." (SUMF ¶ 176 (GD Ex. 27, Maline Rep. ¶ 28).)

### D. Plaintiff's Argument that the Terms of the March 2020 Transaction Are Not "Industry Standard" is a Red-Herring

Plaintiff's contention that the terms of the March 2020 Transaction were "not industry standard" is irrelevant (although in point of fact those terms were not unusual). Section 16(b) does

16

not prescribe the use of any particular set of transaction terms, and no court has ever held that atypical terms are a sufficient basis for finding Section 16(b) liability.

In *Lowinger*, the Second Circuit recognized that lock-up agreements which "keep[] certain shareholders out of the IPO market for a specified period of time or without compliance with other restrictions" are "common" and do not create a "group." 841 F.3d at 130–32. Plaintiff's counsel, who advanced the losing argument in that case, now seeks to flip the holding of *Lowinger* into a negative rule. He seems to suggest that if an "industry standard" agreement is not evidence of group conduct, any transaction term that is *not* industry standard *must be* evidence of a group. But *Lowinger* established no such rule: It simply explained that "coordination between underwriters and other parties to a lock-up agreement with implications for control changes beyond those inherent in an IPO might trigger [a group] finding." *Id.* at 132. In other words, there must be evidence of coordination beyond just the agreements themselves. That is not present here.

Defendants respectfully submit that Plaintiff's counsel makes a similar error in construing this Court's decision denying Defendants' motion to dismiss. There, the Court cautioned that "[i]f discovery doesn't reveal anything beyond industry-standard contracts and parallel investments," Plaintiff "will face an uphill climb on summary judgment." (Dkt. No. 142 at 9.) But nothing in Section 16(b) or Second Circuit precedent suggests that using any novel term or combination of terms in a stock purchase agreement (or in an ancillary agreement) supports any inference of coordination among investors. Doing so would ignore that PIPEs are flexible financing instruments, with each financing tailored to the unique circumstances of each issuer and the market. (SUMF ¶ 312.) The dispositive inquiry for Section 16(b) group allegations continues to be whether the evidence shows "that the members combined in furtherance of a common objective," *CSX Corp*, 654 F.3d at 283 (citation omitted)—for instance, if a transaction term

17

provides for joint decision making over investments or over the allocation of profits or losses. *See, e.g.*, *Morales v. New Valley Corp.*, 999 F. Supp. 470, 475–76 (S.D.N.Y. 1998) (holding that a group was formed where stockholders agreed "to either hold the stock themselves or offer it to defendants" pursuant to a right of first refusal and "to share profits from the appreciation of" stock), *aff'd sub nom. Morales v. Freund*, 163 F.3d 76 (2d Cir. 1999).  No such term is present here.

The bare assertions by Plaintiff's proffered witness Max Holmes ("Holmes") that various terms were not "industry standard" are irrelevant given that those terms, whether standard or not, do not reflect coordinated investment decision making.  Further, as explained in Defendants' *Daubert* motion, Holmes is unqualified to serve as an expert on industry standards for PIPEs involving nanocap companies because he has only a handful of investments remotely related to that market, most of which date from ten or more years ago.  (Dkt. No. 230.)  Moreover, Holmes' claims that the terms here were "not industry standard" must be excluded because he does not explain how experience or data informed those conclusions.  (GD Ex. 30, Holmes Rep. ¶ 31.)

Further, while the Court need not consider expert testimony to enter summary judgment for Defendants here, the evidence shows that the March 2020 Transaction terms are not unusual. Defendants' expert Michael Maline and SEG's Schechter—who have collectively negotiated thousands of PIPEs—and Defendants' expert Michael Weisbach (who has analyzed and published on PIPEs) each testified that the transaction terms in the March 2020 Transaction are unexceptional and the product of market forces of supply and demand.  (SUMF ¶¶ 176, 192, 309.) For small, financially distressed companies like Genius (as it was in March 2020), the flexibility and bespoke nature of PIPEs allows issuers to attract investors with terms to compensate for the risk associated with their investment.  (SUMF ¶ 312 (GD Ex. 28, Weisbach Rep. ¶¶ 8, 12).)

18

II.    **THE SUMMARY JUDGMENT RECORD REFUTES PLAINTIFF'S THEORY OF GROUP FORMATION**

A.    **None of the Defendants' Activity Prior to the March 2020 Transaction Supports the Existence of a Group**

Until the Court ordered him to do so, Plaintiff refused to specify on what date the Defendants putatively combined to form a Section 16(b) group. That is likely because discovery revealed no evidence of coordination among Defendants to which Plaintiff could point to identify a date of group formation. Without any such evidence, Plaintiff speculates that different Defendants joined to form a group at various times on the basis of their negotiation or agreement to transaction documents: *i.e.*, that (i) Anson joined the group by negotiating the Term Sheet with Genius; (ii) Brio, Empery, CVI and Iroquois joined the group by waiving rights they held under the terms of prior investments to allow the March 2020 Transaction to proceed; and (iii) the remainder of the Defendants joined the group based on the terms of the transaction documents they executed. (SUMF ¶¶ 94–108, 253–54.) Plaintiff is wrong as to each.

1.    **Anson Did Not Enter a Group with Genius's CEO Heyward Merely by Executing the Term Sheet**

Plaintiff suggests that Anson formed a group with Genius CEO Andy Heyward ("Heyward") by negotiating the Term Sheet that led to the March 2020 Transaction in which Heyward participated. (GD Ex. 263.) But no court has ever held that a CEO's participation in an investment in his or her own company in parallel with other investors thereby creates a "group" with those investors, or with a lead investor who negotiated the Term Sheet with the company. It is of course common for insiders to participate in PIPE transactions, particularly with small, thinly-capitalized companies: Heyward participated in at least three prior Genius PIPE transactions, and the empirical analysis conducted by Defendants' expert Weisbach found that so-called "C-suite" investors participate in roughly 10% of PIPE issuances. (SUMF ¶ 311 (GD Ex. 28, Weisbach Rep.

19

¶ 65).)  Finding group formation solely because a CEO chose to invest in a transaction alongside other investors would render it "impossible to conduct . . . business," as SEG's Schechter testified, by effectively precluding corporate officers from participating in any transactions.  (SUMF ¶ 311 (GD Ex. 16, Schechter Dep. 42:2–11).)

The undisputed facts of this transaction further confirm that no group was formed:  ***First,*** the evidence shows that Anson and Heyward did not in fact coordinate their investments in Genius: There was no communication between Anson and Heyward regarding the Term Sheet prior to Anson signing the Term Sheet, and Anson only learned that Heyward was investing shortly before the deal.  (SUMF ¶ 156.)  ***Second,*** Anson and Heyward had very different motivations:  Heyward owed a fiduciary duty to Genius to advance the company's best interests as CEO, and as a shareholder his strategy was to buy and hold stock, and Anson owed a duty to its investors to extract as much profit as it could from its trading of the Company's securities.

> **2.  Brio, Empery, CVI and Iroquois Did Not Join a Group by Independently Deciding Whether to Consent to the March 2020 Transaction**

Granting investors certain waiver and consent rights with respect to in issuer's future financing activities is an "extremely common" practice for small companies.  (SUMF ¶ 253 (GD Ex. 16, Schechter Dep. 40:14–23 (noting their inclusion in some 98% of SEG's transactions).)  Such rights protect investors with respect to future actions an issuer might take that could affect that investment.

Here, in order for the March 2020 Transaction to proceed, Genius had to obtain waivers and consents from a majority of warrant holders from prior transactions, which included four Defendants: Brio, Empery, CVI and Iroquois.  (*See, e.g.*, SUMF ¶ 149.)  Each of those parties had an obvious and compelling economic motivation to grant those consents: without them, the March 2020 Transaction could not go forward, and without that infusion of capital, Genius would find

itself in bankruptcy, making those investors' prior investments in Genius worthless. Further, Genius routinely renegotiated its prior PIPEs prior to 2020. (GD Ex. 28, Weisbach Rep. ¶ 21.) That is unsurprising: As Weisbach explained, "issuers often renegotiate with existing investors in order to raise new money in capital markets." (SUMF ¶ 310 (GD Ex. 28, Weisbach Rep. ¶ 79).)

In any event, there is no evidence of coordination among the Defendants. The evidence is that each of the Defendants made independent investment decisions to allow Genius to conduct a financing transaction that could save it from bankruptcy. (SUMF ¶¶ 172–74, 186, 194, 197–98.) That the same incentive may have led sophisticated investment managers to independently make the same choice does not make those managers part of a group.

### B. The March 2020 Transaction Terms Do Not Show the Existence of a Section 16(b) Group

The Term Sheet for the March 2020 Transaction was negotiated by Anson alone. Anson did not coordinate with any other investor in creating the Term Sheet for the March SPA. (*See* GD Ex. 16, Schechter Dep. 35:5–20.) Schechter further testified that he never had a collective meeting—whether in person or electronically—with Anson, Brio, Empery and Iroquois (or anyone else) to discuss the Term Sheet (although even such a meeting would not be evidence of a group). (SUMF ¶ 115 (GD Ex. 16, Schechter Dep. 36:11–18, 160:15–21).) Because there is no competent record evidence that Defendants made a collective decision to enter into the March 2020 Transaction, Plaintiff is left to speculate that the transaction documents themselves show that Defendants entered into a group. Again, Plaintiff is wrong.

### 1. The Transaction Documents Do Not Contemplate Coordination Among the Defendants

Courts have recognized that the terms of a transaction can raise a question as to the existence of a group if such terms themselves require coordination among the group. For example, in *Schaffer v. CC Invs., LDC*, there were "numerous allegations of coordinated activity or

concerted actions," including that defendants, who were alleged to have "collectively purchased 100% of the Preferred Stock," negotiated "as a group," including for a damages provision that expressly permitted the defendants "to allocate . . . payments from the Company among themselves."   153 F. Supp. 2d 484, 488 (S.D.N.Y. 2001).   The documents specifically contemplated a group of investors divvying up proceeds of their individual investments on a collective basis.

But that is not what happened here.  Each Defendant's investment in Genius was funded separately.  (SUMF ¶ 175.)   The Defendants did not contemplate any allocation or distribution of profits or losses.  (SUMF ¶ 196.)  The securities each investor purchased were issued directly to them and it was up to each investor to determine when and how to exercise and/or sell those securities.  (GD Ex. 204, TOON00000001, at -02.)   The transaction documents themselves explicitly disclaimed the existence of a group, as did contemporaneous communications of the Defendants (ensuring that they would not take actions that could be considered group activity). (SUMF ¶¶ 170–74).

### 2.  The Voting and Lock-Up Agreements between the Company and Other Shareholders Do Not Create a Group Among the Defendants

Genius agreed in the March SPA that it would obtain Voting and Lock-Up Agreements from other Principal Shareholders.  Those agreements were executed only by Genius and Principal Stockholders.  In the Voting Agreements, Principal Stockholders committed to approve the March 2020 Transaction: that approval was necessary to comply with NASDAQ rules.  (SUMF ¶¶ 178, 182.)  In the Lock-Up Agreements, Principal Stockholders agreed to be restricted from selling their stock for a 15-month period following consummation of the March 2020 Transaction.  (GD Ex. 200, TOON00000607, at -07.)  The Voting Agreements benefitted Genius and its shareholders by enabling the company to obtain much-needed financing.  (SUMF ¶ 184.)   The Lock-Up

Agreements allowed Genius to ensure the orderly disposition of common stock and prevented sudden declines in the company's share price that could occur with a large number of shares being sold at once. (SUMF ¶ 189.) Those provisions are not uncommon: Weisbach's empirical analysis of a sample of 45 comparable PIPE transactions found eight deals that required shareholder approval and five that included lock-up agreements. (SUMF ¶¶ 183, 192 (GD Ex. 28, Weisbach Rep. ¶¶ 72-76).)

Here, no Defendant was a party to or named third-party beneficiary of any of those agreements, and the agreements vested enforcement authority only in Genius. (SUMF ¶¶ 185, 193; *see also* Dkt. No. 137.) Each Defendant was party only to the March SPA between the respective Defendant and Genius, which required Genius to use its "reasonable best efforts" to seek specific performance of those other agreements. (GD Ex. 204, TOON00000001, at -034.) Because no Defendant was a party to those agreements, they cannot serve as the basis for alleging the existence of a Section 13(d) group. *See, e.g.*, *Chechele*, 819 F. Supp. 2d at 349 (an "[a]greement attached to the motion papers can hardly form the basis for Section 16(b) liability, since [no] member of the alleged shareholder group was a party to the agreement.").

In *Lowinger v. Morgan Stanley & Co. LLC*, the Second Circuit rejected a similar attempt to bring a Section 16(b) claim against underwriters of an IPO because they were parties to a collective lock-up agreement. 841 F.3d 122 (2d Cir. 2016). There, the same plaintiff's counsel in this action argued that lock-up agreements between the lead underwriters of Facebook's IPO and other shareholders, "which prevented the [s]hareholders from selling . . . their pre-IPO shares of Facebook stock for a specified period of time after the IPO without the Lead Underwriter's consent," had the effect of creating a group under Section 13(d). *Id*. at 130. The Second Circuit, however, concluded that "we have explicitly avoided holding that [a lock-up] agreement, without

23

more, forms a group under Section 13(d)." *Id.* It explained that "notwithstanding a contractual arrangement explicitly limiting the disposal of shares," "lock-up agreements, rather than being agreements 'to act together,' are generally one-way streets keeping certain shareholders out of the IPO market for a specified period of time. . .." *Id.* at 130–31. The theory asserted here in this case carries even less weight than the argument rejected by the Second Circuit. In *Lowinger,* the defendants were alleged to be signatory *parties* to the lock-up agreement at issue, which was still insufficient. *See id.* at 131. Here, Defendants were not parties to the Lock-Up Agreements at all. Those agreements therefore cannot support an inference of a group.

### 3. The Voting Agreements Did Not Make Defendants Beneficial Owners of Principal Shareholders' Shares

Defendants also hold any voting authority on account of the Voting Agreements, and those agreements thus did not make Defendants beneficial owners of Principal Shareholders' shares. *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations: Exchange Act Section 16 and Related Rules and Forms, at Question & Answer 105.06 (Oct. 7, 2022) https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-nterpretations/exchange-act-sections-13d-13g-regulation-13d-g-beneficial-ownership-reporting#105-06; *see also Cartica Mgmt., LLC v. Corpbanca, S.A.,* 50 F. Supp. 3d 477, 495 (S.D.N.Y. 2014) (party to a voting agreement could not be deemed the beneficial owner of its counterparties' shares based solely on a voting agreement and the lock-up of the shares). In *Cartica*, the court explained that "[t]he Transaction Agreement," which allowed for specific performance, "does not provide [the counterparty] with either voting power or investment power . . . It contractually obligates Corp Group to vote its shares in favor of the transaction, but it does not shift 'voting power' or 'investment power' to [the counterparty]." Exhibit 11 (Annex A: Transaction Agreement) at §§ 4.4(a);(c);(d); § 7.17, *Cartica*, 50 F. Supp. 3d at 495 (No. 15-CV-

24

2258).

Thus, in *Cartica*, a *party* to a voting agreement with a lock-up with the right to specific performance of the agreement was not deemed a beneficial owner of its counterparty's shares. 50 F. Supp. 3d at 495. Here, Defendants are *non-parties* with no direct right to enforce the Voting Agreements or Lock-Up Agreements. If the direct enforcement rights were not sufficient to confer beneficial ownership in *Cartica*, Defendants' far more attenuated rights here certainly are not.

## C. The May 2020 Registered Direct Transactions Did Not Give Rise to a Group

Like certain other nanocap companies at the start of the COVID-19 pandemic, Genius had a rapid and significant rise in its stock price. (SUMF ¶ 199.) Seeking to "take advantage" of this "opportunity" in the marketplace, Genius conducted a series of registered direct financings. (SUMF ¶ 199 (GD Ex. 16, Schechter Dep. 29:7–15).) Schechter explained that the "beautiful thing about a registered direct is that it could be done quickly . . . we started doing the transaction documents at 9:30 in the morning. The deal was announced at 1:30 in the afternoon the same day." (GD Ex. 16, Schechter Dep. 335:7–16.)

Genius made its offer to participate in each of those transactions separately to each Defendant, and those offers were not contingent upon any other Defendant's participation. (SUMF ¶¶ 213, 222.) Not all Defendants participated, and each Defendant decided to participate or not for their own independent reasons. (SUMF ¶¶ 213–15, 226–27.) There is no evidence of any coordination among Defendants with respect to those transactions. (SUMF ¶¶ 217–19, 229–31.) Certainly, Genius did not consider the Defendants a group with respect to those transactions. (SUMF ¶ 164); *see Sec. & Exch. Comm'n v. Honig*, No.18-CV-8175 (ER), 2023 WL 6386918, at *18 (S.D.N.Y. Sept. 29, 2023) (issuer's view of the members as a group is "accorded weight" in a court's analysis of the existence of a Section 13(d) group). As such, there is no triable group issue on account of these transactions and summary judgment is warranted. *See, e.g., Litzler*, 411 F.

25

Supp. 2d at 415 ("General allegations of parallel investments by institutional investors do not suffice to plead a 'group'") (citing *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 449 (S.D.N.Y. 2001)).

Plaintiff may point to an internal SEG memorandum regarding the registered direct offering on May 28, 2020, to support his group theory. The memo was written for SEG's internal compliance files and states that SEG "received a call from Anson and Iroquois asking if the company was willing to sell common stock off its shelf registration statement at $1.50." (SUMF ¶ 270 (GD Ex. 252, EW-AUG0016713, at -714.) That memo is ambiguous and does not specify whether SEG received a single, joint call from Anson and Iroquois or separate calls from each. (It might also simply be wrong.[4] That ambiguity is conclusively resolved by the evidentiary record: SEG, Anson, and Iroquois's deponents all uniformly testified that there was no joint call. (SUMF ¶ 271.) "[T]his single line" in a memo "is not sufficiently probative to create a factual dispute precluding summary judgment." *Sharp v. Navistar Int'l Corp.*, 15-CV-00413, 2020 WL 7062557, at *13 (N.D. Ill. Nov. 30, 2020) (rejecting description of "investors' negotiating position" as evidence of group formation where author and investors disavowed accuracy); *see Saeli v. Chautauqua Cnty.*, 36 F.4th 445, 456–57 (2d Cir. 2022) ("[T]o defeat summary judgment, 'there must be evidence on which the jury could reasonably find for the [non-moving party].'") (emphasis in original) (citation omitted)). In any event, whether there was a joint call on an unrelated issue at the end of May 2020 cannot show the existence of a group on March 11, two

---

[4] There are numerous other ambiguities and inaccuracies in that memo, which (i) lists "Dan Ripp" as its author, instead of its actual author, Schechter (SUMF ¶ 270 (GD Ex. 16, Schechter Dep. 139:11–21)), (ii) is dated May 28, 2020, but appears in a file named "GNUS Memo 6.2.20.docx" attached to an email sent on June 2, 2020; (SUMF ¶ 270 (GD Ex. 253, EW-AUG0016713)); (iii) refers to "pre-market trading on May 28, 202 [*sic*]" (SUMF ¶ 270 (GD Ex. 252, EW-AUG0016714)); and (iv) incorrectly calculates the size of an offering of "15,000,000 shares at $1.50" as "$30,000,000" instead of $22,500,000 (*id.*)

months earlier.

### D. Salesmanship in SEG's Solicitation of Defendants' Investments Does Not Make Defendants a Group

Emails from SEG's "consummate salesman" Joe Reda are similarly insufficient to raise a triable issue of a group.    (GD Ex. 16, Schechter Dep. 48:4–6.) Schechter was unequivocal in stating that SEG's sales tactics reflected nothing more than puffery from SEG, and there is no evidence to the contrary.  Schechter acknowledged that SEG's sales tactics included (i) telling one investor that a second had already committed to invest, when in fact that second investor had conveyed the opposite, (*id.* at 83:13–21 ("Q. What is Mr. Reda telling Mr. Winer [CVI] on January 24th about the amount Empery is going to put into the deal? A. He's telling him Empery's doing 1 to 3 million. But on January 29th, I believe Ryan [Empery] said it was a waste of time at this point. He's not committing to anything."); (*id.* at 127:2–22 ("Q. The email also state's 'Amin wants you, Shaye [Brio] and him to do 3.34 million each. . . . To your knowledge, did Mr. Nathoo tell Mr. Reda that he wanted Mr. Abbe and Mr. Hirsh to invest 3.34 million? A. No. . . . Q. So why did Mr. Reda say that ? A. Because Joe's a salesman. He wants to get a transaction done. . . .")); and (ii) telling one investor that another investor wanted them in the deal, when the other investor said no such thing.  (*Id.* at 338:5–17 ("Q. And it says, 'Ryan, . . . Amin [Nathoo] and Richie [Abbe]) want your in for size.' . . . And did either Amin or Richie ever say to you or to Mr. Reda that they wanted Ryan in for size? A. No.  This is Joe – one of Joe's sales tactics.)); (*id.* at 339:2–20 ("Q. And it says, 'Richie, Amin asked if we can count on you for two to three mil so I don't have to call every schmuck on the street and keep this to friendly's.  He wants you.' . . . Did Amin say that to you or to Joe Reda? A. He did not say that. . . And if you look at the other tab, there's another email from Joe to Ryan, saying call Shex, Amin and Richie want you in.  And then . . . Amin asks if you could come in.  So it's just Joe selling the deal.  No one's in.  It's a sales tactic.")).)

27

Moreover, even if these sales tactics were not patently obvious from the record (which they are), they still do not create a triable issue that Defendants combined in furtherance of a common objective, since there is no evidence that Defendants actually "act[ed] together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d–5(b)(1)(i) (2024).

Plaintiff also relies on an email written by Reda in May 2020, the contents of which was sent by copying-and-pasting to all of the Defendants individually, including Anson. (SUMF ¶ 222.) In that email, Reda declared: "Whoever doesn't invest in this round, their pro rata will not be invited in any future Genius deals as per the lead." (SUMF ¶ 222 (GD Ex. 227, ANSON_00012931, at -932).) Schechter confirmed that neither Anson nor any other Defendant had given such a directive. Rather, it was just a "high-pressure sales tactic":

> "So this is a high-pressure sales tactic by Joe [Reda] because Joe probably reached out already. And then I cut and pasted it because we wanted to get the deal done. If you look at the time, it's on Friday at 11:54 a.m. And the goal was the get the deal announced before the close. So we had just four hours to get this deal consummated. So that's when Joe goes into high-pressure sales tactics and FOMO [fear of missing out]."

(SUMF ¶ 224 (GD Ex. 16, Schechter Dep. 343:21–344:7).) Schechter explained that as the placement agent, SEG's role was to act as a salesman for the deal, and that he and his colleague at SEG, Joe Reda, had to "pull[] every trick out of his hat to try to get this transaction done for the company before they went bankrupt…." (GD Ex. 16, Schechter Dep. 48:3–11.)

### E. Each Defendant's Independent Decision to Execute Leak-Out Agreements in Exchange for Early Registration of Their Shares Did Not Create a Group

Leak-out agreements are similar in concept to lock-up agreements, which are common in PIPE transactions. (SUMF ¶ 241.) Under a lock-up agreement, parties agree to an outright prohibition on the sale of shares for a period of time. A leak-out agreement *limits* the amount of stock an investor can "sell in one trading day to a defined percentage of that day's trading volume."

28

(SUMF ¶ 242 (GD Ex. 27, Maline Rep. ¶ 47).)  Such agreements are advantageous to issuers, including nanocap issuers, by helping to prevent "volatile downward movement in the price of the Company's stock."  (SUMF ¶ 190 (GD Ex. 20, Weisbach Rep. ¶¶ 7, 118).)

Here, Empery requested that Genius register the shares underlying warrants issued in the March 2020 Transaction, which were months away from registration under SEC Rule 144.  (SUMF ¶ 237.)  Registering the shares would encourage the warrant holders to exercise the warrants and pay Genius for additional shares, which would in turn generate additional cash proceeds for Genius.  (SUMF ¶¶ 238–39.)  However, it also meant the potential for a flood of newly tradeable shares in the market, which could drive down Genius's stock price.  Thus, in response to that request, Genius offered each investor the opportunity to register its shares on the condition that the investor agree to leak-out restrictions.  (SUMF ¶ 239.)  In contemporaneous emails, Schechter called the need for parallel leak-out agreements "obvious[]," (GD Ex. 233, TOON00018480), and explained at his deposition why that was:

> "The company wanted to raise additional capital because the stock price had appreciated greatly from the deal price.  However, because the warrants were exercised on a cashless basis under Rule 144, you would have to hold that security for six months.  And they hadn't held that security for close to six months.  So the ability to get those shares registered would mean the quicker they got registered, the less they would be open to market risk of that security, Genius brands, going back down."

(GD Ex. 16, Schechter Dep. 50:4–18.)

Critically, the decision to accept registration in exchange for a leak-out was in the hands of each Defendant, who could make its decision regardless of how any other investor chose to respond: Any investor that did not wish to sign the leak-out could simply forego registration of its shares.  Each Defendant had an obvious economic motivation to sign that agreement—their Genius stock, unrestricted, could be sold at a significant profit, even if the sale volume were limited by a leak-out agreement—and accordingly each of the Defendants chose to register their shares, and

each signed a leak-out agreement with the Company. (SUMF ¶¶ 258, 294.) There is no evidence that the Defendants coordinated in doing so, nor is there any evidence that they would have benefitted from such coordination.

Plaintiff claims that because the Leak-Out Agreements allocated restrictions based on each Defendant's pro rata participation in the March 2020 Transaction, the agreements necessarily document coordination among Defendants. Not so. The court in *Greenberg*, rejected a similar argument where the plaintiff based his argument on a pro rata method of a "right to register securities" under the relevant documents. *Greenberg v. Hudson Bay Master Fund Ltd.*, No. 14CV5226 DLC, 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015).

In any event, those Leak-Out Agreements never restricted the sale of a single share. (SUMF ¶¶ 261, 296.) The May 18, 2020 Leak-Out Agreements only became operative when the shares underlying the warrants from the March 2020 Transaction were registered, on June 10, 2020. (GD Ex. 28, Weisbach Rep. ¶ 119.) On that date, Genius's stock price was $4.51, well above the $1.65 threshold prices below which an investor's sales would be restricted. (GD Ex. 28, Weisbach Rep. ¶ 119.) The same is true with the June 23, 2020 Leak-Out Agreement. When it was signed on June 23, 2020, Genius's stock price closed at $3.13, well above the $2.00 threshold specified in the agreement. (SUMF ¶ 296 (GD Ex. 28, Weisbach Rep. ¶ 120).)

Plaintiff's contention that the mere existence of leak-out agreements creates a group is foreclosed by the Second Circuit's reasoning in *Lowinger*, 841 F.3d at 122. Like the lock-up agreement in *Lowinger*, the leak-out agreements here were "one-way streets," which helped to maintain "an orderly market free of the danger of large sales of pre-owned shares." *Id.* at 130–31. While *Lowinger* involved the orderly IPO market, this case involves the orderly primary offering market—*i.e.*, the market in which public companies raise capital *post*-IPO. The leak-out

30

agreements serve the same function, however.  Thus, there is no relevant distinction between the two.  (SUMF ¶ 241 (Lock-up agreements and leak-out agreements are both "restrictions on share sales" that "allow issuers to ensure the orderly disposition of new shares issued to marketplaces.").)

Moreover, unlike in *Lowinger*, which involved a single agreement among shareholders and the company, here, each Defendant separately decided whether to enter into the Leak-Out Agreements.  (SUMF ¶¶ 264–65, 297–98.)  Under those agreements' terms, each Defendant retained the ability to independently determine whether and when to sell; the leak-out agreements simply limited the number of shares each Defendant could sell at a particular time.  (SUMF ¶¶ 241–42.)  The Leak-Out Agreements also expressly provided that the obligations of each Defendant were wholly independent of the obligations of any other Defendant, and that no Defendant's obligation under its Leak-Out Agreement would be contingent on, or impacted by, the performance of any other party under any other Leak-Out Agreement.  (SUMF ¶¶ 259, 295.)

Significantly, in *Lowinger*, the Second Circuit was guided by the policy concerns articulated by the SEC as *amicus curiae*, who noted that "ordinary lock-up agreements do not implicate the purposes of Section 13(d) and its definition of a 'group.'" 841 F.3d at 132.  Whereas "Section 13(d) is intended to alert investors about possible changes in control and provide information about possible parties to those changes," "the imposition of damages" based on a lock-up agreement alone "would have nothing to do with the allaying of concerns about changes in control but would greatly raise the costs, and reduce the number, of IPOs." *Id.*  Here, holding that Plaintiff has raised a triable issue of a group merely because more than one Defendant executed parallel leak-out agreements with the Company "would have nothing to do with the allaying of concerns about changes in control but would greatly raise the costs, and reduce the number, of [private offerings]." *Id.*; *see also* Decision and Order at 32, *Augenbaum v. Anson Invs. Master*

*Fund LP et al.*, No. 22-cv-249 (VM) (S.D.N.Y. Mar. 20, 2023) (No. 101) (holding *Lowinger*'s analysis applies to the Leak-Out Agreement).

### F. Defendants' Provisions of Waivers and Consents and the Conversion Agreements Likewise Fail to Raise a Viable Inference of a Group

In May 2020, Genius sought and obtained the consent of the Defendants to sell additional common stock. (Am. Compl. ¶¶ 40–41.) Defendants' consent was required under the March SPA. (GD Ex. 228, CVI_0001993, at -25.).) Each Defendant made the independent decision to grant consent, and sign individual agreements with the Company. (SUMF ¶¶ 217–19, 229–31, 255–57, 264–66, 273–75.)

In June 2020, the Company likewise entered into separate conversion agreements with each Defendant, pursuant to which the Company obtained prepayment of $4 million in promissory notes related to the March SPA and agreed to register previously issued convertible notes. (GD Ex. 28, Weisbach Rep. ¶ 97). Again, each Defendant made the individual decision whether to enter into these agreements. (SUMF ¶¶ 286, 289–90, 294, 297–98.)

Like the Leak-Out Agreements, *supra*, these parallel independent agreements do not give rise to Section 16(b) liability, and discovery has uncovered no coordination between the Defendants relating to the execution of the documents.

### III. PLAINTIFF HAS FAILED TO ESTABLISH THAT DEFENDANTS MET THE TEN PERCENT TEST AT ANY PARTICULAR RELEVANT TIME

Even if Plaintiff could proffer evidence showing the existence of a group—and for the reasons discussed above, he cannot—to prove his Section 16(b) claim he must also show that this group was a statutory insider holding more than 10% of Genius's common stock at the time of *each purchase and sale* for which he seeks disgorgement of profits. *See* 15 U.S.C. § 78p(b) ("This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security . . . involved

32

. . ."); *see also Foremost-McKesson*, 423 U.S. at 249–50 ("[I]n a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner 'before the purchase.'"). Plaintiff has not established a factual basis to show that any combination of Defendants met this test at all relevant dates for which he seeks disgorgement. Defendants are entitled to summary judgment on his Section 16(b) claim for this additional, independent reason.

**A. Plaintiff's Failure to Show the Existence of a Group Until the Execution of the SPA or the Execution of the Leak-Out Agreements Entitles Defendants, at a Minimum, to Partial Summary Judgment**

To begin with, Plaintiff does not offer evidence that all eight Defendants were members of a group before entering into the March 11, 2020 SPA, a date which Plaintiff includes in his calculation of disgorgeable profits. To the extent Defendants joined a group by virtue of the March 11, 2020 SPA (they did not), the March 2020 Transaction would not constitute a "purchase" for disgorgement purposes. *See Foremost-McKesson*, 423 U.S. at 249–50.

Alternatively, to the extent either of the Leak-Out Agreements serve as the basis for a group (they do not), the majority of the disgorgeable profits claims by Plaintiff would have to be rejected. There is no evidence of any purchases by any Defendant following the June 23, 2020 Leak-Out agreements, and only an incredibly small number of purchases following the May 18, 2020 Leak-Out agreements.

In either case, an award of partial summary judgment would be appropriate

**B. Plaintiff Has Failed to Offer Evidence Showing That the Putative Group Continued Through July 8, 2020**

Assuming that Plaintiff can raise a triable issue as to the formation of a group upon the execution of the March SPA or the execution of the Leak-Out Agreements (and he cannot), Plaintiff has not demonstrated that Defendants continued to act as a group through July 8, 2020, the purported "end" date chosen by Plaintiff for calculating disgorgeable profits. (GD Ex. 31,

Holmes Suppl. Rep. ¶¶ 81–82.)    To constitute matchable transactions under Section 16(b), beneficial owners must be insiders "*both at the time of the purchase and sale, or the sale and purchase*, of the security[.]"  15 U.S.C. § 78p(b) (emphasis added).  Here, Plaintiff cannot show that a group existed at all times through July 8, 2020.  To the extent that the Second Circuit suggested otherwise in *Roth v. Jennings*, by stating that coordinated activity need not persist past the time pf purchase for transactions to be matchable, 489 F.3d 499, 512–13 (2d Cir. 2007), that statement is not binding because it conflicts with Section 16(b) itself, Supreme Court precedent, and prior Second Circuit precedent.  *See Foremost-McKesson*, 423 U.S. at 238 (addressing whether the defendant was not a beneficial owner at the time of purchase, and at the time of sale); *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 126 (2d Cir. 2001) (analyzing whether the defendants continued to act as a group at the time of sale).  The SEC itself has rejected that reading of Section 16.   *See* SEC Division of Corporation Finance, Compliance and Disclosure Interpretations: Exchange Act Section 16 and Related Rules and Forms, at Question & Answer 110.02 (April 24, 2009),              https://www.sec.gov/rules-regulations/staff-guidance/compliance-disclosure-interpretations/exchange-act-section-16-related-rules-forms (stating that a person who terminates membership in a group ceases to be subject to Section 16(a) immediately upon termination).

Here, the latest action to which Holmes points as putatively indicative of group conduct is Defendants' execution of leak-out agreements on June 23, 2020.  (GD Ex. 31, Holmes Suppl. Rep. ¶ 60(i)).  Even if each Defendant's independent agreement to a separate leak-out agreement were indicative of Defendants acting as a group—which it is not, for the reasons discussed above—that would not demonstrate that Defendants acted as a group through July 8, 2020.  The arbitrarily drawn July 8, 2020 cutoff is based merely on Holmes's assertion that Defendants "no longer met the 10% Test" due to their stock holdings falling below 10%.  (GD Ex. 31, Holmes Suppl. Rep.

34

¶¶ 5, 18, 58, 60.)  But both Plaintiff and Holmes fail to offer any evidence that Defendants acted together for the purpose of buying or selling Genius stock up through July 8, 2020.

### C.  Plaintiff's Analysis Does Not Establish That Each Alleged Permutation of The Group Would Exceed The 10 Percent Threshold at All Relevant Times

Finally, even if Plaintiff had adduced sufficient evidence of coordinated group activity at any relevant points in time, he must show that the group held more than 10% of Genius's outstanding stock as of the date of each purchase and sale.  Plaintiff's expert provides a calculation of Defendants' holdings, combined with the holdings of Genius's CEO Heyward, to argue that Defendants and Heyward collectively held over 10% of outstanding Genius stock from March 11, 2020, to July 8, 2020.  (*See* GD Ex. 31, Holmes Suppl. Rep. App. ¶¶ 76-82.)  However, Plaintiff's analysis does not account for possible permutations of this alleged group.  As discussed above, there is no evidence to support Heyward's inclusion in the alleged group.  Further, if the Court grants some but not all of Defendants' motions for summary judgment, Plaintiff will have no evidence to establish that those Defendants remaining in the case collectively held more than 10% of Genius's outstanding stock.  In that event, Defendants respectfully request that the Court permit supplemental briefing to address this issue with respect to any Defendants left in the case after the current round of motion practice.

### CONCLUSION

For the foregoing reasons, Defendants request that the Court grant their Motion and enter summary judgment dismissing Plaintiff's claim with prejudice.

Dated:  January 15, 2025
        New York, New York

Respectfully submitted,

**FRESHFIELDS US LLP**

*/s/ Andrew D. Gladstein*
Andrew D. Gladstein
Amella Viso
Shannon Sciaretta

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
(646) 231-7098
andrew.gladstein@freshfields.com
amella.viso@freshfields.com
shannon.sciaretta@freshfields.com

*Counsel for Defendants Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, and Empery Asset Management, LP*

**HOGAN LOVELLS US LLP**

*/s/ Dennis H. Tracey, III*[*]
Dennis H. Tracey, III
Catherine Bratic (*pro hac vice* forthcoming)
Elizabeth Cochrane

390 Madison Avenue
New York, New York 10017
(212) 918-3000
dennis.tracey@hoganlovells.com
catherine.bratic@hoganlovells.com
elizabeth.cochrane@hoganlovells.com

*Counsel for Defendant Anson Investments Master Fund LP*

---

[*]The electronic signature for Defendants other than Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, and Empery Asset Management, LP are used with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.

**ELLENOFF GROSSMAN &
SCHOLE LLP**

<u>*/s/ John Brilling Horgan*</u>*
John Brilling Horgan
Joanna Rebecca Cohen
Aldonsa Valentina Janjigian

1345 Avenue of the Americas
11th Floor
New York, New York 10105
(646) 895-7158
jhorgan@egsllp.com
jcohen@egsllp.com
ajanjigian@egsllp.com

*Counsel for Defendants Brio Capital Master
Fund Ltd. and Brio Select Opportunities Fund
LP*

**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**

<u>*/s/ Susan L. Saltzstein*</u>*
Susan L. Saltzstein
Kurt Wm. Hemr
Jeffrey S. Geier

One Manhattan West
New York, New York 10001
(212) 735-3000
Susan.Saltzstein@skadden.com
Kurt.Hemr@skadden.com
Jeffrey.Geier@skadden.com

*Counsel for Defendant
CVI Investments, Inc.*

**LATHAM & WATKINS LLP**

*/s/ William O. Reckler**
William O. Reckler
Hanyu (Iris) Xie
Peter Trombly (*pro hac vice* forthcoming)

1271 Avenue of the Americas
New York, New York 10020
(212) 906-1350
william.reckler@lw.com
iris.xie@lw.com
peter.trombly@lw.com

*Counsel for Defendants Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC*

**PHILLIPS NIZER LLP**

*/s/ Jared R. Clark**
Jared R. Clark
Marc Andrew Landis

485 Lexington Avenue, 14th Floor
New York, New York 10017
(212) 841-0705
mlandis@phillipsnizer.com
jclark@phillipsnizer.com

*Counsel for Defendant L1 Capital Global Opportunities Master Fund*

**LITMAN, ASCHE & GIOELLA, LLP**

*/s/ Richard Asche**
Richard Asche

140 Broadway #38
New York, New York 10005
(212) 809-4500
richardasche@lagnyc.com

*Counsel for Defendant M3A LP*

**STINSON LLP**

/s/ Kieran M. Corcoran[*]
Kieran M. Corcoran

100 Wall Street, Suite 201
New York, New York 10005
(646) 883-7471
kieran.corcoran@stinson.com

*Counsel for Defendant Richard Molinsky*

## CERTIFICATE OF WORD COUNT

I, Andrew D. Gladstein, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft World, contains 13,071 words in accordance with the Local Rules and does not exceed 35 pages as required by this Court's December 16, 2024 Order (Dkt. 221). In making this calculation, I have relied on the word and Page counts of the word-processing program used to prepare this document.

Dated:  January 15, 2025                                  */s/ Andrew D. Gladstein*
   New York, New York                            Andrew D. Gladstein