UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TODD AUGENBAUM,<br><br>                        Plaintiff,<br><br>-against-<br><br>ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; and RICHARD MOLINSKY,<br><br>                        Defendants,<br><br>-and-<br><br>KARTOON STUDIOS, INC.<br><br>                        Nominal Defendant. | 22-cv-249 (AS)<br><br><u>OPINION AND ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

    Plaintiff Todd Augenbaum accuses defendants of buying and selling securities as an insider group in violation of Section 16(b) of the Securities Exchange Act of 1934. Augenbaum says that defendants were corporate insiders who together owned more than 10% of the securities issued by Genius Brands International, Inc. He claims that the defendants acted in tandem—deciding to go in on the investment together and then sell together—in violation of the bar on short-swing trading.

    Defendants previously moved to dismiss this suit. The Court initially granted defendants' motion to dismiss but gave Augenbaum leave to amend his complaint. *See Augenbaum v. Anson Invs. Master Fund LP*, 2023 WL 2711087, at *1 (S.D.N.Y. Mar. 30, 2023). The Court then denied defendants' motion to dismiss Augenbaum's amended complaint. *Augenbaum v. Anson Invs. Master Fund LP*, 2024 WL 263208, at *1 (S.D.N.Y. Jan. 24, 2024).

Both sides have now moved for summary judgment. Augenbaum also moves to exclude some portions of the testimony of defendants' expert witnesses. Defendants move to exclude the testimony of Augenbaum's two expert witnesses in their entirety. For the following reasons, the cross-motions for summary judgment are DENIED, Augenbaum's motion to exclude is GRANTED IN PART and DENIED IN PART, and defendants' motion to exclude is DENIED.

## BACKGROUND

In August 2019, nominal defendant Genius Brands International (now known as Kartoon Studios) was strapped for cash. *See* Dkt. 281 ¶¶ 31–32. So Genius approached the placement agent and investment bank Special Equities Group ("SEG") for help restructuring its debt and securing additional private financing. *Id.* ¶ 34. SEG has two principals: Joe Reda and Jonathan Schecter. *See id.* ¶ 36.

Within the month, SEG and Genius were laying the groundwork for a PIPE transaction. *Id.* ¶ 38. "PIPE" is short for "private investment in public equity," which means a privately negotiated transaction in a company with publicly issued securities, in contrast with a public offering of securities to the market. *Id.* ¶ 22. Both sides agree that SEG and Genius planned for defendant Anson Investment Master Fund ("Anson") to be the lead investor in the PIPE transaction. *Id.* ¶ 38.

On January 22, 2020, Anson executed a term sheet with Genius for a $10 million offering of secured convertible notes to be issued by Genius. *See* Dkt. 263 ¶ 51. On the agreement's terms, Anson would provide up to $3 million in funding and existing secured note holders would provide at least 200% of the amount of their existing debt. *Id.* Anson retained the law firm Ellenoff Grossman & Schole LLP (EGS) to represent it in connection with the planned deal. *See id.* ¶ 52. EGS did not represent any other clients with respect to that deal, *id.*, but it does represent defendants Brio Capital Master Fund and Brio Select Opportunities Fund ("Brio") in this suit.

Almost immediately after Anson and Genius executed the term sheet, SEG began circulating it to potential investors, including defendants Iroquois Master Fund and Iroquois Capital Investment Group ("Iroquois"), defendant CVI, defendants Empery Asset Master Fund, Empery Debt Opportunity Fund, and Empery Tax Efficient Fund ("Empery"), defendant Robert Molinsky, and Brio. *See id.* ¶ 53. Both sides agree that Anson, Brio, Iroquois, Empery, CVI, and Molinsky had all invested in Genius prior to 2019. Dkt. 281 ¶ 25. These earlier transactions date as far back as 2014. *Id.*

Two days later—on January 24, 2020—SEG asked EGS (copying Anson) to send drafts of the deal documents to Brett Director, the general counsel and chief compliance officer of Empery. *See* Dkt. 226-6 at 94; Dkt. 281 ¶ 10. The EGS attorney responded that, "I'm sure whatever comments Brett has will just improve the docs for all." Dkt. 226-6 at 94. EGS and Director corresponded about the deal documents again four days later, on January 28, 2020. *See* Dkt. 226-7 at 13–120.

Also on January 24, 2020, EGS asked Amin Nathoo, a principal and portfolio manager of Anson, *see* Dkt. 281 ¶ 6, about a term in the deal regarding redemption. *See* Dkt. 226-6 at 105. Reda and Schecter were also included on the email. *Id.* Nathoo wrote back, "Red[emption] should

not be allowed w/o equity conditions being met (registered, liquid etc.) And then given we are getting stock at 15% discount, redemption premium should be 15% up so that we are indifferent between being paid and amortizing out. Those are my thoughts . . . not sure what other folks wi[ll] think. Reda, maybe check with Richie and Ryan?" *Id.* Defendants don't deny that Nathoo's mention of "Richie and Ryan" is a reference to Richard Abbe, an equity owner of Iroquois, and Ryan Lane, a founder and managing member of Empery's general partner. *See* Dkt. 281 ¶¶ 10, 12; Dkt. 263 ¶ 56.

On February 23, 2020, Nathoo contacted SEG and asked if the $10 million funding requirement for the deal had been met, *see* Dkt. 226-7 at 121. Nathoo wrote, "If we're not going to be at the $10mm perhaps we show it [t]o AJ from Obsidian?" *Id.* Obsidian is an investment manager for defendant M3A. Dkt. 281 ¶ 14. After Reda responded that the deal was currently "at $7-13mil," Nathoo emailed back, "[I]f we have a shortage, we show AJ." Dkt. 226-7 at 121.

A day later, Reda emailed defendant L1 about investing in the Genius deal. *See* Dkt. 226-2 at 156. Reda wrote, "This deal is a Highly structured Self-Amortizing Senior Secured Convertible Note Original Issue discount with ratchets and resets and price protection and most favored nations with 100% warrants with the same protective features as the note. Lead investor is in for $3mil out of $10mil...All other existing note holders are in!!!" *Id.* at 157. He also attached an investment letter describing the deal in more detail. *See id.* at 163–67. In the category of "Investors," the letter stated, "Anson Investment Master Fund LP (the **'Lead Investor'**), and other institutional and accredited investors acceptable to the Lead Investor (together with the Lead Investor, the **'Investors'**)." *Id.* at 163.

On March 11, 2020, the deal closed, and Genius entered into securities purchase agreements with each defendant. *See* Dkt. 281 ¶ 166. All the agreements were of the same form. *Id.* The securities purchase agreements also referenced other agreements, including a voting agreement, a lock-up agreement, and a master netting agreement. Dkt. 281 ¶ 177.

Under the securities purchase agreements, Genius promised to sell and issue a total of $13,750,000 in senior secured convertible notes. Dkt. 281 ¶ 167. These notes were initially convertible into common stock at a price of $1.375 per share. *Id.* Genius also promised to sell and issue to the counterparties warrants to purchase 65,476,190 shares of common stock, exercisable for a period of five years at an initial exercise price of $0.26 per share. *Id.*; *see also* Dkt. 232-61. The 2020 convertible notes were issued at an original issue discount of $2,750,000. Dkt. 281 ¶ 168. The participating investors funded the $11 million balance with cash payments of $7 million and full-recourse cash-secured promissory notes payable by the investors to Genius in the principal amount of $4 million. *Id.*

Under NASDAQ Rule 5635(d), a listed company is required to obtain stockholder approval before it can issue twenty percent or more of its outstanding common stock at a discount, as was the case under the March 2020 deal. *Id.* ¶ 178. The securities purchase agreements required Genius to hold a stockholder meeting by May 15, 2020, to approve the issuance of shares of common

stock upon any conversion of the 2020 convertible notes. *Id.* ¶ 180. Under the terms of the agreements, following stockholder approval, the conversion price of the notes and the exercise price of the March 2020 warrants would be reduced to $0.21 per share. *Id.* So on March 3, 2020, Genius entered into voting agreements with some of its principal stockholders to ensure that it would be able to obtain shareholder approval for the March 2020 deal. *Id.* ¶ 181. Defendants say that none of them (defendants) signed one of these voting agreements with Genius, *see id.* ¶ 185, but Augenbaum claims that Molinsky executed one, *see* Dkt. 281 ¶¶ 55–56; *see also* Dkt. 254-50.

On March 10, 2020, Genius also entered into lock-up agreements with its principal stockholders. Dkt. 281 ¶ 187. The lock-up agreements prohibited the stockholders from selling any Genius common stock that they owned at that time for ninety days following the one-year anniversary of the closing date of the securities purchase agreements. *Id.* ¶ 188. Both sides agree that no defendant was a party to any lock-up agreement. *Id.* ¶ 193.

Finally, on March 13, 2020, Genius entered into master netting agreements with every investor in the March 2020 PIPE, including each defendant. *Id.* ¶ 195. The parties dispute what these agreements provided for, but Augenbaum claims that they "provided for joint sharing of risks and rewards [among defendants] in the event of [Genius's] bankruptcy." Dkt. 263 ¶ 80(b).

After the March 2020 PIPE closed, the price of Genius stock began to rise. *Id.* ¶ 199. So Genius sought to raise more capital through what's known as a "registered direct offering." *Id.* These transactions allow companies to raise money quickly through a series of smaller direct offerings, while still complying with SEC regulations. *Id.* ¶ 200.

On March 22, 2020, Genius completed a registered direct offering. Genius entered into a securities purchase agreement with some of its investors in which it agreed to sell 4,000,000 shares of common stock at $0.2568. *Id.* ¶ 204. Anson and Brio participated in this deal. *Id.* ¶ 205.

On May 7, 2020, Genius completed another registered direct offering. *Id.* ¶ 213. This time Genius agreed to sell 8,000,000 shares of its common stock at $0.35 per share. *Id.* Anson, Brio, CVI, Empery, Iroquois, L1, M3A, and Molinsky participated in this transaction. *Id.* ¶ 214.

The next day—May 8, 2020—Genius completed yet another registered direct offering. *Id.* ¶ 226. Genius agreed to sell 12,000,000 shares of common stock at $0.454 per share. *Id.* Almost all the same investors participated: Anson, Brio, CVI, Empery, Iroquois, L1, and Molinsky. *Id.* ¶ 227.

On May 15, 2020, at Genius's 2020 annual stockholders meeting, Genius stockholders voted to lower the conversion price of the notes involved in the March 2020 deal to $0.21 per share and to lower the exercise price of the warrants involved in the March 2020 deal to the same. *Id.* ¶ 233.

On May 18, 2020, for yet the fourth time, Genius completed a registered direct offering. *Id.* ¶ 252. This time, Genius agreed to sell 7,500,000 shares of common stock at $1.20 per share. *Id.* Once again, Anson, Brio, CVI, Empery, Iroquois, L1, and Molinsky all participated in the deal. *Id.* ¶ 254. Each investor in the May 18, 2020 registered direct offering signed a "leak-out" agreement with Genius. *Id.* ¶ 258. Under this agreement, each of the investors could not, for ninety days

4

after the registration statement became effective, sell any common stock obtained through converting the notes or exercising the warrants from the March 2020 deal for a price below $1.65 per share, unless the total amount of shares sold on any trading day by the investor did not exceed a fixed percentage of the daily trading volume. *Id.* ¶ 260. That percentage was based on the investor's pro rata investment in the March 2020 deal. *Id.*

Ten days later, on May 28, 2020, Genius completed another registered direct offering. In this transaction, Genius agreed to sell 20,000,000 shares at $1.50 per share. *Id.* ¶ 267. So that investors would approve of the additional offering, Genius agreed to file a registration statement on or before June 5, 2020, to register the shares underlying the March 2020 warrants with the SEC. *Id.* ¶ 268. Anson, Brio, CVI, Empery, Iroquois, L1, and Molinsky participated in the May 28, 2020 registered direct offering. *Id.* ¶ 269.

On June 4, 2020, Genius filed a registration statement for the resale of 60,100,617 shares of common stock. *Id.* ¶ 276. On June 10, 2020, the SEC declared Genius's June 4 registration statement effective. *Id.* ¶ 277. Among other things, the registration statement allowed the sale of 31,100,091 shares of common stock that defendants obtained pursuant to the exercise of their warrants. *Id.* ¶ 276. The registration statement was followed the next day by a prospectus for the sale of the shares; every defendant subsequently sold Genius shares. *Id.* ¶¶ 278–79.

On June 23, 2020, each defendant entered into two agreements with Genius: a conversion agreement and a leak-out agreement. *Id.* ¶ 286. Under the conversion agreements, Genius promised to file a registration statement with the SEC on June 26, 2020 which covered the resale of the shares issued in exchange for defendants' convertible notes. *Id.* ¶ 287. On June 26, 2020, Genius did exactly that—the SEC declared the statement effective on July 6, 2020. *Id.* ¶ 288. The June leak-out agreements were essentially the same as the May leak-out agreements, except with a trigger price of $2.00 rather than $1.65. *Id.* ¶ 291; Dkt. 263 ¶ 115. The June leak-out agreements were never triggered because the price of Genius's stock stayed above $2.00 throughout the relevant period. Dkt. 281 ¶ 296.

On July 8, 2020, Genius filed a prospectus with the SEC for the proposed resale of 59,523,812 shares of common stock issued upon conversion of the notes from the March 2020 deal. Dkt. 281 ¶ 299. Anson, Brio, CVI, Empery, Iroquois, L1, M3A and Molinsky were listed as selling stockholders. *Id.* ¶ 300.

For all this complicated background, Augenbaum's argument is straightforward: Through these transactions, defendants accumulated millions of shares of Genius stock on the cheap, and then when the price skyrocketed, they sold those shares, while ensuring that other shareholders couldn't do the same. Augenbaum says that between March and August of 2020, defendants made profits on their Genius stock sales totaling nearly half a billion dollars. Dkt. 263 ¶¶ 122–23.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the proponent of expert testimony must show that the "witness ... is qualified as an expert by knowledge, skill, experience, training, or education," and that it is more likely than not that the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," "is based on sufficient facts or data," "is the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) ("[Rule 702] incorporates principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Supreme Court charged trial courts with a gatekeeping role to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" (quoting *Daubert*, 509 U.S. at 589)).

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Nevertheless, "[u]nder *Daubert*, trial judges are charged with ensuring that expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998) (quoting *Daubert*, 509 U.S. at 597). "Thus, while *Daubert* and the Federal Rules of Evidence 'allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye*, they leave in place the "gatekeeper" role of the trial judge in screening such evidence.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

## DISCUSSION

### I. There is a triable question of fact on whether defendants agreed to act together.

"Congress enacted Section 16(b) to prevent the unfair use of information which may have been obtained by a statutory insider." *Roth v. Armistice Cap., LLC*, ---- F.4th ----, 2025 WL 2471028, at *3 (2d Cir. Aug. 28, 2025) (cleaned up). "Section 16(b) thus imposes strict liability on statutory "insiders"—namely, "beneficial owners, directors, and officers,"—requiring them to disgorge profits when the insider purchases and sells an issuer's stock within a six-month period (so-called "short-swing profits" from "matching transactions"). *Id.* (quoting 15 U.S.C. § 78p(b)).

Who qualifies as a "beneficial owner" is determined by Section 13(d) of the Exchange Act. *See Augenbaum*, 2024 WL 263208, at *2. Under Section 13(d), a "beneficial owner" may be a

6

"group." *Id.*; *see also* 15 U.S.C. § 78m(d)(3) (defining a "person" counting as a beneficial owner to include a "group for the purpose of acquiring, holding, or disposing of securities of an issuer").

Rule 13d-5(b) in turn states that a group is formed when "two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). Agreement is key. *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) ("[T]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective.").

"Whether the requisite agreement exists is a question of fact." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 124 (2d Cir. 2001). "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Id.* And "the alleged group members need not be committed to 'acquiring, holding, voting, or disposing of equity securities' on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities." *Id.*

### A. Did defendants agree?

Augenbaum's theory is that defendants formed a group as evidenced by emails, memos, and the various agreements spanning several months in 2020. *See* Dkt. 225 at 26. According to Augenbaum, this evidence shows the existence of a common plan for defendants to purchase and then sell Genius securities in quick succession. Defendants dispute that they ever agreed on anything.

If the only evidence in the record were the investment agreements themselves, Augenbaum might have a hard row to hoe. But as the Court suggested in denying defendants' motion to dismiss, *see Augenbaum*, 2024 WL 263208, at *7, discovery has revealed evidence of communications and coordination between defendants that could support an inference that they agreed to act as a group. That evidence includes messages between defendants and SEG; an internal SEG memo referencing a "joint call" between Anson and Iroquois; and correspondence between SEG and certain defendants trading drafts of deal documents. On the record before the Court, there's enough evidence for a reasonable trier of fact to find that defendants acted as a group.

First and most importantly, discovery has uncovered a trove of messages between SEG, Heyward, and defendants in the lead up to the March 2020 transaction and afterwards. The parties disagree on what to make of them. Augenbaum says these emails are definitive proof of a group. He points to things like Reda's message on August 15, 2019 to Iroquois, Genius's CEO Andy Heyward, and other Genius executives about a plan to restructure Genius's debt which included Anson and Brio investing. *See* Dkt. 226-4 at 2–3. And he calls the Court's attention to numerous emails that Reda and Schecter (and, to a lesser extent, Heyward) sent to defendants during the March 2020 deal negotiations about how the other defendants were acting or planning to act. *See, e.g.*, Dkt. 226-4 at 5–8; *id.* at 156–168; Dkt. 226-5 at 60–61; *id.* at 63–67; *id.* at 69; *id.* at 226-5 at 71–77; Dkt. 226-7 at 124–142; Dkt. 226-9 at 1–4; *id.* at 6–14; *id.* at 23–35; Dkt. 226-11 at 72–76; *id.* at 78–79; *id.* at 81–82; *id.* at 84–86; *id.* at 88–89; *id.* at 91.

7

Defendants' initial response is that the documents are inadmissible as hearsay because they were authored by SEG or Heyward, neither of whom is a party to this suit. *See, e.g.*, Dkt. 263 ¶¶ 31, 32, 35, 38, 42, 45–46. Defendants go on to say that even if the emails were admissible, they're nothing more than aggressive sales tactics. Defendants point to Augenbaum's own acknowledgement that "SEG will take whatever actions are necessary including misstating facts to make a sale" and characterizations of Heyward as a "schemer, a criminal, a dirtbag, and … a scumbag." *See* Dkt. 263 ¶¶ 3, 6.

On admissibility, the messages are relevant for a non-hearsay purpose, since a jury could find that their existence constitutes group communication. That would not be hearsay. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *United States v. Cardascia*, 951 F.2d 474, 486–87 (2d Cir. 1991) (quoting Advisory Committee note to Fed. R. Evid. 801(c)) (cleaned up).

That's also why defendants' attempt to impugn the credibility of SEG and Heyward doesn't undercut the messages' evidentiary value. Instead, the fact of Reda, Schecter, and Heyward's messages is enough to create a triable question as to whether defendants formed a group within the meaning of Section 13(d). Courts across the country have consistently held that communication between security holders can be evidence of an agreement. *See Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 2002 WL 31869391, at *9 (S.D.N.Y. Dec. 20, 2002); *Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 832–34 (N.D. Ill. 1987); *see also Wellman*, 682 F.2d at 363–364 (discussing solicitation of other participants and communication between participants as probative of existence of agreement). And the things SEG told defendants weren't innocuous details. For instance, ahead of the May 8, 2020 transaction, Reda wrote, "Whoever doesn't invest in this round their pro rata will not be invited in on any future GNUS deals 'as per the lead.'" Dkt. 226-11 at 73–74; *id.* at 78; *id.* at 81; *id.* at 84; *id.* at 88; *id.* at 91. Whether there really was a "lead" doesn't matter—what matters instead is that SEG relayed the information it did to defendants and between them, presumably because the information was relevant to defendants' decision-making. That's a sufficient basis for a jury to determine defendants agreed to act together.

Aside from SEG's and Heyward's messages, defendants say that discovery didn't turn up a single call, email, or other record of their coordination. That's not actually true—an internal SEG memo about the May 28, 2020 registered direct offering notes that "[SEG] received a call from Anson and Iroquois asking if the company was willing to sell common stock off its shelf registration statement at $1.50." Dkt. 232-252 at 3. Defendants say that the memo doesn't specify whether SEG received a joint call from Anson and Iroquois or separate call from each; they also point to testimony from SEG, Anson, and Iroquois maintaining that there was no joint call.[1] But a reasonable trier of fact could discount that explanation, based on the contents of the memo.

---

[1] Defendants also say that the memo is inadmissible hearsay. *See* Dkt. 263 ¶ 110. But Schecter testified that he wrote the memo as part of the firm's efforts to comply with FINRA regulations. *See* Dkt. 232-16 at

8

Defendants next contend that they couldn't have acted as a group because they were competitors and didn't trust each other. But dislike can co-exist with coordination. As other courts have observed, the mere fact of disagreement on some issues doesn't "foreclose the possibility of ultimate agreement at the end of the day as to those same issues or, indeed, of agreement as to wholly separate issues." *Schaffer*, 2002 WL 31869391, at *10; *see also Morales v. New Valley Corp.*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998) (noting a group might exist "although the parties might not always march in lockstep"), *aff'd sub nom. Morales v. Freund*, 163 F.3d 763 (2d Cir. 1999).

Moreover, even if defendants were competitors in some respects, there's evidence in the record that many of them worked together prior to signing the March 11, 2020 securities purchase agreements. For instance, Augenbaum points to a chain of emails on January 14, 2020 involving SEG, Anson, and Brio. These emails involve Brio's and Anson's comments on a proposed term sheet for a deal with Genius. *See* Dkt. 226-5 at 50–95. Granted, Brio and Anson don't email each other directly with their respective comments on the term sheet—but Schechter acknowledged at his deposition that defendants were responding to one another's comments via SEG. *See* Dkt. 226-1 at 272 (agreeing that "Mr. Nathoo is providing his response to Mr. Hirsch's comments to Joe Reda and you"). Anson claims that it didn't rely on Brio's comments when deciding to execute the January 22, 2020 term sheet a week later, but the credibility of that assertion is something for the jury to determine. *See Schaffer*, 2002 WL 31869391, at *7 ("[T]he circulation of drafts and related documents among the various investors itself constitutes a basis from which a jury could draw a fair inference of agreement.").

Defendants rely heavily on *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411 (S.D.N.Y. 2006). There, defendants were three institutional investors who participated in a private investment transaction with an issuer. Each of the defendants was represented by their own counsel, but the issuer insisted that "counsel for one investor to act as a principal draftsperson" and the defendants selected one of their counsel to fill that role. *Id.* at 412. In that capacity, the counsel selected as principal draftsperson "circulated drafts to the [other] investors' counsel and communicated comments from them" to the issuer, but he "did not provide legal advice to any investor but his" own client. *Id.* The court held that, standing alone, evidence of "use of a lead draftsman, at the behest of the [issuer]" wasn't enough to create a triable issue of fact as to whether the defendants acted as a group. *Id.* at 416.

The facts fall differently here than in *Litzler*. Unlike in *Litzler*, defendants knew of each other's investment plans prior to purchasing Genius securities. *See id.* at 416 (noting that defendants' "due diligence, the decision to purchase, and the decision to sell, were done individually"). Augenbaum points out that SEG informed defendants of SEG's plan to raise $1 million from Heyward and $10 from investors, *see* Dkt. 226-1 at 182, and to an email from Joe Reda to L1 Capital, informing L1

---

140:7-13. So the memo is likely admissible as a business record. *See United States v. Conde*, 134 F.4th 82, 85–86 (2d Cir. 2025). Moreover, the memo may be admissible as a present-sense impression. *See Sec. & Exch. Comm'n v. AT&T, Inc.*, 626 F. Supp. 3d 703, 738 (S.D.N.Y. 2022) (analyst notes admissible as present-sense impression).

that the "lead investor is in for $3mil out of $10mil…All other existing note holders are in!!!"[2] Dkt. 226-2 at 157. Also unlike *Litzler*, Anson took the lead without any prompting from Genius. *See* Dkt. 232-2 ¶ 30. And—again unlike *Litzler*—SEG also revealed the identities of the intended investors to each other. *Compare* Dkt. 226-1 at 182 (listing potential investors) *with Litzler*, 411 F. Supp. 2d at 412 (noting that placement agent circulated preliminary term sheet "without revealing the identity of potential investors to each other"). Finally, where the lawyer who worked as lead draftsman in *Litzler* "did not provide legal advice" to anyone but his own client, there's evidence here that EGS was trading drafts and comments with defendants other than Anson. *See* Dkt. 226-6 at 94; Dkt. 226-7 at 13–120.

For a similar reason, the facts here differ from *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122 (2d Cir. 2016). There, the Second Circuit maintained that a standard lock-up agreement, without more, does not create a group. *Id.* at 130. But the facts here extend beyond a single lock-up agreement. A jury could consider the multiple successive agreements at issue and the significant communication that is alleged to have occurred. And *Lowinger* acknowledged that while a lock-up agreement was not itself sufficient to create a group, it could be evidence that would "bear upon" the group's potential existence. *Id.* (citation omitted); *see also Morales*, 249 F.3d at 125 (considering existence of sales agreement as potential evidence of group formation).

Finally, defendants appeal to the policy behind Section 16(b). They tell the Court that investors should feel free to make parallel investments without the fear of disgorgement hanging over their heads. That's certainly true—but the record shows there's serious questions about whether defendants' investments genuinely were parallel. This clearly isn't a case in which *only* "[t]he use of a single document in a private placement," *Greenberg v. Hudson Bay Master Fund Ltd.*, 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015), or "[l]ock-[u]p [a]greements, standing alone," *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 349 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir. 2012), are used to demonstrate the existence of a Section 13(d) group. Instead, there's quite a bit of evidence that defendants agreed to work together, from the many SEG emails to the internal memo about a joint call between Anson and Iroquois to the March 2020 deal to the multiple leak-out agreements. Taken together, a jury could find that defendants were a group, running afoul of Section 16(b). So the Court's conclusion does not mean that there are "triable group issues in virtually any parallel transaction." Dkt. 233 at 9.

For his part, Augenbaum says that the evidence in the record is a slam dunk showing that defendants acted as a group. And here's where defendants' arguments come back around—it's not certain on the record before the Court that, as a matter of law, defendants really did act as a group, rather than make parallel investments in Genius that would not qualify as group behavior. *See Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 182 (S.D.N.Y. 2023) ("Allegations

---

[2] Defendants seek to minimize Reda's emails by pointing to Schechter's characterization of Reda's comments as merely puffery from a "consummate salesman." Dkt. 223 at 34. But a reasonable jury could question Schechter's credibility, draw different inferences, or both.

of parallel investment decisions or pre-existing relationships also do not suffice to plead a group."), *aff'd*, 102 F.4th 136 (2d Cir. 2024).

For instance, Augenbaum says that the non-standard terms of the March 2020 deal alone suffice to show defendants' coordination as a group. But that's a move too quick. First, it's not clear to the Court that the terms of the March 2020 deal really were novel. Both sides have submitted dueling expert reports on this issue. Second, as defendants point out, many of the features of the March 2020 deal that Augenbaum claims are indicative of group liability involve agreements to which no defendant was a party. *See Chechele*, 819 F. Supp. 2d at 349 (the "[a]greement attached to the motion papers can hardly form the basis for Section 16(b) liability, since [no] member of the alleged shareholder group was party to the agreement"). So that too is reason to pause before concluding that the March 2020 agreements suffice to show defendants acted as a group. Finally, as noted above, the Second Circuit has been explicit that a standard lock-up agreement, without more, does not form a group under Section 13(d). *See Lowinger*, 841 F.3d at 130.

Viewing the record in full shows that a material question of fact exists. The parties agree about the barebones of the timeline of events and essentially nothing else. They even disagree as to the members of any putative group.[3] Each side points to evidence—emails, declarations, and deposition testimony—that they say supports their own version of events. What's needed are the sorts of credibility determinations and weighing of evidence that are best left for the jury. *See Morales*, 249 F.3d at 125 (finding that "a reasonable trier of fact could discredit the two … sworn statements and infer instead that [the defendants] were in communication with one another").

### B. If defendants agreed, when did they strike up (and end) their agreement?

Defendants say that even if they did create a group, Augenbaum has pointed to no evidence that every defendant was a member of the group before entering into the March 11 securities purchase agreements. *See* Dkt. 233 at 40. So defendants say that, at the very least, they're entitled to partial summary judgment on Augenbaum's claim that they created a group earlier than March 11, 2020. Similarly, defendants argue that the Court should grant partial summary judgment on Augenbaum's claim that defendants acted as a group past June 23, 2020—again for want of evidence. *See id.* at 40–41. Defendants' argument would imply that all conduct before March 11 or after June 23 was not conducted as a "group" as a matter of law, which would place it outside the bounds of Section 16(b).

The Court will risk sounding like a broken record: if and when any Section 13(d) group was formed and disbanded are live questions that remain up for debate. As to any agreement's start date, the Court has gone through the considerable evidence in the record of SEG informing defendants of each other's respective strategies and of certain defendants trading draft documents for

---

[3] Augenbaum argues that defendants created a group with Heyward to complete the March 2020 PIPE. *See* Dkt. 252 at 32–34. Defendants dispute that Heyward was part of any group—they say that CEO participation in a PIPE transaction is normal. *See* Dkt. 233 at 26–27.

11

the March 2020 PIPE. All this evidence comes prior to March 11, 2020. So determining the underlying question of *if* defendants agreed will set the path for any determination of *when* they did so. Moreover, even assuming the evidence points more clearly to group behavior only after the March 2020 agreements, a jury could treat that as circumstantial evidence that a group had existed for some time.

To make their argument about when any supposed group activity ended, defendants ask the Court to disregard the Second Circuit's decision in *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007). In *Roth*, the Second Circuit held that coordinated activity doesn't need to extend past the time of purchase for transactions to be subject to disgorgement under Section 16. *Id*. at 512–13. The defendants assert—in a single sentence—that *Roth* is "is not binding because it conflicts with Section 16(b) itself, Supreme Court precedent, and prior Second Circuit precedent." Dkt. 233 at 41. Here, where there is a material dispute about the existence of the underlying agreement between defendants, the Court doesn't need to reach defendants' argument about *Roth*. Instead, it is for the factfinder to determine whether defendants agreed and, if so, when that agreement arose and ended.

## II. The Court grants in part and denies in part Augenbaum's motion to exclude the testimony of defendants' experts.

Defendants put forward the testimony of three experts: David Marcus, Michael Weisbach, and Michael Maline. Marcus is a senior vice president and former head of the finance practice at an economic and financial consulting firm, who has consulted on financial litigation issues for over twenty-five years. Dkt. 232-26 ¶ 1. Weisbach is a professor of finance at the Ohio State University, who has spent his entire career teaching about corporate finance, corporate governance, private equity, and related topics at business schools across the country. Dkt. 232-28 ¶ 1. Finally, Maline is a partner at Covington & Burling LLP with over twenty-five years of experience representing global investment banks, issuers, and investors in public and private capital markets transactions. Dkt. 232-27 ¶ 1. Augenbaum asks for a litany of exclusions to defendants' expert testimony. The Court denies most of Augenbaum's requests.

Augenbaum first asks the Court to exclude Weisbach's and Maline's testimony that the terms of the March 2020 PIPE and the leak-out agreements were standard. Augenbaum shifts the label he gives to his objection to Weisbach and Maline's testimonies: at certain points, he calls their testimonies irrelevant, *see* Dkt. 228 at 7, while at others, he says their opinions are unreliable, *see* Dkt. 228 at 9. But the substance of his objection is on the merits of what Weisbach and Maline say. *See id.* at 7 ("Plaintiff is skeptical of the parameters chosen for the Weisbach survey. . . ."); *id.* at 8 (Weisbach's opinion "ignores that the Second Circuit's approval of standard lock-up agreements as not creating a Section 13(d) group is premised in part on the underlying agreement having been publicly disclosed."); *id.* at 9 (Weisbach's and Maline's opinions rest on an interpretation of "industry standard" that is "plainly not what *Lowinger* meant by 'standard industry practice' or this Court meant by 'industry standard'").

Disagreement on the merits of an expert's opinion—rather than to an expert's methodologies or qualifications—is not proper grounds for exclusion. *See Amorgianos v. Nat'l R.R. Passenger*

12

*Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (*Daubert* inquiry "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached"); *SEC v. Ripple Labs, Inc.*, 2023 WL 5670711, at *11 (S.D.N.Y. Mar. 6, 2023) ("[D]isagreement over an expert's conclusions does not warrant exclusion."). If the agreements are simply standard practice in the industry, a jury could find that they do not imply group formation. *See Lowinger*, 841 F.3d at 132 (holding that a "standard lock-up agreement[]" that the SEC said was "common" in the industry did not indicate group formation).

To be clear, whether the contracts were "industry standard" is only relevant—and a proper topic for expert testimony—insofar as it makes it more or less likely that defendants acted as a group. The millions of consumers who purchase something on Amazon aren't acting as a group just because they all agreed to identical terms and conditions. To that end, if defendants can show that the terms of the agreements at issue were largely the same as those that others in the industry use, it could lead a jury to conclude that the agreements do not demonstrate group behavior. (Conversely, if Augenbaum can show that the terms of the agreements differed markedly from industry practice, it could lead a jury to conclude that the agreements are evidence of group behavior.) But no expert should treat the question of whether the agreements are "industry standard" as a separate factual question for the jury to answer independent of its implications as to the existence of a group.

Augenbaum next asks the Court to exclude David Marcus's analysis of defendants' trading in Genius stock. Augenbaum argues that Marcus's analysis is irrelevant because Augenbaum isn't arguing that defendants coordinated their sales of Genius stock beyond complying with the terms of the leak-out agreements. *See* Dkt. 228 at 10. Augenbaum also adds that Marcus relies on the wrong dates for his analysis. *Id.*

Marcus's analysis is relevant. *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 329 (S.D.N.Y. 2022) ("Relevance can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" (citation omitted)). Courts have observed that "the different, and at times inconsistent, trading patterns of the various defendants" can "cast serious doubt upon any contention of a concerted effort." *Standard Metals Corp. v. Tomlin*, 503 F. Supp. 586, 603 (S.D.N.Y. 1980). Marcus's analysis speaks directly to that issue. And even if Augenbaum is making a more limited argument concerning how defendants' trading supports a group finding—focusing on compliance with the leak-out agreements—that doesn't constrain defendants in terms of the facts they can rely on to show that there was no group here. To give an example, if the defendants coordinated the timing of their sales to maximize their collective profit while avoiding anyone front-running the others, that might be indicative of the defendants acting as a group. On the other hand, if their trading was erratic and evinced individualized profit-seeking, that's one fact among many that might point away from a group finding. As to the dates that Marcus uses in his analysis, defendants point out that Augenbaum himself uses the same dates in his own papers. *See* Dkt. 249 at 20. But more importantly, Augenbaum's criticism of Marcus's dates "goes to weight of [his] testimony

and not admissibility." *Ultra Recs., LLC v. Ultra Int'l Music Publ'g, LLC*, 2024 WL 4663011, at *4 (S.D.N.Y. Nov. 4, 2024).

Augenbaum next claims that Maline offered an impermissible legal opinion by stating that one of plaintiff experts, Max Holmes, was unqualified to offer expert testimony. *See* Dkt. 228 at 11. However, Maline doesn't do that—instead, Maline expresses disagreement with Holmes's conclusions and explains to the extent that his opinion was grounded in experience with "large, stable, highly-solvent, and well-capitalized issuers," things are different in "the microcap and nanocap market." *See* Dkt. 232-27 ¶ 7. "Contradiction is to be expected and is often unresolvable without trial." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007). However, when Maline testifies at trial, he should not opine on Holmes's qualifications to serve as an expert or speculate as to why Holmes offered the opinions he did—that's obviously out of bounds. An expert "may not opine on the qualification of another expert to testify on a particular subject." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022). Maline should stick to the differences in various industries that may bear relevance here.

Augenbaum also asks the Court to exclude Weisbach's and Maline's testimony about the profitability of PIPE transactions. The Court grants this part of the motion. While there may be ways in which profitability of a transaction might be related to motivation to engage in group behavior (or rather to act individually but in parallel to others), defendants don't clearly explain how their experts' take on profitability is relevant to that issue. *See* Dkt. 249 at 15–17. So for now, it's out. But if Augenbaum's experts open the door to such testimony by commenting on the profitability of PIPE transactions, defendants' experts will be permitted to respond, as long as the testimony is tethered to the group-formation question. Defendants say that Holmes intends to do precisely that (in a speculative and improper way). *Id.* at 16. But they didn't address this issue in their motion to exclude, so the Court will allow the parties to raise in their motions *in limine* any issues they have on the proper scope of testimony concerning profitability.[4]

Augenbaum's penultimate request is that the Court strike Maline's testimony that "it is typical for a single investor's legal team to 'take the pen' and negotiate the terms that ultimately are offered to all investors in the transaction." Dkt. 232-27 ¶ 16. Augenbaum says this statement is beyond the bounds of Maline's expertise and is instead an attempt to smuggle fact-witness testimony. Augenbaum also says that this testimony is inconsistent with Maline's testimony that it is the usual case that "a lot of investors … will send in comments to deals even though they are not lead investors." Dkt. 232-19 at 185:18–20.

Maline's testimony is admissible. Experts can offer testimony about standard industry practice. *See United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony concerning the

---

[4] In general, the Court observes that because both sides used their *Daubert* motions to lob broadside attacks against the other side's experts, there may be issues with specific testimony that may have fallen through the cracks. To the extent that there are any of these particularized issues, both sides can raise them in their motions *in limine*.

ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice."). And Maline's testimony doesn't strike the Court as inconsistent: a lead investor can "take the pen" while still getting input from others.

Finally, Augenbaum asks the Court to exclude Marcus's testimony regarding alternate means of measuring damages. Augenbaum says the testimony can't be admitted because Marcus never explains why he excludes the transactions he does. *See* Dkt. 228 at 13.

As defendants point out, Marcus is simply providing an alternate means of calculating damages that fits defendants' theory of the case. If Augenbaum thinks that any portion of Marcus's calculations aren't justified, that's good fodder for cross-examination. *See Ultra Recs., LLC*, 2024 WL 4663011, at *4 ("Just as [defendants] w[ere] able to explain those unsupported inferences in [their] briefing, [they] can expose any weaknesses in [the expert's] testimony during cross-examination.").

### III. The Court denies defendants' motion to exclude the testimony of Max Holmes and Andrew Chin.

Augenbaum seeks to admit the testimony of Max Holmes and Andrew Chin. Max Holmes's career in finance spans decades; his experience includes "advising public and private companies on debt and equity financings," working at hedge funds worth billions of dollars, and direct involvement in "in reviewing (in some cases personally negotiating) the financial terms of and the legal documentation for new issues of private and public debt and equity securities." *See* Dkt. 232-30 ¶¶ 2–5. Andrew Chin has been a professor of law at the University of North Carolina School of Law for the past twenty-three years and has extensive experience and training in mathematical modeling, statistical inference, and computer technology. Dkt. 232-29 ¶¶ 1–4. Defendants say that both Holmes's and Chin's testimony should be excluded in their entirety. The Court disagrees.

#### A. Max Holmes

Defendants first argue that Holmes is unqualified to offer testimony on the industry standards for PIPE transactions, the formation of a "group" under Section 13(d), and disgorgement calculations. Defendants say that Holmes's general investment background doesn't qualify him to talk about PIPE transactions, that he's never published any articles about group formation, and that he lacks the mathematical training and experience to opine on damages.

The Court disagrees. "[I]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Ultra Recs., LLC*, 2024 WL 4663011, at *2 (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)). Here, there's little question about Holmes's qualifications in the general field. As defendants admit, Holmes has had experience with PIPE transactions. *See* Dkt. 232-18 at 190:3–195:22. And Holmes testified that during his career, he had "significant experience … in group behaviors," pointing to examples of transactions he was involved in where

15

the issue arose. *Id.* at 103:17–110:4. Finally, as to disgorgement calculations, the relevant experience isn't mathematical—instead, it's economic. *See Alan L. Frank L. Assocs., P.C. v. OOO RM Inv.*, 2021 WL 1906468, at *10 (E.D.N.Y. May 12, 2021) (noting that courts have admitted "expert testimony that takes the ultimate form of basic arithmetic when the expert used specialized knowledge, either to identify the appropriate inputs for the relevant computation or to determine what kind of calculation was necessary"). What matters is knowing what kind of transactions to include in the disgorgement calculation, knowledge that Holmes has from his substantial experience in financial markets and private equity.

The Court again cautions that whether an agreement was "industry standard" is only admissible insofar as it is relevant to the existence of a group. Holmes's testimony on whether particular provisions of the PIPE agreement were novel should not extend beyond what is relevant to show the existence of a group.

Next, defendants say that the Court should exclude Holmes's testimony as unreliable because Holmes lacks any clear methodology behind his opinions. But as it appears to the Court, Holmes bases his opinions on his extensive personal experience in finance. That experience provides a reliable basis for his testimony—which is all about standard practice in the finance industry. *See Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 541–42 (S.D.N.Y. 2024)

Finally, defendants say that the Court should exclude Holmes's testimony as unhelpful to the trier of fact. This argument, too, falls in short order. Holmes's testimony is about the circumstances surrounding the March 2020 transaction and its aftermath that were unusual for the financial industry. *See* Dkt. 232-30. Though defendants paint Holmes as testifying about his legal conclusions as to whether defendants formed a group and his speculation about defendants' mental states, what Holmes does is apply the expertise he has from his many years on Wall Street to the specific facts of this case. That's exactly the sort of testimony that would be helpful to a jury.

However, the Court notes that, at times, Holmes uses legal language in describing his methodology and his conclusions. *See, e.g.*, Dkt. 232-31 at 12 (referencing the "plain language" of Section 13(d)); *id.* at 13 (discussing the interpretation of SEC rules). While the substance of Holmes's conclusions isn't legal—as he says so in his report, *see id.* at 12–13—the Court will not permit Holmes to use legal characterizations during his testimony. *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 682 (S.D.N.Y. 2013).

### B. Andrew Chin

Defendants also ask the Court to exclude the entirety of Chin's testimony. Defendants claim that Chin's testimony is unreliable because Chin bases his opinions on a computer program he built specifically for this suit, because Chin relies on data provided by Augenbaum's consulting expert, and because Chin's calculations are based on inaccurate assumptions.

None of these criticisms of Chin's opinions requires exclusion. While the advisory committee notes to Rule 702 properly observes that challenges of the kind made by defendants do not invariably go to weight rather than admissibility, the arguments made here are the sort of testing of expertise that is properly left for cross-examination. *See E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370, at *6 (S.D.N.Y. Aug. 31, 2010) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." (citation omitted)). Chin developed his own computer program—the source code for which is publicly available online—that is tailored to the facts and circumstances of this case. Then he validated his model based on data relevant to this case. Why he used the data he did and the assumptions underlying his model are topics for cross-examination. *See, e.g., Hoover v. Delaney*, 2003 WL 22038639, at *1–*2 (N.D. Ill. Aug. 28, 2003) (holding that "assumptions (or extrapolations)" made by an expert "and the computer program he used, strike the Court as fit subjects for cross-examination"). As Chin is available to testify to the design of the program and the source code has been made public, this is far from an "indecipherable computer program" that the jury will have no means to parse. *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021).

## CONCLUSION

For the above reasons, the Court DENIES the parties' motions for summary judgment. Augenbaum's motion to exclude the testimony of defendants' experts is GRANTED IN PART and DENIED IN PART, and defendants' motion to exclude the testimony of Augenbaum's experts is DENIED.

By October 9, 2025, the parties shall meet, confer, and propose three separate two-week periods for trial during the first six months in 2026, excluding the last two weeks of February, and the month of March.

The Clerk of Court is directed to terminate Dkt. 224, 227, 229, and 231.

SO ORDERED.

Dated: September 30, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge