**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM, <br><br> Plaintiff, <br><br> v. <br><br> ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; CVI INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; AND RICHARD MOLINSKY, <br><br> Defendants, <br><br> -and- <br><br> KARTOON STUDIOS, INC. <br><br> Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO GENIUS'S MOTION FOR JUDGMENT**

Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email:   jabraham@aftlaw.com
        mklein@aftlaw.com

Evan Mandel
Robert Glunt
**MANDEL BHANDARI LLP**
80 Pine Street, 33rd Floor
New York, New York 10005
Telephone: (212) 269-5600
Email: em@mandelbhandari.com
        glunt@mandelbhandari.com

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 1

    The Company and Jaffa ............................................................................................. 1

      Anson ................................................................................................................... 3

      Aaron Morris and SEG ........................................................................................ 3

      Post-Summary Judgment Settlement Discussions ............................................... 5

      The "Litigation Committee" ................................................................................ 5

      Subsequent Developments ................................................................................... 9

ARGUMENT ........................................................................................................................ 9

    A.    Plaintiff Possesses a Primary Right to Pursue §16(b) Claims Which May
          Not Be Settled by the Company in This Action ....................................... 9

    B.    Genius Fails to Demonstrate Any Principle of Federal Law Which Allows
          the Company to Supplant Plaintiff in This Case..................................... 11

    C.    Genius Cannot Utilize State Law Principles to Supplant Plaintiff's Primary
          Right to Prosecute and Settle This §16(b) Claim.................................... 12

    D.    Even if State Law Were to Apply, Genius Has Not Carried Its Burden of
          Demonstrating That the Board Properly Exercised Its Business Judgment ........ 14

        1.    Genius Makes No Showing of Independence .......................................... 15

        2.    Genius Fails to Demonstrate Good Faith................................................. 16

    E.    Genius Has Otherwise Failed to Make a Record Supporting the Fairness of
          the Proposed Settlement....................................................................... 22

CONCLUSION................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*,
    9 F. App'x 53 (2d Cir. 2001) ................................................................................. 12

*Auerbach v. Bennett*,
    47 N.Y.2d 619 (1979) ........................................................................................... 15

*Augenbaum v. Anson Invs. Master Fund LP*,
    2025 WL 2780854 (S.D.N.Y. Sept. 30, 2025)....................................................... 4

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
    845 A.2d 1040 (Del. 2004) ................................................................................... 16

*Blau v. Hodgkinson*,
    100 F. Supp. 361 (S.D.N.Y. 1951) ....................................................................... 14

*Brinckerhoff v. JAC Holding Corp.*,
    263 A.D.2d 352, 692 N.Y.S.2d 381 (1st Dep't 1999) .......................................... 17

*Burks v. Lasker,*
    441 U.S. 471 (1979)................................................................................... 10, 13, 14

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994)............................................................................................... 11

*Citadel Holding Corp. v. Roven*,
    603 A.2d 818 (Del. 1992) ..................................................................................... 21

*City of Orlando Police Pension Fund v. Page*,
    970 F. Supp. 2d 1022 (N.D. Cal. 2013) ................................................................ 20

*City of Pontiac Gen. Employees' Ret. Sys. v. Bush*,
    2021 WL 2588979 (N.D. Cal. June 24, 2021) ...................................................... 20

*Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.*,
    148 Misc.2d 880, 561 N.Y.S.2d 371 (N.Y. Sup. Ct. 1990), *on reargument*, 150 Misc.2d
    126, 567 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991), *aff'd*, 180 A.D.2d 495, 580 N.Y.S.2d 657
    (1st Dep't 1992) .................................................................................................... 21

*Donoghue v. Bulldog Invs. Gen. P'ship*,
    696 F.3d 170 (2d Cir. 2012)............................................................................ 10, 11

*Dottenheim v. Murchison*,
    227 F.2d 737 (5th Cir. 1955) .................................................................................. 9

*Epstein v. Shindler*,
    26 F.R.D. 176 (S.D.N.Y. 1960) ...................................................................... 24

*FTR Consulting Group, Inc. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*,
    2005 WL 2234039 (S.D.N.Y. Sept. 14, 2005)................................................. 24

*Gollust v. Mendell*,
    501 U.S. 115 (1991)............................................................................. 9, 10, 13

*HB Gen. Corp. v. Manchester Partners, L.P.*,
    95 F.3d 1185 (3d Cir. 1996)........................................................................ 11

*In re Par Pharm., Inc. Derivative Litig.*,
    750 F. Supp. 641 (S.D.N.Y. 1990) ............................................................... 16

*In re XO Commc'ns, Inc.*,
    330 B.R. 394 (Bankr. S.D.N.Y. 2005)........................................................... 10

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*,
    411 F. Supp. 2d 458 (S.D.N.Y. 2006)............................................................ 11

*Jain v. J.P. Morgan Sec., Inc.*,
    177 P.3d 117 (Wash. App. 2008).................................................................. 20

*Jones v. Nuclear Pharmacy, Inc.*,
    741 F.2d 322 (10th Cir. 1984) .................................................................... 12

*Joy v. North*,
    692 F.2d 880 (2d Cir.1982), cert. denied, 460 U.S. 1051 (1983) ..................... 16

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) ........................................................................... 17

*Kamen v. Kemper Fin'l Servs., Inc.*,
    500 U.S. 90 (1991)..................................................................................... 15

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.,*
    906 F.3d 215 (2d Cir. 2018)........................................................................ 12

*Levner v. Saud*,
    903 F. Supp. 452 (S.D.N.Y. 1994), *judgment aff'd*, 61 F.3d 8 (2d Cir. 1995) ................. 13

*Levy ex rel. Mktg. Servs. Grp., Inc. v. General Elec. Cap. Corp.*,
    2001 WL 987873 (S.D.N.Y. Aug. 30, 2001)................................................. 24

*Levy v. Gen. Elec. Capital Corp.*,
    2002 WL 1225542 (S.D.N.Y. June 4, 2002) ................................................. 23

*Lewis v. Wells*,
    325 F. Supp. 382 (S.D.N.Y. 1971) ................................................................... 14

*Magida v. Cont'l Can Co.*,
    231 F.2d 843 (2d Cir. 1956) ........................................................................... 13

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*,
    471 F.3d 377 (2d Cir. 2006) ........................................................................... 12

*Matter of DISH Network Deriv. Litig.*,
    133 Nev. 438 (2017) ........................................................................... 15, 16, 19

*Mendell In Behalf of Viacom, Inc. v. Gollust*,
    909 F.2d 724 (2d Cir. 1990) ........................................................................... 13

*Molybdenum Corp. of Am. v. Int'l Min. Corp.*,
    32 F.R.D. 415 (S.D.N.Y. 1963) ...................................................................... 23

*Morales v. Quintel Ent., Inc.*,
    249 F.3d 115 (2d Cir. 2001) ........................................................................... 25

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023) ........................................................................... 24

*Nedick's Stores, Inc. v. Genis*,
    34 F.R.D. 235 (S.D.N.Y. 1963) ...................................................................... 23

*Orchard Hotel LLC v. D.A.B. Grp. LLC*,
    172 A.D.3d 530 (1st Dep't 2019) .................................................................... 19

*Pellegrino v. Nesbit*,
    203 F.2d 463 (9th Cir. 1953) ..................................................................... 13, 14

*Penske Media Corp. v. Shutterstock, Inc.*,
    548 F. Supp. 3d 370 (S.D.N.Y. 2021) ............................................................ 22

*Playboy Enters., Inc. v. Dumas*,
    960 F. Supp. 710, 720 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) ................. 23

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*,
    687 F. Supp. 2d 381 (S.D.N.Y. 2010) ............................................................ 23

*Revive Investing LLC v. FBC Holdings S.A.R.L.*,
    2021 WL 56905 (S.D.N.Y. Jan. 7, 2021) .............................................. 22, 23, 24

*Revive Investing LLC v. FBC Holdings S.A.R.L.*,
    2021 WL 734976 (S.D.N.Y. Feb. 25, 2021), *as amended* (Feb. 26, 2021) ............... 22, 23

*Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*,
    286 F. Supp. 2d 279, 282 (S.D.N.Y. 2003)........................................................... 10

*Segen v. Comvest Venture Partners, LP*,
    2005 WL 1320875 (D. Del. June 2, 2005)........................................................... 14

*Sutherland v. Sutherland*,
    968 A.2d 1027 (Del. Ch. 2008)........................................................................... 20

*Transunion LLC v. Ramirez*,
    594 U.S. 413 (2021).............................................................................................. 10

*Volk v. Zlotoff*,
    285 F. Supp. 650 (S.D.N.Y. 1968) ...................................................................... 14

*William J. Jenack Est. Appraisers & Auctioneers, Inc. v. Rabizadeh*,
    22 N.Y.3d 470 (2013) .......................................................................................... 15

**Statutes, Rules & Regulations**

15 U.S.C. §77k(a) ..................................................................................................... 19

15 U.S.C. §77l(a)(2)................................................................................................... 19

15 U.S.C. §78j(b) ...................................................................................................... 19

15 U.S.C. §78p(b) ............................................................................................. *passim*

15 U.S.C. §78r(a) ...................................................................................................... 19

15 U.S.C. §80a-35(b) ................................................................................................ 13

Fed. R. Civ. P. 17.................................................................................................. 11, 13

Fed. R. Civ. P. 23(e)(2) ............................................................................................ 24

Fed. R. Civ. P. 23.1 .................................................................................................. 16

Fed. R. Civ. P. 24..................................................................................................... 13

Fed. R. Civ. P. 7(b)(1)(A).......................................................................................... 22

FRE 502(d)................................................................................................................... 6

FRE 801(c)................................................................................................................. 16

**<u>Other Authorities</u>**

Arnold S. Jacobs,
    1 *Section 16 of the Securities Exchange Act* (September 2025 Update)..................... 10, 25

Arnold S. Jacobs,
    5A *Disclosure & Remedies Under the Sec. Laws* (Dec. 2025 Update) ........................... 13

Guy P. Lander,
    *14A U.S. Sec. Law for Financial Trans.* (2d ed. Dec. 2025 Update)................................ 25

Plaintiff respectfully submits this memorandum of law in opposition to the judgment sought by Genius Brands International, Inc., n/k/a Kartoon Studios, Inc. ("Genius" or the "Company") (Dkt. 359, the "Motion"; Dkt. 360, the "Memo.").[1]

## PRELIMINARY STATEMENT

In the 90 years since Congress enacted Section 16(b), no corporate issuer in the position of Genius has ever been permitted to settle a §16(b) claim without the support of shareholder-plaintiff bringing the underlying claim the issuer had rejected precisely because the structure of the statute as well as controlling precedent preclude issuers from doing so. Even aside from its tactic being precluded, the record Genius placed before this Court does not even come close to establishing that the proposed settlement is fair and reasonable or that the purported process used to achieve the "Proposed Settlement" was the product of independent or good faith process. Therefore, and as discussed in greater detail below, Genius's motion should be denied in its entirety.

## STATEMENT OF FACTS

**The Company and Jaffa**

Genius has "a history of operating losses and incurred net losses in each fiscal quarter since [its] inception[,]" having recorded cumulative losses of more than $695 million since 2020, losing: $401,670,000 in 2020; $126,291,000 in 2021; $45,595,000 in 2022; $77,103,000 in 2023; $20,739,000 in 2024 and; $24,532,000 in 2025. *See* 2025 Form 10-K at 10, F-6; 2023 Form 10-K at 63; 2021 Form 10-K at F-6.[2] Despite having raised $117.5 million in 2020 in the transactions at issue in this litigation and a subsequent transaction in October 2020 (2020 Form 10-K at 21-22)

---

[1]    Terms undefined herein are defined in the Motion or Memo. "Exhibit #" refers to exhibits to the Declaration of Jeffrey S. Abraham (the "Abraham Declaration" or "Abraham Decl.").

[2]    Genius's SEC filings are available at https://www.sec.gov/edgar/browse/?CIK=1355848.

and ending 2021 with $115.1 million in working capital, Genius has been in a precarious financial condition for at least the past two years. 2021 Form 10-K at 1; 2025 Form 10-K at 9.

Notwithstanding these uniformly poor results, Genius has repeatedly proclaimed that coming developments would be "transformative" or constitute "transformational" developments including the Company's:

- 2016 deal with Sony (2/25/2016 Form 8-K at Ex. 99.1);

- projected 2016 financial outlook (11/18/2015 Form 8-K at Ex. 99.1);

- 2017 launch of *Kid Genius Cartoons Plus!* (9/28/2017 Form 8-K at Ex. 99.1);

- 2018 launch of *Rainbow Rangers* on Nickelodeon (11/21/2018 Form 8-K at Ex. 99.1);

- 2019 partnership with Alibaba (10/16/2019 Form 8-K at Ex. 99.1);

- 2021 acquisition of ChizComm (11/17/2020 Form 8-K, Ex.99.1 & Ex.10.1; 2020 Form 10-K at 19; 2/02/2021 Form 8-K at Ex.99.1);

- 2021 acquisition of WOW! Unlimited Media Inc. (10/27/2021 Form 8-K at Ex. 99.1);

- overall performance in 2023 (Apr. 9, 2024 Form 8-K at Ex. 99.1); and

- 2025 partnership with Nvidia (11/14/2025 Form 8-K at Ex. 99.1).

In October 2025 Genius sold 42% of its equity for approximately $7.3 million, valuing the Company at approximately $17.4 million. 2025 Form 10-K at 25-26. Genius made that sale without disclosing in any Securities and Exchange Commission ("SEC") filing the potential range of recovery in this litigation despite subsequently acknowledging that this action is its largest corporate asset. Dkt. 360 at 14. In contrast, Genius has been punctilious about disclosing the amounts sought in the indemnification lawsuits filed by Empery and Iroquois – which Plaintiff believes are frivolous, *see infra* at pp.20-21. 2025 Form 10-K at F-47.

Genius has also been continuously hostile toward Plaintiff's claims by not only rejecting Plaintiff's demand on which Defendants relied in moving to dismiss, but gratuitously disparaging the §16(b) claim as "unsupported by any facts," "quite remarkable" and "improbable". Dkt. 96-6 at pp.2-6, Dkt. 97 at 8. Michael Jaffa ("Jaffa"), Genius's General Counsel, has been at the forefront of that hostility by providing a declaration which was Exhibit 1 to Defendants' summary judgment motion (Dkt. 232 ¶1), implying that Defendants considered it to be their very best piece of evidence.   Jaffa's Declaration swears that the Company never considered Defendants to be acting as a group and that Plaintiff's allegations are "without merit[.]" Dkt. 232-1 at ¶¶1, 8, 16. Jaffa, as general counsel, is also presumably responsible for the contents of Genius's recent SEC filings, which seem aimed at depressing the Company's stock price, with Genius contending that its market capitalization supports the Proposed Settlement. *See* Nov. 28, 2025, Form 8-K, Dkt. 360 at pp.2, 13, 16 n.6.

**Anson**

Anson is exposed to a potential judgment of $191.4 million plus pre-judgment interest in this action. Dkt. 323-29 ¶¶40-41. Anson has a long history of working closely with Genius (Dkt. 235 (Defendants' R.561. Statement) at ¶25) and provided the funds for the October 2025 capital raise, giving it an up-to-42% equity interest in Genius. December 10, 2025 Prospectus [Rule 424(b)(3)] (available on EDGAR). As part of that financing, Anson has contractual rights enabling it to restrict Genius's ability to obtain additional financing for the next two years. 2025 Form 10-K at 10. The risk which Genius has identified from failing to obtain additional funding is the need "to modify our business plans accordingly." *Id*.

**Aaron Morris and SEG**

Aaron Morris ("Morris") of Morris Kandinov LLP represents Special Equity Group ("SEG") in this action, including defending SEG's Rule 30(b)(6) deposition through Jonathan

Shechter and being listed as counsel in responding to Plaintiff's subpoena. Dkt. 232-16, Abraham Decl. ¶2. Genius has an ongoing dispute concerning the excessive attorneys' fees claimed by SEG with respect to its indemnification agreement in this case. 2025 10-K at F-48; *see also* May 15, 2026 Form 10-Q at p.45 (as a result of Morris's representation of SEG in this case, "SEG has presented bills for legal expenses totaling several hundred thousand dollars, *a figure that the Company views as excessive*.") (emphasis added).

Defendants are repeat clients of SEG, which views them as "friends and family." Dkt. 226-1 at 404-11. Shechter is listed as a trial witness (*see* Dkt. 237 at Exs. 2, 3 (witness lists)), which is unsurprising given that SEG played a central role in this case, as "discovery has uncovered a trove of messages between SEG, Heyward, and defendants in the lead up to the March 2020 transaction and afterwards." *Augenbaum v. Anson Invs. Master Fund LP*, 2025 WL 2780854, at *5-6 (S.D.N.Y. Sept. 30, 2025) (cleaned up).

Nor is there any question that Morris Kandinov has an irreconcilable conflict of interest: While SEG testified in this action that it would be devastating for SEG's business if Plaintiff prevailed, Genius's shareholders obviously want to yield the maximum value from the company's largest asset. As Schecter testified at SEG's deposition in this matter: "It would be better for the industry if the defendants were found not liable." (Dkt. 232-16 (("Schecter Tr.") at 353:19-24.) If an issuer's CEO is found to be part of a §16(b) group alongside investors, "[i]t would be impossible to conduct my business" (*id.* at 42:2-11.) – or at least the way business is conducted by SEG. Schecter testified that companies would necessarily go bankrupt if investors are not permitted to do what Defendants did in this case (*id.* at 63:13-65:6) and that it is more efficient for investors to coordinate with each other by having their lawyers edit the transaction documents. *Id.* at 74:15-75:7. Similarly, with respect to voting agreements – which have been previously been found to

create a group in many §16(b) cases – Schecter claimed that it is "imperative" that key shareholders signed one here to support Defendants' transactions. *Id.* at 268:10-269:5.

**Post-Summary Judgment Settlement Discussions**

Shortly after the Court's summary judgment decision, Plaintiff engaged in an in-person mediation session with CVI facilitated by Mr. Murphy. Abraham Decl. ¶3. Discussions with CVI stalled soon after that mediation.

On December 11, after Plaintiff had reached out to Anson, it communicated an opening offer of $35 million subject to a most-favored-nation clause ("MFN"). This represents "21% of the claimed damages on a Chevron basis" (Abraham Decl. ¶6 and Exhibit 3), which is approximately 70% more than the $21,204,034.25 Anson is now offering to pay in the Proposed Settlement. Abraham Decl. ¶2, Dkt. 360-1 at Exhibit A.

On February 24, faced with settlement talks stagnating, Plaintiff reached out to CVI with Plaintiff ultimately being informed that CVI was still willing to settle the case for $7.5 million, which Plaintiff calculates as 28.1% of CVI's *Chevron*-based disgorgement. Abraham Decl. ¶¶11, 12, Exhibit 9.

Plaintiff separately reached out to Iroquois and had an in-person meeting with Iroquois's counsel (without Mr. Murphy). At that meeting, Iroquois's counsel withdrew an earlier settlement offer, perhaps because Defendants had decided they would instead attempt to cut a deal with Genius. Abraham Decl. ¶4.

**The "Litigation Committee"**

On January 30, 2026, Genius's Board formed the Litigation Committee, retaining Morris as counsel with "in coordination with Jaffa" before its first meeting on February 2, 2026. Exhibit 4, Exhibit 5. The purported trigger for forming the Committee was the indemnification action filed by Iroquois. Memo. at 1. Genius then chose to retain new counsel to represent it in the

indemnification action even though Vinson & Elkins LLP had been actively fending off those claims for years. *See, e.g.*, Abraham Decl. ¶¶5, 21, Exhibit 2, Exhibit 13.

On February 6, 2026, Morris informed Plaintiff that he was counsel for the Litigation Committee and asked to arrange a time to speak about Plaintiff's strategic thinking "in the coming weeks." Exhibit 6. Morris declined to provide the minutes evidencing the Committee's formation and actions unless Plaintiff signed a stipulation pursuant to FRE 502(d), which Morris promptly provided. Plaintiff declined to enter because doing so could potentially tie Plaintiff's hands in opposing the settlement, which it seemed that Morris was intent on pushing through. Exhibit 6.

On February 13, 2026, Morris sent Plaintiff the January 30, 2026 minutes establishing the Committee while stating that the minutes reflecting Morris's engagement would be provided when finalized. Exhibit 7. On February 20, 2026, Plaintiff's counsel inquired regarding the Morris engagement minutes to which Morris proposed a call the next week and then on February 24, 2026, stated that "there's no immediate urgency." Exhibit 6.

On March 4, 2026, Morris informed Plaintiff that he believed the Committee would be retaining Jay Lefkowitz to negotiate for the Committee, while Morris would remain counsel for the Company. Abraham Decl. ¶13. The Committee's March 9, 2026, minutes state that after considering, among other things, "the apparent unwillingness of defendants to discuss resolution in the absence of separate counsel [from Morris], and the potential that counsel for plaintiff may make similar arguments, the Committee determined to engage Mr. Lefkowitz to handle negotiations, if any, with the *Augenbaum* parties." Exhibit 10.

On March 10, 2026, Lefkowitz, who had not been engaged until at the earliest the day before, asked for a ten-minute call. Exhibit 11. During a call on March 11, 2026, Lefkowitz stated he wanted to speak to Plaintiff's counsel "before [he] dove into" getting up to speed and

6

negotiating. Abraham Decl. ¶16. On March 18, 2026, Lefkowitz stated during a telephone call with Plaintiff's counsel that he had only started reviewing the summary judgment filings but was actively negotiating with Defendants and could see reaching a settlement of $40-$50 million. Abraham Decl. ¶17. Plaintiff explained that the amount of the Proposed Settlement was below the range of reasonableness, that: there were different strengths and weaknesses for each Defendant and, in particular, lumping Anson together with other Defendants is value-destructive given the strength of the evidence against Anson; that Plaintiff had been attempting to engage with Defendants individually to see if settlements could be reached; and, that before the Committee had appeared, Plaintiff had settlement offers indicating a far higher recovery. Abraham Decl. ¶16.

On April 8, 2026, Morris, acting on behalf of the Committee, requested a video meeting with Plaintiff. Exhibit 6. On April 13, 2026, Plaintiff's counsel wrote to Morris stating, among other things, that a meeting would be unproductive because it was apparent that Genius had already agreed to a settlement Plaintiff believed to be inadequate. Plaintiff also once again raised the issue of Morris's conflict given his firm's representation of SEG and the ongoing indemnification dispute with Genius in which Morris appeared to have a direct financial interest. *See* Exhibit 6. On April 16, 2026, Morris expressed outrage at any suggestion of conflict but as previously mentioned, certain Defendants expressed concern over the same issue. *See* Exhibit 6, Exhibit 10.

On April 20, 2026, Plaintiff's counsel participated in an approximately one-hour telephone conference call with Committee member Schlesinger as well as Jaffa and Morris but which Lefkowitz did not attend. Exhibit 6, Abraham Decl. ¶18. On April 22, 2026, following an unsuccessful effort to arrange a call with Mr. Murphy to discuss settlement issues, Lefkowitz demanded that Plaintiff provide a global counter-offer – rather than ones directed to the individual Defendants' settlement offers – otherwise Genius would move for Court approval. Abraham Decl.

¶19. Lefkowitz initially refused to provide those amounts, but on April 24 stated that Plaintiff could figure out the amount that each Defendant would be applying based upon pro-rating the settlement amount to the total *Chevron*-based disgorgement, and on April 27 stated that Brio and Empery were not parties to the Proposed Settlement. Exhibit 12. Plaintiff offered to speak with Mr. Murphy, who in response to an email then offered evening times, but notwithstanding Plaintiff's stated willingness to have the meeting, no meeting took place. Exhibit 12; Abraham Decl. ¶20. To remove any doubt that Plaintiff's prior statements had been misunderstood, on May 3, Plaintiff wrote to Messrs. Lefkowitz and Morris explaining that the proposed settlement was well below the amounts being previously discussed with Anson and CVI. Abraham Decl. ¶23 & Exhibit 15.

On May 4, during a telephone status conference with the Court addressing CVI's stay request, Morris stated that a stay was also appropriate because Genius had agreed to a proposed settlement which it planned to present to the Court with a fulsome record. On May 6, Morris filed its motion for dismissal of the claims against the six proposed settling Defendants for $37 million based upon an aggregate settlement value of $50 million if all Defendants joined (Dkt. 360 at 1), representing approximately 13.77% of the potential *Chevron*-based disgorgement of $363,079,218. Dkt. 232-31 at Table 6. Jaffa provided a supporting declaration, *inter alia,* referencing an April 6, 2026, memo which is not attached and alluded to discussions with Mr. Murphy, suggesting he was involved in negotiating the Proposed Settlement (Dkt. 360-1 ¶¶3, 4, 6, 9) when, in fact, that is at best misleading. Tr. at 16:25-17:13.

On May 13, a counsel for Brio stated in Court that Brio would be joining the settlement on a proportional basis. Tr. at 39:4-22. However, the $2,500,000 which Brio apparently agreed to pay, in fact, amounts to approximately 7% of its *Chevron*-based disgorgement of $35,620,470. Dkt.

8

232-31 at Table 6. Empery has stated that it is not interested in settling this litigation. Abraham Decl. ¶25.

**Subsequent Developments**

At the May 13 Status Conference, the Court suggested a process by which Plaintiff would make settlement demands treating the amounts contained in the Proposed Settlement as opening offers and Defendants would respond by Monday, May 18. Tr. at 46:17-49:11. On May 14, Plaintiff made those individual settlement demands which he also communicated to Mr. Murphy. Abraham Decl. ¶25. On Monday, May 18, Plaintiff reached a settlement with L1 Capital – the only Defendant that moved for reconsideration of the Court's summary judgment order (Dkt. 292) – for $3,550,000 representing an approximately 50% bump from the amount agreed to by the Litigation Committee. Abraham Decl. ¶25.

**ARGUMENT**

**A.      Plaintiff Possesses a Primary Right to Pursue §16(b) Claims Which May Not Be Settled by the Company in This Action**

Section 16(b) is pellucid in stating that the relevant federal interest as being "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner…." 15 U.S.C. §78p(b). Congress chose to vest control over §16(b) actions with the securityholder, *i.e*, Plaintiff, once the issuer, *i.e.,* Genius, fails to act on a demand within sixty days. 15 U.S.C. §78p(b). Congress acted intentionally in doing so as the Supreme Court explained to create "a private-profit motive" in "making ***the stockholders its policemen***." *Gollust v. Mendell*, 501 U.S. 115, 124-25 (1991) (cleaned up, emphasis added).

Congress accomplished its goal by "creat[ing] a new cause of action, which, while similar in some respects to a secondary or derivative right, is … in reality a primary right." *Dottenheim v. Murchison*, 227 F.2d 737, 738 (5th Cir. 1955). Indeed, it is hornbook law that a "a Section 16(b)

9

cause of action is a statutorily created right, not a derivative or secondary right." Arnold S. Jacobs, 1 *Section 16 of the Securities Exchange Act* §3:35 (September 2025 Update).[3] This statutory structure of §16(b) when combined with the statute being an express private right of action precludes a corporate issuer from obtaining dismissal of a plaintiff-shareholder's claim. *Burks v. Lasker,* 441 U.S. 471, 584 & n.13 (1979); *accord Burks*, 441 U.S. at 487 (Stewart, J., concurring) (disagreeing with majority opinion and, instead, opining that to the extent federal law is silent on the issue state law should apply without regard to issues of federal policy).

*Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 176 (2d Cir. 2012), does not alter this analysis notwithstanding the Court's concern that the case potentially "leaves the question open as to why the issuer should not be able to, as the real party in interest, step into the case if circumstances arise that might make it fair and equitable for the issuer to intervene" such as if the stockholder stopped prosecuting the case diligently. Tr. at 8:19-9:15. Plaintiff respectfully submits that the only holding in *Donoghue* is that a §16(b) action is sufficiently similar to common law breach of fiduciary duty claim to provide the "close historical or common-law analogue" providing for Article III standing consistent with the Supreme Court's decision in *Transunion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Plaintiff also respectfully submits that the issuer, *i.e.*, Genius, being a real party in interest has been, as previously discussed, a feature of §16(b) since its very inception with the corporate issuer receiving any net recovery.

---

[3]     *See also Chechele v. Elsztain,* explaining that "a § 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law." 2012 WL 12358221, at *2 (S.D.N.Y. Aug. 1, 2012); *Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*, 286 F. Supp. 2d 279, 282 (S.D.N.Y. 2003) (explaining that "§ 16(b) cause of action is a statutory enabling right directly empowering the shareholder to sue; it is not a derivative or secondary right grounded on rights and interests possessed primarily by the corporation and emanating from common law."); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 426 (Bankr. S.D.N.Y. 2005) ("the statutory right of the security holder to commence a Section 16(b) cause of action is not derivative of any right of the corporation" and such a claim "does not simply revert to the corporation's estate upon its filing of bankruptcy").

*Donoghue* also recognizes that "the statute authorizes two categories of private persons to sue for relief: (1) 'the issuer' of the security traded in violation of §16(b); *or* (2) 'the owner of any security of the issuer in the name and in behalf of the issuer,' but only 'if the issuer shall fail or refuse to bring such suit within sixty days after the request or shall fail diligently to prosecute the same thereafter.'" 696 F.3d at 174 (quoting 15 U.S.C. § 78p(b)). Accordingly, Plaintiff is also a real party in interest because he is "a party authorized by statute" to pursue the claim. Fed. R. Civ. P. 17(a)(1)(G). Having more than one real party in interest within the meaning of federal law is not unusual because "[t]here may be multiple real parties in interest for a given claim." *HB Gen. Corp. v. Manchester Partners, L.P.*, 95 F.3d 1185, 1196 (3d Cir. 1996); *accord Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 411 F. Supp. 2d 458, 462 (S.D.N.Y. 2006) ("Defendants are wrong in supposing that there can be only one real party in interest … the question whether one or more than one person or entity is a real party in interest with respect to any given claim depends upon whether substantive law gives one or more than one person a right to enforce that claim.").

**B.      Genius Fails to Demonstrate Any Principle of Federal Law Which Allows the Company to Supplant Plaintiff in This Case**

This Court enquired whether there were any circumstances under which a corporate issuer could reassume control of a §16(b) action. Tr. at 8:11-10:10. The statute does not provide for any such action and, therefore, the presumption must be in the context of the federal securities laws that no such right exists. *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191-92 (1994) (applying the principle of *expressio unius est exclusio alterius* to interpreting the Securities Exchange Act of 1934).

Plaintiff at the status conference stated that a corporate issuer could potentially intervene in the action. Tr. at 12:1-7. However, any such action would necessarily be governed by Fed. R.

11

Civ. P. 24, which is a provision of federal law that does not seem inconsistent with §16(b). However, Genius has not moved to intervene and Plaintiff believes any such intervention motion is necessarily dependent, among other things, on Plaintiff not having been diligent in prosecuting these claims. Tr. at 12:5-13:10; *see also MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 389, 391 (2d Cir. 2006). There are other issues such as timeliness but in the absence of Genius even attempting to address those issues, it is difficult for Plaintiff to respond though he notes it is now more than four years since he filed this case and there is a two-year limitations period for §16(b) actions. 15 U.S.C. §78p(b).

*Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.,* 906 F.3d 215, 218 (2d Cir. 2018), cited by Genius (Memo. at 10) – without mentioning that the decision is based upon Rule 17 – is not on point because *Klein* allowed realignment in a §16(b) action where the plaintiff had lost Article III standing to pursue the claims. *AEC One Stop Grp., Inc. v. Bain Cap. Fund IV L.P.*, 9 F. App'x 53, 54 (2d Cir. 2001), also cited by Genius (Memo. at 12), is similarly not on point because Rule 17 was used to assume control over §16(b) claims assigned as part of a bankruptcy reorganization, in which the plaintiff had similarly lost standing.[4]

**C.      Genius Cannot Utilize State Law Principles to Supplant Plaintiff's Primary Right to Prosecute and Settle This §16(b) Claim**

Genius apparently seeks to rely on Nevada state law for its purported authority to propose a settlement in this action based upon the purported exercise of business judgment informed by the Litigation Committee's deliberations. *See* Memo. at 13-14. The most direct statement of why it cannot do so is a matter of hornbook law, explaining that while "[i]n derivative actions, the

---

[4]      *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324-26 (10th Cir. 1984), which Genius cites as approving Section 16(b) settlement negotiated by one of the plaintiffs and approved by a special litigation committee over the objections of other stockholders, does not stand for the proposition that Genius can settle a plaintiff's claims with or without *any* plaintiff either by way of intervention under Rule 24 or through realignment under Rule 17.

12

general rule is that the board of directors, in the exercise of good faith and reasonable business judgment, can determine whether the best interests of the entity and its stockholders would be served by engaging in litigation[, t]he express language of Section 16(b) renders this general rule inapplicable to Section 16(b) suits." Arnold S. Jacobs, 5A *Disclosure & Remedies Under the Sec. Laws* §4:182 at text accompanying nn.10-11 (Dec. 2025 Update) (citing *Pellegrino*, *supra*; *Levner v. Saud*, 903 F. Supp. 452, 455 n.2 (S.D.N.Y. 1994), *judgment aff'd*, 61 F.3d 8 (2d Cir. 1995)).

*Burks* is on point in refusing to allow the business judgment rule – including through the use of a special litigation committee – to affect claims under the express private right of action created by 15 U.S.C. §80a-35(b), because doing so would pose a "significant threat to an[ ] identifiable federal policy or interest[.]" 441 U.S. at 479. *Burks* places §16(b) actions within the scope of those express federal private rights of action which are not governed by state law principles including a board's exercise of business judgment. 441 U.S. at 484 & n.13.

*Magida v. Cont'l Can Co.*, 231 F.2d 843, 846-47 (2d Cir. 1956), also precludes Genius from taking control of the case from Plaintiff. Although the Court viewed the case as distinguishable (Tr. at 8:11-18), Plaintiff respectfully submits that *Magida* also represents a case in which a corporate issuer attempted to seize control and terminate albeit through a majority vote of shareholders. The Second Circuit held that the corporate issuer could not do so because after board refusal a plaintiff-shareholder's right to act "cannot be estopped by corporate acts." *Id.* at 846-47; *see also Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724, 729 (2d Cir. 1990), *aff'd sub nom. Gollust v. Mendell*, 501 U.S. 115 (1991). Accordingly, courts addressing the issue consistently hold the business judgment rule does not apply to settling §16(b) actions. *See, e.g., Pellegrino v. Nesbit*, 203 F.2d 463, 466-67 (9th Cir. 1953); *Segen v. Comvest Venture Partners*,

*LP*, 2005 WL 1320875, at \*4 (D. Del. June 2, 2005) (rejecting an attempt to use the business judgment rule to dismiss a §16(b) claim).

The business judgment rule being inconsistent with the express private right of action provided by §16(b) actions is also evident in Congress allowing shareholders to intervene in a §16(b) action instituted by the issuer where the company is not diligently prosecuting the claim. 15 U.S.C. §78p(b). Thus, the company's duty is not merely to determine diligently whether prosecution of the suit should continue, but, rather, the company has a duty diligently to prosecute the suit." *Pellegrino*, 203 F.2d at 467. This is because "the opportunity for evasion of the statutory policy is obvious" and that deferring to directors "would ***frustrate the apparent congressional intent***, in providing for stockholder action, to create statutory safeguards against complete control by corporate management of Sec. 16(b) suits." *Id*. at 466-67.

Instead, absent judicial approval, an issuer-negotiated settlement without court approval functions as a dollar-for-dollar setoff. *See, e.g., Lewis v. Wells*, 325 F. Supp. 382, 386 (S.D.N.Y. 1971); *Volk v. Zlotoff*, 285 F. Supp. 650, 657 (S.D.N.Y. 1968); *Blau v. Hodgkinson*, 100 F. Supp. 361, 370 (S.D.N.Y. 1951). Genius's effort to distinguish those cases as involving unquestioned liability represents a distinction without a meaningful difference because even in cases of certain liability business judgment considerations can still be present in terms of such matters as the cost of continued litigation, the distraction to management and the need to maintain good relationships with corporate constituencies. *See, e.g.*, *Burks,* 441 U.S. at 474 (discussing business judgment considerations which would otherwise motivate litigation decisions).

**D.    Even if State Law Were to Apply, Genius Has Not Carried Its Burden of Demonstrating That the Board Properly Exercised Its Business Judgment**

Even if state law does apply – and it clearly does not – Nevada law only allows a board to settle a stockholder derivative claim is premised on the business judgment rule. *See, e.g.*, *Matter*

*of DISH Network Deriv. Litig.*, 133 Nev. 438, 443 (2017).[5] Nevada follows New York in requiring directors seeking to impose their business judgment to stockholder derivative claim must establish they acted independently and conducted a good-faith, thorough investigation. *Matter of DISH Network Deriv. Litig.*, 133 Nev. at 445 (citing *Auerbach v. Bennett*, 47 N.Y.2d 619, 631-34 (1979)). "This burden is a heavy one" and the "facts must be viewed in the light most favorable to the non-moving party." *William J. Jenack Est. Appraisers & Auctioneers, Inc. v. Rabizadeh*, 22 N.Y.3d 470, 475 (2013) (citations omitted).

Genius has not even sought such a determination from this Court. And, if it had, notwithstanding Morris's stating during the May 4 status conference that Genius would provide a robust record supporting the Motion, the record consists of a sworn statement about finances by Genius's CFO, and another declaration by Jaffa suggesting the committee met four times, without including any relevant minutes of meetings or other analyses purportedly conducted by the Board or the Committee – of which Jaffa is not a member. *See* Dkt. 360-1. Jaffa's declaration fails **in its entirety** because it does not establish first-hand knowledge of the meetings, conversations, and memoranda referenced, causing it to have no probative value and making it inadmissible hearsay under FRE 801(c). However, even assuming *arguendo* that Jaffa's declaration is admissible, it still fails to demonstrate either independence or good faith, especially because there is ample evidence to the contrary.

### 1. Genius Makes No Showing of Independence

Genius asserts that "the settlement was negotiated directly by the independent, empowered managers of the Company…." Memo. at 14. Plaintiff assumes that the reference to "managers" is intended to be to the corporate directors or, at the very least, the members of the Committee, who

---

[5]    Genius is incorporated in Nevada (Dkt. 232-32 at 1), so Nevada law would control relevant State law issues in this case. *Kamen v. Kemper Fin'l Servs., Inc.*, 500 U.S. 90, 108-09 (1991).

are authorized under Nevada law to make corporate decisions. However, there is no factual showing of the independence of any director. Instead, Jaffa's declaration only mentions Jeffrey Schlesinger and Anthony Thomopoulos as members of the Litigation Committee who addressed the Board. ¶¶3, 11, 12. That is insufficient for the Court to find the Litigation Committee or the Board (which retained ultimate authority to decide) carried its heavy burden of independence by "a yardstick that must be 'like Caesar's wife'—'above reproach.'" *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004). Indeed, traditionally that burden is met by directors filing declarations establishing their independence. *See Matter of DISH Network Derivative Litig.*, 133 Nev. at 445 ("Based on the evidence before it, the district court ultimately found that the SLC was independent").

### 2.  Genius Fails to Demonstrate Good Faith

A substantial showing of a good faith investigation necessary to warrant dismissal also has not been made because, as an initial matter, the Company's submission is shy on details. Thus, although Jaffa references an April 6 memo to the Committee discussing the litigation, Genius and Jaffa declined to include any such memo and, for that matter, any minutes of meetings in which the matter was purportedly considered. Those materials are routinely presented to courts when a Board or special litigation committee is attempting to establish that it acted in good faith. *See, e.g.*, *Joy v. North*, 692 F.2d 880, 893 (2d Cir.1982), cert. denied, 460 U.S. 1051 (1983) (reversing an order placing a SLC's report under seal and explaining "We simply do not understand the argument that derivative actions may be routinely dismissed on the basis of secret documents. We cannot say what the effect on investor confidence would be if special litigation committees were routinely allowed to do their work in the dark of night."); *In re Par Pharm., Inc. Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990) (a SLC's failure "to document in any manner its procedures, reasoning or conclusions" is fatal to its motion for judgment); *Brinckerhoff v. JAC Holding Corp.*,

16

263 A.D.2d 352, 353, 692 N.Y.S.2d 381, 382 (1st Dep't 1999) (a SLC report that is "a mere two pages in length with respect to the subject transaction, and failed to document the special committee's procedures, reasoning and conclusions, thus effectively insulating its investigation from scrutiny by the courts" is entitled to no deference).

Moreover, Morris's representing SEG in this litigation creates such an obvious conflict that there is no reasonable possibility that good faith could ever be established. As the Court observed, "if you are thinking about putting the settlement together, ***the first thing you would not want to do is to hire a law firm that had previously represented SEG***, given the allegations the plaintiffs are raising in this case, where SEG is right in the middle of it." Tr. at 16:4-11 (emphasis added). As discussed above, Morris's irreconcilable conflict is confirmed by SEG's own testimony stating that this action is an existential threat to its entire business. This is consistent with the Delaware Supreme Court holding that "professional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra cognito*" and sometimes "the selection of professional advisors for the Special Committee doesn't give comfort; it raises questions." *Kahn v. Tremont Corp.*, 694 A.2d 422, 429 (Del. 1997).[6] "[T]he circumstances surrounding the retaining of the Special Committee's advisors, as well as the advice given, cast serious doubt on the effectiveness of the Special Committee." *Id.* at 429. As a result, the Delaware Supreme Court reversed the Chancery Court's finding of fairness because the record showed that "[f]rom its inception, the Special Committee failed to operate in a manner which would create the appearance of objectivity in" its decisions. *Id.* at 430.

Genius attempted to explain away Morris's obviously problematic representation as being intended "to leverage [Morris's] knowledge [and] familiarity with the factual background of the

---

[6]    Genius concedes the Court should look to Delaware courts for guidance on corporate law issues. Memo. at 12 n.5.

case" for efficiency purposes. *Id.* at 16:12-17. That contention cannot withstand even gentle scrutiny because:

(i)    it fails to explain why Vinson & Elkins was sidelined with respect to settlement and indemnification issues even though Michael Charlson is experienced at precisely the type of investigation one would expect a litigation committee to perform (Abraham Decl. ¶27), and is knowledgeable about both the facts of this case and the issues relating to indemnification (Abraham Decl. ¶5 & Exhibit 2);

(ii)   the reason Morris as SEG's counsel knows so much about this case is because SEG is at the center of much of the alleged group conduct and how big a problem the case is for SEG;

(iii)  Kirkland purportedly handled the negotiation "to ensure absolute independence with respect to the decision regarding the terms of the settlement" (*id.* at 16:18-24) – even though elsewhere Genius states that its managers did the actual negotiations (Memo. at 14) – with the Court immediately recognizing that doing so is inconsistent with introducing Kirkland to negotiate in lieu of Mr. Murphy as the Mediator (*id.* at 17:4-18:3); and

(iv)   Genius hiring Mr. Lefkowitz so as to not "incur[] the costs of … additional … mediation, which is extremely expensive" (*id.* at 17:17-20) is confusing because Plaintiff is informed Messrs. Lefkowitz and Murphy bill at comparable rates, and, Mr. Lefkowitz, but not Mr. Murphy, would take significant time to get up to speed, while also ignoring Mr. Charlson's ongoing involvement in this case.

Indeed, the litigation committee investigation in *DISH* is a useful study in contrast because it was "objectively comprehensive by any measure" including 21 interviews, more than 17 formal

18

meetings and multiple information meetings, and the review of hundreds of thousands of pages. 133 Nev. at 450. Similarly, Plaintiff's counsel received a substantial litigation committee report prepared by Mr. Charlson in a Delaware litigation. Abraham Decl. ¶27. Here, in contrast, Genius pays lip service to "substantial analysis and advice" (Memo. at 1) but describes four meetings and two requests for information. Dkt. 360-1 at ¶¶1-12. And, it does so through Jaffa who has been at the forefront of hostility to this action and has taken an active role in crafting the Company's SEC filings in a seeming attempt to depress the stock price. *See* p.3, *supra*.

Also, Genius's submission sworn to by Jaffa and presumably drafted by the Morris firm engages in a classic deceit by stating a fact while omitting to state other facts necessary to make the statements therein not misleading. *E.g.* 15 U.S.C. §§77k(a); 77l(a)(2); 15 U.S.C. §§78j(b), 78r(a) (making such conduct actionable under the federal securities laws); *see also Orchard Hotel LLC v. D.A.B. Grp. LLC*, 172 A.D.3d 530, 531 (1st Dep't 2019) (half-truths can be actionable fraud). Thus, Genius invokes Mr. Murphy's name suggesting that he was involved as a mediator in negotiating the Proposed Settlement (Tr. at 16:25:17:10) when, in fact, as Genius admitted in Court, Mr. Murphy was **not** involved in negotiating the Proposed Settlement. *Id.* at 17:11-13.

The Proposed Settlement is also obviously not the product of good faith because it is not "value maximizing" with respect to the §16(b) claims. Memo. at 12. Instead, Anson had previously made an **opening offer of $35 million** to Plaintiff and CVI had indicated a willingness to settle for $7.5 million (Exhibit 3, Exhibit 9) which combined exceeds the total amount the Proposed Settlement seeks to recover from seven out of the eight Defendants in this action. Indeed, it is hard to understand where Genius opened its bidding considering ***its final agreement was an almost $14 million discount to Anson's opening offer to Plaintiff.*** *See* p.5, *supra*.

19

The Committee cannot excuse the failure to know these facts because the Board minutes establishing the Committee directed it "to ascertain the status of settlement efforts." Exhibit 4 at p.7. The Committee also cannot excuse any failure to take these facts into account because Plaintiff specifically informed the Committee of these facts, but Morris only seemed to care about them after he understood that Plaintiff had emails from Mr. Murphy confirming those discussions. Exhibit 14.

The Committee also failed to submit any information to the Court describing what evidence it found or the reasons it found certain evidence unpersuasive, failing to submit to the Court any report or analysis detailing any finding. That does not show a "willingness to deal openly and honestly with all relevant and material information" but, instead, is the "conscious[] omi[ssion]" that undercuts good faith. *Sutherland v. Sutherland*, 968 A.2d 1027, 1030 (Del. Ch. 2008). In circumstances "where there is no meaningful description or analysis of what the evidence uncovered by the investigation showed, it remains possible that the investigation was broad in concept, but shallow in execution, *pro forma* and halfhearted" business judgment deference is unwarranted. *City of Pontiac Gen. Employees' Ret. Sys. v. Bush*, 2021 WL 2588979, at \*5-6 (N.D. Cal. June 24, 2021); *see also City of Orlando Police Pension Fund v. Page*, 970 F. Supp. 2d 1022, 1030-31 (N.D. Cal. 2013) (the failure to provide a copy of the report precluded a finding that the investigation had been undertaken in good faith).

Instead, the Committee appears to have opportunistically focused its analysis on certain Defendants' bogus indemnification and advancement claims as a reason for settlement. Memo. at 3-6. However, that analysis ignores that it "is well settled that an insider found to have violated section 16(b) may not seek indemnification for the ensuing liability." *Jain v. J.P. Morgan Sec., Inc.*, 177 P.3d 117, 121 (Wash. App. 2008). Similarly, under New York law governing the

indemnification claims here, any prepayment of attorneys' fees – which Iroquois characterized as an advancement – is also barred because it "would do violence to the federal policy… barring enforcement of an indemnity agreement on behalf of a securities law violator. There is no logic in permitting a wrongdoer to enforce a portion of an indemnity provision." *Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.*, 148 Misc.2d 880, 883, 561 N.Y.S.2d 371 (N.Y. Sup. Ct. 1990), *on reargument*, 150 Misc.2d 126, 567 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1991), *aff'd*, 180 A.D.2d 495, 580 N.Y.S.2d 657 (1st Dep't 1992).

Here too, Section 9(k)(iii) of the March 2020 SPA, upon which the claim is based, represents a portion of the overall indemnity provision contained in Section 9(k) and, therefore, may not be enforced either under New York law or as a matter of federal policy upon which *Donaldson Lufkin & Jenrette* is based. That understanding of federal policy was adopted by Congress when it enacted PSLRA to, among other things, limit the rights of indemnification to a party that "prevails in any private action may recover the attorney's fees and costs of that covered person in connection with the action." 15 U.S.C. § 78u-4(f)(2)(B)(ii).

*Citadel Holding Corp. v. Roven*, 603 A.2d 818 (Del. 1992), upon which Iroquois and Empery rely in contending that advancement is allowed even where indemnification is not (Iroquois Cplt. ¶36), is neither controlling nor on point. In *Citadel*, the provision covering advancement "in no way render[ed] the right to advances dependent upon the right to indemnity." *Id.* at 822. Here, in contrast, Section 9(k)(iii) is characterized as an "indemnification" and explicitly dependent upon Section 9(k)(i)'s indemnification rights. *See* March 2020 SPA §9(k)(iii) (referring to "[t]he indemnification required by this Section 9(k).").

21

**E.      Genius Has Otherwise Failed to Make a Record Supporting the Fairness of the Proposed Settlement**

As the Court noted after reviewing the Parties' letters (Dkt. 367, 369, 371, 373), "no clear precedent allow[s] the Company to settle this case without review of this Court." Tr. at 3:9-16. Instead, especially where the terms of a proposed settlement are contested, courts in this District review the fairness of the proposed settlement. *See, e.g.*, *Revive Investing LLC v. FBC Holdings S.A.R.L.*, 2021 WL 56905, at *7 (S.D.N.Y. Jan. 7, 2021), *report and recommendation adopted*, 2021 WL 734976 (S.D.N.Y. Feb. 25, 2021), *as amended* (Feb. 26, 2021) (quoting *FTR Consulting Group, Inc. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*, 2005 WL 2234039, at *2 (S.D.N.Y. Sept. 14, 2005)); *see also Levy ex rel. Mktg. Servs. Grp., Inc. v. General Elec. Cap. Corp.*, 2001 WL 987873, at *5 (S.D.N.Y. Aug. 30, 2001). Indeed, Anson recognized that Plaintiff's claims could only be released upon a showing of fairness. Tr. at 40:2-10. Here, Genius has not made any request of the Court for any fairness hearing. Dkt. 358.

However, even if the Court chose to entertain a motion which has not been made, Genius has only made conclusory statements concerning its rationale – which are, to put it mildly, of questionable veracity – without making any showing by referencing the relative strengths and weaknesses of the claims asserted against each Defendant. The Company's showing is particularly glaring given Morris's statement at the May 4 Status Conference that he would place a robust record before the Court.

Nor will it be sufficient for Genius or Defendants to claim that such a record will eventually be provided. *See, e.g.*, *Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 381 (S.D.N.Y. 2021) (arguments assumed but not developed in an opening memorandum are waived). Instead, a motion must be complete at the time it is made and cannot be completed by additional submissions on reply. *See, e.g.*, *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp.

22

2d 381, 387 (S.D.N.Y. 2010) ("It is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden."); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."), *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

Nonetheless, Plaintiff notes that *Revive Investing*, cited by Genius (Memo. at 15 n.6; Dkt. 369 at 1), settled for approximately 30% of short-swing profits. 2021 WL 56905, at *8-9. *Levy v. Gen. Elec. Capital Corp.* – a case litigated by Plaintiff's counsel – settled for 46% of profits even though the defendant had a "high" chance of judgment. 2002 WL 1225542, at *8 (S.D.N.Y. June 4, 2002). Plaintiff's counsel is also independently aware of a §16(b) case in which he acted as counsel to the issuer which settled after summary judgment had been denied involving a single disputed factual issue which settled for more than 50% of short-swing profits. Abraham Decl. ¶28.[7] Here, in contrast, the Proposed Settlement ranges as low as 7% of the lower *Chevron*-profits in the case of Brio and an average of 13.77% for other Defendants, even though that is well below Anson's opening offer. *See* Exhibit 3.

Genius also contends that the Proposed Settlement "fairly and adequately serves the interests of the corporation on whose behalf the derivative action was instituted." Memo. at 16 n.6. This presumably is based upon the release of the indemnification claims which are either meritless or not yet ripe. *See* p.20-21, *supra*. However, even assuming any merit to the claims – and there is none – it invokes a standard expressly rejected by Judge Hellerstein who, instead, held when

---

[7]    If anything, these facts would independently support Plaintiff's intervention even if Genius had timely acted to file Section 16(b) claims. *Cf. Molybdenum Corp. of Am. v. Int'l Min. Corp.*, 32 F.R.D. 415, 420 (S.D.N.Y. 1963) (allowing intervention to prosecute §16(b) claims alongside an issuer); *Nedick's Stores, Inc. v. Genis*, 34 F.R.D. 235, 237 (S.D.N.Y. 1963) (allowing intervention where the issuer declined to prosecute claims that were not "so obviously unfounded that the proposed intervenor should be denied all opportunity to try them out for the common good of the corporation and its stockholders" and citing the "comprehensive opinion" in *Molybdenum*).

23

rejecting an earlier settlement proposed by the issuer in *Levy* that "Congress has [] expressed a strong policy in favor of recapturing profits made by corporate insiders from short-swing sales … regardless of collateral business considerations[.]" *Levy*, 2001 WL 987873, at *3; *see also Epstein v. Shindler*, 26 F.R.D. 176, 178-79 (S.D.N.Y. 1960) (counterclaims cannot be brought in §16(b) claims because they might interfere in a recovery).

Moreover, even assuming *arguendo* that the collateral business considerations of Genius ought to be considered in a §16(b) action, the entirety of Genius's contention boils is that:

> [1] is anticipated to be *transformative* for the Company (its entire market cap as of today is only $36.8 million) at a point when it expects to run out of operating capital within *weeks*, not months, and [2] faces indemnity and advancement claims that, if proven, would render it insolvent (indeed, defense costs alone may threaten the same). [3] Plaintiff's counsel has not made a superior offer (or suggested how the Company might obtain one), and [4] no rational businessperson could choose to expose the Company to the risks of trial over the current Settlement terms.

Memo. at 16 n.6.

This analysis, however, fails to mention or otherwise justify the Proposed Settlement under the factors used under either Rule 23(e)(2) or the *Grinnell* factors. *Moses v. New York Times Co.*, 79 F.4th 235, 242-43 (2d Cir. 2023). Perhaps more importantly, Genius's contention ignores the added factor which Courts in this District review in §16(b) settlements of "the congressional purpose to cause disgorgement of short-swing trading profits by corporate insiders[.]" *Revive Investing LLC*, 2021 WL 56905, at *7 (quoting *FTR Consulting Group, Inc.*, 2005 WL 2234039, at *2); *see also Levy*, 2001 WL 987873, at *5). Doing so is particularly appropriate because Congress never acted to restrict Section 16(b) claims, even when adopting the Private Securities Litigation Reform Act of 1995, 109 Stat. 737-765, and has, instead, consistently strengthened §16(b) claims.[8]

---

[8]    In 1964, the Exchange Act was amended to bring the securities of companies trading over-the-counter within §16(b)'s short-swing profit recovery provision. *See* Guy P. Lander, *14A U.S. Sec. Law for Financial Trans.* §11:32 (2d ed. Dec. 2025 Update). In 2000, Congress passed the Gramm-Leach-Bliley

Nonetheless, Plaintiff addresses Genius's contentions in turn.

*First*, Genius does not explain why any amounts received by the Proposed Settlement would be transformative. That statement can also not be seriously credited because Genius has purportedly been experiencing transformative events repeatedly for the past decade. *See* p.2, *supra*. The harsh reality, however, is that Genius has been a massively unprofitable business and has dissipated over $100 million in working capital on those consistently money-losing operations. *See* pp.1-2, *supra*.

It is also difficult to credit the notion the Company will run out of working capital when it has been in the same purportedly precarious financial situation since at least December 2025 when the Company made the same claim to this Court. *See* Dkt. 299. Instead, the most the Company's most recent Form 10-K says could happen is that Genius may have to "curtail or cease operations and be required to realize our assets and discharge our liabilities other than in the normal course of business" (2025 Form 10-K at 9), which may be a good thing given the Company's consistent operating losses.

As for Genius's low market capitalization, that is a function of extraordinarily poor corporate management with a track record of losing hundreds of millions of dollars and the Company in its SEC filings emphasizing the risks of this litigation rather than the potential recovery. *See* p.1-2, *supra.* If the Board truly wanted to engage in a transformative transaction, it would shut down its existing business operations and utilize its enormous tax-loss carryforwards (2025 Form 10-K at F-42) to purchase a functioning profitable business with new management.

Act, expanding §16(b)'s reach to cover security-based swap agreements. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 119 n.1 (2d Cir. 2001). In 2002, Sarbanes-Oxley required more rigorous disclosure of insiders' trades. .Jacobs, 1 *Section 16 of the Securities Exchange Act* §3:2. In 2010, The Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress deleted §16(b)'s references to the Gramm-Leach-Bliley Act and added "or a security-based swap" to §16(b)'s third sentence. *Id.*

*Second*, the advancement claim filed by Iroquois and Empery which seems to serve as the factual basis for the concern posed by defense costs lacks merit and no such funds will ever have to be paid if the case is either settled against a particular Defendant or if Plaintiff prevails on his claims. *See* pp.20-21, *supra*. The amounts claimed for indemnification are also highly questionable with Iroquois never explaining how it purportedly incurred $5.2 million in "reasonable" defense costs where Anson, which has a far larger exposure, purportedly incurred $2.8 million, and other Defendants substantially less. Memo. at 4 n.3. The Proposed Settlement also does not solve any issues related to Empery's indemnification claim because Empery is not a party to the agreement.

*Third*, as Plaintiff has previously explained, he made Morris aware of superior offers. Abraham Decl. ¶18. Morris, however, only seemed to care about those superior offers when he learned that Plaintiff had written emails from Mr. Murphy describing those offers. Abraham Decl. ¶22 and Exhibit 14.

*Fourth,* any rational businessperson would reject a settlement inferior to what had been previously offered. Similarly, any rational businessperson would either have not acted to depress the Company's stock price before engaging in the October 2025 financing further tying Genius's hands for certain forms of future funding (*see* p.3, *supra*) and, instead, sought to have tapped the very active existing legal funding market before agreeing to a more than 85% discount on claims that are not only trial-ready, but in which trial is imminent.

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Dated: May 20, 2026

By: /s/ Jeffrey S. Abraham
Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
450 7th Avenue, 38th Floor
New York, New York 10123
Telephone: (212) 279-5050
Email: jabraham@aftlaw.com
          mklein@aftlaw.com

Evan Mandel
Robert Glunt
**MANDEL BHANDARI LLP**
80 Pine Street, 33rd Floor
New York, New York 10005
Telephone: (212) 269-5600
Email: em@mandelbhandari.com
          glunt@mandelbhandari.com

27

**CERTIFICATE OF COMPLIANCE**

I, Jeffrey S. Abraham, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases, that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 8,562 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated: May 20, 2026                              By: /s/ Jeffrey S. Abraham
                                                         Jeffrey S. Abraham

28