# EXHIBIT 7

**ATTORNEY WORK PRODUCT**
**PRIVILEGED AND CONFIDENTIAL**

---

**MEMORANDUM**

**TO:**     Litigation Committee of Kartoon Studios, Inc. (the "Company")

**RE:**     Summary of Key Arguments and Evidence—*Augenbaum v. Anson Investments Master Fund LP, et al.*, No. 1:22-cv-00249 (S.D.N.Y.)

**DATE:**     April 6, 2026

At the request of the Committee, we have prepared this summary of the record developed in the *Augenbaum* matter through discovery and in connection with the parties' respective motions for summary judgment. As the Committee is aware, the *Augenbaum* matter asserts Section 16(b) claims against investors in connection with the March 2020 Securities Purchase Agreement (*i.e.*, the "March 2020 PIPE"). Because no individual Defendant owned more than the statutory threshold of 10% of the Company's outstanding stock, Section 16(b) liability only applies in this case if Plaintiff can aggregate the ownership of all Defendants by proving the existence of a group under the securities law.

The case is scheduled for trial in June 2026. The record is extensive and provides a clear perspective into the arguments likely to be advanced by both sides and the evidence and testimony likely to be presented. At the summary judgment stage, the Court found disputes of material fact regarding the existence of a group that must be resolved by a jury at trial. At trial, Plaintiff must carry the burden, through evidence and testimony, of proving that a group existed. *Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 650 (S.D.N.Y. 2022). Below, we have summarized the anticipated arguments, evidence and testimony likely to be submitted by the parties at trial.

**TABLE OF CONTENTS**

I.      APPLICATION OF SECTION 13(D) ..................................................................3

II.     PLAINTIFF'S ANTICIPATED EVIDENCE AND TESTIMONY ...................................3

        A.      Certain Defendants Were Preexisting Investors In The Company..........................3

        B.      SEG Acted As The "Hub and Spokes" For The March 2020 PIPE ........................4

        C.      Some Investors Potentially Discussed Terms Of The Transaction ........................6

        D.      The Voting, Leak-Out, Lock-Up and Netting Agreements ....................................7

        E.      The Subsequent Registered Direct Offerings ............................................9

III.    DEFENDANTS' ANTICIPATED EVIDENCE AND TESTIMONY ...............................9

        A.      Each Investor Made Independent Investment Decisions........................................9

        B.      The Record Does Not Contain Evidence Of Coordination Between Investors.....11

        C.      SEG Acted Solely On Behalf of the Company As Placement Agent....................15

        D.      The PIPE Terms Were Standard And Do Not Suggest Coordination ...................16

        E.      Leak Out Agreements Were Typical And Requested By The Company..............16

        F.      Defendants Were Not Party to the Voting or Lock-Up Agreements....................17

## I.    APPLICATION OF SECTION 13(D)

Section 13(d) of the Exchange Act requires beneficial owners of more than 5% of a company's registered class of voting securities to report their beneficial ownership. The statute provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this sub-section." Rule 13d-5(b) states that two or more otherwise unaffiliated investors may form a group when such "persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1). As stated by the Court in *Augenbaum*: the "[a]greement is key." Ex. 1, ECF 287, Summary Judgment Opinion at 7 (*citing Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) ("[T]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective.")). At the summary judgment stage, the Court held that whether there was a requisite agreement between the investors in this case is a question of fact to be determined by the jury at trial.

To demonstrate that such a group existed, the Plaintiff must prove to the jury that it is more probable than not that there was such an agreement between the group. "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Id.* Further, "the alleged group members need not be committed to 'acquiring, holding, voting, or disposing of equity securities' on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities." *Id.*

## II.    PLAINTIFF'S ANTICIPATED EVIDENCE AND TESTIMONY

Based on the record at the summary judgment stage, Plaintiff is likely to rely on the following arguments and evidence to demonstrate that the Defendants acted as a "group" under Section 13(d) of the Exchange Act.

### A.    Certain Defendants Were Preexisting Investors In The Company

Plaintiff is likely to introduce communications between Special Equities Group ("SEG"), which the Company had historically utilized for capital market transactions, including its principals Joseph Reda and Jonathan Schechter, Andy Heyward and certain of the Defendants to demonstrate that they were preexisting investors in the Company and knew of and/or spoke to each other prior to the March 2020 PIPE, including:

- On August 16, 2019, Andy Heyward stated to Reda, Schechter, Richard Abbe (Iroquois), and other Company executives and representatives "I have just spoken with both Shaye at Brio, and Rich Molinsky. Explained that Aegis has been terminated. SEG engaged. A restructuring will occur and Rich Abbe will be working closely with Reda and Shex to make it happen, amortizing out of the debt. Though I had nothing more to

3

share, they are on board in principal and will await to hear from Shex." Ex. 2, Dkt. 226-4 at 5.

- On September 19, 2019, Mike Jaffa writes to Molinsky, Nathoo (Anson) and Hirsch (Brio) "[i]n order to extend the term of the note as we have agreed, I will be sending you an amendment to the secured convertible notes via docusign." Ex. 3, Dkt. 254-10 at 2.

- On September 23, 2019, Heyward sends a text to Hirsch (Brio) asking him to send "the final document" to Mike Jaffa who would then forward to Nathoo (Anson) because "they want to see it and not have any surprises added." Ex. 2, Dkt. 226-4 at 174.

- On September 25, 2019, Schechter writes to Nathoo (Anson) and Hirsch (Brio) "Shaye/Amin- I spoke to both of you and this is where we are," including "Shaye gets the option to have his Note redeemed if the Company raises 5mm or more (this is the same term Amin has" and "Any future deals both Shaye and his investor will have the right to split evenly with Amin." Schechter further states "I think we should all jump on the phone to finalize any details and make sure we are on the same page." *Id.* at 180.

- On November 9, 2019, Reda writes to Andy Heyward, Kerry Propper (ATW Partners) and others stating "we should do an all hands call" and "Do you think it makes sense for us to invite Richie [Iroquois], Shaye [Brio] and Amin [Anson] on the call as well?" Ex. 4, Dkt. 254-52,

- On November 17, 2019, Reda writes to Hirsch (Brio) "We have been working with the company and Amin [Anson] and richie [Iroquois] and Kerry all weekend on the restructuring and financing" and "Amin will do 1.4mil shares at $0.21 if you will." Ex. 2, Dkt. 226-4 at 183.

### B. SEG Acted As The "Hub and Spokes" For The March 2020 PIPE

SEG was engaged by the Company in 2019 to restructure its debt and secure additional private financing. Ex. 2, Dkt. 226-4 at 2. In or around August 2019, SEG and the Company decided to pursue a PIPE transaction, with Anson as proposed lead investor. Ex. 5, Dkt. 226-5 at 55. On January 22, 2020, Anson executed a term sheet to participate in a $10 million offering in which Anson would provide up to $3 million in funding. Ex. 6, Dkt. 226-2 at 163-68. After the term sheet was executed, SEG shopped it to potential investors, including Iroquois (Richard Abbe), CVI (David Feldman), Empery (Ryan Lane), Brio (Shaye Hirsch), and an individual investor, Richard Molinsky.

Plaintiff is likely to present evidence of communications between the investors and SEG to argue that SEG acted as the "hub" of the alleged group agreement with "spokes" to each investor, including:

- On January 14, 2020, Nathoo sent a proposed term sheet to SEG. Reda replies "Shaye wants a right of participation added in there too," to which Nathoo responds "No. I

4

don't want it. I already have it. Why would I want others to also have it. He [Hirsch] can have it if he puts up $1.5mm or more. Not for $500k." Ex. 5, Dkt. 226-5 at 60.

- On January 14, 2020, Reda forwarded Nathoo's proposed term sheet to Hirsch (Brio). *Id.*

- On January 14, 2020, Reda forwards Hirsch's comments on the proposed term sheet to Nathoo regarding the right of participation. Nathoo responds to Reda: "There's no chance anyone else is getting a right of participation for only $650k. If he wants that, he has to step up and put up at least the same amount of net new money that I am. I don't need the right of participation in this deal — I'm happy to remove it completely." *Id.* at 71.

- On January 16, 2020, Schechter asks Hirsch (Brio) for input on comments from non-party ATW Partners. Schechter wrote "We spoke to Amin [Nathoo], see responses below and let us know what you think." Hirsch then asked Schechter to call him. *Id.* at 112-13.

- 

- On January 18, 2020, Hirsch (Brio) asks SEG questions regarding transaction documents, including: "Warrants are now part of the bridge up front?"; "Where is the companys undertaking for shareholder vote?"; "Are non-participating noteholders really being converted at 1.51?"; "How is the cash burn being watched? More importantly – has anyone discussed with them the need to cut costs and is there any plan in place?" SEG forwards the email to Nathoo (Anson). *Id.* at 117.

- On January 24, 2020, Charles Phillips of Ellenoff Grossman & Schole LLP ("EGS"), counsel for Anson for the March 2020 PIPE, sent revised transaction documents to Heyward and other executives, Nathoo (Anson), and SEG. Reda replied to EGS that Schechter had wanted Brett Director, general counsel of Empery, to review documents "before company." Phillips responded that Director "will just improve the docs for all." Ex. 7, Dkt. 226-6 at 93-94. The documents were later sent to Director by Reda to "[w]ork your magic. Get docs in shape for Ryan to do $3mil." *Id.* at 99.

- 

- On January 24, 2020 Sam Winer (CVI) emails Schechter "[t]he Waiver provision won't work for us. Doubt it would work for Empery either." Ex. 8, Dkt. 254-23 at 2.

- Beginning January 27, 2020, Brett Director (Empery) and EGS (representing Anson) exchanged revisions of the transaction documents. Ex. 9, Dkt. 226-7 at 14.

- On January 24, 2020, Reda wrote to Winer (CVI) "That's the goal and ryan [Empery] and Amin [Anson] want you in vs. me opening this up to some of your competitors that would probably do the entire deal and destroy the company." Ex. 10, Dkt. 226-14 at 223.

- On January 24, 2020, Nathoo (Anson) wrote to SEG: "Redmeption [sic] should not be allowed w/o equity conditions being met (registered, liquid etc.) And then given we are

5

getting stock at 15% discount, redemption premium should be 15% up so that we are indifferent between being paid and amortizing out. Those are my thoughts… not sure what other folks with think. Reda, maybe check with Richie [Iroquois] and Ryan [Empery]?" Ex. 7, Dkt. 226-6 at 105.

- On January 29, 2020, Reda emails Sam Winer (CVI) stating that "everyone wants you in…most guys doing $1-2 mil" and Schechter tells Winer "Empery reviewing now." *Id.* at 115.

- On February 23, 2020, Nathoo emailed Reda stating that "if we have a shortage, we show AJ," referring to AJ Pomper of Obsidian Global Partners LLC, an investment manager of M3A. Ex. 9, Dkt. 226-7 at 121.
- On February 24, 2020, Reda emails Feldman (L1) stating "Lead investor is in for $3mil out of $10 mil…All other existing note holders are in!!!" Ex. 6, Dkt. 226-2 at 157.

- In emails between March 4-5, 2020, Reda tells Feldman (L1) which investors have already committed: "Anson ($3mil), Empery ($1.5mil), Brio ($1.25-1.5mil), Iroquois ($1-1.5mil), CEO ($1mil), CEO's friends ($500k-1mil)" Ex. 11, Dkt. 226-9 at 2-4.

- Email chain from March 6-8, 2020, in which Feldman (L1) states "[i]t seems like its [sic] more for existing debt holders to improve their deal" in reference to the March 2020 PIPE. Reda responds "Feldy. I don't think you're looking at this right. I don't agree w u. Empery and Heights [CVI investment manager] don't own existing debt and they are both in for $1.5mil. Shex can explain." *Id.* at 7.

- On May 8, 2020, Schechter sent materially identical emails to Anson, Brio, CVI, Empery and Iroquois regarding the May 8, 2020 registered direct offering stating "[w]hoever doesn't invest in this round their pro-rata will not be invited in on any future GNUS deals 'as per the lead' Let me know your real indication of interest and then shex and I will allocate accordingly." Ex. 12, Dkt. 226-11 at 72-73 (Anson), 78 (Brio), 81 (CVI), 84 (Empery), 88 (Iroquois), 91 (L1).

## C.    Some Investors Potentially Discussed Terms Of The Transaction

Plaintiff is likely to introduce evidence that supports an argument that certain of the investors may have spoken directly about the March 2020 PIPE, including:

- In emails beginning January 27, 2020, Brett Director (Empery) and Robert Charron of EGS (representing Anson) discussed the transaction documents and revisions and Charron states "Here's the revised Note. As you said, ended up being fairly well on point. Note I tried to follow what I believe are the terms here but honestly I think it is totally up for negotiation so see what Ryan says on the business points and we'll go back to them. Turning to the SPA now." Ex. 9, Dkt. 226-7 at 14.

- On February 3, 2020, EGS advises Nathoo (Anson) that "Empery's preference is that the company not file a registration statement but rather rely on 144 in 6 months. I took

6

it out of the TS but . . . can put in the documents fairly easily if you and Shex [Schechter] convince Ryan otherwise." Ex. 7, Dkt. 226-6 at 145.

- On February 24, 2020, Anson's counsel (EGS) states to Reda "Empery told me that they won't participate in the deal if the company files a registration statement." *Id.* at 125.

- On May 28, 2020, SEG drafted a memo to file ("NOTES TO THE FILES") stating, in relevant part, that "[w]e received a call from Anson and Iroquois asking if the company was willing to sell common stock off its shelf registration statement at $1.50." Schechter (SEG) subsequently testified "I've never received a call from Richie and Amin on the phone together, never in my life, unqualified" Ex. 13 - Schechter Dep. Tr. 140:16–141:15. Nathoo (Anson) testified "I am quite certain that I would not have done that given that we don't make calls like that with other investors." Ex. 14 - Nathoo Dep. Tr. 344:13–14, 345:20-22. Abbe (Iroquois) testified "I never made a call with Anson" and "I did not make a call with Anson." Ex. 15 - Abbe Dep. Tr. 203:14, 204:10–11.

- Email chain from March 8-9, 2020, in which Reda tells Nathoo (Anson) to "Get him in for $1.5 mil and we are at $11 mil . . . Go Amin go" in reference to getting commitment from M3A to invest in the March 2020 PIPE. Nathoo responds "He said he was thinking $1.5m. But would decide. By tomorrow." Ex. 11, Dkt. 226-9 at 16-17.

## D.    **The Voting, Leak-Out, Lock-Up and Netting Agreements**

Plaintiff has previously attempted to utilize the various ancillary agreements to the PIPE transaction as evidence of coordination between Defendants.

Voting Agreement. The Company was required to obtain stockholder approval of the March 2020 PIPE transaction. In this regard, on March 3, 2020, the Company entered into voting agreements with principal stockholders representing approximately 40% of outstanding common stock to vote in favor of the transaction. Plaintiff is likely to argue two points related to the Voting Agreement. First, Plaintiff will argue the Voting Agreement is evidence of a group because, in Plaintiff's view, Defendants had the ability through the terms of the March PIPE to enforce the terms of the Voting Agreement. Ex. 16, Dkt. 225 at 23. Second, Plaintiff will argue the Voting Agreement caused each Defendant to beneficially own the common stock of the stockholders who entered into the Voting Agreement. In Plaintiff's view, the Defendants were able to direct the voting of the Company's common stock because the Defendants had the right to seek specific performance and injunctive relief to enforce the terms of the Voting Agreement. *Id.* at 32. Defendants will argue they were not party to the Voting Agreement and the Company's agreement to "use its best efforts" to seek specific performance of the Lock-Up Agreement does not give Defendants the ability to enforce it. Defendants will further argue the Voting Agreement did not provide investment or voting power to anyone and only required the stockholders to vote for specific proposals, which allowed the Company to obtain much needed financing by approving the March 2020 PIPE. Ex. 17, Dkt. 253 at 16, 23.

7

Lock-Up Agreement. On March 10, 2020, the Company also entered into Lock-Up Agreements with Andy Heyward and affiliates, which prevented them from selling stock until 90 days after the one-year anniversary of the closing of the March 2020 PIPE transaction. Plaintiff is likely to argue, as it did in its summary judgment briefing, Defendants had the ability through the terms of the March 2020 PIPE to enforce the terms of the Lock-Up Agreement as third party beneficiaries to the Lock-Up Agreement if the Company failed to do so, further evidences the existence of a group under Section 13(d). Ex. 16, Dkt. 225 at 20-21; Ex. 18, Dkt. 266 at 15. Defendants will argue they were not party to the Lock-Up Agreement and the Company's agreement to "use its best efforts" to seek specific performance of the Lock-Up Agreement does not give Defendants the ability to enforce it. Ex. 17, Dkt. 253 at 18.

Master Netting Agreement. On March 13, 2020, the Company entered into Master Netting Agreements with each defendant. Plaintiff will argue the netting agreement is evidence of coordination as, in Plaintiff's view, the agreement provided for joint sharing of risks and rewards in the event of a bankruptcy. Ex. 16, Dkt. 225 at 14. Defendants will argue the Master Netting Agreements were only between an individual Defendant and the Company, and served only to manage that Defendant's own exposure to the Company, not to allocate exposure or coordinate risk among the Defendants themselves. Ex. 17, Dkt. 253 at 21.

Leak-Out Agreements. Plaintiff is likely to argue that the May 18, 2020 and June 23, 2020 Leak-Out Agreements also demonstrate coordination. On May 18, 2020, after stockholders approved the share issuance and the conversion price and warrant exercise price were reduced to $0.21/share, each Defendant entered into a Leak-Out Agreement providing that any sales below $1.65/share were capped at each Defendant's pro-rata share of 30% of daily trading volume for a period of 90 days after registration became effective. On June 23, 2020, all Defendants entered into a Conversion Agreement with the Company that included a second Leak-Out agreement on the same structure, with a higher price threshold of $2.00/share and a shorter 30-day term. Plaintiff will argue that the Leak-Out Agreements coordinated the Defendants' potential sales in a way that demonstrates that they were acting as a group and that each Defendant entered the Leak-Out Agreements knowing each other Defendant was also agreeing to the same terms. Ex. 16, Dkt. 225 at 31. Defendants will argue that the Leak-Out Agreements were signed at the request of the Company, not the Defendants, that the Company wanted to control potential downward pressure on its stock price, and that the Leak-Out Agreements were never applicable because the trading price generally exceeded the threshold of the restrictions. Dkt. 253 at 13-14.

Plaintiff will likely cite emails between certain of the Defendants and SEG regarding the Leak Out Agreements, including:

- Empery provided the form-leak out agreement to SEG to use and stated, "leak out agreements are not typically publicly filed" and the limit should be "30% pro rata among all investors." Ex. 20, Dkt. 226-12 at 29. Schechter then forwarded the Empery form to Anson. Nathoo of Anson suggested to SEG a 30% aggregate limit on sales, to which Schechter responded, "let's see what others comeback with on the Standstill before we make a final decision." *Id.* at 13.

8

- On May 17, 2020, Feldman of L1 wrote "[a]ny leakout is a very bad idea" and "[i]ts in all of our interests not to have it....." Reda responded "Amin [Nathoo] has his mind made up. I'm happy to patch him in for explanation. You can get all your debt repaid and not sign leak out." *Id.* at 18.

- On May 17, 2020, Nathoo signed the Leak Out Agreement and other documents, asking the signature page be held in "escrow" until Empery, L1, Iroquois, Heights, Brio, and Obsidian also had signed. *Id.* at 123.

- On June 22, 2020, Schechter emailed Ryan Lane of Empery, "Everyone is also agreeing to a Lock-Up Agreement [sic] in the same form and substance as last time" and later wrote "Leak-out attached." Ex. 20, Dkt. 226-12 at 234.

### E.    The Subsequent Registered Direct Offerings

After the March 2020 PIPE, the Company completed registered direct offerings on March 22, May 7, May 8, May 18, and May 28, 2020, in which certain of the Defendants participated. Plaintiff is likely to cite these follow-on offerings as evidence of continued coordination between the Defendants, suggesting a group. Plaintiff will point to evidence other investors were excluded from participating in the subsequent offerings and the shares sold were allocated among participating Defendants roughly in accordance with their pro rata participation in the March 2020 PIPE. Ex. 16, Dkt. 225 at 30.

## III.    DEFENDANTS' ANTICIPATED EVIDENCE AND TESTIMONY

Defendants are likely to present evidence at trial that each investor made independent decisions, did not coordinate with each other, were competitors who did not directly communicate, and SEG, as placement agent solely for the Company, engaged in sales tactics by playing Defendants off each other to maximize contributions and close the transaction. Defendants will also introduce expert testimony to demonstrate the PIPE transaction and agreements were routine and the specific terms and structure of the agreements, as well as the trading patterns of the Defendants, do not suggest group coordination.

### A.    Each Investor Made Independent Investment Decisions

Representatives of each Defendant provided deposition testimony and declarations asserting that they respectively made independent investment decisions regarding the March 2020 PIPE transaction, the follow on registered direct transactions, and the related agreements. Ex. 21, Dkt. 233 at 19. Defendants are likely to offer testimony from SEG that the Defendants were competitors, considered only their own interests, and used their own decision making, including:

Anson. Anson is likely to testify that it made its investment decisions independently and did not communicate with any other Defendants regarding their investment plans. Ex. 22, Dkt. 237 at 2.  Anson's role as lead investor was typical and did not create a group. *Id.* at 1. Anson's role as lead investor was to negotiate a term sheet with the Company, which SEG would use to approach

other potential investors. *Id.* Anson did not directly communicate with Brio or rely on comments by Brio on the January 2020 term sheet for the 2020 PIPE. *Id.* at 3. Anson's counsel EGS receiving precedent documents and input on transaction documents from Empery's counsel did not establish the existence of a group. *Id.* at 4. Anson exercised no control over which investors SEG and the Company decided to approach for potential participation in any of the transactions. *Id* at 5. Anson did not make an agreement or arrangement with Andy Heyward and had different motivations relative to the transaction, and Heyward had no ability to trade post-transaction in any event because of the Lock-Up Agreement and thus could not have made an agreement regarding trading with Anson. *Id.* at 7-8.

Brio. Brio is likely to testify that it was a competitor with the other Defendants and did not communicate with any of the Defendants regarding terms of any transaction or investment plans. Ex. 23, Dkt. 238 at 1. Brio had a contentious relationship with Anson, evidenced by disagreements over right of participation (*see supra* IIB), and Hirsch telling Heyward he did not trust Nathoo (Anson) and Brio's belief Anson had withheld certain consents required to proceed with prior Brio-led proposed transaction with the Company prior to the March 2020 PIPE. *Id.* at 5, 6-7. Brio did not rely on legal advice from Robert Charron of EGS in relation to the March 2020 PIPE and EGS served as counsel to Anson. *Id.* at 7. Brio, unlike Anson and other Defendants, does not engage in short-selling and did not short the Company's stock. *Id.* at 2 n.2, 5. Brio does not discuss its trading strategy with outside persons or funds. *Id* at 8.

Empery. Empery is likely to testify that it did not communicate or meet with any other Defendant and did not coordinate its investment strategy. Ex. 24, Dkt. 242 at 6. Empery, whether acting as lead investor or not, uses its own transaction documents or provides substantial comments to draft transaction documents sent to it. *Id.* at 3. Empery refused to participate in numerous proposed financings alongside other Defendants between August 2019 and January 2020. *Id* at 6. Empery's counsel, Brett Director, provided input on the transaction documents, including to ensure they could not be misconstrued, and stated expressly in emails "[w]e are not acting as a group with any other investors." *Id*. Empery agreed to sign the May Leak-Out Agreement requested by the Company in exchange for registration of its shares and did not coordinate its decision with any other Defendant. *Id.* Empery's selling strategy was unique from all other Defendants' and reflects no coordination. *Id.*

Iroquois. Iroquois is likely to testify that it made independent decisions to advance its own interests with respect to its prior investments in the Company, the March 2020 PIPE, and the registered direct offerings. Ex. 25, Dkt. 235 at 1. Iroquois was "hostile" and "adversarial" towards the Company prior to the March 2020 PIPE and was the only investor to declare the Company in default on its 2018 Convertible Notes, which worked against interests of other investors. *Id.* at 3-4. Iroquois was viewed as difficult and uncompromising by the Company and other investors. *Id.* Iroquois declined to participate in the March 22, 2020 registered direct offering. *Id.* at 7. In the subsequent May 2020 offerings Iroquois twice tried to increase its investment at the expense of

other investors. *Id.* Iroquois had a distinct trading pattern compared to other Defendants, including being the only one to increase its overall holdings of the Company's stock. *Id.* at 4-5.

CVI. CVI is likely to testify that it made its own investment decisions based on its own interests. Ex. 26, Dkt. 239 at 4. CVI views other Defendants as competitors competing for a finite number of potential transactions and Sam Winer does not have a close relationship with any other Defendants. *Id.* at 2-3. CVI did not receive proposed transaction documents from SEG for the March 2020 PIPE until March 2, 2020. *Id* at 5. Winer provided limited comments to SEG, before independently and without consulting any other Defendants making the decision to invest. *Id*. at 5-6. CVI agreed to enter the May and June Leak Out Agreements because Winer determined it was in the best interest of CVI to obtain the registration being offered by the Company. *Id.* at 6.

M3A. M3A will likely testify that it was a passive participant in the acquisition of the Company's stock and that passive investors do not join or form a group by participating in an offering. Ex. 27, Dkt. 236 at 3. M3A had never previously invested in the Company and first learned of the March 2020 PIPE on February 29, 2020. M3A was not involved in any negotiations of the term sheet because all negotiations had been completed more than a month before M3A first learned of the deal. *Id.* at 2.

L1. L1 will argue all investment decisions were made independently without any coordination with any other Defendant. Ex. 28, Dkt. 241 at 6. L1 received the term sheet for the March 2020 PIPE from SEG on February 24, 2020, roughly two weeks before the transaction closed and did not comment on the March 2020 PIPE transaction terms. *Id.* at 3. L1 had no relationship with any other Defendant. *Id.* at 4. While L1 was opposed to the Leak-Out Agreements, L1 independently decided to enter into the May and June Leak-Out Agreements. *Id.* at 4-5.

Molinsky. Molinsky will argue he is an individual investor whose investment decisions related to the Company were wholly independent and of his own volition. Ex. 29, Dkt. 240 at 4, 6. Molinsky's invitation to participate in the March 2020 PIPE stemmed from his established relationship with SEG and history as a long-term investor in the Company. *Id.* at 6. Molinsky had no bargaining power with respect to the terms by which he was offered to participate in the transactions. *Id.* at 5-6. Molinsky could not and did not negotiate any terms. *Id.* at 6. The March 2020 PIPE and subsequent registered direct offerings were presented as "take it or leave it." *Id.* Molinsky's marginal position made him irrelevant to any decision-making process and any alleged coordination is highly implausible. *Id.* at 3.

**B.      The Record Does Not Contain Evidence Of Coordination Between Investors**

11

Defendants are likely to present evidence and testimony at trial that the record contains no direct evidence or discussion of an agreement or arrangement between the Defendants, and the Defendants never made such an agreement. Such testimony is likely to include:

Testimony from Anson:

- "I never spoke to any of the Defendants, or any representatives of the Defendants, about Genius or any plans I had to purchase or sell any Genius securities. I did not meet with them or speak to them at all during the course of negotiating any of the transactions that Anson made in Genius." Ex. 30, Dkt. 232-2, ¶ 15.

- "I did not participate in a phone call with SEG and Iroquois or any other Defendant regarding the May 28, 2020 offering — or any investment in Genius." *Id.* at ¶ 54.

- "In the context of this case, I learned that one of the ways that SEG attempted to 'sell' Genius to other potential investors was by using my name or Anson's name and suggesting that Anson wanted other investors — our competitors — to be involved in the transaction. I have never authorized or encouraged SEG, Joe Reda, or Jonathan Schechter to use my name or Anson's name to further investments in Genius or any other company. I have never asked SEG to convey my thoughts, concerns, or terms related to Genius to other investors. Had I known SEG was sending false and inaccurate statements to other investors on my behalf, I would have objected." *Id.* at ¶ 11.

- As to the alleged call between Nathoo (Anson) and A.J Pomper (M3A), Anson argued at summary judgment that each "testified they did not communicate" and points to lack of evidence that "the parties coordinated their conduct, relied on anything stated on the alleged phone call, or discussed any terms of the investment." Ex. 31, Dkt. 274 at 4.

Testimony from Brio:

- "Prior to entering the Stock Purchase Agreement, I did not communicate with any Defendant about its terms, the price or how much Brio would invest, nor did I rely on the involvement of any Defendant in this transaction when deciding whether and how much Brio should invest in the transaction." Ex. 32, Dkt. 232-10, ¶ 42.

- Brio did not communicate with any other investor as to the September 2019 extension of maturity of convertible notes (¶ 27); the December 2019 Warrant Exercise (¶ 33); the January 2020 term sheet (¶ 36); the Voting Agreement and Lock-Up Agreement (¶ 39); the Master Netting Agreement (¶ 43); the March 22, 2020 Registered Direct Offering (¶ 51); the May 7, 2020 Registered Direct Offering

(¶ 54); the May 8, 2020 Registered Direct Offering (¶ 56); the May 15, 2020 stockholder vote (¶¶ 59-60); the May 18, 2020 Registered Direct Offering (¶ 62); the May 18, 2020 Leak-Out Agreement (¶ 64); the May 28, 2020 Registered Direct Offering (¶ 66); the June 2020 cashless warrant exercises (¶ 70); the timing and amount of Brio's sale of Genius shares (¶ 71); the June 23, 2020 Conversion Agreement (¶ 73); the June 23, 2020 Leak-Out Agreement (¶ 74); and whether, how much, or when Brio would sell Genius shares in July 2020 (¶ 76).

Testimony from Empery:

- "Empery does not coordinate or discuss its investment decisions with any other investment managers, and it did not do so here." Ex. 33, Dkt. 232-8, ¶ 22.

- "I did not communicate, or coordinate, with any other investor (much less any other Defendant) about any aspect of this transaction [December 2019 repricing warrants]. Whether any other Defendant participated in this transaction was not a consideration in my decision-making process." *Id.* at ¶ 22.

- Empery did not coordinate with other investors regarding the March 2020 PIPE (¶ 5), the proposed term sheet (¶ 25), Empery's investment amount (¶ 27), the transaction documents and Stock Purchase Agreement (¶ 28), Empery's decision to invest (¶ 29), the registered direct offerings in May 2020 (¶ 31), the May 15, 2020 stockholder vote (¶ 32), the Leak-Out Agreements (¶¶ 36, 41), the June 2020 Conversion Agreement (¶ 43), and trading in Genius stock (¶ 46).

- Empery did not want the March 2020 PIPE to include a registration statement, which was communicated to "to SEG and Robert Charron, (Anson's outside counsel, who, as counsel to the lead investor, was in charge of drafting the March 2020 transaction documents), along with Mintz Levin, the Company's outside counsel." *Id.* at ¶ 33.

Testimony from Iroquois:

- "I have never communicated with any other investor about the price or terms of any transaction in Genius securities, whether to participate in any transaction in Genius securities, or the terms of any transactional document relating to Genius. And, in deciding whether to invest in a transaction with Genius, I have never considered the fact that any other investor was participating in the transaction. My investment decisions have always been my own, based on my own consideration of what is in Iroquois' best interests. Put differently, I have never coordinated or combined with any other investor for purposes of investing in Genius (or any other issuer, for that matter)." Ex. 34, Dkt. 232-6, ¶ 8.

- "I did not participate in a phone call with SEG and Anson (or any other Defendant, for that matter) about the registered direct offerings or any other investment in Genius." *Id.* at ¶ 26.

- Iroquois did not communicate with other investors regarding declaring Genius in default (¶ 16); the December 2019 warrant exercise (¶ 18); Anson's term sheet in January 2020 (¶ 20); the March 2020 Transaction (¶ 23); the May 2020 registered direct offerings (¶ 25); the May 15, 2020 stockholder vote (¶ 27); the May and June Leak-Out Agreements (¶¶ 31–32); and trading in Genius stock after share registration (¶ 34).

Testimony from CVI:

- "I did not have any discussion or communication with any Purported Group Member regarding Genius or CVI's investment in Genius. All decisions regarding CVI's investment in Genius were made by me and my colleagues at Heights and for the sole benefit of CVI. I did not rely upon the fact that any other Purported Group Member was investing in Genius—to the extent such a fact was even known to me—in making investment decisions with respect to Genius." Ex. 35, Dkt. 232-9, ¶ 5.

- CVI did not communicate with other investors regarding its investment decisions and trading activity generally (¶ 6); the waivers and consents in connection with the March 2020 Transaction (¶ 16); the decision to invest in the March 11, 2020 Transaction (¶ 22); the subsequent registered direct offerings (¶ 24); the Leak-Out Agreements (¶ 27); and CVI's trading in Genius securities (¶ 31).

Testimony from M3A:

- "Neither M3A nor 3i nor Obsidian had any role in negotiating the term sheet, and no communications, written oral, with any other investor in Genius Brands." Ex. 36, Dkt. 232-3, ¶ 4.

- "Neither M3A nor 3i nor Obsidian had any communication with any other investor regarding these subsequent offers and were unaware of whether or not any investor purchased stock in these subsequent offerings." *Id.* at ¶ 6.

- "Neither M3A nor 3i nor Obsidian had any contact with any other investor in connection with the leak-out agreements. The offer to register our shares was not dependent on the execution of a leak-out agreement by any other investor." *Id.* at ¶ 7.

14

- M3A argued at summary judgment regarding the potential call with Anson that "there is no allegation the parties agreed to anything during the conversation, that Anson or any other defendant relied in any way on this information, that the parties discussed the terms of the offering, or that the conversation had any impact on the PIPE offering. No agreement was alleged to have been reached during this conversation." Ex. 37, Dkt. 282 at 2.

Testimony from L1:

- "At no time in 2020 did I communicate with any other investor in Genius about L1 Capital's decisions to buy or sell Genius securities." Ex. 38, Dkt. 232-4, ¶ 10.

- L1 did not communicate with other investors about the March 11 transaction documents (¶ 5); all decisions to buy and sell Genius securities (¶ 7); whether Genius investors formed a group (¶ 8); L1 Capital's relationship with other investors (¶ 9); the May Leak-Out Agreement (¶¶ 13, 26); consenting to the registered direct sale (¶ 14); the conversion agreement (¶¶ 15, 34); the June Leak-Out Agreement (¶¶ 17, 36); Anson's term sheet (¶ 18); L1 Capital's investment amount (¶ 19); the price or terms of any Genius transaction (¶ 20); the Voting Agreement (¶ 22); the Lock-Up Agreement (¶ 23); the May 15, 2020 stockholder vote (¶¶ 24–25); cashless warrant exercises (¶¶ 28–29); and the timing, quantity, and decision to sell Genius shares (¶¶ 30–33).

Testimony from Molinsky:

- "Prior to signing [2019 extension agreement], I had no communications or coordination with any other Defendant regarding the terms of the agreement or my investment decision." Ex. 39, Dkt. 232-7, ¶ 8.

- Molinsky did not communicate with other investors regarding the December 2019 Warrant Exercise (¶ 9); the March 2020 PIPE solicitation (¶ 12); the March 2020 PIPE, May 2020 Transactions, and the May and June Leak-Out Agreements (¶ 17); conversion and cashless warrant exercises (¶ 18); and the sale of Genius shares in June and July 2020 (¶ 19).

## C.    **SEG Acted Solely On Behalf of the Company As Placement Agent**

Defendants will argue any information provided to investors by SEG was typical of SEG's role as a placement agent on behalf of the Company. Ex. 21, Dkt. 233 at 27-28. Defendants are likely to characterize Reda's emails as sales tactics typical of a placement agent. Defendants will argue that SEG, in its role as placement agent, was required to communicate with various investors to negotiate terms and solicit participation ultimately for the purpose of building an offering for the Company, and such communications are ordinary in PIPE transactions. Defendants are likely

15

to emphasize that agent-to-investor communications are inherent in the structure of every PIPE transaction, no investor agreed to terms other than those reflected in the transaction, and SEG's communications cannot give rise to an inference that the investors were coordinating among themselves. As to emails directly referencing the intention or preferences of other investors, Defendants will argue that SEG was merely performing its function on behalf of the Company to build and close a funding transaction and statements about other investors' commitments were puffery or sales tactics designed to generate urgency and close the deal, not evidence of an actual agreement or coordination. *Id.* at 34-35.

**D.      The PIPE Terms Were Standard And Do Not Suggest Coordination**

Defendants are likely to rely on expert testimony from Michael Maline of Covington & Burling LLP, Professor Michael Weisbach of Ohio State University, and David Marcus of Cornerstone Research to show the terms of the March 2020 PIPE and ancillary agreements were industry standard. Based on Defendants' submissions at summary judgment:

- Maline is expected to testify that the terms of the March 2020 PIPE transaction and the subsequent registered direct offerings were consistent with industry-standard practices for nanocap issuers in financial distress, and that the structure of the transactions reflects the ordinary dynamics in the PIPE market rather than evidence of coordination. Ex. 40, Dkt. 232-27, ¶ 7.

- Weisbach is expected to testify that he conducted a study of 45 comparable PIPE transactions involving nanocap companies and found that the terms of the March 2020 PIPE and follow-on transactions as well as the Leak Out Agreements were similar to terms found in other PIPEs issued during the same period. Ex. 41, Dkt. 232-28, ¶ 11.

- Marcus is expected to testify that his analysis of the trading data provided by Defendants indicates they used different trading strategies to hedge risk and sell the Company's stock, including that some Defendants engaged in short selling, some sales were private, and different combinations of options transactions were utilized. Ex. 42, Dkt. 232-26, ¶ 35.

**E.      The Leak Out Agreements Were Typical And Requested By The Company**

Defendants are likely to argue that the Leak-Out Agreements do not demonstrate group activity because each Defendant executed an individual, bilateral Leak-Out Agreement with the Company, not with one another, upon request of the Company and after independently determining that it was in the investor's own best interest. Ex. 17, Dkt. 253 at 13. Defendants will argue that the Company requested each investor to execute a Leak-Out Agreement as a condition for the Company agreeing to register the investors' shares for resale and the only parties to any Leak Out

16

Agreement are the Company and each individual Defendant. *Id.*; Ex. 13 - Schechter Dep. Tr. 49:6-16.

### F.        Defendants Were Not Party to the Voting or Lock-Up Agreements

Defendants will argue that the Voting Agreements did not create a group because Defendants were not parties to those agreements. The Voting Agreements were executed between the Company and certain "Principal Stockholders" who agreed to vote in favor of the March 2020 Transaction and restrict their trading in the Company's stock. Ex. 17, Dkt. 253 at 15. Although the Company agreed to use its "reasonable best efforts" to seek specific performance of the Voting Agreements, that commitment did not provide Defendants themselves with any right to obtain injunctive relief or otherwise enforce the Voting Agreements. *Id.* at 16. Because Defendants were not parties to the Voting Agreements, those agreements did not shift any voting or investment power to Defendants and cannot form the basis of a group. *Id.* at 16-17.

Defendants will similarly argue that the Lock-Up Agreements did not create a group because Defendants were not parties to them. The Lock-Up Agreements were executed between the Company and the Principal Stockholders, restricting their sales of Genius stock for fifteen months following closing. *Id.* at 18. Although the Company agreed to use "reasonable best efforts" to enforce these agreements, that obligation did not give Defendants any ability to do so, and thus conferred no "power to dispose, or to direct the disposition of" the Company's securities. *Id.*