# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

TODD AUGENBAUM,

        Plaintiff,

    v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; and RICHARD MOLINSKY,

        Defendants,

-and-

KARTOON STUDIOS, INC.,

        Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

## DECLARATION OF JEFFREY SCHLESINGER

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | |
| | ) | SS: |
| COUNTY OF LOS ANGELES | ) | |

I, JEFFREY SCHLESINGER, declare under penalty of perjury as follows:

1.    I am a member of the Board of Directors (the "Board") of Kartoon Studios, Inc.

(the "Company") and the Board's Litigation Committee (the "Committee"). I am submitting this

declaration in connection with the Company's Motion for Entry of Judgment (ECF 358) in the above-captioned action (the "Action"). The testimony below is based on my personal knowledge in my capacity as a director of the Company.

## Background and Independence

1. I joined the Board in October 2025.

2. Prior to joining the Board, I founded Former Bros. Media LLC, a company that provides strategic advice in the media industry. Prior to that, from September 1989 to August 2020, I served in multiple executive roles at Warner Bros. Worldwide Television Distribution, including most recently President from May 2013 to August 2020.

3. I qualify as an independent director of the Company under the applicable NYSE American rules. I also have no affiliation or financial interest with respect to any of the Defendants in the Action or any of their affiliates or family members. To say this in simpler and definitive terms, I am not aware of any financial, personal or other type of relationship between myself and any Defendant or anyone, to the best of my knowledge, who may be related or connected to Defendants in any way. I have no personal or financial interest whatsoever in the outcome of this Action other than as a result of my fiduciary duty to the Company.

## Work Of The Litigation Committee

4. On January 30, 2026, I attended a Special Meeting of the Board where we discussed recent updates in the Action, namely the Court's denial of summary judgment, the Company's current financial condition and need for additional financing, the increased potential value of the claims from the perspective of the Company, the prior efforts of the parties to reach a settlement, and the status of indemnification and advancement demands made by certain of the Defendants in connection with the Action.

5. At that meeting, the Board unanimously agreed to form a Litigation Committee to further evaluate the Company's claims asserted in the Action, including their potential value and likelihood of success at trial, the indemnity and advancement claims made by Defendants, and the possibility of reaching a settlement with the parties that would be favorable to the Company. The Board instructed the Committee to make a recommendation to the full Board in the best interests of the Company.

6. In the following months, the Committee met formally multiple times, held additional informal calls with management and counsel, and reviewed a range of materials relating to the Action, including:

a. On February 2, 2026, we met with counsel at Morris Kandinov to discuss the current status of the Action and the anticipated work of the Committee. We requested that counsel prepare background materials on the Action as well as the Defendants' indemnity and advancement claims. We also instructed counsel to determine how best to engage with the parties regarding settlement.

b. On February 13, 2026, we received a memorandum from counsel providing an overview of the transactions and claims in the Action.

c. On March 9, 2026, we met to receive updates regarding initial settlement discussions with the parties and the mediator, David Murphy. My perception was that Plaintiff's counsel was not being particularly cooperative, Mr. Murphy was restricted from sharing any details of prior negotiations, and Defendants had inquired as to whether Morris Kandinov could appropriately handle settlement negotiations given its prior representation of Special Equities Group ("SEG"). In consultation with the Company's Chief Operating Officer, Mike Jaffa, we felt that it would be beneficial to retain additional counsel specifically to handle negotiations with the

3

parties. We hired Jay Lefkowitz and his partner Jeff Goldfine of Kirkland & Ellis based on their experience litigating and settling large securities matters, including under Section 16(b), and their prior work in cases involving Jeff Abraham, the Plaintiff's attorney. Because we did not believe Morris Kandinov's prior representation posed an actual conflict with respect to the Committee's work, and for efficiency and cost savings, we determined to continue to retain Morris Kandinov to assist with the Committee's process outside of actual negotiations.

d.      On March 27, 2026, we held a meeting to receive an update as to settlement negotiations from Mr. Lefkowitz, who stated that based on discussions with counsel for Defendants and the mediator, Mr. Murphy, he expected that the Company could achieve a settlement in the range of $35 million to $50 million. Given the Company's financial condition and need for immediate additional financing, we felt that a resolution in that range would be quite favorable if executed in the near-term and pursuant to terms that would eliminate any indemnity and advancement risk to the Company. In connection with the meeting, we received a memorandum from counsel regarding the history of Defendants' indemnity and advancement demands, the arguments on both sides, and the potential exposure to the Company now and if the Action proceeded to trial.

e.      On April 10, 2026, we met to discuss ongoing settlement negotiations between Mr. Lefkowitz, the Defendants and Mr. Murphy. We were advised that after multiple informal rounds, not all Defendants were participating but we could expect an initial proposal from the participating Defendants in the following week. We also received an update as to the amount of pending advancement claims by the Defendants willing to share that information with counsel, and we discussed the viability of those claims and the scope of defense costs that would be incurred regardless of our defenses. Throughout the process, we inquired as to Plaintiff's counsel's

4

participation, but at this point he had not meaningfully contributed. In connection with the meeting, we received a memorandum from counsel laying out key evidentiary materials raised by the parties in prior briefing and likely to be raised at trial, as well as the underlying testimony and materials.

### The Settlement

7.    On April 16, 2026, the Committee met to discuss a potential resolution of claims with certain of the Defendants. Mr. Lefkowitz stated that he had been able to negotiate a resolution at $50 million with six of the eight defendants participating *pro rata*, reflecting a gross cash settlement payment of $36.5 million. He did not expect to be able to obtain a higher amount from the Defendants at that point in time, and the settlement would include the release of all indemnity and advancement claims against the Company.

8.    In evaluating the proposal, we discussed a number of matters, including the Company's immediate need for capital and the likely dilutive terms of any interim financing measured against the difficulties anticipated in proving the claims at trial. Our perception was that, while the Company had not been aware of coordination between the Defendants at the time of the transactions in 2020, Plaintiff had successfully pieced together various emails, deposition testimony and transaction terms that would at least create the specter of coordination at trial. However, in the absence of any direct testimony or evidence of an agreement between Defendants, and given that all witnesses would deny any agreement, we felt that the Company's odds at trial were highly speculative. We fairly considered the potential upside of trial based on the competing damages calculations submitted by the parties, which ranged between approximately $332 million and $438 million. But, while we did not attempt to quantify the exact probability of success, we felt that it was much, much lower than the odds of prevailing. We further considered that even if the Company prevailed at trial, any judgment would likely be appealed, exposing the Company to

the risk of reversal and, in any event, delaying receipt of any recovery indefinitely. On the other hand, the settlement would provide immediate additional capital and resolve the Company's funding requirements indefinitely. Given the Committee's process to that point, the materials reviewed, and the fact that fact discovery was complete and substantially all of the documents and testimony that would be presented at trial were already in the record, we felt that the Committee had a substantial basis on which to evaluate the strengths and weaknesses of the claims and make a recommendation.

9.      On April 20, 2026, I participated in a call with Plaintiff's counsel, Mr. Abraham, Mr. Jaffa, and counsel from Morris Kandinov. Mr. Abraham had been advised by Mr. Lefkowitz of the Committee's consideration of the settlement offer from Defendants and he stated, in sum and substance, the reasons why he believed the settlement was too low and how he could obtain a higher amount by settlement or trial. Among other points, Mr. Abraham stated that two of the Defendants had previously made higher offers than the amounts that they would contribute in the potential settlement. We also discussed the Company's financial position and the need for funding. Mr. Abraham suggested litigation funding but did not have any specific ideas as to how to obtain such funding or the timeline. Following the call, the Committee asked Kirkland to determine the basis for Mr. Abraham's statements regarding the prior offers but ultimately the Committee was not able to confirm, at that time, that they had been made. In any event, my perception was that even if the offers had been made, it was clear at this point that Defendants' willingness to settle the claims had declined, the offers were no longer available, and Plaintiff's prior negotiations did not alter the Company's need to reach a favorable resolution now.

10.     Later in the day on April 20, 2026, we met as a Board to discuss the Committee's findings and recommendation to accept the proposed settlement. The Committee's view, after

having spent considerable time understanding the various legal arguments, chances of success at trial, downside risk of losing, and settlement dynamics, was that the proposed settlement offered an exceptional opportunity for the Company to transform its balance sheet, eliminate risk, and focus on its core mission of kids' programming. All deal-making requires judgment and decision-making in real-time. The Board understood and considered that the $50 million settlement amount reflected approximately 11% to 15% of the Defendants' maximum potential exposure at trial, but ultimately concluded that discount was proportionate to the challenges of proving the claims and that the Company could not risk the potentially existential outcome of losing at trial, obtaining inferior financing in the interim, and incurring defense costs and potential liability from Defendants' advancement claims.

11.    Notwithstanding the fact that we believed the proposed settlement was reasonable and should be accepted, the Board felt that we should exhaust all opportunities to increase the amount further. We determined to delay our acceptance to provide Mr. Abraham an opportunity to try to increase the amount. However, we were advised by Kirkland in the following week that Mr. Abraham had declined to participate in further discussions.

12.    Thereafter, the Company finalized the settlement with the Settling Defendants.

13.    On May 22, 2026, the Committee met again to discuss updates regarding the settlement, including the Court hearing on May 13, 2026, Plaintiff's agreement with L1 to increase its contribution amount, Brio's agreement to participate in the settlement, and the next hearing scheduled for May 26, 2026. As to Brio, we considered the fact that one Brio entity had assets to satisfy a judgment but the other entity did not, and that settling with the solvent entity under the original terms of the settlement and obtaining releases from both entities was advisable. Following the meeting, we were provided with certain materials that Mr. Abraham had argued were not

7

previously considered during the Committee's process. These materials were consistent with the evidence in support of the claims that we received previously and did not materially alter my evaluation of the chances of success and the merits of the settlement.

I declare under penalty of perjury that the foregoing is true and correct.

Jeffrey Schlesinger (May 25, 2026 12:49:01 PDT)

Jeffrey Schlesinger

25/05/2027