**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

     Plaintiff,

  v.

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP; CVI
INVESTMENTS, INC.; EMPERY ASSET
MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP; IROQUOIS MASTER
FUND LTD.; IROQUOIS CAPITAL
INVESTMENT GROUP, LLC; L1 CAPITAL
GLOBAL OPPORTUNITIES MASTER FUND;
M3A LP; RICHARD MOLINSKY,

     Defendants,

  -and-

KARTOON STUDIOS, INC.,

     Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**SETTLING DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO**
**KARTOON'S MOTION FOR JUDGMENT**

CLARK SMITH VILLAZOR LLP
Christopher J. Clark
Benjamin Butzin-Dozier
Diana Wang
666 Third Avenue, 21st Floor
New York, New York 10017
(212) 377-0850 (Telephone)
(212) 377-0868 (Facsimile)

*Counsel for Defendants Iroquois Master Fund*
*Ltd. and Iroquois Capital Investment Group,*
*LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................................1

STATEMENT OF FACTS ..............................................................................................................3

   1.  Plaintiff Points to Significantly Qualified and Contingent
       Potential Settlement Offers Proposed in the Course of Mediation ...................................3

   2.  The Settling Defendants and the Litigation Committee Negotiated
       in Good Faith and at Arms' Length ...................................................................................5

   3.  The Company and the Settling Defendants
       Executed the Settlement Agreement ..................................................................................5

ARGUMENT ................................................................................................................................7

   1.  The Settlement Agreement Was Negotiated at Arms' Length and in Good Faith ..............7

   2.  The Settlement Agreement Provides Fair, Reasonable, and Adequate Value to the
       Company ...........................................................................................................................9

       a.  The Settlement Agreement Provides $36.5 Million in Cash ...................................9

       b.  Plaintiff Summarily Dismisses the $20 Million Value in the Release of
          Indemnification and Advancement Claims Because His Interests are not Aligned
          with the Company ..............................................................................................11

       c.  The Additional *Grinnell* Factors Favor Settlement .............................................12

CONCLUSION............................................................................................................................13

**TABLE OF AUTHORITIES**

*Page(s)*

<u>Cases</u>

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974).................................................................................................. 7

*Credit Suisse First Boston, LLC v. Intershop Commc'ns AG*,
407 F. Supp. 2d 541 (S.D.N.Y. 2006)................................................................................... 12

*Donoghue v. Antara Capital Master Fund LP*,
No. 23 Civ. 4985 (S.D.N.Y. 2023) ....................................................................................... 10

*Donoghue v. CSX Corp.*,
No. 08 Civ. 9252 (S.D.N.Y. 2008)………………………………………………………10

*FTR Consulting Grp. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*,
No. 02 Civ. 8608 (RMB), 2005 WL 2234039 (S.D.N.Y. Sept. 14, 2005) ...................... 7, 9, 13

*In re Baker Hughes, a GE Co., Derivative Litig.*,
2023 WL 2967780 (Del. Ch. Apr. 17, 2023) ............................................................................ 8

*In re Myovant Sciences Ltd. Section 16(b) Litig.*,
No. 20-cv-1807, Dkts. 1, 68 (S.D.N.Y. 2021) ...................................................................... 10

*iXL Enters., Inc. v. GE Cap. Corp.*,
167 Fed. App'x 824 (2d Cir. 2006)....................................................................................... 11

*Koch Indus., Inc. v. Vosko*,
494 F.2d 713 (10th Cir. 1974) ............................................................................................. 12

*Linney v. Cellular Alask P'ship*,
151 F.3d 1234 (9th Cir. 1998) ............................................................................................... 8

*Revive Investing LLC v. FBC Holdings S.A.R.L.*,
No. 20 Civ. 618, 2021 WL 56905 (S.D.N.Y. Jan. 7, 2021)......................................... 7, 8, 9, 10

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Secs. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ............................................................................................ 7

<u>Statutes</u>

11 U.S.C. § 362.................................................................................................................... 11
15 U.S.C. § 78u-4 ................................................................................................................ 12

Anson Investments Master Fund LP ("Anson"),[1] CVI Investments, Inc. ("CVI"), and Iroquois Master Fund Ltd., and Iroquois Capital Investment Group, LLC (together, "Iroquois"), M3A LP ("M3A"), and Richard Molinsky (altogether, the "Settling Defendants")[2] respectfully submit this memorandum of law in support of the judgment sought by Genius Brands International, Inc., n/k/a Kartoon Studios, Inc. ("Genius" or the "Company") (Dkt. 358, the "Motion") and in response to Plaintiff's opposition thereto (Dkt. 387, the "Opposition" or "Opp.").

## PRELIMINARY STATEMENT

During the May 13, 2026 status conference, this Court noted that neither Plaintiff nor the Company had provided a single case holding that an issuer needed a shareholder plaintiff's consent to settle Section 16(b) claims. Plaintiff has still not done so. The Settling Defendants agree that nothing prohibits this Court from approving a settlement, and the Company has set forth a robust record establishing that the Settlement Agreement is fair, reasonable, and adequate. *See generally* Memorandum of Law in Support of Kartoon's Motion for Judgment (Dkt. 360, the "Memo"); Declaration of Michael Jaffa (Dkt. 360-1, "Jaffa Decl."); Genius' Reply in Support of the Motion (the "Reply").

After calling the parties' attention to the dearth of case law involving an issuer settling Section 16(b) claims without a shareholder plaintiff's approval, the Court instructed Plaintiff to provide "a fair and adequate and reasonable demand in response" to the fully negotiated settlement

---

[1] Anson has also filed or will file a separate supplemental memorandum.

[2] The Settling Defendants are aware that L1 Capital Global Opportunities Master Fund ("L1") has apparently entered into an agreement in principle with the Plaintiff, but L1 has not withdrawn from or asserted it will not abide by the terms of the settlement agreement between the Settling Defendants, L1, and the Company and tendered to the Court (Dkt. 360-1, Ex. 1 (the "Settlement Agreement"). The Settling Defendants also learned that the Company has entered into an agreement with Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund, LP ("Brio") to settle the claims asserted against Brio. The Settling Defendants are not a party to that agreement.

agreement, which conveyed at least $50 million in value[3] and $36.5 million in cash to the Company.  Transcript of March 13, 2026 Hearing ("Tr.") at 46:21.  Plaintiff **responded with an aggregate demand of approximately $290 million**.  The Settling Defendants countered with an offer of $45 million cash—and more than $68 million in aggregate value—contingent on Plaintiff's releases of the Settling Defendants, which would avoid a costly appeal.

Plaintiff then purportedly agreed to a single settlement agreement with L1—the Defendant with the second lowest exposure, who had not submitted any indemnification demand—for $3.5 million, which is $1.2 million more than L1 had agreed to pay in its reported agreement with the Company.  L1 settled with Plaintiff for 21% of the potential damages under Plaintiff's "*Chevron*" calculation.  The $59.5 million in value which would be conferred on the Company under the Settlement Agreement represents 22% of the potential damages asserted against the Settling Defendants under Plaintiff's *Chevron* calculation.  Thus, with his purported settlement with L1, Plaintiff has admitted that a *lesser* discount rate is fair and reasonable in this matter, yet in the next breath claims the 22% discount rate is unacceptable from the other Settling Defendants.  Plaintiff's complaints are scattershot and meritless.

This Court should approve the Settlement Agreement because it is fair, adequate and reasonable, both procedurally and substantively.

---

[3] As set forth in more detail below and in the Company's Reply, the indemnification claims are only valueless to Plaintiff, who owns less than $1 of Company stock.  For purposes of this submission, the Settling Defendants have provided a baseline estimate of legal fees to contextualize the value of the settlement in view of the waiver of indemnification claims. Pursuant to these estimates, the value of the settlement is more than $59.5 million.

**STATEMENT OF FACTS**

1. **Plaintiff Points to Significantly Qualified and Contingent Potential Settlement Offers Proposed in the Course of Mediation**

In breach of Mr. David Murphy's confidentiality agreement and the mediation privilege, Plaintiff revealed the contents of confidential settlement communications. Plaintiff believes these communications support his position because they contain two purported settlement offers from Anson and CVI, who putatively offered to settle their claims for more than the settlement reached with the Company. Both proposals, however, were subject to (1) a "most-favored-nation" provision, which would have significantly reduced the dollar value of those proposals from their headline numbers, and (2) a release from Plaintiff and the Company.

*Anson.* As explained in Anson's separate memorandum, Anson's December 11, 2025 communication with Mr. Murphy included two key contingencies: (1) a full general release from the Company and Plaintiff; and (2) a most-favored-nation provision. Further, the offer was expressly conveyed to Mr. Murphy as a one-time offer conditioned on Plaintiff's agreement to the proposal before the end of 2025 because the fund had performed well in 2025, reducing the impact of the amount offered at that time. The offer was also premised on the expectation of saving the significant attorneys' fees to be incurred in preparing for trial. Plaintiff declined to accept the offer, and many of the trial-associated costs have been expended and the fund's performance in 2026 significant increases the impact of a settlement payment.

*CVI.* Plaintiff states that on February 24, 2026, he "reached out to CVI" and was "ultimately [] informed that CVI was still willing to settle the case for $7.5 million," a sum Plaintiff "calculates as 28.1% of CVI's *Chevron*-based disgorgement." Opp. at 5. The documents submitted by Plaintiff show that Mr. Murphy, as mediator, advised Plaintiff that he believed CVI would settle for that amount "subject to the following conditions." Declaration of Jeffrey Abraham,

Dkt. 388 ("Abraham Decl.") Ex. 9.   One of those conditions was a "most-favored-nation" provision in favor of CVI.  *Id.* Ex. 9 ¶ 8.  Plaintiff rejected this condition, and it is now clear that had Plaintiff accepted that mediator's proposal he would not have received anything close to 28% on a *pro rata* basis.   Plaintiff's proposed settlement in principle with L1 corresponds to approximately 21% *pro rata*, which would equate to $5.6 million for CVI, considerably less than $7.5 million.  Another critical condition of that proposal was that Plaintiff was required to deliver a release from Genius (*id.* Ex. 9 ¶ 5), a point Plaintiff did not raise with the company until he had already rejected that mediator's proposal.  *See* Abraham Decl. Ex. 6 at 9.  That proposal was also made nearly three months ago, before CVI incurred significant expenses in the intervening months.

 ***Iroquois.***  Plaintiff vaguely asserts that "Iroquois's counsel withdrew an earlier settlement offer, perhaps because Defendants had decided they would instead attempt to cut a deal with Genius." Opp. at 5.  Plaintiff does not include the amount of the purported offer or the date of the meeting because it vitiates his argument.  The meeting took place on November 5, 2025—months before the Company formed the Litigation Committee in January 2026.  At that meeting, Plaintiff's counsel abruptly left the meeting minutes after it began and Iroquois's counsel conveyed that, to the extent there was any suggestion of an agreement to settle between $1-3 million, Iroquois was revoking that proposal and would wait to hear back from Plaintiff's counsel.  Clark Decl. ¶ 4.

 On January 6, 2026, Iroquois filed a complaint seeking from the Company certain fees and costs which the Company had agreed to advance.  Clark Decl. ¶ 6.  Iroquois' claim does not seek indemnification for any disgorgement under Section 16, but rather seeks advancement and indemnification of Iroquois's legal fees connected with this matter, as the Company had promised in Section 9(k)(iii) of the March 11, 2020 Securities Purchase Agreement.  *Id.*

**2.  The Settling Defendants and the Litigation Committee Negotiated in Good Faith and at Arms' Length**

On January 30, 2026, the Board of Directors of the Company formed the Litigation Committee and delegated to that Committee authority to investigate, review, and evaluate the Section 16(b) claims and Defendants' indemnification and advancement claims, engage in settlement discussions with Defendants, and submit for the Board's consideration any specific settlement proposals.  Abraham Decl. Ex. 4 at 7-8.

Thereafter, on March 9, 2026, the Litigation Committee engaged Kirkland & Ellis LLP ("Kirkland") to represent the Litigation Committee in negotiations regarding a potential settlement.  Jaffa Decl. ¶ 6.  Beginning on March 13, counsel for Iroquois had multiple telephone calls and Zoom meetings with counsel for the Litigation Committee regarding a potential settlement of the claims asserted against the Defendants.  Clark Decl. ¶¶ 10-12.  Between March 13, 2026, and the signing of the Settlement Agreement, counsel for Iroquois spoke with counsel from Kirkland on numerous occasions about the work of the Litigation Committee.  *Id.* ¶ 12.  All meetings and discussions between counsel for the Settling Defendants and the Litigation Committee solely involved counsel from Kirkland.  *See id.* ¶ 11-12.

**3.  The Company and the Settling Defendants Executed the Settlement Agreement**

On May 5, 2026, the Company, the Settling Defendants and L1 entered into the Settlement Agreement.  Dkt. 360-1, Ex. 1.  The next day, on May 6, 2026, the Company filed the Motion.

On May 13, 2026, the Court held a hearing on the Company's Motion.  The Court observed that all parties had reason to pursue a global settlement given the significant uncertainties associated with trial and with any subsequent appeal, and instructed Plaintiff to submit fair and reasonable settlement offers to all Defendants by May 14, 2026.  Tr. at 47:15-19.

On May 14, 2026, Plaintiff submitted individual offers to each Defendant. In the aggregate, those offers **exceeded $290 million**. Clark Decl. ¶ 15; Clark Decl. Ex. 2 at 2-3. The figure of $290 million represents 80% of the aggregate asserted liability under the *Chevron* approach adopted in Plaintiff's expert's report. *See* Dkt. 232-31 at Table 6. Plaintiff's counsel has admitted that he never intended to negotiate a settlement with Anson. *See* Abraham Decl. Ex. 15 (refusing to negotiate with Anson, Brio, and Empery, but noting "[a]t the same time, Plaintiff is more than happy to engage with any or all of the five other Defendants (CVI, Iroquois, M3A, L1, and Richard Molinsky).")

On May 15, 2026, the Settling Defendants responded through Mr. Murphy with an aggregate offer of $45 million, contingent on Plaintiff's accepting the Settling Defendants' offer. Clark Decl. Ex. 2. The Settling Defendants explained that "the Settlement Agreement between the Settling Defendants and the Company [] is fair, reasonable and adequate, and the premium contained in this contingent counterproposal reflects the savings the Settling Defendants would receive by avoiding an appeal." *Id.*

On May 17, 2026, Plaintiff's counsel sent an email to David Murphy purportedly responding to the Settling Defendants' counteroffer. Clark Decl. Ex. 3. Counsel stated bluntly that he "believes the settlement process will, unfortunately, not prove productive." Clark Decl. Ex. 3 at 3.

On May 18, 2026, the Settling Defendants stated that they would keep the $45 million cash offer open through the hearing. Clark Decl. Ex. 3 at 2. Plaintiff made a significantly lower offer to one defendant (L1), who had not previously made an indemnification demand and who had the second lowest exposure of any defendant. Specifically, L1 apparently settled with Plaintiff for $3.55 million—$1.2 million more than the amount agreed upon in the Settlement Agreement and

6

21% of any potential liability under Plaintiff's *Chevron* analysis.  *Compare* Settlement Agreement, Dkt. 360-1, Ex. 1 at Ex. A (L1 settling with the Company for $2,312,109.70), *with* Abraham Decl. ¶ 26 (L1 settling with Plaintiff for $3.55 million).

## ARGUMENT

The Settlement Agreement reflects a fair, reasonable, and adequate settlement under the *Grinnell* factors recently applied in the context of a proposed Section 16(b) settlement in *Revive Investing*, which considers the:

> (1) risks of establishing liability; (2) risks of proving damages; (3) complexity, expense and likely duration of the litigation; (4) stage of proceeding and the amount of discovery completed; (5) ability of defendants to withstand a greater judgment; (6) range of reasonableness in light of the maximum possible recovery and range of reasonableness in light of all the attendant risks of the litigation; and (7) reaction of other shareholders to the settlement.

*Revive Investing LLC v. FBC Holdings S.A.R.L.*, No. 20 Civ. 618, 2021 WL 56905, at *7 (S.D.N.Y. Jan. 7, 2021), *report and recommendation adopted*, 2021 WL 734976 (S.D.N.Y. Feb 25, 2021) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).

As the Court noted, judicial analysis under *Grinnell* "is not a searching review to tell you what I think of the merits." Tr. 47:13-14. "A court need not find every factor militates in favor of a finding of fairness; rather, a court considers the totality of [the] factors in light of the particular circumstances." *In re Merrill Lynch & Co., Inc. Rsch. Reps. Secs. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007).

### 1. The Settlement Agreement Was Negotiated at Arms' Length and in Good Faith

Where a settlement agreement is "the product of arm's-length negotiation between experienced counsel," courts have applied a "presumption of fairness." *FTR Consulting Grp. ex rel. Cel-Sci Corp. v. Advantage Fund II Ltd.*, No. 02 Civ. 8608 (RMB), 2005 WL 2234039, at *3

(S.D.N.Y. Sept. 14, 2005) (internal citations and quotations omitted); *see also Revive*, 2021 WL 56905 at *8. As set forth in more detail in the Company's Reply, counsel for the Settling Defendants engaged in extensive arms'-length negotiations with counsel for the Litigation Committee from Kirkland.

Plaintiff pointedly does not assert that any member of the Litigation Committee lacks independence from any Defendant. Instead, Plaintiff asserts that Morris Kandinov is irreparably conflicted because it previously represented SEG. *See* Opp. at 4. The Litigation Committee determined that there was no conflict and Morris Kandinov could adequately represent the Company's interests. In any event, the Settling Defendants had no contact with Morris Kandinov in the course of negotiations (*see* Clark Decl. ¶¶ 11-12), and the Settling Defendants waited for the Litigation Committee to engage undisputedly independent counsel from Kirkland before discussing a potential settlement.[4] It is well settled that a conflict may be cured by "the addition of new and impartial counsel… even when previous counsel continues to be involved in the case." *Linney v. Cellular Alask P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998); *see also In re Baker Hughes, a GE Co., Derivative Litig*., 2023 WL 2967780, at *21 (Del. Ch. Apr. 17, 2023) (conflicted firm's involvement in coordinating interviews did not taint special committee investigation). Any potential conflict (if there was one) was cured by the engagement of Kirkland, who negotiated every aspect of the Settlement Agreement with the Settling Defendants.

---

[4] Although Plaintiff's counsel accused counsel from Kirkland of "doing someone at or connected to Anson (or some other Defendant) a solid" (*see* Abraham Decl. Ex. 15 at 3), he does not reassert this accusation in the Opposition. The Settling Defendants are aware of no evidence supporting this bald accusation.

2.  **The Settlement Agreement Provides Fair, Reasonable, and Adequate Value to the Company**

In considering the *Grinnell* factors, the Court must answer the "most important question" in the determination of whether an agreement is fair and reasonable: "the need to compare the terms of the compromise with the likely rewards of the litigation." *Revive*, 2021 WL 56905, at *8. In addition, courts consider the reaction of other shareholders to the settlement as well as the complexity, expense and likely duration of litigation, the stage of proceeding and the amount of discovery completed, and the ability of defendants to withstand a greater judgment. *See FTR Consulting*, 2005 WL 2234039, at *2.

a.  The Settlement Agreement Provides $36.5 Million in Cash

The Settlement Agreement addresses both the Company's immediate need for cash and provides the Company with a fair and reasonable resolution after considering the genuine dispute over liability, the threat Plaintiff losing at trial poses to the Company, and comparing the overall value returned to the Company with empirical studies and similar settlements.

***First***, the Settlement Agreement provides $36.5 million in cash and more than $59.5 million in aggregate value to the Company. The aggregate value represents 22% of the potential damages asserted against the Settling Defendants under Plaintiff's expert's *Chevron* calculation, while the $36.5 million cash value represents 14.4% of the *Chevron* alleged damages of the Settling Defendants. Dkt. 232-31 at Table 6. These discount rates are reasonable by every measure:

(i)  Plaintiff has agreed with another Defendant to a 21% discount rate, *see* Opp. at 9, which is ***less than*** the 22% discount rate applied in the Settlement Agreement when considering the total value of the indemnification claims released.

9

(ii) According to the most recent Cornerstone Securities Report, the median settlement of 2025 class action securities claims was 6.5% of plaintiff-styled damages, and the median settlement of 2025 late-stage class action securities claims was 9.3% of plaintiff-styled damages.[5]

(iii) Reported settlements of Section 16(b) claims approved by the Southern District of New York are consistent with the Cornerstone report. *See In re Myovant Sciences Ltd. Section 16(b) Litig.,* No. 20-cv-1807, Dkts. 1, 68 (S.D.N.Y. 2021) ($1,920,000 settlement where estimated damages of $29,860,593); *Donoghue v. Antara Capital Master Fund LP,* No. 23 Civ. 4985, Dkts. 1, 36, 45 (S.D.N.Y. 2023), ($3.3 million settlement where alleged damages of more than $28.75 million (11.5% of plaintiff-calculated damages)); *Donoghue v. CSX Corp.*, No. 08 Civ. 9252, Dkts. 1, 17 (S.D.N.Y. 2008) ($11 million settlement where alleged damages of $128 million (8.5% of plaintiff-calculated damages); *Revive*, 2021 WL 56905 ($300,000 settlement where alleged damages of $1,071,466).

(iv) The Litigation Committee determined that a reasonable settlement range was between $35-$50 million for *all Defendants*. Jaffa Decl. ¶8. The Settlement Agreement's cash value alone *without two of the three Defendants* with the greatest alleged damages is within this range.

**Second**, the Settlement Agreement provides the Company with $5 million in immediately available funds. If the Company were to file for bankruptcy protection before or during trial, an automatic stay will halt proceedings, wasting Court, juror, and the parties'

---

[5] Cornerstone Research, *2025 Review & Analysis of Securities Class Action Settlements*, available at https://www.cornerstone.com/wp-content/uploads/2026/02/Securities-Class-Action-Settlements-2025-Review-and-Analysis.pdf.

resources.  *See* 11 U.S.C. § 362; *iXL Enters., Inc. v. GE Cap. Corp.*, 167 Fed. App'x 824, 827 n.2 (2d Cir. 2006) ("[T]he cause of action to recover short-swing profits became the exclusive 'property' of the debtor-in-possession… at the moment [the debtor] filed for bankruptcy protection."); *Donoghue v. Rosatti*, 23 Civ. 6400, Dkt. 80 (S.D.N.Y. 2023) (applying Section 362(a)'s automatic stay).

*Third*, the Settlement Agreement provides additional upside because the Company has not released claims against other Defendants.  *See* Dkt. 232-31 at Table 6.  The Settlement Agreement allows Plaintiff to continue to pursue these claims, while still receiving $36.5 million in cash and releases from six of the eight defendants.

      b.  <u>Plaintiff Summarily Dismisses the $20 Million Value in the Release of Indemnification and Advancement Claims Because His Interests are not Aligned with the Company</u>

Defendants are entitled to indemnification of their defense costs under the governing agreements, and Plaintiff's argument that these claims are frivolous and valueless fails for three reasons.

*First*, only the Plaintiff has described the claim as "frivolous" and lacking any value.  Opp. at 2.  Plaintiff misleadingly cites to Genius' 2025 Form 10-K, but the Company makes no statement as to the merits of Defendants' indemnification and advancement claims in its 10-K.  To the contrary, the Company has partially performed under the relevant agreements by paying more than $400,000 in interim costs incurred.  *See* Jaffa Decl. ¶ 15.  Based on both the language in the relevant agreements and the Company's advancement of costs and fees incurred to certain Defendants, Iroquois (as an example) is confident that it will succeed in obtaining the full amount of its indemnification claim in a judgment.  Clark Decl. ¶ 8.

*Second*, the public policy concerns that limit indemnification apply at most only to indemnification for *disgorgement* of short-swing profits.  Such a public policy certainly does not

11

apply to defendants who successfully defend themselves and are ultimately not liable. *See, e.g., Credit Suisse First Boston, LLC v. Intershop Commc'ns AG*, 407 F. Supp. 2d 541, 548 (S.D.N.Y. 2006) ("[T]he policies underlying the securities laws are not offended by indemnification by the issuer where the indemnitee has successfully defended itself on the merits."); *Koch Indus., Inc. v. Vosko*, 494 F.2d 713, 725 (10th Cir. 1974) ("[A]s to federal law relating to the Securities Act claims, we find no policy contrary to an award to a party for legal expenses in successfully defending"). In fact, the PSLRA expressly recognizes that indemnification may be available to any Defendants who prevail at trial. 15 U.S.C. § 78u-4 ("[A] covered person that *prevails* in any private action may recover the attorney's fees and costs of that covered person in connection with the action."). To hold otherwise would, as the *Credit Suisse First* court warned, "render illusory the recognized availability of indemnification for expenses incurred in the successful defense of a securities action." 407 F. Supp. 2d at 551.

**Third**, Plaintiff can only afford to make these arguments because the indemnity claims are valueless to him personally. If Plaintiff is unsuccessful at trial, the risk of the indemnity claims pose a significant threat to the Company. This is not a plaintiff prosecuting a claim on behalf of a company; it is a fee-driven exercise in which Plaintiff has all of the upside and none of the downside.

### c.   The Additional *Grinnell* Factors Favor Settlement

The remaining *Grinnell* factors—complexity and likely duration of litigation, the stage of proceedings, the ability to withstand greater judgment, and the reaction of shareholders—also favor approval of the Settlement Agreement. Although this is a late-stage case, the unsuccessful party at trial will almost certainly appeal given the novelty and significance of the legal questions presented. *See* Tr. at 44:17 ("[W]hoever loses this case is going to file an appeal…they are going to file a whole host of post-trial motions in front of me, and then whoever loses is then going to

12

file an appeal."); *see, e.g., FTR Consulting*, 2005 WL 2234039, at *3 (factor three favored settlement where "significant additional time, effort, and expense would be incurred were the case to go forward to trial and possibly appeal[]"). Similarly, not only has no shareholder besides Plaintiff (the owner of 62 cents worth of stock) objected, some of the largest shareholders have voiced their support. *See* Dkt. 395-14; Dkt. 395-15.

## CONCLUSION

The Motion should be granted, and the Court should enter an order approving the Settlement Agreement as fair and reasonable.

Dated: May 25, 2026

/s/ Christopher J. Clark
CLARK SMITH VILLAZOR LLP
Christopher J. Clark
Benjamin Butzin-Dozier
Diana Wang
666 Third Avenue, 21st Floor
New York, New York 10017
TEL: (212) 377-0850
FAX: (212) 377-0868
clark@csvllp.com
benjamin.dozier@csvllp.com
diana.wang@csvllp.com

*Counsel for Defendants Iroquois Master Fund Ltd. and Iroquois Capital Investment Group, LLC*

13

**CERTIFICATE OF COMPLIANCE**

I, Christopher J. Clark, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases, that the foregoing Memorandum of Law was prepared using Microsoft Word, and contains 3,495 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated: May 25, 2026                                          By: /s/ *Christopher J. Clark*
                                                                   Christopher J. Clark