**MB  MANDEL BHANDARI** LLP

80 Pine Street | 33rd Floor | New York, NY | 10005 | T. (212) 269-5600 | F. (646) 964-6667 | www.mandelbhandari.com

June 3, 2026

**BY ECF**

The Honorable Arun Subramanian
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

>  Re:  *Augenbaum v. Anson Investments Master Fund LP, et al.*
>  <u>Case No.: 22-cv-249 (AS)</u>

Dear Judge Subramanian:

We are co-counsel for Plaintiff Todd Augenbaum in this action and write (1) pursuant to the Court's instructions to identify the group at issue in this case, (2) to address the admissibility of Defendants' motives, and (3) to address the admissibility of SEG and Andrew Heyward communications.[1]

Although this letter sets forth substantial evidence supporting Plaintiff's arguments, this letter is by no means exhaustive.  Plaintiff will of course adduce extensive additional evidence at trial in support of the arguments set forth below.

## I.    The Group at Issue in this Case

At the June 1 pre-trial conference, the Court instructed Plaintiff to advise the Court of the group being alleged.  With respect to Plaintiff's substantive claim, Defendants formed a group with each other, Andrew Heyward, and Mr. Heyward's entity, A Squared, to acquire, hold, vote, and dispose of Genius securities.  As discussed below, for purposes of FRE 801 (and potentially other evidentiary purposes), SEG and its agents acted in concert with the group.

## II.    The Group's Efforts to Affect the Price of Genius Stock Are Relevant

At the June 1 pre-trial conference, the Court explained that Plaintiff "would have to approach with some connecting of the dots that showed that defendants had something to do with the withheld press releases and that it has something to do with whether they acted as a group." Irrespective of whether the phrase "pump-and-dump" or other language is employed, there is abundant admissible evidence that, in connection with buying, selling, and holding Genius stock, Defendants coordinated with each other for the purpose of controlling the price of the stock,

---

[1] Unless noted otherwise, internal citations quotation marks, and footnotes have been omitted.

The Honorable Arun Subramanian
June 3, 2026
Page 2

including through a coordinated press strategy.  Because this evidence is admissible, Plaintiff should be free to ask the jury to draw any reasonable inferences from this evidence.

### A.    Defendants' Group Went to Great Lengths to Affect the Stock Price

As a preliminary matter, there is no serious argument that any of the Defendants invested in Genius because they thought it was a well-run or profitable company or had anything approaching decent business prospects.  In 2019-20, Genius had lost money in every single quarter in which it had been in business.  PX440 (3/30/2020 Genius 10-K:  "We have a history of operating losses and incurred net losses in each fiscal quarter since our inception.")  When Empery was initially offered an opportunity to invest in Genius in September 2019, Empery explained that it was "[n]ot investing with a dirtbag CEO named H[e]yward.  He deserves to go bankrupt."  PX-67 at 1.  SEG continued to try to persuade Empery but Empery was steadfast:  "Zero chance I put in a single $1.  Guy is a criminal."  *Id.*  When SEG told Empery that Genius executives are "good guys," Empery responded, "Nah.  Schemers scheme."  PX-361.

If Defendants were investing in a company that they expected to lose money, how did they expect to profit off the investment?  Like the other Defendants, Anson believed that "the company is over valued and over hyped" and is "probably a good long term short.  But it doesn't mean you can't make money along the way by taking advantage of liquidity when it comes."  PX-614 at 1.

The first thing that Defendants' group did was to ensure that Heyward strategically withheld and divulged information about the company in a manner that maximized their profits.  Beginning in September 2019, Anson placed pressure on Genius not to issue press releases until Defendants invested so that Defendants could invest in Genius at the lowest possible price.  As Heyward admitted, "Amin [Nathoo of Anson] doesn[']t want [u]s doing any press or Amin will blow the deal."  PX-70.

Heyward intentionally withheld positive news from the public so as to reduce the price of Genius in the period before the March 11, 2020 PIPE so that Defendants could obtain the most favorable price of the stock.  PX-295 at 1.  Then, after the PIPE closed, Heyward began pumping up the price of the stock by publicizing the news that he had been withholding.  Heyward admitted that was his plan in an email he sent to Molinsky about a week before the March 11 PIPE:

> For the last three months, **we have not done any publicity at all**, since we have focused on securing the necessary financing to take out the current debt **and thus alleviate the pressure on the stock**, while insuring there is adequate liquidity to execute the business model.
>
> That financing has now been put in place, and I anticipate to announce it next Monday.  At that time, **we will begin to roll out a series of important press items, which in my opinion, will drive the stock**

The Honorable Arun Subramanian
June 3, 2026
Page 3

> **dramatically forward**, from which I expect see the return of the Genius
> Brands stock price to previous levels and beyond.

*Id.* (emphasis added).  On March 25, 2020, Heyward admitted the same thing to Anson, explaining that "[w]e have a boatload of news… good news.  We will be rolling it out continuously for the next few weeks."  PX-439.  In a separate communication Heyward again admitted, "[w]e have literally 20 stories backed up."  PX-410 at 4.

Heyward delivered as promised.  Between March 23, 2020 and August 10, 2020, Genius issued at least thirty-six press releases.  ECF No 226-15 ¶ 87.  Defendants' strategy to depress and then push up the stock worked.  Heyward boasted that "Stock too big jump AFTER 2nd [press release of the day].  Up 30% today."  *Id.*  An Anson internal email did not beat around the bush:  "I'm going to pump u upppppppppppp."  PX-661.

But, much to Defendants' chagrin, the press strategy did not work forever.  By mid-June, Anson concluded that "these PRs not working anym[]ore, fck."  PX-667.  And, by July, Defendants had sold substantially all of their Genius stock.

The press releases were not the only thing that the Defendants' group did to influence investor interest and maintain a higher price of Genius stock.  The reality is that virtually everything that Defendant was motivated either in part or in whole by a desire to control the stock price.

Most notably, the only acknowledged purpose of the leak-out agreements was to prop up Genius's stock price.  Genius's COO testified that the sole purpose of the leak-out agreements was to avoid "a rapid decline in the price of Genius Brands' common stock."  DX-442 ¶ 14.  CVI similarly admitted that the leak-out agreements' purpose was to avoid "a sudden downward spike in Genius's stock price."  PX779 ¶ 26.  Although CVI initially found that a leak-out was "[o]dd in this situation," it agreed after being told that "[e]veryone wants it so the stock doesn't get crushed."  PX-544.

Although Defendants claim that the leak-out agreements were entirely Genius's idea, that claim is so far from reality that even Genius cannot get on board.  Genius's COO diplomatically testified that "I do not recall all of the details surrounding the leak-out agreements and their antecedents."  In any event, the documents confirm that it was Defendants who insisted upon the leak-out agreements.  Anson demanded that "[t]he leakout needs to apply to all debt investors, regardless of whether or not they participate in this financing they still need to sign it."  PX-533 at 3.  Anson was also involved in setting the price below which Defendants agreed to limit their sales.  *Id.*  As SEG explained to Anson, "let's see what others comeback with on the Standstill before **we** make a final decision" on the terms on which Defendants can sell their Genius stock. *Id.* at 1 (emphasis added).

Although the term sheet that Genius and Anson signed provided for the Genius stock to be promptly registered (PX-202 at 2), Empery told Anson "that they won't participate in the deal if the company files a registration statement.  They do not want to be named as a selling

The Honorable Arun Subramanian
June 3, 2026
Page 4

shareholder." PX-249 at 1. To be clear, Empery freely admits that it didn't want to register the shares because it wanted to prop up the stock price. As Empery's summary judgment declaration concedes, "I was concerned that the filing of a registration statement might impact the share price of the Company at a point in time when the registration statement was unlikely to receive SEC approval, meaning the filing could impact the stock price for no good reason."[2] PX-778 ¶ 33.

After Empery requested that the terms of the deal be changed so that the shares would not be registered, Defendants "agreed" with each other not to register the shares. PX-671. As Anson admitted, "because the deal was so difficult to fill as not many wanted to play in the deal and we needed these investors, we agreed that the company would not register the stock." *Id.* Anson similarly admitted that the decision not to register the shares dramatically ratcheted up Defendants' profits:

> [B]ecause had the stock been registered, people would have been converting and selling as soon as the shareholder approval had been granted… and the stock was at $1 at the time. So it would have still been a decent win, but the stock would have easily come back down to $0.50 or lower and the big win would not have been realized.
>
> Instead, the stock was able to run to $12 on huge volumes which was as key to our win.

*Id.*

Unsurprisingly, virtually every decision that Defendants made about how to structure the 2020 Genius deals was either strongly influenced or determined by how the decision would impact the stock price. *E.g.* PX-254 (In analyzing when the permit the company to raise additional funds in the future, Anson writes that "we don't want anything that would knock the stock back down. [S]o wouldn't want them to do a deal. [S]o doesn't necessarily benefit the investors to do a deal then."), PX-541 (When determining whether to register the stock post-issuance, CVI opposed registration because it is "[h]ard to see how that filing won't have an impact on the stock.")

### B.    Defendants' Coordination and Motives Are Highly Relevant

While Section 16(b) is on one level a strict liability claim, the Court's proposed charge regarding the definition of a group requires Plaintiff to prove Defendants' intent. The charge

---

[2] At the June 1 pre-trial conference, Empery represented to the Court that "this is the first time anybody in this room has heard a theory that the defendants coordinated together to remove registration from the transaction because they knew it would send the stock price higher." (Tr at 45:15-23.) This is obviously false. Empery's own summary judgment declaration admits that the purpose of removing registration from the deal was to prop up the stock price.

The Honorable Arun Subramanian
June 3, 2026
Page 5

provides that "a 'group' exists when two or more persons **intentionally** agreed to act together for the purpose of acquiring, holding, voting, or disposing of the issuer's securities." (Emphasis added.) In order to prove that Defendants "intentionally agreed to act together," it is critical to show **why** they choose to act together.

Like most business cases, the motive here is to maximize profits. Between March and June 2020, Defendants effectively purchased roughly 500% percent of the stock and stock equivalents that were outstanding before the March 2020 PIPE. ECF 232-31 at 87. Without agreeing with each other to hold their shares, even Defendants admit that they would have sold their shares and tanked the stock's price. *E.g.* PX-671. Defendants thought they could make more money if they coordinated their conduct and that of Heyward in a manner designed to afford each of them the best opportunity to sell their stock profitably. Defendants could not have individually affected the price of the stock; they had to do so collectively. As discussed above, there is ample evidence that that is precisely what happened.

Nor is any of this surprising. It is entirely consistent with the Court's Order denying the motion to dismiss the Amended Complaint. The Order's characterization of Plaintiff's claim – Defendants "also made a pact with each other (the leak-out agreement) not to hurt the price of Genius stock by selling shares on the cheap" – remains accurate today. ECF 142 at 9.

Case law also confirms that a profit-motive is evidence that persons acted in concert. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781–82 (2d Cir. 2016) ("These allegations evince a common motive to conspire—increased profits and the projection of financial soundness—as well as a high number of interfirm communications."). Further, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole[;] and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1497, 1498 (S.D.N.Y. 1990) ("Where evidence even remotely tends to establish conspiracy, the trial court has wide discretion and must allow the jury to scrutinize the behavior of the defendant[s] in its entirety and understand the intent, motive, and method behind its activities."); *United States v. Ibrahim*, No. 07-CR-543 DLI SMG, 2011 WL 1868563, at *2 (E.D.N.Y. May 13, 2011) ("Even though motive does not bear directly on the elements of a charged crime, evidence offered to prove motive is commonly admitted.")

Plaintiff should be permitted to introduce evidence and make arguments about all of the group's coordinated conduct – including the leak-out agreement, the decision not to register the shares, and the press strategy – and the profit-seeking motive behind it.

## III.    Statements by SEG and Heyward

Although a small number of statements by SEG and Heyward were at issue in the motions in limine, there are far more statements that are likely to be at issue at trial. In fact, both Plaintiff and Defendants have designated large numbers of emails from SEG and Heyward as trial exhibits. *E.g.* PX 107, PX-165, PX-169, PX-172, PX-173, PX-174, PX-181, PX-187, PX-

The Honorable Arun Subramanian
June 3, 2026
Page 6


194, PX-204, PX-224, PX-239, PX-308.  As a result, we provide this briefing to aid the Court. Such statements will be admissible for several reasons.

**First**, as the Court determined in its summary judgment ruling, these communications are admissible for a non-hearsay purpose because they are group communications:

> [D]iscovery has uncovered a trove of messages between SEG, Heyward, and defendants in the lead up to the March 2020 transaction and afterwards….
>
> Defendants' initial response is that the documents are inadmissible as hearsay because they were authored by SEG or Heyward, neither of whom is a party to this suit. See, e.g., Dkt. 263 ¶¶ 31, 32, 35, 38, 42, 45–46. Defendants go on to say that even if the emails were admissible, they're nothing more than aggressive sales tactics. Defendants point to Augenbaum's own acknowledgement that "SEG will take whatever actions are necessary including misstating facts to make a sale" and characterizations of Heyward as a "schemer, a criminal, a dirtbag, and … a scumbag." See Dkt. 263 ¶¶ 3, 6.
>
> **On admissibility, the messages are relevant for a non-hearsay purpose, since a jury could find that their existence constitutes group communication**. That would not be hearsay. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *United States v. Cardascia*, 951 F.2d 474, 486–87 (2d Cir. 1991) (quoting Advisory Committee note to Fed. R. Evid. 801(c)) (cleaned up).
>
> That's also why defendants' attempt to impugn the credibility of SEG and Heyward doesn't undercut the messages' evidentiary value. Instead, the fact of Reda, Schecter, and Heyward's messages is enough to create a triable question as to whether defendants formed a group within the meaning of Section 13(d). Courts across the country have consistently held that communication between security holders can be evidence of an agreement. *See Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 2002 WL 31869391, at *9 (S.D.N.Y. Dec. 20, 2002); *Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 832–34 (N.D. Ill. 1987); *see also Wellman*, 682 F.2d at 363–364 (discussing solicitation of other participants and communication between participants as probative of existence of agreement). And the things SEG told defendants weren't innocuous details. For instance, ahead of the May 8, 2020 transaction, Reda wrote, "Whoever doesn't invest in this round their pro rata will not be invited in on any future GNUS deals 'as per the lead.'" Dkt. 226-11 at 73–74; *id.* at 78; *id.* at 81; *id.* at 84; *id.* at 88; *id.* at 91. Whether there really was a "lead" doesn't matter—what matters instead is that SEG

The Honorable Arun Subramanian
June 3, 2026
Page 7

> relayed the information it did to defendants and between them, presumably because the information was relevant to defendants' decision-making. That's a sufficient basis for a jury to determine defendants agreed to act together.

ECF 287 at 7-8. *See also United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 89 (2d Cir. 2014) ("An out-of-court statement offered for some other purpose, such as to show that a statement was made to demonstrate the statement's effect on the listener, or to show the circumstances under which subsequent events occurred is not hearsay."); *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1075 (2d Cir. 1988) ("[T]he instructions to Farino as to the manner in which Amfar was to conduct itself in the bid-rigging operation, and with whom it was to deal, were not hearsay but rather were properly admissible as a 'verbal act' describing the making or terms of the conspiratorial agreement.");*United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986) ("Lowery was not basing his defense on the truth of Fellouris's statements, but rather on the fact that they were made and that Lowery believed them to be true. Accordingly, the proffered testimony did not fit within the definition of hearsay."); *United States v. Ibrahim*, No. 07-CR-543 DLI SMG, 2011 WL 1868563, at *1 (E.D.N.Y. May 13, 2011), *aff'd*, 529 F. App'x 59 (2d Cir. 2013) ("These documents provide background as to Kadir's ties to Iranian revolutionary leadership, in addition to explaining the state of mind with which Kadir's trip to Iran was attempted-a non-hearsay purpose.")

Most or all of the communications between Defendants, SEG, and Heyward are admissible because they are evidence of group communications irrespective of whether the contents of the messages are independently truthful.

**Second**, communications between Defendants, Heyward, and SEG are not hearsay under Fed. R. Evid. 801(d)(2)(e), which governs statements by persons who coordinate with parties. This provision applies "when two people enter into a joint venture of conspiratorial nature" because "the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other." *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002). The "objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal at all." *Id.* As Wright & Miller explain:

> The key is coordinated action. As explained by one court, the hearsay exemption "embodies the long-standing doctrine that when two or more individuals are acting in concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal." Thus, "admissibility under Rule 801(d)(2)(E) does not turn on the criminal nature of the endeavor." "Instead, a statement may be admissible under Rule 801(d)(2)(E) if it is made in furtherance of a lawful joint undertaking."

30B Fed. Prac. & Proc. Evid. § 6778 (2026 ed.). *See also United States v. Musaibli*, 42 F.4th 603, 615 (6th Cir. 2022) ("When determining whether a conspiracy existed under Rule 801(d)(2)(E), '[t]he key is coordinated action'…. In fact, there need not even be a conspiracy

The Honorable Arun Subramanian
June 3, 2026
Page 8

charge in the case for Rule 801(d)(2)(E) to apply.") (quoting Wright & Miller); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 705 n.134 (S.D.N.Y. 2014) ("Rule 801(d)(2)(E) does not require that the technical elements necessary to obtain a conspiracy conviction all have been satisfied— only that the statements were made in furtherance of some joint purpose.")

The Rule's legislative history confirms as much: "'While (this) rule refers to a coconspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged.'" *Id.* (quoting S. Rep. No. 93-1277, 93d Cong., 2d Sess. 24, Reprinted in (1974) U.S. Code Cong. & Admin. News, pp. 7051, 7073).

In *United States v. Holland*, 117 F.4th 1352, 1357 (11th Cir. 2024), the Eleventh Circuit engaged in a lengthy and thoughtful analysis of Rule 801(d)(2)(e) and concluded that a coordinated boat trip falls within the section "in and of itself apart from the illegality of its purpose." The court explained that at least eight other circuits agree, including the Second Circuit. *Id.* (citing *Russo*, 302 F.3d at 45).

Rule 801(d)(2)(e) only applies if the court finds by a preponderance of the evidence that there was coordinated action and that the statements were made in furtherance of the conspiracy. *See United States v. Hwa*, No. 18-CR-538 (MKB), 2022 WL 901796, at *2 (E.D.N.Y. Mar. 27, 2022). In making this determination, the court may consider the hearsay evidence but there must be independent evidence as well. *Id.* "To be 'in furtherance' of a conspiracy, the statements must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy, as by, for example, providing information or reassurance to a coconspirator, seeking assistance from a coconspirator, or by communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).

The coordinated action justifying the admissibility of the evidence need not be the same coordinated action that is alleged in the underlying case, and **the declarant need not be a party to the case**. *See Russo*, 302 F.3d at 45; *Hwa*, 2022 WL 901796, at *2.

Further, once Rule 801(d)(2)(e) applies, the Second Circuit has held that "it follows that just as we do not demand personal knowledge for statements by a party's agent, we also do not require personal knowledge for co-conspirator statements." *United States v. Torres*, 124 F.4th 84, 99–100 (2d Cir. 2024). As a result, a co-conspirator's statement is admissible irrespective of whether there is any showing that the speaker had personal knowledge of the facts contained in the statement. *Id.*

Here, a sufficient showing has been made that **Defendants**, **Heyward**, **SEG**, and **SEG's agents** were engaged in the kind of coordinated action that warrants application of Rule 801(d)(2)(e). *First*, for all of the reasons set forth in the Court's summary judgment ruling, "there's quite a bit of evidence that defendants agreed to act together" (ECF 298 at 10), including "a trove of messages between SEG, Heyward and Defendants in the lead up to the March 2020 transaction and afterwards," *id.* at 7. There is "considerable evidence in the record of SEG

The Honorable Arun Subramanian
June 3, 2026
Page 9

informing defendants of each other's respective strategies and of certain defendants trading draft documents for the March 2020 PIPE." *Id.* at 11-12.

*Second*, there is all of the evidence set forth above in Section II of this letter that details how Defendants, SEG, and Heyward had to work very hard to get on the same page about how press releases were going to be issued, whether the shares were going to be registered, whether leak-out agreements were going to be signed, and when Defendants were going to be permitted to sell their stock.  In this case, Defendants did two extraordinary things that entailed a collective decision as to when and under what circumstances the Genius stock could be sold:  they decided not to register their shares – which absent a subsequent agreement required the stock to be held for six months – and then agreed in the leak-out agreements precisely when and under what terms they could sell their stock.  In other words, Defendants joined forces with respect to the core issue of when and how they would buy, hold, and sell their stock.

*Finally*, there are several glaring admissions by Defendants, Heyward, and SEG that are conclusive of Defendants' coordination in this case.  Most notably, Anson's admission that Defendants initially were at odds with each other on whether to register the shares but then "agreed" with each other not to register the shares because "we needed these investors."  PX-671.   Similarly,  with  respect  to  the  leak-out  agreements,  there  is  SEG's  admission  that "[e]veryone wants it so the stock doesn't get crushed."  PX-544.

Again, although we believe that Rule 801(b)(2)(e) is easily satisfied with the evidence detailed in this letter, there will be extensive additional evidence adduced at trial.

Defendants' coordination easily falls within Rule 801(d)(2)(e).  *See United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) (Holding that attendance and discussion at dinner was sufficient to show that two individuals "engaged in a common scheme to recruit [ ] business to their towns"); *United States v. Gewin*, 471 F.3d 197, 198, 200 (D.C. Cir. 2006) (Rule 801(d)(2)(e) satisfied where participants engaged "in a common enterprise of stock promotion," including a pump-and-dump); *United States v. Ferris*, No. CR-18-159-D, 2019 WL 3935102, at *6 (W.D. Okla. Aug. 20, 2019) ("The United States demonstrated some community of purpose among Dr. Ferris, Dossey, and Isbell – for example, to "ensure better service and care for [PAH] patients" by having their Schedule II prescriptions filled exclusively at the Wellston Clinic Pharmacy and delivering those prescriptions to the patients' homes.")

**Third**, SEG's statements are admissible under Fed. R. Evid. 801(d)(2)(c) and (d) because Heyward was a member of the group and SEG was "answerable" to Heyward.  *See Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992) (holding that statement of corporation's officer were admissible against the corporation's principal because the officer was "answerable" to the principal); *United States v. Goldstein*, No. 21 CR. 550 (DC), 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023) ("Because Goldstein's subordinate Dennis Barrett 'reported directly' to Goldstein, he is an agent within the meaning of the exception[.]"); *Miltland Raleigh-Durham v. Myers*, 807 F. Supp. 1025, 1052 (S.D.N.Y. 1992) (admitting testimony of co-conspirator's agent).

Here, there is no dispute that SEG reported to Heyward, who was both CEO of Genius and a major shareholder.  On September 6, 2019, in discussing whether Iroquois should be permitted to invest in Genius, SEG writes to Heyward, "That's your call.  Not ours.  If he wants

The Honorable Arun Subramanian
June 3, 2026
Page 10

in we can't say no.  You can."  PX-72 at 1.  A few days later, after consulting with Brio, Heyward instructed SEG to structure an investment in which investors would not receive warrants.  PX78 at 2-3.  On September 25, Heyward instructs SEG to call Brio to discuss an investment in Genius.  PX-104.  On March 20, 2020, SEG asked Heyward, "Do I have permission from the company to build an order book at $0.2568 common only?"  PX-212 at 1.

For all of these reasons, the messages between and among Defendants, SEG, and Heyward are admissible.

Respectfully submitted,

/s/ Evan Mandel

Evan Mandel

cc:    Counsel of Record
       (via ECF)