**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD AUGENBAUM, <br><br> Plaintiff, <br><br> v. <br><br> BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; EMPERY ASSET MANAGEMENT, LP; <br><br> Defendants, <br><br> -and- <br><br> KARTOON STUDIOS, INC., <br><br> Nominal Defendant. | Civil Action No. 1:22-cv-00249-AS <br><br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF BRIO CAPITAL MASTER FUND LTD.**
**AND BRIO SELECT OPPORTUNITIES FUND, LP'S RULE 50(a)**
**MOTION FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STANDARD OF REVIEW FOR A RULE 50(a) MOTION FOR JMOL ................................ 4

ARGUMENT ........................................................................................................................... 5

I.   The Court Should Enter JMOL in Favor of Brio on Plaintiff's Section 16(b) Claim ...... 5

    A.   Plaintiff Must Prove Existence of "Group" Under Section 13(d) to Prevail on its Section 16(b) Claim ................................................................................................................ 5

    B.   Plaintiff's Evidence Demonstrates Routine Communications ............................................ 8

    C.   Parallel Agreements with the Same Terms Are Not Evidence of a Group ...................... 14

    D.   Brio Did Not Act in Furtherance of a Common Objective .............................................. 15

    E.   Holmes' Testimony Cannot Support a Jury Verdict in Plaintiff's Favor ......................... 19

    F.   Holmes' Testimony Alone is not Sufficient ..................................................................... 21

    G.   Holmes' Testimony Is Irrelevant to the Group Inquiry ................................................... 21

    H.   Plaintiff's Case Cannot Rely Entirely on Holmes' Testimony ........................................ 23

    I.   Plaintiff's JMOL Improperly Cites to the Record ............................................................ 25

CONCLUSION .......................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Aghaeepour v. N. Leasing Sys., Inc.*,
763 F. Supp. 3d 580 (S.D.N.Y. 2025), *aff'd*, No. 25-548, 2026 WL 1183399 (2d Cir. Apr. 29, 2026) ................................................................................................................................ 5

*Augenbaum v. Anson Invs. Master Fund LP*,
No. 22-CV-249 (AS), 2025 WL 2780854 (S.D.N.Y. Sept. 30, 2025) ........................... 6, 7, 8, 14

*Chechele v. Scheetz*,
819 F. Supp. 2d 342 (S.D.N.Y. 2011), aff'd, 466 F. App'x 39 (2d Cir. 2012) .......................... 14

*Corenco Corp. v. Schiavone & Sons, Inc.*,
488 F.2d 207 (2d Cir.1973) .............................................................................................. 7

*Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers*,
34 F.3d 1148 (2d Cir. 1994) ............................................................................................. 4

*Foremost–McKesson, Inc., v. Provident Secs.*,
423 U.S. 232 (1976)........................................................................................................... 6

*Freeman v. HSBC Holdings PLC*,
57 F.4th 79 (2d Cir. 2023) .............................................................................................. 17

*GAF Corp. v. Millstein*,
453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972) .............................................. 16

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
136 F.3d 276 (2d Cir. 1998) ............................................................................................ 4

*Greenberg v. Hudson Bay Master Fund Ltd.*,
2015 WL 2212215 (S.D.N.Y. May 12, 2015) ............................................................... 16

*Gwozdzinsky v. Zell/Chilmark Fund, L.P.*,
156 F.3d 305 (2d Cir. 1998) ........................................................................................... 6

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
104 F. Supp. 2d 169 (S.D.N.Y. 2000) ..................................................................... 17, 20

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    No. 00 Civ. 01115 (LAK) (S.D.N.Y. Feb. 23, 2001), aff'd 286 F.3d 613 (2d Cir. 2002) ......... 18

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 544 (S.D.N.Y. 2014) ................................................................................. 15

*Litzler v. CC Invs., L.D.C.*,
    411 F. Supp. 2d 411 (S.D.N.Y. 2006) ........................................................................... passim

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.,*
    223 F.Supp.2d 435 (S.D.N.Y. 2001) ..................................................................................... 7

*Morales v. Quintel Ent. Inc.*,
    249 F.3d 115 (2d Cir. 2001) ........................................................................................... 11, 16

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) ................................................................................................. 17

*Nano Dimension Ltd. v. Murchinson Ltd.*,
    681 F. Supp. 3d 168 (S.D.N.Y. 2023), aff'd, 102 F.4th 136 (2d Cir. 2024) ..................... 7, 15

*Nike, Inc. v. Lululemon USA Inc.*,
    23-cv-771 (AS), 2026 WL 879089 (S.D.N.Y. Mar. 31, 2026) ............................................. 4

*Roth v. Armistice Cap.*, LLC,
    2025 WL 2471028 (2d Cir. 2025) ........................................................................................ 5

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ................................................................................................ 7

*Rubenstein v. Int'l Value Advisers, LLC*,
    363 F. Supp. 3d 379 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020) ......................... 7

*Rubenstein v. Int'l Value Advisers, LLC*,
    959 F.3d 541 (2d Cir. 2020) ................................................................................................ 6

*S.E.C. v. Treadway*,
    438 F. Supp. 2d 314 (S.D.N.Y. 2006) ................................................................................. 5

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*,

    115 F. Supp. 2d 440 (S.D.N.Y. 2000) ...................................................................................... 7, 9

*Transcon Lines v. A.G. Becker Inc.*,

    470 F. Supp. 356 (S.D.N.Y. 1979) ............................................................................................ 16

*Wellman v. Dickinson*,

    475 F. Supp. 783 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355 (2d Cir. 1982)...................................... 7

*Wellman v. Dickinson*,

    682 F.2d 355 (2d Cir. 1982) ....................................................................................................... 6

*Wimmer v. Suffolk Cty. Police Dep't*,

    176 F.3d 125 (2d Cir. 1999) ....................................................................................................... 4

**Statutes**

15 U.S.C. § 78m(d) ........................................................................................................................ 1

15 U.S.C. § 78p(b) ..................................................................................................................... 1, 6

**Other Authorities**

Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release

    No. 34-14692, 43 Fed. Reg. 18,484 (Apr. 28, 1978) ................................................................ 17

Modernization of Beneficial Ownership Reporting, Exchange Act Release

    No. 94211, 87 Fed. Reg. 13,846 (Feb. 10, 2022)...................................................................... 17

**Rules**

Fed. R. Civ. P. 50(a) ................................................................................................................... 1, 4

Fed. R. Civ. P. 50(a)(2) ................................................................................................................. 4

**Treatises**

Peter J. Romeo & Alan L. Dye,

    Section 16 Treatise and Reporting Guide § 2.03 (2024 ed.)..................................................... 16

Defendants Brio Capital Master Fund Ltd ("Brio Master") and Brio Select Opportunities Fund, LP ("Brio Select," and together with Brio Master, collectively "Brio"), by and through their undersigned counsel, respectfully submit this Brief in support of Brio's Motion for Judgment as a Matter of Law ("JMOL") pursuant to Fed. R. Civ. P. 50(a).

## PRELIMINARY STATEMENT

The trial record is bereft of evidence supporting Plaintiff's claim under 15 U.S.C. § 78p(b) ("Section 16(b)"). Plaintiff concedes, as he must, that neither the Empery Defendants[1] nor Brio are covered persons under the language of Section 16(b); instead, Plaintiff argues that Brio joined a "group" as defined by 15 U.S.C. § 78m(d) ("Section 13(d)"). However, Plaintiff has offered none of the required proof of group activity required by Section 13(d); instead, Plaintiff points merely to (1) Brio's knowledge of, and comments on, a draft term sheet regarding an investment in Genius Brands International ("Genius"); (2) Brio's having entered into a securities purchase agreement dated March 11, 2020 (the "March 2020 SPA"); (3) Brio's having purchased shares in several registered direct offerings by Genius in the late spring and early summer 2020; (4) Brio's having entered into two agreements (the "Leak Out Agreements") offered by Genius whereby (i) Genius registered the common shares underlying the securities purchased in the March 2020 SPA, and (ii) Brio agreed to restrict the number of such registered shares it could sell in open-market transactions for a defined period of time under defined price terms; and (iii) Brio's sale of approximately 80% of its holdings of Genius' common stock in June and July 2020. None suffices under the law.

Put another way, Plaintiff has adduced at trial only a series of communications and executed agreements demonstrating the existence of parallel transactions as permitted by law.

---

[1] The "Empery Defendants" shall mean Empery Asset Master, LTD, Empery Debt Opportunity Fund, LP, Empery Tax Efficient LP, Empery Asset Management, LP.

1

Plaintiff offers no actual "coordination" to establish that the purported group members came together for a single purpose, but rather has established that several investors communicated about the terms of a securities offering that each agreed to join pursuant to an independent investment decision. As the party bearing the burden of proof, Plaintiff fails to clear the bar for establishing that Defendants were a Section 13(d) group, and thus Defendants cannot be found to bear any Section 16(b) liability.

Plaintiff relies heavily on Brio's execution of investment documents. But signing the same documents and participating in the same financing transactions as other investors is paradigmatic "parallel activity" and insufficient, without more, to form a group. Plaintiff *does not offer more*: there is no evidence that those agreements reflect impermissible levels of coordination among investors beyond negotiating the terms of those transactions, leaving them as they appear on their face, namely perfectly permissible bilateral dealings with Genius.

Likely realizing the paucity of its evidence, Plaintiff posits that while *entry* into the parallel agreements may be permissible, pre-execution communications are not, and points to Brio's communications and awareness of other investors' activities prior to finalization and execution of the March 2020 SPA. This offers no succor to Plaintiff's case, because at most, these show that Brio was informed about, or exposed to, other investors' positions, which *does not suffice* to form a group. The law is clear that, standing alone, communications among investors or their lawyers and awareness of other investor's activities with respect to the terms of the transactions at issue do not establish a group absent *more*. Plaintiff never provides "more"; the record contains no such activity or agreement—only isolated, informational exchanges consistent with ordinary market practice (as reflected in the unrebutted testimony of Special Equities Group ("SEG"), the placement agents Genius hired to effectuate the March 2020 SPA).  Plaintiff adduced evidence and

testimony regarding Brio's having provided comments on a draft term sheet from Anson, but providing feedback on pricing, allocation, or structure of a proposed transaction—especially where the party providing feedback has blocking rights over the transaction—is standard diligence and negotiation. Even Plaintiff's own expert conceded that commenting on price or quantity regarding proposed deal terms is customary. Such conduct reflects independent evaluation of an investment opportunity, not a commitment to joint action.

In the end, despite testimony from five witnesses and hundreds of documents offered into evidence, Plaintiff's *proof* of actual coordination is entirely absent. There are no communications between Brio and alleged group members reflecting joint strategy, and no agreements (written or oral) to acquire, hold, vote, or dispose of securities together. Plaintiff posits that Brio and potentially Heyward came to an agreement as to a "no short-selling" requirement for Genius' financings, but (a) Anson's January 2020 term sheet does not prohibit short-selling, and (b) the March 2020 SPA specifically permits short-selling in the future. No documents have been offered which show more than Brio's negotiation over, or acceptance of, the terms of a proposed parallel transaction; no testimony has been elicited from anyone with personal knowledge that Brio acted as part of a group, or had the intent to form one. The only documents speaking directly to group formation *specifically disclaim* the possibility; the only testimony about group formation *specifically disclaims* that Brio (or Empery, or Anson) intended to, and did, form or join a group. All record evidence shows that Brio evaluated certain economic opportunities, asked questions about the terms, attempted to negotiate those terms to ensure equal treatment under those terms, and then independently decided to enter parallel transactions, all within the bounds of the law. All testimony corroborates that evidence. The supposition Plaintiff offers to the contrary is not enough

3

to establish a Section 13(d) group, and thus Brio is entitled to judgment as a matter of law on Plaintiff's Section 16(b) claim.

## STANDARD OF REVIEW FOR A RULE 50(a) MOTION FOR JMOL

Rule 50(a) of the Federal rules of Civil Procedure allows a defendant to, at any time before the case has been submitted to the jury, to move for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a); *Nike, Inc. v. Lululemon USA Inc.*, 23-cv-771 (AS), 2026 WL 879089, at *2 (S.D.N.Y. Mar. 31, 2026) (Subramanian, J.)*; see also Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999). The Court "should render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Nike, Inc.*, 2026 WL 879089, at *2.

Rule 50(a) does not define the level of specificity needed for the motion, but the purpose of the motion is to articulate the ground on which JMOL is sought to allow the other party to cure the defects in proof that might otherwise preclude him from taking the case to the jury. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (citing Fed. R. Civ. P. 50(a)(2)). In other words, "the JMOL … must at least identify the specific element that the defendant contends is insufficiently supported." *Id.* (citing *Cruz v. Loc. Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994)).

The JMOL movant must then show that either: "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Id.* (granting JMOL where evidence of retaliation against employee, adverse working conditions, and ultimate discharge based on gender was insufficient to submit to the jury); *see also S.E.C. v.*

4

*Treadway*, 438 F. Supp. 2d 314, 316 (S.D.N.Y. 2006) (movant must "demonstrate there is such an overwhelming amount of evidence in favor of movant that reasonable and fair minded persons could not arrive at a verdict against it.").

The Rule 50(a) "standard mirrors that for summary judgment—i.e., that the court must draw all reasonable inference in favor of the nonmoving party without making credibility determinations or weighing the evidence." *Aghaeepour v. N. Leasing Sys., Inc.*, 763 F. Supp. 3d 580, 587 (S.D.N.Y. 2025), *aff'd*, No. 25-548, 2026 WL 1183399 (2d Cir. Apr. 29, 2026).  However, courts in this Circuit recognize that, "though all inferences are to be drawn in the non-movant's favor, an inference is not a suspicion or a guess." *Id.* (cleaned up).  Accordingly, JMOL is appropriate when there is "a complete absence of probative facts to support the conclusion reached," as the jury "can give no deference to impermissible speculation." *Id.* (cleaned up) (observing that Courts may not afford deference to "[e]ven reasonable speculation," such as "where a factfinder concludes that a disputed fact is possible, but that conclusion is premised on a fact that is not known." *Id.* (cleaned up). As Plaintiff's case distills to an insistence that Defendants <u>had to have</u> formed a group, rather than evidence *that they intended to and did form one*, these standards are satisfied and Brio is entitled to judgment as a matter of law.

## **ARGUMENT**

## I.  THE COURT SHOULD ENTER JMOL IN FAVOR OF BRIO ON PLAINTIFF'S SECTION 16(B) CLAIM

### A.  <u>Plaintiff Must Prove Existence of "Group" Under Section 13(d) to Prevail on its Section 16(b) Claim</u>

"Congress enacted Section 16(b) to prevent the unfair use of information which may have been obtained by a statutory insider." *Roth v. Armistice Cap.*, LLC, 2025 WL 2471028, at *3 (2d Cir. 2025) (cleaned up). "Section 16(b) thus imposes strict liability on statutory 'insiders'—namely,

'beneficial owners, directors, and officers,'—requiring them to disgorge profits when the insider purchases and sells an issuer's stock within a six-month period (so-called 'short-swing profits' from 'matching transactions')." *Id.* (quoting 15 U.S.C. § 78p(b)).

To establish liability under Section 16(b), a plaintiff must, by a preponderance of the evidence, demonstrate that a defendant was a beneficial owner of more than 10% of the issuer's equity securities before the short-swing transaction occurred. *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 414 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78p(b)). The statute defines short-swing trading as any purchase and sale, or any sale and purchase, of any equity security of such issuer within any period of less than six months. *Id.* (citing *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998)). The shareholder "must be a 10% beneficial owner before the short-swing transaction" to be subject to the statute's liability provisions. *Id.* (citing *Foremost–McKesson, Inc., v. Provident Secs.*, 423 U.S. 232, 249–50 (1976)).

In turn, Section 13(d) provides that "[w]hen two or more persons act as a ... group for the purpose of acquiring, holding, or disposing of securities of an issuer," the group shall be deemed a 'person' subject to Section 16(b)." *Rubenstein v. Int'l Value Advisers, LLC*, 959 F.3d 541, 544 (2d Cir. 2020); *see also Augenbaum v. Anson Investments Master Fund LP, et al.*, No. 22-cv-249 (AS) Trial Transcript ("Trial Tr.") at 67:14-17 ("[A] group exists when two or more persons intentionally agree to act together for the purpose of acquiring, holding, voting, or disposing of the issuer's securities.").

With respect to formation of the purported group, "[a]greement is key." *Augenbaum v. Anson Investments Master Fund LP, et al.*, No. 22-cv-249 (AS), ECF No. 287, at 7 (S.D.N.Y. Sep. 30, 2025) (citing *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) ("[T]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a

6

common objective."); *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007) (same) (cleaned up); *Rubenstein v. Int'l Value Advisers, LLC*, 363 F. Supp. 3d 379, 391 (S.D.N.Y. 2019), *aff'd*, 959 F.3d 541 (2d Cir. 2020) (same) (cleaned up).

The Second Circuit has made clear that, absent an *intentional* agreement, a group does not exist. *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 115 F. Supp. 2d 440, 443 (S.D.N.Y. 2000) (citing *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir.1973)); *see also Wellman v. Dickinson*, 475 F. Supp. 783, 830 (S.D.N.Y. 1979), *aff'd*, 682 F.2d 355 (2d Cir. 1982) (stating that Section 13(d) requires "a showing of an agreement to act together for a common purpose.") (cleaned up).

Participation in parallel investments does not establish a group under Section 13(d). *Augenbaum v. Anson Invs. Master Fund LP*, No. 22-CV-249 (AS), 2025 WL 2780854, at *8 (S.D.N.Y. Sept. 30, 2025) (citing *Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 182 (S.D.N.Y. 2023)) ("Allegations of parallel investment decisions or pre-existing relationships also do not suffice to plead a group."), *aff'd*, 102 F.4th 136 (2d Cir. 2024); *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006) ("General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'") (citing *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F.Supp.2d 435, 449 (S.D.N.Y. 2001). This is true even where the investors in a parallel transaction appoint a lead draftsperson and coordinate the negotiation and preparation of the transaction documents. *Litzler*, 411 F. Supp. 2d at 415; *see also* Trial Tr. at 67:23-25, 68:1-8)

> ("[T]ransactions between an issuer and multiple investors — sometimes called parallel transactions — are common place. Mere parallel investment activity, such as signing the same investment documents or purchasing the same stock at the same time as part of the same transaction with an issuer, ordinary business relationships, communications among investors or their lawyers, or awareness of each other's activities without an intentional agreement to act together in furtherance of a

7

common objective is insufficient. Without more, a group is not formed by parallel, but in independent investment decisions.").

This Court specifically cautioned that, even on the full summary-judgment record in this case, "it's not certain …that, as a matter of law, defendants really did act as a group, rather than make parallel investments in Genius [,which] would not qualify as group behavior." *Augenbaum v. Anson Invs. Master Fund LP*, 2025 WL 2780854, at *5 (S.D.N.Y. Sept. 30, 2025) (ECF No. 287) (internal quotations omitted). This trial is materially narrower in scope and now turns only on the body of proof against the two remaining Defendants— Brio and Empery. Whatever the record may once have suggested as to other purported group members, Plaintiff's case in chief at trial has failed to evidence that Brio formed or joined a group, and thus has done nothing to overcome the very uncertainty the Court identified nine months ago.

### B. **Plaintiff's Evidence Demonstrates Routine Communications**

Plaintiff has presented evidence that (1) the placement agent for Genius, Special Equities Group ("SEG"), relayed investor demands, comments, and questions to other investors and potential investors regarding both Anson's January 2020 term sheet and the final deal documents for the March 2020 SPA; and (2) the investors in the March 2020 SPA and subsequent offerings entered into parallel agreements containing the same terms. Pointedly, whatever comments and questions Brio had with respect to Anson's term sheet *were not viewed* by those with knowledge as any kind of agreement to invest in the proposed transaction; the evidence introduced at trial shows that while on January 14, 2020, Brio noted that it "would do" an investment of approximately $650,000 to $700,000 *if* Brio could place up to an additional $1,000,000 in the proposed deal (specifically regarding a term sheet Brio had not offered to sign, was not expected to sign, never did sign, and was non-binding upon Anson, which did sign it), when SEG was shopping the deal to other potential investors ten days later, Brio was not even listed in SEG's

8

"shadow order" book. *See* PX-181; PX-221. A reasonable jury could not find that Brio had intentionally agreed to be part of a group based on this evidence.

Despite Plaintiff's best efforts to paint certain communications from SEG as improper, the evidence presented in Plaintiff's case in chief demonstrates nothing more than standard communications between a placement agent and investors. As Plaintiff's expert Mr. Holmes testified, the placement agent is "the middleman who's helping the company raise the money from a small group of investors." *See* Trial Tr. at 189:15-16. That role necessarily required SEG to communicate with the investors about other investors' demands, questions, and comments in order to fulfill its mandate of "fill[ing] the book", or sourcing investment funds from sufficient investors to raise the aggregate amount of capital Genius needed. *See* Trial Tr. at 382:25-383:18. As Mr. Nathoo testified, "[T]he process to get to one set of terms that everyone agrees to sometimes takes back and forth negotiation, and so we were provided feedback by SEG saying: We can't fill up the book, but if we change these terms, perhaps we can get more investors." *Id.* at 383:9-13.

That the Defendants "were brought together at the behest of and for the benefit of [Genius] during a private placement . . . effectuated through a placement agent" is not enough to demonstrate the existence of a group for the purposes of Section 16(b). *Schaeffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 115 F. Supp. 2d 440, 443-44 (S.D.N.Y. 2000) (allowing complaint to proceed "would have a chilling effect on the world of private finance"). As the court recognized in *Litzler*, negotiations involving a placement agent do not support the existence of a group without evidence that the investors agreed to act together. *Litzler*, 411 F. Supp. 2d at 415. To the extent Plaintiff points to the existence of the SEG-facilitated negotiations as evidence of impermissible group formation, the negotiations between the parties in *Litzler*, where no group existed as a matter of law, were far more extensive than the negotiations to which Plaintiff points in the instant action.

9

The SEG communications Plaintiff cites simply do not pass muster. As Mr. Holmes testified, "the normal way to do it" is to negotiate a PIPE transaction "through [a] placement agent[.]" Trial Tr. at 294:9-15. Plaintiff has tried to fit a square peg into a round hole by suggesting that Defendants were sending messages to other investors through SEG and that those communications are somehow evidence of group activity. *E.g.*, Trial Tr. at 725:4-11; 892:2-6. In reality, these kinds of communications are necessary (and commonplace) to facilitate complex PIPE transactions with multiple investors. *See* Trial Tr. at 383:6-8 (Nathoo) (testifying that investors "want their own terms in the deal"); at 494:1-15 (Nathoo) (testifying that investor feedback is necessary to avoid spending time and money on documents for a deal that no one wants to agree to); Trial Tr. at 709:2-8 (Hirsch) ("They were doing their job as placement agents just trying to get the deals to work."); Trial Tr. at 970:10-20 (Lane) (testifying that "clarifying the terms of the transaction documents" through SEG was "important" to make sure "everyone that's involved in the transaction understands how the transaction documents work"); Trial Tr. at 1099:23 (Reda) ("[T]he final docs can go through many investors.").

For example, it is impossible to square Plaintiff's argument that Brio's being privy to Anson's draft term sheet before it was finalized vis-à-vis Genius—a foundational element of Plaintiff's argument that Brio formed a group with Anson—with the possibility set forth in *Litzler* of the parallel investors appointing a lead drafter. *See Litzler*, 411 F. Supp. 2d at 415. Put plainly, if investors being privy to pre-final terms is itself evidence of a group, then *Litzler*'s reference to the permissibility of a lead drafter for deal documents cannot mean what it says; if, however, a lead drafter is permissible without triggering Section 13(d) group formation, then communications about pre-final deal terms among potential investors *must* be permissible, or else no lead drafter would be possible.

10

Plaintiff has not demonstrated that Brio's communications are evidence of group activity. At best, they show Mr. Hirsch's awareness of the terms of certain proposed transactions, and (at times unsuccessful) attempts to negotiate same; under the law, no such communications are evidence that Mr. Hirsch came together with another investor for a single purpose sufficient to form a Section 13(d) group.  *See* PX-181, PX-691, PX-187.

Plaintiff has shown, and Brio does not contest, that it was aware of Anson's activities as it relates to the October 2019 Registered Direct and that Anson was aware of Brio's attempted bridge transaction in the fall of 2019. Yet those communications do not even relate to the March 2020 PIPE transaction or any deal in which Anson and Brio actually participated, and even if they did, they are not sufficient to show Brio was a part of a group for purposes of 13(d). To begin, there is a series of communications where Mr. Hirsch is informed of and asked to consent to what would ultimately become of Mr. Nathoo's October 2019 Registered Direct. *See* PX-63. Brio subsequently considered participating that transaction, but ultimately decided not to do.  *See, e.g.* PX-69, PX-76. Mr. Hirsch was copied on an email thread on September 25, 2019, with Mr. Nathoo, but Mr. Hirsch never responded to that thread. *See* PX-102. Even when these exhibits are viewed in the light most favorable to Plaintiff, the outcome remains the same. Brio was initially informed of Mr. Nathoo's proposed registered direct because, as a result of Brio's pre-existing ownership of certain Genius securities, Brio needed to waive certain rights to enable that registered direct to move forward. *See* Trial Tr. at 1132:25-1133:1-3; Trial Tr. at 634:2-6; Trial Tr. at 697:1-4. Brio did not participate in the October 2019 Registered Direct that is the subject of PX-63 and PX-102 (Trial Tr. at 704:3-5) and thus, could not have "acted" in "furtherance" of a "group" whose purpose was that transaction. *Compare Morales v. Quintel Ent. Inc.*, 249 F.3d 115, 119-126 (2d Cir. 2001).

Plaintiff offers only a base insistence to the contrary, untethered from law or facts adduced in this trial. It does not suffice.

Even when these exhibits are viewed in the light most favorable to Plaintiff, the outcome remains the same. Brio did not participate in the October 2019 Registered Direct that is the subject of PX-63 and PX-102 (Trial Tr. at 704:3-5) and thus could not have formed a group with respect thereto.

Additionally, Mr. Lane, Mr. Nathoo, and Mr. Hirsch all testified that they did not talk to one another about their investment decisions. *See* Trial Tr. at 994:19-21, 998:8-22 (Lane); Trial Tr. at 641:12-22 (Nathoo); Trial Tr. at 830:14-19 (Hirsch). In fact, Mr. Hirsch testified that he had never even met Mr. Lane until this case was filed. *See* Trial Tr. 830:4-6 (Hirsch). The communications between SEG and the investors cannot fill this crucial evidentiary gap and, given the common-place and non-group-forming nature of the parallel transactions SEG was engaged to negotiate for Genius, those communications certainly could not serve as the basis for a reasonable jury's finding that Brio was part of a group.

Likewise, Plaintiff showed that Brio was provided a copy of Anson's draft term sheet (unprompted) by SEG on January 14, 2020 (together with the draft term sheet provided to Brio later that day and the signed January 22, 2020 term sheet (PX-202), the "January Term Sheets"), before the Company had agreed to those terms. The record is clear that Brio was sent the draft term sheet because without Brio's consent to the proposed terms, no deal could happen. Trial Tr. 1132:25-1133:1-3 (Reda); Trial Tr. 1355:4-24 (Schechter). Even if it was somehow "unusual" that Brio was provided with such an early draft of the term sheet (and under the circumstances, it was not), it is clear that (1) Brio's actual comments show there was no coordination between Brio and

12

Anson; and (2) even after Anson and GNUS signed the "final" term sheet, Brio had not actually agreed to participate in the deal, let alone join any supposed group. *See* PX-221 and PX-172.

Plaintiff claims that Brio's comments and questions concerning the January Term Sheets somehow supports his contention that Brio coordinated with Anson. Specifically, Plaintiff cites three emails from Mr. Hirsch concerning the term sheets, none of which show coordination or give rise to an inference that Brio agreed to act in furtherance of a common purpose. *See* PX-172, PX-173, PX-181, PX-188, PX-194.

The first email was sent by Joe Reda on January 14, 2020, and purports to contain Mr. Hirsch's comments to the draft term sheet. *See* PX-172 and PX-173.  As an initial matter, is unclear if Mr. Hirsch's comments are interlineated with Mr. Reda's own take on them, but even if all the "comments" came from Mr. Hirsch, they are still insufficient.  *See* Trial Tr. at 1142:8-11.  The first comment is a *question* whereby Mr. Hirsch seeks clarification of "what happens if there's no recap deal." *See* PX-173. Such a question merely evidences that Mr. Hirsch was doing his due diligence to try to understand the proposed deal prior to agreeing to invest in it (or waive his rights to allow the deal to go forward without Brio).  The second comment was a request that Brio receive the same terms as Anson, specifically a right of participation. Given that the record is replete with evidence that, by definition, investors agree to the *same terms* in a parallel transaction (Trial Tr. at 191:20-23; 578:16-25, 579:13-16; and 762:5-13), Brio's request does not support an inference that it sought to, or did, impermissibly coordinate with Anson.

Next, Plaintiff cites an email where Mr. Hirsch tells SEG on January 14, 2020, that Brio "would do [its] 650k-700k, but I want to know that I can place [an additional] $1mm into the debt deal. Anson should be ok with that- so let's clear that first." *See* PX-181; Trial Tr. at 719:1-9

13

(Hirsch). [2] This, too, is ordinary course activity for negotiating a parallel transaction, and Plaintiff's own expert testified that communications about price and quantity are not evidence of coordination. *See* Trial Tr. at 196:1-19 (Holmes). Finally, Plaintiff cites an email on January 18, 2020, where Mr. Hirsch emails a list of questions about the term sheet to SEG. *See* PX-194.[3] Again, Mr. Hirsch is not "coordinating" with Anson, he is requesting clarification of terms of a deal he is being asked to either invest in or waive his rights to allow to happen. This is also insufficient to establish that Brio acted in furtherance of a common purpose with respect to Genius' securities.

The proffered communications with SEG do not establish that Brio formed, or joined, a Section 13(d) group.

## C. Parallel Agreements with the Same Terms Are Not Evidence of a Group

This District held that investors who entered into parallel, but separate, agreements cannot give rise to a violation of Section 16(b).[4] *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 349 (S.D.N.Y. 2011), aff'd, 466 F. App'x 39 (2d Cir. 2012); *Litzler v. CC Investments, L.D.C.*, 411 F. Supp. 2d 411, 416 (S.D.N.Y. 2006) ("Private offerings of securities generally involve common purchase

---

[2]    Notably, SEG did not view this as any kind of commitment, no matter how soft, with respect to Brio's participation in the proposed transaction; ten days later, on January 24, 2020, Mr. Reda pitched the parallel transaction to CVI and listed a "shadow order book" that *did not include Brio*. *See* PX-221.

[3]    The next chronological exhibit in evidence pertaining to Brio is dated March 10, 2020, and is the Amendment, Waiver and Consent for the final deal documents regarding the March 2020 SPA (PX-399); Brio simply *was not involved* in any of the negotiations or discussions about the terms of the March 2020 SPA between its last questions about Anson's still-unfinalized term sheet on January 18, 2020, and final execution of the March 2020 SPA on March 11, 2020.

[4]    Plaintiff has shown, and Brio does not contest that it signed key investment documents—but that is not sufficient to show Brio was a part of a group for purposes of 13(d) . For example, on March 10, 2020, Brio signed the Amendment, Waiver, and Consent. *See* PX-399; *see also* PX 401. On March 11, 2020, Brio signed the Genius Securities Purchase Agreement. PX-387 at 161. On March 13, 2020, Brio entered into the Master Netting Agreement with Genius. PX-403 at 14. On March 22, 2020 Brio entered into another Securities Purchase Agreement with Genius. PX-403 at 43. On May 18, 2020, Genius and Brio entered into a Leak Out Agreement. PX-569, PX-576. Finally, on June 23, 2020, Genius and Brio entered into another Leak Out Agreement. But signing the same investment documents or purchasing the same stock at the same time as other investors is not sufficient to establish that Brio agreed to act in furtherance of a common objective with regard to Genius' securities. *See Augenbaum v. Anson Invs. Master Fund LP*, No. 22-CV-249 (AS), 2025 WL 2780854, at *5 (S.D.N.Y. Sept. 30, 2025) ("If the only evidence in the record were the investment agreements themselves, Augenbaum might have a hard row to hoe.").

agreements with subscribers."). Plaintiff offers nothing distinguishing about the transactions at issue in this case; each Defendant entered into separate parallel agreements, including securities purchase agreements and leak-out agreements. *See Litzler*, 411 F. Supp. 2d at 415 ("General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'"); *see also Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 182 (S.D.N.Y. 2023) ("allegations of parallel investment decisions or pre-existing relationships also do not suffice to plead a group," finding no 13(d) group); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 544, 552-53, 555 (S.D.N.Y. 2014) (dismissing Section 16(b) claims). Plaintiff has not established that these agreements alone create a Section 16(b) group.

The March 2020 SPA contained a provision regarding the Independent nature of buyer's obligations and rights that the "obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any Buyer under any Transaction Documents." *See* Trial Tr. at 332:23–333:4. The March 2020 SPA also disclaimed that the investors were acting as a group. *See* PX-387.

As Plaintiff's own expert testified, the purpose of a leak-out agreement "is to put a cap on how many shares are dumped onto the market at any moment in time" and that it was a "win-win" for Genius. Trial Tr. at 326:7–8; 326:13–14 (Holmes). Moreover, each of the leak-out agreements were "signed individually by individual investors." *Id.* at 326:21–22.

### D. **Brio Did Not Act in Furtherance of a Common Objective**

Section 13(d) was added to the Exchange Act in 1968 as an "'early warning' mechanism to alert the investing public when a person or group of persons accumulates a significant position in the issuer's securities, signaling a potential shift in corporate control." Peter J. Romeo & Alan

L. Dye, Section 16 Treatise and Reporting Guide § 2.03 (2024 ed.) ("Romeo & Dye") (citing *GAF Corp. v. Millstein*, 453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972)).  Congress adopted the group concept to "prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute."  Romeo & Dye § 2.03 (quoting H.R. Rep. No. 1711, 90th Cong. (1968)); *accord CSX*, 654 F.3d at 282; *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (statute serves to "alert investors to potential changes in corporate control").

It requires that defendants "combine" to "act in furtherance of a common objective," *CSX*, 654 F.3d at 283, a combination *of beneficial ownership*—voting or investment power.  When the Second Circuit held in *Wellman* that the touchstone of a "group" was a "combination to act in furtherance of a common objective," it necessarily meant a "combination [of beneficial ownership] in furtherance of a common objective."  682 F.2d at 363; see *CSX*, 654 F.3d at 284 (group members must act as a "single unit"); *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 373 (S.D.N.Y. 1979) (definition was designed to capture classic change-of-control scenario: activist investors who band together to pursue, pressure, or take over a company, pooling economic and voting power in service of a shared corporate agenda).

Plaintiff's lead authorities confirm this.  In *Morales v. Quintel Ent. Inc.*, a sales agreement with extended lock-up provisions among three shareholders of a closely held company suggested "that [defendants] reached a mutual agreement with respect to holding and disposing of shares"— an agreement relating to their joint beneficial ownership. 249 F.3d at 119, 126. And in *Greenberg v. Hudson Bay Master Fund Ltd.*, the defendants jointly incorporated a Bitcoin start-up, pooled the issuer's convertible notes and cash to fund its assets, and sold it for new convertible preferred stock.

16

2015 WL 2212215, at *3, *6 (S.D.N.Y. May 12, 2015). Both cases turned on joint beneficial ownership, not mere parallel cooperation.

Cooperative activity that falls short of that mark is not a group. "[T]he cooperative activity characteristic of an institutional private placement generally results from sound business considerations … rather than from a desire to affect control of the issuer," typically ends when the transaction closes, and is "of little interest to investors." Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release No. 34-14692, 43 Fed. Reg. 18,484 (Apr. 28, 1978); *see also* Modernization of Beneficial Ownership Reporting, Exchange Act Release No. 94211, 87 Fed. Reg. 13,846 (Feb. 10, 2022) (primary purposes of Section 13(d) "are to provide information to the public and the subject issuer about accumulations . . . by persons who had the potential to change or influence control").

This understanding is consistent with Judge Kaplan's decision in *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, which framed combining to form a group as "analogous with conspiracy."104 F. Supp. 2d 169, 176 (S.D.N.Y. 2000). Conspiracy requires evidence that the participants pursued "the same object." *Freeman v. HSBC Holdings PLC*, 57 F.4th 79 (2d Cir. 2023); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018) ("Proof of conspiracy requires direct or circumstantial evidence that reasonably tends to prove a conscious commitment to a common scheme designed to achieve an unlawful objective.") (alteration and internal quotation marks omitted). That is more than parallel transactions, even among parties in communication:

> The fact that several investors conclude that a stock is undervalued and buy it does not necessarily mean that they formed a group. Indeed, that's true even if they all know one another, speak on the phone every day, and even if one of their number was the guy who first had the idea that the stock was undervalued and told everybody else.

17

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, No. 00 Civ. 01115 (LAK) (S.D.N.Y. Feb. 23, 2001), at 615:3-8, aff'd 286 F.3d 613 (2d Cir. 2002). The "common objective" required for group liability—the effective equivalent of a conspiracy's "object"—thus requires something far more specific than a shared profit motive: "every one of these defendants had a common purpose. They have all acted and they are acting today for the common purpose of making money on their investments … That is quite obviously not enough." ECF No. 321-4 at 613:6-10.

Plaintiff has adduced no evidence of a common objective to pool investment power or affect control. Even viewed most favorably to it, Plaintiff's evidence at most suggests a common objective to buy securities and thereafter profit, which is insufficient. *See Wellman*, 682 F.2d at 365 (2d Cir. 1982) (finding that "the evidence clearly supports the district court's finding that in an effort to achieve their common objective [of a desire to profit from a shift in the corporate control], defendants formed a group"). Indeed, Mr. Hirsch repeatedly testified that he worked independently and did not coordinate with any investor. *See, e.g.,* Trial Tr. at 735:18-20, 812:2-6, 815:10-13. Mr. Hirsch also testified that from his perspective, any investment into Genius was between Brio and Genius, not between Brio, Anson, and Empery. *Id.* at 725:24-25, 726:1-2; 735:18-20; 828:24-829:1-5. Anson and Empery also testified that they did not coordinate with Mr. Hirsch. Trial Tr. at 490:2-8; *id.* at 494:16-21; *id.* at 495:9-11; *id.* at 497:10-15; *id.* at 620:6-8; at 998:2-25-999:1-5. The documents in question support this testimony, as each of the SPA and the Leak Out Agreements are bilateral agreements between the individual investor and Genius, and all obligations set forth therein are several and not joint with any *other* investor in the particular parallel transaction. *See* PX-387.

18

**E.  Holmes' Testimony Cannot Support a Jury Verdict in Plaintiff's Favor**

Holmes spent much of his testimony describing the March 11, 2020 transaction as a "Christmas tree with too many ornaments," testifying that while individual terms had precedents in U.S. corporate history, the combination of so many unusual terms in a single transaction was itself remarkable. *See* Trial Tr. at 273:6-12. He identified the following terms as "unusual": (1) 20% original issue discount on the convertible notes (Trial Tr. at 162:5-13), (2) the 40-year maturity, zero-coupon noncash investor notes (Trial Tr. at 262:18-22), (3) the senior promissory notes with blocking rights, (4) the mandatory monthly amortization on convertibles (Trial Tr. at 273:20-24), (5) accelerated amortization (Trial Tr. at 274:2-7), (6) the default covenant in the convertible notes (Trial Tr. at 275:7-12), (7) the volume of warrants attached to the transaction (Trial Tr. at 266:16-23) and (8) the leak-out agreements restricting sales to 30% of daily trading volume (PX-688; PX-576). Mr. Holmes does not mention, let alone address, how the fiscal reality faced by Genius in late 2019 and early 2020 destroyed its negotiating leverage with respect to the terms of the March 2020 SPA, and how that fiscal reality—as opposed to some asserted "group" coordination—resulted in the foregoing SPA terms.

The record is clear that, in late 2019 and early 2020, Genius was desperate for cash and, having failed at least two times to raise cash from new investors, needed to raise money through existing debtholders and shareholders. *See* PX-129; PX-163; and Trial Tr. at 302:25-303:1. Mr. Holmes admits that it made sense for Genius to seek investments from existing investors and that it made sense to restructure the debt owed to those existing investors as part of the transaction. *See* Trial Tr. at 305:2-17.

The only "evidence" that Plaintiff or Mr. Holmes cite as proof that Brio joined the purported group is that Brio was sent drafts of the term sheet in January 2020 before it was

19

finalized. *See, e.g.,* PX-173; PX-174; PX-181; PX-187; PX-193; PX-194;[5] and Trial Tr. at 222:7-223:22.  As an initial matter, Plaintiff offers no proof that Brio requested a copy of the draft term sheet before it was final, only that SEG provided it to Brio. *See, e.g.,* PX-174. However, the record is replete with proof that the reason Brio was sent this term sheet was that, as a debtholder with blocking rights, Brio needed to either invest in this deal or agree to waive its rights to allow the deal to proceed. *See* Trial Tr. at 252:20-253:5; 600:2-4; 634:2-6; 730:16-19; 738:8-16; 738:24-739:1; and 1132:25-1133:1-3.

Holmes further testified to near-identical trading behavior among Anson, Empery, and Brio. While a previously acknowledged factor supporting the circumstantial inference of group activity may be present, mere presence is insufficient. Instead, one must determine if "the inference of collusion really is justified in light of all the circumstances" surrounding the sale. *Hallwood*, 286 F.3d at 618. Here, the circumstances make clear no such inference is justified. Holmes testified that GNUS stock was trading at $0.24 a share when the March 2020 PIPE closed and was "pretty much flat through May" before "soaring . . . to a peak of almost eight dollars." Trial Tr. at 231:4–11) Holmes further testified that in June 2020, when the Defendants could sell their shares, the stock price was very high and "*starting to come down*." (*Id.* at 329: 14–20) (emphasis added). According to Plaintiff's expert, for investors owing a fiduciary duty the sale of GNUS stock was rational: a quintessential "buy low, sell high." (*Id.* at 330: 18–25). The circumstances surrounding the motivation and timing of the allegedly coordinated trading activity make clear the liquidation of their positions in GNUS by mid-July 2020 were wholly rational, straightforward responses to prevailing market conditions by independent investors pursuing their own interests.

---

[5]    Brio notes, that PX-173, PX-174, and PX-181 reflect the same email chain, with each exhibit building upon the previous one. Additionally, PX-187 and PX-193 also reflect the same email chain.

### F. **Holmes' Testimony Alone is not Sufficient**

Mr. Holmes, having no personal knowledge of the facts of this case, testified repeatedly that the terms of the parties' agreements were "unusual" but that "[e]very one of these [unusual] terms . . . had appeared previously sometime in U.S. corporate history. So it's not like the people putting this deal together had invented some brand new thing that had never occurred. But my analysis is that putting so many of them on the same transaction was a Christmas tree with too many ornaments." *Id.* 273:6–12 (Holmes). Even if this testimony could possibly be construed as supportive of Plaintiff's group theory, the weight of the evidence plainly shows that the agreement terms were the product of Genius's financial condition and the general market conditions at the time. *See, e.g.*, *id.* 301: 8–12 (Holmes) (agreeing that "distressed, insolvent, or [nearly] bankrupt[]" companies "need to offer better terms to investors and "routinely" accept "more investor-friendly protections"); 638:1-10 (Nathoo) ("[O]bviously the company was distressed. And so the potential upside that investors could earn from the deal needed to be higher because you were taking on more risk."); *see also id.* 302:1-9 (Holmes).

Plaintiff's entire case hinges on Mr. Holmes's testimony. Each of the other four witnesses called by Plaintiff testified that Defendants were not acting as a group. A reasonable jury could not find Brio liable on this basis alone. *First*, Mr. Holmes's testimony is completely untethered from the group inquiry. *Second*, his testimony is too conclusory to carry Plaintiff's burden.

### G. **Holmes' Testimony Is Irrelevant to the Group Inquiry**

In its ruling on Defendants' Motion in Limine No. 8, the Court held that Plaintiff could only introduce evidence regarding "whether the terms of transaction documents were standard" if he "show[s] the relevance of the standard or nonstandard nature of documents to group existence." Pretrial Conf. Tr. 35:20–25 (June 1, 2026). The Court later clarified that Plaintiff's expert would be permitted to explain that the agreements "were nonstandard in a way that showed that the

21

[D]efendants were operating as a group because they relied on trust that other [D]efendants would not invoke the provisions in the agreements that may have been the undoing of the entire deal and potentially have a catastrophic effect on the company[.]" Pretrial Conf. Tr. 15:3–16:2 (June 5, 2026). Mr. Holmes made no such showing with respect to the agreement terms.

Whether transaction terms are "industry standard," standing alone, is not relevant to the question of group formation. *See, e.g.*, *Hallwood Realty Partners, L.P.*, at 615:3–15, (ECF No. 321-4) (rejecting ticking off factors as part of analysis of group formation and instead endorsing whether there is an inference of collusion in light of all the circumstances). The only case Brio is aware of that mentions whether a particular term is common in connection with the Section 16(b) group inquiry is *Lowinger*, which involved a lock-up agreement among underwriters in connection with Facebook's initial public offering. After plaintiff's counsel in that action—the same counsel representing Plaintiff here—contended that lock-up agreement should be a basis for Section 16(b) liability, the Second Circuit noted that lock-up agreements are "common . . . even essential, to the typical IPO." *Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122, 131 (2d Cir. 2016). But there is nothing in *Lowinger* to suggest that the Second Circuit intended to make an "industry standard" test part of the group analysis. Transaction terms necessarily reflect the needs and priorities of particular issuers and investors, like those contained in the agreements in this case. Moreover, nothing in Section 16(b) requires the use of a particular set of transaction terms or penalizes the use of novel terms.

Mr. Holmes admittedly has no personal knowledge of the events at issue in this case. Trial Tr. 198:13–14 (Holmes). His testimony was riddled with speculation and conjecture and never connected the purportedly "unusual" nature of the agreement terms to the existence of a group. Expert testimony is irrelevant if not "sufficiently tied to the facts of the case that it will aid the jury

22

in resolving a factual dispute." *Novartis Pharma AG v. Incyte Corp.*, 1:20-cv-400-GHW, 2024 WL 3608338, at *4, *11 (S.D.N.Y. July 29, 2024) (excluding testimony where "expert recently retained . . . for purposes of [] litigation" did "not possess any personal knowledge of what [the parties] were thinking during the negotiations and drafting process" so "[a]ny speculations . . . regarding the 'real motive' the parties had in entering into the Agreement . . . [wer]e improper"); *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 543–44 (S.D.N.Y. 2004) (finding testimony related to "ethical standards" based on experts' "personal, subjective views" was unreliable, unhelpful, and irrelevant because it "would not assist the fact-finder in determining" whether the defendants breached their legal duties and whether those breaches were the proximate cause of the plaintiff's injury); *see also Sigmon for Hindon v. Goldman Sachs Mortgage Company*, 1:12-cv-3367 (ALC), 2018 WL 1517189, at *4 n.4 (S.D.N.Y. Mar. 26, 2018) (it is "well-settled that contract interpretation is not a proper subject of expert testimony").  Nothing in Mr. Holmes's testimony will aid the jury in resolving the issue of whether Brio was part of a group.  It is thus irrelevant and could not serve as a basis for a reasonable jury's verdict.

### H.  Plaintiff's Case Cannot Rely Entirely on Holmes' Testimony

Mr. Holmes's testimony cannot sustain a jury's verdict.  "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (holding that expert testimony cannot sustain a jury verdict where the expert's opinion fails to account for or is contradicted by indisputable record evidence of actual market conditions).  Additionally, "'expert opinion evidence . . . has little probative value in comparison with the economic factors' that may

23

dictate a particular conclusion." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986)).  Similarly, purely speculative expert testimony is insufficient to support a jury's verdict.  *See Medism Ltd. v. BestMed LLC*, 959 F. Supp. 2d 396, 423–24 (S.D.N.Y. 2013) (granting judgment as a matter of law for the defendant where no reasonable juror could have relied upon conclusory testimony from the plaintiff's experts), *rev'd on other grounds*, 758 F.3d 1352 (Fed. Cir. 2014); *see also Hersko v. U.S.*, 13-CV-3255 (JLC), 2017 WL 1957272, at *6 (S.D.N.Y. May 11, 2017).

Over the course of his testimony, Mr. Holmes referred to various aspects of the Genius transactions in which Defendants participated as "unusual" thirty-two times.  What Mr. Holmes did not do is provide any factual support for these conclusory statements or establish how the "unusual" characteristics are connected to any kind of coordination among the investors.  This is compounded by the fact that Mr. Holmes's testimony utterly failed to account for the "economic factors" that dictated the terms of the parties' agreements, *i.e.*, that the Company was on the verge of bankruptcy and the market instability caused by the COVID-19 pandemic.  *See Brooke Grp. Ltd.*, 509 U.S. at 242.  His testimony is also contradicted by the indisputable facts in the record established by all four of Plaintiff's other witnesses, who testified that the relevant transactions were conducted in the same manner as other parallel transactions in which they have participated, and that the terms of the March 2020 PIPE were dictated in large part by the Company's impending bankruptcy and the prevailing market conditions.  *See, e.g.*, Trial Tr. 301: 8–12 (Holmes); 976: 21–25 (Lane); *see also id.* 302:1-9 (Holmes).  Even if this kind of expert testimony could serve as the basis for a jury's verdict, no reasonable jury would rely on this evidence to find in Plaintiff's favor.

## I.  **Plaintiff's JMOL Improperly Cites to the Record**

The frivolousness of Plaintiff's JMOL is evidenced by its utter mischaracterization of cited testimony. *See generally* ECF No. 484. First, Brio did not insist that "all investors" agree not to short Genius Stock. Plaintiff references PX-76, which is a text exchange between Mr. Hirsch and Mr. Heyward. *Id.* at 2. Plaintiff also cites to the following excerpt of testimony:

> Q: And you followed up by saying: And will he agree to sign an agreement never
> to short sell any Genius stock ever from here on? Do you see that?
> A: I do.
> Q: Now, you wrote that because at the time, Brio was not interested in short selling
> Genius stock; correct?
> A: That is correct.

*Id.* (citing Trial Tr. 706:19-25). But Plaintiff interestingly leaves out the following two statements from Mr. Hirsch that follow and contradict Plaintiff's assertion: "we didn't want any agreement with Anson…[t]hat statement was not a serious statement. I wasn't asking for any agreement." Trial Tr. 707:4-8. Additionally, Brio fails to see the relevance of Brio's statement in PX-76, as it pertains to the bridge funding that Brio was proposing in September 2019, but ultimately did not happen.  Furthermore, Plaintiff's characterization of "investors" is misplaced. The joke at issue was directed at a single investor, Anson. *See* PX-76.[6]  Even if Plaintiff could seriously suggest that Brio sought an agreement among the investors not to short the stock (and it did not), the SPA expressly allowed investors to short the stock. PX-387.

Next, Plaintiff claims that Brio "proposed deal terms with Anson" through Heyward and SEG, with a record citation which utterly fails to support that claim. Indeed, to the extent Brio was discussing "terms" with Heyward, those were related to a proposed bridge in 2019 that did not happen. Further, Plaintiff claims that Brio was sent the January 2020 Term Sheets before the terms were finalized, however, there is no testimony to support Plaintiff's contention that this was

---

[6]    Brio further notes that Plaintiff's reference to "negotiated deal terms with Anson" (ECF No. 484 at 2) also pertain to the September 2019 Registered Direct, which Brio did not participate in. Trial Tr. 828:14-18 (Hirsch).

"contrary to SEG's standard practices." Quite the contrary: Mr. Reda and Mr. Schechter both testified that where, as here, an investor such as Brio held blocking rights for proposed financing transactions, it was standard procedure to seek investor's interest first, before potentially wasting everyone's time on a deal that would be vetoed. *See* Trial Tr. at 1268:3-20. Plaintiff then claims that Brio made "substantive edits" that were "integrated into the term sheet before Anson executed it" while citing testimony concerning a document in which SEG agrees to *increase the total investment size* to accommodate Mr. Hirsch. This was not a "substantive term" but a term which Plaintiff's expert testified is permissible and standard.

Finally, Plaintiff claims that "Anson and Brio circulated drafts." ECF No. 484 at 3. That is unequivocally false. Not *once* did the record reveal that Mr. Hirsch, on behalf of Brio, ever circulated or sent a draft term sheet or agreement to SEG, another investor, or any representatives at Genius.[7] At most, Brio received copies of drafts circulated by SEG. *See, e.g.,* PX-173, PX-181, PX 187.

Further, the objection of Brio's communications – a participation right – was not included in the March 2020 SPA and was removed before the final term sheet was even signed. Plaintiff cites a portion of Mr. Hirsch's trial testimony concerning a right of participation that was "integrated into the term sheet before Anson executed it." ECF No. 484 at 2 (citing Trial Tr. 718:2-719:25). However, the right of participation, allegedly requested by Brio, was ultimately omitted from the March 2020 SPA and the final January 22, 2020 term sheet. *See generally* PX-387, PX-202[8] Even if the right of participation had been included, Mr. Hirsch was not seeking to add a new

---

[7]    In his JMOL, Plaintiff does not cite to the record in making this claim. ECF No. 484 at 3.

[8]    The other excerpt of testimony cited by Plaintiff to support his proposition that "rio received Anson's draft term sheet—contrary to SEG's standard practices—and funneled substantive edits back through SEG, which were integrated into the term sheet before Anson executed it" is not specific to Brio. *See* Trial Tr. 1379:11-1380:2 (Schechter).

term to the term sheet, but rather, he sought to ensure that Brio received equal treatment and terms under the SPA. As investors in a parallel transaction receive the same terms, this was a perfectly acceptable and legally permissible request. Plaintiff's JMOL must be denied on this basis alone.

<u>**CONCLUSION**</u>

For the foregoing reasons, Brio respectfully requests that the Court grant its Motion for Judgment as a Matter of Law.

Dated: New York, New York
      June 17, 2026

Respectfully submitted,

**ELLENOFF GROSSMAN & SCHOLE LLP**

*/s/ John Brilling Horgan*
John Brilling Horgan
Joanna Rebecca Cohen
1345 Avenue of the Americas, 11th Floor
New York, New York 10105
(646) 895-7158
jhorgan@egsllp.com
jcohen@egsllp.com

*Counsel for Defendants Brio Capital Master Fund Ltd. and Brio Select Opportunities Fund LP*

## CERTIFICATE OF WORD COUNT

I, John B. Horgan, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, contains 8,906 words in accordance with the Local Rules. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated: June 17, 2026

/s/ John B. Horgan
John B. Horgan

28