**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

             Plaintiff,

    v.

BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP;
EMPERY ASSET MASTER, LTD.; EMPERY
DEBT OPPORTUNITY FUND, LP; EMPERY
TAX EFFICIENT, LP; EMPERY ASSET
MANAGEMENT, LP,

             Defendants,

    -and-

KARTOON STUDIOS, INC.,

             Nominal Defendant.

Civil Action No. 1:22-cv-00249-AS

**ORAL ARGUMENT REQUESTED**

**EMPERY'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

LEGAL STANDARD................................................................................................................4

ARGUMENT .............................................................................................................................5

I.      PLAINTIFF HAS NOT PRESENTED EVIDENCE SUFFICIENT TO SHOW
THAT EMPERY WAS PART OF A SECTION 13(d) GROUP FOR PURPOSES
OF SECTION 16(b)..........................................................................................................5

      A.      Plaintiff's Evidence At Most Demonstrates Routine Communications in
Furtherance of a Parallel Investment .........................................................................6

            1.      Communications Among the Investors' Lawyers Are Not Evidence
of a Group ...................................................................................................7

            2.      A Placement Agent's Efforts to Harmonize Competing Investor
Demands Are Not Evidence of a Group .......................................................8

            3.      Agreements with the Same Terms in Parallel Investments Are Not
Evidence of a Group ...................................................................................11

      B.      Plaintiff's Evidence Does Not Show that Empery Intentionally Agreed To
Act Together with any Other Investor .....................................................................14

      C.      Plaintiff's Evidence Does Not Show that Empery Pooled Its Beneficial
Ownership In Furtherance of a Common Objective ...............................................15

      D.      Max Holmes's Testimony Cannot Support a Jury Verdict in Plaintiff's
Favor ........................................................................................................................18

            1.      Holmes's Testimony Is Irrelevant to the Group Inquiry...........................19

            2.      Holmes's Testimony Is Contradicted by Record Evidence and
Cannot Support a Group Finding...............................................................21

CONCLUSION........................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Augenbaum v. Anson Invs. Master Fund LP*,
  2025 WL 2780854 (S.D.N.Y. Sept. 30, 2025)............................................................6

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...............................................................................................21, 22

*Chechele v. Scheetz*,
  819 F. Supp. 2d 342 (S.D.N.Y. 2011)........................................................................11

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
  654 F.3d 276 (2d Cir. 2011)...................................................................................5, 16

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 544 (S.D.N.Y. 2014)........................................................................12

*Freeman v. HSBC Holdings PLC*,
  57 F.4th 79 (2d Cir. 2023) .......................................................................................17

*Greenberg v. Hudson Bay Master Fund Ltd.*,
  2015 WL 2212215 (S.D.N.Y. May 12, 2015) ............................................................16

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  95 F. Supp. 2d 169 (S.D.N.Y. 2000).........................................................................17

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
  00 Civ. 01115-LAK (S.D.N.Y. Feb. 23, 2001)......................................................17, 19

*Hersko v. U.S.*,
  13-CV-3255-JLC, 2017 WL 1957272 (S.D.N.Y. May 11, 2017) .............................21

*Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*,
  115 F. Supp. 2d 440 (S.D.N.Y. 2000)......................................................................6, 9

*Litzler v. CC Investments, et al.*,
  02 Civ. 6313 (S.D.N.Y. Feb. 3, 2006) ...............................................................8, 9, 10

*Litzler v. CC Invs., L.D.C.*,
  411 F. Supp. 2d 411 (S.D.N.Y. 2006)................................................................. *passim*

*Lowinger v. Morgan Stanley & Co.*,
  841 F.3d 122 (2d Cir. 2016).......................................................................................20

*Morales v. Quintel Ent. Inc.*,
  249 F.3d 115 (2d Cir. 2001)........................................................................................16

**Cases**                                                                                                                          **Page(s)**

*Medism Ltd. v. BestMed LLC,*
    959 F. Supp. 2d 396 (S.D.N.Y. 2013)...................................................................................21

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018)..............................................................................................17

*Nano Dimension Ltd. v. Murchinson Ltd.,*
    681 F. Supp. 3d 168 (S.D.N.Y. 2023)...........................................................6, 11–12

*Nike, Inc. v. lululemon usa inc.,*
    23-cv-771-AS, 2026 WL 879089 (S.D.N.Y. Mar. 31, 2026) ......................................4

*Novartis Pharma AG v. Incyte Corp.,*
    20-cv-400-GHW, 2024 WL 3608338 (S.D.N.Y. July 29, 2024)............................20

*Piao v. Smith,*
    683 F. App'x 55 (2d Cir. 2017) .....................................................................................5

*In re Rezulin Products Liability Litigation,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004).........................................................................20

*Rubenstein v. Int'l Value Advs.,*
    959 F.3d 541 (2d Cir. 2020)...........................................................................................5

*Sigmon for Hindon v. Goldman Sachs Mortgage Company,*
    12-cv-3367-ALC, 2018 WL 1517189 (S.D.N.Y. Mar. 26, 2018) .............................21

*Transcon Lines v. A.G. Becker Inc.,*
    470 F. Supp. 356 (S.D.N.Y. 1979)..............................................................................15

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991).......................................................................................15

*Wellman v. Dickinson,*
    682 F.2d 355 (2d Cir. 1982)...................................................................................14, 15

*Wu v. Sushi Nomado of Manhattan, Inc.,*
    17-cv-4661-MKV, 2024 WL 641251 (S.D.N.Y. Feb. 15, 2024).................................5

**Other Authorities**

17 C.F.R. § 240.13d-5.......................................................................................................5

Fed. R. Civ. P. 50(a) ........................................................................................................4

**Other Authorities**                                                                                          **Page(s)**

Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 2.03
    (2024 ed.) ........................................................................................................................15

Filing & Disclosure Requirements Relating to Beneficial Ownership,
    Release No. 5925 (Apr. 21, 1978) ...................................................................................16

Modernization of Beneficial Ownership Reporting,
    Release No. 94211 (Feb. 10, 2022)..................................................................................17

Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, and Empery Asset Management, LP (collectively, "Empery") respectfully request judgment as a matter of law under Federal Rule of Civil Procedure ("FRCP") 50(a).[1]

**PRELIMINARY STATEMENT**

The trial record is devoid of evidence that could support Plaintiff's claim against Empery. Investors do not form a Section 13(d) group by participating in a parallel transaction, yet that is all Plaintiff's case in chief demonstrated as to Empery. Instead, a Section 13(d) group is formed for purposes of Section 16(b) where beneficial owners agree to act together to pursue a common objective with their investment power. Plaintiff has failed to meet his burden. After five days of trial and admitting more than ninety exhibits into evidence, Plaintiff did not adduce any proof that Empery agreed to act in concert with any other investor or pooled its holdings in furtherance of a common objective. In fact, the record establishes the opposite. This failure of proof renders the ultimate issue a question of law for the Court, not the jury. Judgment as a matter of law must be entered in Empery's favor.

*First*, the absence of evidence against Empery is stark. Plaintiff introduced no evidence that Empery coordinated its investment decisions with any other investor. Of the more than twelve hundred exhibits on the parties' pretrial exhibit lists, only twenty introduced during Plaintiff's case in chief contained emails sent to or from an Empery employee in 2020. And as for the Empery-related evidence that Plaintiff ultimately elicited, it affirmatively negates any suggestion that Empery ever was—or could have been—part of a group. Empery expressly disclaimed group

---

[1] Empery incorporates by reference the arguments made in Defendants' Omnibus Memorandum of Law in Support of their Motion for Summary Judgment, dated January 15, 2025 (ECF No. 233) and Empery's Memorandum of Law in Support of its Motion for Summary Judgment, dated January 15, 2025 (ECF No. 242).

1

status: when the issuer's counsel placed Empery on a single document alongside other investors, Empery's general counsel objected in plain terms: "We are not acting as a group with any other investors." The same independence permeated Empery's conduct throughout the relevant transactions, particularly the March 2020 PIPE. Empery pursued its own terms, not shared ones: its co-founder, Ryan Lane, "obsessively" demanded a cash burn covenant, negotiating it until minutes before signing, and confirmed that the demand was Empery's alone. He testified that Empery "wouldn't have invested if I didn't get the terms that I wanted" but "would have passed." Empery's very decision to invest in the March 2020 PIPE came too late for it to have joined or formed the group that Plaintiff supposes existed. Mr. Lane testified, and the record confirms, that he "made [his] investment decision at close to midnight on March 10"—"like minutes before" signing. As of 7:51 p.m. that evening, Empery had not even told issuer's counsel how much it would invest, because Mr. Lane "hadn't decided how much Empery was going to put in the transaction." Indeed, Plaintiff put forth no evidence that Empery even knew who all of the supposed group members were before signing. And Empery quickly acted against the alleged group's interests: ten days after the March 2020 PIPE, Mr. Lane refused to join a registered direct transaction led by one of the supposed "group" members, calling it "one of the dumbest things I have ever heard" and saying that Empery instead would pass. Conduct of this kind is irreconcilable with membership in a group.

*Second*, there is no evidence that Empery intended to join a group. An intentional agreement is the threshold requirement, and the testimony on it was uniform. Every Defendant representative testified that Defendants did not agree to act as a group. So too did the placement agent testify that the March 2020 PIPE was just like "every deal" and corroborate Empery's fierce independence. No witness testified otherwise, and Plaintiff offered no document, no admission,

2

and no communication suggesting that Empery agreed to bind itself to anyone.  The evidence on this central element runs entirely in one direction, and no reasonable jury could find for Plaintiff. That alone resolves the motion.

*Third*, there is no evidence of an agreement by Empery to act in concert with any other investor or pool its beneficial ownership in furtherance of a common objective.  The evidence showed only that sophisticated investors negotiated and participated in the same private placement. But parallel activity does not a group make: investors who buy into the same deal, on the same day, on the same papers, are not for that reason acting in concert.  The law is clear on that point. It requires a common objective beyond simply investing and making a profit.  Otherwise, every syndicated private financing would create a Section 13(d) group.  Plaintiff has identified no such objective.  He has offered no evidence of an agreement by Empery to vote together, to hold or dispose of shares together, or to pursue any shared design with respect to the issuer's securities. In place of proof, Plaintiff invited the jury to read sinister meaning into ordinary, lawful negotiations among co-investors or their lawyers through Genius's placement agent.  That effort to recast routine deal-making as conspiracy is a substitute for evidence, and it confirms that Plaintiff cannot meet his burden.  Judgment as a matter of law is warranted on this independent basis.

*Finally*, Plaintiff's suggestion that Empery was part of a group is based principally on his expert Max Holmes's testimony that certain aspects of the relevant transactions were "unusual." Mr. Holmes did not provide any factual support for these assertions, nor does he have any personal knowledge of the facts of this case.  Moreover, Mr. Holmes's testimony ignored the economic context of the transactions, rendering his opinion unreliable at best.  This evidence cannot support a jury's verdict, and judgment as a matter of law in Empery's favor is therefore proper.

3

Plaintiff's own Rule 50(a) motion makes clear that the evidence in the record is insufficient for a reasonable jury to find in his favor on his claim against Empery. *See* ECF No. 484. Plaintiff first points to Mr. Director's communications with Mr. Charron, the lead draftsman—but the jury instructions make clear that "communications among investors or their lawyers, . . . without an intentional agreement to act together," are insufficient to establish a group. Plaintiff next points to Empery's leak-out agreement—but that agreement affirmatively negates group conduct, as it was negotiated and signed individually between Empery and Genius and required no coordination whatsoever among any investors. And Plaintiff last points to Empery's purchases in certain registered direct offerings, without support or explanation—but Empery's refusal to join a registered direct transaction just ten days after the March 2020 PIPE entirely undermines this theory of collusion. Each of these theories fails as a matter of law, which forecloses the inferences Plaintiff asks the jury to draw.

On this record, a verdict against Empery could rest only on speculation and misapplication of the law to parallel transactions. Even construing the record in his favor, Plaintiff has not met his burden of proving that Empery intended to form a group or agreed to pool its holdings in furtherance of any common objective. No reasonable juror could conclude that Plaintiff has met his burden to demonstrate that Empery acted as part of a group within the meaning of Section 13(d), unless based upon confusion. Accordingly, the motion should be granted, and judgment as a matter of law should be entered for Empery.

## LEGAL STANDARD

Judgment as a matter of law is appropriate where, after "a party has been fully heard on an issue[,] . . . the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FRCP 50(a); *Nike, Inc. v. lululemon usa inc.*, 23-cv-771-AS, 2026 WL 879089, at *2 (S.D.N.Y. Mar. 31, 2026) (Subramanian, J.); *see also Piao v. Smith*,

4

683 F. App'x 55, 56 (2d Cir. 2017) ("Rule 50 allows a district court to grant a motion for judgment as a matter of law in favor of the defendant if, at the close of the plaintiff's case, a reasonable jury would not have a legally sufficient basis to find for the plaintiff on an issue essential to her claim."). "[J]udgment as a matter of law may be granted only if '(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.'" *Wu v. Sushi Nomado of Manhattan, Inc.*, 17-cv-4661-MKV, 2024 WL 641251, at *2 (S.D.N.Y. Feb. 15, 2024).

## ARGUMENT

### I.    PLAINTIFF HAS NOT PRESENTED EVIDENCE THAT EMPERY WAS PART OF A SECTION 13(d) GROUP FOR PURPOSES OF SECTION 16(b).

Empery is entitled to judgment as a matter of law that it was not part of a Section 13(d) group. To prevail on his Section 16(b) claim, Plaintiff must show by a preponderance of the evidence that Empery was a member of a Section 13(d) group, *i.e.*, it intentionally "agree[d] to act together [with another beneficial owner] for the purpose of acquiring, holding, voting or disposing of equity securities" of Genius. 17 C.F.R. § 240.13d-5(b)(1)(i). "'[T]he touchstone of a group . . . is that the members combined in furtherance of a common objective.'" *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 283 (2d Cir. 2011). "General allegations of parallel investments" or "cooperative activity characteristic of an institutional placement" do not suffice. *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 415 (S.D.N.Y. 2006). Plaintiff has not presented sufficient evidence for a reasonable jury to find that Empery was part of a group. Group status is judged on a defendant-by-defendant basis. *Rubenstein v. Int'l Value Advs.*, LLC, 959 F.3d 541, 544–45 (2d Cir. 2020).

In its decision on summary judgment, this Court cautioned that, even on the full summary judgment record—which encompassed all eight original Defendants—that "it's not certain on the record before the Court that, as a matter of law, defendants really did act as a group, rather than make parallel investments in Genius that would not qualify as group behavior." *Augenbaum v. Anson Invs. Master Fund LP*, 2025 WL 2780854, at \*5 (S.D.N.Y. Sept. 30, 2025) (ECF No. 287) (internal quotations omitted). This trial is materially narrower in scope and now turns only on the body of proof against the two remaining Defendants. Whatever the record may have suggested as to other prior Defendants, Plaintiff's case in chief at trial elicited no evidence that Empery acted as part of a group and thus has failed to overcome the very uncertainty the Court identified. A contrary finding would require the jury to conclude that every fact witness testified falsely about their intent not to form a group and to infer an undisclosed conspiracy notwithstanding the public disclosure of the relevant agreements and releases. Plaintiff cites no Section 13(d) authority endorsing such a theory, nor could he.

### A. Plaintiff's Evidence at Most Demonstrates Routine Communications in Furtherance of a Parallel Investment.

It is well settled that mere parallel investment activity does not demonstrate the existence of a group. *Litzler*, 411 F. Supp. 2d at 415 (S.D.N.Y. 2006); *Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 182 (S.D.N.Y. 2023); *see also Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 115 F. Supp. 2d 440, 443–44 (S.D.N.Y. 2000) (facts "demonstrate[d] nothing more than parallel investment decisions by defendants all of whom agreed to participate at the same time in the same private placement"). This is so even if the investors in a parallel transaction appoint a lead draftsperson and coordinate the negotiation and preparation of the transaction documents. *Litzler*, 411 F. Supp. 2d at 415.

6

Plaintiff has presented evidence purporting to show that (1) Empery's General Counsel, Brett Director, and Anson's lawyer, Robert Charron, coordinated with the Company's counsel, Jeffrey Schultz, to draft the transaction documents; (2) SEG relayed investor demands, comments, and questions to other investors; and (3) the investors in the March 2020 PIPE and subsequent offerings entered into parallel agreements containing the same terms. There is no evidence other than communications among lawyers that Empery communicated with any of the other investors in the March 11, 2020 Genius Brands International, Inc. ("Genius" or the "Company") private investment in public equity (the "March 2020 PIPE") during the relevant time period about whether or not to invest. A reasonable jury could not find that Empery was part of a group based on this evidence.

### 1. Communications Among the Investors' Lawyers Are Not Evidence of a Group.

As is reflected in the Court's jury instructions, "communications among investors or their lawyers" are insufficient to support the existence of a group "without an intentional agreement to act together in furtherance of a common objective." Post-Instruction No. 19 (June 17, 2026). This is because, as the court in *Litzler* made clear, communications like those between Mr. Director and Mr. Charron are commonplace in the context of parallel transactions. *Litzler*, 411 F. Supp. 2d at 415. "The SEC has acknowledged the 'sound business considerations such as cost savings' that generally lead to 'cooperative activity characteristic of an institutional placement.'" *Id.* The communications among the investors' counsel in *Litzler* were precisely the kind that Plaintiff has identified here. In *Litzler*, the investors and their counsel coordinated negotiations; shared information, markups, and comments; and pursued common terms in a single transaction through joint requests, shared drafts, and aligned demands. Tr. Oral Arg. on Summ. J., 13:11–20, *Litzler*

7

*v. CC Investments, et al.*, L.P., No. 02 Civ. 6313 (S.D.N.Y. Feb. 3, 2006) (ECF No. 480-6) (finding no group).

In his case in chief, Plaintiff introduced evidence that Mr. Director and Mr. Charron worked together to draft the documents for the March 2020 PIPE to ensure that the investors' demands were properly presented to the Company.  Trial Tr. 508:21–509:2 (Nathoo) (testifying that Mr. Charron "got feedback" from the other investors "that the documents as they currently were, were [not] good documents, so that they should change to another template form"); 511:10–12 (Nathoo) (testifying that Mr. Charron was "going to relay Empery's comments to the company"); 864:4–11 (Lane) ("[Mr. Director] made the demands that Empery wanted in order to have our participation in the offering to Genius and their counsel and other counsels"); 867:5–10 (Lane) ("We were negotiating with the issuer, Genius Brands."); 888:9–15 (Lane) ("We're trying to get the language that we want so we're satisfied, and then it will be presented to the company."); 1062:16–19 (Reda) (testifying that "Brett Director and Rob Charron were working together to hammer out transaction documents that worked for both of them").  Empery does not dispute that Mr. Director and Mr. Charron worked with the Company to draft the transaction documents.  That they did so is simply not enough to demonstrate they were acting as a group.  *See Litzler*, 411 F. Supp. 2d at 415 (finding no group where the defendants appointed one lawyer to negotiate on behalf of all of the defendants and where that lead counsel "took instructions from his own client and, through the other two lawyers, from their clients" in drafting the documents).

### 2. A Placement Agent's Efforts to Harmonize Competing Investor Demands Are Not Evidence of a Group.

Despite Plaintiff's best efforts to paint certain communications from SEG, Genius's placement agent, as improper, the evidence presented in Plaintiff's case in chief demonstrates nothing more than standard communications between such placement agent and prospective

investors.  As Plaintiff's expert Mr. Holmes testified, the placement agent is "the middleman who's helping the company raise the money from a small group of investors."  Trial Tr. 189:15–16 (Holmes).  That role necessarily required SEG to communicate with the investors about other investors' demands, questions, and comments—and ultimately, to reconcile them.  *See id.* 382:25–383:18 (Nathoo).  As Mr. Nathoo testified, "[T]he process to get to one set of terms that everyone agrees to sometimes takes back and forth negotiation, and so we were provided feedback by SEG saying:  We can't fill up the book, but if we change these terms, perhaps we can get more investors."  *Id.* at 383:9–13.  That is standard and required for a transaction to close.

That the Defendants "were brought together at the behest of and for the benefit of [Genius] during a private placement . . . effectuated through a placement agent" is not enough to demonstrate the existence of a Section 13(d) group for the purposes of Section 16(b).  *Schaffer*, 115 F. Supp. 2d at 443–44 (allowing complaint to proceed "would have a chilling effect on the world of private finance").  As the court recognized in *Litzler*, negotiations involving a placement agent do not support the existence of a group without evidence that the investors agreed to act together.  *Litzler*, 411 F. Supp. 2d at 415.  The negotiations between the parties in *Litzler* were far more extensive than in this case.  For example, in *Litzler*, the initial *term sheet* incorporated terms the placement agent had discussed with multiple potential investors.  Moses Aff. in Supp. of Mot. for Summ. J. ¶¶ 3–4, *Litzler*, No. 02 Civ. 6313 (S.D.N.Y. Feb. 03, 2006) (ECF No. 480-2).  There, the investors knew who the other investors were before purchasing securities in Data Race, Inc. ("Data Race") because they were part of the placement agent's "working group."  *See id.* ¶¶ 7–8.  The investors participated in group conference calls with the company and attended a due diligence session together at Data Race's headquarters that was organized by the placement agent, all before finalizing the term sheet in addition to the final transaction documents.  *Id.* ¶ 6.

The SEG communications to which Plaintiff points as proof of group activity do not pass muster. As even Mr. Holmes testified, "the normal way to do it" is to negotiate a PIPE transaction "through [a] placement agent[.]" Trial Tr. 294:9–15 (Holmes). Plaintiff has tried to fit a square peg into a round hole by suggesting that Defendants were sending messages to other investors through SEG and that those communications are somehow evidence of group activity. *E.g.*, Trial Tr. 725:4–11 (Hirsch); 892:2–6 (Lane). In reality, these kinds of communications are necessary (and commonplace) to facilitate complex PIPE transactions with multiple investors. *Id.* 383:6–8 (Nathoo) (testifying that investors "want their own terms in the deal"); 494:1–15 (Nathoo) (testifying that investor feedback is necessary to avoid spending time and money on documents for a deal that no one wants to agree to); 709:2–8 (Hirsch) ("They were doing their job as placement agents just trying to get the deals to work."); 970:10–20 (Lane) (testifying that "clarifying the terms of the transaction documents" through SEG was "important" to make sure "everyone that's involved in the transaction understands how the transaction documents work"); 1099:23 (Reda) ("[T]he final docs can go through many investors.").

The evidence presented in Plaintiff's case in chief, or lack thereof, does not show that Empery's communications with SEG are evidence of group activity. Indeed, Plaintiff put forth no evidence to suggest that Empery was involved in negotiating the terms contained in the January 2020 term sheet between Anson and Genius. Nor did he show that Empery even knew the identities of all of the investors participating in the March 2020 PIPE until after the transaction documents were signed. He likewise points to no working groups, nor joint investor calls with Empery. As in *Litzler*, there is no evidence with respect to Empery that "any business people from any of the three investors consulted with each other regarding their respective decisions to invest." Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 7, *Litzler*, No. 02 Civ. 6313 (S.D.N.Y. Feb.

10

03, 2006) (ECF No. 264-11). Here, Mr. Lane, Mr. Nathoo, and Mr. Hirsch all testified that they did not talk to one another about their investment decisions. Trial Tr. 994:19–21, 998:8–22 (Lane); 641:12–22 (Nathoo); 830:14–19 (Hirsch). In fact, Mr. Hirsch testified that he had never even met Mr. Lane until this case was filed. *Id.* 830:4–6 (Hirsch). None of the emails in the record contradict this testimony. The communications between SEG and the investors cannot fill this crucial evidentiary gap and certainly could not serve as the basis for a reasonable jury's finding that Empery was part of a group.

### 3.    Agreements with the Same Terms in Parallel Investments Are Not Evidence of a Group.

Investors do not form a group by entering into parallel investments on the same terms. *Chechele v. Scheetz*, 819 F. Supp. 2d 342, 349 (S.D.N.Y. 2011), *aff'd*, 466 F. App'x 39 (2d Cir. 2012); *Litzler*, 411 F. Supp. 2d at 416 ("Private offerings of securities generally involve common purchase agreements with subscribers."). The Court also reinforces this principle in its jury instructions:

> In the context of these transactions, activity such as signing the same investment documents, purchasing the same securities at the same time as part of the same transaction with an issuer, communications among investors or their lawyers, or investors' awareness of each other's activities—without an intentional agreement to act together in furtherance of a common objective of acquiring, holding, voting, or disposing of the issuer's securities—is insufficient to form a group. Without more, a group is not formed by parallel but independent investment decisions.

Post-Instruction No. 19 (June 17, 2026). Such is the case here. Each Defendant entered into a securities purchase agreement ("SPA") with the Company in connection with the March 2020 PIPE, as well as separate, but parallel, leak-out agreements in connection with subsequent registered direct transactions. *See Litzler*, 411 F. Supp. 2d at 415 ("General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'"); *see also Nano Dimension*, 681 F. Supp. 3d at 182 ("allegations of parallel investment decisions or pre-existing

11

relationships also do not suffice to plead a group," finding no 13(d) group); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 544, 552–53, 555 (S.D.N.Y. 2014) (dismissing Section 16(b) claims). Plaintiff has not established that these agreements create a Section 13(d) group.

The plain terms of the March 2020 SPA also refute any inference that Defendants acted as a group. Not only are the agreements insufficient to establish the existence of a group, but they also expressly and repeatedly disclaim one with three different provisions. *First*, the March 2020 SPA makes each buyer's obligation independent: "obligations of each buyer under any transaction document are several and not joint with the obligations of any buyer, and no buyer shall be responsible in any way for the performance of the obligations of any buyer under any transaction documents." Trial Tr. 332:23–333:4 (Holmes). *Second*, the March 2020 SPA disclaims concerted action. *Id.* 334:9–13 ("The company acknowledges and each buyer confirms that the buyers are not acting in concert or as a group with respect to such obligations or the transactions contemplated by the transaction documents"). *Third*, the March 2020 SPA confirms that each investor participated independently and on the advice of its own separate counsel, underscoring that these were parallel, but not coordinated, decisions. *Id.* 334:20–23 ("The company acknowledges and each buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors."). Taken together, these provisions establish that the March 2020 PIPE was structured precisely to avoid establishing a group, and that intent was memorialized in the transaction documents. Parallel agreements containing express, mutual disclaimers of group conduct cannot reasonably be read as evidence of the opposite without supporting facts. On this record, without any such supporting facts, no

reasonable juror could conclude that the March 2020 SPA reflects formation of a Section 13(d) group.

The leak-out agreements likewise cannot support an inference of group conduct; if anything, they affirmatively negate one. As Plaintiff's own expert testified, the purpose of a leak-out agreement "is to put a cap on how many shares are dumped onto the market at any moment in time" and that it was a "win-win" for Genius. Trial Tr. 326:7–8, 326:13–14 (Holmes). Critically, none of the leak-out agreements required Defendants to sell their shares at any particular time or to sell at all. *See, e.g.*, *id.* 407:17–24 (Nathoo); 987:11–20 (Lane). The structure of these agreements is the opposite of coordination. As Plaintiff's own witness confirmed, each leak-out agreement was negotiated between a single investor and Genius and "signed individually by individual investors," *id.* 326:21–22 (Holmes), and imposed obligations running only between that investor and the company. *See id.* 817:11 (Hirsch) ("Anything I signed was just between Brio and the company."). By their very nature, the agreements required no coordination whatsoever among the investors to comply. Each investor could satisfy its own leak-out terms unilaterally, without regard to what any other investor did. *E.g.*, PX-576 at TOON00014700-14701. Nor were the agreements the product of investor collaboration. They were required by Genius itself as a condition of registering the shares underlying the securities in the March 2020 PIPE. Trial Tr. 396:4–7 (Nathoo); 987:4–10 (Lane). In other words, the leak-out agreements existed because the issuer demanded them, not because Defendants coordinated to impose them on one another. That multiple investors entered into similar, Company-imposed agreements is therefore not evidence of a group. No reasonable juror could find otherwise.

13

### B.    Plaintiff's Evidence Does Not Show that Empery Intentionally Agreed to Act Together with any Other Investor.

As the Court has recognized, "[t]o establish the existence of such a group, there must be evidence of an agreement." *Litzler*, 411 F. Supp. 2d at 414; June 5 Pretrial Conf. Tr. at 6:23–7:5. Mere parallel conduct does not suffice. *Litzler*, 411 F. Supp. 2d at 415. The trier of fact "must sift through the record to determine whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). Plaintiff has not presented evidence on this point with respect to Empery.

Plaintiff marshalled five witnesses, but none testified that Empery intended to act as a group. The jury heard testimony from representatives of each of Anson, Brio, and Empery. None testified that they intended to join a group. To the contrary, their testimony was, and the evidence supports, that they made independent investment decisions.

Mr. Lane affirmed that Empery never intended to act as a group at any point in time in connection with its investments in Genius. Trial Tr. 997:3–5. He explicitly denied that Empery negotiated the terms of the 2020 PIPE with other investors, or that Empery worked together with Anson to make the transaction happen. *Id.* 858:13–15, 917:15–17. Mr. Lane emphasized Empery's independence, stating, "I wouldn't have invested if I didn't get the terms that I wanted. I would have passed." *Id.* 877:22–878:1. This included his "obsessive" demand for a cash burn covenant, which he negotiated until "minutes before signing" on March 11, and which he confirmed was Empery's demand alone, not Anson's or Brio's. *Id.* 972:16–974:5. This demand was ultimately included in the documents, *see* PX-385 at 7, underscoring Empery's distinct negotiating position. Mr. Lane's independence was further highlighted when he refused to join a registered direct transaction led by Anson just ten days after the March 2020 PIPE, calling it "one of the dumbest things I have ever heard" and confirming Empery instead would pass. DX-321;

14

*see also* Trial Tr. 982:2–3.  The trial testimony also confirms that Empery could not have coordinated its sales even if it had wanted to.  Mr. Hoe, a witness who was not involved in negotiating any of the terms of the March 2020 PIPE, testified that Mr. Lane ceded voting control to him around the same time that Empery sold significant portions of its Genius position, and that during that time Mr. Hoe alone made the decisions to sell.  *Id.* 1265:11–13; 1269:25–1271:18 (Hoe).  At no point has Plaintiff alleged that Mr. Hoe was part of any purported group agreement.  Nor has Plaintiff alleged that Mr. Hoe coordinated the timing or volume of Empery's sales with any other investor.  There is no basis for the jury to conclude otherwise, and the Court should enter judgment in Empery's favor for that reason.

### C.  Plaintiff's Evidence Does Not Show that Empery Agreed to Act in Concert or Pooled Its Beneficial Ownership in Furtherance of a Common Objective.

Empery understands the Court's position to be that pooling of beneficial ownership is not required to form a group, but respectfully presents the following argument to preserve it.  Section 13(d) was added to the Exchange Act in 1968 as an "'early warning' mechanism to alert the investing public when a person or group of persons accumulates a significant position in the issuer's securities, signaling a potential shift in corporate control."  Peter J. Romeo & Alan L. Dye, Section 16 Treatise and Reporting Guide § 2.03 (2024 ed.) ("Romeo & Dye") (citing *GAF Corp. v. Millstein*, 453 F.2d 709 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972)).  Congress adopted the group concept to "prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute."  Romeo & Dye § 2.03 (quoting H.R. Rep. No. 1711, 90th Cong. (1968)); *accord CSX*, 654 F.3d at 282; *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (statute serves to "alert investors to potential changes in corporate control").

To qualify as a group, Section 13(d) requires that investors "combine[]" to act "in furtherance of a common objective." *CSX*, 654 F.3d at 283. The combination is a combination *of beneficial ownership*, *i.e.*, voting or investment power. When the Second Circuit held in *Wellman* that "the touchstone of a group" is a combination to act "in furtherance of a common objective," it necessarily meant a "combination [of beneficial ownership] in furtherance of a common objective." 682 F.2d at 363; *see CSX*, 654 F.3d at 284 (group members must act as a single unit); *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 373 (S.D.N.Y. 1979) (definition was designed to capture classic change-of-control scenario: activist investors who band together to pursue, pressure, or take over a company, pooling economic and voting power in service of a shared corporate agenda).

Plaintiff has relied on authorities throughout this case that confirm this proposition. In *Morales v. Quintel Ent. Inc.*, for instance, a sales agreement with extended lock-up provisions among three shareholders of a closely held company suggested "that [defendants] reached a mutual agreement with respect to holding and disposing of shares"—an agreement relating to their joint beneficial ownership. 249 F.3d 115, 119, 126 (2d Cir. 2001). And in *Greenberg v. Hudson Bay Master Fund Ltd.*, the defendants jointly incorporated a Bitcoin start-up, pooled the issuer's convertible notes and cash to fund its assets, and sold it for new convertible preferred stock. 2015 WL 2212215, at *3, *6 (S.D.N.Y. May 12, 2015). Both cases turned on joint beneficial ownership, not mere parallel cooperation.

Cooperative activity that falls short of that mark is not a group. "[T]he cooperative activity characteristic of an institutional private placement generally results from sound business considerations . . . rather than from a desire to affect control of the issuer," typically ends when the transaction closes, and is "of little interest to investors." Filing & Disclosure Requirements

16

Relating to Beneficial Ownership, Release No. 5925 (Apr. 21, 1978); *see also* Modernization of Beneficial Ownership Reporting, Release No. 94211 (Feb. 10, 2022) (primary purposes of Section 13(d) "are to provide information to the public and the subject issuer about accumulations . . . by persons who had the potential to change or influence control").

This understanding is consistent with Judge Kaplan's decision in *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, which framed combining to form a group as "analogous to a charge of conspiracy." 95 F. Supp. 2d 169, 176 (S.D.N.Y. 2000). Conspiracy requires evidence that the participants pursued "the same object." *Freeman v. HSBC Holdings PLC*, 57 F.4th 79 (2d Cir. 2023); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018) ("Proof of a conspiracy . . . require[s] . . . direct or circumstantial evidence that reasonably tends to prove a conscious commitment to a common scheme designed to achieve an unlawful objective.") (alteration and internal quotation marks and citations omitted). That is more than parallel transactions, even among parties in communication:

> The fact that several investors conclude that a stock is undervalued and buy it does not necessarily mean that they formed a group. Indeed, that's true even if they all know one another, speak on the phone every day, and even if one of their number was the guy who first had the idea that the stock was undervalued and told everybody else.

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, No. 00 Civ. 01115-LAK (S.D.N.Y. Feb. 23, 2001), at 615:3–8, *aff'd* 286 F.3d 613 (2d Cir. 2002) (ECF No. 321-4). The "common objective" required for group liability—the effective equivalent of a conspiracy's "object"—thus requires something far more specific than a shared profit motive: "every one of these defendants had a common purpose. They have all acted and they are acting today for the common purpose of making money on their investments . . . . That is quite obviously not enough." ECF No. 321-4 at 613:6–10.

17

Plaintiff has adduced no evidence of a common objective by Empery to pool investment power or effect control.  Indeed, Empery was approached *by the Company* to provide the financial assistance the Company desperately needed.  It cannot be that in the parallel transaction context, investing itself suffices to support the existence of a Section 13(d) group as required to state a Section 16(b) claim.  Plaintiff must point to some object, and he has not done so here with respect to Empery.  Accordingly, even viewed most favorably to him, Plaintiff's evidence at most suggests a common objective to buy and profit, which is insufficient.

### D.    Max Holmes's Testimony Cannot Support a Jury Verdict in Plaintiff's Favor.

Of Plaintiff's witnesses, only his hired expert testified that "I think in one of my reports I said that the existence of these leak-out agreements was—in my opinion, could be viewed by the finder of fact as evidence of group coordination."  Trial Tr. 351:7–9 (Holmes).  Mr. Holmes, having no personal knowledge of the facts of this case, testified repeatedly that the terms of the parties' agreements were "unusual" but that "[e]very one of these [unusual] terms . . . had appeared previously sometime in U.S. corporate history.  So it's not like the people putting this deal together had invented some brand new thing that had never occurred.  But my analysis is that putting so many of them on the same transaction was a Christmas tree with too many ornaments."  *Id.* 273:6–12.  Even if this testimony could possibly be construed as supportive of Plaintiff's group theory, the record plainly shows that the agreement terms were the product of Genius's financial condition and the general market conditions at the time.  *See, e.g., id.* 301: 8–12 (Holmes) (agreeing that "distressed, insolvent, or [nearly] bankrupt[]" companies "need to offer better terms to investors" and "routinely" accept "more investor-friendly protections"); 976: 21–25 (Lane) (explaining that Empery's investment in Genius was a product of deal terms that sufficiently addressed the company's risks); 638:1–10 (Nathoo) ("[O]bviously the company was distressed.  And so the

18

potential upside that investors could earn from the deal needed to be higher because you were taking on more risk."); *see also id.* 302:1–9 (Holmes).

Plaintiff's case hinges on Mr. Holmes's testimony. Each of the other four witnesses called by Plaintiff testified that Defendants were not acting as a group. A reasonable jury could not find Empery liable on this basis alone.

### 1.    Holmes's Testimony Is Irrelevant to the Group Inquiry.

*First*, Mr. Holmes's testimony is completely untethered from the group inquiry. In its ruling on Defendants' Motion in Limine #8, the Court held, consistent with its summary judgment ruling, that Plaintiff could only introduce evidence regarding "whether the terms of transaction documents were standard" if he "show[s] the relevance of the standard or nonstandard nature of documents to group existence." Pretrial Conf. Tr. 35:20–25 (June 1, 2026). The Court later clarified that Plaintiff's expert would be permitted to explain that the agreements "were nonstandard in a way that showed that the [D]efendants were operating as a group because they relied on trust that other [D]efendants would not invoke the provisions in the agreements that may have been the undoing of the entire deal and potentially have a catastrophic effect on the company[.]" Pretrial Conf. Tr. 15:3–16:2 (June 5, 2026). Mr. Holmes made no such showing with respect to the agreement terms.

Whether transaction terms are "industry standard," standing alone, is not relevant to the question of group formation. *See, e.g.*, *Hallwood Realty Partners, L.P.*, at 615:3–15 (ECF No. 321-4) (rejecting ticking off factors as part of analysis of group formation and instead endorsing whether there is an inference of collusion in light of all the circumstances). The only case Empery is aware of that mentions whether a particular term is common in connection with the Section 13(d) group inquiry is *Lowinger*, which involved a lock-up agreement among underwriters in

connection with Facebook's initial public offering.  After plaintiff's counsel in that action contended that a lock-up agreement should be a basis for group liability, the Second Circuit noted that lock-up agreements are "common . . . even essential, to the typical IPO." *Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122, 131 (2d Cir. 2016).  But there is nothing in *Lowinger* to suggest that the Second Circuit intended to make an "industry standard" test part of the group analysis.  Transaction terms necessarily reflect the needs and priorities of particular issuers and investors, like those contained in the agreements in this case.  Moreover, nothing in Section 13(d) requires the use of a particular set of transaction terms or penalizes the use of novel terms.

Mr. Holmes admittedly has no personal knowledge of the events at issue in this case.  Trial Tr. 198:13–14 (Holmes).  His testimony was riddled with speculation and conjecture and never connected the purportedly "unusual" nature of the agreement terms to the existence of a group.  Expert testimony is irrelevant if not "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Novartis Pharma AG v. Incyte Corp.*, 20-cv-400-GHW, 2024 WL 3608338, at *4, *11 (S.D.N.Y. July 29, 2024) (excluding testimony where "expert recently retained . . . for purposes of [] litigation" did "not possess any personal knowledge of what [the parties] were thinking during the negotiations and drafting process" so "[a]ny speculations . . . regarding the 'real motive' the parties had in entering into the Agreement . . . [wer]e improper"); *In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 543–44 (S.D.N.Y. 2004) (finding testimony related to "ethical standards" based on experts' "personal, subjective views" was unreliable, unhelpful, and irrelevant because it "would not assist the fact-finder in determining" whether the defendants breached their legal duties and whether those breaches were the proximate cause of the plaintiff's injury); *see also Sigmon for Hindon v. Goldman Sachs Mortgage Co.*, 12-cv-3367-ALC, 2018 WL 1517189, at *4 n.4 (S.D.N.Y. Mar.

20

26, 2018) ("well-settled that contract interpretation is not a proper subject of expert testimony"). As to Genius's bleak financial condition during the relevant time period, Mr. Holmes had no answer but to concede as much. Trial Tr. 301: 8–12 (Holmes). As such, nothing in Mr. Holmes's testimony will aid the jury in resolving the issue of whether Empery was part of a group. It is thus irrelevant and could not serve as a basis for a reasonable jury's verdict.

### 2.    Holmes's Testimony Is Contradicted by Record Evidence and Cannot Support a Group Finding.

*Second*, his testimony is too conclusory to carry Plaintiff's burden. Mr. Holmes's testimony cannot sustain a jury's verdict. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) (holding that expert testimony cannot sustain a jury verdict where the expert's opinion fails to account for or is contradicted by indisputable record evidence of actual market conditions). Additionally, "'expert opinion evidence . . . has little probative value in comparison with the economic factors' that may dictate a particular conclusion." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n.19 (1986)). Similarly, purely speculative expert testimony is insufficient to support a jury's verdict. *See Medism Ltd. v. BestMed LLC*, 959 F. Supp. 2d 396, 423–24 (S.D.N.Y. 2013) (granting new trial and judgment as a matter of law where no reasonable juror could have relied upon conclusory testimony from experts), *aff'd in part and rev'd in part on other grounds*, 758 F.3d 1352 (Fed. Cir. 2014); *see also Hersko v. U.S.*, 13-CV-3255-JLC, 2017 WL 1957272, at *6 (S.D.N.Y. May 11, 2017).

Over the course of his testimony, Mr. Holmes referred to various aspects of the Genius transactions in which Defendants participated as "unusual" thirty-two times. What Mr. Holmes

21

did not do is provide any factual support for these conclusory statements or establish how the "unusual" characteristics are connected to any kind of coordination among the investors. This is compounded by the fact that Mr. Holmes's opinion failed to account for the "economic factors" that dictated the terms of the parties' agreements, *i.e.*, that the Company was on the verge of bankruptcy and the market instability caused by the COVID-19 pandemic. *See Brooke Grp. Ltd.*, 509 U.S. at 242. Mr. Holmes's testimony is contradicted by the indisputable facts in the record established by all four of Plaintiff's other witnesses, who testified that the relevant transactions were conducted in the same manner as other parallel transactions in which they have participated, and that the terms of the March 2020 PIPE were dictated in large part by the Company's impending bankruptcy and the prevailing market conditions. *See, e.g.*, Trial Tr. 301: 8–12 (Holmes); 976: 21–25 (Lane); *see also id.* 302:1–9 (Holmes). Even if this kind of expert testimony could serve as the basis for a jury's verdict, no reasonable jury could rely on it to rule in Plaintiff's favor.

## CONCLUSION

For the foregoing reasons, Empery respectfully requests that the Court grant its motion for judgment as a matter of law.

Dated: June 17, 2026
     New York, New York

**FRESHFIELDS US LLP**

*/s/ Nicholas A. Caselli*
Andrew D. Gladstein
Timothy Howard
Nicholas A. Caselli
Jacob Johnston
Alexandra Carlton
Shannon Sciaretta
Sruthi Rao

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
Telephone: (646) 231-7098
andrew.gladstein@freshfields.com
timothy.howard@freshfields.com
nicholas.caselli@freshfields.com
jacob.johnston@freshfields.com
alexandra.carlton@freshfields.com
shannon.sciaretta@freshfields.com
sruthi.rao@freshfields.com

*Counsel for Defendants Empery Asset Master, Ltd., Empery Debt Opportunity Fund, LP, Empery Tax Efficient, LP, and Empery Asset Management, LP*

**CERTIFICATE OF WORD COUNT**

I, Nicholas A. Caselli, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules") and Rule 8(C) of Judge Arun Subramanian's Individual Practices in Civil Cases ("Individual Rules"), that the foregoing Memorandum of Law was prepared using Microsoft Word, contains 7,200 words in accordance with the Local Rules and the Individual Rules.  In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated:  June 17, 2026                          */s/ Nicholas A. Caselli*
        New York, New York                     Nicholas A. Caselli

24