

**ABRAHAM, FRUCHTER & TWERSKY, LLP**

June 17, 2026

**By ECF**

The Honorable Arun Subramanian
United States District Judge
United States District Court
Southern District of New York
500 Pearl St., Courtroom 15A
New York, NY 10007

      Re:    *Augenbaum v. Anson Investments Master Fund, L.P., et al.* Case No. 1:22-cv-0249

Dear Judge Subramanian:

Pursuant to Fed. R. Civ. P. 50(a)(2), Plaintiff respectfully moves for judgment as a matter of law on the issue of group formation under §13(d) of the Securities Exchange Act of 1934. The uncontroverted trial record establishes that the Empery and Brio Defendants each combined with all alleged group members to form a §13(d) group from March 11 through July 8, 2020. Because Defendants actively coordinated the material terms of their investments, no reasonable jury would have a legally sufficient evidentiary basis to find for Defendants on this issue. Disgorgement of short-swing profits under §16(b) is required as a matter of law because the record facts demonstrate that Brett Director of Empery negotiated with Anson through its counsel, EGS's Robert Charron, on the substantive terms pursuant to which Anson and Empery would agree to purchase Genius's securities in the March 2020 PIPE. Had Anson refused Empery's demands, Empery would not have purchased securities. Genius could not refuse because it was running out of money and Anson and Brio both had blocking rights and had already combined through negotiations in the fall of 2019 and through SEG incorporating Brio's suggestions into Anson's January 2020 term sheet.

## I.    The Uncontradicted Trial Record Establishes Group Formation

The "touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). While concerted action need not be expressly memorialized in writing, *id.*, the record here contains explicit, undisputed evidence of coordinated negotiations over the acquisition, holding, and disposition of Genius securities. Most notably, (1) the group members explicitly discussed their goal of achieving a deal that involved "no shorting" and "no selling" (PX-78), (2) the investors demanded that the March 2020 PIPE documents be modified to specifically prevent the group members from selling their shares (PX-671), and (3) before permitting the group members to sell the PIPE equity, required the members to agree to leak-out agreements that set forth the precise circumstances under which Defendants could sell (*e.g.*, Tr. 395:14-17; PX-576). Those leak-out agreements remained in effect through July 8, the final day of the group period.

**Empery's Coordinated Negotiations:** The record proves that Director directly negotiated substantive deal terms with Anson through Charron to ensure Empery and Anson would combine



The Honorable Arun Subramanian
June 17, 2026
Page 2 of 4

to purchase Genius securities on identical, mutually beneficial terms through the March 11, 2020 PIPE. Tr. 888:9-13. Empery conditioned its investment on Anson yielding to remove registration rights. Tr. 864:7-11. Further, Mr. Lane confirmed that Heyward's voting and lockup agreements were closing deliverables without which Empery would not have funded the PIPE. Tr. 1010:3-13.

**Brio's Coordinated Inter-Investor Terms:** Brio insisted that all investors agree not to short Genius stock. Tr. 706:19-25. Brio's Hirsch negotiated proposed deal terms with Anson, routing comments through Heyward and SEG. Tr. 710:17-711:12. Brio received Anson's draft term sheet—contrary to SEG's standard practices—and funneled substantive edits back through SEG, which were integrated into the term sheet before Anson executed it. Tr. 718:2-719:25; *see also* Tr. 1379:11-1380:2. Brio was aware or must have known that his comments on the proposed term sheet were being relayed to Anson's Nathoo to enable the two funds to coordinate their conduct in purchasing Genius securities in the March 11, 2020 PIPE. *E.g.*, PX-181.

**Post-PIPE Post-Closing Coordination:** The group's alignment continued. Shares sold in subsequent Registered Direct offerings were restricted exclusively to March 2020 PIPE investors. Tr. 517:2-6. Brio purchased Genius stock in each of the registered direct offerings following the March 2020 PIPE and Empery purchased in all the registered direct offerings staring with May 7, 2020, all of which were only offered to investors who had participated in the March 2020 PIPE. *E.g.*, Tr. 516:18-517:19. Then, all investors including Anson, Brio and Empery agreed to limit their sales of Genius stock acquired through securities received in connection with the warrants and notes, respectively, through a leak-out agreements dated May 18, 2020, and June 23, 2020. Tr. 498:15-22. Each Defendant entered into the leak-out agreements knowing all other Defendants were doing so. *E.g.*, PX-690, PX-691. Anson's Nathoo admitted this was to ensure investors did not cut ahead of one another, which would he claimed would be unfair (Tr. 398:7-22), because it would enable investors not signing the leak-out to front their sales before other investors could sell.

This record, therefore, demonstrates conduct on the part of Brio and Empery, and other March 2020 PIPE investors, far surpassing "parallel investing" activity, with coordination with respect to purchasing, selling, holding, and voting Genius securities through direct and indirect communications. Indeed, Defendants admit to direct, inter-investor communications and negotiations to achieve a collective, unified deal structure for the March 2020 PIPE. Tr. 433:11-22, 493:22-494:7, 782:11-24, 1133:8-19.

## II.      Defendants' Defenses Are Foreclosed as a Matter of Law

**Boilerplate Disclaimers Cannot Override Documented Conduct:** Defendants rely on boilerplate disclaimers of group status in transaction documents. However, the Second Circuit is pellucid that when investors explicitly coordinate their conduct, "attempted disclaimers of the legal effect of such joint action" are entirely futile. *Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007).

**Pre-Existing Blocker Rights and Subjective Motives Are Irrelevant:** Defendants argue that their communications were independent actions compelled by pre-existing blocker and consent rights. *E.g.*, Tr. 724:19-725:2. There is, however, no safe harbor shielding coordinating activities driven by consent or blocker rights. Instead, pre-existing contractual links are precisely

The Honorable Arun Subramanian
June 17, 2026
Page 3 of 4

the type of relationships that support a group finding. *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 416 (S.D.N.Y. 2006) (citing *Morales v. Quintel Entertainment, Inc.,* 249 F.3d 115, 127 (2d Cir. 2001)). Whether Defendants would allow their prior investments be wiped out by a bankruptcy is irrelevant; the record demonstrates they combined to engage Genius in a collective deal.

### III.    The Material Facts of This Matter Stand in Sharp Contrast to *Litzler*

Defendants' continued reliance on *Litzler* is misplaced. There, Judge Hellerstein granted summary judgment because "[p]laintiff show[ed] nothing more than the use of a lead draftsman, at the behest of [the issuer], by the investors." *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 416 (S.D.N.Y. 2006); *accord* Dkt. 480-6 at 17:7-11 (finding the transaction's terms were "dictated by the company and not by the investors. They were for the convenience of the company and not for the convenience of the investors"); Dkt. 480-2, ¶4 (the placement agent swore that the identities of the potential investors were kept secret from one another when soliciting potential investors). Here, the record demonstrates the exact inverse: SEG revealed all investors' identities and ongoing participation to the group at every opportunity, and Brio and Empery successfully dictated material terms of the investment despite not acting as lead investors, as explained above.

Anson and Brio circulated drafts, integration of inter-investor edits, with direct negotiations among investors resulting in Defendants coordinating their conduct to dictate investment terms to the Company. The terms of the March 2020 PIPE and the Leak-Out Agreements being set by Defendants, and disputes not even being settled by the issuer constitute clear, objective grounds establishing a §13(d) group. *See Schaffer v. CC Investments, LDC*, 2002 WL 31869391, at *7 (S.D.N.Y. Dec. 20, 2002); *Greenberg v. Hudson Bay Master Fund Ltd.*, 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015).

Defendants repeatedly argued that actions rooted in "sound business considerations" are allowed for efficiency in parallel transactions (*e.g.*, Dkt. 242 at 2) and, in opposing summary judgment, denied having "communicated 'directly and indirectly' with each other to negotiate the relevant transaction documents[,]" instead insisting they negotiated only with Genius or SEG. Dkt. 253 at 5. They now contend the record reflects routine and necessary behavior to get a multi-investor deal done, but their second submission of briefing from *Litzler* breaks that narrative. The *Litzler* defendants argued the "undisputed facts show only 'independent parallel action' and even that only to the degree 'characteristic of an institutional private placement[,]'" (Dkt. 480-3 at p.3) explaining that "[t]hose facts are present here and they are present in virtually every private placement" are "[1] purchased convertible securities from the issuer in the same agreement, [2] there was a common registration statement, and [3] the investors had one lawyer taking the lead on drafting documents and processing comments from all investors." Dkt. 480-3 p.6 n.2. Moreover, the draftsman "acted as a [scrivener] not a lawyer for any of the other parties." Dkt. 480-6 at 7/26:10-13. The record shows limited handwritten suggestions to the deal documents were faxed to the scrivener from other investors. *E.g.*, Dkt. 480-5, 54-62/126. Thus, parallel investment is not mutually exclusive with activity that forms a §13(d) group as a matter of law.

Plaintiff thanks the Court for its time and consideration, and incorporates the arguments made in his summary judgment motion herein by reference.

The Honorable Arun Subramanian
June 17, 2026
Page 4 of 4

Respectfully submitted,

Jeffrey S. Abraham

cc:    All counsel of record (via ECF)