**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

TODD AUGENBAUM,

        Plaintiff,

   -against-

ANSON INVESTMENTS MASTER FUND LP;
BRIO CAPITAL MASTER FUND LTD.; BRIO
SELECT OPPORTUNITIES FUND, LP;
DEFENDANT INVESTMENTS, INC.; EMPERY
ASSET MASTER, LTD.; EMPERY DEBT
OPPORTUNITY FUND, LP; EMPERY TAX
EFFICIENT, LP; IROQUOIS MASTER FUND
LTD.; IROQUOIS CAPITAL INVESTMENT
GROUP, LLC; L1 CAPITAL GLOBAL
OPPORTUNITIES MASTER FUND; M3A LP;
RICHARD MOLINSKY,

        Defendants,

   -and-

KARTOON STUDIOS, INC.,

        Nominal Defendant

Case No. 22 Civ. 00249 (AS)

---

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS POST-TRIAL MOTIONS**

| MANDEL BHANDARI LLP | ABRAHAM, FRUCHTER & TWERSKY, LLP |
|---|---|
| Evan Mandel | Jeffrey Abraham |
| Robert Glunt | Michael Klein |
| A. Leah Vickers | 450 7th Avenue, 38th Floor |
| 80 Pine Street, 33rd Floor | New York, New York 10123 |
| New York, NY 10005 | (212) 279-5050 |
| (212) 269-5600 | |

*Attorneys for Plaintiff Todd Augenbaum*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ............................................................................................................................................. 2

ARGUMENT ................................................................................................................................... 6

    I.      PLAINTIFF IS ENTITLED TO JUDGEMENT AS A MATTER OF LAW ............ 6

          A.      Applicable Standard.................................................................... 6

          B.      Pre-Term Sheet Negotiations Between Brio and Anson ............................ 7

          C.      Pre-Closing Negotiations Between Anson and Empery ............................ 9

          D.      Post-March 2020 PIPE Coordination...........................................11

          E.      Defendants' Defenses Are Foreclosed as a Matter of Law ....................... 14

          F.      Defendants' Arrangements with Heyward Independently Created a §13(d) Group....................................... 17

    II.      PLAINTIFF IS ENTITLED TO A NEW TRIAL ................................................. 20

CONCLUSION................................................................................................................ 25

i

## TABLE OF AUTHORITIES

**Cases**

*Abascal v. Fleckenstein*,
   820 F.3d 561 (2d Cir. 2016) .................................................................................... 21

*Alfaro v. Wal-Mart Stores, Inc.*,
   210 F.3d 111 (2d Cir. 2000) ..................................................................................... 6

*Arlio v. Lively*,
   474 F.3d 46 (2d Cir. 2007) ...................................................................................... 21

*Bevevino v. Saydjari*,
   574 F.2d 676 (2d Cir. 1978) .................................................................................... 20

*Cameron v. City of New York*,
   598 F.3d 50 (2d Cir. 2010) ...................................................................................... 21

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*,
   654 F.3d 276 (2d Cir. 2011) .............................................................................. 18, 19

*Cty. of Ontonagon, Mich. v. Land Located in Dickinson Cty., Mich.*,
   902 F.2d 1568 (6th Cir. 1990) ................................................................................ 21

*DLC Mgmt. Corp. v. Town of Hyde Park*,
   163 F.3d 124 (2d Cir. 1998) .................................................................................... 20

*Donoghue v. Bulldog Investors General Partnership*,
   696 F.3d 170 (2d Cir. 2012) ..................................................................................... 6

*Farrior v. Waterford Bd. of Educ.*,
   277 F.3d 633 (2d Cir. 2002) .................................................................................... 20

*Feder ex rel. Ivax Corp. v. Frost*,
   220 F.3d 29 (2d Cir. 2000) ....................................................................................... 7

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*,
   66 N.Y. 2d 38 (1985) ............................................................................................... 19

*Greenberg v. Hudson Bay Master Fund Ltd.*,
   2015 WL 2212215,
   (S.D.N.Y. May 12, 2015) ........................................................................................ 15

*Gross v. United States*,
   Case No. 07 Civ. 11298 (RMB)(JCF), 2009 WL 2195976,
   (S.D.N.Y. July 21, 2009) ......................................................................................... 23

*Litzler v. CC Invs., L.D.C.*,
411 F. Supp. 2d 411 (S.D.N.Y. 2006) ................................................................. 14, 15, 16

*Lowinger v. Morgan Stanley & Co. LLC*,
841 F.3d 122 (2d Cir. 2016) ................................................................................. 17, 19

*Manley v. AmBase Corp.*,
337 F.3d 237 (2d Cir. 2003) ....................................................................................... 20

*Meng Huang v. Ohio State Univ.*,
116 F.4th 541 (6th Cir. 2024) ............................................................................... 23, 24

*Morales v. New Valley Corp.*,
999 F. Supp. 470 (S.D.N.Y. 1998) ............................................................................. 17

*Morales v. Quintel Entertainment, Inc.*,
249 F.3d 115 (2d Cir. 2001) .............................................................................. 14, 16, 18

*Raedle v. Credit Agricole Indosuez*,
670 F.3d 411 (2d Cir. 2012) ....................................................................................... 21

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ..................................................................................... 7, 14

*Schaffer v. CC Investments, LDC*,
2002 WL 31869391,
(S.D.N.Y. Dec. 20, 2002) ........................................................................................... 15

*Song v. Ives Laboratories, Inc.*,
957 F.2d 1041 (2d Cir. 1992) ..................................................................................... 20

*United States v. Landau*,
155 F.3d 93 (2d Cir. 1998) .......................................................................................... 20

*United States v. Salmonese*,
352 F.3d 608 (2d Cir. 2003) ........................................................................................ 23

*Wellman v. Dickinson*,
682 F.2d 355 (2d Cir. 1982) .......................................................................................... 7

**Statutes**

15 U.S.C. §78m(d)(3) ........................................................................................................ 15

Section 16(b) of the Securities Exchange Act of 1934,
15 U.S.C. § 78p(b) ........................................................................................................ 6

**Rules**

Fed. R. Civ. P. 50 .................................................................................................. 6, 19

Fed. R. Civ. P. 56 ..................................................................................................... 6

Fed. R. Civ. P. 59 ................................................................................................... 20

**Regulations**

17 C.F.R. §240.13d-6(b)(4) ..................................................................................... 16

**TABLE OF ABBREVIATIONS**

| Abbreviation | Item |
|---|---|
| Anson | Anson Investments Master Fund LP |
| Brio | Defendants Brio Capital Master Fund Ltd.; Brio Select Opportunities Fund, LP |
| Dkt. | Docket entries in this action |
| DX__ | Defendants' Admitted Trial Exhibits |
| Empery | Empery Asset Master, Ltd.; Empery Debt Opportunity Fund, LP; Empery Tax Efficient, LP |
| Genius | Genius Brands International |
| PX__ | Plaintiff's Admitted Trial Exhibits |
| SEG | Special Equities Group, Inc. |
| TR | Trial Transcript |

Plaintiff Todd Augenbaum respectfully moves pursuant to Fed. R. Civ. P. 50(b) and 59 for judgment as a matter of law, and either conditionally or in the alternative for a new trial against Defendants Empery and Brio.

### PRELIMINARY STATEMENT

The undisputed facts in this case demonstrate that the terms of the March 2020 PIPE were the product of knowing direct coordination between Anson and Defendants through both SEG and counsel.  Similarly, the undisputed facts in this case demonstrate that Defendants knowingly intended to have an arrangement with Heyward for the purpose of facilitating a later purchase by Defendants of Genius shares at a lower price of $0.21 per share through the Voting Agreement and facilitating future profitable sales of Genius stock by Defendants by requiring Heyward to hold, *i.e.*, not sell the substantial amount of Genius stock he owned.  As a result, and as set forth in greater detail below, this Court should award Plaintiff judgment as a matter of law under Rules 50(a) and 50(b) because the undisputed facts prove that Empery and Brio acted as a group together with Anson, Heyward, and other investors for the purpose of purchasing, selling, holding and voting Genius stock.

In the alternative, the Court should order a new trial under Rules 50 and 59.  Plaintiff submits that a new trial is appropriate for two reasons.  ***First***, to the extent that the Court finds it necessary to weigh evidence or evaluate witness credibility to determine whether Defendants acted as a group, Plaintiff submits that any fair evaluation of such factors would weigh in favor of such a finding.  As such, the jury's verdict is against the weight of the credible evidence and should be set aside in favor of a new trial.  ***Second***, the Court's evidentiary ruling prohibiting evidence that Defendants participated in a "pump and dump" scheme in connection with their

purchases and sales of Genius shares, while permitting Defendants to argue that they "saved the business" was incorrect and independently mandates a new trial.

## FACTS[1]

In August 2019, Genius was desperate for funding after a failed secondary offering. TR 1427:11-1428:6. Anson and Brio, among other investors holding the Company's debt, began collaborating on a plan to provide that funding.  PX 63; PX 67.  Anson and Brio, operating through their principals, Amin Nathoo and Shaye Hirsch, began discussing with each other and Heyward potential investments in Genius, including the prospect of a registered direct purchase, a "friends and family" round, a "bridge loan," and ultimately, a "PIPE" transaction.[2]  TR 701:4-25; PX 63; PX 69; PX 76; PX 78.  Heyward himself was a large shareholder of Genius beneficially owning at least 9.99% of its common stock.  PX 112.

Brio sought to leverage any planned investment to obtain a right to participate in future fundings of Genius.  PX 102.  Brio and Anson, despite numerous negotiations conducted through SEG and Heyward and at least one direct phone call, were unable to come to an agreement on a short-term bridge financing transaction in late 2019.  PX 125.  However, Brio through SEG communicated with Anson to negotiate the provisions of a term sheet governing the larger financing which eventually evolved into the March 2020 PIPE.  Thus, when Anson sent an initial term sheet for the PIPE to SEG on January 14, 2020, SEG promptly forwarded it to Brio for comment before anyone at Genius itself had even finished a review.  PX 174.  *Id.*  Brio and Anson then communicated with each other through SEG concerning the terms of the PIPE

---

[1]    The facts and circumstances giving rise to this action have long been familiar to the Court.  Only those essential to this application are set forth below.

[2]    "PIPE" is short for "private investment in public equity," which means a privately negotiated transaction in a company with publicly issued securities, in contrast with a public offering of securities to the market.

transaction with Brio's edits being incorporated in the Term Sheet as signed by Anson and Genius on January 22, 2020.  PX 173; PX 181; 187; PX 193; PX 194; PX 189, PX 202.

On January 23, 2020, SEG reached out to Empery, which had initially refused to invest even one dollar in the PIPE on any terms (PX 67) as a possible investor in the PIPE.  TR 854:11-19; PX 206.  Empery agreed to "take over the documents" and have its in-house counsel, Brett Director, work on improving terms for investors.  PX 232.  Lengthy direct communications ensued between Director and Anson's counsel, Robert Charron, concerning the substantive terms of the PIPE, including removing a provision providing for registration of the PIPE shares. Empery instead insisted that those the shares purchased in the PIPE remain unregistered and ineligible for public sale for at least six months.  PX 238; TR 872:5-18.  The same negotiations also led to a doubling of the original issue discount from 10% to 20%. TR 841:10-843:7.

Another factor influencing Genius's stock price, though one never disclosed to the jury, were efforts by Anson, Heyward and SEG to control the news flow concerning the Company.  In September 2019, Anson instructed Heyward to begin suppressing positive announcements concerning Genius to lower the stock price.  PX 70.  Heyward did so by not engaging in "any publicity at all" for three months prior to the March 2020 PIPE.  PX 295, PX 439.  Heyward then promised Anson that he would take his "boatload of news" and "roll[] it out continuously for the next few weeks" in an effort to raise the price of the stock immediately after Defendants' acquisition.  PX 439.  Heyward also strategized with SEG concerning the timing of press releases and boasted about the "30%" jump that he had been able to achieve by releasing two on the same day.  PX 410.  Heyward also advised other investors that he was withholding positive news until after the PIPE was announced to pump up the price of stock after the investment was made.  PX 295; PX 439.

3

Defendants were thoroughly familiar with the terms of all the agreements entered into in connection with the March 2020 PIPE and understood of the transaction's terms.  TR 743:9-22; 866:14-867:1.  The Notes which Empery and Brio purchased were initially convertible into Genius common stock at $1.375 per share and the Warrants purchased were exercisable at $0.26 per share.  PX 387.  However, the Term Sheet provided that the price would ultimately be re-set to $0.21 per share as would higher priced Genius warrants which both Empery and Brio owned through prior investments in Genius.  PX 202.

Accordingly, the SPA also provided that the Notes and Warrants, as well as previously issued Warrants which Empery and Brio owned, would be repriced to a $0.21 per share exercise or conversion price at a shareholder's meeting ultimately scheduled for May 15, 2020.  PX 387 § 4(i).  Heyward was key to that planned repricing based upon his large shareholdings in Genius and, as a result, the SPA provided as a closing condition that Heyward and other principal shareholders sign the Voting Agreement (which required that they vote in favor of the relevant shareholder resolutions) prior to the closing of the SPA.  *Id.* § 4(q).  The SPA also required as a closing condition that Heyward enter into a Lock-Up Agreement pursuant to which he could not sell his Genius stock for more than a year.  *Id.* § 7(xiv).

After the March 2020 PIPE closed, as Genius' stock price began to rise with the pre-planned avalanche of press releases, Genius sold millions of shares in the following registered direct offerings.  The Company sold stock in a series of registered direct offerings, pursuant to which it sold registered, immediately tradable shares at a discount to the market price.  The offerings were as follows:

4

| Date | Shares | Price | Participants |
|---|---|---|---|
| March 22 | 4,000,000 | $0.2568 | Anson, Brio |
| May 7 | 8,000,000 | $0.35 | Anson, Brio, Empery |
| May 8 | 12,000,000 | $0.454 | Anson, Brio, Empery |
| May 18 | 7,500,000 | $1.20 | Anson, Brio, Empery |
| May 28 | 20,000,000 | $1.50 | Anson, Brio, Empery |

PX 429; PX 483; PX 504; PX 603.  In the May 7, May 8, May 18, and May 28 RDs, Empery and Brio purchased stock in rough proportion to their pro rata participation in the March 2020 PIPE. *Id.*

After May 15, 2020, when the shareholder resolution approving a new $0.21 per share exercise and conversion price for the Notes and Warrants had been approved, Anson and Empery directly communicated with each other through their attorneys regarding their combined objective to facilitate the profitable sale of the shares acquired through the March 2020 PIPE. PX 519; TR 1580:18-1584:8.  Those discussions resulted in having Genius agree to register the stock underlying the Notes and Warrants issued in the March 2020 PIPE, a set of "leak-out" agreements constraining the number of Genius shares which could be sold below a set price, and a conversion agreement requiring investors to convert the Notes in the final tranche of the March 2020 PIPE into Genius common stock.  PX 690; PX 691; TR 498:15-22.  Defendants requested the leak out agreements with SEG telling Genius and other investors that Anson in particular had insisted upon having such an agreement.  PX 525; PX 538; PX 544. To that end, each Defendant requested and was provided with a schedule of how much each other investor could sell. PX 690; PX 691.

5

The registration of the 59,523,812 shares of common stock issuable upon conversion of the Notes became effective late on July 6, and Defendants could sell their shares on the public markets on July 7.  TR 1162:20-1163:5; PX 714; PX 722.  Defendants quickly liquidated virtually their entire positions in Genius stock.  TR 239:24-241:15.  Anson claimed to have made more than $100 million by itself (PX 730), and trading records demonstrate that Empery and Brio each made tens of millions of dollars.  PX 804; PX 806.

## ARGUMENT

### I.    PLAINTIFF IS ENTITLED TO JUDGEMENT AS A MATTER OF LAW

Fed. R. Civ. P. 50(a) provides that "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Rule 50(b) similarly authorizes the court to grant judgment as a matter of law or a new trial.  Motions for judgment as a matter of law brought under Rule 50 are evaluated under the same rubric as summary judgment motions brought under Rule 56.  *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) ("The same standard that applies to a pretrial motion for summary judgment pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of law during or after trial pursuant to Rule 50").

### A.    Applicable Standard

Section 16(b) "takes the profits out of an entire class of transactions … in which the possibility of abuse of insider information was believed to be intolerably great."  *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 174 (2d Cir. 2012) (cleaned up).  The

6

claim has four elements: "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Feder ex rel. Ivax Corp. v. Frost*, 220 F.3d 29, 32 (2d Cir. 2000) (citations omitted). "No showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement." *Id.* (citations omitted). The only real question here is whether Defendants were a group such that they were a 10% holder of the Company's securities.

The "touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective" of purchasing, holding, voting, or selling securities. *Roth v. Jennings*, 489 F.3d 499, 507–08 (2d Cir. 2007); *see also Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). While concerted action need not be expressly memorialized in writing, the written record here contains explicit, undisputed evidence of coordinated negotiations over the acquisition, holding, disposition, and voting of Genius securities. These negotiations culminated in the execution of explicit written agreements unambiguously governing the acquisition, holding, disposing, or voting of Genius Securities including the March 2020 SPA, the May 18, 2020 leak-out agreement, the June 23, 2020 leak-out agreement, and the Voting and Lock-Up Agreement with Heyward.

### B.      Pre-Term Sheet Negotiations Between Brio and Anson

Brio is an investment firm that invests in small public companies, through special-purpose funds like the Brio Defendants. TR 689:10-25. Shaye Hirsch, the owner, and operator of Brio admitted that, by virtue of its size, Brio is not capable of investing on its own and requires other investors to both lead and participate in its transactions. TR 689:10-16; 690:8-17; 762:23-763:14.

In late 2019, Hirsch proposed that Brio split with Anson on a 50/50 basis a proposed financing for Genius. TR 701:4-25; PX 63; PX 69; TR 698:10-69:7; PX 63. Hirsch did not accept or reject the terms proposed by Anson but, instead, negotiated with Anson to find mutual agreement on terms that would apply to both investors. TR 706:19-25; PX 76. He made the original suggestion to Heyward, who pressed the issue with Anson through SEG. PX 78. Hirsch continued to press for terms, as well as the right to split future Genius deals with Anson in emails and telephone calls with SEG and Anson itself. TR 709:9-710:21; PX 102; PX 106; PX 107.

Brio and Anson were unable to reach agreement in connection with short term financing efforts in the fall. However, they did not use their contractual blocking rights based upon previous Genius investments to prevent each other's investments, and Hirsch made clear that he was still interested in working together with Anson on the PIPE transaction contemplated for the following year. PX 125. As such, when Anson sent an initial term sheet for the PIPE to SEG on January 14, 2020, SEG promptly forwarded it to Brio for comment even before anyone at the Genius itself had even finished a review. TR 712:8-713:14; PX 174.

Brio provided SEG with questions, substantive edits, and information about the amount of money that it would invest, all of which SEG conveyed to Anson. PX 173; PX 181; PX 194. Hirsch knew that SEG was acting as a conduit between Brio and Anson, as he also received information from SEG attributed to Anson. PX 187; PX 193. Hirsch admitted in testimony that he "could assume" that his comments were being provided to Anson. TR 725:14-726:2. The back-and-forth was productive as certain of Brio's comments were incorporated into the Anson term sheet before it was signed by Anson and Genius, PX 189, and neither exercised their blocking rights.

8

As SEG found other investors to contribute to the PIPE, it shared the identities of those investors with Brio. TR 694:17-19. When one of those investors, Empery, insisted that the shares not be registered, and Brio and Anson ultimately agreed. PX-671. And after reaching agreement with Empery and Anson on the terms of the March 2020 PIPE, Brio affirmatively agreed to waive its contractual rights from prior investments which would have enabled Brio form preventing the transaction from proceeding. PX 399; PX 401; TR 737:17-740:23. The next day, because of their coordination, Anson, Brio, and Empery then all signed identical Securities Purchase Agreements to consummate the transaction. PX 387; TR 250:7-10; 743:6-16.

### C.    Pre-Closing Negotiations Between Anson and Empery

Empery Asset Management is an investment company managing multiple investment funds, including the Empery Defendants. TR 848:13-17. Ryan Lane is the Empery principal and led its 2020 investment in Genius. TR 848:21-849:4. In 2019, Empery had investments in Genius that had not performed well. TR 850:2-9. As such, when SEG reached out to Ryan Lane in the fall of 2019 about further investments, he rejected the idea of investing a single dollar on any terms as out-of-hand. PX 67; TR 850:2-6; 850:18-851:3.

Empery's degree of interest changed after the signing of the Anson/Brio Term Sheet. TR 854:11-19; PX 206. Just days after the Term Sheet was signed, Empery agreed to "tak[e] over the documents" and have its counsel begin drafting substantive language for the deal. TR 865:18-866:20; PX 232. Empery was unconstrained by Anson's term sheet, despite Anson and the Company having agreed to invest on those broad terms. As Lane admitted in testimony, his goal was to be part of the transaction proposed by Anson so long as he could get the terms that Empery demanded. TR 881:5-11.

A series of substantive negotiations between Brett Director, in-house counsel for Empery, and Robert Charron, outside counsel for Anson. TR 864:7-11. As Lane admitted, Anson and Empery worked together to negotiate a set of terms to jointly present to Genius for approval. TR 886:13-16. One such change was the increase in the OID from 10% to 20%. TR 841:10-843:7.

And although it is undisputed that the standard practice was for the PIPE shares to be registered (PX 671; TR 389:8-12), Empery also insisted that Anson and Brio agree to remove registration rights from the March 2020 PIPE securities. PX 238; TR 872:5-18; 985:4-8. The original term sheet executed on January 22, 2020 had required that Genius promptly register the securities so that they could be publicly sold. PX 202. Empery believed that doing so would adversely affect Genius' stock price and Empery's ability to profitably sell its Genius stock. TR 872:5-18. Ultimately, Empery was successful in convincing Anson and Brio on this issue and the term was incorporated into the final Securities Purchase Agreement. PX 671; PX 387. In fact, Empery repeatedly admitted that all of the investors agreed that the PIPE shares would not be registered:

> Q. And you made sure that Anson knew Empery's position on whether to try to register the shares; correct?
>
> A. Through my counsel, we made our demands for the participation of our money in this investment. And one of our demands was to remove registration.
>
> Q. And, ultimately, Anson and the other investors agreed to that, right?
>
> A. That's correct.

TR 872:11-18  (Ryan Lane Testimony)

> Q: Isn't it true that the other investors also agreed not to register the shares?
>
> A. That's correct.

10

Q. And Empery and Anson also agreed not to register the shares, correct?

A. That's correct.

TR 917:18-23 (Ryan Lane Testimony).  In contrast, no trial exhibit or testimony suggests that Genius cared about limiting the investors' ability to register their March 2020 PIPE shares with the SEC or that the Company cared about any impact on its stock price and, in fact, Genius had readily agreed to a term sheet that included registration rights.  PX 202.

It is undisputed that, by agreeing not to register the shares, Defendants were agreeing that absent future action the shares could not be sold on the open market for six months.  TR 386:14-16.  But registration rights were not the only conditions to Empery's participation.  Lane also confirmed that Heyward's agreement on the Voting and Lockup Agreements were closing deliverables without which Empery would not have funded the PIPE.  DX 305; TR 1010:3-13.  That Voting Agreement expired on May 16, 2020, and the Lockup Agreement persisted for one year and ninety days after the SPA.  PX 363.

### D.        Post-March 2020 PIPE Coordination

Anson, Brio, and Empery continued coordinating after the closing of the March 2020 PIPE.  Shares sold in subsequent Registered Direct offerings were restricted exclusively to March 2020 PIPE investors. TR 517:2-6.  As previously discussed, Anson and Brio purchased Genius stock in each of the registered direct offerings following the March 2020 PIPE, and Empery purchased in all the registered direct offerings staring with May 7, 2020, all of which were only offered to investors in the March 2020 PIPE.  *See, e.g.*, TR 516:18-517:19.  Defendants claim they had a contractual right to these investments, but no provision of the SPA allows them to invest cash for registered direct offerings.  PX 387.

In May 2020, Anson and Empery agreed that the Genius stock issuable upon conversion of the Notes should be registered with the SEC such that it could be publicly sold and engaged in a series of discussions concerning how best to accomplish that goal. PX 519; TR 1580:18-1584:8. Again, Empery admitted at trial that "Anson and Empery worked together to make" SEC registration happen so that the PIPE shares would be freely tradable. TR 904:6-21; *see also id.* 1582:7-24, 1583:6-9.

In connection with these discussions, Empery circulated a leak-out agreement limiting the number of shares that investors could collectively sell below a set price. PX 521. Anson, Brio and Empery each entered into leak-out agreements on May 18 and June 23, 2020, limiting their sales of Genius stock acquired through the March 2020 PIPE. PX 525; PX 538; PX 544; TR 498:15-22. Each Defendant signed those leak-out agreements knowing all other Defendants were doing the same and knowing the amount of Genius stock each could sell below a certain price. PX-690, PX-691. At trial, Defendants admitted both that they agreed with each other to enter the leak-out agreements and that it was critical to them that all of the investors agreed to do so:

> Q. And you were working with Mr. Charron on figuring out the strategy for registering those shares so they could be sold, is that fair?
>
> A. I was giving him Empery's position to see whether he agreed that it made sense for his client.
>
> Q. And he ultimately did agree, correct?
>
> A. Yes.

TR 1582:18-24 (Brett Director Testimony).

> Q. And, here, one of the escrow conditions was that all of the other major investors in the March 2020 PIPE had to sign the leak-out agreement, right?

A. Yes….

Q. Is it your testimony that had all the other investors not signed the leak-out agreement, you would not have signed the leak-out agreement?

A. It's my testimony that I wanted to be treated fairly. So anyone who's getting their shares registered should have to sign the leak-out agreement if that's what's being imposed on me….

TR 405:15-406:23; *see also* TR 398:7-22 (Nathoo Testimony).

Q…. If any of the investors were going to register their shares, you wanted to make sure that they were restricted to the same degree that Empery was restricted, correct?

A. I – that's mostly accurate, yeah.

TR 910:22-25 (Ryan Lane Testimony).

\*       \*       \*

Defendants' undisputed conduct establish group activity as a matter of law. Anson first negotiated with Brio to come up with Term Sheet and then Anson negotiated with Empery regarding substantive changes to the Term Sheet, all with minimal Genius involvement, to arrive at the final terms of a March 2020 PIPE. The terms of the March 2020 PIPE reflected an understanding, and a contractual requirement, that Heyward agree to vote his stock in favor of re-setting the purchase price to $0.21 per share and hold his stock for at least one year. Defendants' purposeful coordination continued after the March 2020 PIPE, with Anson, Brio, and Empery allocating their purchases of shares sold in the Registered Direct offerings consistent with Brio's original demand that it be given an equal opportunity to participate in future financings and otherwise based upon the proportion of each investor's participation in the March 2020 PIPE. After shareholder approval on May 15, 2020, which reset the purchase price of the Notes and Warrants to $0.21 per share, the investors including Empery and Brio entered into further agreements that Genius register the shares underlying the Notes while also agreeing

13

through the leak-out agreements that they would jointly restrict the number of shares each

Defendant could sell, with the full knowledge and consent of the other Defendants.  This

conduct, caused Defendants and Heyward to have "combined in furtherance of a common

objective…for the purpose of acquiring, holding, or disposing of securities" in Genius.  *Roth*,

489 F.3d at 508.

E.    **Defendants' Defenses Are Foreclosed as a Matter of Law**

At trial, Defendants asserted a series of defenses and justifications for their collective

conduct.  None of these defenses is legally supportable.  Defendants first rely upon boilerplate

disclaimers of group status in both the Securities Purchase Agreement and the leak-out

agreements.  *See* PX 387; PX 576; TR 1430:2-1431:4; 1439:3-1441:24.  However, the Second

Circuit has held that such "attempted disclaimers of the legal effect of such joint action" are

entirely without effect.  *Roth*, 489 F.3d at 511.

Defendants further argue that their communications cannot properly involve an intent to

coordinate their conduct but, instead, were independent actions compelled by pre-existing

blocker and consent rights.  *See e.g.*, TR 724:19-725:2. There is, however, no safe harbor

shielding coordinating activities driven by consent or blocker rights. Instead, pre-existing

contractual links are precisely the type of relationships that support a group finding. *Litzler v. CC*

*Invs., L.D.C.*, 411 F. Supp. 2d 411, 416 (S.D.N.Y. 2006) (*citing Morales v. Quintel*

*Entertainment, Inc.*, 249 F.3d 115, 127 (2d Cir. 2001)).

Defendants' argument that Judge Hellerstein in *Litzler* affirmatively blessed collective

negotiation of the terms of a PIPE and subsequent registration efforts is simply incorrect.  As an

initial matter, *Litzler* does not speak to negotiations or transactions subsequent to the time of the

initial private offering.  Moreover, even as it relates to the initial investment comparable to the

14

March 2020 PIPE, *Litzler* only granted summary judgment because "[p]laintiff show[ed] nothing more than the use of a lead draftsman, at the behest of [the issuer], by the investors." *Litzler*, 411 F. Supp. 2d at 416; *accord* Dkt. 480-6 at 17:7-11 (finding the transaction's terms were dictated by the company and not by the investors. They were for the convenience of the company and not for the convenience of the investors"); Dkt. 480-2, ¶4 (the placement agent swore that the identities of the potential investors were kept secret from one another when soliciting potential investors).

None of that occurred here. Genius never appointed a "lead draftsman." It was Anson that decided to initially serve as the lead investor, and then, with the agreement of the investors, Empery took over the drafting. PX 232. And Defendants knew about each other's participation in the transaction from the very beginning of SEG's involvement. PX 63; PX 69; PX 174; PX 232. Moreover, as explained above, Brio and Empery successfully dictated material terms and arrangements relating to the investment despite not acting as lead investors. The terms of the March 2020 PIPE and the Leak-Out Agreements being set by Defendants, and disputes not even being settled by the issuer constitute clear, objective grounds establishing a §13(d) group. *See Schaffer v. CC Investments, LDC*, 2002 WL 31869391, at *7 (S.D.N.Y. Dec. 20, 2002); *Greenberg v. Hudson Bay Master Fund Ltd.*, 2015 WL 2212215, at *6 (S.D.N.Y. May 12, 2015).

Indeed, the statutory and regulatory structure of Section 13(d) provides that whenever "two or more persons act as a … group" they are deemed to be a single person. 15 U.S.C. §78m(d)(3). Congress implicitly recognized that investor actions in connection with securities offerings would cause investors to "act as a group" by providing statutory safe harbors. *See* 15 U.S.C. §§78m(d)(6)(A)-(B) (exempting acquisitions of securities through registration statements

15

filed with the SEC and investments not exceeding 2% of the outstanding securities within a twelve-month period).

The SEC similarly recognized that ordinary investor activity in connection with private offerings (*i.e.*, the March 2020 PIPE) could cause investors to act as a group and provided a safe harbor exemption limited to when:

> The only actions among or between any members of the group with respect to the issuer or its securities subsequent to the closing date of the non-public offering are those which are necessary to conclude ministerial matters directly related to the completion of the offer or sale of the securities.

17 C.F.R. §240.13d-6(b)(4); *see also Morales*, 249 F.3d at 129 (describing the predecessor Rule 13d-5(b)(2) as "exempting certain acquisitions by institutional investors ... in the absence of any … other agreement."); *Litzler*, 411 F. Supp. 2d at 415-16 (referencing Rule 13d-5(b), a predecessor rule of current Rule 13d-6(b), as the reason coordinated investment activity did not create a §13(d) group).

Here, however, there were multiple non-ministerial actions among or between Defendants with respect to Genius and its securities after the March 2020 PIPE closed on March 17, 2020. These actions include: allocating shares sold in the various registered direct offerings occurring beginning on May 7, 2020 (TR 516:23-517:6); agreeing with each other not to contract for registration rights; the May 18, 2020 leak-out agreement (TR 905:11-13); and the June 23, 2020 conversion agreement containing the second leak-out agreement (TR 825:21-826:2). As such – and as sophisticated investors employing highly qualified legal counsel – Defendants knew that simply writing in an email or a contractual representation that they were not acting as a group was not sufficient to avoid being a member of a §13(d) group.

To confuse the issue, throughout the trial, Defendants conflated parallel transactions and parallel investing. There is no dispute that a parallel transaction is merely several investors

16

purchasing the same security on the same terms from the same issuer.  TR 578:25-579:2 (Nathoo); 762:5-11 (Hirsch); 951:19-23 (Lane).  Investors can enter parallel transactions without coordinating their actions as Defendants did here with Anson and, even if they do coordinate, can still avoid being deemed a §13(d) group by adhering to the safe harbor provisions of Rule 13d-6(b), which Defendants failed to do in this action.

Finally, Defendants argue that *Lowinger v. Morgan Stanley & Co. LLC*, 841 F.3d 122 (2d Cir. 2016), permitted them to enter into the agreement with each other not to sell on the open market for six months and then to modify that agreement through the two leak-out agreements.  In *Lowinger*, the Second Circuit makes clear that its holding "applies only to standard lock-up agreements like those at issue here" involving the distribution of shares by underwriters in an IPO.  *Id.* at 132.  In contrast, none of the parties here were underwriters and the offering was private.  PX-363; TR 945:2-11.  Further, unlike the industry "standard" lock-up in *Lowinger*, it is undisputed that, in a standard PIPE the shares are registered and may be freely sold without the limitations of a leak-out agreement.  PX 671; TR 389:8-12.

### F.    Defendants' Arrangements with Heyward Independently Created a §13(d) Group

Defendants' collective procurement of the Voting and Lock Up Agreements with Heyward is an independent source of 16(b) liability.  Had Brio, Empery and Heyward entered into a written agreement governing Heyward's voting, holding or sale of Genius securities, they would have unquestionably formed a §13(d) group.  *Morales v. New Valley Corp.*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998), *aff'd in relevant part sub nom., Morales v. Freund*, 163 F.3d 763, 765, 767 & n.5 (2d Cir. 1999), holds that a §13(d) group is formed when persons sharing a purpose relating to the purchase, sale, voting or holding of a security are parties to an agreement, even if conditional, lacking specific terms, and requiring action of only one party while there were

17

potential conflicts of interests between the parties.  *See also CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 288-89 (2d Cir. 2011) (Winter, J., concurring) (an agreement with respect to voting of shares makes both parties to the agreement the beneficial owner of the shares subject to the agreement).

Here, Defendants entered no such formal, written, bilateral agreement.  Indeed, Empery's lawyer, Brett Director specifically cautioned them against doing so.  TR 1530:11-1531:16.  However, it is equally well-settled that an ***informal*** agreement or understanding is sufficient to create a §13(d) group.  *See, e.g.*, *Morales*, 249 F.3d at 124.  Here, Defendants intentionally entered precisely such an informal arrangement by requiring Heyward to have entered into both a Voting Agreement and a Lock-up Agreement as a closing condition of the March 2020 PIPE.  TR 1009:21-1010:9; *see also* March 2020 SPA (Dkt 232-61, Ex. 10.1) §§7(xiv)-(xv).

The Lock-up Agreement required Heyward to ***hold*** his Genius stock for more than a year (PX-363), which is one of the common objectives supporting the existence of a §13(d) group.  The Voting Agreement was an agreement requiring Heyward to ***vote*** his Genius shares at the shareholder meeting in favor of Genius re-pricing Defendants' securities to a $0.21 per share exercise or conversion price (PX-297), which also constituted a ***purchase*** within the meaning of §16(b).  *See* 17 C.F.R. §240.16b-6(a).  Those agreements were entered into as part of the March 2020 SPA with a common objective of facilitating Defendants' ***purchase*** of Genius securities.  Thus, even assuming *arguendo* that Defendants did not intend to form a §13(d) group with Anson or any of the other Defendants investing in the March 2020 PIPE, they still unquestionably acted as part of a §13(d) group with Heyward first during the term of the Voting Agreement which remained in force through May 16, 2020 (PX-297, §4(g)) and continuing

18

during the term of the Lock-up Agreement, which remained in effect for one year and ninety days from March 11, 2020.  PX-363 at TOON00000607.

Defendants' intent to have an informal arrangement with Heyward is also evidenced by both the Voting Agreement and Lock-up Agreement ***not*** containing any provision barring third-party enforcement.  PX-297; PX-363.  Absent such a provision, both the Voting Agreement and Lock-up Agreement were enforceable by intended third-party beneficiaries under New York law. *See, e.g., Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 66 N.Y. 2d 38, 43 (1985).

Defendants will likely argue that a lock-up agreement standing alone cannot cause them to be a member of a §13(d) group, relying upon *Lowinger*.  However, any such argument ignores that any agreement can only be the basis for a §13(d) group if it has an objective relating to the purchase, sale, voting or holding of stock.  *See, e.g.*, *CSX Corp.* 654 F.3d at 283; *see also* Brief of the Securities and Exchange Commission, *Amicus Curaie*, in Support of Appellant on Issues Addressed in *Morales v. Quintel Ent. Co.*, at 26-27 (if a lock-up agreement was entered into for one of the §13(d) purposes then it acts to form a §13(d) group).[3]

Again *Lowinger*, is not to the contrary.  Unlike the "standard lock-up agreements" with an underwriter in connection with an IPO, the Heyward lock-up involved a private, secondary offering in which no underwriter was involved."  PX-363; TR 945:2-11; *see also* Brief of the Securities and Exchange Commission, *Amicus Curaie* in *Lowinger v. Morgan Stanley*, at 22 (an objective relating to the sale of stock creating a §13(d) group even if it is part of a lock-up agreement).[4]

---

[3]    The SEC's amicus briefs in *Morales v. Quintel* is available at https://www.sec.gov/files/litigation/briefs/2000/morales0300.pdf..

[4]    The SEC's amicus briefs in *Lowinger v. Morgan Stanley* is available at https://www.sec.gov/files/litigation/briefs/2015/lowinger-morgan-stanley.pdf.

## II.    PLAINTIFF IS ENTITLED TO A NEW TRIAL

Pursuant to Fed. R. Civ. P. 50(c), "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."  In this case, the Court should conditionally grant Augenbaum's motion for a new trial.  In the alternative, should Augenbaum's motion for judgment as a matter of law be denied, the Court should grant his motion for a new trial.

A new trial is appropriately granted under Fed. R. Civ. P. 59 where "the jury's verdict is against the weight of the evidence."  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998).  The rule functions as a check on juror error or confusion, permitting judicial intervention where "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice."  *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002).

Because final judgment is not awarded, a motion for a new trial under Rule 59 "has a less stringent standard than Rule 50 in two significant respects."  *Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003).  ***First***, "[u]nlike a motion for judgment as a matter of law, a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict."  *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998).  ***Second***, a trial judge considering a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'"  *Id.* (*quoting Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir. 1978)); *see also Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) ("In contrast to the standard applied in considering a motion for judgment n.o.v., a trial judge hearing a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'").  Indeed, while a court should exercise "restraint" and

20

avoid overturning a verdict "simply because the judge disagrees with the jury," a trial judge may also evaluate "the credibility of witnesses" in determining whether to grant a new trial. *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) ("On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.").

In this case, a new trial is warranted on two grounds.   As set forth above, Plaintiff submits that the evidence elicited at trial indisputably establishes that Defendants combined in furtherance of a common objective in connection with purchasing, holding, voting, and disposing of securities in Genius.  While Plaintiff does not believe that this determination requires weighing of the admitted evidence or evaluation of witness credibility, to the extent that the Court does believe that such analysis is required, the record unambiguously supports an order directing a new trial.

In addition, the Court's exclusion of evidence concerning Defendants' participation in a "pump and dump" scheme in connection with their purchase of Genius securities constitutes error that mandates a new trial.   An erroneous evidentiary ruling requires a new trial unless the error was harmless. *Abascal v. Fleckenstein*, 820 F.3d 561, 564 (2d Cir. 2016).  "An error is harmless only if the evidence was unimportant in relation to everything else the jury considered and we can conclude with fair assurance that the evidence did not substantially influence the jury." *Id.* at 567 (internal quotation marks omitted).  Courts routinely grant new trials as a result of evidentiary errors. *See, e.g.*, *id.* at 567; *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010); *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007); *Cty. of Ontonagon, Mich. v. Land Located in Dickinson Cty., Mich.*, 902 F.2d 1568 (6th Cir. 1990).

21

The Court excluded substantial evidence that Genius CEO Andrew Heyward, who beneficially owned 9.9% of Genius' stock, acting in consultation with Defendants, planned to issue press releases designed to drive investor interest and increase the price of Genius stock to enable Defendants' profitable sales of stock. June 1 TR at 33-34. In particular, excluded exhibits demonstrated that former-Defendant Anson directed Heyward to withhold positive news from the market in late 2019. PX 70. They also demonstrate that Heyward disclosed to former-Defendants that he intended to "roll out" that news shortly after the 2020 PIPE transaction closed in the hopes of rapidly increasing the stock price. PX 295; PX 439.

Heyward was explicit in his discussions of this strategy, talking about the effectiveness of his releases with SEG and facing pushback from SEG about the number of press releases to put out in a single day. PX 410. The evidence further showed that Heyward executed on his plan, flooding the news with positive press about Genius shortly after closing. PX 434; PX 438; PX 441; PX 443; PX 444; PX 446; PX 449; PX 450. On plan, those press releases helped increase the trading price of Genius stock facilitating Defendants' profitable sale of those securities while also enabling registered direct offerings beginning on May 7, 2020 proving extraordinarily profitable to Defendants. PX 429; PX 483; PX 504; PX 603.

Relatedly, the Court should also have admitted evidence during the liability phase concerning the amount of Defendants' profits. The group scheme that Defendants planned and executed was predicated on the notion that outsized profits could be earned through coordinated activity. Defendants worked together and with SEG to carefully curate a group of investors who would work together to increase the price of Genius stock. The profits that Defendants obtained is crucial to showing both (1) their motive to form the group scheme and (2) that they ultimately carried out the scheme that they planned. *See United States v. Salmonese*, 352 F.3d 608, 612 (2d

22

Cir. 2003)  ("The conspiracy [is] a variation on the classic "pump and dump" scheme—whereby persons holding certain securities fraudulently inflate their price (the 'pump') in order to sell at an artificial profit (the 'dump')."); *Gross v. United States*, Case No. 07 Civ. 11298 (RMB)(JCF), 2009 WL 2195976, at *2 (S.D.N.Y. July 21, 2009) (profits admitted to show existence of pump-and-dump scheme).

Plaintiff was forbidden to discuss Defendants' true motivations for working together on the Genius transaction while, in contrast, Defendants were permitted to paint themselves to the jury as faithful fiduciaries acting to profit their investors while rescuing a troubled company from bankruptcy.  TR 116:19-117:3; 121:12-23; 336:18-23; 1734:9-18; 1759:17-25.  Indeed, Plaintiff was admonished for even suggesting that Defendants did anything wrong or that the rules governing swing trading were in any served any Congressional policy of preventing the misuse of information.  TR 1727:12-1728:7.  Thus, aside from depriving jurors of key information relating to Defendants' intent to coordinate their conduct with Heyward, the false narrative of faithful fiduciaries assuming massive risks was offered without the opportunity for contradiction. By excluding the true motivation for Defendants to participate in the March 2020 PIPE transaction while permitting a false narrative of faithful fiduciaries being justly compensated for assuming massive risks was placed before the jury, while crucial context for Defendants' conduct and key information for evaluating the credibility of Defendants' witnesses was improperly excluded.

The Court of Appeals for the Sixth Circuit recently addressed the dangers of narrowly evaluating the "relevance" of evidence in situations where credibility and motivation are at issue. In *Meng Huang v. Ohio State Univ.*, 116 F.4th 541, 564 (6th Cir. 2024), the court evaluated a sex discrimination case brought by a graduate student at Ohio State.  The *Meng Huang* plaintiff

claimed that she had been sexually assaulted by her thesis advisor and that he had retaliated against her after she spurned his advances.  The advisor denied the claims and argued that the plaintiff had invented them after failing a Ph.D. candidacy exam.  The trial court in *Meng Huang* trifurcated the case and held a four-day trial on the narrow issue of whether the thesis advisor had touched the plaintiff.  The court excluded any evidence that the thesis advisor had retaliated against the plaintiff after the unwanted touching, including any evidence that the defendant had manipulated the candidacy exam.  The plaintiff lost.

On review, the Sixth Circuit ordered a new trial.  The court noted the "danger that bifurcation may deprive plaintiffs of their legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action which they have brought, artificially separating the wrongdoing from the reality of injury."  *Meng Huang*, 116 F.4th at 563.  The Court was particularly troubled by the fact that "the district court also ruled that evidence pertaining to Huang's academic performance and capabilities was irrelevant" in that it "undermined her ability to counter [defendant's] defense at trial—that she was a poor student who was stubborn and wouldn't take his advice, failed her candidacy exam, and then retaliated against him by fabricating sexual harassment allegations."  *Id.* at 566.

As in *Meng Huang*, the Defendants here were permitted to offer a complete story characterizing the facts of the case—that they were noble hedge funds engaged in "rescue financing" of a cartoon maker.  Plaintiff was not permitted to contradict that story, either by presenting the true facts concerning Defendants' involvement in a scheme to defraud Genius investors or even by suggesting that Defendants participation in short swing trading was anything but virtuous.  As a result, the jury was left with an incomplete and context free set of facts from which they were asked to discern Defendants' motivations and goals in investing in

24

Genius securities.  Particularly in light of the complex nature of the claim, this exclusion was improper and cannot be deemed harmless.

In any event, even if the pump-and-dump scheme was excluded, this Court should have admitted evidence that Heyward and the other group members used their group power to extract insider information from Genius so that they could trade on it.

As a result, the Court should order a new trial.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that the Court issue an order granting Plaintiff judgment as a matter of law or a new trial.

**Dated:** New York, NY
       July 16, 2026

Respectfully submitted,
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600


By:   /s/ Evan Mandel
          Evan Mandel

ABRAHAM, FRUCHTER & TWERSKY, LLP
Jeffrey Abraham
Michael Klein
450 7th Avenue, 38th Floor
New York, New York 10123
(212) 279-5050
jabraham@aftlaw.com
mklein@aftlaw.com

*Attorneys for Plaintiff Todd Augenbaum*

25

## CERTIFICATION OF WORD COUNT

I hereby certify that the word count of this Memorandum of Law complies with the word limits of Local Rule 7.1(c).  According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Rule 7.1(c) is 7,621 words.

**Dated:** New York, NY
July 16, 2025

By:      /s/ Evan Mandel
Evan Mandel