**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TODD AUGENBAUM,

Plaintiff,

-against-

ANSON INVESTMENTS MASTER FUND LP; BRIO CAPITAL MASTER FUND LTD.; BRIO SELECT OPPORTUNITIES FUND, LP; DEFENDANT INVESTMENTS, INC.; EMPERY ASSET MASTER, LTD.; EMPERY DEBT OPPORTUNITY FUND, LP; EMPERY TAX EFFICIENT, LP; IROQUOIS MASTER FUND LTD.; IROQUOIS CAPITAL INVESTMENT GROUP, LLC; L1 CAPITAL GLOBAL OPPORTUNITIES MASTER FUND; M3A LP; RICHARD MOLINSKY,

Defendants,

-and-

KARTOON STUDIOS, INC.,

Nominal Defendant

Case No. 22 Civ. 00249 (AS)

# PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS POST-TRIAL MOTIONS

MANDEL BHANDARI LLP
Evan Mandel
Robert Glunt
A. Leah Vickers
80 Pine Street, 33rd Floor
New York, NY 10005
(212) 269-5600

ABRAHAM, FRUCHTER & TWERSKY, LLP
Jeffrey S. Abraham
Michael J. Klein
450 7th Avenue, 38th Floor
New York, New York 10123
(212) 279-5050

*Attorneys for Plaintiff Todd Augenbaum*

# TABLE OF CONTENTS

ARGUMENT .......... 1

I. DEFENDANTS WERE A GROUP AS A MATTER OF LAW .......... 1

II. DEFENDANTS' ARGUMENTS ARE MERITLESS .......... 4

A. Characterizing Coordinated Behavior as "Routine" Does Not Alter Its Legal Character .......... 4

B. The History of Defendants' Negotiations Demonstrates Defendants' Need to Reach Coordinated Agreement .......... 5

C. Defendants Agreed to Hold .......... 6

D. There Is No "CEO Exception" to Group Formation .......... 7

E. Undisputed Facts Compel the Conclusion That Defendants Formed a Group .......... 8

III. THE EXCLUDED EVIDENCE WAS MATERIAL AND THE EXCLUSION WAS PREJUDICIAL .......... 9

CONCLUSION .......... 12

# TABLE OF AUTHORITIES

**Cases**

*Abascal v. Fleckenstein*,
820 F.3d 561 (2d Cir. 2016) ... 11

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*,
66 N.Y. 2d 38 (1985) ... 8

*General Aircraft v. Lampert*,
556 F.2d 90 (1st Cir. 1977) ... 2

*Heublein, Inc. v. General Cinema Corp.,*
722 F.2d 29 (2d Cir. 1983) ... 10

*Lowinger v. Morgan Stanley & Co.*,
841 F.3d 122 (2d Cir. 2016) ... 3, 6

*Morales v. Quintel Entertainment, Inc.*,
249 F.3d 115 (2d Cir. 2001) ... 3, 4, 7

*Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*,
156 F.4th 68 (2d Cir. 2025) ... 9

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) ... 8

*Wellman v. Dickinson*,
682 F.2d 355 (2d Cir. 1982) ... 8

**Rules**

*Modernization of Beneficial Ownership Reporting*,
88 FR 76896-01 (Nov. 7, 2023) ... 8

**Regulations**

17 C.F.R. § 240.16a-1(a)(1) ... 7

17 C.F.R. §240.16b-3(d) ... 7

**Statutes**

Section 16(b) of the Securities Exchange Act of 1934,
15 U.S.C. § 78p(b) ... Passim

# TABLE OF ABBREVIATIONS

| Abbreviation | Item |
|---|---|
| Anson | Anson Investments Master Fund LP |
| Brio | Defendants Brio Capital Master Fund Ltd.; Brio Select Opportunities Fund, LP |
| Brio Br. | Brio's Memorandum of Law in Opposition to Plantiff's Post-Trial Motions (Dkt. 517) |
| Dkt. | Docket entries in this action |
| DX-__ | Defendants' Admitted Trial Exhibits |
| Em. Br. | Empery's Memorandum of Law in Opposition to Plantiff's Post-Trial Motions (Dkt. 516) |
| Empery | Empery Asset Master, Ltd.; Empery Debt Opportunity Fund, LP; Empery Tax Efficient, LP |
| Genius | Genius Brands International |
| Leak Out Agreements | PX-567; PX-688 and substantially identical versions signed by other investors |
| Lock-Up Agreement | PX-363 |
| March 2020 PIPE | PX-387 |
| Open Br. | Plaintiff's Memorandum of Law in Support of his Post-Trial Motions (Dkt. 515) |
| PX-__ | Plaintiff's Admitted Trial Exhibits |
| SEG | Special Equities Group, Inc. |
| TR | Trial Transcript |
| Voting Agreement | PX-297 |

As set forth below, Defendants' arguments are unavailing and Plaintiff is entitled judgment as a matter of law, or, in the alternative, a new trial.

## ARGUMENT

## I. DEFENDANTS WERE A GROUP AS A MATTER OF LAW

Before trial, Defendants ***adamantly*** contended that they ***never communicated*** with each other about the terms of their Genius investments. Empery's counsel stated in MTD oral argument that "it's not a syndicate … negotiating" and that "Anson in this case … negotiated the deal with the company. They … negotiate something they think people will think is fair, and the company talks to the other investors and shops it." PX-755 at 41. And in MSJ briefing, Empery's Ryan Lane submitted a declaration stating (falsely) that "I did not communicate, or coordinate, with any other investor (much less any other Defendant) about any aspect of this transaction." PX-778 ¶ 22. *See also* Dkt. 242 at 6 (Empery MSJ Brief claiming "Empery did not communicate or meet with any other Defendant.") Similarly, Anson's Amin Nathoo swore that "I did not take into account, or know, the desires of other investors." PX-772 ¶ 30

Defendants abandoned this (essentially indefensible) position at trial, and the facts of this case are no longer disputed. The parties ***agree***:

- Both Empery and Brio communicated with Anson concerning the terms each wanted for the Genius PIPE. Brio did so in messages relayed through SEG and Empery did so in direct communications from its counsel to Anson's counsel. PX-173; PX-174; PX-181; PX-194; PX-206; PX-232; PX-238; TR 884:11-16.

- Anson agreed to modify its term sheet to accommodate the demands conveyed to it by Empery and Brio. These terms were then presented to Genius for acceptance. PX-187; PX-189; PX-193; PX-387; PX-671.

- The January 22, 2020 Term Sheet accepted by Genius obligated the company to promptly register the PIPE shares so that they could be sold. PX-202.

- At Empery's insistence, the deal was changed so that PIPE shares would ***not*** be registered, requiring Defendants to hold them for at least several months before selling on public markets. PX-387; PX-671; TR 872:11-18; 1305:1-10. Empery admitted that it would only buy the stock if all of the investors agreed that their shares would not be registered. TR 985:4-8.

- Investors demanded as a pre-condition to participating in the March 2020 PIPE that Heyward enter into a Voting Agreement and Lock-Up agreement. TR 529:4-18; 1009:21-1010:13; PX-297; PX-363; PX-387; DX 305.

- After the March 2020 PIPE deal closed, each Defendant participated, on a pro-rata basis, in multiple discounted Registered Direct transactions which were closed to outside investors. PX-429; PX-483; PX-504; PX-603; TR 516:18-517:19.

- As the price of Genius stock rose, Defendants subsequently agreed to modify their agreement not to sell by entering into the Leak Out Agreements, based on Empery's model. PX-525; PX-538; PX-544; PX-690; PX-691. Defendants admitted that they would only enter into the Leak Out Agreements if all investors agreed. TR 910:16-25. The agreement was drafted by Empery and employed contract language enabling each Defendant, if necessary, to enforce its terms.

- Defendants dumped their Genius stock nearly simultaneously once permitted to do so, while the Leak Out Agreements remained in effect. TR 239:24-241:15; 1169:12-1170:20; 1174:4-1175:21; 1176:11-1178:19; 1591:6-12; PX-524; PX-576; PX-694; PX-789; PX-799.

In its papers, Empery claims that "[f]or four years, Plaintiff contended" that liability was "a question of fact that must be left for a jury" (Em. Br. 1). This is untrue. Plaintiff moved for summary judgment. *See, e.g.* ECF 225. Regardless, the factual consensus firmly established during trial resolves this case as a matter of law. The actions that Empery and Brio undisputably took together with Anson, intentionally working together to mutually decide the business terms and legal restrictions upon which they would buy, hold, and sell Genius securities, made them a §13(d) group, making judgment as a matter of law (or at a minimum a new trial) appropriate under Rules 50 and 59.

*General Aircraft v. Lampert*, 556 F.2d 90, 95 & n.7 (1st Cir. 1977), is instructive. There, the trial court "could not have concluded other than that the three appellants constituted a 'group'" long before the three investors made a Rule 13(d) filing. The three investors had purchased stock "simultaneously in identical transactions (except for amount), one of the investor's shares were held in another investor's name, and the investors communicated with each other. *Id.* The Second Circuit adopted this holding in *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 128 (2d Cir. 2001).

*Morales* is similarly instructive, holding that "a group of shareholders who undertakes the same activity as part of a collective effort" are a §13(d) group. *Id.* at 124. There, the Second Circuit held that whether the defendants acted as a group was a question of fact (*id*. at 123) even though two defendants "played no role in negotiating the Sales Agreement" and its terms may have been "imposed involuntarily" on those defendants. *Id*. at 120, 125-26. *Morales*, however, held that if the record facts demonstrated that the defendants "were in communication with one another, were aware of the provisions of the Sales Agreement with an agreed purpose to acquire Quintel common stock" then a §13(d) group would have been formed. *Id*. at 125-26; *See also Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122, 132 (2d Cir. 2016) (While "'[a]typical language in the lock-up agreement, or other facts and circumstances outside of the lock-up agreement,' may trigger a Section 13(d) 'group' finding," a "group allegation [ ] based entirely on" a standard lock-up agreement ancillary to an IPO does not create a fact question.) (quoting SEC *amicus* brief).

Here, the record facts leave no such room for doubt. Defendants, who were aware of the March 2020 PIPE's terms, communicated with each other for the purpose of acquiring Genius stock. *See, e.g.,* PX-173; PX-174; PX-181; PX-194; PX-206; PX-232; PX-238. This was followed by Leak-Out Agreements, which required Defendants to hold Genius stock unless certain

conditions had been satisfied for sale. *See, e.g.,* PX-525; PX-538; PX-544; PX-690; PX-691. Defendants' effort to avoid liability based upon the Leak-Out Agreements purportedly having been entered into to benefit Genius (Brio Br. at 12 n.3) is a highly questionable proposition. *See*, *e.g.*, PX-525 at TOON00018481-82 (describing the leak-out agreements as a demand from investors participating in a RD). The governing standard established by *Morales* is awareness of the terms combined with communication or coordination while having an agreed purpose within the meaning of §13(d). *Morales*, *supra*. Indeed, in *Morales*, it was a given that the lock-up provisions were for the benefit of the company rather than the defendants.

## II. DEFENDANTS' ARGUMENTS ARE MERITLESS

### A. Characterizing Coordinated Behavior as "Routine" Does Not Alter Its Legal Character

Defendants characterize their negotiations with Anson concerning the terms of the Genius transaction as "standard practice" (Em. Br. 6) or "ordinary course negotiation" (Brio Br. 9). This is incorrect. While SEC Rule 13d-6(b) provides a safe harbor for "ordinary" coordination, that safe harbor was lost in this case based upon, *inter alia*, subsequent non-ministerial actions related to the March 2020 PIPE securities including the Conversion Agreement and the Leak-Out Agreements. *See* Dkt. 225 at 21-23.

Moreover, there was nothing normal about the process resulting in the March 2020 PIPE. As Jonathan Schecter, who put the transaction together, testified, equity investors in a PIPE transaction do not typically negotiate terms with each other. TR 1383:9-12. This conclusion was echoed by Plaintiff's expert, Max Holmes, and Defendant's expert, Michael Maline, who affirmed that the more "routine" practice is for the lead investor to negotiate the relevant deal terms, which are then "shopped" to other investors on a take-it-or-leave-it basis. TR 194:6-197:6; 1235:2-

1240:11. Indeed, Empery and Anson have policies in place to prevent the direct investor-to-investor negotiations that Defendants now call "routine." TR 378:1-8; 890:12-23.

### B. The History of Defendants' Negotiations Demonstrates Defendants' Need to Reach Coordinated Agreement

Defendants emphasize the length of their negotiations with Anson concerning the terms of a Genius investment. Empery notes that it "resisted any deal with Genius for months" (Em. Br. 5, 14) while Brio describes its extensive 2019 communications as "efforts to structure potential efforts that ultimately failed" (Brio Br. 10). Defendants claim these discussions "never resulted in an agreement" and that engaging in such discussions "does not give rise to a Section 13(d) group." *Id.* But this argument muddles several issues.

***First***, the 2019 discussions were never offered as evidence of the ultimate terms of the PIPE or registered direct offerings. Those transaction documents are separately in evidence (*e.g.* PX-387) and there is no dispute that Defendants agreed to identical language.

***Second***, Brio engaged in extensive conversations with Heyward in the fall of 2019 concerning Anson's role in a Genius financing and what assurances Brio would need from Anson. These 2019 discussions prove that Brio believed it important to know whether it could "trust" Anson and whether Anson would ultimately agree to restrictions on its ability to sell the stock. PX-76. Shaye Hirsch conceded Brio could not invest in Genius without other investors and needed those investors' cooperation to obtain good terms. TR 689:10-16; 690:8-17; 762:23-763:14.

***Third***, Empery being unwilling to invest money in Genius in the fall 2019 and its reversal once learning of Anson's involvement is not exculpatory. Rather it demonstrates that Empery's willingness to invest was contingent on not only the other investors' involvement, but their cooperation with Empery concerning the terms Empery demanded, including foregoing

registration of the stock. Indeed, Ryan Lane admitted that Empery would not have invested in Genius absent such agreements from other investors. TR 881:5-11.

***Fourth***, at worst, the 2019 communications are irrelevant, not exculpatory. That Defendants required more favorable economics prior to agreeing to a deal does not demonstrate an ***unwillingness*** to coordinate. If nothing else, it demonstrates the common objective that led Defendants to work together in negotiating against the company.

**C. Defendants Agreed to Hold**

Defendants argue that if the exclusion of registration creates an agreement to hold the stock for six months, then the inclusion creates an agreement to sell the stock**.** Em. Br. at 6-7. Wrong. While investors' agreement not to sell stock on the open market constitutes a "contractual arrangement explicitly limiting the disposal of shares," *Lowinger*, 841 F.3d at 130-31, an agreement providing registration merely provides investors with the right to sell the stock.

As previously explained (Open Br. 12-13), the Leak-Out Agreements, like the agreement to forego registration, are evidence of group formation. Identical leak-out agreements signed by Anson, Empery and Brio all concern "the acquisition, holding, or disposition of an issuer's equity securities." The Leak-Out Agreements created a legal framework in which Defendants (1) limited their sales of their PIPE securities if the market price was low; and (2) knew the restrictions for each other Defendant. PX-525; PX-538; PX-544; PX-690, PX-691; TR 498:15-22. While Empery asserts that the agreements "were negotiated and signed individually between those investors and Genius" (Em. Br. 8), this is incorrect. The trial evidence demonstrated that the Leak-Out Agreements were prepared by and for Defendants rather than Genius itself. PX-521; PX-525; PX-538; PX-544; TR 904:6-21.

Brio argues that it signed the Leak-Out Agreements "to protect its own economic interests and ensure equal treatment among investors." Brio Br. at 13. That Defendants thought they would make more money by colluding confirms that they were a group. Further, Brio ignores the fact that the Leak-Out Agreements were a modification of the existing agreement between Defendants not to register the shares.

**D. There Is No "CEO Exception" to Group Formation**

Plaintiff previously explained that Defendants' collective procurement of the Voting Agreement and Lock-Up Agreement with Heyward independently supports a directed verdict. Open Br. 17-19. In response, Empery contends that a CEO cannot form a §13(d) group with other investors while both Defendants argue that such an agreement was never written. Em. Br. 9; Brio Br. 14. Neither argument has merit.

Section 16 applies to all "beneficial holders" of equity securities, and regulations define such holders through explicit reference to §13(d). 17 C.F.R. § 240.16a-1(a)(1). Nothing in §13(d) or any regulation exempts CEOs from forming a "group" with outside investors especially where, as here, Heyward participated in the March 2020 PIPE. PX-387. There is also nothing in either §16(b) or §13(d) requiring all group members be subject to disgorgement. The exemption afforded by Rule 16b-3(d), which insulated Heyward from liability here, applied only to Heyward as a director or officer of Genius. *See* 17 C.F.R. §240.16b-3(d).

Brio's argument fares no better. An agreement or understanding need not be written down to create a §13(d) group. *See, e.g.*, *Morales*, 249 F.3d at 124. And here, there is evidence of such **an agreement in written form** as Empery and Brio required Heyward to enter into both a Voting Agreement and a Lock-up Agreement as a closing condition of the March 2020 PIPE. TR 1009:21-1010:9; PX 387, Ex. 10.1 §§7(xiv)-(xv). While Defendants were cautioned by Brett

Director against signing such agreements themselves, they structured the documents to make themselves third party beneficiaries. *See* PX-297; PX-363; *see, also e.g., Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 66 N.Y. 2d 38, 43 (1985). Thus, Defendants not signing the agreements is not exculpatory.

### E. Undisputed Facts Compel the Conclusion That Defendants Formed a Group

Empery emphasizes that none of its witnesses ***admitted*** to having formed a §13(d) group and that each claimed that they never "intended to be party of a group." *See* Em. Br. 2, 5-6. Similarly, Brio denies having made an "*intentional* agreement" to be part of a 16(b) group. Brio. Br. 7. This emphasis on intent parallels arguments Defendants made in closing.[1] But Defendants' "intent to form a group" formulation fundamentally misstates the law. To the extent any intent is required,[2] Defendants need only have intended to ***act together*** in connection with some aspect of the transaction. *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007); *see also Modernization of Beneficial Ownership Reporting*, 88 FR 76896-01, 76933 & n.556 (Nov. 7, 2023). Defendants' "group status" is a legal ***consequence*** of the actions they voluntarily took to "combine in furtherance of a common objective" with respect to "the acquisition, holding, or disposition of an issuer's equity securities." Defendants need not specifically ***intend*** to "be subject to Section 16(b)'s short-swing disgorgement remedy," a disadvantageous legal restriction that nobody would voluntarily embrace. *Roth*, 489 F.3d at 51 ("in disclaiming 'group' status, defendants were in effect attempting to disclaim the legal effects of their conduct.").

---

[1] *See* TR 1772:22-24.

[2] Plaintiff has argued that there is no intent requirement because §16(b) provides where "two or more persons act as a…group… [they] shall be deemed a 'person' for the purposes of [§13(d)]." 15 U.S.C. §78m(d)(3); *see also Roth*, at 508; *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982).

Defendants' witnesses admitted that they coordinated with other Defendants concerning the terms of the March 2020 PIPE and modified the terms to ensure that all Defendants were on board. PX-671; TR 872:11-18. Contemporaneous correspondence demonstrated that Defendants entered into Leak-Out Agreements that restricted their ability to sell, were aware of the precise amount of that restriction for each other Defendant and would not have done so if all others did not do so. PX-690; PX-691. Those decisions were knowing, intentional, and drafted to enable third-party enforcement. *Fourth Ocean Putnam Corp.*, 66 N.Y.2d at 43. No additional mental state is required under §16(b). Imposing any further requirement of proof would make §16(b) an "opt-in" regime instead of a strict liability regime.

## III. THE EXCLUDED EVIDENCE WAS MATERIAL AND THE EXCLUSION WAS PREJUDICIAL

Plaintiff is separately entitled to a new trial because the verdict is against the weight of the evidence and because the Court improperly excluded evidence of Defendants' timing press releases to facilitate the sale of the stock purchased in the March 2020 PIPE and realization of enormous profits from that scheme. *See* Open Br. 20-25.

Defendants argue that those facts are irrelevant to whether they acted as a group. Em. Br. 11-12; Brio Br. 19. But Defendants requested and obtained a jury instruction that specifically required a finding of intent. *See* TR 67:14-17. Moreover, any such assessment required the jury to evaluate the communications in the full context in which they were made. *See e.g., Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 83 (2d Cir. 2025) (in the antitrust context, when evaluating whether there has been "a meeting of the minds … courts must examine defendants' conduct and communications ... in context and with the overall picture in mind").

Defendants' motivation for combining in furtherance of a common objective and the true nature of that objective—exploiting advance knowledge of a stream of dubious press releases for

outsized profits—was clearly relevant to the jury's determination. By restricting the Plaintiff's ability to provide the jury with the true facts concerning Defendants' conduct, the Court inadvertently permitted Defendants to advance a false narrative, that they were fundamentally legitimate investors rescuing a troubled company from bankruptcy. TR 116:19-117:3; 121:12-23; 336:18-23; 1734:9-18; 1759:17-1760:3.

Empery claims that Plaintiff was free to argue that Defendants were generally motivated by profit. Em. Br. 12-13. But this is neither correct nor sufficient. Defendants moved for a mistrial after opening statement, arguing that ***any*** discussion of profits was "indelibly" prejudicial. Dkt. 455 at 2. Moreover, the relevance of a pump and dump scheme is not merely that it is potentially profitable. All business is ***potentially*** profitable. The relevance of a pump and dump scheme is that (1) it requires close coordination and trust between investors to function; (2) it can generate outsized profits more quickly than conventional investing; and (3) it is unlawful, thereby incentivizing secrecy and circumspection in communications. These characteristics explain ***why*** Defendants behaved as they did—that is, their "intent"— and provide a "common objective" that specifically required "combination in furtherance" to carry to completion.

Brio argues that *Heublein*, *Inc. v. General Cinema Corp.,* 722 F.2d 29 (2d Cir. 1983), mandates exclusion of fraudulent behavior in §16(b) cases. Brio Br. 20. That is incorrect. *Heublien* involved a defendant who accumulated 18.9% of a public company and appropriately filed §13(d) disclosures. *Id.* at 30. Shortly after the purchase, the company was acquired in a merger, (which the defendant voted against), and the defendant was forced to exchange its shares for shares in the acquirer. *Id.* at 31. The Second Circuit held that this was not a sale triggering §16(b) disgorgement. *Id.* The opinion says nothing about whether evidence of intent or objective is appropriate in 16(b) cases. It merely states, in *dicta*, "that § 16(b) was not intended

to remedy all wrongs" and that if the plaintiff believed that it had been defrauded, it might bring fraud claims. *Id.* at 31.

Finally, Defendants argue that the exclusion of evidence was "harmless," each citing the volume of evidence admitted at trial. Brio argues that Plaintiff was allowed to introduce many exhibits, so it must not have been prejudiced by any exclusion. Brio Br. 23-24. Empery argues that it introduced a lot of evidence and therefore would have won anyway. Em. Br. 14. But harmless error analysis is not a function of the number of pieces of paper admitted, on either side. "An error is harmless only if the evidence was unimportant in relation to everything else the jury considered and we can conclude with fair assurance that the evidence did not substantially influence the jury." *Abascal v. Fleckenstein*, 820 F.3d 561, 567 (2d Cir. 2016).

Given Defendants' insistence on intent as an element of this "strict liability" claim, the facts necessary to demonstrate why Defendants acted as a group and the "common objective" they shared in connection with "the acquisition, holding, or disposition of an issuer's equity securities" cannot be characterized as "unimportant" or an issue that could not have meaningfully influenced the jury. As a result, its improper exclusion appropriately mandates a new trial.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court issue an order granting Plaintiff judgment as a matter of law or, in the alternative, a new trial.

**Dated:** New York, NY
September 29, 2026

Respectfully submitted,
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, New York 10005
(212) 269-5600

By: /s/ Evan Mandel
Evan Mandel

ABRAHAM, FRUCHTER & TWERSKY, LLP
Jeffrey S. Abraham
Michael J. Klein
450 7th Avenue, 38th Floor
New York, New York 10123
(212) 279-5050
jabraham@aftlaw.com
mklein@aftlaw.com

*Attorneys for Plaintiff Todd Augenbaum*

**CERTIFICATION OF WORD COUNT**

I hereby certify that the word count of this Memorandum of Law complies with the word limits of Local Rule 7.1(c). According to the word-processing system used to prepare this Memorandum of Law, the total word count for all printed text exclusive of the material omitted under Rule 7.1(c) is 3,388 words.

**Dated:** New York, NY
September 29, 2026

By: /s/ Evan Mandel
Evan Mandel